F. #2016R00467

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA

        - against -

LOW TAEK JHO,
        also known as "Jho Low," and
NG CHONG HWA,
        also known as "Roger Ng,"

              Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - X

IRIZARRY, CH.J.

GOLD, M.J.

**FILED**
IN CLERK'S OFFICE
DISTRICT COURT E.D.N.Y.

★ OCT - 3 2018 ☆

BROOKLYN OFFICE

I N D I C T M E N T

CR. No. 18 - 00538

(T. 18, U.S.C., §§ 371, 981(a)(1)(C),
982(a)(1), 982(b), 1956(h) and 3551
et seq.; T. 21, U.S.C., § 853(p); T. 28,
U.S.C., § 2461(c))

THE GRAND JURY CHARGES:

        At all times relevant to this Indictment, unless otherwise indicated:

I.     The Defendants

        1.     LOW TAEK JHO, also known as "Jho Low," ("LOW" or "JHO

LOW") was a Malaysian national who advised on the creation of Terengganu Investment

Authority ("TIA"), the predecessor entity to 1Malaysia Development Berhad ("1MDB"),

Malaysia's state-owned and state-controlled investment development company.   LOW

worked as an intermediary in relation to 1MDB and other foreign government officials on

numerous financial transactions and projects involving U.S. Financial Institution #1[1] and

others, though he did not hold a formal position at 1MDB nor was he ever employed by the

Governments of Malaysia or Abu Dhabi.

---

[1]     The identity of U.S. Financial Institution #1 and all other anonymized entities and
individuals discussed herein are known to the Grand Jury.

2.       NG CHONG HWA, also known as "Roger Ng," ("NG" or "ROGER

NG") was a Malaysian national who was employed as a Managing Director by various

subsidiaries, and acted as an agent and employee, of U.S. Financial Institution #1.   NG

worked with Co-Conspirator #1 at U.S. Financial Institution #1 from approximately 2005 to

May 2014.   NG was thus an "employee" and "agent" of an "issuer" within the meaning of

the Foreign Corrupt Practices Act ("FCPA"), Title 15, United States Code, Section 78dd-

1(a).

II.      Relevant Entities and Individuals

A.      U.S. Financial Institution #1

3.       U.S. Financial Institution #1 was a global investment banking, securities

and investment management firm incorporated in Delaware and headquartered in New York,

New York.   It conducted its activities primarily through various subsidiaries and affiliates

(collectively "U.S. Financial Institution #1"), including those that employed the defendant

ROGER NG and some of his co-conspirators, including Co-Conspirator #1.   U.S. Financial

Institution #1 had a class of securities registered pursuant to Section 12 of the Securities and

Exchange Act of 1934 (Title 15, United States Code, Section 78) (the "Exchange Act") and

was required to file reports with the U.S. Securities and Exchange Commission under Section

15(d) of the Exchange Act (Title 15, United States Code, Section 78o(d)).   As such, U.S.

Financial Institution #1 was an "issuer" within the meaning of the FCPA, Title 15, United

States Code, Section 78dd-1(a).

B.      1MDB and Other Relevant Entities

4.      1MDB was a strategic investment and development company wholly owned and controlled by the Government of Malaysia through its Ministry of Finance ("MOF").   It was formed in or around 2009, when the Malaysian government took federal control of TIA, which had previously been the sovereign wealth fund of the state of Terengganu in Malaysia.   1MDB was created to pursue investment and development projects for the economic benefit of Malaysia and its people, primarily relying on debt to fund these investments.   1MDB's development projects were focused in the areas of energy, real estate, tourism and agribusiness.   1MDB was overseen by senior Malaysian government officials, was controlled by the Government of Malaysia and performed a government function on behalf of Malaysia.   Malaysian Official #1, further described below, was a high-ranking official in the Malaysian government and the MOF with high-level authority to, among other things, approve and influence 1MDB business decisions.   1MDB was thus an "instrumentality" of a foreign government within the meaning of the FCPA, Title 15, United States Code, Sections 78dd-1(f)(1)(A) and 78dd-3(f)(2)(A).

5.      Foreign Agency A was an investment fund wholly owned by the Government of Abu Dhabi.   It was established by the Government of Abu Dhabi pursuant to an Emiri Decree in or around 1984, with a mandate to advance Abu Dhabi's natural petroleum wealth for the development of the emirate.   Foreign Agency A was overseen by senior Abu Dhabi government officials, was controlled by the Government of Abu Dhabi, which appointed all the members of Foreign Agency A's board of directors, and performed a government function on behalf of Abu Dhabi.   Foreign Agency A was thus an

"instrumentality" of a foreign government within the meaning of the FCPA, Title 15, United States Code, Sections 78dd-1(f)(1)(A) and 78dd-3(f)(2)(A).

6. Foreign Investment Firm A, a subsidiary of Foreign Agency A, was a private joint stock company incorporated under the laws of Abu Dhabi.

C. Other Relevant Individuals

7. Between in or around 1998 and in or around February 2016, Co-Conspirator #1 was employed by various subsidiaries, and acted as an agent and employee, of U.S. Financial Institution #1. Prior to his separation from U.S. Financial Institution #1 in or around February 2016, Co-Conspirator #1 was the Southeast Asia Chairman and a Participating Managing Director of U.S. Financial Institution #1. Co-Conspirator #1 was an "employee" and "agent" of an "issuer" within the meaning of the FCPA, Title 15, United States Code, Section 78dd-1(a).

8. Co-Conspirator #2 was a U.S. citizen who was a high-ranking official of Foreign Investment Firm A from at least in or around 2012 until in or around 2014.

9. Co-Conspirator #3 was a Malaysian national who was a close relative of Malaysian Official #1 and owned U.S. Motion Picture Company #1, a U.S. legal entity in the business of film production.

D. Foreign Government Officials

10. 1MDB Official #1 was a high-ranking official at 1MDB from at least in or around 2012 until in or around 2014. 1MDB Official #1 was thus a "foreign official" within the meaning of the FCPA, Title 15, United States Code, Sections 78dd-1(f)(1)(A) and 78dd-3(f)(2)(A). 1MDB Official #1 served as one of the principal points of contact between 1MDB and U.S. Financial Institution #1 in connection with 1MDB business.

