UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

- v. -

NG CHONG HWA a.k.a. Roger Ng,

Defendant.

No. 18-cr-538 (MKB)

Date of service: October 30, 2020

**ORAL ARGUMENT REQUESTED**

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT ROGER
NG'S MOTION TO DISMISS THE INDICTMENT AND OTHER RELIEF**

**BRAFMAN & ASSOCIATES, P.C.**
767 Third Avenue, 26th Floor
New York, NY 10017
(212) 750-7800

Marc A. Agnifilo, Esq.
Zach Intrater, Esq.
Teny R. Geragos, Esq.
Jacob Kaplan, Esq.
*Of Counsel*

*Attorneys for Defendant Roger Ng*

**Table of Contents**

I.     INTRODUCTION ....................................................................................................... 1

II.    STATEMENT OF FACTS ......................................................................................... 3

   A.   Overview .............................................................................................................. 3

   B.   Jho Low .............................................................................................................. 5

      1.   Jho Low Develops Business Contacts in the Middle East.................................. 6

      2.   Jho Low's Scheme Begins................................................................................ 7

      3.   Political Fortune Smiles on Low ....................................................................... 9

      4.   The State of Terengganu's Investment Fund – TIA ......................................... 10

      5.   TIA Becomes 1MDB, and Low Brings His Ponzi Scheme to the Next Level.......... 10

      6.   Low Applies to Be a Goldman Sachs Private Wealth Management Client ............... 12

   C.   What Did Goldman Know, Who Knew It And When? ................................................... 14

      1.   January 2009 - Fall 2009: TIA and "Project Tiara" ......................................... 15

      2.   Fall 2009 – Summer 2010: Low's Private Wealth Management Application .......... 16

      3.   Early 2011: Leissner's Two Attempts To Onboard Low ................................... 19

      4.   Early 2012 – 2013: The Three Bond Deals ...................................................... 20

      5.   2014: Goldman's Legal and Compliance Divisions Know Low Is, And Has Been, A Financial Partner of 1MDB Yet Goldman Pursues the 1MDB IPO Anyway...................... 21

      6.   2015: Low Is Revealed and the Goldman Finger-Pointing Begins ...................... 22

   D.   Timothy Leissner ............................................................................................... 23

      1.   Between the 2012 and 2013, Leissner Lied Repeatedly About Low's Involvement to Multiple High-Ranking Executives ........................................................................ 23

      2.   2013-2014: Leissner continues to try to bring Low into the Bank ...................... 25

   E.   Roger Ng........................................................................................................... 26

III.   THE INDICTMENT SHOULD BE DISMISSED FOR LACK OF VENUE ..................... 28

IV.   THE FIRST OBJECT OF COUNT ONE, CHARGING DEFENDANT WITH BEING AN EMPLOYEE OR AGENT OF AN ISSUER, SHOULD BE DISMISSED BECAUSE THE INDICTMENT, AS ALLEGED, HAS ELIMINATED AN ESSENTIAL ELEMENT OF THAT OFFENSE ...................................................................................................................... 37

V.    COUNT TWO MUST BE DISMISSED BECAUSE THE INDICTMENT FAILS TO ALLEGE THAT NG CONSPIRED TO CIRCUMVENT A SET OF INTERNAL ACCOUNTING CONTROLS COGNIZABLE UNDER THE FCPA .......................................... 44

   A.   The Statutory Text and Objectives of the Internal Accounting Control Provision.......... 45

   B.   Count Two's Allegations Do Not Relate to Goldman's Assets...................................... 48

   C.   Prior Applications of the Internal Accounting Control Provision Do Not Square with the Allegations in Count Two.................................................................................................. 49

D.   Because the Alleged Bribes Did Not Relate to a Goldman Transaction or Its Assets, the Internal Accounting Controls Provision Is Unconstitutionally Vague And Must Be Dismissed ...................................................................................................................52

VI.   COUNT THREE SHOULD BE DISMISSED FOR FAILURE TO PROVIDE WHAT THE CONSTITUTION REQUIRES OF AN INDICTMENT AND BECAUSE ONE OF ITS PREDICATES CANNOT BE A SPECIFIED UNLAWFUL ACTIVITY FOR MONEY LAUNDERING UNDER THE "REFERENCE CANON" ......................................................... 56

A.   Legal Standards ................................................................................................... 58

B.   The Convoluted and Undifferentiated Structure of Count Three Lacks Any Independent Allegations ...................................................................................................... 60

C.   Argument .............................................................................................................. 62

1.   An Element is Missing ..................................................................................... 62

2.   No "Design" Is Alleged With Proper Specificity, in Contravention of Supreme Court Precedent ............................................................................................. 67

3.   The Byzantine Structure of Count Three Combined with Zero Independent Allegations Makes it Impossible to Distinguish Allegations Relating to One Object Versus Another ............................................................................................. 72

a.   Count Three Fails to Allege Sufficiently the Three Disparate Objects of Count Three ............................................................................................................73

b.   The Structure of Count Three Mandates That Merely "Parroting the Language" of the Statute is Insufficient to Guarantee Ng's Provide Sufficient Notice Here ................ 77

c.   A Violation of § 78dd-3 Does Not Qualify as a Specified Unlawful Activity ....... 82

VII.   THE GOLDMAN DEFERRED PROSECUTION AGREEMENT SHOULD BE MODIFIED BECAUSE CERTAIN PROVISIONS WILL VIOLATE NG'S CONSTUTIONAL RIGHTS AT TRIAL ................................................................................................ 84

A.   The Silence Provision ......................................................................................... 84

B.   The Witness Provision ........................................................................................ 87

C.   Request for Relief ............................................................................................... 89

VIII.   THE COURT SHOULD ORDER TO GOVERNMENT TO PROMPTLY PROVIDE BRADY MATERIAL IN ITS POSSESSION ............................................................. 91

A.   Ng is Entitled to Communications Between the Government And Leissner's Counsel... 91

B.   Ng Is Entitled to All Material Covered by the DPA Goldman And the Government Recently Executed ............................................................................................. 101

C.   The Government Should Produce the Information in Its Possession Regarding the True Nature of the Financial Transactions Described in Paragraphs 40 and 53 ............................ 114

IX.   ████████████████████████████████████████

A.   ███████████████████████████████████████

1. █████████████████████████████████

████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

X.   CONCLUSION.................................................................................................... 122

## I.     **INTRODUCTION**

Roger Ng waived extradition from his home country of Malaysia to voluntarily leave his wife and young daughter, who have not seen him since May of 2019 and November of 2018 respectively, to come to the United States and bravely engage our justice system and prove his innocence. He and his counsel argue in these motions that this Indictment is deeply flawed and that there are compelling reasons to dismiss these charges and allow him to return home.[1] He and his counsel thank the Court for agreeing to permit an oversized submission in this matter. This case is both massively complex and direly important to him and we appreciate the time the Court has taken and will take in resolving these issues.

As part of the Government's effort to make Goldman pay for its corporate-wide failure to recognize that Low and Leissner were using the company as part of a criminal scheme, it has errantly indicted Ng, who, the evidence will show, was absolutely not involved in the stunning crimes committed by others, and whose only meaningful role was that he introduced Low to Leissner at a time when neither he nor anyone else knew Low was simply a criminal. Leissner would soon join forces with Low, as had many powerful figures before him, and become part of what in reality was a massive Ponzi scheme that Low commenced in 2007 and that would crescendo in a potentially lucrative Initial Public Offering on an entity called 1MDB Energy in late 2014 or 2015.

---

[1] On October 30, 2018, Ng was arrested on a provisional arrest warrant from the United States based on the instant U.S. Indictment. He was incarcerated based on the U.S. charges from October 30, 2018, until his initial appearance on May 7, 2019, a period of over six months. On December 19, 2018, Ng was charged by the Malaysian Attorney General's Chambers with four Malaysian crimes related to his alleged involvement in 1MDB, and bail was granted as to the Malaysian charges (yet denied as to the U.S. charges). On February 15, 2019, Ng waived extradition to the U.S., was released to the custody of U.S. agents on May 3, 2019, and flown over several days to the United States.

The Indictment is remarkable because it seemingly acknowledges that the three Goldman bond deals in the Indictment are part of a far larger scheme, involving diverse participants and other crimes, all with Low at the center. The Indictment, however, steers clear of many of the other crimes and much of the conduct taking place between 2009 and 2014 by Low and others that are set forth in scores of other filings by the U.S. Department of Justice.[2] The Government does this because if the Court or a jury viewed the totality of the conduct, the conduct would look far less like an FCPA bribery and more like a series of frauds and thefts in the nature of a massive Ponzi scheme. The problem of course with these events being a Malaysian-based fraud scheme, as opposed to an FCPA violation concerning Goldman Sachs Group, is that the U.S. would have missed out on the massive payday from October 22, 2020, when Goldman Sachs Group entered into a Deferred Prosecution Agreement ("DPA") and agreed to pay $2.9 billion. As a result, and as is often the case when a law is stretched to accomodate facts that do not naturally fit, the Indictment in this case suffers from a host of serious problems, some of which are addressed in these motions.

First, the Indictment should be dismissed for lack of venue.

Second, by creating the non-existent entity it calls "U.S. Financial Institution #1" as a combination of Goldman Sachs Group, Inc., an issuer of U.S. securities, and other Goldman Sachs entities which are not issuers, the Government eliminates from the jury's consideration a statutory element of FCPA bribery, specifically that Ng must be an employee or agent of an issuer. Accordingly, Count One of the Indictment should be dismissed.

---

[2] Between July 2016 and the present, the U.S. Department of Justice has filed dozens of detailed, factual, sworn, verified complaints seeking civil In Rem remedies. These filings advance a legal theory and factual allegations that are at odds with the allegations in this Indictment.

<u>Third</u>, Count Two should be dismissed because the Indictment fails to allege that Ng conspired to circumvent a set of internal accounting controls cognizable under the FCPA.

<u>Fourth</u>, Count Three should be dismissed for failure to provide what the Constitution requires of an Indictment and because one of its predicates cannot be specified unlawful activity for money laundering under the "reference canon."

<u>Fifth</u>, we petition the Court to modify the provision in the DPA that prevents Goldman employees from testifying in a manner inconsistent with the "facts" in the DPA, as that provision serves to prevent witnesses from telling the truth at this trial; the Court should also modify the DPA to require that Goldman makes its employees available as witnesses for the defense.

<u>Sixth</u>, the Court should order the Government to promptly produce <u>Brady</u> material, including the communications between the Government and counsel for Tim Leissner, communications between the Government and Goldman and all exculpatory material related to information in paragraphs 40 and 53 of the Indictment.

<u>Seventh</u>, the Court should Order that the Government change the designation of over 110,000 items of discovery from "Attorneys' Eyes Only" to "Sensitive Discovery Material."

## II.   **STATEMENT OF FACTS**

### A.   **Overview**

This immensely complex series of events can fairly be broken into four primary elements. <u>First</u> is Jho Low, the undisputed architect of what ended up being one of the largest criminal schemes in the history of civilization, who partnered with a group of public officials from Abu Dhabi and Malaysia, including the Prime Minister himself, who likewise became Low's co-conspirators. <u>Second</u> is Goldman, or more particularly, certain high-level representatives in the legal, compliance and investment banking divisions, who knew that Low might be a fraud and

3

were specifically warned by Ng, among others, but continued to deal with him anyway. Third is Timothy Leissner, who at some point between 2009 and 2012 decided to effectively abandon his role as a Goldman employee to become a full-fledged criminal in the service of Low. As a partner and rainmaker within Goldman, Leissner played a huge role in keeping Low within the relatively good graces of Goldman. Fourth, is Roger Ng, but this is solely because the Government indicted him.  Otherwise, he would be a singularly irrelevant player in a vast ocean of far more powerful, far more involved Goldman executives.

As the Indictment tacticly reveals (mostly by all the things it does not allege), and as the evidence makes abundantly clear, Ng played no role in any of the events driving this case other than to be Malaysian and to have introduced Low, another Malaysian, to Leissner and other superiors at Goldman. In perhaps the most amazing twist of the case, it was Roger Ng who as early as March 2010 specifically warned his superiors at Goldman that Low was a politically exposed person, that Low was not to be trusted, and that Goldman should use caution in dealing with Low. Specifically, a Red Flag Summary states as follows: "**Roger Ng advised caution in accepting [Low's] claims at face value.**" The report further states that **Roger Ng "did not find [Low's] claims to be credible and recommended requiring very specific verification of all claims."** Ng's warnings were shared with the highest levels of the compliance and legal divisions of the company. The company did not listen to him. Yet, while Low remains a fugitive, and while Goldman Sachs Group, Inc. has secured a DPA, and while scores of high-level Goldman partners completely escaped criminal liability, and ██████████████████████████████████████ ████████████████████████ the only person going to trial in the United States for one of the largest financial crimes in recent memory is Ng, the man who warned Goldman of all of this in March 2010.

4

Moreover, while so many in this case have avoided and delayed their day of reckoning—Low remains a fugitive of this Court, Goldman apparently refused to timely provide recordings of incriminating phone calls of its executives, Leissner has continued his campaign of fraud and misdirection, ███████████████—only one man, this defendant Roger Ng, voluntarily placed himself firmly and bravely within this Court's jurisdiction when he waived extradition to voluntarily come to a country in which he knows no one to stand trial as an innocent man in a courtroom in Brooklyn, a place he came to for the first time on the day of his initial appearance.

**B.    Jho Low**

When the bank robber Willie Sutton allegedly told a reporter in 1952 that he robbed banks because that was where the money was, his self-evident statement became part of criminal folklore. Fifty-seven years later, in 2009, the Willie Suttons of the day would no longer concern themselves with robbing banks. Rather, the real money was now in the investment and development funds of certain countries. Switching out a gun and a loot bag for a corrupt politician and a Swiss bank account, Low entered the dubious pantheon of infamous thieves. This case centers on perhaps the single largest heist in the history of the world: the looting of $4.5 billion of Malaysian public funds from 1MDB. The architect, progenitor and primary beneficiary of this crime is Low, who remains a fugitive.[3] To understand the events alleged in the Indictment, it is important to understand the meteoric arc of Low, his ambition, the methods he used, the people who knowingly joined him in this crime, and the people whom he and others used unwittingly to help them commit it, including Ng. While the Indictment starts in 2009, the evidence is overwhelming that Low began his criminal

---

[3] Low's status as as both the architect of this massive crime and a fugitive has not prevented the U.S. Department of Justice from reaching a civil settlement with him. Much like the multi-millionnaire partners of Goldman, Low gets to sit idly by and watch the fate of Ng, who is unable to buy his way out of being prosecuted.

activity at least as early as 2007. The elements of this Ponzi scheme include not only money stolen from 1MDB through the three Goldman Sachs deals (referred to in the Indictment), but also several other large-scale frauds committed by Low and others. As the Court will see, it is impossible to view the actions of Low and others concerning the three Goldman bond deals in the Indictment in isolation. Rather, they are a part of a single heist committed in several phases by Low and his co-conspirators. Indeed, even the theft of 1MDB funds cannot be viewed in isolation. Rather, that theft is part of a course of action by Low and others in the nature of a multiple year Ponzi scheme, with Low stealing new money to pay for previous thefts, as part of his oversized, misguided plan to use his corrupt relationships with powerful people to make himself rich and his criminal associates, most of whom were already rich, richer.

Malaysian by birth, Low attended the prestigious Uplands International school in the Malaysian State of Penang. From there, he attended the famous Harrow school in England and went on to the University of Pennsylvania. Upon graduation in 2005, Low moved his company, Wynton Private Equity, which he had started two years earlier, into the iconic Petronas Twin Towers in downtown Kuala Lampur. He hired Seet Li Lin, a classmate from U. Penn., and Eric Tan, a Malaysian[4] he knew from the nightclub scene, and set about building his business.

1.   Jho Low Develops Business Contacts in the Middle East

Ever mindful of where the money was, Low had his eye on wealthy, influential figures from oil-rich nations, including the United Arab Emirates ("UAE"). For instance, Low struck up a business relationship with Yousef Al Otaiba, who at the time was a senior advisor to the Crown Prince Mohammed bin Sayed Al Nahyan of the Emirate of Abu Dhabi, said to be the fourth richest

---

[4] Seet Li Lin and Eric Tan are specifically mentioned because they play significant roles in the events alleged in the Indictment.

member of royalty in the world. Since 2008, Otaiba has been the UAE's Ambassador to the United States. Low leveraged Otaiba's name, as well as the names of other powerful figures from the UAE, in order to create trust and business relationships with political figures in Malaysia, including the man who would become Prime Minister, Najib Razak. In exchange for using Otaiba's name as part of Low's scheme, Low paid Otaiba tens of millions of dollars from the funds he stole from 1MDB as part of the 1MDB-PetroSaudi joint venture, to be discussed below.

Otaiba introduced Low to Khaldoon Khalifa Al Mubarak, who ran the UAE's sovereign wealth fund, known as Mubadala Development Company. Once Low had developed deep connections in the UAE, he set about using those connections to make equally powerful and corrupt connections in his home country of Malaysia. Low then leveraged his connection to Mubadala to convince the Sultan of the Malaysian State Terengganu to create a state-owned investment fund, the Terengganu Investment Authority ("TIA"), the precursor to 1MDB. Low could see that Malaysia was poised to become a far more sophisticated player on the stage of world finance than it had been, and Low offered Malaysian politicians entre to the wealth of the middle east.

As luck would have it, Low had come to know an individual named Riza Aziz from his time in England. Aziz was the son of Rosmah Mansoor, the wife of then-Malaysian Deputy Prime Minister Najib Razak. By 2007, Low was able to start leveraging his substantial connections in the Middle East to gain business in Malaysia.

2.     Jho Low's Scheme Begins

In 2007, Low learned that Khazanah, Malaysia's Sovereign Wealth Fund, was looking for partners to develop a major construction project in the southern state of Johor, near Malaysia's border with Singapore. This would be called the Iskandar Development Region and it would be a

financial hub in Malaysia to rival neighboring Singapore. In June of 2007, Low contacted Otaiba with details for the planned construction and suggested that Mubadala (the UAE fund) could invest in this promising Malaysian development. Low then arranged for a meeting in Abu Dhabi between Khazanah and Mubadala regarding the project. His success at bringing together a meeting of the Malaysian Sovereign Wealth Fund and the Sovereign Wealth Fund of the UAE put him in then-Deputy Prime Minister Najib's good graces.

The key to Low's success was that he made sure there was something for everyone in every business deal. In the Iskandar project, for instance, Najib and other politicians in Malaysia got political credibility by showing that Malaysia was becoming a more serious financial player through its relationship with the UAE. Otaiba and the other UAE officials were in it for the money, and Low paid them later from funds he derived from subsequent deals in his scheme. Low enjoyed the massive reputational benefit of having such powerful contacts around the world as well as typically stealing large sums of money on every deal. Low also repatriated the tactics he had used to such effect with Middle Eastern figures and did the same back in Malaysia.

As would become relevant in 2009 and 2010, when Low was being considered as a private wealth client at Goldman, Low pulled a stunt in the Iskandar deal in 2008 where he caused his shares of a company called UBG to have an almost comically high valuation as compared with others' shares. The UBG share valuation would be important for at least two reasons. First, as noted, Goldman compliance and legal representatives questioned the validity of Low's claim that he made $105,000,000 on the deal. This figure was connected to the share price, the validity of which was actively questioned by Goldman executives determining whether Low should be made a private wealth client of the bank. Second, the seemingly artificially high valuation of Low's

shares brough Low wealth and, perhaps more importantly, the appearance of wealth, which he could leverage in future business deals.

### 3.      Political Fortune Smiles on Low

In October 2008, the then-Malaysian Prime Minister, Tun Abdullah Ahmad Badawi, announced he would step down as Prime Minister as of March 2009. This all but assured that Najib Razak, then Deputy Prime Minister, and the man Low had courted through his UAE connections, would become Prime Minister. This stroke of luck would elevate Low to having direct access to the Prime Minister himself. What's more, through Low's connection to Khaldoon Khalifa Al Mubarak, the head of the UAE fund Mubadala, whom he met through Otaiba, Low could credibly claim to Malaysian politicians that he himself could help them build domestic investment funds of their own.[5]

As of January of 2009, Low was the advisor to the Sultan of the Malaysian State of Terengganu, which, not coincidentally, was in the process of creating a State-owned Sovereign Wealth Fund called TIA. At the time, the Sultan of Terengganu, Mizan Zainal Abidin, was the constitutional monarch of Malaysia (Malaysia rotates the Sultans of nine of its states to hold the position of Yang-di-Pertuan Agong, essentially the King of Malaysia, for five-year terms). Between 2006 and 2011, it was the State of Terengganu's turn in the rotation and so its Sultan was the country's king. So, as yet another stroke of luck, Low found himself as the advisor to the King of Malaysia.

---

[5] This is the equivalent of the Federal Reserve commissioning Willie Sutton to build all the country's banks and fill them with cash.

4.     The State of Terengganu's Investment Fund – TIA

In January 2009, TIA put out a Request For Proposals ("RFP") seeking a financial firm that could assist in the creation and maintenance of this State-owned fund. Goldman submitted a proposal and won the project. The Government does not allege that bribes or kickbacks played any role in the decision to award the project to Goldman. In April 2009, Najib Razak, whom Low had been courting, became the Prime Minister of Malaysia. On July 31, 2009, TIA was taken over by the Malaysian Ministry of Finance.

5.     TIA Becomes 1MDB, and Low Brings His Ponzi Scheme to the Next Level

On September 25, 2009, the name of TIA was officially changed to 1MDB. As its first order of business, 1MDB entered into a joint venture agreement with a private Saudi Arabian oil services company called PetroSaudi International. The idea for this joint venture was hatched a few weeks earlier during a meeting involving Low, Prime Minister Najib and the two co-founders of PetroSaudi—Tarek Obaid and Prince Turki bin Abdullah. Whether through luck or foresight, Low found himself in an unimaginably fortunate situation. The Malaysian politician he had been chasing, Najib, was elevated from Deputy Prime Minister to Prime Minister, and was now going to preside over a new national fund, 1MDB. To further solidify Low's role with Najib, Low was also connected to Najib's wife through her son, Riza Aziz. Not one to squander such an opportunity, Low thought of a way to use the 1MDB to satisfy his old debts and make himself rich.

The 1MDB-PetroSaudi joint venture appeared to be purely legitimate. By its terms, 1MDB agreed to invest $1 billion into the venture in exchange for one billion equity shares, amounting to a 40% stake, in the joint venture. In return, PetroSaudi agreed to provide the venture with $2.7

billion of assets consisting of energy interests in Turkmenistan and Argentina.[6] The venture also was consistent with a stated policy of Malaysia to attract foreign investment, particularly from wealthy nations such as Saudi Arabia. As a result, there was nothing about the 1MDB-PetroSaudi joint venture that raised red flags within Goldman or anywhere else. Indeed, the fraudulent nature of the 1MDB-PetroSaudi joint venture first came to light only in 2015, nearly six years later, when the former PetroSaudi executive, Javier Justo, provided two journalists with the contents of a PetroSaudi server, prompting a series of articles revealing for the first time that Low and others created the joint venture to siphon more than a billion dollars from 1MDB.

What only Low and a few others knew in the Fall of 2009 was that the joint venture was premised on the lion's share of the over $1 billion invested by 1MDB being secretly siphoned off to Low and other co-conspirators. The key to Low's success was ensuring that everyone controlling the finances of 1MDB would either be complicit in the theft or ignorant of the fact that the money was missing. For example, on October 2, 2009, as RBS Coutts was attempting to ascertain the full name of the final beneficiary of 1MDB funds, the 1MDB CEO, Sharol Halmi, misinformed the bank that the beneficiary, Good Star Limited, was 100% owned by PetroSaudi. The truth, however, was that the sole owner of Good Star was Low.

In addition to having 1MDB officials who were complicit in the theft, the success of the heist depended on having a bank that didn't ask too many questions. On September 22, 2009, the Chief Executive Officer of PetroSaudi, Tarek Obaid, contacted BSI Bank in Geneva, Switzerland to discuss BSI opening an account for the joint venture. He explained to the BSI official that an unspecified portion of the $1 billion being provided to the joint venture by 1MDB would be paid

---

[6] The 1MDB-PetroSaudi joint venture, including how Low's used the joint venture to steal upwards of one billion dollars from 1MDB in 2009, is set out in great detail in the Government's In Rem filings.

to Low as his commission for making the introduction between Najib Razak and the PetroSaudi co-founders, Tarek Obaid and Prince Turki. Because of the fact that Low was said to be taking this share of 1MDB public funds, rather than the money being put into the joint venture, BSI refused to open an account for the joint venture.

As with all fraudulent schemes, the methods and means employed by Low, the PetroSaudi founders and the complicit 1MDB officials[7] were designed to portray complete legitimacy to the world. Yet, all the while they were making false statements to bank representatives and had designs on stealing the 1MDB investment in the venture. The evidence is clear that as of September 2009, Roger Ng had no knowledge that the PetroSaudi joint venture was simply a way of looting 1MDB.

6.     Low Applies to Be a Goldman Sachs Private Wealth Management Client

At the same time he was covertly committing the PetroSaudi theft, Low was trying to become a private wealth management ("PWM") client of the Zurich office of Goldman. A reasonable view of the evidence known now (which was not known by anyone other than Low and a few others at the time) is that after BSI Geneva rejected the PetroSaudi joint venture's application to open an account because, in part, of the commission going to Low, Low realized he needed enhanced personal credibility, particularly in Europe. He seems to have been seeking that credibility by becoming a Goldman PWM client. Low wanted to be a PWM client specifically in Switzerland because while he was known in the Middle East and in Malaysia, he was not yet a household name in Europe. Being a Goldman PWM client in Geneva would give him needed European credibility as well as access to Goldman Sachs banking privileges.

---

[7] Only specific 1MDB officials were knowingly involved in this theft, and that many other officials were not knowingly involved.

