AES:DGR
F. #2016R00467

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
– – – – – – – – – – – – – – –  – – – –X

UNITED STATES OF AMERICA

    - against -                   Docket No. 18-CR-538 (MKB)

NG CHONG HWA,
       also known as "Roger Ng,"

              Defendant.

– – – – – – – – – – – – – –  – – – –X


## THE GOVERNMENT'S MEMORANDUM IN OPPOSITION
## TO THE DEFENDANT'S MOTION TO DISMISS AND OTHER RELIEF

SETH D. DuCHARME
Acting United States Attorney
Eastern District of New York
271 Cadman Plaza East
Brooklyn, New York 11201

Alixandra E. Smith
Drew G. Rolle
Assistant United States Attorneys

Jennifer E. Ambuehl
David A. Last
Katherine Nielsen
Nikhila Raj
Trial Attorneys
      (Of Counsel)

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ........................................................................................... 1

ARGUMENT ..................................................................................................................... 5

I.      NG'S MOTIONS TO DISMISS CANNOT MEET THE HIGH STANDARD SET BY
        THE SECOND CIRCUIT ........................................................................................ 5

II.     THE INDICTMENT PROPERLY ALLEGES VENUE IN THE EASTERN DISTRICT
        OF NEW YORK .................................................................................................... 8

        A.      Applicable Law ......................................................................................... 8

        B.      Discussion ............................................................................................... 12

III.    THE INDICTMENT PROPERLY ALLEGES THE DEFENDANT'S YEARS-LONG
        PARTICIPATION IN A CONSPIRACY TO BRIBE FOREIGN GOVERNMENT
        OFFICIALS IN VIOLATION OF THE FCPA .......................................................... 19

        A.      Applicable Law ......................................................................................... 19

        B.      Discussion ............................................................................................... 20

IV.     THE INDICTMENT PROPERLY ALLEGES THE DEFENDANT ILLEGALLY
        CIRCUMVENTED GOLDMAN SACHS GROUP'S INTERNAL ACCOUNTING
        CONTROLS .......................................................................................................... 25

        A.      Applicable Law ......................................................................................... 25

        B.      Discussion ............................................................................................... 26

                1.      Count Two Properly Tracks the Statutory Language ............................. 26

                2.      The Indictment Sufficiently Alleges Relevant "Transactions," "Assets"
                        and "Internal Accounting Controls" of U.S. Financial Institution #1....... 27

                3.      Defendant's Challenges Relate to the Sufficiency of the Evidence and Not
                        Adequate Pleading of the Indictment, and are Therefore Fact Questions for
                        the Jury ............................................................................................... 32

                4.      The Internal Accounting Controls Provisions of the FCPA Are Not
                        Unconstitutionally Vague ...................................................................... 33

V.      THE INDICTMENT PROPERLY ALLEGES THE DEFENDANT CONSPIRED TO
        COMMIT MONEY LAUNDERING ......................................................................... 37

        A.      Count Three ............................................................................................. 37

        B.      Applicable Law ......................................................................................... 39

        C.      Discussion ............................................................................................... 39

VI.     THE DEFENDANT'S MOTION TO MODIFY THE GOLDMAN SACHS GROUP'S
        DEFERRED PROSECUTION AGREEMENT IS MERITLESS ................................... 52

        A.      DPA Paragraph 23 Does Not Violate the Constitution........................................ 52

B.      DPA Paragraph 5(c) Does Not Violate the Constitution ....................................... 58

C.      The Court Lacks Authority to Modify the DPA .................................................... 61

VII.    THE DEFENDANT'S BROAD REQUESTS FOR "BRADY" MATERIALS ARE
        MERITLESS, MOOT AND/OR PREMATURE ............................................................. 65

VIII.   THE GOVERNMENT'S DISCOVERY PRODUCTIONS TO DATE ARE
        DESIGNATED APPROPRIATELY UNDER THE PROTECTIVE ORDER ............... 91

CONCLUSION.................................................................................................................... 97

## PRELIMINARY STATEMENT

The indictment in the above-captioned case (the "Indictment" or "Ind.") charges the defendant Ng Chong Hwa, also known as "Roger Ng" ("the defendant") with conspiracy to violate the anti-bribery provisions of the Foreign Corrupt Practices Act ("FCPA") (Count One), conspiracy to violate the FCPA by circumventing internal accounting controls at The Goldman Sachs Group, Inc. ("Goldman Sachs Group") (Count Two),[1] and conspiracy to commit money laundering (Count Three).[2]  It alleges that between approximately 2009 and 2014, the defendant, while acting as an employee and agent of Goldman Sachs Group and with the intent, at least in part, to benefit Goldman Sachs Group, conspired with others to obtain and retain business from 1 Malaysia Development Berhad ("1MDB"), Malaysia's state-owned and state-controlled investment development company, through the promise and payment of bribes to government officials in Malaysia and Abu Dhabi.  That 1MDB business included three bond offerings that raised a total of approximately $6.5 billion for 1MDB in 2012 and 2013.  More than $2.7 billion of those funds were misappropriated by the defendant and others and distributed, in part, as bribes and kickbacks to government officials in Malaysia and Abu Dhabi, to family members of those officials and to the defendant, Low and other co-conspirators, and the defendant, Low and others conspired to launder those criminal proceeds in and through the U.S. financial system.

---

[1] The Indictment references "U.S. Financial Institution #1," which the government previously advised the defendant is Goldman Sachs Group.  The Indictment notes that the term "U.S. Financial Institution #1" is also used to refer to Goldman Sachs Group and its related subsidiaries and affiliates collectively (herein, "Goldman").

[2] The Indictment also charges Low Taek Jho, also known as "Jho Low" ("Low"), in Counts One and Three.  Low remains a fugitive.

Finally, to get the 1MDB projects approved by Goldman Sachs Group, the defendant also conspired with other employees and agents of Goldman Sachs Group to knowingly and willfully circumvent the internal accounting controls of Goldman Sachs Group, including by concealing Low's involvement in the deals.

In a series of motions, the defendant seeks to have the Court dismiss all three counts against him, arguing that (1) the Indictment as a whole should be dismissed for lack of venue; (2) the first object of Count One should be dismissed because the Indictment "has eliminated an essential element of that offense"; (3) Count Two should be dismissed because the Indictment fails to allege that the defendant conspired to circumvent internal accounting controls that are "cognizable" under the FCPA; and (4) Count Three should be dismissed for failure to sufficiently allege an element and because the defendant contends that a violation of the FCPA's anti-bribery provisions is not a specified unlawful activity.  (Docket No. 46, hereinafter "Def. Mem.").[3]  The defendant also seeks additional relief, including that the Court order (1) the modification of a deferred prosecution agreement between the United States and Goldman Sachs Group; (2) the provision of information that the defendant characterizes as <u>Brady</u> material; and (3) the re-designation of certain discovery items marked "Attorney's Eyes Only" to "Sensitive." <u>Id.</u>

Although the defendant's first set of motions are styled as motions for dismissal, they are, at bottom, nothing more than a thinly-veiled effort to make a Rule 29 motion as to the

---

[3] The defendant initially filed his motions on October 30, 2020 (Docket No. 43) and then filed a corrected brief shortly thereafter (Docket No. 46).

2

sufficiency of the government's evidence.  A Rule 29 motion, however, is not appropriate at the pre-trial stage.  The government's ability to prove its charges is an issue for the jury at trial.

Rather, in the criminal context, under well-settled Second Circuit law, "an indictment is sufficient if it, first, contains the elements of the offense charged and fairly informs a defendant of the charge against which he must defend, and, second, enables him to plead an acquittal or conviction in bar of future prosecutions for the same offense."  See United States v. Alfonso, 143 F.3d 772, 776 (2d Cir. 1998); United States v. Perez, 575 F.3d 164, 166 (2d Cir. 2009) (holding the defendants had "no basis to challenge the sufficiency of the indictment before trial because it met the basic pleading requirements and was valid on its face.").  Here, because the Indictment alleges the elements of the offenses charged, and its speaking provisions inform the defendant of the charges against him, the defendant's motion to dismiss should be denied in its entirety on this basis.

Moreover, even if the defendant's remaining arguments were cognizable on a motion to dismiss—and they are not—they are without merit.  The Indictment properly alleges that the defendant's crimes took place in the Eastern District of New York, and details specific acts in furtherance of those crimes in the District.  for all three counts in the Eastern District of New York.  The Indictment properly alleges that the defendant participated in a years-long conspiracy to bribe foreign government officials in violation of the FCPA, and further alleges both the specific issuer—Goldman Sachs Group—that provides the jurisdictional basis for the count, as well as the defendant's status as an employer and agent of that issuer.  The Indictment properly alleges that the defendant circumvented the internal accounting controls of Goldman Sachs Group, along with relevant "transactions" "assets" and "internal accounting controls," and the underlying section of the statute is not unconstitutionally vague.  And finally, the Indictment

3

properly alleges that the defendant engaged in a money laundering conspiracy with three objects, and the money laundering statute clearly covers, without limitation, felony violations of the FCPA.

## ARGUMENT[4]

### I.   NG'S MOTIONS TO DISMISS CANNOT MEET THE HIGH STANDARD SET BY THE SECOND CIRCUIT

Motions to dismiss indictments are disfavored, and must satisfy a high standard. See United States v. Bustos de la Pava, 268 F.3d 157, 165 (2d Cir. 2001) ("[D]ismissal of an indictment is an extraordinary remedy reserved only for extremely limited circumstances implicating fundamental rights."); United States v. Kerik, 615 F. Supp. 2d 256, 262 (S.D.N.Y. 2009) ("A defendant seeking to dismiss counts under Rule 12 must satisfy a high standard.").

It is well-established that "an indictment is sufficient if it, first, contains the elements of the offense charged and fairly informs a defendant of the charge against which he must defend, and, second, enables him to plead an acquittal or conviction in bar of future prosecutions for the same offense." Alfonso, 143 F.3d at 776 (quoting Hamling v. United States, 418 U.S. 87, 117 (1974)). Federal Rule of Criminal Procedure 7 ("Rule 7") requires only that an indictment contain a "plain, concise and definite written statement of the essential facts constituting the offense charged." Fed. R. Crim. P. 7(c)(1).

---

[4] The government has detailed the factual allegations against the defendant at length in the Indictment. To the extent there is additional information that is relevant to the government's responses, that information has been included in the appropriate responsive section of this brief. Moreover, while the government disagrees with many of the factual assertions made by the defendant in connection with his motions, the government addresses herein only those assertions that are directly relevant to the defendant's motions; as a result, the government's failure to respond to any individual factual assertion should not be considered acceptance of the truth of that assertion.

The Second Circuit has held that an indictment that tracks the language of the statute is sufficient to meet these notice requirements.  See United States v. Yannotti, 541 F.3d 112, 127 (2d Cir. 2008) (to withstand a motion to dismiss, "an indictment need do little more than to track the language of the statute charged and state the time and place (in approximate terms) of the alleged crime."); United States v. Flaharty, 295 F.3d 182, 198 (2d Cir. 2002) (same); United States v. Bernstein, 533 F.2d 775, 786 (2d Cir. 1976) (observing that the Second Circuit has "consistently sustained indictments" that tracked the applicable statutory language and described the time and place in "approximate terms.").  An indictment that charges a conspiracy "is sufficient if it tracks the language of the statute and alleges all of the essential elements of conspiracy, which are: '(1) an agreement between the defendant and at least one other person to commit an offense; (2) that the defendant knowingly participated in the conspiracy with the specific intent to commit the illegal object of the conspiracy, and; (3) that during the conspiracy an overt act in furtherance of the illegal objective was committed by a member of the conspiracy.'"  United States v. Mermelstein, 487 F. Supp. 2d 242, 251 (E.D.N.Y. 2007) (quoting United States v. Zandstra, No. 00-CR-209, 2000 WL 1368050, at *3 (S.D.N.Y. 2000)).

Federal Rule of Criminal Procedure 12 ("Rule 12") provides that "[a] party may raise by pretrial motion any defense, objection, or request that the court can determine without a trial on the merits."  Fed. R. Crim. P. 12(b)(1).  On a pre-trial motion to dismiss, the court must accept all factual allegations in the indictment as true, and "the sufficiency of the evidence is not appropriately addressed."  Alfonso, 143 F.3d at 776-77.  In other words, Rule 12 authorizes defendants to challenge the lawfulness of a prosecution on purely legal, as opposed to factual, grounds.  See United States v. Aleynikov, 676 F.3d 71, 75–76 (2d Cir. 2012) ("[A] federal

6

indictment can be challenged on the ground that it fails to allege a crime within the terms of the applicable statute.").

Thus, a defendant's factual arguments challenging facially valid pleadings do not justify pre-trial dismissal of the indictment. The government is entitled to marshal and present its evidence at trial and, if warranted, have its sufficiency tested by a motion for judgment of acquittal pursuant to Rule 29 of the Federal Rules of Criminal Procedure. A motion to dismiss a properly pled indictment "confuse[s] standards of pleading with standards of proof." United States v. Reale, No. S4 96 CR. 1069 (DAB), 1997 WL 580778, at *7 (S.D.N.Y. Sept. 17, 1997); Perez, 575 F.3d at 166 (defendants had no basis to challenge "sufficiency of the indictment before trial because it met the basic pleading requirements"); United States v. Gotti, No. S4 02-CR-743 (RCC), 2004 WL 32858, at *2 (S.D.N.Y. Jan. 6, 2004) (a "pretrial motion to dismiss part of the indictment is not the time nor the proper occasion" to contest the sufficiency of the evidence).

Here, the Indictment properly alleges that the defendant has committed three crimes: conspiracy to violate the anti-bribery provisions of the FCPA (Count One), conspiracy to violate the internal controls provisions of the FCPA (Count Two), and conspiracy to commit money laundering (Count Three). As the Indictment "track[s] the language of the statute[s] charged and state[s] the time[s] and place[s] (in approximate terms) of the alleged crime[s]," as required under Second Circuit law, it properly states claims for these offenses. Yannotti, 541 F.3d at 127. The Court should dismiss the defendant's motions to dismiss on this basis alone.

## II.     THE INDICTMENT PROPERLY ALLEGES VENUE IN THE EASTERN DISTRICT OF NEW YORK

The defendant asks the Court to dismiss the Indictment because, according to the defendant, there is no venue for the charged offenses in the Eastern District of New York.  (Def. Mem. 28-37).  As set forth below, the defendant's arguments ignore the clear allegations set forth in the Indictment along with the binding law of this Circuit.

First, for each count, the Indictment properly alleges that the crime occurred "within the Eastern District of New York and elsewhere."  (Ind. ¶¶ 59, 60, 62, 63, 65).  Nothing else is required to defeat the defendant's motion.

Second, even if those allegations were not sufficient by themselves, the detailed speaking indictment makes clear that relevant overt acts in furtherance of the charged conspiracies that require overt acts occurred in this District.  Ultimately, the sufficiency of the government's proof is not at issue on a motion to dismiss, and because the Indictment is properly pled, the defendant's motion must be denied.

### A.     Applicable Law

"[V]enue in federal criminal cases is controlled by a complicated interplay of constitutional provisions, statutes, and rules."  United States v. Rasheed, No. 18-3479, --- F.3d ---, 2020 WL 6930781, at *3 (2d Cir. Nov. 25, 2020) (quoting United States v. Rowe, 414 F.3d 271, 277 (2d Cir. 2005) (alteration in original).  Both Article III, Section 2 and the Sixth Amendment of the Constitution ensure that a defendant will be tried in the place where the crimes were committed.   U.S. Const. art. III, § 2, cl. 3 ("The trial of all crimes . . . shall be held in the state where the said crimes shall have been committed"); U.S. Const. amend VI (guaranteeing a defendant's "right to a speedy and public trial, by an impartial jury of the state

and district wherein the crime shall have been committed"). These constitutional prerequisites were codified in Rule 18 of the Federal Rules of Criminal Procedure, which states that "[u]nless a statute or these rules permit otherwise, the government must prosecute an offense in a district where the offense was committed." Fed. R. Crim. P. 18.

Federal judicial districts are defined by statute. See 28 U.S.C. §§ 81 et seq. Title 28, United States Code, Section 112(c) defines the Eastern District of New York as encompassing "the counties of Kings, Nassau, Queens, Richmond, and Suffolk and concurrently with the Southern District [of New York], the waters within the counties of Bronx and New York." Id. § 112(c). The geography covered by this expansive statutory definition includes the entirety of Brooklyn, Queens, Staten Island and Long Island. But, notably, Congress expanded that geography even further by defining the Eastern District of New York as including the waters within New York County (which surround the island of Manhattan) and Bronx County. Id.

To determine the proper venue for a particular crime, courts first look to the crime's relevant criminal statute. See Rasheed, 2020 WL 6930781, at *3. "[A]bsent an express statutory provision to the contrary, "any offense against the United States begun in one district and completed in another, or committed in more than one district, may be inquired of and prosecuted in any district in which such offense was begun, continued, or completed." United States v. Royer, 549 F.3d 886, 893 (2d Cir. 2008) (internal quotations omitted); 18 U.S.C. § 3237(a).

Because conspiracies—like those alleged in the Indictment—are continuing offenses, "venue is proper in any district in which an overt act in furtherance of [a] conspiracy was committed by any of the coconspirators." United States v. Svoboda, 347 F.3d 471, 483 (2d Cir. 2003) (internal quotation marks and citations omitted). As to the overt act, it must have

9

been (1) performed by any co-conspirator and (2) undertaken for the purpose of accomplishing the objectives of the conspiracy. United States v. Tzolov, 642 F.3d 314, 319–320 (2d Cir. 2011). "This includes not just acts by co-conspirators but also acts that the conspirators caused others to take that materially furthered the ends of the conspiracy." Royer, 549 F.3d at 896; see United States v. Lange, 834 F.3d 58, 70 (2d Cir. 2016) ("An overt act is any act performed by any conspirator for the purpose of accomplishing the objectives of the conspiracy" (quoting Tzolov, 642 F.3d at 319-20)).

In a conspiracy, acts that confer venue can include simply passing through the district in the course of committing the offense. See United States v. Kirk Tang Yuk, 885 F.3d 57, 71-72 (2d Cir. 2018) (conspirator's trip over the Verrazzano Bridge passed over the concurrent waters of Southern and Eastern District of New York and supported venue in the Southern District of New York); Tzolov, 642 F.3d at 320 ("[V]enue for a conspiracy may be laid in a district through which conspirators passed in order to commit the underlying offense."); United States v. Duque, 123 F. App'x 447, 449 (2d Cir. 2005) (flight from Queens passing over the concurrent waters of the Eastern and Southern Districts of New York sufficient to support venue in the Southern District of New York). A defendant need not physically pass through a district to confer venue as electronic and wire communications passing through the district are sufficient. See United States v. Kim, 246 F.3d 186, 193 (2d Cir. 2001) (holding that "wire communications to and from [the prosecuting district] were essential to the continuing offense of causing fraudulent wires to be transmitted" and therefore conferred venue in the prosecuting district); United States v. Naranjo, 14 F.3d 145, 147 (2d Cir. 1994) ("[P]hone calls from one district into another can establish venue in the latter district so long as they further the ends of the conspiracy.").

