# EXHIBIT A

F. #2020R00927

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA

   - against -

THE GOLDMAN SACHS GROUP, INC.,

               Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - X

DEFERRED PROSECUTION
AGREEMENT

Cr. No. 20-437 (MKB)

## DEFERRED PROSECUTION AGREEMENT

The defendant The Goldman Sachs Group, Inc. (the "Company"), pursuant to authority granted by the Company's Board of Directors, reflected in Attachment B, and the United States Department of Justice, Criminal Division, Fraud Section and Money Laundering and Asset Recovery Section, and the United States Attorney's Office for the Eastern District of New York (collectively the "Offices"), enter into this deferred prosecution agreement (the "Agreement").

### Criminal Information and Acceptance of Responsibility

1.     The Company acknowledges and agrees that the Offices will file the attached one-count criminal information (the "Information") in the United States District Court for the Eastern District of New York charging the Company with one count of conspiracy to commit offenses against the United States, in violation of Title 18, United States Code, Section 371, that is, to violate the anti-bribery provisions of the Foreign Corrupt Practices Act of 1977 ("FCPA"), as amended, *see* Title 15, United States Code, Sections 78dd-1, 78dd-2 and 78dd-3.  In so doing, the

Company: (a) knowingly waives its right to indictment on these charges, as well as all rights to a speedy trial pursuant to the Sixth Amendment to the United States Constitution, Title 18, United States Code, Section 3161, and Federal Rule of Criminal Procedure 48(b); and (b) knowingly waives any objection with respect to venue to any charges by the United States arising out of the conduct described in the Statement of Facts attached hereto as Attachment A (the "Statement of Facts") and consents to the filing of the Information, as provided under the terms of this Agreement, in the United States District Court for the Eastern District of New York.  The Offices agree to defer prosecution of the Company pursuant to the terms and conditions described below.

2.      The Company admits, accepts, and acknowledges that it is responsible under United States law for the acts of its officers, directors, employees, and agents as charged in the Information, and as set forth in the Statement of Facts, and that the allegations described in the Information and the facts described in the Statement of Facts are true and accurate.  Should the Offices pursue the prosecution that is deferred by this Agreement, the Company stipulates to the admissibility of the Statement of Facts in any proceeding by the Offices, including any trial, guilty plea, or sentencing proceeding, and will not contradict anything in the Statement of Facts at any such proceeding.  The Company agrees that, effective as of the date the Company signs this Agreement, in any prosecution that is deferred by this Agreement, it will not dispute the Statement of Facts set forth in this Agreement, and, in any such prosecution, the Statement of Facts shall be admissible as: (a) substantive evidence offered by the government in its case-in-chief and rebuttal case; (b) impeachment evidence offered by the government on cross-examination; and (c) evidence at any sentencing hearing or other hearing.  In addition, in connection therewith, the Company agrees not to assert any claim under the United States Constitution, Rule 410 of the Federal Rules

2

of Evidence, Rule 11(f) of the Federal Rules of Criminal Procedure, Section 1B1.1(a) of the United States Sentencing Guidelines ("USSG" or "Sentencing Guidelines"), or any other federal rule that the Statement of Facts should be suppressed or is otherwise inadmissible as evidence in any form.

### Term of the Agreement

3.     This Agreement is effective for a period beginning on the date on which the Information is filed and ending three (3) years from that date (the "Term").  The Company agrees, however, that, in the event the Offices determine, in their sole discretion, that the Company has knowingly violated any provision of this Agreement or has failed to completely perform or fulfill each of the Company's obligations under this Agreement, an extension or extensions of the Term may be imposed by the Offices, in their sole discretion, for up to a total additional time period of one year, without prejudice to the Offices' right to proceed as provided in Paragraphs 17-20 below. Any extension of the Agreement extends all terms of this Agreement, including the terms of the reporting requirement in Attachment D (Corporate Compliance Reporting), for an equivalent period.  Conversely, in the event the Offices find, in their sole discretion, that there exists a change in circumstances sufficient to eliminate the need for the reporting requirement in Attachment D, and that the other provisions of this Agreement have been satisfied, the Agreement may be terminated early.  If the Court refuses to grant exclusion of time under the Speedy Trial Act, 18 U.S.C. § 3161(h)(2), the Term shall be deemed to have not begun and all the provisions of the Agreement shall be deemed null and void, except that the statute of limitations for any prosecution relating to the conduct described in the Statement of Facts shall be tolled from the date on which this Agreement was signed until the date the Court refuses to grant the exclusion of time plus six months.  In addition, if Goldman Sachs (Malaysia) Sdn. Bhd. ("Goldman Malaysia") later is

permitted to withdraw its plea of guilty, this Agreement shall be deemed null and void, except that

the statute of limitations for any prosecution relating to the conduct described in the Statement of

Facts shall be tolled from the date on which this Agreement is signed until six months following

the date on which the plea of guilty is subsequently withdrawn.

### Relevant Considerations

4.      The Offices enter into this Agreement based on the individual facts and

circumstances presented by this case and the Company, including:

        a.      the Company did not receive voluntary disclosure credit pursuant to the

FCPA Corporate Enforcement Policy in the Department of Justice Manual ("JM") 9-47.120, or

pursuant to the Sentencing Guidelines, because it did not voluntarily and timely self-disclose to

the Offices the conduct described in the Statement of Facts;

        b.      the Company received partial credit for its cooperation with the Offices'

investigation of the underlying conduct, including: collecting and producing voluminous evidence

located in other countries; making regular factual presentations and investigative updates to the

Offices; and voluntarily making foreign-based employees available for interviews in the United

States;

        c.      the Company did not receive full credit for its cooperation because the

Company was significantly delayed in producing relevant evidence, including recorded phone

calls in which the Company's bankers, executives, and control functions personnel discussed

allegations of bribery and misconduct relating to the conduct set forth in the Statement of Facts;

        d.      the Company ultimately provided to the Offices all relevant facts known to

it, including information about the individuals involved in the misconduct;

e.     the Company's wholly-owned subsidiary, Goldman Malaysia, is pleading guilty pursuant to Federal Rule of Criminal Procedure 11(c)(1)(C) to one count of conspiracy to commit offenses against the United States, in violation of Title 18, United States Code, Section 371, that is, to violate the anti-bribery provisions of the FCPA, as amended, Title 15, United States Code, Sections 78dd-1 and 78dd-3;

f.     the Company ultimately engaged in remedial measures, including (i) implementing heightened controls and additional procedures and policies relating to electronic surveillance and investigation, due diligence on proposed transactions or clients and the use of third-party intermediaries across business units; and (ii) enhancing anti-corruption training for all management and relevant employees;

g.     the Company has committed to continuing to enhance its compliance program and internal controls, including ensuring that its compliance program satisfies the minimum elements set forth in Attachment C to this Agreement (Corporate Compliance Program);

h.     based on the Company's remediation and the state of its compliance program, and the Company's agreement to report to the Offices as set forth in Attachment D, the Offices determined that an independent compliance monitor is unnecessary;

i.     the nature and seriousness of the offense conduct, including, among other things: the amount of bribes; the level and number of the foreign officials bribed; the duration of the scheme; the resulting illicit gains to and increased stature in the region for the Company from the deals, which were significant to the Company and key to the divisions of the Company in which the deals occurred;

j.      the pervasiveness of the misconduct within the Company, including that high-level employees within the Company's investment bank were involved in the misconduct described in the Statement of Facts and others ignored significant red flags;

k.      the Company has agreed, concurrent with this resolution, to resolve additional investigations relating to the conduct described in the Statement of Facts, including by entering into a Consent Order with the Board of Governors of the Federal Reserve System (the "the Fed") pursuant to which it will pay a civil money penalty of $154 million; by settling an Administrative Action filed by the U.S. Securities and Exchange Commission (the "SEC") and agreeing to pay $606 million in disgorgement and a civil monetary penalty of $400 million; by entering into a Consent Order with the New York State Department of Financial Services (the "DFS") pursuant to which it will agree to pay a civil money penalty of $150 million; by resolving the United Kingdom Financial Conduct Authority's and Prudential Regulation Authority's (the "UK FCA and PRA") investigations and paying a civil penalty to each of $63 million (for a total of $126 million); by resolving the investigation by the Attorney-General's Chambers of the Republic of Singapore (the "Singapore AGC") pursuant to which it will pay $122 million; by resolving the investigation of the Monetary Authority of Singapore (the "Singapore MAS"); by resolving with the Commercial Affairs Department of the Singapore Police Force (the "Singapore CAD"); and by resolving the investigation by the Hong Kong Securities and Futures Commission (the "Hong Kong SFC") pursuant to which it will pay $350 million;

l.      the Company has no prior criminal history; and

m.      the Company has agreed to continue to cooperate with the Offices' ongoing investigation of individuals and other entities, including as described in Paragraph 5 below.

n.      Accordingly, after considering (a) through (m) above, the Offices believe that the appropriate resolution in this case is a deferred prosecution agreement with the Company; a criminal monetary penalty of $2,315,088,000, which reflects an aggregate discount of ten (10) percent off of the bottom of the otherwise-applicable Sentencing Guidelines fine range for the FCPA conduct; disgorgement of $606 million; and a guilty plea by Goldman Malaysia.

### Future Cooperation and Disclosure Requirements

5.      The Company shall cooperate fully with the Offices in any and all matters relating to the conduct described in this Agreement and the Statement of Facts and other conduct under investigation by the Offices at any time during the Term, subject to applicable laws and regulations, until the later of the date upon which all investigations and prosecutions arising out of such conduct are concluded, or the end of the Term.  At the request of the Offices, the Company shall also cooperate fully with other domestic or foreign law enforcement and regulatory authorities and agencies, as well as the Multilateral Development Banks ("MDBs"), in any investigation of the Company, its branches, representative offices, subsidiaries or its affiliates, or any of its present or former officers, directors, employees, agents, and consultants, or any other party, in any and all matters relating to the conduct described in this Agreement and the Statement of Facts.  The Company's cooperation pursuant to this Paragraph is subject to applicable laws and regulations, including relevant data privacy and national security laws and regulations, as well as valid claims of attorney-client privilege or attorney work product doctrine; however, the Company must provide to the Offices a log of any information or cooperation that is not provided based on an assertion of law, regulation, or privilege, and the Company bears the burden of establishing the

validity of any such assertion.  The Company agrees that its cooperation pursuant to this Paragraph shall include, but not be limited to, the following:

a.      The Company shall truthfully disclose all factual information with respect to its activities, those of its branches, representative offices, subsidiaries and affiliates, and those of its present and former directors, officers, employees, agents, and consultants, including any evidence or allegations and internal or external investigations, about which the Company has any knowledge or about which the Offices may inquire.  This obligation of truthful disclosure includes, but is not limited to, the obligation of the Company to provide to the Offices, upon request, any document, record, or other tangible evidence about which the Offices may inquire of the Company.

b.      Upon request of the Offices, the Company shall designate knowledgeable employees, agents, or attorneys to provide to the Offices the information and materials described in Paragraph 5(a) above on behalf of the Company.  It is further understood that the Company must at all times provide complete, truthful, and accurate information.

c.      The Company shall use its best efforts to make available for interviews or testimony, as requested by the Offices, present or former officers, directors, employees, agents and consultants of the Company.  This obligation includes, but is not limited to, sworn testimony before a federal grand jury, in federal trials or at any other proceeding, all meetings requested by the Offices, and interviews with domestic or foreign law enforcement and regulatory authorities.  Cooperation under this Paragraph shall include identification of witnesses who, to the knowledge of the Company, may have material information regarding the matters being investigated or prosecuted.

d.      With respect to any information, testimony, documents, records, or other tangible evidence provided to the Offices pursuant to this Agreement, the Company consents to any and all disclosures, subject to applicable laws and regulations, to other governmental authorities, including United States authorities and those of a foreign government, as well as the MDBs, of such materials as the Offices, in their sole discretion, shall deem appropriate.

6.      In addition to the obligations in Paragraph 5, during the Term, should the Company learn of any evidence or allegation of conduct that may constitute a violation of the money laundering laws that involve the employees or agents of the Company, or should the Company learn of any evidence or allegation of conduct that may constitute a violation of the FCPA's anti-bribery or accounting provisions had the conduct occurred within the jurisdiction of the United States, the Company shall promptly report such evidence or allegation to the Offices.

