UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

- v. -

NG CHONG HWA a.k.a. Roger Ng,

Defendant.

No. 18-cr-538 (S-1) (MKB)

**ORAL ARGUMENT REQUESTED**

**REPLY MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT
ROGER NG'S MOTION TO DISMISS THE INDICTMENT AND OTHER
RELIEF**

**BRAFMAN & ASSOCIATES, P.C.**
767 Third Avenue, 26th Floor
New York, NY 10017
(212) 750-7800

Marc A. Agnifilo, Esq.
Zach Intrater, Esq.
Teny R. Geragos, Esq.
Jacob Kaplan, Esq.
*Of Counsel*

*Attorneys for Defendant Roger Ng*

**Table of Contents**

INTRODUCTION ................................................................................................... 1

I.    The Government's November 13, 2020 Letter ............................................ 1

II.   The Government's Memorandum In Opposition ........................................ 2

III.  The Superseding Indictment ..................................................................... 2

ARGUMENT ......................................................................................................... 3

I.    THE SUPERSEDING INDICTMENT IS PROHIBITED BY A WRITTEN CONTRACT BETWEEN ROGER NG AND THE GOVERNMENT ON WHICH ROGER NG RELIED; THE SUPERSEDING INDICTMENT MUST BE DISMISSED .............................................. 3

II.   THE GOVERNMENT'S RESPONSE UNDERSCORES THAT VENUE IS INAPPROPRIATE IN THIS DISTRICT ....................................................................... 9

    A.   There Is No Act in Furtherance of a Crime Charged in This District .......................... 12

    B.   Roger Ng Had No Reason to Foresee an Act in the EDNY ......................... 16

    C.   There Are No Substantial Contacts With the EDNY .................................... 19

III.  COUNT TWO MUST BE DISMISSED BECAUSE THE INDICTMENT FAILS TO ALLEGE THAT NG CONSPIRED TO CIRCUMVENT A SET OF INTERNAL ACCOUNTING CONTROLS COGNIZABLE UNDER THE FCPA .................................... 20

IV.  COUNT THREE MUST BE DISMISSED FOR FAILURE TO PROVIDE WHAT THE CONSTITUTION REQUIRES OF AN INDICTMENT ................................................. 24

V.   THE GOLDMAN DEFERRED PROSECUTION AGREEMENT SHOULD BE MODIFIED BECAUSE CERTAIN PROVISIONS WILL VIOLATE NG'S CONSTUTIONAL RIGHTS AT TRIAL ................................................................... 33

VI.  THE COURT SHOULD ORDER TO GOVERNMENT TO PROMPTLY PROVIDE BRADY MATERIAL IN ITS POSSESSION ................................................................. 38

    A.   The November 13 Letter Details Unproduced Brady and Rule 16 Material ............... 39

        1.   Goldman's Controls .......................................................................... 40

        2.   Goldman's Compliance ..................................................................... 42

        3.   Goldman's Review of Ng's Emails and Electronic Information Reveal No Incriminating Information Whatsoever – And Goldman Received Cooperation Credit for Providing "All Relevant Facts" to the Government ................................................................. 45

        4.   Ng Never Worked on Project Catalyze .............................................. 47

        5.   Ng Was Not Employed by Any "Issuer" ........................................... 47

    B.   The November 13 Letter Details Unproduced Giglio .................................. 48

        1.   Leissner's Giglio ................................................................................. 48

        2.   Goldman's Giglio ............................................................................... 50

        3.   Other Witnesses' Giglio ..................................................................... 51

C.   The Statement of Facts Indicates There May Be Unproduced Brady or Rule 16 Material With Yet Other Entities; Ng Is Entitled to It All ................................................... 51

D.   The Government's Opposition Does Nothing to Refute Ng's Identification of Unproduced Brady and Rule 16 Material ............................................................... 52

CONCLUSION .................................................................................................................... 57

<u>**INTRODUCTION**</u>

The procedural posture has become complicated in this case, and so this document cannot be simply a standard reply brief. Instead, as discussed during the Court conference on December 10, 2020, Roger Ng must raise topics for the first time. First, the Superseding Indictment should be dismissed because it is contrary to a written agreement entered into by the Department of Justice and Roger Ng. Second, a letter provided by the Government on November 13, 2020 (after Ng's initial Motion to Dismiss) demonstrates that the Government possesses or controls, but has not disclosed, <u>Brady</u> and Rule 16 material.

These new topics are necessary to raise now because of the Government's recent actions in this case. Here is the timeline: On October 22, 2020, the Government and The Goldman Sachs Group, Inc., entered a Deferred Prosecution Agreement ("DPA"). On October 30, 2020, Ng filed a Motion to Dismiss the Indictment and for other relief ("Ng's Motions"). But instead of just filing an Opposition, the Government has responded to Ng's Motions in three ways.

**I.     The Government's November 13, 2020 Letter**

The first thing the Government did was to provide Ng with a thirteen-page letter, dated November 13, 2020, containing 77 bullet-pointed paragraphs, each related to a different factual representation made by Goldman to the Government (the "November 13 Letter," attached as Exhibit 1). Many of the factual representations in the November 13 Letter are wholly inconsistent with one or more of the charged offenses and with the Government's theory of prosecution, and accordingly reveal that the Government possesses or controls <u>Brady</u> and Rule 16 material that it has not provided to Ng. The November 13 Letter appears to be the Government's legally inadequate response to Ng's Motions point VIII.B., in which the defense requested to know "what

1

Goldman has said in presentations to the Government over the past four years and how Goldman's story changed over time." (Ng Mem. at 102.)

Ng has specifically asked the Government to provide all source material in the form of witnesses and documents concerning each of the 77 factual representations in the November 13 Letter. The Government has refused. Ng has alerted the Government that even aside from potential Brady material, the Government has an obligation under Rule 16 to provide this source material as it is material to Ng's defense. As counsel stated to the Court during the December 10, 2020 conference, the Government has refused to produce these materials.

## II.    The Government's Memorandum In Opposition

The second thing the Government did was to submit a Memorandum in Opposition to the Defendant's motions on December 4, 2020. See Dkt. 54, Government's Opposition ("Gov't Opp").

## III.   The Superseding Indictment

The third thing the Government did in response to Ng's Motions was to supersede the indictment on December 9, 2020, to change Counts One and Three based on arguments in Ng's Motions. Only five days earlier, the Government had claimed these arguments were "made without any legal support," "frivolous," "meritless," "both puzzling and meritless," and "without merit." (Gov't Opp. at 15, 41, 42, 23, 3.) In Count One, the Superseding Indictment added facts and an additional legal theory. Specifically, whereas the original Indictment alleged that Ng was an "employee and agent of an issuer" (Indictment ¶ 59(a)), the Superseding Indictment adds the allegation that Ng is "an employee and an agent of an issuer, and a stockholder thereof acting on behalf of such issuer." (Superseding Indictment ¶ 59(a)). The Superseding Indictment also changes the identity of the "issuer" for FCPA purposes, from a made-up "Financial Institution A"

2

to "The Goldman Sachs Group, Inc."  (Superseding Indictment ¶ 1 and passim.)  Finally, the Superseding Indictment added factual bases, a statute, and a legal theory, inserting the statutory citation of Title 18, United States Code, Section 1956(c)(7)(B)(iv), and adding the crime of "bribery of a public official" as a potential "offense against a foreign nation" that could form the Specified Unlawful Activity underlying a money laundering offense.

But the Superseding Indictment is prohibited by an agreement between the prosecuting Offices and Roger Ng.  On February 12, 2019, prior to Ng waiving extradition in Malaysia, the Government and defense counsel reached a written agreement that precludes the Government from making any changes to the original Indictment that adds facts and/or legal theories not included in the original Indictment.  The Superseding Indictment does both, and therefore cannot stand.

## ARGUMENT

I.  **THE SUPERSEDING INDICTMENT IS PROHIBITED BY A WRITTEN CONTRACT BETWEEN ROGER NG AND THE GOVERNMENT ON WHICH ROGER NG RELIED; THE SUPERSEDING INDICTMENT MUST BE DISMISSED**

On October 30, 2018, Ng was arrested in Malaysia on a provisional arrest warrant from the United States.  The provisional arrest warrant, allowing the United States to cause the arrest of Ng by Malaysian authorities, was based on the Indictment returned by an Eastern District of New York Grand Jury on October 3, 2018 (the "Original Indictment").  A judge in Kuala Lumpur, Malaysia, ruled that based on the U.S. filings, including the Original Indictment, Ng would be incarcerated on the U.S. matter pending his extradition to the United States.

In early January 2019, the undersigned traveled to Malaysia and spoke with Ng and his Malaysian counsel.  Between early January 2019 and early February 2019, the undersigned had discussions with members of the the Department of Justice's Money Laundering and Asset

Recovery Section ("MLARS") and Fraud Section and the U.S. Attorney's Office for the Eastern District of New York ("EDNY") (collectively, "DOJ") about the possibility that Ng would waive the rights afforded him as a Malaysian citizen under the Extradition Treaty in existence between Malaysia and the United States.

One topic discussed related to a legal doctrine known as the "Rule of Specialty." Specifically, the undersigned told the DOJ that if Ng was to waive extradition, he would want an agreement providing that the DOJ could not change the Indictment after Ng waived extradition. The DOJ stated that it would seek approvals from its supervision and would present the undersigned with a letter setting forth the protections it was prepared to offer in this regard.

On Tuesday, February 12, 2019 at 8:21 PM, the undersigned received an email from the DOJ, attaching the February 12, 2019 Letter (attached as Exhibit 2). The email read, "Marc, Please find attached the final approved letter, as discussed last week." The email was sent by a Trial Attorney in the Fraud Section and it copied other DOJ representatives, including EDNY representatives. The February 12, 2019 Letter states:

> The U.S. Attorney's Office for the Eastern District of New York and the Money Laundering and Asset Recovery Section and Fraud Section of the U.S. Department of Justice's Criminal Division ("the Offices") write to confirm our understanding regarding your client Ng Chong Hwa, also known as "Roger Ng," with regard to his potential waiver of extradition to the United States in connection with the above-referenced criminal case.
>
> To the extent your client knowingly and willfully waives extradition to the United States no later than February 15, 2019 ("the Deadline"), the Offices agree that your client will not be detained, tried or punished at the request of our Offices except for (1) the offenses charged in the Indictment returned on October 3, 2018 in the above referenced case, or any lesser included offense proved by the facts on which this indictment was grounded . . . .

(Exhibit 2, at 1.)

When the February 12, 2019 Letter reached the undersigned, the undersigned was already en route to Malaysia. The undersigned met with Ng in a prison in Kuala Lumpur and, among other

things, discussed the February 12, 2019 Letter.  The terms of, and promises made in, the February 12, 2019 Letter were discussed between the undersigned, Malaysian counsel and Ng.  Ultimately, relying on the promises in the February 12, 2019 Letter, among other things, Ng decided he would waive extradition.

On Friday, February 15, 2019, Ng, Malaysian Counsel and the undersigned appeared in Court in Kuala Lumpur.  In open court on that date, Ng knowingly and willfully waived extradition to the United States, in fulfillment of his obligations under the February 12, 2019 Letter.

On or about May 3, 2019, Ng was handed over to U.S. law enforcement agents who transported him from Kuala Lumpur to Brooklyn, and he had his Initial Appearance in the EDNY on May 7, 2019.

On December 9, 2020, almost six weeks after the defense filed 122 pages of motions on the Original Indictment, the Government superseded the Indictment. Until a copy of the Superseding Indictment was provided to defense counsel at 5:51 PM on Wednesday December 9, 2020, the day before a scheduled status conference, the defense had no knowledge or forewarning that the Government was intending to supersede.  Given that the Government had promised in writing that it would not try Ng except for the offenses charged in the Original Indictment, it is, at a minimum, curious that the Government did not inform defense counsel either that it had decided to break its written promise or that it interpreted its promise in such a way as to allow a superseding indictment.  Rather, the Government superseded an Original Indictment that it promised it would not supersede, and it did so with no notice to the defense.[1]

---

[1] Had the Government advised defense counsel that it was contemplating superseding the indictment, a discussion could have taken place between defense counsel and the parties who made the written promises in the February 12, 2019 Letter.  However, the Government's actions made such a discussion impossible, leaving Ng with no options but to move to dismiss the Superseding Indictment.

