AES:DGR
F. #2016R00467

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

– – – – – – – – – – – – – – – – – – –X

UNITED STATES OF AMERICA

    - against -                Docket No. 18-CR-538 (MKB)

NG CHONG HWA,
       also known as "Roger Ng,"

           Defendant.

– – – – – – – – – – – – – – – – – – –X

## THE GOVERNMENT'S MEMORANDUM IN FURTHER OPPOSITION TO THE DEFENDANT'S MOTION TO DISMISS AND OTHER RELIEF

TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................................. 1

ARGUMENT ........................................................................................................................ 3

I.      THE SUPERSEDING INDICTMENT SHOULD NOT BE DISMISSED AS IT IS NOT
        PROHIBITED BY WRITTEN CONTRACT AND COMPLIES WITH THE
        GOVERNMENT'S OBLIGATIONS TO THE DEFENDANT AND MALAYSIA ......... 3

        A.      Relevant Background ............................................................................. 4

        B.      Applicable Law ..................................................................................... 5

        C.      Discussion ............................................................................................. 9

                1.      The Extradition Treaty Controls ............................................. 9

                2.      The Superseding Indictment Does Not Violate the Rule of Specialty ...... 12

II.     THE DEFENDANT'S CLAIM THAT THE GOVERNMENT HAS NOT COMPLIED
        WITH ITS DISCOVERY OBLIGATIONS IS MERITLESS ......................................... 17

        A.      The Defendant Mischaracterizes the Content
                and Timing of the Goldman Letter ...................................................... 18

        B.      The Defendant's Demands for The Production of Materials
                Are Moot, Premature and Without Merit ............................................. 20

III.    THE SECOND CIRCUIT HAS NOW HELD THAT ANY FELONY FCPA
        VIOLATION IS A VALID SPECIFIED UNLAWFUL ACTIVITY FOR THE MONEY
        LAUNDERING STATUTE ............................................................................................ 27

CONCLUSION ..................................................................................................................... 29

## PRELIMINARY STATEMENT

In his reply memorandum (see Dkt. No. 58 ("Def. Reply")) in further support of his motion to dismiss and for other relief (see Dkt. No. 46 ("Def. Mot.")), the defendant raises two new arguments.[1]  He asserts that (1) the Superseding Indictment, which was returned by a grand jury after the government filed its response to the defendant's motion, is "prohibited by a written contract between [the defendant] and the government" and therefore "must be dismissed" (Def. Reply 3-9); and (2) the government's disclosure on November 13, 2020 of a letter (the "Goldman Letter," attached as Exhibit 1 to the defendant's reply) summarizing representations and arguments made by counsel for The Goldman Sachs Group, Inc. ("Goldman Sachs Group," and, together with its subsidiaries, "Goldman") was "inadequate" and demonstrates that the government "possess[es] or controls … Rule 16 and Brady material" that it has not provided to the defendant (Def. Reply 38-55).

The defendant is wrong.  First, because the defendant consented to his extradition, it is the treaty between the United States and Malaysia that governs the defendant's presence in the United States, and not the unsigned letter drafted by the parties.  Moreover, even if that letter

---

[1] This sur-reply is limited to addressing new arguments raised by the defendant and noticing a precedential Second Circuit decision that moots one of the defendant's arguments.  The government does not address here the sections of the defendant's brief that are simply replies to the government's response to the defendant's motion (see Dkt. No. 54 ("Govt. Opp."), including Section II (venue); Section III (FCPA internal controls); Section IV (money laundering); Section V (Goldman's DPA); and Section VII (attorney's eyes only material).  The government does not agree with the positions taken by the defendant in these sections, and is prepared to address them further as needed at any oral argument on the defendant's motion.

did control, the government has complied with the terms of that letter by ensuring that the Superseding Indictment does not implicate the rule of specialty.

Second, the government has already produced the Rule 16 material in its possession, custody and control underlying the Goldman Letter to the defendant.[2]  The defendant's demands for immediate production of witness statements and <u>Giglio</u> materials ignore settled law that such requests are untimely, and his continued, baseless accusations that the government has failed to produce what the defendant terms "<u>Brady</u>" material are without merit.

Finally, the government advises the Court that, after the defendant filed his reply memorandum, the Second Circuit issued a precedential opinion in <u>United States v. Ho</u>, --- F.3d ----, No. 19-761, 2020 WL 7702576 (2d Cir. Dec. 29, 2020) ("<u>Ho Appeal</u>"), which held, <u>inter alia</u>, that a violation of Section 78dd-3 of the Foreign Corrupt Practices Act ("FCPA") was a valid specified unlawful activity ("SUA") under the money laundering statute.  This decision moots the defendant's argument in his initial motion—which was identical to that rejected in <u>Ho</u>—that Count Three should be dismissed because Section 78dd-3 is not a valid SUA.

For these reasons, as well as the reasons set forth in the government's initial response, the defendant's motion must be denied in their entirety.

---

[2] The government produced to the defendant all records, documents, communications and recordings in the government's possession, custody and control that it received from Goldman directly, or that were produced by Goldman to other regulatory agencies and then to the government, as of the date of the Goldman Letter (the "Goldman Productions"), which number more than five million pages.  As the government's investigation related to 1MDB is ongoing, materials continue to be produced to the government from sources including Goldman, and those documents will, in turn, be produced to the defendant on a rolling basis.

## ARGUMENT

**I.      THE SUPERSEDING INDICTMENT SHOULD NOT BE DISMISSED AS IT IS NOT PROHIBITED BY WRITTEN CONTRACT AND COMPLIES WITH THE GOVERNMENT'S OBLIGATIONS TO THE DEFENDANT AND MALAYSIA**

The defendant moves to dismiss the Superseding Indictment because, he argues, it violates a prior agreement with the government concerning his waiver of extradition to the United States.  Specifically, he argues that his appearance in the United States is governed by an unsigned February 12, 2019 letter the United States sent the defendant (the "February Letter," attached hereto as Exhibit A), which would have been effective upon the defendant's waiver of extradition and voluntary appearance in the United States.  (Def. Reply 3).

