# BRAFMAN & ASSOCIATES, P.C.

ATTORNEYS AT LAW

256 FIFTH AVENUE, 2ND FLOOR

NEW YORK, NEW YORK 10001

TELEPHONE: (212) 750-7800

FACSIMILE: (212) 750-3906

E-MAIL: ATTORNEYS@BRAFLAW.COM

BENJAMIN BRAFMAN
———

MARK M. BAKER
OF COUNSEL

MARC A. AGNIFILO
OF COUNSEL

ZACH INTRATER
OF COUNSEL

ANDREA L. ZELLAN

JACOB KAPLAN

TENY R. GERAGOS
ADMITTED IN NY & CA

STUART GOLD

January 22, 2021

VIA ECF

The Honorable Margo K. Brodie
United States District Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, NY 11201

Re:    United States v. Ng Chong Hwa a.k.a Roger Ng, 18 Cr. 538 (MKB)

Dear Judge Brodie:

We submit this letter in reply to the Government's January 13th memorandum in further opposition to the defendant's motion to dismiss and other relief. (Dkt. 59 ("Gov't Sur-Reply").) This letter is limited to only the issues addressed in the Government Sur-Reply. Because the Government's recent filing purports to cast doubt on certain facts of which defense counsel and the Government have first-hand knowledge, we also attach two affirmations of counsel with exhibits to shed light on these facts.

This letter addresses two issues. First, that the record shows that Mr. Ng waived extradition such that the Government's Febraury 12, 2019, letter constitutes a binding promise to not materially change the Indictment. Second, that the Government has failed to show why the District Court and Second Circuit decisions in Stein should not mandate the disclosure Mr. Ng seeks.

**The Superseding Indictment Materially Changed the Original Indictment And Is Prohibited by a Written Contract Between Mr. Ng and the Government**

In its most recent filing, the Government argued that: (i) because the February 12, 2019 letter is unsigned, it should not control; (ii) even if viewed as the controlling position of the U.S.

BRAFMAN & ASSOCIATES, P.C.

Government, the letter is moot because Mr. Ng consented, rather than waived, extradition to the U.S.; and (iii) regardless of the Court's opinion on the first two issues, the Government's changes to the Indictment do not run afoul of either its agreement in the February 12, 2019, letter or the Rule of Specialty. We most respectfully disagree with the Government's contentions and address each in turn.

1.  The Government's February 12, 2019 Letter Formed a Contract

A.  *The Email Accompanying the Letter States That the February 12, 2019 Letter Is the Final, Approved Position of the U.S. Government*

The February 12, 2019, letter was an attachment to an email from the same date. (See Dkt. 58, Exhibit 2 at 1-3; see also Agnifilo Affirmation ¶10.) The email stated, "please find the final approved letter, as discussed last week." (Id.) The Government now attempts to distance itself from the letter it wrote and represented as the "final approved letter" by saying that it was unsigned. (See Gov't Sur-Reply at 3.) This cannot stand. At the time the Government sent this letter, it was aware that the undersigned was already in Malaysia, and that counsel would rely on this letter in advising Mr. Ng to waive extradition. Moreover, the letter required that Mr. Ng waive extradition by February 15th, which he did in reliance on the letter. (See Agnifilo Affirmation ¶11.) Therefore, the Court should not permit the Government to disavow the letter when the prosecutors explicitly assured counsel that it was the "final approved letter" of the Department of Justice and where the letter called for an extradition waiver by a certain date, with which the defendant complied.

B.  *Mr. Ng Waived Extradition in Malaysia*

The undersigned travelled to Malaysia between February 11, 2019 and February 16, 2019 for two reasons. First, to discuss the extradition waiver with Mr. Ng and ensure he was fully aware of the consequences of waiving extradition to the United States. Second, to physically appear in Court in Malaysia on February 15, 2019, to ensure that the waiver was entered to the satisfaction of the Court and with the knowing, informed consent of Mr. Ng.

