F. # 2016R00467

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA

    - against -

NG CHONG HWA,
        also known as "Roger Ng,"

                Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - X

Docket No. 18-CR-538 (S-1) (MKB)

MEMORANDUM OF LAW IN SUPPORT OF
THE GOVERNMENT'S MOTIONS IN LIMINE

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ........................................................................... 1

BACKGROUND ................................................................................................... 2

    A. The Defendant's Years-Long Efforts to Secure Business for Goldman through Jho Low........................................................................................................ 3

    B. The 1MDB Bond Transactions and the Diversion of the Proceeds to the Defendant and His Co-Conspirators ....................................................................... 6

DISCUSSION ..................................................................................................... 11

  I. EVIDENCE OF FALSE STATEMENTS REGARDING THE ORIGIN OF DIVERTED BOND FUNDS RECEIVED BY THE DEFENDANT'S CLOSE FAMILY MEMBER IS ADMISSIBLE..................................................... 11

  II. CERTAIN EVIDENCE THAT POST-DATES THE CHARGED CONSPIRACIES IS ADMISSIBLE........................................................................................ 19

  III. THE COURT SHOULD ADMIT MULTIPLE OTHER ACTS COMMITTED BY THE DEFENDANT AS DIRECT EVIDENCE OF THE CHARGED CRIMES AND UNDER RULE 404(b) ............................................................................. 40

  IV. STATEMENTS BY CO-CONSPIRATORS, INCLUDING ████████████ ███████████, ARE ADMISSIBLE .................................................. 66

  V. THE COURT SHOULD PRECLUDE THE DEFENDANT FROM INTRODUCING HIS OWN OUT-OF-COURT STATEMENTS. .......................................... 73

  VI. THE COURT SHOULD PRECLUDE EVIDENCE OR ARGUMENT CONCERNING THE COURT'S JURISDICTION, OR WHETHER THE DEFENDANT SHOULD HAVE BEEN PROSECUTED SOMEWHERE OTHER THAN THIS DISTRICT ............................................................................... 76

  VII. THE COURT SHOULD PRECLUDE EVIDENCE OR ARGUMENTS REGARDING THE INTERNAL ACCOUNTING CONTROLS CHARGE THAT THIS COURT PREVIOUSLY REJECTED ............................................... 80

  VIII. THE COURT SHOULD PRECLUDE THE DEFENDANT FROM OFFERING EVIDENCE OR ARGUMENT REGARDING THE CIRCUMSTANCES OF HIS ARREST IN MALAYSIA, INCARCERATION, EXTRADITION, AND PRE-TRIAL CONDITIONS............................................................................... 83

IX. THE COURT SHOULD PRECLUDE THE DEFENDANT FROM OFFERING
EVIDENCE OR ARGUMENT REGARDING HIS FAMILY BACKGROUND,
NATIONALITY, AND OTHER SIMILAR PERSONAL FACTORS ..................... 85

X.  THE COURT SHOULD PRECLUDE THE DEFENDANT FROM OFFERING
EVIDENCE OR ARGUMENT REGARDING THE POTENTIAL
CONSEQUENCES OF A CONVICTION ................................................................ 88

XI. THE DEFENDANT SHOULD PRODUCE ANY EVIDENCE HE INTENDS TO
ADMIT IN HIS CASE-IN CHIEF ........................................................................... 89

**CONCLUSION** ............................................................................................................ 92

## PRELIMINARY STATEMENT

The government respectfully moves the Court for in limine rulings in connection with the trial in the above-captioned matter.  The government seeks rulings: (1) admitting evidence of documented false statements made to a bank concerning the source of the diverted bond funds received by the defendant's close family member; (2) admitting certain statements made after the time period alleged in the superseding indictment; (3) admitting evidence of certain other acts committed by the defendant that constitute direct evidence of the charged offenses and do not constitute propensity evidence under Rule 404(b) of the Federal Rules of Evidence ("Rule 404(b)"); (4) admitting certain co-conspirators statements;  (5) precluding the defense from offering the defendant's own hearsay statements; (6) precluding evidence or argument concerning this Court's jurisdiction over the trial; (7) precluding improper defense argument concerning the internal accounting controls provisions of the Foreign Corrupt Practices Act (the "FCPA") that were already rejected by this Court; (8) precluding defense evidence concerning the defendant's extradition to the United States for trial; (9) precluding defense evidence or argument concerning the defendant's personal or family circumstances intended to improperly evoke sympathy; (10) precluding defense evidence or argument concerning the punishment or consequences of a conviction; and (11) compelling the production of defense case-in-chief exhibits under Rule 16 of the Federal Rules of Criminal Procedure.

For the reasons set forth below, the government respectfully submits that the Court should grant these motions in their entirety.[1]

---

[1]     The government has filed limited portions of this memorandum and the accompanying exhibits under seal (the "Redacted Information").  While courts recognize a "qualified First Amendment right" to access judicial documents and proceedings and a presumptive right of access to judicial documents under the common law.  Lugosch v. Pyramid

## BACKGROUND

1Malaysia Development Berhad ("1MDB") was a Malaysian strategic investment and development company wholly owned and controlled by the government of Malaysia through its Ministry of Finance.  The International Petroleum Investment Company ("IPIC") was an Abu Dhabi sovereign wealth fund wholly owned by the Government of Abu Dhabi.  Between 2009 and 2014, The Goldman Sachs Group, Inc. ("Goldman Sachs") and its subsidiaries and affiliates, (collectively, "Goldman"), through the defendant Ng Chong Hwa, also known as "Roger Ng," conspired with others, including fellow Goldman banker Tim Leissner ("Leissner") and Malaysian financier Low Taek Jho, also known as "Jho Low" ("Low"), to, among other things, corruptly provide payments and things of value to, or for the benefit of, foreign officials and their relatives in exchange for business advantages and to induce those foreign officials to influence the decisions of their government offices and certain government instrumentalities, including 1MDB and IPIC to obtain and retain business for Goldman.

At the heart of the scheme were three bond transactions Goldman handled for 1MDB in 2012 and 2013 (the "1MDB bond transactions"), which raised more than $6 billion for

---

Co. of Onondaga, 435 F.3d 110, 119, 120 (2d Cir. 2006), (quoting Hartford Courant Co. v. Pellegrino, 380 F.3d 83, 91 (2d Cir. 2004)), those rights may be overcome in certain circumstances, including where a court makes "specific, on the record findings" "demonstrating that closure [or sealing] is essential to preserve higher values and is narrowly tailored to serve that interest." United States v. Alcantara, 396 F.3d 189, 199 (2d Cir. 2005); see also United States v. Amodeo, 71 F.3d 1044, 1050 (2d Cir. 1995).  In making that determination, courts apply a balancing test.  United States v. Doe, 63 F.3d 121, 128 (2d Cir. 1995).  Here, for the reasons set forth in the government's letter filed simultaneously with this memorandum, public disclosure of Redacted Information implicates sufficiently "higher values" that warrant sealing. The government therefore requests that the Court make specific findings, in accordance with Doe, that sealing the Redacted Information is both essential to preserve compelling interests and narrowly tailored to serve those interests.  Alcantara, 396 F.3d at 199 (internal quotation marks omitted).  The government further requests that the Court's findings be made ex parte and under seal.

1MDB and brought Goldman over $600 million in fees and revenue.  Although the funds were ostensibly raised to support energy-related projects designed to benefit the Malaysian people, the defendant, together with Low, Leissner, and their conspirators distributed much of the funds to themselves, their associates, and foreign officials.

Given the scale of the scheme, Low and his co-conspirators required the assistance of a respected, multinational investment bank like Goldman to provide financial know-how, market reach, and credibility to the fundraising.  To that end, the defendant, together with Low, Leissner, and others, facilitated bribe payments to officials at 1MDB and the Malaysian government in exchange for, among other things, their assistance in awarding 1MDB bond transactions to Goldman.  After securing each of the 1MDB bond transactions for Goldman, the defendant, together with Low, Leissner, and others executed the criminal scheme: after Goldman raised billions of dollars through the bond transactions, the conspirators laundered billions of dollars into accounts Low personally controlled and then on to officials at 1MDB and in the governments of Malaysia and Abu Dhabi; and to the defendant, Leissner and other co-conspirators.

## A.    The Defendant's Years-Long Efforts to Secure Business for Goldman through Jho Low

As early as 2009, the defendant began working with Low to secure business for Goldman.  In approximately January 2009, the defendant had discussions with Low about Goldman assisting in the creation of, and potential fundraising for, the Terengganu Investment Authority ("TIA"), an entity that would subsequently become 1MDB.  Goldman was formally engaged on the project, and the defendant, together with Leissner, led its work on the project, which was known internally as "Project Tiara."  During the project, Low served as an adviser to TIA and assisted in its creation.  Indeed, in a January 15, 2009 email concerning the project,

██████—who would later become 1MDB's Executive Director—instructed the defendant, Leissner and other Goldman bankers to "get Jho [Low] involve[d] at every stage" of the project.

After completing Project Tiara, the defendant and Leissner began looking for ways to secure Goldman business leveraging Low and his personal connections to the then-sitting Prime Minister of Malaysia, Najib Razak (the "Prime Minister"), his family, and the newly-created entity 1MDB.  As early as September 2009, the defendant and Leissner were referring to Low as an advisor to both the Prime Minister and 1MDB.  Despite Low having no formal position at 1MDB, the defendant began relentlessly pursuing 1MDB business through Low.  Notably, Low intended to conceal his involvement in 1MDB.  For example, after the defendant emailed the CEO of 1MDB copying Low, Low responded in a separate email, instructing the defendant that when he was "e-mailing the 1mdb guys," he should "bcc" Low.

The defendant and Leissner worked to get Low "credibility" in the market and continued seeking out transactions on which to partner with him and arranging meetings between Low and high-level executives at Goldman.  In November 2009, the defendant emailed Leissner "one idea for 1MDB" and noted that he was "seeing Jho in 2 hours."  Leissner called the defendant's idea "brilliant" and believed it would "get Jho immediate credibility."  The defendant met with Low as planned and updated Leissner after the meeting:  "Just met PM's 3 children with Jho at his apartment.  Will work on getting them join [sic] GS.  Could not talk business, meeting him again tomorrow..."  In that message, the defendant told Leissner he had met the Prime Minister's ("PM's") three children during his meeting at Low's apartment and said he would work on getting them to join Goldman (referred to as "GS").  Days later, the defendant updated Leissner again on his progress, explaining that he learned 1MDB hoped to raise $1.5 billion, and the defendant believed they could work with Goldman's Principal Funding

and Investments group—the same trading desk that would later handle 2012 and 2013 1MDB bond transactions.

   The defendant worked to formalize Goldman's relationship with Low, and in September 2009, he referred Low for a Goldman private wealth management ("PWM") account in Switzerland. Internally at Goldman, the defendant voiced his support for Low's onboarding, explaining that "[Low] is currently our partner in a lot of transactions in Malaysia." During the onboarding process, Low claimed to have more than $100 million to invest. Over a period of months, personnel within the Goldman's Business Intelligence Group ("BIG") and the Compliance Surveillance Strategies Group ("CSSG")—two of the company's control functions—vetted these claims. During their review, they found numerous red flags about Low, including that they were unable to verify his source of wealth and grew concerned about the public reporting about Low's lavish spending. As a result, they rejected Low as a client.

   Undeterred, the defendant and Leissner continued pursuing financial transactions with Low. Among their efforts included discussions to advise Wynton Group ("Wynton")—a Low-controlled entity—and the family of a Kazakh government official to buy the assets of a Kazakh company. Within Goldman, this project was referred to as "Project Gold." As with the failed PWM attempt, BIG conducted due diligence on the transaction focused on legal and reputational risk, known as a "BIG check." Through that process BIG personnel informed the bankers working on the proposed transaction that they had a problem with Goldman advising Wynton on Project Gold if it was a Low entity. The defendant was informed of BIG's concern in or around February 2011.

   Seemingly in response to BIG's concern, the Project Gold deal team at Goldman amended its request to BIG to suggest it was advising Jynwel Capital Ltd. ("Jynwel") rather than

Wynton.  Critically, Jynwel was another Low-controlled entity.  However, BIG still expressed concern about Low's involvement in the project.  The deal was abandoned in February 2011.

Just days after Project Gold was abandoned, the defendant and Leissner began discussions with Low about additional business.  On March 8, 2011, the defendant arranged a meeting between Low and Leissner, and the following day, Goldman initiated a "high priority" background check for Low after Leissner referred Low for another PWM account, this time in Singapore.  Like the first attempt in Switzerland, Low was denied.  In connection with this attempted on-boarding, a compliance employee wrote a PWM banker and, referring to Low, stated, "To be clear, we have pretty much zero appetite for a relationship with this individual." A compliance employee explained that Low "was reviewed by both my EMEA counterpart and BIG team, and it was concluded that no business will be allowed due to significant adverse information and questionable source of wealth.  Please be informed that we do not recommend onboarding this client in PWM Singapore."

Despite Low's repeated rejections, the defendant and Leissner remained steadfast in their effort to obtain business through Low.  However, around this time, they took efforts to conceal those communications.  Like Low, the defendant began consistently using anonymized email addresses to communicate with Low and Leissner about potential business.  Crucially, they did not disclose to BIG or any control function at Goldman that Low was involved in a number of transactions they were pursuing, even those that were opened as new business for Goldman.

**B.      The 1MDB Bond Transactions and the Diversion of the Proceeds to the Defendant and His Co-Conspirators**

The defendant continued working with Low into 2012, at which time the focus turned to the bond transactions Goldman would handle in 2012 and 2013: Project Magnolia, Project Maximus, and Project Catalyze.

In 2012, 1MDB, through wholly owned subsidiaries, formally engaged Goldman to assist with two $1.75 billion bond issuances, for the principal stated purpose of funding the acquisition of certain Malaysian power assets, which was known as "Project Magnolia."  The defendant and Leissner worked on the bond issuances for Goldman.  These bonds were either directly or indirectly guaranteed by IPIC.

Before Goldman was formally engaged, the defendant and Leissner had been coordinating closely with Low on the transaction, using their personal, non-Goldman emails to discuss the outlines of how the deal could be completed.  Then, in February 2012, they met in London with Low and others, including 1MDB employees and agents ███████████████ ████████████████████ and ██████████████████████████████ to discuss, among other things, how to structure 1MDB's purchase of Tanjong Energy Holdings, Goldman's role, the need for the IPIC guarantee, and the fact that, to get approval for the deal and its structure, they would have to bribe specific foreign officials in Malaysia and Abu Dhabi, including the Malaysian Prime Minister.  The co-conspirators subsequently took the agreed-upon steps to effectuate the first bond, including promising and preparing to pay the bribes to foreign officials and misappropriate the bond funds.  As the deal was reviewed internally by Goldman, the defendant and Leissner never disclosed Low's involvement and falsely denied that Low was involved.

On May 21, 2012, Project Magnolia closed.  The transaction raised approximately $1.75 billion for 1MDB.  A day later, approximately $577 million of the bond proceeds were transferred to an account beneficially owned by Aabar Investments PJS Limited, a British Virgin Islands entity that was not associated with the real Abu Dhabi sovereign wealth fund, Aabar Investments PJSC, but, instead, was controlled by a member of the conspiracy ("Aabar-BVI").

Thereafter, through an array of wires to offshore shell accounts and through the United States,

the funds were transferred to accounts beneficially owned or controlled by conspirators,

including the defendant, as follows:

- On or about May 28, 2012, approximately $295 million was wired from Aabar-BVI to a Singapore bank account held in the name of Blackstone Asia Real Estate Partners (the "Blackstone Bank Account"). The recorded beneficial owner of this Blackstone Bank Account was ███████████ ████, a Malaysian national and associate of Low.

- On or about June 5, 2012, Leissner sent an email to the defendant attaching account information for a Hong Kong bank account in the name of Capital Place Holdings Limited ("Capital Place" and the "Capital Place Bank Account"), a BVI entity that was beneficially owned and controlled by Leissner and ███████████. The attachment included the bank's name, address, Swift code, name of the account, and account number.

