# BRAFMAN & ASSOCIATES, P.C.

ATTORNEYS AT LAW

256 FIFTH AVENUE, 2ND FLOOR

NEW YORK, NEW YORK 10001

TELEPHONE: (212) 750-7800

FACSIMILE: (212) 750-3906

E-MAIL: ATTORNEYS@BRAFLAW.COM

BENJAMIN BRAFMAN

MARK M. BAKER
OF COUNSEL

MARC A. AGNIFILO
OF COUNSEL

ZACH INTRATER
OF COUNSEL

ANDREA L. ZELLAN

JACOB KAPLAN

TENY R. GERAGOS
ADMITTED IN NY & CA

STUART GOLD

**TO BE FILED UNDER SEAL**[1]

February 6, 2022

VIA ECF
The Honorable Margo K. Brodie
Chief United States District Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, NY 11201

     Re:    United States v. Ng Chong Hwa a.k.a. Roger Ng, 18 Cr. 538 (S-2) (MKB)

Dear Chief Judge Brodie:

     On Friday evening, the defense was first able to access a recording that contains powerful evidence of actual innocence. The defense now moves to admit this recording into evidence at Roger Ng's upcoming trial. On October 16, 2018, while cooperating with the government, Tim Leissner sat in his home office and conducted a video call with Hwee Bin Lim, Roger Ng's wife. The FBI recorded this video call (the "October 16 Recording"). The October 16 Recording therefore includes audio and video of Ms. Lim.

     The October 16 Recording is admissible into evidence for several different reasons, which are detailed below. However, we will first briefly review how and when we found this piece of video evidence.

---

[1] Counsel files this letter under seal because the discovery discussed herein is covered by the Protective Order.

**BRAFMAN & ASSOCIATES, P.C.**

1. <u>Procedural History</u>

On February 2, 2022, at 10:40 pm, the government shared with defense counsel information pursuant to 18 U.S.C. § 3500, which included 48 documents related to the government's cooperating witness, Tim Leissner. On February 3, 2022, counsel began reviewing these documents, which included lengthy FBI 302 reports and the corresponding FBI notes from interviews with Mr. Leissner.

On February 4, 2022, counsel reviewed government Exhibit ("GX") 3500-TL-19, which is an email from Trial Attorney Jennifer Ambuehl to Assistant United States Attorneys Drew Rolle, Jacquelyn Kasulis, and Main Justice Attorneys MaryAnn McCarthy, Katherine Nielsen, Nikhila Raj and Woo Lee with the subject "recording." The email read:

> Spoke with Justin briefly this evening regarding the recording. We did not have the recording handy, but at a high-level he walked me through some parts of it. In summary, I now understand that Ms. Lim told Arnold the authorities came asking her questions and that with regard to the money they received she/they needed to show proof of the investment. Arnold said he didn't have any documents supporting the purported investment but that she should ask Judy. In response, Ms. Lim said something to the effect of "okay." Ms. Lim also indicated that they didn't have lawyers and that Roger had wanted to leave the country a while ago but she hadn't wanted to and they feel they've now missed their window to do so.

(<u>See</u> GX 3500-TL-19, enclosed.) Counsel, upon reading this email, assumed that "Arnold" was the FBI's code name for Leissner, but did not recognize this recording as one that was produced in discovery. We reviewed the video and audio recordings that had been provided but could not locate any recording corresponding to the description in the above email. Therefore, at 8:26 pm, counsel emailed the prosecution team asking, "Can you please produce to use the recording mentioned in this email immediately?" AUSA Rolle quickly responded to counsel, stating:

> These were produced to you on April 10, 2020 as DOJ-0002370692 and DOJ-0002370693 along with the other Ms. Lim recordings and WeChat messages. They were also re-produced to you on November 10, 2021 on a disc FedEx'd to your attention.

Counsel promptly searched their files, first checking the April 10, 2020, production, where the Admitted Ms. Lim/Leissner Recordings (described in Dkt. 90, Gov't motions <u>in limine</u> ("Gov't MIL") at 27-28) were located. Counsel's copy of the April 2020 production did not include the recording referenced in 3500-TL-19. Next, counsel searched the November 10, 2021 production disc.[2] Counsel played the recordings located on the disc, but the recording only

---

[2] The first disc that was produced to counsel on November 10, 2021 was corrupted. Counsel asked for a reproduction of the disc, which the government provided on November 12, 2021.

BRAFMAN & ASSOCIATES, P.C.

played beeping and clicking noises. In other words, neither Leissner nor Ms. Lim's voices were detected on the recording.

