# BRAFMAN & ASSOCIATES, P.C.

ATTORNEYS AT LAW

256 FIFTH AVENUE, 2ND FLOOR

NEW YORK, NEW YORK 10001

TELEPHONE: (212) 750-7800

FACSIMILE: (212) 750-3906

E-MAIL: ATTORNEYS@BRAFLAW.COM

BENJAMIN BRAFMAN
———
MARK M. BAKER
OF COUNSEL

MARC A. AGNIFILO
OF COUNSEL

ZACH INTRATER
OF COUNSEL

ANDREA L. ZELLAN

JACOB KAPLAN

TENY R. GERAGOS
ADMITTED IN NY & CA

STUART GOLD

February 28, 2022

VIA ECF
The Honorable Margo K. Brodie
Chief United States District Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, NY 11201

      Re:    United States v. Ng Chong Hwa a.k.a Roger Ng, 18 Cr. 538 (MKB)

Dear Chief Judge Brodie:

We are in receipt of letters from the Government and from counsel for Ms. Kimora Lee Simmons Leissner. (Dkt. 151 and 152.)

We first address the letter from Ms. Simmons Leissner's counsel. As counsel noted, Mr. Ng's defense team agreed to not review the communications provided by the Government on Friday February 25, 2022 that may, or may not, fall within the marital privilege. On Saturday February 26, 2022, counsel for Mr. Ng, responding to an email from Ms. Simmons Leissner's counsel, sent the following email to (1) the Government, (2) counsel for Ms. Simmons Leissner and (3) counsel for Mr. Tim Leissner:

> We are in receipt of your email. First, as we advised Mr. Leissner's counsel, we have no interest in reviewing documents that are within the scope of a valid marital privilege, and we are willing to forego review of any potentially privileged documents until you have had a chance to be heard by the Court. As you know, you would have to bear the burden to prove that your client and Mr. Leissner were married and should benefit from the marital privilege despite the fact that Mr. Leissner was married to someone else. Nonetheless, and I say this in

BRAFMAN & ASSOCIATES, P.C.

>the spirit of full disclosure, regardless of whether the marital privilege applies, the issue would then become whether the communications between Mr. Leissner and your client were for the purpose of hiding assets constituting, or purchased with, criminal proceeds, and whether this was something of which they were aware. I say this only because if you intend to brief the issues for the court, I believe the court will want to hear on both of these questions. In the meantime, however, we will not review the challenged material pending a ruling by the Court. Thank you.

We alerted Ms. Simmons Leissner's counsel to these issues in the interest of efficiency, given the tight time frame, hoping they would brief the Court as to their position. However, their letter, while generous with adjectives like "frivolous" and "meritless," fails to provide the Court with any guidance on how they intend to invoke the marital privilege when Mr. Leissner testified that he was married to Judy Chan Leissner at the time he "married" Ms. Simmons Leissner. It is axiomatic that the burden of establishing a valid, legally-cognizable marital privilege rests on the party seeking to prevent the admission of evidence due to that privilege. Given Mr. Leissner's testimony that he was married to Judy Chan Leissner at the time he married Ms. Simmons Leissner, and given that there is nothing in the record to suggest otherwise, this burden that Ms. Simmons Leissner carries is a heavy one, and her letter to the Court offers neither argument nor precedent as to how she intends to meet that burden.

Even if Ms. Simmons Leissner bears the burden that she and Mr. Leissner can benefit from the marital privilege under these circumstances, the evidence already elicited is that while married to Ms. Simmons Leissner, Tim Leissner continued to launder money 1MDB proceeds for Jho Low using shell companies. (Tr. 1146:22-24). Leissner testified that he received €145 million from a "Kuwaiti sheikh." (Tr. 1147:1-3). That money went to Midas Commodities Agents Limited -- a Seychelles entity beneficially owned by Ms. Simmons Leissner. Leissner testified that Jho Low then directed payments of portions of that money – including one $39 million transfer that related to a 1MDB bond payment. (Tr. 1148:1-14). That transfer was made from Midas, an entity beneficially owned by Ms. Simmons Leissner. Leissner testified that he took approximately $80 million of the "Kuwaiti Sheikh's" money for himself. (Tr. 1148:15-19). That money went from Midas (Seychelles), an entity beneficially owned by Ms. Simmons Leissner, through Midas Commodities Limited DE LLC, a Delaware LLC owned by Ms. Simons Leissner, to Keyway Pride Limited LLC, a California company owned by Ms. Simmons Leissner. Leissner named Keyway Pride in his testimony. (Tr. 1149:10). Leissner called Keyway Pride a "shell holding company here in the United States. (Tr. 1149:7-8). Again, Keyway Pride is owned by Ms. Simmons Leissner. Leissner testified that Leissner testified that he used the $80 million that he transferred to Keyway Pride, the shell company owned by Ms. Simmons Leissner, for "investments." (Tr. 1148:19-20). These investments were made into numerous other entities, some of which were also owned by Ms. Simmons Leissner. Leissner testified that these funds were transferred from Midas (Seychelles)'s bank account at a bank in

