

U.S. Department of Justice

United States Attorney
Eastern District of New York

F. #2016R00467

271 Cadman Plaza East
Brooklyn, New York 11201

March 16, 2022

By ECF

The Honorable Margo K. Brodie
Chief United States District Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

      Re:    United States v. Ng Chong Hwa
                  Criminal Docket No. 18-538 (S-2) (MKB)

Dear Chief Judge Brodie:

      The government respectfully submits this letter in further support of its motion in limine to introduce certain statements made by Hwee Bin Lim regarding financial transactions involving proceeds of the charged criminal scheme. For the reasons that follow, in addition to the reasons set forth in the government's moving brief, see ECF No. 90 ("Gov't Mot."), the government's motion should be granted.[1]

I.    Statements by Lim Regarding Financial Transactions Involving Diverted 1MDB Bond Funds Are Admissible as Co-Conspirator Statements

      The government previously moved in limine for a ruling that certain statements Lim made between 2012 and 2014 regarding banking transactions involving diverted 1MDB bond funds are admissible as co-conspirator statements under Federal Rule of Evidence 801(d)(2)(E). Gov't Mot. at 66-72. The government argued that Lim participated, at a minimum, in a conspiracy to launder criminal proceeds and that statements she made in connection with financial transfers involving the diverted bond funds were made during and in furtherance of that money laundering conspiracy.

---

[1]    In connection with the testimony of Eric Van Dorn last week, defense counsel advised that they would likely object to the admission of certain emails and phone calls detailing the establishment, use, and control of the Silken Waters / Victoria Square Bank Account and other Ng-related bank accounts by Lim and the defendant. This evening, the defense advised that those exhibits included GXs 344 to 348, 350 to 361-A (inclusive of sub-exhibits), 379 to 385, 398 and 399, which are emails and phone calls, and 456-A–456-D, which are emails obtained from a corporate services company in Guernsey.

At a pretrial conference on January 26, 2022, the Court deferred ruling on the government's motion. Jan. 26, 2022 Status Conf. Tr. at 11. Based on the documentary evidence set forth below, which the government intends to introduce at trial, the Court should grant the government's motion.

A. <u>The Proffered Evidence</u>

Between 2012 and 2014, Lim had numerous discussions with representatives of UBS regarding the Silken Waters / Victoria Square Bank account. The statements at issue include emails Lim sent to UBS bankers from her own email account as well as emails she sent from an email account that was opened on May 21, 2012—the same day Project Magnolia closed—in her mother's name (the "Fake Tan Email Account"). The statements also include recorded telephone calls Lim had with representatives of UBS.[2]

As set forth below, Lim participated in U.S. dollar financial transactions involving diverted 1MDB bond funds with intent to conceal the nature, source, ownership and control of the funds, and also took part in conversations with the defendant and Tim Leissner about concocting a cover story to explain the transfers of millions of dollars from the Capital Place Bank Account to the Silken Waters / Victoria Square Bank Account.

- On or about May 20, 2012, Lim contacted a UBS banker about acquiring a shell company and opening a bank account in its name. Lim communicated with the banker via the banker's cellphone and personal email account. In a series of email communications on May 21, 2012—the day that Project Magnolia closed— Lim selected Silken Waters Enterprise Limited as the shell company, which had previously been incorporated in the British Virgin Islands by a corporate services company,[3] and stated that she wanted to change the name to Victoria Square Capital Limited. Lim further arranged to meet with another UBS banker the following day, at the residence she shared with the defendant. This was the meeting, memorialized in the account opening documents for the Silken Waters / Victoria Square Bank Account, at which it was falsely stated that the funds to be transferred into the account were profits from "equity investments in Switzerland."

- The UBS account opening documents for the Silken Waters / Victoria Square Bank Account indicate that Tan Kim Chin ("Tan"), Lim's mother, was the beneficial owner of the bank account. However, the telephone number listed for Tan was actually Lim's cellphone number, and the email address listed for Tan was the Fake Tan Email Account—a newly-created email account that included

---

[2] Lim also communicated with representatives of at least one other bank regarding funds that had been transferred to that bank from the Silken Waters / Victoria Square Bank Account.

