# Brafman & Associates, P.C.
### Attorneys at Law
256 Fifth Avenue, 2nd Floor

New York, New York 10001

Telephone: (212) 750-7800

Facsimile: (212) 750-3906

E-mail: attorneys@braflaw.com

BENJAMIN BRAFMAN

———

MARK M. BAKER
OF COUNSEL

MARC A. AGNIFILO
OF COUNSEL

ZACH INTRATER
OF COUNSEL

ANDREA L. ZELLAN

JACOB KAPLAN

TENY R. GERAGOS
ADMITTED IN NY & CA

STUART GOLD

March 18, 2022

VIA ECF
The Honorable Margo K. Brodie
Chief United States District Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, NY 11201

    Re:    <u>United States v. Ng Chong Hwa a.k.a Roger Ng</u>, 18 Cr. 538 (MKB)

Dear Chief Judge Brodie:

We write in response to the government's March 16, 2022, letter seeking to admit certain communications made by Hwee Bin Lim (Mr. Ng's wife) to financial institutions in 2012–14 as co-conspirator statements. (Dkt. 174.) The government cannot establish by a preponderance of the evidence that Hwee Bin Lim knew, at that time, that the funds her family received from Judy Leissner were crime proceeds. Without that knowledge, Hwee Bin Lim could not have been part of a conspiracy to commit money laundering. Her statements to the financial institutions are therefore inadmissible hearsay and not co-conspirator statements.

1. **The Legal Standard for the Coconspirator Exception to the Hearsay Rule**

The hearsay exception for co-conspirator statements requires that the offering party establish all of the following by a preponderance of the evidence: (1) that a conspiracy existed; (2) that the defendant and the declarant were members of the conspiracy; and (3) that the statement was made in furtherance of the conspiracy. *United States v. Zhao Wu Chen*, 322 F. App'x 43, 46 (2d Cir. 2009) ("There must be evidence that there was a conspiracy involving the declarant and the nonoffering party, and that the statement was made during the course and in furtherance of the conspiracy. The offering party must prove that these facts are established by a preponderance of

BRAFMAN & ASSOCIATES, P.C.

the evidence." (citations omitted)); *United States v. Padilla*, 203 F.3d 156, 161 (2d Cir. 2000) ("The exception to the hearsay rule for co-conspirator statements requires that the district court find by a preponderance of the evidence[:] first, that a conspiracy existed that included the defendant and the declarant; and second, that the statement was made during the course of and in furtherance of that conspiracy." (quotation marks and citations omitted)).

In making a preliminary factual determination whether the co-conspirator exception to the hearsay rule applies, an examining court may consider the proffered statement itself. *Bourjaily v. United States*, 483 U.S. 171, 181 (1987). However, "[s]ince *Bourjaily*, all circuits addressing the issue have explicitly held absent *some* independent, corroborating evidence of [the declarant's] knowledge of and participation in the conspiracy, the out-of-court statements remain inadmissible." *United States v. Clark*, 18 F.3d 1337, 1341–42 & n.2 (6th Cir. 1994) (collecting cases) (emphasis in the original); *United States v. Tellier*, 83 F.3d 578, 580 (2d Cir. 1996) ("In making these preliminary factual determinations under Federal Rule of Evidence 104(a), the court may consider the hearsay statements themselves. However, these hearsay statements are presumptively unreliable, and, for such statements to be admissible, there must be some independent corroborating evidence of the defendant's participation in the conspiracy." (citations to *Bourjaily* omitted.)) Furthermore, "'[s]ome' independent evidence is not merely a scintilla, but rather enough to rebut the presumed unreliability of hearsay. Admissibility of the hearsay, therefore, hinges on whether some sufficiently corroborating evidence exists which overcomes the suspected unreliability of out-of-court statements." *Clark*, 18 F.3d at 1342.

As noted, the proponent has the burden to establish the co-conspirator exception by a preponderance of the evidence. This standard means more likely than not, or more than 50%. *See*, *e.g.*, *United States v. Tarantino*, No. 08-CR-0655 JS, 2012 WL 5430865, at *10 (E.D.N.Y. Nov. 7, 2012) ("As the Court stated at the beginning of the re-trial, the Court did not feel that there was enough evidence to present a 51 percent preponderance of the evidence of a criminal motive in making the Tape.").

2.  **There is No Evidence That Hwee Bin Lim Knew the Money Constituted Criminal Proceeds**

From June 2012 through September 2013, Judy Leissner transferred a total of $35.1 million to an account beneficially owned by K.C. Tan—Hwee Bin Lim's mother and Mr. Ng's mother-in-law. At trial, Tim Leissner testified that this money was Mr. Ng's share of money diverted from the 1MDB bond deals. Tellingly, Mr. Leissner never testified that he had spoken with Hwee Bin Lim in 2012 or 2013 about these funds or that she knew that the money coming to K.C. Tan's account during that time frame were proceeds of the 1MDB fraud.

**BRAFMAN & ASSOCIATES, P.C.**

The government attempts to establish Hwee Bin Lim's membership in the money laundering conspiracy by relying on Mr. Leissner's claim at trial that Judy Chan Leissner, Mr. Ng, and Hwee Bin Lim met in Hong Kong in 2016 (following a meeting with a feng shui master) where the parties allegedly discussed a "cover story" to explain the $35.1 million. (Dkt. 174 at 2, 3.) First, this Court should not credit Leissner's testimony about this meeting—or any other matter—given his admission that he is a liar and his demonstrated inability to tell the truth. This is particularly true regarding Leissner's testimony about this alleged meeting, as Leissner did not mention anything to law enforcement about a 2016 Hong Kong meeting until January 22, 2020, nearly 18 months after he started cooperating with the government. (Tr. 2250:25–2252:5.).

