F. #2016R00467

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA

     -against-                                    Docket No. 18-CR-538 (S-2) (MKB)

NG CHONG HWA,
         also known as "Roger Ng,"

               Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - X

## THE GOVERNMENT'S REQUESTS TO CHARGE

TABLE OF CONTENTS

Page

Preliminary Statement.................................................................................................... 1

REQUEST NO. 1 (General Requests) ............................................................................ 2

REQUEST NO. 2 (Knowingly, Intentionally, Willfully) ............................................... 3

A.    Knowingly ......................................................................................................... 3

B.    Willfully ............................................................................................................ 3

C.    Intentionally ...................................................................................................... 3

REQUEST NO. 3 (Counts One and Two: Conspiracy to Violate the FCPA)................ 5

A.    Conspiracy Generally........................................................................................ 11

B.    Elements of Conspiracy to Violate the FCPA .................................................. 12

C.    Additional Instruction – Conspiracy to Violate the FCPA's Antibribery Provisions........ 16

REQUEST NO. 4 (Counts One and Two – Objects of the Conspiracy – Violating the FCPA) .. 20

A.    Violation of the FCPA's Antibribery Provisions............................................... 20

B.    Violation of the FCPA – Internal Accounting Controls: Definition and Elements .......... 32

REQUEST NO. 5 (Count Three: Conspiracy to Commit Money Laundering)........................... 35

A.    Elements of Conspiracy to Commit Money Laundering .................................... 36

B.    Objects of the Charged Conspiracy to Commit Money Laundering ................................ 36

REQUEST NO. 6 (Count Three – Objects of the Money Laundering Conspiracy)..................... 38

A.    Object #1 – Violation of the Money Laundering Statute – International Transfer to Promote Specified Unlawful Activity (§ 1956(a)(2)(A)) ............................................................... 38

B.    Object #2 – Violation of the Money Laundering Statute – Transportation of Monetary Instruments or Funds to Conceal or Disguise Proceeds (§ 1956(a)(2)(B)(i)))............................... 48

C.    Object #3 – Violation of the Money Laundering Statute – Transaction of Criminally Derived Proceeds of Specified Unlawful Activity (§ 1957(a)) .................................................... 51

REQUEST NO. 7 (Conscious Avoidance) ..................................................................... 55

REQUEST NO. 8 (Lawfulness or Benefits of Acts or Goals No Defense).................................. 57

REQUEST NO. 9 (Venue)................................................................................................................ 58

REQUEST NO. 10 (Co-Conspirator Statements and Liability) .................................................... 61

REQUEST NO. 11 (Other Persons Not on Trial).......................................................................... 63

REQUEST NO. 12 (Accomplice Testimony).................................................................................. 64

REQUEST NO. 13 (Defendant's Interest If Defendant Testifies (if applicable)) ....................... 67

REQUEST NO. 14 (Interest in Outcome (if applicable))............................................................. 68

REQUEST NO. 15 (Expert Witnesses) .......................................................................................... 69

REQUEST NO. 16 (Preparation of Witnesses) ............................................................................. 70

REQUEST NO. 17 (Use of Evidence Obtained Pursuant to Searches and Seizures) ................. 71

REQUEST NO. 18 (No Duty to Call Witnesses or Produce Evidence or Use Particular
Investigative Techniques)............................................................................................................... 72

REQUEST NO. 19 (Uncalled Witnesses Equally Available (if applicable))................................ 73

REQUEST NO. 20 (Summary Evidence)....................................................................................... 74

REQUEST NO. 21 (Redactions) .................................................................................................... 75

CONCLUSION................................................................................................................................ 76

## PRELIMINARY STATEMENT

Pursuant to Rule 30 of the Federal Rules of Criminal Procedure, the government respectfully requests that the Court include the following instructions in its charge to the jury. The government also requests leave to offer additional instructions as may become appropriate during the course of the trial.

REQUEST NO. 1
(General Requests)

The government requests that the Court charge the jury in its usual manner on the following subjects:

a.  Function of the Court and the Jury;

b.  Jury Communications with Lawyers and the Court;

c.  Equality of the Parties Before the Court;

d.  Presumption of Innocence;

e.  Burden of Proof and Reasonable Doubt;

f.  Direct and Circumstantial Evidence;

g.  Function of the Indictment and What Is Not Evidence;

h.  The Meaning of "and" in the Indictment;

i.  Permissible Inferences Drawn from the Evidence;

j.  Stipulations;

k.  Objections;

l.  Defendant's Right Not to Testify (if applicable);

m.  Credibility of Witnesses and Discrepancies in Testimony;

n.  Testimony of Law Enforcement or Government Witnesses;

o.  Dates and Amounts Approximate;

p.  Punishment;

q.  Basing Verdict on Sympathy;

r.  Deliberations;

s.  Right to See Exhibits and Have Testimony Read During Deliberations; and

t.  Unanimity.

<u>REQUEST NO. 2</u>
(Knowingly, Intentionally, Willfully)

During these instructions, you will hear me use the terms "knowingly," "willfully," and "intentionally." Therefore, I will define these terms for you.

A.   <u>Knowingly</u>

To act "knowingly" means to act intentionally and voluntarily, and not because of ignorance, mistake, accident, negligence, or carelessness. Whether the defendant acted knowingly may be proven by his conduct and by all of the facts and circumstances surrounding the case.

B.   <u>Willfully</u>

Certain allegations in the Indictment require that the government prove beyond a reasonable doubt that the defendant acted "willfully." "Willfully" means to act voluntarily, purposefully and deliberately, and with an intent to do something the law forbids; that is to say, with a bad purpose either to disobey or to disregard the law. The government need not prove that the defendant was aware of the specific law or rule that his conduct may be violating, but must prove that the defendant acted with knowledge that his conduct was, in a general sense, unlawful. A defendant's conduct is not "willful" if it was due to negligence, inadvertence, or mistake.

C.   <u>Intentionally</u>

A person acts "intentionally" when he acts deliberately and purposefully. That is, the defendant's acts must have been the product of his conscious objective decision rather than the product of a mistake or accident.

Whether a person acted knowingly, willfully, or intentionally is a question of fact for you to determine, like any other fact question. Direct proof of knowledge and criminal intent

3

is almost never available.  It would be a rare case where it could be shown that a person wrote or

stated that as of a given time in the past he committed an act with criminal intent.  Such direct

proof is not required.  The ultimate facts of knowledge and criminal intent, though subjective,

may be established by circumstantial evidence, based upon a person's outward manifestations,

his words, his conduct, his acts and all the surrounding circumstances disclosed by the evidence

and the rational or logical inferences that may be drawn therefrom.  In either case, the essential

elements of the crime charged must be established beyond a reasonable doubt.

<u>Authority</u>

Adapted from the jury charges of the Hon. Kiyo A. Matsumoto, <u>United States v. Shkreli</u>, No. 15-CR-637 (E.D.N.Y. 2017) (hereinafter "<u>Shkreli</u>"), attached hereto as Exhibit A, and <u>United States v. Rivera, et al.</u>, No. 13-CR-149 (E.D.N.Y. 2015) (hereinafter "<u>Rivera</u>"); the jury charge of the Hon. Vernon S. Broderick in <u>United States v. Ng Lap Seng</u>, No. 15-CR-706 (VSB) (S.D.N.Y. 2017) (hereinafter, "<u>Lap Seng</u>"), attached hereto as Exhibit B; the jury charge of the Hon. Loretta A. Preska, <u>United States v. Chi Ping Patrick Ho</u>, No. 17-CR-779 (S.D.N.Y. 2018) (hereinafter "<u>Ho</u>"), attached hereto as Exhibit C; and the jury charge of the Hon. Dora L. Irizarry, <u>United States v. Lange, et al.</u>, No. 10-CR-968 (E.D.N.Y. 2014) (hereinafter "<u>Lange</u>").

REQUEST NO. 3

(Counts One and Two: Conspiracy to Violate the FCPA)

The defendant Roger Ng is formally charged in a Indictment.  The Indictment in

this case contains three counts:  (1) conspiracy to violate the Foreign Corrupt Practices Act, or

FCPA, through bribery; (2) conspiracy to violate the FCPA through the circumvention of internal

accounting controls; and (3) conspiracy to commit money laundering.  As I instructed you at the

outset of this case, the Indictment is a charge or accusation.  I will now instruct you on Counts

One and Two, the two counts charging conspiracy to violate the FCPA.

Count One of the Indictment charges the defendant Roger Ng with conspiracy to

violate the FCPA through bribery as follows:

> In or about and between January 2009 and October 2014, both dates
> being approximate and inclusive, within the Eastern District of New
> York and elsewhere, the defendants LOW TAEK JHO, also known
> as "Jho Low," and NG CHONG HWA, also known as "Roger Ng,"
> together with others, did knowingly and willfully conspire to
> commit offenses against the United States, namely:
>
> (a) being an employee and agent of an issuer, and a stockholder
> thereof acting on behalf of such issuer, to corruptly make use of the
> mails and means and instrumentalities of interstate commerce in
> furtherance of an offer, payment, promise to pay, and authorization
> of the payment of any money, offer, gift, promise to give, and
> authorization of the giving of anything of value, to one or more
> foreign officials, and to one or more persons, while knowing that all
> or a portion of such money and thing of value would be and had
> been offered, given, and promised to one or more foreign officials,
> for purposes of: (i) influencing acts and decisions of such foreign
> official in his or her official capacity; (ii) inducing such foreign
> official to do and omit to do acts in violation of the lawful duty of
> such official; (iii) securing any improper advantage; and
> (iv) inducing such foreign official to use his or her influence with a
> foreign government and agencies and instrumentalities thereof to
> affect and influence acts and decisions of such government and
> agencies and instrumentalities, in order to assist Goldman Sachs
> Group and others in obtaining and retaining business, for and with,
> and directing business to, NG, LOW, Goldman and others, contrary
> to the FCPA, Title 15, United States Code, Sections 78dd-1, 78ff(a)
> and 78ff(c)(2)(a); and

5

(b) while in the territory of the United States, to corruptly make use of the mails and means and instrumentalities of interstate commerce or to do any other act in furtherance of an offer, payment, promise to pay, and authorization of the payment of any money, offer, gift, promise to give, and authorization of the giving of anything of value, to one or more foreign officials, and to one or more persons, while knowing that all or a portion of such money and thing of value would be and had been offered, given, and promised to one or more foreign officials, for purposes of: (i) influencing acts and decisions of such foreign official in his or her official capacity; (ii) inducing such foreign official to do and omit to do acts in violation of the lawful duty of such official; (iii) securing any improper advantage; and (iv) inducing such foreign official to use his or her influence with a foreign government and agencies and instrumentalities thereof to affect and influence acts and decisions of such government and agencies and instrumentalities, in order to assist the defendants and others in obtaining and retaining business, for and with, and directing business to, Goldman, NG, LOW and others, contrary to the FCPA, Title 15, United States Code, Sections 78dd-3 and 78ff(a).

In furtherance of the conspiracy and to effect its objects, within the Eastern District of New York and elsewhere, the defendants LOW TAEK JHO, also known as "Jho Low," and NG CHONG HWA, also known as "Roger Ng," together with others, committed and caused the commission of, among others, the following:

(a) In or about late February 2012, LOW, NG, Co-Conspirator #1, 1MDB Official #3 and others met in London to discuss, among other things, the proposed financing for Project Magnolia, during which LOW discussed the need to pay bribes to government officials in Malaysia and Abu Dhabi to gain their approval for Project Magnolia.

(b) In or around early March 2012, LOW, NG, Co-Conspirator #1 and others traveled to Abu Dhabi for meetings with officials of Foreign Agency A and Foreign Investment Firm A to discuss, among other things, the guarantee for Project Magnolia.

(c) On or about March 23, 2012, LOW met with a banker from Foreign Financial Institution A in Los Angeles, California, during which meeting LOW explained Project Magnolia and discussed, among other things, funds from Project Magnolia that would be sent to the Shell Company Account #1 at Foreign Financial Institution A.

(d) On or about March 25, 2012, LOW, NG, Co-Conspirator #1 and others met in Los Angeles, California to discuss, among other things, matters related to Project Magnolia and the acquisition of the Malaysian Energy Company A

(e) On or about March 26, 2012, LOW, Co-Conspirator #1 and others flew on a private jet from Los Angeles, California to Teterboro Airport in Bergen County, New Jersey.

(f) On or about March 26, 2012, LOW, Co-Conspirator #1 and others traveled from Teterboro Airport in Bergen County, New Jersey, to New York, New York, transiting through the Eastern District of New York, to attend a meeting in New York, New York to discuss, among other things, Project Magnolia.

(g) On or about April 21, 2012, LOW, NG and Co-Conspirator #1 traveled to Singapore, where NG and Co-Conspirator #1 met with employees of Foreign Financial Institution A and discussed, among other things, the due diligence that Goldman had done in connection with Project Magnolia.

(h) On or about April 23, 2012, NG and others caused Silken Waters / Victoria Square to be incorporated in the British Virgin Islands under the name Silken Waters Enterprise Limited.

(i) On or about May 24, 2012, NG and others caused the Silken Waters / Victoria Square Account to be opened at a bank in Singapore, and the beneficial owner of the account was listed as a relative of NG.

(j) On or about May 29, 2012, LOW and others caused approximately $158 million traceable to the proceeds of Project Magnolia to be transferred via wire from the Shell Company Account #2 through a U.S. correspondent bank to the Shell Company Account #4.

(k) On or about June 5, 2012, Co-Conspirator #1 sent an email to NG with banking details for the Capital Place Account.

(l) On or about June 14, 2012, NG, Co-Conspirator #1 and others caused approximately $17.5 million traceable to the proceeds of Project Magnolia to be transferred from the Capital Place Account to the Silken Waters / Victoria Square Account.

