```
 1    UNITED STATES DISTRICT COURT
      EASTERN DISTRICT OF NEW YORK
 2    ------------------------------x
                                         18-CR-538(MKB)
 3    UNITED STATES OF AMERICA,
                                         United States Courthouse
 4                                       Brooklyn, New York

 5           -versus-                    February 15, 2022
                                         9:30 a.m.
 6    ROGER NG HWA,

 7           Defendant.

 8    ------------------------------x

 9                 TRANSCRIPT OF CRIMINAL CAUSE FOR TRIAL
                    BEFORE THE HONORABLE MARGO K. BRODIE
10                    UNITED STATES DISTRICT JUDGE
                             BEFORE A JURY
11

12    APPEARANCES

13    For the Government:        UNITED STATES ATTORNEY'S OFFICE
                                 Eastern District of New York
14                               271 Cadman Plaza East
                                 Brooklyn, New York 11201
15                               BY:  ALIXANDRA E. SMITH, ESQ.
                                      DREW ROLLE, ESQ.
16                                    DYLAN STERN, ESQ.
                                      BRENT WIBLE, ESQ.
17                                    JENNIFER AMBUEHL, ESQ.
                                 Assistant United States Attorneys
18
      For the Defendant:         BRAFMAN & ASSOCIATES
19                               256 Fifth Avenue
                                 New York, New York 10001
20                               BY:  MARC AGNIFILO, ESQ.
                                      TENY GERAGOS, ESQ.
21                                    ZACH INTRATER, ESQ.
                                      JACOB KAPLAN, ESQ.
22

23    Court Reporter:           Rivka Teich, CSR, RPR, RMR, FCRR
                                 Phone:  718-613-2268
24                               Email:  RivkaTeich@gmail.com

25    Proceedings recorded by mechanical stenography.  Transcript
      produced by computer-aided transcription.
```

A. TAI - DIRECT - MS. SMITH

1              (In open court.)

2              THE COURT:  Criminal cause for trial.  United States

3    vs. Ng, 18-CR-538.  I don't believe the parties need to

4    restate their appearances every day.  The court reporter will

5    note same appearances.

6              (Jury enters the courtroom.)

7              THE COURT:  Please be seated.  Good morning, members

8    of the jury.  I know it was a challenge this morning for some

9    of you it happens from time to time.  Please continue to try

10   to be on time.

11             We'll get started.

12             MS. SMITH:  Your Honor, the Government is going to

13   continue with Andy Tai.  He's in the hallway.

14             THE COURT:  Bring him in, please.

15             (Whereupon, the witness resumes the stand.)

16             THE COURT:  Mr. Tai you're still under oath.  Please

17   continue.

18   ANDY TAI, called as a witness, having been previously first

19   duly sworn/affirmed, was examined and testified as follows:

20   DIRECT EXAMINATION

21   BY MS. SMITH:

22   Q    Good morning, Mr. Tai.

23   A    Good morning.

24   Q    I want to start by following up on a few items from

25   yesterday.  We had talked about the various positions at

A. TAI - DIRECT - MS. SMITH

1    Goldman sort of the analyst, associate, vice president.  Do

2    employees automatically get promoted from one level to the

3    next?

4    A    It's not always the case; the junior levels, yes.  So

5    analyst to associate, associate to vice president more or

6    less, it's based on years of experience.  After that from vice

7    president to 1MDB to partner is performance based.

8    Q    Do the number of employees at each level get smaller as

9    you get higher up in the hierarchy?

10   A    That's correct.

11   Q    So there are a fewer vice presidents than associates, for

12   example?

13   A    In general that's correct, yes, ideally.

14   Q    I think yesterday you said that Goldman had about 40,000

15   employees globally.  Approximately how many of those employees

16   are at the managing director level where you are now?

17   A    I think very low, single percentages of the whole 40,000.

18   Q    We also talked a little bit yesterday about the various

19   compliance functions at Goldman.  Who is an individual named

20   John McGuire?

21   A    John McGuire in the 2012 period was head of compliance

22   for Asia.  He was also one of the co-chairs for our Asia IPIC

23   capital committees.

24   Q    We also talked about how in your time at Goldman Sachs

25   you worked in a number of different offices:  New York,

A. TAI - DIRECT - MS. SMITH

1    Singapore, and Hong Kong.  Did you have any kind of

2    arrangement or agreement with the local office that you were

3    in at various times?

4    A    You mean like a contract?

5    Q    Yes.

6    A    I was contracted to the local entity.

7    Q    What does it mean to be contracted to the local entity?

8    A    So my employment contract will be with the local GS

9    entity that I was assigned with.

10   Q    Is the local GS entity a subsidiary of the public

11   company?

12   A    That's correct.

13   Q    When you are working with the local entity are you still

14   working on behalf of Goldman the public company?

15   A    That's correct.

16   Q    When you interact with employees in other offices or

17   divisions, are you aware necessarily of which subsidiary they

18   are working for at a given time?

19   A    No not really.

20   Q    I'd like you to turn to tab 22 of your binder, which is

21   Government's Exhibit 1766 already in evidence.  If we can just

22   see the bottom e-mail here, where it says March 2, 2012,

23   6:51 p.m.

24        Mr. Tai, is this the bottom e-mail in the chain

25   here?

A. TAI – DIRECT – MS. SMITH

1  A    Yes.

2  Q    Who is this e-mail from?

3  A    At the bottom, right?

4  Q    Yes.

5  A    Gmail account.

6  Q    What is the gmail account that it's from?

7  A    Roger.ng1@gmail.com.

8  Q    Who is it sent to?

9  A    Roger Ng.

10 Q    What is the little brackets next to Roger Ng there?

11 A    Security division.

12 Q    We talked about that yesterday, does that mean it's a

13 Goldman address?

14 A    That's correct.

15 Q    What is the subject line on the bottom e-mail?

16 A    It's a forward.  Project Turin, list of edits.

17 Q    For the record, does it say "forward forward," so two

18 forwards in the subject?

19 A    Yes, that's correct.

20 Q    It says:  Sent from my iPad.  Then it says:  Begin

21 forwarded message.  Do you see that?

22 A    Yes.

23 Q    Can you tell where this message, the bottom here, came

24 from?

25 A    I don't know.

A. TAI – DIRECT – MS. SMITH

1   Q    Then just looking at the message itself, it says:  Please

2   check attached file.  If you can read the first, the number

3   one there?

4   A    Page 13, there is no IPIC guarantee, any amount will be

5   negotiated up front.  So please update slide and also ensure

6   1MDB cash flows reflected can pay the U.S. dollar

7   1.75 billion.

8   Q    Are the other numbers two, three, and four also

9   describing updates?

10   A    That's correct.

11   Q    Can you read the bottom here where it says:  And check

12   through page by page?

13   A    And check through page by page to ensure perfect as per

14   discussed re -- regarding -- utilization of funds, yields, et

15   cetera.  Page comb through.

16   Q    Can we scroll up to the top e-mail?  Who is the top

17   e-mail from?

18   A    Roger Ng.

19   Q    Who is it to?

20   A    To me.

21   Q    Is there a copy?

22   A    And copied to Leissner.

23   Q    Does it have the same sort of subject line there?

24   A    Yes, it does.

25   Q    Can you read what Mr. Ng wrote in the e-mail?

175

A. TAI – DIRECT – MS. SMITH

1    A     Read the e-mail?

2    Q     Yes.

3    A     Andy find some comments which is additive to what Tim has

4    provided.  Please pay me when you get in.  Maybe we can meet

5    and I get the presentations from you.  I'm staying at the

6    Conrad in Singapore.  Also, we should circulate the doc

7    presentation spreadsheets for warrants and 1MDB cash flows to

8    Jasmine once this is finalized.  Best R.

9    Q     What is Mr. Ng asking you to do in this e-mail?

10   A     He's asking me to make some edits to a presentation that

11   we have, and getting copies printed and send it to him.

12   Q     The edits that he's asking for is the edits in the list

13   below that we saw in the e-mail that was forwarded?

14   A     That's correct.

15   Q     If we can go back down to that e-mail one more time.

16         So the edit that he's asking for on page 13, it

17   says:  There is no IPIC guarantee fee.

18         When we were talking about this yesterday, is this

19   where the decision is made that IPIC is going to get warrants

20   instead of a guarantee?

21   A     I don't remember specifically the time, but based on the

22   comments we were to make the changes.

23   Q     If we can look at the presentation itself which starts on

24   page three in the document.  What is the date on the

25   presentation?

A. TAI - DIRECT - MS. SMITH

1    A    March 2012.

2    Q    Just to reorient the jury from yesterday, which of the

3    three deals are we working on in March 2012?

4    A    This would have been the first one, Magnolia.

5    Q    These are edits to a presentation related to Magnolia?

6    A    That's correct.

7    Q    The note, as we said, read page 13.

8              Mr. Youkilis, can we go to page 13 of the PDF that

9    is the presentation, which is page 15 as Government's Exhibit

10   1766?

11             If we look at the notes on the bottom of the slide,

12   what is the last note on the slide say?

13   A    Assumes 1 percent guarantee fee to IPIC.

14   Q    If we go back to the cover e-mail again.  Just scroll

15   down to the bottom one.

16             Is this the update that's being asked to be made to

17   the presentation about the guarantee fee?

18   A    Yes, it looks like it.

19   Q    Again, in the bottom e-mail it says:  Please check page

20   by page.

21             What do you understand that to be a reference to?

22   A    On the bottom right, okay.

23             My understanding is just making sure the four points

24   above are constant or flows through the whole thing to be

25   consistent.

A. TAI – DIRECT – MS. SMITH

1  Q    Turn to tab 23, Government's Exhibit 1785 already in

2  evidence.  What is the date on this e-mail?

3  A    March 5, 2012.

4  Q    Is this also in the Magnolia time period?

5  A    Yes, it is.

6  Q    Who is it an e-mail from?

7  A    Roger.ng1@gmail.com.

8  Q    Who is the e-mail to?

9  A    Me.

10 Q    Just looking at the e-mail, what is it generally asking

11 you to do?

12           THE COURT:  Can you restate the exhibit number?

13           MS. SMITH:  Government's Exhibit 1785.

14           THE COURT:  Thank you.

15 Q    Mr. Tai, what is the e-mail asking you to do?

16 A    Asking me to prepare a board paper for IPIC.  It looks

17 like overview of Project Maximus and Turin as well.

18 Q    If you look at the list of bullets there, what is the

19 third bullet talking about?

20 A    So it's basically the benefits and rationale for why IPIC

21 and Aabar were going to participate and work with 1MDB.

22 Q    This e-mail that we're looking at now and also the last

23 e-mail we were just looking at, both have e-mails from

24 Roger.ng1@gmail.com.  Was it common for Mr. Ng to send you

25 Goldman Sachs related e-mails from his gmail account?

*Rivka Teich CSR RPR RMR FCRR*
*Official Court Reporter*

178

A. TAI - DIRECT - MS. SMITH

1   A    Not common.

2   Q    Did Goldman have a policy regarding the use of personal

3   e-mail accounts for work?

4   A    Yes.

5   Q    What was the policy?

6   A    Not to use it for personal e-mails for work.

7   Q    What was your understanding of why Goldman Sachs had that

8   policy?

9   A    Wanted to make sure any information is kept within the

10  Goldman system and no leaks.

11  Q    What do you mean by any information?

12  A    Any all information relating to business is kept within

13  the Goldman Sachs system.

14  Q    Was your personal e-mail address ever used in connection

15  with conducting work for Goldman?

16  A    I generally tried to avoid it, but yes.

17  Q    What were the circumstances under which your personal

18  e-mail address was used?

19  A    So in Asia clients from time to time like to send e-mails

20  to your personal address.  Usually either initiated by a

21  client and they ask for it.  Or Tim will wrote me in from time

22  to time as well.

23  Q    When you say Tim, who are you referring to?

24  A    Tim Leissner.

25  Q    When you say wrote me in from time to time, what do you

A. TAI - DIRECT - MS. SMITH

1    mean?

2    A    There were instances where he would kind of CC my

3    personal e-mails.

4    Q    What was your practice if someone else e-mailed you or

5    copied you on your personal e-mail address in connection with

6    work at Goldman?

7    A    I would generally tell the client not to do so, or I

8    would generally also have forward the e-mail back into the

9    Goldman system for record keeping.

10   Q    Why would you forward the e-mail back to the Goldman

11   system?

12   A    To make sure I keep all the information within the

13   Goldman Sachs system.

14   Q    Did the personal e-mail address sometimes used by others

15   in connection with your work at Goldman, did that have your

16   name in it?

17   A    Yes.

18   Q    It contained the words Andy and Tai?

19   A    That's correct.

20   Q    Is that e-mail address still an e-mail address that you

21   use?

22   A    Yes.

23   Q    Did you use any other personal e-mail address?  Did any

24   other personal e-mail address get copied in that did not have

25   your name on it?

A. TAI – DIRECT – MS. SMITH

1    A    Can you repeat that?

2    Q    Did any e-mail address for you get copied in for Goldman

3    work that did not have your name on it?

4    A    No.

5    Q    We also talked yesterday about Project Maximus which was

6    the third of the three deals.  When deals close like Program

7    Magnolia Maximus and Catalyze, do the people working on the

8    deal generally celebrate the closing?

9    A    Yes.

10   Q    How do they do that?

11   A    We typically organize a closing dinner, we call it.  And

12   invite clients to the dinner.

13   Q    What is the process for setting up a closing dinner?

14   A    You need to get budget approval, book the restaurant,

15   then send out the invitations.  For Government or any

16   officials we also need to get approval from our compliance

17   group.

18   Q    Why would you need to get approval?

19   A    To make sure we comply with all internal policies

20   especially anti-bribery and SCPA.

21   Q    To celebrate the end of deals, does the deal team itself

22   get together without the client?

23   A    That's not a closing dinner.

24   Q    That's not a closing dinner.

25            I'm going to show you a couple of documents that are

A. TAI - DIRECT - MS. SMITH

1    already in evidence.  I'm going to start with Government's

2    Exhibit 886, which is tab 28 in your binder -- sorry 1886.

3    What is this document?

4    A    It is looks like a meeting invite for, I guess -- sorry,

5    a lunch with the team and 1MDB.

6    Q    What is the subject line of the invitation?

7    A    Lunch with 1MDB team.

8    Q    Where is it going to be located?

9    A    It's restaurant in Hong Kong called Yung Kee on

10   Wellington Street.

11   Q    Do the attendees include yourself, Mr. Ng and

12   Mr. Leissner?

13   A    That's correct.

14   Q    What is the date of the lunch?

15   A    November 12, 2012.

16   Q    Is that shortly after Maximus closed?

17   A    Yes.

18   Q    Then if you can look at Government's Exhibit 1887, which

19   is the next tab, 29.  What is this document?

20   A    It's response to a meeting invite.

21   Q    Who is the response from?

22   A    Roger Ng.

23   Q    What does the response say?

24   A    That he accepted the meeting invite to have lunch with

25   1MDB team.

A. TAI - DIRECT - MS. SMITH

1  Q    Is that the response for the invite that we saw in the

2  document just before 1886?

3  A    Yes, that's correct.

4  Q    Can you also take a look at Government's Exhibit 1885,

5  which is tab 27.  Who is this an e-mail from?

6  A    It is from anti-bribery group.

7  Q    Who is it to?

8  A    Myself.

9  Q    What the date on the e-mail?

10 A    November 11, 2012.

11 Q    The subject line says:  Your meals drinks request has

12 been approved.

13        What is this an approval for?

14 A    The approval to host, organize, a closing dinner for

15 1MDB; specifically to kind of mark the closing of project

16 Greyhound and Maximus.

17 Q    What is the date of the closing dinner going to be?  If

18 we look at the middle of the page --

19 A    12 November.

20 Q    It says:  Description over policy rationale.

21        Where was the dinner going to be located?

22 A    Restaurant Petrus at the Island Shangri-La in Hong Kong.

23 Q    If we look at the guest list below, there is a number of

24 guests from 1MDB; is that right?

25 A    That's correct.

A. TAI - DIRECT - MS. SMITH

1  Q    That includes Terence Geh, Jerome Lee, Jasmine Loo and

2  Vincent Koh.

3  A    That's correct.

4  Q    If we scroll to the next page there is a list of Goldman

5  attendees?

6  A    That's correct.

7  Q    Do those include yourself also Mr. Leissner and Mr. Ng?

8  A    Yes.

9  Q    Again signed on the bottom, if you scroll down, the

10  anti-bribery group.  What is the anti-bribery group again?

11  A    A group within our compliance team to make sure that we

12  comply with all anti-bribery policies.

13  Q    In general, did you receive training on anti-bribery

14  policies?

15  A    Yes.

16  Q    What type of training?

17  A    There will be web sessions where you have to look through

18  content and ask questions and have a quiz to understand the

19  anti-bribery policy.

20  Q    How frequently did have those trainings?

21  A    At least once a year.

22  Q    What is your understanding of why you had those

23  trainings?

24  A    I think it's important to educate bankers about what

25  anti-bribery is, what the policies are so we don't violate any

*Rivka Teich CSR RPR RMR FCRR*
*Official Court Reporter*

A. TAI – DIRECT – MS. SMITH

1    of those rules.

2    Q    As a Goldman employee, were you allowed to personally

3    receive any gift or money in connection with a deal?

4    A    Typically no –– no.  I mean there is a dollar, I think a

5    dollar amount.

6    Q    What do you mean by a dollar amount?

7    A    It's a few dollars.  I think there is an amount, I don't

8    remember what the limit is.  It's very low.

9    Q    When you say very low, what kind of ballpark are we

10   talking about?

11   A    A few dollars, I think ten, 15 very small.

12   Q    Why was it important again for you to get permission for

13   this closing dinner from the anti-bribery group?

14   A    Because 1MDB were Government officials giving into the

15   fund.

16   Q    Why was it important because they were Government

17   officials?

18   A    Because they are Government officials so they fall in the

19   anti-bribery review and Foreign Corrupt Practices Ability

20   review.

21   Q    So if you were putting together an event where you were

22   going to be hosting a client like 1MDB, you would always get

23   permission for that?

24   A    Yes.

25   Q    I have a few more documents that I want you to take a

A. TAI – DIRECT – MS. SMITH

1   look at, marked Government's Exhibit 1937, and then 1967 to

2   1974 for identification.  Those are behind tabs 32, 36 to 42

3   of your binder.

4              THE COURT:  Can you repeat the numbers again?

5              MS. SMITH:  1937, 1967 to 1974.

6              THE COURT:  Thank you.

7   BY MS. SMITH:

8   Q    Do you recognize these documents?

9   A    Yes.

10  Q    Are they all e-mails that you either sent or received

11  related to 1MDB?

12  A    Yes.

13             MR. AGNIFILO:  No objection, your Honor.

14             THE COURT:  They are admitted.

15             (Government Exhibit 1937, 1967- 1974, was received

16  in evidence.)

17  Q    Let's start with Government's Exhibit 1937.  If we can

18  zoom in on the top e-mail just to start.  What is the date on

19  this e-mail?

20  A    November 16, 2013.

21  Q    So in terms of the timeline of the three deals, Magnolia,

22  Maximus, Catalyze, where are we?

23  A    I think those deals were completed.

24  Q    Who is the e-mail to?

25  A    Tim Leissner, Anthony Man, Andrea Vella, Jonathan Donne,

186

A. TAI - DIRECT - MS. SMITH

1   and Cyrus Shey.

2   Q    Are they all people who worked on the 1MDB deals?

3   A    Yes.

4   Q    The subject is 1MDB interest payment?

5   A    Yes.

6   Q    We talked about this yesterday, but once a bond closes

7   are issuers like 1MDB on a schedule for repayment?

8   A    Yes.

9   Q    What happens if they don't pay on time?

10  A    If they don't pay, they are what we call defaulting, they

11  miss their payments.  So the lenders have the right to call

12  default and seize assets from 1MDB.

13  Q    What else could happen in a situation like these deals

14  where there was a guarantee?

15  A    So typically then the lenders will actually go ask for

16  the guarantor, whoever provided the guarantee to repay either

17  the interest or the bonds.

18  Q    For these bonds we talked about, Goldman made the initial

19  purchase of the bonds?

20  A    Yes.

21  Q    Remind us what they did once they purchased the bonds?

22  A    Once we purchased the bonds, then either we repackaged or

23  resold it to other investors.

24  Q    In November 2013, who is holding those bonds?

25  A    It would be the third-party investors.

A. TAI - DIRECT - MS. SMITH

1   Q    If 1MDB misses an interest payment, is it a problem for

2   the third-party investors holding the bonds?

3   A    Yes, it is.

4   Q    Is there any problem with that for Goldman as well?

5   A    Yes, because reputationally we have issues since we were

6   the one who sold the bonds to these third-party investors.

7   Q    What do mean by reputationally?

8   A    These third-party investors come to Goldman because it

9   when they buy these bonds they are assuming that Goldman, that

10  we are not selling bonds that will default, that we are not

11  trying to cut short potential losses.  Right.  That's why it's

12  always good to have that kind of reputation.  So if in the

13  future there is other bond salespeople, investors will come

14  back to Goldman.

15          So it is important for our business to maintain that

16  and to demonstrate to third-party investors that we are

17  selling the bonds that we think will perform or pay their

18  interests, and interests and principals overtime.

19  Q    Was there ever a problem with 1MDB making interest

20  payments on the bonds for the three bond deals?

21  A    From time to time there was some instances where they

22  were late on the interest payments.

23  Q    I want to take a closer look to this e-mail chain.  You

24  were on the top of the e-mail chain; is that right?

25  A    That's correct.

                        A. TAI - DIRECT - MS. SMITH

1    Q    You received everything that is below it.  If we can go

2    to --

3              THE COURT:  You have to answer verbally, not shake

4    your head.  The court reporter has to take down your answer.

5              THE WITNESS:  Okay.  I'm sorry.

6    Q    Did you receive everything under the chain eventually?

7    A    Received, yes.  But the bottom -- the first e-mail wasn't

8    directed to me, but I would have seen it, yes.

9    Q    Let's look at the bottom e-mail to start with on page

10   four.

11   A    Yes.

12   Q    So who is this e-mail from?

13   A    It's from a gentleman Kevin Rainbird.

14              (Continued on next page.)

15

16

17

18

19

20

21

22

23

24

25

189

1    BY MS. SMITH: (Continuing.)

2    Q    Where does Mr. Rainbird work?

3    A    Bank of New York Mellon.

4    Q    What is the email sort of generally talking about?

5    A    It's -- Kevin was telling certain members of the Goldman

6    Sachs team that they haven't received any interest payments on

7    the 1MDB bonds.

8    Q    Okay.  Great.

9          MS. SMITH:  And then if we can scroll up to the next

10   email.

11   BY MS. SMITH:

12   Q    And so who is Anthony Mann?

13   A    Anthony -- Anthony Mann was a member of the team in the

14   securities division.

15   Q    And, again, it has that brackets that says SEC DIV.

16         Does that mean it's a Goldman employee in the

17   securities division?

18   A    That's correct.

19   Q    And so what does he say this payment relates to?

20   A    The -- this payment or the missed payment relates to the

21   Magnolia bonds.

22         MS. SMITH:  And then if we can turn to page 3 of the

23   email at the bottom, Mr. Youkilis, the one from Jonathan

24   Donne.  Great.

25   BY MS. SMITH:

                        Denise Parisi, RPR, CRR
                        Official Court Reporter

1  Q    And so this is also November 16th, 2013, and Mr. Donne

2  copies you into the email chain here; is that right?

3  A    That's correct.

4  Q    What does he say after he says "this is Magnolia"?

5  A    Sorry, repeat that.

6  Q    Can you just read the line that starts with the word

7  "absolutely"?

8  A    Okay.  "Absolutely critical that we chase 1MDB on this

9  today."

10 Q    And, again, what was your understanding of why he was

11 saying it was absolutely critical?

12 A    He was trying to prevent making sure that 1MDB was making

13 the interest payments and the bonds were actually not going to

14 default.

15          MS. SMITH:  And then can we scroll up to the email,

16 sort of, at the top of the page at 9:28.

17 BY MS. SMITH:

18 Q    And what's your response here starting with the word

19 "Terence"?

20          THE COURT:  I believe that's 9:26.

21          MS. SMITH:  9:28 a.m.

22          THE COURT:  Thank you.

23          MS. SMITH:  The one from Andy Tai.

24 A    So Terence said that he gave instructions for the bank

25 transfer on the 11th, and we were trying to get some

Denise Parisi, RPR, CRR
Official Court Reporter

1   confirmation.

2   Q    So what do you remember about trying to track down what

3   was going on with this interest payment?

4   A    So what we were trying to understand from 1MDB, you know,

5   if they were making the interest payments, and they said they

6   have been, so we asked them for the documentation.

7   Q    And, ultimately, do you remember what happened with this

8   particular payment?

9   A    It got paid, yeah.

10  Q    Were there other occasions where you also, sort of, had

11  to go through this process?

12  A    Yes.

13  Q    I also want to talk to you about a few additional emails

14  starting with Government's Exhibit 1968, which is tab 37.

15       What's the date on this email?

16  A    February 12, 2015.

17  Q    So this is also after all three bonds have closed?

18  A    That's correct.

19  Q    Who is it from?

20  A    Yong Hong Lim.

21  Q    And who is Yong Hong Lim?

22  A    He was a member of our BIG team, the business

23  intelligence group.

24  Q    And what does his email say?

25  A    He was forwarding us a news article on the 1MDB.

Denise Parisi, RPR, CRR
Official Court Reporter

```
1    Q    And what's the headline of the article?

2    A    Computers and service all wiped out at 1MDB.

3         MS. SMITH:   Mr. Youkilis, if we can turn to the

4    third page of the document at the bottom.

5    BY MS. SMITH:

6    Q    And so there's a URL here that says

7    www.sarawakreport.org.

8    A    Yes.

9    Q    What's the Sarawak Report?

10   A    It was a news website focused on reporting on Malaysian

11   issues.

12   Q    And what was your understanding of why Yong Hong Lim was

13   forwarding this article to you?

14   A    He was just updating the news team and he said he came

15   across this article.

16        MS. SMITH:   And can we also look at Government's

17   Exhibit 1970 -- 1970, which is behind tab 39.

18        THE WITNESS:  Yes.

19   BY MS. SMITH:

20   Q    And what's date of this email?

21   A    March the 1st, 2015.

22   Q    And who is this email from?

23   A    It's internal, like, computer-generated -- automated

24   email.

25   Q    And it says 1MDB daily alert.
```

Denise Parisi, RPR, CRR
Official Court Reporter

1    A     Yes.

2    Q     What's the daily alert?

3    A     So we have, you know, automated systems where they would

4    scan, you know, the news media internet websites for reports

5    on certain clients and, kind of, cull it and then send it to

6    the new team in an email format.

7    Q     And why were you receiving email updates about 1MDB?

8    A     Because I was -- you know, I worked on the 1MDB

9    transactions.

10   Q     Why was it important for you to know, sort of, what was

11   in the press about 1MDB?

