UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

---------------------------------------------------------------

UNITED STATES OF AMERICA,

                                 - against –

NG CHONG HWA *also known as* ROGER NG,

                                   Defendant.

---------------------------------------------------------------

**MEMORANDUM & ORDER**
18-CR-538 (MKB)

MARGO K. BRODIE, United States District Judge:

       On November 4, 2021, the Government moved in limine to admit as co-conspirator statements under Federal Rule of Evidence 801(d)(2)(E) statements made by Defendant Ng Chong Hwa's wife, Hwee Bin Lim, regarding financial transactions involving diverted bond proceeds.  (Gov't Mot. in Lim. ("Gov't Mot.") 66–72, Docket Entry No. 90.)  Ng opposed the motion, (Def.'s Opp'n to Gov't Mot. in Lim. ("Def.'s Opp'n") 12, 36, Docket Entry No. 94), and, at a pretrial conference on January 26, 2022, the Court deferred ruling on the Government's motion, (Jan. 26, 2022 Tr. 11).  On March 16, 2022, the Government filed a letter in further support of its motion, (Gov't Mar. 16, 2022 Letter ("Gov't Letter"), Docket Entry No. 174), and, on March 18, 2022, Ng filed a response to the Government's letter, (Def.'s Resp. to Gov't Letter ("Def.'s Letter"), Docket Entry No. 176).

       For the reasons discussed below, the Court finds that the statements in question are admissible as co-conspirator statements.

    **I.   Discussion**

       The Government argued in its motion in limine that statements Lim made between 2012 and 2014 regarding banking transactions involving diverted bond funds are admissible as co-

conspirator statements because "[t]he proffered evidence establishes by a preponderance of the evidence" that Lim "participated, at a minimum, in the charged money laundering conspiracy" by facilitating the transfer, concealment, receipt, and disposition of the proceeds of the conspiracy. (Gov't Mot. 66, 70.) In its letter, the Government proffers additional information and argues that Lim took "multiple steps to conceal her identity, her control over the account [that received the funds], and the source of the funds," demonstrating that she "knew the funds were proceeds of some criminal activity," as required by the money laundering conspiracy statute, and, "in any event," that "the joint venture in which [Ng] and the declarant participated need not be criminal at all to deem the speaker an agent of the defendant for purposes of Rule 801(d)(2)(E)." (Gov't Letter 6–7 (citing *United States v. Russo*, 302 F.3d 37, 45 (2d Cir. 2002)).)

Ng asserted in his opposition to the Government's motion in limine that the Government had "not carried its burden under Rule 801(d)(2)(E)." (Def.'s Opp'n 2; *id.* at 36 (requesting pretrial Rule 104 hearing to determine admissibility of statements).) In his letter, Ng argues that the Government cannot establish by a preponderance of the evidence that Lim knew between 2012 and 2014 that the funds her family received from Judy Leissner were crime proceeds because neither "independent, corroborating evidence" nor "the proffered communications themselves" establish "that it is more likely than not" that Lim "was part of a money laundering conspiracy." (Def.'s Letter 3.) Ng does not respond to the Government's argument, in the alternative, that Lim's statements are admissible under Rule 801(d)(2)(E) as statements made in furtherance of a lawful joint venture. (*See generally id.*)

Rule 801(d)(2)(E) of the Federal Rules of evidence provides that a statement "made by the party's coconspirator during and in furtherance of the conspiracy" is not hearsay. Fed. R.

2

Evid. 801(d)(2)(E). To admit a statement under this rule, a district court must find "(a) that there was a conspiracy, (b) that its members included the declarant and the party against whom the statement is offered, and (c) that the statement was made during the course of and in furtherance of the conspiracy." *United States v. Al-Moayad*, 545 F.3d 139, 173 (2d Cir. 2008) (quoting *United States v. Alameh*, 341 F.3d 167, 176 (2d Cir. 2003)); *see also United States v. Zhao Wu Chen*, 322 F. App'x 43, 46 (2d Cir. 2009). "The court must find these preliminary facts by a preponderance of the evidence." *Al-Moayad*, 545 F.3d at 173 (citing *Bourjaily v. United States*, 483 U.S. 171, 176 (1987)). "[W]hile the hearsay statement itself may be considered in establishing the existence of the conspiracy, 'there must be some independent corroborating evidence of the defendant's participation in the conspiracy.'" *Id.* (quoting *United States v. Gigante*, 166 F.3d 75, 82 (2d Cir. 1999)). When "the hearsay evidence itself so convincingly implicates the defendant, a district court may require less corroboration to find by a preponderance of the evidence that the defendant participated in the conspiracy for purposes of admitting co-conspirators' statements against him." *United States v. Padilla*, 203 F.3d 156, 162 (2d Cir. 2000). In addition, a court may consider any evidence in making this preliminary determination, regardless of whether that evidence is itself admissible. *See* Fed. R. Evid. 104(a); *Bourjaily*, 483 U.S. at 177–81.

