# BRAFMAN & ASSOCIATES, P.C.

ATTORNEYS AT LAW

256 FIFTH AVENUE, 2ND FLOOR

NEW YORK, NEW YORK 10001

TELEPHONE: (212) 750-7800

FACSIMILE: (212) 750-3906

E-MAIL: ATTORNEYS@BRAFLAW.COM

BENJAMIN BRAFMAN

MARK M. BAKER
OF COUNSEL

MARC A. AGNIFILO
OF COUNSEL

ZACH INTRATER
OF COUNSEL

ANDREA L. ZELLAN

JACOB KAPLAN

TENY R. GERAGOS
ADMITTED IN NY & CA

STUART GOLD

March 28, 2022

VIA ECF
The Honorable Margo K. Brodie
Chief United States District Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, NY 11201

   Re:  United States v. Ng Chong Hwa a.k.a Roger Ng, 18 Cr. 538 (MKB)

Dear Chief Judge Brodie:

  We write in response to the government letter earlier today seeking to preclude "improper and inadmissible testimony from the defendant's wife, Hwee Bin Lim." (Dkt. 188 at 1.) As discussed below, the government's motion should be denied.

**1. Relevance of the Circumstances Surrounding Victoria's Birth**

  The government first argues that Hwee Bin Lim should be precluded from testifying about her family and medical history, claiming that this information is irrelevant. (Dkt. 188 at 1-2.) They are wrong. The timing of Hwee Bin's pregnancy, and the attendant complications of that pregnancy, are critical to understanding the timeline of Hwee Bin's involvement in this matter. Neither Hwee Bin nor counsel for Mr. Ng have any intention of delving too deeply into highly personal and private medical information. However, in light of the government's emphasis on her actions between May 20, 2012 and July 2012, it is supremely relevant that in the midst of this period, specifically on June 3, 2012, she, as a woman in her 40s, had a baby under trying medical circumstances. This undisputed fact determined her actions and those of people around her, all of which is relevant in light of the government's allegations.

**BRAFMAN & ASSOCIATES, P.C.**

Hwee Bin and her family were aware that she had issues with her pregnancy by mid-May 2012. As noted, Mr. Ng and Hwee Bin's daughter, Victoria, was born on June 3, 2012. A number of critical points flow from this fact. First, by mid-May 2012, her elderly mother was by her side due to the emergent circumstances of the pregnancy and would not be traveling to Singapore from Kuala Lumpur when her daughter was in the final two weeks of a trying pregnancy. Second, it explains why Hwee Bin engaged in the activities she did surrounding the receipt of the funds when she did them. She knew that the birth was impending, that it could be difficult, and she did not know exactly when she would deliver or how it would go. Therefore, as soon as she was told that the funds might be arriving, she spoke with Evelyn Teah regarding opening the account and met the bankers the next day. Third, Victoria's birth date explains why Roger received the June 5, 2012 email attaching Capital Place account details. (GX 2287.) Hwee Bin had given birth just two days before, and so was in no condition to deal with anything.

Rule 401 defines relevant evidence as having "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Fed. R. Evid. 401. And Rule 402 states that "[r]elevant evidence is admissible," unless otherwise provided by the Constitution, statute, or another rule or evidence or of the Supreme Court. Fed. R. Evid. 402.

Here, the facts of consequence to the determination of the action are Hwee Bin's activities in late May and early June 2012. These facts have been explicitly highlighted by the government, including in their summary chart (GX 61), which is a timeline that places Hwee Bin's activities in the context of Goldman's activities regarding Project Magnolia, the banking activities relating to Silken Waters/Victoria Square, and the payments to Silken Waters/Victoria Square. (See GX 61.) It is the government that has put Hwee Bin's activities squarely at issue, including by a lengthy exposition on this chart with their summary witness, SA Sean Fern. (See Tr. 3779:15-3782:5.) The explanation for why she was doing what she was doing is of critical importance to the jury.

