UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

---------------------------------------------------------------

UNITED STATES OF AMERICA,

- against –

NG CHONG HWA *also known as* ROGER NG,

Defendant.

---------------------------------------------------------------

**MEMORANDUM & ORDER**
18-CR-538 (MKB)

MARGO K. BRODIE, United States District Judge:

Count Two of the Second Superseding Indictment in this case charges Defendant Ng Chong Hwa, also known as Roger Ng, with conspiracy to circumvent Goldman Sachs's internal accounting controls in violation of the Foreign Corrupt Practices Act ("FCPA"), 15 U.S.C. § 78m(b)(2)(B), 78m(b)(5), and 78ff(a), by withholding accurate information and providing inaccurate information to Goldman Sachs regarding his codefendant Low Taek Jho's involvement in the 1Malaysia Development Berhad ("1MDB") bond deals in order to obtain authorization for the deals. (Second Superseding Indictment ¶¶ 63–65, Docket Entry No. 105.) Trial commenced on February 14, 2022, and after several weeks of testimony, the Government rested its case on March 24, 2022. (Tr. 4363.) At the end of the Government's case, Ng orally moved for a judgment of acquittal pursuant to Rule 29 of the Federal Rules of Criminal Procedure, (Tr. 4365), and filed a written supplemental motion for acquittal on March 26, 2022, (Def.'s Mot. for Acquittal ("Def.'s Mot."), Docket Entry No. 186). On March 27, 2022, the Government filed a written opposition to Ng's motion to supplement its oral opposition. (Gov't Opp'n to Def.'s Mot. ("Gov't Opp'n"), Docket Entry No. 189.)

The Court denied the motion on the record on March 28, 2022, (Tr. 4704), and explains its reasons below.

I. Background

    a. The FCPA's internal accounting controls provision

The "internal accounting controls" provision of the FCPA provides that "[e]very issuer which has a class of securities registered pursuant to [15 U.S.C. § 78*l*] and every issuer which is required to file reports pursuant to [15 U.S.C. § 78*o*(d)]" shall:

> (B) devise and maintain a system of internal accounting controls sufficient to provide reasonable assurances[1] that —
>     (i) transactions are executed in accordance with management's general or specific authorization;
>     (ii) transactions are recorded as necessary
>         (I) to permit preparation of financial statements in conformity with generally accepted accounting principles or any other criteria applicable to such statements, and
>         (II) to maintain accountability for assets;
>     (iii) access to assets is permitted only in accordance with management's general or specific authorization; and
>     (iv) the recorded accountability for assets is compared with the existing assets at reasonable intervals and appropriate action is taken with respect to any differences.

15 U.S.C. § 78m(b)(2)(B). Section 78m(b)(5) of the statute makes it a crime for any person to "knowingly circumvent or knowingly fail to implement a system of internal accounting controls or knowingly falsify any book, record, or account described in [the above] paragraph." *Id.* § 78m(b)(5). Section 78ff(a) sets forth the penalties for violating the statute. *See id.* § 78ff(a). In the charges against Ng, the Government is proceeding under subsections (i) and (iii) of the

---

[1] "Reasonable assurances" means a degree of assurance that "would satisfy prudent officials in the conduct of their own affairs." 15 U.S.C. § 78m(b)(7).

internal accounting controls provision, which require issuers to provide reasonable assurances that transactions are executed, and that access to assets is permitted, "with management's general or specific authorization." (Gov't Opp'n 3–4 (citing 15 U.S.C. § 78m(b)(2)(B)(i), (iii)).)

