

U.S. Department of Justice

*United States Attorney*
*Eastern District of New York*

F. #2016R00467
AES/DGR/DAS

*271 Cadman Plaza East*
*Brooklyn, New York 11201*

February 15, 2023

By E-mail

Jennifer E. Baumann
United States Probation Officer
Eastern District of New York
147 Pierrepont Street
Brooklyn, New York 11201
Email: Jennifer_Baumann@nyep.uscourts.gov

   Re: United States v. Ng Chong Hwa
     Criminal Docket No. 18-538 (S-2) (MKB)

Dear Officer Baumann:

  The government submits this letter in response to the defendant Roger Ng's objections to the January 10, 2023 Presentence Investigation Report (the "PSR") in the above-captioned case (the "Objections" or "Obj.").

I. Introduction and Background – Response

  Although the defendant insists that the Objections are not an effort "to litigate the case or protest Ng's innocence" and that he recognizes that "these sorts of arguments are inappropriate and unhelpful at this stage," that is exactly what he is attempting to do. Obj. at 1. The testimony of Tim Leissner, provided under oath and challenged by a week-long cross-examination, was corroborated by other witnesses' testimony, supported by robust documentary evidence and, most importantly, credited by the jury. The introduction to the Objections makes clear that, as he did at trial, the defendant wants to attack Leissner rather than acknowledge the actual facts of the case. As demonstrated at trial and articulated in the PSR, Ng was a central figure and essential participant in one of the largest and most callous bribery schemes in recent memory, and the defendant's attempts to obscure that fact through these Objections should be rejected for the reasons stated below.

II. Specific Factual Objections – Response

  **Page 1**. The defendant's detention on a provisional arrest warrant in Malaysia on November 1, 2018 and the approximately six months he remained in custody thereafter are noted

1

in the "Release Status" section, just below the "Arrest Date." May 3, 2019 accurately reflects the date on which Ng was arrested on the arrest warrant that was issued based on the indictment.

**Paragraph 5**. The original indictment charging the defendant remains pending. The government intends to move to dismiss the original indictment as to Ng following sentencing, but we believe that Paragraph 5 is currently accurate as written.

**Paragraph 14**. This paragraph accurately describes the overall criminal scheme and the uses of the laundered funds. The defendant does not make any specific recommendation for how Paragraph 14 should be amended, and as demonstrated at trial, Ng and his wife made numerous purchases with the laundered funds, including jewelry, stock investments and an hourglass. See GX-348, GX-349, GX-2479. For these reasons, the defendant's general suggestion to distinguish him from his co-conspirators here should be rejected.

**Paragraph 16**. The PSR is accurate. The defendant's claim that he was "not involved at all in the third bond deal" is directly contradicted by the trial testimony and exhibits. As Leissner testified concerning the defendant's role on Project Catalyze, "instead of being part of the advisor team and the client coverage team, [the defendant's] job was mainly on the securities division side where the was, in fact, employed at that point in time to help sell the bonds that were raised in this underwriting exercise . . ." Tr. 1057–58. Consistent with that testimony, the documentary record makes clear that the defendant and Leissner continued to work with Low on Project Catalyze to sell a remaining supply of bonds that Goldman Sachs could not sell. GX-2469.

The PSR also accurately states that the defendant's professional reputation was enhanced as a result of his work on the 1MDB bond deals. He received the largest bonus of his career in 2012 (the year in which Projects Magnolia and Maximus closed). GX-732, GX-733. The defendant argues that the fact that his 2013 bonus was lower than his 2011 bonus is evidence that he received no professional enhancement from the deals, but he fails to acknowledge that his $1.3 million bonus in 2013 was still the third largest he received over his entire career at Goldman Sachs. The defendant was certainly unhappy about his financial compensation and lack of promotion in the years following the bond deals, see, e.g., Tr. 1122 ("[Roger] still felt that he hadn't been paid enough compared to what he had expected to be paid"), but the PSR accurately recognizes that he still received substantial recognition internally for his work on those deals, which were the largest of their kind at the firm, see Tr. 1121 ("It was often referred to as Roger and Tim's deal.").

**Paragraph 17**. The defendant's objection does not address the factual statement in this paragraph. In this paragraph, the PSR accurately describes the criminal scheme; it has nothing to do with interactions with Goldman Sachs' compliance personnel. In addition to failing to address the substance of the paragraph, the defendant's objection minimizes his role in the criminal scheme by claiming that "Leissner got [the 1MDB] deal done because he (and he alone) lied to Goldman compliance that he dealt with Sheikh Mansour." As set out at trial, and consistent with the jury's verdict, these deals were completed because the defendant, Leissner and others agreed to pay bribes and kickbacks to powerful government officials in two countries whose approval was needed for the deals to be consummated. To further ensure the scheme's success, the co-defendants lied to numerous people. The defendant's attempt to reframe his

jointly undertaken criminal activity as conduct undertaken solely by Leissner is an abnegation of personal responsibility and it should be rejected by Probation in its entirety.

**Paragraph 19**. The use of the term "intermediary" in this paragraph does not reference any particular policy of Goldman Sachs, but rather uses the word based on its common definition. The word "intermediary" here accurately describes Low's position at the center of interactions between Goldman Sachs, 1MBD, and Malaysian and Abu Dhabi officials. We do not object, however, to substituting the word "intermediary" here with "liaison," "go-between," "middleman" or any other synonym.[1] With regard to the second objection raised in this paragraph, we address that argument in Paragraph 38 below.

**Paragraph 20**. The defendant incorrectly states that the trial evidence shows that "$1.1 billion" was paid in "bribes," rather than the approximately $2 billion figure in the PSR. Among other evidence, Government Exhibits 157 and 158, summary charts representing the work of forensic accountant Eric van Dorn, detail certain traced funds from the 1MDB bond deals. Those traced funds include bribe payments from the 1MDB bond deals to the following foreign government officials (in some cases, via accounts in the names of family members) in the following approximate amounts: $756 million to Prime Minister Najib Razak (Government of Malaysia), $12.6 million to Jasmine Loo (Government of Malaysia/1MDB), $2 million to Terence Geh (Government of Malaysia/1MDB), $2 million to Vincent Koh (Government of Malaysia/1MDB), $1.7 million to Jerome Lee (Government of Malaysia/1MDB), $2 million to Nurzahid Taib (Government of Malaysia/1MDB), $4.9 million to Yan Yahaya (Government of Malaysia/Advisor to PM Razak), $895,000 to Amhari Nazaruddin (Government of Malaysia/Advisor to PM Razak), $980,000 to Azlin Alias (Government of Malaysia/Advisor to PM Razak), $230 million to Riza Aziz (Government of Malaysia/Stepson of PM Razak), $472.75 million to Khadem Al-Qubaisi (Government of Abu Dhabi/IPIC), $76.6 million to Mohamed Al-Husseiny (Government of Abu Dhabi/Aabar) and $40 million to Yousef Al Otaiba (Government of the United Arab Emirates). The total of these traced bribe payments is $1,610,425,000. While there was testimony at trial that additional bribes were paid to foreign government officials out of the billions of funds stolen from the 1MDB bond deals by the defendant and his co-conspirators, and that billions in additional kickbacks were paid to various individuals who were not foreign government officials, the government will agree that Paragraph 20 of the PSR can be amended to reflect that the government has been able to

