**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

**18 CR 538 (MKB)**

---

**UNITED STATES OF AMERICA**

**-against-**

**NG CHONG HWA A/K/A ROGER NG,**

**Defendant.**

---

**SENTENCING MEMORANDUM ON**
**BEHALF OF ROGER NG**

> **BRAFMAN & ASSOCIATES, P.C,**
> **256 Fifth Avenue – 2nd Floor**
> **New York, NY 10001**
> **Tel: (212) 750-7800**
>
> *Attorneys for Roger Ng*

Marc Agnifilo
Zach Intrater
Teny Geragos
Jacob Kaplan
   *Of Counsel*

**Table of Contents**

INTRODUCTION ................................................................................................................. 1

PREVIEW OF THIS MEMORANDUM AND THE SECTION 3553(a) FACTORS ......................... 3

INDIVIDUALIZED ASSESSMENT OF ROGER NG ................................................................. 5

  A.  Roger Ng's History and Characteristics ....................................................................... 5

  B.  Nature and Circumstances of Roger Ng's Offense ..................................................... 21

ANALYSIS ......................................................................................................................... 22

  A.  The Sentencing Guidelines Overstate the Degree of Mr. Ng's Alleged Culpability ...... 22

    1.  Base Offense Level .............................................................................................. 22

    2.  Two Level Increase for More Than One Bribe .................................................... 22

    3.  Thirty-Level Increase for Bribes Exceeding $550,000,000 ................................. 23

    4.  Obstruction of Justice ......................................................................................... 24

    5.  Minimal Role ...................................................................................................... 25

    6.  Total Offense Level ............................................................................................. 40

    7.  A Substantial Departure From the Guidelines Is Permitted and Is Appropriate ....... 40

  B.  The Factors Set Forth in 18 U.S.C. § 3553 as Applied in This Case Support A Time-Served Sentence ..... 41

    1.  Mr. Ng's and His Family's Cooperation With 1MDB Investigations in Singapore and Malaysia ..... 41

    2.  Mr. Ng Waived Extradition at the Earliest Opportunity ...................................... 49

    3.  The Six Months That Mr. Ng Was in Sungai Buloh Prison Warrants A Downward Departure Under U.S.S.G. § 5K2.0 And A Substantial Reduction Under Section 3553(a) ..... 52

    4.  Even After Being Released from Sungai Buloh Prison, Mr. Ng Has Been Isolated From His Wife, Child and Family for Almost Another Four Years ..... 57

    5.  Given Mr. Ng's Character and Circumstances, Court Does Not Need to Impose Further Incarceration to Achieve Specific Deterrence ..... 59

    6.  A Sentence of Further Incarceration Will Not Further General Deterrence ..... 63

    7.  Mr. Ng Has Already Suffered More Than Anyone Else Involved in the 1MDB Theft ..... 68

    8.  A Sentence of Time-Served Will Permit Mr. Ng to Return to Malaysia to Face Whatever Prosecution His Home Country Sees Fit ..... 71

    9.  Further Incarceration Would Work an Atypical and Extreme Hardship ..... 73

    10.  As A Non-Citizen, Mr. Ng Is Not Entitled to Many of the Ameliorative Sentencing Provisions Available to U.S. Citizens. ..... 77

CONCLUSION .................................................................................................................... 78

The defendant, Roger Ng, submits this memorandum in anticipation of his sentencing hearing, scheduled for March 9, 2023. We ask for a sentence of time served.

## INTRODUCTION

Roger Ng is a gentle, slight, humble man who finds himself at the epicenter of one of the biggest criminal cases in history, and while others far more powerful and richer than him, have either cut deals with the government or become fugitives (or both), Mr. Ng never ran away and never sacrificed his principles. Mr. Ng has done everything every Government has asked of him—first Singapore, then Malaysia, and now the United States. Singapore wanted to question him for three months in 2017—and Mr. Ng complied. He even returned to Singapore once he was allowed to leave to continue his cooperation. In the Summer and Fall of 2018, Malaysia wanted his family to relinquish all of their bank accounts because some of the funds were tainted with money traceable to 1MDB—and his family complied. The United States indicted him in late 2018 and wanted him to waive extradition to face his charges—and he did so at the earliest opportunity. He has never lied to any government agent or authority and has continued to live his life honestly and with humility in keeping with his Buddhist beliefs. This stands in stark contrast to his alleged co-conspirators, most of whom have fled, and to Tim Leissner, who apparently did not flee to Brazil with his mistress soon enough, continued to commit other crimes after his involvement in 1MDB, and admitted to lying to federal investigators during numerous proffer sessions.

Mr. Ng was arrested on U.S. charges in Malaysia on November 1, 2018. He was incarcerated under brutal and cruel conditions in a Malaysian prison for over six months before being picked up by U.S. authorities. He has lived the last almost four years alone, 10,000 miles from his family, missing his daughter, who has gone from six to almost 11 years of age without having her father. There can be no doubt that Mr. Ng has suffered and has been punished every day since the day of his arrest. While we recognize that of the 1,589 days between November 1,

2018, and March 9, 2023, only the 186 days prior to this Court releasing him on home confinement legally counts against any jail sentence, this entire four-and-a-half-year period has caused tremendous suffering, all of it imposed by the U.S. Government. As such, in connection with this case, the last 1,589 days should be viewed as punishment for purposes of the ultimate sentence.

However, Mr. Ng and his family have already been punished in another way. Even before the announcement of the U.S. charges and before Malaysia filed charges, Mr. Ng's family paid back all of the alleged 1MDB funds in various bank accounts held by Mr. Ng's family and also paid to Malaysia substantial additional funds not related to 1MDB. Prior to Mr. Ng being arrested, prior to his knowledge that the U.S. had charged him with a crime, and prior to any formal legal action in Malaysia, the Ng family, specifically his wife, his mother-in-law and his brother-in-law, relinquished all of the funds that Malaysian authorities claimed were derived from the 1MDB theft. But, the Malaysian government did not just take the money derived from 1MDB. The family also agreed to relinquish bank accounts containing not just 1MDB funds, but virtually the totality of the family's combined wealth over generations. (See Ex. 1, Statutory Declarations by Lim Hwee Bin, Lim Chee Khang and Tan Kim Chin.) Had this been done by the U.S., and not the Malaysian, Government, jeopardy likely would have prevented any further punishment. Of course, because the authority exacting the financial punishment was the Government of Malaysia and the one looking to impose further punishment is the Government of the United States, double jeopardy does not apply. But, the actions of the Malaysian government plainly arise to a recognized form of punishment under U.S. law, and this is something this Court should consider as a factor in rendering a substantially below guidelines sentence.

Based on these, and other, factors discussed in this Memorandum, Mr. Ng is a uniquely-situated defendant, one who has already been punished by his country, has been badly mistreated

while in the custody of his country on U.S. charges, has been separated from his young daughter, wife and family for four years, and who would suffer from a sentence of further incarceration, far more than the typical defendant. We ask that the Court show mercy to him, to his daughter, to his wife, and to his mother, and to sentence him to the prison time he has already served in objectively sub-human conditions in Malaysia. We ask that the Court permit Mr. Ng to return home, to Malaysia, where he is still subject to Malaysian criminal charges related to the massive theft of Malaysian funds.

## PREVIEW OF THIS MEMORANDUM AND THE SECTION 3553(a) FACTORS

This Memorandum focuses on three general topics. First, we lay out the history and characteristics of Mr. Ng. Second, we review a sentencing calculation under the U.S. Sentencing Guidelines. We assert that, consistent with other decisions, the guidelines overstate the seriousness of Mr. Ng's offense (not of the overall offense generally). Third, we review ten different sentencing factors within the scope of Title 18, United States Code, Section 3553(a) that individually and in combination support a very substantial variance from the guidelines to a sentence of time served. These Section 3553(a) factors are set forth below:

First, that Mr. Ng and his family cooperated with the investigations in Singapore and Malaysia beginning in 2017, including relinquishing funds derived from 1MDB and other additional funds.

Second, Mr. Ng voluntarily waived extradition at virtually the earliest opportunity; this is relevant to Section 3553(a)(1) (characteristics of the defendant) and 3553(a)(2)(A)(promoting respect for the law).

Third, Mr. Ng was held for six months in dangerous and sub-human conditions in a prison in Malaysia based solely on the U.S. charges. During this time, he became gravely ill with two diseases: severe Leptospirosis, also known as Weil's disease (a bacterial disease spread through

the urine of infected rats); and Malaria. This is relevant to 3553(a)(2)(B) (relating to adequate deterrence). Also, this Circuit has held that being subjected to harsh conditions is an appropriate basis for a downward sentencing departure.

Fourth, as detailed extensively in this memorandum, since being extradited to the U.S. four years ago, Mr. Ng has been removed from his wife of 25 years, his minor child and his family, and has had to endure prolonged isolation, including suffering from Covid alone.

Fifth, there is no need to specifically deter Mr. Ng or to protect the public from him committing future crimes, such that a term of further incarceration in this country or in Malaysia is unnecessary.

Sixth, because Goldman Sachs, the ultimate alleged beneficiary of the defendant's offense conduct, has paid almost $3 billion to the U.S. Government and $3 billion more to the Malaysian Government among other reasons, this Court need not issue a sentence of further incarceration to this defendant in order to achieve general deterrence.

Seventh, Mr. Ng has already suffered more than any other coconspirator in the 1MDB theft—he has endured four years being away from his wife, daughter, mother and the rest of his family, often isolated in his apartment, during the Covid pandemic, while his case proceeded to trial, causing him extreme emotional distress.

Eighth, a time-served sentence by this Court will permit Mr. Ng to return to Malaysia to face criminal charges in Malaysia.

Ninth, a sentence of imprisonment served in the United States, 10,000 miles from his family and friends, would work an extreme hardship on Mr. Ng's mental health and would exacerbate his diagnosed PTSD symptoms from the abuse he suffered in a Malaysian prison.

Tenth, as a non-citizen, Mr. Ng is not entitled to many of the ameliorative sentencing provisions available to U.S. citizens.

For these reasons, and due to the unique circumstances of this case, we respectfully ask that the defendant not be sentenced to a term of further incarceration, and that instead he be sentenced to the time he has already served under brutal conditions in prison in Malaysia on these charges and permitted to return to Malaysia to face the charges filed against him by the Government of that country.

## INDIVIDUALIZED ASSESSMENT OF ROGER NG

In determining the appropriate sentence for a defendant, a sentencing court "must make an individualized assessment based on the facts presented," which includes "a broad command to consider 'the nature and circumstances of the offense and the history and characteristics of the defendant.'" Gall v. United States, 552 U.S. 38, 50 & n.6 (2007) (quoting 18 U.S.C. § 3553(a)(1)) (emphasis added). In this case, both the circumstances of the offense and the history and characteristics of this defendant urge this Court to impose a time-served sentence. We address these considerations in turn by discussing (1) an overview of Mr. Ng's upbringing and life; and (2) the words and voices of those who have come forward to write the Court letters describing Mr. Ng's many admirable qualities.

### A.  Roger Ng's History and Characteristics

Roger Ng is a fifty-year old Malaysian citizen who has lived mostly in Malaysia and also in Hong Kong. (PSR ¶ 119; see also Ex. 2, Letter of Roger Ng at 1.) The letters submitted on Mr. Ng's behalf describe him a gentle, kind-hearted, humble, ego-less man. His life has been defined by hard work, frugality, providing for his wife, child, parents and in-laws, as well as a deep respect for authority, his elders, his heritage and doing what is right.

Virtually all of the letters submitted on Mr. Ng's behalf discuss his humble and frugal nature, and it is the first thing one notices about him. There is a pure goodness about Mr. Ng that is disarming. Even the Government's first trial witness, Andy Tai, testified that Mr. Ng was kind and gentle. (Tr. at 209-210.) Mr. Tai's sentiments are shared by everyone who meets Mr. Ng. (See id. at 1 ("Roger has demonstrated his kind and caring nature."); Ex. 3, Letter of Julie Ng at 2 ("Everyone who knows him will remember him as kind, humble, and compassionate"); Ex. 4, Letter of SK Cheong at 1 ("he impressed me as a person of impeccable integrity. His personality reflects an aura which is founded on a conservative up-bringing, from a home that is grounded on the strongest family values"); Ex. 5, Letter of Tan Soon Muay at 2 ("All this time in New York, Roger is frugal and even keeps to a vegetarian diet. I know because he does not want to burden the family further financially, saving every bit he could"); Ex. 6, Letter of Ashley Ng at 2 ("He is a kind, hardworking, generous, honest and responsible individual"); Ex. 7, Letter of Loke Sow Fan at 1 ("There are many instances big and small of Roger's humility and kindness…sending fever medication to me personally upon hearing that I had high fever which later confirmed as dengue fever"); Ex. 8, Letter of Lim Chee Khang at 1 ("Roger possessed great self-discipline and was frugal"); Ex. 9, Letter of Wai Yee Chiong at 1 ("He had become a successful banker, I heard, but there was not an ounce of arrogance in his demeanor"); Ex. 21, Letter of Kin Hui Chang ("As a friend, he has always been unpretentious, amicable, generous, honest and down-to-earth.))

In order to understand Mr. Ng, and the difficulties and trauma he has been through between his arrest on these charges on November 1, 2018, and today, one must first understand the people from whom he came, who themselves persevered through war, adversity, anti-Chinese

discrimination, fear and poverty. His maternal great grandparents migrated to Malaya[1] (which was then a British colony) during the Qing (or Ching) Dynasty in the early part of the 20th century (before the 1911 Revolution led to modern China). His paternal grandparents moved from China (post-revolution) to Malaya. Like Mr. Ng, they were humble, hard-working people who lived through the brutal Japanese occupation during World War II, at a time when war crimes were being committed against the area's ethnic Chinese residents. The year after Japan surrendered to the Allied forces, the Malayan Union was born, and in 1957, Malaya became an independent nation. In 1963, the Federation of Malaysia was formed. As a result of this tumultuous history, Mr. Ng's parents and grandparents taught him to take nothing for granted, and that to survive, he would have to "be honest, righteous, benevolen[t] and positive. Such are the core values that Roger holds deeply." (Ex. 5, Letter of Tan Soon Muay at 1.)

Far from being born into privilege, Mr. Ng worked tirelessly to educate himself and to achieve acceptance and ultimately some success in the world of banking. Born in Malaysia to a stern father (who worked as an engineer helping to design and build the national mint and was a manager with Malaysia's Central Bank) and a mother who was a schoolteacher, Mr. Ng had an "overall good childhood… he and his siblings were cared for." (PSR ¶ 121; see also Ex. 2, Letter of Roger Ng at 1.) Growing up, he was close with his siblings, and they remain so today. (Id.) His brother, Rudy Ng, is 52 years old, married with five daughters, lives in Malaysia and works in the telecommunications field. (Ex. 10, Letter of Rudy Ng at 1.) His sister, Julie Ng, is 46 years old, married with one son, lives in London and works as a credit ratings analyst. (Ex. 3, Letter of Julie Ng at 1.)

---

[1] Until 1963, this part of the world was called Malaya.

Growing up, Mr. Ng's father imposed corporal punishment on Mr. Ng including caning and other types of beatings. (PSR ¶ 121; see also Ex. 2, Letter of Roger Ng at 1.) This was not unusual in certain traditional, ethnically-Chinese families living in Malaysia at the time. Though Mr. Ng acknowledges that his father's behavior was not appropriate, he never felt mistreated. Id. Mr. Ng recalls his father's discipline:

> Growing up, I was frequently disciplined severely by my father. This was because I never knew what I wanted. I spent more time on the school football field and then on my school work until I was ten. That year my grades were at their worst. I knew I had to face the abyss with my father but the worst was to come. I was disciplined with the usual caning and told I was beyond hope. He gave me $10 and told me to leave the house for good. It was a shock to me but leave the house I did nevertheless. I had walked 10 miles out of my home in a random direction before my mother came chasing behind to take me home 5 hours later.

(Id.) On the contrary, he viewed his father as looking out for his best interests and unfailingly showed his father the honor and respect expected of a good son. Mr. Ng's brother, Rudy, describes that their father "was very strict with us, disciplined us in the traditional way where canning [sic] was part of the punishment. He guided us every step of the way and inspired us through his unique examples and anecdotal teachings." (Ex. 10 at 1.)

Throughout his life, Mr. Ng was taught humility first and foremost. Rudy Ng writes, "We were taught to respect our elders (superiors), family values to look out for each other, loyalty, integrity and honesty." (Id. at 1; see also Ex. 3, Letter of Julie Ng at 1.) Mr. Ng's father was Buddhist; his mother was Christian. Having the stronger personality, his father's views prevailed in the household. Central to the teachings of Buddhism was the core concept of humility, which is the key to wisdom and fulfillment. Being humble is the single most important quality a person can have. In her letter, Mr. Ng's mother says with pride, "my three children were brought up humbly. My late husband often repeated his mantra to the children to never beg, steal or borrow and to live with pride and dignity." (Ex. 5 at 2.) Mr. Ng was raised with these Buddhist values and holds onto

8

them today. Mr. Ng's mother-in-law's sister writes that, "Roger has always been a religious person, [who] strongly believe[s] in Karma. He is God fearing and a believer in 'good begets good.'" (Ex. 11, Letter of Tan Saw Hun at 1.)