11.     1MDB Official #2 was a high-ranking official of 1MDB from at least in or around 2012 until in or around 2014.   1MDB Official #2 was thus a "foreign official" within the meaning of the FCPA, Title 15, United States Code, Sections 78dd-1(f)(1)(A) and 78dd-3(f)(2)(A).

12.     1MDB Official #3 was a high-ranking official at 1MDB from at least in or around 2012 until in or around 2014.   1MDB Official #3 was thus a "foreign official" within the meaning of the FCPA, Title 15, United States Code, Sections 78dd-1(f)(1)(A) and 78dd-3(f)(2)(A).   1MDB Official #3 served as one of the principal points of contact between 1MDB and U.S. Financial Institution #1 in connection with 1MDB business.

13.     Malaysian Official #1 was a Malaysian national and high-ranking official in the Malaysian government and the MOF from in or around at least 2009 until in or around 2018, with high-level authority to approve 1MDB business decisions.   Malaysian Official #1 was thus a "foreign official" within the meaning of the FCPA, Title 15, United States Code, Sections 78dd-1(f)(1)(A) and 78dd-3(f)(2)(A).

14.     Abu Dhabi Official #1 was a high-ranking official of Foreign Agency A between at least in or around 2012 until in or around 2014, and a high-ranking official of Foreign Investment Firm A.   Abu Dhabi Official #1 was thus a "foreign official" within the meaning of the FCPA, Title 15, United States Code, Sections 78dd-1(f)(1)(A) and 78dd-3(f)(2)(A).

III.   The Criminal Scheme

    A.   Overview

15.     1MDB was created to pursue investment and development projects for the economic benefit of Malaysia and its people.   However, between approximately 2009

and 2014, billions of dollars were misappropriated and fraudulently diverted from 1MDB through various means, in part for the purpose of paying bribes to foreign officials.   The defendants JHO LOW, ROGER NG, Co-Conspirator #1 and others conspired to launder the proceeds of that criminal conduct in and through the U.S. financial system.   These laundered funds were used, in among other ways, to pay bribes to obtain and retain business for U.S. Financial Institution #1, and for the personal benefit of the co-conspirators and their relatives and associates, including, among other things, for the purchase of luxury residential real estate in the United States and artwork from an auction house in New York, New York, and the funding of major Hollywood films.

16.     The defendants JHO LOW and ROGER NG, while NG was acting within the scope of his employment as an agent of U.S. Financial Institution #1, with the intent, at least in part, to benefit U.S. Financial Institution #1, together with others, conspired to obtain and retain business from 1MDB for U.S. Financial Institution #1 through the promise and payment of bribes to government officials in Malaysia and Abu Dhabi.   LOW and NG, Co-Conspirator #1 and others also conspired to launder funds embezzled from 1MDB, some of which were used to pay bribes to government officials in Malaysia and Abu Dhabi, through financial systems in the United States and elsewhere.   As part of the scheme, LOW, NG, Co-Conspirator #1 and others used LOW's close personal relationships with government officials in Abu Dhabi and Malaysia, including LOW's relationship with Malaysian Official #1, to obtain and retain 1MDB business for U.S. Financial Institution #1 through the promise and payment of bribes to these government officials.

17.     In the course of the scheme, the defendants JHO LOW and ROGER NG, Co-Conspirator #1 and others obtained and retained 1MDB business for U.S. Financial

Institution #1, including three bond offerings that raised a total of approximately $6.5 billion for 1MDB in 2012 and 2013. These three bond offerings and related transactions ultimately earned U.S. Financial Institution #1 approximately $600 million in fees and revenue and resulted in NG, Co-Conspirator #1 and others receiving large bonuses from U.S. Financial Institution #1 and enhancing their professional reputations at U.S. Financial Institution #1.

18.     Although the stated purpose of the approximately $6.5 billion raised by the three bond transactions was to support 1MDB projects for the benefit of the Malaysian people, more than $2.7 billion was instead misappropriated by the defendants JHO LOW, ROGER NG and others and distributed, in part, as bribes and kickbacks to government officials in Malaysia and Abu Dhabi, including 1MDB Official #1, 1MDB Official #2, 1MDB Official #3, Malaysian Official #1 and Abu Dhabi Official #1 and their families, including Co-Conspirator #3, as well as to other co-conspirators, including NG, LOW, Co-Conspirator #1 and their families.

19.     In order to get the deals, the defendant ROGER NG also conspired with other employees and agents of U.S. Financial Institution #1, including Co-Conspirator #1, to knowingly and willfully circumvent the internal accounting controls of U.S. Financial Institution #1 in connection with the three 1MDB bond transactions and other 1MDB business. U.S. Financial Institution #1's internal accounting controls were overseen and enforced by its compliance function (the "Compliance Group") and part of its legal department, referred to internally as the "Business Intelligence Group" (the "Intelligence Group"). These groups worked in conjunction with, and as part of, various committees in reviewing transactions, including the three 1MDB bond deals, for approval. However, the business culture at U.S. Financial Institution #1, particularly in Southeast Asia, was highly

focused on consummating deals, at times prioritizing this goal ahead of the proper operation of its compliance functions.

20.     The defendant ROGER NG, Co-Conspirator #1 and other employees and agents of U.S. Financial Institution #1 knew that the defendant JHO LOW played a central role in the bond transactions, including by acting as an intermediary between U.S. Financial Institution #1, 1MDB and other Malaysian and Abu Dhabi government officials. NG, Co-Conspirator #1 and other employees and agents of U.S. Financial Institution #1 also knew that bribes had been promised to these officials to secure 1MDB business for U.S. Financial Institution #1.   NG, Co-Conspirator #1 and other employees and agents of U.S. Financial Institution #1 conspired to conceal that and other information from U.S. Financial Institution #1's Compliance Group and Intelligence Group to prevent those groups from attempting to stop U.S. Financial Institution #1 from participating in the lucrative transactions.   Based on, among other things, their experience at U.S. Financial Institution #1 and in the region, the willingness of co-conspirators and colleagues to assist them, the high fees that the 1MDB deals would generate for U.S. Financial Institution #1 if the deals were successful, and a system of internal accounting controls at U.S. Financial Institution #1 that could be easily circumvented, NG, Co-Conspirator #1 and others believed that they would have, and they in fact did have, repeated success in concealing LOW's involvement from, and pushing these deals through, U.S. Financial Institution #1's control functions to obtain very lucrative business for U.S. Financial Institution #1, themselves and others.