The evidence shows that Ng did nothing more than follow the established protocols in directing Low to other people within Goldman who would then pass on Low's qualifications to be a PWM client. In particular, on September 30, 2009, Ng put Low in touch by email with Goldman Sachs-Singapore PWM banker named Hsin Yue Yong. In a follow up email, Hsin Yue Yong asked Ng for background on Low. Only because he was asked to provide background on Low, Ng responded to Yong by stating that Low was "currently our partner in a lot of transactions in Malaysia. Largely the mid-east and Malaysia relationship. He is close to Saudi, Kuwait and Abu Dhabi royal family who is chairman of mubadalla. Wealth probably in the c.usd200mm." Yong then forwarded this email to seven other people at Goldman, including to Shane Reidel of the Compliance Surveillance Strategy Group. Over the next ten months, Low met with a banker in Goldman's Switzerland office and several compliance officers within Goldman. Though many people on Goldman's business side were pushing for Low to be onboarded as a PWM client, his application was ultimately "closed" in June of 2010 after negative press articles surfaced about Low.

As will be discussed below, Low's efforts to become a private wealth client of Goldman would be picked up again by Tim Leissner in 2011—when he was referred for a PWM account in Singapore. Ultimately, Low would be a household name to virtually everyone at Goldman including Lloyd Blankfein and Michael Evans (former vice chairman at Goldman Sachs), who personally met Low on several occasions. These included: (1) a 2009 meeting at the Four Seasons between Blankfein, Low and Michael Evans, Roger Ng, Prime Minister Najib and 1MDB's Chairman; (2) a December 14, 2012 meeting at Goldman's New York offices between Low, Mohamed Badawy Al Husseiny (CEO of Aabar) and Hazem Shawki (a senior Goldman Middle East executive); (3) a July 2013 meeting on a yacht in the South of France between Michael Evans,

Low, Leissner, Prime Minister Najib and Prince Turki. There is also every reason to believe (from materials the Government has provided in discovery) that a Sepember 2013 meeting between Leissner, Low and several other prominent financial figures took place in the Time Warner Center in New York.[8] Notably, when Ng's assistant asked Leissner's assistant if Ng would be joining the September 2013 meeting, Leissner responded: "I will handle him away from the official meeting. No need to respond to the request." What became clear is that after making the introduction between Low and the partners at Goldman, Ng no longer had a seat at the proverbial table.

### C.    What Did Goldman Know, Who Knew It And When?

The Goldman emails, internal memoranda and other discovery reveal that the legal and compliance divisions of Goldman actively researched Low, his business connections, the sources of his wealth and his prior deals, and over time knew more and more about him. This knowledge, however, possessed at the highest levels of Goldman Sachs, did not prevent Goldman from continuing to engage with Low nor to continue to make hundreds of millions of dollars on deals with which Low was associated.

During the six year period between 2009 and 2015, the compliance and legal departments of Goldman wrestled with the pros and cons of being associated with Low in different capacities. The internal emails of Goldman show that the company was far more motivated by fear of bad press than it was in genuinely investigating the emerging red flags that Low and Leissner had joined forces to steal from 1MDB, Goldman's client. When examining the questions of what Goldman knew, what Ng knew and when they learned it, there are six relevant time periods.

---

[8] In the Government's recent Information, they state that "Low did not ultimately attend" but that during that trip, Low met with the wife of Najib at the Mandarin Oriental (located within the Time Warner Center) to show her an expensive piece of jewelry that the Jeweler designed at Low's request. (Goldman Information ¶ 66.)

14

1. <u>January 2009 - Fall of 2009</u>: the commencement date for the Indictment, during the set up of TIA.

2. <u>Fall of 2009 - June of 2010</u>: when Low first applied to be a PWM client of Goldman's Zurich office, which is when Goldman rejected his application.

3. <u>Early 2011</u>: when Leissner attempted to onboard Low as a PWM client in Singapore, then work with Low on a deal known within Goldman as "Project Gold."

4. <u>2012 - 2013</u>: when Goldman led three lucrative bond deals for 1MDB, all of which Leissner led.

5. <u>2014</u>: when Goldman's legal and compliance divisions knew Low was, and had always been, a financial partner of 1MDB yet Goldman pursued the 1MDB Energy IPO anyway.

6. <u>2015</u>: when Low was revealed to be a fraud.

These distinctions between time periods are important because, as the Indictment alleges, Ng introduced Low to others within Goldman in early 2009, when no one had reason to know that Low was running a fraud scheme. By 2012, as shown below, Low's prime contact at Goldman was no longer Ng, whom Low had already stepped over in favor of far more powerful people, but was instead the rain-making partner, Timothy Leissner. It was Leissner, and Leissner alone, who thereafter lied for Low, protected Low and ultimately became a full-fledged criminal in the service of Low.

1.     <u>January 2009 - Fall 2009: TIA and "Project Tiara"</u>

In January 2009, Ng and Leissner were courting Low in an effort to secure work for Goldman related to TIA. Goldman was well aware of Ng's and Leissner's efforts in this regard for several reasons, including because Ng logged it into the Client Interaction System, as he was supposed to.[9] (See <u>United States v. Leissner</u>, 18 Cr. 439 (MKB) Dkt. 1 ("Complaint" ¶ 23); GS-

---

[9] As an investment banking division Director in 2009, Ng was required to log every meeting into Goldman's Client Interaction database. Notably, when Ng transferred to the Securities Division in December 2010, he was no longer client-facing and was not required, nor expected, to log

1MDB-00289094). Over the course of the month, they met again, and Ng immediately logged it into the client interaction system. (GS-1MDB-00289126.)

A few weeks later, on January 24, 2009, the deal team on Project Tiara (Goldman's internal name for the project) asked the Business Intelligence Group ("BIG") to initiate a check to proceed with Project Tiara. A deal team member, who knew of Low's overall involvement in setting up TIA, asked Roger and others: "Roger, maybe you can advise on the question with regard to whether there was any finder." (GS-1MDB-01967707.) Ng immediately reached out to his then-boss Tim Leissner asking:

> On BIG, they asked if we have a consultant do we run a check on [Low] now or later? We don't have a deal structure or know how much we are making yet. Is it possible to advise BIG down the road we have a consultant or we should say there is one but we don't have the engagement terms etched out yet?

(GS-1MDB-00289134.) Leissner instructed that Ng "leave BIG to when we know how this structure works" (Id.; see generally Complaint ¶ 24; United States v. Ng, 18 Cr. 538 (MKB) Dkt. 1 (Indictment ("Ind.") ¶ 63(b).) Ng disclosed to several employees over multiple years that Low was involved in Project Tiara. (Ind. ¶ 21.) By February 5, 2009, BIG completed their review of TIA, writing "[f]rom a reputational perspective, we have not noted any show-stopping issues for the proposed transaction." (Id.)

        2.    <u>Fall 2009 – Summer 2010: Low's Private Wealth Management Application</u>

In approximately September 2009, Ng (cc-ing Tim Leissner) referred Low for a private wealth management ("PWM") account at Goldman's Swiss Office. (Complaint ¶ 35(a), <u>United States v. Goldman Sachs (Malaysia) Sdn. Bhd.</u>, 20 Cr. 438 (MKB) Dkt. 7, Information ("Goldman

---

meetings. At all time relevant to the Indictment, Leissner was in the Investment Banking Division. He was required <u>at all times</u> to log his meetings.

Information") ¶ 29.) Ng told the PWM banker that Low was "currently our partner in a lot of transactions in Malaysia. Largely the Mideast and Malaysia relationship." (Id.) Therefore, as of the date of the forwarded email, the Compliance Surveillance Strategy Group was aware that Low was currently a partner of Goldman in a lot of transactions in Malaysia, that Low was close to the royal families in Saudi Arabia, Kuwait and Abu Dhabi and that he had approximate wealth of $200 million. Ng's statements were forwarded again to an Anti-Money Laundering Compliance group within Goldman. In other words, Ng was the reason Goldman knew what it did.

Low was immediately put in contact with a Swiss PWM banker, and Goldman began due diligence. Through their due diligence on Low, Goldman once again learned of Low's involvement in the set-up of TIA. Goldman PWM Compliance hired an outside vendor who "conducted further research with the aim of verifying the documentation provided which may substantiate [Low's] claims of business dealings." (GS-1MDB-01366615.) Among the research were three articles that "[r]eference[d] Low's involvement in establishing the sovereign wealth fund, TIA." (Id.)

As Compliance personnel worked to diligence those questions about Low, the business side pressured Compliance to approve Low as a client. Compliance continued to conduct due diligence. For example, in a March 13, 2010, email, a Goldman regional head of compliance, Patrick Kidney, wrote to two others in the department quoting from an article, "Low was in fact instrumental in driving TIA during its formative stage; he continues to play a role in 1MDB, particularly in wooing the Arabs to part with the money to invest in the country." (GS-1MDB-01366683.) Later that day, he wrote of Low: "Negative Feedback from Sources - Of over 10 senior well-placed sources interviewed, none was aware of the Individual nor could substantiate his claims. Several encouraged exercising caution.—**including Roger Ng, who advised caution**

**considering what he knew and had heard**." (GS-1MDB-01366798) (emphasis added).[10] This very same Goldman regional head of compliance wrote, a day later, to a high-level BIG executive and David Lawrence (Associate General Counsel and Managing Director at Goldman), expressing frustration with the pressure to approve Low and underscoring the red flags Low raised as a client:

> This has been an exceptionally trying experience I have to admit, and I believe that no matter what we do [Goldman PWM representative] is not willing to accept that we are not in a position to onboard this prospect . . . I do not believe we will ever be able to get comfortable with this matter. I'd like to shut this down once and for all . . . It is seldom that one sees a vendor report, which has been backed up verbally by them, that so clearly states that we should exercise **extreme caution**.

(Goldman Information ¶ 29) (emphasis added).[11] Just two days later, on March 15, 2010, a comprehensive presentation was given about Low. The participants included the highest levels of compliance within Goldman, including Court Golumbic (Managing Director at Goldman) and David Lawrence. As part of the presentation, informational slides were distributed to the participants. Included among this information distributed to the highest echelons of Goldman's compliance personnel are more statements made by this defendant, Roger Ng. A portion of a report called "Red Flag Summary II," states that, "**Roger Ng advised caution in accepting [Low's] claims at face value.**" The report also states that Ng **"did not find [Low's] claims to be credible and recommended requiring very specific verification of all claims**." This defendant's specific

---

[10] This is one of several warnings that Ng gave to Goldman. In another email, Kidney wrote:

> Regarding the call with Roger: we had spoken with Roger and he had not been as postitive as the prospect was. Their recollection of events was somewhat different. Roger's recollection was simply not the same as the prospect's and Roger recommended that we undertake thorough due diligence to verify what the prospect was telling us. I recommend we discuss with Roger without the prospect being on the phone. I am in Paris tomorrow and Friday so will do my best to make myself available for such a call. (GS-1MDB-01365249.)

[11] This quotation is pulled from the Goldman Malaysia Information. The irony, of course, is that it was defendant Roger Ng's warning to exercise "caution."

and, frankly, remarkably prescient warnings about the fact that Low may be lying about his business connections and intentions, were shared with the leadership of Goldman.

Nevertheless, Goldman's business side continued to try to onboard Low for the next three and a half months. During that time period, Ng was once again asked about Low. He once again told the truth and "confirmed that [Low] was instrumental in introducing Goldman Sachs to the creation of the Malaysian Sovereign wealth Fund process and was part of that process in an advisory capacity. He also mentioned that the Prospective Client was part of a meeting of the Malaysian Prime Minister with Lloyd Blankfein in New York November last year." (GS-1MDB-01365278.)[12] Thousands upon thousands of internal Goldman emails show that in terms of Low and Ng, the information within the company was a one-way street. Ng provided accurate, truthful information about Low to his superiors within the company; and the Goldman compliance groups in turn never advised Ng, who after all was not even a partner in the company, to update him with the information they were compiling about Low's past dealings. Ultimately, on June 25, 2010, Low's PWM application was rejected following a series of negative press articles and, notably, no one at Goldman alerted Ng.

3.    Early 2011: Leissner's Two Attempts To Onboard Low

In 2011, Leissner engaged with Low on another potential project known internally at Goldman as "Project Gold." (Complaint ¶ 35(b).) A senior employee of Goldman "[s]poke to Tim [Leissner]" and their "[b]ias is to not move ahead." (Id. ¶ 35(b)(iii); see also GS-1MDB-01004654.) Leissner informed that employee "I have come to the same conclusion [that this deal is not one to push]" and told the senior employee that he would alert the deal team. (GS-1MDB-

---

[12] Despite these emails, the government still alleged that "Low also specifically requested that Ng, Leissner and other conceal his involvement in 1MDB…and Ng, Leissner and other continued to conspire to conceal Low's involvement…" (Ind. ¶ 22.)

01004742.) There is no record of Leissner informing Ng about his conversations with the senior employee. In fact, just a few days later, Leissner referred Low for another PWM account at Goldman's Singapore Office. (Complaint ¶ 35(c); GS-1MDB-00026075.) Ng, likely believing that Project Gold was still moving forward, arranged for a lunch meeting with Low and Hsin Yue Yong (the Singapore PWM banker) and wrote "[g]iven the various things we have with this client, we should try to make an attempt, if possible." (Complaint ¶ 36.) Ultimately, Low's PWM-Singapore application was rejected.

4.    Early 2012 – 2013: The Three Bond Deals

In approximately 2012, 1MDB engaged Goldman for advice regarding its anticipated purchase of a Malaysian energy company. (Ind. ¶¶ 24-29.) After a series of meetings in February and March (most of which were attended by other members of Goldman), 1MDB decided to structure a deal whereby they would issue $1.75 billion in bonds guaranteed by IPIC—an entity wholly-owned and controlled by the Abu Dhabi government. This project was referred to internally as "Project Magnolia." Soon after Project Magnolia closed on May 21, 2012, approximately $577 million of the bond proceeds were allegedly diverted from 1MDB through numerous wire transfers to bank accounts owned and controlled by Low, Leissner, a high-level official at IPIC, and the wife of Najib. (Ind. ¶ 40.) Leissner, who set up a bank account and received wire details the very same day that Project Magnolia closed, received $51.96 million into an account controlled by him and his now ex-wife. The Government alleges that $24 million was subsequently transferred from that account to an account owned by Ng's relatives. (Ind. ¶ 40.) Notably, this money was never transferred to Ng and the Government does not allege that the money coming to Ng's in-laws was Ng's "cut" or profits from Project Magnolia. The Indictment

does specifically allege, that Ng and Leissner had other business arrangements having nothing to do with the two men being employed at Goldman. (Ind. ¶ 57.)

Almost immediately after Project Magnolia closed, Goldman closed two other bond deals referred to internally as "Project Maximus" and "Project Catalyze." (Ind. ¶¶ 42-55.) Though Ng was part of the deal team for Magnolia, he had a minor role in Maximus, and no role whatsoever in Catalyze. Both Maximus and Catalyze raised more than $4 billion for 1MDB's investment projects. Following the close of Project Maximus on October 19, 2012, approximately $790 million was transferred to a Low-controlled entity. Leissner and his wife's entity received over $20 million, which he then directed to flow to others over the next three months. There is no allegation that Ng or anyone associated with him received any money from Maximus. After Project Catalyze was approved on March 13, 2013, and the proceeds were issued on March 19, 2013, Low caused more than $1 billion to be laundered to numerous different bank accounts. On July 3, 2013, $65 million of the diverted funds were transferred to the Leissner-controlled account. The Government alleges that Leissner than directed approximately $4 million of this to the account of Ng's relatives. (Ind. ¶ 53.) This money was never transferred to Ng.

5. <u>2014: Goldman's Legal and Compliance Divisions Know Low Is,
And Has Been, A Financial Partner of 1MDB Yet Goldman Pursues
the 1MDB IPO Anyway</u>

In March 2014, the Legal Department of Goldman shared emails discussing the fact that KPMG had ceased being 1MDB's auditor "without giving further details." By April 1, 2014, the Legal Department was aware that "the extended March 31 deadline" for 1MDB to file its 2013 yearly financial statement passed without the public fund making any such filing. The Legal Department was also aware that 1MDB's new accounting firm, Deloitte, refused to comment on

the non-filing. Therefore, by April 2014, Goldman was aware of serious red flags indicating something very wrong with the accounting at 1MDB.

The next month, Goldman's Legal and Compliance Divisions would know the likely source of the 1MBD's accounting problem. In May 2014, high-level members of the Goldman Legal and Compliance Divisions became aware of information that Low had a significant financial connection to 1MDB. Emails shared within the legal department, for instance, showed that Goldman was aware that Low had represented to an English court in 2012 that as early as 2011 (a full year prior to the first bond deal) Low was being "backed" by 1MDB in connection with a 1 billion pound bid for a hotel group.[13]

Despite Goldman's Legal and Compliance Divisions knowing in the Spring of 2014 that Low had been financially backed by 1MDB even prior to the first bond deal, and despite knowing that 1MDB's highly-regarded accounting firm quit and that it was having significant accounting issues at that time, Goldman nonetheless pushed full-speed-ahead for the highly lucrative 1MDB energy IPO. This reveals one central fact with unmistakable clarity: no one at Goldman at any level, whether it be the Legal Department, Compliance or Lloyd Blankfein himself, could care less that Low was affiliated with 1MDB. When Goldman found out that Low had been a financial partner with 1MDB the whole time, and for at least a full year before the first bond deal, Goldman responded by doubling down and advising on the 1MDB IPO with other banks, hoping to profit approximately $50 million more.

6.    2015: Low Is Revealed and the Goldman Finger-Pointing Begins

With Goldman keeping Low's secrets pending the IPO, it was a former PetroSaudi employee named Javier Justo who ultimately blew the whistle on Low. In early 2015, Justo

---

[13] At the prevailing exchange rate, this was about a $1.6 billion deal, backed by 1MDB.

provided over 200,000 emails from a PetroSaudi server to journalists who had been covering 1MDB. On March 1, 2015, the story broke that Low used PetroSaudi as a front to steal billions of dollars from 1MDB. The article breaking the story was emailed throughout the highest echelons of Goldman. Over the next several months, two news outlets – the Sarawak Report and the Edge – ran detailed articles concerning Low, 1MDB, and related matters. The many articles were shared among Goldman's Legal, Compliance and Investment Banking divisions. By July 2015, it was revealed that 1MDB funds, through its subsidiary, SRC, had been traced to Prime Minister Najib Razak's personal bank accounts.

By late July 2015, the highest echelons of Goldman, including Lloyd Blankfein himself, were managing the fallout from news articles that increasingly placed Goldman at the heart of the 1MDB scandal.

### D.   Timothy Leissner

At some point between 2009 and 2012—and perhaps only Leissner can identify the precise moment—Leissner effectively stopped being a partner at Goldman and started being a criminal partner of Low. As relevant to the charges against Ng, this transformation on Leissner's part was done in private. There is no indication in the hundreds of thousands of emails and other discovery that Leissner either told Ng that Leissner had begun helping Low commit crimes or shared any information with Ng that would have put Ng on notice of that fact. Rather, Leissner did what every conspirator does: he kept his criminal affiliation a secret.

    1.   Between the 2012 and 2013, Leissner Lied Repeatedly About Low's Involvement to Multiple High-Ranking Executives

It is undisputed that Leissner liked repeatedly to members of the Firmwide Capital Committee ("FWCC") and members of BIG about Low's involvement in the 1MDB deals—even after Leissner received and paid out significant portions of money from the bond deals. For

example, during Project Magnolia, Leissner told the following lies. <u>First</u>, during a telephone call on March 12, 2012, Leissner told a senior member of BIG that Low was not involved in Project Magnolia. (Complaint ¶ 41(a).) Four days later, on March 16, 2012, during an Asia Standards Committee meeting regarding Project Magnolia, a committee member asked Leissner if Low was involved in Project Magnolia and Leissner responded no. (<u>Id.</u> ¶ 41(b).) On or about April 4, 2012, Leissner was questioned at a FWCC meeting about his meeting with Low and a high-ranking official at IPIC. Leissner denied Low's presence, but admitted that [Low] had helped arrange the meeting." (Complaint ¶ 41(d).) The Indictment alleges that Ng, too, stated in that committee meeting that Low was not involved in Project Magnolia other than to set up the meeting. Ng, who was on this call, made no such statement <u>because he was unaware of and not present at the meeting with Low and the high-ranking official.</u>[14] (Ind. ¶ 63(e).) Later that same day, after the FWCC meeting, a high-ranking BIG executive emailed Leissner, stating "I was told Jho Low attended the meeting you had with Sheikh Mansour. Sorry that was wrong." Leissner responded that he "hand delivered a letter by the Prime Minister of Malaysia to him and the Crown Prince." The high-

---

[14] The Government has taken inconsistent positions with respect to this meeting in the following ways:

(1) In the Leissner Complaint (filed June 7, 2018): "On or about April 4, 2012, during a firmwide Capital and Suitability Committee meeting regarding Project Magnolia, the Global Co-Head of the Intelligence Group <u>questioned Leissner about his meeting</u> with [Low] and a high-ranking official of [IPIC] in Abu Dhabi, and Leissner denied [Low] was present, but admitted he had helped arrange the meeting. <u>Leissner did not tell the [FWCC] that [Low] was otherwise involved in Project Magnolia.</u> (Complaint ¶ 41(d)) (emphasis added).

(2) In the Ng Indictment (filed October 2018): "On or about April 4, 2012, <u>NG and [Leissner] falsely stated</u> in a committee meeting that Low was not involved in Project Magnolia other than to set up one meeting with an Abu Dhabi official." (Ind. ¶ 63 (e).)

(3) In the Goldman Information (unsealed October 22, 2020): "On or about April 4, 2012, Leissner falsely stated at a FWCC meeting that Low was not involved in Project Magnolia other than to set up one meeting with IPIC Official 1….<u>Ng was also present during this meeting and did not correct Leissner's false statement about Low's involvement.</u> (Goldman Information ¶ 83(b).)

ranking BIG executive replied, "I guess Low will have had a hand in fixing that you were able to carry the letter from the Malaysian PM . . .  Important we have no role on our side for Low and we should ask that any payments from any of [the] participants to any intermediaries are declared and transparent." Leissner agreed with the executive's admonishment.[15]

Just two months later, when Project Maximus was underway in June and Leissner had already directly received millions of dollars from Low-related entities, Leissner continued to deceive others at Goldman regarding Low.

- On or about June 20, 2012, a member of Goldman's control functions asked members of the deal team, "Is Jho Low involve[d] in this transaction? Please also keep us posted if there are any other politically exposed person involve[d] in this transaction in a non-official capacity." A deal team member responded "no."[16]

- On or about October 10, 2012, Leissner falsely told a firmwide committee that neither Low nor any intermediary was involved in Project Maximus. (Leissner Information 83¶ (d).)[17]

- Leissner continued this charade into 2013 during Project Catalyze. On or about April 24, 2013, a senior Goldman executive who was a member of Goldman's approval committee, emailed Leissner about "1MDB," asking: "Is there a story circulating about an intermediary on the Magnolia trades??" Leissner responded, "Not that I am aware of . . . There definitely was no intermediary on any of the trades. The blogs in Malaysia always try to link a young Chinese business man [sic], Jho Low, to 1MDB. That is not the case other than he was an advisor alongside other prominent figures to the King of Malaysia at the time of the creation of 1MDB."[18]

2.      2013-2014: Leissner continues to try to bring Low into the Bank

In 2013, Golman served as an advisor on a deal referred to internally as "Project Condor." (See Goldman Information ¶ 79.) When the deal was substantially finalized, BIG raised concerns about the Low-controlled entity and advised the deal team—which included Leissner and another

---

[15] Ng was not copied on these emails, nor was he present at the meeting where Leissner delivered the letter.

[16] Though Leissner was involved in this exchange, Ng was not.

[17] Ng was not present at the Firmwide committee meeting.

[18] Ng was not copied on this email, nor was he involved in Catalyze.

senior employee, Andrea Vella[19]—to not proceed. (Id.) Though BIG shared with Leissner and the other employee their concern with Low, BIG doubted that "pens are completely down." (GS-1MDB-0194839.) In other words, Goldman executives knew that Leissner and the other employee would continue to pursue it. One senior executive in BIG wrote to colleagues:

> I have just come off a call with Leissner, Sikhtian and Shawki, discussing a possible advisory role for GS on a bid for Coastal Energy. The Leissner proposal was to advise a JV of IPIC and Jho Lo, the former providing all the financing. I said I did not think that was acceptable. Sikhtian agreed, partly for business reasons – if GS are to take on this role he would want the engagement letter to be with a 100% IPIC or Aabar owned SPV. Leissner agreed to back off the Jho Lo suggestion which he said had come from the Abu Dhabi side. I warned him I saw no prospect of his getting the Jho Lo proposal signed off but he has the right of appeal if he wants to take that route.

(GS-1MDB-01946101.) Indeed, Leissner structured the deal so that Low could remain as a co-investor. (Leissner Information ¶ 79.)

In January of 2014, Leissner once again introduced yet another Goldman partner to Low to "help set up a meeting with the CEO of Salamander," an energy company Low was interested in buying. (GS-1MDB-00079708.) This deal was eventually dubbed within Goldman as "Project Washington." Goldman's London Office continued to work with Low and Leissner over the next couple of months to try to "execute the proposed acquisition of Salamander Energy led by . . . Jynwel Capital," Low's entity. (GS-1MDB-00079879.)

### E.    Roger Ng

In January 2009, Roger Ng was absolutely involved in introducing Low to others in the bank with an eye toward forging a business relationship between Goldman and Low. However, at that time, neither Ng nor anyone else in Goldman knew that Low had designs on committing fraud and stealing money. What Ng did know about Low, which he regularly shared to others in

---

[19] Vella was involved in Projects Magnolia, Maximus, and Catalyze.

Goldman, was that Low was an advisor to the King of Malaysia. It was also known in Goldman

and in Malaysia generally that Low was advising the King as to the creation of TIA. This fact is

reflected in many of the Goldman emails from January 2009. For instance, on January 18, 2009,

Ng sent an email to multiple people within Goldman as well as to Low in which he states explicitly

"our plan with the advisor to the King (Wynton Group) is as follows:…" In this email, Ng made

it crystal clear that the Wynton Group, Low's company, was the advisor to the King. Moreover,

the email was sent to several people within Goldman and also to Low himself, putting the

recipients on notice that Low was the advisor to the Malaysian King in connection with the creation

of the TIA.