10

A defendant does not need to have "actual knowledge that an overt act will occur in a particular district to support venue at that location." United States v. Rommy, 506 F.3d 108, 123 (2d Cir. 2007). Instead, a defendant must have been able to "reasonably . . . foresee[] that part of the offense would take place in the district." Kirk Tang Yuk, 885 F.3d at 70 (alteration in original).

The Second Circuit has "occasion[ally] . . . supplemented" the foreseeability inquiry "with a 'substantial contacts' test that takes into account a number of factors . . . includ[ing] the site of the defendant's acts, the elements and nature of the crime, the locus of the effect of the criminal conduct, and the suitability of the [venue] for accurate factfinding." Kirk Tang Yuk, 885 F.3d at 70 (alteration in original). However, "[w]hen an overt act in furtherance of a criminal conspiracy has been committed in the district . . . , this supplemental inquiry has no relevance," and, in a multi-defendant conspiracy, "commission of an overt act in the district of prosecution fulfills [the] 'substantial contacts' test as to all members of the conspiracy." Id. at 70-72.

At trial, because venue is not an element of the crime, the government must prove venue by a preponderance of the evidence, rather than beyond a reasonable doubt. United States v. Davis, 689 F.3d 179, 185 (2d Cir. 2012). "When considering a motion to dismiss, the Court must treat the indictment's allegations as true," United States v. Kelly, 462 F. Supp. 3d 191, 195 (E.D.N.Y. 2020), therefore, "[w]here a defendant challenges venue in a pretrial motion to dismiss, indictments that allege that the offense occurred 'in the [challenged district] and elsewhere are sufficient to defeat the motion.'" United States v. Griffith, No. 20-CR-15 (PKC), 2020 WL 4369650, at *2 (S.D.N.Y. July 29, 2020) (internal quotation marks omitted). See also United States v. Herron, No. 10-CR-0615 NGG, 2014 WL 949008, at *1 (E.D.N.Y. Mar. 11,

11

2014) ("[O]n a motion to dismiss a count of the indictment, it suffices for the government to allege with specificity that the charged acts support venue in this district."); United States v. Peterson, 357 F. Supp. 2d 748, 751 (S.D.N.Y. 2005) ("Where venue is challenged on a pre-trial motion to dismiss . . . the Government's burden is limited to showing that the indictment alleges facts sufficient to support venue.").

"Unless the government has made what can fairly be described as a full proffer of the evidence it intends to present at trial to satisfy the jurisdictional element of the offense, the sufficiency of the evidence is not appropriately addressed on a pretrial motion to dismiss an indictment." Alfonso, 143 F.3d at 776–77; see also United States v. Ohle, 678 F. Supp. 2d 215, 231 (S.D.N.Y. 2010) ("The question of whether there is sufficient evidence to support venue is appropriately left to trial.").

**B.**     **Discussion**

The defendant's motion to dismiss the Indictment for lack of venue is meritless. The fact that each Count alleges that the charged crime occurred "in the Eastern District of New York, and elsewhere" is sufficient to deny the defendant's motion. See Griffith, 2020 WL 4369650, at *2 (alleging the Southern District of New York and elsewhere). But the Indictment alleges more than that. As discussed below, the Indictment sufficiently alleges both that multiple overt acts or acts in furtherance occurred in this District and that it was reasonably foreseeable to the defendant that such acts would occur. See Svoboda, 347 F.3d at 483 ("[V]enue is proper in a district where (1) the defendant intentionally or knowingly causes an act in furtherance of the charged offense to occur in the district of venue or (2) it is foreseeable that such an act would occur in the district of venue.").

12

1.      **The Indictment Alleges Multiple Acts Occurred in this District**

A central part of the defendant's criminal scheme was to cause Goldman to repeatedly wire hundreds of millions of dollars in bond proceeds that could be diverted into the bank accounts of shell companies beneficially owned and controlled by the defendants and their co-conspirators so they could pay bribes and benefit themselves.  Given the goals of the scheme, every wire transfer or wire communication to and through Goldman, its bank accounts, or accounts owned or controlled by the defendants and their co-conspirators that furthered the scheme were also essential to its success.

As the defendant notes, the Indictment expressly alleges that these relevant wires and electronic communications made in furtherance of the scheme passed through the Eastern District of New York.  (Def. Mem. 31-32 (quoting Ind. ¶¶ 37, 45, 63(e)-(f)).  Because, as alleged, those communications and wires passed through the Eastern District of New York, venue is proper here.  See Tzolov, 642 F.3d at 320 ("[V]enue for a conspiracy may be laid in a district through which conspirators passed in order to commit the underlying offense."); Kim, 246 F.3d at 193 (wire communications conferred venue); Naranjo, 14 F.3d at 147 (phone calls conferred venue).

Notwithstanding the Indictment's allegations as to relevant communications and wire transfers occurring in this District, the defendant argues that more is required to properly allege venue.  For support, the defendant relies heavily on United States v. Bezmalinovic, 962 F. Supp. 435, 436 (S.D.N.Y. 1997).  There, the district court found no venue for a substantive bank fraud charge where "the only acts alleged to have occurred in the [challenged district]" were "the ministerial actions taken by [the defendant's bank]," and all of those acts occurred after the bank

13

fraud crime was completed in another district.  Bezmalinovic, 962 F. Supp. at 437.  The defendant's reliance on this non-binding district court opinion is misplaced.

Not only did Bezmalinovic concern a substantive bank fraud charge as opposed to a conspiracy (as is the case with all of the counts alleged here), but the defendant fails to note that Bezmalinovic has been expressly distinguished by the Second Circuit.  In affirming venue for wire fraud and wire fraud conspiracy charges, the Second Circuit in Kim distinguished Bezmalinovic and held that "wire communications to and from [the relevant district] were essential to the continuing offense of causing fraudulent wires to be transmitted."  Kim, 246 F.3d at 193.  As in Kim, here, the communications and wires made in furtherance of the scheme were central steps in the criminal scheme.  Billions of dollars in bond proceeds were diverted and wired through the Eastern District of New York on their way to the co-conspirators and others, including foreign government officials.  (Ind. ¶¶ 37, 45).  The false statements that the defendant and others made to "committee members and others located in New York, New York" helped conceal defendant Jho Low's involvement in the bond transactions and were made through the Eastern District of New York.  (Ind. ¶¶ 63(e)-(f)).  These allegations are more than sufficient to allege venue.

The defendant also cites the Second Circuit's decisions in Rutigliano and Svoboda to argue that wire transfers convey venue only under certain circumstances, such as when processing relevant stock trades or financial transactions at physical addresses in a district.  (Def. Mem. 31-33).  While true that the transactions in those matters conferred venue, the defendant's argument misses the point.  Such acts may be sufficient to confer venue, but they are certainly not necessary.  For example, in Kirk Tang Yuk, the defendant's co-conspirator needed to simply use the Verrazzano Bridge from New Jersey into Brooklyn to confer venue in the

14

Southern District of New York, as the waters over which he drove are concurrently part of both the Southern and Eastern Districts of New York. Kirk Tang Yuk, 885 F.3d at 71 (finding the evidence of travel over the concurrent waters "undoubtedly sufficient" to support venue). Similarly, in Duque, a flight from John F. Kennedy International Airport to a foreign country that merely passed over a body of water in Queens, New York was sufficient to uphold venue in the Southern District of New York, because, again, those waters are concurrently part of the Southern and Eastern Districts of New York. Duque, 123 F. App'x at 449 (citing 28 U.S.C. § 112(b)). See also United States v. Williams, 536 F.2d 810, 812 (9th Cir. 1976) (upholding venue based on plane's mere flight over the district on its way to another destination, and explaining that "the navigable airspace above a district is as much a part of it as a highway running through it, the fact that the [defendant's co-conspirator] flew over the district rather than driving through it is of little significance").

Taken together, the Indictment sufficiently alleges that overt acts in furtherance of the charged conspiracies occurred in this District.[5]

## 2.    The Defendant's Foreseeability Arguments Are Meritless

The defendant also claims that even if alleged acts occurred in the Eastern District of New York, they "were completely unforeseeable to Ng or to any of his co-conspirators." (Def. Mem. 35). That argument is meritless. As alleged in the Indictment, the defendant worked

---

[5] In addition, although the defendant attempts to question whether he had "substantial contacts" with this District, that inquiry does not apply here in light of the alleged overt acts committed in this District. See Kirk Tang Yuk, 885 F.3d at 69-70 ("When an overt act in furtherance of a criminal conspiracy has been committed in the district . . . , th[e] supplemental [substantial contacts] inquiry has no relevance.").

for nearly ten years as a financier at Goldman, a global investment banking, securities and investment management firm incorporated in Delaware and headquartered in New York.  (Ind. ¶¶ 2-3).  In addition, as alleged, Goldman's personnel in New York played an important role in the review and approval of the 1MDB bond transactions at the core of the scheme, facts which were all known to the defendant.  (See Ind. ¶¶ 63(e)-(g)).

Here, the Second Circuit's decision in Kirk Tang Yuk is, again, instructive. There, although the Florida-based defendants had never set foot in New York, the Second Circuit held that venue in the Southern District of New York was foreseeable to the defendants because their confederate informed them simply that he was "up in New York."  Kirk Tang Yuk, 885 F.3d at 73.  There, a reference to "New York" alone—without regard to a city or town, let alone a borough—made it reasonably foreseeable to the defendants that they could be tried in the Southern District of New York.  Id.  See also United States v. Woolaston, No. 18-CR-212 (AJN), 2020 WL 91488, at *7 (S.D.N.Y. Jan. 7, 2020) (affirming venue and rejecting defendant's argument that an informant's reference to "the city" was "too vague to make it reasonably foreseeable" that the informant was in the Southern District of New York); United States v. Abdallah, 840 F. Supp. 2d 584, 602 (E.D.N.Y. 2012) (finding Eastern District of New York Venue foreseeable where confederate "told the defendant that he was going to be in New York"), aff'd, 528 F. App'x 79 (2d Cir. 2013).  Here, given the defendant's years-long employment by a bank headquartered in New York, along with his numerous contacts with individuals operating in New York as alleged in the Indictment, there is no question that venue in this District was foreseeable to him.

Notwithstanding the clear allegations of the defendant's actual knowledge of, and direct involvement in, the scheme's multiple acts in New York, the defendant nevertheless

16

argues that venue in this District—as opposed to the Southern District of New York—was unforeseeable because "[i]t would be more logical that" the relevant wires and communications to and from Goldman alleged in the Indictment "would head west from Manhattan" or in "[a]ny of the other cardinal directions" and "through the mainland of the United States." (Def. Mem. 35).

This argument, however, ignores geography. Manhattan is an island, surrounded on all sides by the waters of New York County, all of which, as the defendant concedes, Congress has expressly made part of the Eastern District of New York. (Def. Mem. 30 n.20 ("The EDNY 'comprises the counties of Kings, Nassau, Queens, Richmond, and Suffolk and concurrently with the Southern District, the waters within the counties of Bronx and New York.'" (quoting 28 U.S.C. § 112(c))). As discussed above, the Indictment sufficiently alleges relevant communications and wire transfers to and from that island that were made in furtherance of the alleged scheme passed through this District. See United States v. Woolaston, No. 18-CR-212 (AJN), 2020 WL 91488, at *4 (S.D.N.Y. Jan. 7, 2020) (finding sufficient evidence of venue in the Southern District of New York based on a single trip from New Jersey to Queens because it was "practically impossible to travel to Queens without passing through Manhattan, the Bronx, or the Verrazzano-Narrows Bridge").

Ultimately, this case is no different than those, like Kim, 246 F.3d at 192, where a defendant's own familiarity with finance supported the foreseeability of venue in New York. Here, the defendant, as a longtime employee of a New York-headquartered bank and savvy financier knew that his conduct in the course of the relevant financial transactions would cause countless communications and the wiring of billions of dollars through Goldman's New York headquarters, as well as wires to and from numerous other banks required to process large U.S.

17

dollar-denominated transactions like those alleged in the Indictment.  Because, as alleged, those communications and wires made in furtherance of the charged scheme passed through the Eastern District of New York, venue is proper here and the defendant's motion should be denied.

III.    **THE INDICTMENT PROPERLY ALLEGES THE DEFENDANT'S YEARS-LONG PARTICIPATION IN A CONSPIRACY TO BRIBE FOREIGN GOVERNMENT OFFICIALS IN VIOLATION OF THE FCPA**

   The defendant asks the Court to dismiss Count One of the Indictment, which alleges his participation in a conspiracy to violate the anti-bribery provisions of the FCPA, because, he argues, the Indictment does not identify an "actual issuer" that employed the defendant or on whose behalf the defendant worked as an agent.  (Def. Mem. 37-43).  Although styled as a motion to dismiss, the defendant's argument is really an attempt to litigate the sufficiency of evidence he believes will be offered at trial.  Such an inquiry is inappropriate on a motion to dismiss.  Because the detailed allegations in the Indictment, including those specific to Count One, go far beyond the "language of the statute charged and state the time and place (in approximate terms) of the alleged crime," the Court should deny his motion.  See Yannotti, 541 F.3d at 127.

   A.  **Applicable Law**

   In simple terms, the FCPA makes it a crime for certain classes of persons and entities to offer, promise, pay or authorize the payment of bribes to foreign government officials to assist in obtaining or retaining business.  15 U.S.C. §§ 78dd-1, 78dd-3, 78ff(a) and 78ff(c)(2)(a).  The statute does not apply to everyone; instead, it criminalizes bribery undertaken by specific categories of actors.  Id.  Here, Count One charges a conspiracy to violate Section 78dd-1 of the FCPA, which applies to "any issuer which has a class of securities registered" pursuant to Section 12 of the Securities and Exchange Act of 1934, 15 U.S.C. § 78 (the "Exchange Act") or that is required to file reports with the U.S. Securities and Exchange Commission under Section 15(d) of the Exchange Act, 15 U.S.C. § 78o(d), as well as to "any

officer, director, employee, or agent of such issuer, or any stockholder thereof acting on behalf of such issuer." 15 U.S.C. § 78dd-1(a).

As detailed above in Section I, the Second Circuit has "consistently upheld indictments that do little more than to track the language of the statute charged and state the time and place (in approximate terms) of the alleged crime." United States v. Walsh, 194 F.3d 37, 44 (2d Cir. 1999) (internal quotations marks and citations omitted); Flaharty, 295 F.3d at 198 (same); Bernstein, 533 F.2d at 786 (same). An indictment does not, and need not, detail all the information that the government will present at trial to prove each element, nor rule out potential defenses. See, e.g., Perez, 575 F.3d at 166-67. And an indictment that charges a conspiracy is sufficient "if it tracks the language of the statute and alleges all of the essential elements of conspiracy." Mermelstein, 487 F. Supp. 2d at 251.

### B.   Discussion

Count One of the Indictment more than satisfies the pleading requirements of Rule 7 and the Constitution because it not only tracks the statutory language—which is all that is required—but it also provides additional specific information regarding the defendant's criminal scheme. Read as a whole, these detailed allegations fairly inform the defendant of the charge against him, and enable him "to plead an acquittal or conviction in bar of future prosecutions for the same offense." Alfonso, 143 F.3d at 776.

Count One tracks the language of the conspiracy statute, 18 U.S.C. § 371, including the nature of the criminal scheme that was the object of the conspiracy, 15 U.S.C. §§ 78dd-1 and 78dd-3. It alleges that "on or about and between January 2009 and October 2014, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere" the defendant "being an employee and agent of an issuer" knowingly and willfully

conspired with others to violate Section 78dd-1 and that "[i]n furtherance of the conspiracy and to effect its objects" a member of the conspiracy committed or caused to be committed certain described overt acts.  (Ind. ¶¶ 58-60).

The relevant issuer is also expressly alleged in the Indictment as "U.S. Financial Institution #1," which, as the government has previously disclosed to the defendant, was Goldman Sachs Group.  As alleged, U.S. Financial Institution #1 "had a class of securities registered pursuant to Section 12 of the Securities and Exchange Act of 1934 (Title 15, United States Code, Section 78) (the "Exchange Act") and was required to file reports with the U.S. Securities and Exchange Commission under Section 15(d) of the Exchange Act (Title 15, United States Code, Section 78o(d))."  (Ind. ¶ 3).  Both the issuer and the defendant's relationship to it track the statutory language of the FCPA.  See 15 U.S.C. § 78dd-1(a).  That is enough at this stage.

To the extent the defendant argues that he nevertheless lacks sufficient notice of the alleged crime, that claim should be rejected.  Although indictments do not need to "specify evidence or details of how the offense was committed," United States v. Wey, No. 15-CR-611 (AJN), 2017 WL 237651, at *5 (S.D.N.Y. Jan. 18, 2017), here there can be no question that the 34-page Indictment provides more than sufficient specificity.  In addition to identifying the relevant issuer and the defendant's relationship to it, the Indictment goes on to describe how the defendant "conspired to obtain and retain business from 1MDB for U.S. Financial Institution #1 through the promise and payment of bribes to government officials in Malaysia and Abu Dhabi" (Ind. ¶ 16); that he and his co-conspirators' efforts succeeded in obtaining and retaining "1MDB business for U.S. Financial Institution #1, including three bond offerings that raised a total of approximately $6.5 billion for 1MDB in 2012 and 2013" (id. ¶ 17); and that the bonds "earned

U.S. Financial Institution #1 approximately $600 million in fees and revenue" and resulted in the defendant and his co-conspirators "receiving large bonuses from U.S. Financial Institution #1" and increased status at the company, among other things (id. ¶ 17). Given the detailed information set forth in the Indictment, the defendant cannot claim that he has been prejudiced by any lack of specificity in the Indictment, or that he is not fairly informed of the charges against him. See United States v. Raniere, 384 F. Supp. 3d 282, 298 (E.D.N.Y. 2019) ("An indictment satisfies Rule 7(c)(1)—and thus the requirements of the Fifth and Sixth Amendments—if it first, contains the elements of the offense charged and fairly informs a defendant of the charge against which he must defend.").

The defendant cites only two cases in which a court has dismissed charges in an indictment at the pretrial stage, and neither supports his position. In United States v. Pirro, the Second Circuit affirmed the dismissal of a portion of an indictment because, unlike this case, the charging language failed to track the statutory language. Pirro, 212 F.3d at 95. The defendant also cites Russell v. United States, 369 U.S. 749 (1962), an almost 60-year-old case relating to the McCarthy-era Congressional hearings, which the Second Circuit has expressly observed is limited to "the special nature of a charge of refusal to answer questions in a congressional inquiry and not as a broad requirement applicable to all criminal charges that the indictment specify how each essential element is met." United States v. Stringer, 730 F.3d 120, 125-26 (2d Cir. 2013).

Finally, given the clear allegations in the Indictment, the defendant, without any legal support, asks the Court to dismiss the Indictment because, according to the defendant, its allegations usurp the jury's role as factfinder and "relieve" the government of having to prove elements of the crime. (Def. Mem. 37, 43). The defendant's argument is focused on two

22

specific and related elements:  (1) the Indictment's allegation that U.S. Financial Institution #1 was an "issuer" under the FCPA and (2) that the defendant was, in fact, an employee or agent of U.S. Financial Institution #1.  According to the defendant, by specifically alleging the status of U.S. Financial Institution #1's status as an issuer and the defendant's employment and agency relationship with U.S. Financial Institution #1, the government has "reliev[ed] itself of having to prove the statutory element that [the defendant] must be an employee or agent of an issuer." (Def. Mem. 37).