**Payment of Monetary Penalty**

7.      The Offices and the Company agree that application of the Sentencing Guidelines to determine the applicable fine range yields the following analysis:

a.   The 2018 USSG are applicable to this matter.

b.   Offense Level. Based upon USSG § 2C1.1, the total offense level is 48, calculated as follows:

| | |
|---|---|
| (a)(2) Base Offense Level | 12 |
| (b)(l) Multiple Bribes | +2 |
| (b)(2) Value of benefit received more than $550,000,000 | +30 |
| (b)(3) High-Level Official Involved | +4 |
| **TOTAL** | **48** |

9

    c.  <u>Base Fine</u>. Based upon USSG § 8C2.4(a)(3), the base fine is $1,607,700,000 (value of the unlawful payments, pursuant to § 2C1.1(d)(1)).

    d.  <u>Culpability Score</u>. Based upon USSG § 8C2.5, the culpability score is 8, calculated as follows:

| | |
|---|---|
| (a) Base Culpability Score | 5 |
| (b)(1) the organization had 5,000 or more employees and an individual within high-level personnel of the organization participated in, condoned, or was willfully ignorant of the offense | +5 |
| (g)(2) Cooperation, Acceptance | <u>-2</u> |
| **TOTAL** | **8** |

    e.  <u>Calculation of Fine Range</u>:

| | |
|---|---|
| Base Fine | $1,607,700,000 |
| Multipliers | 1.6 (min)/3.2 (max) |
| Fine Range | $2,572,320,000 to $5,144,640,000 |

8.    The Offices and the Company agree, based on the application of the Sentencing Guidelines to the misconduct, that the appropriate disgorgement is $606 million (the "Disgorgement Amount") and the total monetary penalty is $2,315,088,000 (the "Total Criminal Penalty"), $500,000 of which will be paid as a criminal fine by Goldman Malaysia pursuant to its plea agreement entered into simultaneously herewith. The Total Criminal Penalty reflects a ten (10) percent discount off the bottom of the applicable U.S.S.G. fine range for the Company's cooperation. The Company and the Offices further agree that the Company will pay the United States $1,263,088,000, $500,000 of which will be paid as a criminal fine by Goldman Malaysia,

to the United States Treasury within ten business days of the sentencing hearing by the Court of Goldman Malaysia in connection with its plea agreement entered into simultaneously herewith.

9.      The Offices agree to credit the remaining amount of the Total Criminal Penalty against the amount the Company pays to the SEC, Fed, DFS, UK FCA and PRA, Singapore AGC, Singapore CAD and Hong Kong SFC.  The Offices will credit the entire penalty amount that the Company pays to the SEC, Fed, DFS, UK FCA and PRA, Singapore AGC and Singapore CAD, as well as $100 million of the penalty the Company pays to Hong Kong SFC, in connection with parallel resolutions entered into between the Company and those authorities.  The Company's payment obligations to the United States under the Agreement will be complete upon the total payment of $1,263,088,000, so long as the Company pays the remaining amount of the Total Criminal Penalty to the SEC, Fed, DFS, UK FCA and PRA, Singapore AGC and Hong Kong SFC, by the end of one year from the beginning of the Term.  Should any amount of such payments to these authorities not be made by the end of one year from the beginning of the Term, or be returned to the Company or any affiliated entity for any reason, the remaining balance of the Total Criminal Penalty will be paid to the United States Treasury.  The Offices further agree to credit the Disgorgement Amount against any amount equal or greater to the Disgorgement Amount that the Company pays to authorities in Malaysia in connection with the conduct detailed in the Statement of Facts, if paid within one year from the beginning of the Term.  Should the Company not pay the full Disgorgement Amount to Malaysia by one year from the beginning of the Term, or should all or a portion of the Disgorgement Amount be returned to the Company or any affiliated entity for any reason, the remaining balance of the Disgorgement Amount will be paid to the United

States Treasury, except that the Offices agree to credit any part of this amount that is paid to the SEC as disgorgement.

10.     The Company and the Offices agree that the Total Criminal Penalty and the Disgorgement Amount are appropriate given the facts and circumstances of this case, including the Relevant Considerations described in Paragraph 4 of this Agreement.  The Total Criminal Penalty is final and shall not be refunded.  Furthermore, nothing in this Agreement shall be deemed an agreement by the Offices that the Total Criminal Penalty is the maximum penalty that may be imposed in any future prosecution, and the Offices are not precluded from arguing in any future prosecution that the Court should impose a higher fine, although the Offices agree that under those circumstances, it will recommend to the Court that any amount paid under this Agreement should be offset against any fine the Court imposes as part of a future judgment.  The Company acknowledges that no tax deduction may be sought in connection with the payment of any part of the Total Criminal Penalty.  The Company shall not seek or accept directly or indirectly reimbursement or indemnification from any source with regard to the Total Criminal Penalty or the Disgorgement Amount that the Company pays pursuant to this Agreement or any other agreement entered into with an enforcement authority or regulator concerning the facts set forth in the Statement of Facts.

## Conditional Release from Liability

11.     Subject to Paragraphs 17-20, the Offices agree, except as provided in this Agreement and in the plea agreement between the Offices and Goldman Malaysia dated October 22, 2020, that they will not bring any criminal or civil case against the Company or any of its branches, representative offices or direct or indirect affiliates, subsidiaries, or joint ventures,

relating to any of the conduct described in the Statement of Facts or the criminal Information filed pursuant to this Agreement.  The Offices, however, may use any information related to the conduct described in the Statement of Facts against the Company:  (a) in a prosecution for perjury or obstruction of justice; (b) in a prosecution for making a false statement; (c) in a prosecution or other proceeding relating to any crime of violence; or (d) in a prosecution or other proceeding relating to a violation of any provision of Title 26 of the United States Code.

a.      This Agreement does not provide any protection against prosecution for any future conduct by the Company or any of its branches, representative offices or direct or indirect affiliates, subsidiaries, or joint ventures.

b.      In addition, this Agreement does not provide any protection against prosecution of any individuals, regardless of their affiliation with the Company.

### Corporate Compliance Program

12.     The Company represents that it has implemented and will continue to implement a compliance and ethics program designed to prevent and detect violations of the FCPA and other applicable anti-corruption laws or money laundering laws throughout its operations, including those of its branches, representative offices, subsidiaries, agents, and joint ventures, and those of its contractors and subcontractors whose responsibilities include interacting with foreign officials or other activities carrying a high risk of corruption, including, but not limited to, the minimum elements set forth in Attachment C.

13.     In order to address any deficiencies in its internal accounting controls, policies, and procedures, the Company represents that it has undertaken, and will continue to undertake in the future, in a manner consistent with all of its obligations under this Agreement, a review of its

existing internal accounting controls, policies, and procedures, regarding compliance with the FCPA and other applicable anti-corruption laws. Where necessary and appropriate, the Company agrees to modify or maintain its existing compliance program, including internal controls, compliance policies, and procedures in order to ensure that it maintains: (a) an effective system of internal accounting controls designed to ensure the making and keeping of fair and accurate books, records, and accounts; and (b) a rigorous anti-corruption compliance program that incorporates relevant internal accounting controls, as well as policies and procedures designed to effectively detect and deter violations of the FCPA and other applicable anti-corruption laws. The compliance program, including the internal accounting controls system, will include, but not be limited to, the minimum elements set forth in Attachment C.

## Corporate Compliance Reporting

14.     The Company agrees that it will report to the Offices annually during the Term regarding remediation and implementation of the compliance measures described in Attachment C. These reports will be prepared in accordance with Attachment D.

## Deferred Prosecution

15.     In consideration of the undertakings agreed to by the Company herein, the Offices agree that any prosecution of the Company for the conduct set forth in the Statement of Facts be and hereby is deferred for the Term, except as provided in the plea agreement between the Offices and Goldman Malaysia, dated October 22, 2020. To the extent there is conduct disclosed by the Company that is not set forth in the Statement of Facts, such conduct will not be exempt from further prosecution and is not within the scope of or relevant to this Agreement.

16.     The Offices further agree that if the Company fully complies with all of its obligations under this Agreement, the Offices will not continue the criminal prosecution against the Company described in Paragraph 1 and, at the conclusion of the Term, this Agreement shall expire.  Within six months of the Agreement's expiration, the Offices shall seek dismissal with prejudice of the criminal Information filed against the Company described in Paragraph 1, and agree not to file charges in the future against the Company based on the conduct described in this Agreement and the Statement of Facts.  If, however, the Offices determine during this six-month period that the Company breached the Agreement during the Term, as described in Paragraph 17, the Offices' ability to extend the Term, as described in Paragraph 3, or to pursue other remedies, including those described in Paragraphs 17-20, remains in full effect.

**Breach of the Agreement**

17.     If, during the Term, the Company (a) commits any felony under U.S. federal law; (b) provides in connection with this Agreement deliberately false, incomplete, or misleading information, including in connection with its disclosure of information about individual culpability; (c) fails to cooperate as set forth in Paragraphs 5 and 6 of this Agreement; (d) fails to implement a compliance program as set forth in Paragraphs 12 and 13 of this Agreement and Attachment C; (e) commits any act that, had it occurred within the jurisdictional reach of the FCPA, would be a violation of the FCPA; or (f) otherwise fails to completely perform or fulfill each of the Company's obligations under the Agreement, regardless of whether the Offices become aware of such a breach after the Term is complete, the Company shall thereafter be subject to prosecution for any federal criminal violation of which the Offices have knowledge, including, but not limited to, the charges in the Information described in Paragraph 1, which may be pursued by

15

the Offices in the U.S. District Court for the Eastern District of New York or any other appropriate venue.  Determination of whether the Company has breached the Agreement and whether to pursue prosecution of the Company shall be in the Offices' sole discretion.  Any such prosecution may be premised on information provided by the Company or its personnel.  Any such prosecution relating to the conduct described in the Statement of Facts or relating to conduct known to the Offices prior to the date on which this Agreement was signed that is not time-barred by the applicable statute of limitations on the date of the signing of this Agreement may be commenced against the Company, notwithstanding the expiration of the statute of limitations, between the signing of this Agreement and the expiration of the Term plus one year.  Thus, by signing this Agreement, the Company agrees that the statute of limitations with respect to any such prosecution that is not time-barred on the date of the signing of this Agreement shall be tolled for the Term plus one year.  In addition, the Company agrees that the statute of limitations as to any violation of federal law that occurs during the Term will be tolled from the date upon which the violation occurs until the earlier of the date upon which the Offices are made aware of the violation or the duration of the Term plus five years, and that this period shall be excluded from any calculation of time for purposes of the application of the statute of limitations.

18.     In the event the Offices determine that the Company has breached this Agreement, the Offices agree to provide the Company with written notice of such breach prior to instituting any prosecution resulting from such breach.  Within thirty days of receipt of such notice, the Company shall have the opportunity to respond to the Offices in writing to explain the nature and circumstances of such breach, as well as the actions the Company has taken to address and

remediate the situation, which explanation the Offices shall consider in determining whether to pursue prosecution of the Company.

19.   In the event that the Offices determine that the Company has breached this Agreement:  (a) all statements made by or on behalf of the Company to the Offices or to the Court, including the Statement of Facts, and any testimony given by the Company before a grand jury, a court, or any tribunal, or at any legislative hearings, whether prior or subsequent to this Agreement, and any leads derived from such statements or testimony, shall be admissible in evidence in any and all criminal proceedings brought by the Offices against the Company; and (b) the Company shall not assert any claim under the United States Constitution, Rule 11(f) of the Federal Rules of Criminal Procedure, Rule 410 of the Federal Rules of Evidence, or any other federal rule that any such statements or testimony made by or on behalf of the Company prior or subsequent to this Agreement, or any leads derived therefrom, should be suppressed or are otherwise inadmissible.  The decision whether conduct or statements of any current director, officer, or employee, or any person acting on behalf of, or at the direction of, the Company, will be imputed to the Company for the purpose of determining whether the Company has violated any provision of this Agreement shall be in the sole discretion of the Offices.

20.   The Company acknowledges that the Offices have made no representations, assurances, or promises concerning what sentence may be imposed by the Court if the Company breaches this Agreement and this matter proceeds to judgment.   The Company further acknowledges that any such sentence is solely within the discretion of the Court and that nothing in this Agreement binds or restricts the Court in the exercise of such discretion.

21.     On the date that the period of deferred prosecution specified in this Agreement expires, the Company, by the Chief Executive Officer of the Company and the Chief Financial Officer of the Company, will certify, in the form of executing the document attached as Attachment E to this Agreement, to the Offices that the Company has met its disclosure obligations pursuant to Paragraph 6 of this Agreement. Each certification will be deemed a material statement and representation by the Company to the executive branch of the United States for purposes of 18 U.S.C. §§ 1001 and 1519, and it will be deemed to have been made in the judicial district in which this Agreement is filed.