Because the DOJ promised Ng in writing that it would not try him except for "the offenses charged in the indictment returned on October 3, 2018 in the above referenced case, or any lesser included offense proved by the facts on which this indictment was grounded," and because Ng relied on this promise when he waived extradition and the rights afforded him as a Malaysian citizen under the treaty between Malaysia and the United States, this Court should dismiss the Superseding Indictment because it violates the Government's written promise as reflected in the February 12, 2019 Letter.  Moreover, because the Government has dismissed the Original Indictment – the only indictment on which it may try Ng, per its written promise – this case should be dismissed.

Where, as here, the Government makes a promise, a criminal defendant relies on that promise by relinquishing fundamental rights, and the Government thereafter breaks its promise, the Supreme Court of the United States has held that the Fifth Amendment's Due Process clause is implicated.  See generally Mabry v. Johnson, 467 U.S. 504 (1984) (in the context of plea bargains); see also Palermo v. Warden, 545 F.2d 286, 296 (2d Cir. 1976) (holding that where a defendant pleads guilty because he relied on prosecution's promise, defendant has a right to have it fulfilled).

The promises made by the Government in the February 12, 2019 Letter should be analyzed as would a written plea agreement.  The promises made by the Government in each invoke due process concerns because of the fundamental rights being waived and the disparate bargaining power between the Government and the defendant.  The Second Circuit has noted that "plea agreements . . . are unique contracts in which special due process concerns for fairness and the adequacy of procedural safeguards obtain."  United States v. Ready, 82 F.3d 551, 558 (2d Cir. 1996).  Because of the Court's role in ensuring fairness to criminal defendants, including in the

6

context of promises made by the prosecution, Courts historically hold the Government "to the most meticulous standards of both promise and performance."  United States v. Lawlor, 168 F.3d 633, 636 (2d Cir. 1999).  Therefore, Courts "construe plea agreements strictly against the Government," Ready, 82 F.3d at 559, and resolve all ambiguities against the Government.  See, e.g., United States v. Mergen, 764 F.3d 199, 208–09 (2d Cir. 2014); United States v. Vergara, 62 F. Supp. 2d 1108, 1115 (S.D.N.Y. 1999)

The same is true regarding the waiver of extradition.  Once Ng waived extradition, it became an absolute certainty that he would be brought to the United States to stand trial.  By so waiving, he relinquished a broad array of legal and factual challenges, including that the Malaysian Government could find the U.S. evidence lacking, that it could find the U.S. charges inappropriate, or that the EDNY lacked venue, among many other possibilities.  Simply put, as a Malaysian citizen, by waiving extradition, Ng relinquished all hope and possibility that his country would refuse to give him over to the U.S.

The U.S. Government should not be permitted to induce reliance on a written promise and then break that promise once the defendant has waived extradition and is in the U.S.  This Court retains the authority to hold the Government to promises it makes, especially those relied upon by a criminal defendant, who, as here, relinquish fundamental rights in reliance on the Government's promise.

Ng's understanding of the February 12, 2019 letter is clear:  The Government has agreed in writing that it will not change the original offenses on which it caused Ng's arrest or the facts underlying the Original Indictment; on these understandings did he waive extradition.  Here is the precise language of the Government's promise again:  The Government agreed "that your client will not be detained, tried or punished at the request of our Offices except for (1) the offenses

7

charged in the Indictment returned on October 3, 2018 in the above referenced case, or any lesser included offense proved by the facts on which this indictment was grounded."

First, the language "offenses charged in the indictment returned on October 3, 2018" refers not to an Act of Congress (a statute). Rather, this language refers to specifically what Ng is alleged to have done – both his actions and his <u>mens rea</u> – in order to violate the charged statutes. "The term 'offense' means any criminal offense . . . which is in violation of an Act of Congress . . . ." 18 U.S.C. § 3156(a)(2). This definition shows the distinction between the offense (the person's actions and intent) on the one hand, and the Act of Congress, or statute, on the other. The Government did not agree merely to not change the <u>statutes</u> charged, it agreed to not change the <u>offenses</u> charged. By agreeing to not change the offense, the Government agreed to not add or change facts that impact on how it intends to prove that Ng violated a particular law.

This interpretation is bolstered by the next phrase, "or any lesser included offense proved by the facts on which this indictment was grounded." When read alongside the first phrase, this language makes clear that "this indictment" – the Original Indictment, the one returned October 3, 2018 – was "grounded" on particular facts ("the facts"). "[T]he facts" cannot change. Specifically, the Government has promised it will not add or change facts. Given that the facts cannot change, the only additional charge permitted relates to a "lesser included offense" based on the facts as they exist in the Original Indictment. Taken together, the two phrases convey that the Government cannot add facts to the Original Indictment, and that the only charges that can be added to that Original Indictment are lesser included offenses based on those facts. Because the Government added facts, the Superseding Indictment violates the promise the Government made, and must be dismissed.

Any ambiguity in the promises made in the letter must be construed against the Government.  This is so for two principal reasons.  First, it is a well-recognized legal maxim that ambiguity in contract language (even assuming a contract analysis applies) is construed against the drafter.  See Restatement (Second) of Contracts § 206 (1981).  Second, the Government knew it was making a promise on which a criminal defendant would rely and thereafter have no ability to be returned to the position he was in prior to the waiver.  See, e.g., Mergen, 764 F.3d at 208-09.  Together with the Government's superior bargaining position, this combination of factors results in any ambiguity in the promise it made being construed against the DOJ.

The Government clearly violated the written promise it made to not change the offenses in the Indictment.  By inducing Ng to waive extradition and then changing the offenses in the Superseding Indictment, the Government violated fundamental rights afforded Ng as a Malaysian citizen, and broke the agreement it entered into with Ng.  This Court retains full authority, under the Due Process clause, to address this matter.  We ask that the Court dismiss the Superseding Indictment.

## II. THE GOVERNMENT'S RESPONSE UNDERSCORES THAT VENUE IS INAPPROPRIATE IN THIS DISTRICT

The Government's Opposition only further illustrates that the EDNY is not a proper venue for any of the three charges in this case.  The law is clear that venue must be independently appropriate for each count of a multi-count indictment.  United States v. Bozza, 365 F.2d 206, 220-22 (2d Cir. 1966).  Like the Indictment and Superseding Indictment, the Government's response fails to allege or argue facts that would provide this District with venue for any of the three counts under the relevant precedent.

Because all three charges relate to conspiracies that the Government claims took place in more than one district, the offenses are "continuing." The law in this Circuit establishes three principal elements for venue to lie in a continuing offense. Each must be met.

First, there must be an act in the EDNY in furtherance of the crime charged. There has never been a case holding that an electrical transmission of a phone call or of a financial wire can, without more, be the basis of venue. Indeed, each of the cases cited by the Government support Ng's position that such an insignificant contact <u>cannot</u> provide the sole basis of venue.

Second, it must have been reasonably foreseeable to this particular defendant, Roger Ng, that the act in furtherance of the crime charged indeed took place in the EDNY. The Government must allege that Ng specifically foresaw that a phone conversation between him and others in Southeast Asia and Goldman bankers in Manhattan (but no one in the EDNY), or a wire transfer between Europe and Manhattan would be an act in furtherance of the crime charged taking place not in Manhattan, but in the EDNY. The cases cited below demonstrate that the Government has not alleged that venue is appropriate in the EDNY.

Third, when the Government's claim of venue in a particular district is based on a continuing offense theory – where venue may exist in multiple districts – the law in this Circuit is clear that the criminal acts in question must bear "substantial contacts" with the district. <u>United States v. Ramirez</u>, 420 F.3d 134 (2d Cir. 2005); <u>United States v. Saavedra</u>, 223 F.3d 85 (2d Cir. 2000). The Second Circuit's "substantial contacts test" considers four factors: (i) "the site of the defendant's acts, (ii) the elements and nature of the crime, (iii) the locus of the effect of the criminal conduct, and (iv) the suitability of the venue for accurate factfinding." <u>Kirk Tang Yuk</u>, 885 F.3d at 70 (<u>quoting</u> <u>United States v. Lange</u>, 834 F.3d 58, 71 (2d Cir. 2016)).

Tellingly, the Government's Opposition is silent on the critical issue of whether there are substantial contacts between the crimes alleged in the Superseding Indictment and this District. Indeed, the Government does not even attempt to craft an argument that the allegations of venue in the Superseding Indictment meet the "substantial contacts" test as created and re-emphasized by the Second Circuit.  See United States v. Svoboda, 347 F.3d 471 (2d Cir. 2003); United States v. Reed, 773 F.2d 477 (2d Cir. 1985).  This is surely because the facts alleged in the Superseding Indictment fall so resoundingly short of proper venue.  The cases applying the "substantial contacts" test demonstrate that the allegations and the Government's arguments in support of venue in this District are wholly insufficient.

The Government offers two arguments to support venue in this District.  First, that it need only allege venue in this District and need not allege specific facts.  On this point, the Government argues that "for each count, the Indictment properly alleges that the crime occurred 'within the Eastern District of New York and elsewhere'. . . .  Nothing else is required."  (Gov't Opp. at 8.) The Government is incorrect.  The case law is clear that the Government must "allege with specificity that the charged acts support venue in this District."  United States v. Wilson, Crim. A. No. 01-53 (DLC), 2001 WL 798018, at *4 (S.D.N.Y. July 13, 2001) (emphasis added); United States v. Martino, Crim. A. No. 00-389 (RCC), 2000 WL 1843233, at *1 (S.D.N.Y. Dec. 14, 2000); United States v. Szur, Crim. A. No. 97-108 (JGK), 1998 WL 132942, at *9 (S.D.N.Y. Mar 20, 1998); see also United States v. Long, 697 F. Supp. 651, 655 (S.D.N.Y. 1988).

These holdings are consistent with Federal Rule of Criminal Procedure 12, which provides that a venue challenge "must be raised by pretrial motion if the basis for the motion is then reasonably available and the motion can be determined without a trial on the merits."  Fed. R. Crim. P. 12(b)(3)(A)(i).  The Government's argument that the defendant may not raise improper

11

venue as a pretrial motion, therefore, is directly contradicted by Rule 12(b)(3)(A)(i).  Not only is Ng able to raise improper venue now, the Rules provide that he must do so if, as here, the motion can be determined without a trial.

The Government's second argument is that the Superseding Indictment sufficiently alleges facts establishing venue in this District.  The Superseding Indictment alleges five particular facts that provide the sole basis for venue in this District.  The Government's Opposition argued that based solely on those five facts, venue is appropriate.  For the reasons stated below, however, the five alleged acts, even assuming each of them to be true,  are wholly inadequate to establish venue in this District.  See United States v. Alfonso, 143 F.3d 772 (2d Cir. 1998).

The Government argues that solely because electrical transmissions of three wire transactions and two phone calls passed below New York harbor (considered part of both the Eastern and Southern Districts of New York) on their way to and from Manhattan, that the EDNY has venue over the FCPA Bribery, FCPA Internal Accounting Controls, and Money Laundering conspiracy charges, even though absolutely nothing else is alleged in the Superseding Indictment or argued in the response to have happened in the EDNY, and even though there is no allegation or factual argument of an effect or intended effect in this District.

The cases in this area are resoundingly clear that the Government is simply wrong.  The Government is wrong as to each of the three requirements for venue, any one of which alone would be enough to defeat venue in this District.  The three requirements will be reviewed in order.

A.    There Is No Act in Furtherance of a Crime Charged in This District

The Government's contention that an electrical impulse relating to a financial wire or phone call passing through a District can alone give rise to venue is not supported by a single case.

Indeed, all cases considering the so-called "pass through" approach to venue have rejected venue on that basis.

In United States v. Brennan, 183 F.3d 139 (2d Cir. 1999), the Second Circuit addressed and rejected the precise argument the Government makes here. In Brennan, an EDNY case, the Government asserted venue in a mail fraud case "because the mailings underlying each count of conviction 'traveled through' the Eastern District. Each of the mailings was either sent from [defendant Brennan's company]'s offices in lower Manhattan . . . to Texas, France or England or was received at the Manhattan offices from Texas, Seattle or California. It is undisputed that none of the letters was sent from or received in the Eastern District." Id. at 144. The Government in Brennan claimed venue over mail fraud counts because the mail was loaded from or to airplanes at Kennedy and Laguardia Airports in the EDNY in the course of being brought from or to the Manhattan offices. The Court held that because "the Government does not contend that the defendants either devised or executed the fraud in the Eastern District of New York," the fact alone that the mail comprising the mail fraud counts passed through the district on its way to or from somewhere else was an insufficient basis to confer venue. Id. at 145.