The defendant's motion is meritless for two reasons.  First, by its express terms, the February Letter does not control because the defendant consented to his extradition, as opposed to waiving extradition.  Instead, the Extradition Treaty Between the Government of the United States and the Government of Malaysia, Aug. 3, 1995 (the "Extradition Treaty," attached hereto as Exhibit B) governs the defendant's presence in the United States.  (Def. Reply 3). Second, even if the February Letter controlled,[3] the government has complied with the obligations it set out in the letter, which was intended to simply give the defendant the benefit of the Extradition Treaty's rule of specialty protections.  Because the Superseding Indictment does not violate the rule of specialty, it does not violate the terms of the February Letter and the defendant's request must be denied.

---

[3] As discussed below, by its terms, the February Letter does not apply to "any consent to extradition."  The defendant nevertheless argues the February Letter applies because on February 15, 2019, he relinquished any procedural challenges to extradition to which he might have been entitled in front of the Malaysian Sessions Court in reliance on the letter.  (Def. Br. at 5).

A.    <u>**Relevant Background**</u>

On or about October 30, 2018, following the defendant's indictment by a grand jury in the Eastern District of New York (the "Initial Indictment"), Malaysian authorities arrested the defendant in Malaysia pursuant to a provisional arrest warrant.  In or about November 2018, the United States made a formal request to Malaysia for the defendant's extradition pursuant to the Extradition Treaty, and Malaysia moved forward with extradition proceedings against the defendant.

In early 2019, the government and the defendant engaged in discussions regarding potential avenues for the defendant's transfer to the United States outside of the formal extradition process.  (Def. Reply 3-4).  During those discussions, the defendant expressed concern that by coming to the United States outside of the formal extradition process, he would be giving up the rule of specialty protections afforded under the Extradition Treaty.  (<u>Id.</u>).  As part of his proposed appearance in the United States outside of formal extradition, the defendant requested that the government afford him the same protections as would be provided through formal extradition, explicitly calling it a "rule of specialty agreement."  (<u>See</u> Email dated January 29, 2019, attached hereto as Exhibit C).  The government agreed to offer rule of specialty protection congruent with that set out in the Extradition Treaty and closely tracked the Extradition Treaty's rule of specialty provision in the February Letter.

On or about February 15, 2019, the defendant consented to extradition to the United States before the Sessions Court in Malaysia.  (<u>See</u> February 15, 2019 Order, Sessions Court, Kuala Lumpur, attached hereto as Exhibit D ("February 15 Order"); February 15, 2019 Warrant of Removal, Sessions Court, Kuala Lumpur, attached hereto as Exhibit E ("Warrant of Committal")).  Having obtained the defendant's consent, in April 2019, the Malaysian

4

government issued a warrant to temporarily surrender the defendant to the United States (see April 25, 2019 Temporary Surrender Warrant, attached hereto as Exhibit F (the "Temporary Surrender Warrant") pursuant to the Extradition Treaty and Article 22 of the Malaysian Extradition Act of 1992, a copy of which is attached hereto as Exhibit G (the "Extradition Act").

On December 9, 2020, a grand jury in the Eastern District of New York returned the Superseding Indictment, which added factual allegations and amended charging language, but added no new counts against the defendant.  (Superseding Indictment, Dkt No. 55)  Prior to obtaining the Superseding Indictment, the United States confirmed with the Malaysian government that the changes now reflected in the Superseding Indictment did not violate the rule of specialty.

B.    **Applicable Law**

In general, the "rule of specialty" provides that a criminal defendant brought within the jurisdiction of the United States by virtue of an extradition treaty can only be tried for the specific offenses upon which he or she was extradited.  See United States v. Rauscher, 119 U.S. 407, 424 (1886); United States v. Masefield, No. 02 Cr. 441 (LAP), 2005 WL 236443 *2 (S.D.N.Y. Feb. 1, 2005) (The rule of specialty "generally requires that an extradited defendant be charged only for the crimes on which extradition has been granted."); United States v. Levy, 25 F.3d 146, 159 (2d Cir. 1994); Ficcioni v. Attorney General, 462 F.2d 475, 481 (2d Cir. 1972).

Where a defendant is not extradited—for example, if he waived extradition, or if the foreign country surrendered him solely pursuant to its domestic law—the rule of specialty does not apply.  See, e.g., United States v. DiTommaso, 817 F.2d 201, 212 (2d Cir. 1987) (stating that rule of specialty is "limit[ed] to cases involving a formal extradition pursuant to

treaty," whereas defendant "was not extradited; he voluntarily waived his right to extradition");

United States v. Trujillo, 871 F. Supp. 215, 219–20 (D. Del. 1994).

The rule "is founded primarily on international comity and is premised on the notion that the requesting state must live up to whatever promises it made in order to obtain extradition because preservation of the institution of extradition requires the continuing cooperation of the surrendering state." Masefield, 2005 WL 236443 at *2 (internal quotation marks, brackets, and citation omitted); see United States v. Biba, No. 09-CR-836 (DLI), 2017 WL 11380497, at *2 (E.D.N.Y. Mar. 6, 2017) ("[T]he basis for the rule of specialty set forth in [Rauscher] is not a concern about protecting the rights of a defendant, but rather comity . . . .").

As to extraditions between the United States and Malaysia, the Extradition Treaty governs, and Article 16 of the treaty sets forth the rule of specialty protections for defendants extradited from Malaysia. That provision states, in pertinent part:

> A person extradited under this treaty may not be detained, tried, or punished in the Requesting State except for:
>
> (a) the offense for which extradition has been granted or any lesser offense proved by the facts on which the first mentioned extradition was grounded;
>
> (b) any offense committed after the extradition of the person; or
>
> (c) an offense for which the executive authority of the Requested State has consented to the person's detention, trial, or punishment.

(Article 16(1), Extradition Treaty, Exhibit B at 16 (emphasis added)).