In the weeks leading up to the extradition waiver, there was extensive and detailed correspondence between the undersigned and Government lawyers specifically addressing the waiver. On January 23, 2019, while counsel was still in the United States, the Government specifically instructed counsel that for Mr. Ng to be released on bail in the United States, he must "waive" and "not consent" to extradition. (See Geragos Affirmation ¶5; see also Geragos Affirmation Ex. 1 at 1.) On February 7, 2019, the Government sent the undersigned an email that it was working on the "waiver of extradition" (Agnifilo Affirmation, Ex. 1 at 2) and proposed a phone call. That same day, counsel spoke on the phone with the Government, who represented that Mr. Ng would "not be detained and would only be tried and punished only on the Indictment." (Geragos Affirmation ¶8.) On February 12, 2019, the Government sent the undersigned the "final, approved letter" that specifically stated that Mr. Ng would waive, rather than consent, to extradition. (See Dkt. 58, Ex. 2 at 1-3.) While in Malaysia on the evening of February 14th, the undersigned informed the Government that he had met with Mr. Ng and reiterated that "we are

BRAFMAN & ASSOCIATES, P.C.

waiving extradition at Friday's hearing." (Agnifilo Affirmation Ex. 1 at 1.) On the morning of Friday, February 15th (Malaysian time), the undersigned yet again informed the Government, "Roger will waive extradition this morning." (Id. Ex. 2 at 1.)

The undersigned was present in Court during the hearing in Malaysia on the morning of February 15th. During the hearing, Mr. Ng's Malaysian counsel, Datuk Tan Hock Chuan, in the presence of the undersigned, informed the Court that Mr. Ng was waiving extradition. Specifically, Datuk Tan Hock Chuan conferred with the undersigned and the undersigned stated that it was critical that the record reflect that Mr. Ng waived extradition, as opposed to consenting to extradition. (See Agnifilo Affirmation ¶¶15-16.) As a result, as set forth in the attached affirmation, and as has been reported in the Malaysia press, Datuk Tan Hock Chuan stated on the record, "First I am instructed to inform the court that the respondent has agreed to a waiver of the committal/extradition proceedings before this honourable court." (Id. ¶16; Ex. 3 at 1.) When Datuk Tan Hock Chuan here refers to being "instructed," he was so instructed by the undersigned who explained the agreement in existence between the Government and Mr. Ng, through counsel. Within an hour of the waiver being entered, the undersigned emailed the Government officials: "Waiver has been made. All done." (Id. ¶17; Ex. 4 at 1.)

It is telling that the first time the Government claims that Mr. Ng consented to, rather than waived, extradition is after the Government superseded the Original Indictment. Given the many phone calls and emails between the parties that Mr. Ng would waive extradition, given the representation of counsel after the waiver that Mr. Ng had waived extradition, and given the letter provided by the Government that Mr. Ng must waive extradition, one would expect that if the Government was of the view that Mr. Ng did not waive extradition, it would not wait almost two years to bring it up for the first time.

Because Mr. Ng plainly waived extradition, the extradition treaty between the U.S. and Malaysia is not dispositive of this matter. Rather, the issue of whether and to what extent the Government may change the Indictment after Mr. Ng waived extradition is to be determined by the Government's letter. The Court may ask what is the difference between analyzing the changes to the indictment under the Treaty's Rule of Specialty, on the one hand, or as a written promise by the prosecution, on the other? The answer, as indicated below, is that the language of a written promise would be strictly construed against the prosecution because the Government knows the defendant is relying to his detriment on that written promise, as opposed to a defendant who fights extradition.

> 2.      The Only Fair Interpretation of the Government's Written Promise Is That In Exchange for Defendant's Waiver, It Agreed Not to Materially Change the Indictment

A defendant who fights extradition does not enter into an agreement with the Government where each party makes promises in favor of the other. Accordingly,  this situation is distinct from one where a criminal defendant persists in opposing extradition and does not rely on a specific promise made to him. As discussed in United States v. Masefield, No. 02 Cr. 441 (LAP), 2005

BRAFMAN & ASSOCIATES, P.C.