- Roughly two weeks after the bonds were issued, on or about June 11, 2012, $35 million was transferred from the Blackstone Bank Account to the Capital Place Bank Account.

- Thereafter, on or about June 13, 2012—just two days after Capital Place received $35 million from the Blackstone Bank Account—$17.5 million was transferred from the Capital Place Bank Account to a Singapore bank account held by Silken Waters, which entity had been incorporated in BVI on or about April 23, 2012, and changed its name to Victoria Square Capital Limited ("Victoria Square") on or about July 26, 2012 (the "Silken Waters / Victoria Square Bank Account").

- ███████████████████████████████████████ opened the Silken Waters / Victoria Square Bank Account in Singapore on or about May 24, 2012. This account received an additional transfer from Capital Place of approximately $6.9 million traceable to the Project Magnolia proceeds on or about July 16, 2012, for a total of approximately $24.4 million between June and July 2012.

Following the closing of the Magnolia transaction, and while the proceeds of that

bond travelled around the world from one account to another, on their way to the defendant and

others, Goldman began assisting 1MDB on yet another billion-dollar fundraising, which would

become known as "Project Maximus." Project Maximus had many similarities to Magnolia:

(1) it was a $1.75 billion fundraising intended to support 1MDB's acquisition of another

Malaysian power company; (2) during its negotiation and execution, the defendant coordinated

closely with Low while simultaneously concealing and denying Low's involvement; and (3) days

after the deal closed on October 17, 2012, a substantial portion of the proceeds (nearly half) were

diverted to the Aabar-BVI account before being distributed to public officials and the

conspirators.

Despite raising more than $2 billion over a few short months, in or around mid-

January 2013, Goldman, again facilitated a multi-billion-dollar bond transaction for 1MDB to

finance a planned joint venture.  This project was referred to internally at Goldman as "Project

Catalyze."  Two days after Goldman was engaged on Project Catalyze, on January 17, 2013,

Leissner transferred $1 million from Capital Place Holdings to an account beneficially owned by

███████████████████████████████████, and another $1 million to another account

beneficially owned by ███████████████████████████████████.

Project Catalyze closed on March 19, 2013 and, within a week, more than $1

billion in proceeds had been diverted from the transaction.  In July 2013, one of Low's shell

companies sent Capital Place approximately $65 million traceable to Project Catalyze.  Two

months later, as payoffs tied to the scheme, Leissner directed transfers to the defendant totaling

$10.7 million.

Specifically, on or about September 17, 2013, Leissner sent ██████████ an

email containing wire transfer details for the Silken Waters / Victoria Square Bank Account.

Leissner instructed ██████████ to transfer a total of $10.7 million to the Silken Waters /

Victoria Square Bank Account, and ██████████ indicated that ██ would send $6.5 million

from a bank account at Morgan Stanley (the "██████████ Morgan Stanley Bank Account") and

the remainder from the Capital Place Bank Account.  Only a few days later, there was a transfer

of funds from the Capital Place Bank Account to the Silken Waters / Victoria Square Bank

Account, namely, a transfer of approximately $4.2 million.  At that same time, the Silken Waters

/ Victoria Square Bank Account also received a transfer of approximately $6.5 million from the

█████████ Morgan Stanley Bank Account, which had received more than $11 million in

transfers from Capital Place between in or about July 2012 and in or about September 2013.

## DISCUSSION

I.  **EVIDENCE OF FALSE STATEMENTS REGARDING THE ORIGIN OF DIVERTED BOND FUNDS RECEIVED BY THE DEFENDANT'S CLOSE FAMILY MEMBER IS ADMISSIBLE**

   A.  **The Proffered Evidence**

   The government expects that the evidence at trial will show that the defendant received a total of approximately $35 million in bond proceeds that had been diverted from 1MDB via a bank account held in the name of a business entity purportedly controlled by █████ ███████████████████████.  As discussed below, when opening the bank account into which these criminal proceeds were deposited, the defendant's █████████ falsely represented that funds flowing into the account were profits from certain equity investments.

   At trial, the government intends to prove that the defendant used the Silken Waters / Victoria Square Bank Account to receive the diverted proceeds from the 1MDB bond transactions.  The Silken Waters / Victoria Square Bank Account was opened at UBS Singapore in or about May 2012, shortly before receiving the first transfer of diverted bond proceeds.  The account opening documents for the Silken Waters / Victoria Square Bank Account include, among other documents, a Client Profile and Acceptance Checklist dated May 25, 2012.  Among other information, the document details a May 22, 2012 conversation between ██████ and the bank's client advisor for the account in which "██████ explained that they have recently taken profit on ██ equity investments in Switzerland totalling [sic] about $26m.  As such, they intend to transfer this funds [sic] back from BSI to Asia, either Singapore or Hong Kong."  Within approximately two months, as described above, the Silken Waters / Victoria Square Bank Account received two transfers of diverted 1MDB bond proceeds totaling approximately $24.4 million; bank records do not reflect any transfer of funds into the account from equity

11

investments in Switzerland around this time period or, indeed, any other substantial deposits from outside sources.

The bank generated an alert on or about July 3, 2012, following the transfer of $17.5 million into the Silken Waters / Victoria Square Bank Account in June 2012.  The client advisor on the account thereafter created a call report dated July 27, 2012, that further memorialized her May 22, 2012 conversation with ████████.  In this call report, the client advisor wrote:  "Client explained that ████ will have incoming funds from her sale of investments in other banks e.g., Chiyu Banking Corp., BSI, etc.  They will come in 2 tranches due to difference in settlement dates.  First tranche is estimated to be USD 17.5 m and the second tranche USD 7 m."

In or around March 2014, ████████ opened a personal bank account at the same bank (the "████████ Personal Bank Account").  The Client Profile and Acceptance Checklist for that personal account, dated March 24, 2014, included a summary of a visit the client advisor made to ████████ at ████ residence in Malaysia on or about September 11, 2013.  The client advisor reported that ████████████████████ (i.e., ████████████████ and the defendant) were also present, and that ████████ stated that a "gold PE venture that ████ had with a few friends has been liquidated and ████ expects appx. USD11m of funds to be returned to ████ by end Sep 2013 which ████ will send to [the bank] to top up ████ account."

Subsequently, after the Silken Waters / Victoria Square Bank Account received a total of $10.7 million from the Capital Place Bank Account and the ████████ Morgan Stanley Bank Account in September 2013, as described above, the client advisor for the account created a call report dated September 24, 2013, memorializing a September 18, 2013 call with ████████.  With respect to the source of funds, the call report stated that "[c]lient was in a gold

PE venture with ███ friends which has been liquidated," that the funds "came from 2 different banks as ███ has 2 different portions/percentages with 2 friends," and that "[t]he bigger portion was thus from ███ friend who remitted from Morgan Stanley HK and the smaller from another friend who remitted from their account with Chiyu Bank HK."  A bank alert was generated in connection with the two incoming transfers shortly thereafter, on or about October 3, 2013.

Nearly all of the funds that were transferred into the Silken Waters / Victoria Square Bank Account were subsequently transferred out to other accounts.  In 2013, a total of approximately $17 million was transferred from the Silken Waters / Victoria Square Bank Account to an account at another bank held jointly by ████████ and ████████████████.  Later, in 2014, nearly $10 million was transferred from the Silken Waters / Victoria Square Bank Account to a different account held by ████████, for which ████ had power of attorney.

████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████████████

████████████████████████████████████████████

████████████

**B.    Argument**

The account opening documents for the Silken Waters / Victoria Square Bank Account and the ████████████████ Bank Account, including the documents summarizing conversations between the bank's client advisor for the accounts and ████████, and the two call reports dated July 27, 2012, and September 24, 2013, respectively, are admissible as business records under Rule 803(6).  Additionally, ████████'s statements to the bank's client advisor are

admissible on two additional, independent bases:  as non-hearsay statements, as they are not

offered for their truth, and as statements of a co-conspirator, under Rule 801(d)(2)(E).

### 1.    The Documents are Admissible as Business Records

The business records exception to the hearsay rule provides for the admission of:

> A memorandum, report, record, or data compilation, in any form,
> of acts, events, conditions, opinions . . . made at or near the time
> by . . . a person with knowledge, if kept in the course of a regularly
> conducted business activity, and if it was the regular practice of
> that business activity to make the memorandum, report, record or
> data compilation, all as shown by the testimony of the custodian or
> other qualified witness . . . unless the source of information or the
> method or circumstances of preparation indicate lack of
> trustworthiness.

Fed. R. Evid. 803(6).  "The purpose of the rule is to ensure that documents were not created for

'personal purpose[s] . . . or in anticipation of any litigation,' so that the creator of the document

'had no motive to falsify the record in question.'"  United States v. Kaiser, 609 F.3d 556, 574 (2d

Cir. 2010) (quoting United States v. Freidin, 849 F.2d 716, 719 (2d Cir. 1988)).  The Second

Circuit has "stated that Rule 803(6) 'favors the admission of evidence rather than its exclusion if

it has any probative value at all.'"  United States v. Williams, 205 F.3d 23, 34 (2d Cir. 2000)

(quoting In re Ollag Constr. Equip. Corp., 665 F.2d 43, 46 (2d Cir. 1981)).

Notes of calls or meetings taken in the normal course of business, made close to

the time of the events they recorded, and based in part on the declarant's personal knowledge and

observations are admissible as business records under Rule 803(6).  See, e.g., Kaiser, 609 F.3d at

574-75 (business planners that contained contemporaneous handwritten entries related to

companies, including notes of telephone conversations, properly admitted as business records);

Malek v. Federal Ins. Co., 994 F.2d 49, 53 (2d Cir. 1993) (case notes kept by social services

department properly admitted as business records); Muller-Paisner v. TIAA, 528 F. App'x 37, 41

n.2 (2d Cir. 2013) (summary order) (telephone call summaries properly admitted as business

14

records); see also United States v. Goodchild, 25 F.3d 55, 61-62 (1st Cir. 1994) (memos

containing records of telephone conversations with credit card collections department properly

admitted as business records); United States v. Kingston, 971 F.2d 481, 486 (10th Cir. 1992)

(contemporaneous notes of telephone conversations taken by loan counselors properly admitted

as business records).

The account opening documents for the Silken Waters / Victoria Square Bank

Account and the ████████████ Bank Account were created for a business purpose, not for a

personal reason or in anticipation of litigation.  See Kaiser, 609 F.3d at 574.  Moreover, the

Client Profile and Acceptance Checklist that was prepared for each account is an official bank

form that includes entries for information related to due diligence and other compliance-related

topics, in addition to a summary of the client advisor's conversations with ██████.  Finally, the

Client Profile and Acceptance Checklist for the Silken Waters / Victoria Square Bank Account is

dated May 25, 2012, only three days after the client advisor's conversation with ██████ on

May 22, and the Client Profile and Acceptance Checklist for the ██████ Personal Bank

Account is dated March 24, 2014, only a few months after the client advisor's conversation with

██████ on September 11, 2013.  The account opening documents for the two accounts

therefore meet each of the requirements for admissibility as business records under Rule 803(6).

See, e.g., id. at 574-75; Malek, 994 F.2d at 53.  Indeed, the government anticipates offering the

account opening documents, along with other records for the accounts, pursuant to a certification

that the bank records satisfy each of the requirements set forth in the Rule.  See 18 U.S.C. § 3505

(providing for the admissibility of foreign business records via certification).

The July 27, 2012 and September 24, 2013 call reports are also admissible

business records.  Each was created for a business purpose in close proximity to a bank alert to

document the origin and purpose of substantial incoming transfers, was maintained in a bank database, and recounts a conversation between the client advisor and the account holder regarding the origin of funds transferred into the account.  The July 27, 2012 call report was created within approximately two months of the conversation it memorialized, and the September 24, 2013 was created within only days of the conversation it recounted.  The call reports, which the government intends to offer pursuant to a certification under 18 U.S.C. § 3505, are therefore admissible as business records.

### 2.    ▮▮▮▮▮▮'s Statements are Admissible Non-Hearsay

Statements that are introduced for the purpose of proving that they were made and as a predicate for other proof that they were false are not hearsay because they are not offered for the truth of the matter asserted.  Anderson v. United States, 417 U.S. 211, 219-20 (1974); United States v. Pedroza, 750 F.2d 187, 203 (2d Cir. 1984) (statement "offered for its patent falsity" is not hearsay; see also United States v. Sedaghaty, 728 F.3d 885, 916 (9th Cir. 2013) ("The hearsay rule does not apply to evidence offered to establish a foundation for later showing, through other admissible evidence, that it was false." (citation and internal quotation marks omitted)).  Here, ▮▮▮▮▮▮'s statements about the origin of funds that would be or were transferred into the Silken Waters / Victoria Square Bank Account, which are summarized in the account opening documents for the two accounts and the two call reports, are admissible non-hearsay because they are offered not for the truth, but to show that they were made and as a predicate for other proof that they were false.  Anderson, 417 U.S. at 219-20; Pedroza, 750 F.2d at 203; see also Sedaghaty, 728 F.3d at 916.

As set forth above, the account opening documents for the Silken Waters / Victoria Square Bank Account recount ▮▮▮▮▮'s explanation that ▮▮▮ would transfer approximately $26 million in profits on certain equity investments in Switzerland into the

account.  The July 27, 2012 call report reiterates ████'s explanation that the funds were proceeds from ██ sale of investments.  In fact, and contrary to ████'s assertion, within two months of opening the account, approximately $24.4 million in diverted bond funds were transferred from the Capital Place Bank Account into the Silken Waters / Victoria Square Bank Account.

The account opening documents for the ████ Personal Bank Account and the September 24, 2013 call report recount ████'s explanation that the September 2013 transfers into the Silken Waters / Victoria Square Bank Account of approximately $10.7 million from the Capital Place Bank Account and the ████ Morgan Stanley Account were the proceeds of a gold PE venture that had been liquidated and came from two different friends.  Contrary to this claim, both transfers came from ████, acting at Leissner's direction, and were wholly unrelated to any gold private equity venture.

**3.     ████'s Statements are Admissible Co-Conspirator Statements**

████'s statements in the account opening documents and the call reports are also admissible under Rule 801(d)(2)(E) of the Federal Rules of Evidence because they were made by the defendant's co-conspirator during and in furtherance of the charged money laundering conspiracy.  See infra Section IV.B. (further discussion of Rule 801(d)(2)(E)).  In opening the Silken Waters / Victoria Square Bank Account, ████ underwent a due diligence and KYC process.  In the course of that process, ████ provided false information about the nature and origin of millions of dollars that would be transferred into the account.  ██ again made false statements to the bank in 2013 about the nature and origin of an additional $10.7 million that was transferred into the account.  The obvious and apparent reason for making such false representations to the bank was to ensure that the bank would allow the transactions to go forward, so that the defendant could receive his cut of the proceeds of the criminal scheme.

\* \* \* \* \*

For the foregoing reasons, evidence of false statements made regarding the origin of diverted 1MDB bond proceeds that were transferred into the Silken Waters / Victoria Square Bank Account, contained in the accounting opening documents and call reports, is admissible.

II.     **CERTAIN EVIDENCE THAT POST-DATES THE CHARGED CONSPIRACIES IS ADMISSIBLE**

At trial, the government anticipates that it will introduce evidence in its case-in-chief about the actions and statements of the defendant and certain of his co-conspirators in the years after the charged conspiracy periods.  That evidence is admissible for multiple reasons.  The government outlines particular evidence here to which the defendant may object and moves in limine for a ruling that the evidence is admissible.

A.      **Deletion of Email Accounts by the Defendant and Co-Conspirators**

The defendant, his co-conspirators and their associates used a number of different email accounts to communicate with each other about, among other things, the three charged conspiracies.  Many of these email accounts were subsequently deleted in their entirety in 2015 (collectively, the "Deleted Accounts").  A chart with information about the Deleted Accounts is attached hereto as Exhibit A, and additional information about those accounts as well as context for the timing of their deletion is described below.  While the contents of the Deleted Accounts can no longer be recovered from Google, many of the email communications exchanged between and with the Deleted Accounts were preserved in email accounts that were not deleted, including several email accounts used by Leissner.