Counsel asked if AUSA Rolle was available to call and he, together with Ms. Ambuehl, called our offices at 9:08 pm. We stated that our copy of the disc did not play a recording of Leissner and Ms. Lim and instead played differing clicks and noises. AUSA Rolle stated that the disc contained two separate recordings from October 16, 2018—one with video and audio, and one with only audio. AUSA Rolle confirmed that Leissner's only two consensually recorded conversations with Ms. Lim were the June 22, 2018 Admitted Recordings and the October 16, 2018 recording contained the November 2021 discovery disc. Counsel told AUSA Rolle that they would work with their tech company to try to open the files. AUSA Rolle left a duplicate copy of the November 2021 discovery disc downstairs at the U.S. Attorney's Office.

At 11:16 pm on February 4th, counsel was able to view and listen to both recordings for the first time.

2. Summary of the Relevant Recording

Ms. Lim had a particular urgent purpose on the October 16 recording—she was seeking documentary evidence from Leissner's wife, Judy Chan. (See Exhibit 1, Draft Transcript ("Tr.") at 4.) The Malaysian authorities had seized money belonging to Ms. Lim and her family, claiming that the money in the Victoria Square account—the same money the government has built its case around here—was derived from 1MDB and was therefore forfeitable.

Ms. Lim was seeking to get the money released because she had done nothing wrong: Ms. Lim's family and Judy Chan's family had longstanding business in China, and to Ms. Lim's knowledge, the money that Judy Chan transferred to her family's accounts were related to this "real business ongoing." (Tr. at 5.) Indeed, "it has always been the case where there was . . . business ongoing." (Tr. at 5.) And so, when confronted by the Malaysian authorities, "I told them the truth. I told them that it was an investment." (Tr. at 5.)

But the Malaysian authorities wanted documentary proof: "[t]hey said, 'oh, you know, because you cannot provide me any form of documents . . . how to prove that the, that the, whole thing is yours.'" (Tr. at 5-6.) Leissner then clarified, "You mean the Capital Place money right? You mean the Capital Place money?" (Tr. at 6.).

And here Ms. Lim got to the point of the call: She wanted documents from Judy Chan to prove the money related to investments in China. She "just wanted to see . . . [w]hether we have any form of documents, and I mean if you could help me with any form of documents." (Tr. at 8.) Again, Leissner made perfectly clear that he understood what Ms. Lim was talking about: Her family's money, which had been invested with Judy Chan's family in China. "Oh, I got you, you mean with Capital Place, with Judy?" (Tr at 8.) Ms. Lim confirmed: "Yeah, if she still kept any, any, any, any form of documents. If I could contact her." (Tr at 8.) *At all times in the recording, Leissner agrees with Ms. Lim*. Leissner either frequently affirmed by saying, "mhm" or he affirmed in his commentary that she meant the "Capital Place" money. (See Tr. at 6, 8.)

3

BRAFMAN & ASSOCIATES, P.C.

Leissner's responses are indicative of his mind-set, showing what he believed to be true about the money sent to Ms. Lim. His reaction to Ms. Lim's words are not just relevant, but are perhaps the most critical evidence in this case. Leissner—secretly recording the conversation at the government's direction with the FBI in the room—does not say, for instance, "What are you talking about?! That is Roger's cut of the stolen 1MDB proceeds!" He does not say, "We had the meeting with Master Pong and we all came up with our cover story to hide the source of this stolen money!" (Cf. Gov't MIL at 67.) He does not say, "Ms. Lim, this is what I am concerned about, because that money was derived from specified unlawful activity and is therefore evidence of our conspiracy to launder funds derived from a Foreign Corrupt Practices Act violation."

He did not say anything like this. Far from it. Leissner said, "Yeah, maybe so, maybe so. I would have to tell—I would have to speak with her." (Tr. at 8.) When Ms. Lim said "this thing happened like way back in 2005 and then, you know, the whole and then the investment starts and then we decided to wind down in 2011. And why is it you're doing this to me. I mean, who kept documents since those days?" Leissner said, "yeah." (Tr. at 6.) He also recognized that he knew the money was transferred to a bank account in Singapore. (Tr. at 6.) He responded to her descriptions of the business and request for documents in the affirmative "mhm" fifteen times, and alternated the "mhm" with "yeah" (Tr. at 7), "right" (Tr. at 6, 8, 9) and "I see" (Tr. at 6, 7). He said "Oh, I got you." (Tr. at 8.) He immediately recognized what Ms. Lim meant: "you mean with Capital Place, with Judy?" (Tr at 8.) And, *he did not once say anything to the contrary*.

Leissner four times tried to change the subject to Jho Low (Tr. at 8, 12, 14) and Celsius (Tr. at 10), but Ms. Lim repeatedly and immediately turned the subject back to her forward-looking request for the documentation—the reason she wanted to have the call (Tr. at 8, 11, 13). Finally, she told Leissner, "what I'll do is I'll try to reach out to [Judy Chan] myself and then ask her whether she still has any form of our documents prior to all those things and then we'll see how it goes from there." (Tr. at 13.) Leissner responded, "Okay. I think that's perfect." (Tr. at 13.)