BRAFMAN & ASSOCIATES, P.C.

the Bahamas. (Tr. 1148:24-1149:4). Again, Midas (Seychelles) was beneficially owned by Ms. Simmons Leissner. Moreover, Leissner and Ms. Simmons Leissner then engaged in a sophisticated scheme to transfer their interests in all of these investments to a businessman named "Ghanim," who was to provide Ms. Simmons Leissner with $170 million in exchange for those assets. Indeed, Leissner and Ms. Simmons Leissner took a trip in May of 2018 to Lichtenstein for the express purpose of creating a trust for "asset protection" – hiding Leissner's ill-gotten gains, which had been transferred to Ms. Simmons Leissner's name. In sum, the evidence is overwhelming.

While the Government fears "unnecessary and time-consuming" litigation over these privilege issues - issues caused exclusively by the Government – the situation is actually clear and straightforward: Leissner tried to hide hundreds of millions of dollars in Ms. Simmons Leissner's name and in shell companies beneficially owned by her, efforts culminating in the two of them traveling to Liechtenstein with the sole objective of hiding tens of millions of dollars in stolen assets. No litigation – much less time-consuming litigation – is required. In fact, Mr. Leissner's counsel has agreed with the defense on several categories of documents.

The letters of Ms. Simmons Leissner and the Government highlight the same problem the defense has raised for years in this case, specifically that the Government has been strategically dilatory in providing discovery and 3500 material. As to the Leissner 3500 material, defense counsel made a record on January 7, 2022 as follows:

> They're not giving it (the Leissner 3500) for a reason. And defense attorneys a lot less cynical than me would become very suspicious as to why it is that they give over everything else and not this, especially when we've been having such pointed, detailed conversations about this one witness. And for them to not even be able to tell Your Honor that they're going to give it two weeks before he testifies is unusual…There's going to be something in this material that is going to raise issues, which is why they're not giving it to us right now, which is why they didn't give it to us at the end of last year. And I don't know what those issues are going to be because I don't have the materials and those issues could all be avoided if we get it earlier, and it's not right.

The admittedly "institutional failure" as to the privilege issues and the strategic withholding of Leissner's 3500 material go hand in hand. Without Leissner's almost four years worth of statements to the Government, it is impossible to glean where the privilege issues lie. That is why the defense has no choice but to rely on the good faith and the competence of the Government's privilege team. The privilege team is presumably instructed by the trial team as to salient issues as part of its review. The trial team, armed with the statements of Leissner as well as hundreds of witnesses in the case, is able to alert the privilege team to the issues of privilege as well as whether these privileges will apply in light of the crime fraud exception. The defense

BRAFMAN & ASSOCIATES, P.C.

is simply not in a position to run quality control checks on a Government's privilege review team for the simple reason that the trial team has all the information.

The instant situation has been caused solely by the Government. Therefore, for the Government now to suggest that a sensible consequence of its massive, never-ending series of grave mis-steps is to curtail the defendant's cross-examination of the sole cooperating witness is, most respectfully, both misplaced and remarkably tone deaf. The Government argues that these documents it has never seen, which it dubs "challenged documents" and "marital communications," are cumulative and extrinsic. Putting aside that the Government is making this argument without having seen the materials, the Government's argument raises a larger problem. As the Government acknowledges, "Leissner either has or will testify about these topics." Therefore, what the Government is proposing is that after eliciting testimony from its cooperating witness on these matters, that the defendant be curtailed on cross-examining Leissner on these same topics, and its proffered reason for trimming the confrontation right of the defendant is its own mistakes.

The solution we propose is this: we move forward with continued direct of Mr. Leissner tomorrow followed by cross-examination.

Respectfully submitted,

Marc A. Agnifilo, Esq.
Zach Intrater, Esq.
Teny R. Geragos, Esq.
Jacob Kaplan, Esq.

cc:   Counsel for the Government (via ECF and email)
      Counsel for Kimora Lee Simmons (via email)
      Counsel for Tim Leissner (via email)