[3] Silken Waters Enterprise Limited was what is known as a "shelf company": a company that is legally formed and then placed on a "shelf" to be sold at a later date to someone interested in opening a company without going through the formation process.

      Tan's name but was different from Tan's real email account. Ample evidence will demonstrate that this newly-created email account was actually used by Lim, rather than by Tan, and that Lim used the email account to communicate regarding the Silken Waters / Victoria Square Bank Account.[4]

- Lim frequently spoke with the UBS account representative for the Silken Waters / Victoria Square Bank Account by calling the banker's cellphone, including about the transfers of diverted 1MDB bond funds into the account.

- Lim used funds in the Silken Waters / Victoria Square Bank Account traceable to the 1MDB scheme to purchase expensive jewelry, including a six-carat diamond. Lim initially contacted the UBS account representative—using the Fake Tan Email Account—to request a wire transfer instruction form "to make payment for my bling bling purchase." When the account representative asked for payment details, Lim forwarded invoices for the jewelry from her own personal email account that was in her own name. See GX-349.

- Lim also directed other transfers out of the Silken Waters / Victoria Square Bank Account, including on calls that UBS recorded. In one of these calls, Lim and the UBS account representative discussed the fact that under the "nominee directorship" provided by the corporate services company referenced above, "the mails cannot be destroyed" and must be kept for five years. Not long thereafter, Lim directed that the nominee services be terminated and also that Victoria Square Capital Limited be dissolved.

- Lim deleted from her personal email account all email exchanges with UBS employees regarding the Silken Waters / Victoria Square Bank Account, including the emails regarding the account opening and jewelry purchase described above.

- Tim Leissner testified that following a meeting in Hong Kong with the defendant, Lim, Leissner, Judy Chan, and a feng shui master, Lim and the defendant discussed with Leissner a "cover story" to explain why Ms. Chan had sent money to the Silken Waters / Victoria Square Bank Account. The cover story they discussed was that the transfers represented a "return of capital" that had been invested in an unspecified business involving Ms. Chan's family in China. Lim, the defendant, and Leissner also discussed creating a false document to help explain the fabricated initial investment. March 1, 2022 Trial Tr. at 1282-83.

---

[4]     The evidence will establish that in June 2012, the defendant also created an email account that disguised his identity and that he used to communicate with UBS bankers regarding the Silken Waters / Victoria Square Bank Account: victoriasquare.investment@gmail.com (the "Victoria Square Email Account"). Between June 2012 and 2014, both the Fake Tan Email Account and the Victoria Square Email Account were included on the vast majority of communications with UBS bankers regarding the Silken Waters / Victoria Square Bank Account. The defendant ultimately deleted the Victoria Square Email Account in its entirety—including its contents—in early 2015, along with three other email accounts.

3

Later, after the defendant had been detained in Singapore in connection with an investigation by Singaporean authorities of the 1MDB matter, Lim sought to confirm with Leissner that, if asked about the transfers of funds to the Silken Waters / Victoria Square Bank Account, Ms. Chan would use the cover story to explain the transfers. March 1, 2022 Trial Tr. at 1299-1300.

B. Applicable Law

1. Fed. R. Evid. 801(d)(2)(E)

Rule 801(d)(2)(E) provides that a statement "made by the party's coconspirator during and in furtherance of the conspiracy" is not hearsay. Fed. R. Evid. 801(d)(2)(E). "To admit hearsay testimony under Rule 801(d)(2)(E) of the Federal Rules of Evidence, the district court must find (a) that there was a conspiracy, (b) that its members included the declarant and the party against whom the statement is offered, and (c) that the statement was made during the course of and in furtherance of the conspiracy." United States v. Alameh, 341 F.3d 167, 176 (2d Cir. 2003) (citations and internal quotation marks omitted). District courts are to make this finding applying a "preponderance of the evidence" standard. See Bourjaily v. United States, 483 U.S. 171, 175 (1987). In making this determination, a court may consider the hearsay statement sought to be admitted, id. at 181, but "there must be some independent corroborating evidence of the defendant's participation in the conspiracy," United States v. Al-Moayad, 545 F.3d 139, 173 (2d Cir. 2008) (citations, internal quotation marks, and alterations omitted). Additionally, a court may consider any evidence in making this preliminary determination, regardless of whether that evidence is itself admissible. See Fed. R. Evid. 104(a); Bourjaily, 483 U.S. at 177-81.