Second, even if the Court would give Leissner the benefit of the doubt (which he undoubtedly does not deserve), his testimony on this matter could only support a finding that Hwee Bin Lim knew in 2016, after numerous press articles about potential fraud with the bond deals, that the funds Judy Chan Leisner had sent years earlier were criminal proceeds. His testimony does not support a finding that Hwee Bin Lim knew the true source of Judy Chan Leissner's money in 2012–13 when the transfers were made or in 2012–14 when the government's proffered hearsay statements were made.

Accordingly, because the government cannot establish with independent, corroborating evidence that Hwee Bin Lim knew that the $35.1 million were illegal proceeds at the time of her proffered communications, the government cannot establish that she was a co-conspirator at the time the communications were made. The government instead must rely on the proffered statements themselves to establish their own admissibility. As noted above, however, "these hearsay statements are presumptively unreliable, and, for such statements to be admissible, there must be some independent corroborating evidence of the defendant's participation in the conspiracy." *Tellier*, 83 F.3d at 580.

Moreover, the proffered communications themselves do not establish that it is more likely than not that Hwee Bin Lim was part of a money laundering conspiracy. For example, the government relies on the facts that (1) Hwee Bin Lim called a UBS banker on May 20, 2012 (the day before Project Magnolia closed), to inquire about acquiring a shell company and opening an account in its name; and (2) that Hwee Bin Lim emailed bankers on May 21, 2012, to select Silken Waters as the BVI shell company and to seek to change its name to Victoria Square. (Dkt. 174 at 2.)

At most, these communications show that Hwee Bin Lim was aware that Judy Leissner was about to send money to Hwee Bin Lim's family.  This is true – it is a fact that we have embraced from the beginning of the trial, and a fact that the defense specifically addressed in the opening statement. It is why Hwee Bin Lim reached out to acquire a new BVI shell company to

BRAFMAN & ASSOCIATES, P.C.

receive the money. After all, the government's first witness, Andy Tai, testified that shell companies (a type of special purpose vehicle or SPV) have legitimate purposes in transactions. (Tr. 218:9–21.) As Mr. Tai explained: "A lot of times, typically, when someone wants to conduct a financial transaction, they will incorporate an SPV and use the SPV as part of the transaction." (Tr. 218:24–219:1.) Mr. Tai further explained that people can use SPVs to "segregate[e] different financial transactions so it's easier to kind of monitor things and keep, you know, different transactions separate." (Tr. 219: 11–14.) Using BVI-based SPVs also has potential tax benefits. (Tr. 219:18–220:1.) Consequently, that Hwee Bin Lim acquired a BVI shell company in anticipation of receiving funds is the normal course of business, as the government's own witness confirmed. It does nothing to support a finding that she knew the money was illegal proceeds.

The government also relies on the fact that Hwee Bin Lim was present at a May 22, 2012, meeting where UBS was supposedly told that the money being sent to the account were profits from equity investments from Switzerland. (Dkt. 174 at 2.). We expect that Hwee Bin Lim will testify that she told UBS that the money was coming from an investment she and her family had in China. At no time did Hwee Bin Lim or, to her knowledge, anyone else in her family say anything about money coming from Switzerland. As we maintained in our motion to exclude the statements of Fanny Khng (the UBS banker), Ms. Khng's statements are unsworn, unexamined and incorrect. The actual testimony by Ms. Lim will make this abundantly clear.

Similarly, the government alleges that Hwee Bin Lim created an email account in her mother's name to communicate with the bank posing as her mother about the account. (Dkt. 174 at 2–3.) Even if true, this still does not show that Hwee Bin Lim knew the money was illegal proceeds. Rather, it is consistent with her recorded communications with the bank that demonstrate that she was the one managing her elderly mother's account.

The government also alleges that Hwee Bin Lim must have known the illegal source of the funds because she deleted from her personal email account all email exchanges with UBS regarding the Silken Waters/Victoria Square account. (Dkt. 174 at 3.) But these emails were only part of the emails she deleted from her account, and so this fails to demonstrate that she knew the money was illegal proceeds years earlier.

Lastly, the government claims that Hwee Bin Lim's role as a coconspirator is established by the fact that she spoke with UBS bankers about shredding the mail from the bank. (Dkt. 174 at 3.) Notably, this conversation took place in March 2014, six months after the last wires from Judy Chan Leissner to the Victoria Square account, and nearly a year *before* the news articles discussing potential fraud with the 1MDB bond deals. As such, there is no basis to believe that Hwee Bin Lim's discussion about shredding mail had anything to do with her belief that the money was illegal proceeds, as opposed to a general housekeeping matter. It is certainly not uncommon for

BRAFMAN & ASSOCIATES, P.C.

people to shred, as opposed to throw away, written matter containing basic identity information, and the fact that this happened here is of little probative value.

3. **Conclusion**

The government has failed to provide any independent, corroborating evidence establishing that Hwee Bin Lim was part of a money laundering conspiracy at the time the proffered communications were made. Even the proffered communications themselves fail to establish by a preponderance of the evidence (i.e., more likely than not) that Hwee Bin Lim knew that the money Judy Chan Leissner was sending her constituted criminal proceeds. Rather, all of Hwee Bin Lim's communications are consistent with her being aware that Judy Leissner was about to send money to Hwee Bin Lim's family, and her taking steps to manage that money for her elderly mother. Accordingly, for the reasons stated above, the government's request should be denied.

Respectfully submitted,

Marc A. Agnifilo, Esq.
Zach Intrater, Esq.
Teny R. Geragos, Esq.
Jacob Kaplan, Esq.

cc: Counsel for the government (via ECF)