(m) On or about July 16, 2012, an email account in the name of a close relative of Co-Conspirator #1 sent an email to another email account in the name of the same relative, which contained details of

a transfer of funds to the Silken Waters / Victoria Square Account and the notation "For Roger."

(n) On or about July 16, 2012, NG, Co-Conspirator #1 and others caused approximately $6.9 million traceable to the proceeds of Project Magnolia to be transferred from the Capital Place Account to the Silken Waters / Victoria Square Account.

(o) On or about December 19, 2012, LOW and others caused approximately $5 million traceable to Project Maximus to be transferred from the Shell Company Account #2 to the Capital Place Account.

(p) On or about December 20, 2012, LOW, Co-Conspirator #1 and others caused approximately $1 million traceable to the proceeds of Project Maximus to be transferred from the Capital Place Account to the bank account, for which LOW had made the banking referral, of a company beneficially owned and controlled by 1MDB Official #1.

(q) On or about December 27, 2012, an email account in the name of a close relative of NG sent an email to the account representative for the Silken Waters / Victoria Square Account attaching three invoices for diamonds and other jewelry—one of which was addressed to 1MDB Official #3—and requesting payment to the jeweler in the amount of approximately $300,500.

(r) On or about July 22, 2013, LOW, Co-Conspirator #1 and others caused approximately $6 million traceable to the proceeds of Project Catalyze to be transferred from the Management Company #1 Account to a bank account, for which LOW had made the banking referral, of an entity beneficially owned and controlled by 1MDB Official #3.

(s) On or about July 29, 2013, LOW, Co-Conspirator #1 and others caused approximately $1 million traceable to the proceeds of Project Catalyze to be transferred from the Capital Place Account to the account of a company beneficially owned and controlled by 1MDB Official #2.

(t) On or about September 23, 2013, NG, Co-Conspirator #1 and others caused approximately $6.5 million in funds to be transferred from a bank account held by a close relative of Co-Conspirator #1 to the Silken Waters / Victoria Square Account.

(u) On or about September 24, 2013, NG, Co-Conspirator #1 and others caused approximately $4.2 million in funds traceable to Project Catalyze to be transferred from the Capital Place Account to the Silken Waters / Victoria Square Account.

(v) On or about September 28, 2013, at LOW's request, a high-end New York jeweler ("N.Y. Jeweler #1") met with LOW, Malaysian Official #1 and the wife of Malaysian Official #1 at a hotel in New York, New York to show a pink diamond necklace that N.Y. Jeweler #1 had designed for Malaysian Official #1's wife. Approximately three weeks earlier, the pink diamond necklace was purchased using approximately $27.3. million, which funds were sent from a shell company beneficially owned and controlled by LOW and other co-conspirators.

(w) On or about October 10, 2014, LOW, Co-Conspirator #1 and others caused approximately $4.1 million to be transferred via wire from the Management Company #1 Account to the U.S. bank account of N.Y. Jeweler #1, in part, to pay for certain gold jewelry for the wife of Malaysian Official #1.

Count Two of the Indictment charges the defendant Roger Ng with conspiracy to violate the FCPA through circumvention of internal accounting controls as follows:

In or about and between January 2009 and May 2014, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendant NG CHONG HWA, also known as "Roger Ng," together with others, did knowingly and willfully conspire to commit offenses against the United States, namely, to knowingly and willfully circumvent and cause to be circumvented a system of internal accounting controls at Goldman Sachs Group, contrary to the FCPA, Title 15, United States Code, Sections 78m(b)(2)(B), 78m(b)(5) and 78ff(a).

In furtherance of the conspiracy and to effect its objects, within the Eastern District of New York and elsewhere, the defendant NG CHONG HWA, also known as "Roger Ng," together with others, committed and caused the commission of, among others, the following:

(a) On or about January 15, 2009, a high-ranking official at 1MDB's predecessor entity, TIA, advised LOW, NG and Co-Conspirator #1 that it was "best to get [LOW] involve[d] at every stage" of a TIA transaction that was being handled by Goldman.

(b) On or about January 27, 2009, NG and Co-Conspirator #1 discussed via email whether to disclose to the Intelligence Group at Goldman LOW's involvement in [this transaction] and decided not to make such disclosure.

(c) On or about April 30, 2011, NG, using a private, non-Goldman email account, forwarded an email from LOW to Co-Conspirator #1 at a private, non-Goldman email account, and advised Co-Conspirator #1 "this is Roger FYI." The content of the forwarded email from LOW discussed potential business with 1MDB.

(d) On or about May 5, 2011, LOW emailed NG at a private, non-Goldman email account and requested a document related to potential business with 1MDB, and further directed NG "pls do not state names." NG then forward that email to Co-Conspirator #1 at a private, non-Goldman email account and asked for Co-Conspirator's help with that request.

(e) On or about February 7, 2012, LOW emailed 1MDB Official #3 at a private, non-1MDB email account, copying NG and Co-Conspirator #1 at private, non-Goldman email accounts, as well as another person at an anonymized email account, regarding a draft document in connection with the asset sale related to Project Magnolia. LOW asked NG and Co-Conspirator #1 "Any comments?" and wrote "No name pls."

(f) During a telephone call in mid to late March 2012, Co-Conspirator #1 falsely stated to a senior member of the Intelligence Group at Goldman that LOW was not involved in Project Magnolia.

(g) On or about April 4, 2012, Co-Conspirator #1 falsely stated in a committee meeting at Goldman attended by NG that LOW was not involved in Project Magnolia other than to set up one meeting with an Abu Dhabi official. The meeting was also attended by committee members and others located in New York, New York using Goldman's telecommunication facilities, which transited through the Eastern District of New York.

(h) On or about May 12, 2012, Co-Conspirator #1, using a private, non-Goldman email account, forwarded an email from LOW to NG at a private, non-Goldman email account, which included a timeline related to closing details for Project Magnolia.

(i) On or about May 18, 2012, a member of the Project Magnolia deal team sent an email to the members of two Goldman committees, among others, in which she stated that "we have now completed all committee follow up items," including various approvals.

(j) On or about October 10, 2012, Co-Conspirator #1 falsely stated in a committee meeting at Goldman that LOW was not involved in Project Maximus. The meeting was attended by committee members and others located in New York, New York using Goldman's telecommunication facilities, which transited through the Eastern District of New York.

(k) On or about April 24, 2013, Co-Conspirator #1 falsely stated to a senior employee of Goldman based in New York, New York who was also a member of a committee that reviewed the 1MDB bond transactions, that there was no intermediary involved in any of the three 1MDB bond transactions and, specifically, that LOW was not involved in Projects Magnolia, Maximus or Catalyze.

A. <u>Conspiracy Generally</u>

I will first instruct you on conspiracy.  A conspiracy is a kind of criminal partnership, at the heart of which is an agreement or understanding by two or more persons to violate other laws.

A conspiracy to commit a crime is an entirely separate and different offense from the underlying crime that the conspirators intended to commit.  A conspiracy is in and of itself a crime.  If a conspiracy exists, it is still punishable as a crime, even if it should fail to achieve its purpose or even if it was impossible for them to carry out their plan successfully.

The United States Congress has deemed it appropriate to make conspiracy a separate crime.  That is because collective criminal activity poses a greater threat to the public's

safety and welfare than individual conduct, and increases the likelihood of success of a particular criminal venture.

In this case, the defendant is charged with conspiracy to violate the FCPA, but not the substantive crime of violating the FCPA.

B.   <u>Elements of Conspiracy to Violate the FCPA</u>

To prove the crime of conspiracy to violate the FCPA, the government must prove three elements beyond a reasonable doubt:

<u>First</u>, that two or more persons entered into an agreement to violate the FCPA, a crime I will define for you later in my instructions;

<u>Second</u>, that the defendant knowingly and willfully became a member of the conspiracy; and

<u>Third</u>, that any one of the conspirators—that is, the defendant or any member of the conspiracy—knowingly committed at least one overt act during the life of the conspiracy.

1.   <u>First Element: Existence of the Agreement</u>

The first element that the government must prove beyond a reasonable doubt for Counts One and Two is that two or more persons entered into the charged agreement to violate the FCPA.  One person cannot commit a conspiracy alone.  Rather, the proof must convince you that at least two persons joined together in a common criminal scheme.  The government need not prove that members of the conspiracy met together or entered into any express or formal agreement.  You need not find that the alleged conspirators stated, in words or writing, what the scheme was, its object or purpose, or the means by which the scheme was to be accomplished.  It is sufficient to show that the conspirators tacitly came to a mutual understanding to accomplish an unlawful act by means of a joint plan or common design.

You may, of course, find that the existence of an agreement between two or more persons to violate the law has been established by direct proof. But since, by its very nature, a conspiracy is characterized by secrecy, direct proof may not be available. The government is not required to prove that the conspirators sat around a table and entered into a solemn contract, orally or in writing, stating that they have formed a conspiracy to violate the law, setting forth details of the plans, the means by which the unlawful project is to be carried out or the part to be played by each conspirator. A conspiracy, by its very nature, is almost invariably secret in both origin and execution. Therefore, you may infer the existence of a conspiracy from the circumstances of this case and the conduct of the parties involved.

In a very real sense, then, in the context of conspiracy cases, actions often speak louder than words. In determining whether an agreement existed here, you may consider the actions and statements of all those you find to be participants in the conspiracy as proof that a common design existed to act together for the accomplishment of the unlawful purpose stated in the Indictment.

### 2. Second Element: Membership in the Conspiracy

The second element the government must prove beyond a reasonable doubt for Counts One and Two is that the defendant knowingly and willfully became a member in the charged conspiracy. I have explained to you what it means to act knowingly and willfully. A person acts knowingly and willfully if he acts voluntarily and with a bad purpose either to disobey or disregard the law, and not because of negligence, inadvertence, or mistake. In other words, did the defendant participate in the conspiracy with knowledge of its unlawful purpose and with the intent to promote and cooperate in any one of its unlawful objectives?

Knowledge and willfulness may be inferred from a secretive or irregular manner in which activities are carried out.  Whether a defendant acted knowingly may be proven by the defendant's conduct and by all of the facts and circumstances surrounding the case.

In order for a defendant to be deemed a member of a conspiracy, he need not have had a stake in the venture or its outcome.  While proof of a financial or other interest in the outcome of a scheme is not essential, if you find that a defendant did have such an interest, it is a factor you may properly consider in determining whether or not the defendant was a member of the conspiracy charged in the Indictment.

A defendant's participation in the conspiracy must be established by independent evidence of his own acts or statements, as well as those of the other alleged co-conspirators, and the reasonable inferences that may be drawn from them.

A defendant's knowledge may be inferred from the facts proved.  In that connection, I instruct you that, to become a member of the conspiracy, a defendant need not have been apprised of all of the activities of all members of the conspiracy or know the identities of all members of the conspiracy.  Moreover, a defendant need not have been fully informed as to all of the details, or the scope, of the conspiracy in order to justify an inference of knowledge on his part.  In addition, a defendant need not have joined in all of the conspiracy's unlawful objectives.

The extent or duration of a defendant's participation in a conspiracy has no bearing on the issue of guilt.  In considering whether a defendant participated in a conspiracy, be advised that a conspirator's liability is not measured by the extent or duration of his participation as he need not have been a member of the conspiracy for the entire time of its existence.  In addition, each member of the conspiracy may perform separate and distinct acts and may perform them at different times.  Some conspirators play major roles, while others play minor

14

parts in the scheme.  An equal role is not what the law requires.  Even a single act may be sufficient to draw a defendant within the ambit of the conspiracy.  The key inquiry is simply whether a defendant joined the conspiracy charged with an awareness of at least some of the basic aims and purposes of the unlawful agreement and with the intent to help it succeed.

You may not infer that the defendant is guilty of participating in criminal conduct merely from the fact that he was present at the time the crime was being committed and had knowledge that it was being committed.  Similarly, you may not infer that the defendant was guilty of participating in criminal conduct merely from the fact that he associated with other people who were guilty of wrongdoing.

I caution you that mere knowledge or acquiescence, without participation, in the unlawful plan is not sufficient.  Moreover, the fact that the acts of a defendant, without knowledge, merely happen to further the purposes or objectives of the conspiracy, does not make the defendant a member.  More is required under the law.  What is required is that a defendant must have participated with knowledge of at least some of the purposes or objectives of the conspiracy and with the intention of aiding in the accomplishment of those unlawful ends.  In sum, a defendant, with an understanding of the unlawful character of the conspiracy, must have intentionally engaged, advised, or assisted in it for the purpose of furthering the illegal undertaking.  That defendant thereby becomes a knowing and willing participant in the unlawful agreement—that is to say, a conspirator.

### 3.  Third Element: Overt Act

The third element is the requirement of an overt act.  To sustain its burden of proof with respect to the conspiracies to violate the FCPA charged in Counts One and Two of the Indictment, the government must show beyond a reasonable doubt that at least one overt act was committed in furtherance of each conspiracy by at least one of the co-conspirators—either the

defendant or any other member of the conspiracy.  The defendant need not be the person who committed the act.

As noted previously, Counts One and Two of the Indictment each contain a section that describes certain alleged "overt acts."  But the government does not need to prove any of the specific overt acts alleged in the Indictment.  You may find that overt acts were committed that are not alleged in the Indictment.  Ultimately, the only requirement is that one of the members of the conspiracy—again, not necessarily the defendant—has taken some step or action in furtherance of the conspiracy during the life of that conspiracy.

In other words, the overt act element is a requirement that the agreement went beyond the mere talking stage, the mere agreement stage.  The requirement of an overt act is a requirement that some action be taken during the life of the conspiracy by one of the co-conspirators in order to further that conspiracy.