12   A     We do this for, you know, all clients as well.  It's just

13   good to understand what's -- you know, what -- what's the news

14   out there on them.

15   Q     And if you can look at, sort of, the first two headlines

16   there.

17   A     Yes.

18   Q     Can you read the first headline?

19   A     Harrow playboy linked to troubled Malaysian fund.

20   Q     And what's the newspaper for that headline?

21   A     The Sunday Times.

22   Q     And what's the second headline?

23   A     Edge vows to continue reports on 1MDB, businessman Low

24   Taelc Jho.

25   Q     And what's the newspaper there?

1    A    The Straits Times.

2    Q    Do you know what the Edge is?

3    A    The Edge was a local publication focused on business

4    news.

5    Q    When you say "local publication," local to where?

6    A    I think generally they reported on the Singapore,

7    Malaysia news.

8    Q    And would you have reviewed the information in these

9    various articles as the daily reports came in?

10   A    From time to time, I would.  Not always, but, yeah.

11   Q    And, again, why was it important for you to, sort of,

12   understand what was going on with 1MDB in the press?

13   A    Because we worked on the transactions and, you know, it's

14   good to understand what's going on and if there's any impact

15   to Goldman as well.

16   Q    Finally, I would like to have you take a look at a

17   document that we looked at yesterday, which is Government's

18   Exhibit 1867 in evidence.  It's tab 25.

19              THE COURT:  I have 18 --

20              MS. SMITH:   -- 67.

21              THE COURT:  Okay.  Thank you.

22   BY MS. SMITH:

23   Q    And just to recap, we were talking about this email

24   yesterday in connection with Project Maximus; is that right?

25   A    That's correct.

1    Q    And what's the date of the email?

2    A    June 21, 2012.

3    Q    And can you just remind us of just generally what this

4    email was discussing?

5    A    It was highlighting the background of the individuals at

6    1MDB and -- and -- and on eBay.

7    Q    And was it in connection with the BIG's check for Project

8    Maximus?

9    A    That's correct.

10        MS. SMITH:  And if we can just look, Mr. Youkilis,

11   at the top of page 2.

12   BY MS. SMITH:

13   Q    And I think we discussed yesterday your answers at the

14   top here were in response to the questions from Hong Hui Wong;

15   is that right?

16   A    Yes.

17   Q    And that "for number three, no" was in response to the

18   question about whether Jho Low was involved in the

19   transaction?

20   A    That's correct.

21        MS. SMITH:  And so, Mr. Youkilis, can we compare

22   this page 2 to page 9 of Government's Exhibit 1974, which is

23   already in evidence.

24   BY MS. SMITH:

25   Q    And, Mr. Tai, that's tab 42 in your binder.  Sorry, 43 in

Denise Parisi, RPR, CRR
Official Court Reporter

1    your binder.

2    A    Yes.

3    Q    And so we have page 9 of Government's Exhibit 1974 and

4    page 2 of Government's Exhibit 1867 up.

5         Are these both parts of the same email chain?

6    A    Yes, that's correct.

7    Q    And if we're looking at the screen, if we look at the top

8    of the document on the left and the bottom of the document on

9    the right, are those the same portions of the email chain

10   where you're answering the question about Jho Low?

11   A    Yes.

12   Q    And so Government's Exhibit 1974 is just, sort of, a

13   longer version of the chain we looked at yesterday.

14   A    That's correct.

15   Q    Okay.

16        MS. SMITH:  If we can go to page 1 of Government's

17   Exhibit 1974.  And we can take down the first exhibit,

18   Mr. Youkilis.

19        Thanks.

20        And just zoom in on the top three emails, I guess,

21   as much as we can.  There we go.  If we can start with Cherie

22   Er.  I guess just scroll down a little bit at the bottom

23   there.

24   BY MS. SMITH:

25   Q    So what's date on this email?

                        Denise Parisi, RPR, CRR
                        Official Court Reporter

1  A    September 9, 2012.  Sorry, September 10, 2012.

2  Q    And it's a continuation, as we said, of the email chain

3  we were looking at before?

4  A    That's correct.

5  Q    And what does Cherie Er say here?

6  A    That we would need to, you know, finish up the BIG

7  checks, and she checked with BIG -- you know, what the

8  outstanding information they need, and that's the list of

9  individuals they would need to run the background checks as

10 well, especially the ones in red.

11 Q    Why are they sort of continuing to work on the BIG check?

12 A    We need to kind of do a -- make sure that we have a

13 thorough background check for the key individuals involved in

14 any transaction.

15 Q    Can you just remind us of when Project Maximus closes?

16 A    October 17, 2012.

17 Q    Mr. Tai, we're using Government's Exhibit 53 to refresh

18 your recollection?

19 A    That's correct.

20 Q    And so this is prior to close just finishing out all of,

21 sort of, the questions that BIG has?

22 A    Yes.

23        MS. SMITH:  If we can scroll up to the next email.

24 BY MS. SMITH:

25 Q    And is that an email from you?

                    Denise Parisi, RPR, CRR
                    Official Court Reporter

1   A      Yes.

2   Q      Okay.  Do you copy Mr. Leissner and it Mr. Ng into the

3   chain here?

4   A      Yes, I do.

5   Q      And can you read your email for us?

6   A      "Tim, Roger:  Do you have any contacts within Genting to

7   get the IC number CV of the Genting Group Treasurer.  I think

8   it's tricky for 1MDB to ask for it.  Need it to get BIG

9   clearance.  Thanks."

10  Q      Why were you copying Tim and Roger on this email chain?

11  A      Because they had access to Genting and they could ask for

12  it.

13          MS. SMITH:  And then if we can scroll up to the top

14  email.

15  BY MS. SMITH:

16  Q      And so who is this an email from?

17  A      Roger Ng.

18  Q      And the same as we were looking at the email from you

19  before where you're at the top of the chain, if you're at the

20  top, do you, then, get everything underneath it as well?

21  A      Yes.

22  Q      And what does Mr. Ng say in response to your question?

23  A      He replies who the group treasurer is and how to get the

24  information that BIG wants.

25  Q      And who is copied on that email?

                    Denise Parisi, RPR, CRR
                    Official Court Reporter

A. TAI - CROSS - MR. AGNIFILO

1    A    Tim Leissner and myself are copied, but Adrian Seow and

2    Alvin Adisusanto.

3    Q    And then, in general, throughout the chain, as we said,

4    you are going back and forth with BIG on questions.  We talked

5    yesterday about your, sort of, status as a junior member of

6    the team.  In terms of getting answers to these questions,

7    would you then work with more senior members to, sort of,

8    answer BIG's questions and get this closed out?

9    A    For these type of questions, yes.

10            MS. SMITH:  Your Honor, just one moment?

11            THE COURT:  Okay.

12            (Pause.)

13            MS. SMITH:  Thank you, Mr. Tai.

14            Your Honor, we have no further questions.

15            THE COURT:  Okay.  Cross-examination?

16            MR. AGNIFILO:  Yes, Judge.

17    CROSS-EXAMINATION

18    BY MR. AGNIFILO:

19    Q    Good morning, Mr. Tai.

20    A    Good morning.

21    Q    My name is Marc Agnifilo.  I'm Roger Ng's lawyer.

22            I'm going to ask you some questions.  If you don't

23    understand my question, please let me know that you don't

24    understand it, and I will rephrase it for you, okay?

25    A    Thank you.

                    Denise Parisi, RPR, CRR
                    Official Court Reporter

A. TAI - CROSS - MR. AGNIFILO

1    Q    We've never met; right?

2    A    No.

3    Q    And we've never spoken on the phone.

4    A    No.

5    Q    We've never spoken at all.

6    A    No.

7    Q    Okay.  I want to start with where we just left off.

8         MR. AGNIFILO:  If we can pull up Government's

9    Exhibit 1974.

10   BY MR. AGNIFILO:

11   Q    That's the one you were just talking about with AUSA

12   Smith.  We're going to pull that up for you.

13        Do you know --

14        MR. AGNIFILO:  The maiden voyage is always the

15   hardest one, Judge.

16   BY MR. AGNIFILO:

17   Q    You have it in front of you; right?

18   A    1974, yes.

19   Q    That's the one we were just looking at.  And you tell me

20   if this is right.  There's a long string of emails going back

21   and forth, none of which involve Roger Ng; correct?  Until the

22   last one.

23        Take your time.  Take your time.

24   A    That is correct.

25   Q    Okay.  And so you got -- now, since you just looked at

A. TAI - CROSS - MR. AGNIFILO

1   it, what are you guys all discussing generally?  I don't want

2   to go email by email.  Just tell the jury, generally speaking,

3   what are you guys talking about?

4   A    We are working with BIG to make sure that they know what

5   to run for the background checks --

6   Q    Okay.

7   A    -- and any follow-up questions they might have --

8   Q    All right.

9   A    -- and review.

10  Q    And tell me if this is right.  And if we get this up in

11  the meantime, that's great; and if we don't, we're going to do

12  it anyway.

13            MR. AGNIFILO:  We'll put it on the ELMO.

14  BY MR. AGNIFILO:

15  Q    Okay.  We are going to use the ELMO, Judge.

16            THE COURT:  Switch to the ELMO.

17            Pierre, you have to switch to the ELMO.

18            THE COURT:  There you go.

19            MR. AGNIFILO:  There we go.  Okay.  I want the one

20  that the Government just used.  All right.  There we are.

21  Hold on.  We will figure this thing out yet.

22  BY MR. AGNIFILO:

23  Q    Okay.  So you basically say, Tim, Roger -- and that's the

24  first point that you bring Roger into this email chain; right?

25  A    That's correct.

A. TAI - CROSS - MR. AGNIFILO

1    Q    Okay.  And what you want to know is, you want to know, do

2    you have any contacts within Genting to get the IC number CV

3    of the Genting Group Treasurer.

4             What is the IC number?

5    A    Identity card number.

6    Q    Okay.  What is that?

7    A    So, in Malaysia, everyone has a -- it's issued identity

8    card.  It's similar to, like, a passport where it's a unique

9    number to identify individuals.

10   Q    I see.

11            And so you want that, and you also want this CV --

12   the curriculum vitae, like the resume?

13   A    A resume.

14   Q    Yeah, a resume of the Genting Group Treasurer.  Okay.

15            And Roger writes back, he tells you who the group

16   treasure rear is.  It's Azmi bin Abdullah; right?  And he's

17   listed on the senior management list on the website; right?

18   A    Yes.

19   Q    He's talking about a website --

20   A    Yes.

21   Q    -- right?

22   A    That's correct.

23   Q    So what he's telling you is you can get this information

24   on the website; correct?

25   A    That's correct.

Denise Parisi, RPR, CRR
Official Court Reporter

A. TAI – CROSS – MR. AGNIFILO

1   Q    All right.  And then he goes on to say the IC number --

2   which you just told us what that was -- that we have to do a

3   company search, okay?  Do you know what kind of company search

4   he's talking about?

5   A    I think it's -- in Malaysia, there's a registry of

6   companies, because companies need to be registered --

7   Q    Right.

8   A    -- and so you can check the Government database for the

9   company background.

10  Q    And this is something that people can do.  You don't need

11  an in to be able to do that; right?

12  A    I don't know how specific.  There may be, like, a

13  firewall to pay for a fee, but, yes, I think typically you can

14  access it.

15  Q    So if you pay the fee, you can get access to that

16  information; right?

17  A    Yes.

18  Q    Okay.  And so what he's basically telling you is the

19  information that you are looking for is on a website, and you

20  can also pay a fee and access it if this person is part of a

21  public company; right?

22  A    That's correct.

23  Q    Okay.  And that was his only involvement in all of the

24  issues that we looked at in this chain of emails; fair to say?

25  A    I don't know this.  I don't remember if there's

Denise Parisi, RPR, CRR
Official Court Reporter

A. TAI - CROSS - MR. AGNIFILO

1    additional emails in the future --

2    Q    Right.

3    A    -- so based on what I'm seeing now.

4    Q    That's all I'm asking.

5    A    Yeah.

6    Q    On the emails we just talked about in this one particular

7    Government exhibit, you guys are all doing your stuff talking

8    about, you know, BIG and trying to get the deal done, and then

9    there's one issue that comes up about trying to get

10   information about the Genting Treasurer, and Roger tells you

11   there's a website you can look at, and you can also pay money

12   and access this public information; right?

13   A    That's what he's saying on the email, yes.

14   Q    Okay.  Very good.

15            Thank you.

16            All right.  So let me ask you a couple of other

17   questions.

18            Fair to say that Tim Leissner was an aggressive

19   business person in terms of pursuing business and clients; is

20   that fair to say?

21   A    Yes.  Generally, yes.

22   Q    Okay.  And why is that so?  I mean, what in your

23   experience of him makes him an aggressive person in terms of

24   getting clients and business?

25   A    He would like to be in front of clients.  He would like

A. TAI – CROSS – MR. AGNIFILO

1   to interact as much as possible, get meetings, talk to clients

2   as much as possible, and, you know, get mandates.

3   Q    You found him to be a social person?  "Social," like,

4   going out and meeting people.

5   A    Meeting people, yeah.  He liked to meet clients and meet

6   people.

7   Q    And he traveled a lot?

8   A    And he traveled a lot, yes.

9   Q    Would you say he traveled an unusual amount, in your

10  experience?

11  A    I can't -- I don't know all his travel plans.

12  Q    Fair enough.  Fair enough.

13        Fair to say that Leissner developed social

14  relationships as a way of getting new business?

15  A    Yes.

16  Q    Okay.  And how -- from what you could see, how did he go

17  about doing that?  How did he develop social relationships as

18  a way of getting new business?

19  A    That one, I actually don't know because, for me, it's

20  like all of a sudden there's this relationship and -- and the

21  person became a client.  Like, how he did it before, how he

22  knew the person, typically, I actually -- or how he knew a

23  client, I, typically, don't know actually.

24  Q    Have you ever been with him and Jasmine Loo together?

25  A    In meetings, yes.

A. TAI – CROSS – MR. AGNIFILO

1   Q    Have you ever been in situations where it was just you

2   and Tim and Jasmine Loo?

3   A    Yes.

4   Q    All right.  How many times would you say you've been with

5   just you and Tim Leissner and Jasmine Loo?

6   A    Oh, I actually don't know.  I don't remember.

7   Q    Okay.  Do you think it's more than ten?  Less than ten?

8   A    I don't know.  I don't know.

9   Q    That's fine.

10          Did they seem to know each other well?

11  A    Yes.

12  Q    Okay.  Did they seem, from what you were able to observe,

13  to have a close relationship?

14  A    Yes.

15  Q    And it's fair to say that Tim Leissner would often bring

16  issues concerning 1MDB to Jasmine Loo's attention directly;

17  correct?

18  A    From -- there are instances.  I just can't say how often,

19  but, yes, he has done that before.

20  Q    So the question is, something would be going on

21  concerning 1MDB; correct?

22  A    Yes.

23  Q    And Leissner would specifically seek out Jasmine Loo in

24  addressing the issue?

25          MS. SMITH:  Objection, Your Honor.  Personal

A. TAI – CROSS – MR. AGNIFILO

1    knowledge.

2              THE COURT:  Rephrase.

3              MR. AGNIFILO:  Sure.

4    BY MR. AGNIFILO:

5    Q    From what you understand being involved in these deal

6    teams; right?

7    A    (No verbal response.)

8    Q    So what you have to do, just because everything gets

9    written down, so if you're affirming, like, an answer -- or

10   saying no, whatever the answer is -- you have to verbally say

11   the answer.

12   A    I'm sorry.  Yes.  Okay.  Your question?

13   Q    You're doing fine.

14   A    I wasn't sure of your question.

15   Q    So let me -- I gave you a bad question.  Let me start

16   again.  Okay.

17            How many deals did you work on with Tim Leissner,

18   would you say?

19   A    When you -- when you define "deals," is it just

20   transactions we closed or, in general, like, clients, because

21   there were transactions, you know, that we -- there was deals

22   that didn't close -- there were deals that did not involve

23   1MDB, those were deals as well.

24   Q    Yeah, yeah, all the deals.

25   A    A few.  I don't remember how many.

                    Denise Parisi, RPR, CRR
                    Official Court Reporter

A. TAI - CROSS - MR. AGNIFILO

1  Q    Okay.  Would you say it's more than ten?

2  A    No.

3  Q    Less than ten?

4  A    I think so.  I think -- I think it's generally less than

5  ten.

6  Q    Okay.  So you were involved with Leissner in the three

7  1MDB bond deals that you talked about on direct examination;

8  is that correct?

9  A    That's correct.

10 Q    What other deals can you think of sitting here today that

11 you worked on with Tim Leissner other than the three 1MDB

12 deals?

13 A    The three 1MDB acquisitions.

14 Q    Yep.

15 A    Deals -- one deal was the lottery business we talked

16 about previously.  It's a deal, but we didn't close, so that's

17 why I wasn't sure how we defined a deal.

18 Q    That's okay.

19 A    So that stands out.  And I'm sure there were other

20 clients that we worked on together.  I just don't remember how

21 many.

22 Q    Did you work on the Astro initial public offering with

23 Leissner?

24 A    No, I did not.

25 Q    Did you work on anything involving Ananda Krishnan with

A. TAI - CROSS - MR. AGNIFILO

1  Leissner?

2  A    Well, Project Turin which was the power asset was --

3  Project Turin involved Ananda Krishnan because he was the

4  seller of the assets.

5  Q    Now, from what you were able to observe, have you

6  observed Leissner bring things to Jasmine Loo's attention when

7  it concerned 1MDB?

8  A    Yes, he has done that before.

9  Q    Fair to say that -- and you worked with Roger Ng quite a

10 bit as well; correct?

11 A    That's correct.

12 Q    Fair to say Roger Ng was a far less aggressive business

13 person than Tim Leissner?

14 A    In -- yes -- yes, more approachable.

15 Q    Roger was more approachable?

16 A    Yes.  So -- yes.

17 Q    Okay.  What do you mean by that?  When you say that Roger

18 was more approachable, just tell the jury what you're talking

19 about.

20 A    So I think in terms of wanting to meet clients, they

21 were -- probably, you know, have the drive to want to meet

22 clients and find businesses.  Where I think the difference,

23 from my perspective, was, Tim was more insistent in terms of

24 tone and, kind of, talking to people; whereas, Roger was more

25 thoughtful and, I would say, gentle.  Maybe the right way is

A. TAI - CROSS - MR. AGNIFILO

1  gentle.  That's why I'm saying more approachable.

2  Q    You use the word "gentle."  Tell us how Roger was gentle

3  in your experience.

4              MS. SMITH:  Objection, Your Honor.

5              THE COURT:  Basis?

6              MS. SMITH:  Just relevance.

7              THE COURT:   Overruled.

8              Go ahead.

9  BY MR. AGNIFILO:

10  Q    Go ahead.  Please tell us how Roger was gentle.

11  A    Roger was more gentle in the sense that he was not too --

12  he liked to seek opinions.  He was thoughtful and -- he didn't

13  just stamp down his -- you know, his own kind of thoughts.

14  Q    He was open-minded?

15  A    He was open-minded, yes.

16  Q    He would talk to a lot of people?

17  A    He would talk to a lot of people.

18  Q    In your experience, was he kind?

19  A    He was kind, yes.

20  Q    Now, Roger was a specialist on topics concerning

21  Malaysia; fair to say?

22  A    Yes, that's correct.

23  Q    He was from Malaysia; you know that.

24  A    Yes.

25  Q    And tell me if this is right.  And I might not have all

A. TAI - CROSS - MR. AGNIFILO

1  the terms right, so if I say something wrong, you will correct

2  me, and I will appreciate that.

3          Fair to say that the -- let's just talk about the

4  first 1MDB deal -- Magnolia -- okay?

5          There were issues that had to be addressed with the

6  Malaysian Central Bank; am I right?

7  A    That's correct.

8  Q    Okay.  And do you recall what those were?

9  A    I don't -- not all of it.

10 Q    At a high level.  We will use that high-level talk.  At a

11 high level.

12 A    The main thing that comes to mind, if that's okay, is,

13 obviously, it's a Malaysian Government, and the deal that is

14 involved, we wanted to make sure that the Central Bank was

15 aware of this, because -- because 1MDB was owned by the

16 Malaysian Government.

17 Q    Okay.  And so tell me if this is right.

18         Okay.  You guys were raising funds -- forget "you

19 guys."  So Ananda Krishnan is selling his power assets;

20 correct?

21 A    (No verbal response.)

22 Q    And that company is --

23 A    Tanjong, PLC.

24 Q    Tanjong.  Tanjong.

25         So he's selling Tanjong; correct?

Denise Parisi, RPR, CRR
Official Court Reporter

A. TAI – CROSS – MR. AGNIFILO

1    A    (No verbal response.)

2    Q    You just have to answer yes.

3    A    Yes, yes.  I'm sorry.

4    Q    All right.

5         And 1MDB is buying the power plants from Ananda;

6    correct?

7    A    That's correct.

8    Q    In the overall view -- tell me if this is right -- money

9    was being raised in two different currencies; correct?

10   A    For Tanjong PLC.

11   Q    Yes.

12   A    Yes, correct, yes.

13   Q    So money was being raised in U.S. dollars; correct?

14   A    That's correct.

15   Q    And money was being raised in Malaysian ringgit; correct?

16   A    That's correct.

17   Q    Were you, as a Goldman Sachs person on the deal team,

18   involved in any way in the ringgit raise?

19   A    We tried to be helpful in terms of sharing some of our

20   diligence, because we advised on the acquisition, so we knew

21   the assets operating and stats and some of the stuff fairly

22   well.

23   Q    Right.

24   A    So, yes, we tried to help in terms of giving -- sharing

25   some of that diligence information --

Denise Parisi, RPR, CRR
Official Court Reporter

A. TAI – CROSS – MR. AGNIFILO

1    Q    All right.

2    A    -- for the raising of the ringgit.

3    Q    Very good.

4              All right.  So just so we all understand this --

5    because this is not something a lot of people are familiar

6    with -- so money is being raised in the United States dollars;

7    right?

8    A    Yes.

9    Q    Simultaneously, money is being raised in Malaysian

10   ringgit; right?

11   A    That's correct.

12             (Continued on the following page.)

13

14

15

16

17

18

19

20

21

22

23

24

25

1    BY MR. AGNIFILO:

2    Q    And all of the money together, the dollars and the

3    ringgit, are going to go basically for the transaction for the

4    power plants?

5    A    That was our understanding then, yes.

6    Q    All right.  Now, when that happens, tell me if this is

7    right, the Malaysia Central Bank will play a role in approving

8    or not approving or making things more difficult about this

9    transaction; is that fair to say?

10   A    I don't remember that.

11   Q    All right.  Do you remember specifically Roger Ng having

12   to deal with issues concerning the Malaysia Central Bank in

13   connection with Project Magnolia?

14   A    I remember like we had to deal with the central bank.  I

15   don't remember what the issues were.

16   Q    Okay.  And tell me if this is right --

17   A    Okay.

18   Q    -- part of the reason you don't remember what the issues

19   were is because he was dealing -- Roger Ng was dealing with

20   the issues?

21   A    That's correct.  He was involved.  I mean, he was

22   involved.

23   Q    Yeah.  All right.  You -- you're not -- you're not

24   Malaysian; correct?

25   A    That's correct.  I am not.

Michele Lucchese, RPR, CRR

215

1   Q    Okay.  And you don't have tremendous experience dealing

2   with the Malaysia central bank?

3   A    That is correct.

4   Q    But was it your understanding that he was Malaysia, first

5   of all?

6   A    Yes.

7   Q    And that he had dealt with the Malaysian Central Bank in

8   the past?

9   A    That's correct.

10  Q    So he was helpful to the deal team; correct?

11  A    Yes.

12  Q    All right.  Okay.  You talked yesterday about the term

13  intermediary?

14  A    Yes.

15  Q    Do you remember that?

16  A    Yes, yes.

17  Q    All right.  I want to make sure we all understand this

18  perfectly clear.  The policy between 2009 and 2012, is that

19  intermediaries were defined as people who find business for

20  Goldman Sachs in exchange for a fee paid by Goldman Sachs;

21  right?

22  A    That was my understanding.

23  Q    Okay.  And is it your understanding that at some time

24  later the definition of intermediary changed?

25  A    That's correct.

                        Michele Lucchese, RPR, CRR

1    Q    Okay.  In or about 2014 or so, is that what you remember?

2    A    I don't remember when.

3    Q    All right.  Okay.  But before it changed -- we're talking

4    about the time before it changed -- it was very clear that an

5    intermediary was paid by Goldman Sachs; correct?

6    A    That's correct.

7    Q    Okay.  So if a person found business for Goldman Sachs

8    and was not paid by Goldman Sachs during this period of time,

9    that person was not an intermediary; right?

10   A    Under the definitions then that you talked about.

11   Q    I'm talking about the definitions then.

12   A    Then, yeah.

13   Q    Okay.  So, then, between 2009 and 2012, if someone

14   brought business to Goldman Sachs and Goldman Sachs did not

15   pay that person, that person was not an intermediary; right?

16   A    Under the Goldman Sachs definition.

17   Q    Okay.  Was there any other definition as a Goldman Sachs

18   employee that you were supposed to follow?

19   A    No, follow the Goldman Sachs definition.

20   Q    Right.  So all we're talking about for this part of our

21   conversation is the Goldman Sachs definition of intermediary

22   between 2009 and 2012, okay?

23   A    Yes.

24   Q    Okay.  Thanks.  So, if someone else was paying a person

25   who found business for Goldman Sachs and Goldman Sachs wasn't

Michele Lucchese, RPR, CRR

1    paying them, not an intermediary; correct?

2    A    At that point in time, yes.

3    Q    That's all we're talking about.

4         And the significance of whether or not the person

5    was an intermediary is that if they were an intermediary you

6    had to make a BIG notification; correct?

7    A    That's correct.

8    Q    All right.  And BIG is the business intelligence group?

9    A    That's correct.

10   Q    And tell us -- I know you spoke about it a little bit

11   yesterday.  Just remind the jury, what does BIG do in a

12   nutshell?

13   A    So BIG runs - gets details around the transactions, who

14   the individuals are, and they run background checks on those,

15   you know, parties that are involved.

16   Q    Okay.  And so, again, just talking about 2009 to 2012, if

17   the person was not an intermediary, you didn't have to tell

18   BIG about them; correct?

19   A    That's correct, yeah.

20   Q    And taking this one step further, if the person wasn't

21   paid by Goldman Sachs, 2009 to 2012, you didn't have to tell

22   BIG about them; right?

23   A    Under the Goldman Sachs policy, that's correct.

24   Q    Yes.  And you say the Goldman Sachs policy.  You received

25   training on this; right?

                    Michele Lucchese, RPR, CRR

1    A    That's correct.

2    Q    And you received training on how an intermediary is

3    defined; correct?

4    A    Yes.

5    Q    Okay.  And you received training on when you have to make

6    a BIG notification because the person is an intermediary, am I

7    right?

8    A    That's correct.

9    Q    You talked yesterday about something called a special

10   purpose vehicle.  Do you remember talking about that?