"The conspiracy between the declarant and the defendant need not be identical to any conspiracy that is specifically charged in the indictment." *Gigante*, 166 F.3d at 82. "The Government merely needs to demonstrate that the declarant and the defendant[] against whom the statements are offered are members of a conspiracy in furtherance of which the statements are made, and that this conspiracy is 'factually intertwined' with the offenses being tried." *United States v. Grossman*, 843 F.2d 78, 83 (2d Cir. 1988) (quoting *United States v. Stratton*,

3

779 F.2d 820, 829 (2d Cir. 1985)); *see, e.g., id.* at 84 ("[The co-conspirator's] statements about paying [the defendant] his share of the . . . profits undoubtedly were 'factually intertwined' with 'the offenses being tried', i.e., [the defendant's] misappropriation and dissemination of confidential information to generate those same . . . profits."); *United States v. Doulin*, 538 F.2d 466, 468, 471 (2d Cir. 1976) (finding declarant's statements that she had paid the defendant to lie to grand jury to ensure her grandson "would receive only a probationary sentence" were properly before the jury as co-conspirator statements in trial for perjury although no conspiracy was charged). "To be 'in furtherance' of a conspiracy, the statements must in some way have been designed to promote or facilitate achievement of the goals of that conspiracy, as by, for example, providing information or reassurance to a coconspirator, seeking assistance from a coconspirator, or by communicating with a person who is not a member of the conspiracy in a way that is designed to help the coconspirators to achieve the conspiracy's goals." *United States v. Rivera*, 22 F.3d 430, 436 (2d Cir. 1994).

The statements Lim made between 2012 and 2014 regarding banking transactions involving diverted bond funds are admissible as co-conspirator statements. The proffered evidence shows by a preponderance of the evidence that there was a conspiracy that included Lim and Ng and that Lim's statements about these transactions were made in furtherance of the conspiracy. Specifically, the proffered evidence shows that, on May 20, 2012, "Lim contacted a UBS banker about acquiring a shell company and opening a bank account in [the shell company's] name." (Gov't Letter 2.) The next day, on May 21, 2012, Project Magnolia closed, and Lim "selected Silken Waters Enterprise Limited as the shell company" and stated that "she wanted to change the name to 'Victoria Square Capital Limited.'" (*Id.*) Also on or about May 21, 2012, an email address with the username "kctan9983" was established. (Gov't Mot. 66.)

4

On May 22, 2012, Lim met "with another UBS banker" and stated that the funds to be transferred into the account were profits from "equity investments in Switzerland," (Gov't Letter 2); however, a July 16, 2012 email between two accounts with the username "jleissner" suggests the money was "[f]or Roger," (Gov't Mot. 68).  On May 23, 2012, Lim and her family acquired the shell company from a corporate services company, (Gov't Letter 6 n.5), and on May 24, 2012, the Silken Waters / Victoria Square Bank Account was opened, (Gov't Mot. 66).  Although the account opening documents listed Ng's mother-in-law, K.C. Tan, as the beneficial owner of the account, (Gov't Letter 2), and listed "kctan9983" as one of two primary email addresses for the account, (Gov't Mot. 66–67), emails to and from this email address — including emails to an account with the username "victoriasquare.investment," which "appears to have been used by [Ng]" — indicate that Lim was the account user, (*id.* at 67; Gov't Letter 3 & n.4 (noting that Ng "ultimately deleted" the "victoriasquare.investment" email account)), and the telephone number listed for Tan was actually Lim's cellphone number, (Gov't Letter 2).

 Between approximately June 2012 and September 2013, Judy Leissner transferred a total of approximately $35 million in diverted bond proceeds to the Silken Waters / Victoria Square account owned by Tan.  (Gov't Mot. 66.)  After the money was in the account, portions of it were transferred into an account jointly held by Lim and Tan, at which point Lim directed that some of the funds be converted into Malaysian Ringgit "[t]o buy a pc of land," and into an account held in Tan's name, for which Lim obtained power of attorney shortly after.  (*Id.* at 66–67.)  Lim also used funds in the Silken Waters / Victoria Square account "traceable to the 1MDB scheme to purchase expensive jewelry."  (Gov't Letter 3.)  Finally, when Lim learned that certain "mails cannot be destroyed" under the "nominee directorship" provided by the corporate services company through which she had acquired Victoria Square Capital Limited, she "directed that the

5

nominee services be terminated and also that Victoria Square Capital Limited be dissolved," and she "deleted from her personal email account all email exchanges with UBS employees regarding the Silken Waters / Victoria Square" account. (*Id.*)  As Tim Leissner testified, subsequently, in or about 2016, Lim and Ng met with Leissner and Judy Leissner in Hong Kong and discussed a "cover story" to explain why Judy Leissner had sent money to the Silken Waters / Victoria Square account.  (*Id.*; *see also* Gov't Mot. 67.)