The government also cites to cases whose facts have nothing to do with the present circumstances, and so are unhelpful to the Court's consideration. For example, they cite to United States v. Paccione, 949 F.2d 1183 (2d Cir. 1991) for this proposition: "affirming preclusion of evidence that the defendant had son with cerebral palsy." But the government either did not read Paccione or is deliberately distorting its holding. In Paccione, the relevant defendant "presented only character evidence," including four witnesses that the Court allowed, and a fifth who would testify that the defendant's "his then-teenage son had been born with cerebral palsy and that [the defendant] had devoted his life to caring for the son, in order to persuade the jury that [the defendant] would never do anything to risk imprisonment thereby disabling himself from caring for the boy." Id. at 1201. First, the Court had already allowed four other witnesses to testify to the defendant's character. Second, the Court found that the nature of the defendant's son's illness

BRAFMAN & ASSOCIATES, P.C.

"had no bearing on his honesty or integrity and that could well cause the jury to be influenced by sympathies having no bearing on the merits of the case." Id.

The situation in this case, of course, is far different. Hwee Bin is not being called as a character witness. She is a percipient witness on critical issues. Perhaps the most critical issue is the timing of her activities in late May and early June of 2012. The fact of her pregnancy, the fact that she had issues with that pregnancy, and the timing of her delivery are all highly relevant on the single most important issue in this case: why did the transactions involving the money that went into the Silken Waters/ Victoria Square account happen the way they did? This has nothing to do with Roger Ng's character and everything to do with the timeline of events surrounding the $35 million dollars that the government chose to make the centerpiece of their case – the very first words of the government's opening statement.

The government also cites to United States v. Miller, 641 F. Supp. 2d 161, 167 (E.D.N.Y. 2009), but again, they have cherry-picked quotes without explaining the actual facts of the case they cite. Miller was a passport fraud case. The government sought to introduce a prior passport fraud, and the Court denied them from doing so. Id. at 166. Defendant sought to introduce evidence that his "motive in acquiring the fraudulent passport at issue was to visit his family members." Id. at 167. The Court denied this request, because defendant's motive in acquiring the passport had only limited probative value, as it did not explain any of the elements of the offense directly, and "[w]eighed against admission of this evidence is its potential to engender sympathy in an inappropriate effort to excuse defendant's commission of the charged offences. This risk is especially serious where the jury will not be hearing evidence regarding the 1996 passport fraud, which might have cast a less favorable light on defendant's motives." Id. Again, the differences between this case and Miller are clear – Hwee Bin's pregnancy and the circumstances surrounding it are critical to explaining the timeline of why the most fundamentally important facts in this case happened when and how they did.

The government claims, "any medical issues . . . are completely irrelevant to the charged crimes and devoid of probative value." (Dkt. 188 at 2.). But simply saying so does not make it so – the timing of Hwee Bin's pregnancy, and the issues surrounding it, are critically important.[1]

The government also ignores the teachings of the Supreme Court's decision in Old Chief v. United States, 519 U.S. 172 (1997), which is missing entirely from their letter brief. Again, had

---

[1] Contrary to the government's claim (which could have been resolved had the government chosen to speak to defense counsel before filing its letter), the defense has no intention of bringing out that Victoria was conceived by in vitro fertilization.

-3-

BRAFMAN & ASSOCIATES, P.C.

the government mentioned to defense counsel that they had concerns about this issue, perhaps we could have informed them of Old Chief's holding.

Old Chief rejected a Rule 403 balancing analysis that would view an item of evidence "as an island, with estimates of its own probative value and unfairly prejudicial risk the sole reference points in deciding whether the danger substantially outweighs the value and whether the evidence ought to be excluded." Old Chief, 519 U.S. at 182. Instead, the Supreme Court held that "what counts as the Rule 403 'probative value' of an item of evidence, as distinct from its Rule 401 'relevance,' may be calculated by comparing evidentiary alternatives." Id. at 184. Therefore, Rule 403 balancing is informed by whether there is other evidence that can make the same point, and "'[t]he probative worth of any particular bit of evidence is obviously affected by the scarcity or abundance of other evidence on the same point.'" Id. at 185 (quoting 27 C. Wright & K. Graham, Federal Practice & Procedure § 5250, pp 546-47 (1978)).