    **b.  Allegations**

Count Two of the Second Superseding Indictment alleges that Ng "conspire[d] . . . to knowingly and willfully circumvent and cause to be circumvented a system of internal accounting controls at Goldman Sachs" through commission of the following overt acts in furtherance of the conspiracy:

> (a) On or about January 15, 2009, a high-ranking official at 1MDB's predecessor entity, TIA, advised LOW, NG and [Tim Leissner] that it was "best to get [LOW] involve[d] at every stage" of a TIA transaction that was being handled by Goldman.
>
> (b) On or about January 27, 2009, NG and [Leissner] discussed via email whether to disclose to the Intelligence Group at Goldman LOW's involvement in the [TIA transaction], and decided not to make such disclosure.
>
> (c) On or about April 30, 2011, NG, using a private, non-Goldman email account, forwarded an email from LOW to [Leissner] at a private, non-Goldman email account, and advised [Leissner] "this is Roger FYI." The content of the forwarded email from LOW discussed potential business with 1MDB.
>
> (d) On or about May 5, 2011, LOW emailed NG at a private, non-Goldman email account and requested a document related to potential business with 1MDB, and further directed NG "pls do not state names." NG then forward[ed] that email to [Leissner] at a private, non-Goldman email account and asked for [Leissner's] help with that request.
>
> (e) On or about February 7, 2012, LOW emailed [Jasmine Loo] at a private, non-1MDB email account, copying NG and [Leissner] at private, non-Goldman email accounts, as well as another person at an anonymized email account, regarding a draft document in connection with the asset sale related to Project Magnolia. LOW asked NG and [Leissner] "Any comments?" and wrote "No name pls."

(f) During a telephone call in mid to late March 2012, [Leissner] falsely stated to a senior member of the Intelligence Group at Goldman that LOW was not involved in Project Magnolia.

(g) On or about April 4, 2012, [Leissner] falsely stated in a committee meeting at Goldman attended by NG that LOW was not involved in Project Magnolia other than to set up one meeting with an Abu Dhabi official.  The meeting was also attended by committee members and others located in New York, New York using Goldman's telecommunication facilities, which transited through the Eastern District of New York.

(h) On or about May 12, 2012, [Leissner], using a private, non-Goldman email account, forwarded an email from LOW to NG at a private, non-Goldman email account, which included a timeline related to closing details for Project Magnolia.

(i) On or about May 18, 2012, a member of the Project Magnolia deal team sent an email to the members of two Goldman committees, among others, in which she stated that "we have now completed all committee follow up items," including various approvals.

(j) On or about October 10, 2012, [Leissner] falsely stated in a committee meeting at Goldman that LOW was not involved in Project Maximus.  The meeting was attended by committee members and others located in New York, New York using Goldman's telecommunication facilities, which transited through the Eastern District of New York.

(k) On or about April 24, 2013, [Leissner] falsely stated to a senior employee of Goldman based in New York, New York who was also a member of a committee that reviewed the 1MDB bond transactions, that there was no intermediary involved in any of the three 1MDB bond transactions and, specifically, that LOW was not involved in Projects Magnolia, Maximus or Catalyze.[2]

(Second Superseding Indictment ¶¶ 64–65.)

---

[2] The Government did not proceed on overt acts (f), (j), or (k).  (Gov't Letter Regarding Updated Jury Instructions 1 n.1, Docket Entry No. 194; Jury Instructions 48–49, Docket Entry No. 197.)

### c. Motion to dismiss

In a ruling addressing Ng's motion to dismiss Count Two, the Court found that the Superseding Indictment "sufficiently states an offense under 15 U.S.C. § 78m(b)(2)(B)." (Mem. and Order 63, Docket Entry No. 83.) The Court held that "[b]ecause the Superseding Indictment alleges that Ng and others conspired to conceal information from the groups at [Goldman] responsible for enforcing [its] internal accounting controls, and that, had the concealed information been known, it would have triggered an investigation in accordance with those controls that likely would have prevented the authorization of the bond transactions and access to the assets used to purchase the bonds, the allegations in Count Two are sufficient to state an offense under these sections." (*Id.* at 64 (citation omitted).)

In denying Ng's motion, the Court observed that "[w]hile the FCPA's internal accounting controls provision is 'supportive of accuracy and reliability in the auditor's review and financial disclosure process, this provision should not be analyzed solely from that point of view.'" (*Id.* at 60 (quoting *S.E.C. v. World-Wide Coin Invs. Ltd.*, 567 F. Supp. 724, 749–50 (N.D. Ga. 1983)).) "Rather, '[t]he internal controls requirement is primarily designed to give statutory content to an aspect of management stewardship responsibility, that of providing shareholders with reasonable assurances that the business is adequately controlled.'" (*Id.* (quoting *World-Wide Coin Invs. Ltd.*, 567 F. Supp. at 749–50 (discussing section 78m(b)(2)(B))).)