---

[1] The defendant states that "the Government cannot maintain . . . that Low was an intermediary." Obj. at 4. We can, and we do. Caroline Fraser, who is currently Goldman Sachs's head of financial crime compliance for Europe, the Middle East and Africa, explained at trial that "an intermediary is any individual or entity who is compensated directly or indirectly through obtaining, finding or maintaining a firm business opportunity whether or not that business opportunity proceeds or for introducing the firm to a government official." Tr. at 4067-68. This description would clearly apply to Low. While the policy on intermediaries "was made clearer in 2015," Tr. at 4090, the government maintains that the Goldman Sachs policy in place between 2009 and 2012 still captured Low. Whether Low was an "intermediary" under Goldman Sachs's policies during that time is not relevant, however, as the term "intermediary" in Paragraph 19 is not a term of art for the reasons discussed above, and a synonym can suffice.

definitively trace $1.61 billion from the 1MDB bond deals in bribe payments to foreign government officials.

**Paragraph 21**. The defendant repeats a claim rejected by the jury that he was uninvolved in the failure to disclose accurate information to Goldman Sachs committees. As with his objection to Paragraph 17, the defendant attempts to reframe the criminal scheme as one undertaken entirely by Leissner and, in the process, avoiding any personal responsibility for himself. But the PSR accurately states that both Leissner and the defendant agreed to lie to multiple Goldman committees about Jho Low's central role at 1MDB, the bribery scheme they were furthering, and the diversion of 1MDB money they enabled and personally profited from. Despite attending committee meeting for the deal, the defendant said nothing about the scheme—which makes sense, given his interest in seeing it succeed. As the trial testimony made clear, if the co-conspirators said anything, they believed the deal would not have been approved. See, e.g., Tr. 567–68 ("[H]ad we raised Jho's name in his true capacity and his role as a key decision-maker at committee all prior to that, you know, into any of the control functions prior to committee, we would have not been able to proceed with the transaction."); Tr. 910–20, 968–69; 1022–27.

**Paragraph 22**. The defendant claims that there is no evidence that he made any statements regarding the source of the criminal proceeds. See Obj. at 5. This is because, as demonstrated at trial, Ng's communications with the banks that housed these funds were done through Ng's wife (either by his wife in person/by phone, or via email accounts to which the defendant had access)—another level of concealment. See infra discussion of the defendant's objection to Paragraph 60. As a result, we do not believe any amendment to this paragraph is necessary.

**Paragraph 23**. This paragraph is accurate as written and should not be amended based on the defendant's comments. As demonstrated at trial, Ng proposed Low as a Goldman Sachs Private Wealth Management ("PWM") client in Switzerland in October 2009. See GX-1564, GX-1591. Both Patrick Kidney and Christopher French, who worked as an anti-money laundering officer and the co-head of PWM, respectively, testified that Ng's referral of Low was tantamount to an endorsement of his candidacy. See Tr. at 2736-37 (Kidney); Tr. at 3130, 3135 (French). The quoted section in the Objections refers to certain comments that Ng purportedly made to Compliance after the Low referral; these subsequent comments may not have been endorsements in and of themselves, but the initial referral plainly was. Moreover, Ng continued to support Low's PWM candidacy even after certain compliance red flags had been identified and communicated to Ng. See GX-1627, GX-1632; Tr. at 687 (Leissner), Tr. at 3160 (French). And the defendant does not even address the second endorsement, during which Ng again supported making Low a PWM client, this time in Singapore, after the prior onboarding attempt in Switzerland failed. See GX-1679, GX-1680. Paragraph 23 thus accurately describes Ng's endorsement of Low as a PWM client on two occasions.

The defendant also seems to object to the phrase "travelled with Low on lavish trips across the world." Obj. at 5. Indeed, as Ng concedes, he spent thousands of dollars playing Baccarat with Low in Las Vegas and joined Low on a luxury yacht in the Mediterranean Sea. See GX-2841 and GX-2855 (Las Vegas trip); GX-2825, GX-2826, GX-2831, GX-1113-A-02

4

(yacht trip from Nice, France).  These are clearly "lavish trips across the world," and the paragraph should therefore remain unchanged.

**Paragraph 26**.  As described above, both Patrick Kidney and Christopher French testified that Ng's referral of Low was considered an endorsement.  See Tr. at 2736-37 (Kidney); Tr. at 3130, 3135 (French).  The fact that Ng, after his initial referral and implicit endorsement, made subsequent statements regarding Low that were more equivocal—after Compliance had unearthed a host of red flags about Low—does not change the fact that the referral was understood as an endorsement.  Paragraph 26 therefore should not be amended.

**Paragraph 27**.  This paragraph is accurate as written and should not be amended based on the defendant's comments.  The Red Flag Summary was not drafted by Ng, nor did he proactively approach PWM or Compliance with his concerns.  Rather, once he was "briefed on the details of [Low's] claims"—the person he had referred as a PWM client—Ng then "advised caution in accepting the claims at face value."  GX-1601.  This is correctly described in the PSR, as is Ng's failure to recommend rejecting Low's application and Ng's continued support of it.  We would therefore request that Probation not change Paragraph 27.

**Paragraph 28**.  This paragraph is accurate as written and should not be amended based on the defendant's comments.  Ng did indeed report to Compliance that he had met Low only once and that Low was not well-known to him.  See GX-1601.  As demonstrated at trial, this was not true.  See GX-77.  The fact that records of receipts reflecting that Ng met with Low in person more than twenty times prior to Ng's discussion with Compliance may have been accessible by the Compliance Department upon request does not change the fact that, when asked, Ng flagrantly lied to Compliance about his relationship with Low.

**Paragraph 30**.  The defendant's objection is factually inaccurate and should be rejected.  The defendant claims that he "was the person who provided compliance with truthful information about Low's actual role" in the Kazakh Gold deal.  But he fails to note that he did so only after another Goldman banker had identified Low to the same control personnel.  Indeed, Goldman banker Jessica Lam emailed Jho Low's name and CV as the director of Jynwel Resources on February 7, 2011—two days before the email cited by the defendant in support of his objection.  GX-1663.  Two days later, and in response to a question about "the economic opportunity" on the proposed transaction, the defendant first highlighted Low's involvement.  Moreover, he did so as part of an effort to justify the transaction and how lucrative the proposed deal would be for Goldman Sachs, stating, "Jynwell is driving the fund raising process and would also expecting to exist via IPO in HK in the medium term. **That would also be something we would want to lock-up if we decide to take up this assignment.**"

**Paragraph 31**.  This paragraph accurately states that the defendant "supported another attempt to establish Jho Low as a Goldman Sachs PWM client" in Singapore.  The defendant objects, asserting that the paragraph should state it was Leissner who "put Low forward a second time."  The defendant omits that he coordinated the meeting with Low and a PWM banker to help further Low's attempted onboarding in Singapore.  See GX-1677.