The particular tradition of Buddhism that Mr. Ng and his family follow is the Tibetan Nyingma tradition.[2] It teaches that one should see past material and emotional distractions to live in accordance with the ultimate ground of existence. Mr. Ng has put to practice his Buddhist beliefs. One example is how Mr. Ng and his family decided to donate to Shelter Home, a registered welfare organization, which has been in existence since 1981 to help abused, abandoned, neglected or at-risk children in Malaysia:

> The story of Shelter Home was born from our daughter. When she was born prematurely in 2012, we discovered that her nurse that had to abandon her 7-year-old son at this shelter as she was a single parent. As new parents, we could not begin to imagine her plight of having to do this. We made the decision to not only support the shelter, but her 7-year-old son.

(Ex. 2, Letter of Roger Ng at 2.)

Mr. Ng started working when he was ten years old performing manual labor in places like rubber factories and industrial kitchens. Mr. Ng attended public schools in Malaysia and eventually got good grades. At 17 years old, Mr. Ng left Malaysia and attended David Game College in London to prepare for A-Level (or Advanced Level) examinations. While studying abroad is a luxury in the U.S., Malaysia's existing race-based policies limit university education opportunities for minority races and leaves no choice but for many ethnic Chinese Malaysian students to attend schools abroad. Students typically study for their A-Levels for two years. Mr. Ng completed his course of study in six months, solely to save money. Nonetheless, he passed his exams. He then

---

[2] The Palyul lineage or Palyul Monastary is one of six such traditions of the Nyingma school of Tibetan Buddhism.

attended City, University of London for three years and graduated with a Bachelor of Science degree (with honors) in 1993. Mr. Ng partly paid for his own education by working in low-level jobs in finance.

In 1990, while studying for his A-levels, Mr. Ng met Hwee Bin Lim, who was also an ethnic Chinese Malaysian studying in London. They were 18 at the time. Hwee Bin's brother, Lim Chee Khang, described that during Mr. Ng's courtship with Ms. Lim, Mr. Ng was too poor to go out and was unable to pay for Hwee Bin on their dates, a fact that aroused consternation in her older brother. Mr. Lim writes, "[Mr. Ng] would take my sister out on dates but [I] noticed that my sister would have to pay for her own meals which was unacceptable to me as an elder brother." (Ex. 8, Letter of Lim Chee Khang at 1.) However, Ms. Lim and her family learned that Mr. Ng was receiving no family support and that he worked to put himself through school. Mr. Lim "later found out from my sister that Roger had insufficient funds from his parents and was working while studying to supplement his education funds." (Id.) Roger continued to study and "worked so hard all his life." (Ex. 3, Letter of Julie Ng at 2.)

Mr. Ng has had one romantic partner in his life; her name is Hwee Bin Lim. Ms. Lim has had one romantic partner in her life; his name is Roger Ng. Their relationship, which started in 1990 when they were students, continued through the hard work of school, through graduation, through Mr. Ng getting his first job in banking, through Mr. Ng working in banking, through the birth of their daughter ███████ through Mr. Ng leaving Goldman, through the 1MDB investigations by Singapore and Malaysia, through Mr. Ng's arrest on U.S. charges, through the six months Mr. Ng suffered in inhuman conditions with grave illnesses in a Malaysian prison, through four years of Mr. Ng being 10,000 miles away in New York and through a highly publicized criminal trial. After all of this, their relationship is as strong today as it was when they

were 18 years old. (PSR ¶ 122.) The strength of Mr. Ng's connection with his wife derives from the strength of his character and his resolve.

Mr. Ng has an incredibly strong work ethic, as many of the letters point out. Mr. Ng moved back to Malaysia for two years in 1993. He worked for a local Malaysian bank as a project finance loan officer as a way of making money so he could pursue a master's degree in Business Administration ("MBA"). (See Ex. 2, Letter of Roger Ng at 3.) After two years of working and saving money, he returned to England in 1995 to pursue his MBA at a different school in London, with Imperial College, University of London. While studying for an MBA, Mr. Ng interned at Deutsche Bank in London. Once he completed his MBA, he returned to Asia and continued his employment with Deutsche Bank. (See id.)

Mr. Ng had worked for Deutsche Bank for about ten years when Goldman started pursuing him to work for its office in Hong Kong in 2005. During his almost two decades with Deutsche Bank and Goldman Sachs, Mr. Ng consistently worked 16-hour days. As the trial evidence showed, behind the "Masters of the Universe" like Leissner and the other partners of Goldman, who conjure up lucrative business deals that are the life-blood of large banks, there is a litany of smart, talented workers who deal with the regulatory, legal and other administrative details. Mr. Ng was never a deal-maker. He was always a team player, like so many of the hard-working Goldman employees, who made the deals happen. He served in that role for twenty years, in two banks, never causing trouble, never drawing attention to himself or coming onto the radar screen of any of his employer's compliance departments.

Despite Mr. Ng's grueling work schedule, he maintained active involvement with friends and family. His sister notes in her letter how while she was studying for her master's degree in London:

11

> Roger would take the effort to stopover and check on my wellbeing, no matter how hectic his schedules were, to catch up with me over a meal or a drink. I remember he once fell asleep while he was talking to me as he had been flying through 3 different time zones in 3 days.

(Ex. 3, Letter of Julie Ng at 1.) His niece echoed this sentiment, writing that she "never felt distant from [Mr. Ng] despite the physical distancing":

> [a]lthough my uncle was not always around due to travelling for work, he never failed to be around when I needed his help and advice…His advice gave me great clarity and guidance whenever I face any difficulties. He is a person I always seek for advice, and not once he turned me down despite his busy work schedule.

(Ex. 6, Letter of Ashley Ng at 1.) Because Mr. Ng always made time for those close to him, his family members often relied on him for advice and support. (See, e.g., Ex. 12, Letter of Erlny Low Sze Wei at 1 (Mr. Ng's cousin: "He has always unselfishly provided me with advice and unwavering support whenever I needed it since young.").)

In 2014, Mr. Ng retired from Goldman. The primary reason that Mr. Ng voluntarily left was to care for his ailing father and because the job's travel and long hours were inconsistent with his notion of being a good father himself. (See Ex. 2, Letter of Roger Ng at 3.) Mr. Ng had strong, close, loving relationships with both his father, who passed away in January 2015, after a ten-year, severe illness, and his mother. As his niece writes:

> When my grandfather was invalid during the period of 2005 to 2015, he took care of my grandfather and helped the family greatly. He prioritized his family, and would do anything to help them in every way. And for that I look up to him because it reflects his values, personality and work ethic.

(Ex. 6, Letter of Ashley Ng at 2.) Mr. Ng's sister also recalls that as their father's health deteriorated, "Roger was planning to take a step back in his career or somehow find a way to come back to Kuala Lumpur." (Ex. 3 at 1.) For Mr. Ng, taking care of one's family was ingrained at a young age. As a child, he was often tasked to take care of his grandparents "who suffered blindness and dementia in their old age." (Ex. 5, Letter of Tan Soon Muay at 1.)

12

While spending time caring for his ailing parents, Mr. Ng began focusing on his own family. After many years of trying to conceive a child, the couple's daughter, ███ was born on June 3, 2012, two years after Mr. Ng left the Investment Banking Division ("IBD") of Goldman and entered the firm's Securities Division. His sister, Julie, writes that "it was no surprise when my mother told me that Roger had decided to retire from Goldman[] in 2014. I believe one of the reasons for this was also due to the arrival of his daughter, ███ in 2012, after ███████ over the span of 10 years." (Ex. 3 at 1.) Mr. Ng's friends write this Court about the "insurmountable love and care" Mr. Ng showers on ███ (Ex. 7, Letter of Loke Sow Fan at 2; see also Ex. 12, Letter of Erlny Low Sze Wei at 1 ("having witnessed Roger build a successful and aspiring career through his steadfast work ethics, become a devoted husband and loving father to his young daughter has been a real inspiration to our entire family").) It is horribly ironic that a reason Mr. Ng left Goldman was so he could spend as much time as possible with his wife and his daughter. Instead, the last time Ng was with his daughter was October 31, 2018. She was six years old at the time. In four months, she will be 11.

Despite Mr. Ng's separation from ███ he does the best he can to be a present, active father. As he has done his whole life, Mr. Ng reads to his daughter every day before bed. Every morning (New York time), Mr. Ng reads stories to ███ from the other side of the world before she falls asleep. Mr. Ng's niece Ashley visited Mr. Ng last year and observed this ritual and Mr. Ng's dedication to his daughter:

> The present distance and time difference did not deter him from interacting with her. He would religiously wake up early in the morning everyday to read bedtime stories to his daughter, and in the evening, to be there when she wakes up for school. Throughout the day he would constantly be on facetime, to always be present with his family like nothing changed. His commitment to dedicate time with his daughter and share with her the values of life, stories of different religions to help form the right mindset to face difficulties in school and in life must have been keeping his sanity.

13

(Ex. 6, Letter of Ashley Ng at 2; <u>see also</u> Ex. 13, Letter of ███████ ("there was one thing that he never failed to do and that was called his beloved daughter, ████. The twelve hour time difference did not stop him from keeping this date daily."); Ex. 21, Letter of Kin Hui Chang ("Whenever I visited him, his daughter would be in the background, on video-call, doing her own thing or getting ready to go to bed. For months, he would read her historical stories in nightly installments. Something they would watch the same shows on TV, spending time together across time zones.))

Mr. Ng tries his best to deflect his daughter's questions about when he is coming home. As she has gotten older, her questions are more pointed: "But Covid is over; why are you still there?" Mr. Ng's nephew ████ writes that "I feel terrible whenever she asks me about her father and when he is going to come back." (<u>Id.</u> at 1.) Mr. Ng's mother-in-law's sister, Tan Saw Hun, writes that ████ "suffered in silence. She used to ask other members of the family about her father, but no one could bring themselves [to] give her answers." (Ex. 11, letter of Tan Saw Hun at 2.) With her increased age and the endless press coverage about Mr. Ng's case and the 1MDB matter generally, ████ unquestionably knows why her father has not come home. Yet, she has never said a word to her mother or father. Dutifully and sadly, she has waited half of her life for someone to tell her when her father will be back, while she herself suffers in silence.

Mr. Ng's family is concerned for ████s mental state. As Ms. Lim's cousin, Tan Ee Sze wrote, "[Roger being gone] has affected the physical and social health of their daughter. Roger used to run and play sports with her but since his absence, she has lost interest in socializing or any other activities." (Ex. 14, Letter of Ee Sze at 2.) Ms. Tan goes onto state that ████ "used to be a very cheerful and happy girl, now [] she has changed to become a quiet and very lonely 10

year[] old." (Id.) Mr. Ng describes for the Court how they are able to continue their father-daughter

relationship under these circumstances:

> Every morning, my daughter would FaceTime me at 6 am when she wakes up while
> it would be 5 pm in New York. She would want me to stay online with her while
> she prepares for school. She does this religiously. She reminds me that on
> November 1st, 2018, I told her I went for a meeting and have yet to return home. I
> was without contact for more than 6 months. If there is any time that I am
> unavailable she develops a panic and frantically calls repeatedly. Our FaceTime
> when she wakes up at 6 am and goes to bed at 9 pm have become sacred for both
> us to ensure she does not experience another traumatic event. I am gutted every
> time I think of how all this has badly affected her since she was six years old.

(Ex. 2 at 8.)

███████ despair and resignation is felt by the rest of the family. Mr. Ng's mother is 80.

She suffers from heart disease and arterial blockage. She has seen her son twice in more than five

years—and was deeply concerned for him. Just as she has already been deprived of her son's love

and presence late in her life, Mr. Ng has been deprived of being with his mother in her final years.

She writes to this Court:

> Your Honor, I am heading towards my twilight years. I sincerely hope to see my
> son again. I almost lost Roger once and the fear of losing him or not able to see him
> for a long time keeps me awake most nights. The sudden fear sets in each time I
> think of Roger.

(Ex. 5, Letter of Tan Soon Muay at 3.)

Ms. Lim, who has endured without a husband, and has raised their daughter without a

father. Ms. Lim's aunt writes "Despite of the difficulties, Hwee Bin continues to devote time to

███████, especially her education and upbringing. She is now taking care of ███████ like a single

parent." (Ex. 11, Letter of Tan Saw Hun at 2.) And, while this is far less significant than the human

cost of Mr. Ng's absence, the money required to finance a New York apartment rental for four

years is considerable. In all, Ng's being 10,000 miles from home for the last several years have

taken a massive toll on Mr. Ng's family. (See Letter of SK Cheong at 2: "The impact is felt not only by Roger alone, but also his elderly mother, his wife and young daughter.")

The toll on Mr. Ng himself is difficult to comprehend. As recounted in detail below, he spent six months between November 2, 2018, and May 3, 2019, in a Malaysian prison under conditions that are objectively and conclusively cruel and inhumane, and which have resulted in physical damage and psychological trauma that persists to the present and may last forever. Mr. Ng endured weeks of solitary confinement without leaving his small cement cell. He slept on a cold, damp cement floor which, when it rained, became covered with human waste from the hole in the floor into which Ng defecated and urinated. Mr. Ng describes these conditions in his letter to the Court:

> I was placed in solitary confinement in a 12ft x 6ft cell alone with a single hole in the ground for sanitation, a single water tap and with a narrow opening 2ft x1ft for ventilation. The narrow opening allowed access to "air" which the only ventilation in the constant 90°F humid tropical heat but unfortunately also the mosquitos, rats and other vermin from which I later contracted infectious diseases from. When I was not in the hospital or the prison infirmary, this was to be my home for the next 183 days.

(Ex. 2 at 5.)

Due to the infestation, Mr. Ng contracted severe Leptospirosis and Malaria. Ng grew gravely ill, fell unconscious and lost 40% of his body weight:

> Within the first month of being imprisoned, I fell very ill. On November 18th, 2018, less than three weeks after being detained, I was vomiting constantly and experiencing severe diarrhea. I asked for medical treatment but was declined and issued only paracetamol (known as Tylenol in the U.S.). I did not recover and felt very ill and delirious. Three days later, I was allowed to visit prison infirmary to seek medical treatment, and I fell unconscious several times on the infirmary floor. When I came around and was attended to by the prison infirmary medical assistant, he diagnosed me with dysentery and issued me with re-hydration salt, anti-vomit medication and more paracetamol and sent me back to solitary confinement. After a week, I still did not recover. By November 26th, my condition worsened, I was also feeling extreme chills and body aches.

> Despite my illness, I had to continue to appear in court for case management. To get to court, we were hand cuffed together in a 20-person single long chain. We were then loaded into an overcrowded police truck. The hour long journey in the police truck to the court house was a treacherous given we were all chained together with no seats while moving at very high speeds. Today, I still have flashbacks of being herded in chains and sometimes walking in public place can be so overwhelming that I have to leave.
>
> On November 30th, I asked for medical treatment once again as my condition continue to deteriorate. It would only be three days later on December 2nd, that I would be attended by a doctor and finally, a blood test was done. I was called back to the prison infirmary the next day, as I was tested positive for Malaria and Leptospirosis (a bacterial disease spread through the urine of infected animals). That day I was immediately transferred to the emergency ward of a civilian hospital as the illness could not be treated within the prison. At the hospital, I was chained to the bed and in quarantine ward for treating Malaria, as the virus was deadly and transmittable, for one week. After that, for more than a month, from December 9th and January 16th, I kept in the prison infirmary and was in an out between the hospital for treatment. I was constantly vomiting and purging (blood). I could not eat. In less than three months, I lost nearly 40% of my body weight. I knew that I was dying.

(Id. at 6.) The undersigned was in court in Kuala Lumpur on January 4, 2019. Seeing the condition Mr. Ng was in, and hearing of his symptoms, the undersigned asked Mr. Ng's Malaysian lawyer, Datuk Tan Hock Chuan ("Datuk Tan") to ask the Court to Order the prison to produce Mr. Ng's medical records. Datuk Tan did make the request, the undersigned was informed, however, the prison never produced medical records were ever produced.

His sister recalls that when she "saw him for the first time after he was imprisoned in November 2018, he had lost so much weight and looked horribly gaunt." (Ex. 3 at 2.) At the earliest opportunity, after meeting the undersigned twice, Mr. Ng agreed to waive extradition. (See Ex. 2, Letter of Roger Ng at 6.) After waiving extradition, he continued to live in these conditions for the next nearly three months:

> The lights in the cell were kept on 24 hours a day. The wardens woke me up every two hours during the night to ensure I was alive. I developed severe a sleep disorder and insomnia issues that I have not been able to recover from since. I was only allowed out of my solitary confinement once a week for one hour into a yard for

17

sunlight. Otherwise, I was confined to my cell alone all the time. The cell was always damp and vermin infested. There were frequent altercations between the inmates and the wardens in the block and inmates would be subdued with brute force with of thick rubber pipes as batons. The yard time was retracted as collective punishment for everyone the entire block and on many occasions, I was in solitary confinement for as long as two weeks without being let out at all and no sunlight. Many days I would be confine 24 hours in the cell without any interaction.

(Id. at 5-6.)

Finally, on May 3, 2019, he began the three-day journey to the U.S. Ten thousand miles away from home, recovering from these diseases, he continues to bear the physical and emotional scars of enduring these six months of sub-human prison conditions and likely always will. Once Mr. Ng was picked up by U.S. authorities, taken to the U.S. and arraigned, he was given the agreed-upon condition of house arrest. This meant that he spent virtually all of his waking hours alone. As stated in the letter of Teny Geragos, the day Mr. Ng arrived, he "was weak, thinning and pale." (Ex. 15, Letter of Teny Geragos at 1.) The day after Mr. Ng arrived in the U.S., the undersigned and Ms. Geragos began opening statements in the case of United States v. Keith Raniere, 18 Cr. 204 (NGG) which continued for the next eight weeks. (See id. at 1.) She wrote:

> On the very day of Roger's arrival, Marc Agnifilo and I started a different Eastern District trial that lasted for the following eight weeks. Roger's only tie to the United States, given his bail conditions, were now themselves unavailable to him for two months. Roger, gracious as always, wished us the best on our trial and consistently inquired about how we were doing—he, who we could not spend time with, who was alone, and scared, and about to embark on a fight for his own life, always asked about us. I found this remarkable and profoundly moving.