B.   The Defendant ROGER NG and Co-Conspirator #1 Began to Conspire to
Circumvent U.S. Financial Institution #1's Internal Accounting Controls and
Win Business for U.S. Financial Institution #1

21.     Beginning in or around 2009, the defendant ROGER NG began to

conspire with Co-Conspirator #1 and others to circumvent U.S. Financial Institution #1's

internal accounting controls and win business for U.S. Financial Institution #1.   At the time,

NG and Co-Conspirator #1 were both agents acting within the scope of their employment on

behalf of U.S. Financial Institution #1, with the intent, at least in part, to benefit U.S.

Financial Institution #1, and they collaborated on the creation of, and potential fundraising

for, TIA, while knowing that the defendant JHO LOW was an adviser for TIA.   While

working on this deal, NG and Co-Conspirator #1 selectively disclosed to other employees of

U.S. Financial Institution #1 that they were working with LOW as an intermediary to secure

the deal, because they knew that disclosure more widely could have triggered steps to be

taken by certain personnel within the Compliance Group and the Intelligence Group to

investigate the business relationship with LOW and possibly jeopardize the deal.

22.     During the course of the TIA transaction and afterwards, the defendants

JHO LOW and ROGER NG conspired with Co-Conspirator #1 and others to develop

business for U.S. Financial Institution #1, including with TIA's successor entity, 1MDB.

Notwithstanding LOW's public denials about any involvement with 1MDB during this time,

NG, Co-Conspirator #1 and other employees and agents of U.S. Financial Institution #1

knew that LOW remained close to various 1MDB officials and government officials in Abu

Dhabi and Malaysia, including Malaysian Official #1, and worked with him for that reason.

During the course of his work with NG and Co-Conspirator #1, LOW also specifically

requested that NG, Co-Conspirator #1 and others conceal his involvement in 1MDB and U.S.

Financial Institution #1's business, and NG, Co-Conspirator #1 and others continued to conspire to conceal LOW's involvement in their efforts to obtain and retain 1MDB business for U.S. Financial Institution #1 from the Compliance Group and the Intelligence Group.

23.     Between in or around September 2009 and in or around March 2011, the defendant ROGER NG, Co-Conspirator #1 and others supported at least three attempts to make the defendant JHO LOW a formal client of U.S. Financial Institution #1.   NG and Co-Conspirator #1 supported these efforts because, in part, they believed that LOW would work to deliver lucrative business deals, including from 1MDB, for the ultimate benefit of U.S. Financial Institution #1, NG, Co-Conspirator #1 and others.   Ultimately, these attempts were unsuccessful because certain personnel at U.S. Financial Institution #1 within the Compliance Group and the Intelligence Group refused to approve the business relationship between LOW and U.S. Financial Institution #1 based, in part, on concerns that they had about the source of LOW's wealth.   Personnel within the Compliance Group and the Intelligence Group communicated the rejection of LOW's application to U.S. Financial Institution #1 to NG, Co-Conspirator #1 and others.   Notwithstanding their knowledge about the concerns that had been raised by the Compliance Group and the Intelligence Group about LOW not being a suitable client for U.S. Financial Institution #1, NG and other employees and agents of U.S. Financial Institution #1, including Co-Conspirator #1, continued to conspire with LOW based upon their belief that LOW would help ensure that government officials within Malaysia, including at 1MDB, and within Abu Dhabi would deliver lucrative business deals to U.S. Financial Institution #1.

C.   The Defendants JHO LOW and ROGER NG, Together with Others, Won Business for U.S. Financial Institution #1 Through the Payment of Bribes and Kickbacks

24.   Throughout approximately 2012 and 2014, the defendants JHO LOW and ROGER NG conspired with Co-Conspirator #1 and others with the intent, at least in part, to obtain and retain business from 1MDB for the benefit of U.S. Financial Institution #1 through the promise and payment of bribes to government officials in Malaysia and Abu Dhabi using, in part, funds misappropriated and embezzled from the 1MDB bond transactions.   During this time, and through the course of the scheme, LOW, NG, Co-Conspirator #1 and others laundered hundreds of millions of dollars in funds misappropriated and embezzled from 1MDB and used some of those funds to pay millions of dollars in bribes to government officials to obtain 1MDB business for U.S. Financial Institution #1, in particular, three bond offering transactions underwritten by U.S. Financial Institution #1 for 1MDB referred to as "Project Magnolia," "Project Maximus" and "Project Catalyze."

PROJECT MAGNOLIA

25.   On or about January 23, 2012, the defendant JHO LOW sent an email to the defendant ROGER NG, Co-Conspirator #1 and a high-ranking 1MDB official to introduce NG and Co-Conspirator #1 to the high-ranking 1MDB official for purposes of discussing the purchase of an asset by 1MDB.   In the email, LOW stated, "[p]lease exclude me from the email list going forward."

26.   In or around early 2012, the defendants JHO LOW and ROGER NG met in Malaysia with Co-Conspirator #1, 1MDB Official #1, 1MDB Official #3 and others. The purpose of the meeting was to discuss 1MDB's proposed purchase of a Malaysian energy company ("Malaysian Energy Company A"), and U.S. Financial Institution #1's ability to

assist in obtaining financing for the purchase, among other things.   During that meeting, NG, Co-Conspirator #1 and others discussed with LOW, among other things, the type of guarantee that 1MDB needed to obtain to make the bond issuance acceptable to U.S. Financial Institution #1 and ultimately agreed on the suitability of a guarantee from Foreign Agency A. NG, Co-Conspirator #1 and others understood that LOW was acting as an intermediary between 1MDB, Malaysian Official #1 and other government officials from Abu Dhabi.

27.   In or around late February 2012, the defendants JHO LOW and ROGER NG, Co-Conspirator #1, 1MDB Official #3 and others met in London to discuss the proposed financing.   During this meeting, LOW explained that to obtain the necessary support for the financing and the guarantee from Foreign Agency A discussed at the prior meeting with NG, Co-Conspirator #1 and others they would have to pay bribes to government officials in Malaysia and Abu Dhabi, including to Malaysian Official #1 and a high-ranking Abu Dhabi government official, to gain their approval for portions of the transaction.   After the meeting, it was understood that U.S. Financial Institution #1 would be engaged by 1MDB to act as an adviser and arrange the purchase and financing of Malaysian Energy Company A.