      In the simplest terms, Ng never lied to anyone at Goldman about Low. In fact, when asked

about Low in early 2010, while Low was applying to be a private wealth client of Goldman's

Zurich office, Ng actually said the words, out loud, to his superiors at Goldman that were put into

a Red Flag Summary report, a report circulated at the highest levels of Goldman's legal and

compliance divisions. Ng's words are quoted in the report: "Roger Ng advised caution in accepting

[Low's] claims at face value; and that Ng "did not find [Low's] claims to be credible and

recommended requiring very specific verification of all claims." Perhaps, in part, because of Ng's

warning, Low's initial application to be a private wealth client was rejected.

      In late 2010, Ng moved from Investment Banking to the Securities Division.  In 2012, the

Investment Banking Division requested Ng's involvement with the purchase of the Tanjong power

plant for Project Magnolia. One of the reasons Investment Banking wanted Ng involved is because

the deal required approvals from the Malaysian Central Bank, Bank Negara, for funding involving

guarantee by a Malaysian entity, 1MDB. Ng had prior experience dealing with the Central Bank

on these issues from when he was in the Investment Banking Division. Therefore, Ng was brought

into Project Magnolia and participated in meetings and other preparations because of his experience in dealing with the Bank Negara on issues similar to those faced on this deal.

Ng never stopped being a faithful Goldman employee. He pursued the TIA project in 2009 because as a member of the Investment Banking Division, this was expected of him. He studiously abided by the Goldman chain of command, deferring to his superiors and following company protocol at every step. When Low wanted to pursue being a private wealth client, Ng put Low in touch with the right person. And, then did nothing else. When Goldman asked Ng's opinion about Low, he presciently advised the compliance personnel performing the diligence checks to exercise caution and require specific verification of Low's claims. When the company needed Ng's expertise in dealing with the Malaysian Central Bank in connection with the first bond deal, he was called upon and he rendered assistance. Because the Government stretches the FCPA and Money Laundering statutes as well as venue to their breaking points in order to bring this case, the Indictment suffers from a host of serious problems, as will be set forth below.

III.     **THE INDICTMENT SHOULD BE DISMISSED FOR LACK OF VENUE**

Paragraph 21 of the Declaration of Independence objected to the King of England's unjust practice of "transporting us beyond seas to be tried for pretended offences". The Declaration of Independence para. 21 (U.S. 1776.) The proper venue for a criminal case has been fundamental to our system of justice ever since. Here, there is no allegation that Ng had any knowing or foreseeable connection to the Eastern District of New York. As a result, he cannot be tried here for the crimes alleged in the Indictment because venue does not lie here.

Proper venue "was of such concern that the Constitution of the United States 'twice safeguards the defendant's venue right.'" United States v. Auernheimer, 748 F.3d 525, 532 (3d Cir. 2014) (quoting United States v. Cabrales, 524 U.S. 1, 6 (1998)). Article III requires that "the

28

Trial of all Crimes . . . shall be held in the State where the said Crimes shall have been committed." U.S. Const. art. III, § 2, cl. 3. And the Sixth Amendment further guarantees all defendants a trial "by an impartial jury of the State and district wherein the crime shall have been committed, which district shall have been previously ascertained by law." Id. amend. VI. The Federal Rules codify these guarantees, requiring that "the [G]overnment must prosecute an offense in a district where the offense was committed." Fed. R. Crim. P. 18.

The burden is on the Government to both plead and prove that venue is proper for each count in an indictment. See, e.g., United States v. Beech–Nut Nutrition Corp., 871 F.2d 1181, 1188 (2d Cir. 1989). But venue is not an element of the offense, and so "the government need establish it only by a preponderance of the evidence." United States v. Ramirez, 420 F.3d 134, 139 (2d Cir. 2005).

Proper venue depends on the "nature of the crime alleged and the location of the act or acts constituting it." United States v. Tzolov, 642 F.3d 314, 318 (2d Cir. 2011) (internal quotation marks omitted). For a continuing offense, like the conspiracies charged in the present Indictment, "venue may be proper in more than one location," United States v. Rutigliano, 790 F.3d 389, 395 (2d Cir. 2015), because "venue is proper in any district in which an overt act in furtherance of the conspiracy was committed by any of the coconspirators," even if the defendant was not present in the district. United States v. Geibel, 369 F.3d 682, 696 (2d Cir. 2004).

The Second Circuit, however, has recognized a critical limitation to venue, one that is essential to safeguard Ng's Constitutional rights, since he has been "transported beyond seas" to face charges in Brooklyn, a place he does not know: the "substantial contacts test." The "substantial contacts test" was first set forth in United States v. Reed, 773 F.2d 477 (2d Cir. 1985). The Court of Appeals held that "to determine constitutional venue," a "substantial contacts rule"

is necessary, which "takes into account a number of factors – the site of the defendant's acts, the elements and nature of the crime, the locus of the effect of the criminal conduct, and the suitability of each district for accurate factfinding." Id. at 481. United States v. Svoboda distilled this test into the following formulation: Venue is only proper in a particular district if "(1) the defendant intentionally or knowingly causes an act in furtherance of the charged offense to occur in the district of venue or (2) it is foreseeable that such an act would occur in the district of venue." 347 F.3d 471, 483 (2d Cir. 2003). Here, the Indictment fails to allege that either Ng or any of his purported co-conspirators did either; there is, therefore, no venue in the Eastern District.[20]

The Government will undoubtedly argue that simply because the Indictment alleges that the crimes charged occurred "within the Eastern District of New York and elsewhere," this is sufficient to defeat a motion to dismiss, because "[t]he question of whether there is sufficient evidence to support venue is appropriately left for trial." United States v. Ohle, 678 F. Supp. 2d 215, 231 (S.D.N.Y. 2010). But even taking the allegations in the Indictment as true, as necessary at this stage, it is clear that the "substantial contacts test" cannot be met, and therefore the Court should act now to dismiss a case that has no business in this District.

In United States v. Bezmalinovic, Judge Cederbaum granted a motion to dismiss based on lack of venue in the Southern District of New York. See 962 F. Supp. 435 (S.D.N.Y. 1997). Bezmalinovic was charged with bank fraud conspiracy and other crimes based on a mortgage fraud scheme. See id. at 436. Just like here, it was "undisputed that Bezmalinovic did not commit any acts in furtherance of the scheme in the" District where he was charged. Id. at 436. Rather, the locus of most of the events was the Eastern District of New York. But after Bezmalinovic deposited

---

[20] The EDNY "comprises the counties of Kings, Nassau, Queens, Richmond, and Suffolk and concurrently with the Southern District, the waters within the counties of Bronx and New York." 28 U.S.C. § 112(c).

the proceeds of his fraud scheme in the Eastern District, the bank branch sent the check to its processing center in Manhattan, where the funds were credited to Bezmalinovic's account. Then, the checks were sent to the payor bank's processing center, where they were debited from the payor bank's mortgage closing account. Both banks had their headquarters in Manhattan.

Applying the "substantial contacts test," the Court held that the "only acts alleged to have occurred in the Southern District of New York are the ministerial actions taken by MHT and Chemical Bank in the process of crediting defendant's account. It is not alleged that those acts were intended or foreseen by defendant." Id. at 437. Even though the scheme could not have been successful (applying "but for" causation) without the actions taken in the Southern District of New York, this was not enough under the "substantial contacts test" because "defendant did not intend those acts to take place in the Southern District, nor could he have foreseen that the acts would occur there." Id. at 438. Critically, the Court held that if the Government's position was followed, venue "would have no relation to the acts committed by a defendant, to the foreseeable results of those acts, or to the actual effect of those acts, but only to the inner workings of large financial institutions." Id.

This is exactly the case here. The Eastern District of New York appears exactly five times in the Indictment. The only actions that even conceivably took place in this District were actually far less substantial than even the contacts with the Southern District in Bezmalinovic.

The Indictment alleges the following connections to the Eastern District:

- ¶ 37: "Financial Institution #1" transferred part of the proceeds of the Project Magnolia bond offering to 1MDB's wholly-owned subsidiary, "from a place within the United States to and through a place outside the United States, including through the Eastern District of New York";

- ¶ 45: "Financial Institution #1" transferred part of the proceeds of the Project Maximus bond offering to 1MDB's subsidiary, "from a place within the United States to and through a place outside the United States, including through the Eastern District of New York";

- ¶ 45: "[S]ome of the proceeds" of the Project Maximus bond offering "were diverted and transferred via wire to a place in the United States from and through a place outside the United States, and from a place in the United States to and through a place outside the United States, including through the Eastern District of New York";

- ¶ 63(e): On April 4, 2012, Ng and Leissner allegedly state falsely that Low was not involved in Project Magnolia other than to set up a meeting with an Abu Dhabi official. "The meeting was attended by committee members and others located in New York, New York using U.S. Financial Institution #1's telecommunication facilities, which transited through the Eastern District of New York."; and

- ¶ 63(f): On October 10, 2012, Leissner stated falsely that Low was not involved in Project Maximus. "The meeting was attended by committee members and others located in New York, New York using U.S. Financial Institution #1's telecommunication facilities, which transited through the Eastern District of New York."

In total, we have three allegations of certain proceeds traveling by wire "through" the Eastern District and two allegations that certain "telecommunication facilities" "transited through" the Eastern District. It is important to note what is not alleged here:

- No allegation that Ng ever set foot in the Eastern District.
- No allegation that any other co-conspirator ever set foot in the Eastern District.
- No allegation that anyone else from "Financial Institution #1" ever set foot in the Eastern District.
- No allegation that any recipient of bribe money was in the Eastern District.
- No allegation that any person, in any way connected to the conspiracy, was ever in the Eastern District.
- No allegation that any funds originated in the Eastern District.
- No allegation that any funds ended up in the Eastern District.
- No allegation that any proceeds of the fraud were spent in the Eastern District.
- No allegation that any funds affected any business in the Eastern District.
- No allegation that any meetings were held in the Eastern District.
- No allegation that any planning took place in the Eastern District.

This lack of connection to the Eastern District distinguishes this case from a number of fraud cases in which courts in the Second Circuit have upheld the appropriateness of venue where wire transfers were made through the district at issue. These cases all turned on the foreseeability of actions taking place in the district, or actual transactions that were critical to the "locus of the effect," or the "nature of the crime," happening in the district. For example, in United States v.

32

Riley, a securities fraud conspiracy case, the Court found that venue was proper in the Southern District of New York where the electronic routing of fraudulent trades took place through a brokerage in New York. See Crim. A. No. 13-339 (RPP), 2014 WL 53440 (S.D.N.Y. Jan. 7, 2014). There, the Court analogized the defendants to the defendant in Svoboda – all were "savvy investors," and "therefore, it would have been reasonably foreseeable to the Defendants that their alleged acts would cause trading to occur in the Southern District of New York." Id. at *4.

But it was not just the defendants' sophistication in financial markets that caused venue to be proper; rather, it was also that "[h]ere, the Indictment alleges that Investment Adviser A 'used a prime broker located in New York, New York, among other things, to trade shares,'" and also that the actual trading of the shares that formed the basis of the fraud actually happened in the Southern District. Id. It was "[t]hese allegations, concerning the 'locus of the effect of the criminal conduct' and the 'nature of the crime,' which the Court held are sufficient, at the pretrial stage, to show 'substantial contact with the district.'" Id. at *4 (quoting Reed, 773 F.2d at 481).

This was the same reasoning that animated the Court in Svoboda, where the "savvy" stock-trading defendant could reasonably foresee that his trades would be executed on one of the exchanges located in the Southern District, but also, "[m]ore importantly," the defendant "had actual notice that his trades were being executed on NYSE and AMEX" through the trade confirmations that he received. Svoboda, 347 F.3d at 483–84. See also, e.g., United States v. Kim, 246 F.3d 186, 193 (2d Cir. 2001) (venue proper where it was reasonably foreseeable to defendant that acts in furtherance of the charged offense would occur in the district in question); United States v. Rommy, 506 F.3d 108, 123 (2d Cir. 2007) (venue proper when it was reasonably foreseeable to conspirator that an overt act would occur in the district).

Similarly, in United States v. Rutigliano, 790 F.3d 389, 396 (2d Cir. 2015), the Court upheld venue in the Southern District for mail fraud conspiracy where the co-conspirators mailed "false disability re-certification forms to an . . . address in the Southern District of New York. The coconspirators did so in order to perpetuate their fraud, and thereby secure continued receipt of the disability benefits that were the object of the scheme." Id. at 396. Therefore, the Court held that "'acts constituting the [mail fraud] crime' clearly 'implicate' the Southern District, rendering venue there proper." Id. (quoting United States v. Magassouba, 619 F.3d 202, 205 (2d Cir. 2010)). Critically, though, by their actions, the defendants either did something directed towards the district in question, or at the very least could reasonably foresee that their actions would have some effect in those districts.

Even in cases which have upheld venue on what appear to be slender reeds, foreseeability has been critical to the Courts' analysis – where the defendants intended their actions to take place, or where they could foresee those actions having an impact. For example, in United States v. Ramirez–Amaya, 812 F.2d 813 (2d Cir. 1987), the defendant and his coconspirators had agreed to ship cocaine from Colombia to Westchester County Airport in the Southern District. The Government, however, caused the cocaine to be sent to LaGuardia instead – the flight path of the airplane took it over waters that lay in the Southern District, but it ended up in the Eastern District. On appeal, the defendant argued that venue in the Southern District was improper. The Court of Appeals upheld the conviction largely because of foreseeability: Although "LaGuardia was not the destination intended by the coconspirators, they can hardly complain on this basis, for the airport to which they directed the cocaine, Westchester County Airport, is within the Southern District of New York." Id. at 816. Indeed, Court of Appeals stated that it would be "loath to uphold venue" solely on the basis of an insignificant contact with the Southern District (the flight of the plane

over the waters in the Southern District) if that flight was not intended by the defendants or foreseeable to them.

This case, from the allegations of the Indictment itself, is clearly different. All of the actions that the Government alleges touched the Eastern District were completely unforeseeable to Ng or to any of his co-conspirators. All of these actions were purely "ministerial," as they involved solely how electronic pulses moved through wires. None of the wires were either initiated by anyone in the Eastern District nor terminated in the Eastern District – and their effects were not felt in the Eastern District. It could therefore not be foreseeable to Ng that attending a virtual meeting with people in the Southern District while he was overseas would cause the "telecommunication facilities" of Goldman to pass through the Eastern District. Ng was in Asia at the time of the meetings listed. It would be more logical that the wires containing the communications for those meetings would head west from Manhattan – through the mainland of the United States, and under the Pacific Ocean. Any of the other cardinal directions would be just as likely for those wires as east. The wire transfers representing the bond deals' proceeds similarly could not have been foreseen to have any effect in the Eastern District: Ng certainly might have foreseen that such communications would originate in the Southern District, where Goldman's headquarters is located – but why the Eastern District?

It is beyond question that holding Ng's trial in the Eastern District will result in a hardship for him and will prejudice him. See Rutigliano, 790 F.3d 389, 399-400 (2d Cir. 2015) (substantial contacts test "inquiry is made only if the defendant argues that his prosecution in the contested district will result in a hardship to him, prejudice him, or undermine the fairness of his trial." (internal quotation marks and alterations omitted)). As counsel has indicated repeatedly, there are witnesses and documentation in Malaysia, Singapore and Shanxi Province in China that are

directly relevant to the allegations in the Indictment. If the substance of this witness testimony and documentation are as counsel has been led to believe, such information would be not only relevant but potentially dispositive of certain aspects of the charges against Ng. As counsel has stated on the record, due to the Covid-19 pandemic, counsel cannot travel to these locations due to full travel bans imposed by the United States, Malaysia and Singapore. The Malaysian travel ban has been extended until December 31, 2020. As a result of this unprecedented situation where U.S. persons are literally not permitted to travel to the locations where witnesses and documents central to the case are located, the venue issue in this case is far from an academic matter. That electrical impulses may have passed beneath New York harbor at some point must give way to the far more tangible concern that a man facing prison in a country utterly foreign to him is unable to defend himself because his lawyer is prevented from traveling to interview witnesses and collect documents in a timely fashion and possibly at all. The unfairness of trying Ng here is especially acute given that he is charged with similar crimes and identical conduct by the Attorney General's Chamber of Malaysia.

Even aside from the stark unfairness of trying Ng here given the circumstances, the Court appears to have recognized the problem of venue in this matter already. In both of the pleas taken by the Court, the Court has, sua sponte, asked if the defendants waived their venue rights. For example, at Leissner's plea hearing, the Court stated:

> That even though it appears most of the conduct took place in the Southern District of New York, the Government's argument is that the use of interstate wire is sufficient for venue in the Eastern District of New York. But to the extent that there are any issues, that you would waive challenge to venue . . . and agree to venue here in the Eastern District of New York.

(Leissner, 18 Cr. 439 Dkt. 47-1 (Leissner Plea Tr.) at p. 41-42.) In the hearing in which Goldman Sachs Malaysia pled guilty and Goldman Sachs Group entered a DPA, the Court similarly raised the issue of venue, and ensured that the defendants waived their venue rights. Such waiver was the

choice of those defendants – but it is not Ng's choice. He has no connection to the Eastern District; his alleged crimes have precious little to do with the Eastern District; and certainly he never could have imagined any of the actions that he or his co-conspirators took – even accepting all of the Government's allegations as true, which they are not – could have taken place in the Eastern District or have had any effect on the Eastern District.

The Founders took venue extremely seriously, and enshrined those concerns in the Constitution twice. They would be shocked, on these facts, to see this case to go forward in Brooklyn. The Indictment should be dismissed for lack of venue.

## IV. THE FIRST OBJECT OF COUNT ONE, CHARGING DEFENDANT WITH BEING AN EMPLOYEE OR AGENT OF AN ISSUER, SHOULD BE DISMISSED BECAUSE THE INDICTMENT, AS ALLEGED, HAS ELIMINATED AN ESSENTIAL ELEMENT OF THAT OFFENSE

The Indictment does not allege that Ng was an agent of, or employed by, an actual issuer of U.S. Securities. Instead, the Indictment creates a legal fiction called U.S. Financial Institution #1. By creating U.S. Financial Institution #1 as an artificial combination of different business entities, one of which (Goldman Sachs Group, Inc.) is an issuer of U.S. securities and others of which (including Ng's actual employers) are not, the Government relieves itself of having to prove the statutory element that Ng must be an employee or an agent of an issuer. The first object of Count One charges Ng with conspiring to violate the Foreign Corrupt Practices Act ("FCPA"), contrary to Title 15, United States Code, Sections 78dd-1, 78ff(a), and 78ff(c)(2)(a), in violation of Title 18, United States Code, Section 371. (Ind. ¶ 59(a).) Section 78dd-1, commonly known as the "issuer" prong of the FCPA's bribery statute, makes it unlawful "for any issuer . . . or for any . . . employee, or agent of such issuer" to corruptly use means of interstate commerce in furtherance of a bribery scheme. 15 U.S.C. § 78dd-1(a). Therefore, one element of an "issuer" FCPA violation alleged against an individual is that the defendant is an "employee[] or agent" of an "issuer." An

"issuer" is defined as "any person who issues or proposes to issue any security." 15 U.S.C. § 78c(a)(8). The FCPA, however, further restricts the definition of the term – and therefore further restricts the universe of people who can be held liable under the FCPA's bribery provision – to only an "issuer" "which has a class of securities registered pursuant to section 78l of [Title 15] or which is required to file reports under section 78o(d) of [Title 15]." See 15 U.S.C. § 78dd-1(a).

The problem with the Indictment is that it invented "Financial Institution #1," a made-up entity that does not exist. Paragraph 3 of the Indictment reads in full:

> U.S. Financial Institution #1 was a global investment banking, securities and investment management firm incorporated in Delaware and headquartered in New York, New York. It conducted its activities primarily through various subsidiaries and affiliates (collectively "U.S. Financial Institution #1"), including those that employed the defendant ROGER NG and some of his co-conspirators, including Co-Conspirator #1. U.S. Financial Institution #1 had a class of securities registered pursuant to Section 12 of the Securities and Exchange Act of 1934 (Title 15, United States Code, Section 78) (the "Exchange Act") and was required to file reports with the U.S. Securities and Exchange Commission under Section 15(d) of the Exchange Act (Title15, United States Code, Section 78o(d)). As such, U.S. Financial Institution #1 was an "issuer" within the meaning of the FCPA, Title 15, United States Code, Section78dd-l(a).

Although this definitional paragraph may seem innocuous on its face, it has the effect of eliminating the Government's obligation to plead (and later, to prove) an essential element of an FCPA "dd-1" bribery charge, specifically that Ng was an employee or agent of an "issuer." This is because "Financial Institution #1," as defined by the Indictment, is not a single, actual "issuer" of securities, as the FCPA requires. Accordingly, no jury can determine Ng guilty of conspiracy to violate the FCPA as the agent of an "issuer," because no actual "issuer" of securities is set forth in the Indictment.

Goldman has scores of entities, employing people around the world, that do not issue U.S. securities. By way of illustration, Goldman's 2019 Form 10-K lists 93 different entities on Exhibit 21.1 – "Significant Subsidiaries of the Registrant" – everything from "Titanium Luxco 2

S.A.R.L.," organized under the laws of Luxembourg, to "Goldman Sachs LLC," a Mauritian entity, to "Sphere Fundo De Investimento Multimercado — Investimento No Exterior Credito Privado," organized under the laws of Brazil. See Goldman Sachs 2019 Form 10-K (February 20, 2020), Ex. 21.1. Nowhere, though, does the Indictment even name the entity that actually employed Ng during a majority of the timeframe covered by the Indictment.

In addition to simply not identifying the Goldman entity employing Ng, the Indictment is both inconsistent and hopelessly imprecise in how it describes his employment. The introductory paragraph of the Indictment states that Ng "was employed as a managing director by various subsidiaries, and acted as an agent and employee, of U.S. Financial Institution #1." (Ind. ¶ 2.) Later in the same paragraph, the Indictment states, "Ng was thus an 'employee' and 'agent' of an 'issuer' within the meaning of the Foreign Corrupt Practices Act ("FCPA"), Title 15, United States Code, Section 78d-1(a)." Id. There is a significant amount of daylight between these two sentences, though. The Indictment is internally inconsistent, and it is inconsistent in a way that affects Ng's Constitutional rights. Paragraph 2 does nothing to describe what made Ng an agent or employee of an "issuer." Rather, it alleges only that Ng "acted" as an agent and employee of Financial Institution #1. It implicitly acknowledges, then, that Ng was not actually an employee of Financial Institution #1, even if that was actually an entity that had employees – instead, he "was employed" by the subsidiaries, but "acted as" an employee or agent of the parent, Financial Institution #1. Therefore, the Indictment, by its own words, recognizes a distinction between the employees of the subsidiaries and the entity itself. One is not "employed" by one entity and "acting as" an employee of another – one is either an employee or not an employee.

Paragraph 16 has yet another formulation: it accuses Ng of taking actions "while Ng was acting within the scope of his employment as an agent of U.S. Financial Institution #1." (Ind. ¶

16.) So now, Ng is <u>not</u> accused of being an employee of U.S. Financial Institution #1 at all – just an agent. Paragraph 20 has still another description: It states, "ROGER NG, Co-Conspirator #1 and other employees and agents of Financial Institution #1 . . . ." (Ind. ¶ 20.) This paragraph is unclear – it could be alleging that Ng is an "employee and agent," or it could not be refering to Ng as either an employee or an agent, but just to some other group of "employees and agents" of Financial Institution #1.Then, in paragraph 21, the Indictment claims that Ng, along with Leissner, "were both agents acting within the scope of their employment <u>on behalf of</u> Financial Institution #1." (Ind. ¶ 21.) (emphasis added). Paragraph 28 shifts yet again: it states that "ROGER NG told another employee of U.S. Financial Institution #1 . . ." about Low's bribery plan. So now, Ng is not an agent at all – here he is just an "employee." Finally, in the charging paragraph, 59(a), the Government calls Ng "an employee and agent of an issuer." (Ind. ¶ 59(a).)

The Government's description of Ng's employment and agency status thus shifts multiple times even within the course of its own charging document. It seems clear (and will become apparent at trial) that what the Government calls "Financial Institution #1" is a group of entities that have been formed for very particular reasons – to minimize taxation, to maximize profits, to escape liability or in response to the local laws in which the entity is located. One example of this slipperiness is wholly apparent to the Court – for the Court saw on October 22, 2020 how the "GOLDMAN SACHS GROUP, INC." avoided criminal liability and allowed another entity, "Goldman Sachs (Malaysia) Sdn. Bhd."  ("Goldman Malaysia"), not domiciled in the United States, to take the fall for its own alleged role in the 1MDB heist. Why is it that Goldman can use its corporate structure as a shield to avoid liability, and the Government can use that very same structure as a sword against Ng? Perhaps this accounts for some of the Indictment's clear ambivalence about how to characterize Ng.

Moreover, Paragraph 1 of the Information entered on October 22 uses a completely different set of defined terms than Ng's Indictment. In the Information, the Government defines "GOLDMAN SACHS GROUP, INC." as just one part of a larger entity – "'Goldman' or the 'Company' – which is comprised of a whole combination of entities: "GOLDMAN SACHS GROUP, INC.," as well as "its wholly-owned subsidiaries and affiliated entities." (Goldman Information ¶ 1.) Critically, the Information describes only GOLDMAN SACHS GROUP, INC. as "an 'issuer' as that term is used in the FCPA." Id. Accordingly, the Information concedes that the "wholly-owned subsidiaries and affiliated entities" – the only entities for whom Ng ever worked – are not "issuers" as defined by the FCPA.

The Indictment's ever-changing definition of Ng's employment status, though, does not do what it must: Allow the jury – not the Government – to decide the element of Ng's employment or agency status. It is the jury, not the Government, who has to be allowed to decide whether Ng worked for an "issuer" of securities, or whether an "issuer" of U.S. securities exercised the necessary control over Ng's functions so that he could properly be deemed an agent of that issuer. What the Indictment in this case effectively accomplishes is to permit the Government to "deem" Ng an employee and an agent of an issuer, not because the jury found such to be a fact beyond a reasonable doubt, but by the way the Government constructed "U.S. Financial Institution #1".