That argument is both puzzling and meritless.  Paragraph 3 of the Indictment specifically alleges who the relevant issuer is—U.S. Financial Institution #1.  (Ind. ¶ 3).  The Indictment also alleges that the defendant was an employee and agent of U.S. Financial Institution #1.  (Ind. ¶ 59.)  As noted supra, the Indictment indicates that the term "U.S. Financial Institution #1" is used to refer to both Goldman Sachs Group, and to Goldman Sachs Group and its related subsidiaries and affiliates collectively.  However, whether "U.S. Financial Institution #1" refers solely to Goldman Sachs Group or to a larger group of entities that includes Goldman Sachs Group is irrelevant.  In either case, the defendant is clearly on notice—which is all that is legally required at this stage of the case—that he is being charged with conspiracy to violate the FCPA as an employee and agent of the issuer Goldman Sachs Group.

The defendant seems to suggest that an assertion in the Indictment about U.S. Financial Institution #1's status as an "issuer" and the defendant's status as an agent is somehow dispositive as to those elements at trial.  But an Indictment's specific allegations that a defendant has committed various federal crimes can never be dispositive.  Indeed, "[i]t is axiomatic that in a criminal trial an indictment is not evidence." United States v. Juwa, 508 F.3d 694, 701 (2d Cir. 2007) (internal quotation marks omitted).  Therefore, the Indictment's allegations in no way

23

relieve the government of its burden to prove to the jury that the defendant was, in fact, an employee or agent of an "issuer" under the FCPA any more than it relieves the government of its burden of proving that the defendant committed the charged offenses.

       The government will prove at trial that the defendant was, in fact, an employee and agent of an issuer—Goldman Sachs Group—as there is ample evidence supporting that fact. To the extent that the defendant wants to argue that there is insufficient evidence for the jury to find that he was an employee or agent of Goldman Sachs Group (for example, as he suggests, that he was actually an employee or agent of another entity during the relevant time period), he is free to do so.  But those are arguments for trial, not a basis to dismiss the Indictment.

## IV.   THE INDICTMENT PROPERLY ALLEGES THE DEFENDANT ILLEGALLY CIRCUMVENTED GOLDMAN SACHS GROUP'S INTERNAL ACCOUNTING CONTROLS

The defendant asks the Court to dismiss Count Two, which charges the defendant with conspiring to circumvent the internal accounting controls of Goldman Sachs Group.  In support of his motion, he makes two principal arguments: (1) the allegations do not involve a "transaction" or "assets" of an "issuer" as defined by the FCPA, and (2) Section 78m(b)(2)(B) is unconstitutionally vague as applied to the defendant because, if the internal accounting controls specified in the statute are not tied to an issuer's transactions or use of assets, then the provision lacks ascertainable standards and fails to give notice to the accused.  As set forth below, the defendant's arguments misread the Indictment and are premature.

### A.   Applicable Law

In addition to the anti-bribery provisions, the FCPA also contains "accounting provisions" that are applicable to issuers.  One of the components of the FCPA's accounting provisions is the "internal accounting controls" provision, which requires that "issuers":

> devise and maintain a system of internal accounting controls sufficient to provide reasonable assurances that—(i) transactions are executed in accordance with management's general or specific authorization; (ii) transactions are recorded as necessary (I) to permit preparation of financial statements in conformity with generally accepted accounting principles or any other criteria applicable to such statements, and (II) to maintain accountability for assets; (iii) access to assets is permitted only in accordance with management's general or specific authorization; and (iv) the recorded accountability for assets is compared with the existing assets at reasonable intervals and appropriate action is taken with respect to any differences.

15 U.S.C. § 78m(b)(2)(B).  The FCPA provides that it is unlawful for any person to knowingly and willfully circumvent a system of internal accounting controls described in Section

78m(b)(2)(B).  See 15 U.S.C. §§ 78m(b)(5), § 78ff(a).  While the internal accounting controls provision of the FCPA is:

> supportive of accuracy and reliability in the auditor's review and financial disclosure process, this provision should not be analyzed solely from that point of view. The internal controls requirement is primarily designed to give statutory content to an aspect of management stewardship responsibility, that of providing shareholders with reasonable assurances that the business is adequately controlled.

S.E.C. v. World Wide Coin Investments Ltd., 567 F. Supp. 724, 749-50 (N.D. Ga. 1983) (discussing § 78m(b)(2)(B)).  "[T]he following directives can be inferred from the internal controls provisions: (1) Every company should have reliable personnel, which may require that some be bonded, and all should be supervised . . . (3) Reasonable assurances should be maintained that transactions are executed as authorized."  Id.  "Any ruling . . . with respect to the applicability of . . . the internal accounting control provision should be strictly limited to the facts of each case."  Id. at 751.

**B.    Discussion**

**1.    Count Two Properly Tracks the Statutory Language**

Count Two tracks the language of the conspiracy statute, 18 U.S.C. § 371, including the time, place and nature of the criminal conduct that was the object of the conspiracy—15 U.S.C. §§ 78m(b)(2)(B) and (b)(5).  Specifically, the Indictment alleges that "on or about and between January 2009 and May 2014, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere" the defendant, together with others, knowingly and willfully conspired "to circumvent and cause to be circumvented a system of internal accounting controls at U.S. Financial Institution #1," and that "[i]n furtherance of the conspiracy and to effect its objects," a member of the conspiracy committed or caused to be committed certain described overt acts.  (Ind. ¶¶ 61-63).

26

As with Count One of the Indictment, Count Two more than satisfies the pleading requirements of Rule 7 and the Constitution by tracking the statutory language and providing additional specific information regarding the defendant's criminal conduct.  Walsh, 194 F.3d at 44.  In addition to stating the time and place of the alleged crime, the Indictment provides detailed allegations regarding the nature of the criminal conduct (Ind. ¶¶ 15-57).  And as with Count One, there can be no question that the 34-page Indictment provides the defendant with ample notice and specificity regarding the alleged conspiracy to circumvent U.S. Financial Institution #1's internal accounting controls.  (Ind. ¶¶ 19-23, 28, 52, 63).

**2.      The Indictment Sufficiently Alleges Relevant "Transactions," "Assets" and "Internal Accounting Controls" of U.S. Financial Institution #1**

According to the defendant, because the Indictment fails to allege any relevant "transactions," "assets" or "internal accounting controls" of an "issuer" under the FCPA, he could not have violated or conspired to violate the FCPA's internal accounting controls provision.  (Def. Mem. 47).  Each part of this argument fails.

First, as discussed in detail above, the Indictment clearly alleges an "issuer" as defined in the FCPA—U.S. Financial Institution #1.  As a result, the first prong of the defendant's argument fails.  Second, the detailed explanation of the criminal conduct in the Indictment describes, among other things, three bond "transactions" that were "underwritten" by U.S. Financial Institution #1 for various 1MDB subsidiaries, which form the basis of the bribe and kickback scheme. (Ind. ¶ 24).  While the Indictment does not define "underwritten," the balance of the discussion of the criminal scheme makes it clear that, in the first instance, U.S. Financial Institution #1 used its own assets to purchase all of the bonds at issue in the three bond transactions discussed in the Indictment.  (Ind. ¶¶ 33-34, 42, 45, 51-52).

27

As alleged, and as the government will prove at trial, for each relevant bond transaction, U.S. Financial Institution #1 transferred its own assets to the accounts of the respective 1MDB subsidiaries as an initial step in the overall scheme.  After causing those transactions to occur, members of the conspiracy used the same funds in furtherance of the scheme by causing and directing additional transactions to pay bribes to the foreign officials and kickbacks to themselves, after laundering the funds through multiple shell companies owned and controlled by the co-conspirators. (Ind. ¶¶ 25-57).  The Indictment further alleges that, as part of the scheme, the co-conspirators built in excess amounts over and above the cost of the assets identified as the purpose for the bond issuances and used the built-in excess to pay bribes to foreign officials and kickbacks to the co-conspirators.  This allowed the co-conspirators, including the defendant, to conceal from management of U.S. Financial Institution #1 that bribes and kickbacks would be paid in relation to each bond transaction, and to circumvent internal accounting control functions implemented by U.S. Financial Institution #1 to identify and detect potential criminal conduct in connection with the bond transactions.  (Ind. ¶¶ 33-34, 43-44, 52).

At the core of the defendant's argument is his unsupported assertion that the "bribes did not involve any of Goldman's funds and therefore had nothing to do with Goldman's internal accounting controls."  (Def. Mem. 44.)  In making this argument, the defendant appears to suggest that, for purposes of establishing criminal liability for circumventing internal accounting controls (or conspiring to do so) in connection with a bribery scheme, the "transactions" or "assets" must flow directly from the issuer to the bribe or kickback recipient, as opposed to indirectly through a third party.  (Def. Mem. 48.)  Nothing in the statute, however, supports such a narrow interpretation, requiring that only the direct payment of bribes or kickbacks to an intended recipient by an issuer would implicate the issuer's internal accounting

28

controls.[6]  Such a reading of the statute would lead to absurd results, particularly where, as here,

the co-conspirators – including employees and agents of the issuer, such as the defendant –

caused the very transactions and use of assets that flowed from the issuer (U.S. Financial

Institution #1) to the third parties and thereafter to the bribe and kickback recipients (including

themselves).  The defendant's suggestion that any intervening transfer of funds from U.S.

Financial Institution #1 to the 1MDB subsidiaries, and thereafter to shell companies controlled

by members of the conspiracy, somehow breaks the chain of criminal conduct runs completely

counter to the plain language of the statute.  See United States v. Dauray, 215 F.3d 257, 260 (2d

Cir. 2000) ("Our starting point in statutory interpretation is the statute's plain meaning, if it has

one.").

        Third, even though the Indictment adequately tracks the statutory language and

provides additional details about the implication of U.S. Financial Institution #1's assets in the

charged transactions, the FCPA internal accounting controls provision, in fact, does not require

that the issuer's assets be used at all.  One subsection of the FCPA's internal accounting controls

provision—15 U.S.C. § 78m(b)(2)(B)(i)—makes no mention of "assets" at all, but rather focuses

solely on "transactions" and the requirement that an issuer devise and maintain internal

accounting controls sufficient to provide reasonable assurances that "transactions are executed in

accordance with management's general or specific authorization."  15 U.S.C. § 78m(b)(2)(B)(i)

(emphasis added).  A logical reading of "transactions" would include not only transactions

---

[6] Indeed, there is nothing in the statutory language of 15 U.S.C. §§ 78m(b)(2)(B) and
78m(b)(5)) requiring that the internal accounting controls be circumvented for purposes of
paying a bribe.

relating to direct bribe payments from an issuer to a foreign official or kickback procured by an employee of the issuer, but also any indirect transaction involving the issuer related to the bribe or kickback payment, including through third parties in order to conceal the bribes or kickbacks. There is nothing in the plain language of the FCPA that supports the defendant's assertion that internal accounting controls can only be implicated where an issuer uses its own funds to pay a bribe directly to a foreign official, and the defendant's effort to read such a restriction into the statute should be rejected.

Likewise, the defendant's suggestion that, to prove a circumvention of internal accounting controls, the government must also establish the falsification of a particular book or record of the company (Def. Mem. 48, 50), is entirely misplaced and conflates the "books and records" provision of the FCPA and the "internal accounting controls" provision of the FCPA. The plain language of the statute—15 U.S.C. §§ 78m(b)(2)(B) and (b)(5)—does not support the defendant's argument that specific allegations of a false book or record entry is a prerequisite to proving a circumvention of internal accounting controls.  Indeed, the text of Section 78m(b)(2)(B) supports the exact opposite, as two subsections speak only of the requirement that issuers maintain a system of controls to ensure that management authorizes execution of transactions and access to assets.  See 15 U.S.C. §§ 78(b)(2)(B)(i) and (iii).  The focus in these subsections is not on actual entries into the books and records, it is on management control.  See World Wide Coin Investments Ltd., 567 F. Supp. at 750.

Although a false book or record entry may be strong evidence of an individual circumventing internal accounting controls, such evidence is not required to meet the elements of a criminal violation.  This differentiates Count Two from a violation of the "books and records" provision of the FCPA under 15 U.S.C. §§ 78m(b)(2)(A) and (b)(5).  Had the defendant been

30

charged under that alternate provision, a false record of the sort noted by the defendant would be required; however, because that is not the charge at issue in this case, the existence of such a record is irrelevant.

The cases on which the defendant relies in attempting to equate the FCPA's internal accounting controls provision with the books and records provision are unavailing. (Def. Mem. 50-52).  For example, in United States v. Peterson, No. 12-CR-224 (JBW), (E.D.N.Y. Apr. 25, 2012), the defendant pled guilty to conspiracy to circumvent the internal accounting controls provision of the FCPA by concealing from and making false representations to the management of his company (an issuer) about the extent of a Chinese official's involvement in a real estate transaction and using shell companies owned and controlled by the co-conspirators, including Peterson, to effect the bribes to the Chinese official.  Id. at ECF Nos. 7 & 13.  In discussing Peterson's guilty plea, the defendant attempts to narrowly characterize the entirety of Peterson's offense as being limited to causing "the company's accounting [to] list the transaction with the wrong entity and having the company's asset accounting wrongly list the distributions as going to the government instrumentali[]ty instead of the government official." (Def. Mem. 52).  That narrow view, however, ignores other relevant facts relating to the circumvention of the company's internal accounting controls by Peterson and his co-conspirators, including their misrepresentations regarding certain aspects of the transaction at issue and efforts to conceal the foreign official's involvement in the transaction.  See Peterson, ECF. No. 7.

The Indictment in this case more than adequately alleges that U.S. Financial Institution #1 had internal accounting controls that were required to review and approve transactions involving the issuer, including the three 1MDB bond transactions.  (Ind. ¶¶ 19-20).

31

The Indictment further alleges that U.S. Financial Institution #1's internal accounting controls were overseen and enforced by the legal and compliance groups, which "worked in conjunction with, and as part of, various committees, in reviewing transactions, including the three 1MDB bond deals, for approval." (Ind. ¶ 19). The Indictment further alleges that the defendant and his co-conspirators circumvented these control functions by concealing information and making misrepresentations relating to the involvement of Low as an intermediary in the transactions and the payment of bribes and kickbacks in relation to the transactions. (Ind. ¶¶ 20, 22, 28, 52, 63). Ultimately, these will be fact issues for the jury to determine based on the evidence to be introduced at trial. At this stage, because the Indictment is sufficiently pled as to Count Two, the defendant's motion to dismiss that count should be denied.

### 3. Defendant's Challenges Relate to the Sufficiency of the Evidence and Not Adequate Pleading of the Indictment, and are Therefore Fact Questions for the Jury

In addition to arguing that the allegations in the Indictment do not involve a "transaction" or "assets" of an issuer, the defendant also seeks dismissal on the basis that the internal accounting controls alleged in the Indictment are purportedly not "accounting" controls, but rather "compliance preferences." (Def. Mem. 48, 54). In making each of these arguments, however, the defendant again attempts to litigate the sufficiency of the government's evidence on a motion to dismiss, and he asks the Court to bypass the jury's function as a factfinder with respect to Count Two and obtain summary dismissal based on his own skewed perspective of the evidence to be offered at trial.

As an element of the offense, the jury must evaluate, among other things, U.S. Financial Institution #1's internal accounting controls and if the defendant conspired to circumvent them. As explained above with respect to Count One, questions relating to whether

32

"transactions" or "assets" of the issuer were involved and questions as to whether the controls at issue are internal "accounting" controls are left to the jury to decide and are not a sufficient basis for pre-trial dismissal.  See, e.g., United States v. Eichman, 756 F. Supp. 143, 145-46 (S.D.N.Y. 1991) ("[a] motion to dismiss is not a device for the summary trial of the evidence; it is addressed only to the facial validity of the indictment"); United States v. Elie, No. 10 Cr. 336 (LAK), 2012 WL 383403, at *1 (S.D.N.Y. Feb. 7, 2012) ("[T]here is no summary judgment in criminal cases."); Russell v. United States, 369 U.S. 749, 791 (1962) ( "There is no such thing as a motion for summary judgment in a criminal case.").

The government will prove at trial that the defendant did, in fact, conspire to circumvent U.S. Financial Institution #1's internal accounting controls.  See S.E.C. v. e-Smart Technologies, Inc., 82 F. Supp. 3d 97, 110 (D.D.C. 2015) (citing examples of internal accounting controls that company at issue was lacking, including among others, proper documentation supporting company disbursements, policy on conflicts of interest, high-level supervision and review, training on company procedures, keeping current board minutes, poor communication among staff and consultants that led to inaccurate information, and inconsistencies in supporting documentation).  If the defendant wishes to argue at trial that the government failed to provide sufficient evidence that he conspired to circumvent U.S. Financial Institution #1's internal accounting controls, then he is free to do so at the appropriate time and after the evidence has been presented to the jury.

### 4.   The Internal Accounting Controls Provisions of the FCPA Are Not Unconstitutionally Vague

The defendant also argues in the alternative that 15 U.S.C. § 78m(b)(2)(B) is unconstitutionally vague as applied to him because the allegations in the Indictment do not relate

to an issuer's transactions or assets.  As a result, the defendant argues that the internal accounting controls provision of the FCPA both (1) fails to give sufficient notice of prohibited conduct and (2) is prone to "subjective" enforcement.  (Def. Mem. 54).  These claims are premature, as such a determination must be based on the facts of the case which cannot be fully assessed in advance of their presentation at trial.  They are also meritless, because the allegations do, in fact, relate to transactions and assets of an issuer.

When, as in this case, the interpretation of a statute does not implicate First Amendment rights, it is assessed for vagueness only "as applied," i.e., "in light of the specific facts of the case at hand and not with regard to the statute's facial validity."  United States v. Nadi, 996 F.2d 548, 550 (2d Cir. 1993); see United States v. Mazurie, 419 U.S. 544, 550 (1975) ("vagueness challenges to statutes which do not involve First Amendment freedoms must be examined in light of the facts of the case at hand."); United States v. Doe, 145 F. Supp. 3d 167, 177 (E.D.N.Y. 2015) (Brodie, J.) ("As the Second Circuit has noted, the preference for as-applied review follows from "the principle that a person to whom a statute may constitutionally be applied will not be heard to challenge that statute on the ground that it may conceivably be applied unconstitutionally to others, in other situations not before the Court." (quoting United States v. Farhane, 634 F.3d 127, 138 (2d Cir. 2011)).

A statute is void-for-vagueness as applied if it fails to "define the criminal offense with [1] sufficient definiteness that ordinary people can understand what conduct is prohibited and [2] in a manner that does not encourage arbitrary and discriminatory enforcement."  Skilling v. United States, 561 U.S. 358, 402-03 (2010) (quoting Kolender v. Lawson, 461 U.S. 352, 357 (1983)).  The relevant inquiry "is whether the statute . . . as construed, made it reasonably clear at the relevant time that the defendant's conduct was criminal."  United States v. Lanier, 520

U.S. 259, 267 (1997).  In assessing void-for-vagueness challenges, courts are required to

"construe, not condemn, Congress' enactments."  Skilling, 561 at 403; see also United States v.

National Dairy Products Corp., 372 U.S. 29, 32 (1963) (stressing, in response to a vagueness

challenge, "[t]he strong presumptive validity that attaches to an Act of Congress"); see also Doe,

145 F. Supp. 3d at 177 (noting that the preference for as-applied review "is rooted in a concern

with preserving the separation of powers and exercising judicial restraint" (citations omitted)).