**Sale, Merger, or Other Change in Corporate Form of Company**

22.     Except as may otherwise be agreed by the parties in connection with a particular transaction, the Company agrees that in the event that, during the Term, it undertakes any change in corporate form, including if it sells, merges, or transfers business operations that are material to the Company's consolidated operations, or to the operations of any branches, representative offices, subsidiaries or affiliates involved in the conduct described in the Statement of Facts, as they exist as of the date of this Agreement, whether such sale is structured as a sale, asset sale, merger, transfer, or other change in corporate form, it shall include in any contract for sale, merger, transfer, or other change in corporate form a provision binding the purchaser, or any successor in interest thereto, to the obligations described in this Agreement. The purchaser or successor in interest must also agree in writing that the Offices' ability to declare a breach under this Agreement is applicable in full force to that entity. The Company agrees that the failure to include these provisions in the transaction will make any such transaction null and void. The Company shall provide notice to the Offices at least thirty days prior to undertaking any such sale, merger, transfer,

18

or other change in corporate form.  The Offices shall notify the Company prior to such transaction (or series of transactions) if they determine that the transaction(s) will have the effect of circumventing or frustrating the enforcement purposes of this Agreement.  At any time during the Term the Company engages in a transaction(s) that has the effect of circumventing or frustrating the enforcement purposes of this Agreement, the Offices may deem it a breach of this Agreement pursuant to Paragraphs 17-20 of this Agreement.  Nothing herein shall restrict the Company from indemnifying (or otherwise holding harmless) the purchaser or successor in interest for penalties or other costs arising from any conduct that may have occurred prior to the date of the transaction, so long as such indemnification does not have the effect of circumventing or frustrating the enforcement purposes of this Agreement, as determined by the Offices.

## Public Statements by Company

23.	The Company expressly agrees that it shall not, through present or future attorneys, officers, directors, employees, agents or any other person authorized to speak for the Company, make any public statement, in litigation or otherwise, contradicting the acceptance of responsibility by the Company set forth above or the facts described in the Statement of Facts.  Any such contradictory statement shall, subject to cure rights of the Company described below, constitute a breach of this Agreement, and the Company thereafter shall be subject to prosecution as set forth in Paragraphs 17-20 of this Agreement.  The decision whether any public statement by any such person contradicting a fact contained in the Statement of Facts will be imputed to the Company for the purpose of determining whether it has breached this Agreement shall be at the sole discretion of the Offices.  If the Offices determine that a public statement by any such person contradicts in whole or in part a statement contained in the Statement of Facts, the Offices shall so

19

notify the Company, and the Company may avoid a breach of this Agreement by publicly repudiating such statement(s) within five business days after notification.  The Company shall be permitted to raise defenses and to assert affirmative claims in other proceedings relating to the matters set forth in the Statement of Facts provided that such defenses and claims do not contradict, in whole or in part, a statement contained in the Statement of Facts.  This Paragraph does not apply to any statement made by any present or former officer, director, employee, or agent of the Company in the course of any criminal, regulatory, or civil case initiated against such individual, unless such individual is speaking on behalf of the Company.

24.     The Company agrees that if it or any of its branches, representatives or direct or indirect subsidiaries,  affiliates or joint ventures issues a press release or holds any press conference in connection with this Agreement, the Company shall first consult with the Offices to determine (a) whether the text of the release or proposed statements at the press conference are true and accurate with respect to matters between the Offices and the Company; and (b) whether the Offices have any objection to the release or statement.

25.     The Offices agree, if requested to do so, to bring to the attention of law enforcement and regulatory authorities the facts and circumstances relating to the nature of the conduct underlying this Agreement, including the nature and quality of the Company's cooperation and remediation.  By agreeing to provide this information to such authorities, the Offices are not agreeing to advocate on behalf of the Company, but rather are agreeing to provide facts to be evaluated independently by such authorities.  Nothing in this Agreement restricts in any way the ability of the Offices, any other federal department or agency, or any state or local government from proceeding criminally, civilly, or administratively, against any current or former directors,

officers, employees or agents of the Company or against any other entities or individuals.  The parties to this Agreement intend that the Agreement does not confer or provide any benefits, privileges, immunities or rights to any other individual or entity other than the parties hereto.

## Limitations on Binding Effect of Agreement

26.     This Agreement is binding on the Company and the Offices but specifically does not bind any other component of the Department of Justice, other federal agencies, or any state, local, or foreign law enforcement or regulatory agencies, or any other authorities, although the Offices will bring the cooperation of the Company and its compliance with its other obligations under this Agreement to the attention of such agencies and authorities if requested to do so by the Company.

## Notice

27.     Any notice to the Offices under this Agreement shall be given by electronic mail ("e-mail") and personal delivery, overnight delivery by a recognized delivery service, or registered or certified mail, addressed to Chief, FCPA Unit, Fraud Section, Criminal Division, U.S. Department of Justice, 1400 New York Avenue, NW, 11th Floor, Washington, D.C. 20005; Chief, Bank Integrity Unit, Money Laundering and Asset Recovery Section, Criminal Division, U.S. Department of Justice, 1400 New York Avenue NW, Washington, D.C. 20005;  and Chief, Business and Securities Fraud Section, U.S. Attorney's Office for the Eastern District of New York, 271-A Cadman Plaza East, Brooklyn, New York, 11201.  Any notice to the Company under this Agreement shall be given by e-mail or personal delivery, overnight delivery by a recognized delivery service, or registered or certified mail, addressed to David Markowitz, Managing Director

and Co-Head of Americas Litigation, Goldman Sachs & Co. LLC, 200 West Street, New York, New York 10282.  Notice shall be effective upon actual receipt by the Offices or the Company.

## **Complete Agreement**

28.     This Agreement, including its attachments, sets forth all the terms of the agreement between the Company and the Offices.  No amendments, modifications or additions to this

Agreement shall be valid unless they are in writing and signed by the Offices, the attorneys for the

Company, and a duly authorized representative of the Company.

**AGREED:**
**FOR THE GOLDMAN SACHS GROUP, INC.**


Date: 10/21/20

By: _____
Karen P. Seymour
General Counsel
The Goldman Sachs Group, Inc.


Date: 10/21/20

By: _____
Nicolas Bourtin
Stephanie G. Wheeler
Nicole Friedlander
Sharon Cohen Levin
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, New York 10004
Counsel for The Goldman Sachs Group, Inc.


Date: 10/21/20

By: _____
Mark Filip, P.C.
Robert Allen
KIRKLAND & ELLIS LLP
300 North LaSalle
Chicago, IL 60654
Counsel for The Goldman Sachs Group, Inc.


Date: 10/21/20

By: _____
Robert D. Luskin
PAUL HASTINGS LLP
875 15th Street, N.W.
Washington, D.C.
Counsel for The Goldman Sachs Group, Inc.

**FOR THE DEPARTMENT OF JUSTICE:**

SETH DuCHARME
Acting United States Attorney
Eastern District of New York

Date: 10/22/2020

By: _____
Jacquelyn M. Kasulis
Alixandra E. Smith
Drew G. Rolle
Assistant United States Attorneys

DANIEL S. KAHN
Acting Chief, Fraud Section
Criminal Division
U.S. Department of Justice

Date: 10/22/2020

By: _____
Katherine Nielsen
Trial Attorney

DEBORAH L. CONNOR
Chief, Money Laundering and Asset Recovery Section
Criminal Division
U.S. Department of Justice

Leo R. Tsao
Principal Deputy Chief

Date: 10/22/2020

By: _____
Jennifer E. Ambuehl
Nikhila Raj
Mary Ann McCarthy
Woo S. Lee
Trial Attorneys

24

## COMPANY OFFICER'S CERTIFICATE

I have read this Agreement and carefully reviewed every part of it with outside counsel for The Goldman Sachs Group, Inc. (the "Company"). I understand the terms of this Agreement and voluntarily agree, on behalf of the Company, to each of its terms. Before signing this Agreement, I consulted outside counsel for the Company. Counsel fully advised me of the rights of the Company, of possible defenses, of the Sentencing Guidelines' provisions, and of the consequences of entering into this Agreement.

I have carefully reviewed the terms of this Agreement with the Board of Directors of the Company and its Chief Compliance Officer. I have advised the Board of Directors and the Chief Compliance Officer fully of the rights of the Company, of possible defenses, of the Sentencing Guidelines' provisions, and of the consequences of entering into the Agreement.

No promises or inducements have been made other than those contained in this Agreement. Furthermore, no one has threatened or forced me, or to my knowledge any person authorizing this Agreement on behalf of the Company, in any way to enter into this Agreement. I am also satisfied with outside counsel's representation in this matter. I certify that I am the General Counsel for the Company and that I have been duly authorized by the Company to execute this Agreement on behalf of the Company.

Date: _10/21/20_

The Goldman Sachs Group, Inc.

By: _____
Karen P. Seymour
General Counsel

25

## CERTIFICATE OF COUNSEL

I am counsel for The Goldman Sachs Group, Inc. (the "Company") in the matter covered by this Agreement. In connection with such representation, I have examined relevant Company documents and have discussed the terms of this Agreement with the General Counsel of the Company. Based on our review of the foregoing materials and discussions, I am of the opinion that the representative of the Company has been duly authorized to enter into this Agreement on behalf of the Company and that this Agreement has been duly and validly authorized, executed, and delivered on behalf of the Company and is a valid and binding obligation of the Company. Further, I have carefully reviewed the terms of this Agreement with the General Counsel of the Company. I have fully advised her of the rights of the Company, of possible defenses, of the Sentencing Guidelines' provisions and of the consequences of entering into this Agreement. To my knowledge, the decision of the Company to enter into this Agreement, based on the authorization of the Board of Directors, is an informed and voluntary one.

Date: 10/21/20

By: _____
Nicolas Bourtin
Stephanie G. Wheeler
Nicole Friedlander
Sharon Cohen Levin
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, New York 10004
Counsel for The Goldman Sachs Group, Inc.

26

By: _____
Mark Filip, P.C.
Robert Allen
KIRKLAND & ELLIS LLP
300 North LaSalle
Chicago, IL 60654
Counsel for The Goldman Sachs Group, Inc.

By: _____
Robert D. Luskin
PAUL HASTINGS LLP
875 15th Street, N.W.
Washington, D.C.
Counsel for The Goldman Sachs Group, Inc.

**ATTACHMENT A**

**STATEMENT OF FACTS**

The following Statement of Facts is incorporated by reference as part of the

Deferred Prosecution Agreement (the "Agreement") between the United States Department of

Justice, Criminal Division, Fraud Section (the "Fraud Section") and Money Laundering and

Asset Recovery Section ("MLARS"), and the United States Attorney's Office for the Eastern

District of New York (the "Office") (collectively, the "United States"), and the defendant, The

Goldman Sachs Group, Inc. (together with its wholly-owned subsidiaries and affiliated entities,

"Goldman" or the "Company"). Goldman hereby agrees and stipulates that the following facts

and conclusions of law are true and accurate. Certain of the facts herein are based on

information obtained from third parties by the United States through its investigation and

described to Goldman. Goldman admits, accepts, and acknowledges that it is responsible for the

acts of its officers, directors, employees and agents as set forth below. Should the United States

pursue the prosecution that is deferred by this Agreement, Goldman agrees that it will neither

contest the admissibility of, nor contradict, this Statement of Facts in any such proceeding. The

following facts took place during the relevant time period, unless otherwise noted, and establish

beyond a reasonable doubt the charges set forth in the criminal Information attached to the

Agreement.

**The Defendant Goldman and Other Entities**

1.      From in or about and between 2009 and at least 2014 (the "relevant time

period"), Goldman was a global investment banking, securities and investment management firm

incorporated in Delaware and headquartered in New York, New York. Accordingly, during the

relevant time period, Goldman was a "United States person" as that term is used in the Foreign

1

Corrupt Practices Act ("FCPA"), Title 15, United States Code, Section 78dd-1(g).  Goldman had

a class of securities registered pursuant to Section 12 of the Securities Exchange Act of 1934

(Title 15, United States Code, Section 78l) and was required to file periodic reports with the U.S.

Securities and Exchange Commission ("SEC").  Accordingly, during the relevant time period,

Goldman was an "issuer" as that term is used in the FCPA, Title 15, United States Code, Section

78dd-1.  Goldman operated worldwide primarily through wholly-owned subsidiaries and

affiliated entities.  Goldman and its subsidiaries and affiliated entities, combined, had

approximately 38,000 employees.