Brennan alone defeats the Government's theory of venue here. As in Brennan, the Government concedes that none of the co-conspirators devised or executed the FCPA bribery conspiracy, the FCPA accounting controls conspiracy or the money laundering conspiracy offenses in this District, aside from electrical impulses from three financial wires and two phone calls passing across the world and below the harbor. But Brennan disposed of this "pass through" theory, and holds that without more, a piece of mail (or in this case, a watt or joule or ampere of electricity) passing through a district on its way around the globe does not confer venue.

Even aside from (and perhaps because of) Brennan, there has never been any other case holding venue appropriate based on the kind of "pass through" alleged as the sole basis of venue in this case. Each of the cases cited by the Government are either readily distinguishable because they include active conspirators being physically present in the district, a fact undisputedly lacking here, or affirmatively hold against venue in this case.

United States v. Kirk Tang Yuk, 885 F.3d 57 (2d Cir. 2018), cited repeatedly by the Government, is factually distinct from the instant case. The first critical distinction is that in Kirk Tang Yuk, one of the co-conspirators, Jackson, made a phone call from a location within the SDNY (indeed, from the SDNY Courthouse itself), which was the district of prosecution, after he agreed to cooperate. The other distinction is that Jackson himself, while an active co-conspirator, looking to distribute drugs in New York City generally, brought drugs across "the Narrows" from Staten Island to Brooklyn. The Court found that the combination of (i) Jackson physically being present in the SDNY when he made a phone call to a co-conspirator, (ii) the co-conspirator purposefully driving to New York City with 25 kilograms of cocaine to be distributed, and (iii) the co-conspirator and the 25 kilograms of cocaine physically passing over the Southern District of New York, was enough to establish venue in the SDNY. Accordingly, because there is no allegation that a co-conspirator was present in the EDNY in this case, among other factual distinctions, the facts in Kirk Tang Yuk are very different from those here. The Government in this case does not argue, nor does the Superseding Indictment allege, that any co-conspirator set foot in the EDNY during the course of the conspiracy, nor did anything happen in this District aside from the "pass through" of electrical impulses on their way around the world. So, to the extent that the Government suggests that the holding in Kirk Tang Yuk helps them, it is factually distinct and

14

stands for the proposition, not relevant here, that physical presence of a conspirator in the district at issue confers venue.

Another case that does not help the Government is United States v. Tzolov, 642 F.3d 314 (2d Cir. 2011).  In Tzolov, the defendants made fraudulent statements via phone or email from Credit Suisse's Madison Avenue office in the SDNY to investors elsewhere, and then one of the co-conspirators (Butler) boarded a plane in the EDNY.  The Court found this to be sufficient to give the EDNY venue on securities fraud conspiracy and wire fraud conspiracy counts but only because Butler physically entered the EDNY in the course of the offense.  Tzolov, 642 F.3d at 319-320.  As with Kirk Tang Yuk, the distinguishing characteristic of Tzolov is that a conspirator himself entered the EDNY to use the airport as an overt act of the conspiracy.  Notably, the Court found insufficient venue on substantive counts.

The Second Circuit's holding in United States v. Kim, 246 F.3d 186 (2d Cir. 2001), is likewise easily distinguishable because in Kim, the faxes and wire transfers to and from locations in the SDNY were sufficient to give that District venue.  Unlike here, the wires and faxes in Kim were not merely passing through a District, but emanated from, and were being specifically sent to, the District whose venue was at issue.  Therefore, Kim is the opposite of a "pass-through" case; rather it is a "destination and origin" case.  Accordingly, the holding in Kim is wholly inconsistent with the Government's venue theory in the instant case.

The Government's reliance on United States v. Naranjo, 14 F.3d 145 (2d Cir. 1994) is misplaced for the same reason.  In Naranjo, co-conspirators setting up a robbery placed phone calls between the EDNY and SDNY.  Not surprisingly, the Court found that venue was appropriate wherever the conspiratorial phone call was placed or was received. Again, Naranjo is a "destination and origin" case, and not a "pass-through" case.

On this point, the Government also errantly relies upon United States v. Duque, 123 F. App'x 447 (2d Cir. 2005) (not reported), an SDNY case where Diaz, one of the conspirators, was physically located within the SDNY when he placed a phone call to arrange for the drug deal at issue. Diaz then flew over dual EDNY/SDNY waters on his way to Aruba to consummate the drug deal. Duque is thus distinguishable because Diaz was located on the ground in the SDNY and then over SDNY territory on his way to the drug deal.

The cases cited by the Government in its own Opposition therefore show that where a conspirator is physically present in a District in furtherance of the conspiracy, this has been interpreted as an act in furtherance of a conspiracy for purposes of venue. Likewise, where a communication is sent from, or knowingly sent to, a particular District, this too has been interpreted as an act in furtherance of a conspiracy for venue purposes. However, where, as here, there is neither a conspirator physically present in the EDNY nor any communication sent from, or knowingly to, the EDNY, there is no act in furtherance of a conspiracy for purposes of venue. As the cases cited by both sides show, a phone call or a wire transmission passing electronically through the EDNY does not, without more, amount to an act in furtherance of the three conspiracy offenses charged here. Accordingly, because there is no act in furtherance of any of the three crimes charged, the analysis need proceed no further. The charges should be dismissed on this basis alone for lack of venue. However, even assuming that the Court concludes that there is an act in furtherance of the three offenses, the analysis proceeds to the next requirement: foreseeability.

B.   Roger Ng Had No Reason to Foresee an Act in the EDNY

It is undisputed that Roger Ng at all relevant times worked in Southeast Asia. Again, the EDNY appears in just five allegations in the Superseding Indictment: (1) that Goldman sent funds

16

related to Project Magnolia to a 1MDB subsidiary and that such funds passed through the EDNY; (2) that Goldman sent funds related to Project Maximus to a 1MDB subsidiary and that such funds passed through the EDNY; (3) that some of the proceeds of the Project Maximus bond offering were diverted and passed through the EDNY; (4) that on April 4, 2012, Ng and Leissner were on a phone call with Goldman committee members in Manhattan when they falsely stated that Low was not involved in Project Magnolia other than to set up a meeting with an Abu Dhabi official; and (5) that on April 10, 2012, during a phone call with Goldman committee members in Manhattan, Leissner stated falsely that Low was not involved in Project Magnolia.

No case has found foreseeability of venue in these circumstances. The cases cited by the Government are each distinguishable. In United States v. Woolaston, No. 18-CR-212 (AJN) 2020 WL 91488 (S.D.N.Y. Jan. 7, 2020), the Court found venue in the SDNY where the defendant himself travelled over the waterways comprising the SDNY and where a confidential informant was in Manhattan while having text communications with a co-conspirator. Therefore, when told that the confidential informant was "in the city," the defendant could foresee that this meant the SDNY.

In United States v. Abdallah, 840 F. Supp. 2d 584 (E.D.N.Y. 2012), the defendant and Seiden had repeated phone calls while the latter was physically in the EDNY. During the call, the defendant directed Seiden, in the EDNY at the time, to engage in criminal conduct. The defendant was therefore on notice that an act in furtherance of the conspiracy was occurring in the EDNY.

The Government relies on cases that find foreseeability in the EDNY and SDNY where the defendant was on notice that some aspect of the crime was happening in "New York." This is just not the situation here. First, in each of the cases cited by the Government for this proposition – Kirk Tang Yuk, Woolaston, Abdallah – a conspirator or informant was located in the district where

17

venue was eventually found to be proper.  These cases are, therefore, distinguishable for the simple reason that there is no allegation that Ng had any conversations with anyone in the EDNY about any aspect of the crimes, or indeed seemingly about anything whatsoever.

Second, there is no "New York" for venue purposes, and the Government cannot mix the EDNY and SDNY together into a sort of venue succotash.  This relates to the nature of this crime and the location of Goldman Sachs. Perhaps if this was a case about the Coney Island Cyclone or Junior's Cheesecake or any one of millions of famous Brooklyn sites, the Government could have a point.  But, if there is one entity that has everything to do with Manhattan, and (as this case amply shows) nothing to do with Brooklyn, it is Goldman.  Whereas a drug deal in New York City could happen in either the EDNY or the SDNY, there is only one Goldman headquarters and no one – absolutely no one – has ever thought it was located anywhere other than Manhattan.  Therefore, when someone affiliated with Goldman is on a call with headquarters, that person knows that is a call with people in Manhattan.

The best argument that venue based on electrical impulses is not foreseeable stems from the Second Circuit's decision in Tzolov, 642 F.3d at 314.  In Tzolov, the conspirators placed calls and sent emails containing false information from Manhattan to their investors located around the world.  One of the conspirators then left Manhattan and boarded a plane in the EDNY to meet one of these investors.  The EDNY prosecutors, seeking venue over the case, relied solely on the conspirator traveling to the airport in the EDNY.  What the prosecutors in the EDNY did not rely on in arguing for venue is that the electrical impulses from the Manhattan-based calls or emails travelled on, over or under the EDNY.  Why?  Because they didn't think of it.  They didn't think of it because it was not foreseeable.

By embarking on a voyage of legal fantasy that Roger Ng, a Malaysian based in Southeast Asia, would expect to be hauled into Court in Brooklyn solely because electronic impulses passed for 1/10,000th of a second beneath New York harbor, the Government makes a mockery of venue, a concept so critical in protecting people from government abuses that it appears in the Declaration of Independence, Article III of the U.S. Constitution and the Sixth Amendment.

    C.    <u>There Are No Substantial Contacts With the EDNY</u>

In cases such as this one, where the charged offenses are continuing in nature and where there is no allegation that Ng engaged in any purposeful contact in the EDNY, the law in this Circuit is clear that the "substantial contacts" test applies. <u>Kirk Tang Yuk</u>, 885 F.3d at 70; <u>United States v. Reed</u>, 773 F.2d 477 (2d Cir. 1985). As noted, this test examines four features: (1) the site of the defendant's acts, (2) the elements and nature of the crime, (3) the locus of the effect of the criminal conduct and (4) the suitability of the venue for accurate factfinding. It is telling that despite the "substantial contacts" test being a well-established Second Circuit test for establishing venue, the Government barely mentioned it, and neglected its four factors completely.

In regard to the site of the defendant's acts, this has been discussed throughout this Reply Memorandum and in the defense motions. Simply put, the defendant engaged in no acts in this District. As for the elements and nature of the crime, Count One relates to the bribery of public officials in Malaysia and Abu Dhabi. Count Two relates to the internal accounting controls of a company based in Manhattan and having no connection to the EDNY. Count Three relates to financial transactions whose only connection to the EDNY is that three wire transmissions, out of dozens or hundreds involved in the case, passed under New York harbor. In terms of the effect of any criminal conduct, there is quite literally no effect on the EDNY. Malaysia has been rocked to its core by this case. The Malaysian Government was toppled and billions of dollars in public

19

funds went missing.  The only impact in this District is that a unit of electricity passed silently beneath New York Harbor for less than 1/10,000[th] of a second.  The Government has not disputed a single one of these facts.

The final factor relates to the venue's suitability for purposes of fact-finding.  The defense in this case faces unprecedented obstacles in securing witnesses, however, that is not an issue of whether the case is tried in Brooklyn as opposed to another U.S. location.  The problem is that virtually all the witnesses with relevant testimony are overseas.  Due to the Covid-19 pandemic, it is impossible to conduct interviews and to gather documents.  So, to the extent that the Second Circuit's venue jurisprudence considers the defendant's ability to call witnesses and gather evidence, the current difficulties with having this trial in this venue at this time appear to be relevant in the overall analysis.

### III.   COUNT TWO MUST BE DISMISSED BECAUSE THE INDICTMENT FAILS TO ALLEGE THAT NG CONSPIRED TO CIRCUMVENT A SET OF INTERNAL ACCOUNTING CONTROLS COGNIZABLE UNDER THE FCPA

As argued in Ng's Motions, Count Two must be dismissed because the FCPA's internal accounting controls provision applies only to the assets and transactions of an "issuer," yet Count Two's allegations relate to the assets and transactions of 1MDB, a non-issuer.  In making this argument, Ng noted that Count Two "seeks to radically expand the term 'internal accounting controls' to encompass factors wholly unrelated to the financial accounting of Goldman's assets and transactions."  (Ng Mem. at 44.)