In applying the rule of specialty, the Second Circuit "has consistently found that the government is not limited strictly to charges described in an extradition warrant but rather may include [in a superseding indictment] additional facts and additional charges as long as the statutory charge is the same." Masefield, 2005 WL 236443 at *2. The focus is on the offense

6

alleged to have been committed by the defendant.  See Fiocconi v. Attorney Gen. of U.S., 462 F.2d 475, 481 (2d Cir. 1972) (finding no rule of specialty violation where a defendant is tried for "subsequent offenses of the same character as the crime for which they were extradited"); United States v. Sturtz, 648 F. Supp. 817, 819 (S.D.N.Y. 1986) ("A superseding indictment which charges offenses of the same character as the crime for which the fugitive was extradited does not offend the doctrine." (citing United States v. Rossi, 545 F.2d 814, 815 (2d Cir. 1976) (per curiam))).

For example, in Levy, the defendant claimed that the rule of specialty had been violated because he was extradited solely on a narcotics conspiracy charge and not the five other substantive narcotics charges brought against him.  Levy, 25 F.3d at 159.  Rejecting that argument, the Circuit explained, that "we have held that the Rule of Specialty was not violated when a defendant, extradited on a narcotics conspiracy charge, was tried on additional drug trafficking charges because the defendant was not actually tried on separate offenses."  Id.  In reaching this conclusion, the court cited its prior decision in Fiocconi for the proposition that there is no rule of specialty violation where the added crimes are of the "same character" as those for which the defendant was extradited.  See id. (quoting Fiocconi, 462 F.2d at 480-82).

Similarly in Masefield, the defendant, an Australian citizen, was extradited to the United States on a single-object tax-fraud conspiracy from 1993 to 2001 and four counts of filing false tax returns for each year from 1996 to 1999.  After he was extradited, the government superseded the indictment underlying Masefield's extradition, changing the conspiracy count from single-object to multi-object and the four false subscription charges into one multi-year charge covering the period 1993 to 2000.  In denying Masefield's motion to dismiss the superseding indictment for violation of the rule of specialty, the court squarely held that the rule

7

of specialty did not require that a defendant be tried on precisely the charges contained in an extradition warrant; the government could allege and prove facts in addition to those presented in the extradition request.  Id. at *2-*4.  As the court explained, "Put simply, the Government may present additional facts or amplified allegations, so long as [they are] . . . directed to the charge contained in the request for extradition."  Masefield, 2005 WL 236443 at *2 (quoting Restatement (Third) of Foreign Relations Law of the United States § 477, comment c (2005)).

Ultimately, the Second Circuit has made clear that, for purposes of analyzing the rule of specialty in the context of a superseding indictment, the Government is "not limited strictly to charges described in an extradition warrant," provided the "statutory charge is the same."  Id.  (collecting cases); see Levy, 25 F.3d at 159; Fiocconi, 462 F.2d at 481–82 (no violation of the rule of specialty where defendant was first extradited on an indictment alleging a conspiracy spanning 1968 to 1969 and subsequently charged by superseding indictment alleging a conspiracy spanning 1970 to 1972 and additional substantive offenses); Rossi, 545 F.2d at 815 (no violation of the rule of specialty where extradition was tied to a conspiracy spanning 1969 to 1972, but the indictment alleged a conspiracy spanning 1965 to 1973); United States v. Paroutian, 299 F.2d 486, 491 (2d Cir. 1962) (no violation of the rule of specialty where defendant was extradited from Lebanon on a conspiracy charge but tried on a different indictment in a different district alleging substantive narcotics charges); see also United States v. Puentes, 50 F.3d 1567, 1576 (11th Cir. 1995) (no violation of the rule of specialty where superseding indictment returned after extradition extended the conspiracy period by three years); United States v. Andonian, 29 F.3d 1432, 1435–37 (9th Cir. 1994) (no violation of the rule of specialty where the superseding indictment added overt acts to conspiracy charge on which defendant was extradited, as well as substantive counts); United States v. Abello-Silva, 948 F.2d

8

1168, 1174-76 (10th Cir. 1991) (no violation of the rule of specialty where the superseding indictment returned after extradition contained additional facts).

C.    **Discussion**

1.    **The Extradition Treaty Controls**

The defendant's motion is premised on his mistaken belief that the February Letter, rather than the Extradition Treaty, controls his presence in the United States.  As an initial matter, and as discussed _infra_, even if the February Letter controlled, because the Superseding Indictment complies with the rule of specialty protection provided by the Extradition Treaty and offered to the defendant through the February Letter, there is no basis to dismiss the Superseding Indictment.  But as a threshold matter, because the defendant consented to his extradition as opposed to waiving his rights under the Extradition Treaty—as expressly required in the February Letter—his presence here is governed by the Extradition Treaty.

Although the defendant quotes parts of the February Letter at length, he conveniently omits its only footnote, which stated, "This agreement pertains only to your client's waiver of extradition and not to any consent to extradition."  (Exhibit A at n.1 (emphasis added)).  Ultimately, the defendant, represented by both Malaysian and U.S. counsel in the Malaysian extradition proceedings,[4] did not "waive" extradition but rather "consented" to extradition under the Extradition Treaty.  The supporting documents filed in Malaysia reflect this.

---

[4] As the defendant concedes (Def. Reply 3, 5), and as the February 15, 2019 court documents show (see February 15 Order and Warrant of Committal, Exhibits D and E), the defendant was represented by both Malaysian counsel and U.S. counsel at the time he consented to extradition.

9

While the word "waiver" appears in the February 15 Order and the Warrant of Committal, these documents, along with the Temporary Surrender Warrant, demonstrate that the defendant "consented" to extradition to the United States as part of the formal extradition process, thereby granting him the full benefit of the Extradition Treaty.  As the defendant concedes in his motion, this was precisely the outcome the parties had sought to avoid by seeking his "knowing[] and willful[] waive[r] of extradition" as contemplated in the February Letter.  (Exhibit A at 1; Def. Reply 2).