WL 236443 (S.D.N.Y. Feb. 1, 2005), "enforcement of the principle of specialty is founded primarily on international comity . . . ." Id. at *2. See also, e.g., United States v. Saccoccia, 58 F.3d 754, 766 (1st Cir. 1995). The defense agrees with the Government's observation that "the basis for the rule of specialty . . . is not a concern about protecting the rights of a defendant . . . ." United States v. Biba, No. 09-CR-836 (DLI), 2017 WL 11380497 (E.D.N.Y. Mar. 6, 2017). Because the purpose of the rule of specialty is to foster fair dealing between countries and that the defendant is not a party to the treaty, the interpretation of a treaty is different than a written agreement between a government and a criminal defendant.

Where, as here, the Government makes a written promise in non-negotiable language to a criminal defendant, knowing that reliance will forever change that person's legal situation, the relevant analogy is to interpretation of plea agreements rather than to treaties between nations. See generally United States v. Ready, 82 F.3d 551 (2d Cir. 1996) (plea agreements are unique contracts in which special due process concerns apply and are strictly construed against the Government); see also United States v. Vergara, 62 F. Supp. 2d 1108 (S.D.N.Y. 1999). Therefore, we ask the Court to examine the Government's written promise in the February 12, 2019 letter through the lens of interpretation applied to plea agreements.

**The Court Should Order the Government To Promptly Provide Brady Material And Discovery Material in Its Control**

As detailed in Ng's prior submissions, counsel has reason to believe that the Government possesses or controls, but has not turned over, Rule 16 and Brady material. Given the previous, voluminous briefing addressing this issue, counsel will limit this Reply to the topics indicated below.

1.        The Government Has Failed to Adequately Address the Stein Decision

The Government attempts to walk away from the law of this Circuit by reading the principles of United States v. Stein, 541 F.3d 130, 151 (2d Cir. 2008), out of the Second Circuit's decision. The Government claims that Stein could not possibly be relevant to this case because there, a large company that had entered a DPA with the Government refused to pay for employees' legal fees as a result of Government pressure. But in its effort to beat a fleet retreat from the law of this Circuit, the Government fails to recognize that the fundamental point of Stein is the pressure that the Government is able to bring to bear on a large corporation when that company has entered a DPA with the Government – not the object of that pressure.  What about the following from Stein is distinguishable in any way from the present case: "KPMG faced ruin by indictment and reasonably believed it must do everything in its power to avoid it. The government's threat of indictment was easily sufficient to convert its adversary into its agent." Stein, 541 F.3d at 151; see also Stein I, 435 F. Supp. 2d 330, 350 (S.D.N.Y. 2006) ("The cooperation provisions of the DPA . . . require KPMG to comply with demands by the USAO . . . [or else face] the risk that the government will declare that KPMG breached the DPA and prosecute the criminal information to verdict.")

BRAFMAN & ASSOCIATES, P.C.

The only necessary substitution for this analysis to apply to this case is the word 'Goldman' for 'KPMG.' Note that the Government does not cite to cases that overrule <u>Stein</u> – for it remains the law of this Circuit, however inconvenient that fact is for the Government. The DPA is the Sword of Damocles, and it remains suspended over Goldman's collective head. Goldman and the Government both know well the consequences of Goldman's failure to sing from the Government's songbook. But the song that Goldman sang initially had far different words and was set to far different music. Why does the Government insist on hiding the original tune? What is the secret with the presentations that Goldman made to the Government? Indeed, as mentioned, in a prior case counsel had with the same U.S. Attorney's Office, <u>United States v. Shkreli</u>, 15 Cr. 538 (KAM), Ng's counsel received precisely the same kind of material. Here, the same office refuses to provide the same.

Next, the Government claims that "[t]he Goldman Letter is not a list of materials that were excluded from the Goldman Productions. It is a detailed summary of representations and arguments made by legal counsel for Goldman in different materials, the Advocacy Materials (which, as noted above, Goldman's counsel provided to the government during its criminal investigation of Goldman and subsequent plea negotiations)." (Gov't Sur-Reply at 18.) But it is the content of the Goldman Letter that the Government conveniently ignores – that Goldman made numerous statements directly contradicted by the Statement of Facts that was drafted by the Government and signed by Goldman.