1.      **Use of the Deleted Accounts**

The defendant used or was associated with four of the Deleted Accounts: victoriasquare.investment@gmail.com, queensgate.capital@gmail.com, roger.ng1@gmail.com and rogerch.ng@gmail.com, as follows:

- **victoriasquare.investment@gmail.com**:  This email account was used to communicate on behalf of Victoria Square with at least one financial institution and with email accounts held by co-conspirators regarding fund transfers and investments.  As explained above (see supra Background Section), Victoria Square was the entity nominally held by ▮▮▮▮▮ through which the defendant received approximately $35 million in criminal proceeds from the 1MDB bond

19

deals.  Victoria Square was previously known as Silken Waters, but changed its
name to Victoria Square on or about July 26, 2012; the email account
victoriasquare.investment@gmail.com was created shortly before that name
change, on or about June 17, 2012.

- **queensgate.capital@gmail.com**:  The defendant used this email account to
  communicate with Low, Leissner, and others about, among other things, 1MDB
  business that Ng and Leissner were seeking to secure for Goldman; Low's
  communications with the Prime Minister; and the establishment of the Capital
  Place Bank Account that was subsequently used to funnel proceeds of the charged
  conspiracies to the defendant and others.  In or about 2011, this email account was
  used to forward a communication from Low to Leissner, and the author of the
  email wrote, "Hi Tim, this is Roger.  FYI."  In or about 2012, this email account
  was used to communicate with addresses associated with Low and Leissner; in
  one email chain, the author of the email wrote to Leissner, "How do u like the
  name queensgate?  Hehe!" and Leissner replied, "I love it!"

- **roger.ng1@gmail.com**:  The defendant used this email account to communicate
  with Low, Leissner, and others about, among other things, 1MDB business that
  Ng and Leissner were seeking to secure for Goldman; the 1MDB bond deals;
  Low's communications with the Prime Minister; the Capital Place Bank Account;
  and negative press reports surrounding the 1MDB bond deals.

- **rogerch.ng@gmail.com**:  The defendant used this email account to communicate
  with Leissner regarding, among other things, various side deals and the 1MDB
  bond deals.

The remaining Deleted Accounts were used by or associated with Low or another

co-conspirator, as follows:[2]

- **chairman.goodstar@gmail.com**:  This email account was used by Low to
  communicate with financial institutions about transfers and investments related to
  the account held under the name Good Star Limited, which was beneficially
  owned and operated by Low.

- **dealrainman1@gmail.com**:  This email account was used by Low to
  communicate with the defendant, Leissner, and others about, among other things,
  1MDB business that Ng and Leissner were seeking to secure for Goldman,

---

[2] Other email accounts associated with the co-conspirators – including
████████████████████ (associated with Low, deleted on or about July 15, 2011) and
██████████████ (associated with ███, deleted on or about November 23, 2010) –
were deleted during, rather than following, the period of the charged conspiracies.

including the 1MDB bond deals and internal 1MDB business with 1MDB officials.

- ██████████████████: This email account was used by ████████████, who was an associate of Low, the beneficial owner of many of Low's companies and often communicated with the co-conspirators on Low's behalf, including about entities that received criminal proceeds from the 1MDB bond deals.

- ██████████████████: This email account was also used by ████████, including to communicate about an entity that received criminal proceeds from the 1MDB bond deals.

- **jho.low@gmail.com**: This email account was used by Low to communicate with the defendant, Leissner, and others about, among other things, TIA and 1MDB business that Ng and Leissner were seeking to secure for Goldman and the attempts to onboard Low as a Goldman PWM client in Switzerland.

- ██████████████████: This email account was used by ████████, a 1MDB employee and associate of Low who worked on the 1MDB bond deals, to communicate with Low, Leissner, ████, and others about, among other things, various 1MDB deals and investments and Goldman deals and investments.

- ██████████████████: This email account appears to have been used by a 1MDB employee or Board Member to communicate with 1MDB officials, Leissner, and others regarding 1MDB business and with Malaysian government officials, co-conspirators, and others about questions from various media outlets, including The New York Times.

- ██████████████████: This email account was in the name of Nik Faisal Kamil, who was an official of 1MDB and its subsidiary, Strategic Resources Company, and a close associate of Low. The account was used to communicate with Leissner, Low, and others about the 1MDB bond deals and payments related to the money laundering conspiracy.

- ██████████████████████: This email account was used by an individual identifying herself as ██████████ and communicated with the defendant, Leissner, Low, and others about the 1MDB Bond deals. ██████████ was an alias for 1MDB employee and co-conspirator ██. In 2012, for example, Leissner sent an email to this email account with information about one of the bond deals, stating, "Could I trouble you to forward this to our GS [i.e., Goldman Sachs] account. Then I can handle it officially – sorry for that. Many thanks." The same day, ██ sent an email from ██ official 1MDB email account to the Goldman email accounts of the defendant and Leissner with the identical text.

- ████████████████: This email account was used to communicate with the defendant, Leissner, Low, and others about 1MDB business that the defendant and Leissner were seeking to obtain for Goldman and the 1MDB bond deals.

- ████████████████: This email account was used by a relative of Low, including to communicate with Leissner and others about a private investment Low made with criminal proceeds from the 1MDB bond deals.

- ██████████████: This email account communicated with Low regarding the 1MDB bond deals.

### 2.    Deletion of the Accounts

The victoriasquare.investment@gmail.com account, which, as noted above, was created shortly before Silken Waters changed its name to Victoria Square, and that was used to communicate with financial institutions and other co-conspirators about the Silken Waters / Victoria Square Bank Account, was deleted on or about February 3, 2015.  That deletion occurred shortly after transfers totaling approximately $27 million were completed from the Silken Waters / Victoria Square Bank Account in 2013 and 2014 to two other bank accounts, one of which was held jointly by ███████ and ███ and one of which was held by ████████, for which ███ had power of attorney.

The remaining Deleted Accounts, including three email accounts used by the defendant, were all deleted between approximately March 2015 and July 2015.  While press reports detailing possible criminal conduct at 1MDB circulated in the press as early as 2013 (see, e.g., 1MDB: Giant ponzi scheme or strategic investment fund?, KINIBIZ ONLINE (March 26, 2013, 4:12 AM), http://www.kinibiz.com/story/issues/11166/1mdb-giant-ponzi-scheme-or-strategic-investment-fund.html), a steady stream of negative reports began to be published in a series of mainstream news outlets in 2015 about improprieties at 1MDB.  These reports detailed concerns about a 2009 deal with PetroSaudi; discussed Low's involvement with 1MDB generally; noted that 1MDB's prior auditors, Ernst & Young LLP and KPMG LLP, had each

withdrawn; and suggested that a full-scale investigation of 1MDB was warranted.  A summary of

some of the key reports follows:

- On February 8, 2015, The New York Times issued an article titled "Towers of Conspiracy, Jho Low, Well Connected in Malaysia, Has an Appetite for New York," which discussed, among other things, Low's background and connections to 1MDB.  See https://www.nytimes.com/2015/02/09/nyregion/jho-low-young-malaysian-has-an-appetite-for-new-york.html.

- On February 28, 2015, a website run by a former BBC journalist, called the Sarawak Report, published a detailed report about 1MDB and Low.  See HEIST OF THE CENTURY - How Jho Low Used PetroSaudi As "A Front" To Siphon Billions Out Of 1MDB!, SARAWAKREPORT (Feb. 28, 2015), https://www.sarawakreport.org/2015/02/heist-of-the-century-how-jho-low-used-petrosaudi-as-a-front-to-siphon-billions-out-of-1mdb-world-exclusive/.   This report was the result of an in-depth investigation conducted in conjunction with the Sunday Times, and was based in part on "thousands" of emails and other documents obtained by the journalist that detailed communications between Low, 1MDB and others, including about the 2009 deal between 1MDB and PetroSaudi.  The emails and documents were not only quoted extensively in the report, but reproduced in their entirety.  In addition, the article detailed at length Low's wealth and lavish spending.  The article concluded by asking, "It seems reasonable, therefore, to ask whether Malaysia's 1MDB's development money has been channeled towards pleasure and debauchery … instead of helping the intended poor of the country from whence the money has come?"

- Also on February 28, 2015, the Sunday Times ran a story relying in part on the report.  See Jon Ungoed-Thomas, Clare Rewcastle & Josh Boswell, Harrow playboy linked to troubled Malaysian fund, THE SUNDAY TIMES (Feb. 28, 2015, 11:21 PM), https://www.thetimes.co.uk/article/harrow-playboy-linked-to-troubled-malaysian-fund-f8j92snf0vc.

- On March 1, 2015, PetroSaudi responded and said the emails were fake.  See Kuala Lumpur, PetroSaudi slams 'malicious and slanderous' claim about 1MDB monies, THE RAKYAT POST (Mar. 1, 2015, 1:03 PM), https://web.archive.org/web/20150701163309/http://www.therakyatpost.com/news/2015/03/01/petrosaudi-slams-malicious-and-slanderous-claim-about-1mdb-monies/.

- On March 3, 2015, it was reported that PetroSaudi filed a police report in which it claimed it had been hacked.  See Yoursay, PetroSaudi hangs 1MDB with police report, MALASIAKINI (Mar. 3, 2015, 10:00 PM), https://www.malaysiakini.com/news/290877 (last updated Mar. 3, 2015, 10:08 PM), https://www.malaysiakini.com/news/290877.

- Also on March 3, 2015, Transparency International Malaysia called for an investigation of 1MDB's finances, noting the "unexpected withdrawal" of KPMG and Ernst & Young as auditors. See Dinobeano, <u>Transparency International Malaysia calls for Investigation into 1MDB Scandal</u>, DINMERICAN (Mar. 3, 2015), https://dinmerican.wordpress.com/2015/03/03/transparency-international-malaysia-calls-for-investigation-into-1mdb-scandal/.

- On March 7, 2015, The Economist ran a story relying in part on the report. See <u>Gathering steam</u>, THE ECONOMIST (Mar. 5, 2015), https://www.economist.com/asia/2015/03/05/gathering-steam.

Soon after the publication of these and similar articles and reports, the defendant deleted two email accounts that he had used to communicate with co-conspirators during the conspiracies: queensgate.capital@gmail.com and rogerch.ng@gmail.com. Records obtained from Google indicate that these email accounts were deleted in their entirety on March 8, 2015. Shortly thereafter, on March 18, 2015, the defendant deleted, again in its entirety, roger.ng1@gmail.com, a third email account that he had used to communicate with co-conspirators during the conspiracies.

Many of the other Deleted Accounts associated with or used by Low and other co-conspirators were also deleted in their entirety at or around the same time in 2015. Specifically, between March 2015 and July 2015, at least twelve email accounts associated with various co-conspirators were deleted, including four email accounts associated with Low; two email accounts associated with ███████; four email accounts associated with 1MDB employees or Board members; and two email accounts associated with a relative of or associate of Low. See Exhibit A.

**B.** 









D.   **Applicable Law**

1.   **Direct Evidence**

Direct evidence of a crime is not limited to "that which directly establishes an element of the crime." United States v. Gonzalez, 110 F.3d 936, 941 (2d Cir. 1997). Rather, direct evidence also includes evidence that is "inextricably intertwined with the evidence regarding the charged offense," and/or "necessary to complete the story of the crime on trial." United States v. Carboni, 204 F.3d 39, 44 (2d Cir. 2000) (internal quotation marks omitted); see also United States v. Hsu, 669 F.3d 112, 118 (2d Cir. 2012).

### 2.     Evidence Post-Dating a Charged Conspiracy

The law does not require that the only evidence of a conspiracy or other crime be

from the period of the conspiracy or other crime.   See, e.g., Lutwak v. United States, 344 U.S.

604, 617 (1953) (defendants' post-conspiracy acts admissible to help show existence of

immigration scheme); United States v. Mendez, 165 F.3d 15, 1998 WL 802127, at *2 (2d Cir.

1998) ("Evidence of postconspiracy conduct is admissible where, as here, it had real probative

value regarding [the defendants'] willingness and intent to enter into the proven conspiracy."

(internal quotation marks omitted)).

This principle has equal application when the post-conspiracy act is of a

conspirator rather than the defendant.   See, e.g., United States v. Tramunti, 513 F.2d 1087, 1116

(2d Cir. 1975) (citing Anderson v. United States, 417 U.S. 211, 218-19 (1974)) ("Conduct of a

conspirator, not consisting of a hearsay declaration, is admissible to prove the existence of the

conspiracy even though occurring after the termination of it.").   In short, consistent with

common sense, "[e]vidence is not irrelevant merely because it occurs after a conspiracy has

ended."   United States v. Clark, 489 F. App'x 558, 561 n.4 (3d Cir. 2012).

### 3.     Hearsay

Federal Rule of Evidence 802 generally bars the admission of hearsay, which is

defined in Rule 801(c) as "a statement," defined as an "oral assertion, written assertion or

nonverbal conduct" intended as an assertion, that: "(1) the declarant does not make while

testifying at the current trial or hearing; and (2) a party offers in evidence to prove the truth of

the matter asserted in the statement." Fed. R. Evid. 801(c).  It follows that an out-of-court

statement is not barred by Rule 802 if it is not an "assertion" within the meaning of Rule 801 (for

example, an inquiry or a directive), or not offered in evidence to prove the truth of the matter

asserted in the statement.  The Federal Rules of Evidence also contain a number of "exclusions"

from the definition of hearsay, including for a statement made by the defendant when offered by

the government, Fed. R. Evid. 801(d)(2)(A), and for a statement that the defendant "manifested

that it adopted or believed to be true," Fed. R. Evid. 801(d)(2)(B), and "exceptions" to the bar to

hearsay evidence set forth in Rule 802, such as the exception for a "statement of the declarant's

then-existing state of mind (such as motive, intent, or plan)," Fed. R. Evid. 803(3).

        In addition, when a declarant is unavailable, a statement against interest—that is,

a statement that "a reasonable person in the declarant's position would have made only if the

person believed it to be true because, when made, it was so contrary to the declarant's

proprietary or pecuniary interest"—is also admissible.  Fed. R. Evid. 804(b)(3).

### E.    Argument

### 1.    The Deletion of the Deleted Accounts Is Admissible

        Just as in any other case in which a defendant and his conspirators seek to cover

up a crime, that the defendant and his co-conspirators here deleted the Deleted Accounts, and

specifically, when they did so, is relevant and admissible to prove the existence of the charged

conspiracies and the defendant's participation in them.  As detailed above, the Deleted Accounts

were associated with or used by the defendant, his co-conspirators, and associates during the

charged conspiracies to discuss, among other things, 1MDB business that Ng and Leissner were

seeking to secure for Goldman; the 1MDB bond deals; Low's communications with the Prime

Minister and other foreign officials who received bribes; and the establishment and use of shell

entities to receive, transfer, and conceal criminal proceeds.  The timing of the deletion of the

Deleted Accounts—for victoriasquare.investment@gmail.com, shortly after the defendant

completed a series of transfers from the Silken Waters / Victoria Square Bank Account of the

criminal proceeds, and for the remaining Deleted Accounts, shortly after a series of news articles

about improprieties involving 1MDB and Low, in which specific emails and documents exchanged by members of the conspiracies were published and discussion of an investigation of 1MDB was raised—is highly probative of the existence of the charged conspiracies and the defendant's participation in them.