3. This Motion Is Timely

Though this motion comes after the motion in limine dates proposed by the parties and Ordered by this Court, this motion is timely because it is based in part on the 3500 materials that were first produced to counsel on February 2, 2022. The only reason defense counsel became aware of this recording is because there was a piece of Leissner 3500 material that made reference to a recording between Ms. Lim and "Arnold." Figuring that for some reason the prosecutors are referring to Leissner as "Arnold," we realized for the first time late this past Friday evening that there was a recording between Ms. Lim and Leissner that we did not know about, and that we were unable to open. After Ms. Geragos alerted our technical support team to the problem, the tech team, after well over an hour, figured out how to play the recording.

BRAFMAN & ASSOCIATES, P.C.

4. <u>The Recording Is Relevant Because It Reliably Establishes That the Victoria Square Transfers Were Not for a Criminal Purpose</u>

The defense has repeatedly argued that the $35 million in transfers from Capital Place Holdings and Judy Chan's personal Morgan Stanley account to the Silken Waters / Victoria Square account were related to investments, and were not Mr. Ng's cut of 1MDB bribe proceeds:

- *Motion to Dismiss*: "Judy Chan Leissner's relative(s) owed a debt to Ng's relative(s). This debt was wholly unrelated to any of the allegations or events in the Indictment." (Dkt. 46, Memorandum in Support Ng's of Motion to Dismiss at 115.)
- *January 7, 2022 Transcript*: "So what I expect some of the trial evidence to show is that these funds did not come from Switzerland, for instance, the way that Fanny Khng said; that they were related to investments in China, and that is problematic because of the way that money moves in and out of China, it is very difficult to do that. And it is our contention, and we think the evidence is going to bear out that this money was related to investments in China." (1/7/22 Tr. at 18-19.)
- *Motion for CCTV Testimony*: "Ms. Lim will testify directly on that issue. Her testimony will directly contradict the government's allegations regarding the $35 million – perhaps the single central issue in the case. Moreover, as this money was sent to Ms. Lim's family, not Mr. Ng, she has greater knowledge of the facts surrounding these transfers than Mr. Ng does." (Dkt. 122 at 6.)
- *Affirmation in Support of Motion for CCTV Testimony*: "The defense contends that the money sent by Ms. Judy Chan Leissner to the Silken Waters/Victoria Square account is wholly unrelated to the crimes charged, and that indeed these funds relate to a pre-existing debt owed by Judy Chan Leissner to Ms. Lim." (Dkt. 122-1 at 5 ¶17.)

First, the October 16 Recording is relevant because it helps establish, as Mr. Ng has always claimed, that the $35 million was payback for an investment and not his share of proceeds from the 1MDB theft, as the government alleges. Second, the October 16 Recording is relevant to the question of whether Ms. Lim is a co-conspirator, as the government has alleged. If the $35 million payment was payback on an investment, and not criminal proceeds, then Ms. Lim cannot be a co-conspirator, as there is simply no other evidence of her wrongful involvement in any aspect of this case. Third, the October 16 Recording is relevant because it contradicts Leissner's proposed testimony, as alleged in the government's motions <u>in limine</u>, that Mr. Ng, Ms. Lim, Leissner and Judy Chan all met in Hong Kong in 2016 and agreed to make up a story that the Capital Place payments were payback for an investment. As it turns out, and as is evident from the October 16 Recording, the parties did not have to invent a story for the payment because there already was a true and innocent one: it was payback on a previous investment. Significantly, Leissner's words and actions demonstrate his mental state: Leissner knows that the money is from legitimate business investments and he agrees with Ms. Lim's assertion over and over that this is the source of these funds. For the above stated reasons, this video goes to a critical fact that is "of consequence in determining the action." Fed. R. Evid. 401.

5

5.  <u>The Recording Should Be Admitted Because It Is Reliable and Satisfies Several Specified Non-Hearsay Purposes</u>

Statements from the October 16 Recording are admissible into evidence at trial, for four independent reasons.

a.  *The recording is admissible under Rule 803(3)*

The statements of Ms. Lim and Leissner in the October 16 Recording that the defense seeks to admit for the truth of the matter asserted are hornbook examples of both Ms. Lim's and Leissner's states of mind at the time of the October 16 Recording. These statements are therefore admissible pursuant to Federal Rule of Evidence 803(3).

Among the categories of statements that "are not excluded by the rule against hearsay, regardless of whether the declarant is available as a witness," are "[a] statement of the declarant's then-existing state of mind (such as motive, intent, or plan) or emotional, sensory, or physical condition (such as mental feeling, pain, or bodily health), but not including a statement of memory or belief to prove the fact remembered or believed . . . ." Fed. R. Evid. 803(3).