The quantum of independent corroborating evidence required is not high. "The independent evidence need show only 'a likelihood of an illicit association between the declarant and the defendant.'" United States v. Ginsberg, 758 F.2d 823, 828 (2d Cir. 1985) (quoting United States v. Cicale, 691 F.2d 95, 103 (2d Cir. 1982)); United States v. Provenzano, 615 F.2d 37, 44 (2d Cir. 1980) ("'The threshold requirement of admissibility is satisfied by a showing of a likelihood of an illicit association between the declarant and the defendant . . . .'" (quoting United States v. Glazer, 532 F.2d 224, 228 (2d Cir. 1976))). Moreover, "[t]he quantum of independent evidence needed to corroborate the existence of a conspiracy necessarily is dependent on the totality of circumstances, including the strength of the hearsay statements themselves." United States v. Abu-Jihaad, 531 F. Supp. 2d 289, 296 (D. Conn. 2008). When "the hearsay evidence itself so convincingly implicates the defendant, a district court may require less corroboration to find by a preponderance of the evidence that the defendant participated in the conspiracy for purposes of admitting co-conspirators' statements against him." United States v. Padilla, 203 F.3d 156, 162 (2d Cir. 2000)); see also United States v. Santiago, 199 F. Supp. 2d 101, 105 (S.D.N.Y. 2002) ("Although some form of corroboration is required, where, as here, hearsay evidence itself so convincingly implicates the defendant, a court may require less corroboration to find by a preponderance of the evidence that the defendant participated in the conspiracy for purposes of admitting co-conspirators' statements against him.").

Moreover, the well-established practice in the Second Circuit is to follow the Geaney protocol for co-conspirator statements: the government may conditionally admit such statements at trial "subject to the later submission of the necessary evidence" to meet the

4

Case 1:18-cr-00538-MKB Document 174 Filed 03/16/22 Page 5 of 8 PageID #: 3039

requirements of Rule 801(d)(2)(E). United States v. Tracy, 12 F.3d 1186, 1199 (2d Cir. 1993) (citing United States v. Geaney, 417 F.2d 1116, 1120 (2d Cir. 1969)); see also United States v. Cambindo Valencia, 609 F.2d 603, 630 (2d Cir. 1979) ("The law is well settled within this circuit that declarations that are otherwise hearsay may nevertheless be provisionally admitted, subject to connection of the defendant with the conspiracy alleged, as long as the trial court is ultimately satisfied that the participation of the defendant against whom the declaration is offered has been established by a fair preponderance of the evidence independent of the hearsay utterances."); United States v. Fallas, 09-CR-342 (LAP), 2010 WL 3468605, at *4 (S.D.N.Y. Aug. 19, 2010) (rejecting defendant's request for a pre-trial hearing because "[i]n the Second Circuit, statements proffered into evidence as co-conspirator statements are admitted on a conditional basis . . ."). "If the government succeeds in persuading the court that the conditionally admitted coconspirator statements were made during and in furtherance of a conspiracy . . . the statements are allowed to go to the jury." Tracy, 12 F.3d at 1199.