You need not reach unanimous agreement on whether a particular overt act was committed in furtherance of the conspiracy; you just need to all agree that at least one overt act was committed in furtherance of the conspiracy.

You should also bear in mind that the overt act, standing alone, may be an innocent, lawful act.  Frequently, however, an apparently innocent act loses its harmless character if it is a step in carrying out, promoting, aiding or assisting the conspiratorial scheme. You are therefore instructed that the overt act does not have to be an act that in and of itself is criminal or constitutes an objective of the conspiracy.

C.  Additional Instruction – Conspiracy to Violate the FCPA's Antibribery Provisions

In addition to the three elements described above, the government must also prove beyond a reasonable doubt with regard to Count One, which charges conspiracy to violate the FCPA through bribery, either that the defendant was an officer, director, employee, or agent of

an issuer, or a stockholder thereof acting on behalf of such issuer, or that the defendant was in the territory of the United States when he undertook any act in furtherance of the conspiracy.

a.    <u>Issuer Association</u>

The first way that the government can meet this requirement with regard to Count One is by proving beyond a reasonable doubt that the defendant was an officer, director, employee, or agent of an issuer, or a stockholder acting on behalf of such issuer.

An "issuer" is any company that has a class of securities registered under Section 12 of the Securities Exchange Act of 1934 or is required to file periodic reports with the Securities and Exchange Commission. The Indictment alleges that the Goldman Sachs Group was an "issuer," and whether the Goldman Sachs Group was an "issuer" is a factual question for you to resolve.

The terms "officer," "director," and "employee" have their ordinary meanings.

An "agent" is a person who agrees to perform acts or services for another person or company (known as the "principal"). To create an agency relationship, there must be: (1) a manifestation by the principal that the agent will act for it; (2) acceptance by the agent of the undertaking; and (3) an understanding between the agent and the principal that the principal will be in control of the undertaking. The "undertaking" consists of the acts or services which the agent performs on behalf of the principal. Such control need not be present at every moment; its exercise may be attenuated, and it may even be ineffective. Proof of agency need not be in the form of a formal agreement between agent and principal; rather, it may be inferred

circumstantially and from the words and actions of the parties involved.[1]  One may be an agent for some business purposes and not others.

A "stockholder" is someone who owns a share or shares in a company, especially a corporation.[2]

This requirement may be satisfied if the government proves that the defendant was an officer, director, employee, or agent of an issuer, or a stockholder acting on behalf of such issuer.

        b.      <u>Act in Furtherance Within the Territory of the United States</u>

The second way that the government can meet this requirement with regard to Count One is by proving beyond a reasonable doubt that the defendant, while in the territory of the United States, undertook any act in furtherance of the conspiracy.  The territory of the United States includes the fifty states and the District of Columbia.  Such an act includes the use of the mails or any means or instrumentality of interstate commerce, which I will explain in greater detail below, but it need not be such an act.  Rather, the government may meet its burden as to this requirement if it proves that the defendant, while in the territory of the United States, undertook any act in furtherance of the conspiracy.

****

---

[1]    <u>See</u> <u>Cleveland v. Caplaw Enters.</u>, 448 F.3d 518, 522 (2d Cir. 2006); <u>CutCo Indus. v. Naughton</u>, 806 F.2d 361, 366 (2d Cir. 1986); <u>United States v. Russo</u>, 302 F.3d 37, 45 (2d Cir. 2002).

[2]    <u>See</u> STOCKHOLDER, Black's Law Dictionary (11th ed. 2019) (citing the definition of "SHAREHOLDER").

Please note that the government need not prove this requirement with regard to Count Two, which charges conspiracy to violate the FCPA through circumvention of internal accounting controls, but only with regard to Count One.

<u>Authority</u>

Adapted from <u>Ho</u>; the jury charge of the Hon. Pamela K. Chen, <u>United States v. Juan Angel Napout, et al.</u>, 15-CR-252 (E.D.N.Y. 2017) (hereinafter "<u>Napout</u>"), attached hereto as Exhibit D; the jury charge of the Hon. Janet Bond Arterton in <u>United States v. Lawrence Hoskins</u>, No. 12-CR-238 (JBA) (D. Conn. 2019) (hereinafter, "<u>Hoskins</u>"), attached hereto as Exhibit E; <u>see also</u> the jury charges in <u>Shkreli</u> and <u>Rivera</u>; Sand, <u>et al.</u>, <u>Modern Federal Jury Instructions</u> ("Sand"), Instructions 6-3, 6-4, 19-2, 19-3, 19-4, 19-6, 19-7, 19-10.1.

REQUEST NO. 4

(Counts One and Two – Objects of the Conspiracy – Violating the FCPA)

I will now explain what constitute violations of the antibribery provisions of the FCPA, which are alleged to be the objects of the conspiracy charged in Count One of the Indictment, and what constitutes a violation of the internal accounting controls provision of the FCPA, which is alleged to be the object of the conspiracy charged in Count Two of the Indictment. The objects of a conspiracy are the illegal goal or goals the co-conspirators agree or hope to achieve.

As previously noted, the defendant Roger Ng is not charged with <u>actually committing</u> these unlawful acts, but rather with <u>conspiring</u> to commit them. I therefore describe for you the elements of these unlawful acts only so you can understand what the government must prove was an objective of the conspiracy.[3]

A.    <u>Violation of the FCPA's Antibribery Provisions</u>

The FCPA's antibribery provisions make it a crime for certain individuals to offer to pay, pay, promise to pay, or authorize the payment of money or anything of value to a foreign official for one or more specified business purposes, which I will explain. The two objects of the conspiracy charged in Count One are: (i) violating the FCPA's antibribery provisions as an officer, director, employee, or agent of an issuer, or a stockholder thereof acting on behalf of such issuer (the "Issuer Prong"); and (ii) violating the FCPA's antibribery provisions while in the territory of the United States (the "Territorial Prong").[4]

---

[3]    <u>See</u> Charge of the Hon. Carol Bagley Amon, <u>United States v. Nemorin</u>, No. 03-CR-366 (E.D.N.Y. 2003).

[4]    <u>See</u> <u>United States v. Ho</u>, 984 F.3d 191, 212-13 (2d Cir. 2020); <u>United States v. Hoskins</u>, 902 F.3d 69, 91, 96-97 (2d Cir. 2018).

In considering the two alleged objects of the conspiracy charged in Count One, you should keep in mind that you need not find that the conspirators agreed to accomplish each of these two objects or goals.  Instead, an agreement to accomplish either one of the two objects is sufficient.  However, you must all agree on the specific object or objects the conspirators agreed to try to accomplish, and you may find that they agreed to try to accomplish more than one.  If you find that two or more persons agreed to accomplish either of the two objects charged in Count One, the illegal purpose element will be satisfied, regardless of whether or not that object was in fact accomplished—that is, regardless of whether that goal succeeded.

       1.    <u>Definition and Elements – Object #1 – Issuer Prong</u>

The elements of a violation of the FCPA's antibribery provisions under the Issuer Prong are:

<u>First</u>, at relevant times, an individual was an officer, director, employee, or agent of an issuer, or a stockholder thereof acting on behalf of such issuer;

<u>Second</u>, the individual acted corruptly and willfully;

<u>Third</u>, the individual made use of the mails or any means or instrumentality of interstate commerce, such as email, telephone calls, or text or electronic messages, in furtherance of the offense, or such use of the mails or any means or instrumentality of interstate commerce in furtherance of the offense was reasonably foreseeable to the individual;

<u>Fourth</u>, the individual offered, paid, promised to pay, or authorized the payment of money or a gift or of anything of value;

<u>Fifth</u>, that the offer, promise to pay, or authorization of the payment of money or a gift or anything of value was either (a) to a foreign official, or (b) to any other person or entity while the individual or any member of the alleged conspiracy knew that all or a portion of the payment would be offered, given, or promised, directly or indirectly, to a foreign official;

21

Sixth, that the payment offered, given, promised or authorized was intended for any one of four purposes relevant to this action: (a) to influence any act or decision of a foreign official in his official capacity; (b) to induce—which means to entice or persuade[5]—such a foreign official to do or omit to do any act in violation of the lawful duty of such foreign official; (c) to secure any improper advantage; or (d) to induce such a foreign official to use his or her influence with a foreign government and agencies and instrumentalities thereof to affect and influence acts and decisions of such government and agencies and instrumentalities; and

Seventh, the payment was made to assist the issuer in obtaining or retaining business for or with, or directing business to, any person or company.

a.    First Element – Issuer Association

The first element is that an individual was either an officer, director, employee, or agent of an issuer—here, Goldman Sachs Group—or a stockholder acting on behalf of such issuer—again, Goldman Sachs Group.  I have already defined this element for you in the context of the conspiracy charge, and I instruct you to apply that definition here.

b.    Second Element – "Corruptly" and "Willfully"

The second element is that the individual acted corruptly and willfully.

An act is corruptly done if it is done voluntarily and intentionally and with a bad purpose or evil motive of accomplishing either an unlawful end or result, or a lawful end or result by some unlawful method or means.  The term "corruptly" in the FCPA means that the offer, payment, or promise was intended to induce a foreign official to misuse his or her official position.

---

[5]    See INDUCEMENT, Black's Law Dictionary (11th ed. 2019).

I have already defined the term "willfully," and you are instructed to apply that definition here. I add only that the individual need not have been aware of the specific provision of the law that he is charged with violating, or any other specific provision.

           c.      Third Element – Use of Mails or Instrumentality of Interstate Commerce

The third element is that the individual made use of the mails or any other means or instrumentality of interstate commerce, such as email, in furtherance of the offense, or such use of the mails or any means or instrumentality of interstate commerce in furtherance of the offense was reasonably foreseeable to the individual.

The term "interstate commerce" means trade, commerce, transportation, or communication among the several states, or between any foreign country and any state, or between any state and any place outside thereof, and such term includes intrastate use of (a) telephones or other means of communication, such as email, text messages, electronic messenger applications or faxes, between the states or between the United States and a foreign country, or a transfer of money by wire between states or between the United States and a foreign country; or (b) any other interstate commerce instrumentality.[6] If such mechanisms as trade, transportation, and communication are utilized by persons in goods passing between various states, or between United States and a foreign country, they are instrumentalities of interstate commerce. I instruct you that, as a matter of law, sending an international wire transfer through a U.S. bank constitutes the use of a means or instrumentality of interstate commerce.

It is not necessary for the individual to be directly or personally involved in the charged wire, as long as the wire was reasonably foreseeable in the execution of the alleged

---

[6]     See 15 U.S.C. § 78c(a)(17).

bribery scheme.  A wire may be reasonably foreseeable where, among other circumstances, the use of a wire would occur in the ordinary course of business.[7]

> d.   <u>Fourth Element – Offer, Promise or Payment of Anything of Value</u>

The fourth element is that the individual offered, paid, promised to pay, or authorized the payment of money or a gift or anything of value.  A "thing of value" can take any form, whether cash, check, wire transfer, gifts, donations, contributions, or anything else.  It is not required that the individual provide or offer the thing of value himself.  Rather, a defendant who engages in bribery of a foreign official indirectly, through any other person or entity, is liable under the FCPA just as if the individual himself had engaged in the bribery directly.  Thus, if the individual authorized another person to pay a bribe, that authorization alone is sufficient for you to find that this element has been proved.

Furthermore, it is not necessary that the payment actually take place.  Instead, it is the offer or the authorization that completes the crime.  This element is satisfied if you find that the individual promised or authorized an unlawful payment, even if you believe that the payment was not actually made.  It is sufficient simply if the individual believed that a bribe would be offered or paid or that he promised or authorized the offer or payment.

> e.   <u>Fifth Element – Foreign Official</u>

The fifth element is that the offer to pay, payment, promise to pay, or authorization of payment was to a foreign official, or to any other person or entity, while the

---

[7]    <u>See</u> <u>S.E.C. v. Straub</u>, 2016 WL 5793398, at *11-12 (S.D.N.Y. Sept. 30, 2016) (concluding that, under the FCPA, a "a defendant 'makes use of the mails or any means or instrumentality of interstate commerce' if he acts with the knowledge that the use of the mails will follow in the ordinary course of business, or where such use can be reasonably foreseen, even though not actually intended" (citations and alterations omitted)); <u>accord</u> <u>United States v. Coburn</u>, 439 F. Supp. 3d 361, 371 & n.7 (D.N.J. 2020).

individual knew that all or a portion of the payment or gift would be offered, given, or promised, directly or indirectly, to a foreign official.

I have already defined the term "knowingly," and you are instructed to apply that definition here.  I also add that for purposes of the FCPA, a person's state of mind is knowing with respect to conduct, a circumstance, or result if:  (1) such a person is aware that such person is engaging in such conduct, that such circumstance exists, or that such result is substantially certain to occur; or (2) such person has a firm belief that such circumstance exists or such result is substantially certain to occur.  For purposes of the FCPA, a person is deemed to have knowledge of a circumstance if the evidence shows that he or she was aware of a high probability of the existence of such circumstance, unless he or she actually believes that such circumstance does not exist.

The term "foreign official" means any official or employee of a foreign government, or any department, agency, or instrumentality thereof, or of a public international organization, or any person acting in an official capacity for or on behalf of such government or department, agency or instrumentality thereof, or for or on behalf of any such public international organization.