11   A    Yes.

12   Q    Could you tell us what a special purpose vehicle is?

13   A    It's typically called a shell company.  So it's just a

14   registered company with no assets in it that someone will

15   register to conduct financial transaction.

16   Q    Okay.  And in your experience -- how long have you been

17   in banking now?  13 years?

18   A    Since '06, so 16 years.

19   Q    16 years.  16 years.  Okay.

20         And in your experience in banking, do SPVs, special

21   purpose vehicles, have legitimate purposes in transactions.

22   A    Yes, they do.

23   Q    Okay.  And please tell the jury how that's the case.

24   A    A lot of times, typically, when someone wants to conduct

25   a financial transaction, they will incorporate an SPV and use

Michele Lucchese, RPR, CRR

1    the SPV as part of the transaction.

2    Q    And why would the person do that?  What's the advantage

3    to creating an SPV?

4    A    It's -- it's -- there are multiple reasons.  I'll just

5    list why, some examples.

6    Q    Yeah, and you can do it on a very basic level.

7    A    Yeah.  It just -- the way I think about it is you do it

8    because it's a -- the SPV is a cleaner asset.  It's a new

9    company, so you don't have to, you know, change any document,

10   existing documentation to comply with the transaction.

11          The SPV also helps in terms of just segregating

12   different financial transactions so it's easier to kind of

13   monitor things and keep, you know, different transactions

14   separate.

15   Q    Okay.  And there's nothing wrong with using an SPV;

16   correct?

17   A    There's nothing wrong.

18   Q    Now, from time to time, in your experience, why would

19   someone incorporate an entity in the British Virgin Islands?

20   A    Typically for tax benefits.

21   Q    Okay.  And explain to the jury what you mean by tax

22   benefits.

23   A    So some of these, like BVI, British Virgin Islands, that

24   you talked about, they have more -- a lower tax rate, for

25   example, so individuals who would like to incorporate their

1    entities there to -- so they have to pay lower taxes.

2    Q    Okay.  And there's nothing wrong with trying to pursue

3    lower taxes; correct?

4    A    As long as done legally.

5    Q    As long as it's done legally?

6    A    Yes.

7    Q    And, so, correct me if I am wrong, a legal way to pay

8    less taxes under certain circumstances is to be incorporated

9    in the British Virgin Islands?

10   A    That's my understanding, yeah.

11   Q    Okay.  And I might be saying it wrong, so you will

12   correct me if I do, there is a country call Seychelles?

13   A    Yes.

14   Q    Did I say it right?

15   A    I have no idea.  I know which country you're talking

16   about.

17   Q    All right.  And in your experience, have you seen people

18   incorporate entities in -- is it the Saychelles (phonetic)  or

19   Seychelles?

20   A    I don't know what the pronunciation is, but, yes, I've

21   seen it before.

22   Q    Do you have an understanding as to why someone might do

23   that?

24   A    That I don't know.

25   Q    Is it your experience as being in banking at a pretty

                    Michele Lucchese, RPR, CRR

1    high level for 16 years that a lot of these decisions about

2    where to incorporate relate to taxes, as you told the jury;

3    right?

4    A    That's correct.

5    Q    And then sometimes, tell me if this is right, there are

6    treaties between different countries that relate to taxes;

7    correct?

8    A    That's correct.

9    Q    All right.  And do you know what some of those treaties

10   between different is countries are?

11   A    Not specifically.

12   Q    Do you know, for instance, does Singapore have relations

13   with other countries in terms of taxes and things like that?

14   A    Yes.

15   Q    And what are -- we don't need all of them.  Just give us

16   an idea of some of them.

17   A    I don't know which specifically country -- Singapore has

18   with other countries.  I know there are some that, for

19   example, avoids double taxation of income.

20   Q    So is it fair to say that when someone is deciding where

21   to incorporate an entity there are a great deal of strategies

22   that go into that decision?

23   A    That's correct.

24   Q    Okay.  And to a certain extent a knowledge of

25   international tax issues is also important; correct?

Michele Lucchese, RPR, CRR

1    A    Yes.

2    Q    Okay.  All right.  I want to ask you a few questions

3    about these committee conference calls that you talked about

4    for a little bit yesterday.

5            I think you said yesterday you listened in on

6    several conference calls that are, you know, these committee

7    meetings by conference call; right?

8    A    That's correct.

9    Q    All right.  And there's the capital committee; correct?

10   A    Yes.

11   Q    And then there's a firm-wide capital committee which is

12   all of Goldman Sachs; right?

13   A    Yes.

14   Q    And then there's an Asia Pacific Capital Committee, is

15   that another entity?

16   A    Yes.

17   Q    So tell me if I have this right.  So if there is a deal

18   or a transaction in Asia, it will first go sometimes to the

19   Asia Capital Committee for review?

20   A    That's correct.

21   Q    And then sometimes it will go up to the firm-wide, the

22   whole company capital committee; correct?

23   A    That's correct.

24   Q    And then there are things called suitability committees

25   too; right?

1    A    Yes.

2    Q    And then there will be an Asia Pacific suitability

3    committee; right?

4    A    Yes.

5    Q    And then a firm-wide, the whole company suitability;

6    correct?

7    A    Yes.

8    Q    And you participate -- you listen on the phone for some

9    of these firm-wide capital committee meetings and suitability

10   committee meetings; correct?

11   A    That's correct.

12   Q    All right.  Do these meetings have a protocol about who's

13   expected to speak?

14   A    Typically, it's the senior members of the team.

15   Q    Okay.  And tell me if this is your understanding, so the

16   senior members of the team are going to be speaking in a

17   firm-wide capital committee meeting, for instance; correct?

18   A    Yes.

19   Q    And the only reason -- and the only way that someone

20   other than a team leader would speak at such a meeting is if

21   the team leader specifically delegated that person to speak;

22   right?

23   A    It's not always the case there is a delegation.

24   Sometimes, you know, the other members of the team, if they

25   know the facts, they can also speak up.

Michele Lucchese, RPR, CRR

224

1    Q    Okay.  Now, if one were to speak -- well, let me withdraw

2    the question.  Sorry.

3         Andrea Vella and Tim Leissner are both partners of

4    Goldman Sachs; correct?

5    A    That's correct.

6         MR. AGNIFILO:  Can we just pull up Government

7    Exhibit 803 for a second?

8    Q    We're going to go to the ELMO.  We're to looking at -- I

9    can tell you this is Government Exhibit 803.  There it is.  I

10   have taken the liberty to highlight senior members of

11   management on there.

12        And, so, the members of senior management are Tim

13   Leissner and Andrea Vella.

14   A    That's correct.

15   Q    All right.  And what you said is that at these capital

16   committee meetings the people you're expecting to speak are

17   the members of senior management, which, in this case, would

18   be Leissner and Bella; correct?

19   A    Yes.

20   Q    All right.  And you were not a partner at the time at

21   Goldman Sachs and you're not a partner today?

22   A    Still not a partner, no.

23   Q    Okay.  And Roger was not a partner at the time of Goldman

24   Sachs and to your knowledge, he's never been a partner?

25   A    He's never been a partner.

                    Michele Lucchese, RPR, CRR

1    Q    Okay.  And, so, without the partner's approval -- in your

2    experience, without the partner's approval, is someone who's

3    not a partner expected to weigh in on something that he or she

4    thinks at one of these capital committee meetings?

5    A    At the committee or just the --

6    Q    No, no, no.  And during the meeting itself, unless you

7    talk to the senior management, to the partner beforehand,

8    would the partner expect you to take the lead and start making

9    comments during the call?

10           MS. SMITH:  Objection, Your Honor.  What the partner

11   would expect.

12           THE COURT:  Rephrase the question.

13           MR. AGNIFILO:  Sure.

14   Q    You have been working with partners at Goldman Sachs for

15   how long?

16   A    15 years.

17   Q    Okay.  Do you endeavor to figure out what the partner

18   expects of you?

19   A    Yes.

20   Q    Okay.  Do you expect -- let me ask you a question.  If

21   you don't think the partner wants you to talk at a meeting,

22   are you going to talk at a meeting?

23   A    No.

24   Q    That's not a good way to ever be a partner; right?

25   A    Yeah, that's correct.

                    Michele Lucchese, RPR, CRR

1  Q    At the current time, there's 400 partners, about, at

2  Goldman Sachs?

3  A    That's what I think.  I think so.

4  Q    Yeah.  40,000 people, 40,000 people work at Goldman

5  Sachs, and they've got 400 partners?

6  A    Roughly around there, yes.

7  Q    Now, do you know if at any point in time any of these

8  committee meetings were such that certain people were not able

9  to speak, they're in a listening-only mode on the call?

10 A    That one I actually don't know.

11 Q    Have you heard that, that certain committee meetings

12 certain people might be in a listen-only mode?

13 A    I've never heard that before, actually.  I don't....

14 Q    Since we're talking about Goldman Sachs, you talked

15 yesterday -- you were asked questions about Goldman Sachs in

16 New York; right?

17 A    Yes.

18 Q    And Goldman Sachs headquarters is in New York; right?

19 A    Yes.

20 Q    And by New York, we mean Manhattan; right?

21 A    Yes.

22 Q    That's -- Goldman headquarters has always been in

23 Manhattan; right?

24 A    Yes.

25 Q    Okay.  I think you said yesterday that it was in two

Michele Lucchese, RPR, CRR

1    different locations in Manhattan, it was on 85 Broad; right?

2    Near Wall Street?

3    A    That's correct.

4    Q    Which is very much in Manhattan; right?

5    A    Yes.

6    Q    And it was also at -- at the current time it's at 200

7    West Street; right?

8    A    Yes.

9    Q    Very much Manhattan; right?

10   A    Yes.

11   Q    And you worked at Goldman Sachs in New York for what,

12   about two years?

13   A    Two and a half.

14   Q    Two and a half years.  You left Michigan.  Was that --

15   you went somewhere else and then went to Goldman Sachs?

16   A    I went to UBS in L.A. for a year and then --

17   Q    Okay.

18   A    -- came to Goldman.

19   Q    And when you worked at Goldman Sachs here in New York,

20   you worked at 200 West?

21   A    No.  85 Broad Street.

22   Q    You were at 85 Broad Street, before they moved?

23   A    Before they moved.

24   Q    To your knowledge, does Goldman Sachs have any offices in

25   Brooklyn?

Michele Lucchese, RPR, CRR

228

```
1    A    Not that I'm aware of.

2    Q    Do you know if it has an office in Queens?

3    A    Not I'm aware of.

4    Q    Do you know if it has an office in Staten Island?

5    A    Not I'm aware of.

6    Q    Okay.  And how about Long Island, does it have an office

7    on Long Island?

8    A    I don't know about.

9    Q    The one that you know is in Manhattan; right?

10   A    We have one in New Jersey, 30 Hudson.

11   Q    All right.  So there's Manhattan and there's New Jersey?

12   A    Right.

13   Q    And then there are a number of other offices all over the

14   world; right?

15   A    That's correct.

16   Q    But none in Brooklyn, Queens, Staten Island, Long Island,

17   as far as you know?

18   A    As far as I know.

19   Q    Okay.  So when you are having a meeting at Goldman Sachs

20   in New York, that's a meeting in Manhattan; right?

21   A    In New York, it could be wherever the client wants it to

22   be as well.

23   Q    But if you're at the Goldman Sachs offices?

24   A    If I'm at the Goldman Sachs offices, yes.

25   Q    And when you have -- I think you were asked yesterday
```

Michele Lucchese, RPR, CRR

1    about these -- these committee meetings, the firm-wide capital

2    committee meetings.  That is a meeting with people that you

3    understand are sitting in Manhattan; right?

4    A    I think most of them are, because it's global.  It could

5    be individuals from other offices.  I just don't remember.

6    Q    Right.  But the people that are at the Goldman Sachs

7    office here in New York, they're in Manhattan; right?

8    A    They could do it from their home as well.

9    Q    No, no.  Right.  They could be home.  But if they're in

10   the office.

11   A    Oh, they're in their office?

12   Q    If they're in the office here in New York, what that

13   means is Manhattan; right?

14   A    I would think so, yes.

15   Q    You don't know of any office in New York that's not the

16   one in Manhattan?

17   A    No, I don't know.

18   Q    You talked earlier today about the fact that from time to

19   time you yourself would use your personal e-mail for Goldman

20   Sachs business; correct?  From time to time?

21   A    Yeah.  There are instances, yes.

22   Q    And I think you even said earlier today that, and tell

23   me, I don't want to get this wrong, that in Asia it happens

24   from time to time that people will ask for your personal

25   e-mail address as opposed to your work e-mail address?

                     Michele Lucchese, RPR, CRR

1    A    That's correct.

2    Q    All right.  And there are times when you yourself gave

3    your personal e-mail address to a potential client; correct?

4    A    I don't remember that.

5    Q    Okay.  Do you remember if certain people at 1MDB had your

6    personal e-mail addresses?

7    A    I think they -- yes.

8    Q    Do you remember -- do you remember specifically if

9    Terence Geh might have had it?

10   A    He may have had it.

11   Q    You do know Terrence; right?

12   A    Yes.

13   Q    And do you know if he and Roger knew each other?

14   A    Yes, they knew each other.

15   Q    Do you know if they were both bicycle riders?

16   A    I've heard that before, yes.

17   Q    That they road bicycles together?

18   A    Yes.

19   Q    Roger rides a bicycle; correct?

20   A    Yes.

21   Q    Do you remember him being out of the office for some

22   extended period of time because of a bike accident?

23   A    I remember the bike accident.  I don't remember if -- if

24   he was actually out.

25   Q    Okay.  And did you -- not at the time that he was out of

1  the office, but do you remember seeing him soon after he came

2  back?

3  A    I don't remember the specific -- I mean, I'm sure I've

4  seen him when he came back.

5  Q    All right.  Did you and he ever talk -- I'm not asking

6  what each of you said.  Did you and he ever talk about the

7  bike accident?

8  A    I don't remember.

9  Q    But you said you know he had a bike accident?

10 A    I remember he had a bike accident.

11 Q    Now, I'm just going to ask you a few questions on topic

12 and I'm not trying to -- do you remember using your personal

13 e-mail with a person Ujin Timan?

14 A    Yes.

15 Q    Who was Ujin Timan?

16 A    He was a client of Tim's.

17 Q    And how did it come about that you used your personal

18 e-mail in having communication with Ujin Timan?

19 A    I don't remember exactly how.  Typically Tim would just

20 rope me in.

21 Q    Okay.  And when you say Tim roped you in, what do you

22 mean by maybe Tim roped me in?

23 A    Roped me in.  He added me to the e-mail chain or he

24 connected me.

25 Q    Because he was a partner and you were not; right?

                    Michele Lucchese, RPR, CRR

1    A    That's correct.

2    Q    Okay.  Could Tim sometimes be forceful with you?  Let me

3    not use that word.

4         Could Tim be insistent with you.

5    A    I don't know if I'm answering your question correct, but

6    Tim was the partner.  I just do whatever he tells me to do.

7    Q    Okay.  And why is it that you would do whatever Tim told

8    you to do because he was the partner?  Explain that to us.

9    A    I mean, he was head of the office and my boss, basically,

10   so you have to take his direction.

11   Q    Okay.  And if you didn't take Tim's direction, what were

12   you concerned could happen to you?

13   A    He may not like me -- I don't know.  Compensation, get

14   fired.  Like, just negative.  Yeah.

15   Q    So let's unpack that.

16   A    Yeah.

17   Q    It could affect your compensation; correct?

18        You have to answer yes or no.

19   A    I'm sorry.  Yes.

20   Q    And how could Tim affect your compensation?

21   A    He was a partner, so he had, you know, influence over how

22   I would be compensated and performance review.

23   Q    And, so, it was your understanding that if Tim said

24   negative things about your performance and if Tim said that

25   you didn't listen to the direction of your superiors, that

                    Michele Lucchese, RPR, CRR

1    could affect your compensation?

2    A    Yes.

3    Q    And I think you also said you could get fired; right?

4    A    Yes.

5    Q    Okay.  So you were concerned that if you didn't listen to

6    Tim you could get fired; is that right?

7    A    Yeah.  Yes.  A little extreme, but, yes.

8    Q    Okay.  Now, you went to Abu Dhabi twice; right?  Do you

9    remember that?

10   A    I think it's twice, I don't remember specifically if it's

11   twice.

12   Q    Okay.  I'm going to ask you if you remember getting an

13   e-mail -- sending an e-mail to Tim Leissner on or around April

14   16, 2012 where you asked him if Tim wanted you and Roger --

15              MS. SMITH:  Objection, Your Honor.

16              MR. AGNIFILO:  I'm just asking if he remembers.

17              THE COURT:  Why don't you show him the e-mail?

18              MR. AGNIFILO:   Yeah.  That's fine, Judge.

19              I want to mark for identification only Defense

20   Exhibit AT-23 for the identification only.

21              THE COURT:  1A23?

22              MR. AGNIFILO:   No, no.  I'm sorry.  A like apple, T

23   like Tom, or A like Andy, T like Tai, 23.  So if I put this

24   here.

25              THE COURT:  The ELMO is turned to your private.  You

                    Michele Lucchese, RPR, CRR

1    can put it on the ELMO.

2            MR. AGNIFILO:  I could give it to Mr. Tai.

3            THE COURT:  You could also put it on the ELMO.  The

4    ELMO is on for you now.

5            MR. AGNIFILO:  Got it okay.

6            THE COURT:  So the witness should be able to see it.

7    Q    Could you see that okay, Mr. Tai?

8    A    Yes.

9    Q    You can read it okay?

10   A    Yes.

11   Q    And can you see that there's two e-mails there; right?

12           MS. SMITH:  Objection, Your Honor.  There's no

13   question.

14           THE COURT:  Well, why don't you give the witness a

15   minute to just read it.

16           MR. AGNIFILO:  Sure.  Take your time.

17   A    Okay.  Yes, I read it.

18   Q    These are two e-mails between you and Tim Leissner and

19   others; correct?

20           MS. SMITH:  Objection, Your Honor.  It's not in

21   evidence.

22           MR. AGNIFILO:  I offer it, Judge.

23           MS. SMITH:  Objection.

24           THE COURT:  Okay.  We're going to take our break for

25   15 minutes while we discuss this.

                    Michele Lucchese, RPR, CRR

235

PROCEEDINGS

1          Please remember that you cannot talk about the case

2    and I will see you back here in 15 minutes.  So that would be

3    20 minutes to 12:00.

4          (Jury exits the courtroom.)

5          THE COURT:  You may step outside.

6          (Witness leaves the stand.)

7          THE COURT:  Please be seated, everyone.

8          Can you put it on the ELMO so I can see it.

9          MR. AGNIFILO:  I'm sorry, Judge.

10         THE COURT:  That's okay.  So tell me what this

11   document is so I can understand the parties' position on this.

12         MR. AGNIFILO:   All right.  So, Your Honor, what

13   this document is it's an e-mail that starts with an e-mail

14   from Andy Tai to Tim Leissner copying Roger Ng.  There's a

15   response sent by Tim Leissner to Andy Tai copying Roger Ng and

16   it's about -- it's dated Monday, April 16, 2012.  And it is --

17   the first e-mail is from Andy Tai.  He says, "Just got wind

18   that Andrea, John, Cyrus, and Cherie are on the way to Abu

19   Dhabi tonight.  They are concerned that Dubai guys are not

20   running things the right way.  Do you want Roger and I to be

21   there as well?"

22         And Tim responds, "No need, Chief.  I hope John is

23   not going.  Don't need many people here and I told him no need

24   for John.  He and Cyrus can tag team."

25         THE COURT:  Okay.  And I take it this is about one

Michele Lucchese, RPR, CRR

PROCEEDINGS

1   of the deals?

2          MR. AGNIFILO:  Yes, Judge.  This is the run-up on

3   the first deal.

4          THE COURT:  Okay.  So what's the Government's

5   objection?

6          MS. SMITH:  It's hearsay, Your Honor.

7          THE COURT:  Okay, so I'm not sure I appreciate the

8   distinction between this e-mail and all the e-mails that you

9   have offered through this witness.

10          MS. SMITH:  Well, Your Honor, first of all, the

11   defense didn't object to any of those e-mails.  But, secondly,

12   it is, in fact, hearsay.  He certainly is capable of asking

13   the witness whether or not he offered to go on a trip to Dubai

14   and was told by Mr. Leissner that he didn't need to, if this

15   refreshes his recollection.  But I don't know what the

16   evidentiary basis is for putting this into evidence.

17          MR. AGNIFILO:  Your Honor, if I may.  I didn't

18   object to the e-mails because they weren't hearsay because

19   they weren't offered for the truth, nor is this e-mail offered

20   for the truth.  And as Your Honor pointed out, it is very much

21   in the same vein as the dozens and dozens of e-mails that have

22   already been admitted by the Government.

23          We're not trying to offer anything here for the

24   truth.  We're trying to show the interaction in the form of an

25   e-mail between Andy Tai and Tim Leissner and that Tim Leissner

Michele Lucchese, RPR, CRR

237

PROCEEDINGS

1    tells Andy Tai and Roger don't come to Abu Dhabi is a

2    singularly relevant and central fact to this case and the fact

3    that it's in an e-mail is also very significant.

4                    (Continued on next page.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Michele Lucchese, RPR, CRR

PROCEEDINGS

1            THE COURT:  Right, but the e-mail is secondary
2    evidence.  The proper, and you can correct me if you believe I
3    am wrong on the evidentiary basis, the proper way for you to
4    cross him about this is to ask him about it.  You were trying
5    to do so but he didn't recall.  You showed him the e-mail to
6    now refresh his recollection.  You should then ask him the
7    question as to whether or not he had a conversation with Tim
8    about going to Abu Dhabi.  You are allowed to ask him.  My
9    understanding is this e-mail only comes in if, in fact, he
10   then denies that he ever did so.
11           And you wanted -- and I'm not sure that you would,
12   it would be considered extrinsic evidence -- that you wanted
13   to then show -- if he didn't recall is one thing and you are
14   refreshing his recollection.  Here you are asking me to put
15   this before the jury instead of crossing him about the fact
16   itself.
17           MR. AGNIFILO:  Most respectfully, I think I have the
18   absolute right in the first instance to bring in relevant,
19   non-hearsay evidence just like the Government does.
20           THE COURT:  You have the absolute right to ask him
21   any question that you have a good-faith basis to ask him about
22   on cross and that is where you start.
23           To the extent he denies this then you can introduce
24   it.  I don't believe you have the right under the rules of
25   evidence to simply offer in an e-mail for purposes of what,

SN   OCR   RPR

PROCEEDINGS

1  attacking his credibility --

2           MR. AGNIFILO:  No.

3           THE COURT:   -- or showing the relationship between

4  him and Mr. Leissner and Mr. Ng?  You can ask him about it.

5           MR. AGNIFILO:  Okay.  I will do it that way, Judge.

6           THE COURT:  If you think I am wrong, cite me case

7  law.

8           MR. AGNIFILO:  Judge, that's fine.

9           THE COURT:  And I will reverse my ruling and allow

10  you to put this in, but you start with asking the question.

11  He didn't recall or at least he didn't recall when you started

12  to ask him but maybe it was because you didn't get an

13  opportunity to specify which e-mail.  He's now had an

14  opportunity to look at the e-mail and I think you can ask him

15  questions about it.

16           MR. AGNIFILO:  Very good.  I will go that way if

17  Your Honor permits us, we will do it this way certainly today.

18  I may want to flesh this out because it's going to come out

19  again and again.

20           THE COURT:  Of course.

21           MS. SMITH:  And, Your Honor, I wanted to circle back

22  to my original objection to Mr. Agnifilo's questions about

23  Mr. Leissner and Mr. Ng's character traits.  I objected in

24  part because I don't believe the character trait of Mr. Ng

25  being gentle is relevant.  But since Mr. Agnifilo asked that

SN  OCR  RPR

240

PROCEEDINGS

1   question, I intend to do a character cross of the witness on

2   redirect.

3           MR. AGNIFILO:  If what she means by a character

4   cross, if you knew X would your opinion change, I think that

5   would be highly prejudicial because that would be taking the

6   presumption of innocence away from this case and if that's

7   what she has in mind, Judge, I would object strenuously to

8   that.

9           THE COURT:  Tell me what you have in mind,

10  Ms. Smith.

11          MS. SMITH:  Mr. Agnifilo elicited the character

12  trait of gentleness.

13          THE COURT:  He didn't elicit it.  The witness

14  answered a question and I can go back and look at the

15  question, but I think it was a comparison between Leissner and

16  Ng and that was the witness's answer and he followed up on

17  that.

18          MS. SMITH:  That's correct and he followed up and

19  said in general is he a gentle person.  I would cross him with

20  whether or not he knows that there are specific instances

21  where the defendant was reprimanded for harassment and

22  bullying which would be counter to this character trait of

23  gentleness.

24          THE COURT:  He was talking about based on his

25  knowledge.

SN   OCR   RPR

PROCEEDINGS

1          MS. SMITH:  Right and -- it goes to the reliability

2    of that opinion.

3          MR. AGNIFILO:  That's no factual finding.  They're

4    bringing up some type of inter-Goldman insinuation of some

5    sort.  I think it's far afield.  I was asking about the

6    distinction between Leissner and Mr. Ng in terms of how they

7    get business.  That's how the whole area started.

8          MS. SMITH:  If Mr. Tai doesn't know the answer to

9    the question that's fine, but you need a good-faith basis to

10   ask it.

11         THE COURT:  What rule are you relying on, counsel?

12         MS. SMITH:  There was an incident at --

13         THE COURT:  What rule?

14         MS. SMITH:  What rule?

15         THE COURT:  Yes.

16         MS. SMITH:  Form character witness?  600 something.

17         THE COURT:  You believe you can ask the specific

18   question in response to the answer that the witness gave.

19         MS. SMITH:  So, Your Honor, Rule 405 is sort of the

20   general rule on character.  When evidence of a person's

21   character or character trait is admissible, it may be proved

22   by testimony about the person's reputation.  On

23   cross-examination of the character witness, the Court may

24   allow inquiry into specific instances of the person's conduct.

25         MR. AGNIFILO:  That's for a character witness,

SN   OCR   RPR

PROCEEDINGS

1    Judge.  And also they don't have a good-faith basis to think

2    that Andy Tai knows anything about this.

3           MS. SMITH:  I have a good-faith basis to ask the

4    question whether or not Mr. Tai has knowledge.  I don't know.

5           MR. AGNIFILO:  They know he doesn't know and we all

6    know what they're trying to do and it's not right.  This is

7    something that the witness started.  This is something that

8    the witness got into and now they're going to use their

9    witness as a way to try to get into some -- some unproven --

10          THE COURT:  I understand your argument,

11   Mr. Agnifilo.  I assume the Government will be putting on some

12   witness who knows about this incident.

13          MS. SMITH:  That's actually not --

14          THE COURT:  I appreciate what you are saying and I

15   believe if, in fact, this information was outright elicited by

16   the defense on cross-examination you would have a stronger

17   argument, but here the witness brought this up in response to

18   a question that was not so direct.