      As the Government argues, the proffered evidence shows by a preponderance of the evidence that there was a conspiracy to launder money by "conceal[ing] or disguis[ing] the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity," as required by 18 U.S.C. § 1956(a)(2)(B)(i), as well as by engaging in a "monetary transaction in criminally derived property of a value greater than $10,000" that is "derived from specified unlawful activity," as required by 18 U.S.C. § 1957 — another of the objects of the charged money laundering conspiracy.  (*See* Second Superseding Indictment ¶ 67, Docket Entry No. 105; *see also* Gov't Letter 6 ("Lim played a central . . . role in acquiring a shell company . . . to open the Silken Waters / Victoria Square" account "at the exact same time that Project Magnolia closed" and "took multiple steps to conceal her identity, her control over the account, and the source of the funds").)  The proffered evidence also shows that both Ng and Lim were participants in the conspiracy, as they both appear to have controlled email accounts in connection with the Silken Waters / Victoria Square account that was, on its face, controlled by Tan, and to have communicated frequently with UBS bankers from these accounts.  (*See, e.g.*, Gov't Letter 3 & n.4 (noting that Ng created the victoriasquare.investment email in June of 2012, which "disguised his identity" and which "he used to communicate with UBS bankers" about the account; that both this email address and the kctan9983 address Lim used "were included on the

vast majority of communications" with the bank about the account; and that Ng deleted this account in its entirety in early 2015).) With respect to Lim, the evidence also tends to show that the knowledge requirements of the statutes have been met — that is, that Lim knew the funds represented the "proceeds from some form, though not necessarily which form, of [specified unlawful] activity," 18 U.S.C. § 1956(c)(1), and knew, at least, that the funds were "criminally derived," *id.* § 1957(c); *United States v. Reiss*, 186 F.3d 149, 154 (2d Cir. 1999). In addition, with respect to both Lim and Ng, Tim Leissner's testimony at trial is independent evidence that corroborates their involvement. Finally, the Court agrees with the Government that, "[g]iven Lim's active involvement in [the] financial transactions . . . , her statements in 2012 through 2014 regarding [these] banking transactions . . . were made during and in furtherance of the charged conspiracies and are therefore admissible." (Gov't Mot. 71.)

    Ng argues that the Government "cannot establish with independent, corroborating evidence" that Lim knew that the $35 million were illegal proceeds "at the time of her proffered communications" because (1) although Leissner testified that this money was Ng's "share" of the criminal proceeds, he "never testified that he had spoken with . . . Lim in 2012 or 2013 about these funds or that she knew" this during this timeframe, and (2) Leissner's testimony that the parties discussed a cover story in 2016 does not establish Lim's membership in the conspiracy because it is unreliable and, in any event, "could only support a finding that . . . Lim knew in 2016, after numerous press articles about potential fraud with the bond deals, that the funds . . . were criminal proceeds." (Def.'s Letter 2–3.)

    While the veracity of Leissner's testimony has been challenged, as noted above, it is still independent, corroborating evidence of both Ng's and Lim's involvement in the conspiracy. In addition, although his testimony does not, by itself, support a finding that Lim knew at the time

7

of the transfers that the funds were criminal proceeds, other evidence proffered by the Government supports this conclusion. For example, although Ng argues that Lim's efforts to acquire a shell company and open the Silken Waters / Victoria Square account show "[a]t most" that she "was aware that Judy Leissner was about to send money" to her family, and although Ng expects Lim to testify that the money was from an investment she and her family had in China, the timing of Lim's efforts to set up the account vis-à-vis the closing of the Magnolia Project the following day bolsters Leissner's testimony. (*Id.*) Ng also argues that, even if Lim created an email account in her mother's name, this is "consistent with her recorded communications with the bank that demonstrate that she was the one managing her elderly mother's account"; the emails she deleted concerning the Silken Waters / Victoria Square account were "only part of the emails she deleted from her account" and thus "fail[] to demonstrate that she knew the money was illegal proceeds years earlier"; and "there is no basis to believe" that her "discussion about shredding mail had anything to do with her belief that the money was illegal proceeds, as opposed to a general housekeeping matter." (*Id.* at 4.)

Ng is free to elicit this testimony from Lim and argue these alternative explanations to the jury, but the fact that Lim was controlling Tan's account, that she further directed the funds into accounts she personally controlled and used them for personal transactions, and that the other alleged co-conspirators, including Leissner and Judy Leissner, were aware of the source of the funds, (*see, e.g.*, Gov't Mot. 68 (proffering that Judy Leissner transferred the funds at Leissner's direction and sought guidance from him in mid-June of 2012 "as to what she should tell bank employees about the money's origin")), taken together with Leissner's testimony and the timing of the account setup, provide a sufficient basis to conclude that it is more likely than not that Lim had knowledge of the source of the funds and participated in the conspiracy during the relevant

8

timeframe, and that her statements about the transactions during that time were made in furtherance of the conspiracy.

## II. Conclusion

Accordingly, the Court grants the Government's request to admit Lim's statements as co-conspirator statements under Rule 801(d)(2)(E).

Dated: March 20, 2022
      Brooklyn, New York

SO ORDERED:

s/ MKB

MARGO K. BRODIE
United States District Judge