The probative value of evidence relating to Hwee Bin's circumstances in late May 2012 is not high simply because they are critical to explaining why she did what she did when she did it, and why her mother would not be leaving her side at the time. Rather, the probative value is also heightened because there is no other alternative source of information to put the truth before the jury. Moreover, the prejudicial effect of testimony relating to the circumstances of Hwee Bin's pregnancy and delivery is low: unfortunately, many people have difficult pregnancies; unlike in Paccione, the defense is not making a play for sympathy for Roger Ng: thankfully, Victoria is a healthy child. This is not character evidence of why the jury should acquit Roger Ng because he has a sick child, or because his wife is currently in the hospital. Rather, the government has put Hwee Bin's actions in late May 2012 squarely at issue, and the proffered evidence is the only evidence that can explain these critical facts.

**2.  Statements On the Recorded Calls are Admissible as Non-Hearsay**

The government claims, "any of Lim's statements introduced through her testimony would not be offered to rebut a charge of recent fabrication, as the government has alleged – and adduced evidence at trial – that Lim began fabricating a cover story at least as early as 2016, long before her self-serving statements to Leissner in 2018." (Dkt. 188 at 3.) But just because the government says so, does not make it so. The government is correct to cite to Tome v. United States for the proposition that "the consistent statements must have been made before the alleged influence, or motive to fabricate, arose." 513 U.S. 150, 158 (1995). They are incorrect about when, in this case, that motive could have arisen.

The only evidence that Hwee Bin engaged in some kind of "cover story" in 2016 is the testimony of Leissner. But, as was painfully clear to everyone in the courtroom, Tim Leissner is simply not a reliable source of information. The government is attempting to preclude Hwee Bin's

-4-

BRAFMAN & ASSOCIATES, P.C.

testimony before she has testified. Counsel expects that her testimony will make clear that Leissner never told her that he received a grand jury subpoena, either at the 2016 meeting or any other time. Moreover, she will testify that there was never any discussion about a "cover story." Rather, as Leissner indicated during his testimony on cross examination, Leissner was interested in the Master Pong reading, and the November 2016 meeting focused on that reading, other social issues and never so much as touched on Leissner's legal situation or those of anyone else. To the extent that Leissner has said anything different than this, we invite the jury to decide which version it believes. There will be no doubt that Hwee Bin's account of these events will be believed and Leissner's discarded as the lies they are.

Assuming for the sake of argument and legal analysis, Hwee Bin ever had a reason to "fabricate" or an "improper . . . motive" under Rule 801(d)(1)(B)(i), this would have arisen only after November 1, 2018, when Roger Ng was arrested. But the statements happened <u>before</u> November 1, 2018. <u>Before</u> this time, Hwee Bin would have no reason to fabricate anything – since Leissner's account of the 2016 meeting with the feng shui master is fantastical; it never happened. Thus, consistent with <u>Tome</u>, Hwee Bin's statements to Leissner were "were made before the charged recent fabrication or improper influence or motive." <u>Tome</u>, 513 U.S. at 167, 115 S. Ct. 696, 705, 130 L. Ed. 2d 574 (1995).

The government's letter next takes a remarkable turn. After presenting evidence for six weeks, and having chosen not to play the recordings with Leissner, the government attempts to support their position with statements they chose not to admit as evidence at trial. This is a poor attempt to have this Court decide a critical question based on a lie of Tim Leissner so egregious that the government would not even present it to the jury.

The government's letter reads, "Moreover, when Lim spoke to Leissner in June 2018, she expressed to him concern that 'Friend/Everybody was worried you might be compromised,' demonstrating that she was already worried at that point about speaking to him honestly." (Dkt. 188 at 3.) The next words of the government's letter are the most telling. Do they cite to a transcript page, or an exhibit in evidence, for this statement? No. Because there is no evidence whatsoever of it in the record. They cite to Docket Number 90, their own motions in limine, and Docket Number 138, the Court's decision regarding the recording that was made based on the government's proffer of what the evidence would be. But the government never introduced any evidence on that point at trial. There is nothing in the record that Leissner's statement – which is not on the recording, and of which there is zero documentary evidence – is true. The government, having rested their case, is trying to have this Court make decisions based on information they choose not to put into evidence. It is remarkable that the government could even write, "[t]hus, Lim was already fabricating facts as of 2016 and, by June 2018, she had a clear motive to fabricate when speaking to Leissner." (Dkt. 188 at 3.) Having had their opportunity to prove their case, the

-5-

BRAFMAN & ASSOCIATES, P.C.

government should not be allowed to now resort to information not in the record to keep evidence out of the record.