### d. Evidence at trial

At trial, the Government presented evidence that the bond deals Goldman arranged and underwrote for 1MDB required the authorization of Goldman's Firmwide Capital Committee and Firmwide Suitability Committee. (*See* Gov't Opp'n 2 (citing exhibits).) The Government also presented evidence that Goldman Sachs had an internal accounting control that addressed

5

the risk of unauthorized deals and that required that the "Deal Captain" on a deal "receive appropriate approval and authorization before execution." (Tr. 4152–53 (discussing GX 952, a printout from Goldman's database of internal accounting controls).) Committee members testified about facts that the committee would need to know in considering whether to authorize the transactions, including:

> (1) the identities of any intermediaries or key decisionmakers for 1MDB, even if they did not hold an official position with 1MDB, Trial Tr. at 286–87, 3059–60, 3655–57; (2) that 1MDB would make a significant monetary payment, in addition to awarding options, as consideration for IPIC's guarantee of the bonds, Trial Tr. at 284–86, 3053, 3654; (3) that certain deal team members had a personal financial interest in the transactions, Trial Tr. at 287–88, 3060, 3657; and (4) that the approval of the deals by officials in Malaysia and Abu Dhabi was procured through bribery, Trial Tr. at 3060–61, 3657.

(Gov't Opp'n 3.) "Leissner testified that he and [Ng] did not disclose these facts because they knew that, if they told the truth, the committees would not authorize the transactions." (*Id.* (citing Tr. 568, 912–20, 2428).)

## II. Discussion

### a. Rule 29

Rule 29 provides, in relevant part, that:

> [a]fter the government closes its evidence or after the close of all the evidence, the court on the defendant's motion must enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction. The court may on its own consider whether the evidence is insufficient to sustain a conviction. If the court denies a motion for a judgment of acquittal at the close of the government's evidence, the defendant may offer evidence without having reserved the right to do so.

Fed. R. Crim. P. 29(a); *United States v. Pugh*, 945 F.3d 9, 19 (2d Cir. 2019). "[T]he critical inquiry on review of the sufficiency of the evidence to support a criminal conviction must be . . . to determine whether the record evidence could reasonably support a finding of guilt beyond a

6

reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 318 (1979); *Pugh*, 945 F.3d at 19 ("The test for sufficiency . . . is whether a rational jury could conclude beyond a reasonable doubt that a defendant is guilty of the crime charged." (quoting *United States v. Eppolito*, 543 F.3d 25, 45 (2d Cir. 2008))). In determining whether the evidence is sufficient, courts "'view the evidence presented in the light most favorable to the government[,]' and '[a]ll permissible inferences must be drawn in the government's favor.'" *United States v. Landesman*, 17 F.4th 298, 319 (2d Cir. 2021) (alterations in original) (quoting *United States v. Guadagna*, 183 F.3d 122, 129 (2d Cir. 1999)). Under this inquiry, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson*, 443 U.S. at 319 (citing *Johnson v. Louisiana*, 406 U.S. 356, 362 (1972)); *United States v. Zhong*, 26 F.4th 536, 560 (2d Cir. 2022) ("A defendant . . . cannot prevail on a sufficiency-of-the-evidence challenge 'if any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" (quoting *United States v. Kozeny*, 667 F.3d 122, 139 (2d Cir. 2011))).

    **b.**  **Defendant's motion**

The parties both argue that the plain meaning and legislative history of the internal accounting controls provision supports their theory of the case.