The government has no objection to paragraph 31 being amended to state the following:

5

In March 2011, Roger Ng supported another attempt to establish Jho Low as a Goldman Sachs PWM client, this time for an account based in Singapore. **After Leissner formally referred Low for an account**, the Singapore compliance team initiated another check on Low and found that Ng's attempt to open a Swiss PWM account for Low was unsuccessful. When the Swiss team learned about this second attempt, they considered Low's case to be "open and shut." **Nevertheless, Ng set up a meeting with Low, Leissner, and another Goldman banker to discuss the Singapore PWM account and find a way to onboard Low.** Ng was later informed that it was unlikely that Low would clear the compliance division's background investigation process.

**Paragraph 32**. This paragraph is accurate as written and should not, as the defendant suggests, "mention that Goldman did not have a policy in 2011 that Low could not have any dealings with the bank." Obj. at 7. This paragraph correctly describes Ng's ongoing relationship with Low and attempts to pursue business opportunities with him after Compliance had identified significant concerns and red flags relating to Low. This paragraph does not—and need not—reference any Goldman Sachs policies at that time.

**Paragraph 33**. As noted in the first sentence of this paragraph, Ng and Leissner "<u>attempted</u> to engage in side-deals with Low, including deals for their own benefit, which they did not disclose to Goldman Sachs" (emphasis added). The use of the word "attempted" here makes clear that these deals did not come to fruition. We believe that this paragraph is therefore accurate as written and should not be amended.

**Paragraph 35**. This paragraph is accurate as written. The defendant attempts to equate is conduct in furtherance of the scheme with that of Andy Tai and other bankers working in Asia. But as Mr. Tai explained during his testimony, Goldman's internal policy prohibited the use of personal email for Goldman business, and when emails were sent to his personal email address, he would instruct clients not to do that or forward the email back to Goldman's email system. Tr. 178–79. By contrast, the defendant used personal email to discuss Goldman and other business extensively with Jho Low, including multiple anonymous email accounts. He conducted entirely separate email discussions over those accounts that avoided Goldman's systems entirely. And he deleted the entirety of multiple email accounts over which he was communicating with Low.

**Paragraphs 36, 37, and 38**. The PSR's description of the February 2012 meeting among the co-conspirators in London is accurate. Objecting to that recitation, the defendant repeats, almost word-for-word, arguments made to the jury concerning the February 2012 meeting. The jury's conviction on all counts suggests they rejected those arguments in their entirety; and rightly so, as they were contradicted by the credible evidence.

As an initial matter, the defendant mischaracterizes the February 2012 meeting as a "room full of people," ignoring the fact that the small group summoned to Low's apartment in London were the people necessary to execute the billion dollar bond deal. Chief among them were the defendant and Leissner, whose firm was giving 1MDB the billions of dollars needed for the bribes and the deal. Notably, each of the attendees would receive corrupt payments as part of the scheme. While Leissner did not recall Terence Geh being in attendance, the documentary

6

evidence makes clear that he was, including the defendant's email welcoming him "to the deal team" the day after the meeting. GX-1751.

During that meeting, they discussed the financing for the Tanjong acquisition and the 1MDB bonds that would be issued. After the defendant detailed the structure of the bond deal, Low outlined the groups of people who would need to be bribed to get the deal done. Although Low stopped short of stating exact dollar amounts of each bribe, he explained that the leaders of each country involved would need roughly equivalent bribe amounts. This structure was corroborated by the tracing set out at trial, showing the largest bribe amounts flowing to heads of state in Malaysia and Abu Dhabi. Smaller amounts—still totaling millions of dollars—went to lower-level officials at 1MDB and in Malaysia. Leissner never knew the identities of the individuals behind the shell companies to which bribes were paid or the findings of the FBI's forensic accountant, yet his description of the scheme was entirely consistent with the flow of corrupt funds from the bond deals. GX-151, GX-152, GX-153.

As he did at trial, the defendant tries to attack Leissner's recollection of the pivotal London meeting, claiming that Leissner "bald-faced lie[d]" about taking "an aimless" and "long, ambling walk through London" after the meeting. This, he says, is proven because Leissner and the defendant stayed at different hotels and took different flights out from London that evening. But the defendant mischaracterizes the trial testimony entirely. At no point did Leissner testify to having a "long, ambling walk through London" with the defendant. As he testified consistently on direct, and throughout the exceedingly detailed cross-examination on this point, after having dinner at an unknown time, Leissner walked with the defendant back to "my hotel" at the Four Seasons before departing London. Tr. 884-85; 1644.

The defendant's remaining arguments in his PSR objection simply rehash alternative theories presented at trial and rejected by the jury. For example, he again asserts that, by January 2012, Leissner had already secured the 1MDB bond transactions for the benefit of a competing investment bank, Lazard. From that (faulty) premise, the defendant argues that the February 2012 meeting did not happen because the deal was already secured. This theory makes little sense and is entirely contradicted by the trial record. In January 2012, the 1MDB financing deal later known as "Project Magnolia" did not exist. Rather, at that time, 1MDB had only agreed to buy Tanjong Energy in an M&A transaction. The financing of that acquisition through 1MDB bonds would become Project Magnolia. Work on the financing began, at the earliest, in early February 2012, see GX-1736—a month too late for the defendant's specious claim that the "deal was already in place" by January 19, 2012. DX-2106.

Accordingly, the PSR should not be amended as to the February 2012 meeting in London.

**Paragraph 40**. The defendant's proposed correction is misleading and factually inaccurate. The PSR correctly states that on March 23, 2012, Ng received a call from Low that a meeting concerning the 1MDB deal had been moved to Los Angeles. That statement is drawn directly from a March 23, 2012 email the defendant sent to Leissner concerning the meeting with Low. GX-1808. Ignoring that email entirely, the defendant cites an email from a day later and claims that it was really Leissner who informed the defendant of the meeting's location. GX-2265. The PSR is accurate as written.

7

**Paragraph 42**. Ng's objection to Paragraph 42 is unfounded. According to Swampillai, the April 21, 2012 meeting was arranged for Goldman Sachs to explain to representatives of BSI Bank the planned transfer of funds from a bank account controlled by a 1MDB subsidiary to a BSI Bank account in the name of "Aabar PJS Limited." See Tr. at 3208-16. Leissner testified that Low and Ng organized the meeting with BSI bankers at a restaurant in Singapore, and that he and Ng had a "pre-meeting" with Low in a separate, private room at the restaurant during which Low "briefed [them] on what he would like [them] to disclose" to the BSI bankers. Tr. at 943-44. Swampillai similarly testified that he was told Low was in a different room at the restaurant. Tr. at 3218, 3237-38. Other evidence corroborated that Low was in Singapore at the time. Tr. at 2641-43; GX-2831-E, GX-2897-A. Moreover, Leissner testified that the purpose of the meeting was to "give this transaction the stamp of approval of Goldman Sachs," and that he made clear to the BSI bankers that Goldman was comfortable with the transaction. Tr. at 943, 945-46. Swampillai testified that the purpose of the meeting was for Goldman to help BSI compliance personnel understand the transaction and that, during the meeting, Leissner dismissed questions about due diligence Goldman had conducted in connection with the transaction and said that BSI was responsible for conducting its own due diligence. Tr. at 3236, 3239-40. Based on the foregoing trial evidence, Ng's objection to Paragraph 42 should be rejected. At most, Paragraph 42 should be revised to indicate that Ng and Leissner attended the meeting with representatives of BSI Bank while Low waited in a separate room at the same location.