(Id. at 1-2.) "Under house arrest and alone in New York, I was grateful for basic necessities, such as sanitation with plumbing, running water, windows and shelter. However, the isolation and road to recovery has been long, unrelenting, and full of hopelessness." (Ex. 2, Letter of Roger Ng at 7.)

With the onset of the Covid-19 pandemic in the early part of 2020, Mr. Ng's loneliness intensified, as did his concern for his family. As Ms. Geragos writes in her letter:

Between March and June 2020, I would Zoom with Roger for ten hours each day as we reviewed discovery, as necessitated by the Protective Order. He was permitted to do nothing else. On his Zooms with me, Roger would express grave concern for his family, parents, and in-laws. What would happen if they fell ill? What if ▇▇▇▇▇ got sick? How could his wife manage alone? What if the inverse happened? He was helpless and alone during a time when we all needed support the most.

Roger was in extraordinary circumstances, within a time of extraordinary circumstance. He had no family visitation nor social visits. He was granted sixty minutes of exercise three times a week and ninety minutes of grocery shopping once a week. He could not receive deliveries of food or household items because of his building's restrictions combined with his pretrial release conditions. Through it all, Roger never once complained. Instead, he would inquire about my family, and kept a mild-mannered humor that belied the inner turmoil we all knew he must have been feeling.

(Ex. 15, Letter of Teny Geragos at 2-3.) In the Spring of 2020, Ng reported that he had clear Covid symptoms. We monitored his progress from afar, but, as he was forced to do in prison in Malaysia, he endured a serious, potentially fatal illness, in this case, Covid, alone and without any human interaction. He was isolated from family until a full fourteen months after the lockdown, when he "finally saw his sister and nephew." (Id. at 3.)

Being 10,000 miles from his family, Mr. Ng relied on his religious beliefs. As an unlikely and fortunate stroke of luck, or perhaps Karma, one of the very few Palyul Monasteries in the U.S. is located in the Eastern District of New York in Elmhust, Queens. It is there, at the Nyingma Palyul Dharma Center, that Mr. Ng sought refuge. As described by the Venerable Khenpo Tenzin Norgay Rinpoche, a Buddhist monk teaching at the Center, Mr. Ng has consistently participated in their "daily prayer practices" to live through the difficulties of the last several years. (Ex. 16, Letter of Khenpo Tenzin Norgay Rinpoche at 1.) Mr. Ng has immersed himself in prayer as a way of coping with the hardship, uncertainty and fear of the last four years. He has regularly participated in prayer events with their community and it has provided "him much needed refuge and support to continue to endure this very challenging and stressful period in his life." (Id.) Mr.

19

Ng's mother writes that they "speak often about religion and the path to the land of God. [The Tibetan Centre is] where Roger found his peace and path to spiritual wisdom." (Ex. 5, Letter of Tan Soon Muay at 3.)

The concept of suffering is at the core of Buddhist teachings. The Buddhist learns that suffering derives from craving life to be different than it is. The pursuit of material wealth, the frustration of unfairness, the desire for power or fame, these are the things that cause suffering. To avoid suffering, the Buddhist leads a contained existence, focusing on things that are permanent: one's character and humility. In a world that takes much away, these things remain. To that end, last Memorial Day weekend, he participated in the Tibetan Buddhism religious practice for three days which included fasting for 72 hours. (See Ex. 14, Letter of Ee Sze at 1.) Over the last four-and-a-half years, Mr. Ng has led the existence of a monk, eating alone, sleeping alone, living alone, hoping his current circumstances are temporary, focusing on maintaining his resolve, suppressing his terror to joyfully read to his daughter before bedtime, assuring his wife and mother that "this" will not last forever.

He says reassuring things to his loved ones but privately, he is terrified. With not just the U.S. case, but a pending case in Malaysia, also related to 1MDB events, he lives in a state of despair and hopelessness. Mr. Ng's family and friends are concerned that Mr. Ng's "emotional health has been deteriorating." (Id. at 1.) Mr. Ng's niece Ashley describes for the Court how she "witnessed first hand my uncle's solitude behavior from living alone in isolation the past ... years and my grandmother's sadness seeing my uncle in such a poor emotional state." (Ex. 6, Letter of Ashley Ng at 2.) Probation and Pretrial Services showed similar concerns given Mr. Ng's █████████ ████████. (PSR ¶ 131.) At Probation's urging, Mr. Ng has been seeing a psychiatrist to cope with insomnia and depression and a therapist weekly to help cope with his pain. His diagnoses and

treatments are discussed in detail below. Mr. Ng has been grateful to receive this care in recent

months, as it has helped treat his depression and his reliance on ▆▆▆▆ to soothe his pain:

> My therapist had diagnosed me with severe depression and anxiety. In the past 7
> months, my psychiatrist prescribed a drug called Gabapentin to help treat ▆▆▆▆
> ▆▆▆▆ and help with my sleep disorder condition. The therapy is something
> very new to me. I found talking about mental issues extremely uncomfortable.

(Ex. 2, Letter of Roger Ng at 10.)

For the past four years, Mr. Ng has lived a life that is unlike any other. He is alone with

"obsessive thoughts" that he "cannot control." (<u>Id.</u>) He describes this isolation "as a regression

into myself and I cannot plan anything beyond the moment. This feeling is very helpless." (<u>Id.</u>)

While he no longer is subject to the active cruelty and disease of the prison in Malaysia, he remains

subject to a condition that is cruel and terrifying nonetheless. He has lived in isolation, fear, and

hopelessness over missing his child grow up, missing his mother in the final years of her life,

missing his wife and family. Prisoners in the U.S. get regular family visits; they hold their children,

they touch their spouse's hand, they are able to kiss and hug hello and goodbye – in sum, they are

able to satisfy, however imperfectly, the single most basic human need: being close – physically,

actually close – to the people they love.

### B.  Nature and Circumstances of Roger Ng's Offense

The conduct at issue was addressed at a six-week trial and summarized by the Probation

Department in the PSR and counsel's Objections to the PSR (ECF 222). Although we respect the

jury's verdict, it was not an affirmation of every Government allegation or a wholesale acceptance

of every witness's testimony. As this Court presided over the trial, it is in the best position to

determine the scope of Mr. Ng's conduct within the parameters of the jury's verdict.

<u>**ANALYSIS**</u>

**A.  The Sentencing Guidelines Overstate the Degree of Mr. Ng's Alleged Culpability**

Driven by the multi-billion-dollar crime committed by Low and others, the U.S. Sentencing Guidelines lead to a draconian, and we submit, inappropriate sentence regardless of how they are calculated. However, while the Guidelines are no longer binding on the Court, nor is the Court compelled to even view them as reasonable, the law is clear that the Guidelines must be calculated and consulted as the first of many steps as part of the sentencing process.

1.  <u>Base Offense Level</u>

The Probation Department states that the Base Offense Level for Count One charging the Foreign Corrupt Bribery Act ("FCPA"), Bribery provision, is a Level 12 under § 2C1.1(2). Insofar as § 2C1.1 is the guideline section applicable to bribery offenses, the defense agrees that this is the base offense level for Count One. (PSR ¶ 87.)

However, the Probation Department engages in the same sentencing calculation for Count Two, the FCPA Circumventing Accounting Controls provision, as it does for the bribery provision. We respectfully argue that this is an error, though likely a harmless one. As an initial observation, because the Justice Department has never before brought a FCPA Accounting Controls provision count to trial, there is no precedent as to what guidelines provision would apply to the circumvention of a company's accounting controls. We do not engage in a Guidelines analysis for Count Two.

The Base Offense Level for Count Three is 8, pursuant to U.S.S.G. § 2S1.1(a)(2).

2.  <u>Two Level Increase for More Than One Bribe</u>

The Probation Department awarded a two-level increase for more than one bribe. (PSR ¶ 88.) While the evidence is indeed clear that there was in fact more than one bribe, the defense opposes the two-level increase because there is no credible evidence that Mr. Ng knew there was

more than one bribe. The only evidence in the case that Mr. Ng could have possibly known that Leissner and Low would make more than one bribe stems from Leissner's incredible testimony about the meeting in London in February 2012 where Low drew up and annotated an international bribery chart laying out all the Malaysian and Abu Dhabi officials they would one day bribe.

3.   Thirty-Level Increase for Bribes Exceeding $550,000,000

As we argued to the Probation Department, the defense objects to the 30-level increase for the total amount of the bribes paid by Low, Leissner and the others because there is no evidence in the record that Mr. Ng was told, knew, or should have known of the total amount of the bribes paid. (PSR ¶ 89; Ng Objections to the PSR at 15.) To be clear, not even Leissner, who himself paid many of the bribes and kickbacks to the bribe recipients, knew to whom the money was being paid. Moreover, there is no evidence that Leissner ever told Mr. Ng the amount of the bribes or to whom they were being paid, nor was there evidence that Mr. Ng was involved in negotiating the payments of those bribes. In fact, during Project Maximus, Leissner texted Andrea Vella following a meeting with Low, "Please don't tell Roger about our meeting with the friend." (DX-2445.) This, we contend, is affirmative evidence of Leissner keeping the bribery conspiracy from Mr. Ng. In light of this, we object to Mr. Ng being sentenced in accordance with the total amount of the bribes as this amount was unforeseeable to him and should not be considered part of the offense or relevant conduct.

Moreover, as a brief reminder, the evidence is undisputed that Mr. Ng never paid a bribe. At no time did Mr. Ng give so much as a dime, directly or indirectly, to anyone as a bribe, a gift, a gratuity or a tip. So, the question is only what Mr. Ng knew about what other people planned to do or what they had done. The answer to that question is that there is no proof he knew of any bribe amounts.

In sum, there is no factual showing by a preponderance of the credible evidence that Mr. Ng knew the amount of the bribes. He plainly did not. As a result, Mr. Ng cannot be held responsible, for purposes of a sentencing calculation, for the total amount of the bribes paid in this case.

Instead, the proper calculation under § 2B1.1 is that of the "gain" that was derived, according to the verdict, by Mr. Ng. This is because the amount of "loss" cannot be reasonably determined as to Mr. Ng. See U.S.S.G. § 2B1.1, application note 3.B. This "gain" was approximately $35 million, which corresponds to a 22-level increase. See U.S.S.G. § 2B1.1(b)(1)(L).

4. Obstruction of Justice

We object to the two-level enhancement for obstruction of justice on the grounds presented in the PSR. (PSR ¶ 77, 83; 103; Ng Objections to the PSR at 14.) The relevant Sentencing Guideline Section 3C1.1 applies, "if one, the defendant willfully obstructed or impeded or attempted to obstruct or impede the administration of justice with respect to the investigation of the instant offense of conviction, and two, the obstructive conduct related to the defendant's offense of conviction and any relevant conduct or closely related offense." The guidelines also explain the "obstructive conduct that occurred prior to the start of the investigation of the instant offense may be covered if the conduct was purposely calculated and likely to thwart the investigation or prosecution of the offense of conviction." U.S.S.G. § 3C1.1, Comment Note 1. The record before the Court did not show the relationship, if any, between the deletion of the email accounts between February and March 2015 (prior to any FBI investigation) and the offenses of conviction. There is also no basis to conclude that the deletion of the email accounts were purposefully calculated or likely to thwart the investigation of the instant offences of conviction. Moreover, there is no evidence whatsoever that the closing of the corporation was purposely

24

calculated and likely to thwart the investigation or prosecution of the offense. The money from these accounts were simply transferred to an account in Ms. Tan's personal name, who was the original beneficiary of the corporation. Ms. Lim testified that she did not want to pay for "hold mail" anymore and that the historical documentation of the corporation remained available with the secretarial company and the bank. (Tr. 5016-17.)

5.  Minimal Role

We argue that given the scope of the offense, the fact that Mr. Ng did not pay any bribes, was only tangentially involved in Project Maximus, was not at all involved in Project Catalyze, was not told to whom Leissner was paying bribes and kickbacks nor the amounts, that Mr. Ng and Low did not speak after 2012, that Mr. Ng was never invited to many of the critical meetings between the co-conspirators, that Mr. Ng played a minimal role in this massive bribery scheme and should receive a four-level downward adjustment. (See Ng Objections to the PSR at 14-15.)

It is for precisely cases like Mr. Ng's that Guidelines Section 3B1.2 provides for "mitigating role" adjustments to a defendant's offense level "[b]ased on the defendant's role in the offense." U.S.S.G. § 3B1.2. Whether a defendant should receive such an adjustment depends on "the defendant's relative culpability [with] reference to his or her co-participants in the case at hand." United States v. Alston, 899 F.3d 135, 149 (2d Cir. 2018) (quotation marks and emphasis omitted). The Guidelines specify five "non-exhaustive ... factors" a "court should consider" in determining a defendant's relative culpability:

> (i) the degree to which the defendant understood the scope and structure of the criminal activity; (ii) the degree to which the defendant participated in planning or organizing the criminal activity; (iii) the degree to which the defendant exercised decision-making authority or influenced the exercise of decision-making authority; (iv) the nature and extent of the defendant's participation in the commission of the criminal activity, including the acts the defendant performed and the responsibility and discretion the defendant had in performing those acts; (v) the degree to which the defendant stood to benefit from the criminal activity.

25

U.S.S.G. § 3B1.2 application note 3(C). The Guidelines also provide that even "a defendant [who] performs an essential or indispensable role in the criminal activity ... may receive a[ ] [mitigating role] adjustment." Id. See United States v. Wynn, 37 F.4th 63, 67-68 (2d Cir. 2022).

Thus, to determine whether a defendant qualifies for a mitigating role adjustment under U.S.S.G. § 3B1.2, the sentencing court must assess the relative culpability of the defendant compared to participants in the overall criminal activity in which the defendant was involved. See, e.g., United States v. Isaza–Zapata, 148 F.3d 236, 237–38 (3d Cir. 1998). Where a district court does not perform the required comparative analysis, Courts of Appeal generally remand for resentencing. See id. To be clear, a defendant's role with respect to his co-conspirators, while important for the § 3B1.2 analysis, cannot form the sole basis for the Court's finding of a minimal (or minor) role. See United States v. Rahman, 189 F.3d 88, 159 (2d Cir.1999) ("[a] reduction [pursuant to U.S.S.G. § 3B1.2] will not be available simply because the defendant played a lesser role than his co-conspirators; to be eligible for a reduction, the defendant's conduct must be 'minor' or 'minimal' as compared to the average participant in such a crime."); United States v. Neils, 156 F.3d 382, 383 (2d Cir.1998) ("Under U.S.S.G. § 3B1.2, the district court is required to gauge the appellant's culpability relative to the elements of the offense of conviction as well as in relation to the co-conspirators."). We contend that whether looking at Mr. Ng's co-conspirators or at his role in the offense based on an average participant, Mr. Ng was minimally culpable.

The core of the Government's proof as to Mr. Ng's role was that Mr. Ng brought Low into the bank, attended three meetings with Low during Project Magnolia and received $35 million of 1MDB proceeds from 2012 through 2013. We aim to show the Court that in the context of the entire 1MDB scheme, Mr. Ng's role was minimal both when compared to his alleged co-conspirators and the average participant in a crime of this scope. See U.S.S.G. § 3B1.2.

26

First, the Government will argue that Mr. Ng played a critical role because he was central to bringing Low into the bank beginning in 2009 "establishing the relationship between Low and Goldman and cultivating it in the years preceding the bond deals." (ECF 223, Government Objections to PSR at 14.) This argument disregards that toward the end of 2008, Leissner and Mr. Ng received an internal Goldman email that the State of Terengganu (one of the several States comprising Malaysia) was starting a sovereign wealth fund called the Terengganu Investment Fund or TIA, and that Leissner and Mr. Ng, as members of Goldman's investment banking division, should chase down this potential business opportunity. (Tr. at 1403-04.) Because Low was the advisor to the Sultan of Terengganu (the highest executive officer of the State) and therefore a key person in the creation of TIA, Mr. Ng developed a relationship with Low.

Mr. Ng's relationship with Low was not a secret and was disclosed to the bank. At all times while Mr. Ng was employed by IBD, Mr. Ng properly included the meeting in the Goldman calendar every time he met with Low. At all times when Mr. Ng met with Low or one of Low's associates and sought reimbursement from Goldman, Mr. Ng properly included Low or Low's company on the expense report. (See generally, GX-77, 1002-1100.) This was a requirement of IBD, and Mr. Ng complied. This was for two reasons. First, keeping track of meetings and contacts outside of the office was required by the IBD, and Mr. Ng complied with these requirements. Second, Goldman instructed Mr. Ng to chase down the TIA opportunity and Mr. Ng did so, and kept Goldman apprised of his meetings with Low in furtherance of his duties. Unlike Leissner, Mr. Ng never lied about meeting with Low; he never neglected to include such a meeting when

required to do so,[3] he never falsely said he was meeting with someone else when he was meeting with Low. Every time he met with Low and he was required to note the meeting, Mr. Ng did so.

Although Mr. Ng faithfully did his job as a Goldman employee in pursuing the TIA business opportunity, Mr. Ng nonetheless accurately and truthfully shared negative information about Low to his Goldman superiors, including the highest levels of compliance, when asked for his opinion on such matters. Though the Government's Indictment claims that the conspiracies began in 2009, the trial evidence is that the illegal activity commenced in January 2012 with the start of Project Magnolia.