28.   Following the February 2012 meeting, the defendant ROGER NG told another employee of U.S. Financial Institution #1 about the plan to pay bribes to government officials in Malaysia and Abu Dhabi.   NG understood and agreed with Co-Conspirator #1 and other employees and agents of U.S. Financial Institution #1 not to disclose this information to personnel within the Compliance Group, the Intelligence Group or the committees within U.S. Financial Institution #1 that would review this proposed bond issuance and other 1MDB transactions.

29.     In or around March 2012, 1MDB selected U.S. Financial Institution #1 to be the sole bookrunner and arranger for the $1.75 billion bond deal, guaranteed by Foreign Agency A, and designed, in part, to pay for the acquisition of Malaysian Energy Company A.   This transaction was referred to internally at U.S. Financial Institution #1 as "Project Magnolia."

30.     Following U.S. Financial Institution #1's formal engagement to work on Project Magnolia, the defendant ROGER NG continued to conspire with Co-Conspirator #1 and others, including other employees and agents of U.S. Financial Institution #1, to work with the defendant JHO LOW on the transaction.

31.     In or around early March 2012, the defendants JHO LOW and ROGER NG, Co-Conspirator #1, various 1MDB officials and others traveled to Abu Dhabi for meetings with officials of Foreign Agency A and Foreign Investment Firm A to discuss the guarantee for Project Magnolia.   Throughout that time, NG knew that LOW arranged the meetings with the officials of Foreign Agency A and Foreign Investment Firm A, and that some of these officials, among others, would be paid bribes by LOW, or at his direction, to influence the approval of the guarantee.

32.     During this same time, in an effort to win and retain the bond deal to finance the purchase of Malaysian Energy Company A, the defendant JHO LOW also enlisted the assistance of various 1MDB officials with the promise of remuneration.   For example, on or about March 8, 2012, 1MDB Official #1 and LOW discussed 1MDB's acquisition of Malaysian Energy Company A via an online chat, during which chat LOW stated he would "[g]ive [1MDB Official #1] big present" when the transaction was done.   In the same chat, LOW further instructed 1MDB Official #1 to delete at least one email and other documents he

had sent to 1MDB Official #1, and stated "delete from email and destroy once done." Additionally, LOW informed Co-Conspirator #1 that 1MDB Official #3 was being paid a bribe for her assistance in obtaining and retaining the bond deal.

33.     The defendants JHO LOW and ROGER NG, Co-Conspirator #1 and others also knew that LOW intended to use funds misappropriated from 1MDB's bond deal to pay and cause to be paid bribes to foreign officials in Malaysia and Abu Dhabi to influence those officials to obtain the necessary approvals and any additional assistance to execute Project Magnolia for U.S. Financial Institution #1.

34.     In or around the end of May 2012, near the closing of Project Magnolia, the defendants JHO LOW and ROGER NG continued to conspire with Co-Conspirator #1 and others to divert some of the funds from Project Magnolia into the bank accounts of shell companies that NG, LOW, Co-Conspirator #1 and others beneficially owned and controlled.   At this time, NG, LOW and Co-Conspirator #1 expected to keep some of the diverted funds for their personal use, and understood that other Project Magnolia funds would be used to pay bribes to government officials in Malaysia and Abu Dhabi and elsewhere in exchange for their assistance in obtaining and retaining business for U.S. Financial Institution #1 with respect to the execution of the bond transaction and the purchase of Malaysian Energy Company A.

35.     On or about May 20, 2012, Co-Conspirator #1 sent an email asking his close relative for the account details for a bank account in the name of Holding Company #1 ("Holding Company #1 Account").   Holding Company #1 was a shell company incorporated in the British Virgin Islands that was owned by this close relative of Co-Conspirator #1 and was controlled by both Co-Conspirator #1 and his close relative.   Co-Conspirator #1 wrote,

"[b]est if they are US$ accounts. We should also tell the bank that we will receive a transfer."

36. On or about May 21, 2012, the bond deal known as Project Magnolia closed, earning significant fees for U.S. Financial Institution #1, and resulting in large year-end bonuses paid by U.S. Financial Institution #1 to the defendant ROGER NG, Co-Conspirator #1 and other employees and agents of U.S. Financial Institution #1 who participated in obtaining and structuring the bond deal. NG and other employees and agents of U.S. Financial Institution #1 intentionally structured Project Magnolia, and future transactions, as bond deals rather than other forms of financing, because doing so generated much higher revenues and fees for U.S. Financial Institution #1, improved the bank's reputational standing in both the Southeast Asia region and globally and provided NG and other bankers with increased remuneration and professional prestige, even though the bond financing was more expensive for 1MDB.

37. U.S. Financial Institution #1 transferred part of the proceeds of the Project Magnolia bond offering via wire to 1MDB's wholly-owned subsidiary, from a place within the United States to and through a place outside of the United States, including through the Eastern District of New York. At the time, the defendants JHO LOW and ROGER NG, Co-Conspirator #1 and others knew that a large portion of the proceeds of the bond would be diverted to themselves and others, including foreign government officials, through shell companies beneficially owned and controlled by themselves and others.

38. On or about May 22, 2012, approximately $577 million of the bond proceeds were transferred from the account of 1MDB's wholly-owned subsidiary to Shell Company Account #1, an account at Foreign Financial Institution A in the name of a

company incorporated in the British Virgin Islands with a name similar to Foreign
Investment Firm A, but which was not in fact associated with Foreign Investment Firm A.
Although the signatories on Shell Company Account #1 were Abu Dhabi Official #1 and
Co-Conspirator #2, the defendant JHO LOW and another co-conspirator controlled Shell
Company Account #1.

39.     On or about May 25, 2012, approximately $295 million was transferred
via wire from Shell Company Account #1 to an account at a foreign bank in the name of a
shell company beneficially owned and controlled by the defendant JHO LOW and a co-
conspirator ("Shell Company Account #2").

40.     Within three months of the closing of Project Magnolia, millions of
dollars of bond proceeds that had been transferred to Shell Company Account #2 were
transferred into Holding Company #1 Account, and these funds were transferred via wire to
and from the United States.   Approximately $24 million of these funds was subsequently
transferred to a bank account beneficially owned by a relative of the defendant ROGER NG.