It is elementary that "[a]n indictment must set forth each element of the crime that it charges." Almendarez–Torres v. United States, 523 U.S. 224, 228 (1998); see also United States v. O'Brien, 560 U.S. 218, 224 (2010) ("Elements of a crime must be charged in an indictment . . . ."). This is because "[t]he Constitution gives a criminal defendant the right to have a jury determine, beyond a reasonable doubt, his guilt of every element of the crime with which he is

charged." United States v. Gaudin, 515 U.S. 506, 522–23 (1995); see also Jones v. United States, 526 U.S. 227, 232 (1999).

"An indictment that fails to allege the essential elements of the crime charged offends both the Fifth and Sixth Amendments." United States v. Pirro, 212 F.3d 86, 92 (2d Cir. 2000). Such a failure offends the Fifth Amendment because "[i]f the indictment does not state the essential elements of the crime, the defendant cannot be assured that he is being tried on the evidence presented to the grand jury, or that the grand jury acted properly in indicting him." Id. (citation omitted). The "factual particularity" called for by the Indictment Clause "requires that an indictment contain some amount of factual particularity to ensure that the prosecution will not fill in elements of its case with facts other than those considered by the grand jury." United States v. Walsh, 194 F.3d 37, 44 (2d Cir. 1999). "To allow the prosecutor, or the court, to make a subsequent guess as to what was in the minds of the grand jury at the time they returned the indictment would deprive the defendant of a basic protection which the guaranty of the intervention of a grand jury was designed to secure." Russell v. United States, 369 U.S. 749, 770 (1962). In addition, if an Indictment does not allege an element of an offense properly, a jury cannot determine a defendant's guilt beyond a reasonable doubt on that element, as Gaudin requires. And, an indictment that does not properly state the elements of the offense with particularity also violates the Sixth Amendment because the defendant will not "be informed of the nature and cause of the accusation" against him. See Russell, 369 U.S. at 761 (quoting U.S. Const. Amend. VI); see also Pirro, 212 F.3d at 92; Walsh, 194 F.3d at 44.

"Because the requirement of a sufficient indictment serves these important purposes, the indictment must be considered as it was actually drawn, not as it might have been drawn." Pirro, 212 F.3d at 92 (citing Sanabria v. United States, 437 U.S. 54, 65–66 (1978) ("The precise manner

in which an indictment is drawn cannot be ignored . . . .")). Moreover, "[t]he timing of the defendant's objection [to the Indictment] is important to the level of scrutiny employed." Id. When, as Ng does in this motion, a defendant raises a defect in an indictment pretrial, that defendant "is entitled to a more exacting review of the indictment than one who waits until after trial to object." Id. (citing United States v. Goodwin, 141 F.3d 394, 401 (2d Cir. 1997); United States v. Wydermyer, 51 F.3d 319, 324–25 (2d Cir. 1995)).

Undoubtedly, the Government will respond that Rule 7(c)(1)'s requirements are minimal; that they have recited the language of allegations, that agency is a highly factual determination, and that all of Ng's arguments must therefore be left to the jury to decide. But that is not the argument here – it is a matter of the Government's Indictment assuming the existence of one of the elements that the jury must find, thus removing that requirement from the jury. The jury must be permitted to determine whether or not Ng, who while employed by Goldman Sachs Labuan or Goldman Sachs Malaysia or other entities, was, at the same time, an agent or employee of "Goldman Sachs Group, Inc.," an issuer of U.S. securities. This Indictment removes this issue from the consideration of the jury by eliminating the differences between different Goldman entities and "deems" them all to be tantamount to U.S. issuers. Simply put, this violates Ng's right to have a jury pass on each and every element of the first object of Count One. This is precisely what Gaudin prohibited when it enunciated the hornbook proposition that "[t]he Constitution gives a criminal defendant the right to have a jury determine, beyond a reasonable doubt, his guilt of every element of the crime with which he is charged," and why the Supreme Court reversed the trial court: "The trial judge's refusal to allow the jury to pass on the 'materiality' of Gaudin's false statements infringed that right." Gaudin, 515 U.S. at 522–23. Because the first object crime of Count One violates the U.S. Constitution, it must be dismissed.

43

V.  **COUNT TWO MUST BE DISMISSED BECAUSE THE INDICTMENT FAILS TO ALLEGE THAT NG CONSPIRED TO CIRCUMVENT A SET OF INTERNAL ACCOUNTING CONTROLS COGNIZABLE UNDER THE FCPA**

Count Two charges that Ng conspired with others to circumvent the internal accounting controls of an "issuer." Read properly, the statutory text focuses on whether an individual circumvented the financial accounting of the transactions and assets of a company deemed an "issuer" under the FCPA. Those who conspire to pay bribes generally use their company's funds, and conceal the nature of the payments by describing them in the company's books and records as legitimate business expenses. In such circumstances, internal accounting controls are circumvented because those examining the company's assets and liabilities would not be able to discover the illegal bribe. For example, if a Goldman employee used Goldman funds to pay a bribe and then accounted for the bribe as a legitimate (as opposed to illegal) expenditure, that would violate the law.

Even the Government must to admit that nothing of the sort happened in this case. Rather, the bribes alleged in this case were paid from stolen 1MDB funds, not Goldman funds. These bribes did not involve any of Goldman's funds and therefore had nothing to do with Goldman's internal accounting controls.

By charging Ng in Count Two with conspiring to circumvent Goldman's internal accounting controls, the Government seeks to radically expand the term "internal accounting controls" to encompass factors wholly unrelated to the financial accounting of Goldman's assets and transactions. Even viewing the facts in the light most favorable to the Government, its theory

of Count Two is plainly inconsistent with the text, the context, and the intent of the internal accounting controls provision of the FCPA and should be dismissed.[21]

### A. The Statutory Text and Objectives of the Internal Accounting Control Provision

Count Two is charged under 15 U.S.C. § 78m(b)(2), which provides as follows:

> Every issuer which has a class of securities registered pursuant to section 78l of this title and every issuer which is required to file reports pursuant to section 78(d) of this title shall –

(A)   make and keep books, records, and accounts, which in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the issuer;

(B)   devise and maintain a system of internal accounting controls sufficient to provide reasonable assurances that –

　　(i)   transactions are executed in accordance with management's general or specific authorization;

　　(ii)   transactions are recorded as necessary

　　　　(I)   to permit preparation of financial statements in conformity with general accepted accounting principles or any other criteria applicable to such statements, and

　　　　(II)   to maintain accountability for assets;

　　(iii)   access to assets is permitted only in accordance with management's general or specific authorization; and

　　(iv)   the recorded accountability for assets is compared with the existing assets at reasonable intervals and appropriate action is taken with respect to any differences . . . .

15 U.S.C. §§ 78m(b)(2)(A), (B).

---

[21] Note, too, that like in Count One, Count Two fails to identify the precise "issuer" whose accounting controls were allegedly circumvented. Again, the Indictment is silent regarding what specific company employed Ng and what factual connection that company might have to an actual "issuer" of U.S. securities.

Subsection (2)(A) refers specifically to "transactions and dispositions of the assets of the issuer," not of some other random entity. This is because this "record-keeping" provision has three basic objectives:

> (1) books and records should reflect transactions in conformity with accepted methods of reporting economic events, (2) misrepresentation, concealment, falsification, circumvention, and other deliberate acts resulting in inaccurate financial books and records are unlawful, and (3) transactions should be properly reflected on books and records in such a manner as to permit the preparation of financial statements in conformity with GAAP and other criteria applicable to such statements.

World-Wide Coin Invs., Ltd., 567 F. Supp. at 748.[22] These objectvies only make sense in the context of an "issuer" keeping records of its own transactions and assets, not those of another entity.

The next provision, the internal accounting control provision under subsection (2)(B), also refers to "transactions" and "assets." Much like with the record-keeping provision, the internal accounting controls provision only makes sense when addressing the transactions and assets of the issuer itself, not some other company. This is because the "internal controls requirement is primarily designed to give statutory content to an aspect of management stewardship responsibility, that of providing shareholders with reasonable assurances that the business is adequately controlled." World-Wide Coin, 567 F. Supp. at 750. As these shareholders are shareholders of the issuer, they need reasonable assurances that the issuer, not some other company, is adequately controlled.

Moreover,

> Internal controls safeguard assets and assure the reliability of financial records, one of their main jobs being to prevent and detect errors and irregularities that arise in the accounting systems of the company. Internal accounting controls are basic

---

[22] This Northern District of Georgia case is one of the few discussing this provision.

indicators of the reliability of the financial statements and the accounting system and records from which financial statements are prepared.

Id. Again, the emphasis is on the accounting system and financial statements of the issuer, not a different company.

These objectives are crystalized in the specific requirements of the internal accounting control provision. For example, subsection (2)(B)(ii) refers to transactions that are "recorded as necessary (I) to permit preparation of financial statements . . . and (II) to maintain accountability for assets." This only makes sense if it is referring to the financial statements and assets of the actual company doing the recording – the "issuer." In other words, if the issuer itself is not engaging in a transaction that could appear on its own financial statement or if there is no use of the issuer's own assets, this section does not apply for the simple reason that such would not be within the purview of the issuer's "internal accounting controls."

Similarly, subsection (2)(B)(iii) states, "access to assets is permitted only in accordance with management's general or specific authorization." The assets being discussed here are the assets of the issuer itself and not the assets of another company. Plainly, management of one company lacks authorization over another company's assets. Therefore, the term "assets" means the assets of the issuer; not the assets of some other entity.

The same is true for subsection (2)(B)(iv), which states, "the recorded accountability for assets is compared with the existing assets at reasonable intervals and appropriate action is taken with respect to any differences." This section imposes on an issuer an affirmative obligation to record its own assets and to compare its own assets at different points in time so as to discern whether the issuer's assets could be getting diverted as part of a bribery scheme. The point again is that the term "assets" refers solely to the assets of the issuer.

47

From all of these internal accounting control requirments, it is evident that the FCPA's internal accounting control provision applies only to the transactions and assets of the issuer, not some other company. Consequently, as explained below, Count Two must fail because the allegations against Ng do not involve a Goldman transaction or its assets and therefore Ng could not have violated, nor have conspired to violate, the FCPA's internal accounting control provision.

### B.    Count Two's Allegations Do Not Relate to Goldman's Assets

The factual allegations that Ng conspired to circumvent Goldman's internal accounting controls are contained in Paragraphs 19-23 and Paragraph 63. None of these allegations relate to Goldman's internal accounting, an internal accounting of a Goldman transaction or its assets. That Low was involved in the bond deals may have been a compliance issue, but it was certainly not an internal accounting issue, as neither Low nor any other co-conspirator was paid a penny as part of a Goldman transaction or from Goldman's assets. Accordingly, the Government has failed to allege how Goldman funds, assets or financial resources (i.e., the type of financial data that would be reflected in a financial statement) are implicated in Low's being involved or not involved in the three bond deals or in Project Tiara (the TIA project). Moreover, it is equally clear Goldman did not itself engage in any transaction (i.e., an exchange or transfer of goods, services or funds[23]) related to the bribes that should have been recorded on a financial statement related to its assets.

Similarly, because the bribes were paid from 1MDB's funds and not Goldman's assets (as the Government must concede), the bribes had no connection to Goldman's internal accounting controls. The Government has therefore not alleged how the prospect of Low bribing foreign officials with money not belonging to, or otherwise appearing on the books of, Goldman impacts

---

[23] Merriam-Webster defines "transaction" as "something transacted, especially: an exchange or transfer of goods, services or funds."

upon Goldman's accounting controls. In short, the Government fails to identify any funds, assets or transactions of or relating to Goldman that were falsified, altered or impacted in any way so as to effect the company's accounting controls.

The closest the Government comes to identifying an internal control (albeit not accounting related) is to identify the compliance and legal groups within Goldman. However, a compliance group is not an accounting control any more than a law enforcement agency is a law. An accounting control plainly is not a group; rather, it is a protocol concerning the identification, management and disposition of the issuer's assets. And, when the Government suggests that an accounting control could be a group, the Government is all but conceding there is no accounting control concerning the assets of Goldman that pertain to this situation. This undoubtedly why the Information filed against Goldman does not charge violations of the FCPA's internal accounting controls provision.

If any internal accounting controls were circumvented in this case, it could only have been those of 1MDB as the funds to pay the bribes were taken for 1MDB assets. This would not violate the FCPA, however, because, as noted above, the FCPA's internal accounting controls provision applies only to an issuer (like Goldman), which 1MDB is not. Because Goldman did not have internal accounting controls related to the assets or transactions of 1MDB, nor could it have such controls, Ng could not have conspired to circumvent Goldman's internal accounting controls and Count Two must be dismissed.

### C. Prior Applications of the Internal Accounting Control Provision Do Not Square with the Allegations in Count Two

In addition to being inconsistent with the FCPA's text, the Government's theory of Count Two is also inconsistent with the Government's own Resource Guide To The U.S. Foreign Corrupt Practices Act (the "Resource Guide") (2d ed. July 2020). The Resource Guide specifically limits

application of the internal accounting controls provision to accounting controls regarding "the firm's assets." The Resource Guide states that "under the 'internal controls' provision, issuers must devise and maintain a system of internal accounting controls sufficient to assure management's control, authority, and responsibility over the firm's assets." (Resource Guide at 38) (emphasis added). Reinforcing this notion, the Resource Guide further states, "the accounting provisions require that all public companies account for all of their assets and liabilities accurately and in reasonable detail . . . ." (Id.)

As noted above, there has never been a criminal case where a defendant was convicted for violating his company's internal accounting controls when it was undisputed that his company did not engage in a transaction concerning its own funds. The reason there has never been such a case in the 43-year history of the Foreign Corrupt Practices Act is because the Government's theory underlying Count Two is patently unsound for the reasons set forth above.

To date, every existing criminal violation of the internal accounting controls provision of the statute involved an affirmative falsification of some record, document or piece of information that was maintained by the issuer and involved the company's assets, such that it could be reflected on the issuer's financial statement. For instance, in a recently-filed indictment entitled United States v. Yanliang Li, S.D.N.Y. 19 Cr. 760, the Government alleged that certain defendants "obtained reimbursement for the bribes from China Subsidiary through false expense claims designed to conceal the true nature of the expenditures at issue." The act of falsifying expense claims would be a clear example of circumventing internal accounting controls because the company's expense claims would be included in the issuer's financial statement as part of accounting for the issuer's assets. By falsifying something that would be reflected in the issuer's basic accounting, the defendant circumvented that issuer's internal accounting controls. The key

50

difference between the indictment in <u>Yanliang</u> and the one here is that the defendant there allegedly engaged in conduct that would directly impact the accounting controls of the company.

Another example of an Indictment charging a violation of the internal accounting control provision is <u>United States v. Gordon J. Coburn et al.</u>, Crim. A. No. 19-120 (D.N.J., Feb. 14, 2019), Dkt. 1. There, the Indictment alleged that a co-conspirator instructed a second co-conspirator who was a member of Cognizant's real estate group to "create a fake version of the claims list – one that replaced the $3.7 million 'approvals/campus regularization' request with eleven previously-rejected claims worth roughly the same amount." (<u>Id.</u> at ¶ 24.) As with <u>Yanliang</u>, the <u>Coburn</u> Indictment charged that the defendants created false documents which caused the assets and transactions of the issuer to be depicted falsely, which in turn would result in the accounting controls being circumvented.

In the case of <u>United States v. Och-Ziff Capital Management Group, LLC</u>, E.D.N.Y. 16 Cr. 516,[24] the company falsified its own records related to the retention and nature of services of, and payments to, an intermediary in Libya so as to conceal the illicit nature of the payments. Again, the defendant was allegedly involved in falsifying payments of the company, which would be reflected in the company's basic accounting.

In another EDNY case, <u>United States v. Peterson</u>, Crim. A. No. 20-224 (E.D.N.Y. Apr. 25, 2012) Dkt. 7, the managing director of Morgan Stanley's Real Estate's Shanghai office, was indicted for conspiring to circumvent internal accounting controls by having a Morgan Stanley real estate fund sell a percentage of a building it owned to a Chinese government official who had helped Morgan Stanley purchase the building. To hide the government official's reduced-rate

---

[24] The matter was resolved with a DPA for the company. Neither the company nor any of its executives were convicted.

investment, the defendant and others misrepresented the transaction to Morgan Stanley's compliance department to make it seem as if a Chinese government instrumentality, (which had been previously vetted by the compliance department) was investing and not the government official personally. To do so, the defendant repeated to Morgan Stanley numerous times, before, during and after the transaction, that the government entity itself was investing in the building.

Because the defendant concealed the government official's personal investment, Morgan Stanley allowed the investment—which led to an immediate paper profit of $2.88 million to the government official—and caused Morgan Stanley to pay distributions to the government official from its own assets. Ultimately, the defendant circumvented Morgan Stanley's internal accounting controls by having the company's accounting list the transaction with the wrong entity and having the company's asset accounting wrongly list the distributions as going to the government instrumentalilty instead of the government official. This scenario is vastly different from Ng's case as the defendant in Peterson circumvented Morgan Stanley's internal accounting controls as it related to a Morgan Stanley's own transaction and assets. Here, as noted above, Ng is charged with circumventing Goldman's internal accounting controls even though the alleged bribes did not involve Goldman's own transactions and assets.

These cases show the disparity between how the DOJ has enforced the FCPA's internal accounting controls in the past and how they are trying to force the square peg of the provision into the round hole of this case.

    **D.**    **Because the Alleged Bribes Did Not Relate to a Goldman Transaction or Its Assets, the Internal Accounting Controls Provision Is Unconstitutionally Vague And Must Be Dismissed**

In the event this Court finds the internal accounting controls provision could still apply even though the charged conduct did not relate to a Goldman transaction or its assets, such

definition would cause the provision to be unconstitutionally vague as applied to Ng. By charging this offense despite acknowledging that no assets of the issuer were involved, the Government strips the term "internal accounting controls" of any semblance of meaning, scope and content. The result is a statute that when applied to these facts "fails to give ordinary people fair notice" of what is proscribed and becomes "so standardless that it invites arbitrary enforcement." Johnson v. United States, 576 U.S. 591, 595 (2015); see also Smith v. Goguen, 415 U.S. 566, 578 (1974) (a criminal law provides constitutionally deficient notice where it lacks "any ascertainable standard").

Because we are arguing that the statute is unconstitutionally vague as applied, a closer review of the precise factual allegations is warranted. See United States v. Mazurie, 419 U.S. 544, 550 (1975) ("Vagueness challenges to statutes which do not involve First Amendment freedoms must be examined in light of the facts of the case at hand."); United States v. Rybicki, 354 F.3d 124, 129 (2d Cir. 2003) (en banc) ("[W]hen . . . the interpretation of a statute does not implicate First Amendment rights, it is assessed for vagueness only as applied, i.e., in light of the specific facts of the case at hand and not with regard to the statute's facial validity." (internal quotations omitted)).

As detailed above, Count Two's allegations against Ng do not relate to a Goldman transaction or its assets. Rather, the Indictment alleges that Ng and others conspired to keep Low's involvement in the bond deals a secret from Goldman. The term "internal accounting controls" has a settled legal and historical meaning only when it applies to the transactions and assests of the issuer employing the internal accounting controls. Once the term is decoupled from an accounting of the issuer's assets and transactions, the term becomes endlessly expansive. It could be applied, as the Government applies it here, to virtually any eventuality facing a company, be it risk

management, general compliance, or best practices. Once the core definition of the term changes
and expands to cover generalized notions of compliance and risk-management, for instance, it
stops being a principle of accounting with a fixed, knowable, definitive meaning. Untethered from
accounting, the term can apply to any number of situations that may impact the financial condition
of the firm. Sex scandals, undisclosed illness of a CEO, political instability, and rising seas can all
impact an issuer's bottom line. But that does not make these possibilities issues concerning the
firm's internal accounting controls.

The Supreme Court has ruled that "[v]agueness may invalidate a criminal law for either of
two independent reasons. First, it may fail to provide the kind of notice that will enable ordinary
people to understand what conduct it prohibits; second, it may authorize and even encourage
arbitrary and discriminatory enforcement." City of Chicago v. Morales, 527 U.S. 41, 56 (1999);
Rybicki, 354 F.3d at 134 (same); see also Kolender v. Lawson, 461 U.S. 352, 357 (1983) ("As
generally stated, the void-for-vagueness doctrine requires that a penal statute define the criminal
offense with sufficient definiteness that ordinary people can understand what conduct is prohibited
and in a manner that does not encourage arbitrary and discriminatory enforcement.").

Both reasons apply in this case. In evaluating the first basis, the Supreme Court has noted:
"because we assume that man is free to steer between lawful and unlawful conduct, we insist that
laws give the person of ordinary intelligence a reasonable opportunity to know what is prohibited,
so that he may act accordingly. Vague laws may trap the innocent by not providing fair warning."
Grayned v. City of Rockford, 408 U.S. 104, 108 (1972). The Court of Appeals has held "that notice
is insufficient if lay persons are required to "perform[] the lawyer-like task of statutory
interpretation by reconciling the text of [ ] separate documents." Chatin v. Coombe, 186 F.3d 82,

89 (2d Cir. 1999) (invalidating a prison administrative prohibition as unconstitutionally vague as applied).

Here, a person of ordinary intelligence reading the FCPA's internal accounting control provision would believe that it applies only to accounting of an issuer's transactions and assets. Nothing in the provision's text indicates that it would extend beyond these accounting-related matters to also include an issuer's compliance preferences. As such, the statute, as applied in this case, failed to provide notice to Ng that he would have violated the FCPA's internal accounting controls by not informing Goldman that Low was involved in the bond deals.

In considering the second factor, the Second Circuit has noted: "An enactment fails to provide sufficiently explicit standards for those who apply it when it 'impermissibly delegates basic policy matters to policemen, judges and juries for resolution on an ad hoc and subjective basis.'" Chatin, 186 F.3d at 89 (quoting Grayned, 408 U.S. at 108-09.)

Even under the standard interpretation, the internal accounting control provision is "highly subjective"; as one court has noted:

> The main problem with the internal accounting controls provision of the FCPA is that there are no specific standards by which to evaluate the sufficiency of controls; any evaluation is inevitably a highly subjective process in which knowledgable individuals can arrive at totally different conclusions. Any ruling by a court with respect to the applicability of both the accounting provisions and the internal accounting control provisions should be strictly limited to the facts of each case.

World-Wide Coin, 567 F. Supp. at 751. The subjective enforcement of this provision is far more dangerous under the Government's theory in this case because, once the internal accounting controls provision is untethered from accounting, there is no limit to how far prosecutors can expand the term. As noted above, the prosecutors could apply the provision to anything that has an effect on the financial condition of an issuer, no matter how far attenuated from the firm's accounting.

Limited to accounting-relating issues, the internal accounting controls provision, although "highly subjective," may still pass constitutional muster. That, however, is a case for another day. The problem in this case is that once the Government untethered the internal accounting controls provision from accounting – as it has done to include compliance and general business practices under the rubric of accounting – the statute becomes unconstitutionally vague. In this respect, the internal accounting provision is similar to the honest services doctrine that was addressed by the Supreme Court in <u>Skilling v. United States</u>, 561 U.S. 358 (2010). There, the Supreme Court found that honest services fraud, 18 U.S.C. § 1346, was not unconstitutionally vague in defining the term "scheme or artifice to defraud" to include a "scheme or artifice to deprive another or the intangible right of honest services" only if the statute was limited solely to bribery and kickback schemes. Once the statute was expanded further, as the Government tried to do in <u>Skilling,</u> it became unconstitutionally vague. <u>See</u> <u>Skilling</u>, 561 U.S. at 368 ("Congress intended at least to reach schemes to defraud involving bribes and kickbacks. Construing the honest-services statute to extend beyond that core meaning, we conclude, would encounter a vagueness shoal.").

Here, too, because the Government has expanded the internal accounting controls provision beyond its core meaning to include non-accounting-related controls, this Court should find that the Government's Count Two theory renders the internal accounting provision unconstitutionally vague as applied to Ng. Count Two should therefore be dismissed.

## VI.    COUNT THREE SHOULD BE DISMISSED FOR FAILURE TO PROVIDE WHAT THE CONSTITUTION REQUIRES OF AN INDICTMENT AND BECAUSE ONE OF ITS PREDICATES CANNOT BE A SPECIFIED UNLAWFUL ACTIVITY FOR MONEY LAUNDERING UNDER THE "REFERENCE CANON"

Count Three fails utterly to provide adequate notice to Ng and therefore fails to clear even the low bar set by Federal Rule 7(c)(1). This failure violates several of Ng's Constitutional rights and cannot be salvaged by a bill of particulars. Count Three should therefore be dismissed.

Count Three is remarkable both for the scope of its ambition and the depth of its failure. It alleges a single money laundering conspiracy with three very different, very complex, money laundering statutes as objects. But Count Three does not include even a single factual allegation of its own. Rather, Count Three consists solely of a rote recital of statutory language. The Government's decision to charge Count Three this way fails to provide the notice that the Constitution requires.

An indictment is, fundamentally, about notice: Notice of what the Government is alleging the defendant did wrong; notice of what the Grand Jury found; notice of what the defendant has to be prepared to meet; notice of what future charges would be barred by double jeopardy. Each of these principles is enshrined in its own Constitutional provision. Each of these is violated by Count Three's structure and what Count Three fails to allege.

First, Ng does not know what the Government is alleging he did wrong because Count Three fails to identify an element of the offense charged. It does not identify the Malaysian law that is alleged to be one of the two predicate "specified unlawful activities," as it must; does not allege that the transactions violating this mystery Malaysian law occurred at least in part in the United States, as it must; and does not even list the statutory citation to the specified unlawful offense, as it must. How can Ng be protected against double jeopardy in these circumstances? How can he know on what grounds the grand jury returned the Indictment? How can the Court be sure that a jury's verdict would be based on the same theory that the grand jury found?

Second, Count Three also fails to allege – as the Supreme Court requires – that Ng conspired to move funds internationally with the "design," or purpose, to "conceal or disguise" those funds. This means that the Indictment does not inform Ng of which activities or transactions he must be prepared to defend against.