        In support of his argument that Count Two should be dismissed prior to trial, the

defendant quotes the World Wide Coin court's opinion regarding internal accounting controls:

> The main problem with the internal accounting controls provision
> of the FCPA is that there are no specific standards by which to
> evaluate the sufficiency of controls; any evaluation is inevitably a
> highly subjective process in which knowledgeable individuals can
> arrive at totally different conclusions. Any ruling by a court with
> respect to the applicability of both the accounting provisions and the
> internal accounting control provisions should be strictly limited to
> the facts of each case.

567 F. Supp. at 751 (emphasis added).  However, this case, and all of the others cited by the

defendant on this claim, actually support the denial of the defendant's motion to dismiss and

reinforce the notion that the Indictment, which has been sufficiently pled, should be allowed to

proceed to trial, where all of the facts regarding the internal accounting controls of U.S. Financial

Institution #1 and their knowing and willful circumvention by the co-conspirators can be

determined.  In fact, the defendant does not cite a single case in support of his argument in which

the court found a statute void for vagueness at the pre-trial stage.  See, e.g., United States v.

Mazurie, 419 U.S. 544, 550 (1975) (ruling statute not unconstitutionally vague on post-

conviction appeal); United States v. Rybicki, 354 F.3d 124 (2d Cir. 2003) (holding statute not

unconstitutionally vague as applied on post-conviction appeal).  As a result, and for the reasons noted above, the defendant's motion as to Count Two should be denied.

But even if the defendant's void-for-vagueness argument was not premature, it still fails on its merits.  The defendant first claims the internal accounting controls provision fails to give sufficient notice of the conduct proscribed if the criminal conduct is unrelated to a transaction or asset of an issuer.  (Def. Mem. 52-53).  The government has already refuted this claim, as the Indictment alleges sufficient facts relating to the charged conspiracy to violate the internal accounting controls provision, including allegations relating to transactions and assets of an issuer, as addressed in detail above.

The defendant's second argument—that the internal accounting controls provision is prone to "subjective enforcement"—is similarly unavailing.  While he seeks to frame this as a separate argument, it is at base the same argument: that the Indictment fails to allege a cognizable internal accounting control that the defendant circumvented, because it purportedly does not tie the allegations to a transaction or asset of an issuer.  As discussed above, the allegations in the Indictment fully comply with the requirements of Rule 7 and the Constitution.  Thus, the defendant's void-for-vagueness argument fails because the Indictment does exactly what the defendant agrees it must do to be constitutionally sufficient—connect the allegations to a transaction or asset of an issuer.  Courts have routinely held that "a requirement of willfulness makes a vagueness challenge especially difficult to sustain," because "'[a] mind intent upon willful evasion is inconsistent with surprised innocence.'"  United States v. Hescorp, Heavy Equip. Sales Corp., 801 F.2d 70, 77 (2d Cir. 1986) (quoting United States v. Ragen, 314 U.S. 513, 524 (1942)).

## V.     THE INDICTMENT PROPERLY ALLEGES THE DEFENDANT CONSPIRED TO COMMIT MONEY LAUNDERING

The defendant moves to dismiss Count Three of the Indictment, which charges him with conspiracy to commit money laundering, on two separate grounds.  First, he claims this count, notwithstanding its detail, fails to provide adequate notice of multiple aspects of the offense, such that the only proper remedy is dismissal.  (Def. Mem. 56-57, 61-82).  Second, he claims that one of the charged specified unlawful activities fails as a matter of law, because it is not a specified unlawful activity.  (Id. at 82-84).  Neither of these arguments has merit.

As to the first argument, Count Three easily satisfies the Rule 7(c) standard.  That the defendant wishes to have more information about how the government will prove this offense is not a basis for dismissal.  Indeed, even if Count Three provided insufficient notice about what the defendant is alleged to have done, that too would not be a basis to dismiss, but only—at most—a basis to order the government to provide more information.  In any event, it is apparent from the defendant's brief that he well understands the crimes he is alleged to have committed.  He is not entitled to avoid a jury weighing his guilt by claiming otherwise.

As to the second argument, the defendant's assertion conflicts with the statute's plain text and evident purpose, and if accepted, would lead to absurd results.  The defendant also omits that Judge Preska rejected an identical claim.  This Court should do the same.

### A.     Count Three

Count Three alleges that the defendant conspired to, among other things, misappropriate over $2.7 billion in funds that Goldman raised for 1MDB through three bond

transactions, "some of which were used to pay bribes" to government officials in Malaysia and Abu Dhabi "through financial systems in the United States and elsewhere."  (Ind. ¶¶ 16, 18).

   For each bond transaction, Goldman transferred part of the proceeds via wire to 1MDB's wholly-owned subsidiary, "from a place within the United States to and through a place outside of the United States," with the defendant knowing that "a large portion of the proceeds of the bond would be diverted to themselves and others, including foreign government officials, through shell companies beneficially owned and controlled by themselves and others."  (Ind. ¶¶ 34, 37, 44, 45, 53).  The Indictment also provides several specific examples of transfers of funds totaling hundreds of millions of dollars each and transfers of funds into bank accounts at U.S. financial institutions, including to accounts that eventually funded U.S. Motion Picture Company #1, the purchase of a condominium in New York, and the purchase of art through Art Auction House #1 in New York.  (See, e.g., Ind. ¶¶ 39-41, 46-50, 54).

   Based on these allegations, the defendant is charged with conspiring to: (a) "transport, transmit and transfer monetary instruments and funds from a place in the United States to and through a place outside the United States and to a place in the United States from and through a place outside the United States" with the intent to promote one or more specified unlawful activities ("SUAs"), namely, violations of the FCPA and "offenses against a foreign nation involving the misappropriation, theft and embezzlement of public funds by and for the benefit of a public official, in violation of Malaysian Penal Law"; (b) transmit and transfer such funds knowing that conduct was designed, at least in part, to conceal and disguise proceeds from the SUAs; and (c) engage in monetary transactions within the United States valued at more than $10,000 derived from one or more of the SUAs.  (Ind. ¶ 65).

**B.      Applicable Law**

As detailed above in Section I, the Second Circuit has held that an indictment that tracks the language of the statute is sufficient to meet the notice requirements of Rule 7 and the Constitution.  See, e.g., Yannotti, 541 F.3d at 127.  An indictment need not detail all the information that the government will present at trial to prove each element, nor rule out potential defenses.  See, e.g., Perez, 575 F.3d at 166-67.  And an indictment that charges a conspiracy is sufficient "if it tracks the language of the statute and alleges all of the essential elements of conspiracy."  Mermelstein, 487 F. Supp. 2d at 251.

**C.      Discussion**

The defendant challenges Count Three on five bases: (1) failure to specify which Malaysian law the defendant violated; (2) failure to allege activities in the United States as part of the violation of Malaysian law; (3) failure to allege a design to conceal or disguise the funds that were transported, transmitted or transferred internationally; (4) failure to allege sufficient facts that support the three charged conspiratorial objects; and (5) alleging an SUA that, he asserts, is not an SUA as a matter of law.  These challenges rest on a misreading of the Indictment, the law, or both.

**1.      The Defendant is Not Entitled to Dismissal on the Ground that Count Three Must Cite a Specific Provision of Malaysian Law**

Section 1956(c)(7)(b)(iv) provides in relevant part that "the term 'specified unlawful activity' means . . . with respect to a financial transaction occurring in whole or in part in the United States, an offense against a foreign nation involving bribery of a public official, or the misappropriation, theft, or embezzlement of public funds by or for the benefit of a public official."

39

Here, there is no dispute that the defendant is alleged have conspired to engage in such conduct with respect to Malaysia.  (Ind. ¶ 65(a)).  Nor is there any dispute that Count Three tracks the statute.  (See Def. Mem. 60 (acknowledge that Count Three follows "the text of the money laundering statute")).  Under settled law, that is sufficient under Rule 7(c).  See Yannotti, 541 F.3d at 127.  Even if it were not, Count Three goes farther, providing extensive details about how the defendant committed this offense.

According to the defendant, nevertheless, he is entitled to dismissal of Count Three because the Indictment does not cite a specific provision of Malaysian law.  (Def. Mem. 62-63).  The defendant's sole support for his contention that an indictment must itself contain such a citation is that, a decade ago, in another circuit, one indictment did so.  (Id. at 63).  That says nothing about what the law requires.  As the Court is aware, and as demonstrated by this very case, it is common for the government to choose to allege more than the law requires.  That choice, in a different case, in a different circuit, a long time ago, does not entitle the defendant to dismissal here.  The defendant also omits that, in this circuit, indictments uniformly use the language used here, noting the country, but not the specific foreign statutes, at issue.  See, e.g., United States v. Boustani, No. 18 Cr. 681 (WFK), (E.D.N.Y. Dec. 19, 2018) (violation of Mozambique law); United States v. Ho, No. 17 Cr. 779 (KBF) (S.D.N.Y. Dec. 18, 2017) (violation of Ugandan and Chadian law); and United States v. Ng Lap Seng, No. 15 Cr. 706 (VSB) (S.D.N.Y. Nov. 22, 2016) (violation of Dominican and Antiguan law).

This is not to say that the defendant will never, before trial, be provided with the specific foreign statutes he is alleged to have violated.  On the contrary, as was done in the foregoing cases, pursuant to Rule 26.1, the government will, at the appropriate time, submit the relevant elements of the Malaysian law to the Court, and request jury instructions in line with

40

those elements be charged to the jury.  The government also is willing to confer with the defendant about those elements to see if the parties can reach an agreement as to them (as was done in multiple of the foregoing cases) or as to a schedule for briefing and/or a hearing.  But whether or not an agreement is reached as to substance or timing, the defendant is not entitled to dismissal.

Nor, relatedly, and contrary to his conclusory suggestion (Def. Mem. 63-64), made without any legal support, is the defendant entitled to dismissal because the Indictment does not list the pertinent subsection of the money laundering statute that references an offense against a foreign nation.  It is apparent that the defendant is acutely aware of the applicability of the relevant subsection (18 U.S.C. § 1956(c)(7)(b)(iv)), which is cited in his motion.  (Id. at 64).  And, as he acknowledges, he must have been both "misled" and "prejudiced" by a citation error to be entitled to dismissal.  (Id. at 65 n.23).  He plainly has not been and is not.

## 2.  The Defendant is Not Entitled to Dismissal on the Ground that Count Three Purportedly Fails to Allege Conduct in the United States

The defendant also contends that Count Three must be dismissed because it purportedly fails to allege conduct in the United States.  (Def. Mem. 64-65).  As an initial matter, as noted above, the defendant acknowledges that Count Three tracks the statute.  That alone defeats his claim.  In any event, the contention that Count Three fails to allege conduct in the United States is demonstrably wrong.  Indeed, as described above, the Indictment does not just allege that conduct in the United States occurred, but—though not required—provides specific examples of transfers into and out of bank accounts at U.S. financial institutions, including to bank accounts in the United States for the benefit of public officials, including Malaysian Official #1.  (See, e.g., Ind. ¶¶ 37, 40-41, 45, 50, 53).  Every one of these allegations is expressly

41

incorporated into Count Three.  (Ind. ¶ 64).  To the extent that the defendant suggests that they

may be ignored because they are not repeated verbatim in Count Three itself (Def. Mem. 64),

that suggestion may reasonably be characterized as frivolous.  There is no support in law or logic

for the proposition that an indictment must repeat allegations a second time, rather than refer to

them—nor would such a requirement have any effect, other than to require more paper to print

the Indictment.

### 3.    Count Three Sufficiently Alleges a Conspiracy to Conceal and Disguise Funds

The defendant next asserts that Count Three must be dismissed because while it

alleges that he conspired to move funds internationally knowing that such movement was

"designed," at least in part, "to conceal . . . the proceeds of specified unlawful activity," 18

U.S.C. § 1956(a)(2)(B)(i), it "fails to make such an allegation with specificity."  (Def. Mem. 67).

This assertion is baseless.  The defendant discusses, at some length, Cuellar v. United States, 553

U.S. 550 (2008) and its progeny, which describe the contours of the offense.  (Def. Mem. 68-71).

But these cases are about the sufficiency of the evidence at trial.  They did not purport to—and

did not—change the long-settled law about the sufficiency of an indictment.  And again, the

defendant not only does not dispute that Count Three tracks the statute; he affirmatively

acknowledges that it does.  (See id. at 70).

Moreover, again, although not required, the Indictment does far more than allege

that the defendant had the requisite intent.  The Indictment alleges the defendant knew, from the

beginning of the scheme, that the purpose of diverting funds from the bond transactions "into the

bank accounts of shell companies that NG, LOW, Co-Conspirator #1 and others beneficially

owned and controlled" was, at least in part, to conceal that the "diverted funds for their personal

use" and "used to pay bribes to government officials in Malaysia and Abu Dhabi" were

misappropriated from 1MDB.  (Ind. ¶ 34).  And the Indictment details the bases for that

allegation.  For example, paragraph 44 alleges:

> [t]he defendants JHO LOW and ROGER NG, Co-Conspirator #1
> and others knew that a large portion of the proceeds of Project
> Maximus would be illegally diverted to themselves and others,
> including foreign government officials, through shell companies
> beneficially owned and controlled by themselves and others.  NG
> knew at the time that Malaysian Official #1, Abu Dhabi government
> officials and 1MDB officials, among others, would receive money
> from the proceeds of Project Maximus that passed through bank
> accounts of various shell companies beneficially owned and
> controlled by LOW and others . . . .

(See also Ind. ¶¶ 37, 40, 50, 53).

The defendant is entitled to dispute that he did not do what he is charged with

doing or to argue to the jury at trial that it should view individual transfers other than as part of a

larger scheme.  (See Def. Mem. 70-71).  He is not entitled to avoid trial on such a basis or any

similar assertion that the Indictment is factually wrong when it says that he committed a crime.

See, e.g., Elie, 2012 WL 383403 at *1 ("[T]here is no summary judgment in criminal cases. . . .

[A] pretrial motion to dismiss an indictment is not a permissible vehicle for addressing the

sufficiency of the government's evidence." (internal quotation marks omitted)) (rejecting motion

to dismiss under this "very well established principle"); United States v. Bout, No. 08 Cr. 365,

2011 WL 2693720, at *5 n.73 (S.D.N.Y. July 11, 2011) ("To the extent [the defendant's]

challenges are to the sufficiency of the Government's evidence to satisfy—as opposed to the

sufficiency of the Indictment to allege—the federal elements of the crimes charged, those

arguments are not appropriately decided on a motion to dismiss." (internal quotation marks

omitted; emphases in original)).

### 4. Count Three's Conspiracy Objects are Adequately Pled

The defendant also claims that Count Three is deficient because it charges a multiple-object conspiracy, the objects have some different elements, and the Indictment does not expressly say which of its factual allegations support which object or objects. (Def. 72-84). But though this section of his brief is a dozen pages, he does not identify any authority for the proposition that an indictment must identify which one of its factual allegations support which object in a multiple-object conspiracy. Since an indictment need only be a "plain, concise and definite written statement of the essential facts constituting the offense charged" under Rule 7, and thus need not provide specific factual allegations of the kind in the Indictment here at all, it plainly is not the law that such factual allegations must also say which objects they support. Dismissal of an indictment is an "extraordinary remedy reserved only for extremely limited circumstances implicating fundamental rights." United States v. De La Pava, 268 F.3d 157, 165 (2d Cir. 2001). There is no right, much less a "fundamental right," to what the defendant seeks.

Without a single case in support of his novel proposition (and one that, if adopted, would disincentive providing the kind of detail provided in the Indictment), the defendant resorts to a series of questions. (See Def. Mem. 72 ("How can he know, without more, which of the allegations incorporated from Count One relate to one, as opposed to another, of the three objects for the money laundering conspiracy?"); id. at 76 "But how is Ng supposed to defend against one theory, as opposed to the other[?]"); id. ("How can Ng know which of those incorporated allegations from Count One should be read to include the requirement of proceeds, and which should not?")). The apparent purpose of this rhetorical device is to suggest that the defendant is hopelessly confused by Count Three—which he terms "byzantine" (id. at 58; see also id. at 72). But the remedy for alleged confusion is clarity, not dismissal. The law does not provide that, if a

44

defendant needs more information about charges, they must be dismissed   However, the defendant has not filed a motion for a bill of particulars, or otherwise sought clarity about what he is purportedly confused about.  Instead, he seeks the windfall of dismissal.  He is not so entitled.[7]

Moreover, while the Indictment does not expressly link factual allegations to objects (and it is not required to do so), it is obvious what allegations support what aspects of the scheme.  For example, several paragraphs of the Indictment detail how the defendant and others used shell companies that they beneficially owned and controlled to launder criminal proceeds of the scheme, which clearly supports, at the very least, the concealment object.  (See, e.g., Ind. ¶¶ 34, 35, 37-41).  In short, the Indictment provides a detailed narrative of how the defendant committed the offense charged in Count Three.

Finally, the defendant suggests even if dismissal might not otherwise be warranted, it is purportedly necessary here because the jury at trial may be confused by the multiple-object conspiracy.  (See Def. Mem. 76.)  He asks, "how can the Court be sure that the jury will be unanimous on which of the objects of the money laundering conspiracy they decided?"  (Def. Mem. 76; see also id. at 79-80; id. at 82).  The answer is straightforward: this Court will instruct them as to the requirement that they be unanimous as to which object or

---

[7] His failure to seek a bill of particular is unsurprising, because the Indictment provides great detail.  A bill of particulars is required only when the charges of an indictment are so general that they do not advise the defendant of the specific acts of which he is accused.  United States v. Torres, 901 F.2d 205, 234 (2d Cir. 1990); see also United States v. Cephas, 937 F.2d 816, 823 (2d Cir. 1991); United States v. Panza, 750 F.2d 1141, 1148 (2d Cir. 1984).  "A bill of particulars is not a general investigative tool, a discovery device or a means to compel the government to disclose evidence or witnesses to be offered prior to trial."  United States v. Gibson, 175 F. Supp. 2d 532, 537 (S.D.N.Y. 2001) (citation omitted).

objects they find.  If the defendant has a particular jury instruction in mind, he is free to propose one at the appropriate time.  That is how our system ensures that the jury follows the law—not removing a facially valid charge from its consideration.

     **5.**     <u>**The Money Laundering Statute Covers any Felony Violation of the FCPA**</u>

Finally, the defendant claims that one of the two violations of the FCPA charged as an SUA—that under Section 78dd-3—is not an SUA as a matter of law.  This is so, the defendant asserts, because the version of the FCPA in existence at the time the pertinent portion of the money laundering statute was enacted did not include Section 78dd-3.  (Def. Mem. 82-84).  This claim, too, is meritless.

Statutory interpretation "must begin with the language employed by Congress and the assumption that the ordinary meaning of that language accurately expresses the legislative purpose."  <u>United States v. Albertini</u>, 472 U.S. 675, 680 (1985) (internal quotation marks omitted).  Where "the statute's language is plain, 'the sole function of the courts is to enforce it according to its terms.'"  <u>United States v. Ron Pair Enters., Inc.</u>, 489 U.S. 235, 241 (1989) (quoting <u>Caminetti v. United States</u>, 242 U.S. 470, 485 (1917)); <u>see also</u> <u>Connecticut Nat'l Bank v. Germain</u>, 503 U.S. 249, 253-54 (1992) ("We have stated time and again that courts must presume that a legislature says in a statute what it means and means in a statute what it says there.").