      2.      Goldman Sachs (Malaysia) Sdn. Bhd. ("Goldman Malaysia") was a

wholly-owned subsidiary and agent of Goldman.  Goldman Malaysia was incorporated in

Malaysia and had offices in Kuala Lumpur.  Goldman Malaysia's records and accounts were

included in Goldman's consolidated financial statements to the SEC.  Goldman Malaysia also

received revenue related to the relevant transactions described more fully below.  During the

relevant time period, Goldman Malaysia and its employees and directors were agents of an

"issuer" as that term is used in the FCPA, Title 15, United States Code, Section 78dd-1.

      3.      Goldman Sachs (Singapore) Pte., Goldman Sachs International, Goldman

Sachs Bank USA, Goldman Sachs & Co. L.L.C. and Goldman Sachs (Asia) L.L.C. are each

Goldman subsidiaries, and they and their employees were agents of Goldman that assisted in

carrying out business around the world, including the relevant transactions and conduct set forth

herein.  During the relevant time period, Goldman Sachs (Asia) L.L.C. was incorporated in

Delaware, had offices in Hong Kong and was a "domestic concern" as that term is used in the

FCPA, Title 15, United States Code, Section 78dd-2, and a "United States person" as that term is

used in the FCPA, Title 15, United States Code, Section 78dd-2(i).

## Goldman Executives, Employees and Agents

4.      Tim Leissner ("Leissner") was employed by various Goldman subsidiaries and acted as an agent and employee of Goldman with respect to the transactions and conduct set forth herein.  Leissner was employed by Goldman from in or about and between 1998 and 2016, and was a Participating Managing Director ("PMD") from in or about and between November 2006 and February 2016.  Additionally, he held various senior positions in Goldman's Investment Banking Division in Asia from in or about and between 2011 and 2016, including Chairman of Southeast Asia, a region that included Malaysia, from in or about and between July 2014 and February 2016, and he served on the Board of Directors for Goldman Malaysia. Leissner's job included obtaining and executing business for Goldman.  During the relevant time period, with respect to the transactions and conduct set forth herein, Leissner was an employee and agent of an "issuer" and a "domestic concern" as those terms are used in the FCPA, Title 15, United States Code, Sections 78dd-1(a) and 78dd-2(a).

5.      Ng Chong Hwa, also known as "Roger Ng" ("Ng"), was employed by various Goldman subsidiaries from in or about and between 2005 and 2014, including Goldman Malaysia, and acted as an agent and employee of Goldman with respect to the transactions and conduct set forth herein.  In or about and between April 2010 and May 2014, Ng was a Managing Director ("MD") of Goldman.  For part of that time, Ng served as Head of Investment Banking and on the Board of Directors for Goldman Malaysia, and was then employed by another Goldman subsidiary in Malaysia.  Ng worked with Leissner on the relevant transactions, and his job included obtaining and executing business for Goldman.  During the relevant time period, Ng was an employee and agent of an "issuer" as that term is used in the FCPA, Title 15, United States Code, Section 78dd-1(a).

3

6. "Employee 1," an individual whose identity is known to the United States and the Company, was employed by at least one Goldman subsidiary, and acted as an agent and employee of Goldman. In or about and between October 2007 and November 2018, Employee 1 served as a PMD and, during the relevant time period, held various leadership positions in Goldman's Asia operations. Employee 1 worked with Leissner and Ng on the relevant transactions. During the relevant time period, Employee 1 was an employee and agent of an "issuer" as that term is used in the FCPA, Title 15, United States Code, Section 78dd-1(a).

**Foreign Government Entities and Officials**

7. 1Malaysia Development Berhad ("1MDB") was a strategic investment and development company wholly owned by the Government of Malaysia through its Ministry of Finance ("MOF"). It was formed in or about 2009 to pursue investment and development projects for the economic benefit of Malaysia and its people, primarily relying on debt to fund these projects. 1MDB was overseen by senior Malaysian government officials, was controlled by the Government of Malaysia and performed a function on behalf of Malaysia. During the relevant time period, 1MDB was an "instrumentality" of a foreign government, as that term is used in the FCPA, Title 15, United States Code, Sections 78dd-1(f)(1), 78dd-2(h)(2), 78dd-3(f)(2).

8. International Petroleum Investment Company ("IPIC") was an investment fund wholly owned by the Government of Abu Dhabi. It was established by the Government of Abu Dhabi and was overseen by senior Abu Dhabi government officials, was controlled by the Government of Abu Dhabi and performed a government function on behalf of Abu Dhabi. During the relevant time period, IPIC was an "instrumentality" of a foreign government, as that

term is used in the FCPA, Title 15, United States Code, Sections 78dd-1(f)(1), 78dd-2(h)(2), 78dd-3(f)(2).

9.      Aabar Investments PJS ("Aabar") was a private joint stock company incorporated under the laws of Abu Dhabi, and a subsidiary of IPIC.   During the relevant time period, Aabar was an "instrumentality" of a foreign government, as that term is used in the FCPA, Title 15, United States Code, Sections 78dd-1(f)(1), 78dd-2(h)(2), 78dd-3(f)(2).

10.      "1MDB Official 1," an individual whose identity is known to the United States and the Company, was a high-ranking official at 1MDB.  1MDB Official 1 served as one of the principal points of contact between 1MDB and Goldman in connection with 1MDB business.  During the relevant time period, 1MDB Official 1 was a "foreign official" as that term is used in the FCPA, Title 15, United States Code, Sections 78dd-1(f)(1)(A), 78dd-2(h)(2), 78dd-3(f)(2).

11.      "1MDB Official 2," an individual whose identity is known to the United States and the Company, was a high-ranking official at 1MDB.  During the relevant time period, 1MDB Official 2 was a "foreign official" as that term is used in the FCPA, Title 15, United States Code, Sections 78dd-1(f)(1)(A), 78dd-2(h)(2), 78dd-3(f)(2).

12.      "1MDB Official 3," an individual whose identity is known to the United States and the Company, was a high-ranking official at 1MDB.  During the relevant time period, 1MDB Official 3 served as one of the principal points of contact between 1MDB and Goldman in connection with 1MDB business.  1MDB Official 3 was a "foreign official" as that term is used in the FCPA, Title 15, United States Code, Sections 78dd-1(f)(1)(A), 78dd-2(h)(2), 78dd-3(f)(2).

13.     "1MDB Official 4," an individual whose identity is known to the United States and the Company, was a high-ranking official at 1MDB.  During the relevant time period, 1MDB Official 4 was a "foreign official" as that term is used in the FCPA, Title 15, United States Code, Sections 78dd-1(f)(1)(A), 78dd-2(h)(2), 78dd-3(f)(2).

14.     "1MDB Official 5," an individual whose identity is known to the United States and the Company, was an official at 1MDB.  During the relevant time period, 1MDB Official 5 was a "foreign official" as that term is used in the FCPA, Title 15, United States Code, Sections 78dd-1(f)(1)(A), 78dd-2(h)(2), 78dd-3(f)(2).

15.     "Malaysian Official 1," an individual whose identity is known to the United States and the Company, was a high-ranking government official in the executive branch of the Government of Malaysia and the Ministry of Finance ("MOF").  Malaysian Official 1 had authority to approve, and exert influence over, 1MDB business.  During the relevant time period, Malaysian Official 1 was a "foreign official" as that term is used in the FCPA, Title 15, United States Code, Sections 78dd-1(f)(1)(A), 78dd-2(h)(2), 78dd-3(f)(2).

16.     "Malaysian Official 2," an individual whose identity is known to the United States and the Company, was an official in the executive branch of the Government of Malaysia and a special advisor to Malaysian Official 1.  During the relevant time period, Malaysian Official 2 was a "foreign official" as that term is used in the FCPA, Title 15, United States Code, Sections 78dd-1(f)(1)(A), 78dd-2(h)(2), 78dd-3(f)(2).

17.     "Malaysian Official 3," an individual whose identity is known to the United States and the Company, was an official in the executive branch of the Government of Malaysia and a special advisor to Malaysian Official 1.  During the relevant time period,

Malaysian Official 3 was a "foreign official" as that term is used in the FCPA, Title 15, United States Code, Sections 78dd-1(f)(1)(A), 78dd-2(h)(2), 78dd-3(f)(2).

18.     "Malaysian Official 4," an individual whose identity is known to the United States and the Company, was an official in the executive branch of the Government of Malaysia and a special advisor to Malaysian Official 1.  During the relevant time period, Malaysian Official 4 was a "foreign official" as that term is used in the FCPA, Title 15, United States Code, Sections 78dd-1(f)(1)(A), 78dd-2(h)(2), 78dd-3(f)(2).

19.     "Abu Dhabi Official 1," an individual whose identity is known to the United States and the Company, was a high-ranking official of IPIC and Aabar.  Abu Dhabi Official 1 had influence over and held signatory authority for IPIC.  During the relevant time period, Abu Dhabi Official 1 was a "foreign official" as that term is used in the FCPA, Title 15, United States Code, Sections 78dd-1(f)(1)(A), 78dd-2(h)(2), 78dd-3(f)(2).

20.     "Abu Dhabi Official 2," an individual whose identity is known to the United States and the Company, was a high-ranking official of Aabar.  Abu Dhabi Official 2 had influence over and held signatory authority for Aabar.  During the relevant time period, Abu Dhabi Official 2 was a "foreign official" as that term is used in the FCPA, Title 15, United States Code, Sections 78dd-1(f)(1)(A), 78dd-2(h)(2), 78dd-3(f)(2).

### Additional Individuals

21.     During the relevant time period, Low Taek Jho, also known as "Jho Low" ("Low"), was a Malaysian national who worked as an intermediary in relation to 1MDB and other foreign government officials on numerous financial transactions and projects involving Goldman and others.

22. During the relevant time period, "Individual 1," an individual whose identity is known to the United States and the Company, was a Malaysian national and associate of Low.

## The Criminal Scheme

### Overview

23. In or about and between 2009 and 2014, Goldman, through certain of its agents and employees, together with others, knowingly and willfully conspired and agreed with others to corruptly provide payments and things of value to, or for the benefit of, foreign officials and their relatives to induce those foreign officials to influence the decisions of 1MDB, IPIC and Aabar to obtain and retain business for Goldman, including positions as an advisor to 1MDB on the acquisitions of Malaysian energy assets, underwriter of the 1MDB bonds, and underwriter of certain other 1MDB business, including the contemplated initial public offering ("IPO") of 1MDB's Malaysian energy assets. Leissner, Ng and Employee 1 used Low's connections within the Governments of Malaysia and Abu Dhabi to obtain and retain this and other business for Goldman and, in turn, concealed Low's involvement in the deals from certain employees and agents of Goldman. In total, Goldman conspired to provide approximately $1.6077 billion to, or for the benefit of, foreign officials and their relatives, of which approximately $18.1 million was paid from accounts controlled by Leissner.

24. The bribes resulted in Goldman being engaged on, among other projects, three bond offerings that were related to 1MDB's energy acquisitions and that raised a total of approximately $6.5 billion for 1MDB in 2012 and 2013. The bribes were also intended to help Goldman secure a role on the anticipated IPO of those energy assets. These three bond offerings

and a related acquisition, along with a transaction involving Low and IPIC,[1] ultimately earned Goldman in excess of $600 million in fees and revenue across its divisions, and increased Goldman's stature in Southeast Asia.  In the course of this scheme, payments and communications made in furtherance of the scheme were made via wires that passed through the Eastern District of New York.

25.     Pursuant to Goldman's internal accounting controls, each 1MDB bond transaction required Goldman management's general and specific authorization.  Moreover, because Goldman initially purchased the full value of each bond from 1MDB using Goldman's assets, the transactions needed to be appropriately authorized and properly recorded.  Among other things, Goldman's internal accounting controls included the Firmwide Capital Committee ("FWCC"), which was authorized by Goldman's Chief Executive Officer to provide global oversight and approval of bond transactions, including those transactions in which Goldman used its own assets to purchase the financial instruments, like the 1MDB bonds.  Goldman's internal accounting controls also included approval of the bonds by Goldman's Business Intelligence Group ("BIG") and compliance, both of which were represented on the FWCC.  While certain of Goldman's employees and agents, including Leissner, Ng and Employee 1, circumvented these and other controls, other Goldman employees and agents who were responsible for implementing its internal accounting controls failed to do so in connection with the 1MDB bond deals.  Specifically, although employees serving as part of Goldman's control functions knew that any transaction involving Low posed a significant risk, and although they were on notice that he was involved in the transactions, they did not take reasonable steps to ensure that Low was not involved.  Additionally, there were significant red flags raised during the due diligence process

---

[1] This transaction involved Leissner, Employee 1, Low and IPIC, and Low's monetary contribution to this deal involved funds misappropriated from the bond offerings.

and afterward, including, but not limited to, Low's involvement in the deals, that were either ignored or only nominally addressed so that the transactions would be approved and Goldman could continue to do business with 1MDB.