In its Opposition, the Government argues that (1) the Superseding Indictment sufficiently alleges relevant "transactions," "assets" and "internal accounting controls" of Goldman Sachs; (2) Ng's challenges to Count Two are fact questions for the jury; and (3) Count Two properly tracks the statutory language.  These arguments miss the point and are unavailing.

20

The Government argues that Count Two relates to Goldman's assets and transactions because Goldman "used its own assets to purchase all of the bonds at issue in the three bond transactions discussed in the Indictment." (Gov't Opp. at 27.) The Government further notes that Goldman "transferred its own assets to the accounts of the respective 1MDB subsidiaries as an initial step in the overall scheme" and that, "[a]fter causing those transactions to occur, members of the conspiracy used the same funds in furtherance of the scheme by causing and directing additional transactions to pay bribes to the foreign officials and kickbacks to themselves, after laundering the funds through multiple shell companies owned and controlled by the co-conspirators." (Id. at 28.)

What the Government ignores, however, is that once Goldman "transferred its own assets to the accounts of the respective 1MDB subsidiaries," these assets were no longer Goldman assets; rather, the assets belonged to 1MDB. Similarly, when the Government argues that "members of the conspiracy used the same funds in furtherance of the scheme," it fails to recognize that these were not the same funds, i.e., Goldman assets, but rather 1MDB assets. Accordingly, even assuming the facts alleged by the Government are true, all the Superseding Indictment alleges is that the FCPA conspiracy involved assets that, in the past, were once Goldman assets. At the time of the alleged FCPA violation, however, all parties agree that the assets belonged to 1MDB, not Goldman.

While there is no factual dispute surrounding the allegations in Count Two, Ng's Motions raised a legal issue as to whether the FCPA's internal accounting controls provision can apply where the assets and transaction no longer belong to the issuer (Goldman) and instead are wholly owned by a non-issuer (1MDB). The Government seems to be arguing that, as a legal matter, the FCPA would still apply because "[n]othing in the statute . . . supports such a narrow interpretation,

requiring that only the direct payment of bribes or kickbacks to an intended recipient by an issuer would implicate the issuer's internal accounting controls." (Gov't Opp. at 28–29.)

As argued in Ng's Motions, however, the FCPA's text demonstrates that its internal accounting control provision applies only to the transactions and assets of the issuer, not some other company:

> For example, subsection (2)(B)(ii) refers to transactions that are "recorded as necessary (I) to permit preparation of financial statements . . . and (II) to maintain accountability for assets." This only makes sense if it is referring to the financial statements and assets of the actual company doing the recording – the "issuer." In other words, if the issuer itself is not engaging in a transaction that could appear on its own financial statement or if there is no use of the issuer's own assets, this section does not apply for the simple reason that such would not be within the purview of the issuer's "internal accounting controls."

> Similarly, subsection (2)(B)(iii) states, "access to assets is permitted only in accordance with management's general or specific authorization." The assets being discussed here are the assets of the issuer itself and not the assets of another company. Plainly, management of one company lacks authorization over another company's assets. Therefore, the term "assets" means the assets of the issuer; not the assets of some other entity.

> The same is true for subsection (2)(B)(iv), which states, "the recorded accountability for assets is compared with the existing assets at reasonable intervals and appropriate action is taken with respect to any differences." This section imposes on an issuer an affirmative obligation to record its own assets and to compare its own assets at different points in time so as to discern whether the issuer's assets could be getting diverted as part of a bribery scheme. The point again is that the term "assets" refers solely to the assets of the issuer.

(Ng Mem. at 47.) These subsections establish that the FCPA's internal accounting controls provision refers only to the assets and transactions of the issuer. Consequently, because the assets and transactions at the time of the alleged FCPA violation in this case related only to 1MDB and not to Goldman, Ng could not have violated the FCPA's internal accounting controls provision and Count Two must be dismissed.

Despite the text of these subsections, the Government relies on subsection (2)(B)(i) to argue that the FCPA "does not require that the issuer's assets be used at all." (Gov't Opp. at 29.). This reliance is misplaced. That provision requires that an issuer "devise and maintain a system of internal accounting controls sufficient to provide reasonable assurances that – (i) transactions are executed in accordance with management's general or specific authorization." 15 U.S.C. § 78m(b)(2)(B)(i). Although this provision refers to "transactions" as opposed to "assets," it nonetheless refers to the transactions of the issuer, not some other third party. Any other reading would be nonsensical and lead to absurd results, as it would require an issuer – in order not to violate the FCPA – to somehow devise and maintain a system of internal accounting controls sufficient to provide reasonable assurances that an unrelated, independent and separate company's transactions are executed in accordance with the issuer's general or specific authorization. This Court should not interpret the FCPA in such an illogical manner.

Here, Goldman's "transaction" ended when it transferred its assets to 1MDB. This transaction was executed in accordance with Goldman's general or specific authorization in that the assets were transferred to 1MDB as Goldman had intended. At that time, neither Ng nor any other co-conspirator circumvented or conspired to circumvent Goldman's internal accounting controls related to this transaction. That Ng and his co-conspirators are alleged to have subsequently paid bribes from 1MDB's assets had no bearing on Goldman's internal accounting controls and therefore, as a matter of law, they could not have violated the FCPA.

Lastly, the Government also argues that Count Two is proper because it tracks the statutory language. (Gov't Opp. at 26–27.) Although this argument might pertain to Rule 7's pleading requirements, it is irrelevant in determining whether the count "fails to state an offense" under Rule 12(b)(3)(B)(v). Because the allegations in Count Two are based on 1MDB's assets and

transactions, not Goldman's, the count fails to state an offense as there could be no FCPA violation as a matter of law.

## IV.   COUNT THREE MUST BE DISMISSED FOR FAILURE TO PROVIDE WHAT THE CONSTITUTION REQUIRES OF AN INDICTMENT

The Government's opposition to Ng's motion to dismiss Count Three is similar to Count Three itself:  Remarkable primarily for what it leaves out.  The Government has chosen not to deal with the substance of Ng's arguments, but rather to rely on boiler plate bromides ("tracks the statute," etc.).  These do nothing to refute the simple fact that the (now Superseding) Indictment is deficiently pled in a number of ways.  After ridiculing the problems that Ng raised, the Government proceeded to supersede the Indictment to fix one of those very problems.[2]  But the Government did not dismiss Count Three, did not fix the more fundamental problems with the Count, and did not even address the serious issues Ng pointed out.  The arguments Ng makes regarding Count Three have nothing to do with the Government's proofs.  Rather, they center on the Superseding Indictment itself.

In sum, here are the remaining problems:

First, the Superseding Indictment does not name the Malaysian statute that supposedly serves as an SUA.  Think about an indictment that charged a § 371 conspiracy "in violation of a

---

[2] The Government opposed Ng's "conclusory suggestion" that the Indictment actually include a reference to 18 U.S.C. § 1956(c)(7)(B)(iv), claiming that it was "made without any legal support," and that Ng was obviously "acutely aware" of the relevant subsection because Ng figured it out on his own.  (Gov't Opp. at 41.)  Ng will not respond to these statements, because the Government has already demonstrated, more elegantly than Ng could, these claims' validity:  While this reply was pending, the Government superseded the Indictment to add the statutory citation, and to more closely track the Malaysian statute (still unnamed) that Ng allegedly conspired to violate.  (See Superseding Indictment, Dkt. No. 55, at 30-31.)

Ng will also rest on the arguments he made in his opening brief with respect to the inapplicability of § 78dd-3 to serve as an SUA; Jam is controlling law and is directly on point; the Government's six pages of arguments about how the "money laundering statute is clear on its face" do nothing to change that.  (Gov't Opp. at 47.)

United States law," but that did not name the statute violated.  Would such language pass muster?  Of course not.  Nor should the Superseding Indictment.

Second, Count One's incorporated allegations do not allege transactions involving the United States with any specificity; all of the money laundering object statutes require such allegations, and the SUA of § 1956(c)(7)(A)(iv) (an offense against a foreign nation involving bribery, misappropriation, theft, or embezzlement), requires it as well.

Third, Count One's incorporated allegations do not sufficiently delineate between the three objects of the Count Three conspiracy.  These three objects have very different elements, but Count One's undifferentiated mass of allegations provides no notice of which transactions relate to which objects of the conspiracy.  Here are two examples:

- "Proceeds":  The Supreme Court has limited International Concealment money laundering only to "proceeds" of SUAs, while International Promotional money laundering is not so limited; the Superseding Indictment does nothing to distinguish between the two, and does not allege any transactions involving "proceeds" of an FCPA conspiracy that touch the United States.

- "Design":  The Supreme Court has held that International Concealment money laundering comprises only transactions where the "design," or purpose, of an international movement of funds is to conceal or disguise something about those funds.  The Superseding Indictment does not allege that any funds transaction involving the United States was designed to conceal or disguise anything about the funds that were transacted.

    - Moreover, because Count Three contains no independent allegations, there is simply no way to tell, from the face of the Superseding Indictment, which transactions relate to International Concealment money laundering and which relate to some other object (International Promotional or Monetary Transaction).

The Supreme Court and the Court of Appeals have held that indictments which, like the Superseding Indictment, fail to include such information do not pass Constitutional muster and should be dismissed.  This is because a deficient indictment offends several bedrock Constitutional rights, including the Grand Jury clause of the Fifth Amendment, the Double Jeopardy clause of

25

the Fifth Amendment, and the Sixth Amendment right to be "informed of the nature and cause of

the accusation."

Part of the Government's problem appears to stem from a basic misunderstanding of an

indictment's purpose.  At the beginning of its opposition on this point, the Government makes a

statement so surprising it merits being quoted at length:

> Indeed, even if Count Three provided insufficient notice about what the defendant
> is alleged to have done, that too would not be a basis to dismiss, but only – at most
> – a basis to order the [G]overnment to provide more information.  In any event, it
> is apparent from the defendant's brief that he well understands the crimes he is
> alleged to have committed.

(Gov't Opp. at 37.)

There is no citation for this statement – because it is breathtakingly incorrect as a matter of

law, as Judge Irizarry held just last year.  See United States v. Biba, 395 F. Supp. 3d 227, 239

(E.D.N.Y. 2019) (dismissing counts of an indictment at the motion to dismiss stage where

"Defendant was not informed properly of the nature of the charges stated in Counts Three and Six,

which constitutes a violation of his Sixth Amendment rights."); see also, e.g., United States v.

Pirro, 212 F.3d 86, 95 (2d Cir. 2000) (affirming dismissal of counts of indictment because "Pirro

was not adequately informed of the nature of the accusation against him, as is his right under the

Sixth Amendment.  For the same reasons, the grand jury may not have understood the elements of

the crime and the evidence necessary to support the indictment, as required by the Fifth

Amendment.").

Indeed, Federal Rule of Criminal Procedure 12 contains a specific provision on this very

point.  It states that one category of "Motion[] That **Must** Be Made Before Trial" is "**a defect in**

**the indictment** or information; including:  .  .  .  **(iii) lack of specificity**."   Fed R. Crim. P.

12(b)(3)(B)(iii) (emphasis added).

We know that the Government appears to take issue with Ng raising questions, but here is one more:  Why would there be a specific Rule governing the precise motion that Ng has made if, as the Government claims, "insufficient notice about what the defendant is alleged to have done . . . would not be a basis to dismiss"?  (Gov't Opp. at 37.)  For many of the questions Ng raised in his Motions, there are no easy answers.  But for this question, the answer is clear:  The Government is wrong.  Of course a lack of notice is a basis for a motion to dismiss, and of course a lack of specificity in the indictment is a valid basis to dismiss an indictment.  It is right there in the Rules.[3]

The Second Circuit has held the way it has, and the Rules state what they state, because the kind of lack of specificity, the kind of lack of notice, found in Count Three is a problem of both Constitutional and practical dimension.  The Fifth and Sixth Amendments contains no less than three separate protections for defendants which are safeguarded by a properly-drafted indictment, which provides notice and specificity.