The Warrant of Committal, which was filed in Malaysia following the defendant's consent to extradition, expressly noted that the defendant "having been advised in accordance with the provision of paragraph 22(1)(b) of the Extradition Act 1992, consent [sic] to the waiver of the committal proceedings" and shall be held in custody "safely until [he is] delivered pursuant to the provisions of the said Act."  (Exhibit E at 2 (emphasis added)).  Critically, the warrant's reference to paragraph 22 of the Extradition Act was an express reference to the rule of specialty protections that would be afforded to the defendant in light of his consent to extradition:

> (1) When the fugitive criminal is brought before the Sessions Court he may inform the Court that he consents to a waiver of the committal proceedings before the Court and the Court shall—
>
> (a) ascertain whether the consent is given voluntarily;
> (b) upon being satisfied that such consent is given voluntarily, advise the fugitive criminal that the effect of so consenting will be that—(i) he will be committed to prison;
>
> . . .
>
> (iii) upon his return to the country which made the requisition for his return, he shall be tried for the extradition offence in respect of which his extradition was requested or he may be tried for any lesser

10

> offence proved by the facts on which that extradition offence was
> grounded; . . . .

(Extradition Act ¶ 22(1), Exhibit G at 19 (emphasis added); <u>see</u> Warrant of Committal, Exhibit E

at 2 (citing ¶ 22(1)(b) of the Extradition Act)).  Both the Warrant of Committal and the

Temporary Surrender Warrant set out the three offenses upon which defendant's extradition was

based:

> conspiracy to violate the anti-bribery provisions of the Foreign
> Corrupt Practices Act, Title 15, United States Code, Sections 78dd-
> 1, 78dd-3, 78ff(a) and 78ff(c)(2)(a) in violation of Title 18, United
> States Code, Sections 371 and 3551; conspiracy to violate the
> internal accounting control provisions of the Foreign Corrupt
> Practices Act, Title 15, United States Code, Sections 78m(b)(2)(B),
> 78m(b)(5) and 78ff(a) in violation of Title 18, United States Code,
> Sections 371 and 3551; and conspiracy to commit money
> laundering, in violation of Title 18, United States Code, Sections
> 1956(h) and 3551 . . . .

(Exhibit E; <u>see also</u> Exhibit F).  These are the same offenses with which the defendant is charged

in both the Initial Indictment and the Superseding Indictment.

      Accordingly, because the defendant consented to extradition, he received the full

benefit of the rule of specialty by virtue of the Extradition Treaty.  The February Letter, which

was expressly tied to a potential "knowing[] and voluntar[y] waiver" of his extradition rights in

Malaysia, does not control.

      However, as discussed below, irrespective of whether the February Letter or the

Extradition Treaty applies, the Court should reject defendant's request because the Superseding

Indictment complies with the rule of specialty and the proposed terms of the February Letter.[5]

---

[5] Given the defendant's claim that the February Letter controls, he does not argue that the
Extradition Treaty has been violated.  But even if he did, he would not have standing to raise such
a claim under the Extradition Treaty unless Malaysia first lodged an official protest.  <u>See, e.g.</u>,

### 2.      **The Superseding Indictment Does Not Violate the Rule of Specialty**

The defendant contends that the February Letter controls his appearance in the United States because he relied on the offer contained in that letter and relinquished his procedural challenges to extradition in front of the Malaysian Sessions Court. (Def. Reply 5). Even if the defendant was correct, because the Superseding Indictment alleges no new offenses against the defendant that violate the rule of specialty, and because the defendant has received the full protection afforded by the rule, there is no basis to dismiss the Superseding Indictment.

The purpose of the February Letter was to provide the defendant with the rule of specialty protection that he otherwise would have forfeited in the event that he waived extradition and voluntarily appeared in the United States outside of the formal Malaysian extradition process.  As he concedes, the defendant expressly sought this protection from the government.  (Def. Reply 4; Ex. C).  In order to grant the same protection afforded by the rule of specialty, the February Letter tracked the language of the Extradition Treaty's "Rule of Specialty" provision faithfully, substituting a reference to the Initial Indictment in lieu of "the offense for which extradition has been granted," as outlined below:[6]

----

United States v. Barinas, 865 F.3d 99, 105 (2d Cir. 2017) (holding that an individual defendant lacks standing to invoke the rule of specialty unless the extraditing country also protests the specialty violation, as extradition treaties are agreements between countries that do not create personal rights), cert. denied, 139 S. Ct. 54 (2018); United States v. Garavito-Garcia, 827 F.3d 242, 246 (2d Cir. 2016) (same); United States v. Suarez, 791 F.3d 363, 367–68 (2d Cir. 2015) (holding that a defendant has standing to raise a specialty claim only if the surrendering country first lodges an official protest).  In this case, as noted above, the Malaysian government has been apprised of the contents of the Superseding Indictment and have raised no objection.

[6] The reference to the Initial Indictment was substituted in lieu of the Extradition Treaty language – "the offense for which extradition has been granted" – because, under the terms of the February Letter, the agreement would apply when the defendant had waived extradition and was appearing voluntarily in the United States, and not pursuant to formal extradition from Malaysia.

| The February Letter | Extradition Treaty, Article 16 "Rule of Specialty" |
|---|---|
| [T]he Offices agree that your client will not be detained, tried or punished at the request of our Offices except for | A person extradited under this treaty may not be detained, tried, or punished in the Requesting State except for: |
| (1) the offenses charged in the indictment returned on October 3, 2018 in the above-referenced case, or any lesser included offense proved by the facts on which this indictment was grounded, and | (a) the offense for which extradition has been granted or any lesser offense proved by the facts on which the first mentioned extradition was grounded; [and] |
| (2) any offense committed after the waiver of extradition and initial appearance in the Eastern District of New York. | (b) any offense committed after the extradition of the person |

As is clear, the language set out in the February Letter is coterminous with the Extradition Treaty. The effect is also clear: the February Letter was intended to provide the defendant the rule of specialty protections of the Extradition Treaty, no more and no less.