Ng recognizes that the arguments of lawyers are not evidence; this is not controversial – but it is also not the point. The point, again, is that the arguments of lawyers were based on something: documents, witness statements, and other types of evidence. It is this material to which Ng is entitled. What did Goldman base its initial arguments on? The Government has the answers in its possession but refuses to disclose them. And, to be clear, the Government appears to still, at this late date, mistake its obligations under <u>Brady</u> and <u>Giglio</u>: It states that "even if the Advocacy Materials contained <u>Giglio</u>, that information has already been provided to the defendant in the Goldman Letter." (Gov't Sur-Reply at 23.) Not so. Just as a lawyer's arguments are not evidence, the Government's summary of evidence is not evidence. The <u>Giglio</u> that the Government has failed to produce is the evidence that underlies the Goldman presentations, and not the Government's summary of that evidence from those presentations. Ng is entitled to the material itself.

Finally, the Government states that "feigns surprise that in trying to resolve a criminal investigation, Goldman's counsel would advocate for its client and attempt to draw inferences different from those drawn by the government," (Gov't Sur-Reply at 21), and that it is "pure speculation" that the Goldman materials contain <u>Brady</u> (<u>Id.</u> at 23). But many of the contradictions between the Goldman Letter and the Statement of Facts are not "inferences" that are "draw[n]," but rather direct contradictions which go to the very heart of this case. Here are four examples, highlighted in Ng's motions:

- First, that according to Goldman itself, the Goldman controls at issue were not "internal accounting controls" – nothing is more important for the resolution of Count Two.

5

BRAFMAN & ASSOCIATES, P.C.

- Second, that Roger Ng was not an employee of any "issuer" – Goldman Sachs Group, Inc. – this directly undermines one of the essential elements required to prove Count One.
- Third, that Goldman performed an exhaustive search of its network and did not uncover any "potentially significant information" about Ng.
- Fourth, that Ng never even worked on Project Catalyze, one of the three deals listed in the Superseding Indictment.

These are not "inferences" that might be "draw[n] . . . different from those drawn by the [G]overnment" – no, they are direct contradictions. They are exculpatory. They are <u>Brady</u>.

2.      <u>The Government's Refusal to Provide Materials Will Unnecessarily Delay the Trial Given the International Nature of This Case And Travel Restrictions</u>

As a practical matter, regardless of whether the materials are deemed Rule 16, <u>Brady</u>, <u>Giglio</u> or 3500, the result will be the same. Once the information is finally provided to counsel—including statements made by numerous overseas witnesses—the defense will be forced to prepare for trial, review this voluminous information and conduct additional investigations based on this new information within weeks of trial. It will be nearly impossible for counsel to accomplish these tasks in a constitutionally meaningful way in such a short time frame. Consequently, this Court and counsel will be forced to make difficult decisions regarding adjourning the trial date that will not only affect Ng's rights but also the rights of other defendants (some detained pending trial) who are seeking precious trial time during a raging pandemic.

Moreover, Ng has been on home incarceration for the past 20 months awaiting trial. While the recent trial adjournments have been necessary because of the Covid-19 pandemic, we see no justification to force an unnecessary and costly delay simply because the Government refuses to turn over required materials. Accordingly, to the extent this Court deems the requested materials as <u>Giglio</u> or 3500 material (as opposed to Rule 16 or <u>Brady</u> material), we request that this Court implore the Government to provide these materials at least 6 weeks before trial so as to avoid trial delays.

BRAFMAN & ASSOCIATES, P.C.

We thank the Court for your consideration.

Respectfully submitted,

Marc A. Agnifilo, Esq.
Zach Intrater, Esq.
Teny R. Geragos, Esq.
Jacob Kaplan, Esq.

cc:     Counsel for the Government (via ECF and email)

7