Courts routinely admit, as direct evidence probative of consciousness of guilt, evidence that defendants or their conspirators sought to cover up what they had done, particularly when that evidence demonstrates that relevant documents or information was destroyed or concealed.  See, e.g., United States v. Carpenter, 372 F. Supp. 3d 74, 80 (E.D.N.Y. 2019) (evidence of the "remote wipe" of an electronic device "is probative of the Defendant's consciousness of guilt"); United States v. Sprecher, 783 F. Supp. 133, 155 (S.D.N.Y. 1992) ("It is difficult to imagine more compelling evidence of consciousness of guilt than the elaborate efforts of [defendant] to prevent the production of the [b]ank [ ] records."), aff'd, 988 F.2d 318 (2d Cir. 1993); see generally United States v. Triumph Capital Group, Inc., 544 F.3d 149, 160 (2d Cir. 2008) ("[Defendant]'s efforts to obstruct the investigation evidence a consciousness of guilt . . . .").  So too here.  It does not matter that certain of the deletions did not directly involve the defendant, or that they took place after the charged conspiracies (and indeed, it accords with common sense that that is often when deletion of evidence or concealment takes place).  See generally United States v. Costello, 352 F.2d 848, 854 (2d Cir. 1965) ("Evidence of an act (or a statement offered other than for its truth) has no special evidentiary hurdle to overcome and, whether the act is by a coconspirator or third person and whether it occurs during the period of a conspiracy or not, the evidence is admissible so long as the act is probative of a crime charged against a defendant and the evidence is not excludable on some special ground.  Thus, the acts of others not involving the defendant directly may come in against him merely to show the

existence of a conspiracy, with which he is to be linked by quite separate proof."), rev'd on other

grounds sub nom., Marchetti v. United States, 390 U.S. 39 (1968).[3]

[3] In addition, although the Court need not reach the issue, this evidence is also admissible under Rule 404(b) because it demonstrates that, contrary to what the government expects the defendant to argue at trial, he knowingly participated in the conspiracies.  It also assists in demonstrating the nature of the relationship between the defendant, Leissner, Low, and others, which was both close and corrupt, such that they took similar actions, close in time to each other, to seek to conceal their involvement in the conspiracies.













### III. THE COURT SHOULD ADMIT MULTIPLE OTHER ACTS COMMITTED BY THE DEFENDANT AS DIRECT EVIDENCE OF THE CHARGED CRIMES AND UNDER RULE 404(b)

The government intends to offer evidence of multiple other acts committed by the defendant as direct evidence of the charged criminal scheme and, in the alternative, for a proper non-propensity purpose under the Second Circuit's "inclusionary approach" to other act evidence under Rule 404(b).  As set forth below, the government respectfully asks the Court to admit in limine: (1) evidence that, in 2011, the defendant and Low proposed paying kickbacks to secure approval for a financial transaction involving a state-owned company in Malaysia; (2) evidence that, in 2010 and 2011, the defendant, at Low's direction, tried to curry favor with the Prime Minister by attempting to secure a $300,000 donation from Goldman to the Prime Minister's wife's charity and attempting to secure internships at Goldman for one of the Prime Minister's children; (3) evidence of the defendant's retention of an intermediary on deals in the Malaysian State of Sarawak between 2006 and 2012, whom the defendant believed was improperly paying government officials; (4) evidence of the defendant's self-dealing and improper personal business activities with Leissner and others while at Goldman; and (5) additional evidence of how the defendant's relationship with Low developed, including his trips on chartered flights with Low, his attendance at a lavish 2010 event organized by Low, and his meeting with Low on a luxury yacht.

Federal Rule of Evidence 404(b) prohibits admission of "[e]vidence of a crime, wrong, or other act . . . to prove a person's character in order to show that on a particular occasion a person acted in accordance with the character."  Fed. R. Evid. 404(b).  The Rule allows such evidence to be admitted, however, "for another purpose, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident."  Id.  The Second Circuit "has adopted an 'inclusionary' approach to other act evidence

under Rule 404(b), which allows such evidence to be admitted for any purpose other than to demonstrate criminal propensity."  United States v. LaFlam, 369 F.3d 153, 156 (2d Cir. 2004).

Evidence of uncharged criminal activity is also admissible, without reference to Rule 404(b), when it constitutes direct proof of a charged crime, if it provides the jury with background for the events alleged in the indictment, or if it arose out of the same transaction or series of transactions as the charged offenses.  See, e.g., United States v. Gonzalez, 110 F.3d 936, 941 (2d Cir. 1997) (holding that background evidence may be admitted to show the circumstances surrounding the events alleged in the indictment or to furnish an explanation of the understanding or intent with which certain acts were performed).  In such circumstances, evidence is generally admissible if it is relevant under the "very broad" standard of Rule 401. See, e.g., United States v. Gramins, 939 F.3d 429, 450 (2d Cir. 2019) (noting that "[r]elevance" under Rule 401 is "easily satisfied" and citing cases for the proposition that Rule 401 "is very broad").

Finally, Federal Rule of Evidence 403 provides that "[t]he court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence."  Evidence is not unduly prejudicial when it is not "more inflammatory than the charged crime[s]," United States v. Livoti, 196 F.3d 322, 326 (2d Cir. 1999), or, put another way, when it involves conduct that is no "more sensational or disturbing than the crimes with which" the defendant is charged, United States v. Roldan Zapata, 916 F.2d 795, 804 (2d Cir. 1990).  See also United States v. Rosemond, 958 F.3d 111, 125 (2d Cir. 2020) ("The probative value of prior bad-act evidence is not substantially outweighed by the

risk of prejudice if the conduct is not 'any more sensational or disturbing' than the charged crime."), cert. denied, 141 S. Ct. 1057 (2021).

### A.     The Defendant and Low's Willingness to Pay Kickbacks in 2011

#### 1.     Relevant Background

As explained above and alleged in the Indictment, soon after meeting Low, the defendant and Leissner began working with Low to secure potential business opportunities for Goldman.  Throughout 2010, the defendant and Leissner would identify and pass on to Low transactions in which Low, his companies, or 1MDB could undertake, ranging from commodities investments to acquisitions in the power sector.  In October 2010, the defendant and Leissner were working on a potential oil and gas transaction with ███████████, a private equity firm run by ███████████ ("███████"), a former Goldman banker and friend of the defendant and Leissner.  The project related to a large offshore gas field in Indonesia called "Natuna D-Alpha Field" (the "Natuna Field") owned by the Malaysian state-owned company Petronas.  One aspect of the transaction was Petronas' potential sale of additional oil and gas fields to ██████ (the "Petronas-██████ transaction")

The defendant and Leissner were working on aspects of the transaction at Goldman.  After ██████ failed to make progress on the Petronas-██████ transaction, the defendant and Leissner brought in Low to help.  By that point, the defendant and Leissner had already tried, and failed, to establish a Swiss PWM account for Low at Goldman.  Despite working on aspects of the Petronas sale at Goldman, the defendant and Leissner did not disclose to Goldman their efforts to have Low assist in completing a Petronas-██████ transaction.

On or about October 18, 2010, the defendant and Leissner traveled to Geneva, Switzerland for a planned meeting with Low and ██████ at a clinic near Montreaux on Lake Geneva.  As planned, they met in person with Low concerning the Petronas-██████

42

transaction, and Low explained that he would speak to the Prime Minister about influencing Petronas to go forward with the transaction.  Only days after the trip, the defendant emailed Low at an anonymized email address and passed on a briefing memorandum concerning the proposed sale by Petronas, including the sale of two Indonesian oil and gas fields called Muriah and Ketapang (the "Muriah and Ketapang Fields") that were part of the proposed Petronas-█████ transaction.

The transaction failed to progress in 2010, but the defendant and Leissner continued their efforts with Low in early 2011.  The work with Low continued notwithstanding their knowledge that during a review of an unrelated transaction that year, BIG objected to the involvement of Low or any of his entities.  Reflecting their continued work on the Petronas-█████ transaction, in April 2011, the defendant forwarded Leissner a related presentation he had received from █████ the prior year.  Attempting to leverage Low's ties to Abu Dhabi, Leissner revised the presentation to highlight a potential role for IPIC who was proposed to partner with Petronas on aspects of the deal.  Leissner sent the defendant the new presentation, stating that he had "re-done the presentation so that you can send it to JL."

The following day, the defendant updated Leissner on a meeting he had with Low the prior night, during which they appear to have discussed multiple potential deals involving Low.  As reflected in a summary sent by the defendant to Leissner, those deals included a deal called "Project Red" that the defendant was contemporaneously pushing through Goldman with Leissner and the Petronas-█████ transaction's sale of the Muriah and Ketapang Fields.  In his summary email, the defendant stated that, as to the "Muriah & Ketapang" deal, they needed to "pay █████ so that he plays ball, fees wise 1% of deal value.  This will make it easier for future Petronas deals."  In that message, the defendant was relaying to Leissner that to obtain Petronas'

approval for the transaction and pave the way for future Petronas deals, they needed to pay kickbacks to ███████████ ("████████"), a member of the Petronas board of directors, and a close associate of the Prime Minister.

The defendant and Leissner had worked with ███████ in 2010 on an unrelated transaction and, although ███████ had been formally engaged as a "Finder" for Goldman, he had no role on the Petronas-███████ transaction, other than occupying a board seat for an interested party—the seller, Petronas.  As the defendant knew, ███████ had previously tried to block other transactions with Goldman, and the defendant and Leissner feared that he would block the Petronas-███████ transaction if Mustapha was not paid.

In a follow-up email, the defendant told Leissner that if ███████ had any other detail for Low concerning Indonesian and Malaysia's partnership in the proposed transactions, he needed to let him know quickly because Low was "meeting with the boss" that evening, i.e., the Prime Minister.  Indeed, shortly after sending that email, the defendant sent Leissner an "agenda for JL to PM on Indonesia, which walked through the talking points Low planned to give to the Prime Minister regarding, among other things, Indonesia and the Petronas-███████ transaction.   In that email, the defendant again listed the next steps for the transactions, repeating that they needed to "pay ███████ [███████] so that he plays ball," which will "make it easier for future."

### 2.   Discussion

The defendant's work with Low and Leissner to secure business opportunities for Goldman is at heart of the alleged scheme.  As alleged in the Indictment, the defendant's efforts to leverage Low for Goldman business dated back to 2009 and continued unabated even after the final 2013 1MDB bond transaction.  The proffered evidence concerning the defendant's use of Low in 2010 and 2011 to help secure support of the Petronas-███████ transaction provides

"crucial background evidence that [gives] coherence to the basic sequence of events" leading to up to the first 2012 bond transaction.  See United States v. Gonzalez, 110 F.3d 936, 942 (2d Cir. 1997).  The evidence concerning Petronas-███████ transaction shows that, even in 2010 and 2011, Low was actively liaising with the Prime Minister about financial transactions related to state-owned entities like Petronas and 1MDB and was proposing to the defendant and Leissner the strategies for moving forward with the transactions, such as paying kickbacks to ensure a transaction's approval.  That sequence of events would continue up to and through the first 1MDB bond transaction.

Additionally, the sequence of the 2011 emails detailed above is powerful direct evidence of the defendant's relationship with Low and his role as the conduit for communications with, and updates from, Low.  See United States v. Tartir, 347 F. App'x 655, 657 (2d Cir. 2009) (Testimony about "prior acts was admissible as direct evidence because it provided background related to [co-conspirator's] relationship with [defendant].").  As the emails make clear, it was the defendant who met personally with Low on the Petronas-███████ deal among others, summarized Low's comments, and circulated them to Leissner.  That the defendant—not Leissner or a third party—was having these important and sensitive discussions is direct evidence of him leading discussions with Low at a time just prior to the first 1MDB bond transaction and is admissible.  See United States v. Thai, 29 F.3d 785, 813 (2d Cir. 1994) (affirming the admission of direct evidence that tended to establish a leadership position among the defendants); United States v. Bumagin, 136 F. Supp. 3d 361, 369 (E.D.N.Y. 2015) ("Evidence of leadership in a conspiracy is also relevant as direct evidence.").

This takes on even greater importance, where, as here, the defendant has indicated in his pre-trial filings that he will make clear his relationship with Low was simply as the person

who introduced Low to Goldman prior to the 1MDB bond transactions.  (See ECF No. 46 (hereinafter "Def. Mem.") at 1, 4 (claiming the defendant "played no role in any of the events driving this case other than to be Malaysian and to have introduced Low, another Malaysian, to Leissner and other superiors at Goldman")).  Given the proffered defense arguments on this point, this evidence should be admitted to rebut them.  See United States v. Zackson, 12 F.3d 1178, 1182 (2d Cir. 1993) ("Where a defendant claims that his conduct has an innocent explanation, prior act evidence is generally admissible to prove that the defendant acted with the state of mind necessary to commit the offense charged.").

Finally, the proffered evidence concerning the Petronas-█████ transaction "demonstrates the context of certain events relevant to the charged offense," and is therefore admissible to complete the story of the crimes charged.  See United States v. Inserra, 34 F.3d 83, 89 (2d Cir. 1994).  Specifically, common to each of the transactions summarized in the defendant's April 2011 emails about the deals including the Petronas-█████ transaction reflect Low's personal efforts to enlist the support and assistance of the Prime Minister, whom the defendant called "the boss."  Low's role as the key advisor and intermediary for the Prime Minister is crucial to understand the charged schemes and Low's central role in all of them.

Even if this evidence did not constitute direct evidence of the charged crimes, applying the Second Circuit's "inclusionary approach" to other act evidence under Rule 404(b), multiple non-propensity bases support its admission.  See United States v. Dupree, 870 F.3d 62, 76 (2d Cir. 2017) ("[P]rior act evidence is admissible if offered for any purpose other than to show a defendant's criminal propensity." (internal quotation marks omitted).  For example, the defendant's discussions with Low and Leissner about paying kickbacks in 2011 helps "to inform the jury of the background of the conspiracy charged," and "explain how the illegal relationship

between [Low, the defendant, and Leissner] developed" leading up to the 2012 and 2013 1MDB bond transactions.  See Dupree, 870 F.3d at 76.  The discussion around the Petronas-████ transaction makes clear that, by 2011, the defendant, Low, and Leissner were already comfortable discussing transactions that would involve the payment of kickbacks to interested parties like ████, illustrating the evolution of their relationship since 2009 when Low acted as the advisor to TIA on Project Tiara.

Moreover, the fact that, in 2011, the co-conspirators in the charged scheme each spoke so openly about paying off interested parties to "play ball" on a transaction also underscores "the mutual trust that existed between coconspirators" at the time and undermines any claim that their participation in the scheme occurred by mistake or happenstance.  See Dupree, 870 F.3d at 76; United States v. Rosa, 11 F.3d 315, 334 (2d Cir. 1993).  Evidence of the substantial trust among the conspirators helps establish that the defendant was not invited into the bribery and money laundering conspiracy by mistake or as an unwitting dupe—he was longtime trusted associate of Low who was comfortable taking on the serious risks attendant to using illicit payments to secure business.

Turning to the Rule 403 balancing, given the high probative value of this evidence and the seriousness of the charged conduct, there will be no undue prejudice to the defendant in admitting it.  The charged bribery and money laundering conspiracy is vast and included the defendant's participation in a scheme that paid over a billion in bribes to numerous government officials in two countries, some at the highest levels, and his receipt of tens of millions of dollars in misappropriated and diverted funds from the 1MDB bond deals secured through those bribes and kickbacks.  Viewed in context, the relatively narrow scope of testimony concerning the proposed kickbacks in the Petronas-████ transaction is not "any more sensational or

disturbing than the alleged crime" and Rule 403 presents no bar to its admission.  See Rosemond, 958 F.3d at 125 ("The probative value of prior bad-act evidence is not substantially outweighed by the risk of prejudice if the conduct is not 'any more sensational or disturbing' than the charged crime.").

**B.**     **The Defendant's Efforts to Arrange a Donation to a Charity Run by** █████ **and to Secure Internships for** ████████████ **at Low's Request**

As discussed above, throughout 2010 and 2011, the defendant knew of Low's ties to the Prime Minister and worked with Low to use those ties to secure business for Goldman. The government intends to offer evidence that, contemporaneously with these efforts, Low directed the defendant and Leissner to confer benefits on the Prime Minister by making a donation to a charity run by the Prime Minister's wife and by helping secure internships at Goldman and elsewhere for one of the Prime Minister's children.  As set forth below, these efforts are admissible as both direct evidence and pursuant to Rule 404(b).

**1.     Relevant Background**

In mid to late 2010, Low sought to secure a $300,000 donation from Goldman to "Bakti," a charity run by ████████████████████.  The defendant and Leissner believed that Goldman's donation would help enhance their relationships in Malaysia. The defendant and Leissner subsequently engaged a Goldman giving program funded Goldman Managing Directors' salaries in an attempt to complete the donation.