Judge Friendly examined Rule 803(3) in <u>United States v. DiMaria</u>, and its analysis controls the outcome here. <u>See</u> 727 F.2d 265 (2d Cir. 1984). DiMaria was charged with conspiring to possess stolen cigarettes and untaxed cigarettes, respectively, and with the accompanying substantive offenses. <u>See id.</u> at 267. The evidence at trial established that a tractor trailer loaded with cigarettes was hijacked. <u>See id.</u> Law enforcement located the stolen trailer in a yard where the conspirators had parked it and established surveillance. <u>See id.</u> at 267-68. After DiMaria and others loaded cigarettes from the trailers into a van, DiMaria got into his Cadillac and left the yard. <u>See id.</u> The FBI stopped him. <u>See id.</u> As Special Agents approached him, DiMaria said, "'I thought you guys were just investigating white collar crime; what are you doing here? I only came here to get some cigarettes real cheap.'" <u>Id.</u> at 270.

At trial, the defense sought to introduce this statement through an FBI Special Agent pursuant to Rule 803(3), on the theory that "real cheap" cigarettes meant untaxed (or "bootleg") cigarettes, not stolen cigarettes, and therefore the statement helped disprove that DiMaria intended to transact in stolen cigarettes. <u>See id.</u> The District Court refused to allow the statement into evidence and DiMaria was convicted. <u>See id.</u>

The Court of Appeals reversed. Judge Friendly explained that DiMaria's statement indicated "that his existing state of mind was to possess bootleg cigarettes, not stolen cigarettes. It was not offered to prove that the cigarettes were not stolen cigarettes but only to show that DiMaria did not think they were." <u>Id.</u> The Court then explained that while the Rule 803(3) exception to hearsay permits evidence of the declarant's then existing state of mind, there is an "exception to the exception" built into Rule 803(3) that bans "a statement of memory or belief to prove the fact remembered or believed." Fed. R. Evid. 803(3).

BRAFMAN & ASSOCIATES, P.C.

The exception to the exception was elucidated in Shepard v. United States, 290 U.S. 96, 98 (1933). The defendant in Shepard, a doctor, was charged with murdering his wife. The defendant's wife—the victim—had stated "'Dr. Shepard has poisoned me.'" Id. at 98. The government sought to introduce this statement pursuant to the state of mind exception. Justice Cardozo's opinion rejected this attempt, holding that the statement was not being used "to prove [the victim's] present thoughts and feelings, or even her thoughts and feelings in times past. It used the declarations as proof of an act committed by someone else, as evidence that she was dying of poison given by her husband . . . . The testimony now questioned faced backward and not forward . . . ," and was therefore properly analyzed under the "exception to the exception." Id. at 104.

But a statement like DiMaria's (or Ms. Lim's statements regarding the documents she was seeking) "was not a statement, like Mrs. Shepard's, of what he or someone else had done in the past. It was a statement of what he was thinking in the present." DiMaria, 727 F.2d at 271 (citing United States v. Zito, 467 F.2d 1401, 1404 & n. 4 (2d Cir. 1973); United States v. Partyka, 561 F.2d 118, 125 (8th Cir. 1977)).

Ms. Lim's statements, like DiMaria's, fall squarely into the 803(3) exception, and not into the "exception to the exception." The statements are clearly what Ms. Lim was thinking in the present, when she called Leissner—they are the sole reason she called Leissner at the time she called him. Ms. Lim called Leissner with just one motive: To get documentary proof of the investments her family had made with Judy Chan's family in China. (See, e.g., Tr. at 4 ("Um, yeah so that's, that's why I thought I wanted to call you and then talk to you about."); Tr. at 8 ("so that's how I thought . . . just wanted to see . . . . [w]hether we have any form of documents, and I mean if you could help me with . . . any form of documents.").)

Leissner agrees with her—and provides crucial details that demonstrate his own state of mind. (Tr. at 8 ("Yeah, maybe so, maybe so. I would have to tell—I would have to speak with [Judy Chan].") Leissner could have said anything to Ms. Lim. He could have tried to tie her to the crimes charged in this case in any number of ways—including all of the lies that he has told the government about feng shui masters and secret meetings. (See, e.g., Gov't MIL at 24-25.) But he didn't do any of that. Leissner's response to Ms. Lim proves his own mental state.