    2.  <u>Money Laundering – Knowledge Requirements</u>

    Section 1956(a)(2)(B)(i) of Title 18, United States Code—one of the objects of the charged money laundering conspiracy—prohibits transferring funds to or through the United States while knowing that the funds "represent the proceeds of some form of unlawful activity" and that the transfer is designed, at least in part, "to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity." 18 U.S.C. § 1956(a)(2)(b)(i). The statute further defines the phrase "knowing that the property involved in a financial transaction represents the proceeds of some form of unlawful activity" to mean that the person "knew the property involved in the transaction represented proceeds from some form, though not necessarily which form, of activity that constitutes a felony under State, Federal, or foreign law, regardless of whether or not such activity is specified in paragraph (7)." Id. § 1956(c)(1); United States v. Maher, 108 F.3d 1513, 1526 (2d Cir. 1997).

    Section 1957(a) of Title 18, United States Code—another of the objects of the charged money laundering conspiracy—prohibits a person from knowingly engaging in a "monetary transaction in criminally derived property of a value greater than $10,000" that is "derived from specified unlawful activity." 18 U.S.C. § 1957(a). The statute thus requires proof of knowledge that a transaction involved "criminally derived property," which is defined to mean "any property constituting, or derived from, proceeds obtained from a criminal offense." Id. § 1957(f)(2). The statute expressly provides that the government "is not required to prove the defendant knew that the offense from which the criminally derived property was derived was specified unlawful activity." Id. § 1957(c). As relevant to mens rea, to prove a violation of Section 1957, the government must establish (1) general knowledge of the subject property's criminal nature and (2) that the property was in fact derived from specified unlawful activity. United States v. Richard, 234 F.3d 763, 769 (1st Cir. 2000); see also United States v. Reiss, 186 F.3d 149, 154 (2d Cir. 1999) ("In a prosecution for an offense under § 1957, the Government is not required to prove the defendant knew that the offense from which the criminally derived property was derived was specified unlawful activity. Rather, the defendant need only know that the funds were criminally derived." (internal citation and quotation marks omitted)).

5

C. <u>Argument</u>

The proffered evidence easily establishes by a preponderance of the evidence that Lim participated in the charged money laundering conspiracy. Statements she made between 2012 and 2014 regarding banking transactions involving diverted bond funds are therefore admissible. Moreover, these statements are powerful evidence of both the fact that the defendant and his wife controlled the Silken Waters / Victoria Square Bank Account and that they sought to conceal their control—an essential element of the charged money laundering conspiracy.[5]

As set forth above, Lim played a central and crucial role in acquiring a shell company that she then used to open the Silken Waters / Victoria Square Bank Account, which received over $35 million in diverted 1MDB bond funds.[6] She did so at the exact same time that Project Magnolia closed, and she took multiple steps to conceal her identity, her control over the account, and the source of the funds, including by (1) communicating with a UBS banker over the banker's cellphone and personal email account to acquire the shell company and open the account; (2) falsely identifying her mother as the beneficial owner of the account in the account opening documents while listing her own cellphone number as the contact number for her mother; (3) providing false information that the funds to be transferred into the account were profits from her mother's "equity investments in Switzerland"; (4) creating the Fake Tan Email Account, a new email account in her mother's name that she used to communicate with the UBS account representative for the account; and (5) deleting from her own personal email account emails that related to the Silken Waters / Victoria Square Bank Account. As noted, the defendant, like his wife, created an anonymized email account—the Victoria Square Email Account—that he used to communicate with UBS bankers regarding the Silken Waters / Victoria Square Bank Account, including in connection with banking transactions, and deleted the email account in early 2015. Throughout the period from mid-2012 through mid-2014, Lim and the defendant regularly communicated with UBS bankers using the Fake Tan Email Account and the Victoria Square Email Account.

---

[5] The government also notes that, in cross-examining Eric Van Dorn, the FBI forensic accountant, the defense suggested that the defendant's family members had incorporated Silken Waters in April 2012, nearly two months before the Silken Waters / Victoria Square Bank Account received the first transfer from Capital Place. March 14, 2022 Trial Tr. at 2991-92. In doing so, the defense left the jury with a misimpression. In fact, and as Lim's email communications with a UBS banker make clear, a corporate services company incorporated Silken Waters in April 2012. It was not until May 23, 2012, that the defendant's family members acquired the entity from the corporate services company. Having left the jury with a misimpression on this score, the defendant should not be heard to contend that Lim's emails—which elucidate this timing with clarity—are inadmissible.