An "instrumentality" of a foreign government is an entity controlled by the government of a foreign country that performs a function the government treats as its own. State-owned or state-controlled companies that provide services to the public may meet this definition.  To decide if 1Malaysia Development Berhad, or 1MDB, was an "instrumentality" of the Malaysian government and if the International Petroleum Investment Company, or IPIC, and Aabar Investments PJSC were "instrumentalities" of the Abu Dhabi government, you may consider the following factors for the relevant time period:  (1) whether a foreign government

25

had a majority ownership interest in the entity; (2) whether a foreign government had the ability

to appoint or remove members of the board or the ability to hire and fire senior management;

(3) whether any of the entity's profits went to a foreign government or a foreign government

provided financial support to the entity; (4) whether the entity provided a service to the public at

large, including by encouraging economic development or by investing the country's wealth for

future generations; and (5) whether the public and the foreign government generally perceived

the entity to be performing a government function.[8]

These factors are not exclusive, and no single factor will determine whether

1MDB was an instrumentality of the Malaysian government and whether IPIC and Aabar

Investments PJSC were instrumentalities of the Abu Dhabi government.  In addition, you do not

need to find that all the factors listed above weigh in favor of 1MDB, IPIC or Aabar Investments

PJSC being an instrumentality in order to find that 1MDB, IPIC or Aabar Investments PJSC was

an instrumentality.

If you find that 1MDB, IPIC or Aabar Investments PJSC was an instrumentality,

then you must find that the instrumentality's employees were "foreign officials" under the

FCPA.

f.    Sixth Element – Offer, Promise, Payment or Authorization
      Intended for One of the Charged Purposes

The sixth element is that the offer, promise, payment or authorization was

intended for any one of four purposes relevant to this action:  (a) to influence any act or decision

of a foreign official in his official capacity; (b) to induce such a foreign official to do or omit to

do any act in violation of the lawful duty of such foreign official; (c) to secure any improper

---

[8]      See United States v. Esquenazi, 752 F.3d 812, 925-28 (11th Cir. 2014); the jury charge of
the Hon. Jose E. Martinez in United States v. Joel Esquenazi, No. 09-CR-21010 (JEM), ECF
No. 520 at 23-25 (S.D. Fla. 2011).

advantage; or (d) to induce such a foreign official to use his or her influence with a foreign government and agencies and instrumentalities thereof to affect and influence acts and decisions of such government and agencies and instrumentalities.

The offer to pay, payment, promise to pay, or authorization of payment does not need to have been for all of these purposes.  If the offer to pay, payment, promise to pay, or authorization of payment was for any of these purposes, or more than one, this element has been met.

g.      Seventh Element – Obtaining or Retaining Business

The seventh and final element is that the offer, promise, payment or authorization was made to assist the issuer—that is, Goldman Sachs Group—in obtaining or retaining business for or with, or directing business to, any person or company.  "Obtain business" has its normal meaning, that is, to get, to acquire, or to secure a person or company's business.  "Retain business" also has its normal meaning, that is, to keep or continue to have a person or company's business.

It is not necessary that any person or company actually obtained or retained any business as a result of the unlawful offer, payment, promise, or gift, only that the defendant intended to assist the issuer, Goldman Sachs Group, in obtaining or retaining business for or with any person or company.

2.      Definition and Elements – Object #2 – Territorial Prong

The elements of a violation of the FCPA's antibribery provisions under the Territorial Prong are:

First, an individual was not an issuer or a domestic concern;

Second, the individual acted corruptly and willfully;

Third, the individual, while in the territory of the United States, used the mails or any means or instrumentality of interstate commerce, or did any other act, in furtherance of the offense;

Fourth, the individual offered, paid, promised to pay, or authorized the payment of money or a gift or of anything of value;

Fifth, that the offer, payment, promise to pay, or authorization of the payment of money or a gift or anything of value was either (a) to a foreign official, or (b) to any other person or entity while the individual or any member of the alleged conspiracy knew that all or a portion of the payment would be offered, given, or promised, directly or indirectly, to a foreign official;

Sixth, that the payment offered, given, promised or authorized was intended for any one of four purposes relevant to this action: (a) to influence any act or decision of a foreign official in his official capacity; (b) to induce such a foreign official to do or omit to do any act in violation of the lawful duty of such foreign official; (c) to secure any improper advantage; or (d) to induce such a foreign official to use his or her influence with a foreign government and agencies and instrumentalities thereof to affect and influence acts and decisions of such government and agencies and instrumentalities; and

Seventh, the offer, payment, promise or authorization was made to assist the defendant, Low, and others in obtaining or retaining business for or with, or directing business to, any person or company, such as Goldman.

As you can see, many of the same elements that apply to a violation of the FCPA under the Issuer Prong (the first object of the conspiracy) also apply to a violation under the Territorial Prong (the second object of the conspiracy). The main differences are that, under the second object, (i) the individual must have engaged in any act in furtherance of a corrupt

payment, offer, promise, or authorization to pay while in the territory of the United States, and (ii) there is no requirement that the individual made use of the mails or any means or instrumentality of interstate commerce.

a.      First Element – Not an Issuer or Domestic Concern

The first element is that an individual was not himself an "issuer" or a "domestic concern."  I have already defined the term "issuer."  A "domestic concern" is a citizen, national, or resident of the United States at the time of the charged events.  As explained above, even if the individual is not himself an issuer, the individual could still have been an officer, director, employee, or agent of an issuer.

b.      Second Element – "Corruptly" and "Willfully"

The second element is that the individual acted corruptly and willfully.  I have already defined these terms and you are instructed to apply those definitions here.

c.      Third Element – Act in Furtherance Within the Territory of the United States

The third element is that the individual, while in the territory of the United States, made use of the mails or any means or instrumentality of interstate commerce, or did any other act, in furtherance of a corrupt payment or offer.  The territory of the United States includes the fifty states and the District of Columbia.  I explained earlier what it means to make use of the mails or any means or instrumentality of interstate commerce.  Bear in mind that unlike the "issuer" object of the conspiracy, which requires that the individual made use of the mails or any means or instrumentality of interstate commerce, this object of the conspiracy does not require such proof.  Rather, it is sufficient that the individual, while in the territory of the United States, took any act (regardless of whether it involved the mails or any means or instrumentality of interstate commerce) in furtherance of a corrupt offer or payment.

29

       d.       <u>Fourth Element – Offer, Promise or Payment of Anything of Value</u>

The fourth element is that the individual offered, paid, promised to pay, or authorized the payment of money or a gift or anything of value, as I have already defined.  Such offer, payment, promise or authorization need not have occurred in the territory of the United States.

       e.       <u>Fifth Element – Foreign Official</u>

The fifth element is that the offer to pay, payment, promise to pay, or authorization of payment was to a foreign official, or to any other person or entity, while the individual knew that all or a portion of the payment or gift would be offered, given, or promised, directly or indirectly, to a foreign official, as I have defined previously.

       f.       <u>Sixth Element – Purpose of Offer, Payment, Promise or Authorization</u>

The sixth element is that the offer to pay, payment, promise to pay, or authorization of payment was for one or more of the four purposes I outlined previously.

       g.       <u>Seventh Element – Obtaining or Retaining Business</u>

The seventh and final element is that the offer, promise, payment or authorization was made to assist the defendant, Low, and others in obtaining or retaining business for or with, or directing business to, any person or company, such as Goldman, as I have defined earlier.

As I said earlier, it is not necessary that any person or company actually obtained or retained any business whatsoever as a result of an unlawful offer, payment, or gift, only that the defendant intended to assist in obtaining or retaining business for or with any person or company.

****

I remind you that the government need not prove that the defendant actually violated the FCPA antibribery provisions under either the Issuer Prong or the Territorial Prong, which are the unlawful acts charged as the objects of the conspiracy in Count One.   Rather, what the government must prove beyond a reasonable doubt is that the purpose of the conspiracy was to violate the FCPA antibribery provisions and that the defendant knowingly and intentionally joined that conspiracy.

### 3.   Solicitation of Bribe Not a Defense

For the objects of the conspiracy charged in Count One, it does not matter who suggested that a corrupt offer, payment, promise or gift be made.  The FCPA prohibits any corrupt offer or payment or promise or gift, if made for one of the business purposes I described, regardless of who first suggested it.  It is not a defense if the offer or payment or gift was first suggested or requested by someone other than the defendant, or demanded on the part of a foreign official as a price for continuing to do business or for some other benefit, or that the business may have been harmed if the payment or gift was not made.  That the offer to pay, payment, promise to pay, or authorization of payment or gift may have been first suggested by someone else, including the recipient, is not an excuse if you find that the defendant decided to offer or make a corrupt payment, nor does it alter the corrupt purpose with which the offer to pay, payment, promise to pay, or authorization of payment or gift was made.[9]

---

[9]    See United States v. Kozeny, 582 F. Supp. 2d 535, 540 (S.D.N.Y. 2008) ("Thus, while the FCPA would apply to a situation in which a 'payment [is] demanded on the part of a government official as a price for gaining entry into a market or to obtain a contract,' it would not apply to one in which payment is made to an official 'to keep an oil rig from being dynamited,' as example of 'true extortion.' The reason is that in the former situation, the bribe payer cannot argue that he lacked the intent to bribe the official because he made the 'conscious decision' to pay the official. In other words, in the first example, the payer could have turned his back and walked away – in the latter example, he could not.").

B.    Violation of the FCPA – Internal Accounting Controls: Definition and Elements

I'll now turn to Count Two, which, as I previously explained, charges the

defendant with conspiracy to violate the FCPA through the circumvention of internal accounting

controls.  In addition to the antibribery provisions, the FCPA also contains accounting provisions

that are applicable to issuers.  Section 78m(b)(2)(B) of the FCPA is the statute's "internal

accounting controls" provision, which requires that issuers:

> devise and maintain a system of internal accounting controls
> sufficient to provide reasonable assurances that—(i) transactions
> are executed in accordance with management's general or specific
> authorization; (ii) transactions are recorded as necessary (I) to
> permit preparation of financial statements in conformity with
> generally accepted accounting principles or any other criteria
> applicable to such statements, and (II) to maintain accountability
> for assets; (iii) access to assets is permitted only in accordance
> with management's general or specific authorization; and (iv) the
> recorded accountability for assets is compared with the existing
> assets at reasonable intervals and appropriate action is taken with
> respect to any differences.

15 U.S.C. § 78m(b)(2)(B).  The FCPA provides that it is unlawful for any person to knowingly

and willfully circumvent a system of internal accounting controls described in

Section 78m(b)(2)(B).  Under the FCPA, a system of internal accounting controls includes both

controls to ensure that a company's financial statements are prepared in conformity with

generally accepted accounting principles and controls to address the aspect of management

stewardship responsibility that provides shareholders with reasonable assurances that the

business is adequately controlled.[10]  Internal accounting controls under the FCPA therefore

include controls that help ensure that an issuer's financial transactions are executed as authorized

---

[10]    S.E.C. v. World-Wide Coin Invs., Ltd., 567 F. Supp. 724, 749–50 (N.D. Ga. 1983)
("While [the internal accounting controls] requirement is supportive of accuracy and reliability in
the auditor's review and financial disclosure process, this provision should not be analyzed
solely from that point of view.").

by management and that access to the company's assets is permitted only in accordance with management's authorization.[11]

The elements of a violation of the FCPA's internal accounting controls provision, as charged in Count Two of the Indictment, are that an individual, <u>first</u>, acted knowingly and willfully, <u>second</u>, to circumvent an issuer's—in this case, Goldman Sachs Group's—system of internal accounting controls.[12]

    1.    <u>First Element – Knowingly and Willfully</u>

The first element is that an individual acted knowingly and willfully.  I have already defined the terms "knowingly" and "willfully" for you, and you are instructed to apply those definitions here.

    2.    <u>Second Element – Circumvention of Internal Accounting Controls</u>

The second element is that the individual acted to circumvent an issuer's system of internal accounting controls.

To "circumvent" means to avoid a restrictive problem, rule, or other restriction, especially by clever and sometimes dishonest means.[13]

As described above, the system of internal accounting controls are the controls that the issuer—here, Goldman Sachs Group—put in place to provide shareholders with reasonable assurances that the business is adequately controlled.[14]  "Reasonable assurances"

---

[11]    <u>See</u> <u>World-Wide Coin Invs., Ltd.</u>, 567 F. Supp. at 746, 750.

[12]    <u>See</u> ECF No. 83 at 59 ("The FCPA provides that it is unlawful for any person to knowingly and willfully circumvent a system of internal controls.") (citing 15 U.S.C. §§ 78m(b)(5), 78ff(a); <u>United States v. Willig</u>, 568 F. Supp. 2d 1284, 1293 (D. Kan. 2008)).

[13]    <u>See</u> CIRCUMVENT, Black's Law Dictionary (11th ed. 2019).

[14]    <u>See</u> <u>World-Wide Coin Invs., Ltd.</u>, 567 F. Supp. at 750

means a degree of assurance that would satisfy prudent officials in the conduct of their own affairs.[15]  Put another way, internal accounting controls are controls put in place by an issuer to reasonably ensure that the access to and use of its assets were consistent with management's authorization, as well as to maintain accountability for the assets.[16]

****

I remind you that the government need not prove that the defendant actually violated the FCPA's internal accounting controls provision, the unlawful act charged as the object of the conspiracy in Count Two.  Moreover, the government does not need to prove that Goldman Sachs Group had a particular internal accounting control or system of controls in place that the defendant intended to circumvent because, as I previously instructed you, it is not a defense to a conspiracy charge that the object of the conspiracy could not be achieved.[17]  Rather, what the government must prove beyond a reasonable doubt is that the purpose of the conspiracy was to violate the FCPA's internal accounting controls provision and that the defendant knowingly and intentionally joined that conspiracy.

Authority

Adapted from the jury charges in Ho, Lap Seng, and Hoskins; see also the jury charge of the Hon. Theodore D. Chuang in United States v. Mark Lambert, No. 18-CR-12 (TDC) (D. Md. 2019).

---

[15]     See ECF No. 83 at 60 (quoting 15 U.S.C. § 78m(b)(2)(B).