19          MS. SMITH:  I agree, Your Honor -- I believe that

20   the defense followed up in a way that reemphasized it and

21   re-elicited the opinion as a general matter and not just as a

22   comparison.  And I certainly expect that in closing

23   Mr. Agnifilo is going to argue that his client was a gentle

24   person and you heard that from Mr. Tai.

25          THE COURT:  I will look at the law on this.

SN   OCR   RPR

PROCEEDINGS

1          MS. SMITH:  Thank you, Your Honor.

2          MR. AGNIFILO:  Your Honor, I think there is one

3    issue that is of great urgency that I want to bring to Your

4    Honor's attention.  Last night at 11:30 p.m. we were given

5    120,000 pages of documents including e-mail accounts between

6    Tim Leissner and Judy Leissner, including an electronic device

7    belonging to Tim Leissner that the Government said could

8    contain in excess of 5,000 pages of an electronic device --

9    that could contain statements by our client.

10          This has gotten to the point and I have to put this

11    on the record directly, to get 120,000 pages of material --

12    this relates to the heart of this case.  The first thing the

13    Government said in its opening statement was the phrase 35

14    million because that's their whole case; that he got $35

15    million from crime proceeds and the truth is that this was an

16    investment.

17          And the truth is that they have evidence of that

18    that they have been sitting on for the better part of three

19    years and I haven't gone through what these documents show.

20    And it's going to take a while because it's 120,000 pages of

21    documents.  But I have to now confront the possibility that

22    this defense team might not be effective on behalf of Mr. Ng

23    if we just continued to go forward.  I don't know what these

24    documents say.  I think it's unforgivable that to get 120,000

25    pages of documents after the opening statements about the core

244

PROCEEDINGS

1    issue in this case, the core issue in this case is, is the

2    investment, the investment in China -- and I have been

3    desperate for three years to try to track this down.

4         It took me two years to be able to get to Malaysia

5    to try to track this down and I finally did and I went with

6    all of the information that was made available to this point.

7    I am not getting a chance to go to Malaysia again.  No

8    Americans right now are going to Malaysia at the moment and

9    for us to get 120,000 pages of documents concerning this

10   critical issue -- these aren't compliance documents from

11   Goldman Sachs or more committee memos.

12        This is e-mail traffic between Tim Leissner and Judy

13   Leissner that's going to be about a variety of things and I

14   expect that some of it might have to do with the business

15   interests that I am so desperate to find out about.  And for

16   them to do this after we opened, I can't imagine what the

17   justification would be other than strategy to give this to me

18   after we opened.

19        And the real world problem that I have to confront

20   is can I be effective, can I be legally effective given the

21   impossible position the Government has put me in and I have

22   very, very extreme concerns about that.

23        I want to put on the record now is we will make this

24   120,000 pages of material a priority, but depending on what's

25   in it I have great concerns about the fairness of this trial.

SN   OCR   RPR

PROCEEDINGS

1    I have great concerns that we just got the defendant's

2    statements to law enforcement after the openings.  This is --

3    this is not a one-time thing.  This has been a steady, steady

4    series of the same thing over and over and over; giving us

5    stuff, a lot of stuff, very, very late in the game.

6         Remember back when when we were trying to chase down

7    cellphones in Hong Kong and lo and behold we found them.  But

8    we had to tell them about it.  They didn't tell us about it.

9    So this is the latest chapter in this saga, Judge, and this

10   time it's worse and this time we opened and this time we have

11   witnesses that are testifying and in the middle of that to get

12   120,000 pages of documents including statements by the

13   defendant?  I mean, it's unprecedented.

14        I think it's troubling and I think the Government is

15   starting to -- there's no doubt that Your Honor has done

16   everything in the Court's power to be fair and to try to keep

17   the trial moving and get us what we need.  Our issue is to get

18   this type of material in this volume at this stage in the game

19   is unprecedented and I submit it puts us in an almost

20   impossible position.  Either we go forward with the trial as

21   scheduled and somehow we learn the contents of 120,000 pages

22   of documents or we don't, and we shouldn't have to make that

23   call.

24        I want this -- I have -- Your Honor has helped me.

25   We have moved heaven and earth to have this trial and I want

PROCEEDINGS

1    to have it.  I want to have it, but I want to have it fair.  I

2    can't have it any other way, Judge.  I have an obligation.  I

3    have a duty and this man deserves effective legal

4    representation and I am concerned about my ability to give

5    that to him.

6             THE COURT:  Thank you.  I will hear from the

7    Government.

8             MR. ROLLE:  First, we disagree strongly with many of

9    the things that Mr. Agnifilo said.  We did not produce

10   statements to law enforcement after openings that did not

11   happen.  I can to the production that was made of material in

12   large part released to the prosecution team from the

13   government's filter team in this case.

14            For many months we have had discussions with

15   Mr. Agnifilo and his team in response to questions that they

16   had about material held on a privileged review team on the

17   other side of the wall designed to prevent privileged

18   information from coming that we were not entitled to have.  We

19   had detailed discussions with them and we are going to push

20   back strongly on the idea that this was a surprise production

21   of surprise information to them.

22            THE COURT:  It seems to be that in the last

23   discussion, you indicated that all information from the

24   privileged team would be disclosed by the end of December.

25            MR. ROLLE:   So, the conversation we had in December

PROCEEDINGS

1    the Government walked counsel through specific categories of

2    information that they asked about.  As to Boon-Kee Tan, as to

3    Judy Chan Leissner, as to Terence Geh, as to Tammy Lee, which

4    is Judy Chan Leissner's assistant, as to Tim Leissner.  We

5    walked through in detail the number of documents to be

6    reviewed by the privilege team, the time and length of that

7    review.  After that call, the privilege review team in fact

8    completed that review.

9         We then spoke in January.  We advised them of the

10   fact that the review had been completed and we were producing

11   relevant information to them.  We prioritized immediately

12   anything that may relate to the Government's case which was

13   produced to them.  The production that we made to them was the

14   remainder of the same categories of the same numbers that we

15   had talked to them about months before.  And in this

16   production, which was supposed to go out before openings and

17   the reason it didn't happen is as we were producing it, the

18   prosecution team identified specific communications between

19   Tim Leissner and his criminal defense attorneys, clearly

20   privileged on -- just based on the header information which

21   gave us grave concern that something happened in the

22   generation of this production by the filter review team.

23        So we went back to the filter team we said that we

24   are seeing potentially privileged information.  You have to

25   check and confirm that there are no privileged documents in

SN   OCR   RPR

PROCEEDINGS

1    this production.  That took them some time.  The production

2    was reset and we made the production as soon as it was

3    released to us again and we made that production yesterday.

4            THE COURT:  Why didn't you have that conversation

5    with counsel about the delay, the cause of the delay and the

6    fact that this was coming?

7            MR. ROLLE:   Judge, we have had conversations with

8    them about the delays in production particularly as to the

9    filter side material for some time.  We didn't expect their

10   response here.  We should have given them a heads up and we,

11   frankly, apologize for the delay caused the by the privileged

12   information we identified.  We wish we could have had that

13   sooner.  But certainly as to the core of what this material is

14   we have had detailed discussions with counsel about what is in

15   this production.

16           As to the statements of the defendant, there are

17   three e-mails we've identified that had not otherwise been

18   produced before in some form that are in this production.

19   There are a total of approximately nine e-mails we identify

20   that were sent by the defendant.  The e-mails that are in this

21   production, the substance and discussion and content has been

22   produced to them long before this production.  They have the

23   material and we -- once we received them from the filter

24   review team, we turned them over.

25           I think the record in this case and the approach

SN   OCR   RPR

249

PROCEEDINGS

1    that we've taken at every turn including as to the cellphones

2    Mr. Agnifilo is talking about, as soon as the prosecution team

3    has information that might be relevant to the things that they

4    are saying or to our case, we have turned them over.  We

5    regret the timing of the privileged production here and we

6    made it as soon as we could.

7            So I think on these points, we are happy to continue

8    to engage with counsel about these topics.  The privileged

9    review has been completed as to these categories of

10   information and we turned them over, Judge.

11           MR. AGNIFILO:  Your Honor, if I may, I think the

12   easiest way to decide -- to see what's really going on here is

13   Your Honor sat right on Your Honor's bench yesterday at 3:30

14   and Your Honor said I don't want anymore surprises.  You know,

15   what a perfect time to bring this up, yesterday at 3:30 when

16   the Court said, I don't want anymore surprises.

17           If they were really acting in good faith and they

18   were really telling us things -- forget about us, telling the

19   Court, when Your Honor said I don't want anymore surprises,

20   that would have been the perfect time to say, you know what,

21   Judge, something is about to happen at 11:30 tonight, but they

22   didn't say a word and that silence is all we need to know.

23           MR. ROLLE:  One last point, Judge, if I may.  What

24   we did explain in detail to counsel about these buckets of

25   documents in December and January was the vast majority of

SN   OCR   RPR

PROCEEDINGS

1  these e-mail communications, A, they're not entitled to Judy

2  Chan's communications because she's Tim Leissner's wife.  We

3  identified to them that consistent with the vast majority of

4  the materials that they already had were documents that were

5  Giglio and 3500 material for the Government's witnesses which

6  we intended to turn over and we did turn over and if we

7  identify anything else, we will produce it.

8       One other note, in the defense's letter they are

9  claiming that they keep getting voluminous productions of

10 discovery.  Well, in part that's true, but consistent with

11 what we've told them, that we are continuing to investigate.

12 The Government issued multiple search warrants in the last two

13 weeks and as soon as we get things returned, we will produce

14 it to the defense.  I am sure that that is voluminous, but we

15 are continuing, as we maintain, to investigate the claims

16 being made in this case and we will continue to make

17 productions of similar information going forward.

18      MR. AGNIFILO:  Your Honor, I think the problem is

19 Judy is Tim Leissner's wife when they don't want to give us

20 stuff, but when they want to put stuff into the record, she's

21 his coconspirator.  I don't know how she can be both, but they

22 decide which bucket she is going to go in when it suits them.

23 When they want to withhold evidence from us, they're married.

24 And we have no visibility into this crazy process.  There's a

25 filter team doing God knows what.  All we know is we get

SN  OCR  RPR

251

PROCEEDINGS

1   120,000 pages of documents the night after we open and it's no

2   way to have a fair trial, Judge.

3           I just want the information.  I don't want to stop

4   the trial.  I don't want to have to stop the trial or ask to

5   stop the trial.  I want to go forward.  We've moved heaven and

6   earth to get here, but we have to have a fair trial.

7           THE COURT:  First of all, it sounds like the

8   information came over from the privilege team.  I don't think

9   you dispute that.

10          MR. AGNIFILO:  That's what I'm told.  I have no

11  reason to dispute it.  I don't know when it went from the

12  privilege team to the trial time.

13          THE COURT:  It sounds you had a conversation with

14  the prosecution and this information should have been

15  disclosed end of December.

16          MR. AGNIFILO:  Ms. Geragos is more familiar with

17  this, Your Honor.

18          MS. GERAGOS:  I want to add one thing on the record

19  is that January 28, 2022, which is about a month after our

20  conversation with the Government and the privilege team which

21  is a conversation we told the Court we were going to have a

22  few days earlier, they did release materials to us that were

23  recently released to the Government team by the privilege

24  review team.

25          So after that point -- we thought that was the end

SN   OCR   RPR

252

PROCEEDINGS

1   of the Leissner privileged productions.  We did not understand

2   that there was going to be 5,000 more pages of documents that

3   were going to be released from the privilege team to the

4   Government team.

5           MR. ROLLE:   Judge, on one point just to explain and

6   clarify, that production of the material Ms. Geragos is

7   mentioning, part of this is failure to communicate on several

8   fronts.  The Government prioritized for production -- after

9   our December phone call about the remaining items on the

10  filter side we prioritized for production anything that may

11  appear to relate to the Government's case or their defenses.

12  That was prioritized for immediate production sooner than the

13  broader universe of random e-mails between Judy Chan or her

14  children or Tim Leissner about their marriage or about their

15  personal life.

16          We made it clear to them that that was what we

17  understood the universe was, separate from the smaller

18  universe of potentially relevant information the filter team

19  had passed over.  Consistent with our disclosure obligations,

20  we prioritized for production that first set because it was

21  critical and we all agreed and we explained that to counsel

22  and made that production which they then received.

23          The remainder, which is what we have here, is the

24  remaining numbers that were released from filter that we had

25  walked counsel through in December.  I think we were two ships

SN  OCR  RPR

PROCEEDINGS

1    passing in the night it sounds like as to what the

2    second-to-last filter production was.

3              This is the production of the irrelevant or largely

4    personal information we flagged for them in December.  We

5    maintain that the relevance of that is speculative and in our

6    view, as we said in December, would largely relate to the

7    cross-examination of government witnesses, not to evidence the

8    Government would be offering in its case in chief.  That's the

9    distinction and the process by which we tried to apply and be

10   deliberate and careful about this.

11             And, again, we certainly apologize for the time it

12   clearly took for filter to get this and for it to be produced.

13   That shouldn't have happened, but we continue to act in good

14   faith and get counsel what they want and be clear with them

15   about what we have and what's coming.

16             THE COURT:  At the very least, the fact that you had

17   additional information to be disclosed should have been made

18   clear to counsel before opening statements.  They should have

19   had the choice to either delay opening statements or to speak

20   to the Court about getting me to get them that information

21   sooner rather than later, but turning over all of this

22   information after opening statements is just not acceptable.

23   It doesn't matter whether it's from the prosecution team or

24   the taint team.  Either way, this information should have been

25   provided before yesterday.

SN   OCR   RPR

PROCEEDINGS

1          Now, Mr. Agnifilo, first before I discuss how to

2   proceed, is there anything else that needs to be disclosed?

3   Is the taint team still reviewing information?

4          MR. ROLLE:   No, the taint team is no longer

5   reviewing these buckets of information.  They have produced to

6   us what they deem nonprivileged information.

7          THE COURT:   And has all of the information that

8   should be that were produced to you now disclosed to defense?

9          MR. ROLLE:   Yes, Your Honor.  That's my

10  understanding.

11          THE COURT:   What about the 3500 material for

12  Mr. Leissner and other witness?

13          MR. ROLLE:   We have produced the 3500 for

14  Mr. Leissner.

15          THE COURT:   All of it?

16          MR. ROLLE:   At this point, yes, if there are any

17  further reports generated we will turn those over, but we have

18  produced those materials.  We have additional materials for

19  Kevin Swampallai that we expect is to review and produce and

20  he will testify later in the trial, Judge.

21          THE COURT:   Mr. Agnifilo, if you need time to review

22  these documents, we can take a day off from the trial to allow

23  you to do that.

24          MR. AGNIFILO:   I appreciate that.

25          THE COURT:   Obviously I recognize and appreciate

SN   OCR   RPR

PROCEEDINGS

1    that in the middle of trial the last thing you want to do is

2    to take time from preparing for witnesses to review documents

3    of information that you don't know what's in it.  After you

4    have had an opportunity to look at what you have tonight you

5    let me know if we need to take a day off from this trial so

6    you will have the time you need to review these documents

7    appropriately in order to represent Mr. Ng as I know you would

8    like to.

9                 MR. AGNIFILO:  Yes.  I appreciate that, Judge.  And

10   I will do that.

11                THE COURT:  Is there anything else we need to

12   discuss?

13                MR. AGNIFILO:  No.

14                THE COURT:  We're late for the jury, but I am going

15   to give the parties five minutes since we all probably need to

16   use the restroom.

17                MR. AGNIFILO:  Thank you, Judge.

18                (Recess taken.)

19
     (Continued on the following page.)
20

21

22

23

24

25


                          SN   OCR   RPR

PROCEEDINGS

1          THE COURT:  I'm not going to allow the Government to

2     redirect on that point.  Maybe I was wrong in the first

3     instance to allow follow-up with the answer; but as I said,

4     based on how the answer came in, that's not what counsel was

5     trying to do.  So I'm not going to compound the issue by

6     allowing the Government to ask this witness about instances

7     that the Government has no basis to believe he knows anything

8     about.

9          MS. SMITH:  I want to sort of site to Federal Rule

10    of evidence 404(a)(1) that says:  If the defendant puts his

11    good character at issue as part of his defense, once the

12    defendant has offered evidence of that, the prosecution is

13    afforded substantial latitude to rebut evidence.

14         The question of whether or not the defendant is kind

15    came from Mr. Agnifilo.  He put in an issue the question of

16    kindness of gentleness.  Once he did that, and your Honor

17    ruled it admissible --

18         THE COURT:  In the context of him working with the

19    defendant.

20         MS. SMITH:  Right.  I completely agree.

21         THE COURT:  I'm not allowing the redirect.

22         MS. SMITH:  The rule does permit us to actually

23    introduce evidence to rebut it.  So if this witness doesn't

24    know, we will put in evidence through other witnesses who do

25    have specific information that could rebut this evidence.

PROCEEDINGS

1          THE COURT:  We can discuss that at that time.

2          MS. SMITH:  Thank you.

3          THE COURT:  As to this witness I won't allow the

4   redirect.

5          MS. SMITH:  Thank you.  To be clear, your Honor, I

6   don't know whether he knows.  It's possible he does.  I don't

7   know.

8          THE COURT:  Okay.  I won't break at lunch probably

9   until 1:30.

10          (Jury enters the courtroom.)

11          (Witness resumes the stand.)

12          THE COURT:  Please be seated everyone.

13          Members of the jury, I apologize for the delay.  As

14   I explained to you in my preliminary instructions, at times

15   the Court has to discuss evidentiary issues with the parties.

16   We have now done that and we're ready to proceed.

17          We probably won't break for lunch until around 1:30,

18   since we're starting late.  The cafeteria is open until

19   2:30 p.m. today.

20          Please proceed.

21   CROSS-EXAMINATION

22   BY MR. AGNIFILO:

23   Q    Mr. Tai, do you remember communicating with Tim Leissner

24   on or about April 16, about the possibility that you and Roger

25   Ng would travel to Abu Dhabi where Mr. Leissner was?

Rivka Teich CSR RPR RMR FCRR
Official Court Reporter

PROCEEDINGS

1   A    I don't remember.

2   Q    Is there something I can give you to refresh your

3   recollection, an e-mail?

4   A    I don't remember.

5   Q    I'm going to show the witness only for the purposes of

6   his recollection AT23.  This is only for Mr. Tai.

7           Mr. Tai, do you have it in front of you?

8   A    Can you blow it up?

9   Q    Can we make it a little bigger?

10          Tell me when you can see it.  I don't want you to

11  read anything, just look at it.

12  A    Okay.

13  Q    Is your recollection refreshed?

14  A    Not really, aside from this being an e-mail.

15  Q    Without getting into it, did you send an e-mail?

16  A    Yes.

17  Q    Did you receive an e-mail response from Mr. Leissner?

18  A    Yes.

19  Q    Do you recall wanting to go down with Mr. Ng on April 16,

20  2012 to Abu Dhabi?

21          THE COURT:  Can you make it a little bigger?  I

22  can't read it either.

23          MR. AGNIFILO:  Yes.  Let's make it bigger.  We're

24  going to switch to the Elmo, Judge.

25          THE COURT:  That's better.

259

PROCEEDINGS

1    BY MR. AGNIFILO:

2    Q    Can you see that okay?

3    A    Yes.

4    Q    Do you recall communicating with Mr. Leissner on or about

5    April 16, 2012?

6    A    I only can remember -- the e-mail in front of me.  I

7    don't remember the specifics.

8    Q    And did you send an e-mail, do you recall sending an

9    e-mail at that time?

10            MS. SMITH:  Objection.  Asked and answered.

11            THE COURT:  Overruled.  You can answer.

12   A    I don't recall aside from the e-mail I see it now.

13            MR. AGNIFILO:  We're going to offer it.

14            THE COURT:  It's admitted.

15            (Defendant Exhibit AT23, was received in evidence.)

16   BY MR. AGNIFILO:

17   Q    We can put it up for the jury.

18            Mr. Tai, you sent an e-mail, did you not, to Tim

19   Leissner copying Roger Ng on April 16, 2012, correct?

20   A    That's correct.

21   Q    In the e-mail you say:  Tim, just got wind that Andrea,

22   Jon, Cyrus and Cherie are on their way to Abu Dhabi tonight.

23            Do you see that?

24   A    Yes.

25   Q    Just to be clear, Andrea is Andrea Vella; is that

Rivka Teich CSR RPR RMR FCRR
Official Court Reporter

260

PROCEEDINGS

1    correct?

2    A    Yes.

3    Q    John is Jon Donne?

4    A    Yes.

5    Q    And Cyrus is Cyrus Shey?

6    A    Yes.

7    Q    And Cherie is Cherie Er?

8    A    That's correct.

9    Q    Are all of those people are in the investment banking

10   division of Goldman Sachs at the time?

11   A    Yes, they are.

12   Q    Just to be clear, this is during Program Magnolia, which

13   would close only one month later, correct?

14   A    I think it is, based on the timing.

15   Q    You go on to say:  They are concerned, in quotes, that

16   the Dubai guys are not running things the right way.  Do you

17   see that you wrote that?

18   A    Yes.

19   Q    Would the Dubai guys be the Middle East team of Goldman

20   Sachs?

21   A    I don't remember.

22   Q    Then you say:  Do you want Roger and I to be there as

23   well?

24        Do you see that?

25   A    Yes.

Rivka Teich CSR RPR RMR FCRR
Official Court Reporter

261

PROCEEDINGS

1  Q    He responds to you, does he not, on the next e-mail above

2  it?

3  A    That's correct.

4  Q    He says:  No need, Chief.

5           Right?

6  A    Yes.

7  Q    Do you recall that you -- you went to Abu Dhabi twice, do

8  you recall you didn't go around the 16th of April?

9  A    I don't remember when I went to Abu Dhabi actually.  I

10 know it's twice.

11 Q    Do you remember any other conversations where

12 Mr. Leissner would have changed his mind and said, yes, please

13 come?

14 A    I don't remember.

15 Q    Okay.  Do you recall two days later, I want to ask if you

16 recall, do you recall two days later that Tim Leissner

17 communicated to you that there would no longer be a

18 contribution or a guarantee payment to IPIC?

19 A    I don't remember.

20 Q    Do you remember at some point in time that Tim Leissner

21 did communicate that to you?

22 A    I don't remember.

23 Q    We're going to do what we did before, this is just to

24 refresh your recollection, this is not for the jury.  I'm

25 going to ask you to focus on the one in the middle.

Rivka Teich CSR RPR RMR FCRR
Official Court Reporter

262

PROCEEDINGS

1    A    The one in the middle, right?

2    Q    Yes.  Do you recall that on or about April 18, Leissner

3    said to you along the lines of:  That at one point there was a

4    contemplated a contribution or guarantee payment to IPIC that

5    is no longer contemplated so please delete?

6    A    I don't remember but it's on the e-mail.

7         MS. SMITH:  Your Honor, we don't object to it coming

8    in.

9         THE COURT:  Admitted.

10        MR. AGNIFILO:  AT24.

11        THE COURT:  Thank you.

12        (Defendant Exhibit AT24, was received in evidence.)

13   BY MR. AGNIFILO:

14   Q    The e-mail that I'm asking you to focus on is the one in

15   the middle.  In that e-mail, in the middle, Tim Leissner --

16   this is two days later after the e-mail we just looked at

17   where you were saying, me and Roger could go to Abu Dhabi, and

18   he says no chief.  Right.  So this is two days later?

19   A    That's two days later.

20   Q    What Leissner says is the following.  Also I forgot,

21   somewhere I saw a contribution or guarantee payment to IPIC

22   that is no longer contemplated so please delete.

23        Do you see that he says that?

24   A    I see in that e-mail.

25   Q    Then it says:  Once turned around can you please send to

Rivka Teich CSR RPR RMR FCRR
Official Court Reporter

PROCEEDINGS

1    Jasmine; Roger, can you take a look too.

2              Do you see that?

3    A    Yes.

4    Q    Does any of what we just reviewed refresh your

5    recollection as to whether you were in Abu Dhabi during this

6    period of time?

7    A    It doesn't refresh whether I was there.

8    Q    Do you remember the dates that you went to Abu Dhabi?

9    A    I don't.

10   Q    Okay.  Correct me if I'm wrong, what you said yesterday

11   is when you went the first time there was no substantive

12   meeting with anyone from IPIC, correct?

13   A    That's what I can remember.

14   Q    When you went the second time, there was a more

15   substantive meeting, right?

16   A    I don't remember what the second -- I don't remember the

17   second -- what we did the second meeting.

18   Q    Do you remember the first time that you went with Roger

19   and Leissner and others, and the only person to meet Mohamed

20   Al-Hussein was Leissner?

21   A    Yes, I remember something like that.

22   Q    Tell the jury what you remember along those lines.

23   A    So we were for the first meeting we were supposed to go

24   meet management of Aabar IPIC and Mohamed, that's the guy, we

25   were supposed to meet him.  I remember it was -- we waited a

264

PROCEEDINGS

1    while, he was late.  And then he showed up.  I think we shook

2    hands with him, but that's it.  Then I remember he just went

3    off with Tim to do their own meeting.  That's it.

4    Q     Were you with Roger during this trip?

5    A     I think Roger was there, yes.

6    Q     Tell me if I have this right.  You and Roger and Leissner

7    and others fly from Asia to Abu Dhabi to meet the IPIC Aabar

8    leadership, correct?

9    A     We were supposed to, yes.

10   Q     That's why you flew there?

11   A     That's right.

12   Q     And you waited some period of time, all of you, correct?

13   A     That's correct.

14   Q     And then Mohamed Al-Hussein shakes your hand, right?

15   A     I think he made introductions, yes.

16   Q     What you just said is he then goes off with just Tim

17   Leissner, right?

18   A     Definitely -- Tim was definitely, he went off with Tim.

19   I don't remember who else was with Tim.  So there was a

20   subsequent discussion without me.  I don't remember who was

21   there.

22   Q     Do you remember staying back with Roger as Tim and

23   Al-Hussein left?

24   A     I remember staying back.  I don't remember who I stayed

25   back with.

A. TAI - REDIRECT - MS. SMITH

1          MR. AGNIFILO:  Nothing else at this point.

2          THE COURT:  Okay.  Redirect?

3          MS. SMITH:  Yes, briefly.

4    REDIRECT EXAMINATION

5    BY MS. SMITH:

6    Q    Mr. Agnifilo asked you about Mr. Leissner and Jasmine Loo

7    and whether they knew each other well.  Did Mr. Ng also know

8    Ms. Loo well?

9    A    Yes.

10   Q    Did they also have a close relationship?

11   A    Close, they knew each other, yes.

12   Q    When Mr. Ng had an issue, did he also raise it to Jasmine

13   Loo?

14   A    Yes, he did.

15   Q    Mr. Agnifilo asked you about sort of Mr. Leissner's style

16   or Mr. Ng's style in getting business.  Did both of them want

17   to get business for Goldman?