3. **The Government Ignores the Applicable Section of Rule 801 – Rule 801(d)(1)(B)(ii)**

The government's letter hides Rule 801(d)(1)(B)(ii) in a footnote. (Dkt. 188 at 3 n.2.) But this Rule is critically important. Rule 801(d)(1)(B)(ii) provides that a statement is not hearsay if "[t]he declarant testifies and is subject to cross-examination about a prior statement, and the statement: . . . (B) is consistent with the declarant's testimony and is offered: . . . (ii) to rehabilitate the declarant's credibility as a witness when attacked on another ground."

The Court of Appeals has held that the defense does not have to wait until redirect to offer statements pursuant to this Rule: "We reject [the] contention . . . that Rule 801(d)(1)(B)(ii) is applicable only if the declarant's credibility or memory is 'challenged during cross-examination.' The Rule applies to a witness who 'is subject to cross-examination,' about the prior statement; this language does not restrict admissibility to statements of one who has already been cross-examined." United States v. Flores, 945 F.3d 687, 706 (2d Cir. 2019) (citations omitted); see also United States v. O'Connor, 650 F.3d 839, 862-63 (2d Cir. 2011) (trial judge had discretion to allow introduction of a prior consistent statement even before the declarant had given any testimony, where the defendants "had begun their attacks on the credibility of [the declarant's] expected testimony in their opening statements" and "it was clear" that the declarant would be called to testify and "could be cross-examined by the defense about the statement").

Rule 801(d)(1)(B)(ii) is a recent amendment to the Rules, first promulgated in 2014. It was added precisely because "the original Rule 801(d)(1)(B)" was "limited" in "scope" because it "left many prior consistent statements potentially admissible only for the limited purpose of rehabilitating a witness's credibility," and "did not . . . provide for substantive admissibility of consistent statements that are probative," for example, "to explain what otherwise appears to be an inconsistency in the witness's testimony" or "to rebut a charge of faulty memory." Fed. R. Evid. 801 advisory committee's note to 2014 amendment.

Therefore, "[a]s amended in 2014, Rule 801(d)(1)(B)(ii) allows for the substantive use of prior consistent statements that are probative for rehabilitative purposes other than those specifically enumerated in subsection (i)." United States v. Purcell, 967 F.3d 159, 196 (2d Cir. 2020). These purposes include admitting prior consistent statements that were introduced to rebut the opposing party's "attacks on [the declarant's] credibility and memory," notwithstanding that the defendant's "challenges to [the declarant's] memory were brief and were not their main challenges." United States v. Flores, 945 F.3d 687, 705-06 (2d Cir. 2019); see also, e.g., United States v. Cox, 871 F.3d 479, 487 (6th Cir. 2017) (holding that Rule 801(d)(1)(B)(ii) allowed

BRAFMAN & ASSOCIATES, P.C.

evidence of prior consistent statements that "rebutted [an] attack on [the declarant's] purportedly faulty memory.").

Here, Hwee Bin will testify about why her family received approximately $35 million from Judy Chan Leissner's entities. The government will undoubtedly "attack[]" her "credibility as a witness," and so the defense will be able to rehabilitate her credibility with the evidence of her prior consistent statement – the statement she made to Tim Leissner in October 2018 – a statement that is consistent and also happens to be the truth.

**4.     Conclusion**

For the reasons stated above, the government's requests should be denied.

Respectfully submitted,

Marc A. Agnifilo, Esq.
Zach Intrater, Esq.
Teny R. Geragos, Esq.
Jacob Kaplan, Esq.

cc:     Counsel for the government (via ECF)