    **i.**  **Ng's arguments**

Ng argues that the Government has read the word "accounting" out of the "internal accounting controls" provision, and contends that if this word is to be given any effect, it is clear that internal "accounting" controls are "a limited and defined set of controls" that are "only one aspect of a company's total control system" and that are to be distinguished from legal, risk-management, compliance, and other controls. (*See* Def.'s Mot. 10–13.) Ng also argues that

the provision's legislative history supports his interpretation because a Senate report indicates that the internal accounting controls provision was a response to the historical problem of companies "play[ing] games" with their own books and records in order to be able to pay bribes, (Tr. 4484), in the recognition that, "[i]n the past, corporate bribery ha[d] been concealed by the falsification of corporate books and records," (Def.'s Mot. 10 (quoting S. Rep. No. 95-114 (1977))).  In support of this argument, Ng quotes the Senate's report and argues that "[b]ecause the accounting profession ha[d] defined the objectives of a system of accounting control, the definition of the objectives [in the statute was] taken from the authoritative accounting literature," (*id.* (quoting S. Rep. No. 95-114)), and therefore "[w]hat is required to define, understand, implement and assess an 'internal accounting control' under the FCPA is a matter of accounting and auditing, and not broadly a legal, compliance or other controls matter," (*id.* at 11).

      Ng urges the Court to look to the interpretation of section 78m(b)(5) adopted by the U.S. Securities and Exchange Commission (the "SEC") and argues that the SEC explicitly rejected a broader definition of "internal accounting controls over financial reporting" under the Sarbanes Oxley Act, which requires public companies to maintain "internal control over financial reporting" that provides "reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles," (*id.* at 14 (first citing 15 U.S.C. § 7262; and then citing 17 C.F.R. § 240.13a-15(f))), noting that its definition was "consistent with the description of internal accounting controls" in the FCPA's internal accounting controls provision, (*id.* (quoting Management's Report on Internal Control Over Financial Reporting and Certification of Disclosure in Exchange Act Periodic Reports, Exchange Act Release No. 34-47986, 80 SEC

8

Docket 1014 (June 5, 2003))). In addition, Ng argues that the Government's broad interpretation of the internal accounting controls provision "is unsupported by prior civil cases that have interpreted the exact same statute in SEC matters." (*id.* at 1; *see also id.* at 21–26.)

Based on his interpretation of the statute, Ng argues that the Court must grant his Rule 29 motion because (1) the Government failed to present evidence that any accounting controls were violated, as there is "no evidence" that the alleged conduct in this case had any impact on the accuracy of Goldman's accounting or financial reporting as an issuer of securities, (*see, e.g.*, *id.* at 7, 11); (2) there is no violation of the FCPA because there is no dispute that the transactions were authorized by the appropriate committees and executed in accordance with that authorization, (*see id.* at 16, 18–21); and (3) if the Government's broad theory is accepted, "[a]n enormous swath of conduct, never contemplated by Congress, would be swept within the ambit of the FCPA," rendering section 78m(b)(5) constitutionally vague as applied, (*see id.* at 16, 26–29).

      ii. **The Government's arguments**

The Government's "theory is that [Ng] conspired to circumvent Goldman's internal accounting controls by obtaining authorization [of the bond deals] from [Goldman's] Firmwide Capital Committee and . . . Firmwide Suitability Committee through providing false information to, and withholding accurate information from, the committees." (Gov't Opp'n 3; Tr. 4482–83.) The Government argues that, because subsections (i) and (iii) of the internal accounting controls provision "plainly designate[] management authorization of transactions and access to assets as part of a system of internal accounting controls, the [G]overnment has properly relied" on these committees' "authorization of the 1MDB bond deals in presenting its case." (Gov't Opp'n 4.) Focusing on the common meaning of the word "circumvent" — which is "to manage to get

9

around especially by ingenuity or stratagem" — the Government further argues that the statute "plainly reaches circumvention through acts of deception."[3]

The Government also argues that the statute's legislative history supports its interpretation of the statute because (1) the Senate's 1977 report on the internal accounting controls provision "underscore[d] the importance of 'management's stewardship responsibility' and the need both 'to provide shareholders with reasonable assurances that the business is adequately controlled' and 'to furnish shareholders and potential investors with reliable financial information.'" (*Id.* (quoting S. Rep. No. 95-114).)  In addition, the Government argues that, in adding a scienter requirement to the statute in 1988, Congress intended for criminal penalties to apply to "conduct calculated to evade the internal controls requirement," (*id.* (quoting H.R. Rep. No. 100-576, 917 (1988) (Conf. Rep.))), and to read the statute as Ng suggests, such that "'circumvent' has a cabined meaning that does not include obtaining authorization through fraud or deception," would lead to absurd results, as it would encourage such conduct.  (*Id.* at 5.)