**Paragraphs 46 and 47**. The PSR is accurate and the defendant's objection mischaracterizes the trial evidence. As set forth throughout, Leissner's testimony was detailed, corroborated, and credited by the jury. The defendant's role on Project Maximus is not in dispute. He remained a member of the deal team and participated in the committee review process as with Project Magnolia. Tr. 1022-27; GX-811, GX-814, GX-1873. As with the first deal, Low promised the defendant a corrupt kickback on the deal, but this time, the payment was delayed. Tr. 1027-31. Consistent with Leissner's testimony concerning that delay, his payment on that deal—as well as payments to other officials that had been similarly delayed—was finally made after Project Catalyze. GX-153.

**Paragraph 48**. We agree that this paragraph should be amended to say that Project Maximus closed in October 2012.

**Paragraph 50**. The PSR is accurate. As discussed throughout, the defendant worked on all three transactions and received corrupt kickback payments traceable to Project Magnolia and Project Catalyze.

**Paragraph 52**. The defendant objects to the fact that the PSR states that approximately $2 million in bribes were paid from the 1MDB bond deals. As detailed in the government's response to the defense's objection to Paragraph 20, and as set forth in Government Exhibits 157 and 158, the government will agree that the total of traced bribe payments to foreign government officials from the 1MDB bond deals is $1,610,425,000. The government further notes that the chart in the PSR, which details $1,137,075,000 in traced bribe payments, omits bribe payments to the following officials in Abu Dhabi and the United Arab Emirates (also reflected in Government Exhibits 157 and 158): $472.75 million to Khadem Al-Qubaisi (Government of Abu Dhabi/IPIC), $76.6 million to Mohamed Al-Husseiny

8

(Government of Abu Dhabi/Aabar) and $40 million to Yousef Al Otaiba (Government of the United Arab Emirates).

**Paragraph 53**. The defendant objects to the fact that the PSR states that the total amount of bribes is $2,665,475,000. As detailed in the government's response to the defense's objection to Paragraph 20, and as set forth in Government Exhibits 157 and 158, the government will agree that the total of traced bribe payments to foreign government officials from the 1MDB bond deals is $1,610,425,000.

The defendant also objects to the statement in the PSR that Leissner received $73.4 million from the charged bribery and money laundering conspiracies. It is correct that Leissner received $73.4 million in funds traceable to the 1MDB bond deals, as reflected in Government Exhibits 157 and 158, and that this represents the money that he received in connection with the charged bribery and money laundering conspiracies. The government agrees that there was evidence introduced at trial that Leissner also laundered millions of dollars for Low through Leissner-related entities that were not related to the 1MDB bond deals, and that Leissner retained a portion of these funds; however, these additional actions undertaken by Low and Leissner were not part of the charged conspiracies.

**Paragraphs 54 and 58**. The PSR is accurate. The defendant's objection focuses entirely on the testimony of Stephen O'Flaherty and the committees' questions concerning Leissner's claimed meeting with Sheikh Mansour. Leissner affirmatively lied about the meeting with Sheikh Mansour. But that was only part of the trial record. As multiple witnesses testified, at no point did the defendant, Leissner or others involved in the circumvention conspiracy disclose Jho Low's true involvement in the transaction, nor did Leissner or Ng disclose the bribes that were promised to be paid or their personal pecuniary interest in the deal. As committee members made clear, disclosure of this type of information was material to the committees' ability to review and approve the transaction. Tr. 283-84 (Mass); 3654-55 (Broderick). And had the co-conspirators told the truth, the deal would not have happened.

**Paragraph 55**. As noted above with regard to Paragraph 19, the term "intermediary" is used in this paragraph in accordance with its common understanding, not as a term of art in reference to a Goldman Sachs policy. This paragraph accurately states that multiple committee members testified that Ng was expected to report the use of third parties, as well as his own financial interests in any transaction. See Tr. at 286-88 (Mass); Tr. at 3060 (O'Flaherty); Tr. at 3656-57 (Broderick). We therefore request that Paragraph 55 remain as written, but we would not object to the phrase "third-party intermediaries" being changed to "third parties" or something similar.

**Paragraph 57**. The PSR is accurate. The defendant identifies nothing inaccurate as to this paragraph and, instead, asks Probation to ignore the trial testimony entirely. As the record shows, consistent with Leissner's testimony, Ng was very careful about all of his dealings with Low on the 1MDB bond deals and never disclosed to Goldman control functions that he avoided the Goldman systems entirely by closely coordinating with Low over his personal email accounts.

9

**Paragraph 59**. Ng objects to this paragraph on the basis that there is "no credible evidence that Leissner or Ng contemplated a 'guarantee fee' being used as a bribe payment." There was ample evidence introduced at trial that Ng, Low, Leissner and others contemplated several different potential structures for the 1MDB bond deals to ensure that funds could be siphoned off for kickbacks and bribes, including structures that had a "guarantee fee." See, e.g., GX-1746, GX-1753, GX-1766, GX-1767. However, the wire payment made to the Fake Aabar account in connection with Project Magnolia was not made for a "guarantee fee." Since Ng and Leissner's failure to disclose Low's involvement in the deal is already addressed in Paragraph 58, the government believes that the first sentence of Paragraph 59 would be more accurate if it was rewritten to state the additional omissions that Ng and Leissner made about the deals, as follows: "Ng and Leissner also never disclosed to the Goldman Sachs committees that bribes would be paid to foreign officials in Malaysia and Abu Dhabi from the 1MDB bond deal proceeds to get the deals done; that Ng and Leissner had a personal financial interest in the deal (specifically, that they would be receiving kickbacks); or that the "Fake Aabar" account would receive a payment from 1MDB to facilitate the payment of bribes and kickbacks."

**Paragraph 60**. Ng objects to Paragraph 60 on two grounds, arguing that (1) "[t]here was no evidence whatsoever" that Ng communicated with any bank representatives regarding the source of funds; and (2) Hwee Bin Lim testified that she—and not Ng—"made one jewelry purchase" from the account. Obj. at 12-13. Ng's objections should be rejected.

With respect to the former objection, the trial evidence clearly established that Ng and Lim worked together to both open and control the Silken Waters/Victoria Square Account at UBS Singapore, and to conceal the true nature of the funds deposited into the account from bank representatives. Around the same time that Goldman's committees approved Project Magnolia and wired nearly $1 billion to an account held by a 1MDB subsidiary, Lim called Evelyn Teah, a banker at UBS Singapore, and then on May 21, 2012, contacted her via e-mail (using an account in her own name) and expressed interest in setting up a shell company under the name "Victoria Square Capital Limited." GX-159; GX-2463. Lim offered to meet representatives of the bank at the home she shared with Ng. GX 701-A; GX-2463.