Second, the Government will argue, as they have many times, that Mr. Ng "was a central player in $6.5 billion of bond transactions…and knew that these massive transactions would be the source of the bribe payments. (ECF 223 at 14.) Mr. Ng, who was never a partner at Goldman and lacked meaningful authority, was the only Goldman employee, aside from Leissner, charged by the U.S. Department of Justice, the evidence is that he did almost nothing to advance any bribery scheme.

At the time of Project Magnolia, when TIA had turned into 1MDB, Mr. Ng had already transferred from IBD to Securities two years earlier. He was no longer on the client side of the bank, but still covered Malaysia for his new securities sales role. (Tr. at 85-86.) He was in a bicycle accident on December 26, 2011, and was not working in the early part of January 2012. (Tr. at 230 (Tai testifying he remembered the bike accident, but does not remember if Mr. Ng was out); (Tr. at 1549) (Leissner testifying he remembered Mr. Ng's bike accident).) Leissner, alone, started

---

[3] Unlike the IBD, Securities did not require its personnel to indicate with whom they were meeting. Therefore, once Mr. Ng moved from IBD to Securities, he stopped informing Goldman of his out-of-office meetings, consistent with Goldman policy.

putting together the deal with Ananda Krishnan—first meeting with Shahrol Halmi, the CEO of 1MDB on January 12, 2012 (DX-2103), then meeting with Ananda Krishnan (DX-2102), then meeting with Nazir Razak (Najib Razak's brother) (DX-2103) and finally meeting with Jho Low alone on January 18, 2012 (DX-2104). It is significant that Mr. Ng was not a part of these meetings.

The Government will surely argue that Mr. Ng was in attendance for key meetings beginning in February during Project Magnolia where the bribery scheme was discussed. The Government has argued these meetings are the February meeting in London at Low's apartment, the March meeting in Abu Dhabi, the March meeting in Los Angeles at L'Ermitage, and the April meeting in Singapore.

The London Meeting. There is no credible evidence the participants at this meeting discussed that proceeds of the bond deals would be used to discuss bribes, because Leissner's recitation of this meeting changed so drastically during the course of his cooperation. First, Leissner did not mention the international world leader bribery chart in his meetings with the Government until April 29, 2021, almost three full years after he first started cooperating. (See Tr. at 1633-34.) Second, Leissner cannot keep straight who is at the meeting. He testified Nik Faisal was present; but we know that is wrong. Rather, it appears Terrence Geh was present even though Leissner says he was not. (See Ng Objections to PSR at 9.) Leissner even went so far as to testify as to the many things Nik Faisal did during this meeting. (See id. at 8-9.) Third, Leissner's testimony was rendered impossible by the undisputed travel records. Leissner testified on direct that following the bribery meeting in Low's apartment, he and Mr. Ng went on walk through London; they went to dinner and back to Leissner's hotel room, all the while allegedly reflecting on how lucky they each were to be able to participate in Low's massive, lucrative bribery plot. (See Tr. at 456.) However, the travel records show that Leissner and Mr. Ng stayed at different

29

hotels, with Leissner staying at the Four Seasons Hotel in London Park Lane (GX 1349-A-03) and Mr. Ng staying two miles away at the Waldorf Hilton (GX-1107-A-03). Mr. Ng checked out of his hotel at 6:17pm (Tr. at 2683) and departed London Heathrow at 10:05p.m. (Tr. at 2685). Leissner's travel records show that he took a taxi from 6:45p.m. to 7:34p.m. (GX- 1349-A at 87; Tr. at 3369-71) and flew out of London Heathrow that night on an 8:45p.m. flight (Tr. at 1644, 2687). Leissner's detailed story of the post-bribe meeting aimless walk around London was a bald-faced lie, proven so by documents. (See also Ng Objections to PSR at 9-10.)

The Abu Dhabi Meeting. Leissner testified that around March 4, 2012, Low handed Leissner a letter from the Malaysian Prime Minister that Leissner was to hand-deliver to Sheikh Mansour. (Tr. at 903-04.) According to Leissner, Mr. Ng and Andrea Vella were idly present when this hand-off took place. As with the February 2012 meeting, featuring the international world leader bribery chart, the Court is asked to not credit this preposterous account, and accordingly reduce his guidelines by four points for his minimal role.

For example, only two days after Leissner claimed the meeting happened in Abu Dhabi, Leissner returned to Abu Dhabi by himself. (GX-1352-A-06.) Between the March 4th meeting and the March 8th trip, Low emailed this letter to Mohammed al-Husseiny. (GX-2252.) He instructed al-Husseiny "Please do not reply to this e-mail. Please provide name and contact via BBM or delivery person." (Id.) One day later, Leissner traveled to Abu Dhabi. Even the Government walked back Leissner's during summation, saying "We also see Tim Leissner, he was just in Abu Dhabi, he's going back to Abu Dhabi a few days later to make sure this letter gets delivered." (Tr. at 5246.) This is yet another example of Leissner lying about Mr. Ng's involvement in order to fabricate Mr. Ng's role. Therefore, because Leissner was not even in possession of the "letter"

during the March 4th meeting where he claimed Mr. Ng was present for the hand-off of the letter, his testimony on this point should not be credited.

The evidence also suggests that Low and/or Leissner drafted the letter from the Prime Minister as well as the return letter from Sheikh Mansour. They are forgeries.[4] The letters were forged by Low and/or Leissner specifically to fool the compliance divisions within Goldman into believing that the two world leaders themselves wrote the letters and were firmly behind the deal, making its success all but assured.

The April 4, 2012, Capital Committee Meeting. The Government will argue that Mr. Ng played a critical role because he worked to "get Goldman Sachs' approval without revealing the massive bribes." (ECF 223 at 14.) Part of the Government's evidence in this regard is the Goldman Sachs Capital Committee Meeting from April 4, 2012. It was during this meeting that Leissner, participating by telephone, lied to Stephen O'Flaherty. There is no question that Leissner lied. Leissner admitted he lied (for whatever that is worth). O'Flaherty testified that in fact he continued to believe what Leissner said was true even though the trial evidence conclusively proved Leissner was lying. The pertinent issue for the trial and now for sentencing of Mr. Ng, however, is whether Mr. Ng heard Leissner's lie, knew Leissner was lying and said nothing to correct the lie told by Leissner.

---

[4] The Government has remained silent on this issue. If the defense is correct and the letters were drafted by Leissner or Low, the Government should say so. Not only has there now been a conviction based, in part, on this information, but this matter is proceeding to sentencing based, in part, on Leissner's testimony on this point. If, on the other hand, the Government has concluded, based on some modicum of investigation, that the letters are not forgeries, it should share the results of that investigation. Silence, under these circumstances, is not a responsible position for the Justice Department to take.

O'Flaherty testified that he asked Leissner about why Leissner was present at the meeting with Sheikh Mansour and further what role Low as playing at the meeting. O'Flaherty testified that when he asked Leissner this question that Leissner was irritated. O'Flaherty testified that Leissner said Low was not present at the meeting, and that Leissner said that Low had come to Abu Dhabi with a letter from the Prime Minister of Malaysia Razak, which he handed to Leissner but was not present at the meeting that then followed with Sheikh Mansour. Mr. Ng would have no idea whether Leissner was giving a truthful or untruthful answer to O'Flaherty's question, just as O'Flaherty had no idea.

Leissner admitted that he lied to O'Flaherty when he told O'Flaherty and others at Goldman that Leissner himself hand-delivered the letter from the Malaysian Prime Minister directly to Sheikh Mansour. Moreover, Leissner testified that he told this lie to O'Flaherty and others specifically so that Goldman would continue to work on the bond deal.

Not only did Leissner lie to O'Flaherty about delivering the Prime Minister's letter to Sheikh Mansour, he lied to the Government and to the jury as well. He told the Government both that he gave the letter to Sheikh Mansour, as he had previously falsely told Goldman, and that he had given the letter to Khadem al-Qubaisi, which is the lie he repeated to the jury.[5] He also falsely told the jury that Mr. Ng was present when Low gave Leissner the letter. Considering that the travel records indicate that Mr. Ng travelled to Abu Dhabi on March 4, 2012, and April 10, 2012, this event would have been in connection with one of these two trips. However, as stated, on March 7, 2012, there is an email from Low to al-Husseiny asking that al-Husseiny provide Low by BBM

---

[5] Leissner told the jury that al-Husseiny drove Leissner to al-Qubaisi's home. He could not tell the jury anything about the car nor the front of al-Qubaisi's home, nor the neighborhood he went to. Midway in his testimony, he supposed that perhaps Jasmine Loo, whom Leissner knows to be a fugitive, may have been there too. (Tr. at 1660-62.)

the name and contact number for the delivery person. This means that the letter would not have been delivered either in connection with the March 4 or April 10 trips to Abu Dhabi, and, more importantly, that it was not hand-delivered by Leissner at all, but by the "delivery person" referred to in Low's email.

On April 16, 2012, Leissner also traveled to Abu Dhabi, while Mr. Ng and Andy Tai were in Asia. Tai emailed Leissner that he heard people were going to Abu Dhabi to help on the deal, and he asked if Leissner wanted Mr. Ng and Mr. Tai to come to Abu Dhabi. Leissner responded, "no need Chief." (DX-AT-23.) As a result, Mr. Ng and Mr. Tai did not go to Abu Dhabi. Nonetheless, Leissner included both Mr. Ng and Mr. Tai as being present.

Singapore "Taste of Paradise" Meeting. The Government will argue that Mr. Ng's presence at the meeting with BSI bankers in Singapore showed that he did not have a minimal role in the scheme. However, this Court heard from two witnesses about this meeting and those two witnesses had diametrically opposed testimony concerning what Leissner, as Goldman's representative, did and said at this meeting. Swampillai testified that (i) Leissner did not make a presentation of facts; (ii) Leissner did not provide documents or charts; (iii) Leissner did not talk about the structure of the bond deal; (iv) that there was no mention of Goldman underwriting the bond deal; and (v) there was no mention of the guarantee or how a guarantee would be structured. (Tr. at 3269-70.) Leissner, on the other hand, testified that:

> Roger and I went into that lunch. We went through this structure of Magnolia, described our underwriting effort, the structure of the underwriting including the guarantee, and highlighted as Jho had requested that Goldman Sachs was doing the underwriting and that we were comfortable with this transaction which is why we were ready to do that underwriting.

(Tr. at 946.) We ask the Court to credit Mr. Swampillai's testimony as to the meeting.

Project Maximus and Project Catalyze. The Government will argue that Mr. Ng was an active member of the deal team on Project Maximus and critical to selling the bonds in Project Catalyze. Though the Government submitted evidence that Mr. Ng traveled to London and Abu Dhabi on Project Magnolia (compared to Leissner's dozens of meetings and trips to foreign countries to close the deal), there was a dearth of evidence as to Mr. Ng's involvement in either Project Maximus or Project Catalyze. As to Project Maximus, the Government introduced one piece of evidence through deal team member, Andy Tai, that Mr. Ng attended the closing dinner in Hong Kong on November 12, 2012, shortly after Project Maximus closed. (Tr. at 181.) Mr. Ng did not organize the event. As for Project Catalyze, the Government introduced one exhibit related to his role in selling bonds while he was in the Securities Division. (See GX-2469.) There is no dispute that Mr. Ng was never "wall-crossed" onto the Project Catalyze deal team.

To the contrary with Leissner. On Project Maximus and Project Catalyze, Leissner was traveling to Abu Dhabi, London, France, Hong Kong, Las Vegas and other places frequently to secure the business for Goldman and meet with Low, and Mr. Ng was not present. For example, at the time Project Maximus was closing, Leissner met with Low and Vella and specifically instructed Vella to not tell Roger they had met, even though Mr. Ng was in the same city. (GX-2445.) On Project Catalyze, Leissner and others at Goldman met with Low, Najib Razak, Jasmine Loo and others at Time Warner Center in New York. (DX-2623.) Though Mr. Ng was in New York at the time, Leissner instructed his assistant that Mr. Ng will not be joining the meeting and Leissner would "handle him away from the meeting." (Id.)

Though the Government has argued that Mr. Ng "travelled with Low on lavish trips across the world" (ECF 223 at 4), it is also undisputed that once the criminal conduct with the 1MDB bond deals began, Mr. Ng never travelled with Low. In contrast, Leissner admitted to several trips

with Low. In November 2012, Leissner traveled to Low's lavish and multi-million dollar birthday party in Las Vegas, to which Mr. Ng was not even invited. Leissner even used Low's agent to charter yachts for hundreds of thousands of dollars. In 2013, Leissner met Low on his yacht in the South of France. Mr. Ng was not invited, nor was he present.

Even after Goldman realized hundreds of millions of dollars in world-wide corporate profits from the 1MDB transactions, Mr. Ng continued his quiet existence at the bank for another few years before leaving of his own volition to start a family. In that time, he was never once promoted, nor was he recognized for playing any meaningful role in the bond deals.

To the contrary, Mr. Ng's lack of a meaningful role in the three tremendously lucrative bond deals was not lost on his employer. Whereas Leissner was promoted, touted and congratulated by the leaders of the bank for his central role in securing the bond deals for Goldman, Mr. Ng received the opposite reception from his "co-conspirators" and colleagues at Goldman. Though not evidence at the trial, there was a tremendous amount of discovery that Goldman produced to the Government showing the Goldman "co-conspirators" did not think Mr. Ng was a valuable member of the team on Magnolia, Maximus or Catalyze:

- As Project Magnolia was closing in May of 2012, Toby Watson emailed a Goldman Sachs superior about deal team member Jonathan Donne stating, "[w]e finally got the IPIC signature pages as the CEO went off to the South of France on Friday night and so his lawyers couldn't get hold of him to release the signed pages on Friday night! Jon Donne has done another great job on this deal. He really took over as Tim Leissner's number two with the client as Roger Ng went awol and drove all the documentation process…." (GS-1MDB- 00726818);

- After Project Catalyze, Toby Watson, Jonathan Donne, and Dexter D'Souza were on a recorded line where Mr. Watson complained that Roger was not doing any work on sales for Project Catalyze (GS-1MDB-AU-00001528);

- Over several phone calls after Project Catalyze, Mr. Watson was pushing Mr. Ng to sell Catalyze bonds and Mr. Ng deferred to Mr. Leissner (GS-1MDB-AU-00001537, GS-1MDB-AU-00001540);

- On a recorded phone call between Toby Watson and Andrea Vella, Mr. Vella stated that Roger was "brain dead" and Mr. Watson stated that Mr. Ng was not prioritizing the trading book at Goldman Sachs by not selling down the Project Catalyze position (GS-1MDB-AU-00001583).

The above documentation is contrary to the Government's position and demonstrates that even within Goldman, Mr. Ng's role in the offense was minimal, and the only claim to the contrary was provided by Tim Leissner, who was patently incredible.

The three people charged in the United States are Mr. Ng, Low and Leissner. Evidence at trial established that Low was one of the master fraudsters of our time. The evidence showed that Low received – personally – more than a billion dollars. His spending was prodigious, almost unbelievable – he spent $7 million in a single night on a party for himself. He sponsored the purchases of $40,000 handbags. He financed the production of major Hollywood pictures. The government spent a good deal of time at trial proving up all of this spending (none of which was done by Mr. Ng) and showed that Low was truly a larger than life fraudster. He was also the undisputed mastermind of the 1MDB conspiracy. Evidence at trial established that Low was involved in every single transaction that made up this scheme and directed the activities of dozens of other people in furtherance of the conspiracy. Unquestionably, Low was at the top of the pyramid.

Also, without question, Low's number one deputy in executing this scheme was Tim Leissner. Leissner, the Chairman of Southeast Asia for Goldman Sachs, a participating managing partner and member of the partnership committee of the firm, was utterly corrupted by Low. In his role in the scheme, he interacted directly with heads of state and government ministers throughout the entire conspiracy and received payments from every bond deal and loan 1MDB participated in. Aside from the bond deals themselves, he also engaged in hundreds of millions more of illegal transactions to launder Low's money, and was not required to plea guilty to this conduct. (See Tr.

36

at 2291 (detailing a €145 million transfer from a Low-directed entity to a Leissner-controlled entity).) He agreed to cooperate with the government, did not step foot in jail (his first night in custody was spent in a hotel), lied to the government in dozens of meetings with them and was not required to plead guilty to this conduct. He was released on bail using shares of Celsius that he stole from Mr. Ng and returned to his $30 million Beverly Hills home he bought using money laundered for Low. The only money he has forfeited are shares that include ones that belong to Mr. Ng. A sampling of his conduct in the scheme is recited below:

- He lied to Stephen O'Flaherty, head of the Business Intelligence Group ("BIG") at Goldman Sachs about having a meeting with Sheikh Mansour, a fact that was then used in the Capital Committee Meeting memo used to approve Project Magnolia. (See Tr. at 3109-3110); Mr. Ng did not speak to any higher-up at Goldman, nor did they know who he was;

- He paid bribes and kickbacks to several individuals on behalf of Low; Mr. Ng did not pay a single bribe or kickback;

- He met with other members of the conspiracy such as Jasmine Loo and Mohammed al-Husseiny all over the world, including Abu Dhabi, Dubai, Hong Kong, New York, London; Though Mr. Ng was friends with Jasmine Loo, there is no evidence that he met with al-Husseiny or Khadem al-Qubaisi;

- He was paid $28 million from Genting—the same company that 1MDB purchased power assets from in Project Maximus—and paid $14 million of that money out to the son of the founder of Genting, Lim Chee Wah (Tr. 2017-20);

- He "washed" money through Capital Place Holdings, a bank account he controlled, for Mohammed al-Husseiny through Solution Century Limited, an account in the name of Husseiny's wife. Specifically, on June 4, 2013, Solution Century Limited transferred $9.5 million to Capital Place Holdings and two months later Capital Place Holdings transferred $8.5 million back to Solution Century Limited. (Tr. at 4453-54.) Capital Place Holdings kept $1 million;

- He met with Prime Minister Najib Razak several times, including in the Prime Minister's office, home and on a yacht in Nice during the period of the three bond deals; Ng never met with Najib after he moved to the Securities Division in late 2010.