41.     Within one month of the closing of Project Magnolia, approximately
$133 million of the bond proceeds that had been funneled into Shell Company Account #1
was then transferred to an account at Foreign Financial Institution A opened in the name of a
company incorporated in the British Virgin Islands and beneficially owned and controlled by
Co-Conspirator #3, a close relative of Malaysian Official #1 ("Shell Company Account #3").
Between on or about June 20, 2012 and November 20, 2012, 11 wires totaling approximately
$60 million was then transferred from Shell Company Account #3 to Holding Account #2, an
account at U.S. Financial Institution #2 in Los Angeles, California.   Holding Account #2 is
owned and controlled by U.S. Motion Picture Company #1, a U.S. legal entity owned in part

by Co-Conspirator #3 whose funds, among other things, were used to assist in the production of the film "The Wolf of Wall Street."

PROJECT MAXIMUS

42.     In or about May 2012, the defendants JHO LOW and ROGER NG, Co-Conspirator #1 and others began to plan a second bond transaction, known internally at U.S. Financial Institution #1 as "Project Maximus," which was designed, in part, to raise capital for 1MDB to purchase a second Malaysian power generation company.   LOW, NG, Co-Conspirator #1 and others knew that LOW and others would and did pay bribes to influence Malaysian and Abu Dhabi officials to obtain the necessary approvals to execute the bond offering.   1MDB also awarded this bond offering, which was structured similarly to the first bond issuance, but with an indirect guarantee from Foreign Agency A, to U.S. Financial Institution #1.

43.     As with Project Magnolia, while the defendant ROGER NG, Co-Conspirator #1 and other employees and agents of U.S. Financial Institution #1 continued to work with the defendant JHO LOW to acquire this business for U.S. Financial Institution #1 and to execute the second bond issuance, they concealed LOW's involvement in the transaction from the Compliance Group and the Intelligence Group at U.S. Financial Institution #1 for the same reasons that they concealed his involvement with Project Magnolia.

44.     The defendants JHO LOW and ROGER NG, Co-Conspirator #1 and others knew that a large portion of the proceeds of Project Maximus would be illegally diverted to themselves and others, including foreign government officials, through shell companies beneficially owned and controlled by themselves and others.   NG knew at the

time that Malaysian Official #1, Abu Dhabi government officials and 1MDB officials, among others, would receive money from the proceeds of Project Maximus that passed through bank accounts of various shell companies beneficially owned and controlled by LOW and others, including Co-Conspirator #1 and his close relative, to influence those officials to execute the bond with U.S. Financial Institution #1.   In fact, NG provided direction to Co-Conspirator #1's close relative regarding the transfer of some of these funds. Abu Dhabi Official #1 and Co-Conspirator #3, among others, received some of the funds traceable to the Project Maximus bond issuance.

45.     Project Maximus closed on or about October 17, 2012, raising approximately $1.75 billion for a 1MDB wholly-owned subsidiary, and resulting in substantial revenues and other fees for U.S. Financial Institution #1.   U.S. Financial Institution #1 transferred part of the proceeds of Project Maximus via wire to the subsidiary of 1MDB from a place within the United States to and through a place outside of the United States, including through the Eastern District of New York.   Thereafter, some of the proceeds from the bond offering were diverted and transferred via wire to a place in the United States from and through a place outside of the United States, and from a place in the United States to and through a place outside of the United States, including through the Eastern District of New York.

46.     On or about October 19, 2012, two days after Project Maximus closed, approximately $790 million of the proceeds of the bond was transferred to and through a series of shell company accounts beneficially owned and controlled by the defendant JHO LOW and a co-conspirator.   Some of these funds were later transferred to Holding Company

#1 Account and the accounts of Malaysian and Abu Dhabi officials, including various 1MDB officials.

47.     Within one week of Project Maximus closing, approximately $60 million of the bond proceeds was transferred to Shell Company Account #3.   On or about November 14, 2012, an additional approximately $45 million of bond proceeds was transferred to Shell Company Account #3.   Within approximately one day of the November 14, 2012 transfer, approximately $35.8 million was transferred from Shell Company Account #3 to U.S. Law Firm Account #1, owned and controlled by U.S. Law Firm #1 based in New York, New York.   Nearly all of these funds were then transferred approximately four days later to U.S. Law Firm Account #2, owned and controlled by U.S. Law Firm #2 based in New York, New York.   These funds were used by Co-Conspirator #3 to acquire a condominium in New York, New York that was beneficially owned by the defendant JHO LOW.

48.     Between on or about May 29, 2012 and November 30, 2012, the defendant JHO LOW and others also caused the transfers via wire of approximately $472,750,000 traceable to the Project Magnolia and Project Maximus bond proceeds from Shell Company Account #2 to an account at Foreign Financial Institution B in the name of a company beneficially owned by Abu Dhabi Official #1 ("Shell Company Account #4").

49.     Between on or about May 29, 2012 and December 3, 2012, the defendant JHO LOW and others also transferred via wire approximately $55 million traceable to the Project Magnolia and Project Maximus bond proceeds from Shell Company Account #2 to the account of a company at Foreign Financial Institution C beneficially

owned and controlled by Co-Conspirator #2 and a close relative of Co-Conspirator #2

("Shell Company Account #5").

50.     The defendant ROGER NG knew that some of the bond proceeds from

Project Maximus were transferred by the defendant JHO LOW or at his request to Holding

Company #1 Account in furtherance of the scheme.   Thereafter, LOW, NG, Co-Conspirator

#1 and others caused some of these funds to be transferred to the accounts of 1MDB officials

or relatives of such officials, or to the accounts of shell companies beneficially owned and

controlled by 1MDB officials, including 1MDB Official #1 and 1MDB Official #2, in

exchange for their assistance in obtaining and retaining business for U.S. Financial

Institution #1.

## PROJECT CATALYZE

51.     In or about November 2012, despite having raised over $3 billion in the

prior 11 months, 1MDB sought to raise an additional $3 billion through a third bond issuance

known internally at U.S. Financial Institution #1 as "Project Catalyze."   This bond issuance

was purportedly designed to fund 1MDB's portion of a joint venture with Foreign Investment

Firm A.   U.S. Financial Institution #1 was engaged on the project in or around early 2013

and, again, secured substantial revenues and fees from the deal.

52.     As they had with the two prior 1MDB bond issuances, the defendant

ROGER NG, Co-Conspirator #1 and other employees and agents of U.S. Financial Institution

#1 continued to work with the defendant JHO LOW as an intermediary between U.S.