Third, the Byzantine structure of Count Three, combined with the complete lack of independent allegations, makes it impossible to distinguish which allegations relate to one, as opposed to another, of the three different objects. Each of these three different statutes contain different elements, of course, but the Indictment provides exactly zero notice of what activities Ng did, or conspired to do, that fall within one type of money laundering versus the other. The Supreme Court has held that in cases such as this, more specificity is required to put the defendant on notice of what he must be prepared to meet.

Finally, and apart from all of the notice deficiencies, one subsection of the FCPA listed in the Indictment cannot serve as a "specified unlawful activity" ("SUA") for purposes of money laundering. The Indictment includes alleged violations of 15 U.S.C. § 78dd-3 as an SUA for each object of Count Three, but that subsection is not a cognizable as an SUA because it did not exist at the time the FCPA was added to the list of SUAs in the money laundering statute. Accordingly, the "reference canon" forbids it from serving as a predicate here, and should be struck from the Indictment.

### A.    Legal Standards

Federal Rule of Criminal Procedure 7(c)(1) provides that an indictment "must be a plain, concise, and definite written statement of the essential facts constituting the offense charged" and must include the "statute, rule, regulation, or other provision of law that the defendant is alleged to have violated." Fed. R. Crim. P. 7(c)(1). An indictment is only "sufficient if it, first, contains the elements of the offense charged and fairly informs a defendant of the charge against which he must defend, and, second, enables him to plead an acquittal or conviction in bar of future prosecutions for the same offense." Hamling v. United States, 418 U.S. 87, 117 (1974).

This is because an indictment is supposed to provide "substantial safeguards to a criminal defendant." Russell v. United States, 369 U.S. 749, 763 (1962) (quotation marks omitted). A deficient indictment "offends both the Fifth and Sixth Amendments." United States v. Pirro, 212 F.3d 86, 92 (2d Cir. 2000). A defective indictment violates the Grand Jury Clause of the Fifth Amendment because the defendant "cannot be assured that he is being tried on the evidence presented to the grand jury, or that the grand jury acted properly in indicting him." Id. (citation omitted). Second, and similarly, a defective indictment violates the Indictment Clause of the Fifth Amendment, which "requires that an indictment contain some amount of factual particularity to ensure that the prosecution will not fill in elements of its case with facts other than those considered by the grand jury." United States v. Walsh, 194 F.3d 37, 44 (2d Cir. 1999) (quotation marks omitted). Third, a defective indictment exposes a defendant to double jeopardy, in violation of the Fifth Amendment, and so an indictment must contain "enough detail that he may plead double jeopardy in a future prosecution based on the same set of events." United States v. Stavroulakis, 952 F.2d 686, 693 (2d Cir. 1992). Fourth, a defective indictment does not allow a defendant to "be informed of the nature and cause of the accusation" as required by the Sixth Amendment. U.S. Const. Amend VI.

Therefore, to survive a motion to dismiss, the indictment must "acquaint the defendant with the specific crime with which he is charged, allow him to prepare his defense, and protect him from double jeopardy." United States v. Juwa, 508 F.3d 694, 701 (2d Cir. 2007) (citation and quotation marks omitted). In other words, an "essential purpose of an indictment is to give the defendant notice of the charge so that he can defend or plead his case adequately." United States v. Neill, 166 F.3d 943, 947 (9th Cir. 1999) (quotation marks omitted). When examining an indictment on a pretrial motion to dismiss, which is "invariably drafted by the Government,

fundamental fairness requires that the Government be held to the highest standards of 'both promise and performance.'" United States v. Gotti, 457 F. Supp. 2d 411, 415 (S.D.N.Y. 2006) (quoting In re Altro, 180 F.3d 372, 375 (2d Cir. 1999)).

On a pretrial motion to dismiss, "the facts alleged by the government must be taken as true." United States v. Velastegui, 199 F.3d 590, 592 n.2 (2d Cir.1999). But it is axiomatic that an indictment must be dismissed where it "fails to allege the essential facts constituting the offense charged." Pirro, 212 F.3d at 91-92.

The Government's opposition to this motion will be familiar: It will claim, correctly, that Rule 7 erects only a low bar for an indictment to survive a motion to dismiss; and it will claim, correctly, that Count Three recites mechanistically the text of the money laundering statute. Thus, the Government will argue that because the Indictment chants the words of the statute and incorporates the undifferentiated mass of 57 paragraphs of allegations from Count One, Count Three should survive this motion to dismiss. But even a low bar is just that – a bar, and it must be cleared by the words of the Indictment itself. Rule 12 exists for a reason: some indictments are deficient under Rule 7's standard, and Rule 7's standard safeguards critical constitutional rights for defendants.

The plain words of the Indictment (or, more accurately, the words which are missing from the Indictment) make clear that Count Three of this Indictment is deficient. Compared to other indictments that charged similar offenses, and measured against the controlling case law, Count Three is insufficiently pled here.

### B.     The Convoluted and Undifferentiated Structure of Count Three Lacks Any Independent Allegations

Count Three alleges a single conspiracy to commit three different types of money laundering offenses – a triple object conspiracy:

- § 1956(a)(2)(A) ("International Promotional" money laundering), see Ind. ¶ 65(a)(i);

- § 1956(a)(2)(B)(i) ("International Concealment" money laundering), see id. ¶ 65(a)(ii); and

- § 1957 ("Monetary Transaction" violations), see id. ¶ 65(b).

However, this triple object conspiracy is particularly complex and opaque as each of these three statutes contains quite different and intricate elements. As just one example, International Concealment money laundering has two additional knowledge requirements that International Promotional money laundering does not. Notwithstanding their different elements, all three statutes require the allegation of a predicate "specified unlawful activity" before they can be proven. See § 1956(a)(2)(A)(i) (forbidding the international movement of funds "with the intent to promote the carrying on of specified unlawful activity"); § 1956(a)(2)(B)(i) (forbidding the international movement of funds "designed . . . to conceal or disguise . . . the proceeds of specified unlawful activity"); § 1957 (forbidding certain monetary transactions involving "criminally derived property . . . derived from specified unlawful activity."). Count Three lists the same two "specified unlawful activities" for all three prongs of the money laundering conspiracy: violations of three different subsections of the FCPA and violations of some unnamed Malaysian law. See id. ¶¶ 65(a), 65(b).

Thus, Count Three combines an incredibly complicated structure – three different varieties of money laundering objects, with each object containing its own distinct elements and alleging multiple specified unlawful activity predicates – with zero independent factual allegations whatsoever. Count Three consists solely of statutory language. There is not a single, solitary additional allegation contained within Count Three. The only allegations in Count Three are incorporated by reference to Count One. See id. ¶ 64. None of the allegations from Count One that

are incorporated, though, provide the type of notice needed in a case charged the way the Government has chosen to charge Count Three.

### C.     Argument

#### 1.     An Element is Missing

An indictment must "contain[] the elements of the offense charged." United States v. Resendiz–Ponce, 549 U.S. 102, 108 (2007) (quoting Hamling, 418 U.S. at 117). If it does not, it must be dismissed. In addition, Rule 7(c)(1) mandates that "For each count, the indictment . . . must give the official or customary citation of the statute, rule, regulation or other provision of law that the defendant is alleged to have violated." Fed R. Crim. P. 7(c)(1). "The wording of this Rule imposes two requirements: the statement of the essential facts and the citation of the statute. They are separate requirements and not a restatement of one another." United States v. Gonzalez, 686 F.3d 122, 128 (2d Cir. 2012) (brackets and quotation marks omitted; emphasis in original).

Count Three fails this requirement because it does not sufficiently cite the statute that Ng is alleged to have violated. Specifically, Count Three lists two "specified unlawful activities" for each of the three different types of money laundering alleged to be objects of the conspiracy, and the same exact formulation is repeated three times: "felony violations of the FCPA, Title 15, United States Code, Sections 78dd-1, 78dd-3, 78m(b)(2)(B), 78m(b)(5) and 78ff(a), and offenses against a foreign nation involving the misappropriation, theft and embezzlement of public funds by and for the benefit of a public official, in violation of Malaysian Penal Law . . . ." (Ind. ¶¶ 65(a)(i), 65(a)(ii), 65(b).)

First, one of the "specified unlawful activities" is not "specified" at all – to which Malaysian law is the Indictment referring? The Indictment uses the term "Malaysian Penal Law." There are two primary bodies of criminal laws in Malaysia: the Penal Code and the Malaysian

Anti-Corruption Act of 2009. By using the term "Penal Law," we assume that the Indictment is referring to the Penal Code. But, even so, the Malaysian Penal Code, as it appears in English, consists of 323 pages. The Indictment provides no notice of what particular Malaysian Penal Code violation (if this is even indeed what the Government means by "Penal Law") Ng has violated. There is no statutory number or statutory title or even a description of a particular Malaysian offense that Ng violated to be guilty of Count Three. A related problem is this: What specific Malaysian statute did the Grand Jury vote upon in voting a true bill on Count Three? How is the Court supposed to know what basis the grand jury used to find a valid specified unlawful activity? And how can Ng be sure that he will not be charged again with a violation based on some other section of Malaysian law? When the Government has chosen to allege specified unlawful activities defined in 18 U.S.C. § 1956(c)(7)(B)(iv) in the past, it has identified the foreign statutes that are alleged to have been violated with specificity. See, e.g., United States v. Esquenazi, Crim. A. No. 09-21010 (JEM), Dkt. No. 685, at 32 (Count Nine, ¶ 9) (alleging specified unlawful activities including "violations of the criminal bribery laws of Haiti, The Republic of Haiti's Penal Code Articles 137 and 140 . . . .") This is not a mere detail. Ng has waived extradition to go to trial on a specific indictment voted by a grand jury. What Malaysian law did the grand jury find that he violated to be properly indicted of Count Three? He has been in this country now for a year-and-a-half and the Government still has not told his counsel what Malaysian statute was violated as a predicate of Count Three.

Second, Count Three does not even set forth the statutory citation within the money laundering statute for this unspecified "specified unlawful activity." While the FCPA specified unlawful activity is accompanied by a reference to its statutory citation, there is no such reference to the section that permits "an offense against a foreign nation" to serve as a specified unlawful

63

activity. Since the Government did not allege it, we looked it up – it is 18 U.S.C. § 1956(c)(7)(B)(iv). By failing to provide notice that the Government is relying on Section 1956(c)(7)(B)(iv) in the charging language, the charge plainly fails to advise this defendant of each and every element of the crime charged against him.

Third, and perhaps most importantly, Count Three's recitation of the statutory language suffers from yet another flaw: it fails to allege a critical statutory element of the charged "specified unlawful activity." Section 1956(c)(7)(B)(iv) only permits an "offense against a foreign nation" to serve as a specified unlawful activity if it involves "a financial transaction occurring in whole or in part in the United States." 18 U.S.C. § 1956(c)(7)(B)(iv) (emphasis added). Count Three simply does not allege that the "specified unlawful activity" of an offense against a foreign nation – which it does not list – occurred in whole or in part in the United States. This necessary charging language is missing from the Indictment. And this failure cannot be rescued by citation to the statutory section, since Count Three does not even include the statutory citation to § 1956(c)(7)(B) at all. In this regard, this Count suffers from the most basic of infirmities, requiring dismissal: it fails to allege an essential element of the offense both in terms of the language of the element and its statutory citation.

The Government will argue in vain that Count Three expressly incorporates the allegations in paragraphs 1-57 of Count One. See Ind. ¶ 64. But this incorporation cannot save the Indictment from the fact that the charging language in Count Three: (1) Does not allege that the transactions which supposedly form the basis of the specified unlawful activity took place in whole or in part in the United States; and (2) Does not even contain a reference to the statutory citation containing that language. Finally, as will be detailed below, the Government cannot simply cite to an undifferentiated mass of allegations in Count One and tell the defense to, in essence, just figure

out which transactions might have occurred in whole or in part in the United States, and which did not. This is important, because notwithstanding their differences, all three of the money laundering statutes require that the transaction have something to do with the United States: For International Concealment and International Promotion, the transactions have to move "from a place in the United States to or through a place outside the United States," or vice versa. 18 U.S.C. § 1956(a)(2). Monetary Transaction requires "that the offense under this section takes place in the United States . . . ." 18 U.S.C. § 1957(d)(1). Therefore, many of the most specific allegations in the Indictment are not properly the subject of the money laundering conspiracy charge. Only a solitary allegation (¶ 47) is alleged to have taken place entirely within the United States, and there is no allegation that the transportation of that money was done with the intent to conceal or disguise anything about the funds or, indeed, that any co-conspirator had anything to do with that transaction.

"[I]t has long been the rule in this Circuit that a deficiency in an indictment's factual allegations of the elements of an offense is not cured by the fact that the relevant count cited the statute that the defendant is alleged to have violated." United States v. Gonzalez, 686 F.3d 122, 128 (2d Cir. 2012) (quotation marks omitted). Here, the Government has done neither – it has not alleged that the underlying financial transactions giving rise to an offense against a foreign nation occurred "in whole or in part in the United States," and it has failed to even list the statutory citation.[25]

Ng brings these defects to the Court's attention at the earliest possible stage of the case. Therefore, this case is very different from the situation faced in United States v. Wydermyer, 51

---

[25] Of course, a "citation error" is not a reason to dismiss an indictment "unless the defendant was misled and thereby prejudiced," but here, the defects in the Indictment go far beyond a mere citation error.  Fed. R. Crim. P. 7(c)(2).

F.3d 319 (2d Cir. 1995). There, the defendants argued on appeal that their money laundering conspiracy indictment was deficient because it did not include certain statutory language, but had never made a motion before or even during trial; rather, the District Court noticed the error <u>sua sponte</u> more than six months after the jury's guilty verdict. <u>See id.</u> at 324. The Court of Appeals affirmed the convictions primarily "[b]ecause the indictment must be read liberally in the circumstances of this case." <u>Id.</u>

In <u>Wydermyer,</u> the indictment was read "liberally" because "[t]he scrutiny given an indictment . . . depends on the timing of the defendant's objection." <u>Id.</u> Since the defendants raised their claims after the jury verdict, the infirmities in the defendants' indictment did not affect their Sixth Amendment notice rights, or their Fifth Amendment double jeopardy rights. <u>See id.</u> at 325. When, as in <u>Wydermyer</u>, the lack of allegations in an indictment are raised after trial, the "only colorable issue that might involve prejudice to substantial rights . . . is whether, in violation of the Fifth Amendment, the defendants were tried on charges upon which a grand jury had not passed." <u>Id.</u> The Court of Appeals held that "[l]iberally construed, this indictment adequately set forth the charged offenses to the grand jury." <u>Id.</u> In part, this was because the Arms Export Control Act ("AECA") – the predicate offense – was listed explicitly. Therefore, the defendants could not prevail on their "belated claim that the conspiracy count was insufficient" because they could not show that "the indictment, liberally construed, was not 'sufficient to identify the offense which the defendant conspired to commit.'" <u>Id.</u> at 326 (quoting <u>Wong Tai v. United States</u>, 273 U.S. 77, 81 (1927)). Accordingly, the Court found that the indictment "apprise[d] the grand jury in essential terms of the object of the conspiracy," because it did list the AECA. <u>Id.</u> at 325-26.

But, as <u>Wydermyer</u> recognized, "[t]he timing of the defendant's objection [to an indictment] is important to the level of scrutiny employed; a defendant who objects to the

indictment before trial . . . is entitled to a more exacting review of the indictment than one who waits until after trial to object." United States v. Pirro, 212 F.3d 86, 92 (2d Cir. 2000). Ng is moving to dismiss the Indictment at the first possible opportunity, not "belated[ly]" raising the issue after the jury's verdict. Therefore, his notice and double jeopardy rights are fully at stake. Second, the Indictment should not be "liberally construed" here; rather, while at this stage the Court must of course accept the factual allegations of the Indictment as true, "[i]n ruling on a pre-trial motion to dismiss an indictment for failure to state an offense, the district court is bound by the four corners of the indictment. . . . The indictment either states an offense or it doesn't." United States v. Boren, 278 F.3d 911, 914 (9th Cir. 2002). Here, it does not. Third, the insufficiency here is even more pronounced than in Wydermyer because the indictment there at least listed the statute constituting the specified unlawful activity; here, it does not.

For these reasons, the Government's failure to include a statutory element in the charged Money Laundering Conspiracy count, either in terms of the language itself or the statutory citation to that language, must result in dismissal of that aspect of Count Three.

> 2.    No "Design" Is Alleged With Proper Specificity, in Contravention of Supreme Court Precedent

Count Three also fails to allege sufficiently one of the elements of International Concealment money laundering: that Ng conspired to move funds internationally with the "design[] . . . to conceal . . . the proceeds of specified unlawful activity." 18 U.S.C. § 1956(a)(2)(B)(i) (emphasis added). This is no idle requirement – the Supreme Court has held that such an allegation is necessary for any indictment alleging International Concealment money laundering. Because the Indictment fails to make such an allegation with specificity, the International Concealment object of Count Three should be dismissed.

The Supreme Court confronted International Concealment in Regalado Cuellar v. United States, 553 U.S. 550 (2008). There, the defendant was driving a Volkswagen Beetle through Texas and towards Mexico when he was stopped by law enforcement. See id. at 554. A search uncovered a secret compartment, and inside the compartment was about $81,000 in cash, wrapped in plastic bags and duct tape. See id. Animal hair covered the back seat of the car. See id. (The defendant claimed he had just been transporting goats – unlikely in a Volkswagen Beetle. See id.) The Government charged the defendant with International Concealment money laundering, and he was convicted at trial. See id. at 554-55.

A panel of the Fifth Circuit reversed and vacated the conviction, see 441 F.3d 329 (5th Cir. 2006), but on rehearing en banc, the full Circuit affirmed the conviction over Judge Jerry Smith's dissenting opinion that "[t]here is a difference between concealing something to transport it, and transporting something to conceal it." 478 F.3d 282, 296–97 (Smith, J., dissenting). In other words, "how one moves . . . money is distinct from why one moves the money. Evidence of the former, standing alone, is not sufficient to prove the latter." Regalado Cuellar, 553 U.S. at 566 (emphasis in original).

The Supreme Court reversed the full Fifth Circuit and agreed with Judge Smith's rationale. The Court held that while the Government had proven the defendant concealed the money so that he could move it without being detected, "[t]he evidence suggested that the secretive aspects of the transportation were employed to facilitate the transportation . . . but not necessarily that secrecy was the purpose of the transportation. . . . [T]he Government failed to introduce any evidence that the reason drug smugglers move money to Mexico is to conceal or disguise a listed attribute of the funds," that is, the nature, location, source, ownership, or control of the proceeds of specified unlawful activity. Id. at 566–67.

68

The Supreme Court's reasoning focused on the statutory term "design." Id. at 563. The Court held that "'design' means purpose or plan; i.e., the intended aim of the transportation." Id. An Indictment must charge that the "purpose of the [funds'] transportation," not just "the manner in which it was carried out," (that is, the "structure and arrangement" was to conceal or disguise something about the funds), to properly make out an International Concealment money laundering charge under § 1956(a)(2)(B)(i). Id. at 564.

In analyzing Domestic Concealment money laundering, § 1956(a)(1)(B)(i), the domestic analogue to § 1956(a)(2)(B)(i), the Second Circuit has similarly held that part (B)(i) requires proof that the defendant "knew that a purpose of the financial transaction was concealment of the source, ownership, etc., of the funds," in other words "that the defendant knew of the transaction's obfuscatory purpose." United States v. Maher, 108 F.3d 1513, 1526 (2d Cir. 1997); see also, e.g., United States v. Ness, 565 F.3d 73, 78 (2d Cir. 2009) (reversing conviction under § 1956(a)(2)(B)(i) because Government's evidence "shows only an intent to conceal the transportation, not an intent to transport in order to conceal."); United States v. Garcia, 587 F.3d 509, 519 (2d Cir. 2009) (reversing guilty plea for money laundering conspiracy because "[w]hile this transaction was effected covertly in an effort to conceal the transaction from the authorities, there is no indication from the record that the transaction itself was an effort to conceal anything about the money. That is insufficient under Cuellar, for it evinces only how the money was moved, and does not speak to why it was moved."); United States v. Roberts, 650 F. Supp. 2d 219, 220, 222 (E.D.N.Y. 2009) (granting judgment of acquittal for defendant charged with violating § 1956(a)(2)(B)(1) because "the government has not established that Defendant knew that the alleged transportation of funds was designed to conceal or disguise the nature, the location, the source, the ownership, or the control of such funds, as it must under 18 U.S.C. § 1956(a)(2)(B)(i)

. . . Here, as in <u>Cuellar</u> and <u>Ness</u>, the evidence submitted by the government shows only an intent to conceal the transportation, not an intent to transport money in order to conceal it").

The Indictment here fails the requirements of <u>Santos</u>, <u>Maher</u>, <u>Ness</u>, <u>Garcia</u>, and <u>Roberts</u>. It makes no allegation regarding either the purpose of any funds' transportation, nor of Ng's knowledge of that purpose (aside, again, from the bare recital of statutory text). Indeed, the words "design" or "designed" appear in just two ways in the Indictment: Three times to describe how 1MDB and Goldman (neither of whom are charged in the Indictment, of course) structured certain bond deals, and once to describe the appearance of a pink diamond necklace. These references have nothing to do with the flow of funds. (<u>See</u> Ind. ¶¶ 29, 42, 51, 60(i).) And none of these allegations provide even the slightest inkling that any of the co-conspirators (let along Ng) moved funds internationally in a way designed to conceal those funds.

The few appearances of the word "purpose" have similarly no relation to any monetary transactions. (<u>See</u> <u>id.</u> ¶¶ 15, 18, 25.) The word "conceal" appears in Count One only in relation to how Low's involvement was supposedly kept from Goldman's compliance functions – again, having nothing whatsoever to do with the transfer of any money, let alone the co-conspirators' purpose in moving money internationally, as the statute requires. (<u>See</u> <u>id.</u> ¶¶ 20, 22, 43, 52.) This is no mere word search – there is no allegation in the incorporated language from Count One that any transportation, transmission, or transfer of monetary instruments was done internationally with the "design" (or "purpose") of "concealing" or "disguising" anything about those monetary instruments.

The Indictment does describe numerous international transfers of money, but taking all of the allegations in the Indictment as true, none of these come even close to alleging that the co-conspirators "designed," or intended, for "such transportation, transmission, or transfer" to conceal

or disguise something about those funds. For example, paragraph 37 alleges that "U.S. Financial Institution #1 transferred" certain proceeds of the "Magnolia" bond deal internationally, and that "the defendants JHO LOW and ROGER NG, Co-Conspirator #1 and others knew that a large portion of the proceeds of the bond would be diverted to themselves and others, including foreign government officials, through shell companies beneficially owned and controlled by themselves and others." (Ind. ¶ 37.) Of course, the Government chose not to charge "Financial Institution #1," and so it is unclear how this transfer's "design" could have been to conceal or disguise something about those funds. But more fundamentally, Paragraph 37 says nothing about why it was that the funds had to move internationally to conceal or disguise those funds. Similarly, paragraph 40 alleges that certain Magnolia bond proceeds were "transferred via wire to and from the United States," and then "[a]pproximately $24 million of these funds was subsequently transferred to a bank account beneficially owned by a relative of the defendant ROGER NG." (Ind. ¶ 40.) Here, too, there is no allegation relating to the purpose of those transfers. Paragraph 41 simply alleges that about $60 million in Magnolia proceeds were transferred from an overseas account to an account in Los Angeles for the purpose of funding a movie. (See Ind. ¶ 41.) The allegations in paragraph 53, that certain proceeds of the "Catalyze" bond deal were transferred between the U.S. and other countries, that these funds were "misappropriated and embezzled," and that "more than $4 million of these funds were also transferred via wire to a bank account beneficially owned by a relative of NG," similarly fail to make any allegations about why the international character of those transfers themselves had anything to do with concealing or disguising the source or ownership of that money.[26] The Indictment thus fails to draw the necessary connections between

---

[26] The Indictment includes numerous other descriptions of funds transfers, but the vast majority of these do not describe funds transfers "from a place in the United States to or through a place outside

any international movement of funds representing the "proceeds" of either specified unlawful activity, and the "design," or purpose, of those funds transfers. The Indictment simply does not provide the necessary notice to Ng of which transfers, or which actions, form the basis of the International Concealment object.

The next section will demonstrate how the Government's decision to charge multiple types of money laundering, all as objects of the same money laundering conspiracy, only compounds the lack of notice, because even the scant allegations that can be divined from the undifferentiated mass of Count One might relate to International Promotion money laundering, or Monetary Transaction money laundering, as easily as they could to International Concealment money laundering.

3.    The Byzantine Structure of Count Three Combined with Zero Independent Allegations Makes it Impossible to Distinguish Allegations Relating to One Object Versus Another

Ng has already shown how the Indictment attempts a completely novel theory of FCPA internal accounting controls violation. But Government has chosen to climb out on a second limb with its Indictment: The defense has been unable to find a single FCPA case in which the Government chose to charge, supposedly as part of a single money laundering conspiracy, three different objects in a single count without a single independent allegation to support that conspiracy charge this structure, and the structure the Government has chosen creates an impossible situation for Ng. How can he know, without more, which of the allegations incorporated from Count One relate to one, as opposed to another, of the three objects for the money laundering conspiracy? He cannot, from the face of the Indictment. This is precisely the

---

the United States or to a place in the United States from or through a place outside the United States," and therefore cannot fall within the ambit of § 1956(a)(2).

evil that Rule 7(c)(1)'s standard is meant to protect against, and it is another reason that Count Three should be dismissed.

> ### a. Count Three Fails to Allege Sufficiently the Three Disparate Objects of Count Three

International Promotion, International Concealment, and Monetary Transactions are different statutes, with different elements, and those differences make a difference. See Russello v. United States, 464 U.S. 16, 23 (1983) ("[W]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." (quotation marks omitted)).

One primary difference between International Promotional and International Concealment money laundering is that International Concealment includes two knowledge requirements that International Promotion does not, both involving the word "proceeds": First, the defendant must know that the funds being moved internationally represent the proceeds of unlawful activity; and second, the defendant must know that the movement of the funds is itself designed to conceal something about those proceeds. Compare 18 U.S.C. § 1956(a)(2)(A) with § 1956(a)(2)(B)(i).