The money laundering statute is clear on its face.  It covers, without limitation, "any felony violation of the Foreign Corrupt Practices Act."  18 U.S.C. § 1956(c)(7)(D).  Accordingly, this Court should "enforce it according to its terms."  <u>Ron Pair Enters.</u>, 489 U.S. at 241 (internal quotation marks omitted).

46

The defendant nevertheless argues that this Court should read an unexpressed limitation into the statute, by invoking the "reference canon" (Def. Mem. 82), which, he claims, requires reading the money laundering statute as "in effect cut[ting] and past[ing] the referenced statute as it existed when the referring statute was enacted, without any subsequent amendments," Jam v. Int'l Fin. Corp., 139 S. Ct. 759, 769 (2019).  This argument should be rejected for multiple reasons.  Resort to the reference canon is both unnecessary, because the statute is clear, and improper, because it would lead to absurd results and unintelligible criminal laws.

First, because the money laundering statute is clear on its face, the Court need not and should not resort to a canon.  Canons provide a method of "supplementing and narrowing the possible meaning of ambiguous text."  Natural Res. Def. Council, Inc. v. Muszynski, 268 F.3d 91, 98 (2d Cir. 2000).  They "do not come into play if the language of the statute is plain." United States v. DiCristina, 726 F.3d 92, 99 n.8 (2d Cir. 2013) (citing Connecticut Nat'l Bank, 503 U.S. at 253); see also Green v. City of New York, 465 F.3d 65, 78 (2d Cir. 2006) ("Only if an attempt to discern the plain meaning fails because the statute is ambiguous, do we resort to canons of construction.").  Jam, upon which the defendant relies (Def. Mem. 82), is in accord. There, the Supreme Court stated that "[w]e ordinarily assume, absent a clearly expressed legislative intention to the contrary, that the legislative purpose is expressed by the ordinary meaning of the words used," and examined the statutory text before noting that the "natural reading" of that text was "confirmed" by the reference canon.  Jam, 139 S. Ct. at 769 (internal quotation marks omitted).

In any event, canons are "guides," not "mandatory rules," and are useful only to the extent they "help judges determine the Legislature's intent."  Chickasaw Nation v. United

47

States, 534 U.S. 84, 94 (2001).  The money laundering statute "takes dead aim at the attempt to

launder dirty money."  United States v. Stavroulakis, 952 F.2d 686, 691 (2d Cir. 1992).  "Why

and how that money got dirty is defined in other statutes."  Id.  The money laundering statute is

thus structured very differently from one that merely "in effect cuts and pastes" a different

"referenced statute," Jam, 139 S. Ct. at 769.  "[I]n expounding a statute," a court "must . . . look

to the provisions of the whole law, and to its object and policy."  Pilot Life Ins. Co. v. Dedeaux,

481 U.S. 41, 51 (1987) (internal quotation marks omitted; alteration incorporated).  The structure

and purpose of the money laundering statute make clear that the list of SUAs in Section

1956(c)(7) is meant to be "link[ed]" to the actual criminal statutes set forth therein "so that the

one develops in tandem with the other."  Jam, 139 S. Ct. at 769.  This Court should decline the

defendant's invitation to interpret the money laundering statute in a manner that ignores its

structure and purpose, and freezes it in time.

Moreover, application of the canon invoked by the defendant here would lead to

absurd results.  "[I]nterpretations of a statute which would produce absurd results are to be

avoided if alternative interpretations consistent with the legislative purpose are available."

Griffin v. Oceanic Contractors, Inc., 458 U.S. 564, 575 (1982); see also, e.g., United States v.

Dauray, 215 F.3d 257, 264 (2d Cir. 2000); cf. Jam, 139 S. Ct. at 771-72 (discussing whether an

interpretation in accord with statutory text would create "undesirable results").  The defendant's

suggestion (Def. Mem. 83) that his interpretation, if adopted, would merely limit the application

of one subsection of the money laundering statute in cases involving one provision of the FCPA

is demonstrably incorrect.  The money laundering statute is replete with the same kind of cross-

references.  See, e.g., 18 U.S.C. § 1956(c)(7) (specified unlawful activity includes "any act or

activity constituting an offense listed in section 1961(1) of this title . . . .").  Adopting the

48

defendant's interpretation would mean that virtually every offense in the statute would be strictly limited to the definition of an offense at the time it was first enacted, no matter how many years ago—despite the statute's long-understood purpose broadly to criminalize financial transactions that promote or launder the proceeds of serious criminal activity.  See, e.g., United States v. LeBlanc, 24 F.3d 340, 346 (1st Cir. 1994).  This would lead to absurd results.

For example, if a new drug were scheduled as a controlled substance (as happens with some frequency), transmitting money to or from the United States to promote selling that drug would no longer appear to be a crime.  See 18 U.S.C. § 1956(c)(7)(A); id. § 1961(1)(A). Similarly, transmitting money to promote the selling of arms (or laundering the proceeds of such sales) would appear to be a crime only if the specific arms were identified and placed on the United States Munitions List at the time the pertinent section was enacted.  See id. § 1956(c)(7)(B)(v)(I).  This would be a boon to traffickers of modern weapons, chemical agents, and related systems.  See, e.g., Amendment to the International Traffic in Arms Regulations: Revi-sion of U.S. Munitions List Categories XIV and XVIII, FR 49531-01, 2016 WL 4011597 (July 28, 2016).  It is inconceivable that Congress so intended.

Nor would such significant and problematic ramifications be limited to the money laundering statute.  See, e.g., 18 U.S.C. § 924(c) (prohibiting use of a firearm in connection with a "drug trafficking crime," defined as "any felony punishable under the Controlled Substances Act (21 U.S.C. 801 et seq.), the Controlled Substances Import and Export Act (21 U.S.C. 951 et seq.), or chapter 705 of title 46"); id. § 1961(1)(B) (d-fining "racketeering activity" as including "any act which is indictable under any of the following provisions," and then listing such provisions).  As Judge Preska explained in rejecting an identical argument to that presented by the defendant:

> The statute refers to the FCPA generally, and if the prohibited
> acts related only to statutes in effect at the time the statute
> was passed, then there would be zillions of statutes, different
> new drugs and the variety of other things which would not be
> included.

United States v. Ho, No. 17 Cr. 779 (LAP), Dkt. No. 212, at 66.[8]

The defendant argues that if Congress had meant for later enacted parts of the FCPA to be included, it would have written "as it may be amended." (Def. Mem. 83). But he does not identify an example of a time when Congress has amended a statute to add a new, express cross-reference to a section that is subsumed within a preexisting, broader cross-reference. If, as the defendant suggests, Congress "manifest[ed]" an "intent" for the statute only to cover certain FCPA offenses (id.) one reasonably would expect it to manifest a different intent, at least once, elsewhere in the same statute. It has not done so. The reason is apparent: there is no need to do so.

The absence of an example in support of the defendant's presumption as to congressional intent is particularly difficult to reconcile with the canon upon which the defendant relies, which has existed since at least 1938, if not 1890. See Hassett v. Welch, 303 U.S. 303, 314 (1938) (cited at Def. Mem. 83); Snell v. Chicago, 133 Ill. 413, 437-39 (1890). It is settled law that Congress is "presumed to have legislated against the background of our traditional legal concepts." United States v. United States Gypsum Co., 438 U.S. 422, 437 (1978). Yet if the defendant is correct, Congress has knowingly permitted the money laundering statute to ossify

---

[8] Ho subsequently was convicted, and has appealed his conviction, including as to this ruling. His appeal has been argued and a decision is pending.

with respect to all kinds of conduct.  There is no reason to presume that Congress has acted so irrationally.

Finally, criminal laws must be interpreted such that they are understandable by laypeople of ordinary intelligence.  See Papachristou v. City of Jacksonville, 405 U.S. 156, 162 (1972); see also, e.g., United States v. Balde, 927 F.3d 71, 76 (2d Cir. 2019) ("Criminal laws are ordinarily written to be understood by the non-specialist individuals who are subject to the law, law enforcement officers, prosecutors, and jurors . . . ."); Dickerson v. Napolitano, 604 F.3d 732, 741 (2d Cir. 2010).  If the defendant's position were accepted, it would no longer suffice for one to read that laundering the proceeds of a "specified unlawful activity" is a crime, and then to review the list of SUAs.  See 18 U.S.C. § 1956(c)(7).  With respect to most SUAs, if not all, one would instead need to determine (a) when each SUA was added to the money laundering statute, and then (b) how the referenced SUA statute read at that time.  This is no easy feat for someone without access to a costly legal database, particularly when the sections at issue may have been enacted decades ago.  And one would have to repeat the same time-consuming task outside of the money laundering context as well.  See, e.g., id. § 924(c), id. § 1961(1).  This Court should avoid an interpretation of the law that renders it unintelligible on its face "by the non-specialist individuals who are subject to the law." Balde, 927 F.3d at 76.

In sum, the defendant's proposed interpretation is unsupported by statutory language, conflicts with statutory structure, requires one to presume that Congress has acted irrationally, creates absurd results, and risks rendering the statute facially unintelligible by lay people.  His interpretation should be rejected.

51

VI.    **THE DEFENDANT'S MOTION TO MODIFY THE GOLDMAN SACHS GROUP'S DEFERRED PROSECUTION AGREEMENT IS MERITLESS**

On October 22, 2020, in the related criminal case <u>United States v. The Goldman Sachs Group, Inc.</u>, 20-CR-437, Goldman Sachs Group entered into a DPA with the government to resolve its criminal exposure for its role in the criminal conduct detailed in the Indictment in this case.  <u>See</u> Goldman Sachs Group DPA, attached hereto as Exhibit A.[9]  The defendant contends that two of the DPA's provisions will result in "violat[ions of his] constitutional rights at trial and should therefore be modified."  (Def. Mem. 84).  The defendant is wrong; there is no constitutional violation here and the remedy he seeks is inappropriate and unsupported by law.

A.    **DPA Paragraph 23 Does Not Violate the Constitution**

The first sentence of Paragraph 23 of the DPA (the "First Sentence") reads:

> The Company [which the DPA defines as Goldman Sachs Group] expressly agrees that it shall not, through present or future attorneys, officers, directors, employees, agents or any other person authorized to speak for the Company, make any public statement, in litigation or otherwise, contradicting the acceptance of responsibility by the Company set forth above or the facts described in the Statement of Facts.

(Exhibit A at 19).  The defendant asserts that the First Sentence will make unidentified Goldman employees "afraid" to provide testimony contrary to the Statement of Facts, were they to be called to testify at the defendant's trial, which fear, the defendant contends, is so grave as to violate the Firth and/or Sixth Amendments.  (Def. Mem. 84-87).  The defendant therefore requests that the Court modify that paragraph to include language noting "that it specifically does

---

[9] The DPA has been made publicly-available by the government (<u>see, e.g.</u>, https://www.justice.gov/usao-edny/press-release/file/1329961/download), and was also produced to the defendant in discovery.

not apply in the case against [him]."  (Id. at 89).  This request fails for multiple, independent reasons.

### 1.    **Applicable Law**

A criminal defendant has "a right to establish a defense by presenting witnesses." United States v. Williams, 205 F.3d 23, 29 (2d Cir. 2000).  But the right to present a defense witness is "not unqualified," and it is "subject to countervailing public interests."  Buie v. Sullivan, 923 F.2d 10, 11 (2d Cir. 1990). "Such countervailing interests include preventing perjury and investigating past criminal conduct."  Williams, 205 F.3d at 29. Thus, for example, "a due process violation does not arise merely because the prosecutor interviews a potential defense witness in hopes of obtaining his testimony, or because the government warns a defense witness of the consequences of committing perjury."  Id. (citation omitted).

A defendant claiming witness intimidation by the government bears the burden of making a three-part showing of "materiality, bad faith, and lack of fundamental fairness." Buie, 923 F.2d at 12. First, the defendant must show "that he was deprived of material and exculpatory evidence that could not be reasonably obtained by other means."  Williams, 205 F.3d at 29; see also Buie, 923 F.2d at 12 (defendant must be "totally deprived" of the evidence). Second, the defendant must demonstrate "bad faith on the part of the government," Williams, 205 F.3d at 29, and that showing must be made with "evidence" rather than mere "[s]peculation." Buie, 923 F.2d at 12-13. Bad faith typically "involve[s] threats of prosecution or other intimidating conduct that was designed to intimidate." United States v. Pinto, 850 F.2d 927, 932 (2d Cir. 1988) (emphasis in original). Third, the defendant "must demonstrate that the absence of fundamental fairness infected the trial; the acts complained of must be of such quality as necessarily prevents a fair trial."  Williams, 205 F.3d at 29-30 (internal quotation marks omitted).

2.     **Discussion**

The defendant, who bears the burden, fails cogently to allege let alone

demonstrate any of the requisite elements to make out his claim.

First, he does not come close to demonstrating that unidentified Goldman

witnesses he might call at trial would—purportedly but for the First Sentence—provide "material

and exculpatory evidence that could not be reasonably obtained by other means." Williams, 205

F.3d at 29-30.  Indeed, he does not appear even to attempt to explain how the First Sentence

operates to "totally deprive[]" him of such evidence, Buie, 923 F.2d at 12, as is required given

that the DPA binds Goldman itself, and not any of its employees.  The defendant instead simply

speculates that certain witnesses might be disinclined to offer certain testimony.  (Def. Mem. 86).

That is insufficient.  See Buie, 923 F.2d at 12-13.  And notably, the defendant appears to have

access to documents that contain his prior statements, which is the very evidence that he suggests

is exculpatory (although it is not, and in any event, he is aware of his own prior statements).

(See Def. Mem. 27 (referencing a 2010 report that in which "Ng's words are quoted")).  The

defendant's motion may be denied on this basis alone.

Second, the defendant does not come close to demonstrating "bad faith on the part

of the government."  Williams, 205 F.3d at 29.  He does not allege that the First Sentence

resulted from bad faith (although a mere allegation would be insufficient).  Instead, the defendant

asserts that he is concerned that the First Sentence—which the defendant characterizes as

"unnecessarily add[ed] . . . to the DPA"—will "dissuade" Goldman employees from testifying

"out of intimidation that Goldman, and possibly the employee himself, could then be charged

with a crime."  (Def. Mem. 86).  This proffered concern can easily be aired on cross-

examination, just as it is in any other case where an employee of a company currently or

54

formerly under investigation testifies.  In any event, the defendant must show "bad faith" by the government, not merely that, had the government taken a different approach, he would have less to cross-examine witnesses about.  Any suggestion that the government did something unusual or improper, much less acted in bad faith, in signing the DPA is baseless.

As an initial matter, the First Sentence was not specially inserted into the DPA. The First Sentence is standard language that is routinely included in DPAs with corporate entities, and is not unique to Goldman Sachs Group.  See, e.g., United States v. TechnipFMC plc, 19-CR-278 (KAM), DPA at 17, available at https://www.justice.gov/opa/press-release/file/1177316/download (contains identical First Sentence); United States v. Keppel Offshore & Marine Ltd, 17-CR-697 (KAM), DPA at 17, available at https://www.justice.gov/opa/press-release/file/1020706/download (contains identical First Sentence); United States v. Och-Ziff Capital Management Group LLC, 16-CR-516 (NGG), DPA at 17-18, available at https://www.justice.gov/opa/file/899306/download (contains identical First Sentence).  The government plainly did not engage in conduct that was targeted to this defendant and "designed to intimidate" particular witnesses who might favor him, Pinto, 850 F.2d at 932 (emphasis in original).  It entered into a standard agreement with a corporate entity.

Nor does the defendant meaningfully engage with the language of that agreement. The First Sentence is, by its plain language, limited to statements by Goldman Sachs Group (the "Company expressly agrees that it shall not … make any public statement") or individuals who are "authorized to speak for" Goldman Sachs Group.  (Exhibit A at 19 (emphases added)). Because Goldman Sachs Group is a corporate entity, it must necessarily "speak" through others; for example, at the hearing to waive indictment and exclude time under the Speedy Trial Act, a corporate representative was authorized by Goldman Sachs Group's Board of Directors to speak

on Goldman Sachs Group's behalf.  See United States v. The Goldman Sachs Group, Inc., 20-CR-437, Minute Entry dated October 22, 2020.  In short, the First Sentence does no more than reflect the entirely unremarkable proposition that, as a corporate defendant that has entered into a DPA to resolve its criminal exposure, Goldman Sachs Group may not subsequently make statements that would contradict its own acceptance of responsibility generally or the Statement of Facts (which functions as Goldman Sachs Group's allocution) in particular.  The First Sentence does not and cannot bind employees of Goldman—who, notably, are not parties to the DPA—who act or speak in their individual capacity (e.g., by providing testimony at a criminal trial).

Moreover, the defendant does not say that he will seek to call an "authorized representative" of Goldman Sachs Group at trial (and testimony by such a person would likely be inadmissible).  Rather, the defendant says that he will seek to call individual employees, including "members of Goldman's Business Group and compliance department," to testify about their knowledge of his's involvement in the 1MDB deals in an attempt to establish that he did not circumvent internal controls but rather "assisted Goldman in addressing its Low-related concerns."  (Def. Mem. 86).  There is nothing in the First Sentence that would bar or otherwise materially hinder the testimony of such employees about their interactions with the defendant or any other fact of relevance.  The defendant's contention that the First Sentence will operate to "dissuade" an employee "from testifying out of intimidation that Goldman Sachs Group, or the employee, could be charged with a crime by the Government" (id.) is hyperbole, at best.  Indeed, the DPA does not bind individual employees, and the Statement of Facts is not a document sworn to by individual employees.  Thus, testimony by an employee that is inconsistent with the

DPA or Statement of Facts could never be the basis for the <u>employee</u> facing any repercussions at all based on the DPA.

The cases cited by the defendant (Def. Mem. 86-87) bear no resemblance to these indisputable facts. For example, in <u>United States v. Golding</u>, 168 F.3d 700, 703-04 (4th Cir. 1999), a prosecutor told an attorney for the defendant, whose wife was scheduled to testify on the defendant's behalf, that the government would prosecute the wife for certain crimes if she testified; the prosecutor later argued during summation that the fact that the defendant's wife failed to testify demonstrated that the defendant's story was false. The court held that the prosecutor's actions in "threaten[ing] a defense witness with prosecution simply to prevent testimony which would have been damaging to her own case" and then "further abus[ing] her power by using the very situation she had created against the defendant in closing argument," constituted prosecutorial misconduct that warranted a new trial. <u>Id.</u> Similarly, in <u>United States v. MacCloskey</u>, 682 F.2d 468, 476-79 (4th Cir. 1982), a witness testified at a pre-trial hearing in a manner that was detrimental to the government; thereafter, the prosecutor called the attorney for the witness and threatened the witness by stating that she "better remember the privilege of the Fifth Amendment." The witness subsequently refused to testify at trial, invoking the Fifth Amendment. <u>Id.</u> The court concluded that the prosecutor's threat violated the defendant's due process right to present his defense witnesses freely, and granted the defendant's motion for a new trial. <u>Id.</u> And in <u>United States v. Smith</u>, 478 F.2d 976, 977-79 (D.C. Cir. 1973), the prosecutor directly told a witness for the defense that if he testified at trial he could potentially be charged with, among other things, murder and obstruction of justice. The defendant does not, because he cannot, make any similar allegation here.