### Goldman's Relationship with Low

26.     In or about 2009, Leissner and Ng were introduced to Low, who was known to be close to various high-ranking officials in Malaysia and Abu Dhabi, and through Low began cultivating relationships with Malaysian Official 1 and others to secure business for Goldman.

27.     In or about January 2009, Leissner and Ng discussed with Low and others a role for Goldman in the creation of and potential fundraising for Terengganu Investment Authority ("TIA"), 1MDB's predecessor entity.

28.     Leissner and Ng also attempted to onboard Low as a Goldman client, or otherwise work with Low, on numerous occasions in or about and between 2009 and 2013.  For example, in or about September 2009, Ng referred Low for a private wealth management account ("PWM") through a Goldman European subsidiary.  Ng described Low as "our partner in a lot of transactions in [M]alaysia.  Largely the mid-east and [M]alaysia rationship [sic]."  As part of the onboarding process, Goldman's control functions, including BIG, vetted Low's finances and raised questions about his source of wealth.  As control functions personnel worked to diligence those questions about Low, the business side continued to pressure them to approve Low as a client.  In a March 13, 2010 email, a Goldman regional head of compliance wrote to a high-level BIG executive and others, expressing frustration with the pressure to approve Low and underscoring the red flags Low raised as a client:

> This has been an exceptionally trying experience I have to admit, and I believe that no matter what we do [Goldman PWM representative] is not willing to accept that

we are not in a position to onboard this prospect . . . I do not believe we will ever be able to get comfortable with this matter. I'd like to shut this down once and for all . . . It is seldom that one sees a vendor report, which has been backed up verbally by them, that so clearly states that we should exercise extreme caution.

29.     Ultimately, BIG personnel rejected Low as a Goldman client because of his inability to satisfactorily answer questions raised by Goldman's control functions, as well as negative news coverage about Low's lavish spending.  Notwithstanding this rejection, there were additional attempts to onboard Low and his companies as a Goldman client.

30.     For example, in early 2011, Leissner tried to onboard two of Low's companies as clients of Goldman but was unable to do so due to compliance's continued objections to Low.

31.     Around the same time, Leissner made an additional attempt to bring Low on as a PWM client through Goldman's Singapore office, without referencing the prior attempt. Low was again denied due to, among other things, his questionable source of wealth.  In a March 11, 2011 email chain discussing the attempt, a high-ranking employee in compliance and MD noted, "To be clear, we have pretty much zero appetite for a relationship with this individual," and a high-ranking employee in BIG and MD expressed, "this is a name to be avoided."

32.     Even after the control functions had rejected Low as a client, Leissner, Ng and others at Goldman continued their relationship with Low and used him to obtain and retain business for Goldman from 1MDB and others.  In or about and between 2012 and 2013, Leissner, Ng, Employee 1 and other Goldman employees worked with Low to help 1MDB raise more than $6.5 billion via three separate bond offering transactions, referred to internally at Goldman as "Project Magnolia," "Project Maximus" and "Project Catalyze," respectively.

**Project Magnolia**

33.     In or about February 2012, 1MDB engaged Goldman as its financial advisor for its anticipated purchase of a Malaysian energy company ("Malaysian Energy Company A").  Low helped secure Goldman's role in that transaction.

34.     On or about January 23, 2012, Low arranged a meeting between Leissner, Ng and a high-ranking 1MDB official.  In making the arrangements, Low emailed all three at their personal email addresses, and stated "Making an introduction to [Leissner] and [Ng]'s private e-mail accounts [….] Please exclude me from the e-mail list going forward."  Thereafter, Leissner and Ng worked with the high-ranking 1MDB official on the potential purchase of Malaysian Energy Company A.

35.     1MDB was also interested in raising funds to acquire Malaysian Energy Company A, including through a bond transaction.  In or about early 2012, Leissner, Ng, 1MDB Official 1, 1MDB Official 3, Low and others met in Malaysia to discuss the necessity of a guarantee from IPIC to make the bond transaction feasible for Goldman, which would purchase all of the bonds initially, and then sell the bonds to other investors.

36.     In or about February 2012, Leissner and Ng traveled to London to meet with Low and others to discuss the proposed bond transaction.  Leissner and Ng utilized Goldman resources to fund their travel to London.

37.     At that meeting, Low explained that government officials from Abu Dhabi and Malaysia needed to be bribed to both obtain the guarantee from IPIC and get the necessary approvals from Malaysia and 1MDB.  Low advised that a high-ranking official of IPIC ("IPIC Official 1") and Malaysian Official 1 needed to be paid the largest bribes out of all the

government officials to approve the transaction, and that other lower-level officials would need to be bribed as well.

38.     Subsequently, Leissner and Ng each separately informed Employee 1 about the information they had learned at the London meeting regarding the need to bribe foreign officials.

39.     Low also promised remuneration to various 1MDB officials to facilitate the deals and to ensure Goldman's role in those deals.  For example, on or about March 8, 2012, 1MDB Official 1 emailed himself a copy of an online chat he had with Low on or about March 8, 2012, in which they discussed, among other things, Malaysian Energy Company A.  In that chat, Low told 1MDB Official 1 that he would give 1MDB Official 1 a "big present" when the Malaysian Energy Company A transaction was completed and then directed 1MDB Official 1 to "delete from email and destroy once done."

40.     On or about March 5, 2012, Leissner, Ng, Employee 1, Low and others traveled to Abu Dhabi to meet with IPIC and Aabar representatives regarding the potential debt financing that would assist 1MDB in raising funds for the acquisition of Malaysian Energy Company A.  During the same trip, Low arranged a meeting between Leissner and IPIC Official 1, during which Leissner delivered a letter from Malaysian Official 1 addressed to IPIC Official 1.

41.     On or about March 19, 2012, 1MDB formally chose Goldman as the "sole bookrunner and arranger" for the $1.75 billion debt financing transaction designed, in part, to pay $822 million towards Malaysian Energy Company A's acquisition.  IPIC was chosen to serve as guarantor on the bond and Aabar was granted certain options by the 1MDB issuer for assistance in securing the guarantee.

13

42.     One of Goldman's goals in pursuing this transaction was to secure more business for itself, including a role in the potential IPO of 1MDB's energy assets, as explicitly stated in Goldman's FWCC memorandum circulated during the approval process for Project Magnolia:  "Post closing, we expect significant follow on business from 1MDB and 1MDB Energy[,] including the IPO of 1MDB Energy."

43.     As work progressed on Project Magnolia, between on or about March 25, 2012 and on or about March 29, 2012, Leissner and Ng traveled to Los Angeles, California and New York, New York to discuss matters related to Project Magnolia with Low and others. Leissner and Ng traveled using Goldman resources.

44.     Meanwhile, although employees within Goldman's control functions suspected that Low may be involved in the deal, the only step taken by the control functions to investigate that suspicion was to ask members of the deal team whether Low was involved and to accept their denials without reasonable confirmation.

45.     For example, during a telephone call in or about March 2012, a high-ranking employee in BIG and MD voiced suspicions that Low was involved in Project Magnolia. Leissner denied that Low was involved.  Similarly, on or about April 3, 2012, the day before a FWCC meeting to discuss Project Magnolia, a high-ranking executive in BIG, who was also an advisor to the FWCC ("Employee 2"), emailed other members of BIG that "Leissner said Jho Low not involved at all in deal as far as he [is] aware but that Low was present when Leissner met [IPIC Official 1] in Abu Dhabi."

46.     On or about April 4, 2012, the FWCC meeting was held, which was attended telephonically by Goldman executives in New York, New York.  During this meeting, Leissner was asked whether Low was involved in Project Magnolia and Leissner said that, other

14

than arranging a meeting between Leissner and IPIC Official 1, Low was not involved.  Ng was also present during this meeting and did not correct Leissner's false statement about Low's involvement.  Later that same day, after the FWCC meeting, Employee 2 emailed Leissner, stating "I was told Jho Low attended the meeting you had with [IPIC Official 1] . . . that was wrong."  Leissner responded that he "hand delivered a letter by the Prime Minister of Malaysia to [IPIC Official 1] and the Crown Prince."  Employee 2 replied, "I guess Low will have had a hand in fixing that you were able to carry the letter from the Malaysian PM . . . Important we have no role on our side for Low and we should ask that any payments from any of [the] participants to any intermediaries are declared and transparent."  Leissner agreed with Employee 2's admonishment.

47.     Goldman's control functions accepted the statements of the deal team members about Low's involvement at face value, rather than taking additional steps that Goldman's control functions took in other deals, such as reviewing the electronic communications of members of the deal team to look for evidence of Low's involvement (e.g., searching for references to Low).  For example, had Goldman conducted a review of Leissner's electronic communications at this time, it would have discovered multiple messages linking Low to, among others, the bond deal, 1MDB officials, Malaysian Official 1 and Abu Dhabi Official 1, as well as the use of personal email addresses by Leissner and Ng to discuss Goldman business.

48.     During this time period, Low, Leissner and Ng continued to structure the bribery scheme.  Leissner and Ng ultimately understood that Low intended to use the funds raised through Project Magnolia to pay bribes, and cause bribes to be paid, to foreign officials in Malaysia and Abu Dhabi to influence those officials to obtain the necessary approvals and assistance for Goldman to execute Project Magnolia.

49.     On or about May 16, 2012, Goldman's committees approved Project Magnolia, and on or about May 21, 2012, the $1.75 billion bond issuance closed.  Goldman purchased the entire bond issuance from 1MDB.

50.     On or about May 22, 2012, Goldman caused approximately $907,500,000 in proceeds from Project Magnolia to be wired to a 1MDB subsidiary ("1MDB Subsidiary 1"), through a correspondent bank account in New York, New York.  Goldman booked approximately $192,500,000 in fees for this bond transaction and an additional approximately $16,800,000 in fees for advising on the acquisition of Malaysian Energy Company A.

51.     Low and others caused the following transfers of funds from the proceeds of Project Magnolia:

a.     On or about May 22, 2012, approximately $576,943,490 of the Project Magnolia bond proceeds were transferred from the account of 1MDB Subsidiary 1 to an account at Foreign Financial Institution A ("Shell Company Account 1") in the name of a company incorporated in the British Virgin Islands with a name similar to Aabar ("Shell Company 1").  However, Shell Company 1 was not, in fact, associated with Aabar but was rather associated with Abu Dhabi Official 1, Abu Dhabi Official 2 and Low.  Abu Dhabi Official 1 and Abu Dhabi Official 2 were signatories on Shell Company Account 1, and Low exercised control over Shell Company Account 1.

b.     On or about May 25, 2012, approximately $295 million was transferred via wire from Shell Company Account 1 to an account at a foreign bank in the name of a shell company beneficially owned and controlled by Low and Individual 1 ("Shell Company Account 2").  On or about July 25, 2012, another approximately $133 million was transferred via wire from Shell Company Account 1 to Shell Company Account 2.

c.       On or about June 18, 2012, approximately $133 million was transferred from Shell Company Account 1 to an account at Foreign Financial Institution A, opened in the name of a company incorporated in the British Virgin Islands and beneficially owned and controlled by a close relative of Malaysian Official 1 ("Shell Company Account 3"). Between on or about August 8, 2012 and on or about August 22, 2012, another approximately $16 million was transferred from Shell Company Account 2 through another shell company to Shell Company Account 3.

d.       Between on or about June 20, 2012 and on or about November 20, 2012, approximately $60 million was transferred over multiple wires from Shell Company Account 3 to the account of U.S. Motion Picture Company 1, an account at U.S. Financial Institution 1 in Los Angeles, California ("Holding Company 1 Account").  U.S. Motion Picture Company 1 was a U.S. legal entity owned, in part, by a close relative of Malaysian Official 1, and the funds transferred from Shell Company Account 3 to Holding Company 1 Account were used to, among other things, finance movie productions.

e.       Between on or about May 29, 2012 and on or about August 1, 2012, approximately $258.75 million was transferred via wire from Shell Company Account 2 to an account at Foreign Financial Institution B in the name of Shell Company Account 4, which was beneficially owned and controlled by Abu Dhabi Official 1.

f.       Also between on or about May 29, 2012 and on or about July 13, 2012, approximately $35 million was transferred via wire from Shell Company Account 2 to an account at Foreign Financial Institution C in the name of Shell Company Account 5, which was beneficially owned and controlled by Abu Dhabi Official 2.