One such protection is the Grand Jury clause of the Fifth Amendment.  See U.S. Const. Amend. V ("No person shall be held to answer for a capital, or otherwise infamous crime, unless

_____

[3] In fact, the Court of Appeals has observed that "Federal Rule of Criminal Procedure 12(b)(2) explicitly provides that a claim that an indictment is insufficiently specific 'must be raised prior to trial.'  This mandate is no mere pleading technicality.  Rather, it serves a number of important purposes, including deterrence of gamesmanship – Rule 12(b)(2) prevents a defendant from deciding whether to object to an indictment's purported lack of specificity based solely on whether he is convicted or acquitted – and insuring that indictments are not routinely challenged (and dismissed) after the jury has been seated and sworn, a result that would waste jurors' time and force courts frequently to confront complex Double Jeopardy questions."  United States v. Crowley, 236 F.3d 104, 108 (2d Cir. 2000).

Therefore, Ng is raising these problems at the earliest possible stage of the proceedings for three reasons.  First, quite contrary to the Government's Opposition, the motion must be made now, pursuant to Rule 12(b)(3)(B)(iii).  Second, the "timing of a defendant's objection is important to the level of scrutiny employed," and Count Three is deserving of the "exacting review" called for by the Court of Appeals when such challenges are raised in a motion to dismiss.  United States v. Wydermyer, 51 F.3d 319, 324 (2d Cir. 1995).  Third, if the problems with Count Three are not corrected now, the Court will face practical, real-world problems due to the Government's decision to structure Count Three the way that it has.

27

on a presentment or indictment of a Grand Jury.")  After Ng raised the Grand Jury issue in his

opening brief, the Government's only response was that Count Three's lack of notice was no big

deal because "at the appropriate time" (apparently up to the Government to decide) the

Government will elect to inform the defendant of certain critical information – including the

elements of one of the SUAs.  (Gov't Opp. at 40.)  The Government claims the problem is just that

Ng is "hopelessly confused," but "the remedy for alleged confusion is clarity, not dismissal.  The

law does not provide that, if a defendant needs more information about charges, they must be

dismissed."  (Id. at 44-45.)

        Yes, it does.  By 1962 the Supreme Court had already recognized that "it is a settled rule

that a bill of particulars cannot save an invalid indictment."  Russell v. United States, 369 U.S.

749, 760 (1962).  The problem is not Ng's confusion.  It is that the Government's position

completely reads the Grand Jury's critical role out of the criminal process.

        The Fifth Amendment's Grand Jury clause "requires that an indictment contain some

amount of factual particularity to ensure that the prosecution will not fill in elements of its case

with facts other than those considered by the grand jury."  United States v. Walsh, 194 F.3d 37, 44

(2d Cir. 1999) (quotation marks omitted).  This issue has nothing to do with what Ng knows or

does not know.  It has to do with what the Grand Jury heard or did not hear.  The Fifth Amendment

provides a defendant the "substantial right to be tried only on charges presented in an indictment

returned by a grand jury."  United States v. Miller, 471 U.S. 130, 140 (1985).  The Government

cannot, now, supplement the Superseding Indictment's lack of information, because that ship has

already sailed – the Grand Jury has already voted.  This is why "an indictment that is defective for

failure to allege an essential element is not rescued by prosecutorial advice in the nature of a bill

of particulars stating the element, because 'the grand jury d[oes] not see or participate in preparing

28

[a] bill of particulars'." United States v. Gonzalez, 686 F.3d 122, 128-29 (2d Cir. 2012) (quoting United States v. Camp, 541 F.2d 737, 740 (8th Cir. 1976)).

This is precisely the case here, and the Superseding Indictment should be dismissed. Indeed, the Government candidly admits, in its Opposition, that it has failed to plead elements in the Superseding Indictment. See Gov't Opp. at 40, 41 (stating that at some point in the future, the Government will "submit the relevant **elements** of the Malaysian law to the Court, and request jury instructions in line with those **elements** be charged to the jury. The [G]overnment is also willing to confer with the defendant about those **elements** . . . .") (emphasis added). Ng, however, is not the entity to whom these elements must be presented. The Grand Jury is, and the Government has failed to do so, by its own admission. See United States v. Urso, 369 F. Supp. 2d 254, 267 (E.D.N.Y. 2005) (holding that "each allegation, read in the context of the whole indictment, must still be pled with sufficient factual particularity such that the defendant is able to prepare to meet the government's charges, and such that all concerned parties, including the court, can be confident that the government's case at trial will reflect the evidence presented to the grand jury. If either test is not met, then the indictment is too vague, and must be dismissed.").

For related reasons, the Superseding Indictment also fails to fulfill the Sixth Amendment's guarantee that a criminal defendant "be informed of the nature and cause of the accusation." U.S. Const. Amend. VI. Notice is fundamental. This is why the Government is so wrong when it asserts robotically that simply because Count three "tracks the language of the statute," it is "sufficient to meet the notice requirements of Rule 7 and the Constitution." (Gov't Opp. at 39; see also Gov't Opp. at 40 ("Count Three tracks the statute"); Gov't Opp. at 41 ("Count Three tracks the statute. That alone defeats his claim."); Gov't Opp. at 42 ("Count Three tracks the statute")).

Yes, yes, a thousand times yes – it tracks the statute.  But Rule 7(c)(1) "imposes two requirements:  the statement of the essential facts <u>and</u> the citation of the statute:  <u>They are separate requirements and not a restatement of one another</u>; and it has long been the rule in this Circuit that a deficiency in an indictment's factual allegations of the elements of an offense is not cured by the fact that the relevant count cited the statute that the defendant is alleged to have violated." <u>Gonzalez</u>, 686 F.3d at 128 (brackets and internal quotation marks omitted; emphasis in original). So, while "the language of the statute may be used in the general description of an offence . . . it must be accompanied with such a statement of the facts and circumstances as will inform the accused of the specific offence, coming under the general description, with which he is charged." <u>Hamling v. United States</u>, 418 U.S. 87, 117-18 (1974) (internal citation and quotation marks omitted).

Our system does not put the burden on the defendant to just "figure it out" when he is charged with a federal crime.  The Government's flippant assertion that "it is apparent from the defendant's brief that he well understands the crimes he is alleged to have committed" is so astonishing for just this reason:  It turns the fundamental purpose of an indictment on its head. Judge Irizarry already rejected this precise argument from the Government in this District.  "[T]he government's argument that the act of filing the motion at issue proves Defendant's knowledge of the . . . charge is not supported by the record or the law. . . .  [T]he theory for denial articulated by the government, that a Defendant's filing of a motion to dismiss charges that are not sufficiently alleged in an indictment proves, <u>ipso facto</u>, satisfactory notice of such charges, cannot be one a Defendant is required to meet, because it seemingly would preclude all challenges to an indictment's sufficiency." <u>Biba</u>, 395 F. Supp. 3d at 239.

In the Government's last attempt to rescue Count Three, it sets up a straw man by attempting to reduce Ng's point about the Indictment's fundamental deficiencies to a mere technical complaint that the allegations of Count One should be "repeated verbatim in Count Three itself," and then knocks that straw man down, calling its characterization "frivolous." (Gov't Opp. at 42.)

But Ng is not complaining about repeating allegations. He is complaining about missing allegations. There are several categories of such missing allegations. First, the Superseding Indictment does nothing to distinguish between transactions involving "proceeds" of criminal activity, which is required for International Concealment but not International Promotional money laundering, and transactions that do not involve proceeds. See United States v. Santos, 553 U.S. 507, 514 (2008). Second, the Superseding Indictment does not allege any transactions involving "proceeds" of an FCPA or unnamed Malaysian crime that touch the United States.

Third, the Superseding Indictment fails to allege that any co-conspirator moved funds internationally with the "design," or purpose, to conceal those funds, as the Supreme Court requires. See Regalado Cuellar v. United States, 553 U.S. 550 (2008). Significantly, when the Government tries to demonstrate that the Indictment does what it does not, it resorts to creative use of quotation marks to supply the missing – and required – words:

> Moreover, again, although not required, the Indictment does far more than allege that the defendant had the requisite intent. The Indictment alleges the defendant knew, from the beginning of the scheme, that the purpose of diverting funds from the bond transactions *"into the bank accounts of shell companies that NG, LOW, Co-Conspirator #1 and others beneficially owned and controlled," **was at least in part, to conceal that the** "diverted funds for their personal use"* . . . .

(Gov't Opp. at 42 (quoting, in part, Indictment ¶ 34) (emphasis added). The bolded words are in the Government's brief, but are **not** in the Indictment. Like superseding the Indictment while this reply was pending, the Government's own actions seem to acknowledge they know they have a

problem.  And it still does nothing to answer the question of what the Grand Jury heard on this point – evidence of concealment, or no?

Read the actual paragraph 34.  It does allege a step in a fraud (which is not charged), and it does allege a step in an FCPA conspiracy (which is charged).  No doubt about it.  But it does not describe anything at all about International Concealment money laundering:  no allegation of any design, or purpose, of any international funds transactions; no allegation that such design was to conceal or disguise some listed aspect of the funds comprising those transactions; and no allegation of any transaction that touched the United States.[4]  Precedent, and the Constitution, require more.

Nor does the Superseding Indictment even name the Malaysian statute alleged to be violated, in clear contravention of settled precedent.  "[W]here an indictment charges a crime that depends in turn on violation of another statute, the indictment must identify the underlying offense."  Pirro, 212 F.3d at 93.  See also United States v. Thompson, 141 F. Supp. 3d 188, 195 (E.D.N.Y. 2015) (quoting Charles Alan Wright, et al., 1 Fed. Prac. & Proc. Crim. § 124 (4th ed. 2014) ("[C]ourts generally hold that '[i]f a statute makes it a crime to engage in certain conduct "contrary to law," it is not enough simply to cite that statute and recite in the pleading that the act was contrary to law—the pleading must show what other law was violated, either by citation to the other statute or by sufficient factual allegations.'"); United States v. Awan, 459 F. Supp. 2d 167, 175–76 (E.D.N.Y. 2006) (dismissing charge of a conspiracy to provide "material support or resources" to be used in a conspiracy to murder, kidnap, or maim a person outside the United States because the indictment did not specify the kind of "material support"); United States v. Teh, 535 F.3d 511, 516 (6th Cir. 2008) ("[T]he words 'contrary to law' . . . do[ ] not fully set forth the

---

[4] Attached as Exhibit 3 is a chart of each allegation Ng could find in the Superseding Indictment that relate to some transfer of funds; as the Court will see, each and every one fails to provide adequate notice in one or more ways.

'contrary to law' element."). The Superseding Indictment does not do this with respect to the mystery Malaysian statute alleged to be an SUA. According to the Court of Appeals, it is therefore deficient.

In short, this is not about "repeat[ing] allegations a second time" and so "require[ing] more paper to print the Indictment." (Gov't Opp. at 42.) It is about what is printed on that paper – not what Count Three fails to repeat from Count One, but what Count One fails to include in the first place. As mentioned in Ng's opening brief, this case appears to be the first time anywhere that the Government has chosen to charge a triple object money laundering conspiracy in an FCPA case without delineating any acts that allegedly violate one, or the other, of two very different SUAs. What did the Grand Jury find? No one, reading the four corners of this Superseding Indictment, could know. How is Ng supposed to defend against one theory versus another? Which allegations should be read to allege "proceeds," and which should not? What was the "design" of the funds transactions? Which Malaysian law was violated? The Government's decision to lump all three objects of Count Three together, with no specificity in the Count One allegations and no independent Count Three allegations, makes it impossible to determine what object the Grand Jury found the defendants agreed to violate, or to compare the Grand Jury's determinations to the petit jury's, or to provide notice to Roger Ng, or to protect him from Double Jeopardy.

## V.   THE GOLDMAN DEFERRED PROSECUTION AGREEMENT SHOULD BE MODIFIED BECAUSE CERTAIN PROVISIONS WILL VIOLATE NG'S CONSTITUTIONAL RIGHTS AT TRIAL

Ng argued in his motion that the "silence provision" contained in ¶ 23 of Goldman's DPA will violate his Constitutional rights by preventing Goldman witness from telling the truth at trial out of fear that their truthful and exculpatory testimony will be deemed a violation of the DPA. (Ng Mem. at 84–87.) In response, the Government contends that Ng's argument fails to establish

the necessary elements of witness intimidation by the Government.[5]  This argument ignores both the facts of this case and the facts surrounding the Goldman DPA.