Applying the controlling law in this Circuit, the Superseding Indictment in no way violates the rule of specialty protections. The changes reflected in the Superseding Indictment can be summarized primarily as: (1) specifically identifying references to Goldman Sachs Group and its subsidiaries, which was an institution that was uncharged at the time of the Initial Indictment;[7] (2) further explaining the manner in which the defendant violated the statute by noting that the defendant was a stockholder of the issuer under the FCPA; and (3) providing additional notice regarding the SUAs that serve as the object of the money laundering conspiracy. Notably, the Superseding Indictment did not change the statutory charges on which

---

[7] The defendant claims that the government has "change[d] the identity of the 'issuer' for FCPA purposes," (Def. Reply 2), yet he ignores that the government disclosed to him in pre-trial discovery that Goldman Sachs Group was the issuer and repeated that fact in its opposition to his initial motion (Govt. Opp. 1).

defendant was extradited or the scheme underlying those charges.  As a result, under well-settled law of this Circuit—which has affirmed the addition of substantive charges even after extradition—the Superseding Indictment violated neither the rule of specialty contained in the Extradition Treaty nor its mirrored provision in the February Letter.  See Levy, 25 F.3d at 159; Fiocconi, 462 F.2d at 481–82.

   In his initial motion, the defendant spent the majority of his lengthy filing complaining, inaccurately, that the Initial Indictment failed to give him adequate notice.  The Superseding Indictment provided the defendant additional notice above and beyond the Initial Indictment.  In particular, clarifying the defendant's status as a "stockholder," specific statutory citations, and relevant SUAs for the charged money laundering scheme further informs the defendant of the numerous ways in which his conduct violated the relevant criminal statutes with which he was previously charged in the Initial Indictment.  See United States v. Mejia, 545 F.3d 179, 207 (2d Cir. 2008) ("[W]here there are several ways to violate a criminal statute . . . federal pleading requires . . . that an indictment charge [be] in the conjunctive to inform the accused fully of the charges."); United States v. Ahmed, 94 F. Supp. 3d 394, 432 (E.D.N.Y. 2015) ("[W]here there are several ways to violate a criminal statute, a charge alleging two distinct ways to violate a statute, is not only permissible but required." (citing Mejia)).

   The defendant now objects to these changes by invoking the rule of specialty, but in doing so, he misapprehends the rule.  He claims that the rule of specialty protections in the February Letter prohibited the government from altering the Initial Indictment in any way that would change the offenses upon which defendant was extradited "or the facts underlying" them. (Def. Reply 4, 7).  He goes even further, falsely claiming that "[b]y agreeing to not change the offense, the Government agreed to not add or change facts that impact on how it intends to prove

14

that Ng violated a particular law." (Id. at 8). The defendant is incorrect. Even if the February

Letter controlled—which, as explained above, it does not—the terms of the letter did not include

an agreement "to not add or change facts" impacting how the government intends to prove Ng's

guilt, as the defendant suggests. Rather, the February Letter noted that the defendant would not

be detained, tried or punished except for "the offenses charged" in the Initial Indictment. As

explained above, that is entirely the case with the Superseding Indictment, which charges the

defendant with the exact same offenses as the Initial Indictment.

Notably, the defendant fails to cite a single case in support of his extraordinary

claims, and in the process, he pushes the rule of specialty far beyond its limits. As the Second

Circuit has explained, the rule of specialty "has never been construed to permit foreign intrusion

into the evidentiary or procedural rules of the requisitioning state." United States v. Flores, 538

F.2d 939, 944 (2d Cir. 1976). But here, the defendant argues that the standard rule of specialty

protections reflected in the February Letter give him authority to intrude on any post-extradition

changes to an indictment, even those that may provide additional notice of the previously

charged crimes consistent with the Constitution and laws of the United States. In essence, if left

to the defendant, the indictment would be frozen in time. That interpretation must be rejected.

The rule of specialty confers no such power and rightly so, as it would more than "intru[de] into

the evidentiary or procedural rules of the [United States]," it would nullify them. Flores, 538

F.2d at 944.

In sum, whether by virtue of the Extradition Treaty or operation of the February

Letter, the defendant has sought, and received, the rule of specialty protections. As discussed

above, the defendant's interpretations of the rule are contrary to well-established law. Because

the Superseding Indictment does not improperly allege any new offenses that would violate the rule of specialty, the defendant's motion should be denied.

## II.     THE DEFENDANT'S CLAIM THAT THE GOVERNMENT HAS NOT COMPLIED WITH ITS DISCOVERY OBLIGATIONS IS MERITLESS

Despite failing to cite a single case or acknowledge the applicable, settled legal framework for the production of materials pursuant to 18 U.S.C. § 3500 ("Section 3500"), Giglio v. United States, 405 U.S. 150 (1972), and Brady v. Maryland, 373 U.S. 83 (1963) in his reply, the defendant broadly and baselessly asserts that the government "possesses or controls, but has not turned over, Rule 16 and Brady material."  (Def. Reply 38-51).  He then demands the production of three categories of materials: (1) materials "underlying" the Goldman Letter (see, e.g., id. at 39); (2) Section 3500 and Giglio materials (see, e.g., id. at 40 ("[p]roffers of Goldman witnesses"); 41-42 ("witness statements" and information that is "Giglio with respect to [] Goldman witnesses"; and 48-52 (Giglio for Leissner and Goldman)); and (3) oral and written presentations containing representations and arguments made by counsel for Goldman in the course of the investigation and plea negotiations (collectively, the "Advocacy Materials") (see, e.g., id. at 40 ("Goldman's formal papers")).  As detailed at length in the government's initial response (see Govt. Opp. at 65-90), these arguments are meritless.

First, the government has already produced Rule 16 material "underlying" the Goldman Letter (and otherwise) in its possession, custody, or control.

Second, the defendant's request for early disclosure of Section 3500 and Giglio is premature, under settled law and established practice in this District that the defendant does not even address, let alone dispute.

Finally, the representations and arguments made by Goldman's counsel in the Advocacy Materials that could be subject to disclosure pursuant to the government's obligations have been summarized for the defendant in the Goldman Letter.  Having obtained the substance

17

of those arguments—and the actual evidence on which those arguments were based—the defendant offers no legal basis to demand the production of the Advocacy Materials themselves.

A.     **The Defendant Mischaracterizes the Content and Timing of the Goldman Letter**

In support of his arguments—which are otherwise identical to those made in his initial motion—the defendant cites the Goldman Letter, which he mischaracterizes as both as a "response" to his motion filed on October 30, 2020, and as "describing . . . categories of material evidence" that the government purportedly has failed to produce.  (Id. at 1, 38-39).  Given the defendant's mischaracterizations, the government begins by correcting the record as to the actual information contained in the Goldman Letter, and the timing of the letter's production to the defendant.