In September 2010, after legal counsel reviewed the proposed donation and provided an update on the ongoing due diligence process, the defendant emailed the update to Low, noting that if the donation was "urgent [Leissner] can extend his personal cheque," but told Low that Goldman and the defendant would "be guided by you."  In an email to Leissner, the defendant said that Low messaged him: "Fuming for █ is serious," referring to the fact that

████ was upset about the delay.  The defendant told Leissner that "by end of next [week,] if no cheque we got to be ready for personal."  The defendant followed up in another message stating that ████ was "not happy its [sic] taken so long and is questioning our sincerity."  In a later email from the defendant to Low, the defendant explained that they were close to finalizing the donation, but that Leissner was available if "you need to catch up and have him explain to the Madam."  Madam refers to ████  Despite these efforts, the donation was not completed.

In June 2011, Low sent the defendant and Leissner the resume for ████ ████, and Low told them, "██ would like an opportunity to be considered to work for one year at GS's London Government Department starting September 2011."  After Goldman did not retain ██, in September 2011, Leissner attempted to connect the Prime Minister's ████ with bankers at a private equity firm.

### 2.    Discussion

Evidence of the defendant and Leissner's attempts to curry favor with the Prime Minister through the large charity donation and internship offer are admissible as direct evidence of the charged crimes and under Rule 404(b).

The Court should admit evidence of the defendant's efforts to curry favor with Prime Minster Razak at Low's direction as direct evidence of the charged crimes.  As an initial matter, the government intends to offer at trial text communications in which Low and the defendant discuss the charged bribery and money laundering scheme using coded language and referring to ████ as "Madam."  As a result, the defendant's 2010 communications with Low using the same terminology to refer to ████ will be highly probative to identifying ████ ████ in the subsequent messages.

More generally, at trial, establishing the existence of a relationship between Low and the Prime Minister is a necessary part of understanding the charged scheme, which involved

49

the payment of bribes and kickbacks to, among others, the Prime Minister and his close relatives.

Here, Low's ability to relay the reactions from ████████████████ concerning the

potential Goldman donation and to forward the defendant the resume for the Prime Minister's

████ each constitute strong circumstantial evidence of the close connection between Low and

the Prime Minister's family.  It is also highly probative of Low's role as the Prime Minister's

intermediary who could act for his benefit.

   In addition to being probative of Low's role, the defendant's efforts to secure the

charity donation will provide the jury with yet another example of the defendant's role as Low's

lead Goldman interlocutor during the relevant time period.  In addition to communicating

directly with Low, the messages also show that the defendant worked aggressively to ensure

Low's request was met, even if it meant Leissner had to cut a personal check to the charity in

case Goldman failed to deliver.  Because this evidence illuminates the defendant's position and

role relative to his co-conspirators in the charged scheme, it should be admitted as direct

evidence.  See Thai, 29 F.3d at 813.

   The proffered evidence should also be admitted pursuant to Rule 404(b) as

relevant for multiple non-propensity purposes, including to establish knowledge, motive, and

absence of mistake.  As noted above, a central aspect of the charged scheme is the existence of a

close relationship between Low and the Prime Minister.  The proffered evidence is probative of

the defendant's knowledge that Low and the Prime Minister's family were close, and that Low

had acted and would act as an intermediary for the Prime Minister.  Additionally, the proffered

evidence is also relevant to establish the defendant's motivations at the time: to help win

Goldman business by pleasing Low and the Prime Minister, including through offering money

and other things of value.

Rule 403 does not bar this evidence.  Given the defendant's role in the payment of bribes and kickbacks to multiple government officials, including the Prime Minister , the proffered evidence concerning his efforts to curry favor with his family are not so sensational as to be unduly prejudicial.  Accordingly, considering its probative value, the evidence should be admitted.

### C.   The Defendant's Work with a Corrupt Intermediary on Goldman Transactions with the State of Sarawak

#### 1.   The Proffered Evidence

At trial the government intends to offer evidence concerning the defendant's work at Goldman on multiple transactions involving the Malaysian State of Sarawak between 2006 and 2012.  These transactions were brought to Goldman through a third-party Malaysian investment firm operated by a Malaysian businessman ("Intermediary-1").  Intermediary-1 maintained relationships with government officials in the State of Sarawak—some of whom had been publicly accused of corruption—and whose approvals were needed for the deals.  After vetting by Goldman's internal compliance personnel, which relied on representations from the defendant about Intermediary-1 and the proposed payments, Intermediary-1 was approved as a "finder" and "intermediary" for Goldman and was cleared by Goldman to receive substantial finder's fees directly from Goldman on multiple transactions.

The proposed fees to Intermediary-1 grew over time, and as part of the Goldman's review process for engaging and paying Intermediary-1, the deal teams—which included the defendant, Leissner, and other bankers who would later work on the 1MDB bond transactions— submitted descriptions of Intermediary-1's role on the transaction and justifications for the fees to be paid by Goldman.  Together, the defendant and other deal team members crafted facially plausible justifications for Intermediary-1's involvement as an "advisor" on the deals.  However,

Intermediary-1 did not act as an advisor, but was simply a middleman between Goldman and government officials in the State of Sarawak whose approvals were necessary to complete the transaction.  The defendant understood Intermediary-1's role as a middleman and not as a legitimate advisor.  The defendant and Leissner were told, and continued to believe, that the transactions in the State of Sarawak would not go forward without ensuring Intermediary-1's involvement. ████████████████████████████████████

████████████████████████████████████████████

█████████████████████

### a.    2006 Sarawak Transaction

After the defendant joined Goldman from another investment bank, one of the first transactions on which he worked with Leissner was a 2006 interest rate swap transaction involving the State of Sarawak in Malaysia.  The deal was brought to Goldman by Intermediary-1 and, in February 2006, Leissner informed personnel in BIG that the deal team had orally agreed to pay Intermediary-1 a finder's fee.  In response, BIG personnel in Asia escalated the issue to colleagues in New York and began reviews of the transaction and Intermediary-1.  Given the bribery and reputational risks associated with engaging and paying Intermediary-1, personnel in BIG created a new review process for this and ultimately future transactions in Asia.

During that review process, BIG personnel engaged directly with the defendant.  As part of BIG's review, on February 21, 2006, the defendant and Leissner received a newly created "Due Diligence Template for Introducing Fee Arrangements," a form designed by BIG personnel to gain information about Intermediary-1 and the proposed payment.  A completed questionnaire was completed by the deal team, which highlighted explicitly that the defendant

had "known [Intermediary-1] from his tenure in ███████████ (1998/99) and ha[d] worked, and are working, with him on a number of other assignments."

Following a review by New York-based BIG personnel, the proposed payment to Intermediary-1 was approved and a formalized consultancy agreement was executed between Goldman and Intermediary-1, which was signed by Leissner, and memorialized the expected $500,000 payment. As BIG personnel are expected to explain at trial, much of the Intermediary policy at Goldman was formalized in response to the 2006 Sarawak Transaction and required legitimate business justifications from bankers attempting to engage and pay an intermediary, particularly those close to government officials.

### b.    2011 and 2012 Sarawak Transactions

In 2011, the defendant, together with many of the bankers who would handle the 2012 and 2013 1MDB bond transactions, began working on a new series of transactions involving the State of Sarawak. In May 2011, the defendant, together with Leissner, and others, began working on an $800 million bond offering for a wholly owned subsidiary of the State of Sarawak. Like the 2006 Sarawak transaction, Intermediary-1 brought the transaction to Goldman, and was set to receive a finder's fee of approximately $4 million. This arrangement triggered the intermediary review process led by BIG. During the internal committee review process for the deal, the fees paid to Intermediary-1 were a significant focus. Both BIG and external FCPA counsel reviewed the intended payments to Intermediary-1 and a letter with explicit anti-corruption provisions was executed with Intermediary-1. The transaction closed in June 2011.

Just months later, in November 2011, the defendant and deal team members including Leissner went through the intermediary review process yet again for Intermediary-1 in connection with another $500 million bond offering involving the State of Sarawak.

Intermediary-1 had brought the transaction to Goldman and was to be paid approximately $3mm. With the proposed payment to Intermediary-1, BIG personnel sought updated information on the arrangement "for the purpose of engaging the FCPA counsel."  After the deal team submitted information to BIG, the defendant received a copy of preliminary findings by BIG related to government officials involved in the transaction, including public reporting of bribery and corruption.  Ultimately, Goldman agreed to pay the fee to Intermediary-1, but after the Malaysian central bank did not approve the deal, the $500 million bond offering was halted.

However, in June 2012, the transaction was "re-activated," but was now targeting a fundraising of $800 million.  The deal team was largely the same and included the defendant, and Leissner.  Given the increased deal size, Intermediary-1 was to be paid approximately $5 million.  Despite its review just six months before, BIG again undertook a review of the proposed payment to Intermediary-1, and the use of Intermediary-1 was again a focus throughout the committee review process.

For each of the three reviews undertaken by BIG and the relevant transaction committees for the 2011 and 2012 Sarawak transactions, the defendant, Leissner and others, helped craft the language used to justify the payments to Intermediary-1.  As reflected in committee submissions, they described Intermediary-1 as repeatedly playing a crucial role intermediating between Goldman and the State of Sarawak, crediting Intermediary-1 with securing the transactions for Goldman. █████████████████████████████████

████████████████████████████████████████

██████████████████████████████████████

███████████████████████████████████████

███████

2.      **Argument**

The Court should admit evidence of the Sarawak transactions and Intermediary-1 because it is probative as non-propensity evidence of the relationship of mutual trust among the conspirators in the charged crimes, and as evidence of defendant's knowledge, motive, and absence of mistake.

First, the proffered evidence, including the defendant's work with Leissner and others to present Intermediary-1 as a legitimate "advisor" and his belief that at least some of the money paid to Intermediary-1 was being passed to Malaysian government officials should be admitted as evidence of the relationship between the conspirators and their level of mutual trust. The Sarawak transactions underscore the trust among the conspirators to not reveal to BIG or compliance the truth about Intermediary-1—that he was a third party who passed money on to government officials and did not otherwise play a legitimate role, which required they instead provide facially plausible justifications needed to get the transaction approved internally.

Second, the defendant's involvement in the Sarawak transactions is probative of what the defendant knew at the time of the charged crimes.  The defendant's participation in BIG's reviews for the Sarawak deals helps establish the defendant's knowledge that Malaysia was a high-risk jurisdiction for bribery and money laundering, especially with the use of an intermediary close to government officials, and that substantial steps were needed to mitigate that risk for the Sarawak transactions, including internal and external reviews by FCPA counsel and a formalized agreement with provisions directly addressing FCPA and money laundering compliance.  All of which the defendant foreclosed on the 1MDB transactions by concealing Low's involvement from the outset.

To that end, the evidence concerning the Sarawak transactions powerfully shows that, as of at least 2006, the defendant knew that if a third party was receiving money on a

Goldman transaction, it could trigger an intensive review by BIG and even by external FCPA counsel. His first-hand knowledge of those intensive reviews is probative of his motive to conceal Low's role as an intermediary on, among other deals, the 1MDB bond transactions. Having seen the review and formalized agreements required to deal with Intermediary-1, the defendant knew that disclosure of Low's involvement in the 1MDB bond transactions could, at best, jeopardize the deals before they started, or, at worst, lead to the discovery of their criminal scheme. To avoid that result, he conspired to actively conceal Low's involvement.

Third, and finally, admitting evidence of the defendant's prior work on the Sarawak transactions is also proper to negate the erroneous inference that his failure to disclose Low's involvement was somehow a mistake. In view of his roles on the Sarawak transactions and the Intermediary-1 due diligence process, the defendant understood very well that such information had to be disclosed, and he knew, as far back as 2006, that personnel in BIG could be highly focused on payments to third parties in a Goldman transaction, let alone payments like the bribes and kickbacks to be paid for the 1MDB bond transactions.

As to Rule 403 balancing, admitting evidence of the defendant's work on the Sarawak transactions would create no undue prejudice because his omissions as to Intermediary-1's role are substantially less serious than the money laundering and bribery scheme the defendant subsequently engaged in with Low and others. See Rosemond, 958 F.3d at 125.

### D. Evidence of the Defendant's Undisclosed Side Deals with Leissner and Others While Employed at Goldman is Admissible

The government seeks to admit evidence of the defendant's efforts with Leissner and others to engage in financial transactions for his own personal benefit while at Goldman. For the reasons set forth below, this evidence is admissible as direct evidence of the charged

crimes and relevant to issues of the defendant's knowledge, motive, and the mutual relationship of trust with Leissner.

### 1.    The Proffered Evidence

During the charged conspiracy period, the defendant and Leissner worked together to complete business transactions for their personal benefit, which were not disclosed to Goldman and in violation of the company's policies and procedures.  Goldman maintained formal written policies concerning its employees' outside business activities, including their own private investments.  Such policies were in effect for the entirety of the defendant's employment at Goldman from 2005 through 2014.  In short, these policies made clear that "[a]ll private investments" by Goldman employees, their spouses or other "related persons require[d] prior firm approval," which approval would be conditioned on factors outlined in the policy, "including a determination that the private investment does not present a potential conflict or reputational issue."

Investments subject to the policy included those into start-up or other business ventures, investments into real estate not for personal use, and transactions where profit was expected (including loans and other debts).  Goldman employees also had to obtain pre-approval to receive compensation, including wages and finder's fees, from any private investments without prior approval.  These policies also required disclosure to Goldman to ensure that the company itself did not lose opportunities for profitable business because its employees chose to pursue those opportunities for their own benefit

Accompanying these provisions was Goldman's Code of Business Conduct and Ethics, which provided that employees had to disclose any transaction or relationship that could "reasonably be expected to give rise to a conflict of interest or perceived conflict of interest," and that employees "must never use or attempt to use [their] position at the firm to obtain any

improper personal benefits (including loans or guarantees of obligations or gifts, from any person or entity)."

Notwithstanding Goldman's policies restricting personal investment activities and requiring numerous approvals, the defendant, together with Leissner and, at times, with fellow banker ███████████ ("████████"), pursued numerous transactions for their own personal benefit without disclosing their efforts to Goldman.  These conversations took place over the defendant's personal email, ensuring they would not be detected by Goldman.  Two examples of his efforts are described below.

In 2010, a business associate with whom the defendant and Leissner were working to find potential transactions sent the defendant information on a Philippines copper project being sold for $50 million.  After receiving the information, the defendant responded, copying Leissner, saying that they had an interested buyer in China.  The business associate told the defendant that a 7.5% commission was available to the defendant and Leissner for finding a buyer.  Thereafter, the defendant and Leissner discussed the potential commission they could receive, and the defendant exclaimed that the 7.5% commission ($3,750,000) was "still more than my bonus."

In 2012, the defendant, Leissner, and ████████ attempted to purchase equity warrants from a Vietnamese company using the shell company Capital Place (the entity involved in the charged bribery and money laundering conduct) as a pass-through entity to conceal their identities.

Beginning in late February 2012, the defendant, Leissner and ████████ learned from a Vietnamese-based intermediary known as ████████ that warrants worth just more than $2 million were available for sale.  At the time, it appears that other Goldman bankers were

having discussions with parties involved in the potential sale.  In addition, ███████ was a

contracted intermediary for Goldman and had worked with Leissner and █████ to help secure

Goldman business.

Nevertheless, the defendant, Leissner, and █████ began strategizing with █

███ about how to acquire the warrants for themselves while hiding their identities.  The

defendant, Leissner, and █████ discussed the transaction over their personal email accounts,

with the defendant using his anonymized "queensgate" email address.  During their discussions,

they agreed to use a shell company to handle the trade and discussed using Capital Place and

another off-shore shell company called "Kingsway Pacific Ltd.," both of which were shell

companies nominally owned by █████.  Reflecting the group's concern about getting

linked to the transaction, Leissner wrote the defendant and █████, stating that █████ "may

come up with another holding Co that does not have █ as a director. Or should we use another

name" and suggested options that would appear "completely disconnected."

On March 2, 2012, the defendant submitted the Capital Place corporate records to

a Malaysian investment bank that would broker the trade for the defendant, Leissner, and ████

██.  Discussions among the defendant, Leissner, █████, and █████ continued through

August 2012, but the deal was not completed.