The law is clear that "statements of future intent are not excludable as hearsay." United States v. Badalamenti, 794 F.2d 821, 826 (2d Cir. 1986); see also United States v. Best, 219 F.3d 192, 198 (2d Cir. 2000) ("A declarant's out-of-court statement as to his intent to perform a certain act in the future is not excludable on hearsay grounds."); Shelden v. Barre Belt Granite Employer Union Pension Fund, 25 F.3d 74, 79 (2d Cir. 1994) ("[U]nder [Rule 803(3)], the existence of the plan or intention may be proven by evidence of the person's own statements as to its existence."(citation and internal quotation marks omitted).) Ms. Lim's statements regarding the documentation she was seeking from Leissner or Judy Chan are exactly these types of statements, and are therefore admissible pursuant to Rule 803(3).

Indeed, the government itself cited to Rule 803(3) in seeking admission of various purported statements in the June 22 "Video Call," and the same rationale they used there applies

7

BRAFMAN & ASSOCIATES, P.C.

here. For example, the government sought to introduce pursuant to Rule 803(3) a purported "written response" that Ms. Lim made on the "Video Call" (of which there is no actual video, unlike the October 16 Recording, and of which there is no actual evidence aside from Leissner's word that the written responses were made). Leissner told the government that Ms. Lim wrote, "My Victoria is ok" during the so-called "Video Call." (See Gov't MIL at 38.) The government claimed that "[t]o the extent that the statement 'My Victoria is ok' is hearsay, it is a statement of Lim's then-existing mental condition. Fed. R. Evid. 803(3)." (Id.) If this purported statement does not fall into the "exception to the exception" of a statement of belief to prove the fact believed, then of course the Ms. Lim's statements on the October 16 Recording regarding the documents she sought from Leissner and Judy Chan do not either. Similarly, relating to Ms. Lim's purported written statement that "Friend/Everybody was worried you might be compromised," which Leissner told the government Ms. Lim wrote down (but which no one else has ever seen), the government contended "[t]he statement is also not hearsay because it is a statement of Lim's then-existing mental condition (i.e., her worry that, as a co-conspirator, Leissner might be cooperating)." (Gov't MIL at 37-38 (citing Fed. R. Evid. 803(3) and United States v. Cardascia, 951 F.2d at 487)). As with Ms. Lim's statements in the June 2016 recording, the statements in the October 16 Recording that relate to the truth of the matter are statements of what the participants were "thinking in the present." DiMaria, 727 F.2d at 271. They look forwards, not backwards. They are therefore admissible under Fed. R. Evid. 803(3).

      b. *The recording is admissible Under Rule 106*

The October 16 Recording is independently admissible pursuant to Rule 106, which provides that "[i]f a party introduces all or part of a writing or recorded statement, an adverse party may require the introduction, at that time, of any other part—or any other writing or recorded statement—that in fairness ought to be considered at the same time." Fed. R. Evid. 106. Because excluding the October 16 Recording would "exclude information substantially exculpatory" of Roger Ng and Ms. Lim, it should be admitted into evidence. See United States v. Cooper, Crim. A. No. 19-159 (ARR), 2019 WL 5394622, at *7-8 (holding, in the context of two different oral statements made by the defendant, that "[t]he first oral statement that the government seeks to exclude is relevant to and explanatory of the oral statement that it plans to admit . . . and it is also potentially exculpatory," as "[r]edaction would distort the meaning" of the other statement," and the first statement "provides important context and ensures that the jury receives a 'fair and impartial' understanding" of the evidence as a whole).

Recall that in its motions in limine, the government argued vigorously to introduce statements from three audio recordings that Leissner (and the FBI) made with Ms. Lim on June 22, 2018 (the "June 22 Recordings"). Recall, too, that the government had the temerity to categorize one of these recordings misleadingly as a "Video Call," notwithstanding that the government *does not* have a video recording of that call. (Compare Gov't MIL at 27-28 (claiming the recording is a "Video Call," and claiming that Ms. Lim "on multiple occasions" "held up a page of printer paper to the camera with writing on it" and "made several non-audible gestures on the [V]ideo [C]all") with Gov't MIL Reply at 26 (conceding that the "Video Call" "was not video-recorded but was only audio-recorded," and "the Video Call was not video-recorded.").)

BRAFMAN & ASSOCIATES, P.C.

The government therefore has no evidence that Ms. Lim actually wrote anything, or made any facial expressions, except for Leissner's word. But the government has trumpeted these supposed writings and "gestures," and remarkably even included them in its draft transcript of the "Video Call." (See Gov't MIL at 28 ("In the draft transcript of the Video Call, these written statements and gestures are indicated by the bracket [ACTION].").) The Section 3500 material that has been produced to date, however, makes clear that Leissner was not taking contemporaneous notes of the so-called "Video Call": FBI notes state that "TL not write anything down." (GX 3500-TL-12-H at 2).