[6] Leissner testified that the funds transferred into the Silken Waters / Victoria Square Bank Account were kickbacks for the defendant's role in the criminal scheme, <u>see, e.g.</u>, Feb. 16, 2022 Trial Tr. at 382-83, there is ample documentary evidence showing that Leissner instructed Ms. Chan to make the transfers, and bank records clearly demonstrate—as FBI forensic accountant Eric Van Dorn testified—that the funds are traceable to the 1MDB bonds.

These actions alone provide ample basis to conclude that Lim knew the funds were the proceeds of criminal activity and that she intended to conceal both that fact and that she and the defendant controlled the funds. That Lim later urged Leissner and Ms. Chan to concoct a cover story regarding the origin of the funds and the purpose of the transfers and that she assured Leissner that the defendant had made only limited statements to law enforcement authorities in Singapore further confirms that she knew the funds at issue were criminal in nature.

Defense counsel has suggested that to invoke the co-conspirator exception, the government must establish that Lim knew the funds at issue were the proceeds of a violation of the Foreign Corrupt Practices Act. Dec. 21, 2021 Status Conf. Tr. at 27-29; Feb. 24, 2022 Trial Tr. at 1101. This is an incorrect statement of the law that is contradicted by the plain language of the statute. As set forth above, even to establish a substantive violation of the objects of the charged money laundering conspiracy, the government would be required to prove only that Lim knew the funds were proceeds of <u>some</u> criminal activity. The proffered evidence easily establishes such knowledge by a preponderance of the evidence.

Moreover, and in any event, a number of Circuits, including the Second Circuit, have recognized that the co-conspirator exception has its roots in agency law and have held that the joint venture in which the defendant and the declarant participated need not be criminal at all to deem the speaker an agent of the defendant for purposes of Rule 801(d)(2)(E). <u>See, e.g.</u>, <u>United States v. Russo</u>, 302 F.3d 37, 45 (2d Cir. 2002) (statements made in furtherance of joint venture admissible, and joint venture need not be charged or criminal in nature); <u>United States v. El-Mezain</u>, 664 F.3d 467, 503 (5th Cir. 2011) ("statements made in furtherance of a lawful common enterprise are admissible" under Rule 801(d)(2)(E)); <u>United States v. Gewin</u>, 471 F.3d 197, 201 (D.C. Cir. 2006) (Rule 801(d)(2)(E) "is not limited to unlawful combinations"); <u>United States v. Peralta</u>, 941 F.2d 1003, 1007 (9th Cir. 1991) (statements admissible under Rule 801(d)(2)(E) if made in furtherance of a common enterprise with a lawful objective). The proffered evidence plainly shows that Lim and the defendant were engaged in a common venture to direct banking transactions involving the Silken Waters / Victoria Square Bank Account.

For the foregoing reasons, Lim's statements between 2012 and 2014 regarding financial transactions involving diverted bond proceeds are admissible under Rule 801(d)(2)(E).[7]

                                                  Respectfully submitted,

                                                  BREON PEACE
                                                  United States Attorney

By:    s/
           Alixandra E. Smith
           Drew G. Rolle
           Dylan A. Stern
           Assistant U.S. Attorneys

| | |
|---|---|
| DEBORAH L. CONNOR | JOSEPH BEEMSTERBOER |
| Chief, Money Laundering and Asset | Acting Chief, Fraud Section |
| Recovery Section, Criminal Division | Criminal Division |
| U.S. Department of Justice | U.S. Department of Justice |
| | |
| s/ | s/ |
| Jennifer E. Ambuehl | Brent Wible |
| Trial Attorney | Trial Attorney |

cc:    Counsel for the defendant (via ECF and email)

---

[7] Many of the statements are admissible on other grounds as well, e.g., as directives or questions that are not offered for the truth of the matter asserted.

8