[16]     See ECF No. 83 at 60; see also S.E.C. v. Dauplaise, 2006 WL 449175, at *9 (M.D. Fla. Feb. 22, 2006) ("The internal accounting controls element of a company's control system is that which is specifically designed to provide reasonable, cost-effective safeguards against the unauthorized use or disposition of company assets and reasonable assurances that financial records and accounts are sufficiently reliable for purposes of external reporting.") (quoting World-Wide Coin, 567 F. Supp. at 750).

[17]     Sand, Instruction 19-10.1; United States v. Wallace, 85 F.3d 1063, 1068 (2d Cir. 1996).

REQUEST NO. 5
(Count Three: Conspiracy to Commit Money Laundering)

Count Three of the Indictment charges the defendant Roger Ng with conspiracy to

commit money laundering as follows:

In or about and between January 2009 and October 2014, both dates
being approximate and inclusive, within the Eastern District of New
York and elsewhere, the defendants LOW TAEK JHO, also known
as "Jho Low," and NG CHONG HWA, also known as "Roger Ng,"
together with others, did knowingly and intentionally conspire to:

(a) transport, transmit and transfer monetary instruments and funds
from a place in the United States to and through a place outside the
United States and to a place in the United States from and through a
place outside the United States, (i) with the intent to promote the
carrying on of one or more specified unlawful activities, to wit:
felony violations of the FCPA, Title 15, United States Code,
Sections 78dd-l, 78dd-3, 78m(b)(2)(B), 78m(b)(5) and 78ff(a), and
offenses against a foreign nation involving bribery of a public
official and the misappropriation, theft and embezzlement of public
funds by and for the benefit of a public official, in violation of
Malaysian law, as defined in Title 18, United States Code, Section
1956(c)(7)(B)(iv), contrary to Title 18, United States Code, Section
1956(a)(2)(A); and (ii) knowing that the monetary instruments and
funds involved in the transportation, transmission and transfer
represented the proceeds of some form of unlawful activity, and
knowing that such transportation, transmission and transfer was
designed in whole and in part to conceal and disguise the nature,
location, source, ownership and control of the proceeds of one or
more specified unlawful activities, to wit: felony violations of the
FCPA, Title 15, United States Code, Sections 78dd-l, 78dd-3,
78m(b)(2)(B), 78m(b)(5) and 78ff(a), and offenses against a foreign
nation involving bribery of a public official and the
misappropriation, theft and embezzlement of public funds by and
for the benefit of a public official, in violation of Malaysian law, as
defined in Title 18, United States Code, Section 1956(c)(7)(B)(iv),
contrary to Title 18, United States Code, Section 1956(a)(2)(B)(i);
and

(b) engage in one or more monetary transactions within the United
States involving criminally derived property of a value greater than
$10,000 that was derived from one or more specified unlawful
activities, to wit: felony violations of the FCPA, Title 15, United
States Code, Sections 78dd-l, 78dd-3, 78m(b)(2)(B), 78m(b)(5) and
78ff(a), and offenses against a foreign nation involving bribery of a

35

public official and the misappropriation, theft and embezzlement of public funds by and for the benefit of a public official, in violation of Malaysian law, as defined in Title 18, United States Code, Section 1956(c)(7)(B)(iv), contrary to Title 18, United States Code, Section 1957(a).

A.   Elements of Conspiracy to Commit Money Laundering

To prove the crime of conspiracy to commit money laundering, the government must prove two elements beyond a reasonable doubt:

First, the existence of the conspiracy charged, that is, an agreement or understanding to violate a certain law of the United States; and

Second, that the defendant knowingly and willfully became a member of the conspiracy charged.

I instructed you regarding these two elements in my instructions for Counts One and Two. Those same instructions apply here, as do my instructions for Counts One and Two concerning liability for acts of co-conspirators.

As you heard me say a moment ago, there are only two elements of Count Three. For this conspiracy count, unlike the conspiracies charged in Counts One and Two, you need not find that an overt act was committed by anyone in furtherance of the conspiracy.[18]

B.   Objects of the Charged Conspiracy to Commit Money Laundering

The Indictment alleges three objects of the conspiracy charged in Count Three: (1) to transport, transmit or transfer money internationally with an intent to promote the carrying on of specified unlawful activity, in violation of 18 U.S.C. § 1956(a)(2)(A); (2) to transport, transmit or transfer money internationally knowing that the money represented proceeds from

---

[18]    See Whitfield v. United States, 543 U.S. 209, 219 ("conviction for conspiracy to commit money laundering, in violation of 18 U.S.C. § 1956(h), does not require proof of an overt act in furtherance of the conspiracy").

some form of unlawful activity and knowing that such transportation, transmission and transfer was designed, at least in part, to conceal and disguise the nature, location, source, ownership or control of the proceeds of one or more specified unlawful activities, in violation of 18 U.S.C. § 1956(a)(2)(B)(i); or (3) to engage in a monetary transaction within the United States involving criminally derived property of a value greater than $10,000 that was derived from specified unlawful activity, in violation of 18 U.S.C. § 1957(a).

Thus, the conspiracy charged in Count Three has alleged more than one objective, that is, multiple ways in which the members conspired to commit money laundering. The government need not prove that the defendant entered into an agreement to accomplish all three of the unlawful objectives alleged. If you find unanimously that the defendant agreed to commit any one of these three objectives, then this element would be proved.

As was the case with Counts One and Two, however, the defendant is not charged with any of the substantive money laundering crimes that are the objects of the conspiracy. Remember that conspiracy, standing alone, is a separate crime, even if the conspiracy is not successful and even if you find that the defendant never actually committed the substantive crimes that were the object of the conspiracy.

<u>Authority</u>

Adapted from the jury charges in <u>Ho</u>, <u>Napout</u> and <u>Lap Seng</u>; <u>see also</u> the jury charge of the Hon. Joseph F. Bianco in <u>United States v. Philip Kenner, et al.</u>, No. 13-CR-607 (JFB) (E.D.N.Y. 2015) ("<u>Kenner</u>"); Sand, Instruction 19-2.

REQUEST NO. 6
(Count Three – Objects of the Money Laundering Conspiracy)

I will now explain the elements of each of the three objects of the conspiracy

charged in Count Three.  As was the case for Counts One and Two, I describe for you the

elements of these unlawful acts only so you can understand what the government must prove

beyond a reasonable doubt was an objective of the conspiracy.

In considering the three objects of the conspiracy charged in Count Three, you

should keep in mind that you need not find that the conspirators agreed to accomplish all of the

three objects or goals.  Instead, an agreement to accomplish any one of the three objects is

sufficient.  However, you must all agree on the specific object or objects the conspirators agreed

to try to accomplish, and you may find that they agreed to try to accomplish more than one.  If

you find that two or more persons agreed to accomplish any one of the three objects charged in

Count Three, the illegal purpose element will be satisfied, regardless of whether or not that

object was in fact accomplished—that is, regardless of whether that goal succeeded.

A.    Object #1 – Violation of the Money Laundering Statute – International Transfer to
      Promote Specified Unlawful Activity (§ 1956(a)(2)(A))

The first object of the money laundering conspiracy charged in Count Three of

the Indictment is the transportation, transmission or transfer of funds or monetary instruments to

or from the United States, with an intent to promote certain other crimes, known as specified

unlawful activity.  The relevant statute on this subject is Title 18, United States Code, Section

1956(a)(2)(A), which reads as follows:

> Whoever transports, transmits, or transfers, or attempts to transport,
> transmit, or transfer a monetary instrument or funds from a place in
> the United States to or through a place outside the United States or
> to a place in the United States from or through a place outside the
> United States . . . with the intent to promote the carrying on of
> specified unlawful activity [shall be guilty of a crime].

38

The elements of a violation of this statute are as follows:

First, that an individual transported or transferred or transmitted, or attempted to transport or transfer or transmit, a monetary instrument or funds from a place in the United States to or through a place outside the United States, or to a place in the United States from or through a place outside the United States.

Second, that the individual did so with the intent to promote the carrying on of specified unlawful activity.

1.   First Element – Transportation of a Monetary Instrument or Funds To or From or Through the United States

The first element is that an individual transported or transferred or transmitted, or attempted to transport or transfer or transmit, a monetary instrument or funds from a place in the United States to or through a place outside the United States or to a place in the United States from or through a place outside the United States.

The term "monetary instrument" means coin or currency of the United States or of any other country, travelers' checks, personal checks, bank checks, money orders, investment securities in bearer form or otherwise in such form that title thereto passes upon delivery, and negotiable instruments in bearer form or otherwise in such form that title thereto passes upon delivery. The term "funds" refers to money or negotiable paper which can be converted into currency. For this object of the conspiracy, it does not matter whether the monetary instrument or funds at issue was derived from criminal activity.[19]

---

[19]   See, e.g., United States v. $739,047.03 in U.S. Currency, 103 F. App'x 245, 247 (9th Cir. 2004) ("Promotion of carrying on of bank fraud by attempting to transfer money to a location outside the United States, 18 U.S.C. § 1956(a)(2), does not require the funds in question to be proceeds of prior unlawful activity."); United States v. Dhafir, 2005 WL 8158837, at *1 (N.D.N.Y. Aug. 31, 2005) ("Under 1956(a)(2)(A), then, it is irrelevant whether the funds were derived from a legal or an illegal source provided that the Government proves that the defendant dealt with the funds in a manner intended to promote specified unlawful activity.").

"Transported" or "transferred" or "transmitted" are not words that require a definition; they have their ordinary, everyday meaning.  The individual need not have physically carried funds or monetary instruments in order to prove that he is responsible for transferring or transporting or transmitting.  All that is required is that the individual caused the funds or monetary instrument to be transported or transferred or transmitted by another person or entity. To satisfy this element, the funds or monetary instruments must have been transported, transferred or transmitted from somewhere in the United States to or through someplace outside the United States or to someplace in the United States from or through someplace outside the United States.  This element is satisfied where funds or monetary instruments were transported, transferred or transmitted into or out of United States-based accounts, even where the United States was not the country the funds or monetary instruments were originally coming from or ultimately headed to.[20]

        2.      <u>Second Element – Intent to Promote Specified Unlawful Activity</u>

        a.      <u>Introduction</u>

The second element is that the individual acted with intent to promote the carrying on of one or more crimes, referred to as a "specified unlawful activity" or "SUA."

I instruct you, as a matter of law, that for this object of the conspiracy charged in Count Three, the term "specified unlawful activity" includes:  (i) violations of the FCPA's antibribery provisions, the object of the conspiracy charged in Count One; (ii) violations of the FCPA's internal accounting controls provision, the object of the conspiracy charged in Count

---

[20]    <u>See</u> <u>Ho</u>, 984 F.3d at 203-07 (rejecting the defendant's argument that "the money laundering statute does not cover wire transfers where the United States is neither the point of origination nor the end destination for the money, but is instead just an intermediate stop along the way," and specifically where the defendant used "U.S.-based correspondent accounts").

Two; (iii) bribery of a public official, in violation of one or more of the laws of Malaysia; and (iv) the misappropriation of public funds by or for the benefit of a public official, in violation of one or more of the laws of Malaysia. I have already explained to you the elements of the first two specified unlawful activities: violating the antibribery and internal accounting controls provisions of the FCPA. Shortly, I will explain the elements of the third and fourth specified unlawful activities: bribery of a public official and the misappropriation of public funds by or for the benefit of a public official, in violation of one or more of the laws of Malaysia.

Keep in mind, though, as I instructed earlier with respect to the FCPA, the defendant does not need to be aware of the specific provision or provisions of the law that it was the object of the conspiracy to violate, or any other specific provision, provided that he had knowledge that his conduct was, in a general sense, unlawful. You need not find that these activities actually occurred, but merely that the defendant joined the conspiracy with the objective to promote, facilitate or assist them to occur.

b.   Foreign Bribery and Misappropriation Laws – Malaysia

As noted above, the third and fourth specified unlawful activities involved in the money laundering conspiracy the defendant is charged with are offenses against a foreign nation. Here, the defendant is charged with conspiring to promote the bribery of a public official or the misappropriation of public funds by or for the benefit of a public official, in violation of Malaysian law. I am now going to describe multiple provisions of Malaysian law, but in considering Count Three, you need not find that the defendant intended to promote a violation of all of them. Rather, as I described previously, it is sufficient if you find that he acted with an intent to promote a violation of the FCPA, or a violation of one or more laws of Malaysia, or both.

41

i.      Malaysian Anti-Corruption Commission Act 2009

The Malaysian Anti-Corruption Commission Act 2009, or the Malaysian Anti-Corruption Act, prohibits the bribery of both Malaysian public officials and foreign—that is, non-Malaysian—public officials.

In order to be in violation of Section 21 of the Malaysian Anti-Corruption Act, which prohibits bribery of Malaysian public officers, two elements must be proven:

First, that an individual offered an officer of a public body any gratification.[21] Under Malaysian law, an "officer of a public body" is defined as any person who is a member, an officer, an employee or a servant of a public body, and includes a member of the administration, a member of Parliament, a member of a State Legislative Assembly, a judge of the High Court, Court of Appeal or Federal Court, and any person receiving any remuneration from public funds.[22]  A "public body" includes not only the government of Malaysia, but also any company or subsidiary company over which the government of Malaysia has a controlling power or interest.[23]  "Gratification" means any money, donation, gift, loan, fee, reward, valuable security, property, payment, financial benefit, or any other similar advantage, service, favor or valuable consideration of any kind.[24]  Because an offer is all that is required, it is not necessary that the individual provided the gratification or that the officer accepted the gratification.