18   A    Yes.

19   Q    Mr. Ng was the country head for Malaysia, right?

20   A    That's correct.

21   Q    It was his job to get business from Malaysia for Goldman?

22   A    Yes.

23   Q    He just went about it in a different way.

24   A    Can you --

25   Q    He went about it in a different style?

                    Rivka Teich CSR RPR RMR FCRR
                         Official Court Reporter

A. TAI - REDIRECT - MS. SMITH

1   A    In a different style, yes.

2   Q    Mr. Agnifilo asked you about whether Mr. Leissner

3   developed social relationships to get new business; is that

4   right?

5   A    Yes.

6   Q    Was that approach unique to Tim Leissner?

7   A    No.

8   Q    Is that common for people --

9            MR. AGNIFILO:  Object to leading.  It's her witness,

10  your Honor.

11           MS. SMITH:  It's redirect, your Honor.

12           THE COURT:  Rephrase the question.

13  BY MS. SMITH:

14  Q    Was it common for people to use social relationships to

15  get business?

16  A    Not uncommon, people do it, yes.

17  Q    Mr. Agnifilo asked you about official intermediary policy

18  and some of the technical details about that.  You at the

19  time, you testified you didn't know whether Jho Low had any

20  role in the deals; is that right?

21  A    That's correct.

22  Q    In fact, I think we talked about it, did Mr. Leissner

23  ever talk to you about Jho Low being involved in the deals?

24  A    No.

25  Q    Did Mr. Ng talk to you about Jho Low being involved in

A. TAI - REDIRECT - MS. SMITH

1    the deals?

2    A    No.

3    Q    Did you have any idea if he was an outside person or if

4    he was someone who worked for 1MDB?

5    A    No idea.

6    Q    Here the compliance team asked specific questions about

7    Jho Low; is that right?

8    A    Yes.

9    Q    Both at committee meetings and in e-mails?

10   A    That's what I remember, yes.

11   Q    And if they asked about whether someone was involved in a

12   deal, was it okay to provide them with false information?

13   A    No.

14   Q    Was it okay to lie to them?

15   A    No, it's not okay to lie.

16   Q    As a managing director, if you knew that there was false

17   information being provided to BIG, would you correct it?

18              MR. AGNIFILO:  I object to the form of the question.

19              THE COURT:  I'm not following you, counsel.

20              MR. AGNIFILO:  Speculative question.  If something

21   then something.

22              THE COURT:  Overruled.  You can answer.

23              THE WITNESS:  Can you repeat the question?

24   BY MS. SMITH:

25   Q    As a managing director, if you knew that false

A. TAI - REDIRECT - MS. SMITH

1  information was being provided to BIG, would you correct it?

2  A    Yes, I would.

3  Q    As a math can director if you knew false conversation was

4  provided to the committee would you correct it?

5  A    Yes.

6  Q    Mr. Agnifilo asked you questions about shell companies in

7  the British Virgin Islands.  If a Goldman employee has a

8  British Island company, are they required to disclose it?

9  A    Yes, they would have to.

10  Q    Mr. Agnifilo also asked you a couple of questions about

11  Goldman's office in Manhattan.  When you come to Goldman's

12  office in Manhattan, have you flown into J.F.K.?

13  A    Yes, I have.

14  Q    Lastly, Mr. Agnifilo asked you questions about sort of

15  the personal e-mail address.  Again, did you initiate Goldman

16  e-mails using your personal e-mail?

17  A    In general I did not initiate.

18  Q    When a personal e-mail was used, was it in your own name?

19  A    It was my own name.

20  Q    Did you ever delete the entire contents of your personal

21  e-mail account?

22  A    No.

23          MS. SMITH:  No further questions.

24          MR. AGNIFILO:  I just have a couple, Judge.

25          THE COURT:  Sure.

Rivka Teich CSR RPR RMR FCRR
Official Court Reporter

A. TAI - RECROSS - MR. AGNIFILO

1    RECROSS-EXAMINATION

2    BY MR. AGNIFILO:

3    Q    Mr. Tai, in 2012 Mr. Ng was not in investment banking at

4    all, right?

5    A    No, he was in securities.

6    Q    So he wasn't a country head of anything in 2012.

7    A    No.  In securities, no.

8    Q    So he was in the securities division in 2012, correct?

9    A    That's correct.

10   Q    He wasn't in investment banking in 2012, correct?

11   A    That's what I can remember.

12   Q    That's all right.  So he wasn't the head of Malaysia in

13   2012, right?

14   A    If he was not in investment banking, like you said, then

15   that's correct.

16   Q    You never asked Roger if Jho Low was involved in the

17   deal, right, you never asked him that?

18   A    No.

19            MR. AGNIFILO:  Nothing else, Judge.

20            MS. SMITH:  No further questions, your Honor.

21            THE COURT:  You're excused Mr. Tai.

22            (Whereupon, the witness was excused.)

23            MR.  WIBLE:  The Government calls Robert Mass.

24            THE WITNESS:  Can I take my mask off.

25            THE COURT:  You can.  First stand and raise your

270

R. MASS - DIRECT - MR. WIBLE

1   right hand.

2                 (Witness takes the witness stand.)

3                 (Witness sworn.)

4                 THE WITNESS:  I do.

5   ROBERT A. MASS, called as a witness, having been first duly

6   sworn/affirmed, was examined and testified as follows:

7                 THE COURT:  Thank you.  Please be seated.  State

8   your name for the record.

9                 THE WITNESS:  Robert Alan Mass.

10                THE COURT:  I'll just ask you to please keep the mic

11  close to you so we can hear you clearly.

12                If you can spell your last name for the record.

13                THE WITNESS:  M-A-S-S.

14                THE COURT:  Thank you.  Please proceed counsel.

15  DIRECT EXAMINATION

16  BY MR. WIBLE:

17  Q    Good afternoon, Mr. Mass.  What do you do for a living

18  currently?

19  A    I'm currently retired.  I'm in graduate school.  And I

20  teach part-time at Hunter College as an adjunct instructor.

21  Q    When did you retire?

22  A    In June of 2020.

23  Q    Where did you work before you retired?

24  A    I worked at Goldman Sachs for 27 years before that.

25  Q    What was the most senior position you held at Goldman

Rivka Teich CSR RPR RMR FCRR
Official Court Reporter

R. MASS - DIRECT - MR. WIBLE

1    Sachs?

2    A    I was a partner.  And I guess the two most senior

3    positions I held were, I was in charge of compliance for all

4    trading and sales businesses in the firm.  And I was also in

5    charge of our international compliance efforts for a number of

6    years for the entire firm.

7    Q    What role did you hold at Goldman Sachs in 2012 and 2013?

8    A    In 2012 and 2013 I was the head of compliance for all the

9    sales and trading divisions, which that division was called

10   the securities division.  In June of 2013 I also took on the

11   head of international compliance.

12   Q    Would you please briefly describe your duties and

13   responsibilities as head of compliance for the securities

14   division and head of compliance head of international

15   compliance?

16   A    As head of compliance with the securities division, my

17   job was essentially policing the members of the securities

18   division to make sure that they were following all of the laws

19   of various jurisdictions in which we were working, as well as

20   all of our internal policies.

21        I did the same thing with respect to the

22   international job.  My job was to make sure that all of

23   Goldman Sachs' employees outside the United States were

24   complying with all the laws and rules that apply to them.

25   Q    Approximately how many people reported to you as head of

R. MASS - DIRECT - MR. WIBLE

1   international compliance?

2   A    Roughly 600.

3   Q    What about in your role as head of compliance for the

4   securities division?

5   A    Somewhere between 115 and 150, depending on the year.

6   Q    Were the Goldman Sachs employees who reported to you in

7   those roles employed by various Goldman subsidiaries around

8   the world?

9   A    Yes.

10  Q    Generally speaking, did Goldman's internal divisions or

11  groups cut across the regional subsidiaries?

12  A    I'm not sure I understand exactly that question.

13  Q    Whether the compliance group, for example, included

14  employees who were not only employed by Goldman here in the

15  United States but also by Goldman entities located elsewhere

16  in the world?

17  A    I was the global head of securities division compliance,

18  so I had employees in all of the places that Goldman Sachs was

19  located in the world where we had businesses, that did

20  businesses of the securities division.  Now I'm going back to

21  your prior question, some of them were employees of Goldman

22  Sachs international, some were employees of local entities,

23  employees of different entities around the world.  Regardless

24  of where they were technically employed, they reported up to

25  me.

R. MASS - DIRECT - MR. WIBLE

1    Q     Got it.  Who did you report to?

2    A     I reported to the head of compliance for the firm who's

3    name was Allen Cohen.

4    Q     Which Goldman Sachs office were you physically based in

5    in the 2012 to 2013 time period?

6    A     In 2012 until the end of May 2013 I was in the New York

7    office.  Starting in June 2013 I was in the London office,

8    which is where I spent four years as the head of international

9    compliance.

10   Q     Would you please briefly describe your educational and

11   work background before you joined Goldman Sachs?

12   A     Sure.  I graduated from the University of California

13   Santa Cruz with a degree in politics.

14            I then went to Harvard Law School.  Upon my

15   completion of my Harvard Law School degree I went to work at

16   Kramer Levin, a litigation firm in New York.  I was there for

17   four years with a brief leave of absence where I was a staff

18   attorney at the American civil Liberties Union.

19            Then after the four years there, I went to the

20   Manhattan District Attorney's Office where I spent ten years

21   prosecuting, first, street criminals in the career criminal

22   unit, and then the mafia organized crime, and then finally

23   police corruption towards the end of my tenure there.

24            I went directly from the Manhattan District

25   Attorney's Office to Goldman Sachs where I was for 27 years.

R. MASS - DIRECT - MR. WIBLE

1    Q    I'd like to focus your attention on the internal process

2    at Goldman Sachs for reviewing and approving Goldman's

3    participation in certain transactions, specifically, bond

4    transactions.  During your time at Goldman Sachs were you on

5    any internal committees at Goldman that were responsible for

6    reviewing proposed deals?

7    A    Yes.

8    Q    What committee or committees were you on?

9    A    At various times I was on four transaction committees.  I

10   was on the structured investment products committee, which is

11   a committee that approved structured investment products that

12   were sent down retail channels that we sent to high-net worth

13   individuals to human beings.  I was also on the firm-wide

14   suitability committee, which was a committee that reviewed

15   over-the-counter derivative transactions; that is, contracts

16   between Goldman and a client which had a return to one of us

17   based on some derivative.  I was also on the firm-wide capital

18   committee, which was the committee that approved bond

19   issuances and bond underwritings for Goldman.  And I was also

20   on the firm-wide commitments committee, which is the committee

21   that handled any equities like stocks that Goldman was going

22   to help a client issue and Goldman would underwrite.  That's

23   where, for example, IPOs went.  Those were the four

24   committees.

25   Q    So focusing your attention specifically on the firm-wide

R. MASS - DIRECT - MR. WIBLE

1   suitability committee and the firm-wide capital committee.

2   Were you on either of those two committees in 2012 and 2013?

3   A    I was on the firm-wide suitability committee in 2012 and

4   2013.  I may have been on the capital committee or put on the

5   capital committee after I moved to London, I don't remember.

6   I know I was on the firm-wide suitability committee during

7   those time periods.

8   Q    Did all proposed bond transactions go before those two

9   committees?

10  A    No.  The capital committee had certain bond transactions

11  that would go to it based on certain criteria.  The

12  suitability committee didn't generally review bond deals.  It

13  would review a bond deal only in the context of some sort of

14  important derivative or complex derivative that was associated

15  with the bond deal, and then we would review the entire

16  transaction.  But we were focused principally on suitability

17  on the over-the-counter derivative.

18  Q    I believe you mentioned that certain bond deals went

19  before the firm-wide capital committee if there were certain

20  criteria that were met.  Can you give us a general sense of

21  the criteria?

22  A    I can only give you a general sense, I don't remember

23  what the specific policies were.  But they tended to be deals

24  that were particularly large or had unusual aspects to them

25  that might raise reputational issues for the firm.

1    BY MR. WIBLE: (Continuing.)

2    Q     What sort of reputational issues are you referring to?

3    A     Well, it might be that the client is a client that's

4    gotten a lot of negative publicity in the newspaper recently,

5    and we wanted to make sure -- we wanted to see whether we

6    wanted to continue to do business with that client.  It might

7    be that the transaction raised legal issues.  It might be the

8    edge of legality.  Of course, we wouldn't do anything that we

9    knew was illegal, but it might be that we were accused of

10   doing something illegal.  It might be something where the

11   Congress or regulator around the world has said they wanted

12   to -- they were going to apply special scrutiny to

13   transactions of this nature, so we would want to make sure we,

14   too, applied scrutiny.  It might be potential Foreign Corrupt

15   Practices Act issues, some potential bribery.  We wanted to

16   make sure that there wasn't any, so we looked at it very

17   carefully.  It's that kind of issue that would come to us.

18   Q     Generally speaking, how were the firm-wide suitability

19   and the firm-wide capital committees comprised?  What did

20   their membership consist of?

21   A     They were only -- what -- Goldman has different levels.

22   There's analysts, associates, vice presidents, manage

23   directors, and partners; and the committees were essentially

24   filled with partners, usually from the senior -- senior

25   part -- the senior partners, not just the junior partners,

1    because the idea was that you wanted people who were not

2    directly in the line of those supervisor of the business group

3    that was doing the treading -- or doing the transaction -- you

4    wanted people who were -- who were not as directly involved

5    who could bring their years of experience to the analysis of a

6    transaction.  So you would have people from all different

7    regions, all different disciplines on the committee.

8            The other thing I would say is that in addition to

9    these people being senior and, by and large, virtually all

10   senior partners, the -- the goal was to have -- and I think it

11   was eventually codified with the firm, but I don't remember

12   the details -- that at least 50 percent of the people were not

13   business people -- they were from the support side of the

14   firm -- they were people like compliance people -- lawyers,

15   comptrollers -- people who were not out there doing business,

16   because we wanted to make sure we had the mix of both the

17   business people and control and support of people in the

18   committees.

19   Q    For deals or proposed transactions that went before the

20   committees, was committee approval required before Goldman

21   could go forward and complete the deal?

22   A    Yes.

23   Q    As you understood it, what was the overall purpose of

24   this committee review process?

25   A    As I understood it, the committee review process was

278

1    to -- for these large or -- the transactions or transactions

2    which had some significant reputational risk to them, to make

3    sure that they were appropriate for the firm to do and that

4    senior people at the firm -- not just the business people who

5    would presumably get bonuses based on the success of a

6    transaction, but senior people who were away from that, follow

7    up that the firm -- that it was an appropriate thing to attach

8    the firm's name to.

9    Q    As you understood it, if these committees approved the

10   transaction, was any further approval typically required

11   before the deal could move forward?

12   A    Unless we stated it as a criteria in our, sort of,

13   approval -- approval subject to somebody else approving, the

14   answer was no.  Ours was supposed to be the final approval.

15   Q    Is it fair to say that the -- if the firm-wide

16   suitability committee and the firm-wide capital committee

17   approved the deal, that that represented the approval of the

18   senior management at Goldman?

19   A    Yes.  That was the approval of the firm.  It was a --

20   going beyond senior management, it was the approval of the

21   firm for the transaction.

22   Q    Now, did the firm-wide suitability committee review the

23   bond transactions that Goldman Sachs handled for 1MDB in 2012

24   and 2013?

25   A    Yes.

1    Q    Were you on the firm-wide suitability committee at that

2    point in time?

3    A    Yes.

4    Q    I would like to show you what's been marked for

5    identification as Government's Exhibit 829.  You should have

6    the binder in front of you.  This will appear behind tab 1,

7    and it should also come up on the screen in front of you,

8    whatever is easiest for you.

9    A    I'm, sort of, old style.  I like to look here.  Yes.

10   Q    Do you recognize this document?

11   A    Yes.

12   Q    What is it?

13   A    This is the kind -- this is an email that I had received

14   that was sent from the --

15   Q    Well, if you let me just interrupt you for a moment.

16        Was this an email that you received in the course of

17   your work at Goldman Sachs?

18   A    Yes.

19   Q    Does it relate to the work of the firm-wide suitability

20   committee?

21   A    Yes.

22        MR. WIBLE:  Your Honor, the Government offers

23   Exhibit 829.

24        MR. AGNIFILO:  I do not object.

25        THE COURT:  It's admitted.

                        Denise Parisi, RPR, CRR
                        Official Court Reporter

1          (Government Exhibit 829, was received in evidence.)

2     BY MR. WIBLE:

3     Q    So, Mr. Mass, just focusing on the cover email briefly

4     for a moment, it's an email dated April 2nd, 2012, and in the

5     "to" line, it looks -- in the "to" and "cc" lines, it looks

6     like it was sent to several list serves:  GSFSC private

7     members, GSFSC working group, GSFSC private assistance.

8          Can you explain what the FSC private members refers

9     to?

10    A    Sure.

11          In a -- in an investment bank, there needs to be --

12          THE COURT:  Mr. Mass, if you can try to speak into

13    the mic as much as possible.

14          THE WITNESS:  I'm sorry, Your Honor.

15          THE COURT:  That's okay.  We have an overflow room

16    where the public is sitting, so we need to make sure we're

17    using the mics.

18          Thank you.

19    A    In a investment bank, there needs to be an information

20    barrier between the investment banking division -- the people

21    who are working on the private secret deals of various

22    companies -- and the people who are trading public securities.

23    Sometimes that's called the Chinese wall, but it's really an

24    information barrier, and we call people who are on the

25    private -- who are on the investment banking side of the wall

                    Denise Parisi, RPR, CRR
                    Official Court Reporter

1    who are not allowed to -- who are not allowed to trade

2    securities without special approvals, private side people.  We

3    call people on the public side -- the people who can trade

4    freely without -- without getting special approvals public

5    side people; and so what -- since this is a secret deal --

6    this is sort of a confidential deal -- presumably, based on

7    this memo -- the only people from the firm-wide suitability

8    committee who are going to review this deal because it was

9    still confidential were the private side members of the

10   committee, not the public side members, the members from the

11   investment banking division and other private side divisions

12   and not the public side members who are typically in the

13   securities division or the research department.

14   Q    I would like you to turn page 2 of the exhibit now.

15        Mr. Mass, what is this document?

16   A    This was the document that the memo was forwarding to

17   us -- that that email was forwarding to us.  It's the -- a

18   memo which we were going to review in connection with that --

19   the meeting that that first --

20        THE COURT:  Is this in evidence, counsel?

21        MR. WIBLE:  I had offered it, Your Honor.

22        MR. AGNIFILO:  Yes.

23        MS. SMITH:  There was no objection, and you received

24   it.

25        THE COURT:  Okay.

Denise Parisi, RPR, CRR
Official Court Reporter

1    A     It's the memo describing the transaction we were going to

2    review.

3    Q     And it says confidential capital committee memo at the

4    top of the page there, Mr. Mass.

5           In your experience, when the firm-wide suitability

6    committee was reviewing a bond deal, was it common for members

7    to -- members of the suitability committee to receive a copy

8    of the capital committee memo?

9    A     Yes.  We didn't really want -- if the capital committee

10   memo, which was usually very full, contained everything it

11   needed to contain, we didn't require the members of the deal

12   team to redo the entire memo just for us.  We would use what

13   the conflict -- what the capital committee used.

14   Q     What's the project name that's identified at the top of

15   this committee memo?

16   A     Magnolia 2012.

17          THE COURT:  And who was the Goldman client

18   identified in the memo.

19   A     1 Malaysia Development Berhad.

20   Q     Can you give general overview of the type of information

21   that's included in a committee memo like this one?

22   A     The first page includes the members of the Goldman Sachs

23   organization that were involved in the review of the

24   transaction, both the investment bankers, some of usually the

25   lawyers that were involved.

1          And then there was a detailed -- usually a detailed

2     description of what the transaction was.  Often times there

3     would be charts and graphs of -- if they were using special --

4     special purpose vehicles.

5          It would also have information about the nature of

6     the client, what relationship we have with the client.  It

7     would have what the due diligence we had done on the client --

8     that the deal team had done on the client and its financial

9     statements -- about its financial statements and its tax

10    position.  It would have the financials for the company, and

11    it would also have a section on issues for the committee,

12    which is the place that I tended to focus.  It was the place

13    where if there were any potential reputational compliance,

14    legal issues, they would be highlighted.

15    Q    Is it important for committee memos to be accurate?

16    A    Yes.

17    Q    Is it important for committee memos to be complete?

18    A    Yes.

19    Q    So I would like you to turn, if you would, to page 6 of

20    the exhibit.  It should say Government's Exhibit 829-006 in

21    the bottom right-hand corner.

22    A    I see it.

23    Q    Can you just tell us generally -- I'm not asking by any

24    means to walk through this in detail, but can you just

25    describe generally what's depicted in this chart?

                         Denise Parisi, RPR, CRR
                          Official Court Reporter

284

1    A       Yeah.  This is a chart which, for this transaction,

2    describes the flow of monies through -- and guarantees and

3    other legal documents among all the different legal entities

4    that are -- that were being used to conduct the transaction.

5    Q       Do you see a box, sort of, toward the left-hand side of

6    the page where it says International Petroleum Investment

7    Company, PJSC, or IPIC?

8    A       Yes.

9    Q       What does the chart show about IPIC's role in the deal?

10   A       It shows that IPIC is providing a guarantee to 1MDB

11   Energy Labuan, which is the issuer of the notes.

12   Q       Now, if you could turn, please, to the next page of the

13   exhibit, the one that has the number 007 in the lower

14   right-hand corner.

15   A       I'm there.

16   Q       If you would, please, could you read aloud the second and

17   third paragraphs on the page beginning with 1MDB and Aabar?

18   A       "1MDB and Aabar have agreed in connection with the

19   acquisition that in consideration for IPICs providing its

20   guarantee in connection with the notes, the issuer will grant

21   a call option in favor of Aabar Investments PJS Limited

22   95.3 percent owned by IPIC.  Aabar and 1MDB Energy Labuan have

23   therefore entered into a contribution agreement under which

24   Aabar has the right to exercise the call option any time

25   during the next ten years from the date of granting of such

1   options, into common shares to acquire up to 49 percent of

2   1MDB Energy Labuan's shareholding in 1MDB Energy Bidco, which

3   in turn will own 100 percent of Tanjong Energy.  The exercise

4   price for the call option will be at the share price of 1MDB

5   energy upon completion of the acquisition."

6   Q    Is a call option basically the right to purchase shares

7   at some point in the future?

8   A    Yes.

9   Q    And aside from these options, was any payment of money to

10  IPIC or Aabar in return for the guarantee disclosed in this

11  committee memo?

12  A    No.

13  Q    Would such a payment, if it existed, have been important

14  to you as a committee member in considering the deal?

15  A    Yes, it would.

16  Q    Why?

17  A    Because we want to review every single part of this

18  transaction because if there was a payment -- we review all

19  payments to make sure that they are appropriate in size --

20  that is, that somebody is not overpaying, because that might

21  suggest some impropriety -- or could conceivably underpay,

22  which also might suggest some impropriety.

23           We really try to kick the tires on every single

24  corner of a transaction to make sure that there was no

25  illegality or inappropriate behavior, and so we needed to know

286

1   each piece of it.

2   Q    Were there any expectations regarding the type of

3   information that would be included in a committee memo?

4   A    Well, it should cover completely each -- any -- all

5   payments that are being made in context of this should also

6   cover all the relevant actors.  There were a lot of

7   expectations when people did memos.  We were reliant, in

8   large -- you know, in large part on the deal team to bring to

9   us the relevant information about the transactions so we could

10  make that decision about whether this is an appropriate

11  transaction for us to do.  We didn't have our own

12  investigative force which was going out there and redoing

13  everything and re-talking to the clients, so we really did

14  rely on the deal team to present us with everything.

15  Q    If there were any third parties involved in a transaction

16  in helping to arrange it or set it up, would that be important

17  for the deal time to disclose to the committee in considering

18  a proposed transaction?

19  A    Yes.

20  Q    As a committee member, would it be important for you to

21  know about the involvement of any third parties irrespective

22  of whether Goldman Sachs was paying the third party?

23  A    Yes.

24  Q    Why is that?

25  A    Well, a -- a third party -- there's a long and sad

Denise Parisi, RPR, CRR
Official Court Reporter

287

1    history in the financial of financial intermediaries, people

2    who are third parties, getting paid something which gets

3    kicked back to someone --

4              MR. AGNIFILO:  I'm going to object to the form of

5    this testimony.  It seems to be opinion testimony.  He's not

6    an expert witness.

7              THE COURT:  The question is fine.

8              Mr. Mass, why don't you answer the question more

9    directly.

10             THE WITNESS:  Sorry, Your Honor.  Answer the

11   question --

12             THE COURT:   -- more directly.

13             THE WITNESS:  Okay.

14   A    We wanted to make sure that if there are any third-party

15   intermediaries, that they were doing appropriate work; that

16   third-party intermediaries were properly disclosed; and that

17   the work they were doing was compensated at a fair level.

18   That was what we do with all the intermediaries we came

19   across.

20   Q    If any members of the Goldman deal team had a personal

21   financial interest or a financial stake in a proposed

22   transaction, would that be important for the deal team to

23   disclose to the committee?

24   A    Yes.

25   Q    Why is that?

                      Denise Parisi, RPR, CRR
                      Official Court Reporter

1   A      Because we expect Goldman Sachs employees to -- their

2   full compensation for the business they do for Goldman Sachs

3   to be what they receive from the firm.  If they were to

4   receive something else, it might bias their treatment of

5   the -- of a client.  We would need to know about it so that we

6   could assess whether they were acting in the best interest of

7   the client or the firm.

8              MR. WIBLE:   Mr. Youkilis, you could take that down,

9   please.

10  BY MR. WIBLE:

11  Q     Mr. Mass, how often did the firm-wide suitability

12  committee meet?

13  A     Generally, roughly, once a week.

14  Q     And were all of the committee members based in the same

15  place, or where were they located?

16  A     They were based all over the world.  We had

17  videoconference facilities in New York and London, but we

18  would often have people who were in the -- in the Asia time

19  zone as well who would dial in or sometimes use some other

20  facility to video in.

21  Q     How did the deal teams appear before the committee?

22  A     The deal teams either appeared in person in the New York

23  or London offices -- or by video, if they were videoing in --

24  and occasionally just on the phone.

25  Q     Could you please describe for us, once the committee had

                    Denise Parisi, RPR, CRR
                    Official Court Reporter

1    assembled and a deal team was before the committee, how did

2    the meeting run?

3    A     The committee chair would -- well, the deal teams were

4    called in one by one, so each -- if there was more than one

5    deal on, the second deal team wouldn't be in the meeting when

6    the first deal team presented.

7           The committee chair would have decided in advance

8    how he wanted the presentation to go.  Did he want -- and he

9    would tell that to the head of the deal team -- he or she, I

10   should say -- might ask, take it from the beginning, give us

11   the full background; or they might say, we read the memo, we

12   just have a few questions; or they might propose some other

13   way of presentation, but it was different for different deals,

14   and then the team would present, and we would have a

15   discussion.

16   Q     And were the firm-wide suitability committee meetings

17   memorialized in any way?

18   A     Yes.  They were all memorialized.

19   Q     I would like to show you now what's been marked for

20   identification as Government's Exhibit 804.  It should be

21   behind Tab 2 in your binder.