        **c.**    **The plain language of the statute encompasses the conduct in this case**

Statutory construction "begin[s] with the language of the statute," and "[i]f the statutory language is unambiguous, [courts] construe the statute according to the plain meaning of its words." *Katz v. Focus Forward, LLC*, 22 F.4th 368, 372 (2d Cir. 2022) (quoting *United States ex rel. Wood v. Allergan, Inc.*, 899 F.3d 163, 171 (2d Cir. 2018)); *see also Springfield Hosp., Inc. v. Guzman*, 28 F.4th 403, ---, 2022 WL 790689, at *9 (2d Cir. Mar. 16, 2022) (construction begins with "plain text" of statute); *United States v. Gayle*, 342 F.3d 89, 92 (2d Cir. 2003) ("Statutory construction begins with the plain text and, if that text is unambiguous, it usually

---

[3] (Gov't Opp'n 4 (quoting *Circumvent*, Merriam-Webster Dictionary, https://www.merriamwebster.com/dictionary/circumvent (last visited Apr. 8, 2022); and then citing *Circumvent*, Black's Law Dictionary (11th ed. 2019)).)

10

ends there as well."). "In looking at a statute's plain meaning, [courts] also must consider the context in which the statutory terms are used, as '[courts] do not . . . construe statutory phrases in isolation; [they] read statutes as a whole.'" *Springfield Hosp., Inc.*, 28 F.4th at ---, 2022 WL 790689, at *9 (quoting *United States v. Morton*, 467 U.S. 822, 828, (1984)); *Saks v. Franklin Covey Co.*, 316 F.3d 337, 345 (2d Cir. 2003) ("The text's plain meaning can best be understood by looking to the statutory scheme as a whole and placing the particular provision within the context of that statute."). This is also true where the issue of construction is the use of the word "and" as opposed to the word "or." *See Mizrahi v. Gonzales*, 492 F.3d 156, 164 (2d Cir. 2007) ("[C]ourts resolving difficult issues of construction will consider how a disjunctive or conjunctive form fits into the statutory scheme as a whole.").

"If . . . [a] statutory provision [is] ambiguous . . . , '[courts] then turn to canons of statutory construction for assistance in interpreting the statute.'" *United States v. Rowland*, 826 F.3d 100, 108 (2d Cir. 2016) (quoting *Greathouse v. JHS Sec. Inc.*, 784 F.3d 105, 111 (2d Cir. 2015)). Courts "resort to legislative history only if, after consulting canons of statutory instruction, the meaning remains ambiguous." *Id.*; *see also Allergan, Inc.*, 899 F.3d at 171 ("[W]hen the terms are ambiguous or unclear[,] [courts] consider legislative history and other tools of statutory interpretation."). Under the canon of absurdity, it is "well-established that '[a] statute should be interpreted in a way that avoids absurd results.'" *Gibbons v. Bristol-Myers Squibb Co.*, 919 F.3d 699, 705 (2d Cir. 2019) (alteration in original) (quoting *S.E.C. v. Rosenthal*, 650 F.3d 156, 162 (2d Cir. 2011)). "[C]ourts should look beyond a statute's text under the canon against absurdity 'only where the result of applying the plain language would be, in a genuine sense, absurd, *i.e.*, where it is quite impossible that Congress could have intended the result and where the alleged absurdity is so clear as to be obvious to most anyone.'"

11

*Id.* at 705–06 (quoting *Catskill Mountains Chapter of Trout Unlimited, Inc. v. U.S. EPA*, 846 F.3d 492, 517 (2d Cir. 2017)).[4]