Internal UBS records reflect that on May 22, 2012, in connection with opening the Silken Waters/Victoria Square Account, Lim's mother reported that she had "recently taken profit on her equity investments in Switzerland totaling about $26m," and that she intended to transfer the funds from BSI Bank to an account based in Asia. GX-2463. This misrepresentation was made to UBS approximately one month after Ng and Leissner met with bankers from BSI Bank in Singapore to discuss Project Magnolia, and was intended to provide a cover story for the receipt of the criminal proceeds. In June and July of 2012, the Silken Waters/Victoria Square Account received more than $24 million in funds traceable to the 1MDB bonds, approximately the same amount referenced in the internal UBS records.

While Lim's mother was listed as the beneficial owner of the Silken Waters/Victoria Square Account on UBS account opening documents, Ng and Lim secretly controlled and managed the account. The account opening documents listed Lim's telephone number. GX-303, GX-346, GX-701-A. Moreover, Ng and Lim created two e-mail accounts to impersonate Lim's mother and control the bank account. The first was the Tan E-Mail Account, which was created on May 21, 2012, the day Project Magnolia closed. GX-2566-A. This email

account purportedly belonged to Tan, but the account user agreed to the terms of service from the same IP address that was associated with Ng's Apple account. Id.; GX-2557-A-02. Ng and Lim also created a second email account, the Victoria Square E-Mail Account, to track activity in the bank account. In August 2012, the Victoria Square E-Mail Account sent an email regarding investments that was signed "R," a signature frequently used by Ng in his other personal email accounts. GX-2479. Several emails sent to the Tan E-Mail Account and the Victoria Square E-Mail Account from a banker at another bank were addressed to "Mr. and Ms. Ng." GX-2465, GX-2466, GX-2467. The foregoing evidence demonstrates that Ng and Lim together controlled the Silken Waters/Victoria Square Account and sought to conceal the source of funds from bank representatives. Indeed, the false representation that the funds were profits on investments that would be transferred from BSI Bank—the bank Ng had expected to receive bond funds from 1MDB and distribute them onward—shows that Ng played a key role in concocting the false information to provide to bank representatives.

With respect to the latter objection, the trial evidence established that funds in the Silken Waters/Victoria Square Account were used to purchase, among other things, (1) a six-carat diamond for $300,500; (2) a diamond-filled hourglass for $20,000; and (3) shares of Bristol Myers Squibb for over $200,000. GX-154, GX-159, GX-348, GX-349; GX-451-A. Evidence adduced at trial established that all three purchases involved wire transfers that passed through the Eastern District of New York. Id.

The six-carat diamond was purchased from a Hong Kong jeweler on or around November 12, 2012. At that time, Ng was present in Hong Kong to attend a celebratory "closing dinner" with 1MDB officials in connection with Project Maximus. GX-1885. The day before the closing dinner, Ng had a private dinner with Leissner and Jasmine Loo; Ng's wife purchased diamonds using more than $300,000 in diverted 1MDB bond funds in the Silken Waters/Victoria Square Account, and Loo also purchased jewelry valued at over $35,000 from the same jeweler. GX-154, GX-349, GX-350, GX-1149-A. The receipt for the jewelry Loo purchased was sent to Ng's wife. In directing payment from the Silken Waters/Victoria Square Account, Ng's wife used an email address that appeared to be her mother's but that she controlled. GX-348, GX-350. Lim testified that she purchased the diamond for her and Ng's daughter. Tr. at 4709-10.

The foregoing evidence is more than sufficient to establish Ng's involvement in spending his profits from the criminal scheme on luxury jewelry items. Ng and his wife controlled the Silken Waters/Victoria Square Account and the expenditures made from it using diverted 1MDB bond proceeds. And the circumstances support the conclusion that Ng was involved in, or at a minimum sanctioned, the purchase of the six-carat diamond with those criminal proceeds. Nonetheless, the government would not object to revising the last line of paragraph 60 to read as follows: "Ng and his wife then used Ng's profits from the scheme to fund investments and purchases in excess of $10,000 in the United States, including hundreds of thousands of dollars spent on luxury jewelry items."

**Paragraph 64**. It is not clear what the defendant is requesting here, but to the extent that he is suggesting that the Tan E-Mail Account "actually," rather than "purportedly," belonged to Tan, this suggestion should be rejected. Contrary to Ng's objection, there can be no serious dispute that Lim, and not her mother, used the Tan E-Mail Account.

11

The Tan E-Mail Account was created on May 21, 2012, the very day when Project Magnolia closed and Lim reached out to a UBS banker and expressed interest in setting up a shell company under the name "Victoria Square Capital Limited." GX-2463, GX-2566-A. Use of the Tan E-Mail Account was one way that Ng and Lim sought to conceal their ownership and control of the Silken Waters/Victoria Square Account. Account opening documents for the Silken Waters/Victoria Square Account identified Tan as the account's beneficial owner and listed the Tan E-Email Account and Lim's cellphone number as the means of contact for Tan. GX-303, GX-346, GX-701-A. Ng and Lim used the Tan E-Mail Account, along with the Victoria Square E-Mail Account, to control and track activity in the Silken Waters/Victoria Square Account. In August 2012, the Victoria Square E-Mail Account sent an e-mail regarding investments that was signed "R," a signature frequently used by Ng in his other personal e-mail accounts. GX-2479; Tr. at 3802-07. Several emails sent to the Tan E-Mail Account and the Victoria Square E-Mail Account from a banker at another bank were addressed to "Mr. and Ms. Ng." GX-2465, GX-2466, GX-2467; Tr. at 3807-09. Lim also sent an email from the Tan E-Mail Account discussing making a "payment for my bling bling purchase," which evidence adduced at trial demonstrated was jewelry purchased with laundered funds. GX-348.

In addition, the user of the Tan E-Mail Account agreed to the terms of service from the same IP address that was associated with Ng's Apple account. GX-2557-A-02, GX-2566-A. The defendant suggests that this connection can be explained by Lim's testimony that her mother lived with her and Ng at the time. First, this explanation fails to consider each of the points raised above, which conclusively establish that Ng and Lim controlled the Tan E-Mail Account and used it to impersonate Tan and conceal the ownership of the Silken Waters/Victoria Square Account. Second, in rendering its verdict, the jury clearly rejected Lim's testimony and found her explanations—about this and other matters—incredible. For these reasons, Paragraph 64 is accurate as written and should not be amended in response to the Objections.

**Paragraph 75**. This paragraph is accurate as written and should not be amended in response to the Objections. A screenshot of GX-72 is included below, which lists the various email accounts that were deleted by Ng and his co-conspirators, as well as the underlying government exhibits in the rightmost column, all of which were introduced at trial. As noted below, Ng deleted the first of his four accounts on February 3, 2015 and the last of the four on March 18, 2015. Low deleted the first of his five accounts on March 6, 2015 and the last of the five on June 4, 2015. As demonstrated at trial, this time period is also the immediate aftermath of the Sarawak Report. See GX-101. It is therefore accurate to say that these email accounts were deleted in the same time period.