- In June 2012, after Project Magnolia closed, Leissner started several deals where Low was either directly involved or working behind the scenes, such as Project Friendship, Project Midori, Project X-Men, a project where 1MDB would try to raise $2 billion from a guarantee with the Japanese bank JBIG, a project where Jynwel would purchase

La Perla fashion company, and Project Condor; Mr. Ng was not involved in these transactions;

- He continued to engage in a criminal scheme with Low after the Goldman bond deals (See Tr. at 2291 (detailing a €145 million transfer from a Low-directed entity to a Leissner-controlled entity); Tr. at 2970-78 (detailing at least $50 million in transfers from Low-related entities to Leissner-controlled entities).) He lied to agents about these transactions and the fact that he had ongoing business with Low.[6]

- One month before he was arrested in the U.S., Leissner traveled to Lichtenstein with his wife, Kimora Lee Simmons, to take advantage of bank secrecy and put his ill-gotten gains in a trust (Tr. at 2304-2306); One month before Mr. Ng was detained in Malaysia on the U.S. indictment, his family surrendered their assets to Malaysia and Singapore. Mr. Ng never fled Malaysia.

- One month before he was arrested in the U.S., Leissner tried to renew his Brazilian passport so he could travel to Brazil with his children's nanny who he was having an affair with (Tr. at 1335-37). He told her "Brazil is the right place" for him; One month before Mr. Ng was detained in Malaysia, he was at home with his wife and child.

Since we are arguing that Mr. Ng played a minimal role, the Court is required to compare Mr. Ng's conduct with the other two people charged in this matter. As the Second Circuit said, "the culpability of a defendant . . . must depend necessarily on such factors as the nature of the defendant's relationship to other participants, the importance of the defendant's actions to the success of the venture, and the defendant's awareness of the nature and scope of the criminal enterprise." United States v. Garcia, 920 F.2d 153 (2d Cir. 1990). Here, a comparison of Roger Ng to his co-conspirators shows that he was by far the least culpable. This is true even if one takes the Government's view of the evidence presented at trial.

First, "the degree to which the defendant understood the scope and structure of the criminal activity." U.S.S.G. § 3B1.2 application note 3(C)(1). The uncontroverted evidence at trial

---

[6] Attached as Exhibit 17 are the recordings that Leissner made with Low following Leissner's arrest. At minute 17, Low asked Leissner, "Do you have an update on, um, all the other things?" Leissner responded, "No, I have no other update." He met with the agents after this recorded call and did not disclose his ongoing scheme with Low.

demonstrates that Mr. Ng had no interaction whatsoever with numerous other people who were characterized by the government as co-conspirators. He had no concept of how Low had pulled various parts of the conspiracy together. Second, "the degree to which the defendant participated in planning or organizing the criminal activity." U.S.S.G. § 3B1.2 application note 3(C)(2). Again, even under the Government's construction of the facts, Mr. Ng did not devise any part of this scheme; he did not make decisions about the use of any other people as part of the scheme; he did not supervise anyone else in the conspiracy. Third, "the degree to which the defendant exercised decision-making authority or influenced the exercise of decision-making authority." U.S.S.G. § 3B1.2 application note 3(C)(3). Fourth, "the nature and extent of the defendant's participation in the commission of the criminal activity, including the acts the defendant performed and the responsibility and discretion the defendant had in performing those acts." U.S.S.G. § 3B1.2 application note 3(C)(4). The government itself must concede that Mr. Ng had nothing to do with two of the three bond deals mentioned in the Indictment. Moreover, the evidence developed at trial showed that Low and Leissner conducted hundreds of millions of dollars of additional criminal conduct that took place after Mr. Ng unquestionably had nothing more to do with the conspiracy. Finally, "the degree to which the defendant stood to benefit from the criminal activity." U.S.S.G. § 3B1.2 application note 3(C)(5). When put next to Low and Leissner, even the money the government claims Mr. Ng received pales in comparison.

This is also true when looking at the average participant in an FCPA or a money laundering conspiracy. Such an average participant would be more involved in understanding the scope of the criminal activity needed to execute a bribe scheme of this size. An average participant would be involved in more parts of the conspiracy than Mr. Ng was. An average participant would direct others, or at least direct certain parts of transactions, in ways that Mr. Ng did not. And an average

participant in a $6 billion fraud would make out with more than half of a single percentage point of the deal.

6. <u>Total Offense Level</u>

Based on the calculation encouraged by the defendant, the adjusted offense level would be a total of 30 for each of Count One and Count Three. For Count One, this is derived from a base offense level of 12, an increase based on gain of 22 levels, and a decrease of 4 levels for minimal role.  We object to the 30-level upward loss adjustment, the 2-level upward adjustment for more than one bribe paid, and the 2 level upward adjustment for obstructing justice. We also object to the failure of the Probation Department to recognize that a 30-level upward adjustment significantly overstates Mr. Ng's criminal activity.

For Count Three, the level 30 is derived from a base offense level of 8, an increase of 22 levels based on laundered funds of $35 million (§ 2S1.1(a)(2)), an increase of 2 levels for a conviction under 18 U.S.C. § 1956 (§ 2S1.1(b)(2)(B)), an increase of two levels for sophisticated laundering (§ 2S1.1(b)(3)), and a decrease of 4 levels for minimal role.

We agree that Counts 1, 2, and 3 should all be grouped together. Under Sentencing Guideline Section 3D1.3(a), the most serious count is used, which in this case are Counts One and Three . Because all 3 counts are grouped together, there is no offense level increase based on the multiple counts. <u>See</u> U.S.S.G. § 3D1.4.

Accordingly, the total offense level, as calculated under the Guidelines, would be 30 for either Count One or Count Three. Of course, we maintain the objections we set forth in this memorandum and in our objections to the PSR.

7. <u>A Substantial Departure From the Guidelines Is Permitted and Is Appropriate</u>

The Supreme Court and United States Court of Appeals for the Second Circuit have each made clear that the United States Sentencing Guidelines are merely the first step of a far more

involved, detailed and particularized sentencing analysis. <u>United States v. Rita</u>, 551 U.S. 338 (2007); <u>United States v. Kimbrough</u>, 552 U.S. 85 (2007); <u>United States v. Preacely</u>, 628 F.3d 72, 79 (2d Cir. 2010). In fact, trial judges "may vary (from the guidelines range) based solely on policy considerations, including disagreements with the Guidelines. <u>Kimbrough</u>, 552 U.S. at 101. Indeed, the trial judge is not expected to agree with the Guidelines or to even find them to be reasonable. "A district court may not presume that a Guidelines sentence is reasonable; it must instead conduct its own independent review of the sentencing factors…" <u>United States v. Cavera</u>, 550 F.3d 180, 189 (2d Cir. 2008) (<u>en banc</u>). This Court not only has wide latitude to vary from the Guidelines based but may wholly disregard them if the Court does not believe they lead to a reasonable sentence.

It hardly needs to be stated that a Guidelines sentence, as calculated in the PSR, would produce an absurd result here – a Level 53 would produce a Guidelines range of life imprisonment to life imprisonment.  The only question for the Court to decide is how wrong the Guidelines are. A Level 30 provides a cogent, reasonable point of departure for Steps Two and Three of the sentencing process.

**B.  The Factors Set Forth in 18 U.S.C. § 3553 as Applied in This Case Support A Time-Served Sentence**

   1.  <u>Mr. Ng's and His Family's Cooperation With 1MDB Investigations in Singapore and Malaysia</u>

Mr. Ng and his family's cooperation with the Singapore and Malaysia governments demonstrate two factors relevant to this Court's Section 3553(a) analysis. <u>First</u>, his cooperation shows Mr. Ng's true character and his respect for the law. <u>Second</u>, in fashioning a sentence to provide just punishment for the offense, this Court should consider the loss of property and

restraint on liberty that Mr. Ng suffered as he cooperated with these two governmental investigations.

        a.  *Mr. Ng Was Banned From Travelling Out of Singapore for Three Months*

As was reflected by the trial evidence, the Singapore government forced Mr. Ng to remain in Singapore for about three months. While Mr. Ng was not incarcerated during this time, he was forced against his will to remain in a foreign country, away from his home and family. His passport was taken from him and he was ordered by police officials to not leave Singapore for three months. The defense does not contend that this period should be formally counted against any period of incarceration imposed. However, we do argue that the compelled deprivation of Mr. Ng's liberty by government officials in Singapore in connection with the 1MDB investigation should be considered by this Court as a Section 3553(a) factor in determining the appropriate sentence.

The Singapore government officials prevented Mr. Ng from travelling out of the country solely so they could ask Mr. Ng questions about 1MDB, the role of BSI Bank and the funds entering accounts of his family that originated with 1MDB. These are all the same topics at the center of the U.S. trial. Indeed, the questions posed by the Singapore officials made Mr. Ng aware for the first time of the true origin of the $35 million. For 92 days, he answered every question asked of him by Singaporean law enforcement. Eventually, when Singapore permitted Mr. Ng to travel, he returned to Malaysia and also travelled to Hong Kong and Beijing related to his work with Celsius. Thereafter, Mr. Ng and his family stayed in Malaysia, where he and his family remained despite knowing that Malaysia was conducting a massive investigation into the 1MDB affair. It bears noting that despite Singapore's thorough investigation, resulting in the prosecution of three BSI bankers, it never charged Mr. Ng with a crime.

b.  *Mr. Ng's In-Laws Paid the 1MDB Funds Back to Malaysia Prior to*
*Anyone Being Aware of the U.S. or Malaysian Charges*

The most comprehensive investigation into the 1MDB theft was conducted by the
Government of Malaysia, which has brought six separate criminal cases related to 1MDB. By the
Summer of 2018,[7] it was widely known that the Malaysian government was investigating Najib
Razak. As part of this investigation, the Commercial Crime Investigation Department ("CCID")
of the Royal Malaysian Police contacted Hwee Bin Lim in July 2018. Ms. Lim reported on more
than ten occasions to the CCID office to answer questions about the money passing into accounts
associated with her and her family. Despite the massive amount of information compiled by the
Malaysian police, it never contacted Mr. Ng. However, the Malaysian government did ban Mr. Ng
earlier and later members of his family from travel outside of Malaysia. It also froze several bank
accounts belonging to Mr. Ng and his wife. Ultimately, and as discussed in more detail below, the
Malaysian government reached an agreement with Mr. Ng's wife, brother-in-law and mother-in-
law that in exchange for Malaysia releasing all criminal sanctions and agreeing to not charge
anyone in Mr. Ng's family, the family members would surrender the full contents of several bank
accounts in Singapore, including all funds derived from 1MDB and other funds unrelated to 1MDB
to the Malaysian government.

Indeed, among the events and circumstances showing the good character of Mr. Ng and his
family, their demonstrated respect for the laws of Malaysia and the authority of its public officials

---

[7] The Malaysian general election was held on May 9, 2018. Until that day, the Barisan Nasional
coalition, Najib Razak's party, had ruled Malaysia since the nation's independence in 1957.
However, during the 2018 election, the Pakatan Harapan coalition, together with a second party,
won a majority of the votes, and the Barisan Nasional party was out of power. With Najib Razak's
party out of power, the Malaysian investigations into the theft and official corruption surrounding
1MDB moved forward.

as well as the punishment they have already suffered, is that Mr. Ng's family voluntarily and fully forfeited to Malaysian criminal authorities all 1MDB funds, as well as substantial additional funds not derived from 1MDB, prior to Mr. Ng being aware of the U.S. charges and prior to the filing of Malaysian charges. There are two overarching elements to these events that are relevant to Mr. Ng's sentencing in this case. First, the family paid this money back prior to any criminal charges being brought. Second, the forfeiting of property derived from criminal activity as well as funds not derived from any criminal activity under these circumstances is itself a form of punishment, which should be taken into account when determining how much more Mr. Ng should be punished.

    c.   *Mr. Ng's Family Was Told It Was in Possession of 1MDB Funds And Agreed to Pay the Money Back as Well as Substantial Additional Funds*

As she testified at the trial, the CCID of the Royal Malaysian Police contacted Ms. Lim in July 2018. Ms. Lim voluntarily appeared at the CCID offices on more than ten occasions, each time without a lawyer, between July and October 2018. She was questioned by then-Director of the CCID Tuan Amar Singh, as well as Tuan Rajagopal and Tuan Munaindy about the circumstances of how 1MDB funds had come into the possession of her and her family.

The CCID officials explained to Ms. Lim that the $35 million that was transferred into various accounts in 2012 and 2013 were derived from money misappropriated from 1MDB. While Ms. Lim explained to the CCID – and as she testified to the jury – that the money paid by Judy Chan Leissner was the repayment of an investment in businesses in China,[8] neither Ms. Lim nor

---

[8] As the Court will recall, the video tape Leissner and the FBI made on October 16, 2018, depicts Ms. Lim telling Leissner that she was being questioned by Malaysian authorities and that these authorities were asking her to provide proof as to the investment she claimed to have made with Judy Chan Leissner. As part of this conversation, Ms. Lim asked Leissner to prevail on Judy Chan Leissner to get a copy of the agreement between Judy Chan Leissner and Ms. Lim concerning the initial investment. As we know, Leissner, who was cooperating, did not do so. The result was that

anyone in her family disputed the CCID's representations that much of the money in different accounts held by Ms. Lim, her mother and her brother were in fact derived from 1MDB, even though they did not know this other than being told by the CCID.

CCID officials proposed an arrangement between the Attorneys General of Malaysia, Singapore and the Lim family. If the Lim family surrendered the money transferred from Judy Chan Leissner, which was still in the banks in Singapore, to the Government of Malaysia, the Lim family was assured that (1) the travel bans on Mr. Ng and the Lim family would be lifted, (2) all bank accounts would be unlocked, and (3) no criminal or civil actions would be levied against the Lim family or Mr. Ng.

On October 30, 2018, three written Statutory Declarations were prepared. The first was signed by Ms. Lim. It provided that she would relinquish all claims to monies in three particular accounts that she controlled in two separate banks: OCBC and Nomura that, again, Malaysian authorities concluded contained 1MDB funds. (See Ex. 1 at 1.)

The second was signed by Lim Chee Khang, Mr. Ng's brother-in-law. (See Ex. 1 at 4.) It provided that Lim Chee Khang would relinquish all claims to monies in a particular account that he controlled in a bank called UOB that the Malaysian authorities concluded contained money derived from 1MDB.

The third was signed by Tan Kim Kuan, Mr. Ng's mother-in-law. (See Ex. 1 at 6.) It provided that she would relinquish all claims to monies in seven accounts in three different banks

---

Mr. Ng proceeded to trial without the written agreement, which remains in China. This video is attached (in two parts) as Exhibit 18. (Though we provided it to the Court when we filed the motion in limine to admit the video (ECF 132), we had not formally made it part of the record. We now formally make it part of the record.)

that she controlled or of which she was a beneficial owner that Malaysian authorities concluded contained 1MDB funds. (See id.)

The bank accounts corresponding to these three declarations contained funds traceable to 1MDB. However, the Nomura accounts alone contained 499,500 shares of Celsius stock, worth in excess of $50 million at present. This Nomura account also contained over $2 million of funds belonging to Mr. Ng and Ms. Lim and that were not derived from the Capital Place Holdings account. (See DX-401-1, showing Mr. Ng and Ms. Lim's deposits into the River Blue account at Deutsche Bank, which were later transferred to River Blue's bank account at Nomura.) The UBS account contained $1 million of funds belonging to his brother-in-law, which are unrelated to 1MDB. Indeed, the three accounts contained the cumulative wealth and savings of the Lim family over the course of generations. When Mr. Ng's wife, brother-in-law and mother-in-law agreed to sign the attached declarations and to give the full contents of each of these bank accounts to the Government of Malaysia, two objectives were being accomplished.

First, the Malaysian authorities had proven to the family members that some of the monies in these accounts were indeed derived from 1MDB. Just as Mr. Ng's counsel did not challenge this fact during the trial, the family members did not challenge it to the Malaysian authorities. So, the first objective was that the family agreed that 1MDB funds as well as other funds not derived from 1MDB would be forfeited to the Government of Malaysia.

Second, the Malaysian authorities promised that in exchange for forfeiting the 1MDB funds as well as the funds not derived from 1MDB, neither Malaysia (the country from which the funds were misappropriated) nor Singapore (the country in which the bank accounts were present) would bring criminal charges against anyone, that travel bans would be lifted and that bank accounts would be unfrozen. To clarify, the focus of the inquiry was exclusively on the individuals holding

the different bank accounts. Mr. Ng was not a focus of the Malaysian investigation as of late October 2018. In terms of a U.S. investigation, Mr. Ng was told when he was in Singapore in 2017 that the U.S. had an investigation, but he was never told he was a target of it.