Financial Institution #1, 1MDB officials, Malaysian Official #1 and other foreign government

officials, and they continued to conceal this fact from the Compliance Group, the Intelligence

Group and committees at U.S. Financial Institution #1.   Further, although required by

internal policies of U.S. Financial Institution #1, the defendant ROGER NG failed to disclose that he and Co-Conspirator #1 had received a portion of the funds diverted from the prior bond transactions through LOW and that LOW, NG, Co-Conspirator #1 and others had caused bribes and kickbacks to be paid to 1MDB officials and others who were involved in the transactions.

53.     The Project Catalyze bond issued on or about March 19, 2013.   By or at the direction of the defendant JHO LOW, some of the approximately $3 billion raised by this bond issuance was transferred to and through a series of transactions to Holding Company #1 Account, which account was owned and controlled by Co-Conspirator #1 and his close relative.   These misappropriated and embezzled funds were transferred via wire to a place in the United States from and through a place outside of the United States, and from a place in the United States to and through a place outside of the United States.   Some of these funds were further transferred via wire to accounts in the name of entities beneficially owned and controlled by 1MDB officials, including 1MDB Official #2 and 1MDB Official #3. More than $4 million of these funds were also transferred via wire to a bank account beneficially owned by a relative of NG.

54.     Within seven days of Project Catalyze closing, the defendant JHO LOW and other co-conspirators caused the transfers via wire of approximately $1.2 billion in funds traceable to Project Catalyze to a bank account at Foreign Financial Institution D in the name of another shell company ("Shell Company Account #6").   Within two months of the closing of Project Catalyze, LOW caused a client account to be opened in the name of that shell company ("Shell Company #6") at Art Auction House #1, an auctioneer of high-end artworks based in New York, New York.   In approximately May 2013, at auctions held at Art Auction

House #1 in New York, New York, LOW acquired five works of art for approximately $58.3 million in the name of Shell Company #6.   The following month, LOW caused approximately $58.3 million in funds traceable to Project Catalyze to be transferred from Shell Company Account #6 to Art Auction House #1 to purchase the artworks.   Between on or about July 3, 2013 and September 9, 2013, additional funds traceable to Project Catalyze totaling approximately $79 million were transferred from Shell Company Account #6 to Art Auction House #1 to acquire additional artworks.

55.     Following the closing of Project Catalyze, through the end of 2014, the defendant ROGER NG, Co-Conspirator #1 and U.S. Financial Institution #1 sought to obtain and worked to execute several additional transactions with 1MDB, particularly focusing on a proposed initial public offering ("IPO") of 1MDB's energy assets ("1MDB Energy"). Throughout the time period of these additional transactions, the defendant JHO LOW and others, including Co-Conspirator #1, continued to pay bribes and kickbacks to certain Malaysian and 1MDB officials and others, including from the proceeds of the Project Catalyze bond and other 1MDB transactions, to influence those officials to award a role for U.S. Financial Institution #1 in the IPO.

56.     On or about June 2, 2014, Co-Conspirator #1 and the defendant JHO LOW discussed, via electronic chat, efforts to win a position for U.S. Financial Institution #1 in the 1MDB Energy IPO, including the need to "suck up to" 1MDB Official #2 and to send "cakes," referring to bribes, to "madam boss."   In prior email correspondence, the defendant ROGER NG, LOW and Co-Conspirator #1 referred to the wife of Malaysian Official #1 as "the Madam."   LOW asked Co-Conspirator #1 if he could transfer money from Shell Account #1 directly into the account of another company incorporated in the British Virgin

Islands and beneficially owned and controlled by Co-Conspirator #1 and his close relative ("Management Company #1 Account") so that Co-Conspirator #1 could "settle madam cakes 2."

57.     The defendant ROGER NG continued his personal relationship with Co-Conspirator #1 after NG's departure from U.S. Financial Institution #1, and continued to work with Co-Conspirator #1 on other business ventures.

## COUNT ONE
(Conspiracy to Violate the FCPA—Bribery)

58.     The allegations contained in paragraphs one through 57 are realleged and incorporated as if fully set forth in this paragraph.

59.     In or about and between January 2009 and October 2014, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendants LOW TAEK JHO, also known as "Jho Low," and NG CHONG HWA, also known as "Roger Ng," together with others, did knowingly and willfully conspire to commit offenses against the United States, namely:

(a)     being an employee and agent of an issuer, to corruptly make use of the mails and means and instrumentalities of interstate commerce in furtherance of an offer, payment, promise to pay, and authorization of the payment of any money, offer, gift, promise to give, and authorization of the giving of anything of value, to one or more foreign officials, and to one or more persons, while knowing that all or a portion of such money and thing of value would be and had been offered, given, and promised to one or more foreign officials, for purposes of: (i) influencing acts and decisions of such foreign official in his or her official capacity; (ii) inducing such foreign official to do and omit to do acts in violation

of the lawful duty of such official; (iii) securing any improper advantage; and (iv) inducing such foreign official to use his or her influence with a foreign government and agencies and instrumentalities thereof to affect and influence acts and decisions of such government and agencies and instrumentalities, in order to assist U.S. Financial Institution #1 and others in obtaining and retaining business, for and with, and directing business to, NG, LOW, U.S. Financial Institution #1 and others, contrary to the FCPA, Title 15, United States Code, Sections 78dd-1, 78ff(a) and 78ff(c)(2)(a); and

        (b)      while in the territory of the United States, to corruptly make use of the mails and means and instrumentalities of interstate commerce or to do any other act in furtherance of an offer, payment, promise to pay, and authorization of the payment of any money, offer, gift, promise to give, and authorization of the giving of anything of value, to one or more foreign officials, and to one or more persons, while knowing that all or a portion of such money and thing of value would be and had been offered, given, and promised to one or more foreign officials, for purposes of: (i) influencing acts and decisions of such foreign official in his or her official capacity; (ii) inducing such foreign official to do and omit to do acts in violation of the lawful duty of such official; (iii) securing any improper advantage; and (iv) inducing such foreign official to use his or her influence with a foreign government and agencies and instrumentalities thereof to affect and influence acts and decisions of such government and agencies and instrumentalities, in order to assist the defendants and others in obtaining and retaining business, for and with, and directing business to, U.S. Financial Institution #1, NG, LOW and others, contrary to the FCPA, Title 15, United States Code, Sections 78dd-3 and 78ff(a).