For money laundering statutes that refer to "proceeds," "the rule [is] that the predicate offenses must produce proceeds before anyone can launder those proceeds." United States v. Mankarious, 151 F.3d 694, 705 (7th Cir. 1998); see also, e.g., United States v. Conley, 37 F.3d 970, 980 (3d Cir. 1994) (restricting definition of "proceeds" to funds "derived from an already completed offense, or a completed phase of an ongoing offense, before they can be laundered"); United States v. Seward, 272 F.3d 831, 836 (7th Cir. 2001) (recognizing that "[t]he transaction or transactions that created the criminally-derived proceeds must be distinct from the money-laundering transaction."). By contrast, International Promotion does not contain any mention of

"proceeds" at all, since it is focused on preventing movements of funds that "promotes" the "carrying on" of specified illegal activities – not the concealment of the results of illegal activities. See United States v. Krasinski, 545 F.3d 546, 550 (7th Cir. 2008) ("The absence of a 'proceeds' requirement in section 1956(a)(2)(A) reflects that Congress decided to prohibit any funds transfer out of the country that promotes the carrying on of certain unlawful activity.").

This difference between the two statutes is significant because International Concealment is vulnerable to potential "merger" problems that are not present in allegations of International Promotion. In United States v. Santos, the Supreme Court reaffirmed that the term "proceeds" in § 1956 means "profits," and not simply "receipts." See 553 U.S. 507, 514 (2008). Santos explained that this distinction carries with it a real difference, for otherwise, many statutes would impermissibly "merge" with the money laundering statute. See id. at 515-17. The defendants in Santos operated an illegal lottery. If "proceeds" meant merely "receipts" of the lottery, then "nearly every violation of the illegal-lottery statute would also be a violation of the money-laundering statute, because paying a winning bettor is a transaction involving receipts that the defendant intends to promote the carrying on of the lottery." Id. at 515. This would create an impermissible "merger" problem – a real problem, because the lottery statute carries a 5-year statutory maximum, while the money laundering statute carries a 20-year maximum.

This problem, moreover,

is not limited to lottery operators. For a host of predicate crimes, merger would depend on the manner and timing of payment for the expenses associated with the commission of the crime. . . . [A]ny wealth-acquiring crime with multiple participants would become money laundering when the initial recipient of the wealth gives his confederates their shares. Generally speaking, any specified unlawful activity, an episode of which includes transactions which are not elements of the offense and in which a participant passes receipts on to someone else, would merge with money laundering.

Id. at 516 (emphasis added). As Justice Stevens noted in his concurrence, "[a]llowing the Government to treat the mere payment of the expense of operating an illegal gambling business as a separate offense is in practical effect tantamount to double jeopardy." Id. at 527 (Stevens, J., concurring). Accordingly, the Supreme Court affirmed the vacateur of the defendants' money laundering conviction.

The FCPA conspiracy alleged in Count One is precisely the type of crime that Santos describes – a conspiracy whose statutory maximum is 5 years, just like the illegal lottery; a "wealth-acquiring crime with multiple participants," just like the illegal lottery. Id. at 516. And the International Concealment object of the conspiracy charged in Count Three suffers from exactly the same type of potential merger issue that the Supreme Court identified in Santos, while the International Promotion object does not.

The defense is not making a merger argument; that would be premature at this point. Rather, the reason Count Three should be dismissed arises from the structure of the Indictment itself. To be clear, this has nothing to do with the Government's proofs, nothing to do with the evidence or lack thereof. It is a problem that springs solely from the structure of the Indictment: Unlike Santos, and unlike any other FCPA and money laundering case that the defense has been able to find, the Government has chosen to structure the money laundering conspiracy charge as violating both International Promotion, which does not carry a requirement of "proceeds" and therefore does not potentially suffer from the Santos merger problem, and International Concealment, which does include such a requirement and thus does potentially suffer from the merger problem. See, e.g., United States v. Harder, 168 F. Supp. 3d 732, 746 (E.D. Pa. 2016) ("Santos is inapplicable to international promotional money laundering charges") (citing United States v. Krasinski, 545 F.3d 546, 550 (7th Cir. 2008) ("The absence of a 'proceeds' requirement

in section 1956(a)(2)(A) reflects that Congress decided to prohibit any funds transfer out of the country that promotes the carrying on of certain unlawful activity."); United States v. Moreland, 622 F.3d 1147, 1167 (9th Cir. 2010) ("any error in omitting a profits definition for proceeds was not prejudicial" because Government charged § 1956(a)(2)(A), which does not require a showing of proceeds)."). Here, though, both of these statutes are charged as objects of the same conspiracy – and the jury would have to unanimously find that the conspirators conspired to violate one, as opposed to the other, statute. The allegations in Count One do not delineate between actions that may have violated the International Concealment statute as opposed to International Promotion (or monetary transaction, for that matter). But how is Ng supposed to defend against one theory, as opposed to the other – and how can the Court be sure that the jury will be unanimous on which of the objects of the money laundering conspiracy they decided?

This notice and double jeopardy problem is compounded by the Government's decision to charge Count Three with no independent allegations, no notice, no delineation, no distinction whatsoever of which allegations relate to which money laundering statute. The Government has chosen to rely solely on the allegations of Count One in describing Count Three. That was their choice, but it is one they must live with, and it is one that does not provide notice to Ng in the way that an Indictment must. How can Ng know which of those incorporated allegations from Count One should be read to include the requirement of proceeds, and which should not? It is impossible to do from the face of the Indictment. The Indictment has to be limited to its four corners, and ambiguities should be construed against the Government, as the author of the document. As the Second Circuit has held, "[b]ecause the requirement of a sufficient indictment serves . . . important purposes, the indictment must be considered as it was actually drawn, not as it might have been drawn." United States v. Pirro, 212 F.3d 86, 92 (2d Cir. 2000) (citing Sanabria v. United States,

437 U.S. 54, 65–66 (1978) ("The precise manner in which an indictment is drawn cannot be ignored . . . .")).

Comparing the Indictment to others that have charged similar offenses demonstrates this Indictment's deficiency. For example, in United States v. Shvarts, 90 F. Supp. 2d 219, 223–24 (E.D.N.Y. 2000), abrogated on other grounds by United States v. Coppa, 267 F.3d 132 (2d Cir. 2001), the Court examined an indictment that charged securities fraud and money laundering conspiracy. In denying the defendants' motion to dismiss, the Court first held that "[i]nsofar as the defendants contend that the statute was designed to be separate and distinct from the underlying offense which must be completed before the proceeds from it are 'laundered' in violation of § 1956, they are correct." Id. at 223. The Court further held, however, that the indictment was sufficient because the money laundering conspiracy count "makes plain that it occurred after the completion of the underlying offense," as it charged, among other things, that the defendants first sold their illegally-obtained stock warrants, and then "dispersed the profits generated from these sales through various foreign and domestic accounts in the same names as the defendants' nominee accounts." Id. at 224 (emphasis in original).

The Indictment here makes no such allegations – and indeed, contains a variety of transactions that could been read to apply equally to any one of the three money laundering objects of the Count Three conspiracy. The Constitution does not allow such ambiguities.

> b.   *The Structure of Count Three Mandates That Merely "Parroting the Language" of the Statute is Insufficient to Guarantee Ng's Provide Sufficient Notice Here*

In its opposition to this motion, the Government will likely cite to the Second Circuit's well-worn statement from United States v. Tramunti that "an indictment need do little more than to track the language of the statute charged and state the time and place (in approximate terms) of

the alleged crime." 513 F.2d 1087, 1113 (2d Cir. 1975). As described above, Count Three actually

fails even <u>Tramunti</u>'s standard – it does not track the language of Section 1956(c)(7)(B), it does

not even cite to Section 1956(c)(7)(B), it does not list the offense against a foreign nation alleged

to be a specified unlawful offense, and it does not distinguish between transactions – or even an

agreement to conduct transactions – that would apply to one, two, or three of its money laundering

objects.

But even if Count Three did all of these things, "the Supreme Court has recognized a

limitation on th[e] practice" of merely reciting the language of the statute as sufficient to guard a

defendant's Constitutional rights in certain cases. <u>United States v. Pirro</u>, 212 F.3d 86, 93 (2d Cir.

2000). In other words, "while an indictment parroting the language of a federal criminal statute is

often sufficient, there are crimes that must be charged with greater specificity." <u>United States v.</u>

<u>Resendiz-Ponce</u>, 549 U.S. 102, 109 (2007). In such cases, "a sufficient indictment must contain

the elements of the offense <u>and</u> apprise the defendant of the nature of the charge. The requirement

of notice derives from the defendant's Sixth Amendment right to be informed of the nature and

cause of the accusation." <u>United States v. Hooker</u>, 841 F.2d 1225, 1230 (4th Cir. 1988) (emphasis

added).

In <u>Russell v. United States</u>, the Government charged defendants with refusing to answer

questions posed by Congressional subcommittees, but did not identify what subject was actually

being inquired into, and therefore the defendants could not know whether that subject was

"pertinent." <u>See</u> 369 U.S. 749, 752 (1962). The Supreme Court held that the indictments were

insufficient and reversed the convictions. The Court did so even though the indictments "set out

the not only the times and places of the hearings at which the petitioners refused to testify, but also

specified the precise questions which they then and there refused to answer," and so protected the

defendants against double jeopardy. Id. at 764. The Court held that "[t]he vice of these indictments, rather, is that they failed to satisfy the first essential criterion by which the sufficiency of an indictment is to be tested, i.e., that they failed to sufficiently apprise the defendant of what he must be prepared to meet." Id.

Russell thus held that "where the definition of an offense . . . includes generic terms, it is not sufficient that the indictment shall charge the offense in the same generic terms as in the definition; but it must state the species – it must descend to particulars." Id. at 765 (quotation marks and citation omitted). The statutory language is useful, but not sufficient, in such cases – "it must be accompanied with such a statement of the facts and circumstances as will inform the accused of the specific offense, coming under the general description, with which he is charged." Id. "In sum, for an indictment to fulfill the functions of notifying the defendant of the charges against him and of assuring that he is tried on the matters considered by the grand jury, the indictment must state some fact specific enough to describe a particular criminal act, rather than a type of crime." Pirro, 212 F.3d at 93.

This is precisely the problem with Count Three. The allegations that are incorporated from Count One do not differentiate between monetary transactions that would promote specified unlawful activity, on the one hand, or conceal the proceeds of specified unlawful activity, on the other hand, or represent transactions of more than $10,000 using the proceeds of specified unlawful activity, on the third hand. Because Count Three does not "descend to particulars" in this way, it is impossible to either know on which basis the grand jury found probable cause to indict Ng, and it also will be impossible to determine which monetary transactions the co-conspirators supposedly agreed to engage in to further one of the objects, as opposed to another of the objects, of the conspiracy. Of course, the jury would have to unanimously find that the co-conspirators conspired

79

to violate the money laundering conspiracy in furtherance of a single object, but the Indictment provides no feasible way for them to do so.

United States v. Rosenblatt puts a fine point on this problem. 554 F.2d 36, 39 (2d Cir. 1977). There, Brooks, an employee of a post office in Manhattan, falsified postal records and obtained checks drawn on the U.S. Treasury, payable to people who were not entitled to the money. See id. at 37. Brooks then took the checks to defendant Rosenblatt, who deposited the checks into an account he controlled and kept about ten percent for his fee. See id. Rosenblatt and Brooks were indicted for conspiracy to defraud the United States, in violation of 18 U.S.C. § 371. Rosenblatt was convicted at trial.

The Second Circuit reversed, holding that there was no agreement between Rosenblatt and Brooks "concerning the type of fraud in which they were engaged." Id. at 37. Brooks was defrauding the United States by obtaining the checks without authorization. But Rosenblatt did not know what Brooks had done. Instead, Brooks told Rosenblatt that the checks were valid, but that the payees just did not want to pay taxes on their money or did not want to reveal kickbacks they had gotten on government contracts. "In other words, both men agreed to defraud the United States, but neither agreed on the type of fraud." Id. at 38.

The Court first observed that "[t]he law of conspiracy requires agreement as to the 'object' of the conspiracy," and so while the co-conspirators do not have to "have agreed on the details of their criminal enterprise," the "'essential nature of the plan' must be shown." Id. (quoting Blumenthal v. United States, 332 U.S. 539, 557 (1947)). This is necessary because "'the gist of the offense remains the agreement, and it is therefore essential to determine what kind of agreement or understanding existed as to each defendant.' The importance of making this determination cannot be overstated." Id. at 39 (quoting United States v. Borelli, 336 F.2d 376, 384 (2d Cir.

1964)). Therefore, Rosenblatt and Brooks could not have conspired with one another, because while they "'agreed' to commit offenses against the United States, [] they did not agree on the same offenses." Id. at 40.

Precisely the same danger exists in this case because of how the Government has decided to plead Count Three. The structure makes it impossible to determine what agreement the grand jury found regarding one object versus another, and to compare the grand jury's finding with the case that will be delivered to the jury.

United States v. Stavroulakis, 952 F.2d 686 (2d Cir. 1992) is not to the contrary. In Stavroulakis, the defendants were charged under § 371 with conspiring to violate § 1956. Defendants attempted to argue, pursuant to Rosenblatt, that there was no agreement on the nature of the conspiracy because the co-conspirators each thought the money being laundered came from two different specified unlawful activities – one thought it was drug money, and the other thought it was gambling proceeds. See id. at 690. The Second Circuit held that "so long as the unlawful source is proven to be one of the illegal activities enumerated in § 1956(c)(7), it is not essential that the conspirators agree on the same illegal activity. . . . All the specified unlawful activities are clustered, almost willy-nilly, under a single definition section of the statute. So long as the cash is represented to have come from any of these activities, a defendant is guilty of the substantive offense of money laundering." Id. at 691.

The issue here is different. Ng agrees that, as described by the Government, if there was an agreement to launder money, such an agreement would have involved the proceeds of the FCPA violation (and whatever Malaysian statute the Government has in mind). In other words, Ng is not arguing that the co-conspirators thought they were engaging in different specified unlawful activities, as did the defendants in Stavroulakis. Instead, this case is rather on all fours with

Rosenblatt: the problem is how to determine whether the grand jury and the petit jury agree on the same object of the of the conspiracy – International Promotion, International Concealment, and Monetary Transaction. Without any independent allegations, how is the Court to know? This is a Constitutional violation, plain and simple. Because the Indictment makes no distinction in its allegations of three different, complicated objects, it has the same problem as identified in Rosenblatt and must be dismissed.

c.    *A Violation of § 78dd-3 Does Not Qualify as a Specified Unlawful Activity*

The Government has charged two "specified unlawful activities" as the predicates for each of the three different objects of the Count Three conspiracy:  the FCPA and the unnamed Malaysian statute.  The Government asserts that "felony violations of the FCPA, Title 15, United States Code, Sections 78dd-1, 78dd-3, 78m(b)(2)(B), 78m(b)(5) and 78ff(a)" are the sections of the FCPA that were supposedly violated.  But 15 U.S.C. § 78dd-3 cannot serve as one of these predicates because it did not exist at the time the FCPA was included as a specified unlawful activity underpinning money laundering offenses.

"Specified unlawful activity" is a defined term in the money laundering statute, and the definition of "specified unlawful activity" is found in § 1956(c)(7).  See 18 U.S.C. § 1956(c)(7) ("the term 'specified unlawful activity' means – . . . ."); Stavroulakis, 952 F.2d at 691 ("All the specified unlawful activities are clustered, almost willy-nilly, under a single definition section of the statute.")  One of the specified unlawful activities listed in §1956(c)(7) is "any felony violation of the Foreign Corrupt Practices Act."

But § 78dd-3 cannot serve as one of the specified unlawful activities under § 1956(c)(7), because in 1992, when Congress amended § 1956(c)(7) to include the FCPA as a specified unlawful activity, § 78dd-3 did not yet exist.  See Pub. L. No. 102-550, § 1534, 106 Stat. 3672

(1992).  Section 78dd-3 was created six year later, in 1998.  <u>See</u> International Anti-Bribery and Fair Competition Act of 1998, Pub. L. No. 105-366, § 4, 112 Stat. 3302 (1998).

The "reference canon" dictates that § 1956(c)(7)'s reference to the FCPA means the FCPA as it existed when that reference was written.  In <u>Jam v. International Finance Corporation</u>, --- U.S. ---, 139 S. Ct. 759 (2019), the Supreme Court held that "a statute that refers to another statute by specific title or section number in effect cuts and pastes the referenced statute as it existed when the referring statute was enacted, without any subsequent amendments." <u>Id.</u> at 769 (citations omitted); <u>see also</u>, <u>e.g.</u>, <u>Hassett v. Welch</u>, 303 U.S. 303, 314 (1938) (observing the "well settled canon" of statutory construction that "[w]here one statute adopts the particular provisions of another by a specific and descriptive reference to the statute or provisions adopted . . . [s]uch adoption takes the statute as it exists at the time of adoption and does not include subsequent additions or modifications [of] the statute so taken unless it does so by express intent." (quotation marks and citations omitted)).

Accordingly, a violation of § 78dd-3 is not a specified unlawful activity for either § 1956 or § 1957 (which states that "the term[] 'specified unlawful activity' . . . shall have the meaning given . . . in section 1956"). Congress specifically referred to the FCPA in § 1956(c)(7) as it existed in 1992 – when it was added to the list of crimes that could serve as a "specified unlawful activity." Subsequent additions to the FCPA, like § 78dd-3, do not fall within that definition. Congress chose not to include language such as "as it may be amended" when it included the FCPA in § 1956(c)(7) – but it did not. This omission manifests Congress's intent to "cut and paste" the FCPA as it existed in 1992, not as it has been subsequently amended. Congress knows how to take into account future amendments to statutes when they are referenced in other statutes, but it made a decision not to do so here.

Each object of Count Three lists § 78dd-3 as one of its "specified unlawful activities," and each therefore suffers from the same problem. It is, of course, clear that a conviction for a conspiracy cannot stand if one of its objects is legally defective – even if other objects are valid. See, e.g., Yates v. United States, 354 U.S. 298, 312 (1957) ("the proper rule to be applied is that which requires a verdict to be set aside in cases where the verdict is supportable on one ground, but not on another, and it is impossible to tell which ground the jury selected"); Williams v. N. Carolina, 317 U.S. 287, 292 (1942). In United States v. Garcia, the Second Circuit reversed a conviction for money laundering where "the jury was given three disjunctive bases for conviction, one of which was legally sufficient and two of which were legally insufficient." 992 F.2d 409, 415 (2d Cir. 1993). The Court held that since it "cannot tell the basis upon which the jury based its conviction of Garcia," the conviction had to be reversed. Id. at 416.

If the § 78dd-3 specified unlawful activity were to go to the jury here, the same error would obtain, and therefore that section should be dismissed from the Indictment.

## VII.   THE GOLDMAN DEFERRED PROSECUTION AGREEMENT SHOULD BE MODIFIED BECAUSE CERTAIN PROVISIONS WILL VIOLATE NG'S CONSTUTIONAL RIGHTS AT TRIAL

On October 22, 2020, the Department of Justice announced that it had reached a DPA with Goldman. As argued below, two of the DPA's provisions, whether intended or not, will violate Ng's constitutional rights at trial and should therefore be modified.

### A.   The Silence Provision

In addition to collecting $2.9 billion from Goldman, the Government also received something nearly as valuable from the DPA: Goldman's silence. Under ¶ 23 of the DPA:

> The Company expressly agrees that it shall not, through present or future attorneys, officers, directors, employees, agents or any other person authorized to speak for the Company, make any public statement, in litigation or otherwise, contradicting

the acceptance of responsibility by the Company set forth above or the facts described in the Statement of Facts.

Making this provision even more stifling, the Government has "sole discretion" in determining "whether any public statement by any such person contradicting a fact contained in the Statement of Facts will be imputed to the Company for the purpose of determining whether it has breached this Agreement." Id. Should the Government find that Goldman violate this provision, Goldman would be subject to prosecution "for any federal criminal violation of which the [the Government has] knowledge, including, but not limited to, the charges in the Information." Id.; see also id. at ¶¶ 17-20.

This "silence" provision, enforced at the sole discretion of the Government, ensures that no Goldman employee will contradict the Government's narrative relating to Goldman's misconduct – including Ng's alleged misconduct for which he is charged. This creates a constitutional issue in this case because it is "elementary that criminal defendants have a right to establish a defense by presenting witnesses." United States v. Williams, 205 F.3d 23, 29 (2d Cir. 2000). The Supreme Court described this fundamental right, "the right to offer the testimony of witnesses, and to compel their attendance, if necessary, is in plain terms the right to prepare a defense, the right to present the defendant's version of the facts as well as the prosecution' to the jury so it may decide where the truth lies." Taylor v. Illinois, 484 U.S. 400, 409 (1988) (quoting Washington v. Texas, 388 U.S. 14, 19 (1967)). "The right to establish a defense by presenting witnesses serves the truth-seeking function of the trial process by protecting against the dangers of judgments 'founded on a partial or speculative presentation of the facts.'" Williams, 205 F.3d at 29 (quoting Taylor, 484 U.S. at 411).

As the Second Circuit has noted: "Under certain circumstances, intimidation or threats that dissuade a potential defense witness from testifying may infringe a defendant's due process

rights." United States v. Pinto, 850 F.2d 927, 932 (2d Cir. 1988). In such situations, reversal is warranted where "the government's conduct interfered substantially with a witness's 'free and unhampered choice' to testify." Id.

That is precisely what the Government has done in this case. Because of this provision, Goldman employees who are potential exculpatory witnesses for Ng will now be afraid to testify on his behalf out of fear that the Government will find, in its sole discretion, that their testimony contradicts the DPA's Statement of Facts. For example, paragraph 25 of the Statement of Facts states that Goldman's employees and agents, including Leissner and Ng, circumvented Goldman's internal controls—an allegation that underlies Count Two of the indictment against Ng. In truth, as detailed above, Ng was one of the first Goldman employees to raise concerns about Low's background. These warnings were shared with the highest levels of the compliance and legal divisions—and with many individuals that the defense expects to be witnesses at the trial.

To fully defend Ng against Count Two, counsel would seek to call members of Goldman's Business Integrity Group and compliance department (both of whom were responsible for Goldman's internal accounting controls). Through these witnesses, counsel would establish that, far from circumventing Goldman's controls, Ng assisted Goldman in addressing its Low-related concerns.

In addition to paragraph 25, there are sixteen other paragraphs in the Statement of Facts that refer to Ng's conduct. Yet, due to the "silence" provision, even if a Goldman employee had information that directly contradicted any one of these allegations (e.g., the Red Flag Summary detailed above), the employee would be dissuaded from testifying out of intimidation that Goldman, and possibly the employee himself, could be then charged with a crime by the Government. Accordingly, by unnecessarily adding this provision to the DPA, the Government

86

will violate Ng's Due Process rights at trial. See, e.g., United States v. Golding, 168 F.3d 700, 702-03 (4th Cir. 1999) (prosecutors violate defendant's rights by threatening to bring additional charges against a witness if the witness gave exculpatory testimony on behalf of a defendant); United States v. MacCloskey, 682 F.2d 468, 475, 479 (4th Cir. 1982) (granting new trial where the prosecutor suggested to a prospective witness's attorney that "he would be well advised to remind his client [the witness] that, if she testified at [the defendant's] trial, she could be reindicted [for conspiracy to murder] if she incriminated herself during that testimony," ruling that the prosecutor's comment "destroyed the choice . . . [of the witness] to testify freely."); see also United States v. Smith, 478 F.2d 976, 977-79 (D.C. Cir. 1973) (defense witness told by prosecutor that if he testified as indicated by other testimony he could or would be prosecuted for carrying a concealed weapon, obstructing justice, and as an accessory to murder); United States v. Goodwin, 625 F.2d 693, 702-03 (5th Cir. 1980) (defense witnesses intimidated by threats of prison officials conditioned upon whether the witnesses testified at trial); United States v. Hammond, 598 F.2d 1008, 1012-15 (5th Cir. 1979) (defense witness threatened by FBI agent with retaliation in other cases pending against him); United States v. Henricksen, 564 F.2d 197, 198 (5th Cir. 1977) (per curiam) (defense witness intimidated by terms of his plea bargain in another case); United States v. Thomas, 488 F.2d 334, 335-36 (6th Cir. 1973) (per curiam) (defense witness told by secret service agent during recess of trial that he would be prosecuted for a felony if he testified).

## B. The Witness Provision

The crux of this case involves conduct alleged to have occurred in Southeast Asia, more than 9000 miles from the Eastern District of New York. Not surprisingly, many of the key trial witnesses are foreign nationals who live and work in Southeast Asia and are therefore beyond this Court's subpoena power. While this may seem to create an equal issue for both the Government

87

and the defense, the actual disparity is glaring. Under paragraph 5(c) of the DPA, Goldman is

obligated to

> use its best efforts to make available for interviews or testimony, as requested by
> the Offices, present or former officers, directors, employees, agents and consultants
> of the Company. This obligation includes, but is not limited to, sworn testimony
> before a federal grand jury, in federal trials or at any other proceeding, all meetings
> requested by the Offices, and interviews with domestic or foreign law enforcement
> and regulatory authorities.

Because of this provision, the Government can require that Goldman makes its present or

former Goldman employees available to testify for the Government at trial. Even before the DPA

was filed, Goldman had already provided the Government with access to its employees and had

voluntarily made some of its foreign-based employees available to the Government for interviews

in the United States.[27] (See DPA ¶ 4(b) (noting that Goldman "received partial credit for its

cooperation with the Offices' investigation of the underlying conduct, including: collecting and

producing voluminous evidence located in other countries; making regular factual presentations

and investigative updates to the Offices; and voluntarily making foreign-based employees

available for interviews in the United States."))

As a result of this provision in the DPA, the Government controls which, if any, Goldman

employees will be trial witnesses. This will undoubtedly lead to a one-sided portrayal of the facts.

This issue is compounded by the "silence" provision in paragraph 23 of the DPA, which, as noted

above, threatens Goldman with violating the DPA if a Goldman employee makes a statement "in

litigation or otherwise" that contradicts the facts described in the Statement of Facts. Coupling

---

[27] Because neither Goldman nor the Government informed counsel that potential foreign witnesses
were in the United States to be interviewed, counsel did not have the opportunity to serve these
witnesses with Rule 17 trial subpoenas while they were within this Court's subpoena power.

these provisions, the Government will not only be able to choose which Goldman witnesses will testify at trial (¶ 5(c)) but also control what these witnesses will say at trial (¶ 23).