57

Finally, even assuming arguendo that the defendant could meet his burden as to the first two elements, he does not and cannot "demonstrate" an "absence of fundamental fairness" that will "prevent[] a fair trial." Williams, 205 F.3d at 29-30 (internal quotation marks omitted). If, as he suggests, he is concerned that a witness is somehow biased in favor of the government in light of the DPA, the defendant can inquire whether the witness is even aware of the DPA, and if so, can ask further whether the witness is aware of this provision, and if appropriate and if a sufficient foundation exists, can probe as to potential bias. There is nothing fundamentally unfair about that process.

### B.  DPA Paragraph 5(c) Does Not Violate the Constitution

Paragraph 5(c) of the DPA reads:

> The Company shall use its best efforts to make available for interviews or testimony, as requested by the Offices, present or former officers, directors, employees, agents and consultants of the Company. This obligation includes, but is not limited to, sworn testimony before a federal grand jury, in federal trials or at any other proceeding, all meetings requested by the Offices, and interviews with domestic or foreign law enforcement and regulatory authorities. Cooperation under this Paragraph shall include identification of witnesses who, to the knowledge of the Company, may have material information regarding the matters being investigated or prosecuted.

(Exhibit A at 8). The defendant contends that because this paragraph allows the government to "require[10] that Goldman make[] its present or former Goldman employees available to testify" at trial, including those employees who are located overseas and may be "beyond the Court's

---

[10] The defendant mischaracterizes the language of Paragraph 5(c) in making this argument. Paragraph 5(c) does not say that Goldman is "required" to make its employees available for testimony at the government's request, but only that Goldman will use its "best efforts" to do so.

subpoena power," but does not grant the defendant the same right, the paragraph violates his right to present witnesses at trial.  (Def. Mem. 87-89).   The defendant thus seeks for this Court "to require Goldman to make its employees available as defense witnesses to the same degree it makes its employees [] available to the Government."  (Id. at 89).[11]  The request also fails for multiple reasons.

First, the defendant has tools available to him to compel witnesses to provide trial testimony, whether located in the United States or abroad.  See Fed. R. Crim. P. 15, 17; 28 U.S.C. § 1783 (providing for extraterritorial subpoena power over "a national or resident of the United States who is in a foreign country").  He does not argue that those tools are insufficient.  Indeed, it appears that he has not even attempted to undertake them.[12]  Instead, he seeks an end-run around those tools in the form of an order requiring that a corporate entity that is cooperating with the government affirmatively assist him without regard to the Federal Rules of Criminal Procedure.  Unsurprisingly, the defendant does not cite a single case in which a court has granted or even contemplated such a novel order.  Nor is the government aware of one.

_____

[11] The defendant cites Williams in this section, suggesting that the constitutional right he believes is implicated is the Fifth Amendment (Def. Mem. 89), but his motion fails regardless of whether it is based in the Fifth or Sixth Amendments.

[12] The defendant states that his counsel is "not [currently] able to travel to Malaysia to interview potential witnesses because of the country's Covid-19 restrictions." (Def. Mem. 89 (emphasis added)).  It is not clear whether this fact is relevant to the defendant's motion, because the defendant has not indicated whether any of these potential witnesses are Goldman employees, the only individuals who would be impacted by this motion.  Moreover, the defendant has not indicated whether his counsel has attempted to conduct informational interviews by other means, such as by telephone or video conference.  The defendant has also not indicated whether he has attempted to conduct informational interviews of potential witnesses in any other countries.

Second, the defendant fails to explain how the Constitution might require such a revolutionary order.  It does not.  The defendant does not explain or cite any authority supporting his position that the Constitution requires that he and the government have equal investigative or trial-related means to obtain evidence—a proposition that would call into question all manner of techniques and federal rules.  And to the extent that the defendant appears to rest his claim on Williams and similar cases (see Def. Mem. 89), his claims fails for substantially the same reasons set forth above.  The defendant has not even attempted to explain how particular, unidentified Goldman witnesses that may be located overseas would—but for the paragraph to which he objects—provide "material and exculpatory evidence that could not be reasonably obtained by other means."  Williams, 205 F.3d at 29-30.  Nor does the defendant allege that the government acted in bad faith.  Nor can he; as with the First Sentence, the language in Paragraph 5(c) is standard language in DPAs with corporate entities.  See, e.g., TechnipFMC plc, 19-CR-278 (KAM), DPA at 7 (contains identical Paragraph 5(c)); United States v. Keppel Offshore & Marine Ltd, 17-CR-697 (KAM), DPA at 7 (contains identical Paragraph 5(c)); United States v. Och-Ziff Capital Management Group LLC, 16-CR-516 (NGG), DPA at 6 (contains identical Paragraph 5(c)).  It is plainly not improper for the government to enter into a DPA, premised in part on cooperation, much less so improper as to violate the Constitution.  The defendant does not appear to disagree, but suggests that the DPA here somehow is different because certain witnesses are located abroad.  But that fact does not turn a standard provision into a constitutional violation, particularly when the defendant does not allege, never mind

60

demonstrate, that the provision so interferes with his lawful rights as to render his trial fundamentally unfair.[13]

### C.       The Court Lacks Authority to Modify the DPA

Because the DPA does not impair the defendant's Constitutional rights, the Court need not consider the defendant's requests to modify the DPA.  That said, the defendant's argument that this case presents extraordinary circumstances that would permit the Court to exercise to modify the DPA (Def. Mem. 89-91) is, in any event, meritless.

The defendant rests his argument on a single case, United States v. HSBC Bank USA, N.A., 863 F.3d 125, 135 (2d Cir. 2017), which stands for the opposite proposition from the one for which the defendant advocates.  In HSBC, a corporate entity sought to waive indictment, proceed by information and enter into a DPA with the government to resolve criminal exposure; as a result, the parties appeared before the district court to seek approval of the waiver of indictment and an order excluding time under the Speedy Trial Act for the term of the DPA.  Id.

---

[13] Even if a defendant were to demonstrate that there is evidence located abroad (such as witness testimony) that ultimately remains beyond the power of this Court to compel, "a trial absent such overseas proof" is not "constitutionally infirm." United States v. Ologeanu, No. 18-CR-81, 2020 WL 1676802, at *3 (E.D. Ky. Apr. 4, 2020); see also United States v. Rosen, 240 F.R.D. 204, 213-15 (E.D. Va. 2007).  Ologeanu and Rosen both address whether the inability of a defendant to compel such overseas evidence violates a defendant's Sixth Amendment right to compel witnesses, and each concludes that it does not.  Id.; see also United States v. Greco, 298 F.2d 247 (2d Cir. 1962) (holding that a court's inability to compel the attendance of Canadian witnesses for a defendant did not give rise to a claim under the Sixth Amendment right to compulsory process).  Significantly, Rosen reached this conclusion even where the evidence in question could have been compelled by an MLAT, a process available only to the government, and the government chose not to exercise that power on the defendant's behalf.  240 F.R.D. at 215 ("the right to compulsory process extends only as far as a court's own process powers, and cannot be stretched to include compelling the invocation of treaty process powers available only to the Executive Branch").

at 129-30.  Instead of simply entering the order, the district court required that the parties make submissions explaining why the district court should "accept the DPA"; ultimately approved the DPA, but only "pursuant to the Court's supervisory power"; and required that the parties file quarterly reports with the district court to "keep it apprised of all significant developments in the implementation of the DPA" so that the district court could determine if the DPA was being properly implemented.  Id.

On appeal, the Second Circuit held that the district court had erred by "invoking its supervisory power . . . to oversee the government's entry into and implementation of the DPA" because it had "impermissibly encroached on the Executive's constitutional mandate" to exercise its powers to enforce the law.  Id. at 129.  The Second Circuit explained that "[t]he supervisory power doctrine is an extraordinary one which should be 'sparingly exercised,'" id. at 136 (citing United States v. Jones, 433 F.2d 1176, 1181-82 (D.C. Cir. 1970)), and that, "in the absence of a showing of impropriety" on behalf of the government, the district court had erred by "invoking its supervisory power to monitor the implementation of the DPA."  Id. at 136-37.  This is because "there is a presumption of regularity" supporting prosecutorial decisions, such as whether, when, and under what terms the government may permit a defendant to resolve its criminal exposure with a DPA, and "in the absence of clear evidence to the contrary, courts presume that [prosecutors] have properly discharged their official duties."  Id. at 136.  In short, HSBC stands for the proposition that, with respect to a DPA, the role of the district court is "limited to arraigning the defendant, granting a speedy trial waiver … and adjudicating motions or disputes as they arise" between the parties to the DPA, and that the district court may not assert its supervisory power to interfere in any aspect of the DPA unless there is a clear showing of "executive misconduct," that is, "misconduct that smacks of impropriety."  Id. at 137 n.4.  See

62

also United States v. Fokker Services, B.V., 818 F.3d 733, 737-38 (D.C. Cir. 2016) (holding district court that disagreed with the terms of a corporate DPA did not have the authority to refuse to exclude time under the Speedy Trial Act for the DPA, as "judicial authority is at its most limited when reviewing the Executive's exercise of discretion over charging determinations" and that "in the absence of clear evidence to the contrary, courts presume that prosecutors have properly discharged their official duties" (internal quotation marks and citations omitted)).

Here, the defendant does not argue that the government has engaged in any misconduct by entering into the DPA with Goldman Sachs Group. Nor can the defendant plausibly make such an argument; as detailed above, the DPA with Goldman Sachs Group is a standard agreement that the government routinely enters into with corporate entities, and the language of Paragraph 5(c) and the First Sentence is standard language that is routinely included in such DPAs. Instead, the defendant seizes on the phrase "unusual circumstances" from the introductory paragraph of the HSBC decision, and contends that "[t]his case presents unusual circumstances," without acknowledging that the Second Circuit explicitly limited such potential circumstances to those involving "executive misconduct." (Def. Mem. 90).[14]

_____

[14] The defendant further suggests that HSBC's "unusual circumstances" language can be satisfied where witness testimony is "material to the case and if the witness is unavailable to appear at trial," because the Second Circuit in United States v. Johnpoll, 739 F.2d 702 (2d Cir. 1984), referred to such a situation as constituting "exceptional circumstances" in the context of a deposition pursuant to Rule 15. (Def. Mem. 90-91). This second linguistic leap is similarly unsupported by the case law. Simply because a witness must be shown to be both material and unavailable to meet the standard to justify a Rule 15 deposition does not mean that because certain witnesses may be unavailable to travel to the United States to testify in this trial, the government has engaged in egregious misconduct that would permit the court to modify a DPA with an entirely different defendant. As noted above, if the defendant believes that he can meet

Finally, even if there were such misconduct (and there was not), it is highly questionable, at best, whether the defendant—who is not a party to the DPA, which has already been entered into, after negotiation, and relied upon by not just the government but Goldman Sachs Group—has standing to demand that the DPA be modified.  Indeed, even in cases where a resolution between the government and a private entity is reached pursuant to a statute that explicitly contemplates that the resolution must be reached "in the public interest," which would seem to suggest that a court should take into consideration the interests of third parties, courts have concluded that judicial authority to determine whether such a resolution is in fact "in the public interest" is heavily circumscribed.  See, e.g., United States v. Microsoft Corp., 56 F.3d 1448 (D.C. Cir. 1995) (holding that district court erred in rejecting approval of a consent decree simply because the district court "believed other remedies were preferable," as the "public interest inquiry" in the antitrust context must be construed "narrowly" and a district court should only reject a proposed decree if "on its face and even after government explanation, appears to make a mockery of judicial power.").  But the Court need not decide whether the defendant has standing, because he fails to make out any of the required elements of his claim.

---

the Rule 15 standard for depositions of individuals abroad, he is free to pursue that route to seek to secure their testimony.  What he seeks here is to be relieved from even trying to do so.

**VII.  THE DEFENDANT'S BROAD REQUESTS FOR "BRADY" MATERIALS ARE MERITLESS, MOOT AND/OR PREMATURE**

In this section of his brief, the defendant speculates that broad categories of material may exist; characterizes such material, if it exists, as falling within Brady v. Maryland, 373 U.S. 83 (1963); and accordingly demands its immediate production.  (Def. Mem. 91-116). This request is meritless, moot, and/or premature.  None of what the defendant claims exists is in fact exculpatory. The government has, in any event, already produced to the defendant all documents in its possession, custody, or control that fall within his demands (to the extent they are comprehensible); and the remainder of what he seeks is early disclosure of witness statements and/or materials pursuant to Giglio v. United States, 405 U.S. 150 (1972), to which he is not entitled multiple months before trial, under settled law.

Since the defendant's arraignment two years ago, the government has provided the defendant with voluminous discovery pursuant to Rule 16 (totaling millions of pages); has made productions of materials that are beyond the scope of Rule 16, including in response to specific requests by the defendant; and has also provided the defendant with additional materials that are potentially (though not in fact) exculpatory.  In short, the government is aware of its discovery obligations, and has more than complied with them.

As the government has previously advised the defendant, see Def. Mem. Ex. 2, the government also understands and will comply with its continuing obligation to produce any exculpatory material as defined by Brady and its progeny, and, before trial, the government will produce to the defendant witness statements pursuant to 18 U.S.C. § 3500, as well as potential impeachment materials pursuant to Giglio.

A.     **Applicable Law**

1.     **Brady** and **Giglio**

"Under Brady and its progeny, 'the Government has a constitutional duty to disclose favorable evidence to the accused where such evidence is 'material' either to guilt or to punishment.'" United States v. Certified Environmental Servs., Inc., 753 F.3d 72, 91 (2d Cir. 2014) (quoting United States v. Coppa, 267 F.3d 132, 139 (2d Cir. 2001)). "Favorable evidence" that must be disclosed for purposes of Brady "includes not only evidence that tends to exculpate the accused, but also evidence that is useful to impeach the credibility of a government witness," also known as "Giglio material." Id. "[A] prosecutor must disclose evidence if, without such disclosure, a reasonable probability will exist that the outcome of a trial in which the evidence had been disclosed would have been different." Coppa, 267 F.3d at 142. "Because Brady and its progeny are grounded in the Due Process Clauses of the Constitution, the essential purpose of the rules enunciated in these cases is to protect a defendant's right to a fair trial by ensuring the reliability of any criminal verdict against him." Id. Thus, a Brady violation occurs only where the government suppresses evidence that "could reasonably [have been] taken to put the whole case in such a different light as to undermine confidence in the verdict." Kyles v. Whitley, 514 U.S. 419, 435 (1995).

The government must disclose Brady and Giglio material "in time for its effective use at trial." Coppa, 267 F.3d at 142. The required timing of such a disclosure depends on the materiality of the evidence and the particular circumstances of each case; accordingly, the Second Circuit has refrained from defining the phrase "in time for effective use." United States v. Taylor, 17 F. Supp. 3d 162, 177 (E.D.N.Y. 2014); see also United States v. Rodriguez, 496 F.3d 221, 227–28 (2d Cir. 2007). A defendant has "no pretrial discovery right to Giglio

66

materials." United States v. RW Prof'l Leasing Servs. Corp., 317 F.Supp.2d 167, 179 (E.D.N.Y. 2004) (citing United States v. Nixon, 418 U.S. 683, 701 (1974)); see also, e.g., United States v. Gatto, 316 F. Supp.3d 654, 657-60 (S.D.N.Y. 2018) (declining to order immediate disclosure of purported "'exculpatory and impeaching witness statements'").

   Moreover, courts in the Second Circuit "generally do not compel immediate disclosure of Brady/Giglio materials where (1) the Government represents it is aware of and will comply with its Brady/Giglio obligations, and (2) the Defense does not provide any reason for suspecting the Government will not comply." United States v. Mohamed, 148 F. Supp. 3d 232, 246 (E.D.N.Y. 2015); see, e.g., United States v. Rivera, 89 F. Supp. 3d 376, 396–97 (E.D.N.Y. 2015) (declining to compel early disclosure where government represented it would produce Brady materials immediately upon becoming aware of such materials and would produce Giglio materials in advance of trial); United States v. Badoolah, No. 12-CR-774 (KAM), 2014 WL 4793787, at *16 (E.D.N.Y. Sept. 25, 2014) (same).

   **2.**  **Section 3500**

   Title 18, United States Code, Section 3500 ("Section 3500" or the "Jencks Act") governs the production of statements by government witnesses in a criminal case.  Section 3500 explicitly "prohibits a District Court from ordering the pretrial disclosure of witness statements." Coppa, 267 F.3d at 145; see In re United States, 834 F.2d 283, 286-87 (2d Cir. 1987) (granting mandamus to vacate order requiring production of witness statements); United States v. Percevault, 490 F.2d 126, 131 (2d Cir. 1974) (reversing order suppressing witnesses' testimony on the grounds that the government did not produce witness statements in advance of trial despite being ordered to do so).  However, where "witness statements . . . fall within the ambit

of <u>Brady</u>/<u>Giglio</u>" they "may be required to be produced in advance of trial despite the Jencks Act." <u>Coppa</u>, 267 F.3d at 146.

>   **3.**   **Rule 16**

Federal Rule of Criminal Procedure 16 provides that the government "must permit the defendant to inspect and copy" all documents and other physical objects in the Government's "possession, custody, or control" that are "material to preparing the defense." Fed. R. Crim. P. 16(a)(1)(E)(i).  A document "is material if it could be used to counter the government's case or to bolster a defense." <u>United States v. Stevens</u>, 985 F.2d 1175, 1180 (2d Cir. 1993); <u>see also</u> <u>United States v. Chalmers</u>, 410 F. Supp. 2d 278, 289 (S.D.N.Y. 2006) (noting that the "material to the defense" standard of Rule 16 "is arguably a broader scope of documents than exculpatory materials required by <u>Brady</u>").  The concept of materiality under Rule 16, however, is not boundless.  In the Rule 16 context, "[m]ateriality means more than that the evidence in question bears some abstract logical relationship to the issues in the case.  There must be some indication that the pretrial disclosure of the disputed evidence would have enabled the defendant <u>significantly</u> to alter the quantum of proof in his favor." <u>United States v. Maniktala</u>, 934 F.2d 25, 28 (2d Cir. 1991) (emphasis added) (quoting <u>United States v. Ross</u>, 511 F.2d 757, 762-63 (5th Cir. 1975)).