17

g.     Between on or about June 15, 2012 and on or about July 9, 2012, a total of approximately $1.6 million was transferred from Shell Company Account 2 through another shell company account to an account at Foreign Financial Institution D that was beneficially owned and controlled by 1MDB Official 3.

h.     Between on or about June 11, 2012 and on or about July 16, 2012, approximately $51.96 million was transferred via wire through the United States from Shell Company Account 2 to Holding Company 2 Account, which was beneficially owned and controlled by Leissner and his close relative, and, in turn, approximately $24.4 million was subsequently transferred from Holding Company 2 Account to an account at Foreign Financial Institution E beneficially owned by Ng's relative ("Shell Company Account 6").[2]

**Project Maximus**

52.     Within weeks of closing Project Magnolia, in or about May 2012, 1MDB sought assistance from Goldman to purchase a second Malaysian energy company ("Malaysian Energy Company B") and to issue a bond to raise funds for the acquisition.  In or about August 2012, 1MDB agreed to purchase Malaysian Energy Company B for approximately $814 million and planned to finance the purchase with another $1.75 billion bond guaranteed indirectly by IPIC.

53.     Once again, Goldman's control functions simply accepted at face value the representations of the deal team members and failed to further investigate Low's suspected involvement in this bond deal.  For example, on or about June 20, 2012, a member of Goldman's control functions asked members of the deal team, "Is Jho Low involve[d] in this transaction?

---

[2] Based on records, the name of the company that held Shell Company Account 6 subsequently changed, but Shell Company Account 6 remained beneficially owned by Ng's relative.

Please also keep us posted if there are any other politically exposed person involve[d] in this transaction in a non-official capacity."  A deal team member responded "no."

54.     Additionally, on or about October 10, 2012, in response to committee questions, Leissner told a firmwide committee that neither Low nor any intermediary was involved in Project Maximus.  Despite their continued concern, as evidenced by their repeated questions, Goldman's control functions did not engage in electronic surveillance of Leissner's correspondence or activities to determine whether Low was involved in the deal.

55.     Goldman's continued control failures were further compounded when Goldman ignored additional red flags raised by Project Maximus, including that 1MDB was seeking to raise additional funds within a few months of raising $1.75 billion via Project Magnolia without having utilized the full amount from that deal, and was also seeking to raise far more than was needed to acquire Malaysian Energy Company B.  Goldman's control functions also failed to verify how Project Magnolia's proceeds were used.

56.     On or about October 19, 2012, Project Maximus closed.  Goldman purchased the entire bond issuance from 1MDB.  On or about October 19, 2012, Goldman caused approximately $1.64 billion to be transferred via wire through correspondent accounts in the United States to another 1MDB subsidiary ("1MDB Subsidiary 2").  Goldman booked approximately $110,000,000 in fees for Project Maximus.

57.     Low and others caused the following transfers of funds from the proceeds of Project Maximus:

a.     On or about October 19, 2012, approximately $790,354,855 was transferred from 1MDB Subsidiary 2 to Shell Company Account 1.

        b.        Between on or about October 24, 2012 and on or about December 17, 2012, approximately $664 million was transferred from Shell Company Account 1 to Shell Company Account 2.

        c.        Between on or about October 23, 2012 and on or about November 14, 2012, approximately $106.2 million was transferred from Shell Company Account 1 to Shell Company Account 3, which was beneficially owned and controlled by a close relative of Malaysian Official 1.

        d.        Between on or about October 30, 2012 and on or about November 19, 2012, approximately $30 million was transferred from Shell Company Account 2 to an account held by Malaysian Official 1.

        e.        Between on or about October 29, 2012 and on or about November 30, 2012, approximately $214 million was transferred from Shell Company Account 2 to Shell Company Account 4, which was beneficially owned and controlled by Abu Dhabi Official 1.

        f.        Between on or about July 3, 2012 and on or about December 19, 2012, approximately $21 million was transferred from Shell Company Account 2 and another shell entity to an account beneficially owned and controlled by an official in the government of the United Arab Emirates ("UAE Official 1").

        g.        Between on or about November 2, 2012 and on or about January 22, 2013, approximately $31.6 million was transferred from Shell Company Account 2 to Shell Company Account 5 and another account beneficially owned and controlled by Abu Dhabi Official 2 and his close relative.

h.      On or about December 6, 2012, approximately $5 million was transferred from Shell Company Account 2 to an account beneficially owned and controlled by 1MDB Official 3.

i.      Between on or about December 6, 2012 and on or about January 21, 2013, approximately $20.5 million was transferred from Shell Company Account 2 to Holding Company 2 Account.

58.     Leissner then directed follow-on transfers from Holding Company 2 Account to government officials and others.  For example, on or about December 4, 2012, Leissner emailed his close relative from his personal account with bank account details and amounts to be wired from Holding Company 2 Account to Malaysian Official 2, 1MDB Official 4 and 1MDB Official 5.  On or about January 15, 2013, Leissner again emailed his close relative from his personal account, correcting some banking information and adding a transfer to 1MDB Official 2.

a.      On or about December 7, 2012, Leissner directed approximately $1 million to be transferred from Holding Company 2 Account to an account beneficially owned and controlled by Malaysian Official 2.

b.      Between on or about December 7, 2012 and on or about December 20, 2012, Leissner directed approximately $700,000 to be transferred from Holding Company 2 Account to an account beneficially owned and controlled by 1MDB Official 5 and his close relative.

c.      On or about December 20, 2012, Leissner directed approximately $1 million to be transferred from Holding Company 2 Account to an account beneficially owned and controlled by 1MDB Official 1.

d.      Also on or about January 17, 2013, Leissner directed approximately $1 million to be transferred from Holding Company 2 Account to an account beneficially owned and controlled by 1MDB Official 4.

e.      On or about January 17, 2013, Leissner directed approximately $1 million to be transferred from Holding Company 2 Account to an account beneficially owned and controlled by 1MDB Official 2.

### Project Catalyze

59.      In or about November 2012, almost immediately after Project Maximus closed, Leissner[3] and Low began working on another bond issuance.  Ultimately, Goldman underwrote a third bond issuance that raised an additional $3 billion for 1MDB with Goldman acting as arranger and underwriter.  This bond issuance was purportedly intended to fund 1MDB's portion of a joint venture with Aabar.

60.      Goldman's control functions had continued suspicions that Low was working on the third bond deal.  Once again, however, the control functions relied solely on the deal team members' denials of Low's involvement without any further scrutiny.

61.      On or about April 24, 2013, a senior Goldman executive who was a member of Goldman's approval committee located in New York, New York, emailed Leissner about "1MDB," asking: "Is there a story circulating about an intermediary on the Magnolia trades??"  Leissner responded, "Not that I am aware of . . . There definitely was no intermediary on any of the trades.  The blogs in Malaysia always try to link a young Chinese business man [sic], Jho Low, to 1MDB.  That is not the case other than he was an advisor alongside other

---

[3] Ng had a new position within Goldman by this time and did not work directly on the deal team for Project Catalyze, but was recognized by Goldman as a continued contact point for 1MDB.

prominent figures to the King of Malaysia at the time of the creation of 1MDB." There was no follow-up by Goldman's control functions about Low.

62. Goldman also failed to address the other red flags that were raised by the proposed $3 billion transaction, including, once again, 1MDB raising large sums of money with no identified use of proceeds within months of Project Magnolia and Project Maximus, and Goldman's failure to verify use of past bond proceeds. Adding to the transaction's risks was the upcoming Malaysian general election, which directly affected the political future of Malaysian Official 1.

63. Goldman's committees nevertheless approved Project Catalyze on or about March 13, 2013, and the proceeds from Project Catalyze were issued on or about March 19, 2013. Goldman purchased the entire bond issuance from 1MDB and booked approximately $279,000,000 in fees on Project Catalyze.

64. Low and Leissner continued to pay bribes to government officials from the bond proceeds. On or about March 19, 2013, Goldman transferred via wire from and through the United States approximately $2.7 billion from Project Catalyze to an account for another 1MDB subsidiary ("1MDB Subsidiary 3") at Foreign Financial Institution A. Subsequently, Low caused approximately $1,440,188,045 to be transferred through a series of pass-through accounts to accounts beneficially owned or controlled by Low and Individual 1. Low then directed multiple transfers to various government officials, including:

a. On or about March 21, 2013, approximately $620 million was transferred from a shell entity beneficially owned or controlled by Low, Shell Company Account 7, to an account beneficially owned and controlled by Malaysian Official 1. Four days later, on

23

or about March 25, 2013, another approximately $61 million was transferred from Shell Company Account 7 to the same account for Malaysian Official 1.

        b.      On or about April 5, 2013, approximately $10 million was transferred from Shell Company Account 8, an account beneficially owned and controlled by Low, to an account beneficially owned and controlled by Abu Dhabi Official 2.

        c.      On or about July 1, 2013, approximately $1 million was transferred from Shell Company Account 8 to an account beneficially owned and controlled by 1MDB Official 5.

        d.      On or about October 21, 2013, approximately $11.5 million was transferred from Shell Company Account 8 to Shell Company Account 3.

        e.      On or about September 11, 2013, approximately $1 million was transferred from Shell Company Account 8 to an account beneficially owned and controlled by 1MDB Official 1.

        f.      On or about September 11, 2013, approximately $1 million was transferred from Shell Company Account 8 to an account beneficially owned and controlled by Malaysian Official 2.

        g.      On or about September 11, 2013, approximately $980,000 was transferred from Shell Company Account 8 to an account beneficially owned and controlled by Malaysian Official 3.

        h.      On or about September 11, 2013, approximately $895,000 was transferred from Shell Company Account 8 to an account beneficially owned and controlled by Malaysian Official 4.

i.      On or about July 3, 2013, approximately $65.1 million was transferred from Shell Company Account 8 to Holding Company 2 Account.  From there, Leissner directed payment of approximately $4.2 million to Shell Company Account 6, which was beneficially owned by Ng's close relative.

j.      On or about July 29, 2013, approximately $1 million was transferred from Holding Company 2 Account to an account beneficially owned and controlled by 1MDB Official 2.

k.      Also on or about July 29, 2013, approximately $1 million was transferred from Holding Company 2 Account to an account beneficially owned and controlled by 1MDB Official 4.

l.      On or about July 19, 2013, approximately $6 million was transferred from Holding Company 2 Account to another account beneficially owned and controlled by Leissner and his close relative, Management Company 1 Account.  Subsequently, on or about July 22, 2013, approximately $6 million was transferred from Management Company 1 Account to an account beneficially owned and controlled by 1MDB Official 3.

m.      On or about June 27, 2013, Low transferred approximately $30 million from an account he beneficially owned and controlled to an account beneficially owned and controlled by UAE Official 1.

### Other Anticipated 1MDB Deals

65.      After the bond deals were complete, Goldman continued to pursue 1MDB business, including a role in the anticipated 1MDB Energy IPO.  In the pursuit of that additional business, in or about September 2013, Goldman hosted a roundtable in New York for Malaysian Official 1.  Several senior Goldman executives, Leissner, Low, 1MDB Official 3 and others were

scheduled to attend this meeting, though Low did not ultimately attend.  However, during that trip, a New York jeweler ("Jeweler 1") met with Low and the wife of Malaysian Official 1 in a hotel suite at the Mandarin Oriental Hotel in New York, New York, to show the wife of Malaysian Official 1 a piece of expensive jewelry that Jeweler 1 had designed for her at Low's request.

66.     On or about January 13, 2014, 1MDB invited Goldman to submit a proposal to provide services to 1MDB in connection with the IPO.  Goldman worked on the proposed IPO through 2014, during which time Low and Leissner continued to make or promise corrupt payments to government officials, including from Project Catalyze's misappropriated proceeds.

67.     On or about June 2, 2014, Leissner sent an email to himself at his personal email account containing a chat between himself and Low in which the two discussed 1MDB business opportunities that Goldman was trying to win at the time, including the IPO. Specifically, they discussed how to manage officials at 1MDB to steer additional business to Goldman, including getting Goldman to serve as a Joint Global Coordinator for the IPO.

a.     For example, Low stated that 1MDB Official 2 and another high-ranking 1MDB official were unhappy with Goldman for not "deliver[ing]" a loan to 1MDB in 2013, which was ultimately provided by Foreign Financial Institution F.  As a result, according to Low, 1MDB would only give Goldman a more limited role in the IPO.  Leissner responded that he "would have delivered" the loan, and expressed frustration that Goldman was concerned about issues related to 1MDB's delayed financial reporting at the time, declaring "Committee is stupid!!!"

b.      Low and Leissner then agreed that Leissner would "babysit" 1MDB Official 2 and the high-ranking 1MDB official, and Low would "manage via [1MDB Board of Directors]."  Leissner also noted that neither named official provided "much of value" but that they "need[ed] to suck up to them."

c.      Low and Leissner also discussed sending "cakes" to "madam boss" and Low asked if he could transfer money to Management Company 1 Account so that Leissner could "settle madam cakes 2."  Low asked Leissner, "Do u mind if funds go [from] [Shell Company 1] to u [sic] direct at [Management Company 1]?  Or u [sic] think too sensitive?"  Leissner responded, "[Shell Company 1] is ok too.  But need to get it out asap.  Best today.  Because I am seriously in trouble."

d.      Low and Leissner further discussed Leissner's continued efforts to onboard Low as a formal Goldman client.  Leissner explained he would "push harder" for Low once Leissner was confirmed as Goldman's Southeast Asia Chairman of the Investment Banking Division.