The first element the Government claims is missing is materiality.  In making this argument, the Government claims that "Ng does not come close to demonstrating that unidentified Goldman witnesses he might call at trial would – purportedly but for the [silence provision[6]] – provide material and exculpatory evidence that could not be reasonably obtained by other means." (Gov't Opp. at 54.)  In his Motions, however, Ng argued that, to fully defend against Count Two (alleging a conspiracy to circumvent internal accounting controls) he would seek to call members of Goldman's Business Integrity Group and Compliance department (both of whom were responsible for Goldman's internal controls) to establish that Ng "was one of the first Goldman employees to raise concerns about Low's background, and that his "warnings were shared with the highest levels of the compliance and legal divisions."  (Ng Mem. at 86.)  This example lists potential Goldman witnesses and what exculpatory information they would provide.

This example is even more poignant after the Government's belated disclosure – nearly two weeks after Ng's motions were filed – of the November 13 Letter, including that Goldman's counsel had met with the Government prior to the DPA and provided them with the following information relating to the internal accounting controls that provide the basis for Count Two:

- The Business Integrity Group, Compliance and the Firmwide Capital Committee were internal controls, but not internal accounting controls.

---

[5] Before proceeding any further, it is remarkable that the Government asks the Court to examine its conduct by the standard of criminal witness intimidation, and argues that so long as the elements of witness intimidation by the United States Department of Justice are not met, then the Court need not get involved.

[6] In its Opposition, the Government refers to the "silence provision" as the "First Sentence" of ¶ 23. (Gov't Opp. at 52.) Notwithstanding the Government's generic nomenclature, Ng's concerns relate to the entire ¶ 23 of the Goldman NPA, not just the first sentence.

- Goldman did not violate the FCPA's internal accounting controls or books and records provisions, representing that Goldman's internal accounting controls were unrelated to the bond offerings and that any bribes had been paid with stolen funds from 1MDB after Goldman had properly transferred the bond offerings' proceeds to 1MDB.

- Goldman authorized the relevant transactions to proceed and the transactions were properly accounted for by Goldman.

- There was no evidence that any transaction had not been executed in accordance with management's direction, that any assets had been accessed without management's authorization or that any of Goldman's controls had been deficient.

- Certain compliance controls were unrelated to accounting.

- The Firmwide Capital Committee's approval for a transaction was the only relevant internal accounting control at issue, and that documentation relating to follow-up items from committee meetings and committee deliberations was not an internal accounting control.

- The money used to pay bribes was misappropriated from 1MDB after the bond transactions occurred, and the bond transactions were correctly accounted for in Goldman's actual books and records.

(See Ex. 1 (November 13 Letter) at 3, 6–7.)

All this information is exculpatory as it establishes that the Goldman controls underlying Count Two were not in fact internal accounting controls (as required by the FCPA). Moreover, this information supports Ng's contention that the alleged bribes were paid with funds stolen from 1MDB after Goldman had completed its bond transactions and therefore could not have affected Goldman's internal accounting controls.

At trial, Ng will need to call witnesses from Goldman's Firmwide Capital Committee, the Business Integrity Group and the Compliance department to establish that none of the internal controls in this case were internal accounting controls. Notably, Ng himself does not have access to this information because the Government has refused to provide Ng with the witnesses and materials that Goldman provided to the Government in support of the company's statements.

35

Consequently, the Government's argument Ng has "not come close" to identifying witnesses with material and exculpatory evidence is disingenuous as the Government has repeatedly refused to provide Ng with this exculpatory information.

The second element the Government claims is missing is "bad faith on part of the government." (Gov't Opp. at 54.)  The Government attempts to support this argument by noting that the "silence provision" is "routinely included in DPAs with corporate entities, and is not unique to Goldman Sachs Group." (Id.)  That the Government uses this language in other cases is irrelevant, as the question of bad faith should be determined by the Government's use of the "silence provision" in this particular case where, as demonstrated by the Government's recent disclosures, Goldman presented information to the Government that directly contradicted claims in the DPA's Statement of Facts.  For example, ¶ 25 of the Statement of Facts asserts that Goldman's internal accounting controls included its Firmwide Capital Committee, BIG and Compliance department.  This statement is directly contradicted by Goldman's representations to the Government that Goldman's Firmwide Capital Committee, BIG and Compliance department were internal controls, but not internal accounting controls.

Because these departments were not internal accounting controls, conspiring to circumvent these entities could not be a violation the FCPA's internal accounting controls provision.  Yet this is exactly what is charged in Count Two's overt acts.  Specifically, the overt acts in ¶ 63(b), (c) and (d) of the Superseding Indictment all refer to interactions between BIG and Ng or Leissner.  Ng intends to call witnesses from BIG (or cross-examine these witnesses if called by the Government) to establish that these overt acts could not be part of an FCPA internal accounting controls violation because BIG was not part of Goldman's internal accounting controls.  These witnesses will undoubtedly be chilled by the DPA's silence provision.  It is one thing for the

36

Government to force Goldman, under the threat of indictment, to "agree" to facts in a DPA that Goldman does not believe to be accurate.  It becomes bad faith, however, when the Government shields those "facts" with a silence provision that will prevent the truth from coming out at Ng's criminal trial.  Bad faith here is further compounded because the Government refuses to provide Ng with the exculpatory witnesses and materials that Goldman provided to the Government as part of their DPA negotiations.

The Government also claims the DPA's silence provision will not affect trial witnesses because the provision is limited to Goldman Sachs Group itself or "individuals who 'are authorized to speak <u>for</u>' Goldman Sachs Group."  (Gov't Opp. at 55.)  The Government further argues that the silence provision "does not and cannot bind employees of Goldman – who, notably, are not parties to the DPA – who act or speak in their individual capacity."  (<u>Id.</u>)  This argument is misleading given that the language of the silence provision explicitly includes "officers, directors, employees [and] agents" (DPA at ¶ 23), and is not limited, as the Government now claims, to "individuals who 'are authorized to speak <u>for</u>' Goldman Sachs Group."  (Gov't Opp. at 55.)

Moreover, the Government's argument disregards the third sentence of the silence provision, which grants the Government "sole discretion" is determining "whether any public statement by any such person contradicting a fact contained in the Statement of Facts will be imputed to the Company for the purpose of determining whether it has breached this Agreement." (DPA at ¶ 23.)  Given the Government's sole discretion, all of Goldman's officers, directors, employees and agents – including the members of Goldman's Firmwide Capital Committee, BIG and Compliance department that Ng might call at trial – will be concerned that the Government will impute their truthful testimony against Goldman and claim that Goldman breached the DPA.

The Government next claims Ng has not met the third element by failing to demonstrate an "'absence of fundamental fairness' that will 'prevent[] a fair trial.'"  (Gov't Opp. at 58; citation omitted.)  Specifically, the Government argues that if Ng "is concerned that a witness is somehow biased in favor of the Government in light of the DPA, the defendant can inquire whether the witness is even aware of the DPA, and if so, can ask further whether the witness is aware of this provision, and if appropriate and if a sufficient foundation exists, can probe as to potential bias."  (Id.)

The Government's argument misunderstands the fundamental unfairness that the silence provision will cause.  Although counsel will seek to probe and cross-examine Goldman witnesses to demonstrate how the silence provision has biased their testimony, this inquiry will be insufficient to establish the true nature of Goldman's internal controls.  For example, if the head of Goldman's Firmwide Capital Committee, BIG or Compliance department testifies – out of fear of violating the silence provision – that the department was part of Goldman's internal accounting controls, counsel will have the opportunity to cross-examine this witness about the silence provision's effect on his testimony.  While this cross-examination will show the witness's bias because of the silence provision, the jury will still not hear the underlying, exculpating truth:  That these entities were not part of Goldman's internal accounting controls.  To prevent this fundamental unfairness, this Court should modify the DPA as requested in Ng's Motions.

## VI.     THE COURT SHOULD ORDER TO GOVERNMENT TO PROMPTLY PROVIDE __BRADY__ MATERIAL IN ITS POSSESSION

The Government possesses or controls, but has not turned over, Rule 16 and Brady material.  Ng tried to cure this problem without the Court's involvement by requesting the material directly from the Government.  The Government refused to provide it.  Ng was therefore forced, in his opening Motions, to ask the Court to intervene and compel the Government to fulfil its basic

38

obligations under the law.  Only <u>after</u> Ng filed his Motions did the Government provide a thirteen-page single-spaced letter detailing categories of <u>Brady</u> and Rule 16 material (the "November 13 Letter"), but to date has still not provided the underlying materials.

Recall the timeline of events:

- October 22, 2020:  The Government and Goldman entered into a Deferred Prosecution Agreement (the "DPA"), which included, as Attachment A," a Statement of Facts (the "Statement of Facts"), as well as an Information against Goldman (the "Goldman Information").

- October 30, 2020:  Ng's Motions are filed.

- November 13, 2020:  The November 13 Letter.

- December 9, 2020:  The Superseding Indictment is returned.

- December 14, 2020:  The original date of Ng's Reply.

Ng will first demonstrate how the November 13 Letter points to the existence of significant quantities of <u>Brady</u> and Rule 16 material that are within the possession, custody, or control of the Government but have not been produced.  Next, Ng will reply briefly to some of the points made by the Government in its Opposition to Ng's Motions.  The inescapable conclusion is that this case has significant <u>Brady</u> and Rule 16 issues that the Court must address; otherwise the entire prosecution may well be at risk.

A.    <u>The November 13 Letter Details Unproduced Brady and Rule 16 Material</u>

The November 13 Letter is striking for three primary reasons.  <u>First</u>, when Ng filed his Motions, he had no idea of the existence of the material detailed in the November 13 Letter. <u>Second</u>, the November 13 Letter demonstrates that the Government appears to be misconstruing its <u>Brady</u> and Rule 16 obligations.  The Government appears to think that it can simply describe for Ng categories of material evidence, including that which directly contradicts its theory of the case, and that is that.  Not so.  Ng is entitled to the underlying material itself, along with any

39

presentations made to the Government – not just the Government's bullet-pointed summary of that evidence.   Third, the information in the November 13 Letter appears to derive from a number of sources, and the Government must be ordered to produce material from all of these sources:

- Goldman's formal presentations.  Goldman clearly made presentations to the Government on this case; those presentations included documentary evidence and references to documentary evidence.  If the Government is in possession of that documentary evidence, the defense is entitled to all of it.  The Goldman presentations also included representations what witnesses would say if called to testify.  The defense entitled to all recordings, transcripts, summaries, and notes regarding any and all such testimony.

- Other summaries provided by counsel outside of white papers and formal presentations.

- Proffers of Goldman witnesses.

- Memorialization, in whatever form, of the changes in Goldman's testimony.   The November 13 Letter summarizes dozens of Goldman representations, many of which are directly and explicitly contradicted by the Statement of Facts and the Information.  *How* did these positions change?  Ng is entitled to all memoranda, notes, and summaries of Goldman's prior positions, in whatever form they exist:  Email, voicemail, handwritten notes, etc.

Some examples of these contradictions are set forth in bullet-pointed comparisons below; the Court should compel the Government to produce all of the material related to each category.

        1.     *Goldman's Controls*

**Example #1**

- November 13 Letter:  Goldman claimed "BIG, Compliance and the Firmwide Capital Committee were internal controls, but not internal accounting controls."  (Id. at 3.)

      **Compare With:**

- Information ¶ 26:  "Among other things, Goldman's internal accounting controls included the Firmwide Capital Committee ("FWCC"), . . . Goldman's Internal Accounting Controls also included approval of the bonds by Goldman's Business Intelligence Group ("BIG") and compliance . . . ."

- Statement of Facts ¶ 25:  "Goldman's internal accounting controls included the Firmwide Capital Committee . . . .  Goldman's internal accounting controls also included approval of the bonds by [BIG] and compliance."

**Example #2**

- November 13 Letter:  "Goldman's internal accounting controls were unrelated to the bond offerings . . . ."  (<u>Id.</u> at 6.)

- November 13 Letter: "there was no evidence that any transaction had not been executed in accordance with management's direction, that any assets had been accessed without management's authorization or that any of Goldman's controls had been deficient."  (<u>Id.</u> at 7.)

    **Compare With:**

- Information ¶ 26:  "Pursuant to Goldman's internal accounting controls, each 1MDB bond transaction required management's general and specific authorization."

- Statement of Facts ¶ 25:  "Pursuant to Goldman's internal accounting controls, each 1MDB bond transaction required Goldman management's general and specific authorization."

These are direct contradictions.  Why does Goldman agree to these statements in the Statement of Facts when they made representations directly to the contrary to the Government? The Government argues in its Opposition that the statements in the November 13 Letter were merely "advocacy material," and "are not records of contemporaneous conduct, but are, instead, the product of Goldman's lawyers advocating on the company's behalf after the fact."  (Gov't Opp. at 74; <u>see generally</u> <u>id.</u> at 74-76.)