Contrary to the defendant's conclusory assertion, the Goldman Letter does not describe "categories of material evidence" from Goldman that the government has not yet produced; rather, as previously explained (Govt. Opp. 72-73; see also infra n.2), well before the defendant received the Goldman Letter, he received in Rule 16 discovery the Goldman Productions, which comprise more than five million pages of actual records, documents, communications and recordings in the government's possession, custody, and/or control that it received, either directly or indirectly, from Goldman.

The Goldman Letter is not a list of materials that were excluded from the Goldman Productions.  It is a detailed summary of representations and arguments made by legal counsel for Goldman in different materials, the Advocacy Materials (which, as noted above, Goldman's counsel provided to the government during its criminal investigation of Goldman and subsequent plea negotiations).  By providing the defendant with a full summary of

18

representations and arguments made by Goldman's lawyers long after the charged crimes, the Goldman Letter in many respects went beyond the government's discovery obligations.  The breadth of the government's disclosure is not a basis for the defendant to demand more information where he already has both the arguments of Goldman's lawyers and, most importantly, the actual evidence produced by Goldman.

That is particularly true because, as the defendant himself notes (Def. Reply 40-51), the representations and arguments that he views as potentially helpful were controverted by facts that Goldman Sachs Group and Goldman Malaysia admitted in the Statement of Facts ("SOF") in connection with the resolution of their criminal cases on October 22, 2020 (see United States v. The Goldman Sachs Group, Inc., No. 20-CR-437 (MKB) and United States v. Goldman Sachs (Malaysia) Sdn. Bhd., No. 20-CR-438 (MKB)).   That is unsurprising, because, as the defendant knows and omits from his reply, those representations and arguments find no support in the Goldman Productions and the actual evidence in this case.  And although, with the benefit of the Goldman Letter, the defendant's motion repeatedly highlights representations and arguments by Goldman's lawyers, a lawyer's argument is not evidence.

In sum, the only materials that the government has not provided are the Advocacy Materials themselves—that is, documents drafted by Goldman's counsel, such as white papers and presentations—and not, as the defendant contends, the "underlying" evidence in the Goldman Productions, which has already been produced to the defendant in Rule 16 discovery. And for the reasons set forth below in Section II.B., the defendant is not entitled to the Advocacy Materials.

Moreover, although irrelevant to the disposition of his motion, the defendant is wrong to assert that the Goldman Letter was produced in "response" to the defendant's motion.

19

The government began compiling the representations and arguments made by Goldman's counsel that are summarized in the Goldman Letter—which were made over a period of four years—prior to the resolution of the criminal investigation of Goldman on October 22, 2020. Thereafter, the government moved expeditiously to complete its review of the Advocacy Materials and finalize the Goldman Letter after the Goldman resolution became public, producing the Goldman Letter approximately three weeks later and approximately four months prior to the currently scheduled trial date.[8]

**B.     The Defendant's Demands for The Production of Materials Are Moot, Premature and Without Merit**

As noted above, the defendant's demands for the production of materials fall into three categories: (1) so-called evidence "underlying" the Goldman Letter, (2) witness statements and <u>Giglio</u> material, and (3) the Advocacy Materials.  All three requests should be denied.

<u>First</u>, as discussed above, the government has already provided the defendant with the Goldman Productions, which—as far as the government is aware—constitute the "documents and information [that Goldman's counsel] rel[ied] on in making these representations" and arguments in the Goldman Letter (Def. Reply 41), with the exception of certain witness statements and <u>Giglio</u> material that the defendant is not entitled to at this time.[9]  The defendant

---

[8] Clearly unaware of the government's intention to provide the Goldman Letter shortly after the Goldman resolution became public, the defendant incorrectly assumed that the Goldman Letter was triggered by the defendant's motion.  Notably, the defendant would not have known that the Goldman resolution would be publicly announced on the date that it was, and it is that resolution which appears to have triggered many of the defendant's so-called "<u>Brady</u>" requests in his October 30, 2020 filing.  (<u>See</u>, <u>e.g.</u>, Def. Mot. 101-14).

[9] As an example, the defendant states that "Goldman's lawyers certainly must have relied on documents and/or information when representing to the Government that Goldman had all manner of compliance and controls in place – what are these?"  (Def. Reply 43).  The defendant is well-aware, however, that the Goldman Productions contain extensive information from Goldman about

feigns surprise that in trying to resolve a criminal investigation, Goldman's counsel would advocate for its client and attempt to draw inferences different from those drawn by the government.  (See, e.g., id. at 41-42).  Of course, none of that is surprising; indeed, the defendant does the same throughout his motion papers, and will presumably attempt to do the same at trial. Irrespective of whether the defendant attempts to advance arguments previously raised by Goldman's lawyers, because he has received the evidence underlying those arguments, his current motion must be denied.

Second, with respect to witness statements and Giglio material, the defendant entirely ignores the applicable, settled law cited by the government that makes clear he is not entitled to that information at this time.  (See Govt. Opp. at 66-68 (citing cases holding that (1) a defendant has "no pretrial discovery right to Giglio materials" (United States v. RW Prof'l Leasing Servs. Corp., 317 F. Supp. 2d 167, 179 (E.D.N.Y. 2004) (citing United States v. Nixon, 418 U.S. 683, 701 (1974)); see also, e.g., United States v. Gatto, 316 F. Supp. 3d 654, 657-60 (S.D.N.Y. 2018)) and (2) Section 3500 explicitly "prohibits a District Court from ordering the pretrial disclosure of witness statements" (United States v. Coppa, 267 F.3d 132, 145 (2d Cir. 2001); see In re United States, 834 F.2d 283, 286-87 (2d Cir. 1987)); United States v. Percevault, 490 F.2d 126, 131 (2d Cir. 1974)).