2.    **Argument**

The Court should admit evidence of the defendant's undisclosed side deals with

Leissner that violated Goldman's internal policies because it is direct evidence and not otherwise

barred by Rule 404(b) as relevant to the defendant's knowledge, intent, motive, and as

background on the defendant's partnership and mutual trust with Leissner.

The defendant's side deals constitute direct evidence because, at trial, the

government must establish that the defendant was the user of numerous personal email accounts,

including anonymized accounts designed to conceal his identity.  The defendant's communications about the side deals undertaken with Leissner will constitute clear evidence of his ownership, use, and control over the various non-Goldman email accounts.

The 2012 side deal concerning the Vietnamese equity warrants is directly relevant to the charged scheme for an additional reason: the defendant used the very same offshore shell company—Capital Place—that he and his co-conspirators used to pay bribes and kickbacks and launder funds in furtherance of the charged offenses.  The defendant's use of that shell in the side deals is highly probative of the defendant's belief that Capital Place was an entity that he and Leissner could use to conceal their conduct.

To the extent the defendant's side deals do not constitute direct evidence of the charged crimes, they are still admissible as relevant to the proper, non-propensity purposes of "explain[ing] how the illegal relationship between [the defendant and Leissner] developed" prior to their execution of the charged scheme and to establish the defendant's knowledge, intent, motive, plan or absence of mistake.  See Dupree, 870 F.3d at 76.  As evidence of their side deals shows, defendant and Leissner could trust each other during the charged scheme because that trust was durable; hardened by their numerous efforts to enrich themselves even when it conflicted with their work at Goldman and violated its policies.  Understanding their course of dealing on these side deals helps illustrate how the defendant found himself partnering with Leissner to commit the charged offenses.  See United States v. Delligatti, No. 15 Cr. 491, 2018 WL 1033242, at *7 (S.D.N.Y. Feb. 23, 2018) ("[W]here potential evidence explains the development of the illegal relationship … and explains the mutual trust that existed between the coconspirators, it will be plainly admissible.").

These side deals are also powerful evidence of one of the defendant's motives: his greed. He joined the charged bribery and money laundering conspiracy out of a desire for more money, and evidence of these side deals with Leissner make that clear. Notwithstanding the millions of dollars in salary, bonuses and Goldman stock he received as an employee, he undertook these side deals because it was all still not enough. Accordingly, this evidence should be admitted. See United States v. Hoey, 725 F. App'x 58, 61 (2d Cir. 2018) (finding evidence of the defendant's "spending habits coupled with the depletion of the Company's funds due to financial struggles was highly probative of [the defendant's] motive for taking money from the Plan); United States v. Leigh, 104 F.3d 356 (2d Cir. 1996) (unpublished) ("[G]reed" was appropriate as motive evidence under Fed. R. Evid. 404(b) to rebut [defendant]'s good faith defense, and was not unfairly prejudicial.").

Additionally, the defendant's attempted purchase of the Vietnamese equity warrants deal is also relevant to the issues of knowledge and absence of mistake. As that transaction shows, the defendant knew of Leissner's control over offshore shell companies, including Capital Place and that in accepting tens of millions of dollars of misappropriated and diverted 1MDB money from Capital Place account he did not mistakenly believe it was ███ ███ sending the money—he knew it was Leissner. Accordingly, evidence of the defendant's side deals with Leissner should be admitted at trial.

### E. Evidence of How the Defendant's Relationship with Co-Conspirator Low Developed Is Admissible

The Indictment charges conspiracies to violate the FCPA's anti-bribery and internal accounting controls provisions and to commit money laundering between in or about January 2009 and in or about October 2014. As set out above, the government will show how beginning in early 2009, the defendant, with Low's assistance, sought to win business for

Goldman in Malaysia and elsewhere, including through Low's relationship with the Prime

Minister, and to circumvent Goldman's internal accounting controls.  The government also seeks

to introduce additional other act evidence to establish how the relationship between the

defendant and Low developed and to explain the relationship of mutual trust between the

defendant and Low leading up to the three 1MDB bond issuances underwritten and arranged by

Goldman.[6]

As summarized above, the defendant, together with Leissner relentlessly pursued

numerous business efforts with Low leading up to the 1MDB bond transactions.

Notwithstanding the concerns about Low that BIG personnel had expressed to the defendant by

2011, on several occasions, the defendant travelled with Low in connection with various

potential deals, including the following:

- In or around May 2011, the defendant and Leissner communicated with Low and others regarding the sale of stock in a Malaysian bank by an Abu Dhabi-based bank ("Abu Dhabi Bank-1") to an Abu Dhabi sovereign wealth fund, Aabar Investments PJS ("Aabar"), a project referred to internally at Goldman as "Project Red."  As described further below, the defendant traveled to France to meet with Low in connection with this deal.

- In or around September 2011, Leissner wrote to the defendant, using their personal email accounts, about a potential transaction involving an Indonesian oil and gas company and asked the defendant to forward the message to Low.  That day, the defendant was scheduled to travel with Low and one of Low's close associates from Singapore to Jakarta on a chartered flight, although it is not clear whether the defendant in fact went to Jakarta.  The defendant and Leissner thereafter had further email communications with Low associates about a potential transaction involving the Indonesian company and Jynwel, the Low-controlled entity discussed above.

---

[6] This section does not include an exhaustive recitation of interactions between the defendant and Low leading up to the 1MDB bond issuances that were underwritten and arranged by Goldman, but merely sets forth certain key events that illustrate how the co-conspirators developed a relationship of mutual trust.

- In or around December 2011, Low corresponded with Mohammed Al-Husseiny, Aabar's CEO, and members of Low's own family about a potential transaction involving Jynwel, IPIC, and an oil company in Papua New Guinea.  Later that month, the defendant traveled with Low and others on a chartered flight from Hong Kong to Abu Dhabi.  While in Abu Dhabi, the defendant asked a Goldman colleague to send him a slide deck that would show that an upcoming deal would be "accretive for Red shareholders."  The referenced deal appears to be the purchase by a Malaysian bank of certain assets; Aabar had acquired a stake in the Malaysian bank earlier that year through Project Red, described above.

### 1.    The Proffered Evidence

At trial, in addition to the trips described above, the government seeks to offer

evidence of additional trips taken by the defendant and Low for both social and business

purposes, on private jets, including for the following:

- In November 2010, less than six months after Goldman determined not to take on Low as a PWM client, the defendant flew with Low and others from Singapore to Las Vegas on a chartered flight for a lavish party hosted by Low (or a close associate acting on his behalf) that included appearances by multiple popular recording artists.

- The defendant obtained approval from Goldman to travel from Malaysia to London on May 20, 2011, ostensibly in connection with Project Red (discussed above).  That day, the defendant explained to his primary contact at Abu Dhabi Bank-1 that he was meeting with Low in London on Saturday, May 21, 2011, in advance of a meeting Low planned to attend in Abu Dhabi on May 24, 2011 with representatives of Aabar and IPIC and, later that day, with representatives of Abu Dhabi Bank-1.  After arriving in London, the defendant flew to Nice, France to meet with Low.  In connection with the 2011 Cannes Film Festival that took place in mid-May, Low hosted a lavish party and chartered two luxury yachts (through a close associate), at least one of which was cruising in the Mediterranean Sea near Nice at the time.  Low's assistant arranged for a car to take the defendant from the airport in Nice to a pier in a neighboring town on the French Riviera, where a tender transported the defendant to one of the yachts.  Email communications indicate that, once aboard the yacht, the defendant reviewed a draft Goldman presentation on Project Red with Low and his associates.  Others at Goldman revised the presentation to incorporate feedback provided by Low and his associates while on the yacht.  The next day, the defendant flew on a chartered flight with Low and others from Nice to London before the defendant boarded a commercial flight to Asia later that night.

- As described above, between at least late 2010 and late 2011, the defendant traveled with Low on several occasions on private jets chartered by Low or on his

behalf, including, at a minimum, to attend the 2010 event in Las Vegas, to return from the French Riviera, and to visit Abu Dhabi in December 2011.

**2.   Argument**

Establishing why Low was comfortable discussing and engaging in a massive scheme to misappropriate bond proceeds and bribe foreign officials with the defendant will be a key issue at trial.  To aid the jury's understanding of how this facet of the larger illegal conspiracy came about, it will be essential to place the defendant's dealings with Low in context by introducing evidence regarding the background, development, and nature of the defendant's relationship with Low.  As discussed above, much of the proof regarding the development of the defendant's relationship with Low is core, direct evidence of the charged conspiracies.  Certain of the proof regarding how their relationship developed, however, is arguably other act evidence. This latter evidence is key to establish how the relationship of mutual trust between the defendant and Low came about.

The defendant's travel with Low on a chartered flight to Las Vegas in 2010 to attend a lavish event, his meeting with Low on a luxury yacht in the Mediterranean Sea shortly after the 2011 Cannes Film Festival, and his travel with Low on chartered flights at least in 2010 and 2011, among other evidence, shows how the relationship between the defendant and Low developed and helps explain the mutual trust that existed between them.  This evidence will aid the jury's understanding of how, in February 2012, the defendant, Low, and others came to agree to bribe multiple foreign officials and divert billions of dollars in bond proceeds from 1MDB. The defendant was not merely a banker with whom Low had an arms-length relationship.  To the contrary, over the course of three years leading up to the bond issuances at the heart of this case, the defendant and Low developed a close relationship.

The proffered other act evidence is admissible "to inform the jury of the background of the conspiracy charged in order to help explain how the illegal relationship between participants in the crime developed, or to explain the mutual trust that existed between coconspirators," United States v. Rosa, 11 F.3d 315, 334 (2d Cir. 1993); see also United States v. Mercado, 573 F.3d 138, 141 (2d Cir. 2009); United States v. Pitre, 960 F.2d 1112, 1119 (2d Cir. 1992), and to "enable the jury to understand the complete story of the crimes charged," United States v. Reifler, 446 F.3d 65, 92 (2d Cir. 2006) (citation and internal quotation marks omitted). This evidence is highly probative of the relationship of mutual trust that existed between the defendant and Low and how they came to engage, along with others, in significant criminal conduct. The probative value of this evidence is not substantially outweighed by the danger of any unfair prejudice to the defendant. See Fed. R. Evid. 403. The Second Circuit has repeatedly held that evidence of prior acts can be admitted to inform the jury of the background of the charged conspiracy, even where those prior acts involved criminal conduct. See, e.g., Mercado, 573 F.3d at 141-42. Here, the government does not contend that the defendant's travels with Low on chartered flights, his attendance at a lavish 2010 event organized by Low, and his meeting with Low on a luxury yacht were necessarily criminal in nature, but instead merely seeks to demonstrate that the defendant developed a close relationship with Low leading up to the 1MDB bond issuances. The proffered evidence should, therefore, be admitted.

IV.    **STATEMENTS BY CO-CONSPIRATORS, INCLUDING ███████████████ ███████████, ARE ADMISSIBLE**

A.    **The Proffered Evidence**

Both ██████████████████████████████████████████████████

████████████████, among others, participated in the charged conspiracies by, among other

things, facilitating the transfer, concealment, receipt, and disposition of proceeds of the charged

bribery and money laundering conspiracies.[7]

███████████████████████

███, as set forth below, participated in financial transactions involving diverted

bond proceeds and ████████████████████████████████████████████

████████████████████████████████████████████████████████████

██████████████████████████████████████████████.

- Between approximately June 2012 and September 2013, a total of approximately $35 million was transferred from the Capital Place Bank Account and the ████ ████████ Morgan Stanley Bank Account to the Silken Waters / Victoria Square Bank Account.  Of this total, at least approximately $27 million was transferred on to other accounts, including (a) approximately $17 million was transferred between June and October 2013 to a bank account held jointly by ████ and ████ ████; and (b) approximately $10 million was transferred in or about June 2014 to a bank account held in ██████████'s name for which ████ had power of attorney beginning later that month.

- Silken Waters Enterprise Limited Corporation was incorporated in BVI on or about April 23, 2012.  The Silken Waters / Victoria Square Bank Account was opened on or about May 24, 2012.  Only a few days earlier, on or about May 21, 2012, an email account with username "████████" was established.  This email

---

[7] At trial, the government intends to introduce statements of other co-conspirators, including but not limited to ████████ Low, Leissner, etc., all of whom were previously identified to the defendant as co-conspirators in the course of the government's Rule 16 discovery.  While the government is moving pre-trial on these particular statements of ████████████, it is prepared to make additional offers of proof beyond what is already in the charging documents regarding the status of other co-conspirators (and thus the admissibility of their statements) to the extent challenged by the defense.

account was listed on the account opening documents for the Silken Waters / Victoria Square Bank Account and was one of two email accounts primarily used to communicate with bank employees regarding the Silken Waters / Victoria Square Bank Account.  Some emails sent from and to this account indicate that ██, rather than ██████, was the account user.  For example, (a) on or about June 27, 2012, an email was sent from "██████████" to an email account with username "victoriasquare.investment", an account which appears to have been used by the defendant, forwarding a message from a bank employee about a private equity investment vehicle, with the message "Pls look for ████"; and (b) on or about August 21, 2014, a bank employee sent an email to "█████████" regarding an initial public offering and addressed the email to "Roger and ██."

- On October 11, 2013, $7 million was transferred from the Silken Waters / Victoria Square Bank Account to a bank account held jointly by ██████████ ██.  That same day, in a recorded telephone conversation, ████ instructed a representative of the bank that received the transfer to convert $4.1 million into Malaysian Ringgit.  ████ signed an "Overseas & Foreign Currency Transfer" form dated October 11 in connection with this transaction.  A handwritten notation at the bottom of the form reads:  "To buy a pc of land in Johor," an area of Malaysia that abuts Singapore.





As set forth below, ███████ received over $100 million in diverted 1MDB bond proceeds into a bank account ██ controlled and transferred over $100 million of those funds to others, including to an account opened by █████, the defendant's █████████ and to accounts beneficially owned and controlled by foreign officials.

- Incorporation documents show that █████████ was the director and shareholder of Capital Place. Between approximately June 2012 and July 2013, over $100 million in diverted 1MDB bond proceeds was transferred into the Capital Place Bank Account from Low-affiliated entities.

- In mid-June 2012, █████████ wrote to Leissner about opening the ███ █████ Morgan Stanley Bank Account, into which ██ said ██ would transfer approximately $12 million. ████████████████████████████████████████ ████████████████████████████████ Later in 2012, a total of over $8 million was transferred from the Capital Place Bank Account to ████████████ Morgan Stanley Bank Account. Additional funds were transferred from the Capital Place Bank Account to the ███████████ Morgan Stanley Bank Account in 2013.

- On July 16, 2012, an email with the subject line "Money" was sent from one account with the username █████████ to another account with the username █████████ that included information regarding an account held in the name "Silken Waters Enterprise Limited," as well as information regarding the beneficiary bank's correspondent account. The first line of the email read: "For Roger: UBS Private." The next day, on July 17, 2012, following an email instruction from █████████, $6.9 million was transferred from the Capital Place Bank Account to the Silken Waters / Victoria Square Bank Account.

- In 2013, Leissner █████████ exchanged emails about transfers to various entities that were beneficially owned and controlled by government officials.

- In or about September 2013, Leissner █████████ exchanged emails regarding a total of $10.7 million to be transferred to the Silken Waters / Victoria Square Bank Account, with $4.2 million to be transferred from the Capital Place Bank Account and $6.5 million to be transferred from the █████████ Morgan Stanley Bank Account. The funds were subsequently transferred as discussed.

- In or about December 2013, █████████ emailed Leissner a spreadsheet tracking transfers into and out of the Capital Place Bank Account. The

spreadsheet showed well in excess of $100 million in diverted 1MDB bond
proceeds flowing into the Capital Place Bank Account and over $100 million in
outgoing transfers, including to the Silken Waters / Victoria Square Bank
Account, accounts beneficially owned by government officials, and the ████
████████ Morgan Stanley Bank Account that was used to transfer diverted bond
funds to the Silken Waters / Victoria Square Bank Account.