For all of its detailing of the June 22 recordings, the government completely failed to inform the Court that there was *another* recording of Ms. Lim and Leissner: The October 16 Recording. The government completely failed to inform the Court that the October 16 Recording, unlike the "Video Call," was actually videotaped. These failures speak volumes.

The government's failures demonstrate why it is so critical that the October 16 Recording be admitted to avoid "the misleading impression created by taking matters out of context." Fed. R. Evid. 106 Advisory Committee's Note. During the June 22 "Video Call," Leissner asked Ms. Lim, "You're not worried about Capital Place, are you?" Ms. Lim responded, "No. I'm not." (Gov't MIL at 38.) The government claims (based solely on what Leissner told them) that Lim then wrote, "My Victoria is ok." Id.

The government's rationale for admitting these statements is as follows, quoted directly from their motion:

> Leissner's question is not hearsay. See Coplan, 703 F.3d at 84. Lim's responses are also not hearsay because they are not being offered for their truth—it is not relevant whether Lim was in fact worried about Capital Place, or merely was saying she was to encourage Leissner to respond— but rather to show that Lim, an alleged co-conspirator, knows what 'Capital Place' is and why Leissner would be asking about it in a conversation about the defendant's potential arrest. In particular, her response 'My Victoria is ok'—which Leissner understood was a reference to the Silken Waters / Victoria Square Bank Account—further underscores the nature of the prior relationship between Leissner and Lim, and that Lim is aware of the entities used by Leissner and the defendant to transfer criminal proceeds, *and the problems it would create for the defendant, Leissner, and Lim should information about such entities become known to law enforcement*.

(Gov't MIL at 38 (emphasis added).) But here's the thing: The October 16 Recording demonstrates that the actual truth is exactly the opposite. Ms. Lim is seeking documents relating to Capital Place *to affirmatively show to the authorities in Malaysia* and get her family's money back. She's not looking for the documents to *hide* the Capital Place transfers—she is looking for the documents to *show* evidence relating to those transfers to her government and defeat any claim for forfeiture of those funds. The statements in the June 22 "Video Call" are not complete without the October 16 Recording—the October 16 Recording provides actual evidence to

9

**BRAFMAN & ASSOCIATES, P.C.**

disprove what Leissner made up and which the government seeks to put before a jury in Your Honor's court. This is exactly the evil which Rule 106 is designed to prevent.

Ms. Lim explains that while there are no criminal proceedings happening, the Malaysian authorities had seized her family's money and were "looking at [] forfeiture." (Tr. at 4.) Ms. Lim continued, "So, I tried to explain to them, right? That, um, it has always been the case where there was, uh, business ongoing . . . . I told them the truth. I told them that it was an investment." (Id. at 5.) Leissner does not challenge anything that Ms. Lim said. (See id.) Ms. Lim is standing up to the Malaysian authorities, and refusing to go along with their forfeiture, because "it was a big thing, you know? And, uh, I don't believe what was said [by the Malaysian authorities]." (Id.) She refused to just "surrender" her family's money, "because there is a real business ongoing" between her family and Judy Chan's and the proceeds of that "real business" is what was sent from Capital Place to Ms. Lim's family—at least as far as she understood. (Id.) So, Ms. Lim continued, the Malaysian authorities were demanding documentation of her claim. See id. at 6 (relaying that Malaysian authorities told Ms. Lim "'oh you know, because you cannot provide me any form of documents and what's so, what not, how to prove that the, that the [money] is yours.'").

Leissner then clarifies exactly what Ms. Lim is referring to: "You mean the Capital Place money right? You mean the Capital Place money?" (Id.) Ms. Lim confirms, "Mm, mm, correct." (Id.) Ms. Lim tells Leissner that the reason she was calling him—the entire point of her communication—was to get the Malaysian authorities the documentation they were demanding, in the hopes that by providing this documentation, they would release her family's money.  It is precisely the opposite of what the government is try to make the jury believe by using the June 22 recordings selectively—that Ms. Lim somehow wanted to hide the Capital Place transfers from the authorities. Ms. Lim is asking Leissner "[w]hether we have any form of documents, and I mean if you could help me with . . . any form of documents" relating to Capital Place, so that she can show them to the Malaysian authorities.  What the October 16 Recording shows is that Ms. Lim knows of Capital Place because it was the entity that returned her family's money—not that her knowledge of Capital Place came from the conspiracy, but for a completely innocent reason.