Second, that the individual offered the officer of a public body gratification in exchange for the officer either taking an action or declining to take an action in his capacity as such officer.  It is not necessary for the government to prove that the officer actually acted or

---

[21]     Malaysian Anti-Corruption Act § 21.
[22]     Malaysian Anti-Corruption Act § 3.
[23]     Id.
[24]     Id.

declined to act in response to the inducement he received, that the officer accepted the gratification intending to take or decline to take the requested act, or that the officer had the power, right, or opportunity to take or decline to take the requested act.  Moreover, the inducement need not relate to the affairs of the public body itself.  Rather, the element is satisfied if the government proves that the individual offered gratification with the intent to cause the public official to take some action—or decline to take some action—in his capacity as an officer.[25]

In order to be in violation of Section 22 of the Malaysian Anti-Corruption Act, which prohibits bribery of foreign public officials, meaning public officials outside of Malaysia, two elements must be proven:

First, that an individual, either by himself or in conjunction with others, gave, promised or offered, or agreed to give or offer, a foreign public official any gratification, as defined previously, whether for the benefit of that foreign public official or of another person.[26] Under Malaysian law, a "foreign public official" includes any person who holds a legislative, executive, administrative or judicial office of a foreign country, meaning a country outside of Malaysia, whether appointed or elected, or any person who exercises a public function for a foreign country, including a person employed by a board, commission, corporation, or other body or authority that is established to perform a duty or function on behalf of the foreign country.[27]

Second, that the individual gave, promised or offered the foreign public official gratification in exchange for the foreign official (a) using his position to influence any act or

---

[25]     Malaysian Anti-Corruption Act § 21.
[26]     Malaysian Anti-Corruption Act § 22.
[27]     Malaysian Anti-Corruption Act § 3.

decision of the state or organization for which he performs his duties; (b) acting or declining to act regarding any of his official duties; or (c) aiding in procuring or preventing the granting of any contract for the benefit of any person.  As was the case for the bribery of Malaysian officers, it is not necessary for the government to prove that the foreign public official actually accepted the gratification, that the foreign public official actually acted or declined to act in response to the inducement he received, that the foreign public official accepted the gratification intending to take or decline to take the requested act, or that the foreign public official had the power, right, or opportunity to take or decline to take the requested act.  And the inducement need not relate to the scope of the foreign public officer's official duties.  This element is satisfied if the government proves that the individual gave, promised or offered gratification with the intent to cause the foreign public official to influence an official decision, act in his official capacity, or affect the granting of a contract to any person.[28]

Under both Section 21 and Section 22 of the Malaysian Anti-Corruption Act, if it is proven that an individual received or agreed to receive, accepted or agreed to accept, obtained or attempted to obtain, solicited, gave or agreed to give, promised, or offered, any gratification, then there is a rebuttable presumption that the individual acted with corrupt intent.[29]

Section 28 of the Malaysian Anti-Corruption Act also prohibits attempts, preparations, abetments and criminal conspiracies.  If an individual (a) attempts to commit any offense under the Act; (b) does any act in preparation for or in furtherance of any offense under the Act; or (c) abets or is engaged in a criminal conspiracy to commit any offense under the Act, he shall be liable as if he committed the substantive offense.  To prove this violation under

---

[28]     Malaysian Anti-Corruption Act § 22.
[29]     Malaysian Anti-Corruption Act § 50.

Malaysian Law, the government must prove that the individual attempted to bribe a Malaysian public officer or a foreign public official; did something preparatory to or in furtherance of the bribery of a Malaysian public officer or a foreign public official; abetted the bribery of a Malaysian public officer or a foreign public official; or engaged in a criminal conspiracy to bribe a Malaysian public officer or a foreign public official.[30]  Under Malaysian law, "conspiracy" is defined as an agreement between two or more persons to do an illegal act or a legal act through illegal means.[31]  A person "abets" something when he instigates or commands someone to do that thing, or when he intentionally aids the doing of that thing.[32]

ii.    <u>Malaysian Penal Code</u>

The Malaysian Penal Code prohibits the criminal misappropriation of property. Section 403 of the Malaysian Penal Code states that whoever dishonestly misappropriates or converts to his own use, or causes any other person to dispose of, any property, shall be punished.[33]  Here, "dishonestly" means doing something with the intention of causing wrongful gain to one person or wrongful loss to another, irrespective of whether the act causes actual wrongful gain or loss.[34]  "Wrongful gain" means gain by unlawful means of property to which the person gaining is not entitled, and "wrongful loss" is the loss by unlawful means of property to which the person losing it is legally entitled.[35]

---

[30]    Malaysian Anti-Corruption Act § 28.
[31]    Malaysian Anti-Corruption Act § 3; Malaysian Penal Code § 120A.
[32]    Malaysian Anti-Corruption Act § 3; Malaysian Penal Code § 107.
[33]    Malaysian Penal Code § 403.
[34]    Malaysian Penal Code § 24.
[35]    Malaysian Penal Code § 23.

Criminal misappropriation under Malaysian law can be proven by three elements:

First, the thing in question constitutes property.  "Property" means real or personal property of every description, including money, whether situated in Malaysia or elsewhere, whether tangible or intangible.[36]

Second, the individual misappropriated, converted to his own use or caused another person to dispose of such property; and

Third, the individual acted dishonestly, as defined above, in misappropriating, converting to his own use or causing another person to dispose of the property.

Section 109 of the Malaysian Penal Code also punishes anyone who abets any offense under the Code.[37]  A person "abets" something when he instigates or commands someone to do that thing, or when he intentionally aids the doing of that thing.[38]

The Malaysian Penal Code also prohibits criminal conspiracy.  Under Section 120A of the Code, a criminal conspiracy has two elements:

First, an agreement between two or more persons;

Second, to commit, or cause to be committed, an illegal act or an act which is legal by illegal means.[39]  Criminal conspiracy is a standalone crime under Malaysian Law.[40]

In addition, under Section 34 of the Malaysian Penal Code, when a criminal act is done by several individuals in furtherance of a common intention, each such person is liable for that act as if it was done by that person alone.[41]

---

[36]    Malaysian Anti-Corruption Act § 3.
[37]    Malaysian Penal Code § 109.
[38]    Malaysian Penal Code § 107.
[39]    Malaysian Penal Code § 120A.
[40]    Malaysian Penal Code § 120B.
[41]    Malaysian Penal Code § 34.

As I previously instructed you, the fourth specified unlawful activity charged in Count Three is the misappropriation of public funds by or for the benefit of a public official. If after considering the elements of criminal misappropriation of property under Malaysian law, as I have just explained them, you find that there was a conspiracy to misappropriate public funds by or for the benefit of a public official that violated Malaysian law, then the government has proved the fourth specified unlawful activity.

<u>Authority</u>

Adapted from the Malaysian Anti-Corruption Commission Act 2009 §§ 3, 21, 22, 28, 50; Malaysian Penal Code §§ 23, 24, 34, 107, 109, 120A, 120B, 403; <u>see also</u> the jury charges in <u>Ho</u> and <u>Lap Seng</u>; Sand, Instructions 50A-11, 50A-12, 50A-13 and 50A-14.

**B.** Object #2 – Violation of the Money Laundering Statute – Transportation of Monetary Instruments or Funds to Conceal or Disguise Proceeds (§ 1956(a)(2)(B)(i))

The second object of the money laundering conspiracy charged in Count Three of the Indictment is the knowing transportation of funds or monetary instruments to conceal or disguise the origin of the property.  The relevant statute on this subject is Title 18, United States Code, Section 1956(a)(2)(B)(i), which reads as follows:

> Whoever transports, transmits, or transfers, or attempts to transport, transmit, or transfer a monetary instrument or funds from a place in the United States to or through a place outside the United States or to a place in the United States from or through a place outside the United States . . . knowing that the monetary instrument or funds involved in the transportation, transmission, or transfer represent the proceeds of some form of unlawful activity and knowing that such transportation is designed in whole or in part . . . to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity [shall be guilty of an offense].

The elements of a violation of this statute are as follows:

First, that the individual transported or transferred or transmitted, or attempted to transport or transfer or transmit, a monetary instrument or funds from a place in the United States to or through a place outside the United States, or to a place in the United States from or through a place outside the United States.

Second, that the individual did so with the knowledge that the monetary instrument or funds involved represented the proceeds of some form of unlawful activity.

Third, that the individual did so with the knowledge that the transportation, transfer or transmission was designed, in whole or in part, to conceal or disguise the nature, location, source, ownership or control of the proceeds of specified unlawful activity.

1.      First Element – Transportation of a Monetary Instrument or Funds to or From or Through the United States

The first element is that the individual transported or transferred or transmitted, or attempted to transport or transfer or transmit, a monetary instrument or funds from a place in the United States to or through a place outside the United States or to a place in the United States from or through a place outside the United States.

I have previously defined this element for you in the context of the first charged object of the money laundering conspiracy, and I instruct you to apply that definition here.

2.      Second Element – Knowledge that the Property Involved Was the Proceeds of Unlawful Activity

The second element is that the individual knew that the property involved in the transportation, transmission or transfer was the proceeds of some form of unlawful activity.

To satisfy this element, the individual must have known that the property involved in the transaction represented proceeds from some form, though not necessarily which form, of activity that constitutes a felony under state, federal, or foreign law.  I instruct you as a matter of law that the violations of the FCPA and the Malaysian laws previously described are felonies.  The term "proceeds" means any property derived from or obtained or retained, directly or indirectly, through some form of unlawful activity, including the gross receipts of such activity.

The government does not have to prove that the conspirators specifically knew that the property involved in the transportation, transmission or transfer represented the proceeds of any specific offense.  Nor does the government have to prove that the conspirators knew the property involved in the offense in fact was the proceeds of specified unlawful activity, including the violations of the FCPA and Malaysian laws previously described.  Rather, if the government

proves that the individuals agreed to transport, transmit or transfer property they knew to be the proceeds of some illegal activity that was a felony, this element is satisfied.

Keep in mind that it is not necessary for all conspirators to believe that the proceeds came from the same unlawful activity; it is sufficient that each potential conspirator believed that the proceeds came from some unlawful activity.[42]

3.    Third Element – Knowledge of the Unlawful Purpose of the Transportation

The third element is that the individual transported, transferred or transmitted the monetary instruments or funds with knowledge that the transportation, transfer or transmission was designed to conceal or disguise the nature, location, source, ownership, or control of the proceeds of specified unlawful activity.

Proof only that the funds were concealed is not sufficient to satisfy this element. Instead, the purpose of the transportation needs to have been to conceal or disguise the nature, location, source, ownership, or control of the proceeds and that the individual knew that this was the purpose of the transportation.[43]

Authority

Adapted from the jury charge of the Hon. Raymond J. Dearie, United States v. Vitaly Korchevsky, et al., 15-CR-381 (E.D.N.Y. 2018); see also Sand, Instructions 50A-16, 50A-17, 50A-18 and 50A-19.

---

[42]    See United States v. Stavroulakis, 952 F.2d 686, 689 (2d Cir.), cert. denied, 504 U.S. 926 (1992) (money laundering conspiracy even though one conspirator believes proceeds are from narcotics trafficking, and other believes they are from illegal gambling.)

[43]    See United States v. Huezo, 546 F.3d 174, 178-79 (2d Cir. 2008).

C.      Object #3 – Violation of the Money Laundering Statute – Transaction of
        Criminally Derived Proceeds of Specified Unlawful Activity (§ 1957(a))

The third object of the money laundering conspiracy charged in Count Three of

the Indictment is engaging in a monetary transaction within the United States involving

criminally derived property of a value greater than $10,000 that was derived from specified

unlawful activity.  The relevant statute on this subject is Title 18, United States Code, Section

1957(a), which provides, in relevant part:

> Whoever . . . knowingly engages or attempts to engage in a monetary
> transaction in criminally derived property that is of a value greater
> than $10,000 and is derived from specified unlawful activity [and
> does so] in the United States . . . [commits a crime].

The elements of a violation of this statute are as follows:

First, that an individual engaged, or attempted to engage, in a "monetary

transaction" in or affecting interstate commerce;

Second, that the monetary transaction involved criminally derived property of a

value greater than $10,000;

Third, that the criminally derived property was in fact derived from specified

unlawful activity;

Fourth, that the individual acted knowingly, that is, with knowledge that the

transaction involved proceeds of a criminal offense; and

Fifth, that the transaction took place in the United States.[44]

1.      First Element – Engaging in a Monetary Transaction

The first element is that an individual engaged in a monetary transaction in or

affecting interstate commerce.

---

[44]      See United States v. LaSpina, 299 F.3d 165, 182 (2d Cir. 2002).

The term "monetary transaction" means the deposit, withdrawal, transfer, or exchange, in or affecting interstate or foreign commerce, of funds or a monetary instrument by, through, or to a financial institution. The term "financial institution" includes a bank insured by the Federal Deposit Insurance Corporation ("FDIC") and an agency or branch of a foreign bank in the United States.

The term "interstate or foreign commerce" means commerce between any combination of states, territories or possessions of the United States, or between the United States and a foreign country.

You must find that the transaction affected interstate commerce in some way, however minimal. This effect on interstate commerce can be established in several ways. First, any monetary transaction with a bank insured by the FDIC affects interstate commerce, so if you find that that any financial institution involved in the transaction was insured by the FDIC that is enough to establish that the transaction affected interstate commerce. Second, if the source of the funds used in the transaction affected interstate commerce, that is sufficient as well. Third, if the transaction itself involved an interstate transfer of funds, that would also be sufficient.

2.    Second Element – Transaction Involved Criminally Derived Property

The second element is that the monetary transaction involved criminally derived property having a value in excess of $10,000.

The term "criminally derived property" means any property constituting, or derived from, proceeds obtained from a criminal offense. The term "proceeds" has the same meaning as I just explained. To satisfy this element, the government is not required to prove the defendant knew that the offense from which the criminally derived property was derived was

52

specified unlawful activity.[45]  All of the property involved in the transaction need not be criminally derived property.  However, more than $10,000 of the property involved must be criminally derived property.