22          Do you recognize that document?

23   A     Yes.  Those are the way in which suitability committee

24   meetings were memorialized.  Those are meeting minutes for one

25   of our meetings.

1          MR. WIBLE:  Your Honor, the Government offers

2     Government's Exhibit 804.

3          MR. AGNIFILO:  No objection.

4          THE COURT:  It's admitted.

5          (Government Exhibit 804, was received in evidence.)

6     BY MR. WIBLE:

7     Q    Mr. Mass, what's the -- you said this is minutes from a

8     firm-wide suitability committee meeting; correct?

9     A    Yes.

10    Q    And what's the date of the meeting that's listed at the

11    top of the page?

12    A    April 4th, 2012.

13    Q    And what particular deal did these minutes relate to?

14    A    These are 1MDB senior guaranteed notes.

15         I just want to add, you will see it's "meeting

16    type," it says "ad hoc."  Sometimes we didn't -- we would meet

17    in between our weekly meetings, and this looks like that was

18    what that was.

19    Q    Mr. Mass, do you have an independent recollection of what

20    occurred at this April 2012 firm-wide suitability committee

21    meeting?

22    A    No.

23    Q    Generally, what's reflected in the memo as to the outcome

24    of the suitability committee meeting?

25    A    The transaction was approved subject to four conditions.

                         Denise Parisi, RPR, CRR
                         Official Court Reporter

1          MR. WIBLE:  Mr. Youkilis, if you could scroll down a

2     bit in the page.

3     BY MR. WIBLE:

4     Q    Right there in the middle, are those the conditions that

5     you are referring to, Mr. Mass?

6     A    Yes.

7     Q    When the committee had conditions or follow up points

8     along these lines, did the deal team typically have to come

9     back before the committee to receive approval?

10    A    There was no typical.  They had to report back to the

11    committee, but it might have been in the form of emails or

12    conversations with the chairman of the committee, or that we

13    could require them to come back to the entire committee.  It

14    was our discretion.

15    Q    If you would, now, turn please to the last page of that

16    document, the number 003 in the lower right-hand corner.

17    A    I have it.

18    Q    That is an attendance sheet for the April 4, 2012,

19    committee meeting; correct?

20    A    Yes, it is.

21    Q    And there are a number of committee members who are

22    marked as absent.

23          Are you able to tell us to what extent the committee

24    members who were marked as absent were on the public side as

25    opposed to the private side within Goldman?

                          Denise Parisi, RPR, CRR
                          Official Court Reporter

1    A    Yes, I can.

2              Would you like me to go name by name.

3    Q    You don't need to give us exact, but if you could give us

4    the general sense.

5    A    Virtually, all of them are public side people.  There are

6    a few private side, but most of them are public side.

7    Q    You testified that this particular meeting was for

8    private side members only; is that right?

9    A    That's correct.  So they would not have been invited.

10   Q    So the annex also lists three presenters.  In addition to

11   the presenters, do you recall if other deal team members also

12   attended the meeting?

13   A    I don't recall.

14             MR. WIBLE:  You could take that down, please.

15   BY MR. WIBLE:

16   Q    Now I want to show you what's been marked for

17   identification as Government's Exhibit 839.

18             Do you recognize that -- I'm sorry, Mr. Mass.  This

19   should appear behind tab 3 in your binder.

20   A    I have it.

21   Q    Do you recognize that document?

22   A    Yes.

23   Q    And was this a document that was created in the ordinary

24   course of business at Goldman Sachs?

25   A    Yes.

                        Denise Parisi, RPR, CRR
                        Official Court Reporter

1    Q    Was it a document you received in your role on the

2    firm-wide suitability committee?

3    A    I believe so.

4         MR. WIBLE:  Your Honor, the Government offers

5    Government's Exhibit 839.

6         MR. AGNIFILO:  My only concern is he doesn't seem

7    clear on whether he received it.  I won't object.  That's

8    fine.  It's fine.

9         THE COURT:  It's admitted.

10        (Government Exhibit 839, was received in evidence.)

11   BY MR. WIBLE:

12   Q    Mr. Mass, what is this document?

13   A    This is a -- let me just quickly look at it.

14   Q    Sure.

15   A    Yeah.  This is a follow-up to the conditional approval we

16   gave on the Magnolia transaction to the -- in the suitability

17   committee.  It's a follow-up memo that the deal team put

18   together for us.

19   Q    If you would turn, please, to page 3 of the exhibit.

20   Could you give us a general overview of what's shown here?

21   A    This -- this is what I was referring to earlier as an --

22   an example of what I was referring to earlier where the -- we

23   set some conditions for the transaction, those are on the

24   left-hand column where it says "follow up"; and the deal team

25   came back to us with their response to those conditions

Denise Parisi, RPR, CRR
Official Court Reporter

1    telling us whether they -- whether they were fulfilled or not

2    and what the current situation was, if they were not fully

3    fulfilled.

4    Q    Where the committee had follow-ups and a deal team

5    submitted memo addendum like this one, was it common for the

6    committee to hold a follow-up meeting?

7    A    It wasn't -- I don't know if "common" is the right word.

8    Actually, it wasn't common.  We would usually accept the deal

9    team -- I would accept the -- the committee, having received

10   confirmation that the follow-ups were followed up upon and

11   were finished.  We wouldn't necessarily have another meeting.

12            MR. WIBLE:  Mr. Youkilis, we can take that down.

13   BY MR. WIBLE:

14   Q    And, Mr. Mass, I would like to show you what's been

15   marked for identification as Government's Exhibit 807.  And,

16   Mr. Mass, it would be behind tab 4 in your binder.

17   A    I have it.

18            THE COURT:  Can you repeat that?

19            MR. WIBLE:  The number, Your Honor, it's 807.

20            THE COURT:  Thank you.

21   BY MR. WIBLE:

22   Q    Do you recognize that document?

23   A    Yeah.  It's a set of committee minutes for a meeting -- a

24   suitability committee on May 16th, 2012.

25            MR. WIBLE:  Your Honor, the Government offers

                        Denise Parisi, RPR, CRR
                        Official Court Reporter

295

1    Government's Exhibit 807.

2              MR. AGNIFILO:  No objection.

3              THE COURT:  It's admitted.

4              (Government Exhibit 807, was received in evidence.)

5    BY MR. WIBLE:

6    Q    Mr. Mass, what do --

7              MR. WIBLE:  Mr. Youkilis, if you could scroll down

8    to the bottom, couple paragraphs there.

9              Thank you.

10   BY MR. WIBLE:

11   Q    Mr. Mass, what do the minutes show is the outcome of this

12   May 16, 2012, suitability committee follow-up meeting?

13   A    Just give me a second to look at it.

14   Q    Sure.

15             (Pause.)

16   A    This shows that the team returned to the committee; we

17   had another meeting; there was discussion; and that we

18   approved the transaction subject to certain conditions, which

19   are listed.

20   Q    So at some point after -- after this May 16, 2012,

21   committee meeting, did the firm-wide suitability committee

22   ultimately approve Project Magnolia?

23   A    I don't have any specific recollection that we

24   approved -- we did anything subsequent, but this -- this is

25   approval so long as those four conditions are fulfilled.

                        Denise Parisi, RPR, CRR
                        Official Court Reporter

1    Q    Was the firm-wide suitability committees review here any

2    more or any less thorough than its review in connection with

3    any other deals?

4    A    It might have been more thorough than other deals.

5    Q    Following Project Magnolia, did Goldman handle other bond

6    issuances for 1MDB in 2012 and 2013?

7    A    Yes.

8           MR. WIBLE:  Mr. Youkilis, you could take that down,

9    please.

10   BY MR. WIBLE:

11   Q    For each of those bond deals, was there a similar review

12   by the firm-wide suitability committee?

13   A    Yes.

14   Q    I would like to ask you to take a look now at the last

15   two documents you have in your binder behind tabs 5 and 6.

16   It's what's been marked for identification as Government's

17   Exhibits 838A and 836A.

18   A    I see them.

19           (Continued on the following page.)

20

21

22

23

24

25

                        Denise Parisi, RPR, CRR
                        Official Court Reporter

MASS - CROSS - MR. AGNIFILO

1    Q    Do you recognize those documents?

2    A    Yes.  Those are the minutes reflecting our suitability

3    committee's approval of the two subsequent line B DB

4    transactions, Maximus and Catalyze.

5              MR. WIBLE:  Your Honor, the Government offers

6    Exhibits 838A and 836A.

7              MR. AGNIFILO:  No objection.

8              THE COURT:  They are admitted.

9              (Government Exhibit 838A & 836A, was received in

10   evidence.)

11             MR. WIBLE:  Can I have just one moment, Your Honor.

12             THE COURT:  Sure.

13             (Pause.)

14   Q    Mr. Mass, you just referred to Project Maximus and

15   Catalyze.  Did the firm's suitability committee ultimately

16   approve those transactions?

17   A    Yes.

18             MR. WIBLE:  Thank you, Your Honor.  No further

19   questions.

20             THE COURT:  Cross-examination, counsel?

21             MR. AGNIFILO:  Yes.

22   CROSS-EXAMINATION

23   MR. AGNIFILO:

24   Q    Good afternoon, Mr. Mass.

25   A    Good afternoon.

                    Michele Lucchese, RPR, CRR

MASS – CROSS – MR. AGNIFILO

1    Q    I know you are pursuing your philosophy Ph.D., so I'm not

2    going to keep you long.

3            Fair to say you don't have a clear recollection of

4    these meetings from ten years ago now.

5    A    Correct.

6    Q    Okay.  Do you know the man on trial?

7    A    I just know his name.

8            MR. AGNIFILO:  I have nothing else, Judge.

9            THE COURT:  Thank you.

10           Any redirect?

11           MR. WIBLE:  No, Your Honor.  Thank you.

12           THE COURT:  You are excused, Mr. Mass.  Thank you.

13           THE WITNESS:  Thank you, Your Honor.

14           (Witness excused.)

15           THE COURT:  Will the Government call its next

16   witness.

17           MR. WIBLE:  Yes, Your Honor.  The Government calls

18   Alex Cohen.

19           THE COURT:  Instead of having you wait, I'm not sure

20   where this witness is, so why don't we break for lunch for

21   half an hour.  So I will see you back at quarter to 2:00.

22   Please enjoy your lunch and please remember not to discuss the

23   case with anyone.

24           (Jury exits the courtroom.)

25           THE COURT:  I will see the parties at a quarter to.

Michele Lucchese, RPR, CRR

1            MR. AGNIFILO:  Thank you, Judge.

2            MR. WIBLE:  Thank you, Your Honor.

3          (Lunch recess.)

1

AFTERNOON SESSION
2                    (In open court; outside the presence of the jury.)

3              THE COURT:  Please be seated.

4              MR. WIBLE:  Would you like me to have the witness on

5     the stand before the jury comes in?

6              THE COURT:  Yes, that will save us time.

7              We are ready for the jury.

8              (The jury enters the courtroom.)

9              THE COURT:  Please be seated, everyone.

10             Members of the jury, I hope you had a great lunch.

11    I understand that the cafeteria was open today.  Excellent.

12             Can you swear in the witness, please.

13             Can you please stand and raise your right hand.

14             THE COURTROOM DEPUTY:  Do you solemnly swear or

15    affirm that the answers and the testimony that you are about

16    to give to the Court will be the truth, the whole truth and

17    nothing but truth?

18             THE WITNESS:  Yes.

19             THE COURT:  Can you state your name for the record,

20    sir.

21             THE WITNESS:  Alex Cohen, C-O-H-E-N.

22             THE COURT:  Thank you.  Please be seated.

23             You may proceed.

24             MR. WIBLE:  Thank you, Your Honor.

25    ALEX COHEN, called as a witness, having been first duly

MASS – DIRECT – MR. WIBLE

1   sworn/affirmed, was examined and testified as follows:

2   DIRECT EXAMINATION

3   BY MR. WIBLE:

4   Q    Good afternoon, Mr. Cohen.

5          What do you do for a living currently.

6   A    I am the CFO of a marketing company in New York.  Can

7   you --

8   Q    I'm not sure if it's on.

9   A    -- a CFO for a marketing company in New York.

10  Q    Could you explain what CFO means?

11  A    I'm responsible for the, I guess, overall finances of the

12  company, the financial health, accounts payable, accounts

13  receivable, invoicing, treasury, and the like.

14  Q    What's the name of the company?

15  A    Strategic Marketing Group.

16  Q    Are you also an owner of Strategic Marketing Group?

17  A    Yes.

18  Q    When did you become an owner of Strategic Marketing

19  Group?

20  A    Early 2013.

21  Q    And you said you were also the chief financial officer or

22  CFO of Strategic Marketing Group?

23  A    Correct.

24  Q    How long have you been the CFO of Strategic Marketing

25  Group?

MASS - DIRECT - MR. WIBLE

1    A    Since the fall of 2002.

2    Q    And in the 2009 to 2014 time period, what sorts of work

3    did Strategic Marketing Group do?

4    A    Special events, brand activation, influencer and

5    marketing, celebrity procurement, sampling events for liquor

6    companies, for software companies, PR.  It sort of ran the

7    gamut.

8    Q    When you say PR, what are you referring to?

9    A    Public relations.  Client would, you know, try to get a

10   placement in a media outlet and we would help with that.

11   Q    And you touched on this a bit already, but what sorts of

12   clients did Strategic Marketing Group work for, companies,

13   individuals?

14   A    Mostly companies, but individuals from time to time.

15   Company -- you know, some brands name companies.

16   Q    And in the instances where Strategic Marketing organized

17   an event, can you give a ballpark cost to the client of an

18   event that the company organized in the 2009 to 2014 time

19   period?

20   A    If it was a single night event, you know, maybe high six

21   figures, but --  all the way to 7, 8 million.  If it was an

22   event program, meaning a number of events over, you know,

23   several weeks or a program like that, it could, you know, also

24   be into the millions.

25   Q    And as the chief financial officer of Strategic

MASS – DIRECT – MR. WIBLE

1    Marketing, what role did you play in connection with events

2    that the company organized, or hosted?

3    A    Typically, my role would be invoicing the client for --

4    for the, you know, for the budget of the event, paying vendors

5    or, at least, my team and I paying vendors, wiring money, and

6    some insurance depending on the -- depending on the event, you

7    know, sometimes insurance would need to be procured, Workers'

8    Comp, liquor liability, other things, you know, with a big

9    catering event.

10   Q    Did Strategic Marketing ever organize any events for a

11   man named Jho Low?

12   A    Yes.

13   Q    Approximately how many events did Strategic Marketing

14   organize for Jho Low?

15   A    Four or five.

16   Q    Did you ever meet Jho Low?

17   A    No.

18   Q    Did you ever meet anyone who was sort of coordinating

19   these events on his behalf?

20   A    Yes.

21   Q    Who did you meet?

22   A    Catherine Tan.

23   Q    Could you just briefly describe the circumstances in

24   which you met Ms. Tan.

25   A    Sure.  So I believe she was a business manager for the

MASS − DIRECT − MR. WIBLE

1   client and we met to go over the budget for, I believe, the

2   2009 event in our offices in New York.

3   Q     And as you understood it, what sorts of events did

4   Strategic Marketing organize for Jho Low?

5   A     High-end celebrity, like high-end catering, decor,

6   celebrity, and maybe some musical talent, you know, maybe to

7   celebrate a birthday or, you know, just because.

8   Q     Did you personally attend any those events?

9   A     No.

10  Q     Did you help coordinate receipt of payment from the

11  client in payment to vendors in connection with those events?

12  A     Yes.

13  Q     Approximately how much did those events that Strategic

14  Marketing organized for Jho Low typically cost?

15  A     The range, I believe, was about I guess anywhere from 1

16  million all the way up to 8 million and change.

17  Q     And directing your attention now to 2010, do you recall

18  an event that Strategic Marketing organized for Jho Low that

19  year?

20  A     Yes.

21  Q     Where did it take place?

22  A     Vegas, I believe.

23  Q     Do you remember the specific location in Las Vegas?

24  A     The Venetian Hotel.

25  Q     And what do you recall about that event generally?

MASS - DIRECT - MR. WIBLE

1   A     It was a budget in the 3 million, three-three range.

2   There were a number of celebrities.  There were some musical

3   talent.  And, yeah, that's -- you know, it was a very high-end

4   event.

5   Q     I would like to show you what has been marked for

6   identification as Government Exhibit 2801.  You should have a

7   binder next to you and it should appear behind tab one in your

8   binder and it should also be up on the screen.

9              THE COURT:  2801?

10             MR. WIBLE:  Yes, Your Honor.

11             THE WITNESS:  Okay, I have it.

12  Q     Do you recognize that document, Mr. Cohen?

13  A     I do.

14  Q     Did you -- does it contain e-mails that you sent and

15  received in the course of your work at Strategic Marketing?

16  A     It does.

17             MR. WIBLE:  The Government offers Government Exhibit

18  2801.

19             MR. INTRATER:  No objection, Your Honor?

20             THE COURT:  It is admitted.

21             (Government Exhibit 2801, was received in evidence.)

22  Q     Mr. Cohen, this is an e-mail chain dated October 18, 2010

23  and the top e-mail in the chain is from Jason Strauss to you

24  and I think there are also some messages in here from a person

25  named Noah Tepperberg.

MASS - DIRECT - MR. WIBLE

1      Can you just explain who Jason Strauss and Noah

2   Tepperberg.

3   A     Noah Tepperberg and Jason Strauss were the primary owners

4   of Strategic Marketing during this time.

5   Q     And are they today?

6   A     They are not.

7   Q     Just focusing for a moment on the first e-mail in the

8   chain at the top of the page there, under -- in the signature

9   block for Jason Strauss it lists Strategic Hospitality Group,

10  Tao, Lavo Tao Beach.  Can you just generally describe what

11  that is a reference to?

12  A     Jason -- at that time Jason and Noah also had interests

13  in some hospitality venues and those are some of them.

14  Q     When you say "hospitality venues," what are you referring

15  to?

16  A     Bars, nightclubs, day clubs.  You know, generally, more

17  like bars and clubs rather than restaurants.

18  Q     Got it.

19         So, now, if I could direct your attention to the

20  first e-mail in the chain which appears on the top of page 2.

21  A     Okay.

22  Q     So this is a message from Jason Strauss to you and Noah

23  Tepperberg, it reads, "What SG wire info?  Catherine Tan is

24  going to wire us money for the Jason Tan Bday."

25         What did you understand him to be referring to when

MASS – DIRECT – MR. WIBLE

1   he wrote "What SG wire info."

2   A    I think he was asking for our wire info so the client

3   could pay us for this event.

4   Q    And, specifically, the reference to "SG," you understood

5   that to be what?

6   A    Strategic Marketing Group.

7   Q    So, moving up in the chain, now at the bottom of page

8   1 -- well, maybe one other question there.

9        Jason Strauss had referenced Catherine Tan in this

10  e-mail.  Who is that.

11  A    Catherine Tan, I believe, or it was -- she was the

12  business manager, as I mentioned before, for the client.  So

13  she was like my counterpart, but on the client side.

14  Q    So, now, moving up to the next e-mail in the chain that

15  appears at the bottom of page 1.

16  A    Okay.

17  Q    Noah Tepperberg responds with some bank account wiring

18  information for Strategic Marketing Group, and then scrolling

19  up immediately above that e-mail, you send, at 6:35 p.m., on

20  October 18th, "Provide bank address."  And you wrote "What

21  event is this?  And how is it working?  How much is the wire?

22  I don't know anything.  Thanks."

23       Can you just explain what you were saying there and

24  why you were asking those questions.

25  A    Right.  Typically we would -- when we were doing an event

MASS – DIRECT – MR. WIBLE

1    or event program, we would, you know, create a file of, you

2    know, just the details of the event and how the payment was

3    going to work, if it was going to be in full, if it was going

4    to be in installments just so we can get the team ready, that

5    they were aware that they were going to, you know, have to pay

6    vendors, and et cetera, et cetera.  So I was just trying to

7    get what this was so we could start allowing for, you know,

8    the workflow of the event.

9    Q    Now, scrolling up to the e-mail at the top of the page,

10   this is the response from Jason Strauss, who wrote "Jho Low

11   Bday.  Will explain tomorrow.  We are booking talent for his

12   Bday."

13          Were you involved in booking talent for events that

14   Strategic Marketing organized.

15   A    No.

16          MR. WIBLE:  If you could take that down, Mr.

17   Youkilis.  I would like you to now take a look, please, at the

18   document behind tab 2 in the binder.  This has been marked for

19   identification as Government Exhibit 2802.

20   A    Okay.

21   Q    Do you recognize that document, Mr. Cohen?

22   A    I do.

23   Q    And does this document consist of e-mails you sent or

24   received in the course of your work at Strategic Marketing?

25   A    It does.

309

MASS – DIRECT – MR. WIBLE

1      MR. WIBLE:  Your Honor, the Government offers

2  Government Exhibit 2802.

3      MR. INTRATER:  No objection, Your Honor.

4  It is admitted.

5      (Government Exhibit 2802, was received in evidence.)

6  Q   I would like to draw your attention first to the e-mail

7  that appears at the -- well, the lower part of the page.  It

8  is an e-mail chain from November 18, 2010, among you, Jason

9  Strauss, and Noah Tepperberg.  And in the first e-mail in the

10 chain, Mr. Tepperberg asks "Any word from Jho on his Bday?"

11      And scrolling up just above that, you respond,

12 "Nothing has hit Strategic Group.  Has this been confirmed."

13      Can you just explain what you were saying there.

14 A   Right.  The funds hadn't hit the account yet and then I

15 just followed up with is this event actually happening.

16 Q   And then scrolling up just to the very top e-mail on the

17 chain, Mr. Strauss responds, "I will hit her again."

18      Did you understand who he was referring to there.

19 A   Yes.

20 Q   Who was that?

21 A   Catherine Tan.

22 Q   Again, who is she?

23 A   The business manager for the client.

24      MR. WIBLE:  Okay.  You can take that down, please.

25 Q   Now, I would like you to take a look if you would at what

MASS – DIRECT – MR. WIBLE

1   has been marked for identification as Government Exhibit 2807

2   and it should be behind tab three in your binder.

3   A    I have it.  Thank you.

4   Q    Do you recognize that document?

5   A    I do.

6   Q    And does this document consist of e-mails you sent and

7   received in the course of your work at Strategic Marketing?

8   A    It does.

9        MR. WIBLE:  Your Honor, the Government offers

10  Government Exhibit 2807.

11       THE COURT:  Do you have any objection, counsel?

12       MR. INTRATER:  I'm sorry, Your Honor.  No, I do not.

13  Thank you, Your Honor.

14       THE COURT:  It is admitted.

15       (Government Exhibit 2807, was received in evidence.)

16  Q    Mr. Cohen, if you would, I'd like to draw your attention

17  to the bottom of the first page.  There's an e-mail there from

18  Noah Tepperberg to you and Seth Rodsky, dated November 3, 2010

19  at 7:47 p.m.  It reads, "Alex, see below from Jho and please

20  advise."

21       And if you can turn to page 2 of the exhibit, can

22  you just explain what sort of message it was that Mr.

23  Tepperberg was forwarding to you here.

24  A    I believe that was a screen shot of a Blackberry

25  messenger message.

MASS – DIRECT – MR. WIBLE

1   Q    And, so, it reads, "Bank has confirmed funds sent.

2   Please confirm receipt."  It's from Tan Kim Loong via his

3   company.  And then there is like a line break.

4           "Please do not have my name anywhere on any invoices

5   or e-mails or bank because I'm not involved."

6           Another break.  Tan Kim Loong.  "Eric doing entire

7   charity Thanksgiving event and paying for it."

8           Another line break and then "okay."

9           Did you know who Tan Kim Loong or Eric was.

10  A    No.

11  Q    Did you ever meet him?

12  A    No.

13          MR. WIBLE:  You can take that down, please.

14  Q    I'm going to ask you now to take a look at couple of

15  exhibits.  They should be behind tabs four and five in your

16  binder.

17  A    Okay.

18  Q    And these have been marked for identification as

19  Government Exhibits 2803 and 2803A.  If you could just take a

20  minute and have a look at those, please.

21  A    Okay.

22  Q    Is that an e-mail that you sent in the course of your

23  work at Strategic Marketing?

24  A    It is.

25          MR. WIBLE:  Your Honor, the Government offers

MASS - DIRECT - MR. WIBLE

1    Government Exhibit 2803 and Government Exhibit 2803A.

2              MR. INTRATER:  No objection.

3              THE COURT:  Thank you.  It is admitted.

4              (Government Exhibit 2803 & 2803A, was received in

5    evidence.)

6              MR. WIBLE:  Very quickly just highlight the e-mail,

7    blow up the e-mail on the left side first, please.

8    Q    This is an e-mail dated November 19, 2010 from you to an

9    e-mail address cs.cst11@gmail copying Noah Tepperberg and

10   Jason Strauss.

11             Who were you sending the e-mail to at that e-mail

12   address.

13   A    Catherine Tan.

14             MR. WIBLE:  If we could just turn now to the

15   attachment to the e-mail, Government Exhibit 2803A, which is

16   behind tab number five.

17   Q    What is this document?

18   A    This is an invoice, invoicing the client for the event.

19   Q    Okay.  And to whom was the invoice addressed?

20   A    Butamba Investments, Ltd.

21   Q    Where?

22   A    British Virgin Islands.  Attention Tan Kim Loong Tong.

23   Q    And can you briefly just walk us through the items on the

24   invoice and briefly explain what they me?

25   A    Sure.  The first line, the 1.314 million is for the

MASS – DIRECT – MR. WIBLE

1  production, the decor, the staging, the entertainment, the

2  sound and -- in connection with not only the general decor for

3  the party but the set up for the artists, you know, the stage,

4  you know, all of the equipment that the artists would need to

5  have the performance.

6          Then the next is just, you know, catering the food,

7  the booze, the catering staff, the rentals, which would be

8  like tables and glassware, et cetera, et cetera.

9          And then the next line item, 1235, would be fees

10  that we were paying to celebrities and musical talent to

11  attend the event and perhaps perform.

12          And the last item is for Asian artists.  Yeah, I

13  don't remember exactly, you know, what the art was, but that's

14  what it's for.

15  Q    And what was the total amount of the invoice?

16  A    $3,518,580.

17          MR. WIBLE:  You can make take that down, Mr.

18  Youkilis.

19  Q    Now, Mr. Cohen, did Strategic Marketing frequently either

20  create or receive guest lists for guests that would be

21  attending events organized by Strategic Marketing?

22  A    Yes.

23  Q    And what, if anything, would the company do with those

24  guest lists?

25  A    It was a document where we were able to track who was

314

MASS - DIRECT - MR. WIBLE

1    planning on coming to the event, how many people they were

2    attending with.  There could be travel information on there

3    also, their flight, their ground transportation needs.

4          It was sort of like a tool that helped with a few

5    different facets of the event.

6    Q    I'd now like to ask you to take a look at a few documents

7    here, Government Exhibits 2804, 2804A, 2811, and 2812.  And

8    they should be behind tabs 6, 7, 9, and 10 in your binder.