The statute requires issuers to "devise and maintain a system of internal accounting controls." 15 U.S.C. § 78m(b)(2)(B). Although the statute does not define "internal accounting controls," and while the Court could read these words in isolation and interpret the statute to apply only to a limited subset of controls specifically related to accounting, a literal reading of the statute, in its entirety, would be inconsistent with such a narrow reading. The statute defines an adequate system of internal accounting controls by reference to the objectives of such a system, and the plain language of the statute indicates that such systems are intended not only to provide reasonable assurances of accurate internal accounting for purposes of external financial reporting, as addressed by objectives (ii) and (iv), but also to provide reasonable assurances that the company is adequately controlled, as addressed by objectives (i) and (iii), under which the Government is proceeding against Ng. Objectives (i) and (iii) indicate that the system of controls must include controls that will reliably ensure that transactions are executed, and access to assets is permitted, in accordance "with management's general or specific authorization." *Id.* § 78m(b)(2)(B)(i), (iii). As the facts of this case demonstrate, "circumvention" of such a system

---

[4] In making his oral motion, Ng argued that the Government cannot pick and choose which objective(s) of an internal accounting control system it charges him with conspiring to circumvent because, in setting forth these objectives, the statute joins them with the conjunctive word "and," such that he can only be found liable for conspiring to knowingly circumvent a system of internal accounting controls if he conspired to circumvent all of the objectives of the system that the statute lists. (*See* Tr. 4472–75.) However, in his supplemental motion, Ng appears to abandon this argument. While the use of the conjunctive "and" in section 78m(b)(2)(B) indicates that issuers must devise and maintain a system of internal accounting controls that meets all four objectives, section 78m(b)(5) does not require a person to violate controls related to all four objectives. Rather, it criminalizes the knowing circumvention of "a system of internal accounting controls . . . described in paragraph (2)." 15 U.S.C. § 78m(b)(5). Because the system must contain controls devised to meet all four objectives, an attempt to circumvent controls related to any objective is an attempt to circumvent part of the system.

does not depend on the falsification of a book or record — which the statute specifically addresses in a separate provision. *See id.* § 78m(b)(2)(A) ("books and records" provision). Rather, subsections (i) and (iii) are aimed at ensuring the effective discharge of managements' stewardship responsibility, and they explicitly contemplate that an attempt to circumvent management's informed authorization for transactions and access to assets may violate the statute.[5]

Thus, applying the law as the Court understands it to the evidence presented, and viewing the evidence in the light most favorable to the prosecution, the Court cannot conclude that the evidence is insufficient to sustain a conviction. A rational trier of fact could find the essential elements of the crime beyond a reasonable doubt.

---

[5] Although Ng argues that the Government's interpretation of the statute is unsupported by prior civil case law, (Def.'s Mot. 21–26), these decisions are not helpful to the Court's task. In two of these cases, the SEC did not allege circumvention of internal accounting controls. *See S.E.C. v. China Ne. Petroleum Holdings Ltd.*, 27 F. Supp. 3d 379, 393–94 (S.D.N.Y. 2014) (books and records violation); *S.E.C. v. Stanard*, No. 06-CV-7736, 2009 WL 196023, at *30 (S.D.N.Y. Jan. 27, 2009) (books and records and failure to implement controls). In another case, the court provided examples of what might constitute an internal accounting control, confining them to the subset of controls Ng argues the statute is limited to, and dismissed allegations that the defendants had circumvented a system of internal accounting controls because the complaint failed to allege a particular control that was violated. *See S.E.C. v. Patel*, No. 07-CV-39, 2009 WL 3151143, at *25–27 (D.N.H. Sept. 30, 2009). The bulk of the cases Ng cites demonstrate that one way to violate the statute is by providing false information to auditors. *See S.E.C. v. Retail Pro, Inc.*, 673 F. Supp. 2d 1108, 1141–42 (S.D. Cal. 2009) (stating that "[e]vidence showing that a person misled company auditors can support a claim that the person knowingly circumvented a company's system of internal accounting controls" and collecting cases Ng cites). Lastly, one case describes the purpose of the statute as ensuring accurate books and records, which the books and records provision addresses, and, in a footnote, as ensuring that issuers use accepted methods of accounting. *See United States v. Wittig*, 425 F. Supp. 2d 1196, 1216 n.39, 1217 (D. Kan. 2006), *rev'd sub nom. United States v. Lake*, 472 F.3d 1247 (10th Cir. 2007). However, none of these cases engages in an analysis of the plain meaning of the statute, which the Court finds to be broader than Ng contends based on a literal reading of the statute's objectives.