12

| Date of Account Deletion | Account | Associated With | Date Account Created | Nature of Deletion | Government Exhibit |
|---|---|---|---|---|---|
| 02/03/2015 | victoriasquare.investment@gmail.com | Roger Ng ("Ng"), Lim Hwee Bin, Tan Kim Chin | 06/17/2012 | Entire Account | GX 2563-A |
| 03/06/2015 | project.lionfish@gmail.com | Jho Taek Low ("Low") | 08/27/2010 | Entire Account | GX 2586-A |
| 03/08/2015 | queensgate.capital@gmail.com | Ng | 04/30/2011 | Entire Account | GX 2562-A |
| 03/08/2015 | rogerch.ng@gmail.com | Ng | 05/14/2005 | Entire Account | GX 2564-A |
| 03/18/2015 | roger.ng1@gmail.com | Ng | 11/13/2009 | Entire Account | GX 2561-A |
| 06/02/2015 | mgmt.1mdb@gmail.com | Low | 12/14/2014 | Entire Account | GX 2588-A |
| 06/04/2015 | dealrainman1@gmail.com | Low | 03/01/2011 | Entire Account | GX 2569-A |
| 06/04/2015 | nik.faisal.src@gmail.com | Nik Faisal, Low | 08/10/2011 | Entire Account | GX 2574-A |
| 06/04/2015 | erickimloong.tan@gmail.com | Eric Tan Kim Loong ("Eric Tan") | 05/29/2009 | Entire Account | GX 2575-A |
| 06/04/2015 | jho.low@gmail.com | Low | 01/10/2005 | Entire Account | GX 2572-A |
| 06/16/2015 | erictan.omc@gmail.com | Eric Tan | 05/30/2009 | Entire Account | GX 2576-A |
| 06/17/2015 | project.dodobird@gmail.com | Jasmine Loo | 04/25/2011 | Entire Account | GX 2581-A |
| 07/09/2015 | jwo.gekko@gmail.com | Jerome Lee | 12/09/2011 | Entire Account | GX 2573-A |

The defendant also objects to the statement that "Ng stopped traveling to the United States around this same time." But that is an accurate statement—in fact, the objections seem to confirm that Ng last traveled to the United States on March 27, 2015, a mere seven days after he deleted the "roger.ng1@gmail.com" email account he used in furtherance of the bribery and money laundering scheme. The defendant's explanation that he was "no longer traveling to the United States as often" because of his departure from Goldman Sachs is an ex post justification, not a fact that was proved at trial. The fact remains that he stopped traveling to the United States within a month of the publication of the Sarawak Report and following a six-week period when he deleted four email accounts. This paragraph should therefore not be amended.

**Paragraph 76**. For the reasons stated above in regard to the Page 1 Objection, we believe that the defendant's arrest date is properly noted as May 3, 2019; accordingly, it is accurate to say that he did not make any post-arrest statements, and no amendment is required. However, if Probation believes it is appropriate to include the language that the defendant quoted here, we request that the PSR note the source of the statements: the FBI agent who drafted the 302 was not present with Ng when he purportedly made these statements, but rather was relaying information that Malaysian authorities told him about their conversation with the defendant. We therefore defer to Probation's view as to whether such a statement would qualify as a post-arrest statement for purposes of the PSR, but request that if Probation does decide to include it, that it also reference the provenance of the statement.

**Paragraphs 77(A), 78, 89, 97 – Loss Calculation**. Ng objects to the 30-level increase pursuant to U.S.S.G. § 2B1.1(b)(1)(P) for losses of more than $550,000,000, arguing that "there is no evidence Ng was told, knew, or should have known the total amount of the bribes paid" and that the "amount was unforeseeable to him and should not be considered port of the offense or relevant conduct." Obj. at 14. This argument runs counter to both the law and the facts, and it should be rejected.

13

"The loss amount attributable to a particular defendant includes the loss caused by the defendant's own acts and omissions and, in the case of jointly undertaken criminal activity[,] . . . all reasonably foreseeable acts and omissions of others in furtherance of the jointly undertaken criminal activity." United States v. Bliss, 566 F. App'x 49, 52 (2d Cir. 2014) (citing U.S.S.G. § 1B1.3(a)(1) and United States v. Royer, 549 F.3d 886, 905 (2d Cir. 2008)); see also United States v. Iannuzzi, 372 F. App'x 98, 100 (2d Cir. 2010). Specifically, where a member of the conspiracy was "involved from the beginning," is "all over" a host of key documents, acted in a "savvy and sophisticated manner," and told a series of "bold face lies," it is appropriate to hold that conspirator responsible for the entirety of the loss. Bliss, 566 F. App'x at 52.

Based on the case law and the specific facts here, the full amount of the bribes are appropriately attributable to Ng. First, the defendant was involved in the bribery scheme from the beginning, establishing the relationship between Low and Goldman Sachs and cultivating it in the years preceding the bond deals. See, e.g., GX-1504, GX-1525, GX-1531, GX-1538, GX-1546, GX-1558, GX-1567. As discussed above, Ng proposed Low as a Private Wealth Management client first in October 2009 in Switzerland, and then again in March 2011 in Singapore after Low had been rejected by Compliance. Second, Ng was an essential piece of the overall bribery plan from the outset, acting alongside Leissner to get the imprimatur of Goldman Sachs attached to bond transactions that Ng knew would be used to pay massive bribes to government officials in Malaysia and Abu Dhabi. Indeed, Ng attended the February 26, 2012 London meeting at Low's residence where the bribery plan was outlined—and which included Ng among the set of recipients of illicit proceeds from the bond transactions. See Tr. at 442-50; GX-1745, GX-1753.

As discussed above, Ng was a savvy and sophisticated player in the scheme, both in terms of its implementation and its concealment. From the outset, Ng was an active participant in this extraordinarily complex scheme, coordinating with Low from his personal email account (see GX-1764, GX-1767, GX-1768) and working to both structure the bond transactions and get Goldman Sachs's approval without revealing the massive bribes. As demonstrated at trial, these were exceedingly complicated transactions, and Ng worked diligently to close the deals. See, e.g., GX-78. And when it came time for him to receive his own bribery payment, Ng acted in a highly sophisticated manner: as discussed above, he established multiple fake email accounts, had his wife act as the primary communicator with the bank personnel, concocted a cover story for the source of the $35 million, and deleted the additional email accounts he used in connection with the scheme. The defendant was a central player who should be held responsible for the full extent of the jointly undertake criminal activity.