Even though the family members maintained that they were unaware of the true source of the funds, they agreed to relinquish the funds as a gesture of good faith toward their country and as a way of resolving all legal matters concerning the funds. The three declarations were signed by Mr. Ng's wife, brother-in-law and mother-in-law on October 30, 2018. On October 31, 2018, they were hand-delivered to Tuan Rajagopal at the CCID office. Upon providing the three signed Statutory Declarations to Malaysian authorities, Mr. Ng and his family believed, as they had been assured, that the legal matters concerning 1MDB were behind them.

The next day, November 1, 2018, the day of Mr. Ng's and Ms. Lim's wedding anniversary, Ms. Lim received a phone call from the CCID. A police official told her that her husband, Mr. Ng, was to report to the CCID office as soon possible. As directed, Mr. Ng reported to the CCID office and was arrested based on the U.S. charges contained in the first indictment in this case. He was brought before a court in Kuala Lumpur, Malaysia the next day and was detained on the U.S. Indictment.

    d. *These Events Show Mr. Ng's and His Family's Good Character and Respect for the Laws of Malaysia*

In determining an appropriate sentence for Mr. Ng, there are two aspects to these events that are relevant. The first is that when Malaysian police officials told the family that the family was in possession of 1MDB funds, the family agreed to pay not only the money in their accounts derived from 1MDB but other funds prior to Mr. Ng being aware of any charges against him. This shows that Mr. Ng as well as his family readily accepted the Malaysian government's representation that stolen 1MDB funds were in their accounts and that they were willing to fully

repay these monies, as well as substantial other monies. It is also significant that this decision to repay the money, as well as other monies, was made at a time when no charges had been filed against anyone. It is one thing for a charged defendant to offer repayment as a way of getting a lower sentence. It is quite another for an uncharged person to pay back money when he has not been charged or implicated in a crime, nor when such money has been specified in a charging document. Here, no one was charged with a crime and there was no formal factual statement that a certain sum of money would be subject to legal process. Nonetheless, the Ng family agreed to relinquish the totality of several bank accounts to the Government of Malaysia solely because Malaysia represented that stolen 1MDB monies had passed into their accounts.

> e. *The Court Should Consider This as A Form of Punishment Already Imposed Upon Mr. Ng in Determining What Additional Punishment Is Necessary*

The second relevant aspect is that these actions taken by the Government of Malaysia amount to a punishment of Mr. Ng and his in-laws which should be considered under Section 3553(a) in determining how much more Mr. Ng should be punished. Where, as here, police officials forfeit the totality of several bank accounts, taking not only money derived from 1MDB but other untainted funds as well, and in exchange promise, among other things, that no criminal charges will be brought, this amounts to a punishment that in fairness should be considered as a Section 3553(a) factor.

Had the Malaysian government limited the forfeiture to only the monies derived from 1MDB, this would still have been an extraordinary act on the part of Mr. Ng's extended family. The notion of paying restitution or forfeiture in full even prior to criminal charges being brought is extraordinary by any measure. However, his family did far more than this. It agreed also to

relinquish to the Malaysian Government millions of dollars that had nothing to do with 1MDB funds and that were in addition to money derived from 1MDB.

What's more, this arrangement was reached with Malaysian police officials as part of an agreement to resolve potential criminal liability and financial restrictions on the Ng family. Under these circumstances, this amounts to a clear criminal punishment exacted against Mr. Ng and his extended family.[9]

Moreover, that Mr. Ng and his family were told that if they signed over the bank accounts, there would be no criminal charges and that the day after they did so, Mr. Ng was arrested on the U.S. Indictment is also a form of punishment this Court should consider. Malaysian authorities certainly knew about the U.S. Indictment and wanted to collect the 1MDB money, and as much other money as they could, before losing Mr. Ng to the Americans.

2. Mr. Ng Waived Extradition at the Earliest Opportunity

To fully appreciate the significance of Mr. Ng's decision to waive extradition and agree to voluntarily come to the U.S., we must examine that decision in the context of what had happened over the previous several months. As discussed in the above section, it was agreed that Mr. Ng's family would relinquish virtually all of their wealth, amassed over generations, to Malaysia in exchange for a promise that no charges would be brought. The signed Statutory Declarations were provided to Malaysian police officials on October 31, 2018. (See Ex. 1.) The very next day, November 1, 2018, Mr. Ng was arrested. Even the most forgiving of people would conclude that this is an unspeakable double-cross. Even the most forgiving of people would never trust any

---

[9] The concept of punishment is derived from Supreme Court jurisprudence concerning the "double jeopardy" clause. The Supreme Court defines punishment. It goes without saying that the defense is not raising a double jeopardy argument in connection with the U.S. proceedings in light of the fact that Malaysia has already exacted a criminal punishment for the same conduct.

government again. However, Mr. Ng's actions showed that he never lost trust in government or the rule of law. What's more, he showed that he trusted the government of, and the rule of law in, a country not his own, specifically the United States.

The undersigned was hired to represent Mr. Ng toward the end of December 2018. It was apparent that there were considerable challenges to Mr. Ng securing U.S. counsel on this matter. First, Mr. Ng was in a Malaysian jail with virtually no ability to communicate to the outside world, much less with lawyers in the U.S. Second, several U.S. lawyers were apparently conflicted from or unwilling to represent someone in a matter concerning Goldman. A third challenge, and one that will be discussed below, is that Mr. Ng became very ill with severe Leptospirosis and Malaria while in prison between November 18, 2018, and the end of December 2018. He was transferred to a hospital and remained in the hospital for about a week. When he was not in the hospital, he was in the prison infirmary. These three factors presented challenges with securing counsel.

The undersigned flew to Kuala Lumpur on January 1, 2019, and arrived on January 3, 2019. Mr. Ng had a court appearance at the High Court in Kuala Lumpur on January 4, 2019, and the undersigned was permitted to meet with him in person for the first time in an ante room attached to the courtroom. Mr. Ng was still visibly ill. He was very skinny; his skin had a yellowish-greenish tint. The undersigned explained the U.S. Indictment, court procedures in the U.S., the potential timing of a U.S. trial (an estimate that was off by about three years due to the unforeseen Covid pandemic) and the fact that he could waive or not waive extradition, with a full description of the consequences of each option. Without getting into the details of any discussions, it was apparent that waiving extradition was a meaningful possibility.

The undersigned returned to the U.S. and had extensive, detailed conversation with the U.S. prosecution team about the possibility of an extradition waiver. Because the prosecution team

50

consisted of AUSAs from the EDNY as well as trial lawyers from the Fraud Section and Anti-Money Laundering Section in Washington D.C., as well as layers of supervision in each of the three offices, reaching an agreement as to the terms of an extradition waiver took about five weeks (despite the parties working hard to resolve the issues). Once an agreement was in place, part of which involved a letter confirming that the U.S. Government would abide by the so-called "Rule of Specialty" even though Mr. Ng was waiving extradition, the undersigned flew back to Malaysia.

Sungai Buloh Prison is a 45-minute drive north and west of downtown Kuala Lumpur. Mr. Ng's Malaysian lawyer, Datuk Tan, and the undersigned were permitted to meet with Mr. Ng on February 14, 2019, but because of his continuing illness and a Tuberculosis outbreak in the prison, we met him in a segregated area. The undersigned read out loud from the letter from the Justice Department concerning his potential extradition, including that the provisions in the letter would expire if we did not waive extradition in open court the next day. Mr. Ng was informed by his counsel that as a Malaysian citizen, if he contested extradition, he could conceivably prevail, remain in Malaysia and never face U.S. charges. This was a possibility because the 1MDB matter was so important to the Malaysian government that it could choose to prosecute the case independent of the U.S. Alternatively, even if he ultimately did lose extradition, with all legal challenges and appeals, he could delay the extradition process for many years.

Ultimately, Mr. Ng did what good men do. He decided it was best for his wife, his young daughter, his mother and for his wife's parents for him to face the U.S. charges responsibly and promptly, and to try to get the matter behind him so he could return to his life, and to the people who love and need him in Malaysia. On the morning of February 15, 2019 (the evening of February 14th in Brooklyn), Mr. Ng, represented by Datuk Tan, and in the presence of the undersigned, waived extradition in open court.

51

Despite waiving extradition on February 15, 2019, and requesting to be extradited within thirty days, the U.S. authorities picked up Mr. Ng and transport him to the U.S. on May 3, 2019, almost three months later. Mr. Ng was met by U.S. officials who traveled with him for another three days, arriving in New York on May 6, 2019. Pursuant to agreement, Mr. Ng was arraigned and placed on house arrest at an apartment we secured for him in Manhattan.

Section 3553(a) discusses the character of the defendant and, separately, the need to promote respect for the law. Here, a man who has never been to the U.S., aside from several business trips, had such strength of character and respect for the U.S. legal system that he immediately waived extradition from his home country to come to the U.S. to face these charges. An additional reason behind the urgency and the prompt extradition waiver is that Mr. Ng had become very ill while in prison, as will be further described below.

3. <u>The Six Months That Mr. Ng Was in Sungai Buloh Prison Warrants A Downward Departure Under U.S.S.G. § 5K2.0 And A Substantial Reduction Under Section 3553(a)</u>

As noted, Mr. Ng was in a Malaysian jail that was unlike anything in the U.S. A "sentencing court may depart if the court finds 'that there exists an aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the guidelines.'" <u>United States v. Carty</u>, 264 F.3d 191, 196 (2d Cir. 2001) <u>quoting</u> U.S.S.G. ¶ 5K2.0. Applied to a defendant's pretrial prison conditions, the Second Circuit stated, "no evidence exists to show that the Sentencing Commission took the conditions of a pre-sentence detainee's confinement into account in creating the Guidelines. Indeed, there is no indication that the Commission contemplated that federal presentence detainees would be kept in any detention facilities other than federal facilities." <u>Carty</u>, 264 F.3d at 196; <u>United States v. Francis</u>, 129 F.Supp.2d 612, 616 (S.D.N.Y. 2001). The Second Circuit continued, "we hold today that pre-

sentence confinement conditions may in appropriate cases be a permissible basis for downward departures." Carty, 264 F.3d at 196. See also Francis, 129 F. Supp. 2d at 616; United States v. Sutton, 973 F. Supp. 488 (D.N.J. 1997)

By virtue of the decision in Carty, the law in this Circuit, even before United States v. Booker, 543 U.S. 220 (2005), firmly established that pre-sentence confinement conditions, particularly in non-federal facilities, could give rise to a below-Guidelines sentence. In recent years, after Booker was decided, and focusing exclusively on Section 3553(a) factors, sentencing judges have relied heavily on harsh pretrial prison conditions in issuing drastically below-guidelines sentences. This has been true even with defendants convicted in large-scale white-collar cases with very high guidelines calculations. See United States v. Kaleil Isaza Tuzman, S.D.N.Y., 15 CR 536 (PGG). In Tuzman, the Court gave the defendant a time-served sentence in a large-scale fraud case where the Court calculated the Guidelines range to be 210-262 months. The drastic reduction was based, in large part, on the harsh prison conditions the defendant faced abroad before his being extradited to the U.S. In sentencing the defendant to time-served, the Court stated, "(i)n determining an appropriate sentence for Mr. Tuzman, I have given great weight to the suffering he endured in Colombia." Tuzman, 15 CR 00536 (PGG), ECF 1216 Sentencing Tr. at 66. The Tuzman case is instructive.

Roger Ng was held on the U.S. charges in a Malaysian prison facility that was far below any acceptable standard of human decency. Among other atrocities, his exposure to diseased rat urine and Malaria-carrying mosquitos caused him to become gravely ill, requiring significant medical intervention. He carries the physical and emotional scars of this inhumane treatment with him to this day, and will for the rest of his life. As Mr. Ng explains in his letter to the Court:

> Six months in the Malaysian prison had a devasting effect mentally and physically. Until today, I find myself reclusive socially as I continue to deal with this brutal

and distressing experience. The time without sunlight and in isolation made me lose my mind and become frightful. I am scared because I have been there before and I am scared to go back again. I suffered from chronic insomnia from this—a condition I never had before, despite constantly traveling for work. I experienced a feeling of hopelessness that I have not recovered from since. November 1st, 2018 was the last day I had any friends or social interaction. Until today, my only social interactions are with my attorneys and my family, who I speak to over the phone. I have a fear of engaging with people—how do I engage with them? How do I speak with them? How can I feel safe in a stranger's presence? I cannot.

(Ex. 2 at 7.)

Mr. Ng was in the Sungai Buloh prison for six months and two days commencing on November 2, 2018, and ending in the date he was picked up by U.S. officials, May 3, 2019. He was held in prison exclusively because of the U.S. charges. During this period, he was subjected to lengthy periods of pure isolation, diseased rats, Malaria-carrying mosquitos, and human waste. The lights of his 12 x 6 foot cement cell were on 24 hours a day. He tried his best to sleep on a cold, often wet cement floor. The cement floor had a hole into which he was to defecate and urinate. There was no toilet. There was no flushing mechanism to transport the human waste to some other location. There was no bed, no chair, no mattress. Rather, he slept directly on the cold, damp, often-soiled cement floor. For the first two weeks, he did not even have a blanket.

This resulted in Mr. Ng contracting severe Leptospirosis and Malaria. As will be further discussed below, while being subjected to these conditions, Mr. Ng experienced for the first time in his life both visual and auditory hallucinations. In order to soothe itself from the painful, terrifying illnesses ravaging his body while isolated in a concrete cell amidst rats, mosquitos and often his own human waste, his mind left him, as he has explained it. The trauma of being in pain, helpless, alone and without hope caused him to psychologically leave the time and place that was causing so much emotional devastation. He describes having an out-of-body experience where "he" was no longer in the cell. Mr. Ng describes this in his letter to the Court:

> Those first two weeks felt like a pressure chamber. I heard things that were not there; I saw things that did not exist; and I hallucinated. I would hear other inmates on the block scream for hours on end, until they fainted or fell asleep. The only way for me to survive was to go to a place in my brain that did not exist—essentially, I mentally left to another world.

(Ex. 2 at 5.)

He lost his ability to participate in social settings, he developed persistent insomnia and is still experiencing the debilitating physical effects of having these diseases ravage his body. This experience has changed him forever, regardless of his future. Moreover, it has also made him more vulnerable than he would be otherwise, and more so than a typical person, to future incarceration. For all of these reasons, which will be further developed, Mr. Ng's experience at this prison, including the impact this inhuman treatment has had on his mental and physical well-being, justifies a sentence of time served.

Mr. Ng's cell was constantly infested with rats, which seemed to come through the hole in the cement floor. There was no escaping them. For the first two weeks, he was confined to his cell twenty-four hours a day, often for days on end, and his only companionship was an endless scourge of rats coming from this open sewage hole. Heavy rains are frequent in Malaysia, and this caused the human waste to rise up into his cell, along with rats, mosquitos and other vermin living in holes beneath the prison. Those two weeks, Mr. Ng slept on the bare, wet, cold cement floor, the same one that would be covered with fecal matter and urine when it rained. The floor was never cleaned and was always, at a minimum, damp. Often, it was far worse than that. It was only after two weeks that he was provided with a thin latex mattress and a blanket. Mr. Ng continued to remain in complete solitary confinement twenty-four hours a day with the exception that now once a week, he was permitted to leave his cell for one hour. But, even this one hour per week was taken away as a punishment for certain other inmates committing some perceived transgression.

When pressed by his counsel, Mr. Ng said that of all the conditions – the human waste, the rats, the mosquitos, the sleeping on a wet, cold cement floor, the fear of malaria, the fear of rat-born disease, the fear of being beaten by a guard or another inmate – the worst was isolation, even if only for a few weeks.

As a result of the prison conditions, Mr. Ng's health quickly began to suffer. He found he was losing consciousness and falling to the floor. He had severe diarrhea, stomach cramps and a fever. He asked the prison officials for medical care but in the beginning received none. He was told he likely had dysentery or food poisoning and that it would pass. But after more than two weeks of increasingly severe symptoms – vomiting, diarrhea, chills, cramps, fever and headache - he complained enough that the prison officials gave him a blood test. The blood test revealed that Ng suffered from Leptospirosis and Malaria. Mr. Ng almost certainly contracted Leptospirosis due to his being exposed to rat urine from the diseased rats in his chronically-damp, fecal-matter-covered prison cell. Malaria is a parasitic infection transmitted when a mosquito with plasmodium microorganisms in its saliva bites a person and passes the parasites into the person's blood stream. These parasites then travel through the blood to the liver, where they mature and reproduce.

Because his symptoms had persisted for over two weeks by the time the blood test revealed the disease, Mr. Ng's severe Leptospirosis and Malaria had advanced beyond the point that the prison's medical personnel could help him. He was transferred to a hospital outside the prison, where for nearly a week he was aggressively treated intravenously with antibiotics and rehydration fluids. After being discharged from the hospital, he spent another four weeks in the prison infirmary.

The six months in this Malaysian prison changed Mr. Ng forever. More than anything, he was traumatized. The combination of being very sick, in pain, alone, frightened and not knowing

56

if anyone would help him caused severe emotional trauma that he has yet to overcome. He lost the ability to sleep for any appreciable periods straight. He developed nightmares and fears of being around others. The Leptospirosis ravaged his digestive system to the point that there are only a handful of foods he can tolerate.

He also had no way of knowing when the trauma would end. When he waived extradition, the undersigned conveyed to him what the Government had indicated was the likely timetable to be transported to the U.S.—which was approximately five weeks. It turns out, Mr. Ng waited almost three months to be taken out of the jail and to the U.S.

While each episode of inhuman treatment is inhuman in its own way, the common thread of the cases is that a fellow human being, vulnerable and powerless, was subjected to objectively sub-human treatment at the hands of government officials such that this person's life will never be the same, that the emotional scars will never fully heal, and that regardless of what the future may hold, that person's life has forever changed for the worse.