60.    In furtherance of the conspiracy and to effect its objects, within the Eastern District of New York and elsewhere, the defendants LOW TAEK JHO, also known as "Jho Low," and NG CHONG HWA, also known as "Roger Ng," together with others, committed and caused to be committed, among others, the following:

## OVERT ACTS

(a)    On or about March 23, 2012, LOW met with a banker from Foreign Financial Institution A in Los Angeles, California, during which meeting LOW explained Project Magnolia and discussed funds from Project Magnolia that would be sent to Shell Company Account #1 at Foreign Financial Institution A.

(b)    On or about March 25, 2012, LOW, NG, Co-Conspirator #1 and others met in Los Angeles, California and New York, New York to discuss, among other things, matters related to Project Magnolia and the acquisition of the Malaysian Energy Company A.

(c)    On or about April 21, 2012, LOW, NG, Co-Conspirator #1 and others met with bankers from Foreign Financial Institution A in Singapore and discussed, among other things, funds from Project Magnolia that would be sent to Shell Company Account #1 at Foreign Financial Institution A.

(d)    On or about May 29, 2012, LOW and others caused approximately $158 million traceable to the proceeds of Project Magnolia to be transferred via wire from Shell Company Account #2 through a U.S. correspondent bank to Shell Company Account #4.

(e)      On or about December 19, 2012, LOW and others caused approximately $5 million traceable to Project Maximus to be transferred from Shell Company Account #2 to Holding Company #1 Account.

(f)      On or about December 20, 2012, LOW, Co-Conspirator #1 and others caused approximately $1 million traceable to the proceeds of Project Maximus to be transferred from Holding Company #1 Account to the bank account, for which LOW had made the banking referral, of a company beneficially owned and controlled by 1MDB Official #1.

(g)      On or about July 22, 2013, LOW, Co-Conspirator #1 and others caused approximately $6 million traceable to the proceeds of Project Catalyze to be transferred from Management Company #1 Account to a bank account, for which LOW had made the banking referral, of an entity beneficially owned and controlled by 1MDB Official #3.

(h)      On or about July 29, 2013, LOW, Co-Conspirator #1 and others caused approximately $1 million traceable to the proceeds of Project Catalyze to be transferred from Holding Company #1 Account to the account of a company beneficially owned and controlled by 1MDB Official #2.

(i)      On or about September 28, 2013, at LOW's request, a high-end New York jeweler ("N.Y. Jeweler #1") met with LOW, Malaysian Official #1 and the wife of Malaysian Official #1 at a hotel in New York, New York to show a pink diamond necklace that N.Y. Jeweler #1 had designed for Malaysian Official #1's wife. Approximately three weeks earlier, the pink diamond necklace was purchased using

approximately $27.3 million, which funds were sent from a shell company beneficially owned and controlled by LOW and other co-conspirators.

        (j)     On or about October 10, 2014, LOW, Co-Conspirator #1 and others caused approximately $4.1 million to be transferred via wire from Management Company #1 Account to the U.S. bank account of N.Y. Jeweler #1, in part, to pay for certain gold jewelry for the wife of Malaysian Official #1.

(Title 18, United States Code, Sections 371 and 3551 <u>et seq.</u>)

COUNT TWO
(Conspiracy to Violate the FCPA—Circumvention of Internal Accounting Controls)

        61.     The allegations contained in paragraphs one through 57 are realleged and incorporated as if fully set forth in this paragraph.

        62.     In or about and between January 2009 and May 2014, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendant NG CHONG HWA, also known as "Roger Ng," together with others, did knowingly and willfully conspire to commit offenses against the United States, namely, to knowingly and willfully circumvent and cause to be circumvented a system of internal accounting controls at U.S. Financial Institution #1, contrary to the FCPA, Title 15, United States Code, Sections 78m(b)(2)(B), 78m(b)(5) and 78ff(a).

        63.     In furtherance of the conspiracy and to effect its objects, within the Eastern District of New York and elsewhere, the defendant NG CHONG HWA, also known as "Roger Ng," together with others, committed and caused to be committed, among others, the following:

## OVERT ACTS

(a)     On or about January 15, 2009, a high-ranking official at

1MDB's predecessor entity, TIA, advised LOW, NG and Co-Conspirator #1 that it was "best

to get [LOW] involve[d] at every stage" of a TIA transaction that was being handled by U.S.

Financial Institution #1.

(b)     On or about January 27, 2009, NG and Co-Conspirator #1

discussed via email whether to disclose to the Intelligence Group at U.S. Financial Institution

#1 LOW's involvement in the transaction referenced in Paragraph 63(a), and decided not to

make such disclosure.

(c)     During a telephone call in mid to late March 2012, Co-

Conspirator #1 falsely stated to a senior member of the Intelligence Group at U.S. Financial

Institution #1 that LOW was not involved in Project Magnolia.

(d)     On or about April 3, 2012, in response to questioning, Co-

Conspirator #1 falsely told a senior member of the Intelligence Group at U.S. Financial

Institution #1 that LOW was not involved in Project Magnolia.

(e)     On or about April 4, 2012, NG and Co-Conspirator #1 falsely

stated in a committee meeting at U.S. Financial Institution #1 that LOW was not involved in

Project Magnolia other than to set up one meeting with an Abu Dhabi official.   The meeting

was attended by committee members and others located in New York, New York using U.S.

Financial Institution #1's telecommunication facilities, which transited through the Eastern

District of New York.

(f)     On or about October 10, 2012, Co-Conspirator #1 falsely stated

in a committee meeting at U.S. Financial Institution #1 that LOW was not involved in

Project Maximus. The meeting was attended by committee members and others located in New York, New York using U.S. Financial Institution #1's telecommunication facilities, which transited through the Eastern District of New York.

(g)    On or about April 24, 2013, Co-Conspirator #1 falsely stated to a senior employee of U.S. Financial Institution #1 based in New York, New York who was also a member of a committee that reviewed the 1MDB bond transactions, that there was no intermediary involved in any of the three 1MDB bond transactions and, specifically, that LOW was not involved in Projects Magnolia, Maximus or Catalyze.

(Title 18, United States Code, Sections 371 and 3551 et seq.)

## COUNT THREE
(Conspiracy to Commit Money Laundering)

64.    The allegations contained in paragraphs one through 57 are realleged and incorporated as if fully set forth in this paragraph.