While the Government has unfettered access to these foreign witnesses, Ng does not. Moreover, as noted in Court on several occasions, counsel is not able to travel to Malaysia to interview potential witnesses because of the country's Covid-19 restrictions. Unlike the Government, Ng does not have the might of a DPA behind him to require Goldman's foreign witnesses to travel to the United States and testify in the Eastern District of New York in his defense. This reality has Constitutional consequences, as described above. See Williams, 205 F.3d at 29 (quoting Taylor v. Illinois, 484 U.S. 400, 411 (1988)).

### C.      Request for Relief

To redress the Constitutional concerns listed above, counsel firsts requests that the Government agree to modify the Goldman DPA in two ways. First, the "silence" provision should be modified so that it specifically does not apply in the case against Ng. Second, the "witness" provision should be modified to require Goldman to make its employees available as defense witnesses to the same degree it makes its employees available to the Government. By modifying the DPA in this manner, the Government will remove fundamental unfairness that will otherwise permeate the trial.

If the Government does not agree, we request that this Court use its "supervisory power" that "permits federal courts to supervise 'the administration of criminal justice' among the parties before the bar." United States v. HSBC Bank USA, N.A., 863 F.3d 125, 135 (2d Cir. 2017) (quoting United States v. Payner, 447 U.S. 727, 735 n.7) (1980)). As noted by the Supreme Court:

> The purposes underlying use of the supervisory powers are threefold: to implement a remedy for violation of recognized rights; to preserve judicial integrity by ensuring that a conviction rests on appropriate considerations validly before the jury; and finally, as a remedy designed to deter illegal conduct.

United States v. Hasting, 461 U.S. 499, 505 (1983).

We appreciate that, in the normal course, a district court plays a limited role in DPAs. In HSBC Bank, the district court used its "supervisory power" to involve itself in the implementation of a DPA. The Second Circuit noted that the district court justified its use of the power because "it is easy to imagine circumstances in which a deferred prosecution agreement, or the implementation of such an agreement, so transgresses the bounds of lawfulness or propriety as to warrant judicial intervention to protect the integrity of the Court." HSBC Bank, 863 F.3d at 136. The Second Circuit rejected the district court's argument by noting:

> We agree that it is not difficult to *imagine* such circumstances. But the problem with this reasoning is that it runs headlong into the presumption of regularity that federal courts are obliged to ascribe to prosecutorial conduct and decisionmaking. That presumption is rooted in the principles that undergird our constitutional structure. In particular, because the United States Attorneys are charged with taking care that the laws are faithfully executed, there is a presumption of regularity support[ing] their prosecutorial decisions and, in the absence of clear evidence to the contrary, courts presume that they have properly discharged their official duties. In resting its exercise of supervisory authority on hypothesized scenarios of egregious misconduct, the district court turned this presumption on its head.

Id. Given the presumption of regularity, the Second Circuit noted that, "[a]bsent unusual circumstances . . . , a district court's role vis-à-vis a DPA is limited to arraigning the defendant, granting a speedy trial waiver if the DPA does not represent an improper attempt to circumvent the speedy trial clock, and adjudicating motions or disputes as they arise." Id. at 129.

This case, however, presents "unusual circumstances." Because of the confluence of the DPA provisions and the need for foreign witnesses at trial (along with the Covid-19 related travel restrictions), Ng has no ability to call material witnesses in his defense at trial. In the Rule 15 context, the Second Circuit has noted that "exceptional circumstances" are present when a

"witness' testimony is material to the case and if the witness is unavailable to appear at trial."
United States v. Johnpoll, 739 F.2d 702, 709 (2d Cir. 1984).

Those exceptional circumstances are even more severe in this case because, in contrast to
Ng, the Government has the ability to call any Goldman witness it wants, on pain of a violation of
the DPA. Moreover, because of the "silence" provision, the Government will also be able to ensure
that these witnesses testify in conformity with the Government's narrative depicted in the DPA's
Statement of Facts. Unlike in HSBC Bank, counsel here does not have to "imagine" a scenario
where the DPA "so transgresses the bounds of lawfulness or propriety as to warrant judicial
intervention to protect the integrity of the Court." This injustice is currently scheduled to take place
on March 8, 2021—Ng's trial date. We are therefore asking this Court to "implement a remedy for
violation of recommended rights" (Hasting, 461 U.S. at 505) and modify the DPA so that (1) the
"silence" provision specifically does not apply in the case against Ng; and (2) Goldman is required
to make witnesses available to both the Government and Ng for trial.

## VIII.   THE COURT SHOULD ORDER TO GOVERNMENT TO PROMPTLY PROVIDE BRADY MATERIAL IN ITS POSSESSION

### A.   Ng is Entitled to Communications Between the Government And Leissner's Counsel

On August 28, 2018, Tim Leissner appeared before Your Honor and provided a factual
allocution comprised of a variety of admissions regarding his role in one of the largest frauds ever
perpetrated, and implicating his one-time friend, and subordinate, Ng.

Leissner's script matched – often word for word – central parts of the Indictment that is
now pending against Ng. More troubling, a critical concept that is found nowhere in Leissner's
Information (the notion of a nefarious "culture" of hiding information from compliance in the

Southeast Asia offices of what the Indictment calls "Financial Institution #1") somehow appears in Leissner's allocution and then figures prominently in the Ng Indictment.

Who wrote these identical words? Leissner or the Government? What communications did the parties have in crafting Leissner's script? Did Leissner omit some critical piece of information that the Government wanted out? Did Leissner include information that the Government wanted in? Did the Government decide that Leissner should discuss the "culture" of his office, or did Leissner make that call? And, if there was coordination between Leissner and the Government, why did that happen? ███████████████████████████████████████████████? Courts around the country recognize that a criminal defendant is entitled to know the answers to these and related questions███████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████

Although the defense in this case asked for any such information by letter on September 16, 2020, the Government has refused to provide this material. (See Exhibit 1, Ng BOP and Brady Letter to DOJ at 5; Exhibit 2, DOJ BOP and Brady Response.) Therefore, Ng now requests that the Court order the Government to produce the items attached to this motion as Attachment A (see Exhibit 3, Attachment A), or to represent to the Court that no such material exists or was ever communicated in any form.

The Government has a duty to disclose all material evidence favorable to a criminal defendant. See, e.g., United States v. Madori, 419 F.3d 159, 169 (2d Cir. 2005) (citing Brady v. Maryland, 373 U.S. 83, 87 (1963)); see also Giglio v. United States, 405 U.S. 150, 154–55 (1972) (applying Brady to material that can be used to impeach prosecution witnesses). "A Brady

violation occurs when the government fails to disclose evidence materially favorable to the accused." Youngblood v. West Virginia, 547 U.S. 867, 869 (2006). Evidence is favorable if it is either exculpatory or impeaching. See, e.g., Strickler v. Greene, 527 U.S. 263, 281–82 (1999). Evidence is material if "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." Youngblood, 547 U.S. at 870 (internal quotation marks omitted). Materiality, for the purposes of Brady, does not mean that "disclosure of the suppressed evidence would have resulted ultimately in the defendant's acquittal," but only a "showing that the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." Id. (internal quotation marks omitted). The assessment of materiality is made in light of the entire record. United States v. Agurs, 427 U.S. 97, 112 (1976). When the Government violates its Brady obligations, "it deprives the defendant of his or her liberty without due process of law." United States v. Triumph Capital Grp., Inc., 544 F.3d 149, 161 (2d Cir. 2008). Materials reflecting, or communications leading to, material changes in a cooperator's statements are covered by Brady and its progeny. See id. at 165.

Here, during Leissner's plea hearing performance, the Court stated, "Okay. So I need you to tell me in your own words what you did to make you guilty . . . ." (Leissner Plea Tr. at 35.) (emphasis added). Leissner then told the Court, "Your Honor, I wrote a statement." (Id. at 35) (emphasis added).

But did he? A close comparison of the Indictment filed against Ng with the plea colloquy that Leissner claimed he wrote himself lays bare that numerous sections mirror each other – often word for word. Here are just some examples:

- Compare Ind. ¶ 21 ("NG and Co-Conspirator #1 were both agents acting within the scope of their employment on behalf of Financial Institution #1") with Leissner Plea Tr. at 36:15-

17 ("I acted on behalf of, and within the scope of my employment and agency of, Goldman Sachs . . . .")

- Compare Ind. ¶ 4 ("1MDB was a strategic investment and development company wholly owned and controlled by the Government of Malaysia") with Leissner Plea Tr. at 37:12-14 ("1MDB was a strategic investment and development company wholly owned and controlled by the Government of Malaysia.")

- Compare Ind. ¶ 15 ("1MDB was created to pursue investment and development projects for the economic benefit of Malaysia and its people.") with Leissner Plea Tr. at 37:14-16 ("1MDB was created to pursue investment and development projects for the economic benefit of Malaysia and its people.")

- Compare Ind. ¶ 16 ("while NG was acting within the scope of his employment as an agent of U.S. Financial Institution #1, with the intent, at least in part, to benefit U.S. Financial Institution #1") with Leissner Plea Tr. at 37:16-18 ("While acting within the scope of my employment and with the intent to benefit Goldman Sachs and myself . . . .")

- Compare Ind. ¶¶ 18 ("bribes and kickbacks"), 52 ("caused bribes and kickbacks to be paid"), 55 ("continued to pay bribes and kickbacks") with Leissner Plea Tr. at 37:19-21 ("I entered into a conspiracy . . . to pay bribes and kickbacks . . . .")

- Compare Ind. ¶ 20 (Low was "acting as an intermediary between U.S. Financial Institution # 1, 1MDB and other Malaysian and Abu Dhabi government officials") with Leissner Plea Tr. at 39:20-21 (Low "was acting as an intermediary for on [sic] behalf of Goldman Sachs, 1MDB, and Malaysian and Abu Dhabi officials").

- Compare Ind. ¶ 44 (co-conspirators knew that proceeds "would be illegally diverted to themselves and others, including foreign government officials, through shell companies beneficially owned and controlled by themselves and others.") with Leissner Plea Tr. at 38:17-22 (Leissner knew that funds "would be diverted to me and others, including government officials, through shell companies beneficially owned and controlled by myself and others"),

- Compare Ind. ¶¶ 15 (laundered funds were used "to pay bribes to obtain and retain business for U.S. Financial Institution #1"); 16 (defendants conspired "to obtain and retain business from 1MDB for U.S. Financial Institution #1", co-conspirators used Low's connections "to obtain and retain 1MDB business for U.S. Financial Institution #1"); 23 (co-conspirators concealed Low's involvement in the efforts "to obtain and retain 1MDB business for U.S. Financial Institution #1"); 24 (co-conspirators intended "to obtain and retain business from 1MDB for the benefit of U.S. Financial Institution #1") with Leissner Plea Tr. at 40:5-6 (Low paid "to obtain and retain 1MDB business for Goldman Sachs").

- Compare Ind. ¶¶ 45 (Project Maximus "result[ed] in substantial revenues and other fees for U.S. Financial Institution #1"); 51 (Project Catalyze resulted in "substantial revenues and fees from the deal" for "U.S. Financial Institution #1") with Leissner Plea Tr. at 40:13-

94

14 (the "three bond deals and related transactions resulted in substantial fees and revenues for Goldman Sachs").

- Compare Ind. ¶ 65(a) (alleging that the transfer of certain funds were "designed in whole and in part to conceal and disguise the nature, location, source, ownership and control of the proceeds" of specified unlawful activities) with Leissner Plea Tr. at 38:24-39:2 (fund transfers were "designed, at least in part, to conceal and disguise the nature, location, source, ownership, and control of the diverted and the stolen funds.")

- Compare Ind. ¶ 36 (Project Magnolia resulted in "large year-end bonuses" for the co-conspirators) with Leissner Plea Tr. at 40:16 ("I received large year-end bonuses").

Perhaps Leissner's plea colloquy was just plagiarized by him independently of the Government. After all, he does say that he "read the information filed by the government." Leissner Plea Tr. at 36:4-5. If so, then his colloquy will be just one more example of Leissner's lies, since he replied to the Court's admonition to describe "in your own words what you did to make you guilty" by saying "**I** wrote a statement." Id. at 35:18-19; 22 (emphasis added). If Leissner did not actually write the statement, but just lifted his performance wholesale from the Government's charging document, that's fine; but the defense is entitled to know from the Government whether they had any involvement in or supervision of the statement that Leissner made to the Court.

But that seems to not be the whole story. For aside from the numerous examples, above, of identical language in the Leissner plea allocution and the Government's charging documents, there is an even more intriguing example – one that raises questions about whether there was any interplay between the Government and Leissner in crafting Leissner's allocution. There is one significant statement in the Leisner plea allocution which is nowhere in the Leissner Information – but which, critically, then shows up in the Ng Indictment. This is a remarkable allegation regarding the "culture" of "Financial Institution #1."

Paragraph 19 of the Ng Indictment and Paragraph 20 of the Leissner Information each describe how the internal accounting controls of "Financial Institution #1" were overseen by two

groups: the "Compliance Group" and the "Business Intelligence Group." See Ng Ind. ¶ 19 and Leissner Information ¶ 20. Since these two paragraphs are performing the same function, perhaps it is unsurprising that the first three sentences of Paragraph 20 of the Leissner Information and Paragraph 19 of the Ng Indictment are virtually identical. (E.g., compare Ind. ¶ 19 ("These groups worked in conjunction with, and as part of, various committees in reviewing transactions, including the three 1MDB bond deals, for approval") with Leissner Information ¶ 20 ("These groups worked in conjunction with, and as part of, various committees in reviewing transactions, including the three 1MDB bond deals, for approval.").)

Then, though, the Indictment takes a sharp turn, and includes a concept nowhere to be found in the Leissner Information: "However, the business culture at U.S. Financial Institution #1, particularly in Southeast Asia, was highly focused on consummating deals, at times prioritizing that goal ahead of the proper operation of its compliance functions." Ind. ¶ 19. Again, this sentence – and this concept – is wholly missing from the Leissner Information. Where did this idea come from? One clue may be found in Leissner's plea allocution, where Leissner stated, "During the course of the conspiracy, I conspired with other employees and agents of Goldman Sachs very much in line of [sic] its culture of Goldman Sachs to conceal facts from certain compliance and legal employees of Goldman Sachs . . . ." (Leissner Plea Tr. at 39:16-18). Leissner's plea took place on August 28, 2018, and the Government filed its Indictment against Ng just about a month later, on October 3, 2018. So, again, why did the Indictment include this nugget about the "culture" of "Financial Institution #1"? Whose idea was it to include in the Leissner allocution, and what conversations or communications were there between Leissner's counsel and the Government regarding whether that concept was going to be included in the allocution? The Constitution mandates that the defense is entitled to an answer to this question. This is true as a general matter.

It is especially true here, where Leissner stands poised to be the Government's sole witness implicating Ng in allegedly unlawful conduct.

If the Government was involved in crafting Leissner's performance at his plea hearing, it is not necessary for the Court to decide that the Government cannot or should never do so. Certain types of involvement would certainly be improper. For example, if the Government knew that Leissner initially drafted a version of events in which Ng was less directly implicated, and did not disclose that fact, and all communications surrounding any changes to Leissner's allocution as delivered, Ng's due process rights would be violated. See, e.g., Triumph Capital, 544 F.3d at 162 ("The difference between the government's final version of events and the version supported by Silvester's initial proffer, which was suppressed, is directly relevant to the intent element of the consulting contract bribe charges. . . . By suppressing [the special agent]'s notes of that proffer, the government deprived Spadoni of exculpatory evidence going to the core of its bribery case against him.").

As another example, if the Government's involvement went even further, and scripted either Leissner's colloquy or his trial testimony, this would obviously be improper, and should likewise be a subject of vigorous cross-examination. See, e.g., United States v. Milles, 363 F. App'x 506, 509 (9th Cir. 2010) (finding it "highly improper" for Government to hand witness a Q&A sheet thirty minutes before he testified but denying relief in part because defendants were able to cross-examine witness on the document); United States v. Cincotta, 689 F.2d 238, 244–45 (1st Cir. 1982) (Government document coaching witnesses on how to present testimony was "prosecutorial misconduct" but denying relief because the trial court permitted defendant to cross-examine witnesses on the documents and explained to the witnesses "in great detail why the government conduct was improper" prior to their testimony); Maldonado v. Scully, Civ. A. No.

89-5483 (RWS), 1990 WL 102209, at *2 (S.D.N.Y. July 12, 1990) (noting impropriety when "prosecutor took the position that the State would entertain a plea from the co-defendants only if they allocuted to the facts as the prosecutor purported to know them to be"); cf. In re Eldridge, 82 N.Y. 161, 171 (1880) ("[The attorney's] duty is to extract the facts from the witness, not to pour them into him; to learn what the witness does know, not to teach him what he ought to know.").

Other communications might not be per se improper – but the defense must be allowed to know about them. The point, as defense counsel in an ongoing case in the Southern District of New York put it aptly, "is that if prosecutors comment on proposed allocutions, and if those comments lead to material changes in a cooperator's allocution, the defense should know, and should be given the opportunity to cross-examine the cooperator on his or her willingness to adopt those changes." United States v. Ahuja, 18 Cr. 328 (KPF). This is a matter of due process █████

████████████████████████████████████████████████████████████

██████████████████████████████████████████

█████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████

███████████████████████████████████████████

█████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████ In

Ahuja the defendants were charged with "mismarking" securities they held in two hedge funds they operated, which allegedly fraudulently inflated the value of those funds. See Ahuja, Crim. A. No. 18-328 (S.D.N.Y.), Dkt. 2 (Ind.) at ¶ 17. These actions, the Government charged, defrauded the funds' investors. One of the hedge funds' employees, Amin Majidi, ended up cooperating with the Government and pled guilty on October 31, 2018. Two other defendants, Anilesh Ahuja and Jeremy Shor, proceeded to trial, which began on June 3, 2019.

Just before trial, in May 2019, defense counsel for Ahuja served a Rule 17 subpoena on Majidi's counsel, which requested any communications that Majidi's counsel had with the Government regarding Majidi's plea allocution. Before Majidi's counsel produced responsive documents, but after the trial had started, the Government produced some communications between the Government and Majidi's counsel which showed, among other things, that Majidi's plea allocution drafted by Majidi differed in substantial respects from the allocution that he actually delivered in court at his plea hearing, and that the Government had line-edited the draft allocution to better fit their theory of the case against Ahuja and Shor.[28] The Government also produced documents showing that the allocution of a second cooperator, Dinucci, also changed between the time it was drafted and when it was delivered in court. Moreover, the communications between the Government and the cooperators' counsel at least suggested the possibility that the parties were attempting to communicate only orally regarding any changes to the plea allocutions, so as to avoid a paper trail.

---

[28] Notably, during his plea hearing, Majidi stated that he was reading from "written notes"; the Court asked whether the "thoughts expressed in those notes are yours," and Majidi replied, "They are mine." See Ahuja, Crim. A. No. 18-328 (S.D.N.Y.), Dkt. No. 366, at 2. Compare this to Leissner:
> THE COURT:  Okay.  So I need you to tell me in your own words what you did to make you guilty . . . . .
> LEISSNER:  Your Honor, I wrote a statement.  (Leissner Plea Tr. at 35:18-19, 22.)

Defense counsel for Ahuja and Shor sought to cross-examine Majidi and Dinucci on the changes to their allocutions, but the Court denied their request. Ahuja and Shor were convicted at trial. In November 2019, Ahuja's counsel made a FOIA request to the Executive Office of United States Attorneys, seeking documents that the AUSAs on the case had created relating to the allocutions of the cooperators. As a result of the FOIA process, even more materials relating to the Government's interactions with defense counsel were uncovered. On July 24, 2020, Judge Failla held a hearing into the Government's actions, and has ordered the Government to produce additional documents.

Sometimes, violations of defendants' rights through improper witness coaching or interactions between the Government and its cooperators are discovered early enough that the Government's witnesses can be cross-examined on those interactions. In certain such cases, courts have held that although "[t]here is no doubt the prosecutors acted improperly," the defendant's ability to cross-examine Government witnesses regarding the improper activity precluded reversal of a conviction based on the Government's violations. These decisions, however, are predicated wholly on the fact that the impeaching information was available during cross-examination. See, e.g., United States v. Milles, 363 F. App'x 506, 508 (9th Cir. 2010) (Prosecutors drafted and provided "Q&A" to Government witness, which defense discovered by happenstance; because witness was recalled and cross-examined regarding the Government's script, Court held that "[t]hough highly improper, the prosecutors' misconduct did not deny Milles his right to a fair trial"); United States v. Sayakhom, 186 F.3d 928, 945 (9th Cir.1999) (holding defendant did not show that the alleged coaching materially affected the outcome of the trial and stating "[c]ross-examination and argument are the primary tools for addressing improper witness coaching"); United States v. Bryant, No. 95 CR. 240 (JFK), 1996 WL 183010, at *4 (S.D.N.Y. Apr. 17, 1996)

("To the extent that Bryant's counsel wished to examine Agent Cousin with respect to any alleged efforts by Agent Cousin to 'coach,' 'extort' or 'threaten' the witnesses who testified against Bryant, counsel was free to do so."). Indeed, <u>Geders v. United States</u>, 425 U.S. 80 (1976) held that what is good for the goose is good for the gander: there, the Court was confronted with possible coaching of a defense witness while on a break in proceedings. The Court held that "[t]he opposing counsel in the adversary system is not without weapons to cope with 'coached' witnesses" – primarily, of course, this weapon is cross-examination. "A prosecutor may cross-examine a defendant as to the extent of any 'coaching' during a recess . . . . Skillful cross-examination could develop a record which the prosecutor in closing argument might well exploit by raising questions as to the defendant's credibility, if it developed that defense counsel had in fact coached the witness as to how to respond . . . ." <u>Geders</u>, 425 U.S. at 89–90.

Ng requests to be armed with the "weapons" to which <u>Geders</u> refers: the communications that the Government had with Leissner and Leissner's counsel regarding his allocution. Ng is eager to demonstrate to the jury what Leissner's word is worth, but to do so, he must have – and is entitled to, clearly – the information requested here. In this case, the Court has an opportunity to avoid the types of problems that bedeviled the prosecutions in <u>Ahuja</u> and <u>Triumph Capital</u>. By ordering the Government to produce the materials and communications in Attachment A of this motion, or certifying that no such materials or communication exist, the Court will ensure, before the trial, that Ng's due process rights are not violated.

**B.      Ng Is Entitled to All Material Covered by the DPA Goldman And the Government Recently Executed**

As a result of its actions regarding 1MDB, Goldman Sachs Group, Inc. faced indictment and the potential loss of its U.S. banking privileges as well as the ability to conduct transactions in dollars, a consequence that could signal the end of the company. Unsurprisingly, Goldman said

what it had to say, and its final statements have been memorialized in publicly filed documents. Now, Ng should be entitled to Goldman's "regular factual presentations and investigative updates" to the DOJ. (See DPA at 4, ¶ 4(b).) He is entitled to know what Goldman has said in presentations to the Government over the past four years and how Goldman's story changed over time. The Government has explicitly admitted the existence of material that Goldman provided to the Government (see id.), but has not provided it to Ng (see Ex. 1 at p. 5; Ex. 2 at p. 5). Ng has specifically requested this documentation and he has not received it.[29] (Id.) It is contrary to the Government's Rule 16 and Brady obligations and it is contrary to the settled law of this Circuit. Ng therefore moves for all material covered by the DPA entered into recently between Goldman and the Government.

"The threat of ruinous indictment brings significant pressure to bear on corporations." United States v. Connolly, 16 Cr. 370 (CM), 2019 WL 2120523, at *13 (S.D.N.Y. May 2, 2019) (citing United States v. Stein, 541 F.3d 130, 151 (2d Cir. 2008) ("Stein II") (brackets, quotation marks, and further citations omitted). As the Second Circuit observed in the KPMG tax shelter case, "KPMG was faced with the fatal prospect of indictment; it could be expected to do all it could, assisted by sophisticated counsel, to placate and appease the government." Stein II at 142. Judge McMahon put a fine point on the situation of another financial behemoth facing down the

---

[29] In response to the Ng's Brady letter, the Government  wrote: "You have requested all 'materials in the possession…of the government' pursuant to Brady. . . . In response, we refer you to the material already produced in discovery."

The Government "cannot hide Brady material as an exculpatory needle in a haystack of discovery materials." United States v. Thomas, 981 F. Supp. 2d 229, 239 (S.D.N.Y. 2013). At some point, such evidence is effectively unavailable to the defense, even if it has technically been produced. See United States v. Gil, 297 F.3d 93, 106 (finding Brady evidence unavailable when made as part of a large production on the eve of trial); see also United States v. Hsia, 24 F. Supp. 2d 14, 29–30 (D.D.C. 1998) ("The Government cannot meet its Brady obligations by providing . . . 600,000 documents and then claiming that [the defendant] should have been able to find the exculpatory information in the haystack").

barrel of an indictment: "Deutsche Bank was facing the threat of ruin, such that the only 'choice'

facing Deutsche Bank when it received the [Government's] letter was the 'level of cooperation' it

would provide to the Government – because not cooperating was not an option. Viewed in that

light, the [Government's] request that Deutsche Bank conduct a 'voluntary' investigation was a

classic 'Godfather offer' – one that could not be refused." Id.

In this case, it was Goldman in the role of the bandleader who had signed Johnny Fontaine,

to bring Judge McMahon's movie reference to a final resting place. To save its collective skin, on

October 22, 2020, Goldman Sachs pled to an Information and signed a plea agreement before Your

Honor. See United States v. The Goldman Sachs Group, Inc., Crim. A. No. 20-437 (MKB) (Oct.

22, 2020). In exchange, Goldman Sachs got what it was looking for: It escaped the death penalty.