>   **B.**   **<u>The Defendant Does Not Have a Right to Early Production of Documents Related to Leissner's Allocution</u>**

The defendant asks that the Court order immediate production of all communications between the government and Tim Leissner and/or Leissner's counsel related to Leissner's allocution in connection with his guilty plea in <u>United States v. Leissner</u>, 18-CR-439

on August 28, 2018.  (Def. Mem. 91-101).[15]  The defendant speculates at great length that he

might be able to use such materials, if they exist, for a number of different reasons, including

that: (1) Leissner "may have initially drafted a version of events in which [the defendant] was

less directly implicated"; (2) the government may have "scripted . . . Leissner's colloquy"; and

(3) the government may have commented on Leissner's proposed allocution, which may have led

to "material changes in [the] allocution."  (Id. at 97-98).[16]

        As is apparent, all of these bases are really just one: the defendant wants

"weapons" that could possibly be used during a potential cross-examination of Leissner should

he testify at trial.  (Id. at 100-01).  In short, the defendant's request is for early production of

Section 3500 and/or potential impeachment material for Leissner.  See also id. at 92 (the

information is needed to "cross-examine" the witness); id. (the information is necessary for

"cross-examination"); id. (the information will purportedly show that the witness's plea was a

---

[15] The defendant further requests that the Court order the government to either produce
all items detailed in Exhibit 3, Attachment A to the defendant's memorandum, or to "represent to
the Court that no such material exists or was ever communicated in any form."  (Def. Mem. 92).
While this demand is contained within the section in which the defendant requests information
about communications between the government and Leissner and/or Leissner's counsel about his
allocution, the items in Attachment A are not specific to Leissner, and the defendant does not
explain why he is entitled to all of these items at this stage of the case.  For example, many of
these items seek witness statements, including the requests for "communications with law
enforcement agencies, including the FBI, about the content or substance of a witness's proffer
statements or actual or anticipated testimony," "other communications concerning the content or
substance of any Government witness's proffer statements or actual or anticipated testimony,"
and "communications with any lawyer for any government witness concerning this case."  Such
requests are clearly premature, as district courts are "prohibited" from ordering "the pretrial
disclosure of witness statements."  Coppa, 267 F.3d at 145.

[16] The defendant further states that the government may have "scripted . . . Leissner's
trial testimony" (Def. Mem. 97); it is unclear to what testimony the defendant refers, but his
request is meritless in any event.

"performance"); id. at 95 (the information is expected to show that the witness "lies"); id. at  97

(the information will assist in "vigorous cross-examination"); id. at 98 (the defendant's request

should be granted so he has "the opportunity to cross examine" the witness); id. at 101 (the

information will be used to "demonstrate to the jury what [the witness's] word is worth").  But it

is settled law that the defendant is not entitled to such material multiple months before trial (and

that the Court lacks authority to order early production of Section 3500 material).  Indeed, the

defendant appears to acknowledge the law requires no more than "that the impeaching

information [be] available during cross-examination."  (Def. Mem. 100 (citing cases)).

          To be clear, as stated above, the government will produce to the defendant prior to

trial potential impeachment materials pursuant to Giglio and witness statements pursuant to

Section 3500.  And, at that time, it will also produce documents related to Leissner's allocution

to which the defendant may be entitled, such as prior written drafts of Leissner's allocution

and/or communications regarding Leissner's allocution, to the extent that they both exist and fall

within either or both of these two categories.  However, the defendant cites nothing suggesting,

much less holding, that he is entitled to such material months before trial.  He is not.  See RW

Prof'l Leasing Servs. Corp., 317 F. Supp. 2d at 179; Coppa, 267 F.3d at 145.

          None of the cases cited by the defendant is to the contrary.  Several discuss the

unremarkable proposition that allegations that a government or defense witness was "coached"

are properly addressed through cross-examination of that witness.  See, e.g., Geders v. United

States, 425 U.S. 80 (1976) (holding that denial of defendant's access to his attorney during an

17-hour overnight recess was improper, and noting that concerns about improper influence by

defendant's counsel should have been dealt with by permitting cross-examination); United States

v. Sayakhom, 186 F.3d 928, 945 (9th Cir. 1999) (holding that defendant's disputed contention

70

that government witness was coached did not materially affect the fairness of the trial, and noting that cross-examination was the "primary tool" for addressing improper witness coaching).  The remaining cases are simply examples of instances where courts have evaluated, <u>after trial</u>, the impact of the government's failure to produce certain material.  For example, in <u>United States v. Triumph Capital Group, Inc.</u>, 544 F.3d 149, 161-62 (2d Cir. 2008), the government failed to disclose prior to trial notes taken by an agent during a meeting with an attorney for a witness, during which the attorney made representations about what the witness would say about certain events.  The Second Circuit concluded that because the notes materially differed from other statements made by the witness, they constituted impeachment material that should have been provided to the defendant, and granted the defendant a new trial on certain counts impacted by that material.  <u>Id.</u>  Similarly, in <u>United States v. Ahuja</u>, 18-CR-328 (KPF) (S.D.N.Y.), the government failed to disclose prior to trial certain documents related to a cooperator's plea allocution, and also appeared to have inaccurately described the nature of some of those documents.  <u>See, e.g.</u>, <u>Ahuja</u> Docket Nos. 368, 391.   Notably, however, the district court in that case had not yet reached a determination as to whether the documents that were not produced both should have been and warranted a new trial.  In sum, not one of these cases supports the proposition that a court both has authority and should order that Section 3500 and/or potential impeachment material be produced multiple months before trial, much less that such an order should be issued when the government has represented that it is aware of its obligations, has complied with them, and will continue to do so, and the defendant offers no cogent basis for a contrary finding.

71

**C.      The Government Has Complied with its Disclosure Obligations For Documents Received From Goldman, Which is Neither Under the Government's Control Nor Part of the Prosecution Team**

The defendant asks the Court to order immediate production of "all material[s] covered" by "Paragraphs 4 and 5 of the DPA" (Def. Mem. 102, 109), alleging that he has not received the "majority" of the material Goldman provided to the government during the course of its investigation, including but not limited to "factual presentations" and "investigative updates" (id. at 104-06).  He further contends that Goldman is under the "control" of the government, and, in any event, part of the "prosecution team," and, as such, the government's discovery and disclosure obligations extend to all materials in Goldman's possession, even if the government is unaware of them.  (Id. at 107-12).[17]  The defendant is wrong.  The government has more than complied with its obligations with respect to all materials received from Goldman, it does not control Goldman for discovery purposes, and Goldman is no more a member of the prosecution team than an individual cooperator is.

**1.      The Government Has Gone Beyond Its Discovery Obligations in Its Disclosures of Documents Obtained From Goldman**

**a.      Materials Received from Goldman**

---

[17] The defendant also observes that the DPA states that Goldman "voluntarily [made] foreign-based employees available for interviews in the United States," and then complains that the government did not "notify" him about these interviews when they occurred, effectively "hid[ing]" the witnesses from him.  (Def. Mem. 112-13).  The defendant further contends that he should have the "same access" to Goldman's witnesses as the government does by virtue of DPA Paragraph 5(c).  (Id.)  This argument is unsupported by any case law whatsoever, and is simply a rehash of the defendant's earlier, meritless argument that the Court should modify the DPA. (See supra Section VI).

As an initial matter, the defendant's statement that the defense has not received the "majority" of materials provided by Goldman to the government is false. In July 2019—shortly after the defendant was arraigned—the government began producing documents received from Goldman. Since then, the government has continued to make productions of such materials soon after it receives them. To date, the government has produced to the defendant more than five million pages of documents and other materials that it received either directly from Goldman, or that were produced by Goldman to other regulatory agencies and then to the government. These productions include the very materials referenced in the DPA that the defendant conclusorily states he has not received the "majority" of, such as "recorded phone calls in which the Company's bankers, executives and control functions personnel discuss allegations of bribery and misconduct related to 1MDB" (Def. Mem. 104).

In addition, on November 13, 2020, the government produced to the defendant materials related to the DPA and guilty plea entered in related cases by Goldman Group and Goldman Malaysia. These materials included all of the final resolution documents; information about individuals and entities that were anonymized in those documents; and copies of documents memorializing resolutions reached by Goldman with other domestic and foreign law enforcement and regulatory entities, which were publicly announced on October 22, 2020. The government also provided the defendant with a detailed, 13-page letter (the "Goldman Letter") that contained information about representations and arguments made by counsel for Goldman in the course of the government's investigation and during plea negotiations between the government and Goldman that, if true, could be viewed as arguably helpful to the defense. The Goldman Letter provided information far beyond what is required under Rule 16, including early disclosure of what otherwise might fall within Section 3500 or constitute Giglio material.

73

b.  <u>Advocacy Materials of Goldman's Counsel</u>

The only category of Goldman materials in the government's possession that have

not been produced to the defendant (other than recently-received documents that will be

produced expeditiously) are certain advocacy materials used by Goldman's counsel at various

points during the investigation and during plea negotiations, including PowerPoint presentations,

white papers, and other communications (collectively, the "Advocacy Materials").

The defendant attempts to characterize this information as exculpatory or

otherwise relevant to his defense, but he is mistaken about the nature of the information

conveyed in the Advocacy Materials.  They are not records of contemporaneous conduct, but are,

instead, the product of Goldman's lawyers advocating on the company's behalf after the fact..

Significantly, although the after-the-fact arguments of Goldman's lawyers are not materials to

which the defendant is entitled to prepare his defense, in the Goldman Letter, the government

nevertheless disclosed to the defendant representations and legal arguments made in the

Advocacy Materials as early potential Section 3500 material and <u>Giglio</u> information.

The defendant complains at some length about his failure to receive in discovery a

PowerPoint presentation compiled by Goldman's counsel that was reported in the New York

Times.  (Def. Mem. 104-05).  However, the information that the defendant claims he is entitled

to from that PowerPoint, or any similar material, is indisputably, at most, potential <u>Giglio</u>

material for someone the defendant believes to be a witness against him.  The defendant is not

entitled to such information multiple months before trial.  But even if he were, the defendant

concedes that he <u>already</u> has the very information he seeks.  (<u>See</u> Def. Mem. 105 n.31 ("Though

counsel has not seen this presentation, counsel can now confirm after combing through discovery

materials that all of these details [in the PowerPoint] are completely accurate."))  Indeed, given

74

the voluminous discovery produced to date from Goldman's own records and email accounts of

numerous co-conspirators, the defendant already has contemporaneous documents—which are

far better fodder for cross-examination than a PowerPoint put together years later by lawyers

advocating for Goldman, which would be inappropriate for use in cross-examination in any

event.

The defendant suggests that, notwithstanding the foregoing, he is entitled to the

Advocacy Materials now, pursuant to Rule 16(a)(1)(E).  (Def. Mem. 105).  That suggestion is

meritless.  Rule 16(a)(1)(E) contains a materiality requirement, which the Second Circuit has

explained means that the "evidence would have enabled the defendant significantly to alter the

quantum of proof in his favor."  United States v. Maniktala, 934 F.2d 25, 28 (2d Cir. 1991)

(emphasis added) (internal quotation marks omitted)).  Here, because the government has

produced to the defendant all of the factual information and documentation underlying the

Advocacy Materials; summarized additional representations and arguments made by Goldman in

those materials; and those materials are not contemporaneous records, but instead the products of

advocacy by lawyers, they would not "alter the quantum of proof" in this case.  Indeed, they are

not proof of anything at all and would not be admissible or subject to use at trial.

Even assuming these materials could assist counsel in cross examining

government witnesses—a tenuous argument, here, since the defendant already has the same

information in a different form—that is of no moment.  It is well-established that a defendant is

not entitled to early production of Giglio material.  See RW Prof'l Leasing Servs. Corp., 317 F.

Supp. 2d at 179.  At bottom, like so much of his brief, the defendant's request for the Advocacy

Materials is a request to be provided with an advantage to which he is not entitled.[18]

### 2. The Government Does Not "Control" Goldman for the Purposes of Discovery

The defendant also makes the sweeping argument, based solely on United States

v. Stein, 488 F. Supp. 2d 350 (S.D.N.Y. 2007), that because the government entered into a DPA

with Goldman, the government's discovery obligations extend to materials in Goldman's

possession, custody or control of which the government has no knowledge.  (Def. Mem. 106-08).

That argument should be rejected.  Stein was predicated on unique factual and procedural

circumstances that do not exist here, and, in any event, in the 13 years since its publication, no

other court appears to have adopted its holding.  That is for good reason.

Stein related to the prosecution of former KPMG employees for the development

and marketing of unlawful tax shelters.  See Stein, 488 F. Supp. 2d at 352.  The government had

previously entered into a DPA with KPMG with extensive cooperation agreement terms.  Id. at

353.  Subsequently, attorneys for the KPMG employees requested that the district court issue a

Rule 17 subpoena to KPMG for several categories of documents.  Id. at 355.  The government

objected to certain categories in the proposed subpoena, but advised the court that for other

categories, there was no need for a subpoena because the government could obtain the

documents from KPMG and produce them "promptly" to the defendants.  Id.  In so arguing, the

government acknowledged that it had "the unqualified right to demand from KPMG the

---

[18] While the defendant's request for the Advocacy Materials can and should be denied for the reasons set forth above, in the event the Court wishes to examine them before ruling, the government will provide them for ex parte review.

production of any documents within KPMG's control," but contended that the DPA "does not give the government 'possession, custody or control' of documents that are within the hands of KPMG and its agents," and thus it did not have to obtain those documents that it objected to the defendants being provided.  Id. at 360.

The court rejected the government's position as "untenable," and relying on interpretations of the meaning of the phrase "possession, custody, or control" from the Federal Rules of Civil Procedure and a number of civil decisions, held that "control" included the "legal right to obtain the documents in question."  Id. at 361-63.  The court therefore concluded that the requested documents, while located at KPMG, were nevertheless in the government's possession, custody or control, and were discoverable under Rule 16.  Id. at 364.

These facts were unique to Stein and are entirely absent here.  The Goldman DPA's cooperation provision is limited to matters "relating to the conduct described in this Agreement and the Statement of Facts and other conduct under investigation by the [government] at any time during the Term," and is further restricted by and subject to "applicable law and regulations, including relevant data privacy and national security laws and regulations, as well as valid claims of attorney-client privilege or attorney work product doctrine."  (Ex. A at 7, ¶ 5).

Tellingly, the defendant omits this information from his brief.  Instead, he incorrectly claims that the government can obtain "any document, record or other tangible evidence" without limitation.  (Def. Mem. 107 (citing DPA ¶ 5(a), without acknowledging the limitations to that subparagraph set forth in ¶ 5, detailed above)).  The government has no such right or ability.  Moreover, unlike in Stein, the government has never attempted to dissuade the Court from issuing a Rule 17 subpoena (which, notably, the defendant here has not sought),

much less based on the assurance that it was going to "promptly" obtain the documents in question from the company itself.

Putting aside the clear distinctions between the present case and <u>Stein</u>, there is substantial reason to question <u>Stein</u> on its own terms, and several courts, including one in this circuit, have declined to follow <u>Stein</u>.  For example, <u>United States v. Meregildo</u>, the court rejected the <u>Stein</u> court's injection of civil discovery principles into the <u>Brady</u> context, stating that "the Federal Rules of Civil Procedure do not establish the boundaries of the Government's due process obligations under <u>Brady</u> . . . [a]nd imposing their generous reach on the Government as a constitutional mandate is a bridge too far."  <u>United States v. Meregildo</u>, 920 F. Supp. 2d 434, 440 (S.D.N.Y. 2013)

Other courts have similarly rejected the holding in <u>Stein</u> on facts similar to this case, including in an FCPA prosecution.  <u>See</u> <u>United States v. Carson</u>, No. 8:09-cr-00077-JVS (C.D. Cal. Dec. 8, 2009) (Order, ECF No. 133).  In <u>Carson</u>, the defendants moved to compel the government to produce documents from their former employer, Control Components, Inc. ("CCI"), which had entered into a plea agreement with the government, arguing that the government's discovery obligations extended to CCI.  <u>Id.</u> at 2.  Similar to this case, the plea agreement required CCI to "truthfully disclose to the Department all non-privileged information with respect to the activities of CCI and its affiliates . . . concerning all matters relating to corrupt payments to foreign public officials or to employees of private customers in connection with their operations about which CCI has any knowledge and about which the Department . . . shall inquire." <u>Id.</u>  The <u>Carson</u> court denied the defendants' motion, rejecting "the contention that under Rule 16 the Government's obligation extends to materials in the possession of a private third party."  <u>Id.</u> at 3.  The court then addressed the <u>Stein</u> decision, concluding that "[t]here are

78

many reasons not to follow Stein's lead," including that the tenor of the opinion was

"inconsistent" with "Rule 16 case law in general."  Id. at 6.  The court further contrasted the

"sweeping and open-ended" terms of the DPA in Stein with the much more limited language in

the CCI plea agreement, noting that "[b]y no stretch of the imagination did CCI enter into an

agreement allowing the Government to request anything in the possession of CCI."  Id.

Similarly, in United States v. Norris, the defendant claimed that the government

had violated Rule 16 and Brady by failing to turn over materials held by several foreign-based

cooperating companies from which the Government "had broad power to obtain overseas

documents" because they had "elected to enter into corporate amnesty and plea agreements."

United States v. Norris, 753 F. Supp. 2d 492, 530 (E.D. Pa. 2010).  The court disagreed, holding

that the defendant had not demonstrated that the government "had the requisite control of the

materials possessed by [the companies] as to have discovery obligations attendant to those

materials."  Id.  The court also rejected the defendant's claim that, simply because the

government "could have possibly obtained the materials" by virtue of the cooperation provisions

contained in the plea agreements, the documents were in the "possession" of the government.  Id.

at 530-31.  Norris concluded: "Because the materials were in possession of non-governmental

entities that were in no way working with the [government] or acting on its behalf, the

[government] had no constructive possession of the materials, and, correspondingly, no

discovery obligations that would entitle Defendant to a new trial."  Id. at 531.

It is unsurprising that no other court has followed Stein and that several courts

have rejected it, because ascribing possession and control of documents of massive, private

company to the government would be practically untenable.  Here, for example, as the defendant

highlights for the Court (Def. Mem. 38-39), Goldman is a global financial institution with more

than 38,000 employees and a presence in more than 60 cities.  As such, it has millions of

documents domestically and overseas to which the government has no general right of access or

knowledge or understanding of.  Under the regime suggested by the defendant, the government

would either be forced to rely on the company's guarantees to satisfy its discovery obligations, or

would be required to collect every one of Goldman's documents—regardless of their facial

relevance or sensitivity—to undertake its own search.

### 3.  Goldman is Not Part of the Prosecution Team

Finally, the defendant asserts that, regardless of the DPA's provisions, Goldman,

a private company with its own interests and lawyers, is nevertheless a "part of the prosecution

team" in this case, and thus the government must be ordered to seek out and produce all Brady

and Giglio material, if any, in Goldman's possession but not the government's possession,

regardless of the government's lack of knowledge of the existence of any such material.  (Def.

Mem. 108-12).  This is so, the defendant suspects, because it "appears" that Goldman "played an

active and instrumental role in the government's investigation" and that the government "may

have delegated numerous investigative tasks to Goldman."  (Id. at 109).  The defendant is wrong

as a matter of law and fact.

The government "cannot be required to produce that which it does not control and

never possessed or inspected."  United States v. Canniff, 521 F.2d 565, 573 (2d Cir. 1975); see

also United States v. Hutcher, 622 F.2d 1083, 1088 (2d Cir. 1980) ("We reject . . . a notion of

'possession' which is so elastic as to embrace materials that the prosecution never had in its files,

never inspected, and never knew about.").  Indeed, a prosecutor is not even deemed to control or

possess documents of "every agency and individual within the federal government."  United

States v. Meregildo, 920 F. Supp. 2d 434, 440 (S.D.N.Y. 2013); aff'd sub nom. United States v.