68.     On or about June 2, 2014, approximately $1.215 million was transferred from Shell Company Account 8 to Management Company 1 Account.

69.     On or about October 10, 2014, Leissner caused approximately $4.1 million to be transferred from Management Company 1 Account to Jeweler 1 in New York, New York, in part to pay for approximately $1.3 million in jewelry that had been purchased on or about January 3, 2014 by the wife of Malaysian Official 1 while she, Malaysian Official 1 and Low were in the United States.

70.     On or about October 14, 2014, Leissner transferred approximately $600,000 from Holding Company 2 Account to an account beneficially owned and controlled by Abu Dhabi Official 2 and his close relative.

71.     Also on or about October 14, 2014, Leissner transferred approximately $3.5 million from Holding Company 2 Account to the business account of an associate of Malaysian Official 1's relative.

### Additional Failures of Goldman's Control Functions

72.     After the bond deals were completed, in or about and between March 2013 and February 2016, additional red flags were raised in the press and on internal phone calls among Goldman's employees and executives about Low's involvement in the deals and the possible payment of bribes in connection with the deals.  Goldman failed to investigate these red flags or to perform an internal review of its role in the bond deals despite the clear implication that the deals had involved criminal wrongdoing.  Further, high ranking employees of Goldman failed to escalate concerns about bribery and other criminal conduct related to the bond deals pursuant to Goldman's escalation policy, which required that any Goldman employee who became aware of any conduct that could raise, among others, "a legal, compliance, reputational, ethical, accounting, [or] internal accounting control" issue to report such conduct immediately to a supervisor and Goldman's control functions.

73.     Specifically, in or about May 2013, a Goldman PMD ("Employee 3") who had been involved in the 1MDB deals, discussed the deals in a series of phone calls with Goldman senior executives that were recorded on Goldman phone lines.  For example, on or about May 8, 2013, Employee 3 called a senior Goldman executive about, among other things, Project Catalyze.  Employee 3 stated, "the main reason for the delay for [IPIC] not having

funded their three billion into the JV with 1MDB is [Abu Dhabi Official 1] is trying to get something on the side in his pocket." He continued later, "I think it's quite disturbing to have come across this piece of information . . . ." The senior Goldman executive replied, "What's disturbing about that? It's nothing new, is it?" In response, Employee 3 agreed that the situation was nothing new. Employee 3 had at least one substantially similar phone conversation with at least one other senior Goldman executive.

74. Subsequently, in May 2015 and again in October 2015, amid negative media reporting linking Low with the 1MDB bond deals and Malaysian Official 1, Goldman executives and employees discussed Low's involvement in the 1MDB deals. For example, on a recorded call on or about October 13, 2015, Employee 3 told the senior Goldman executive that a senior IPIC officer had informed his subordinate that "there are a number of key people who are involved in, let's call it the situation. [Abu Dhabi Official 1] is one. Jho Low for sure. He thinks Jho Low is the leader of the pack. And he has a very strong view that [Leissner] is involved." The control functions never took steps to address these red flags.

75. There were also subsequent emails and recorded phone calls between Employee 3 and senior Goldman executives in the control functions about the disparity between how due diligence and risk issues were handled on various deals. In particular, they discussed the unusual latitude granted to certain employees, such as Leissner and Employee 1.

76. For example, in or about January 2016, on a recorded call between Employee 2, who had been involved in BIG's review of each of the relevant transactions, and Employee 3, they discussed, among other things, Leissner's conduct, including Leissner's false statements that Low was not involved in the 1MDB deals. Employee 2 then noted that there were several similarly "problematic" people from a compliance perspective at Goldman, and

29

Employee 3 agreed, immediately mentioning Employee 1 as an example of a "problematic" person.  Employee 3 also noted the "double standard" between the minor repercussions meted out to favored employees like Leissner and Employee 1 when they got caught trying to circumvent the control functions, and the more serious repercussions to other, less favored employees who engaged in similar behavior.  Employee 2 agreed, stating, "Yes, double standard, and it looks stupid."  In the course of the call, Employee 2 also noted that Leissner's email communications had been searched as part of an internal investigation into a separate incident involving the use of an intermediary that occurred subsequent to the 1MDB deals, which Employee 2 stated "seems to me should have been done ages ago."  Employee 3 similarly discussed on a recorded call in or about February 2016 with a high-ranking employee in compliance and MD how repercussions for control functions violations varied radically between deals.

### Goldman's Other Low-Related Deals and Contacts

77.     The 1MDB bond deals and underlying acquisitions were not the only Low-related transactions that Goldman engaged in during the relevant period.  Despite the negative view that Goldman's control functions took of Low, there were numerous potential and completed deals with which Low was involved in some manner.

78.     For example, Goldman served as an advisor on a deal in or about 2013 where a Low-related entity was one of the original clients.  The deal was not submitted for due diligence review until it was substantially finalized.  At that point, BIG raised concerns about the involvement of the Low-related entity and advised the deal team that the deal should not proceed if Low was involved as a client, received a fee or had an active role in the deal.  Through his relationship with Abu Dhabi Official 1, Low arranged for another entity to become Goldman's

putative client.  However, Low remained in the deal as a co-investor and an active participant.

Goldman deal team members knew this was merely a technical change in the deal structure, and

knew but did not inform BIG of Low's continued involvement in the deal.  BIG employees were

later surprised to see press reports that the deal had been completed with Low's involvement in

late 2013.  The deal resulted in a multi-million dollar fee for Goldman.  Goldman's control

functions performed no additional review after the deal was completed.

79.      In addition, senior executives at Goldman had continuing contact with

Low during the relevant period.  These contacts included, but were not limited to, a meeting in or

about 2009 between a senior Goldman executive and PMD and Malaysian Official 1 that was

arranged by Low; a meeting in or about 2012 that was attended by a Goldman senior executive,

Abu Dhabi Official 2 and Low, among others; and a meeting on a yacht in Southern France in or

about 2013 attended by another senior Goldman executive and PMD, Leissner, Malaysian

Official 1 and Low, among others.

**ATTACHMENT B**

**CERTIFICATE OF CORPORATE RESOLUTIONS**

WHEREAS, The Goldman Sachs Group, Inc. (the "Company") has been engaged in discussions with the United States Department of Justice, Criminal Division, Fraud Section and Money Laundering and Asset Recovery Section, and the United States Attorney's Office for the Eastern District of New York (collectively, the "Offices") regarding issues arising in relation to certain improper payments to foreign officials to obtain or retain  business for the Company; and

WHEREAS, in order to resolve such discussions, it is proposed that the Company enter into a certain agreement with the Offices; and

WHEREAS, the Company's General Counsel, Karen P. Seymour, together with outside counsel for the Company, has advised the Board of Directors of the Company of its rights, possible defenses, the Sentencing Guidelines' provisions, and the consequences of entering into such agreement with the Offices;

Therefore, the Board of Directors has RESOLVED that:

1.      The Company (a) acknowledges the filing of the Information charging the Company with one count of conspiracy to commit an offense against the United States, in violation of Title 18, United States Code, Section 371, that is, to violate the anti-bribery provisions of the Foreign Corrupt Practices Act  of 1977 ("FCPA"), as amended, Title 15, United States Code, Sections 78dd-1, 78dd-2, and 78dd-3; (b) waives indictment on such charges and enters into a deferred prosecution agreement with the Offices; (c) agrees to accept a monetary penalty against Company totaling  $2,315,088,000, and to pay such penalty pursuant to Paragraph 8 of the DPA

with respect to the conduct described in the Information; (d) agrees to pay disgorgement in the amount of $606 million pursuant to Paragraph 8 of the DPA with respect to the conduct described in the Information;

2.      The Company accepts the terms and conditions of this Agreement, including, but not limited to, (a) a knowing waiver of its rights to a speedy trial pursuant to the Sixth Amendment to the United States Constitution, Title 18, United States Code, Section 3161, and Federal Rule of Criminal Procedure 48(b); and (b) a knowing waiver for purposes of this Agreement and any charges by the United States arising out of the conduct described in the Statement of Facts of any objection with respect to venue and consents to the filing of the Information, as provided under the terms of this Agreement, in the United States District Court for the Eastern District of New York; and (c) a knowing waiver of any defenses based on the statute of limitations for any prosecution relating to the conduct described in the Statement of Facts, or relating to conduct known to the Offices prior to the date on which this Agreement was signed, that is not time-barred by the applicable statute of limitations on the date of the signing of this Agreement;

3.      The General Counsel of the Company, Karen P. Seymour, is hereby individually authorized, empowered and directed, on behalf of the Company, to execute the Deferred Prosecution Agreement substantially in such form as reviewed by this Board of Directors at this meeting with such changes as the General Counsel of the Company, Karen P. Seymour, may approve;

4.      The General Counsel of the Company, Karen P. Seymour, is hereby individually authorized, empowered and directed to take any and all actions as may be necessary or appropriate and to approve the forms, terms or provisions of any agreement or other documents as may be

B-2

necessary or appropriate, to carry out and effectuate the purpose and intent of the foregoing resolutions; and

      5.      All of the actions of the General Counsel of the Company, Karen P. Seymour, which actions would have been authorized by the foregoing resolutions except that such actions were taken prior to the adoption of such resolutions, are hereby severally ratified, confirmed, approved, and adopted as actions on behalf of the Company.

Date: _10/22/20_

By: _____

David M. Solomon
Chairman, Board of Directors
The Goldman Sachs Group, Inc.

B-3

## ATTACHMENT C

## <u>CORPORATE COMPLIANCE PROGRAM</u>

In order to address any deficiencies in its internal controls, compliance code, policies, and procedures regarding compliance with the Foreign Corrupt Practices Act ("FCPA"), 15 U.S.C. §§ 78dd-1, *et seq.,* and other applicable anti-corruption laws, The Goldman Sachs Group, Inc. (the "Company") agrees to continue to conduct, in a manner consistent with all of its obligations under this Agreement, appropriate reviews of its existing internal controls, policies, and procedures.

Where necessary and appropriate, the Company agrees to adopt new, or to modify or maintain its existing compliance programs, including internal controls, compliance policies, and procedures in order to ensure that it maintains: (a) an effective system of internal accounting controls designed to ensure the making and keeping of fair and accurate books, records, and accounts; and (b) a rigorous anti-corruption compliance program that incorporates relevant internal accounting controls, as well as policies and procedures designed to effectively detect and deter violations of the FCPA and other applicable anti-corruption laws.  At a minimum, this should include, but not be limited to, the following elements to the extent they are not already part of the Company's existing internal controls, compliance code, policies, and procedures:

*Commitment to Compliance*

1. The Company will ensure that its directors and senior management provide strong, explicit, and visible support and commitment to its corporate policy against violations of the anti-corruption laws and its compliance codes, and demonstrate rigorous adherence by example.   The Company will also ensure that middle management, in turn, reinforce those standards and

encourage employees to abide by them. The Company will create and foster a culture of ethics and compliance with the law in its day-to-day operations at all levels of the company.

*Policies and Procedures*

2.     The Company will develop and promulgate a clearly articulated and visible corporate policy against violations of the FCPA and other applicable foreign law counterparts (collectively, the "anti-corruption laws"), which policy shall be memorialized in a written compliance code or codes.

3.     The Company will develop and promulgate compliance policies and procedures designed to reduce the prospect of violations of the anti-corruption laws and the Company's compliance code, and the Company will take appropriate measures to encourage and support the observance of ethics and compliance policies and procedures against violation of the anti-corruption laws by personnel at all levels of the Company. These anti-corruption policies and procedures shall apply to all directors, officers, and employees and, where necessary and appropriate, outside parties acting on behalf of the Company in a foreign jurisdiction, including, but not limited to, agents and intermediaries, consultants, representatives, distributors, teaming partners, contractors and suppliers, consortia, and joint venture partners (collectively, "agents and business partners"). The Company shall notify all employees that compliance with the policies and procedures is the duty of individuals at all levels of the company. Such policies and procedures shall address:

a.     gifts;

b.     hospitality, entertainment, and expenses;

c.     customer travel;

C-2

       d.     political contributions;

       e.     charitable donations and sponsorships;

       f.     facilitation payments; and

       g.     solicitation and extortion.