This is a surprising argument.  Goldman's lawyers and law firms occupy the pinnacle of legal practice in New York.  They are icons of the federal bar.  Surely, they had good-faith bases for making the representations they did to the Government.  Surely, their good-faith bases for making these representations included documents and information.  Therefore, the operative question is this:  What documents and information did they rely on in making these representations?  The Court knows well, from its own experience, that large-scale investigations involving corporations like Goldman involve presentations to the Government, usually in the form of PowerPoint "decks," which refer to, or even embed, documents, witness statements, or other

sources of information.  And of course, any such documents and/or information on the points above are <u>Brady</u>, because they tend to show that Ng's argument in his Motion is exactly right – nothing alleged in the Superseding Indictment amounts to the circumvention of an *accounting* control. Who would know this better than Goldman – the entity whose controls are at issue in this case?

Any such documents and/or other information are also <u>Giglio</u> with respect to any Goldman witness who will assert on the stand something directly contrary to what Goldman asserted to the Government – that Goldman's internal accounting controls were wholly unrelated to the bond offerings.  Any such witness from Goldman would be speaking in their official capacity and describing Goldman's controls.  If documents and/or other information exist that demonstrate that Goldman did not consider any of the processes and controls at issue to be "accounting controls," any Goldman employee who the Government calls as a witness and says otherwise should be cross-examined about that fundamental change in Goldman's story.

Finally, the defense must be permitted to inquire into *how* the story changed.  The defense has no idea whether Goldman had a corporate revelation by itself, or whether the Government was involved in shaping its (now) cooperator's testimony on a central issue at stake in this case.  Ng is entitled to those documents and/or other information to cross Goldman's witnesses.  To the extent the Government has possession, custody, or control over such documents and/or other information, it is also discoverable under Rule 16, as it is certainly material to the defense under Rule 16(a)(1)(E).

### 2.   *Goldman's Compliance*

**Example #3:**

- The November 13 Letter first outlines the size and scope of its compliance functions, describes significant due diligence steps that Goldman took, and concludes, "Goldman had every reason to believe, following Goldman's extensive reviews of the bond offerings, that the offerings were legitimate transactions in furtherance of those activities."  (<u>Id.</u> at 3.)

42

- November 13 Letter: "Goldman's review committees, outside law firms and auditors vetted the bond offerings and all concluded that it was reasonable to proceed." (<u>Id.</u> at 4.)

- November 13 Letter: "Goldman's compliance and control functions were rigorous and working effectively during the relevant time period, including in relation to the 1MDB bond offerings and Low-related deals." (<u>Id.</u> at 5.)

- November 13 Letter: "[T]he transactions were properly accounted for by Goldman." (<u>Id.</u> at 7.)

- November 13 Letter: "[T]he money used to pay bribes was misappropriated from 1MDB after the bond transactions occurred, and the bond transactions were correctly accounted for in Goldman's actual books and records." (<u>Id.</u> at 7)

- November 13 Letter: "Goldman did not violate the FCPA's internal accounting controls or books and records provisions." (<u>Id.</u> at 6.)

**Compare with:**

- Statement of Facts ¶ 25: "Goldman employees and agents who were responsible for implementing its internal accounting controls failed to do so in connection with the 1MDB bond deals."

- Ng Indictment ¶ 19: "The business culture at U.S. Financial Institution #1, particularly in Southeast Asia, was highly focused on consummating deals, at times prioritizing this goal ahead of the proper operation of its compliance function."

- Statement of Facts ¶ 44: "Although employees within Goldman's control functions suspected Low may be involved in [Project Magnolia], the only step taken by the control functions to investigate that suspicion was to ask members of the deal team whether Low was involved and to accept their denials without reasonable confirmation."

Which is it?  Did Goldman's controls fall down on the job, or did Goldman do all manner of due diligence, as spelled out by Goldman's able inside and outside counsel during presentations and meetings with the Government?   Goldman's lawyers certainly must have relied upon documents and/or information when representing to the Government that Goldman had all manner of compliance and controls in place – what are these?  If Goldman did engage in all manner of due diligence and internal and external reviews of the deals, then why did Goldman accept the Statement of Facts and the Information, which state just the opposite?  Did Goldman come to this

43

realization by itself, or did the Government shape its transformation?  If the latter, then what documents, objects, voicemails, or any other material did the Government use – and where is this material?

**Example #4:**

- November 13 Letter: "[D]uring the second and third 1MDB bond transactions, Goldman's control functions required the deal teams to present 1MDB with various alternatives that, in Goldman's view, could meet 1MDB's financing needs more cheaply; in response, 1MDB articulated rational reasons that the more expensive structure was more suited to its goals – namely, speed and certainty of execution and confidentiality – which the bankers and committees found reasonable."

- November 13 Letter:  "Goldman bankers and control functions self-identified every red flag noted in the Statement of Facts, which supported Goldman's decision to repeatedly decline transactions with 1MDB in 2014, including transactions far more lucrative than the anticipated IPO was expected to be, so as to better understand 1MDB compliance issues." (Id. at 5.)

> **Compare with:**

- Information ¶ 26:  "[T]here were significant red flags raised during the due diligence process and afterward . . . that were either ignored or only nominally addressed to that the transactions would be approved and Goldman could continue to do business with 1MDB."

- Statement of Facts ¶ 72:  "After the bond deals were completed . . . additional red flags were raised . . . .  Goldman failed to investigate these red flags or to perform an internal review of its role in the bond deals despite the clear implication that the deals had involved criminal wrongdoing."

Here, Goldman claimed to the Government that it declined billions of dollars' worth of business with 1MDB; this is a sharp departure from the characterization of Goldman in Asia being the Wild East, with a hunger for 1MDB business at whatever legal and ethical cost.  Again, information like what is described in the November 13 Letter is directly contrary to allegations in the Indictment and Information.  What documents and/or information did Goldman provide the Government about declining billions of dollars in busines with 1MDB?  And, again, how and why did Goldman's story change, leading it to admit that "red flags" were not noticed or investigated?

**Example #5:**

- November 13 Letter:  "[W]hile Goldman's policy on intermediaries did not require bankers to inform Goldman's approval committees of all intermediaries involved in a potential transaction during the relevant period, it was well understood by bankers that all substantive issues related to intermediaries, including any intermediary being paid by other parties, were to be disclosed"; "Goldman's review committees, outside law firms and auditors vetted the bond offerings and all concluded that it was reasonable to proceed." (Id. at 4.)

> **Compare with:**

- Indictment ¶ 21:  "Ng and Co-Conspirator #1 selectively disclosed to other employees of U.S. Financial Institution #1 that they were working with LOW as an intermediary to secure the deal, because they knew that disclosure more widely would have triggered steps to be taken by certain personnel within the Compliance Group and the Intelligence Group to investigate the business relationship with LOW and possibly jeopardize the deal."

If disclosure more widely was not required, then this allegation in the Indictment is

irrelevant and inflammatory.  Moreover, if the grand jury heard testimony on this topic, the defense

has a right to know what it was, because it may have affected their decision.

> 3. *Goldman's Review of Ng's Emails and Electronic Information Reveal No Incriminating Information Whatsoever – And Goldman Received Cooperation Credit for Providing "All Relevant Facts" to the Government*

**Example #6:**

- November 13 Letter:  "targeted email reviews completed by Goldman Compliance during the 1MDB bond transactions failed to identify anything suggesting any inappropriate conduct"  (Id. at 6);

- Goldman "did not identify emails on Goldman's server between Ng and Low demonstrating that Ng had engaged in any misconduct; Ng triggered surveillance of his Goldman email account 33 times between approximately 2009 and 2013, including in connection with emails to Low regarding a potential transaction in 2009 and a potential 1MDB investment in 2011."  (Id.);

- "As part of its internal investigation, Goldman had reviewed documents on Goldman's network drives and in the recycling bins related to Ng's computers, and that review did not result in the identification of potentially significant information." (Id. at 8);

45

**Compare with:**

- DPA at 4, ¶ 4.d.:  Accepting Goldman's results from these reviews and providing Goldman cooperation credit for "provid[ing] to the Offices all relevant facts known to it, including information about the individuals involved in the misconduct."

Ng is entitled to the contents of these reviews, including all search terms used.  Moreover, Ng is entitled to know whether the Government reviewed the search terms or the results of Goldman's review, or whether the Government just took Goldman's word for it?

In sum, Goldman received cooperation credit – paid less money to the Government – based on providing "all relevant facts" to the Government.  "All relevant facts" include all facts relating to the review of Ng's emails, of course – and this necessarily means that Goldman's review of Ng's emails did not reveal a single iota of illegal activity, that Goldman provided that information to the Government, and the Government accepted that representation as part of "all" facts known to Goldman.  Therefore, the Government itself admits – provided Goldman with credit for its conclusion – that not one email shows that Ng had engaged in any misconduct.

Moreover, the very fact that Ng's emails triggered surveillance 33 times, including for emails with Low, means that it was not as though Ng was trying to hide any emails he had with Low; these were on Goldman's servers, but not a single one indicated that Ng engaged in any misconduct.

The November 13 Letter also implicitly raises the same questions regarding Leissner's misconduct, but the November 13 Letter is notably silent on this question.  Goldman's review of its network did not reveal "potentially significant information" relating to Ng – but what about relating to Leissner?  Did Goldman's review turn up any emails that Leissner had "engaged in any misconduct"?  If Goldman did turn up any such emails, were they all produced in discovery?

This, in turn, raises another question, unaddressed by the November 13 Letter:  What statements, documents, or other evidence, if any, did Goldman make or have regarding the <u>relative</u> culpability of Leissner, on the one hand, and Ng, on the other?

        4.    *Ng Never Worked on Project Catalyze*

**Example #7:**

- November 13 Letter:  "Ng only worked on Project Magnolia and Project Maximus, and not on Project Catalyze or other relevant transactions."  (<u>Id.</u> at 10.)

This claim goes directly to a central weakness of the Government's case:  The Superseding Indictment alleges that Ng received money from the proceeds of Project Magnolia and Project Catalyze (but not from Project Maximus).  But why would Ng receive money from the proceeds of a deal he did <u>not</u> work on (Catalyze), but not receive money from the proceeds of a deal he <u>did</u> work on (Maximus)?  This makes no sense, and Ng is entitled to whatever documents and/or information Goldman presented on this point.

        5.    *Ng Was Not Employed by Any "Issuer"*

**Example #8:**

- November 13 Letter:  "Ng . . . [was] not employed by Goldman Group."  (<u>Id.</u> at 9.)

- November 13 Letter:  "[D]uring the relevant time period, Ng and Co-Conspirator #1 were employed by Goldman Malaysia . . . Ng was employed by Goldman Sachs Asia LLC only prior to October 2008."  (<u>Id.</u>)

The status of Ng's employment is critical to the defense, which argued in its opening Motion that the Indictment created a fictional entity called "Financial Institution #1," which the Indictment dubbed an "issuer" of securities under the Exchange Act.  In fact, as the Government acknowledged by superseding the Indictment on just this point, the only "issuer" at issue in this case is The Goldman Sachs Group, Inc., a/k/a "Goldman Group."

If Ng never worked for Goldman Group, then he was not an employee of an issuer, and all the Government has left is the possibility that he was the agent of an issuer, or a "stockholder acting on behalf of" an issuer, at all times relevant to the Indictment.  The November 13 Letter raises the critical question, though, of what documents and/or information Goldman presented to the Government to support its claim that Ng was not an employee of the Goldman Group.  Was there negotiation between Goldman and the Government on this point?  If so, how did Goldman's position "evolve"?

**Example #9:**

- November 13 Letter:  "Ng [and his alleged co-conspirators] were not senior executives at Goldman, and were not members of Goldman's executive office, management committee, regional Asia Management committee or any committee that approved transactions."  (Id. at 9.)

One of Ng's defenses is that he was simply an employee, doing what he was told during his employment at Goldman.  As just one example, while other Goldman executives were on yachts with Jho Low (but were not charged by the Government), Ng was never at any such meetings.  What documents and/or information did Goldman present to the Government to demonstrate the low-level nature of Ng's position?