---

its compliance programs and internal accounting controls, including documents like "Due Diligence and Approval Guidelines for Complex or Strategic Transactions" (GS-1MDB-00000001) and "Goldman Sachs Policy on Committees Involved with the Management of the Firm" (GS-1MDB-02652540).   Similarly, the defendant asks "[w]hat documents and/or information did Goldman provide the Government about declining billions of dollars in business with 1MDB?"  (Def. Reply 44).  Again, the defendant is well-aware that the Goldman Productions contain information about various opportunities that Goldman had to work with 1MDB other than the three bond deals.

The defendant's attempt to create an end-run around the timing requirements for materials covered by Section 3500 and <u>Giglio</u> by simply declaring such materials are discoverable pursuant to Rule 16(a)(1)(E) because they are "material to preparing [his] defense" (Def. Reply 52) fails for multiple reasons.  Rule 16 <u>explicitly</u> does not apply to witness statements (<u>see</u> Rule 16(a)(2) ("Nor does this rule authorize the discovery or inspection of statements made by prospective government witnesses except as provided in 18 U.S.C. § 3500")), and such an interpretation, for which the defendant cites not a single case or other authority, is inconsistent with the extensive case law regarding the appropriate timing of Section 3500 and <u>Giglio</u> materials.  The defendant appears to admit as much, as he explicitly labels the majority of the materials he seeks as "<u>Giglio</u> material" (<u>see, e.g.</u>, Def. Reply 48-51, 53) and then argues for the early disclosure of such materials solely by posing the question "[b]ut why wait?" (<u>id.</u> at 53)—without any acknowledgement of the relevant legal framework.  The defendant is no more entitled to early disclosure of these materials than any other defendant.  He also fails to mention that the government has in fact provided him with certain categories of early <u>Giglio</u> and Section 3500 materials already.  (<u>See, e.g.</u>, the Goldman Letter and materials discussed in Govt. Opp., Section VII).

<u>Third</u>, the defendant does not cite a single case or other authority that would suggest that he is entitled to the Advocacy Materials themselves.  As established in the government's prior brief, these materials are not discoverable pursuant to Rule 16 because the defendant already has the underlying documents on which these materials were based.  He has no need for the arguments that other lawyers, for a third party, chose to make based on these materials.  (<u>See</u> Govt Opp. 75 (citing <u>United States v. Maniktala</u>, 934 F.2d 25, 28 (2d Cir.

22

1991))).  But even if he had such a need, to the extent they bear on his defense, he has been provided with the arguments themselves, in the Goldman Letter.

In claiming that he needs more, the defendant asserts that the Advocacy Materials—which were created not by Goldman employees with first-hand knowledge but by its lawyers—must be produced because they constitute <u>Giglio</u> "with respect to any Goldman witness who will assert on the stand something directly contrary to what Goldman asserted to the Government.  (Def. Reply 42).  This assertion is strained, at best.

The defendant should not be permitted at trial to cross-examine fact witnesses with Goldman's legal arguments and advocacy (as opposed to documents and underlying evidence) made in the course of plea negotiations.  A statement by Goldman's counsel that the defendant believes is helpful to him is no more admissible in the guise of cross-examination than a harmful statement by Goldman's counsel would be on direct or redirect examination.  To the extent the defendant appears to disagree, this issue will need to be addressed before trial, likely through <u>in limine</u> briefing.  Regardless, even if the Advocacy Materials contained <u>Giglio</u>, that information has already been provided to the defendant in the Goldman Letter; there is nothing about the form of a white paper or presentation <u>itself</u> that is <u>Giglio</u>, rather than the information it contains; and the defendant is, in any event, not entitled to <u>Giglio</u> material at this time.

The defendant's continued suggestions that the Advocacy Materials constitute <u>Brady</u> fail as a matter of both fact and law.  As an initial matter, this is pure speculation, which alone defeats it.  <u>See</u> <u>United States v. Halloran</u>, 821 F.3d 321, 341 (2d Cir. 2016) ("[U]nsubstantiated speculation cannot support a finding that undisclosed evidence is material under Brady").  To the extent the defendant offers any basis for his suggestion, it appears to be not that the words in the Advocacy Materials themselves will assist him, but that the absence of

certain arguments or information therein will assist him.  For example, the defendant contends

that, if the Advocacy Materials did not contain a representation or argument that he "took any

money from 1MDB," that would be "<u>Brady</u>."  (Def. Reply 49).  This does not make sense.

Again, the defendant already has all of the information (other than witness

statements and certain <u>Giglio</u>) underlying the Advocacy Materials of which the government is

aware—namely, the Goldman Productions.  To the extent that the defendant wishes to argue at

trial that there is insufficient evidence to support the charges against him, the Advocacy

Materials are entirely immaterial to that effort.  To the extent, however, that he intends to argue

to the jury that he is not guilty because Goldman's counsel, after the fact, and without first-hand

knowledge, did not make certain representations or arguments to the government, that is plainly

improper.  Arguments of lawyers are not evidence.  Nor, more fundamentally, is a lack of

evidence proof of anything.  In short, "absence of evidence is not evidence of absence." <u>United</u>

<u>States v. Acosta-Gallardo</u>, 656 F.3d 1109, 1117 (10th Cir. 2011).

Another theory offered by the defendant in support of his position is that, if the

Advocacy Materials contain <u>Giglio</u> as to Tim Leissner, and in particular, show that Leissner

"engaged in other unlawful activity without [the defendant], then it makes it more likely that

Leissner engaged in the unlawful activity alleged in the Indictment without [the defendant] as

well," and thus is "Brady."  (Def. Reply 49-50).  This argument is frivolous.  It is well-settled

that a "defendant may not seek to establish his innocence . . . through proof of the absence of

criminal acts on [other] specific occasions." <u>United States v. Scarpa</u>, 897 F.2d 63, 70 (2d Cir.

1990).  Moreover, if accepted, the defendant's argument would render meaningless the

distinction between <u>Brady</u> and <u>Giglio</u>.  Contrary to settled law, if the defendant were correct, a

cooperator's criminal history, for example, would be deemed exculpatory of the defendant,

24

unless every other crime he committed was with the defendant.  Similarly, such a proposal would mean a witness's admission that he engaged in unrelated misconduct would be exculpatory, unless that misconduct, too, were with the defendant.  The defendant cites nothing in support of this novel proposition.  It is demonstrably not the law.