**B.      Applicable Law**

Rule 801(d)(2)(E) of the Federal Rules of evidence provides that a statement

"made by the party's coconspirator during and in furtherance of the conspiracy" is not hearsay.

Fed. R. Evid. 801(d)(2)(E).  "To admit hearsay testimony under Rule 801(d)(2)(E) of the Federal

Rules of Evidence, the district court must find (a) that there was a conspiracy, (b) that its

members included the declarant and the party against whom the statement is offered, and (c) that

the statement was made during the course of and in furtherance of the conspiracy."  United

States v. Alameh, 341 F.3d 167, 176 (2d Cir. 2003) (citations and internal quotation marks

omitted).  District courts are to make this finding applying a "preponderance of the evidence"

standard.  See Bourjaily v. United States, 483 U.S. 171, 175 (1987).  In making this

determination, a court may consider the hearsay statement sought to be admitted, id. at 181, but

"there must be some independent corroborating evidence of the defendant's participation in the

conspiracy," United States v. Al-Moayad, 545 F.3d 139, 173 (2d Cir. 2008) (citations, internal

quotation marks, and alterations omitted).  Additionally, a court may consider any evidence in

making this preliminary determination, regardless of whether that evidence is itself admissible.

See Fed. R. Evid. 104(a); Bourjaily, 483 U.S. at 177-81.

The quantum of independent corroborating evidence required is not high.  "The

independent evidence need show only 'a likelihood of an illicit association between the declarant

and the defendant.'" United States v. Ginsberg, 758 F.2d 823, 828 (2d Cir. 1985) (quoting

United States v. Cicale, 691 F.2d 95, 103 (2d Cir. 1982)); United States v. Provenzano, 615 F.2d

37, 44 (2d Cir. 1980) ("'The threshold requirement of admissibility is satisfied by a showing of a

likelihood of an illicit association between the declarant and the defendant . . . .'" (quoting

United States v. Glazer, 532 F.2d 224, 228 (2d Cir. 1976))).  Moreover, "[t]he quantum of

independent evidence needed to corroborate the existence of a conspiracy necessarily is

dependent on the totality of circumstances, including the strength of the hearsay statements

themselves." United States v. Abu-Jihaad, 531 F. Supp. 2d 289, 296 (D. Conn. 2008).  When

"the hearsay evidence itself so convincingly implicates the defendant, a district court may require

less corroboration to find by a preponderance of the evidence that the defendant participated in

the conspiracy for purposes of admitting co-conspirators' statements against him." United States

v. Padilla, 203 F.3d 156, 162 (2d Cir. 2000)); see also United States v. Santiago, 199 F. Supp. 2d

101, 105 (S.D.N.Y. 2002) ("Although some form of corroboration is required, where, as here,

hearsay evidence itself so convincingly implicates the defendant, a court may require less

corroboration to find by a preponderance of the evidence that the defendant participated in the

conspiracy for purposes of admitting co-conspirators' statements against him.").

### C.    Argument

The proffered evidence establishes by a preponderance of the evidence that both

███████████████ participated, at a minimum, in the charged money laundering conspiracy.

Statements they made between 2012 and 2014 regarding banking transactions involving diverted

bond funds are therefore admissible.[8]

---

[8] ████████████████████████████████████████████████████████████
███████████████████████████

With respect to ███, the approximately $35 million in diverted bond funds transferred to the Silken Waters / Victoria Square Bank Account was intended for the defendant. The email communication between Leissner and ████████ describing a $6.9 million transfer to the Silken Waters / Victoria Square Bank Account as "For Roger," along with other evidence, makes that clear. ███ helped conceal that the funds were for the defendant's benefit. Approximately $27 million of the diverted bond funds received from the Capital Place Bank Account and the ████████ Morgan Stanley Bank Account were transferred from the Silken Waters / Victoria Square Bank Account to an account ███ held jointly with ████████ or an account held by ██████ for which ███ had power of attorney. Once the diverted bond funds were in an account ███ controlled, ███ directed further transactions involving the funds, including the $4.1 million October 11, 2013 transaction described above. ████████████ ███████████████████████████████████████████████ ████████████████████████████████████████ Given ████ active involvement in financial transactions involving the defendant's cut of the criminal proceeds, ███ statements in 2012 through 2014 regarding banking transactions involving diverted bond funds were made during and in furtherance of the charged conspiracies and are therefore admissible under Rule 801(d)(2)(E).

████████████ also played a key role in the charged conspiracies, receiving over $100 million in diverted bond funds into a bank account ███ controlled and transferring over $100 million of these funds on to other participants in the scheme, including to the Silken

███████████████████████████████████████████████████
████████████████████████████      ████████████████

Waters / Victoria Square Bank Account ████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████ knew the

funds that ██ began receiving into the Capital Place Bank Account in the summer of 2012 were

illicit. ██ transferred funds received into Capital Place to the Silken Waters / Victoria Square

Bank Account—understanding that the transfers were intended for the defendant—and others at

Leissner's request. ████████ statements between 2012 and 2014 about these transfers and

about transfers into and out of the Capital Place Bank Account and the ████████ Morgan

Stanley Bank Account more generally were made during and in furtherance of the charged

conspiracies and are therefore admissible at trial.

For the foregoing reasons, ████████████ statements between 2012

and 2014 regarding financial transactions involving diverted bond funds are admissible under

Rule 801(d)(2)(E) of the Federal Rules of Evidence.

## V.    THE COURT SHOULD PRECLUDE THE DEFENDANT FROM INTRODUCING HIS OWN OUT-OF-COURT STATEMENTS.

Partly as a result of the defendant's failure to produce any Rule 16 reciprocal discovery, the government is not aware of any specific statement of the defendant he intends to introduce at trial.  One of the defendant's professed defenses, however, is that he was the proverbial canary in the coal mine, warning Goldman of the risks Low posed as early as March 2010.  In support of these assertions, the defendant appears to intend to rely on email communications he sent, additional emails sent by others, documents purportedly recounting his statements, and witness who would testify as to his statements.  (See Def. Mem. at 4, 13, 16, 19-20, 26-28.)  For example, in pre-trial filings, the defendant has claimed he "specifically warned" certain Goldman representatives that "Low might be a fraud" and that Low "was a politically exposed person, that Low was not to be trusted, and that Goldman should use caution in dealing with Low," but Goldman did not listen to him.  (Id. at 3-4.)  His filings also reveal his intent to call unnamed Goldman witnesses to establish that he "was one of the first Goldman employees to raise concerns about Low's background," and that his "warnings were shared with the highest levels of the compliance and legal divisions."  (Id. at 4, 86; ECF No. 58 ("Def. Reply") at 34.)  The defendant's own out-of-court statements, whether introduced by testimony or contained in documents, are inadmissible hearsay when offered by him and should be precluded.

A defendant's out-of-court statement is not hearsay when offered by the government.  Fed. R. Evid. 801(d)(2)(A).  A defendant, however, does not have a parallel ability to offer his own statements.  See, e.g., United States v. Yousef, 327 F.3d 56, 153 (2d Cir. 2003) (concluding the "Government was free to introduce a statement as an admission by a party-opponent," but that the defendant "had no right to introduce it on his own").  Were the law otherwise, a defendant "could effectuate an end-run around the adversarial process by, in effect,

testifying without swearing an oath, facing cross-examination, or being subjected to first-hand scrutiny by the jury." United States v. McDaniel, 398 F.3d 540, 545 (6th Cir. 2005).  Nor, except in extremely limited circumstances, may a defendant introduce his own out-of-court statements as evidence of his state of mind.  To be admissible on that basis, the statement must be relevant to a then-existing state of mind or intent regarding a relevant fact.  See, e.g., United States v. Lesniewski, 2013 WL 3776235, at *5 (S.D.N.Y. July 12, 2013) (explaining that the Rule 803(3) exception "allows admission of a statement of the declarant's then-existing state of mind (such as motive, intent, or plan) or emotional, sensory, or physical condition").  This hearsay exception permits the limited admission only of statements of future intent, not those concerning past intent and/or motive.  Shepard v. United States, 290 U.S. 96, 105-06 (1933); see also United States v. Best, 219 F.3d 192, 198 (2d Cir. 2000) ("A declarant's out-of-court statement as to his intent to perform a certain act in the future is not excludable on hearsay grounds.").  Finally, even where a declarant's out-of-court statement is not otherwise inadmissible hearsay, it "must meet the requirements of, inter alia, relevance, and it must not be excludable on the grounds of undue confusion or prejudice under Rule 403."  United States v. Gupta, 747 F. 3d 111, 139 (2d Cir. 2013) (affirming preclusion of evidence that a defendant allegedly intended to give "his wealth to charity" as both inadmissible hearsay and irrelevant).

While it is unclear what evidence the defendant may offer, the government anticipates introducing certain written statements of the defendant during its case-in-chief pursuant to Federal Rule of Evidence 801(d)(2).  See, e.g., United States v. Marin, 669 F.2d 73, 84 (2d Cir. 1982); United States v. Gotti, 457 F. Supp. 2d 395, 397 (S.D.N.Y. 2006).  The government's ability to introduce the defendant's statements under Fed. R. Evid. 801(d)(2) does not create a parallel ability for the defendant to do the same, and any attempts by the defendant

to do so should be precluded.[9] <u>See</u> <u>Marin</u>, 669 F.2d at 84 ("When the defendant seeks to

introduce his own prior statement for the truth of the matter asserted, it is hearsay, and it is not

admissible.").

---

[9] To the extent the government only offers a portion of a statement, the government may seek to preclude the defendant from offering additional portions of those communications into evidence as inadmissible hearsay.  To the extent practicable, the government will endeavor to notify the defendant in advance if it intends to admit only a portion of any specific statement of the defendant.  This should allow the defendant the opportunity to make any motion he may wish to make pursuant to Federal Rule of Evidence 106.

**VI.    THE COURT SHOULD PRECLUDE EVIDENCE OR ARGUMENT
        CONCERNING THE COURT'S JURISDICTION, OR WHETHER THE
        DEFENDANT SHOULD HAVE BEEN PROSECUTED SOMEWHERE OTHER
        THAN THIS DISTRICT**

The defendant has repeatedly asserted that venue is not proper in this District.

(See Def. Mem. at 28-37; Def. Reply at 9-20.)  As this Court noted in its Memorandum and

Order denying the defendant's motion to dismiss the Superseding Indictment for lack of venue,

"[c]ourts in the Second Circuit engage in 'the practice of deferring a ruling on the propriety of

the prosecution's choice of venue to trial.'"  (ECF No. 83 (hereinafter "Order") at 42 (quoting

United States v. Delgado, No. 5:19-cr-00034, 2020 WL 2924482, at *2 (D. Vt. June 3, 2020)).)

Having failed to dismiss the indictment, the government anticipates that the defendant will

challenge the government's evidence of venue at trial.  The law permits the defendant to argue

that the offense with which he was charged was not "begun, continued or completed" in this

District.[10]  United States v. Royer, 549 F.3d 886, 893 (2d Cir. 2008) (internal quotations

omitted); 18 U.S.C. § 3237(a).  However, the Court should preclude the defendant from offering

evidence or argument concerning this Court's jurisdiction or whether the case should have been

brought in this District—or in the United States more generally.

The question of whether the court has jurisdiction is a legal rather than factual

matter, it is not considered part of the general issue in a criminal trial, and it should be

determined by the Court prior to trial.  See United States v. Davis, 726 F.3d 357, 365-66 (2d Cir.

---

[10] As the Court explained, venue can be established in a number of ways.  "Actions of co-
conspirators are sufficient to confer venue" and "venue is proper in any district where electronic
communications are sent or received."  (Order at 43-44.)  "Venue is also appropriate in any
district through which electronic communications are routed," and "venue lies in both the district
where a telephonic communication in furtherance of a crime was made and where it was
received."  (Id. at 44-45.)  In addition, "courts in this Circuit have routinely found that 'passing
through' a district is sufficient to confer venue."  (Id. at 47.)

2013) (holding district court correctly determined as a matter of law the existence of jurisdiction and properly instructed the jury that it only needed to determine if the offense had occurred) (citing United States v. Cook, 922 F.2d 1026 (2d Cir. 1991)).  Regardless, the defendant has conceded this Court's jurisdiction.  In his brief in support of his motion to dismiss the indictment, the defendant stated that he "voluntarily placed himself firmly and bravely within this Court's jurisdiction."  (Def. Mem. at 5.)  Any argument on this legal issue would be outside the purview of the jury and such jurisdictional arguments should therefore be precluded.

The Court should also preclude arguments that the case against the defendant should not have been brought against the defendant in this Court or would have better been brought elsewhere.  First, the Second Circuit has "instructed that '[v]enue may lie in more than one place if the acts constituting the crime and the nature of the crime charged implicate more than one location.'"  United States v. Thompson, 896 F.3d 155, 171 (2d Cir. 2018) (alteration in original) (quoting United States v. Lange, 834 F.3d 58, 68 (2d Cir. 2016)); accord United States v. Kirk Tang Yuk, 885 F.3d 57, 69 (2d Cir. 2018).  Any argument that the defendant should be acquitted because the case should have been brought in another District or in a foreign country suggests that only a single venue is appropriate in a given case.  That is not the law.

To permit legally improper argument as to jurisdiction will confuse the jury and undermine the Court's jury instructions.  At the close of the evidence, we expect that the Court will provide the jury with a clear venue instruction based on the controlling law of this Circuit.  Any argument from the defendant that the case should not have been brought in the United States, or in Brooklyn specifically, will be inconsistent with those expected instructions and thereby risk "confusing the issues, misleading the jury, undue delay [and] wasting time."  Fed. R. Evid. 403.  This risk is especially high here, where the defendant is a Malaysian national and—as

in any case involving foreign bribery and money laundering charges—many of the acts in furtherance of the charged crimes occurred outside of the United States.  As such, the probative value of such arguments or evidence from the defendant is substantially outweighed by the dangers of prejudice, confusion and delay, and they should be precluded.  See Fed. R. Evid. 401, 403.

Furthermore, arguments or evidence related to the claim that the case should have been brought elsewhere or that prosecution in the United States is unfair would create an improper risk of jury nullification.  It is well-settled that "it is the duty of juries in criminal cases to take the law from the court and apply that law to the facts as they find them to be from the evidence."  Sparf v. United States, 156 U.S. 51, 102 (1895); United States v. Carr, 424 F. 3d 213, 220 (2d Cir. 2005).  Courts have consistently held that while juries may have "the power to misapply the law," that power does not give rise to a right to do so.  United States v. Thomas, 116 F.3d 606, 615-16 (2d Cir. 1997) (emphasis added); see also Dunn v. United States, 284 U.S. 390, 393 (1932) (describing jury nullification as the "assumption of power" which a jury has "no right to exercise").  "[N]o juror has a right to engage in nullification[] and, on the contrary, it is a violation of a juror's sworn duty to follow the law as instructed by the court."  Thomas, 116 F.3d at 616.  As such, "trial courts have the duty to forestall or prevent such conduct," and the Second Circuit has "categorically" rejected "the idea that, in a society committed to the rule of law, jury nullification is desirable or that courts may permit it to occur when it is within their authority to prevent."  Id. at 614, 616; see also United States v. Edwards, 101 F.3d 17, 19 (2d Cir. 1996).  Here, where the Court will instruct the jury as to the law of venue and ask the jury to apply the facts to the law, an argument by the defendant to the jury that his prosecution in this Court is

unfair, should happen elsewhere, or that the Court's version of the law should be replaced by his own would be an argument for jury nullification.  Such an argument should not be countenanced.

Accordingly, the defendant should not be permitted to elicit evidence or present arguments to the jury concerning his view that he should have been prosecuted in a different District or country and that it is unfair for him to be prosecuted in this Court.

VII.    **THE COURT SHOULD PRECLUDE EVIDENCE OR ARGUMENTS REGARDING THE INTERNAL ACCOUNTING CONTROLS CHARGE THAT THIS COURT PREVIOUSLY REJECTED**

In his motion to dismiss the indictment, the defendant raised a number of challenges to Count Two, which charges him with conspiracy to circumvent Goldman's internal accounting controls.  (Def. Mem. at 44-56.)  In ruling on the defendant's motion to dismiss, the Court rejected each of those challenges.  (Order at 58-70.)  Accordingly, the defendant should be precluding from pressing these arguments before the jury at trial.