Next, the simple fact that the October 16 recording includes actual video of Ms. Lim, and the June 22 "Video Call" does not, is relevant to avoid leaving the jury with the misimpression that Ms. Lim is somehow scared or nervous about talking to Leissner. This is the inference that the government wants the jury to draw from their gloss on the June 22 "Video Call"—first, that Ms. Lim actually wrote anything, and second that she wrote things, instead of saying them, because she was afraid of being recorded talking about criminal activity. If that was so, then why would she speak freely on October 16, and why would she not write anything down and show it to Leissner? Why would she be so open with him? The Court must allow the jury to look at Ms. Lim's face, her tone, her gestures, her entire countenance—and determine for itself if Ms. Lim is a scared and cowering co-conspirator or not. The answer will be clear to anyone with eyes. To not allow the October 16 Recording but allow the June 22 "Video Call" would leave a definitive misimpression in the jury's minds—a misimpression that is contradicted by the actual evidence.

10

BRAFMAN & ASSOCIATES, P.C.

Beyond the misleading impression relating to the Capital Place transfers, the October 16 Recording also contains a direct reference to the June 22 recordings that the government wants to introduce, which is necessary to complete that topic for the jury. Leissner, speaking about Jho Low, says that "I think he spread a bunch of rumors around about me, to be honest, also and, which I don't, quite frankly I didn't quite understand that, Ms. Lim, but, I don't know." (Id. at 8.). Ms. Lim responded, "I did mention to you the last time, right, that was a couple of months back. Yeah." (Id.). So the October 16 Recording relates directly to the June 22 recordings, and completes them.

Moreover, the background information contained in the October 16 recording is admissible. As the government says in its own motions in limine, "to the extent that any of this background information contains what might be otherwise be deemed hearsay, such statements are admissible as context and to explain the interactions with Lim that followed. See United States v. Pedroza, 750 F.2d 187, 200 (2d Cir. 1987) ("When statements by an out-of-court declarant are admitted as background, they are properly so admitted not as proof of the truth of the matters asserted but rather to show the circumstances surrounding the events, providing explanation for such matters as the understanding or intent with which certain acts were performed."); United States v. Certified Environmental Servs., Inc., 753 F.3d 72, 89 (2d Cir. 2014) ("An out-of-court statement offered for some other purpose [than to prove the truth of a fact asserted], such as . . . to demonstrate the statement's effect on the listener, or to show the circumstances under which subsequent events occurred, is not hearsay." (citations omitted))." (Gov't MIL at 36.)

    c. *The recording is admissible under Rule 807*

This evidence is also admissible under Rule 807, the residual hearsay exception, which allows otherwise inadmissible hearsay to be admitted where:

> (1) the statement is supported by sufficient guarantees of trustworthiness—after considering the totality of circumstances under which it was made and evidence, if any, corroborating the statement; and (2) it is more probative on the point for which it is offered than any other evidence that the proponent can obtain through reasonable efforts.

Fed. R. Evid. 807(a).

Here, both prongs are met. First, there is no doubt that Ms. Lim made the statements, as they are captured on both video and audio recording made by the government's cooperator. As to the facts underlying her statement—that the money sent from Capital Place was for a prior investment and not proceeds of the 1MDB fraud—this too has sufficient guarantees of trustworthiness. There will be no dispute that $35 million was sent by Tim Leissner and Judy Chan to Silken Waters/Victoria Square. The only question is why. The government asserts that the $35 million was sent to Mr. Ng's in-laws as Mr. Ng's alleged proceeds from the 1MDB fraud. The only evidence the government has directly supporting its theory will be the testimony of its cooperator, Leissner. In the October 16 Recording, however, Ms. Lim makes clear several

11

BRAFMAN & ASSOCIATES, P.C.

times that the money Leissner and Chan sent was to pay back a prior investment and not proceeds. As noted above, not only does Leissner not challenge this assertion when made by Ms. Lim, but he actually confirms that he knows exactly what she is referring to by responding: "Oh, I got you, you mean with Capital Place, with Judy?" Additionally, when Ms. Lim asks numerous times for records establishing the investment, Leissner does not once challenge Ms. Lim that the investment happened. This is important because the only person the government has to support its proceeds argument is the same person who establishes the trustworthiness of Ms. Lim's statements by acknowledging that the money was for a prior investment.

As to the second prong, this video is the best evidence of Ms. Lim's plea to Leissner to prevail on Judy to get the documents she needs. She is clearly concerned on the call itself when she is telling Leissner that the Malaysian authorities are not persuaded that she is innocent because has not presented documentation of the investment. This is a pressing crisis at the time, and her call with Leissner is the action she is taking in order to get the documents she needs. Also, having the jury see her face and hear the tone in her voice as she describes the Malaysian authorities and her need for the documents is far better evidence than testimony about this legal crisis over three years after the fact. This videotape *is* the evidence, the evidence of what Ms. Lim was going through at the time with the Malaysian authorities, the evidence of how she endeavored to solve this problem by contacting Leissner, and the evidence of how she tried to convince Leissner to contact Judy to get the records she needs. Only by watching the videotape itself can the jury pass upon the earnest nature of Ms. Lim, upon the genuineness of her request, and upon the evidence of her mind set at the time that these documents exist, that she needs them, and that Leissner can help her get them.