3.   Third Element – Property Derived from Specified Unlawful Activity

The third element is that the criminally derived property involved in the financial transaction was derived from specified unlawful activity.  I instruct you as a matter of law that violations of the FCPA's antibribery and internal accounting controls are "specified unlawful activities" under the law.  I further instruct you that misappropriation of public funds by or for the benefit of a public official in violation of Malaysian law is also a "specified unlawful activity."

4.   Fourth Element – Knowledge

The fourth element is that the individual knowingly engaged in the monetary transaction involving criminally derived property, as defined above.

I have previously defined the term "knowingly" for you.  I further instruct you that in a prosecution for an offense under this section, the individual does not need to know the particular offense from which the criminally derived property was derived.  However, the individual must know that the transaction involved criminally derived property, which, I remind you, means any property constituting, or derived from, proceeds obtained from a criminal offense.[46]

---

[45]     18 U.S.C. § 1957(c).

[46]     See United States v. Weisberg, 2011 WL 4345100, at *3 (E.D.N.Y. Sep. 15, 2011) (explaining that "Section 1957 requires only that the defendant know that the money 'in' the transaction is 'criminally derived.'  No further mens rea is necessary.").

5.      Fifth Element – Transaction Took Place in the United States

The fifth element is that the transaction took place in the United States.  A

transaction takes place in the United States if it involves the transfer or transmission of funds into

or out of accounts located in the United States.[47]

Authority

Adapted from the jury charges of the Hon. Dora L. Irizarry, United States v. Syed
Imran Ahmed, 14-CR-277 (E.D.N.Y. 2016) and the Hon. Valerie Caproni, United States v.
Sheldon Silver, 15-CR-93 (S.D.N.Y. 2015); see also Sand, Instructions 50A-26–50A-31.

---

[47]      See 18 U.S.C. § 1957(f)(1) (defining the term "monetary transaction" as "including any
transaction that would be a financial transaction under section 1956(c)(4)(B)"); Ho, 984 F.3d at
203-07; United States v. All Assets Held at Bank Julius Baer & Co., Ltd., 571 F. Supp. 2d 1, 14
(D.D.C. 2008) ("Because the term 'monetary transaction' includes a 'financial transaction' as
defined under Section 1956(c)(4)(B), the Court's analysis of the term with respect to its use in
Section 1956(a) is also applicable to Section 1957.").

REQUEST NO. 7
(Conscious Avoidance)

As I explained, for purposes of Counts One, Two and Three, the government is required to prove that the defendant knowingly and intentionally became a member of the conspiracy and that the object of the conspiracy was to:  in Count One, violate the FCPA's antibribery provisions; in Count Two, violate the FCPA's internal accounting controls provision; and in Count Three, commit money laundering.  In determining whether the defendant acted knowingly with respect to the object or objects of the conspiracy, you may consider whether the defendant deliberately closed his eyes to what would otherwise have been obvious to him.

If you find beyond a reasonable doubt that the defendant was aware that there was a high probability that his co-conspirators' objective was to violate the law as charged in Counts One, Two and Three, but that the defendant deliberately avoided confirming this fact, you may treat this deliberate avoidance of positive knowledge as the equivalent of knowledge of the object of the charged conspiracy.  However, if you find that the defendant actually believed that he or his co-conspirators were acting with a lawful purpose with regard to any of the charged counts, he may not be convicted of that count.

Moreover, guilty knowledge may not be established by demonstrating that the defendant was merely negligent, foolish, or mistaken.  There is a difference between knowingly participating in the conspiracy and knowing the objects of the conspiracy.  "Conscious avoidance" or "willful blindness" as I have described it cannot be used as a basis for finding that the defendant knowingly joined the conspiracy.  It is logically impossible for a defendant to join the conspiracy unless he or she knows the fact that the conspiracy exists.

However, if you find beyond a reasonable doubt that the defendant chose to participate in a joint undertaking, you may consider whether the defendant deliberately avoided

confirming an otherwise obvious fact: that the purpose of the partnership he joined was to violate the law.

<u>Authority</u>

Adapted from the jury charges in <u>Lap Seng</u> and of the Hon. Kiyo A. Matsumoto in <u>United States v. Evan Greebel</u>, 15-CR-637 (KAM) (E.D.N.Y. 2017); Sand, Instruction 3A-2. <u>See</u> <u>id.</u> cmt. ("Instruction 3A-2 is appropriate when a defendant has claimed a . . . lack of knowledge as to the unlawful aims of a conspiracy, but the evidence suggests deliberate ignorance.").

"A conscious-avoidance charge is appropriate when (a) the element of knowledge is in dispute, and (b) the evidence would permit a rational juror to conclude beyond a reasonable doubt that the defendant was aware of a high probability of the fact in dispute and consciously avoided confirming that fact." <u>United States v. Hopkins</u>, 53 F.3d 533, 542 (2d Cir. 1995) (citations and internal quotation marks omitted). The Second Circuit has cautioned that "the prosecutor should request that the 'high probability' and 'actual belief' language be incorporated into every conscious avoidance charge." <u>United States v. Feroz</u>, 848 F.2d 359, 360 (2d Cir. 1988) (per curiam) ("[K]nowledge of the existence of a particular fact is established (1) if a person is aware of a high probability of its existence, (2) unless he actually believes that it does not exist."). Second Circuit "precedents establish that the doctrine [of conscious avoidance] may be invoked to prove defendant had <u>knowledge</u> of the unlawful conspiracy. But we do not permit the doctrine to be used to prove intent to participate in a conspiracy. The reason for this distinction is that common sense teaches it is logically impossible to intend and agree to join a conspiracy if a defendant does not know of its existence. Yet once defendant's participation in a conspiracy has been proved, conscious avoidance may properly be used to prove his knowledge of its unlawful objectives." <u>United States v. Reyes</u>, 302 F.3d 48, 54–55 (2d Cir. 2002).

REQUEST NO. 8
(Lawfulness or Benefits of Acts or Goals No Defense)

With respect to all counts, it is not a defense that, had there been no offer or giving of a corrupt payment or offer of payment, the Malaysian public officials or Abu Dhabi public officials might have performed the same act or acts, or that the actions taken by the Malaysian public officials or the Abu Dhabi public officials or the acts that the defendant intended to be taken by them may have been desirable or beneficial to the public or to any particular country, or would not have harmed the public, or any particular country.  Nor is it a defense that the actions taken by the Malaysian public officials or Abu Dhabi public officials as a result in whole or in part of the alleged bribes may have been only the first step in an otherwise lawful or proper process.  The laws in this case are not concerned with the results of an offer or giving of corrupt payments, but rather that such offers and payments not be made.

Authority

Adapted from Ho; see United States v. Alfisi, 308 F.3d 144, 151 (2d Cir. 2003) (a public official acts "corruptly" even where the official's actions were legally correct and benefitted the public) (citing United States v. Manton, 107 F.2d 834, 845 (2d Cir. 1939)); see also City of Columbia v. Omni Outdoor Advertising, Inc., 499 U.S. 365, 378 (1991) ("A mayor is guilty of accepting a bribe even if he would and should have taken, in the public interest, the same action for which the bribe was paid."); United States v. Orenuga, 430 F.3d 1158, 1165 (D.C. Cir. 2005) (proper to charge jury that "[i]t is not a defense to the crime of bribery that had there been no bribe, the public official might have lawfully and properly performed the same act" (internal quotation marks omitted)); United States v. Quinn, 359 F.3d 666, 675 (4th Cir. 2004) ("[I]t does not matter whether the government official would have to change his or her conduct to satisfy the payor's expectations."); United States v. Jannotti, 673 F.2d 578, 601 (3d Cir. 1982) ("it is neither material nor a defense to bribery that had there been no bribe, the [public official] might, on the available data, lawfully and properly have made the very recommendation that [the briber] wanted him to make" (internal quotation marks omitted)).

<u>REQUEST NO. 9</u>
(Venue)

In addition to all of the elements of the crimes charged that I have described for you, you must decide whether each of the three charged crimes occurred, in whole or in part, within the Eastern District of New York.  This is a concept known as "venue."  You are instructed that the Eastern District of New York includes the following counties:  Kings (also known as Brooklyn), Queens, Richmond (also known as Staten Island), Nassau, and Suffolk.  In addition, the Eastern District of New York includes the waters within New York and Bronx Counties, which include the waters surrounding the island of Manhattan that separate Manhattan from the other boroughs of New York City and from the State of New Jersey, as well as the air space above the district or the waters in the district.[48]

To establish that venue for a charged crime is appropriate in this district, the government must prove that some act in furtherance of the crime occurred here, in the Eastern District of New York.  This means that with respect to the crime charged, even if other acts were committed outside this district or if the crime was completed elsewhere, venue is established in the Eastern District of New York so long as some act in furtherance of the crime took place in this district.  Indeed, a defendant need not personally have been present in the district for venue to be proper.  Venue turns on whether any part of the crime or any act in furtherance of the

---

[48]   <u>See</u> 28 U.S.C. § 112(c); <u>see also</u> <u>United States v. Kirk Tang Yuk</u>, 885 F.3d 57, 71 (2d Cir. 2018) (finding the evidence of travel over the concurrent waters "undoubtedly sufficient" to support venue); <u>United States v. Rutigliano</u>, 790 F.3d 389 (2d Cir. 2015) (venue proper where wire in furtherance of scheme traveled through or over waters of Eastern District of New York, which are statutorily defined to be part of the Southern District)

offense was committed in the district.  In a conspiracy, such as those charged in Counts One, Two and Three, actions of coconspirators are sufficient to confer venue.[49]

Venue can be conferred in a number of different ways.  Venue can be conferred based on physical presence or conduct, and passing through a district, including through or over waters, is sufficient to confer venue.[50]  Venue can also be properly based on electronic impulses, including email communications and electronic transfers of funds such as banking transfers, passing through a district.[51]  Venue lies in any district where electronic communications are sent or received[52] and any district through which electronic communications are routed.[53]  Venue is also proper where a telephonic communication in furtherance of a crime was made and where it

---

[49]     See ECF No. 83 at 43 (citing United States v. Kim, 246 F.3d 186, 193 (2d Cir. 2001); United States v. Naranjo, 14 F.3d 145, 147 (2d Cir. 1994)); see also United States v. Svoboda, 347 F.3d 471, 483 (2d Cir. 2003) ("[V]enue is proper in any district in which an overt act in furtherance of [a] conspiracy was committed by any of the coconspirators.").

[50]     See ECF No. 83 at 47 (citing United States v. Duque, 124 F. App'x 447, 449 (2d Cir. 2005); Kirk Tang Yuk, 885 F.3d at 71-72; United States v. Tzolov, 642 F.3d 314, 320 (2d Cir. 2011)).

[51]     See ECF No. 83 at 49 (explaining that an electrical wire or communication passing and/or transiting through the Eastern District of New York is sufficient to confer venue).

[52]     See ECF No. 83 at 44 (citing United States v. Lange, 834 F.3d 58, 70 (2d Cir. 2016), Kim, 246 F.3d at 192-93; United States v. Royer, 549 F.3d 886, 895 (2d Cir. 2008); United States v. Teman, 465 F. Supp. 3d 277, 314 (S.D.N.Y. 2020); United States v. Kenner, 2019 WL 6498699, at *9 (E.D.N.Y. Dec. 3, 2019); United States v. Kubitshuk, 2017 WL 3531553, at *4 (S.D.N.Y. Aug. 17, 2017)).

[53]     See ECF No. 83 at 44 (citing United States v. Brown, 293 F. App'x 826, 829 (2d Cir. 2008); United States v. Peterson, 357 F. Supp. 2d 748, 752 (S.D.N.Y. 2005); United States v. Ohle, 441 F. App'x 798, 802 (2d Cir. 2011); United States v. Goldberg, 830 F.2d 459, 465 (3d Cir. 1987)).

was received.[54]  The government need not prove all of these bases of venue; any one is sufficient.

Unlike the elements I just explained to you that the government must prove beyond a reasonable doubt, the government must prove venue by a preponderance of the evidence, a lesser standard.[55]  To establish a fact by a preponderance of the evidence means to prove that the fact is more likely true than not.  A preponderance of the evidence means the greater weight of the evidence, both direct and circumstantial.

<u>Authority</u>

Adapted from the jury charges in <u>Ho</u> and <u>Napout</u>; <u>see also</u> ECF No. 83 at 40-54.

---

[54]    <u>See</u> ECF No. 83 at 45 (citing <u>Lange</u>, 834 F.3d at 70; <u>United States v. Abdallah</u>, 528 F. App'x 79, 83 (2d Cir. 2013); <u>United States v. Christo</u>, 413 F. App'x 375, 376 (2d Cir. 2011); <u>United States v. Rommy</u>, 506 F.3d 108, 120 (2d Cir. 2007); <u>United States v. Gilboe</u>, 684 F.2d 235, 239 (2d Cir. 1982); <u>Kenner</u>, 2019 WL 6498699, at *5).

[55]    <u>See</u> <u>United States v. Gonzalez</u>, 922 F.2d 1044, 1054-55 (2d Cir. 1991) (affirming that venue is governed by a preponderance standard).

<u>REQUEST NO. 10</u>
(Co-Conspirator Statements and Liability)

The charges against the defendant allege that he participated in a conspiracy.  In that regard, I admitted into evidence against the defendant the acts and statements of others because these acts and statements were committed by persons who, the government charges, were also confederates or co-conspirators of the defendant on trial.

The reason for allowing this evidence to be received against the defendant has to do with the nature of the crime of conspiracy.  A conspiracy is often referred to as a partnership in crime.  Thus, as in other types of partnerships, when people enter into a conspiracy to accomplish an unlawful end, each and every member becomes an agent for the other conspirators in carrying out the conspiracy.