9    A    Okay.

10   Q    Do you recognize those documents?

11   A    I recognize that these are documents that we would have

12   and maintain regarding an event, but they were not to me.

13   Q    So you didn't personally receive the e-mails and

14   attachments here?

15   A    Correct.

16   Q    Are these e-mails and the attachments records that were

17   and are maintained by Strategic Marketing?

18   A    Yes.

19   Q    And were these documents provided to Strategic Marketing

20   in connection with two events that Strategic Marketing

21   organized for clients?

22   A    It appears so, yes.

23   Q    And were they kept and maintained by Strategic Marketing

24   in the ordinary course of business?

25   A    Yes.

315

MASS – DIRECT – MR. WIBLE

1      MR. WIBLE:  Your Honor, Government offers Government

2   Exhibits 2804, 2804A, 2811 and 2812.

3      MR. INTRATER:  No objection, Judge.

4      THE COURT:  They are admitted.

5      (Government Exhibit 2804, 2804A, 2811, 2812, was

6   received in evidence.)

7   Q   Let's look first at 2804 that we've got up.  It's a

8   November 22, 2010 e-mail.

9   A   Okay.

10  Q   "Subject:  Kindly review."  What e-mail account was this

11  one sent from?

12  A   Eric -- erickimloong.tan@gmail.com.

13  Q   Could you please read the text of the e-mail out loud to

14  the jury?

15  A   "Dear Cat, Noah, Jason:  FYI attached.  Please confirm.

16  You should receive funds on Tuesday, went out today.  Let's

17  lock in all.  Looks like smaller group than expected, but

18  let's make it intimate and pack it up with hot girls, only

19  top-quality model ones, please.  Thank you."

20  Q   Did Strategic Marketing ever arrange for models to attend

21  events that it organized?

22  A   Yes.

23  Q   Let's turn now to Government Exhibit 2804 in evidence.

24  It should be behind tab 7.

25  A   Okay.

MASS - DIRECT - MR. WIBLE

1  Q    This was the attachment to that e-mail you just looked

2  at.  What is this document?

3  A    This is a page of a guest list.

4  Q    Are there different categories of guests listed on this

5  guest list?

6  A    Yes.

7  Q    What are the categories?

8  A    Female, male celebs, female celebs.

9  Q    And male as well on the left-hand side?

10  A    Sorry.  Right.  Male, female, male celebs, female celebs.

11  Q    What is last name listed in the male category?

12  A    Roger Ng.

13  Q    Do you know whether any of the people listed on this

14  guest list actually attended the events?

15  A    I do not.

16  Q    Can you just identify some of the celebrities who are

17  listed on the guest list?

18  A    Yes.  Olivia Munn.  Sorry.  I'm just having trouble

19  reading it.

20       MR. WIBLE:  Mr. Youkilis, if you could just blow up

21  the male celebs.

22  A    Thank you.  Fergie, Kim Kardashian.

23       I'm just looking at the males.

24       Yeah.  Those seem to be the bold-- you know, the

25  boldface names.

MASS - DIRECT - MR. WIBLE

1       I'm sorry.  Jamie Foxx, Ferrell, P. Diddy and Leo

2   DiCaprio.

3   Q   And, now, if you would take a look at Government Exhibit

4   2811 in evidence.  It is an e-mail dated November 2, 2012.

5   I'm sorry.  This should be behind tab nine in your binder.

6   Let me know --

7   A   Yes, thank you.  Got it.

8   Q   And it is an e-mail dated November 2, 2012.

9   A   Okay.

10  Q   If we could turn now to the attachment, Government

11  Exhibit 2812, behind tab 10.

12  A   Okay.

13  Q   What is this document?

14  A   This also appears to be a guest list.

15  Q   And does Tim Leissner's name appear on this guest list?

16  A   It does.

17  Q   I would like to ask you to take a look at one more

18  document.  You can take that one down.  This one has been

19  marked for identification as Government Exhibit 2809.  It

20  should be behind tab 8 in your binder.

21  A   Okay, I have it.

22  Q   Do you recognize that document?

23  A   I do.

24  Q   Is it an e-mail that you sent in the course of your work

25  at Strategic Marketing?

MASS – DIRECT – MR. WIBLE

1    A    It is.

2            MR. WIBLE:  Your Honor, the Government offers

3    Government Exhibit 2809.

4            MR. INTRATER:  No objection, Your Honor.

5            THE COURT:  It is admitted.

6            (Government Exhibit 2809, was received in evidence.)

7    Q    Mr. Cohen, this is an e-mail you sent on January 14,

8    2011, addressed to Cat.

9            Who are you referring to as Cat there.

10   A    Catherine Tan.

11   Q    And generally, what's laid out or what's set out in this

12   e-mail?

13   A    This is a line item list of actual costs that were spent

14   on the November 2010 event.

15   Q    So just looking down the list of costs under the heading

16   11/29/10, there are several entries there for Diddy.  Who are

17   you referring to as Diddy?

18   A    Puff Daddy, the producer and the recording artist.

19           (Continued on next page.)

20

21

22

23

24

25

1    Q    And just below that there are a number of entries for

2    Kesha.  Who are you referring to as Kesha?

3    A    Kesha is also a female pop star, recording artist.

4    Q    Can you generally describe what the fees or various line

5    items listed are for Diddy and Kesha?

6    A    Sure.  So it looks like Diddy's fee was his -- the fee

7    that we paid him to appear and perhaps perform at the event,

8    the plane was the cost of the private plane to get him there.

9    The over flight, I don't know what that means.  The catering

10   and the WiFi I believe would be for the plane, the plane

11   catering and the WiFi; and then Diddy ground would be cars for

12   Diddy and any of his group, to get to and around the event.

13        With respect to Kesha, the same thing, 150,000 for

14   her to appear/perform, if she did.  The plane, the same thing,

15   a private plane for her.  Commercial flights would be for, I

16   guess, her junior staff to get there and return.  Ground

17   transportation, cars for her and her crew.  Catering, I don't

18   know, and security would be for most likely a security person

19   for Kesha, most likely someone that she chose.

20   Q    And just below those entries there's an entry for Foxx

21   flight.  Who were you referring to as Foxx?

22   A    Jamie Foxx, the actor/recording artist.

23   Q    A few entries down the page there are a couple of line

24   items there for DiCaprio.  Who were you referring to as

25   DiCaprio?

SN   OCR   RPR

1    A    The actor, Leonardo DiCaprio.

2    Q    And the very last line item, models $31,000, can you

3    explain what that's a reference to?

4    A    Payments to models, aspiring actresses, actors to be at

5    the event, sort of to fill the room.

6    Q    If we could turn then to the second page of the exhibit,

7    about five lines down from the top there's a line item for old

8    hospitality tabs.  So from there down to the bottom of your

9    e-mail, did those entries relate to the November 2021 event in

10   Las Vegas?

11   A    The old hospitality tabs through which one --

12   Q    From there down through the end of your list.

13   A    Well, the -- the old hospitality tabs, Lavo, Avenue,

14   Avenue Low, Lavo Las Vegas Marquis were and then the next one,

15   were definitely not related to the event.

16   Q    And can you explain to us what Lavo NYC, Avenue NYC,

17   Lavo --

18   A    Those are hospitality venues that Strategic Hospitality

19   Group had an interest in in clubs and bars in New York City

20   and Vegas.

21   Q    And as you understood it, whose bills were listed in this

22   part?

23   A    Jho Low.

24   Q    And at the bottom of the e-mail there's total estimate

25   $3.47 million and estimated balance on hand $29,275.

SN   OCR   RPR

A. COHEN – CROSS – MR. INTRATER

1          Can you generally describe what those entries

2     represent.

3     A     Yeah.  So, the total estimated is the sum of all of those

4     line items on this page and the prior page and the estimated

5     balance on hand is the difference between what we were paid on

6     that invoice earlier and what was spent.

7               MR. WIBLE:  May I have one moment, Your Honor?

8               THE COURT:  Yes.

9               (Pause in proceedings.)

10              MR. WIBLE:  No further questions.

11              THE COURT:  Cross-examination.

12              MR. INTRATER:   Thank you, Your Honor.  May I

13    approach the witness?  I have a binder of exhibits for him.

14              THE COURT:  Sure.

15              MR. INTRATER:   Thank you so much.

16    CROSS-EXAMINATION

17    BY MR. INTRATER:

18    Q     Good afternoon, Mr. Cohen.

19    A     Good afternoon.

20    Q     My name is Zack Intrater and I represent Roger Ng.  The

21    Government asked you some questions and I would like to ask

22    you a few more.  Have you ever met Roger Ng?

23    A     No.

24    Q     I will point him out.  Have you ever sent Roger Ng an

25    e-mail?

SN   OCR   RPR

A. COHEN - CROSS - MR. INTRATER

1   A    Not that I recall.

2   Q    Did you ever receive an e-mail from Roger Ng?

3   A    Not that I recall.

4   Q    Did you ever send a text message?

5   A    No, not that I recall.

6   Q    Did you ever receive a text message from him?

7   A    Not that I recall.

8   Q    Did you ever send or receive any kind of communication

9   from Roger Ng?

10  A    No.

11  Q    You work for Strategic Marketing; correct?

12  A    Correct.

13  Q    And you are currently the CFO as well as an owner?

14  A    Correct.

15  Q    Is it fair to say, among other things, that you keep

16  track of the money?

17  A    Correct.

18  Q    Has any entity associated with Strategic ever received a

19  dollar from Roger Ng?

20  A    I would only know the Strategic Marketing Group entity.

21  Q    Okay.  How about that entity?

22  A    No.

23  Q    No?

24  A    Correct.

25  Q    Has Strategic Marketing, the entity you know, ever paid

SN   OCR   RPR

A. COHEN - CROSS - MR. INTRATER

1    any money to Roger Ng?

2    A    Not that I know of.

3    Q    Has Strategic Marketing ever thrown a party in honor of

4    Roger Ng?

5    A    Not that I know of.

6    Q    The Government has called you to testify here today at a

7    trial for a man that you never met, never communicated with

8    and never did any business with.  Do I have that right so far?

9    A    Yes.

10   Q    Okay.  Now, let's talk about Jho Low who the Government

11   talked to you about and who you have interacted with.  You

12   never met him, but you interacted with him; right?

13   A    I never interacted with him.

14   Q    You never met him?

15   A    Or interacted with him.

16   Q    But you had e-mail exchanges back and forth, no?

17   A    Not with Jho Low.  Not me.

18   Q    Only you and Catherine Tan?

19   A    I believe so.

20   Q    Who you understood to work for Jho Low?

21   A    Correct.

22   Q    I got it.  Thank you.

23        Now, you started with Strategic Marketing in about

24   2002.

25   A    Correct.

SN   OCR   RPR

A. COHEN - CROSS - MR. INTRATER

1    Q    And were you the CFO right off the bat?

2    A    Yes.

3    Q    Strategic at that point was owned by Noah Tepperberg?

4    A    Yes.

5    Q    And a guy named Jason Strauss?

6    A    Yes, this was a third partner at that time.

7    Q    And who was the third partner?

8    A    Tony Berger, B-E-R-G-E-R.

9    Q    Okay.  Before the pandemic a big part of Strategic's

10   business was throwing parties; is that right?

11   A    Yes.

12   Q    You can put it anyway you want, but it's organizing

13   events, how ever you like to put it?

14   A    Yes, throwing parties, sampling events, big events;

15   correct.

16   Q    And as you said on direct some of these parties can get

17   pretty pricey?

18   A    Correct.

19   Q    It could be up to several million dollars?

20   A    Correct.

21   Q    For a single nights event?

22   A    Correct.

23   Q    And you mentioned on direct Strategic would put on events

24   for both organizations, corporations, et cetera, as well as

25   for individuals; right?

325

A. COHEN - CROSS - MR. INTRATER

1   A    Correct.

2   Q    Can you give the jury a representative estimate of the

3   percentage of events that Strategic put on for corporations

4   and organizations versus ones that were thrown by individuals?

5   A    95 percent corporations, 5 percent individuals.

6   Q    What types of individuals can afford a 2 or 3 or $7

7   million party?

8   A    Very successful ones.

9   Q    At least financially successful.

10  A    Correct.

11  Q    So even if someone is making a million dollars a year,

12  they couldn't afford a 3 million, $7 million party; is that

13  fair?

14  A    That's fair.

15  Q    So, in your experience, were there any differences

16  between the corporate affairs that Strategic put on and the

17  individual affairs that Strategic put on?

18  A    Yes.

19  Q    Okay, could you tell the jury what some of those

20  differences might be?

21  A    Sure.  So typically when we did a corporate event it was

22  for a brand a new product of a brand, so there was a there was

23  some Strategic strategy or there was a strategy orders

24  promoting you know promoting a brand or a party?

25  Q    Is that why you're Strategic?

SN   OCR   RPR

326

A. COHEN - CROSS - MR. INTRATER

1    A    Yes, no pun intended.

2    Q    Okay.

3    A    Whereas the individual events were more, you know, just

4    to celebrate life, a birthday, you know, whatever --

5    whatever -- however the wind was blowing.

6    Q    Fair enough.  You and I have never met before; correct?

7    A    Correct.

8    Q    But in preparation for your testimony here today you met

9    with the Government several times; is that right?

10   A    I spoke with the Government.

11   Q    You never met them in person?

12   A    Not until today.

13   Q    About how many times did you meet with them?

14   A    Three.

15   Q    And one of those meetings was December 17th of 2021, I

16   think?

17   A    I don't remember.

18   Q    Was it in December, if you remember?

19   A    That sounds right.

20   Q    And another meeting you had with them late January, is

21   that accurate?

22   A    Yes.

23   Q    And when was the third, if you can remember?

24   A    There was a quick call a few days ago.

25   Q    How long were the meetings?

SN   OCR   RPR

A. COHEN - CROSS - MR. INTRATER

1   A    The first two were about an hour and ten minutes and this

2   last one -- again, these were calls or video calls.  It was

3   about 50 minutes.

4   Q    When the Government met with you the second time, they

5   asked you questions just like the first time, right?

6   A    Correct.

7   Q    There were some different questions the second time than

8   the first time; right?

9   A    I don't remember.  I thought it was pretty similar, but

10  you may be right.  Nothing materially different between one

11  and two.

12  Q    I wasn't there?

13  A    Right, right, right, right.

14  Q    Okay.  But they added -- there were additional facts and

15  they clarified things; is that fair to say?

16  A    Yes.

17  Q    It would have been strange if the questions were exactly

18  precisely the same from one to the next, right?  That's not

19  your recollection.

20            THE COURT:  Sustained.  Rephrase the question.

21            MR. INTRATER:   I will move on, Judge, thank you.

22  BY MR. INTRATER:

23  Q    So Roger Ng was never a Strategic client but Jho Low was;

24  correct?

25  A    Correct.

SN   OCR   RPR

A. COHEN – CROSS – MR. INTRATER

1   Q    Is it fair to say that for a period, let's call it 2012,

2   Jho Low was one of Strategic's biggest clients; right?

3   A    Yes.

4   Q    And indeed Jho Low and entities related to him provided

5   Strategic with about $8 million over the course of 2012; is

6   that right?

7   A    Top line revenue, yes, but not profit.

8   Q    But how about the top line revenue of Strategic total in

9   2012, how much was that, just rough?  I mean, I just want the

10  jury to get a rough estimate?

11  A    Understood.  Maybe 30, 35 million top line.

12  Q    So Jho Low could have provided as much as 25 percent of

13  Strategic's top line revenue in 2012; right?

14  A    Correct, but not profit.

15  Q    Understood.

16  A    Yes, yes.

17  Q    And Roger Ng provided 0.0 percent of Strategic's top line

18  revenue; right?

19  A    As far as I know, right.

20  Q    You first held an event for Jho Low in 2009; right?

21  A    Yes.

22  Q    At the time, did you have any information that Jho Low

23  was a criminal?

24  A    No.

25  Q    Did you have any information that he was paying you for

SN   OCR   RPR

A. COHEN – CROSS – MR. INTRATER

1   his party with stolen money?

2   A    No.

3   Q    Did you have any information that he was paying you for

4   his party that he defrauded from somebody?

5   A    No.

6   Q    Did you know in 2009 that Jho Low was a bribe payer?

7   A    No.

8   Q    If you had thought any of that at the time, no way you

9   would have taken his money; right?

10  A    Correct.

11  Q    You hesitated there for a minute.

12         So, Strategic, you said on direct organized you said

13  four to five, I think, but I just want to walk through with

14  you here on cross.

15  A    All right.

16  Q    November in 2009 there's a birthday party in Las Vegas;

17  right?

18  A    Correct.

19  Q    Now, in 2010, were there two events for Jho Low in

20  November or just one?

21  A    I only remember the one that we spoke about earlier.

22  Q    Okay.  Now, the one that we spoke about earlier in 2010,

23  that was actually characterized as a charity event; is that

24  right?

25  A    At one point it was.

330

A. COHEN - CROSS - MR. INTRATER

1    Q    In late November of 2010; correct?

2    A    Correct.  Thanksgiving, around Thanksgiving.

3    Q    In February of 2011, okay, there was a Grammy party or a

4    party relating to the Grammys at around the same time as the

5    Grammys and that was held in California; right?

6    A    Correct.

7    Q    And then July of 2012, we're moving into 2012, there was

8    a boat trip.  And where was that?

9    A    I don't remember what -- where it was, like, what part of

10   the world but it was a small-ish event that I forget our role

11   in that, but I do remember it.  I do remember something about

12   it.

13   Q    Could it have been France?

14   A    I really don't know.

15   Q    We'll look at a document in a minute and see if it

16   refreshes your recollection.

17        Later in 2012 in November of 2012 there's a real

18   extravaganza for Jho Low's birthday; correct.

19   A    Correct.

20   Q    And would you say that this November of 2012 event, was

21   that the single biggest event that Strategic held for Jho Low

22   or were they all sort of similar in size?

23   A    That was the biggest.

24   Q    And that's November of 2012, that's a birthday party and

25   that's Las Vegas; correct?

SN   OCR   RPR

A. COHEN - CROSS - MR. INTRATER

1    A    Correct.

2    Q    And then in April of 2013 there was a party that was

3    organized in Malaysia; right?

4    A    Can I stop you there?

5    Q    Sure.

6    A    We didn't have anything to do with -- we had -- we had

7    nothing more to do with that client after 12/31/2012.  When I

8    say we, Strategic Marketing Group, you know, did not -- we did

9    not engage them.  So that's why I said four or five events

10   because I think you just listed about five.

11   Q    I think I know where you are going with that.  You

12   mentioned before, you told the jury that around the end of

13   2012 the beginning of '13, Tepperberg and Strauss ceased to be

14   associated with Strategic; right?

15   A    Yes, right, and I could see where the confusion is.  It's

16   12/31 of 2012 officially.

17   Q    All right.  Do you understand that in April of 2013,

18   there was a party in Malaysia that Tepperberg and Strauss put

19   on for Jho Low in Malaysia?

20   A    I don't remember.

21   Q    Okay.  There's a document that I can try to show you to

22   refresh your recollection on that, but we will move on.

23   A    Okay.

24   Q    Now, some of these parties that Strategic organized for

25   Jho Low included celebrities; correct?

SN   OCR   RPR

A. COHEN - CROSS - MR. INTRATER

1   A    Correct.

2   Q    And only if you know, do you know whether any of these

3   celebrities were real, longtime friends of Jho Low?

4   A    I don't.

5   Q    Like, did Leonardo DiCaprio and Jho Low go to school

6   together?

7   A    I don't know.

8   Q    In fact, lots of these celebrities were getting paid to

9   go to these parties; correct?

10  A    Correct.

11  Q    And some of the people that you mentioned on direct are

12  musicians; correct?

13  A    Correct.

14  Q    And musicians play music at parties?

15  A    Correct.

16  Q    But other of the celebrities were not musicians; correct?

17  A    Correct.

18  Q    So what was their role?

19  A    To spruce up the party, to, you know --

20  Q    Could you take a look at the first document in your

21  binder there, AC-03.

22  A    Yes, I have it.

23  Q    Do you recognize this document?

24  A    I don't remember it, but --

25  Q    Do you recognize what it is?

SN   OCR   RPR

A. COHEN - CROSS - MR. INTRATER

1   A    It looks like it's referring to a --

2   Q    I'm sorry, I'm trying to get it into evidence.

3   A    Yes, yes.

4   Q    I'm asking whether you recognize it.

5   A    Yes, yes.

6   Q    What do you recognize it to be?

7   A    I recognize it to be an e-mail that is --

8   Q    Is it one e-mail or a series of e-mails?

9   A    A series of e-mails.

10  Q    Okay.

11  A    That is discussing a -- an agreement, an appearance

12  agreement for Leo DiCaprio.

13  Q    And did you send and receive e-mails in this chain in the

14  course of your duties at Strategic?

15  A    Yes.

16         MR. INTRATER:  Your Honor, the defense offers

17  Defendant's Exhibit AC-03.

18         MR. WIBLE:  No objection, Your Honor.

19         THE COURT:  It is admitted.

20         (Defendant Exhibit AC03, was received in evidence.)

21  BY MR. INTRATER:

22         MR. INTRATER:  If we can put this up and go,

23  Ms. Silverstein, to the bottom of page one and highlight that

24  subject line from and to.

25         (Exhibit published.)

SN   OCR   RPR

A. COHEN - CROSS - MR. INTRATER

1   Q    Do you see the bottom there, the bottom e-mail there,

2   from Melanie Washington sent November 2, 2009 to Noah

3   Tepperberg?

4   A    Yes.

5   Q    The subject line is re Caesar's Palace, L. DiCaprio

6   appearance agreement.  Do you see that?

7   A    Yes.

8   Q    And do you have an understanding of who L. DiCaprio is?

9   A    Yes.

10  Q    Now, can you turn to the third page of this document and

11  the fourth page of this document.

12              (Exhibit published.)

13  Q    Let me know if pages three and four are an executed

14  agreement, a contract?

15  A    Yes, they appear to be.

16              MR. INTRATER:  Could you turn to page three.

17              (Exhibit published.)

18  A    Yes.

19  Q    Terrific?

20              MR. INTRATER:  Could we pull out the paragraph one

21  if you can make that bigger, just paragraph one?  The one

22  numbered one.

23              (Exhibit published.)

24  BY MR. INTRATER:

25  Q    And do you see that this is an agreement for Leonardo

                        SN   OCR   RPR

A. COHEN - CROSS - MR. INTRATER

1    DiCaprio; is that right?

2    A    Yes.

3    Q    It's an agreement for him -- a contract for him to show

4    up at this party; right?

5    A    Correct.

6    Q    And the purchase -- who is paying Leonardo DiCaprio to

7    come to this party has to pay him an appearance fee; correct?

8    A    Correct.

9    Q    And in 1-A they have to provide him with exclusive

10   roundtrip private plane travel; right?

11   A    Correct.

12   Q    If you look at 1-A how long does Leonardo DiCaprio have

13   to stay at this party?

14   A    About, just about one --

15   Q    Is it, like, a day?

16   A    Yes.

17   Q    Okay.  And, in B does -- subparagraph B, does it indicate

18   what Leonardo DiCaprio has to do for however much money he's

19   going to get for showing up at this party?

20   A    Yes.

21   Q    What are the things he has to do?

22   A    Attend a party, attend a dinner, be present for private

23   gambling activities.

24   Q    He has to do those three things.  It's not a test.

25   A    Yes, yes.

SN   OCR   RPR

336

A. COHEN - CROSS - MR. INTRATER

1    MR. INTRATER:  Can we just go to paragraph two,

2   please.

3    (Exhibit published.)

4   BY MR. INTRATER:

5   Q    Now let's see how much he's going to get paid for doing

6   those three things.  How much is he going to get paid for

7   doing those three things?

8   A    $100,000.

9   Q    Well, that's the upfront fee.

10  A    $150,000.

11  Q    Yeah.  He has to show up in Vegas for one day.  He has to

12  go to a party, eat some food and be present for gambling and

13  he gets $150,000?

14  A    It appears that way.

15  Q    Okay.  And the agreement is signed; right?

16  A    Yes.

17  Q    Okay.  Now, the first event that Strategic hosts or puts

18  on for Jho Low, just approximately, do you remember about how

19  much that party cost, just approximately?

20  A    I don't -- I don't remember.  Maybe -- I don't remember.

21  Q    No problem.  Would it be at least in the high six

22  figures?

23  A    Yes.

24  Q    And it could be seven figures, that is over $1 million

25  but you don't remember exactly?

SN   OCR   RPR

A. COHEN - CROSS - MR. INTRATER

1  A    Correct.

2  Q    Totally fine.

3  A    Can you please look at document AC-05, Defendant's

4  Exhibit.

5          (Exhibit published.)

6  A    Yes.

7  Q    Do you recognize this document?

8  A    Yes.

9  Q    And what do you recognize it to be?

10  A    The attachment or the e-mail?

11  Q    Both, both.

12  A    It's an e-mail from Noah to me from -- to me and Melanie

13  with a copy to Jason and it is a followed by an attachment

14  which is a budget for an event.

15  Q    And this was created in the course of your work at

16  Strategic; is that right?

17  A    Correct.

18          MR. INTRATER:  Your Honor, the defense offers

19  Exhibit AC-05.

20          MR. WIBLE:  No objection.

21          THE COURT:  It is admitted.

22          (Defendant Exhibit AC-05, was received in evidence.)

23          (Exhibit published.)

24  BY MR. INTRATER:

25  Q    This is an e-mail from Noah Tepperberg -- and at that

A. COHEN - CROSS - MR. INTRATER

1  point he's one of the owners of Strategic; correct?

2  A    Correct.

3  Q    And he says to you, I added in 5K for Sasha's model

4  wrangling fee and then 31K -- that means $31,000; right?

5  A    Correct.

6  Q    For, quote, models.

7  A    Correct.

8  Q    Why is there a quote around the word models if you know?

9  A    I don't know.

10 Q    What's a model wrangling fee?

11 A    The model wrangling fee -- so, in hospitality in event

12 marketing it's not unusual to have a promoter that would

13 get -- would -- would invite guests to an event and so Sasha

14 is someone who had a roster of people that would attend an

15 event.

16 Q    These are people, right?  The models are people; right?

17 A    Right.

18 Q    Why are they being wrangled?

19 A    That's just a term in our business, celebrity wrangling.

20 Q    Understood.  I want to ask you very quickly about the

21 last paragraph which is just one sentence, and does Noah say,

22 My estimate is the from -- the grammar is not great -- the

23 talent fees, Pauly and small places we padded, SG will make

24 about 100K off this so far.

25         What do you understand that to mean?

                    SN  OCR  RPR

A. COHEN – CROSS – MR. INTRATER

1    A    That the fee, the profit for this event would be about

2    100K to the agency.

3    Q    And who's Pauly?

4    A    I don't know.

5    Q    What does the small places we padded mean?

6    A    If we estimated too high on something, the actuals came

7    in under that, it would be the difference between the two.