13

### d. The statute is not vague as applied

Ng argues that, if the statute is interpreted as the Government suggests, to include conduct that does not have a "proven effect on . . . financial statements," then it is "void for vagueness as applied" to him. (Def.'s Mem. 26.) In support, he argues that a statute is void for vagueness "if its prohibitions are not clearly defined," (*id.* at 27 (quoting *Arriaga v. Mukasey*, 521 F.3d 219, 222 (2d Cir. 2008))), and that if the Court looks "to the dictionary definition of the term 'accounting,' as well as to the 'widely-accepted core meaning' of the term 'accounting,'" it will conclude that an "internal accounting control" is "a control that directly relates to the preparation and accuracy of financial statements," (*id.*). To conclude otherwise, Ng argues, "would potentially criminalize vast — and indefinite — amounts of activity," such as his use of personal email accounts at work, such that public companies' "businesses and employees could find themselves indicted" for compliance violations that have "nothing to do with the company's financial statements or accounting," which would be "contrary to the words of the law, the legislative history of the law, and prior decisions interpreting the law." (*Id.* at 27–29; *see also id.* at 17 (arguing that the Government's theory would lead to "draconian results" by criminalizing "all manner of false statements made by employees" and providing hypothetical examples of employees withholding information to gain committee approval for loans).)

The Government argues that Ng's hypothetical examples can be set aside "in the context of an as-applied challenge," as "the facts of this case bear no resemblance to those hypothetical scenarios." (Gov't Opp'n 5.) In support, the Government argues that, "[u]nlike the examples hypothesized in [Ng's] brief, the information [he] withheld from the Firmwide Capital Committee and the Firmwide Suitability Committee . . . included the involvement of an exceptionally high-risk individual with whom the firm had previously refused to do business, the

14

fact that bond proceeds would be used to pay hundreds of millions of dollars in bribes to foreign officials in both Malaysia and Abu Dhabi, and information that materially changed the economic structure of the deal." (*Id.*) Therefore, the Government argues, "[e]ven if there were a line to draw regarding the statute's reach[,] . . . it need not be drawn in this case." (*Id.*)

To ensure that persons are not denied liberty without due process, "the void-for-vagueness doctrine requires that a penal statute define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement." *Beckles v. United States*, 580 U.S. ---, ---, 137 S. Ct. 886, 892 (Mar. 6, 2017) (quoting *Kolender v. Lawson*, 461 U.S. 352, 357 (1983)); *United States v. Dawkins*, 999 F.3d 767, 787 (2d Cir. 2021) (same). "The 'void-for-vagueness doctrine addresses concerns about (1) fair notice and (2) arbitrary and discriminatory prosecutions.'" *United States v. Scott*, 979 F.3d 986, 993 (2d Cir. 2020) (quoting *Skilling v. United States*, 561 U.S. 358, 412 (2010)).

"Under the 'fair notice' prong, a court must determine 'whether the statute, either standing alone or as construed, made it reasonably clear at the relevant time that the defendant's conduct was criminal.'" *United States v. Napout*, 963 F.3d 163, 181 (2d Cir. 2020) (quoting *United States v. Halloran*, 821 F.3d 321, 338 (2d Cir. 2016)); *Copeland v. Vance*, 893 F.3d 101, 110 (2d Cir. 2018). "This requirement assures that statutes do not 'lull the potential defendant into a false sense of security, giving him no reason even to suspect that his conduct might be within its scope.'" *United States v. Houtar*, 980 F.3d 268, 273 (2d Cir. 2020) (quoting *United States v. Herrera*, 584 F.2d 1137, 1149 (2d Cir. 1978)). "Statutes need not, however, achieve 'meticulous specificity,' which would come at the cost of 'flexibility and reasonable breadth.'" *Id.* (quoting *Arriaga*, 521 F.3d at 224). "[T]he more important aspect of [the] vagueness doctrine

15

'is not actual notice, but [the arbitrary enforcement prong],'" *Kolender*, 461 U.S. at 358, which "requires that a statute give 'minimal guidelines' to law enforcement authorities, so as not to 'permit a standardless sweep that allows policemen, prosecutors, and juries to pursue their personal predilections,'" *Mannix v. Phillips*, 619 F.3d 187, 197 (2d Cir. 2010) (quoting *Kolender*, 461 U.S. at 358). In deciding the adequacy of these guidelines, the Second Circuit has held that a court can uphold the statute on two alternate grounds:

> (1) that [the] statute as a general matter provides sufficiently clear standards to eliminate the risk of arbitrary enforcement or (2) that, even in the absence of such standards, the conduct at issue falls within the core of the statute's prohibition, so that the enforcement before the court was not the result of the unfettered latitude that law enforcement officers and factfinders might have in other, hypothetical applications of the statute.