In addition, the full extent of the bribers were foreseeable to Ng because he understood the sums in play—both generally and personally. The defendant was a central player in $6.5 billion of bond transactions, an unprecedented sum, especially in Asia, and the largest transactions of his career, and Ng knew that these massive transactions would be the source of the bribe payments. See Tr. at 392. And on a more personal level, the defendant certainly knew exactly how much he received: over $35 million. See GX-151, GX-154. The defendant also had a sense of where he fell on the overall spectrum of bribe recipients. As described by Low at the London meeting that Ng attended, at the top of the Malaysian column were Prime Minister Najib Razak and his wife, Rosmah Mansour, and below that were Malaysian officials. See Tr. at 446-50. Then on the Abu Dhabi side, there was Sheikh Mansour at the top, followed by Khadem Al-

14

Qubaisi, Mohamed Al-Husseiny, Yousef Otaiba and IPIC in general. Id. And then, of course, there were Low, Leissner and Ng. This hierarchy of bribes was reflected in actual payments to these individuals, as demonstrated at trial. See GX-158. Thus, even if Ng did not know the exact payments to each bribe recipient, it was foreseeable to him that individuals like Low, Razak, Qubaisi and others would be receiving exorbitant sums, significantly in excess of his already-enormous $35 million payment. Accordingly, the full amount of the bribes was foreseeable to Ng, and the 30-level increase for loss amount under U.S.S.G. § 2B1.1(b)(1)(P) is appropriate.

The defendant also claims that the 30-level increase "significantly overstates Ng's criminal activity." Obj. at 15. We disagree. As described above, Ng was an essential participant in a brazen bribery scheme that siphoned billions of dollars away from the people of Malaysia and put over $35 million in corrupt kickbacks in his own pocket. The defendant went to great lengths to ensure that the deals went through as planned and conceal the bribes he received for his efforts. The defendant's greed not only victimized the people of Malaysia, but it also fundamentally undercut the public's faith in government and institutions on a global scale. For these reasons and all those articulated above, the 30-level increase in offense level does not overstate Ng's criminal activity.

**Paragraphs 77(B), 78, 83, 93, 103 – Obstruction of Justice.**

The PSR correctly applies the two-point offense level increase for obstruction of justice under U.S.S.G. § 3C1.1. That section provides for a two-point offense level increase where:

> (1) the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction, and (2) the obstructive conduct related to (A) the defendant's offense of conviction and any relevant conduct; or (B) a closely related offense.

U.S.S.G. § 3C1.1.

"[A]n obstruction of justice enhancement only applies 'if the court finds that the defendant willfully and materially impeded the search for justice in the instant offense.'" United States v. Gershman, 31 F.4th 80, 103 (2d Cir. 2022) (quoting United States v. Zagari, 111 F.3d 307, 328 (2d Cir. 1997)). As the Second Circuit recently noted, the "threshold for materiality is conspicuously low" for purposes of applying the obstruction enhancement, and there is "no general requirement that the obstruction succeed." Gershman, 31 F.4th at 103–104.

Where the alleged obstruction "occur[s] prior to the start of the investigation of the instant offense of conviction," the adjustment may apply "if the conduct was purposefully calculated, and likely, to thwart the investigation or prosecution of the offense." U.S.S.G. § 3C1.1, cmt n. 1. This extends to efforts to thwart state, local, and foreign investigation where such acts would reasonable be expected to affect the U.S. prosecution. See United States v. Ayers, 416 F.3d 131, 134 (2d Cir. 2005) (Section 3C1.1 "does not purport to limit its reach to federal investigations or federal judicial proceedings."); United States v. Teyer, 322 F. Supp. 2d

15

359, 367 (S.D.N.Y. 2004) (applying Section 3C1.1 enhancement where the defendant's "effort to frustrate the Belizean prosecution would reasonably be expected to have an effect on the prosecution here").

   The PSR correctly applies the two-point increase under Section 3C1.1 in view of the defendant's deliberate efforts to obstruct the investigation into his criminal conduct through his destruction of communications related to the scheme—both electronic and hard copy—and the dissolution of shell companies used in the scheme. In late 2013 and continuing into 2014, there continued to be critical coverage of Low and his suspected misconduct at 1MDB and corruption allegations. GX-1991, GX-1992. Among the outlets covering Low closely was the Sarawak Report, a website read widely in Malaysia and bookmarked by the defendant in his iCloud account. GX-2557-B. The government established at trial that during this time, on a recorded call in March 2014, the defendant's wife called to request the destruction of mail for the Silken Waters / Victoria Square shell company—the entity that had received criminal proceeds from the 2012 bond deal. GX-359.

   In early 2015, the defendant and his wife worked to delete the entirety of multiple email accounts used in the scheme. Indeed, the very month that additional news reports broke concerning corruption at 1MDB, the defendant and his wife deleted the "victoriasquare.investment" email account, which they personally used to communicate with the bank holding his criminal proceeds from the 1MDB bribery and money laundering scheme. GX-72, GX-101, GX-1968, GX-1969, GX-1973. The following month, the "queensgate.capital," "rogerch.ng" and "roger.ng1" accounts—all used to communicate with Low—were also deleted in their entirety. GX-72. The same month, he stopped travelling to the United States. GX 2851. And just five months later, the defendant was questioned by the Malaysian Anti-Corruption Commission. T. 4753.

   These acts properly support the enhancement, as they were "purposefully calculated, and likely, to thwart the investigation or prosecution of the offense." U.S.S.G. § 3C1.1, cmt n. 1. In particular, they helped hide the defendant's communications with Low, Leissner and other co-conspirators and further obfuscated the defendant's control over the bank accounts and shell companies used in furtherance of the bribery and money laundering scheme. The timing of these acts—particularly the email deletions in 2015—show that the defendant was concerned with the expanding official investigations into 1MDB. The defendant's concern extended to the U.S. investigation into 1MDB, as evidenced by Leissner and the defendant's coordination with each other in February 2016 immediately after Leissner was stopped by the FBI and served with a grand jury subpoena.

   Attempting to minimize the significance of these acts, the defendant claims that the deletion of the multiple email accounts was unconnected to "the offenses of conviction." That objection ignores the evidence and its import in this case. These were email accounts used by the defendant to communicate with Low, including about the 1MDB bond deals, and, as to the "victoriasquare.investments" account, to exclusively communicate about the use of the criminal proceeds he gained from the scheme. Evidence of the defendant's control over the anonymized email accounts would have linked him directly to the shell companies and bank accounts being operated from that email account.

16

As to the shell account dissolution and mail destruction, the defendant claims that this was all done to "simply transfer[] [the money] to an account in Mrs. Tan's personal name, who was the original beneficiary of the corporation." As the government established at trial, Ms. Tan—the defendant's mother-in-law—had no real tie to these companies and accounts at all, aside from concealing the defendant's control by having her name on the paperwork. It was the defendant who filled the account with criminal proceeds, and planned to use that money for real estate, stocks, and jewels. The closure of the accounts, dissolution of the company and destruction of the mail had nothing to do with Ms. Tan—it was to ensure that the true ownership and control of the shell companies would be harder to determine. As such, these acts support application of the enhancement.

**Paragraphs 77(C), 78, 92, 102 – Role in the Offense**.

The defendant bears the burden of establishing a downward role adjustment, and he fails to do so here. "The commentary to the Guidelines provides that a 'minimal role' adjustment applies to a defendant who is 'plainly among the least culpable of those involved in the conduct of a group.'" United States v. Carpenter, 252 F.3d 230, 234 (2d Cir. 2001) (quoting U.S.S.G. § 3B1.2, comment. n.1). "The Guidelines make clear that the "minimal role" adjustment should be used 'infrequently.'" Id.