4. Even After Being Released from Sungai Buloh Prison, Mr. Ng Has Been Isolated From His Wife, Child and Family for Almost Another Four Years

After waiving extradition on February 15, 2019, then suffering for almost three more months in Sungai Buloh Prison, on May 6, 2019, Mr. Ng was arraigned and put on house arrest with restrictive conditions. Aside from meetings with his counsel, he had almost no ability to leave his small apartment. While he did spend long hours alone, counsel took solace in the fact that at least he was safe and was in a place with basic human amenities. However, when counsel advised him that he could expect a trial in the U.S. within a year, neither counsel nor anyone else foresaw what would begin to take shape toward the end of 2019.

As the Court will recall, one of the key dilemmas facing defense counsel was trying to secure documentation, particularly relating to the money invested with Judy Chan Leissner, that

was located in China. During the November 11, 2019, court conference, counsel advised the Court that "there's important evidence overseas that we are still trying to get our hands on." By late January 2020, the undersigned had a phone conversation with a representative of the U.S. Center for Disease Control, who advised counsel against travelling to China and parts of Southeast Asia. These were the earliest days of the Covid pandemic, which was still confined to China. Unfortunately, that is where the documents we were looking for were located. In March 2020, the world closed down. Between the volume of discovery and counsel's need to travel, it became a forgone conclusion that the trial in this case would be delayed for years. Ultimately, the Court made this trial a priority, which we greatly appreciate, and we started the trial on February 7, 2022. However, while the parties and the Court were focused on the case, Mr. Ng dealt privately with the hardship of his being alone, thousands of miles from his wife and child, with no family, friends or any social life whatsoever, watching his young daughter grow up from afar, watching his mother grow older, and being denied a life with his wife and family.

In this section, we ask the Court to view the 1,403 days between May 6, 2019, and March 9, 2023, as being a form of punishment already imposed. We understand that unlike the time that Mr. Ng was in prison in Malaysia on U.S. charges, which counts toward a jail sentence, that time on house arrest or on release with restrictive conditions does not legally count as incarceration. Accordingly, we do not ask the Court to count this time formally. Rather, we ask that the Court view this period of almost four years as a Section 3553(a) factor that would reduce any jail term set by the Court.

Given the unique nature of Mr. Ng's pretrial conditions, specifically that Mr. Ng was alone, that his wife and child were 10,000 miles away, and that his freedom was dramatically curtailed by being compelled to remain in a country not his own for four years, he has suffered a form of

punishment unlike the typical defendant on house arrest. The typical house arrest involves a defendant living in his home with his family. A defendant under house arrest does not have to endure the radical upending of one's life. Nor is he confronted with the most punishing of all prison-type conditions: isolation, loneliness and separation. What Mr. Ng has experienced over the last 1,403 days is far more akin to the punishment inherent in a prison setting than it is to a typical defendant under house arrest. Indeed, in many ways, Mr. Ng's experience is more physically and psychologically challenging than if he was in a proper, humane prison setting, complete with family visits, edible food and basic necessities.

Also, this almost four year period must be viewed in conjunction with the trauma of his prison experience that came before it. Rather than being in a familiar, safe environment to heel from the trauma of prison, Mr. Ng was transported by federal agents to the other side of the earth and placed on house arrest, alone, away from his family for an unknowable duration of time. The only thing to occupy his already anxious, fearful mind was the unparalleled stress of being the only defendant actively prosecuted by the U.S. for the single largest crime in Malaysian history. In this situation, Mr. Ng was doomed to continue to suffer the emotional trauma that started in prison. This is why his counsel persistently asked the Court to try to make his trial a priority, despite the trial backlog facing the Court. Ultimately, Your Honor did make Mr. Ng's trial a priority and he and his counsel will always be grateful.

5.   <u>Given Mr. Ng's Character and Circumstances, Court Does Not Need to Impose Further Incarceration to Achieve Specific Deterrence</u>

Given Mr. Ng's personal circumstances, including the punishment he has already suffered, that he was on supervised release with this Court for four years without incident, that this was his first arrest, and that he will never again work in banking or for an American company in any industry, the risk of his violating the laws of any country is remote; and his risk of violating a U.S.

law is virtually non-existent. Accordingly, this Court does not need to impose additional incarceration in order to specifically deter Mr. Ng, under the particular circumstances here.

Due to the facts of this case, a sentence of time-served would reflect the needs for "adequate deterrence to criminal conduct," to "protect the public from further crimes of the defendant," and to "promote respect for the law," as required by 18 U.S.C. § 3553(a)(2)(A)-(C). Under this prong of Section 3553(a), courts assess how to affix a sentence that is sufficient, but not greater than necessary to comply with the statutory purpose of specific deterrence. The Supreme Court has further emphasized this fundamental goal in sentencing. The "likelihood that [a defendant] will engage in future criminal conduct" is "a central factor that district courts must assess when imposing sentence." Pepper v. United States, 131 S. Ct. 1229, 1242 (2011). We respectfully submit these concerns are met in this case with a sentence of time served.

After considering Mr. Ng's life and individual characteristics and considering the relevant 18 U.S.C. § 3553 factors, this Court should find that a sentence of time-served is "sufficient, but not greater than necessary" to accomplish the goals of sentencing. The brutal Malaysian incarceration and subsequent isolation that Mr. Ng has suffered in the past five years, and particularly how he has responded to this adversity, have demonstrated Mr. Ng's true character and his unyielding respect for the law. He will not commit future crimes. He will not put his family, friends, and his community at risk. In the past five years, he has fastidiously dedicated his time to preparing for his trial, being the best father possible despite the difficult circumstances and being a model defendant under pretrial supervision.

This last point deserves further explanation. In four years of being absolutely alone in a foreign country with the isolation of Covid, the crushing anxiety of not just any trial, but one of the most important, controversial trials in Malaysian history, and while being 10,000 miles from

all his family and friends while these frightening events unfold, Mr. Ng has nonetheless comported himself at every moment with respectfulness, grace and an inner courage that is truly extraordinary. As Ms. Geragos writes, "Through it all, Roger never once complained." (Ex. 15, Letter of Teny Geragos at 3.) He unfailingly shows full and complete respect for each and every person associated with our judicial system and with everyone he meets. And, he has done so while enduring unimaginable personal and family hardships.

So, our first appeal to the Court to view Mr. Ng as someone who, even without further incarceration in this case, will never commit a future crime, is based exclusively on his demonstrated character, especially during the adversity he has experienced. However, there are other factors as well.

<u>First</u>, given the horrors he endured in Malaysia, he presents little risk of recidivism. As detailed extensively above, Mr. Ng suffered greatly in the Malaysian prison. He is still feeling the effects of the incarceration. This experience alone can give the Court assurances that he will never break the law of any country.

<u>Second</u>, Mr. Ng will never be employed as a banker again at Goldman, or any other bank. His felony conviction for FCPA and money laundering violations render him essentially un-hirable at a bank similar to those who previously employed him—Deutsche Bank and Goldman. Therefore, even if he was inclined to commit additional crimes – and we submit he certainly is not – he will be unable to do so. See <u>United States v. Wynaar</u>, No. 09-CR-656, 2010 WL 3718912, at *2 (E.D.N.Y. Sept. 13, 2010) ("Specific deterrence is achieved through incapacitation and the impact of this conviction on the defendant's employability."); <u>United States v. Amarante</u>, No. 08-CR-76, 2008 WL 4427917, at *2 (E.D.N.Y. Sept. 22, 2008) ("Specific deterrence is satisfied by

the sentence in light of the defendant's law abiding background and the fact that he cannot apply for certain employment because of this felony conviction.").

Third, Mr. Ng will almost certainly not ever work for another U.S. company and will unlikely be permitted into the United States due to the instant conviction. For the reasons stated in this section, it is highly unlikely that Mr. Ng will violate any nation's laws. However, Section 3553(a) appears concerned only with specific deterrence concerning crimes against Americans or American interests.

Fourth, Mr. Ng is a first-time offender who has not committed any other crimes before or since. See United States v. Jenkins, 854 F.3d 181, 192 (2d Cir. 2017) (discussing how recidivism substantially decreases with age). Even assuming, as the Court must at this juncture, that Mr. Ng committed these crimes, any of Mr. Ng's arguable wrongdoing ceased in September 2013, almost a decade ago. Contrast this with Mr. Ng's co-conspirators, Jho Low, Tim Leissner, Jasmine Loo and Terrence Geh. Low, indicted with Mr. Ng in 2018, has been a fugitive since 2016. He has settled civil forfeiture lawsuits with the Department of Justice from some unknown country, even negotiating that $15 million dollar of the frozen funds be paid to his attorneys.[10] Similarly, Loo and Geh have also fled Malaysia and evaded prosecution by any country. Leissner continued to commit crimes even after his arrest and has continued to commit a fraud against Mr. Ng to this day. (See Ex. 22, Roger Ng v. Tim Leissner Summons and Complaint.) He has admitted lying to the Department of Justice for months after his arrest, including lying about Mr. Ng's involvement in the 1MDB scheme despite the lack of evidence. And following the bond deals, he continued to

---

[10] Matthew Goldstein, Jho Low Will Give Up as Much as $900 Million in Assets in 1MDB Scandal, N.Y. Times, Oct. 30, 2019, at https://www.nytimes.com/2019/10/30/business/jho-low-1mdb-malaysia.html.

receive 1MDB funds. (DX-1240; DX 1241.) In 2014, Leissner-controlled entities received at least $50 million in transfers from Low-related entities traceable to 1MDB. (Tr. at 2970-78.) In 2017, he also received a €145 million transfer from a Low-directed entity to a Leissner-controlled entity. (Tr. at 2291.) One month before his arrest, he was attempting to flee to Brazil with his mistress (Tr. at 1335-1337) and sell approximately $150 million in assets to hold in Liechtenstein, a country known for its strict bank secrecy (Tr. 2304-08).

On the other hand, Mr. Ng stayed in Malaysia when the news about 1MDB started to hit the press. He traveled around Asia consistent with his duties for Celsius, including traveling to Singapore. When he traveled to Singapore for Celsius in 2017, he was banned from leaving for three months. During those three months, he sat down with Singaporean authorities twenty-two times and cooperated extensively with their investigation. Once allowed home, he flew back to Malaysia and stayed in Malaysia at the same address he had lived in for TEN years. In fact, Mr. Ng even traveled to Hong Kong and Beijing to meet Celsius distributors prior to his scheduled return to Singapore to continue his cooperation.

Given Mr. Ng's demonstrated strength of character, imprisonment in Malaysia, his being unemployable as a banker or with a U.S. company, his compliance with four years of court-imposed restrictions, the low chance of recidivism and his lack of criminal history, a further prison sentence is not required to achieve specific deterrence.

### 6. A Sentence of Further Incarceration Will Not Further General Deterrence

General deterrence is often a major sentencing consideration in any white-collar case. It is especially important where, as here, the case is of great public concern and is widely reported. We expect the Government to argue that Mr. Ng must receive a stern sentence to further general deterrence, and we address that issue here.

There are three reasons why the Court need not sentence Mr. Ng to further incarceration in order to promote general deterrence. <u>First</u>, the punishment that Mr. Ng has suffered already is more than sufficient to deter any executive from committing a similar offense. <u>Second</u>, the Government's prosecution of Goldman Sachs Group, resulting in a Deferred Prosecution Agreement, and of Goldman Sachs (Malaysia) Sdn Bhd, resulting in a guilty plea to Conspiracy to violate the bribery provision of the FCPA, and a total financial penalty of about $3 billion serves as potent deterrence to corporations and executives all over the world. <u>Third</u>, the comprehensive prosecutions by the Malaysian government, which charged Mr. Ng, Leissner, Low and others also provides powerful general deterrence, making it unnecessary to further punish Mr. Ng.

> a. *Mr. Ng's Imprisonment in Malaysia Is Terrifying and Effective General Deterrence*

Nothing puts the fear of God into a typical financial executive more than the thought of being in a cramped cell exposed to diseased rats and mosquitos, sleeping on a wet concrete floor covered with fecal matter and almost dying of severe Leptospirosis and Malaria. News of Mr. Ng's conditions have been reported in the press in a case where finance executives around the world are following the matter closely.[11] And, if that somehow was not enough, it is also relevant that the Malaysian government already recovered all of the allegedly ill-gotten gains of the 1MDB offenses as well as substantial other monies in the control of Mr. Ng's family members. In sum, Mr. Ng has

---

[11] <u>See</u> Chester Tay, <u>Ex-Goldman Sachs banker Roger Ng denied bail</u>, The Edge Markets, Jan. 7, 2019, at https://www.theedgemarkets.com/article/exgoldman-sachs-banker-roger-ng-denied-bail ("Ng was hospitalized for five days from Dec 3, suffering from illnesses like leptospirosis, food poisoning, dengue and viral infection."); <u>see also</u> Khairah Kairm, <u>Court denies bail for Roger Ng</u>, New Straits Times, Jan. 7, 2019, at https://www.nst.com.my/news/crime-courts/2019/01/447843/court-denies-bail-roger-ng ("He (Ng) is unwell and the prison department will show that it is true.")

already been punished savagely, completely and publicly. No further message to the world's executives need be sent.

### b.   *The U.S. Prosecution of Goldman Is Effective General Deterrence*

The FCPA is designed to prevent U.S. companies and their executives from committing foreign bribery to beat out the competition in securing lucrative business opportunities, and to dissuade them from altering the company's accounting in covering up the bribery. By prosecuting Goldman and by securing a deferred prosecution agreement from Goldman Sachs Group and a guilty plea from Goldman Sachs (Malaysia) together with a $3 billion financial penalty, the Government has already achieved the full measure of general deterrence.

### c.   *The Malaysian Cases Provide General Deterrence*

The Attorney General's Chambers of Malaysia has brought a series of criminal prosecutions in connection with the events related to the 1MDB matter. The Malaysian cases are comprehensive in their scope and should be viewed by the Court as providing effective general deterrence, especially alongside the U.S. prosecution of Goldman. So the Court can appreciate the general nature of the cases, we briefly summarize them here.

### i.   The SRC Case Against the Former Prime Minister

In July 2018, Malaysia charged former Prime Minister Najib Razak with crimes related to a subsidiary of 1MDB called SRC International, from which the former Prime Minister allegedly stole $42 million. These events are wholly unrelated to the three bond deals at the center of the U.S. case. Razak went to trial and was convicted, and sentenced to 12 years. He is currently serving his prison sentence.

      ii.    The Low Theft Case

In August 2018, Malaysia charged Jho Low and his father, Larry Low, with theft and money laundering in connection with money stolen from 1MDB. Jho and Larry Low were convicted in absentia. They remain fugitives.

      iii.    The 1MDB Case Against the Former Prime Minister

In September 2018, Malaysia charged former Prime Minister Razak with a second case involving, among other things, "criminal breach of trust" in connection with the 1MDB theft. This trial is ongoing.

      iv.    The 1MDB Case Against Mr. Ng, Low, Jasmine Loo, Leissner and Goldman Sachs

On December 17, 2018, about six weeks after the United States charges were unsealed, Malaysia charged Jho Low, Jasmine Loo, Tim Leissner, Roger Ng and certain Goldman Sachs subsidiaries with crimes relating to misappropriating the 1MDB bond proceeds. Of the four individual defendants charged in this case, only Mr. Ng has appeared before the court for his charges of abetting Goldman to omit facts and make untrue statements in the sale of 1MDB bonds. Low, Loo and Leissner remain active fugitives in Malaysia. Indeed, Leissner is a fugitive from Malaysia despite his being a past and current cooperating witness with the U.S. Department of Justice.

On January 9, 2023, at a court hearing of Mr. Ng's case in Malaysia, the Deputy Public Prosecutor recommended that Mr. Ng be given something called a "Discharge Not Amounting to an Acquittal" ("DNAA"), which was granted by the Court. The basis for the DNAA, according to the prosecutor, was that Mr. Ng had still not been sentenced in the U.S. case. The prosecutor stated, "we have clearly stated that we want to carry on with this case. [But] because the DOJ is taking so

long, we are asking for a DNAA."[12] Mr. Ng faces up to ten years in prison in Malaysia in connection with this Malaysian matter.

v.     The Goldman Sachs Corporate and Directors Case

On August 9, 2019, Malaysia charged Goldman Sachs International, Goldman Sachs (Asia) LLC and Goldman Sachs (Singapore) Pte. as well as 17 directors of these three entities. In July 2020, Goldman and the Malaysian government settled this case with Goldman paying $2.5 billion, promising to return another $1.4 billion, and in exchange all charges against Goldman and these 17 directors were dismissed.

vi.     The False Audit Report Case Against the Former Prime Minister

Finally, on December 12, 2019, Malaysia charged former Prime Minister Razak with a third case involving the falsification of the 1MDB audit report. This case is still in a pretrial posture.

The relevance of this series of Malaysian prosecutions concerning events related to the theft from 1MDB and related crimes is that these cases provide substantial general deterrence against corporate malfeasance generally, including large banks such as Goldman. In the context of the sweeping cases brought by the Malaysian government to eradicate corruption in Malaysia, punish its former Prime Minister, return to the people of Malaysia the money misappropriated from a public fund, and bring to justice the responsible parties, the U.S. need not severely punish Mr. Ng to achieve general deterrence, which has been attained already by these Malaysian prosecutions.

---

[12] Timony Achariam, <u>Roger Ng given DNAA while Malaysian court awaits conclusion of his American trial</u>, The Edge Markets, Jan. 9, 2023, at https://www.theedgemarkets.com/node/651023.