65.    In or about and between January 2009 and October 2014, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendants LOW TAEK JHO, also known as "Jho Low," and NG CHONG HWA, also known as "Roger Ng," together with others, did knowingly and intentionally conspire to:

(a)    transport, transmit and transfer monetary instruments and funds from a place in the United States to and through a place outside the United States and to a place in the United States from and through a place outside the United States, (i) with the intent to promote the carrying on of one or more specified unlawful activities, to wit: felony violations of the FCPA, Title 15, United States Code, Sections 78dd-1, 78dd-3, 78m(b)(2)(B), 78m(b)(5) and 78ff(a), and offenses against a foreign nation involving the misappropriation,

theft and embezzlement of public funds by and for the benefit of a public official, in violation of Malaysian Penal Law, contrary to Title 18, United States Code, Section 1956(a)(2)(A); and (ii) knowing that the monetary instruments and funds involved in the transportation, transmission and transfer represented the proceeds of some form of unlawful activity, and knowing that such transportation, transmission and transfer was designed in whole and in part to conceal and disguise the nature, location, source, ownership and control of the proceeds of one or more specified unlawful activities, to wit: felony violations of the FCPA, Title 15, United States Code, Sections 78dd-1, 78dd-3, 78m(b)(2)(B), 78m(b)(5) and 78ff(a), and offenses against a foreign nation involving the misappropriation, theft and embezzlement of public funds by and for the benefit of a public official, in violation of Malaysian Penal Law, contrary to Title 18, United States Code, Section 1956(a)(2)(B)(i); and

(b)     engage in one or more monetary transactions within the United States involving property of a value greater than $10,000 that was derived from one or more specified unlawful activities, to wit: felony violations of the FCPA, Title 15, United States Code, Sections 78dd-1, 78dd-3, 78m(b)(2)(B), 78m(b)(5) and 78ff(a), and offenses against a foreign nation involving the misappropriation, theft and embezzlement of public funds by and for the benefit of a public official, in violation of Malaysian Penal Law, knowing that the funds were the proceeds of some unlawful activities and were in fact proceeds of one or more specified unlawful activities, to wit: felony violations of the FCPA, Title 15, United States Code, Sections 78dd-1, 78dd-3, 78m(b)(2)(B), 78m(b)(5) and 78ff(a), and offenses against a foreign nation involving the misappropriation, theft and embezzlement of public funds by

and for the benefit of a public official, in violation of Malaysian Penal Law, contrary to Title 18, United States Code, Section 1957(a).

(Title 18, United States Code, Sections 1956(h) and 3551 et seq.)

## CRIMINAL FORFEITURE ALLEGATION AS TO COUNTS ONE AND TWO

66.    The United States hereby gives notice to the defendants that, upon their conviction of the offense charged in Count One or Count Two, the government will seek forfeiture in accordance with Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c), which require any person convicted of such offenses to forfeit any property, real or personal, constituting, or derived from, proceeds obtained directly or indirectly as a result of such offenses.

67.    If any of the above-described forfeitable property, as a result of any act or omission of the defendants:

(a)    cannot be located upon the exercise of due diligence;

(b)    has been transferred or sold to, or deposited with, a third party;

(c)    has been placed beyond the jurisdiction of the court;

(d)    has been substantially diminished in value; or

(e)    has been commingled with other property which cannot be divided without difficulty;

it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p), to seek forfeiture of any other property of the defendants up to the value of the forfeitable property described in this forfeiture allegation.

(Title 18, United States Code, Section 981(a)(1)(C); Title 28, United States Code, Section 2461(c))

CRIMINAL FORFEITURE ALLEGATION AS TO COUNT THREE

68.     The United States hereby gives notice to the defendants that, upon their conviction of the offense charged in Count Three, the government will seek forfeiture in accordance with Title 18, United States Code, Section 982(a)(1), which requires any person convicted of such offense to forfeit any property, real or personal, involved in such offense, or any property traceable to such property.

69.     If any of the above-described forfeitable property, as a result of any act or omission of the defendants:

        (a)     cannot be located upon the exercise of due diligence;

        (b)     has been transferred or sold to, or deposited with, a third party;

        (c)     has been placed beyond the jurisdiction of the court;

        (d)     has been substantially diminished in value; or

        (e)     has been commingled with other property which cannot be divided without difficulty;

it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 18, United States Code, Section 982(b), to seek forfeiture of any

other property of the defendants, up to the value of the forfeitable property described in this

forfeiture allegation.

      (Title 18, United States Code, Sections 982(a)(1) and 982(b); Title 21, United

States Code, Section 853(p))

A TRUE BILL

_____
FOREPERSON

_____
RICHARD P. DONOGHUE
UNITED STATES ATTORNEY
EASTERN DISTRICT OF NEW YORK

_____
DEBORAH L. CONNOR
CHIEF
CRIMINAL DIVISION, MONEY LAUNDERING
AND ASSET RECOVERY SECTION
U.S. DEPARTMENT OF JUSTICE

_____
SANDRA L. MOSER
ACTING CHIEF
CRIMINAL DIVISION, FRAUD SECTION
U.S. DEPARTMENT OF JUSTICE

F.#: 2016R00467

FORM DBD-34
JUN. 85

No.

# UNITED STATES DISTRICT COURT

## EASTERN *District of* NEW YORK

## CRIMINAL DIVISION

## THE UNITED STATES OF AMERICA

*vs.*

*LOW TAEK JHO, ALSO KNOWN AS "JHO LOW," AND NG CHONG HWA, ALSO KNOWN AS "ROGER NG,"*

Defendants.

# INDICTMENT

(T. 18, U.S.C., §§ 371, 981(a)(1)(C), 982(a)(1), 982(b), 1956(h) and 3551 et seq.;
T. 21, U.S.C., § 853(p); T. 28, U.S.C., § 2461(c))

*A true bill.*

_____                    _____
                                                                                              Foreperson

*Filed in open court this* _____ *day*

*of* _____ *A.D. 20* _____

_____
                                                                                              Clerk

*Bail, $* _____

_____

*Jacquelyn M. Kasulis, Drew G. Rolle, Assistant U.S. Attorneys, (718) 254-7000*
*Jennifer C. Ambuehl, Katherine A. Nielsen, Mary Ann McCarthy, Nikhila Raj*
*Trial Attorneys, U.S. Department of Justice (202) 514-2000*