For, as part of the deal struck by Goldman and the Government, the Government gave Goldman

Sachs Group a DPA. The DPA is, of course, literally a lifeline for Goldman Sachs: Without it, if

the Government had indicted the company, it would almost certainly have gone out of business.[30]

The DPA reveals a course of dealing between the Government and its cooperator – a course

of dealing that includes Rule 16, exculpatory and/or impeachment information – that has been thus

far withheld from Ng. It is clear from the Government's own filings that the Government has not

turned over information that is within its possession, custody, or control, and that is material to the

defense, exculpatory, and/or impeaching.

The DPA includes two sections that are critical for this motion: First, a section called

"Relevant Considerations" (see id. at 4-7, ¶ 4); and second, a section called "Future Cooperation

and Disclosure Requirements," (see id. at 7-9, ¶ 5). Essentially, Paragraph 4 outlines the

---

[30] The DPA also included several sweeteners for Goldman, including no requirement of a monitor.
(See id. at 5, ¶ 4(f).). Of course, fundamentally, Goldman was able to buy its way out of its
problems–not an option offered to Ng.

cooperation that Goldman already provided the Government and Paragraph 5 details the cooperation that Goldman will be forced to provide going forward.

Paragraph 4 demonstrates that Goldman, now the Government's newly-minted cooperator, has already produced a trove of material to the Government, but the Government has not provided this material to Ng.

The "Relevant Considerations" section provided Goldman with "partial credit for its cooperation with the Offices' investigation of the underlying conduct, including:

- "collecting and producing voluminous evidence located in other countries" (id. at 4, ¶ 4(b));
- "making regular factual presentations and investigative updates to the Offices" (id.);
- "voluntarily making foreign-based employees available for interviews in the United States" (id.);
- "producing relevant evidence, including recorded phone calls in which the Company's bankers, executives, and control functions personnel discussed allegations of bribery and misconduct relating to" the 1MDB matter (id. at 4, ¶ 4(c));
- "provid[ing] all relevant facts known to it, including information about the individuals involved in the misconduct" (id. at 4, ¶ 4(d)).

The defense has not received the majority of this material, to which we are entitled. First, Ng has not received the "factual presentations" that Goldman provided to the Government. Goldman's presentations to the Government have been widely reported, with one New York Times article even detailing timing, individual slides, and remarkable detail:

> In November, for example, the bank met with federal prosecutors in Washington and delivered a lengthy PowerPoint presentation that sought to paint Mr. Leissner as a man practiced in the art of deception, according to two people familiar with the presentation.
>
> One slide in the presentation said that Mr. Leissner may have been briefly married to two women at the same time.
>
> Another slide included a photo of Mr. Leissner praying with other men, as well as images of a government-issued ID card that showed Mr. Leissner describing himself as Muslim. The people familiar with the presentation said Goldman

officials used the slide to claim that Mr. Leissner twice converted to Islam in order to impress wealthy Muslim women he was dating.[31]

Goldstein, Matthew, Goldman Sachs's Tactic in Malaysian Fraud Case: Smear an Ex-Partner, NEW YORK TIMES (Jan. 16, 2019),  https://www.nytimes.com/2019/01/16/business/goldman-malaysia-1mdb-leissner.html. These details are exculpatory and impeachment material, or at the very least Rule 16(a)(1)(E)  material (requiring Government to "permit the defendant to inspect and to copy . . . items[] if the item is within the government's possession, custody, or control and "is material to preparing the defense"). However, the defense, despite asking for these, does not have them. The Court should order the Government should produce this immediately.[32] It is clear, moreover, that since Goldman provided these materials to the Government, they are not privileged.[33]

---

[31] Though counsel has not seen this presentation, counsel can now confirm after combing through discovery materials that all of these details are completely accurate.

[32] These materials should include all notes, reports, analysis and commentary relating to these presentations, as well as any others containing exculpatory information. See, e.g., Spicer v. Roxbury Correctional Institute, 194 F.3d 547, 559–61 (4th Cir. 1999) (holding that the prosecution violated Brady by failing to produce records of an attorney proffer made to the government); see also United States v. Pelullo, 105 F.3d 117, 122–23 (3d Cir. 1997) ("[R]ough notes often may constitute valuable Brady material.").

Moreover, the Government should be ordered to turn over memoranda and/or notes of attorney proffers during which attorneys for the Government's cooperator, Goldman Sachs, alleged co-conspirators, including Tim Leissner, and other potential witnesses previewed exculpatory evidence that their clients would provide.  The Government should be required to turn these materials over under Brady because statements made to the Government by attorneys on behalf of their clients are attributable to the clients for Brady purposes.  See, e.g., Spicer, 194 F.3d at 559–61; see also United States v. Triumph Capital Grp., Inc., 544 F.3d 149, 163 (2d Cir. 2008).

[33] See, e.g., In re Steinhardt Partners, L.P., 9 F.3d 230, 236 (2d Cir. 1993) (rejecting "attempt to use the [work product] doctrine to sustain the unilateral use of a memorandum containing counsel's legal theories voluntarily submitted to an investigatory body," holding that "selective assertion of privilege should not be merely another brush on an attorney's palette, utilized and manipulated to gain tactical or strategic advantage. . . .  [A] corporation has substantial incentives to cooperate with [Government] requests for assistance. Voluntary cooperation offers a corporation an opportunity to avoid extended formal investigation and enforcement litigation by the [Government], the possibility of leniency for prior misdeeds, and an opportunity to narrow the

Second, the defense is entitled to know what the "investigative updates" are and how it impacted the nature of this investigation, and who directed it. In other words, did Goldman direct the investigation or the Government? How much information was shared? Who decided which witnesses would be interviewed, and what would be asked? Who provided documents and topics for those interviews? Numerous decisions from courts throughout the country have recognized that, with increasing frequency, the Government "outsources" its investigations to private companies. There is nothing inherently nefarious about such a practice, but it certainly implicates the rights of a criminal defendant, as these cases have also recognized: In such cases, the private company becomes part of the prosecution team, and its files become the Government's files for the purposes of Rule 16, Brady, and Giglio. The reference to Goldman's "investigative updates," which it obviously shared with the Government, begs a number of obvious questions, including what else Goldman shared and, more importantly, whether the Government has examined all of Goldman's files for any material that must, under the law, be turned over to Ng.

Critically, based upon the language of the DPA, it appears likely that Goldman's files contain Rule 16 or Brady material, and that Ng would be entitled to that non-privileged material.

**Rule 16**. United States v. Stein, the KPMG tax shelter case, is directly on point. See 488 F. Supp. 2d 350, 360-64 (S.D.N.Y. 2007). There, the district court required the Government, under Rule 16, to produce documents in the possession of KPMG precisely because, just like here, KPMG had signed a DPA, which gave the Government the right to demand production of documents from KPMG. Id. KPMG attempted to argue that Rule 16 material was limited only to material actually in the Government's physical possession. The court rejected this argument out of

issues in any resulting litigation."); Permian Corp. v. United States, 665 F.2d 1214, 1221 (D.C. Cir. 1981) (rejecting selective waiver of attorney-client privilege).

hand, holding that "it cannot be reconciled with the plain language of Rule 16. The rule speaks of 'possession, custody or control,' not simply 'possession.' KPMG's argument would read the words 'custody or control' out of the rule in flat contravention of the principle that all words in a statute, rule or contract are to be given meaning whenever possible." Id. at 363.

Here, just like in Stein, the DPA provides that "[t]he Company shall truthfully disclose all factual information with respect to its activities . . . including any evidence or allegations and internal or external activities . . . about which the Offices may inquire." (DPA at 8, ¶ 5(a).) "This obligation of truthful disclosure includes, but is not limited to, the obligation of the Company to provide the Offices, upon request, any document, record, or other tangible evidence . . . ." Id. The language of the DPA could not be more clear: this is the exact same situation as Stein. The Government controls Goldman through the DPA, and Rule 16 requires that Ng be allowed to "inspect and to copy" all material in the possession of either Goldman or the Government that is covered by paragraphs 4 and 5 of the DPA.

Indeed, in Stein II, the Second Circuit held that KPMG, nominally an "adversary" of the Government in the tax shelter investigation, was actually converted into a "state actor" when it refused to advance attorneys' fees for certain partners when both the firm and the partners were being investigated. See Stein II at 146-151. The Court asked, rhetorically, "So how can KPMG, an adversary of the government, also be its partner?" Id. at 151. It answered, "[a]n adversarial relationship does not normally bespeak partnership. But KPMG faced ruin by indictment and reasonably believed it must do everything in its power to avoid it. The government's threat of indictment was easily sufficient to convert its adversary into its agent." Id. The Court of Appeals therefore upheld the dismissal of indictments against the KPMG partners who had been charged based on Sixth Amendment violations – the Court imputed KMPG's refusal to provide counsel to

the Government. Again, the DPA was key, and directly on point here. See also, e.g., United States v. Tomasetta, 10 Cr. 1205 (PAC), 2012 WL 896152, at *5 (S.D.N.Y. Mar. 16, 2012) ("If the Government has a written agreement with the third party giving it the legal right to obtain documents upon demand . . . the Government may be in 'control' of such materials, even if in the possession of third parties.").

**Brady**. It is well-settled that the Government's Brady obligations extend beyond the materials in the Government's actual possession. See Kyles v. Whitley, 514 U.S. 419, 437 (1995); see also, e.g., United States v. Reyeros, 537 F.3d 270, 281 (3d Cir. 2008); United States v. Risha, 445 F.3d 298, 303 (3d Cir. 2006) ("There is no question that the government's duty to disclose under Brady reaches beyond evidence in the prosecutor's actual possession.").

This is because Brady imposes on the Government a "duty to learn of any favorable evidence known to the others acting on the government's behalf in the case . . . ." Kyles, 514 U.S. at 437 (emphasis added). Since the Government "is presumed to have knowledge of all information gathered in connection with his office's investigation of the case," United States v. Avellino, 136 F.3d 249, 255 (2d Cir. 1998), the Government has "constructive possession" or "constructive knowledge" of Brady material in the hands of anyone who is "an arm of the prosecutor" or part of the "prosecution team." See, e.g., Gil, 297 F.3d at 106 ("The government is reasonably expected to have possession of evidence in the hands of investigators, who are part of the 'prosecution team'); United States v. Morell, 524 F.2d 550, 555 (2d Cir. 1975) (Brady obligations extend to those who are "an arm of the prosecutor," including those who are "intimately involved in the prosecution"); United States v. Bin Laden, 397 F. Supp. 2d 465, 481 (S.D.N.Y. 2005) ("a prosecutor has constructive knowledge of any information held by those whose actions can be fairly imputed to him").

"Whether someone is part of the prosecution team depends on the level of interaction between the prosecutor and the agency or individual." United States v. Meregildo, 920 F. Supp. 2d 434, 440–41 (S.D.N.Y. 2013); see also Risha, 445 F.3d at 304 (Government has constructive possession over materials in another entity's files where, inter alia, (1) the entity is "acting on the government's 'behalf' or is under its 'control'"; (2) the entity and the Government "are part of a 'team,' are participating in a 'joint investigation' or are sharing resources; and (3) the Government has 'ready access' to the evidence at issue."). Here, the level of interaction is as high as Mount Everest, as described in paragraph 4 of the DPA. The true scope of the relationship between Goldman and the Government is unknown. It certainly appears, based on the language of the DPA, that Goldman and its counsel played an active and instrumental role in the Government's investigation of this case. It may well be that the Government delegated numerous investigative tasks to Goldman; the point here is that Ng does not know any of that because the Government has not seen fit to produce this information. The DPA is clear that the "interaction" has been sustained and intimate, and Ng is determined to find out exactly how sustained and exactly how intimate. To do so, he is entitled to the information covered by paragraphs 4 and 5 of the DPA through Brady and its progeny.

Courts have repeatedly held that where the Government and the SEC conduct a "joint investigation," the SEC is deemed to be a member of the prosecution team. See, e.g., United States v. Martoma, 990 F. Supp. 2d 458, 460-62 (S.D.N.Y. 2014) (in determining that SEC was a member of the prosecution team, relying, inter alia, on the fact that the Government and SEC conducted joint witness interviews, shared documents and often conferred about the SEC's parallel investigation); United States v. Gupta, 848 F. Supp. 2d 491, 492-94 (S.D.N.Y. 2012) (holding that the SEC's and the Government's "joint fact-gathering" triggered the Government's Brady

obligations); <u>United States v. Rigas</u>, 779 F. Supp. 2d 408, 414 (M.D. Pa. 2011) (holding that the SEC and Government's investigation were jointly undertaken); <u>United States v. Reyes</u>, 577 F.3d 1069, 1078 (9th Cir. 2009) (reversing conviction due to, <u>inter alia</u>, the Government's failure to disclose information uncovered in a parallel civil SEC investigation).

But it is not just the SEC with whom the Government can jointly investigate a case. A private party may be so closely aligned with the Government that it becomes a member of the prosecution team. <u>See</u> <u>United States v. Duronio</u>, Crim. No. 02-933 (JAG), 2006 WL 1457936, at *2-4 (D.N.J. May 23, 2006).

For example, in <u>Connolly</u>, defendants worked at Deutsche Bank and were accused of conspiring to manipulate the London Inter-Bank Offered Rate ("LIBOR"). <u>See</u> 2019 WL 2120523, at *1. Deutsche Bank engaged in an investigation led by Paul Weiss, its outside counsel, while maintaining a close relationship with the Government, which was also conducting an investigation. <u>See id.</u> The similarities between what Deutsche Bank did in <u>Connolly</u> and what Goldman did here are striking:

- Just like in the present case, the Government demanded that the bank's lawyers "would regularly provide updates on its internal investigation." <u>Id.</u> at *2; <u>compare with</u> DPA at 4, ¶ 4(b) (Goldman "ma[de] regular . . . investigative updates to" the Government);

- Just as Goldman presumably did here, Paul Weiss submitted a "white paper" on behalf of Deutsche Bank, which "provides an exhaustive overview of the Bank's substantial cooperation with the Government during its LIOR investigation." <u>Id.</u> at *7; <u>compare with</u> DPA at 4, ¶ 4(b) (Goldman "ma[de] regular factual presentations" to the Government);

- Just as Goldman did here, Paul Weiss "extracted and reviewed" millions of electronic documents, many of which were located in other countries, and listened to voluminous audio recordings. <u>Id.</u>; <u>compare with</u> DPA at 4, ¶¶ 4(b), 4(c) (crediting Goldman with "collecting and producing voluminous evidence located in other countries" and "producing relevant evidence, including recorded phone calls");

- Just like with Goldman here, "Deutsche Bank would not have been eligible for cooperation credit had it not done these things." <u>Id.</u>; <u>compare with</u> DPA at 4, ¶ 4(b) ("the Company received partial credit for its cooperation with the Offices' investigation"); at 6, ¶ 4(m)

110

("the Company has agreed to continue to cooperate with the Offices' ongoing investigation"); at 10, ¶ 8 ("The Total Criminal Penalty reflects a ten (10) percent discount off the bottom of the applicable U.S.S.G. fine range for the Company's cooperation.")

• Just like with Goldman here, "Deutsche Bank also assisted and facilitated the Department's interviews of current and former employees, including foreign employees." Id. at *8; compare with DPA at 4, ¶ 4(b) (crediting Goldman with "voluntarily making foreign-based employees available for interviews in the United States.")

In Connolly, Defendant argued that, because of the close relationship between Deutsche Bank's investigation and the Government's investigation, his uncounseled interviews with Paul Weiss "were both 'fairly attributable' to the Government and 'compelled,' thereby violating his constitutional right against self-incrimination" as articulated in Garrity v. New Jersey, 385 U.S. 493 (1967). Id. at 10.[34] The Court ultimately held that "the Government violated Garrity, because Deutsche Bank's interviews of [the defendant], for which he was compelled to sit under threat of termination, are fairly attributable to the Government." 2019 WL 2120523, at *14.

Ng is obviously not asking the Court to find a Garrity violation in this motion. The point here is that the Government has failed in its obligation to turn over the information covered by the

---

[34] Garrity held that where statements are obtained from employees under threat of termination, those statements are involuntary for Fifth Amendment purposes and therefore inadmissible in a criminal trial. See Garrity, 385 U.S. at 496-97. "[T]he Garrity rule applies with equal vigor to private conduct where the actions of a private employer in obtaining statements are 'fairly attributable to the government,'" Connolly, 2019 WL 2120523, at *10 (quoting Stein II, 541 F.3d at 152 n.11 (2d Cir. 2008)), that is, when "there is a sufficiently close nexus between the state and the challenged action." Blum v. Yaretsky, 457 U.S. 991, 1004 (1982) (internal quotation marks and citation omitted).

In turn, "a close nexus of state action exists between a private entity and the state when a governmental actor (i) exercises coercive power; (ii) is entwined in the management or control of the private actor; (iii) provides the private action with significant encouragement, either over or covert; (iv) engages in a joint activity in which the private actor is a willful participant; (v) delegates a public function to the private actor; or (vi) entwines the private actor in governmental policies." Connolly, 2019 WL 2120523, at *10 (citing Stein, 541 F.3d at 147 (citing Flagg v. Yonkers Sav. & Loan Ass'n, 396 F.3d 178, 187 (2d Cir. 2005))). Where the Government also influences the "specific conduct of which the party complains," there is a Garrity violation. Id. at *11.

DPA. These materials exist, as made clear from the DPA, but Ng does not have them. The Government should be ordered to turn them over.

Third, the DPA states that Goldman saved itself from corporate death in part by "voluntarily making foreign-based employees available for interviews in the United States" (DPA ¶ 4(b).) The Government never notified Ng of any foreign-based employees of Goldman who were coming to the United States to be interviewed. The Government knows that Ng cannot subpoena witnesses who are located overseas. The Government knows that critical witnesses in this case are located overseas. The Government knows that, therefore, the only way Ng's counsel would have been able to interview these witnesses is to have subpoenaed them when they were in the United States. But the Government hid those witnesses from him.

This is wrong, and should not be countenanced by this Court. "The focus of the Brady rule is fairness. The interests that it vindicates are more fundamental than those addressed by pretrial discovery rules." Meregildo, 920 F. Supp. 2d at 439 (S.D.N.Y. 2013) (citations omitted); see also, e.g., United States v. Agurs, 427 U.S. 97, 107 (1976) ("We are not considering the scope of discovery . . . . We are dealing with the defendant's right to a fair trial mandated by the Due Process Clause of the Fifth Amendment to the Constitution.").

Paragraph 5 of the DPA, "Future Cooperation and Disclosure Requirements," is also critically important for Ng. This section deals not with all of the information Goldman has already provided to the Government, but rather with what Goldman must do going forward. The DPA requires a remarkable amount of future cooperation from Goldman. Understandable, perhaps, because Goldman is now the Government's cooperator. It dictates that Goldman "shall cooperate fully with the Offices in any and all matters relating to the conduct described in this Agreement and the Statement of Facts and other conduct under investigation by the Offices" for a period that

includes "the date upon which all investigations and prosecutions arising out of such conduct are concluded". (Id. at 7, ¶ 5.) Among the requirements are that Goldman:

- "[S]hall truthfully disclose all factual information with respect to its activities . . . including any evidence or allegations and internal or external investigations, about which the Company has any knowledge or about which the [Government] may inquire," including "any document, record, or other tangible evidence" that the Government asks for (id. at 8, ¶ 5(a));
- "[S]hall use its best efforts to make available for interviews or testimony, as requested by the [Government]," Goldman's employees, agents, or consultants, including grand jury and trial testimony, along with "all meetings requested by the Offices, and interviews with domestic or foreign law enforcement and regulatory authorities" (id. at 8, ¶ 5(c));
- Critically, "Cooperation under this Paragraph shall include identification of witnesses who, to the knowledge of the Company, may have material information regarding the matters being investigated or prosecuted" (id.).

Ng voluntarily waived extradition to the United States to prove his innocence. To do so, he will need the testimony of witnesses who are overseas. After all, Ng never worked in the United States, and should not have been charged here in the first place. At the very least, Ng should have the same access to "witnesses who, to the knowledge of [Goldman], may have material information regarding the matters being investigated or prosecuted." (Id.)

All of this shows that Goldman is clearly part of the "prosecution team" here.[35] It is clear that the Government has ready access to evidence if only "minimal steps" are necessary to acquire it or if it can be obtained through a "simple inquiry." Duronio, 2006 WL 1457936, at *4; see also United States v. Perdomo, 929 F.2d 967, 970-71 (3d Cir. 1991) (finding that although the

---

[35] Should the Court find that the record is not sufficiently developed to conclude that Goldman was part of the "prosecution team," Ng respectfully requests that the Court hold an evidentiary hearing to determine (1) the extent of cooperation between the Government and Goldman in the investigation of this case, and (2) the Government's ability to access Goldman's files. See Gov't of the V.I. v. Martinez, 780 F.2d 302, 306 (3d Cir. 1986) ("[w]here a factual question is raised as to whether a Brady violation occurred, the defendant is 'entitled to have it determined by the district court in a hearing appropriate to the factual inquiry.'") (quoting United States v. Alexander, 748 F.2d 185, 193 (4th Cir. 1984)).

prosecutor argued that he did not have knowledge of a witness's criminal record, the information was readily available and should have been provided to the defense). Here, the Government has far more than "ready access": it has a contractual, legal right to access.

> **C.    The Government Should Produce the Information in Its Possession Regarding the True Nature of the Financial Transactions Described in Paragraphs 40 and 53**

The Indictment insinuates, but does not state explicitly, that Ng received more than $28 million as his share of the billions looted from 1MDB. Ng has reason to believe that the Government is in possession of information that will show that he and his relatives were unaware about the source of those funds, that Ng received no money from anyone (except Goldman) from his time working at Goldman, and that Ng's relatives and Judy Chan Leissner (Leissner's wife at the time) engaged in ventures completely unrelated to 1MDB, Goldman, or anything else covered by the Indictment. The Government has not provided any of this information to Ng, and he moves for an Order compelling the Government to provide this information.

The Indictment acknowledges, as it must, that Ng had – at best, and accepting all of the Government's allegations as true – a minimal role in the charged conduct. Of the billions of dollars moving back and forth as part of the IMDB mess, the Indictment mentions exactly two financial transactions that, it alleges, have something to do with Ng. First, in paragraph 40, the Indictment states that some Project Magnolia bond proceeds were transferred to an account in the name of Capital Place Holdings, Ltd., held at Chiyu Banking Corp. Ltd. (listed as the "Holding Company #1 Account") in the Indictment. The Indictment then alleges that "[a]pproximately $24 million of these funds were subsequently transferred to a bank account beneficially owned by a relative of the defendant ROGER NG." (Ind. ¶ 40.) Second, in paragraph 53, the Indictment states that some Project Catalyze bond proceeds were transferred to the Capital Place Holdings account, and that

"[m]ore than $4 million of these funds were also transferred via wire to a bank account beneficially owned by a relative of NG." (Ind. ¶ 53.)[36]

Prior to May 2012, Judy Chan Leissner's relative(s) owed a debt to Ng's relative(s). This debt was wholly unrelated to any of the allegations or events in the Indictment. However, when Judy Chan Leissner's Capital Place Holdings bank account received $35,000,000 from the Low-controlled Blackstone account on June 11, 2012, comprising proceeds of the 1MDB theft, Judy Chan Leissner was able to pay part of the pre-existing debt. Accordingly, on June 13, 2012, Capital Place sent $17,500,000 to an account controlled by Ng's relative. Thereafter, additional monies were paid to Ng's relative, all of it related to the same pre-existing debt. Neither Ng nor his relative had any idea about the source of these funds and certainly did not know the source was Leissner's involvement in crimes against 1MDB. The defense believes that the Government has information – documents and/or witness statements – that are material to this issue, and requests that the Court order the Government to produce any such information. Such information would obviously fall within the rubric of Brady material, and must be disclosed.

Moreover, once the Government produces the material relating to Leissner's transfers of funds to Ng's relatives, and it becomes clear to the Court that these transfers had nothing to do with anything that Ng did or failed to do with respect to Low, 1MDB, or indeed anything at all relating to his employment whatsoever, Ng will move to have the allegations in paragraphs 40 and 53 struck from the Indictment.

The Federal Rules of Criminal Procedure grant the Court authority to strike surplusage from an Indictment. See Fed. R. Crim. P. 7(d) ("Upon the defendant's motion, the court may strike

---

[36] In the recently-filed Goldman Sachs Information, the Government admits that "Ng had a new position within Goldman by [the time of Project Catalyze] and did not work directly on the deal team for Project Catalyze . . . ." (Goldman Information ¶ 60, n.4.)

surplusage from the indictment or information."). A motion to strike surplusage should be granted where "the challenged allegations are not relevant to the crime charged and are inflammatory and prejudicial." United States v. Hernandez, 85 F.3d 1023, 1030 (2d Cir.1996) (quotation marks and citations omitted). The touchstone of the inquiry is relevance – after all, many allegations in indictments are plenty prejudicial; if they are relevant, then Courts ordinarily will not strike them: "The determinative question in a motion to strike surplusage is not the potential prejudice, but rather the relevance of the allegation to the crime charged in the indictment. If the evidence of the allegation is admissible and relevant to the charge, then despite prejudice, the language will not be stricken." United States v. Napolitano, 552 F. Supp. 465, 480 (S.D.N.Y. 1982).

When the truth regarding the approximately $28.4 million comes out, the allegations in paragraphs 40 and 53 will be irrelevant, because they relate to a pre-existing debt. These are highly inflammatory allegations, because the way the Government has dropped them into the Indictment was designed to make it appear that these funds were Ng's "payoff" for his illegal activity. Ng requests respectfully that the Court order the Government to produce any information it has regarding the true nature of the financial transactions described in paragraphs 40 and 53.











███████████████████████████████████████████████████████████

███████████████████████████████████████████████████

## X.    <u>CONCLUSION</u>

For the foregoing reasons, Ng respectfully requests that this Court grant the relief requested above.

Dated:        October 30, 2020
              New York, NY

                                        Respectfully submitted,

                                        _____
                                                /s/
                                        Marc A. Agnifilo, Esq., *Of Counsel*
                                        Zach Intrater, Esq., *Of Counsel*
                                        Teny R. Geragos, Esq.
                                        Jacob Kaplan, Esq.

                                        **BRAFMAN & ASSOCIATES, P.C.**
                                        767 Third Avenue, 26th Floor
                                        New York, NY 10017
                                        (212) 750-7800