Pierce, 785 F.3d 832 (2d Cir. 2015).  See also United States v. Quinn, 445 F.2d 940, 944 (2d Cir. 1971) (rejecting argument "that 'knowledge of any part of the government is equivalent to knowledge on the part of this prosecutor'" as "completely untenable"); United States v. Chalmers, 410 F. Supp. 2d 278, 287-90 (S.D.N.Y. 2006) (holding "prosecution team" did not include other government agencies conducting their own investigations into the United Nations Oil-for-Food Program, including the Departments of State, Treasury, and Defense, the Central Intelligence Agency, the National Security Agency and the U.S. Congress).  As the Second Circuit has explained, a contrary rule would be unworkable:

> [T]he imposition of an unlimited duty on a prosecutor to inquire of other offices not working with the prosecutor's office on the case in question would inappropriately require [courts] to adopt a monolithic view of government that would condemn the prosecution of criminal cases to a state of paralysis.

United States v. Avellino, 136 F.3d 249, 255 (2d Cir. 1998) (internal quotation marks omitted).

Whether a person or agency is part of the prosecution team depends on the level of interaction between the prosecutor and the agency or individual.  See United States v. Locascio, 6 F.3d 924, 949 (2d Cir. 1993) (reports made by FBI agents in the course of investigations unrelated to the defendants' prosecutions should not be imputed to prosecution team); Pina v. Henderson, 752 F.2d 47, 49 (2d Cir. 1985) (prosecutor's constructive knowledge did not extend to a parole officer who "did not work in conjunction with either the police or the prosecutor" but did extend to a police officer who was the investigating officer on the case); United States v. Morell, 524 F.2d 550, 555 (2d Cir. 1975); United States v. Bin Laden, 397 F. Supp. 2d 465, 481 (S.D.N.Y. 2005), aff'd sub nom. In re Terrorist Bombings of U.S. Embassies in E. Africa, 552 F.3d 93 (2d Cir. 2008)

81

Here, the defendant is not claiming that the government's discovery obligations extend to other government agencies, even if they had some involvement in this matter, but rather to a private, multinational company based on the sole fact that it is cooperating with the government's investigation.  But the Second Circuit has "never held that the 'prosecution team' includes cooperating witnesses."  United States v. Garcia, 509 F. App'x 40, 43 (2d Cir. 2013); see also, e.g., Meregildo, 920 F. Supp. 2d at 444.  To the contrary, as numerous courts have explained, cooperators have their own interests and motives, so it would be illogical to treat them as part of the prosecution team.  See, e.g., Meregildo, 920 F. Supp. 2d at 445 ("[C]ooperating witnesses, in most cases, have not served the law but violated it.  They are not concerned with the escape of guilt or suffering of innocents.  Their cause is their own.").  These decisions accord with common sense: cooperators "stand in a very different position in relation to the prosecution than do police officers and other governmental agents."  United States v. Graham, 484 F.3d 413, 417 (6th Cir. 2007) (holding there was no Brady violation in connection with documents under control of government witness because witness "remained an independent actor" while cooperating).

The defendant's suggestion that this case is somehow different because the government sought documents from Goldman and interacted with it during the course of the lengthy investigation rests on an incorrect premise.  "Interacting with the prosecution team, without more, does not make someone a team member."  Meregildo, 920 F. Supp. 2d at 441-42.  Nor does the fact that a company chose to cooperate, or, after cooperating, chose to enter into an agreement with the government.  See, e.g., United States v. Buske, No. 09 Cr. 65, 2011 WL 2912707, at *7-8 (E.D. Wis. July 18, 2011) (rejecting argument that "[b]ecause of the coordinated effort between [the company the defendant allegedly defrauded] and the

82

government," the company was part of the prosecution team); United States v. Norris, 753 F.

Supp. 2d 492, 529-31 (E.D. Pa. 2010) (rejecting argument that government "violated Rule 16

and Brady by failing to turn over materials in the possession of three . . . foreign corporations

with whom the [government] had plea agreements," and noting that "the fact that the

[government] could have possibly obtained the materials does not give rise to any discovery

obligations"), aff'd, 419 F. App'x 190 (3d Cir. 2011); United States v. Josleyn, 206 F.3d 144,

154 (1st Cir. 2000) ("While prosecutors may be held accountable for information known to

police investigators . . . we are loath to extend the analogy . . . to cooperating private parties who

have their own set of interests.  Those private interests . . . are often far from identical to—or

even congruent with—the government's interests." (citations omitted)).  In short, that a private

party chose to cooperate or provided materials to a prosecutor does not thereby make that party

an "arm of the prosecutor."  United States v. Gil, 297 F.3d 93, 106 (2d Cir. 2002)

Moreover, the record in this case establishes beyond any doubt that the

government conducted an independent criminal investigation, and did not treat Goldman as an

arm of the government.  The voluminous discovery in this case shows that the government:

(1) conducted its own independent interviews of witnesses; (2) issued grand jury subpoenas to

various individuals and entities, including to Goldman itself—a step entirely inconsistent with a

joint or "outsourced" investigation; (3) did not have access to materials Goldman withheld as

privileged or the decision-making process behind those determinations; (4) obtained evidence

through additional investigative steps, including multiple search warrants executed on third-party

email service providers, as well as Mutual Legal Assistance Treaty requests for foreign evidence;

and (5) made its own independent assessment of the evidence.  Furthermore, as the DPA makes

clear—and as the defendant fails to acknowledge—Goldman did not "voluntarily and timely

self-disclose" the criminal misconduct at issue in this case, and only received a 10% credit for its cooperation (less than the 25% credit permitted under relevant Department of Justice policies, and given in other cases) because it "was significantly delayed in producing relevant evidence, including recorded phone calls." (Ex. A at 4). That undisputed fact is wholly inconsistent with the defendant's conclusory claim that Goldman and the government are one and the same. See Joselyn, 206 F.3d at 153 (noting that where an entity withholds information from the government, courts have been reluctant to find a team effort).

The cases the defendant cites only further demonstrate why his claim here fails. In United States v. Duronio, No. Crim. 02-933(JAG), 2006 WL 1457936, at *2 (D.N.J. May 23, 2006), aff'd, No. 06-5116, 2009 WL 294377 (3d Cir. Feb. 9, 2009), the defendant, an employee of UBS, committed a malicious computer attack against UBS. The government conducted an investigation of the defendant, while UBS conducted a separate internal investigation of the defendant and several other employees, and hired an expert firm to do forensic analyses of the computers that belonged to the other employees. Id. at *1-*2. After concluding that those computers did not contain evidence of the attack, the expert firm reconfigured the computers, wiping them clean. Id. The defendant claimed that the computers contained Brady and the government was responsible for the destruction of that evidence because UBS and/or the expert firm had engaged in a "joint investigation." Id. at *2. The district court disagreed, concluding that neither UBS nor the expert firm was part of a "joint investigation" with the government because, inter alia, the government had conducted its own, separate investigation; while the government had consulted with the expert firm hired by UBS, it also hired its own expert; and UBS withheld from the government certain information at the outset of the investigation, including the fact that it was looking at additional employees. Id. at *2-*4. Here, the conduct of

84

government and Goldman similarly does not have the hallmarks of a "joint investigation"—the government conducted its own, separate investigation, and Goldman (as detailed above) was "significantly delayed" in providing the government with relevant evidence.

The defendant also invokes United States v. Connolly, No. 16 Cr. 0370 (CM), 2019 WL 2120523 (S.D.N.Y. May 2, 2019), which is entirely inapposite.  The issue before the court in Connolly was not whether a corporate entity was part of the "prosecution team" for purposes of discovery; rather, as the defendant acknowledges (Def. Mem. 111), the question in Connolly was whether particular interviews conducted by Deutsche Bank—the defendant's employer—were both fairly attributable to the government and compelled, and thus in violation of the right against self-incrimination articulated in Garrity v. New Jersey, 385 U.S. 493 (1967).  Connolly, 2019 WL 2120523, at *10.  That has nothing do with this case.  The defendant does not disagree, but suggests, without any legal support whatsoever, that whether an employer's actions are "fairly attributable" to the government for purposes of a Fifth Amendment violation is the same question as whether an entity is part of the prosecution team.  (Def. Mem. 112).  It is not, as explained above.  That is for good reason.  It is one thing to examine whether a particular step (interviewing someone, in the case of Connolly) was performed by a private party at the government's direction, and if appropriate to treat that step as if it was undertaken directly by the government.  It is quite another to declare that the private party effectively is part of the government, and thus that all of its documents should be deemed—contrary to fact—to be known to and in the possession or control of the government.  That proposition is "completely untenable," Quinn, 445 F.2d at 944, and like the defendant's claim, discussed above (that Goldman is so in "control" of the government such that the government should be deemed to know about and possess all of Goldman's materials), would lead to an absurd result.

85

There are, moreover, myriad differences between this case and <u>Connolly</u>.  For example, in <u>Connolly</u>, Deutsche Bank was directed to conduct its internal investigation by a government regulatory agency (2019 WL 2120523, at *2-*3); no such directive was given here. That agency also directed Deutsche Bank to conduct interviews of specific employees, to take a certain approach in those interviews (specifically, to approach the interviews "as if [the interviewer] was a prosecutor") and to report the results of the interviews to the agency (<u>id.</u> at *3-*4); here, the government conducted its own interviews of witnesses, and did not direct Goldman to conduct any interviews.  Moreover, the district court in <u>Connolly</u> concluded that the government in that case did not appear to have undertaken a "substantive parallel investigation" or engaged in "independent investigative activities"; by contrast, the government in this case, as detailed above, took significant independent investigative steps beyond seeking certain information from Goldman, including conducting its own interviews, subpoenaing other individuals and entities and obtaining evidence through search warrants and Mutual Legal Assistance Treaty requests for foreign evidence.

Finally, the defendant is not entitled to an evidentiary hearing (which he requests in a footnote (Def. Mem.113 n.35)), to probe the relationship between Goldman and the government, which appears to be nothing more than a fishing expedition for impeachment material before trial, and thus to give the defendant an unfair advantage.  To be sure, courts faced with allegations of government misconduct sometimes order a hearing or authorize discovery on the misconduct claim, but before doing so they require that the defendant make a threshold showing that misconduct in fact occurred.  <u>See</u> <u>Wade v. United States</u>, 504 U.S. 181, 186 (1992) (defendant claiming refusal to file a 5K motion was based on unconstitutional motive must make a "substantial threshold showing"); <u>United States v. Berrios</u>, 501 F.2d 1207, 1211 (2d Cir. 1974)

86

(defendant seeking discovery on claim of selective prosecution must provide "some evidence

tending to show the existence of the essential elements of the defense"); United States v.

Sanders, 211 F.3d 711, 717 (2d Cir. 2000) (same for claim of vindictive prosecution).  So too in

this area.  See United States v. Mahaffy, 446 F. Supp. 2d 115, 127 (E.D.N.Y. 2006) (the

defendant's "conclusory assertions" that "the S.E.C. operated as a surrogate for the USAO,

without more, do not warrant an evidentiary hearing").  The defendant here has made no such

showing (nor could he), much less one that overcomes the overwhelming record that Goldman

was, and remains, a private entity, with its own interests, and not part of the prosecution team.

**D.**     **The Defendant's Request for Discovery Regarding Indictment Paragraphs 40 and 53 is Moot and/or Premature**

Finally, the defendant requests that the Court order the government to provide

him with all "documents and/or witness statements" related to the allegations contained in

Paragraphs 40 and 53 of the Indictment.  (Def. Mem. 114-15).  Paragraph 40 reads:

> Within three months of the closing of Project Magnolia, millions of dollars of bond proceeds that had been transferred to Shell Company Account #2 were transferred into Holding Company #1 Account, and these funds were transferred via wire to and from the United States. Approximately $24 million of these funds was subsequently transferred to a bank account beneficially owned by a relative of the defendant ROGER NG.

Paragraph 53 reads:

> The Project Catalyze bond issued on or about March 19, 2013. By or at the direction of the defendant JHO LOW, some of the approximately $3 billion raised by this bond issuance was transferred to and through a series of transactions to Holding Company #1 Account, which account was owned and controlled by Co-Conspirator #1 and his close relative . . . Some of these funds were further transferred via wire to accounts in the name of entities beneficially owned and controlled by 1MDB officials, including 1MDB Official #2 and 1MDB Official #3.  More than $4

87

million of these funds were also transferred via wire to a bank
account beneficially owned by a relative of NG.

In support of his request, the defendant alleges that the approximately $28

million in proceeds that were stolen from Project Magnolia and Project Catalyze and

transferred into a bank account controlled by the defendant's relative did not constitute an

illegal kickback to the defendant for his role in the criminal schemes charged in the

Indictment; rather, the defendant claims that these $28 million in transfers constituted

repayment of a "completely unrelated" debt allegedly owed by Leissner's former wife to

unspecified "relative(s)" of the defendant.  (Def. Mem. 114-15).  Absent, of course, is

any actual evidence of that claim.[19]

In any event, whatever the "merits" of his factual position, the defendant's

request for documents related to Paragraphs 40 and 53 should be denied as moot, because

the government has produced the documents in its possession, custody, or control related

to the corporate entities, bank accounts and monetary transfers related to Shell Company

Account #2, Holding Company #1, the accounts beneficially owned and controlled by

1MDB officials, including 1MDB Official #2 and 1MDB Official #3, and the bank

account beneficially owned by the defendant's relative.  These documents include, inter

---

[19] The government has repeatedly requested reciprocal discovery from the defendant; to
date, the government has not received any such discovery.  Fed. R. Crim. P. 16(b); see, e.g.,
United States v. Smith, 985 F. Supp. 2d 506, 522 (S.D.N.Y. 2013) ("Rule 16 also imposes
reciprocal discovery obligations on defendants.").  If the defendant intends to introduce evidence
at trial of this alternative explanation for the payment of $28 million in stolen proceeds from
Project Magnolia and Project Catalyze to an account controlled by the defendant's relative, the
defendant must produce any such evidence to the government pursuant to Fed. R. Crim. P.
16(b)(1)(A).

alia, bank records, email communications and incorporation documents.  For example, on

November 22, 2019, the government produced to the defendant numerous documents

obtained from Leissner's relative:  (1) emails and other materials obtained through

judicially authorized search warrants from emails accounts used by Leissner's former

wife (Bates numbered DOJ-0000386910 to DOJ-0000453753), and (2) documents related

to Holding Company #1 (Bates numbered DOJ-0000453754 to DOJ-0000455290).  And

to the extent that the defendant requests "witness statements" related to Paragraphs 40

and 53 (Def. Mem. 115), that request is premature.  See Coppa, 267 F.3d at 145;

Percevault, 490 F.2d at 131.

Finally, the defendant states that he will, in the future, "move to have the allegations in

Paragraphs 40 and 53 struck from the Indictment" as purported surplusage, because, he asserts,

he will be able to prove his alternate explanation for the transfers.  (Def. Mem. 116).  Although it

does not appear that there is anything in this respect for the Court to rule upon at this time, any

such motion would be baseless.  "Motions to strike surplusage from an indictment will be

granted only where the challenged allegations are not relevant to the crime charged and are

inflammatory and prejudicial. . . . [I]f evidence of the allegation is admissible and relevant to the

charge, then regardless of how prejudicial the language is, it may not be stricken."  United States

v. Scarpa, 913 F.2d 993, 1013 (2d Cir. 1990); see also United States v. Hernandez, 85 F.3d 1023,

1030 (2d Cir. 1996).  The standard "is an exacting one, and only rarely is alleged surplusage

stricken from an indictment."  United States v. Murgio, 209 F. Supp. 3d 698, 724 (S.D.N.Y.

2016) (citing United States v. Smith, 985 F. Supp. 2d 547, 610 (S.D.N.Y. 2014) (internal

quotation marks and citation omitted).  Here, the transfers detailed in Paragraphs 40 and 53,

which are expected to be proven at trial through, among other things, bank records and email

communications produced to the defendant in discovery, plainly are relevant to the charged

conspiracies.  Even if the defendant had admissible evidence of his proffered, alternate

explanation for the transfers, a dispute as to <u>why</u> the transfers were made is not a basis to strike

them from the Indictment.  Rather, it is for the jury, as fact-finder, to resolve.  <u>Cf.</u>, <u>e.g.</u>, <u>United</u>

<u>States v. Elie</u>, No. 10 Cr. 336 (LAK), 2012 WL 383403, at *1 (S.D.N.Y. Feb. 7, 2012) ("[T]here

is no summary judgment in criminal cases." (internal quotation marks omitted)); <u>see generally</u>

<u>United States v. Alfonso</u>, 143 F.3d 772, 776 (2d Cir. 1998) ("To the extent that the district court

look[s] beyond the face of the indictment and dr[aws] inferences as to proof that would be

introduced by the government at trial . . . such an inquiry into the sufficiency of the evidence [is]

premature.").

## VIII.   THE GOVERNMENT'S DISCOVERY PRODUCTIONS TO DATE ARE DESIGNATED APPROPRIATELY UNDER THE PROTECTIVE ORDER

███████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████████████████

███████████████████████████████

█████████████████████████████████████████████

██████████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████████████

█████████████████████████████████████████████

███████████████████████████████████████████████

██████████

### A.   Relevant Background

███████████████████████████████████████████████

█████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████████████

91



███████████████████████████████████████████████████████

█████████

**B.**     **Applicable Law**

█████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████████

███████████████████████████████████████████████

██████████████████████████████████████████████████

███████████████████████████████████████████████████

█████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████████████████████████

███████

93

C.   **Discussion**

███████████████████████████

████████████████████████████████

██████████████████████████████████

████████████████████████████████

██████████████████████████████████

███████████████████████████████████

███████████████████████████████

██████████████████████████████████

█████████████████████████████████

████.[20]

| Def. Mem. "Attorney's Eyes Only" | Previously Produced "Sensitive" Discovery Material" |
|---|---|
| DOJ-0002186375 | DOJ-00050608 |
| DOJ-0002222047 | DOJ-00050612 |
| DOJ-0002211588[21] | DOJ-00050921 |
| DOJ-0002238332 | DOJ-00058828 |
| DOJ-0002254024 | DOJ-00050667 |
| DOJ-0002230315 | DOJ-00053157 |

---

[20] Additionally, the substance of DOJ-0002223343 was also disclosed in discovery produced as "Sensitive" discovery material.

[21]      This is the corrected Bates number for the document counsel cited as DOJ-0002211688.

| Def. Mem. "Attorney's Eyes Only" | Previously Produced "Sensitive" Discovery Material" |
|---|---|
| DOJ-0002314711 | DOJ-00049165 |
| DOJ-0002309204 | DOJ-00057019 |

## <u>CONCLUSION</u>

For the reasons set forth above, the government respectfully submits that the

defendant's motions are without merit and should be denied in their entirety.

Dated:  Brooklyn, New York
         December 4, 2020

                                        Respectfully submitted,

                                        SETH D. DᴜCHARME
                                        Acting United States Attorney

                        By:     _____/s/_____
                                        Alixandra E. Smith
                                        Drew G. Rolle
                                        Assistant U.S. Attorneys
                                        (718) 254-7000

                                        DEBORAH L. CONNOR
                                        Chief, Money Laundering & Asset Recovery Section
                                        Criminal Division
                                        U.S. Department of Justice

                        By:     _____/s/_____
                                        Jennifer E. Ambuehl
                                        Nikhila Raj
                                        Trial Attorneys

                                        DANIEL S. KAHN
                                        Acting Chief, Fraud Section
                                        Criminal Division
                                        U.S. Dept. of Justice

                        By:     _____/s/_____
                                        Katherine Nielsen
                                        David Last
                                        Trial Attorneys