4.     The Company will ensure that it has a system of financial and accounting procedures, including a system of internal controls, reasonably designed to ensure the maintenance of fair and accurate books, records, and accounts.  This system shall be designed to provide reasonable assurances that:

       a.     transactions are executed in accordance with management's general or specific authorization;

       b.     transactions are recorded as necessary to permit preparation of financial statements in conformity with generally accepted accounting principles or any other criteria applicable to such statements, and to maintain accountability for assets;

       c.     access to assets is permitted only in accordance with management's general or specific authorization; and

       d.     the recorded accountability for assets is compared with the existing assets at reasonable intervals and appropriate action is taken with respect to any differences.

*Periodic Risk-Based Review*

5.     The Company will develop these compliance policies and procedures on the basis of a periodic risk assessment addressing the individual circumstances of the Company, in particular the foreign bribery risks facing the Company, including, but not limited to, its geographical organization, interactions with various types and levels of government officials, industrial sectors

C-3

of operation, potential clients and business partners, use of third parties, gifts, travel and entertainment expenses, charitable and political donations, involvement in joint venture arrangements, importance of licenses and permits in the Company's operations, degree of governmental oversight and inspection, and volume and importance of goods and personnel clearing through customs and immigration.

6.     The Company shall review its anti-corruption compliance policies and procedures no less than annually and update them as appropriate to ensure their continued effectiveness, taking into account relevant developments in the field and evolving international and industry standards.

### *Proper Oversight and Independence*

7.     The Company will assign responsibility to one or more senior corporate executives of the Company for the implementation and oversight of the Company's anti-corruption compliance code, policies, and procedures.  Such corporate official(s) shall have the authority to report directly to independent monitoring bodies, including internal audit, the Company's Board of Directors, or any appropriate committee of the Board of Directors, and shall have an adequate level of stature and autonomy from management as well as sufficient resources and authority to maintain such autonomy.

### *Training and Guidance*

8.     The Company will implement mechanisms designed to ensure that its anti-corruption compliance code, policies, and procedures are effectively communicated to all directors, officers, employees, and, where necessary and appropriate, agents and business partners. These mechanisms shall include: (a) periodic training for all directors and officers, all employees in positions of leadership or trust, positions that require such training (e.g., internal audit, sales,

C-4

legal, compliance, finance), or positions that otherwise pose a corruption risk to the Company, and, where necessary and appropriate, agents and business partners; and (b) corresponding certifications by all such directors, officers, employees, agents, and business partners, certifying compliance with the training requirements. The Company will conduct training in a manner tailored to the audience's size, sophistication, or subject matter expertise and, where appropriate, will discuss prior compliance incidents.

9.      The Company will maintain, or where necessary establish, an effective system for providing guidance and advice to directors, officers, employees, and, where necessary and appropriate, agents and business partners, on complying with the Company's anti-corruption compliance code, policies, and procedures, including when they need advice on an urgent basis or in any foreign jurisdiction in which the Company operates.

*Internal Reporting and Investigation*

10.      The Company will maintain, or where necessary establish, an effective system for internal and, where possible, confidential reporting by, and protection of, directors, officers, employees, and, where appropriate, agents and business partners concerning violations of the anti-corruption laws or the Company's anti-corruption compliance code, policies, and procedures.

11.      The Company will maintain, or where necessary establish, an effective and reliable process with sufficient resources for responding to, investigating, and documenting allegations of violations of the anti-corruption laws or the Company's anti-corruption compliance code, policies, and procedures. The Company will handle the investigations of such complaints in an effective manner, including routing the complaints to proper personnel, conducting timely and thorough investigations, and following up with appropriate discipline where necessary.

*Enforcement and Discipline*

12.     The Company will implement mechanisms designed to effectively enforce its compliance code, policies, and procedures, including appropriately incentivizing compliance and disciplining violations.

13.     The Company will institute appropriate disciplinary procedures to address, among other things, violations of the anti-corruption laws and the Company's anti-corruption compliance code, policies, and procedures by the Company's directors, officers, and employees.   Such procedures should be applied consistently, fairly and in a manner commensurate with the violation, regardless of the position held by, or perceived importance of, the director, officer, or employee. The Company shall implement procedures to ensure that where misconduct is discovered, reasonable steps are taken to remedy the harm resulting from such misconduct, and to ensure that appropriate steps are taken to prevent further similar misconduct, including assessing the internal controls, compliance code, policies, and procedures and making modifications necessary to ensure the overall anti-corruption compliance program is effective.

*Third-Party Relationships*

14.     The Company will institute appropriate risk-based due diligence and compliance requirements pertaining to the retention and oversight of all agents and business partners, including:

a.     properly documented due diligence pertaining to the hiring and appropriate and regular oversight of agents and business partners;

C-6

b.      informing agents and business partners of the Company's commitment to abiding by anti-corruption laws, and of the Company's anti-corruption compliance code, policies, and procedures; and

c.      seeking a reciprocal commitment from agents and business partners.  The Company will understand and record the business rationale for using a third party in a transaction, and will conduct adequate due diligence with respect to the risks posed by a third-party partner such as a third-party partner's reputations and relationships, if any, with foreign officials.  The Company will ensure that contract terms with third parties specifically describe the services to be performed, that the third party is actually performing the described work, and that its compensation is commensurate with the work being provided in that industry and geographical region.  The Company will engage in ongoing monitoring of third-party relationships through updated due diligence, training, audits, and/or annual compliance certifications by the third party.

15.     Where necessary and appropriate, the Company will include standard provisions in agreements, contracts, and renewals thereof with all agents and business partners that are reasonably calculated to prevent violations of the anti-corruption laws, which may, depending upon the circumstances, include:  (a) anti-corruption representations and undertakings relating to compliance with the anti-corruption laws; (b) rights to conduct audits of the books, records, and accounts of the agent or business partner to ensure compliance with the foregoing; and (c) rights to terminate an agent or business partner as a result of any breach of the anti-corruption laws, the Company's compliance code, policies, or procedures, or the representations and undertakings related to such matters.

C-7

*Mergers and Acquisitions*

16.     The Company will develop and implement policies and procedures for mergers and acquisitions requiring that the Company conduct appropriate risk-based due diligence on potential new business entities, including appropriate FCPA and anti-corruption due diligence by legal, accounting, and compliance personnel.

17.     The Company will ensure that the Company's compliance code, policies, and procedures regarding the anti-corruption laws apply as quickly as is practicable to newly acquired businesses or entities merged with the Company and will promptly:

a.     train the directors, officers, employees, agents, and business partners consistent with Paragraph 8 above on the anti-corruption laws and the Company's compliance code, policies, and procedures regarding anti-corruption laws; and

b.     where warranted, conduct an FCPA-specific audit of all newly acquired or merged businesses as quickly as practicable.

*Monitoring, Testing, and Remediation*

18.     In order to ensure that its compliance program does not become stale, the Company will conduct periodic reviews and testing of its anti-corruption compliance codes, policies, and procedures designed to evaluate and improve their effectiveness in preventing and detecting violations of anti-corruption laws and the Company's anti-corruption codes, policies, and procedures, taking into account relevant developments in the field and evolving international and industry standards.  Company will ensure that compliance and control personnel have sufficient direct or indirect access to relevant sources of data to allow for timely and effective monitoring and/or testing of transactions.  Based on such review and testing and its analysis of

C-8

any prior misconduct, the Company will conduct a thoughtful root cause analysis and timely and appropriately remediate to address the root causes.

**ATTACHMENT D**

**REPORTING REQUIREMENTS**

The Company agrees that it will report to the Offices periodically, at no less than twelve-month intervals during a three-year term, regarding remediation and implementation of the compliance program and internal controls, policies, and procedures described in Attachment C. During this three-year period, the Company shall: (1) conduct an initial review and submit an initial report, and (2) conduct and prepare at least two follow-up reviews and reports, as described below:

a.      By no later than one year from the date this Agreement is executed, the Company shall submit to the Offices a written report setting forth a complete description of its remediation efforts to date, its proposals reasonably designed to improve the Company's internal controls, policies, and procedures for ensuring compliance with the FCPA and other applicable anti-corruption laws, and the proposed scope of the subsequent reviews.  The report shall be transmitted to Chief, FCPA Unit, Fraud Section, Criminal Division, U.S. Department of Justice, 1400 New York Avenue, NW, 11th Floor, Washington, D.C. 20005; Chief, Bank Integrity Unit, Money Laundering and Asset Recovery Section, Criminal Division, U.S. Department of Justice, 1400 New York Avenue NW, Washington, D.C. 20005; and Chief, Business and Securities Fraud Section, U.S. Attorney's Office for the Eastern District of New York, 271-A Cadman Plaza East, Brooklyn, New York, 11201.  The Company may extend the time period for issuance of the report with prior written approval of the Offices.

b.      The Company shall undertake at least two follow-up reviews and reports, incorporating the Offices' views on the Company's prior reviews and reports, to further monitor

D-1

and assess whether the Company's policies and procedures are reasonably designed to detect and prevent violations of the FCPA and other applicable anti-corruption laws.

        c.     The first follow-up review and report shall be completed by no later than one year after the initial report is submitted to the Offices.  The second follow-up review and report shall be completed and delivered to the Offices no later than thirty days before the end of the Term.

        d.     The reports will likely include proprietary, financial, confidential, and competitive business information.  Moreover, public disclosure of the reports could discourage cooperation, impede pending or potential government investigations and thus undermine the objectives of the reporting requirement.  For these reasons, among others, the reports and the contents thereof are intended to remain and shall remain non-public, except as otherwise agreed to by the parties in writing, or except to the extent that the Offices determine in their sole discretion that disclosure would be in furtherance of the Offices' discharge of their duties and responsibilities or is otherwise required by law.

        e.     The Company may extend the time period for submission of any of the follow-up reports with prior written approval of the Offices.

D-2

**ATTACHMENT E**

**CERTIFICATION**

To:     United States Department of Justice
        Criminal Division, Fraud Section
        Attention: Chief – FCPA Unit

        United States Department of Justice
        Criminal Division, Money Laundering and Asset Recovery Section
        Attention: Chief – Bank Integrity Unit

        United States Attorney's Office
        Eastern District of New York
        Attention: Chief – Business and Securities Fraud Section

Re:     Deferred Prosecution Agreement Disclosure Certification

The undersigned certify, pursuant to Paragraph 21 of the Deferred Prosecution Agreement ("DPA") filed on October 22, 2020, in the U.S. District Court for the Eastern District of New York, by and between the United States and The Goldman Sachs Group, Inc. (the "Company"), that undersigned are aware of the Company's disclosure obligations under Paragraph 6 of the DPA and that undersigned have disclosed to the Criminal Division's Fraud Section and Money Laundering and Asset Recovery Section, and the United States Attorney's Office for the Eastern District of New York (collectively, the "Offices") any and all evidence or allegations of conduct required pursuant to Paragraph 6 of the DPA, which includes evidence or allegations that may constitute a violation of the money laundering laws that involve the employees or agents of the Company, or evidence or allegations that may constitute a violation of the FCPA's anti-bribery or accounting provisions had the conduct occurred within the jurisdiction of the United States ("Disclosable Information").   This obligation to disclose information extends to any and all Disclosable Information that has been identified through the Company's compliance and controls program, whistleblower channel, internal audit reports, due diligence procedures, investigation process, or other processes.  The undersigned further acknowledge and agree that the reporting requirement contained in Paragraph 6 and the representations contained in this certification constitute a significant and important component of the DPA and the Offices' determination whether the Company has satisfied its obligations under the DPA.

The undersigned hereby certify respectively that he is the Chief Executive Officer ("CEO") of the Company and that he is the Chief Financial Officer ("CFO") of the Company and that each has been duly authorized by the Company to sign this Certification on behalf of the Company.

E-1

This Certification shall constitute a material statement and representation by the undersigned and by, on behalf of, and for the benefit of, the Company to the executive branch of the United States for purposes of 18 U.S.C. § 1001, and such material statement and representation shall be deemed to have been made in the Eastern District of New York. This Certification shall also constitute a record, document, or tangible object in connection with a matter within the jurisdiction of a department and agency of the United States for purposes of 18 U.S.C. § 1519, and such record, document, or tangible object shall be deemed to have been made in the Eastern District of New York.

By: _____        Dated: _____
        David M. Solomon
        Chief Executive Officer
        The Goldman Sachs Group, Inc.


By: _____        Dated: _____
        Stephen M. Scherr
        Chief Financial Officer
        The Goldman Sachs Group, Inc.

E-2