B.   The November 13 Letter Details Unproduced Giglio

Aside from the numerous examples of Brady and Rule 16 material that does not appear to have been produced to Ng, the November 13 Letter also includes numerous categories of Giglio material to which Ng is entitled.  Here are some examples:

1.   *Leissner's Giglio*

**Example #10:**

- November 13 Letter "[B]y taking money from 1MDB, Co-Conspirator #1 exposed Goldman to substantial risk given that Goldman purchased the entire issuance from 1 MDB in each bond offering . . . ."  (Id. at 8.)

48

To be clear, it appears – from the Superseding Indictment – that there is no evidence of Ng taking any money from 1MDB.  If Goldman had any evidence of Ng taking money from 1MDB, that certainly should be covered by Rule 16 and the defense hereby demands it.  On the other hand, if Goldman made presentations with documents and/or information that Ng never took any money from 1MDB, then that absence is <u>Brady</u>; the defense is entitled to those documents and/or information.

Moreover, Ng is entitled to whatever documents and/or information Goldman presented regarding the risk to which Leissner exposed Goldman.  All of this material is Leissner's <u>Giglio</u>. While Ng will have plenty of examples of Leissner's deceitfulness, disloyalty, and untrustworthiness, this is a prime example:  Leissner, to profit solely himself to the tune of tens of millions of dollars, put his employer at risk to the tune of billions of dollars.  This demonstrates the degree to which Leissner was concerned only for himself and was willing to put others he knew and worked with at risk simply to profit himself.  This is exactly how he has treated Roger Ng, and the defense is entitled to have the information that demonstrates this pattern of behavior.

**Example #11:**

- November 13 Letter:  Leissner "usurped a potential opportunity for Goldman to serve as a financial advisor for a company that was attempting to gain a stake in oil fields; such an opportunity was the exact type of service Goldman provided." (<u>Id.</u> at 9.)

For the same reasons as for Example #10, the defense is entitled to all documents and/or information that Goldman provided on this topic.  There is no indication whatsoever that Ng was involved in this illegal activity.  That Leissner committed other illegal activity without Ng's involvement during the course of Leissner's association with Goldman is both <u>Brady</u> as to Ng and <u>Giglio</u> as to Leissner.  It is <u>Giglio</u> as to Leissner because it makes him even less credible.  It is <u>Brady</u> as to Ng because if Leissner engaged in other unlawful activity without Ng, then it makes

it more likely that Leissner engaged in the unlawful activity alleged in the Indictment without Ng as well.

2.    *Goldman's <u>Giglio</u>*

**Example #12:**

- November 13 Letter:  "[T]here were two separate schemes in the conspiracy – one to allegedly generate business for Goldman and one to misappropriate billions of dollars from 1MDB for individuals' personal benefit."  (<u>Id.</u> at 11.)

    **Compare with:**

- Statement of Facts ¶ 24:  "The bribes resulted in Goldman being engaged on, among other projects, three bond offerings that were related to 1MDB's energy acquisitions . . . . The bribes were also intended to help Goldman secure a role on the anticipated IPO of those energy assets."

**Example #13:**

- November 13 Letter:  The corruption of public officials "was not to obtain or retain business for Goldman."  (<u>Id.</u> at 11.)

    **Compare with:**

- Statement of Facts ¶ 23:  "Goldman . . . knowingly and willfully conspired and agreed with others to corruptly provide payments [to] . . . foreign officials . . . to obtain and retain business for Goldman . . . ."

**Example #14:**

- November 13 Letter:  "[T]he evidence does not support that one of Goldman's goals in pursuing the bond offerings was to secure a role in the IPO, especially as the anticipated fees on the IPO at that time were $7.5 million versus $200 million for Project Magnolia." (<u>Id.</u> at 11.)

    **Compare with:**

- Statement of Facts ¶ 23:  The business that Goldman sought "to obtain and retain" through the bribe payments "include[ed] . . . underwriter of certain other 1MDB business, including the contemplated initial public offering ("IPO") of 1MDB's Malaysian energy assets."

- Statement of Facts ¶ 24:  "The bribes were also intended to help Goldman secure a role on the anticipated IPO of those energy assets."

- Statement of Facts ¶ 42: "One of Goldman's goals in pursuing this transaction was to secure . . . a role in the potential IPO of 1MDB's energy assets . . . ."

**Example #15:**

- November 13 Letter: "[T]he decision to reject Low as a Private Wealth Management ("PWM") client was not BIG's decision, but instead a consensus decision of PWM management, BIG and Compliance . . . ." (Id. at 7.)

   **Compare with:**

- Statement of Facts ¶ 29: "Ultimately, BIG personnel rejected Low as a Goldman client . . . ."

Here, the November 13 Letter sets forth several examples where Goldman's initial statements to the Government are flatly contradicted by the documents that Goldman ultimately signed. How, and why, Goldman's position changed so drastically over time is a topic on which Ng should receive all information in the possession, custody, or control of the Government.

   3. *Other Witnesses' Giglio*

**Example #16:**

- November 13 Letter: "Goldman's Counsel represented and argued that Low was not discussed during the October 10, 2012 committee meeting; only one Goldman employee remembered Low's name coming up at a committee meeting for Project Maximus, but he/she was mistakenly thinking that Project Maximus was the first bond deal he/she was involved in; rather, the records showed he/she actually attended a Project Magnolia Asia Pacific Capital committee meeting where Low's name was raised." (Id. at 6.)

Ng has the right to know who this employee is, where the employee's recollection is recorded, and what other information from this employee, if any, the Government relied on in making either a charging decision or included as fact in its charging documents.

   C. <u>The Statement of Facts Indicates There May Be Unproduced Brady or Rule 16 Material With Yet Other Entities; Ng Is Entitled to It All</u>

The Statement of Facts asserts that "[c]ertain of the facts herein are based on information obtained from third parties by the United States through its investigation and described to

Goldman." (Statement of Facts at 1.) This sentence explicitly acknowledges that the materials described are in the "possession, custody, or control" of the Government ("obtained . . . by the United States"), and therefore are subject to Rule 16. Any such information obtained from third parties that found its way into the Statement of Facts should, by definition, be "material to preparing the defense" under Rule 16. Moreover, if the information obtained from third parties contradicts Goldman's assertions, which themselves are frequently flatly contradictory to the Statement of Facts, then they are covered by <u>Brady</u> and <u>Giglio</u>.

D.     The Government's Opposition Does Nothing to Refute Ng's Identification of Unproduced Brady and Rule 16 Material

Ng will turn, briefly, to the Government's Opposition to Ng's Motion. The Government terms Ng's requests "meritless, moot, and/or premature," and stated that it has "already produced to the defendant all documents in its possession, custody, or control that fall within his demands." (Gov't Opp. at 65.) Notwithstanding this strong and definite language, the Government sent – after Ng's Motions were filed but before the Government's Opposition was due – the November 13 Letter, which contains page after page of reference to material that the Government is obligated to produce, but has not.

With respect to materials relating to Leissner's allocution, Ng has pointed out substantial examples of "tracking" by both Leissner and the Government:  instances where Leissner's allocution matches up, word for word, with the Government's written product, and also at least one critical point (Goldman's "culture" in Asia) in which it appears the Government may have interacted with Leissner and subsequently changed its pleadings. (<u>See</u> Ng Mem. at 91-101.) The Government does not deny that such communications occurred; its only response is that Ng is seeking "weapons" for cross-examination. (Gov't Opp. at 69-70.) This is true; Ng admits it candidly. █████████████████████████████████████████████████

████████████████████████████████████████

████████████   The Government's only response, really, is "not yet."  For example, the Government claims that Ng pointed out examples "where courts have evaluated, after trial, the impact of the government's failure to produce certain material."  (Gov't Opp. at 71.)

True.  But why wait?  In his Motions, Ng pointed out recent cases in which the Government's late production of materials just like those Ng is seeking here caused significant problems with the prosecutions:  Hearings, motions, etc.  Why should any of that be necessary?  Ng seeks the information regarding Leissner's allocution with enough time before trial so that it can be effective on cross-examination.  To refute the point made by Leissner about Goldman's supposed "culture" in Asia, for example, Ng will have to interview numerous witnesses and examine large quantities of documents to show that Leissner was wrong.  Ng is not looking for any unfair advantage here; the concept seems far-fetched.  Instead, Ng is looking to avoid the problems faced by the Courts in Ahuja, Triumph Capital Group, and Milles.  Why would the Government want to go through an entire prosecution and trial when the Court of Appeals might weigh in later and hold that the Government's disclosures were too little, too late?  Production of all materials relating to Leissner's allocution is one way to avoid the problems Ng highlighted in his opening Motion.

Next, the Government flatly asserts that "Goldman is no more a member of the prosecution team than an individual cooperator is."  (Gov't Opp. at 72.)  But this flat assertion is flat wrong.  Stein is the law of this Circuit, and it remains good law.  The Government spends a significant amount of time trying to distinguish Stein from the instant case by citing to three cases – Meregildo, Carson, and Norris.

Here's the thing, though – all of these three cases lack the critical thing that <u>Stein</u> and this case share:  the DPA.  Because of the DPA, and the Statement of Facts, this case is on all fours with <u>Stein</u>, and not with these other cases.  The DPA – a contract between the Government and Goldman – is completely unlike the cooperation agreement that an "individual cooperator" signs. Ng's opening Motion demonstrates exactly why this is.  Without the DPA, as <u>Stein</u> recognized so eloquently, Goldman "faced ruin by indictment and reasonably believed it must do everything in its power to avoid it.  The government's threat of indictment was easily sufficient to convert its adversary into its agent."  <u>Stein II</u>, 541 F.3d 130, 151 (2d Cir. 2008).

A case cited by the Government makes exactly this point – for Ng.  The Court in <u>Carson</u> explicitly distinguished <u>Stein</u> because CCI, the company at issue in <u>Carson</u>, only signed a plea agreement, and <u>not</u> a DPA.  The Court specifically quoted the <u>exact</u> same provision in the <u>Stein</u> DPA that Ng highlighted, and contrasted it to the situation in <u>Carson</u>, stating:  "By no stretch of the imagination did CCI enter into an agreement <u>allowing the Government to request anything in the possession of CCI</u>."  <u>Carson</u>, Crim. A. No. 09-077, at *5 (C.D. Ca. Dec. 8, 2009) (emphasis added).

The problem for the Government is that Goldman <u>did enter into just such an agreement</u>. Here is the language from the <u>Stein</u> DPA quoted in <u>Carson</u>:  KPMG agreed to "[c]ompletely and truthfully disclosing all information in its possession to the Office and the IRS about which the Office and the IRS may inquire, including but not limited to all information about activities of KPMG . . . ."  <u>Id.</u>  And here is the language from Goldman's DPA:  Goldman "shall truthfully disclose all factual information with respect to its activities . . . including any evidence or allegations and internal or external investigations, about which the Company has any knowledge or about which the Offices may inquire.  **This obligation of truthful disclosure includes, but is**

54

**not limited to, the obligation of [Goldman] to provide to the Offices, upon request, any document, record, or other tangible evidence about which the Offices may inquire of [Goldman].**"  (Goldman DPA at 8, ¶ 5(a) (emphasis added).).  The instant case therefore cannot be more similar to <u>Stein</u> – as recognized by <u>Carson</u>, the Government's own case.

Finally, Ng's Motions demonstrated why Goldman should be viewed as part of the prosecution team in this case.  (<u>See</u> Ng Mem. at 108-13.)  But even if there is not yet a sufficient record to so hold, such a record will be developed through a factual inquiry, and Ng reiterates his respectful request that the Court hold an evidentiary hearing to determine the extent of Goldman's cooperation and the Government's access to Goldman's files.  <u>See</u> <u>Gov't of the V.I. v. Martinez</u>, 780 F.2d 302, 306 (3d Cir. 1986).





## <u>CONCLUSION</u>

For the foregoing reasons, Ng respectfully requests that this Court dismiss the Superseding Indictment on the ground that it breaches the agreement between Ng and the Government.  In the alternative, Ng respectfully requests that the Court grant the relief requested in Ng's Motions.

Dated:      December 21, 2020
            New York, NY

                                  Respectfully submitted,

                                      /s/
                                  Marc A. Agnifilo, Esq., *Of Counsel*
                                  Zach Intrater, Esq., *Of Counsel*
                                  Teny R. Geragos, Esq.
                                  Jacob Kaplan, Esq.

                                  **BRAFMAN & ASSOCIATES, P.C.**
                                  767 Third Avenue, 26th Floor
                                  New York, NY 10017
                                  (212) 750-7800