Finally, the defendant's remaining arguments related to discovery also fail.  For all of the reasons set forth in the government's opposition, Goldman is neither controlled by the government for purposes of Rule 16, nor is it a member of the prosecution team for purposes of Brady and Giglio.  (Govt. Opp. 75-87).  In his reply, the defendant improperly conflates these two standards, wrongly stating that Goldman is a "part of the prosecution team" because, as he asserts, United States v. Stein, 488 F. Supp. 2d 350 (S.D.N.Y. 2007) ("Stein") is the "law of this Circuit" (Def. Reply 53).  But Stein—in which a district court found that a company was "controlled" by the government for purposes of Rule 16—is not relevant to the "prosecution team" analysis, has not been followed by any other court, and is clearly distinguishable on its facts from this case.  (See Govt. Opp. 76-80).[10]  Moreover, while the defendant is correct that the company at issue in United States v. Carson, No. 8:09-cr-00077-JVS (C.D. Cal. Dec. 8, 2009) (Order, ECF No. 133) entered into a plea agreement with the government rather than a DPA—a fact that the government discussed in its response (Govt. Opp. 78)—the Carson court explicitly

---

[10] The defendant's citation to United States v. Stein, 541 F.3d 130, 151 (2d Cir. 2008) ("Stein Appeal") is inapposite, because the Second Circuit did not address the issue from Stein relevant to this case (that is, whether the company at issue was a part of the "prosecution team" for purposes of the government's discovery obligations), but rather considered whether the company, in adopting a policy to stop paying legal fees and expenses to employees facing criminal charges, had acted at the direction of the government, and in doing so had violated the employees' Sixth Amendment rights.  In concluding that the company's adoption of the policy was indeed "state action," the Second Circuit in Stein Appeal did not conduct any analysis of the language of the company's DPA.  Id. at 146-51.

25

concluded not only that the tenor of the <u>Stein</u> case was "inconsistent" with "Rule 16 case law in general," but also highlighted facts that make clear that Goldman's DPA is much more akin to the plea agreement in <u>Carson</u> than the DPA in <u>Stein</u>.  <u>See</u> <u>Carson</u> at 2-6; (Govt. Opp. at 78-79).

III.   **THE SECOND CIRCUIT HAS NOW HELD THAT ANY FELONY FCPA VIOLATION IS A VALID SPECIFIED UNLAWFUL ACTIVITY FOR THE MONEY LAUNDERING STATUTE**

As detailed in the government's initial response, the defendant's argument that Count Three should be dismissed because it invalidly charged a violation of the FCPA under Section 78dd-3 as an SUA was identical to an argument made by the defendant in United States v. Ho, No. 17 Cr. 779 (LAP) ("Ho"). (See Govt. Opp. 46-51). Specifically, both asserted that because Section 78dd-3 did not exist at the time the money laundering statute was enacted, Section 78dd-3 was not a valid SUA. (See Def. Mem. 82-84; Ho, Dkt. No. 151-1). In Ho, the district court rejected the defendant's argument, and the jury subsequently returned guilty verdicts against the defendant on two money laundering counts, each of which identified Section 78dd-3 as one of the SUAs. Ho, Dkt. Nos. 212 (at 66) and 201. After conviction, Ho appealed that ruling and others. (Govt. Opp. 50 n.8).

On December 29, 2020, after the defendant filed his reply brief in this case, the Second Circuit rejected Ho's appeal and affirmed the district court's judgement in a precedential opinion, specifically affirming that any felony violation of the FCPA, including a violation of Section 78dd-3, could serve as an SUA under the money laundering statute. Ho Appeal, --- F.3d at ----, 2020 WL 7702576 at *1, *6-*7. The Second Circuit held that the money laundering statute's plain language defines an SUA to include "any felony violation of the Foreign Corrupt Practices Act" and, thus, resorting to the reference cannon is "unnecessary." Id. at *7 (emphasis in original). The Court concluded that the money laundering statute "contains no textual limitation" and that "the use of the word 'any' – particularly when paired with the broad descriptor 'felony violation of the Foreign Corrupt Practices Act,' rather than specific prohibitions – reinforces the natural reading of the statute to refer to whatever conduct

27

constitutes such a violation."  Id.  The Court further explained that this reading of the statute was

"consistent with the statutory context" of the money laundering statute, which aims squarely at

"attempts to launder dirty money" while leaving why and how money was dirty to be defined by

other statutes, including incorporating developments in those statutes that "provide[d] new ways

for money to become tainted."  Id. at *8.[11]  The Court also rejected the notion that Congress was

required to specify the inclusion of amendments to the FCPA or that Congress' failure to amend

the money laundering statute reflected its intent to exclude those amendments.  Id. at * 8.

   As the Ho Appeal is now binding precedent in the Second Circuit, the defendant's

arguments here that Section 78dd-3 is not a valid SUA must fail.

---

[11] The Court also specifically considered Jam v. Int'l Fin. Corp., 139 S. Ct. 759 (2019), and
concluded that the Court's interpretation was neither inconsistent with Jam nor compelled it to
resort to the reference cannon to interpret the money laundering statute.  Id. at * 8.

## CONCLUSION

For the reasons set forth above and in its initial response, the government respectfully submits that the defendant's motion is without merit and should be denied in its entirety.

Dated: Brooklyn, New York
       January 13, 2021

Respectfully submitted,

SETH D. DuCHARME
Acting United States Attorney

By: _____/s/_____
Alixandra E. Smith
Drew G. Rolle
Assistant U.S. Attorneys
(718) 254-7000

DEBORAH L. CONNOR
Chief, Money Laundering & Asset Recovery Section
Criminal Division
U.S. Department of Justice

By: _____/s/_____
Jennifer E. Ambuehl
Nikhila Raj
Trial Attorneys

DANIEL S. KAHN
Acting Chief, Fraud Section
Criminal Division
U.S. Dept. of Justice

By: _____/s/_____
Katherine Nielsen
David A. Last
Trial Attorneys

29