First, the defendant should be precluded from adducing evidence and arguing that he did not violate Goldman's internal accounting controls because the bribes at issue were paid from assets that belonged to 1MDB, rather than Goldman.  Contrary to the defendant's argument in his motion to dismiss Count Two (Def. Mem. at 48), nothing in the statute supports such a narrow interpretation that only the direct payment of bribes by an issuer would implicate the issuer's internal accounting controls.  As the government argued in opposing the defendant's motion to dismiss, Goldman's internal accounting controls were implicated because Goldman underwrote the bond transactions, transferring its own assets to the accounts of the relevant 1MDB subsidiaries as an initial step in the overall scheme.  (Gov. Mem. at 27-28.)  Indeed, in denying the defendant's motion to dismiss Count Two, the Court rejected the defendant's argument, recognizing that the relevant "transaction" and use of "assets" for purposes of Count Two were Goldman's purchase of the bonds with its own assets.  (Order at 63.)  The defendant should not be permitted to confuse the issues with respect to Count Two by arguing to the jury that Goldman's internal accounting controls were not implicated because the bribes were paid with assets that belonged to 1MDB.

Second, and relatedly, the defendant should be precluded from presenting evidence and arguing that prior enforcement actions involving the FCPA's internal accounting

controls provision "do not square" with the allegations in Count Two.  The defendant made this argument in moving to dismiss Count Two, contending that all prior criminal applications of the FCPA's internal accounting controls provision involved the company's own funds.  (Def. Mem. at 50).  As discussed above, the Court rejected this argument in denying the defendant's motion to dismiss Count Two, based on the plain language of the statute, which does not require that an issuer's funds be used for the bribe payments for an internal accounting controls violation, and the allegation in the superseding indictment that Goldman was involved in the "transactions" as the bank which underwrote the 1MDB bond transactions and transferred the funds from the bond issuances to 1MDB.  (Order at 64, 66.)  For this reason, and because the facts underlying prior enforcement actions are wholly irrelevant to any question of fact for jury resolution, the defendant should not be permitted to present evidence or argue about how this case compares to prior cases brought under the FCPA's internal accounting controls provision.

Third, the defendant should be precluded from presenting evidence and arguing that the circumvention of internal accounting controls requires the falsification of an accounting document.  The Court previously rejected this argument, finding that it conflated the FCPA's books and records provision with the statute's internal accounting controls provision.  (Def. Mem. at 43-44; Order at 66.)  The Court further held that the focus of the internal accounting controls provision is on management control, to ensure both accurate accounting and responsibility over the firm's assets, not entries in a company's books and records.   (Order at 67-68.)  The defendant therefore should not be permitted to argue that a false accounting record is required to convict the defendant on Count Two.

Fourth, the defendant should be precluded from suggesting to the jury that application of the internal accounting controls provision in this case is somehow unfair.  In

considering the defendant's vagueness argument in his motion to dismiss, the Court found that the statute gave sufficient notice to the defendant that concealment of Low's involvement in bond deals underwritten by Goldman could constitute a violation and that the provision is not prone to subjective enforcement given the allegations in the superseding indictment.  (Def. Mem. at 54-55; Order at 70.)  The defendant therefore should not be permitted to argue that he lacked sufficient notice that his conduct could violate the internal accounting controls provision or that the charge in Count Two is otherwise unfair.

For the foregoing reasons, as well as those given in the government's opposition to the defendant's motion to dismiss the superseding indictment, the defendant should be precluded from presenting evidence in support of or making arguments regarding Count Two that the Court previously rejected in considering the defendant's motion to dismiss.

**VIII.   THE COURT SHOULD PRECLUDE THE DEFENDANT FROM OFFERING EVIDENCE OR ARGUMENT REGARDING THE CIRCUMSTANCES OF HIS ARREST IN MALAYSIA, INCARCERATION, EXTRADITION, AND PRE-TRIAL CONDITIONS**

The defendant should be precluded from offering evidence or argument concerning the circumstances of his arrest in Malaysia on the charges in this case or his subsequent incarceration, extradition, or pre-trial conditions of release.  In his filings, the defendant highlights his 2018 arrest in Malaysia and subsequent six-month incarceration pending extradition to the United States.  (Def. Mem. at 1; Def. Reply at 3-4.)  He also notes his multi-day transport to the United States, which he described as a country in which he purportedly "knows no one."  (Def. Mem. at 5.)  The defendant also says he "relinquished a broad array of legal and factual challenges" in waiving extradition and voluntarily coming here to "bravely engage our justice system."  (Def. Mem. at 5; Def. Reply at 7.)  Once in the United States, the defendant spent time in what amounted to home confinement before those conditions were modified.  See generally Jan. 28, 2021 Status Conf. Tr.  The defendant should be precluded from introducing evidence about such details at trial and from mentioning the same subjects in his opening statement.

Evidence or argument as to the circumstances of how the defendant has come to face trial in the Eastern District of New York is irrelevant.  The fact that the defendant was arrested in Malaysia and temporarily surrendered to the United States, for example, is not probative of whether and to what extent the defendant conspired to violate the FCPA or to launder money.  See Fed. R. Evid. 401; see also United States v. Reevey, 364 F.3d 151, 157-58 (4th Cir. 2004) (evidence of circumstances of defendant's arrest was inadmissible as confusing and misleading because the defendant "was not charged with any offense arising out of the circumstances surrounding his arrest").  Details of the defendant's incarceration and home

confinement bear no relation to the proper considerations of the jury.  Moreover, the clear

purpose for the defense to introduce evidence about the circumstances of the defendant's arrest,

extradition, and pre-trial conditions of detention and release would be to attempt to invoke

sympathy from the jury.  This is an improper purpose.  Such evidence should be precluded not

just because it is irrelevant but also because any conceivable probative value of such evidence

would be substantially outweighed by the unfair prejudice of such a ploy for sympathy.  See Fed.

R. Evid. 403.

IX.   **THE COURT SHOULD PRECLUDE THE DEFENDANT FROM OFFERING EVIDENCE OR ARGUMENT REGARDING HIS FAMILY BACKGROUND, NATIONALITY, AND OTHER SIMILAR PERSONAL FACTORS**

The Court should preclude the defendant from offering evidence or argument concerning his family background, nationality, or other similar personal factors such as health condition and age.  The defendant has repeatedly referenced his family background and nationality in filings in this case.  For example, he has referenced his wife and young daughter and the significant time this criminal proceeding has caused him to be separated from them. (Def. Mem. at 1.)  He has also made several references to his Malaysian nationality, arguing that one of his only two roles in this case was "to be Malaysian."  (Id. at 4.)  The defendant should be precluded from introducing evidence about such details at trial, and from mentioning the same subjects in his opening statement.

Evidence is admissible only if it is relevant.  See Fed. R. Evid. 401.  Moreover, "[d]istrict courts have broad discretion to balance the probative value of evidence against possible undue sympathy or bias as well as prejudice."  United States v. Miller, 641 F. Supp. 2d 161, 167 (E.D.N.Y. 2009).  Courts have broad discretion to exclude evidence if it has "an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one[.]"  Fed. R. Evid. 403, Adv. Comm. Notes.  Indeed, when evidence is of limited probative value, it should be excluded if it has the "potential to engender sympathy in an inappropriate effort to excuse defendant's commission of the charged offenses."  Miller, 641 F. Supp. 2d at 167; see also United States v. Paccione, 949 F.2d 1183, 1201 (2d Cir. 1991) (affirming preclusion of evidence that the defendant had son with cerebral palsy); United States v. Kaufman, 2021 WL 51521, at *2 (S.D.N.Y. Jan. 6, 2021) (precluding evidence and argument "concerning defendant's family background, health conditions, other personal factors unconnected to guilt or innocence" as it would "would invite the jury to determine the case on

the basis of factors that are not relevant to guilt or innocence"); United States v. Battaglia, 2008 WL 144826, at *3 (S.D.N.Y. Jan. 15, 2008) (precluding "evidence of Defendant's family and personal status" as not "relevant to the issue of whether Defendant committed the crimes charged"); United States v. Harris, 491 F.3d 440, 447 (D.C. Cir. 2007) (affirming preclusion of evidence designed "mainly to cast [the defendant] in the sympathetic light of a dedicated family man").

Details about the defendant's daughter or the length of time he has been separated from his family have no bearing on the issues in this case because they are not probative of whether the defendant conspired to violate the FCPA or to commit money laundering. While the government may seek to introduce evidence regarding statements and actions of ███████ ███████████ and certain limited evidence regarding ███████████████████ ██████████—as such evidence further links the defendant to the Silken Waters / Victoria Square Bank Account—this evidence will be clearly relevant to the charges. Any attempt by the defendant to introduce evidence and argument that he is a family man separated from his loved ones during a global pandemic, has a clear purpose: to try and encourage sympathy and distract from the facts at issue. That is improper. The risk of juror confusion and unfair prejudice is manifest because the jury would be asked to look past the defendant's conduct in this case. This sort of appeal to the jury should be excluded under Rule 403.

Additionally, arguments suggesting the defendant's nationality caused his prosecution are improper and should be precluded. The defendant's argument that his nationality had bearing on his indictment by a federal grand jury is absurd on its face and has no place at trial. His baseless claims are probative of nothing. They distract from the actual evidence at trial. And they appear to be yet another attempt at nullification. For these reasons, any argument

86

by the defendant that he is being prosecuted for being Malaysian should be precluded.  See United States v. Stewart, 2004 WL 113506, at *1 (S.D.N.Y. Jan. 26, 2004) (granting motion to preclude defendant from "presenting arguments or evidence that would invite the jury to question the Government's motives in investigating and indicting" the defendant); see also United States v. Regan, 103 F.3d 1072, 1082 (2d Cir. 1997) (a "selective prosecution defense is an issue for the court rather than the jury").

X.    **THE COURT SHOULD PRECLUDE THE DEFENDANT FROM OFFERING EVIDENCE OR ARGUMENT REGARDING THE POTENTIAL CONSEQUENCES OF A CONVICTION**

The defendant should similarly be precluded from offering evidence or argument concerning the punishment or consequences he faces if convicted here or upon return to Malaysia, where additional criminal charges are pending.  (See Def. Mem. at 1 (noting Ng has been charged with four Malaysian crimes relating to his involvement in 1MDB).)  Where the jury has no role at sentencing—such as in this case—it "should be admonished to 'reach its verdict without regard to what sentence might be imposed.'"  Shannon v. United States, 512 U.S. 573, 579 (1994) (quoting Rogers v. United States, 422 U.S. 35, 40 (1975)). This is for good reason: argument concerning punishment "invites [jurors] to ponder matters that are not within their province, distracts them from their fact finding responsibilities, and creates a strong possibility of confusion." Id.  Accordingly, the potential consequences of a criminal conviction here, as well as any additional consequences if convicted on the pending criminal charges in Malaysia, should not be a subject of evidence or argument submitted to the jury.

## XI.    THE DEFENDANT SHOULD PRODUCE ANY EVIDENCE HE INTENDS TO ADMIT IN HIS CASE-IN-CHIEF

Despite the government's requests over the past two years, the defendant has not identified for the government any evidence—such as papers, documents, data, photographs, or other tangible objects—the defendant intends to use in his case-in-chief.  The defendant has also not identified any similar evidence he intends to admit during cross-examination of the government's witnesses.  The government requested defendant's reciprocal Rule 16 discovery in its initial discovery production on May 23, 2019, and has routinely reiterated its request since.  Pursuant to Federal Rule of Criminal Procedure 16(b), the defendant must provide in discovery any such evidence he intends to introduce during his case-in-chief, including during the cross-examination of any government witnesses, other than those produced to him by the government.  The government requests the Court order the defendant to produce any evidence he intends to use in his case in chief.

Rule 16(b) governs the defendant's disclosures in a criminal case.  In relevant part, it requires the defendant to provide the government with documents and records that the defendant "intends to use . . . in the defendant's case-in-chief at trial."  Fed. R. Crim. P. 16(b)(1)(A); see Apr. 7, 2021 Status Conf. Tr. at 56-57 ("Defendant always has reciprocal discovery obligations, if they intend to call witnesses affirmatively in their defense, and they have documents in their possession, they should affirmatively show them.").  The Rule's purpose "is to avoid surprise and gamesmanship" and "it definitely contemplates reciprocity in the production of evidence that both parties intend to introduce in their case-in-chief at trial." United States v. Hsia, 2000 WL 195067, at *1 (D.D.C. Jan. 21, 2000) (internal quotations omitted).

Of course, Rule 16 does not require a defendant to disclose evidence he intends to use for purposes of cross-examining a government witness.  But to the extent that a defendant

seeks to admit evidence during such cross-examination to affirmatively support his theory of the case, such evidence falls within the ambit of Rule 16 and must be produced.  As the District Court for the District of Columbia has explained:

> A "case-in-chief" is defined as "[t]he part of a trial in which a party presents evidence to support its claim or defense." Defendant's cross-examination of government witnesses, and the evidence introduced during that cross-examination, certainly may be used to support her defense . . . . The cross-examination of these and other government witnesses therefore is properly seen as part of defendant's case-in-chief if it buttresses her theory of the case.

Hsia, 2000 WL 195067, at *2 (citing Black's Law Dictionary 207 (7th ed. 1999)).  The Hsia court distinguished evidence introduced by the defense through a government witness—which falls within Rule 16 and must be disclosed—from materials used by a defendant "merely to impeach a government witness, and not as affirmative evidence in furtherance of [the defendant's] theory of the case, it is not part of [the defendant's] case-in-chief."  Id. at *2 n.1. Numerous other district courts have recognized this same distinction.  See United States v. Swenson, 298 F.R.D. 474, 477 (D. Idaho 2014) ("Defendants have a duty to produce any exhibits they intend to use at trial during cross examination of a government witness other than for impeachment purposes."); United States v. Holden, 2015 WL 1514569, at *4 (D. Or. Mar. 19, 2015) (holding, based on Swenson and Hsia, that a defendant must disclose non-impeachment substantive evidence that the defendant seeks to use in examination of government or defense witnesses); United States v. Larkin, 2015 WL 4415506, at *5 (D. Nev. July 20, 2015) (finding the approach adopted in Holden, Swenson and Hsia is "consistent with the structure and integrity of Rule 16(b) as a whole"); United States v. Aiyaswamy, 2017 WL 1365228, at *5 (N.D. Cal. Apr. 14, 2017).

Here, the defendant has yet to identify a single document he intends to use during his case-in-chief or in cross-examination of the government's witnesses.  Perhaps the defendant's

failure to provide reciprocal discovery is a result of having none to produce; he may not intend to introduce any covered evidence at trial, which is his right.  The defendant cannot, of course, rely upon an undefined defense strategy to avoid producing documents in compliance with the spirit and letter of Rule 16.

Accordingly, the government respectfully requests that the defendant be ordered to produce any evidence the defendant intends to use in his case-in-chief as soon as possible, and no later than January 3, 2021, whether the defendant intends to use that evidence after the government rests or during cross-examination of government witnesses.

## **CONCLUSION**

For the reasons set forth above, the government's motions in limine should be

granted.

Dated:    Brooklyn, New York
           November 3, 2021

                                       Respectfully submitted,

                                       BREON PEACE
                                       United States Attorney

By:               /s/
                                       Alixandra E. Smith
                                       Drew G. Rolle
                                       Dylan A. Stern
                                       Assistant U.S. Attorneys
                                       (718) 254-7000

                                       DEBORAH L. CONNOR
                                       Chief, Money Laundering & Asset Recovery Section
                                       Criminal Division
                                       U.S. Department of Justice

By:               /s/
                                         Jennifer E. Ambuehl
                                       Nikhila Raj
                                       Trial Attorneys

                                       JOSEPH BEEMSTERBOER
                                       Acting Chief, Fraud Section
                                       Criminal Division
                                       U.S. Department of Justice

By:               /s/
                                         Brent Wible
                                       Trial Attorney