As courts in this Circuit have recognized, "although '[t]he residual exception should be invoked sparingly,' Robinson v. Shapiro, 646 F.2d 734, 742 (2d Cir. 1981), 'the rules on hearsay should be read to exclude unreliable hearsay but to admit reliable hearsay . . . . [S]uch 'reliable hearsay' has, of course, the effect of promoting the truth-seeking function of a . . . trial and, therefore, ought to be presented to the finders of facts." Picard v. Sage Realty, No. 20 CIV. 10057 (JFK), 2021 WL 5826295, at *2 (S.D.N.Y. Dec. 8, 2021) (citing United States v. Carneglia, 256 F.R.D. 384, 392 (E.D.N.Y. 2009) & Davis v. City of New York, 959 F. Supp. 2d 427, 434 (S.D.N.Y. 2013)). To promote the truth-seeking function of the jury, the jury must hear the truth. As the October recording makes clear, the truth is that Ms. Lim asked Leissner to help her obtain the records demonstrating that Ms. Lim's family had invested with Judy Leissner's family years earlier, and that the money paid by the Leissners from Capital Place to Silken Waters/Victoria Square was to pay back the investment. Keeping this reliable information from the jury—as the government hopes will happen—does not serve the truth-seeking function of the jury, Mr. Ng's constitutional right to defend himself or justice itself.

   d.  *The other grounds of admissibility*

Additionally, the fact that Ms. Lim asked and directed Leissner to help her obtain records of the investment is admissible non-hearsay because an "inquiry is not an 'assertion,' and accordingly is not and cannot be a hearsay statement." Quartararo v. Hanslmaier, 186 F.3d 91, 98 (2d Cir.1999); see also United States v. Dawkins, 999 F.3d 767, 789 (2d Cir. 2021) ("The

BRAFMAN & ASSOCIATES, P.C.

statement '[d]o not accept money from these people' was an order, *i.e.*, an imperative rather than a declarative statement, and it was offered not for its truth, but for the fact that it was said. It was therefore not hearsay."); United States v. Kuthuru, 665 F. App'x 34, 38 (2d Cir. 2016) ("Questions and commands are ordinarily not hearsay because they are not offered for the truth of the matter asserted"); United States v. Bellomo, 176 F.3d 580, 586 (2d Cir. 1999) ("The most significant statements fall into the category of commands as to which the witness was the percipient hearer of the command. Statements offered as evidence of commands or threats or rules directed to the witness, rather than for the truth of the matter asserted therein, are not hearsay."); United States v. Amato, No. 03-CR-1382 (NGG), 2006 WL 1891119, at *1 (E.D.N.Y. June 27, 2006) (admitting evidence, over the Government's objection, that the declarant directed the witness to "place a car on a street at a particular time" because directives are not hearsay (citing Bellomo)). Ms. Lim's requests of Leissner are—to quote the government's motion in limine regarding the June 22 Recording, which they seek to admit— "best understood not as assertions of fact by Lim, but rather as a directive or imperative, and therefore are not hearsay." United States v. Bellomo, 176 F.3d 580, 586 (2d Cir. 1999) ("commands or threats or rules directed to the witness, rather than for the truth of the matter asserted therein" are not hearsay); United States v. Dawkins, 999 F.3d 767, 789 (2d Cir. 2021) (an "imperative rather than a declarative statement," such as a directive to do or not to do something, is "not hearsay" when "offered not for its truth, but for the fact that it was said").

    e. *The recording is highly probative and there will be no undue prejudice to the government in admitting it into evidence*

For the reasons set forth above, the October 16 Recording is relevant, and there are multiple bases for its admission. The final step is to examine whether, under Rule 403, the October 16 Recording is more prejudicial than probative. There is no serious contention that it is. Here, too, the Government's own words are useful in demonstrating why. It may well be that the government does not want to see a critical pillar of their case—the transfers from Capital Place—crumble when the truth comes out, "so it is understandable that [the government] would prefer not to have them presented to the jury." (Gov't Reply MIL at 25 n. 15.) But, as the government noted, "Because virtually all evidence is prejudicial to one party or another, to justify exclusion under Rule 403 the prejudice must be unfair." Costantino v. Herzog, 203 F.3d 164, 174 (2d Cir. 2000) (emphasis in original). There is nothing unfair about this evidence, much less so substantially so that preclusion under Rule 403 is warranted." (Id.).

Thank you for your consideration.

Respectfully submitted,

Marc A. Agnifilo, Esq.
Zach Intrater, Esq.
Teny R. Geragos, Esq.
Jacob Kaplan, Esq.

cc:    Counsel for the government (via email)