Accordingly, the reasonably foreseeable acts, declarations, statements and omissions of any member of the conspiracy and in furtherance of the common purpose of the conspiracy, are deemed, under the law, to be the acts of all of the members, and all of the members are responsible for such acts, declarations, statements and omissions.

Thus, if you find that the defendant was a member of a criminal conspiracy charged, then any acts done or statements made in furtherance of the conspiracy by persons also found by you to have been members of that conspiracy, may be considered against the defendant.  This is so even if such acts were done and statements were made in the defendant's absence and without his knowledge.

Before you may consider the statements or acts of a co-conspirator in deciding the issue of the defendant's guilt, you must first determine that the acts and statements were made during the existence, and in furtherance, of the unlawful scheme.  If the acts were done or the statements made by someone whom you do not find to have been a member of the conspiracy, or

61

if they were not done or said in furtherance of that conspiracy, they may not be considered by

you as evidence against the defendant as to that conspiracy.

<u>Authority</u>

   Adapted from the jury charges in <u>Rivera</u>, of the Hon. Sterling Johnson, Jr. in <u>United States v. Scalisi</u>, 10-CR-46 (E.D.N.Y.) and of the Hon. Kiyo A. Matsumoto in <u>United States v. Barret</u>, 10-CR-806 (E.D.N.Y.)

REQUEST NO. 11
(Other Persons Not on Trial)

You have heard evidence about the involvement of certain other people in the crimes charged in the indictment.  You may not draw any inference, favorable or unfavorable, towards the government or the defendant from the fact that certain persons are not on trial before you.  That these other individuals are not on trial before you is not your concern.  You should neither speculate as to the reason these other people are not on trial before you nor allow their absence as parties to influence in any way your deliberations in this case.  Nor should you draw any inference from the fact that any other person is not present at this trial.  Your concern is solely the defendant on trial before you.  The possible guilt of others is no defense to a criminal charge.  Your job is to decide if the government has proven this defendant guilty.  Do not let the possible guilt of others influence your decision in any way.  The only issue in this case is whether the government has proven the charges against this defendant beyond a reasonable doubt.

Authority

Adapted from the jury charges in Rivera and Napout; see also Sand, Instruction 2-18 (citing the Sixth Circuit Pattern Criminal Jury Instruction 2.01).

63

<u>REQUEST NO. 12</u>
(Accomplice Testimony)

You have also heard testimony from government witnesses who pled guilty to charges arising out of the same or related facts to this case.  You are instructed that you are to draw no conclusions or inferences of any kind about this defendant's guilt from the fact that any of the prosecution witnesses themselves pled guilty to similar charges.  Those witnesses' decisions to plead guilty were personal decisions about their own guilt.  You may not use it in any way as evidence against this defendant.

You also heard from witnesses who testified that they were themselves involved in many of the charged crimes with the defendant.  Experience will tell you that the government sometimes must rely on the testimony of witnesses who admit participating in criminal activity.  Otherwise, it would be difficult or impossible to detect and prosecute wrongdoers.  The government argues, as it is permitted to do, that it must take the witnesses as it finds them and that people who themselves take part in criminal activity have the knowledge required to show criminal behavior by others.  For that reason, the law allows the use of such testimony.  It is the law in the federal courts that such testimony may be enough, standing alone, for conviction if the jury finds that the testimony establishes guilt beyond a reasonable doubt.

However, because of the interest a cooperating witness may have in testifying, the testimony should be scrutinized with special care and caution.  The fact that the witness may benefit from his cooperation may be considered by you as bearing upon his credibility.

Like the testimony of any other witness, cooperating witness testimony should be given such weight as it deserves in light of the facts and circumstances before you, taking into account the witness's demeanor and candor, the strength and accuracy of the witness's

recollection, his background and the extent to which his testimony is or is not corroborated by other evidence in the case.

You may consider whether a cooperating witness has an interest in the outcome of the case and, if so, whether that interest has affected his testimony. You should ask yourselves whether the witness would benefit more by lying or by telling the truth. Was his testimony made up in any way because he believed or hoped that he would somehow receive favorable treatment by testifying falsely, or did he believe that his interest would be best served by testifying truthfully? If you believe that that witness was motivated by hopes of personal gain, was the motivation one that would cause him to lie or was it one that would cause him to tell the truth? Did this motivation color his testimony? You are the ones to decide that. You are the deciders of the facts.

You have already heard testimony that these cooperating witnesses pled guilty after entering into an agreement with the government to testify. There's also evidence that the government agreed to dismiss some charges against those witnesses or agreed not to prosecute them on other charges in exchange for the witness's agreement to plead guilty and testify against the defendants or otherwise agreed to testify.

The government is allowed to enter into these agreements, and it is not your concern why the government made an agreement with a particular witness or whether you approve or disapprove of the government's tactics. You may, however, consider the effect, if any, that the existence or terms of the agreement may have on the witness's credibility.

The government has also promised to bring the witness's cooperation to the attention of the sentencing Court. When someone cooperates with the government, the government does not determine what sentence they are going to get. Nor does the government

typically make a recommendation to the sentencing judge as to how much time they are going to get.  What the government will do, if it is satisfied with the level of cooperation, is write to the sentencing judge what is known as a 5K letter.  The 5K letter sets forth the cooperating witness' criminal acts as well as the substantial assistance the witness has provided.  I instruct you that the 5K letter does not guarantee the cooperating witness a lower sentence.  This is because the sentencing Court may, but is not required, to take the 5K letter into account when imposing sentence on the cooperating witness.  The Court has discretion, whether or not a 5K letter is written, to impose any reasonable sentence the Court deems appropriate up to the statutory maximum.  The final determination as to the sentence to be imposed rests with the Court, not with the government.  In sum, you should look at all the evidence in deciding what credence and what weight, if any, you want to give the cooperating witness and the 5K.

Authority

Adapted from the jury charges of the Hon. William F. Kuntz, II, United States v. Pagett, 17-CR-306 (E.D.N.Y. 2019) ("Pagett") and of the Hon. Brian M. Cogan in United States v. Joaquin Archivaldo Guzman Loera, 09-CR-466 (S-4) (E.D.N.Y. 2019).

## REQUEST NO. 13
### (Defendant's Interest If Defendant Testifies (if applicable))

In a criminal case, a defendant cannot be required to testify, but, if he chooses to testify, he is, of course, permitted to take the witness stand on his own behalf.  In this case, the defendant decided to testify.  You should examine and evaluate the testimony of the defendant just as you would the testimony of any witness with an interest in the outcome of this case.

### Authority

Adapted from the jury charges in Shkreli and Rivera; Sand, Instruction 7-4.

<u>REQUEST NO. 14</u>
(Interest in Outcome (if applicable))

In evaluating credibility of the witnesses, you should take into account any evidence that the witness who testified may benefit in some way from the outcome of this case. Such an interest in the outcome creates a motive to testify falsely and may sway the witness to testify in a way that advances his own interests. Therefore, if you find that any witness whose testimony you are considering may have an interest in the outcome of this trial, then you should bear that factor in mind when evaluating the credibility of his or her testimony and accept it with great care.

This is not to suggest that every witness who has an interest in the outcome of a case will testify falsely.  It is for you to decide to what extent, if at all, the witness' interest has affected or colored his or her testimony.

<u>Authority</u>

Adapted from the jury charge in <u>Kenner</u>; Sand, Instruction 7-3.

REQUEST NO. 15
(Expert Witnesses)

In this case, I have permitted certain witnesses to express their opinions about matters that are in issue.  A witness may be permitted to testify to an opinion on those matters about which he or she has special knowledge, skill, experience, and training.  Such testimony is presented to you on the theory that someone who is experienced and knowledgeable in the field can assist you in understanding the evidence or in reaching an independent decision on the facts.

In weighing this opinion testimony, you may consider the witness's qualifications, his or her opinions, the reasons for testifying, as well as all of the other considerations that ordinarily apply when you are deciding whether or not to believe a witness's testimony.  You may give the opinion testimony whatever weight, if any, you find it deserves in light of all the evidence in this case.  You should not, however, accept opinion testimony merely because I allowed the witness to testify concerning his or her opinion.  Nor should you substitute it for your own reason, judgment, and common sense.  The determination of the facts in this case rests solely with you.

Authority

Adapted from the jury charges in Shkreli and Rivera; Sand, Instruction 7-21.

REQUEST NO. 16
(Preparation of Witnesses)

You have heard evidence during the trial that witnesses have discussed the facts of the case and their testimony with the lawyers before the witnesses appeared in court.

Although you may consider that fact when you are evaluating a witness's credibility, I should tell you that there is nothing either unusual or improper about a witness meeting with lawyers before testifying so that the witness can be aware of the subjects he will be questioned about, focus on those subjects and have the opportunity to review relevant exhibits before being questioned about them.  Such consultation helps conserve your time and the Court's time.  Indeed, it would be unusual and surprising for a lawyer to call a witness without such consultation.

Again, the weight you give to the fact or the nature of the witness's preparation for his or her testimony and what inferences you draw from such preparation are matters completely within your discretion.

Authority

Adapted from the jury charge in Ho; see also the jury charge of the Hon. Richard J. Sullivan in United States v. Peirce, 06-CR-1032 (S.D.N.Y. 2008).

<u>REQUEST NO. 17</u>
(Use of Evidence Obtained Pursuant to Searches and Seizures)

You have heard testimony about evidence seized in connection with certain searches or seizures conducted by law enforcement officers, and in particular, of email and other electronic evidence obtained pursuant to court-approved search warrants.  Evidence obtained from these searches and seizures was properly admitted in this case, and may be properly considered by you.  Such searches and seizures were entirely appropriate law enforcement actions.  Whether you approve or disapprove of how evidence was obtained should not enter into your deliberations, because I instruct you that the government's use of the evidence is entirely lawful.

You must, therefore, regardless of your personal opinions, give this evidence full consideration along with all the other evidence in the case in determining whether the government has proven the defendant's guilt beyond a reasonable doubt.

<u>Authority</u>

Adapted from the jury charge of the Hon. Katherine B. Forrest, <u>United States v. Levin</u>, 15-CR-101 (S.D.N.Y. 2016).

<u>REQUEST NO. 18</u>
(No Duty to Call Witnesses or Produce Evidence or Use Particular Investigative Techniques)

Although the government bears the burden of proof, and although a reasonable doubt can arise from lack of evidence, you are instructed that there is no legal requirement that the government use any specific investigative techniques or pursue every investigative lead to prove its case.  Therefore, although you are to carefully consider the evidence adduced by the government, you are not to speculate as to why they used the techniques they did or why they did not use other techniques.  The government and its investigative techniques are not on trial.

In this regard, I also charge you that all persons who may have been present at any time or place mentioned in the case, or who may appear to have some knowledge of the issues in this case, need not be called as witnesses.  Nor does the law require that all things mentioned during the course of the trial be produced as exhibits. I remind you, however, that the government bears the burden of proof.

<u>Authority</u>

Adapted from the jury charges in <u>Shkreli</u> and <u>Rivera</u>; Sand, Instruction 4-4; <u>United States v. Saldarriaga</u>, 204 F.3d 50, 52 (2d Cir. 2000) (per curiam); <u>United States v. Knox</u>, 687 F. App'x. 51, 54-55 (2d Cir. Apr. 14, 2017) (summary order).

## REQUEST NO. 19
### (Uncalled Witnesses Equally Available (if applicable))

There are several persons whose names you have heard during the course of the trial but who did not appear here to testify.  I instruct you that each party had an equal opportunity or lack of opportunity to call any of these witnesses.  Therefore, you should not draw any inferences or reach any conclusions as to what they would have testified to had they been called.  Their absence should not affect your judgment in any way.

You should, however, remember my instruction that the law does not impose on a defendant in a criminal case the burden or duty of calling any witness or producing any evidence. The burden of proof to prove the charges beyond a reasonable doubt remains with the government at all times.

### Authority

Adapted from the jury charges in Pagett and Lange; Sand, Instruction 6-7.

REQUEST NO. 20
(Summary Evidence)

Some exhibits were admitted into evidence in the form of charts and summaries.

Those charts and summaries were admitted in order to save the time of reviewing voluminous

records and to avoid inconvenience.  You should consider these charts and summaries the same

way you would any other evidence.

Authority

Adapted from the jury charge in Pagett and of the Hon. Brian M. Cogan in United
States v. Nadeem, 13-CR-424 (E.D.N.Y. 2015); see also Sand, Instruction 5-12.

REQUEST NO. 21
(Redactions)

Among the exhibits received in evidence, there are some documents that are

redacted.  "Redacted" means that part of the document was taken out.  You are to concern

yourself only with the part of the document that has been admitted into evidence.  You should

not consider any possible reason why the other part of it has been redacted.

Authority

Adapted from the jury charge of the Hon. Kimba M. Wood, United States v.

Cespedes-Pena, 14-CR-520 (S.D.N.Y. 2015).

<u>CONCLUSION</u>

The government respectfully requests that the Court include the foregoing in its instructions to the jury.  In addition, the government requests the opportunity to submit further instructions or amend those submitted as appropriate.

Dated:  Brooklyn, New York
       March 18, 2022

                                        Respectfully submitted,

                                        BREON PEACE
                                        United States Attorney

               By:     <u>s/                       </u>
                                        Alixandra E. Smith
                                        Drew G. Rolle
                                        Dylan A. Stern
                                        Assistant U.S. Attorneys

DEBORAH L. CONNOR                JOSEPH BEEMSTERBOER
Chief, Money Laundering and Asset      Acting Chief, Fraud Section
Recovery Section, Criminal Division     Criminal Division
U.S. Department of Justice           U.S. Department of Justice

<u>s/                     </u>          <u>s/                     </u>
Jennifer E. Ambuehl                  Brent Wible
Trial Attorney                       Trial Attorney

cc:     Clerk of the Court (MKB) (by ECF)
        All counsel of record (by ECF)