8    Q    But you would get to keep that?

9    A    It depends on the agreement, but in this case, yes.

10   Q    So you can estimate something higher and then it comes in

11   lower, but Strategic gets to keep that extra money?

12   A    Correct.  But the estimates would be approved by the

13   client.

14   Q    Totally understood.

15   A    Yes, yes, yes.

16   Q    And you said that there's an attachment to this; right?

17   A    Yes.

18        MR. INTRATER:  Can we please turn to page two of

19   this document and just pull out for the jury celebrity

20   outreach.

21        (Exhibit published.)

22   BY MR. INTRATER:

23   Q    So, you've got Leonardo DiCaprio; right?

24   A    Yes.

25   Q    And how much does he get?

SN   OCR   RPR

A. COHEN – CROSS – MR. INTRATER

1    A    250,000.

2    Q    And then you have Paris Hilton.  How much does she get?

3    A    $100,000.

4    Q    Megan Fox, who is she?

5    A    Who is she?

6    Q    Yes.

7    A    She is an actress.

8    Q    Okay.

9    A    And she got $250,000.

10   Q    Let's go down a couple of lines.  You see there's a

11   reference to Pauly?

12   A    Yes.

13   Q    Who is that?

14   A    Pauly Shore.

15   Q    How much does he get?

16   A    $7,000.

17   Q    Come on.  Why?

18   A    I don't know.

19   Q    7,000.  And then Kim Kardashian.  This is way back in

20   2009.  This is early Kim.

21   A    Early Kim.

22   Q    What does she get?

23   A    $50,000.

24   Q    Okay.  So these Jho Low parties have heavy celebrities;

25   right?

SN   OCR   RPR

A. COHEN - CROSS - MR. INTRATER

1  A    Typically.

2  Q    And then some not so heavy celebrities that get 7,000?

3  A    Yes.

4  Q    Sorry, okay.  And models, but it's not just the people,

5  there's also tremendous expenses on liquor, and on other kinds

6  of fun things; right?

7  A    Yes.

8  Q    Huge money being spent.  Would you agree?

9  A    Yes.

10  Q    Now, we've talked about these events and we will talk

11  about a couple more.  But in addition, did Strategic also work

12  with Jho Low regarding nightclubs that Strategic owned and

13  that Jho Low would patronize?

14  A    Strategic didn't -- the Strategic I was employed at

15  didn't own any nightclubs.

16  Q    I got you.  But didn't Jho Low pay money into Strategic

17  for nightclub bills, like, expenditures that he had made at

18  nightclubs?

19  A    He -- he did that through -- right, he did that through

20  the event budget and if there was an excess amount in the

21  event budget, it would at times go towards satisfying those

22  hospitality tabs.

23  Q    Is your hesitation because you worked for a particular

24  entity, but Tepperberg and Strauss also owned other things and

25  Jho Low would patronize those other things, those clubs?

SN   OCR   RPR

A. COHEN - CROSS - MR. INTRATER

1    A     My hesitation was to make sure I got the answer right.

2    Q     That's all we want.

3    A     Yeah.

4    Q     Jho Low was going to clubs that Tepperberg and Strauss at

5    least are the part owners in; right?

6    A     Owners or operators of, yeah.

7    Q     And spending money?

8    A     Correct.

9    Q     And then he is paying into either Strategic or entities

10   related to Strategic, both for the parties and for the

11   nightclub business?

12   A     That happened sometimes, correct.

13

14   (Continued on the following page.)

15

16

17

18

19

20

21

22

23

24

25

343

A. COHEN - CROSS - MR. INTRATER

1    BY MR. INTRATER:

2    Q    So I'd like you to look at a document that's been marked

3    as AC41, Defendant's exhibit AC41.  Do you have that there?

4    A    What tab?

5    Q    Tab 41, the next one in the binder.

6    A    I have it.

7    Q    Do you recognize this document?

8    A    Yes.

9    Q    What do you recognize it to be?

10   A    An e-mail that is giving an accounting of how much money

11   was still on account at Strategic Group from Jho Low and where

12   some of that money that was on account was going.

13   Q    Are there two pages of attachments behind it?

14   A    Yes.

15   Q    You sent this e-mail in the course of your duties at

16   Strategic?

17   A    Correct.

18           THE COURT:  Counsel, I'm not seeing that on the

19   screen.

20           MR. INTRATER:  I'm sorry.  Two pages of attachments,

21   your Honor.  The first is identified as SMG0020116.  The

22   second is SMG0020117.  Those are attachments to the e-mail

23   that is found at SMG0020114 and 115.

24           THE COURT:  Okay.

25   BY MR. INTRATER:

Rivka Teich CSR RPR RMR FCRR
Official Court Reporter

A. COHEN - CROSS - MR. INTRATER

1  Q    Do you see all of that, Mr. Cohen?

2  A    I do.

3  Q    The e-mail the attachments are those -- that was sent in

4  the course of your duties as Strategic?

5  A    Yes.

6         MR. INTRATER:  Your Honor, the defense would offer

7  Defendant's exhibit AC41 into evidence.

8         MR.  WIBLE:  No objection.

9         THE COURT:  Admitted.

10        (Defendant Exhibit AC41, was received in evidence.)

11  BY MR. INTRATER:

12  Q    This is an e-mail you said that you sent that itemizes

13  certain nightclub bills from Jho Low, right?

14  A    Yes.

15  Q    Do you say on April 13, 2010, Noah/Jason going into the

16  past weekend there were $179,000 and change remaining in the

17  account.  There were three checks from this past weekend.  The

18  checks are attached.

19        When you say checks, what are you referring to?

20  A    Receipts.

21  Q    Those are the attachments?

22  A    I believe so.

23  Q    There are three different receipts and each one of these

24  receipts from one bar tab, right?

25  A    Each receipt is from one bar tab.

A. COHEN - CROSS - MR. INTRATER

1    Q    You've got three bar tabs.

2    A    Yes.

3    Q    The total of the three bar tabs is $385,773.27; is that

4    right?

5    A    Yes.

6    Q    I just want to look, I just want to look at the

7    attachments for one second.  I'm going to turn actually to the

8    last page of the document, SMG0020117.  Let's look at this

9    one.  We have 65 bottles of Cristal; is that right?

10   A    Yes.

11   Q    Those 65 bottles cost almost $100,000?

12   A    Yes.

13   Q    That's after tax money, right?

14   A    Yes.

15   Q    Three magnums of something called Platinum, about 7500

16   bucks.  Forty-four bottles of what?

17   A    I'm guessing that's Patron Silver, tequila.

18   Q    $17,500 on 44 bottles of tequila, right?

19   A    Yes.

20   Q    Does Patron have a gold?  Is there a better, or is that

21   the best?

22   A    I don't know.

23   Q    Eight bottle eights of Ace of Spades, that's another

24   champagne?

25   A    Correct.

346

A. COHEN - CROSS - MR. INTRATER

1   Q    $12,000 and then one giant six liter bottle of cristal,

2   $60,000?

3   A    Yes.

4   Q    Then there was a tip, right?

5   A    Yes.

6   Q    What was the tip for this one single solitary bar tab for

7   Jho Low?

8   A    $38,955.40.

9   Q    That was the tip?

10  A    Yes.

11  Q    We've got parties, we've got bar tabs, and the spending

12  is enormous; is that fair to say?

13  A    Yes.

14  Q    Indeed, didn't Jho Low also sometimes pay for other

15  people's bar tabs at the nightclubs that Tepperberg & Strauss

16  had an interest in?

17  A    I don't know.

18  Q    AC08, take a look at it.  Same drill, do you recognize

19  it, what do you recognize it to be?

20  A    I recognize it.  It's an e-mail, and during the normal

21  course of business.

22         MR. INTRATER:  Your Honor, the defense would offer

23  Defendant's exhibit AC08 into evidence.

24         THE COURT:  Any objection from the Government?

25         MR.  WIBLE:  No objection, your Honor.

347

A. COHEN - CROSS - MR. INTRATER

1          THE COURT:  Admitted.

2          (Defendant Exhibit AC08, was received in evidence.)

3          MR. INTRATER:  Can we focus in on the original

4  message of Paul Goldstein?  Great.

5  BY MR. INTRATER:

6  Q    Is this an e-mail from someone named Paul Goldstein who

7  worked at Tao, one of the nightclubs that Tepperberg & Strauss

8  had an interest in?

9  A    Yes.

10  Q    Is this e-mail to you along with Tepperberg & Strauss?

11  A    Yes.

12  Q    Subject line VIP, right?

13  A    Yes.

14  Q    Does Goldstein say: One of Eric Tan's close biz

15  associates is going to Vegas this week, Monday to Friday.  His

16  name is Suhail Al Ansari (Mubadala).  Do you see that?

17  A    Yes.

18  Q    I believe Eric may want to take up his tab, Noah will

19  confirm that.  Do you see that?

20  A    Yes.

21  Q    This refers to Eric Tan.  Who did you understand that to

22  be?

23  A    I really didn't know.

24  Q    Well, did you know whether Jho Low was referred to as

25  Eric Tan in within Strategic group and in e-mails that

Rivka Teich CSR RPR RMR FCRR
Official Court Reporter

A. COHEN - CROSS - MR. INTRATER

1  Strategic sent?

2  A    I don't remember.  I don't remember.

3  Q    I want to -- you can flip forward real quick to tab 22 in

4  your binder.  I want to see if that refreshes your

5  recollection.  There is an e-mail in the middle of the page

6  there.

7  A    Yes.

8  Q    Does that refresh your recollection as to what Jho Low

9  was called on e-mail?

10  A    Yes.

11  Q    It does.  And what does it refresh your recollection to?

12  A    It was one of a few possible different names that were

13  used to discuss Jho Low or to refer to Jho Low as a different

14  name. I never knew if there was an actual Eric Tan or -- but

15  yes, I see where you're getting at.

16  Q    Let's go back to AC08 in evidence.  And do you have an

17  understanding as to who Eric Tan is here now?

18  A    Yes.

19  Q    Who is that?

20  A    It could very well be Jho Low.

21  Q    He wants to pay for Suhail Al Ansari's tab in Vegas?

22  A    It appears that way.

23  Q    That's Suhail Al Ansari, there is a parenthesis on the

24  word Mubadala, right?

25  A    Yes.

349

A. COHEN - CROSS - MR. INTRATER

1   Q    Do you know what Mubadala is?

2   A    I do not.

3   Q    So sometimes now you got parties that are Jho Low's

4   parties, Strategic's involvement.  You have enormous bar tabs

5   that Jho Low is spending hundreds of thousands of dollars a

6   night on.  He's also picking up other people's bar tabs,

7   including someone associated with this Mubadala.

8   A    Yes.

9   Q    How did these very large bills that Jho Low is racking

10  up, how did they get paid off?

11  A    We saw how some got paid, from the money left over from

12  an event.  But other than that, I don't know.

13  Q    What I mean is, Strategic is organizing these events,

14  right?

15  A    Yes.

16  Q    All of this stuff has to get paid for?

17  A    Yes.

18  Q    Strategic is receiving wires, right?

19  A    Yes.

20  Q    From somewhere?

21  A    Yes.

22  Q    In fact, you're receiving wires from several different

23  entities, right, you're the CFO?

24  A    Yes.

25  Q    Not just one bank account that you're getting money from,

A. COHEN – CROSS – MR. INTRATER

1    right, you're getting money from several different entities,

2    right?

3    A    For all of my clients?

4    Q    Just in connection with Jho Low.

5    A    The Jho Low events were just a payment from one payor per

6    event.

7    Q    Right, right.  But across all the different events there

8    were different payors.

9    A    I believe there was at least more than one, correct.

10   Q    I'm going to mark for you an exhibit, I'm going to call

11   it Defendant's Exhibit AC50.  It's not in your binder.

12   A    Okay.

13            MR. INTRATER:  I'm going to show it to you.  I'll

14   show it to my colleagues and the Government first.

15            May I approach?

16            THE COURT:  Yes.  You don't need permission.

17   BY MR. INTRATER:

18   Q    I want to see if you recognize it and what you recognize

19   it to be?

20   A    This wasn't to me.

21   Q    Okay.

22   A    I don't recognize it.

23   Q    Is it an e-mail to Strategic to somebody at Strategic?

24   A    Well, that's the extension of the e-mail; but it was in

25   2014.

351

A. COHEN - CROSS - MR. INTRATER

1  Q    Okay, understood.  Thank you.

2          Are you familiar with an entity called Capital Place

3  Holdings?

4  A    No.

5  Q    Do you know whether or not Capital Place Holdings ever

6  paid off any of Jho Low's bills with Strategic?

7  A    With Strategic Marketing Group?

8  Q    Any entity involving Strategic?

9  A    I have no idea.

10 Q    Aside from all of the events that Strategic actually put

11 on for Jho Low, isn't it true that Strategic also helped Jho

12 Low get into certain other events?

13 A    I don't know.

14 Q    I want to show you a document to see if it refreshes your

15 recollection.  It is document Defendant's exhibit AC13.  It's

16 in your binder.

17 A    Okay.

18 Q    This is a four-page series of e-mails.  Take a look and

19 tell me if you recognize it, what you recognize it to be, and

20 whether or not these e-mails were sent and received in the

21 ordinary course of your work at Strategic?

22          THE COURT:  Can you put that on the Elmo?

23          MR. INTRATER:  I'm so sorry.

24 A    Yes, in the normal course.

25          MR. INTRATER:  Your Honor, the defense would offer

A. COHEN - CROSS - MR. INTRATER

1   Defendant's exhibit AC13.

2            THE COURT:  Any objection?

3            MR.  WIBLE:  No, your Honor.

4            THE COURT:  Admitted.

5            MR. INTRATER:  Thank you, your Honor.

6            (Defendant Exhibit AC13, was received in evidence.)

7   BY MR. INTRATER:

8   Q    Can you please turn to the third page of document, sir?

9   There is an e-mail that is sent Monday January 31 --

10  January 29, 2011 by Noah Tepperberg?

11  A    Yes.

12  Q    Is this an e-mail from Noah Tepperberg inviting Jho Low

13  to go to a party called the Two Kings event?

14  A    Yes.

15  Q    Is that party thrown by Jay Z and Lebron James?

16  A    They were the hosts, yes.

17  Q    They were the hosts.  Thank you for clarification.  The

18  last sentence of that first paragraph:  The dinner is going to

19  be filled with all COEs and CMOs.  What is a CMO for the jury?

20  A    Chief Marketing Officer.

21  Q    Of all the Fortune 100 companies and celebrities.  Right?

22  A    Okay.

23  Q    It is meant to be a business networking dinner with the

24  leaders of the sports and entertainment world and the CEO of

25  Microsoft Steve Ballmer is the keynote speaker, along with Jay

353

                    A. COHEN - CROSS - MR. INTRATER

1    Z and Lebron, who also speak at the event.

2              Do you see that?

3    A    Yes.

4    Q    I read that correctly?

5    A    You did.

6    Q    So Jho Low is set up to go to the event with the CEOs and

7    CMOs of Fortune 100 companies, right?

8    A    Yes.

9    Q    This is in 2011, right?

10   A    Yes.

11   Q    You remember the Government showed you a document where

12   Roger Ng might have gone to a party thrown by Jho Low?

13   A    Yes.

14   Q    That was in 2010?

15   A    Yes.

16   Q    Here we're in 2011 and Jho Low is with the CEOs and CMOs

17   of Fortune 100 companies?

18   A    Yes.

19             THE COURT:  Sustained.

20             MR. INTRATER:  Sorry.  Apologized.

21   BY MR. INTRATER:

22   Q    Do you know whether --

23             MR. INTRATER:  I'm going to let it go, Judge.

24   Q    You said that one of the events that Strategic handled

25   for Jho Low was a boat trip, right?

                    Rivka Teich CSR RPR RMR FCRR
                        Official Court Reporter

A. COHEN - CROSS - MR. INTRATER

1    A    Yes.

2    Q    But you didn't remember exactly where that was?

3    A    Correct.

4    Q    You said you told the Government that the word Strategic

5    was used in the names of several different entities that were

6    associated with Strauss & Tepperberg; is that fair?

7    A    Yes.

8    Q    Can you name some of the other entities that were

9    associated with Tepperberg & Strauss that had the word

10   Strategic in them?

11   A    Strategic Hospitality Group.

12   Q    This is just Tepperberg & Strauss, not necessarily what

13   you were involved with.

14   A    I was not involved with.

15   Q    Okay.

16   A    That's the only one that comes to mind?

17   Q    Strategic Management Services in Nevada?

18   A    I remember that one now that you say it.

19   Q    That's associated with Tepperberg & Strauss?

20   A    I believe so.

21   Q    But not you?

22   A    Correct.

23   Q    Okay.  I want to show you a document that's been marked

24   Defendant's exhibit AC15, it's in your binder.

25   A    Okay.

A. COHEN - CROSS - MR. INTRATER

1   Q    Do you recognize it?

2   A    Yes.

3   Q    Sent received in the ordinary course with your work at

4   Strategic?

5   A    Yes.

6        MR. INTRATER:  Your Honor, I offer Defendant's

7   Exhibit AC15 into evidence.

8        MR.  WIBLE:  No objection.

9        THE COURT:  Admitted.

10       (Defendant Exhibit AC15, was received in evidence.)

11  BY MR. INTRATER:

12  Q    Is the first e-mail here from Noah Tepperberg on July 7,

13  2012?

14  A    Yes.

15       MR. INTRATER:  Can you just highlight the top half

16  of that e-mail?

17  Q    Does Tepperberg say to Ashlee Amon -- do you know who

18  Ashlee Amon is?

19  A    Yes.

20  Q    Who is that?

21  A    She was an assistant at Strategic Marketing Group at the

22  time.

23  Q    Does he say:  Ash, here is the a partial list for the

24  boat trip.  Jason has confirmed these four girls will be

25  joining us.  The plan is to fly them to NYC on Tuesday,

A. COHEN - CROSS - MR. INTRATER

1    July 16, all economy from LA.  Put at Dream downtown.  You

2    need to get their passports for info for Cat Tan who needs it

3    for plane charter and boat.  Cat Tan is a woman who worked for

4    Jho Low?

5    A    I believe so, yes.

6    Q    On Wednesday, July 17, we will fly with Jho to Nice.

7           You didn't go, Mr. Cohen?

8    A    Correct.

9    Q    Cat will arrange everything from there.

10          And then you forwarded that e-mail to Brett Rogoff,

11   right?  He's one of your current partners?

12   A    Correct.

13   Q    What did you write to Brett and to Seth Rodsky?  These

14   are other current partners?

15   A    At that time.  Seth is no longer.

16   Q    I'm sorry.  What did you write?

17   A    Strategic Escorts LLC.

18   Q    What did you mean?

19   A    I was being funny.

20   Q    I know.  But tell the jury how you were being funny?

21   A    I was poking fun at the fact that these women were coming

22   on this boat trip, that we were procuring them and arranging

23   transportation.

24   Q    You said we you weren't doing any of this?

25   A    We, as in the firm or people at the firm.

Rivka Teich CSR RPR RMR FCRR
Official Court Reporter

A. COHEN - CROSS - MR. INTRATER

1   Q    So you're saying Strategic Escorts LLC, but that's not an

2   actual entity that Strategic ran, you're just making a joke?

3   A    Correct.

4   Q    I want to move forward to this, what you said, was the

5   biggest party that Strategic threw for Jho Low.  This is

6   November of 2012?

7   A    Yes.

8   Q    Where is this November 2012 party, where was that held?

9   A    Nevada.

10  Q    Can you give the jurors a sense of what happened at this

11  party, like, was something set up special?  Can you give an

12  overview?

13  A    I wasn't there but I understand it to have been a built

14  out, if you will.  Almost like a circus like atmosphere with

15  staging and decor and lighting and power.  And sort of in

16  somewhere in the desert, so sort of like almost like a

17  festival, a mini festival that was built out.

18              THE COURT:  Counsel, before you continue, do you

19  have a lot more for this witness?

20              MR. INTRATER:  I have about 15 minutes.

21              THE COURT:  I haven't given the jurors an afternoon

22  break.

23              MR. INTRATER:  I'm sorry, okay.

24              THE COURT:  I was planning to end 15 minutes early.

25  I didn't want to deprive them of their break.

                    A. COHEN - CROSS - MR. INTRATER

1          MR. INTRATER:  Do you want to end now?

2          THE COURT:  Sidebar.

3          (Continued on the next page.)

SIDEBAR CONFERENCE

1            (Sidebar conference.)

2            THE COURT:  One question about this witness, what is

3    the basis for his knowledge about this party since he wasn't

4    there?

5            MR. INTRATER:  I think he was still there in late

6    2012, your Honor.  I believe that they separated in

7    January 2013.  He was still employed by the company at this

8    time.

9            THE COURT:  But his basis for his knowledge of what

10   happened in Las Vegas.

11           MR. INTRATER:  He's the CFO.  He's putting together

12   all of the -- he's running the numbers for all of the

13   different things that are happening.

14           THE COURT:  Just establish that.  Because I

15   understand his testimony just now to be based on what he was

16   told about the party --

17           MR. INTRATER:  I'm not going to go further into it.

18           THE COURT:  -- as opposed to what he saw from

19   whatever invoices he might have looked at.

20           MR. INTRATER:  I'll do that then a couple of

21   questions.  I don't want to hold them up.

22           (End of sidebar conference.)

23           (Continued on the next page.)

24

25

A. COHEN - CROSS- MR. INTRATER

1      (In open court.)

2  BY MR. INTRATER:

3  Q    A couple of last questions.  Do you recall that the

4  Government showed you Government's Exhibit 2812, this was a

5  guest list from, this is 2812 which is in evidence, I'm

6  putting it on to the Elmo.  Is this a guest list, an invite

7  list?

8  A    Guest list.

9  Q    This is November 2012, right, and is the first heading

10  Malaysia?

11  A    Yes.

12  Q    Line number four is Tim Leissner, right?

13  A    Yes.

14  Q    He's sandwiched in between Jasmine Loo and Nik Kamil?

15  A    Yes.

16  Q    Number 11 is Jho Low?

17  A    Yes.

18  Q    Then really dim, but right below there you see Singapore?

19  A    Yes.

20  Q    And there is one name highlighted there Yak Yew Chee,

21  right?

22  A    Yes.

23      MR. INTRATER:  Your Honor, I have nothing further

24  for this witness.  Thank you.

25      THE COURT:  Thank you, counsel.

Rivka Teich CSR RPR RMR FCRR
Official Court Reporter

PROCEEDINGS

1          Redirect counsel?

2          MR. WIBLE:  No, your Honor.

3          THE COURT:  Thank you for your testimony.  You're

4    excused.

5          (Whereupon, the witness was excused.)

6          THE COURT:  Ladies and gentlemen of the jury, thank

7    you for your patience today.  We're adjourned for today since

8    I did not give you an afternoon break.

9          Please remember not to discuss the case, not to read

10   about it, not to have anyone speak to you about it.

11         I will see you tomorrow at 9:30 a.m.  Have a good

12   night.

13         (Jury exits the courtroom.)

14         THE COURT:  Please be seated everyone.  So we've

15   gotten a request from the press.  Apparently they are not able

16   to see the exhibits as best as they would like to in the

17   overflow room.  I don't know if the Government is aware of how

18   they were able to do this in the last case before Judge

19   Donnelly.  Were there arrangements made in advance to get the

20   exhibits to the press?

21         MS. SMITH:  Your Honor, I'm not sure.  In the past

22   the Government, if there is an admitted exhibit that is

23   requested, we have made it available to the press after

24   redacting any PII.  So we can do that here.  I don't know

25   about sort of real time broadcast of the exhibits to the other

362

PROCEEDINGS

1    room.  I do think our press officer said it was done in R.

2    Kelly, so I can talk to that team and see how it was done.  I

3    think it was done by court staff.  We can see if we can sort

4    it out.

5           THE COURT:  I'll reach out to the IT department and

6    see if they can arrange for that happen so they can have

7    access to the exhibits in the overflow room.  If they are

8    unable to do that for any reason -- I assume if they've done

9    it before they can do it again -- if they are unable to do it

10   for any reason, we need to think how best to get the evidence

11   to the folks that are watching in the overflow room since we

12   can't accommodate them in this courtroom.

13          Anything else we need to discuss today?

14          MS. SMITH:  No, your Honor.  Probably as a result of

15   this, we have gotten a request for some the exhibits that were

16   shown.  In accordance with our normal practice we were

17   planning on preparing redacted versions without PII and

18   provide them to the press and we wanted to let your Honor

19   know.

20          THE COURT:  That's fine.  If they are admitted in

21   the evidence, they are available, I guess at least

22   technically.

23          Can you tell me who you're planning to calling and

24   when?

25          MS. SMITH:  We are planning on call Tim Leissner.

Rivka Teich CSR RPR RMR FCRR
Official Court Reporter

363

                              PROCEEDINGS

1              THE COURT:  I'll see the parties in the morning.

2              MR. AGNIFILO:  Thank you, your Honor.

3              THE COURT:  One of the jurors indicated to Pierre

4    that he informed us during jury selection that he has to take

5    his wife to a doctor's appointment on the 17th at 10:00 a.m.

6              MR. AGNIFILO:  That rings a bell.

7              THE COURT:  I thought it was Friday, and we

8    discussed because it was the Friday it wouldn't be a conflict

9    because the Court doesn't sit on Friday.

10             MR. AGNIFILO:  That rings a bell too.

11             THE COURT:  Maybe I screwed up the date.  I'll

12   gather some more information tomorrow then decide how best to

13   proceed.

14             MR. AGNIFILO:  Very good thank you.

15             MS. SMITH:  Thank you, your Honor.

16             (Proceedings adjourned.)

17

18

19

20

21

22

23

24

25

364

```
1                      I N D E X

2    WITNESS                              PAGE

3
     ANDY TAI
4
     DIRECT EXAMINATION    BY MS. SMITH        5
5    CROSS-EXAMINATION     BY MR. AGNIFILO    34
     REDIRECT EXAMINATION  BY MS. SMITH      100
6    RECROSS-EXAMINATION   BY MR. AGNIFILO   104

7
     ROBERT A. MASS
8
     DIRECT EXAMINATION    BY MR. WIBLE      105
9    CROSS-EXAMINATION     BY MR. AGNIFILO   132

10
     ALEX COHEN
11
     DIRECT EXAMINATION    BY MR. WIBLE      136
12   CROSS-EXAMINATION     BY MR. INTRATER   156

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Rivka Teich CSR RPR RMR FCRR
Official Court Reporter

365

1                         I N D E X

2                         EXHIBITS

3     GOVERNMENT                  PAGE
      1937, 1967- 1974             20
4     829                         115
      804                         125
5     839                         128
      807                         130
6     838A & 836A                 132
      2801                        140
7     2802                        144
      2807                        145
8     2803 & 2803A                147
      2804, 2804A, 2811, 2812     150
9     2809                        153

10

11                        EXHIBITS

12    DEFENDANT                   PAGE
      AT23                         94
13    AT24                         97
      AC03                        168
14    AC-05                       172
      AC41                        179
15    AC08                        182
      AC13                        187
16    AC15                        190

17

18

19

20

21

22

23

24

25