*Houtar*, 980 F.3d at 277 (alteration in original) (quoting *Farrell v. Burke*, 449 F.3d 470, 494 (2d Cir. 2006)). "Outside of the First Amendment context, [courts] look to whether the 'statute is vague as applied to the particular facts at issue.'" *Scott*, 979 F.3d at 993 (quoting *Holder v. Humanitarian Law Project*, 561 U.S. 1, 18 (2010)). "The vagueness issue on an as-applied challenge is not whether the statute's reach is clear in every application, but whether it is clear as applied to the defendant's conduct." *Houtar*, 980 F.3d at 276 (citing *Holder*, 561 U.S. at 21).

In view of the facts presented at trial, the Court cannot conclude that the internal accounting controls provision is vague as applied. As discussed above, the statute's text provides fair notice that a conspiracy to circumvent internal controls related to management's authorization of transactions and access to assets is a criminal offense. An ordinary person would understand that conspiring to withhold critical information and provide inaccurate information to Goldman's Firmwide Capital Committee and Firmwide Suitability Committee in order to procure their authorization for the bond deals in this case would constitute unlawful circumvention of Goldman's internal accounting controls. *See Houtar*, 980 F.3d at 275 ("In an

16

as-applied vagueness challenge, the inquiry 'begins with the text of the [statute],' and asks 'whether the [statute's] language conveys sufficiently definite warning as to the proscribed conduct when measured by common understanding.'" (citation omitted) (alterations in original) (first quoting *VIP of Berlin, LLC v. Town of Berlin*, 593 F.3d 179, 187 (2d Cir. 2010); and then quoting *Rubin v. Garvin*, 544 F.3d 461, 467 (2d Cir. 2008))). Although Ng argues that the common meaning of the word "accounting" limits the statute to the preparation and accuracy of financial statements, and that a broader interpretation is contrary to prior caselaw and his hypothetical examples, the Court has concluded, based on a literal reading of the statute, that it has a broader reach, and, as the Government argues, the scenarios Ng relies on have limited relevance in the context of an as-applied challenge. *Id.* at 276 ("Because [the] vagueness inquiry depends primarily on the text of the challenged statute, caselaw scenarios are of limited relevance." (citation omitted) (citing *VIP of Berlin, LLC*, 593 F.3d at 187)).

In addition, in setting forth the objectives of a system of internal accounting controls, the statute provides, "as a general matter," the necessary "minimal guidelines" to avoid arbitrary law enforcement. *Farrell*, 449 F.3d at 494. The statute does not sweep so broadly as to criminalize the "most basic compliance violation," such as the use of a personal email address at work, as Ng suggests. (Def.'s Mot. 28–29.) Rather, as the Government argues, there is ample evidence that Ng agreed with Leissner and others "to conceal material facts from [Goldman Sach's internal] committees in order to obtain their approval," including the involvement of Low, with whom the firm had previously refused to conduct business several times, Low's decision-making role at 1MDB, and the bribery scheme, knowing that the committees would not have approved the bond deals "if they were presented with full and accurate information." (Gov't Opp'n 6.) Based on the statute's applicability to knowing and willful circumvention of internal accounting controls,

17

including controls related to management's authorization of transactions and access to assets, the statute is not unconstitutionally vague as applied to this conduct.

### III. Conclusion

For the reasons discussed above, the Court denied Defendant's Rule 29 motion with respect to Count Two.

Dated: April 8, 2022
       Brooklyn, New York

SO ORDERED:

s/ MKB

MARGO K. BRODIE
United States District Judge