As established at trial and reflected in the PSR, the defendant's role in the instant offense was far from minor. This is illustrated by the mere fact that he received $35 million from the criminal scheme—an amount that was **30 times more** than the corrupt payments made to lower level Malaysian government officials like Amhari Nazaruddin and Azlin Alias, and places him the top eight of overall payment recipients proved at trial. GX-158. In addition, together with Leissner, he was the lead banker shepherding the deal through Goldman Sachs. Without an approved transaction, there was no money to divert and use to pay bribes and kickbacks. As such, his role was crucial to the scheme's success and Section 3B1.2 does not apply.

Nevertheless, the defendant cites three reasons supporting his requested four-point "minimal role" reduction: (1) that he "did not pay any bribes"; (2) that he "was not told to whom Leissner was paying bribes nor the amounts"; and (3) he did not speak to Low "after 2012." None of these reasons support application of the role adjustment. The defendant knowingly joined a bribery and money laundering conspiracy. He knew that government officials in two countries would be bribed, he knew that Leissner's shell company would be used to facilitate bribe payments, and he knew that Leissner was making payments at Low's direction. Even if Probation could credit the defendant's claims of ignorance as to certain details of the scheme—which it cannot—the trial evidence established that he possessed substantial knowledge of the scheme and its operation both before and during its execution. As such, he is not entitled to a minimal role adjustment.

Accordingly, Probation should reject the defendant's request for a minimal role adjustment.

17

**Paragraph 84.** As noted in the Objections, the defendant did not plead guilty and indeed proceeded to trial. Accordingly, and as reflected elsewhere in the PSR, there should be no adjustment for acceptance of responsibility.

**Paragraph 85.** Ng requests that Probation consult the 2013 Guidelines Manual in computing his offense level rather than the most recent iteration. "As a general matter, a sentencing court should apply the version of the Sentencing Guidelines in effect as of the date of sentencing." United States v. Boyle, 283 F. App'x 825, 826 (2d Cir. 2007); see United States v. Keigue, 318 F.3d 437, 442 (2d Cir. 2003). "An exception applies, however, when the Guidelines in effect at the time of sentencing call for a more severe sentence than the Guidelines in effect at the time of the offense; in such circumstances, the Ex Post Facto Clause requires the use of the earlier version of the Guidelines. Boyle, 283 F. App'x at 826; see United States v. Kilkenny, 493 F.3d 122, 126–27 (2d Cir. 2007).

Here, the defendant has not identified any reason why his sentence would be more severe under the 2013 Guidelines rather than the current version. If he does so, we would agree that the 2013 Guidelines should apply; if not, then this objection should be rejected.

**Paragraphs 94, 104.** We believe that the PSR properly calculated the Adjusted Offense Level to be 50 for Count 1 and 54 for Count 3. The defendant's arguments to the contrary should be rejected for the reasons articulated above.

**Paragraphs 105-08.** We agree with Probation and the defendant that Counts 1, 2 and 3 should be grouped together. For the reasons stated above, we agree with Probation's calculation that the Combined Adjusted Offense Level is 54.

III.     Offender Characteristics – Response

**Paragraphs 118, 120, 122, 123.** We have no objection to the PSR being amended to reflect the defendant's comments.

**Paragraph 132.** 

**Paragraph 145.** The defendant claims that he does not have the ability to pay a fine because he "has significant debts and liabilities and he has a negative Total Net Worth." Obj. at 16. Ng also claims that he surrendered $2,020,829.16 to the Malaysian government, which renders him incapable of paying a fine. We disagree. As was noted in the PSR, the vast majority of the defendant's liabilities are personal loans from family members and legal fees, which are being paid for by his family as well (see PSR ¶ 144). The defendant does, in fact, appear to have considerable assets that may be liquidated and used to pay a fine. Indeed, the burden is on the defendant to establish his inability to pay, see United States v. Thompson, 227 F.3d 43, 45 (2d Cir. 2000), and the defendant's negative net worth and previous surrender of funds to the Malaysian authorities—which he has failed to establish through any independent evidence—do not demonstrate that he is unable to pay a fine. See also U.S.S.G. § 5E1.2(a)

("The court shall impose a fine in all cases, except where the defendant establishes that he is unable to pay and is not likely to become able to pay any fine."). We therefore request that this paragraph not be amended.

**Paragraph 159.** The defendant does not seem to dispute that the government may seek forfeiture here, but reiterates his claim that he and his wife surrendered over $2 million to the Malaysian government. Even if he did, in fact, surrender this sum (which he has not corroborated), that does not change the government's ability to seek forfeiture, which is provided by statute. As noted in the PSR, the government may seek forfeiture in accordance with 18 U.S.C. §§ 981(a)(1)(C) and 982(a)(1), and 28 U.S.C. § 2461(c). Accordingly, we believe that this paragraph is accurate as written and should not be amended.

**Paragraph 162.** The defendant states that "there are several factors that warrant a departure from the guidelines range," but does not identify any with specificity. Based on our review of the Sentencing Guidelines, we agree with Probation that there are not any factors that would warrant a departure, and Paragraph 162 should remain as written.

**Paragraph 163.** ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ We also agree that the Bureau of Prisons' ultimate determination of the defendant's time of incarceration should credit the time he spent in Malaysian custody. See 18 U.S.C. § 3585(b) (a defendant "shall be given credit toward the service of a term of imprisonment for any time he has spent in official detention prior to the date the sentence commences (1) as a result of the offense for which the sentence was imposed").

****

Thank you for your consideration, and please let us know if you have any questions or if we can provide any additional information.[2]

                Respectfully submitted,

                BREON PEACE
                United States Attorney

By:    s/
      Alixandra E. Smith
      Drew G. Rolle
      Dylan A. Stern
      Assistant U.S. Attorneys

cc:    Clerk of the Court (MKB) (by email and ECF)
       Counsel for the defendant (by email and ECF)

---

[2] The government has filed portions of this letter that address Ng's medical conditions under seal. While courts recognize a "qualified First Amendment right" to access judicial documents and proceedings and a presumptive right of access to judicial documents under the common law, Lugosch v. Pyramid Co. of Onondaga, 435 F.3d 110, 119, 120 (2d Cir. 2006) (quoting Hartford Courant Co. v. Pellegrino, 380 F.3d 83, 91 (2d Cir. 2004)), those rights may be overcome in certain circumstances, including where a court makes "specific, on the record findings" "demonstrating that closure [or sealing] is essential to preserve higher values and is narrowly tailored to serve that interest," United States v. Alcantara, 396 F.3d 189, 199 (2d Cir. 2005). See also United States v. Amodeo, 71 F.3d 1044, 1050 (2d Cir. 1995). In making that determination, courts apply a balancing test. United States v. Doe, 63 F.3d 121, 128 (2d Cir. 1995). Here, given the sensitive personal nature of these specific topics, public disclosure of this letter implicates sufficiently "higher values" that warrant sealing. The government therefore requests that the Court make specific findings, in accordance with Doe, that sealing those portions of this letter is both essential to preserve compelling interests and narrowly tailored to serve those interests. Alcantara, 396 F.3d at 199 (internal quotation marks omitted).