In sum, because Mr. Ng has already been severely and publicly punished, because the U.S. has recovered $3 billion from Goldman, because Malaysia has recovered, and will recover, almost $4 billion from Goldman, in addition to the other Malaysian matters, this Court does not need to sentenced Mr. Ng to additional incarceration to achieve general deterrence.

7.   Mr. Ng Has Already Suffered More Than Anyone Else Involved in the 1MDB Theft

Roger Ng is the person with the least authority, influence and power of virtually everyone involved in the series of crimes concerning 1MDB; he is also one of the few people being punished.

Both the U.S. and the Malaysian Government charged Goldman with fraud, bribery, and other crimes committed in both countries. The bank realized over $600 million in profit from the 1MDB deals, funds that were spread among the partners of the bank. The Government of Malaysia charged 17 members of Goldman, most of them partners, with various Malaysian crimes. As part of the corporate-wide financial settlement between Malaysia and Goldman, all of the Goldman executives saw their cases get dismissed, without them ever setting foot in a Malaysian courtroom, or sleeping on the filth-covered cement floor of a Malaysian prison. In short, in exchange for $3.9 billion, the Malaysian Government gave Goldman and these 17 individual Goldman defendants a complete pass. They never had to leave their homes, go to a courtroom or be inconvenienced in any way.

The U.S. Government charged Goldman with bribing Malaysian and United Arab Emirates public officials, alleging corporate-wide malfeasance in connection with the lucrative 1MDB bond deals. Goldman resolved the U.S. case by paying another $3 billion (bringing the total amount paid by the bank to about $7 billion) in exchange for a Deferred Prosecution Agreement for Goldman Sachs Group. In addition, Goldman Sachs (Singapore) entered a corporate guilty plea. The U.S. Government prosecuted one Goldman partner, Tim Leissner, who has yet to set foot in a prison.

Rather, despite the fact that Leissner repeatedly lied to the agents in multiple proffer sessions about central issues in the investigation, the Government awarded him with a cooperation agreement, permitted him to secure his bail with shares of a company called Celsius that he stole from Mr. Ng (see, Ex. 22), is permitting him to remain a fugitive from justice in the Malaysian case in which he is charged with stealing from 1MDB, and will, one day soon, ask this Court for a lenient sentence in exchange for his valuable assistance.

The one person not getting any of this treatment from the U.S. Government is the one who is not a partner at Goldman: Roger Ng. Unlike Leissner who was "arrested" by the FBI and brought to a Residence Inn, Mr. Ng languished in a Malaysian prison and contracted life-threatening and horrid illnesses. Unlike Leissner, who was permitted to live in his $30 million Beverly Hills mansion that he bought with stolen money, Mr. Ng was forced to wait in this country for four years – most of that time under house arrest - for his trial.

The Government reached a financial settlement with Jho Low whereby Low relinquished about $900 million to the U.S. Government. Low reported after the financial settlement he reached with the U.S. Department of Justice that all outstanding matters were resolved. Like Leissner, Low has not seen the inside of a jail cell. The Government may reply that Low is a fugitive and beyond its reach. Low is a fugitive and has never been to jail because Low fled to avoid apprehension. Mr. Ng suffered in a Malaysian prison and stood trial in the U.S. because he did not flee.

The Government of Singapore conducted a criminal investigation. As noted, Mr. Ng was forced to remain in Singapore for three months in 2017 to answer questions about 1MDB and the proceeds that were stolen. The investigation focused on BSI Bank's Singapore branch, where the prosecution witness, Kevin Swampillai, was employed. Swampillai testified that in fact he lied to 1MDB's auditor, KPMG, in connection with its audit of 1MDB. He lied that 1MDB had far greater

liquid assets than they actually had. He then altered the minutes of an audit meeting to perpetuate that lie. He also said that he received almost $6 million in illegal kickbacks. Swampillai told the jury what his punishment was: "I had a warning in lieu of prosecution." (Tr. at 3292).

While Low, Leissner, the 17 Goldman Sachs executives and dozens of others continue to live in their homes, pursue employment opportunities, spend time with loved ones and live free lives after reaching financial or other settlements, Mr. Ng has not. The Government may ask that this Court sentence Mr. Ng in a way that sends a message to the world that crime does not pay. But what message has the Government already sent by cutting multi-billion-dollar deals with the world's most powerful bank that results in none of its highest-ranking members being indicted? What message does the government send when it allows a fugitive from Malaysia to remain a government cooperator without having to answer to Malaysia for the money he stole from Malaysia? The message of this case is this: The Goldman's of the world will pay for their crimes with money; the Mr. Ng's of the world will pay with the number of days they have left on this earth.

However, we are better than that. Mr. Ng waived extradition and came to this country because we are better than that. We are better than that because the law in this country takes into account the suffering Mr. Ng has clearly experienced, it allows a sentencing judge to take account of his character and the unique experiences he has had. We are better than that because a sentencing judge can review all of the participants in a given situation, see how, if at all, punishment has been apportioned and deliver a sentence that is fair.

8. <u>A Sentence of Time-Served Will Permit Mr. Ng to Return to Malaysia to Face Whatever Prosecution His Home Country Sees Fit</u>

A sentence of time-served will permit Mr. Ng to return to Malaysia so that the Malaysian Attorney General can determine how to proceed with the charges filed against Ng, Leissner,[13] Low and Jasmine Loo. As noted, the Malaysian prosecutor stated at the last Court conference that it intends to pursue the Ng case once Mr. Ng returns to the jurisdiction. Obviously, Malaysia has a supreme interest in resolving the 1MDB-related matters insofar as 1MDB was a Malaysian fund consisting of Malaysian money that was embezzled with the alleged involvement of the Malaysian Prime Minister. The U.S. Government has consistently acknowledged the need to return Mr. Ng to Malaysian authorities as soon as possible. In a letter from Jeffrey Olson, Associate Director of the U.S. Department of Justice Office of International Affairs ██████████████████████

████████████████████████████████████████████████

████████████████████████████ hat in the event that Mr. Ng is convicted and sentenced, ██████████████████████████████████

████████████████████████████████████████ (Ex. 23, March 7, 2019, Letter of Jeffrey Olson, Associate Director of the U.S. DOJ OIA.)

In terms of the timing of Mr. Ng being returned to Malaysia, Associate Director Olson wrote, █████████████████████████████████████████

████████████████████████████████████████████████

████ As we know, Mr. Ng arrived in the U.S. on May 6, 2019. Six months from that date would be November 6, 2019. Due to circumstances beyond the Court's and the defendant's control, the

---

[13] Like Ng, Leissner is also charged in Malaysia, but rather than submitting to the jurisdiction of the Malaysian Court, as Ng did with the United States, Leissner will be continuing his open and notorious fugitivity while cooperating with the U.S. Justice Department.

trial actually started on February 14, 2022, two years and three months later than the estimate the U.S. provided to Malaysia.

By assuring the Malaysian Attorney General's office that Mr. Ng would be tried promptly and then returned to Malaysia prior to him having to serve any U.S. sentence that was imposed, the U.S. Department of Justice formally recognized that Malaysia has a compelling interest in resolving its matter promptly one way or the other, and that the U.S. was deferring to that interest in terms of asking the sentencing judge to permit Mr. Ng to return to Malaysia before surrendering to a U.S. prison.

Similarly, Mr. Ng has the right to resolve his Malaysian matter as promptly as possible. Just as Mr. Ng has lived for four-and-a-half years with the U.S. matter hanging over his head, so too has he had to endure pending, unresolved, serious criminal charges in his home country during this entire period. Indeed, he continues to face those charges, as the Malaysian press has widely reported that upon his return to Malaysia, the Malaysian case will proceed.

Living as a charged criminal defendant takes an immense emotional toll. For Mr. Ng, this means chronic anxiety, feelings of hopelessness, ███████████ terror that he will never see his daughter, wife and mother again, and deep and profound depression. Anyone who believes that the only punishment in a criminal case is prison has not spent enough time with people under indictment. Mr. Ng has had to live like this for over four-and-a-half years, and has had to do so facing two cases in two countries.

We ask this Court to sentence Mr. Ng to time served so that he can return to his home country and resolve the Malaysian matter. In closing on this point, it is ironic that counsel for Mr. Ng is asking for precisely that which Leissner continues to avoid: honoring one's legal obligations to face justice rather than continuing to be a fugitive.

9.  <u>Further Incarceration Would Work an Atypical and Extreme Hardship</u>

Further incarceration of Mr. Ng would cause extreme hardship that is both unique and far outside the heartland of typical hardship suffered by someone serving a prison sentence.

As an initial point, and as has been discussed already, Mr. Ng was exposed to brutal prison conditions that have already taken a severe psychological toll. Once outgoing, gregarious, and self-confident (while always remaining humble), Mr. Ng presents now as scared, beaten and vulnerable. While he has grown close to his lawyers, even this has taken considerable time. He has no friends. He has lived his last four years in this country without a single friend. Through both necessity and choice, Mr. Ng spends long hours completely alone. As noted, he reads to his daughter and speaks with her as much as he can. He also remains in close contact with his wife and other family in Malaysia. However, he appears to be afraid of people he does not know. He is hesitant to speak with them or to engage them in any regard. That he has been able to speak openly with his Pretrial Services Officer Bianca Carter who has been a wonderful and supportive resource, and whose compassion has been a blessing to Mr. Ng and his lawyers, is a credit to Officer Carter and to Mr. Ng's ability to trust and even rely upon people once he sees they are good-intentioned and hope to help him.

Another person whom Mr. Ng met who had an important impact on his life was the Probation Officer, Jennifer Baumann. On June 24, 2022, Mr. Ng had a Pre-Sentence Investigation Report interview with Probation Officer Baumann. Toward the end of the interview, Probation Officer Baumann raised the topic of Mr. Ng getting mental health counseling, saying in substance, that Mr. Ng could benefit from such counseling. By early August, 2022, Mr. Ng was regularly seeing a therapist provided by the Court. By September 2022, Mr. Ng was provided with a Psychiatrist named Dr. Lama Bazzi. Doctor Bazzi has provided a Psychiatric Evaluation of Mr. Ng. (<u>See</u> Ex. 24, Psychiatric Evaluation.)

Being provided with a therapist and a psychiatrist by the Court was an important development for Mr. Ng. Mr. Ng had never spoken with a therapist until he spoke with Jennifer McCarthy in August 2022. (See Ex. 2, Letter of Roger Ng at 10.) Ms. McCarthy recommended that Mr. Ng come under the care of a psychiatrist, Lama Bazzi. In advance of sentence, we asked Dr. Bazzi to draft a Psychiatric Evaluation of Mr. Ng and she did so. (See Ex. 24, Psychiatric Evaluation.)

In relevant part, Doctor Bazzi stated that Mr. Ng "presented with depressed mood, heightened anxiety, rumination, fearfulness, and insomnia." (Id. at 5.) She reports that Mr. Ng "remained convinced that he was suffering from a silent illness that would kill him unexpectedly," and that he has somatic fears that "he is actually dying and no one will help him, and he imagines himself dead, alone, for days before anyone notices, almost on a daily basis." (Id. at 5-6.) She further reported that Mr. Ng "is hypervigilant and mistrustful, he has mood swings, he has difficulty sleeping, he suffers from foreshortened sense of the future, is constantly waiting for something bad to happen, and he lives in fear of those in authority who have control of his life subjecting him to solitary confinement or locking him in a small space." (Id. at 5.) The doctor observed that Mr. Ng "has nightmares, awakens in cold sweats on a nightly basis and is unable to sleep without ███████████████ or now, high doses of Gabapentin." (Id.) She further stated that "he has panic attacks in crowds because he has flashbacks to being in the bus, shackled to other prisoners, sick, vomiting, and suffering from diarrhea and delirium." (Id.)

The doctor continued, "He is desperately afraid of confinement and he dissociates completely when he thinks about how it will feel to be in a small room, alone, cold, and wet, again. He frequently hyperventilates when he thinks about confinement and the unknown nature of his future makes him feel more helpless, hopeless, and completely alone." (Id.)

Based on these and other observations, Doctor Bazzi diagnosed Mr. Ng as suffering from Posttraumatic Stress Disorder ("PTSD"), a psychiatric disorder occurring in people who have experienced or witnessed a traumatic event. (Id. at 4.)  In particular, the Doctor indicated that Mr. Ng's "experiences of confinement in Malaysia rise to the level of Criterion A of PTSD."  (Id. at 6.) According to the Diagnostic and Statistical Manual of Mental Health Disorders, Fifth Edition (DSM-5), Criterion A involves "exposure to actual or threatened death, serious injury, or sexual violence in one (or more) of the following ways: (1) directly experiencing the traumatic event; (2) witnessing in person, the event as it occurred to others; (3) learning that the traumatic event occurred to a close family member or close friend; and (4) experiencing repeated or extreme exposure to aversive details of the traumatic event (i.e. first responders…)"

In discussing Mr. Ng's PTSD diagnosis, the doctor further stated that Mr. Ng has "symptoms of genuine PTSD that he does not thrust forward and that he avoids discussing, if he can. He is emotionally detached from his experiences but simultaneously clearly has intrusive thoughts about his past and is scared to reactivate his PTSD and avoids talking about the details of his confinement." (Id. at 5.) She continued:

> that because Mr. Ng "suffers from PTSD and has frequent dissociation from reality, he sometimes appears unengaged in the conversation or distant from the emotions associated with his trauma. This is a hallmark of PTSD and is a primitive defense mechanism that occurs when he is flooded emotionally and feels completely incapacitated by his experiences.

(Id.) The doctor concludes that Mr. Ng's "symptoms are unlikely to resolve spontaneously:

> his PTSD is likely going to be exacerbated by confinement and by any experiences that reactivate his trauma. The prognosis for PTSD, even in the best of circumstances, is guarded because the individual must first be able to believe that the world can be safe for them and that they are competent in navigating their circumstances and that they have agency over their lives and their future. Because this is not the case for Mr. [Ng], it is likely that his PTSD is chronic in nature, and he will decompensate in times of stress and in situations that reactivate his trauma.

(Id. at 6.)

In light of the cruel and inhumane treatment Mr. Ng received in the Malaysian prison and the almost four years being 10,000 miles away from all the people he loves, Mr. Ng has come to suffer symptoms of PTSD that have never resolved. In fact, given the stress of the criminal trial, the uncertain nature of his sentence and when, if ever, he will be with his wife, daughter and other family again, Mr. Ng has been under overwhelming stressors which have caused his PTSD symptoms to remain as powerfully as ever.  As Doctor Bazzi makes clear, a sentence that requires Mr. Ng to go back to prison, after his experiences of prison in Malaysia, would exacerbate his PTSD symptoms. In a prison environment, Mr. Ng would decompensate because his trauma, which was caused by directly experiencing traumatic events involving death or threatened death, (see Criterion A of the DSM-5), was itself from his experiences in a prison.

However, aside from this small handful of people, Mr. Ng has experienced a form of loneliness over these four years that few will ever experience. This is due to the particular circumstances Mr. Ng has faced. First, being brutally mistreated in a Malaysian prison and becoming very ill. Second, by being away from everyone he ever knew and loved awaiting a trial of massive proportions, both for him and for his native country. While the experiences of defendants passing through the justice system obviously vary, there are a few that are so far outside the norm as to be truly unique. This is such a situation. Mr. Ng has vulnerabilities that are unique given these unique circumstances.

Another aspect of this case that presents a uniquely cruel hardship is the plight of Mr. Ng's daughter if he is sentenced to serve a jail term in the United States. As noted, ██████ was last with her father in the Fall of 2018, when she was six years old. In June 2023, she will be eleven years old. This five-year period is unlike anything affecting the typical U.S. prisoner, who is assured family visitation and can be physically present with his or her children. It would be a

hardship outside the heartland of typical hardship impacting children whose parent is in jail to keep Mr. Ng on the other side of the world from his daughter.

> 10. **As A Non-Citizen, Mr. Ng Is Not Entitled to Many of the Ameliorative Sentencing Provisions Available to U.S. Citizens.**

Finally, as a non-citizen, Mr. Ng is not entitled to many of the ameliorative sentencing provisions available to U.S. citizens. Consequently, Mr. Ng would not be eligible for the 12-month sentence reduction through the RDAP drug-treatment program (even though Mr. Ng has suffered ███████████████████ since being extradited) or eligible to serve the last 9-12 months of his sentence on home confinement or half-way house. As a result, a 30-month sentence in this case would only be reduced by 15% for good time credit, leading to Mr. Ng spending approximately 25.5 months in prison. Given his ineligibility for these provisions, a 30-month sentence for Mr. Ng is the equivalent of a 55-month sentence for a similarly situated U.S. citizen (i.e., 8.25 months off for good time credit, 12 months off for RDAP and the last 9 months in a half-way house or on home confinement, leading to approximately 25.75 months in prison on a 55-month sentence). Moreover, as a non-U.S. citizen, Mr. Ng would not be eligible to serve his time in a federal camp facility.

**<u>CONCLUSION</u>**

Roger Ng is a humble, hard-working, religious, good man. He has been taken from his country, his family, his friends, his home. Stripped of his dignity in a Malaysian prison, he has been made to be sick, afraid, alone and hopeless, and still suffers the debilitating effects of PTSD. There would be no more noble exercise of the truest form of justice than to permit this soul to return home after all he has already been through. We respectfully request this Court sentence Mr. Ng to time served.

Dated:   February 24, 2023
      New York, New York

            Respectfully submitted,

            Marc A. Agnifilo
            Teny R. Geragos
            Zach Intrater
            Jacob Kaplan