**UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK**

**18 CR 538 (MKB)**

---

**UNITED STATES OF AMERICA**

**-against-**

**NG CHONG HWA A/K/A ROGER NG,**

        **Defendant.**

---

**SENTENCING APPENDIX ON
<u>BEHALF OF ROGER NG</u>**

       **BRAFMAN & ASSOCIATES, P.C.
256 Fifth Avenue – 2nd Floor
New York, NY 10001
Tel: (212) 750-7800**

       *Attorneys for Roger Ng*

Marc Agnifilo
Zach Intrater
Teny Geragos
Jacob Kaplan
  *Of Counsel*

**United States v. Ng Chong Hwa A/K/A Roger Ng**
**Docket No.: 18 Cr. 538 (MKB)**

| | |
|---|---|
| Exhibit 1 | Statutory Declarations |
| Exhibit 2 | Letter of Roger Ng |
| Exhibit 3 | Letter of Julie Ng |
| Exhibit 4 | Letter of Sk Cheong |
| Exhibit 5 | Letter of Tan Soon Muay |
| Exhibit 6 | Letter of Ashley Ng |
| Exhibit 7 | Letter of Loke Sow Fan |
| Exhibit 8 | Letter of Lim Chee Khang |
| Exhibit 9 | Letter of Wai Yee Chiong |
| Exhibit 10 | Letter of Rudy Ng |
| Exhibit 11 | Letter of Tan Saw Hun |
| Exhibit 12 | Letter of Erlny Low Sze Wei |
| Exhibit 13 | Letter of ▮▮▮▮▮▮ |
| Exhibit 14 | Letter of Tan Ee Sze |
| Exhibit 15 | Letter of Teny Geragos |
| Exhibit 16 | Letter of Venerable Khenpo Tenzin Norgay Rinpoche |
| Exhibit 17 | Leissner / Low Recording |
| Exhibit 18 | Leissner / Lim Recording |
| Exhibit 19 | Letter of Pang Kim Bun |
| Exhibit 20 | Letter of Venerable Khenpo Ugyen Wangchuk |
| Exhibit 21 | Letter of Kin Hui Chang |
| Exhibit 22 | Ng Chong Hwa A/K/A Roger Ng v. Timothy Leissner, 159736/2022 |

**United States v. Ng Chong Hwa A/K/A Roger Ng**
**Docket No.: 18 Cr. 538 (MKB)**

|  | Summons and Complaint |
| --- | --- |
| Exhibit 23 | March 7, 2019 Letter from DOJ |
| Exhibit 24 | Psychiatric Evaluation of Roger Ng |

## STATUTORY DECLARATION

I, **LIM HWEE BIN (MALAYSIA IC NO. ███████████)** of ███████████ ███████████ Kuala Lumpur, do solemnly and sincerely declare as follows:

1.  I maintain the following bank account(s) in Singapore:

    (1)    Bank Name    :  OCBC Bank

           Bank Account No.    :  ████████

           Account Holder(s)    :  1.  Tan Kim Kuan
                                        2.  Lim Hwee Bin

    (2)    Bank Name    :  OCBC Bank

           Bank Account No.    :  ███████

           Account Holder(s)    :  1.  Lim Hwee Bin

2.  I am the beneficial owner of the following bank account(s) in Singapore

    (1)    Bank Name    :  Nomura

           Bank Account No.    :  ██████

           Account Holder(s)    :  1.  River Blue Investing Corp



EXHIBIT

**1**

*United States v. Roger Ng, 18 Cr. 538 (MKB)*

Page **1** of **3**

3. I have relinquished all claims to all monies in the said accounts.

4. Accordingly, I have no objection and consent to the following:

   (a) liquidating all investments (including, without limitation, fixed income, equity and derivative investments), if any, in the abovementioned bank account(s) into cash;

   (b) transferring all assets in the abovementioned bank account(s) (net of liabilities secured by the said account(s)) to account(s) as may be determined by 1Malaysia Development Berhad; and

   (c) Commercial Affairs Department's application under Section 370 of the Singapore Criminal Procedure Code to seek an order for the transfer of all assets in the abovementioned bank account(s) (net of liabilities secured by the said account(s)) to account(s) as may be determined by 1Malaysia Development Berhad (in such currency as 1Malaysia Development Berhad may deem fit).

5. I confirm that my consent is given voluntarily. I also confirm that I do not wish to attend the court hearing in relation to the application made under Section 370 of the Singapore Criminal Procedure Code application.

And I make this solemn declaration by virtue of the provisions of the Singapore Oaths and Declarations Act (Cap. 211), and subject to the penalties provided by that Act for the making of false statements in statutory

declarations, conscientiously believing the statements contained in this declaration to be true in every particular.

Declared by **LIM HWEE BIN**                    )

**(MALAYSIA IC NO. ██████████)**     )   

in  SHAH MQM Malaysia                              )

on this **30ᵗʰ** day of **October**   2018      )



...............................................
Before me
Notary Public

NOTARY PUBLIC
★ AL SABRI AHMAD **KABRI** ★
PN.S/JU/14/2
SHAH ALAM SELANGOR, MALAYSIA

## STATUTORY DECLARATION

I, **LIM CHEE KHANG (MALAYSIA IC NO.** ▮▮▮▮▮▮▮▮ **)** of ▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮, Terengganu, do solemnly and sincerely declare
as follows:

1.   I maintain the following bank account in Singapore:

    (1)    Bank Name    :  UOB
            Bank Account No.  :  ▮▮▮▮▮▮▮▮
            Account Holder(s)  :  1.  Lim Chee Khang

2.   I have relinquished all claims to all monies in the said accounts.

3.   Accordingly, I have no objection and consent to the following:

    (a)    liquidating all investments (including, without limitation, fixed income, equity and derivative investments), if any, in the abovementioned bank account(s) into cash;

    (b)    transferring all assets in the abovementioned bank account(s) (net of liabilities secured by the said account(s)) to account(s) as may be determined by 1Malaysia Development Berhad; and

    (c)    Commercial Affairs Department's application under Section 370 of the Singapore Criminal Procedure Code to seek an order for the transfer of all assets in the abovementioned bank account(s) (net of liabilities secured by the said account(s)) to account(s) as may be determined by 1Malaysia Development Berhad (in such currency as 1Malaysia Development Berhad may deem fit).

Page **1** of **2**

4.  I confirm that my consent is given voluntarily. I also confirm that I do not wish to attend the court hearing in relation to the application made under Section 370 of the Singapore Criminal Procedure Code application.

And I make this solemn declaration by virtue of the provisions of the Singapore Oaths and Declarations Act (Cap. 211), and subject to the penalties provided by that Act for the making of false statements in statutory declarations, conscientiously believing the statements contained in this declaration to be true in every particular.

Declared by **LIM CHEE KHANG**                    )

**(MALAYSIA IC NO. ▮▮▮▮▮▮▮**                    )

SHAH ALAM
in Malaysia                                        )

on this 30ᵗʰ day of  October   2018               )

Before me

NOTARY PUBLIC
AL SABRI AHMAD KABRI
Fv;S1/30/14/2
SHAH ALAM, SELANGOR, MALAYSIA

Page **2** of 2

# STATUTORY DECLARATION

I, **TAN KIM KUAN @ TAN KIM CHIN (MALAYSIA IC NO.** ▮▮▮▮▮▮▮) of 207, Jalan Sultan Zainal Abidin, 20000, Kuala Terengganu, Terengganu, do solemnly and sincerely declare as follows:

1.    I maintain the following bank account(s) in Singapore:

    (1)    Bank Name    :  OCBC
              Bank Account No.  :  ▮▮▮▮▮▮▮
              Account Holder(s)  :  1.  Tan Kim Kuan
                                    2.  Lim Hwee Bin

    (2)    Bank Name    :  UBS
              Bank Account No.  :  ▮▮▮▮
              Account Holder(s)  :  1.  Tan Kim Chin

    (3)    Bank Name    :  UBS
              Bank Account No.  :  ▮▮▮▮
              Account Holder(s)  :  1.  Tan Kim Chin

    (4)    Bank Name    :  OCBC
               Bank Account No.  :  ▮▮▮▮▮▮▮
              Account Holder(s)  :  1.  Tan Kim Kuan

    (5)    Bank Name    :  Nomura
              Bank Account No.  :  ▮▮▮▮
              Account Holder(s)  :  1.  Tan Kim Kuan @ Tan Kim Chin

(6)    Bank Name       :  OCBC

        Bank Account No.  :  █████████

        Account Holder(s)  :  1.  Tan Kim Kuan

2.    I am the beneficial owner of the following bank account(s) in Singapore

    (1)    Bank Name       :  Nomura

        Bank Account No.  :  ████████

        Account Holder(s)  :  1.  River Blue Investing Corp

3.    I have relinquished all claims to all monies in the said accounts.

4.    Accordingly, I have no objection and consent to the following:

    (a)    liquidating all investments (including, without limitation, fixed income, equity and derivative investments), if any, in the abovementioned bank account(s) into cash;

    (b)    transferring all assets in the abovementioned bank account(s) (net of liabilities secured by the said account(s)) to account(s) as may be determined by 1Malaysia Development Berhad; and

    (c)    Commercial Affairs Department's application under Section 370 of the Singapore Criminal Procedure Code to seek an order for the transfer of all assets in the abovementioned bank account(s) (net of liabilities secured by the said account(s)) to account(s) as may be determined by 1Malaysia Development Berhad (in such currency as 1Malaysia Development Berhad may deem fit).

5.    I confirm that my consent is given voluntarily. I also confirm that I do not wish to attend the court hearing in relation to the application made under Section 370 of the Singapore Criminal Procedure Code application.

And I make this solemn declaration by virtue of the provisions of the Singapore Oaths and Declarations Act (Cap. 211), and subject to the penalties provided by that Act for the making of false statements in statutory declarations, conscientiously believing the statements contained in this declaration to be true in every particular.

Declared by  **TAN KIM KUAN @ TAN KIM CHIN**          )

**(MALAYSIA IC NO. █████████████ )**          )

in **SHAH ALAM** Malaysia          )

on this **30ᵗʰ** day of **October**    2018          )

Before me

Notary Public

NOTARY PUBLIC

AL SABRI AHMAD KABRI
PN(S)/30/14/2

SHAH ALAM, SELANGOR, MALAYSIA

Page **3** of **3**

**ROGER NG'S PERSONAL STATEMENT**

February 24, 2023

Dear Judge Brodie:

My name is Ng Chong Hwa and also go by Roger Ng. I am a 51-year-old Malaysian with no other citizenship. I have been married to my wife since 1997 and we have one child who is turning 11 years old on June 3 this year. On Nov 1, 2018, I was arrested on a U.S. Indictment in Malaysia on the request of the U.S. Department of Justice (DOJ) and I went to prison that day. I have been away from my family ever since—it has been 1,576 days since I've held my daughter in my arms. I spent 183 days in solitary confinement in a Malaysian prison including more than a month in the hospital and prison infirmary. As soon after I was able to engage and consult a U.S. counsel on January 4, 2019, I waived extradition on February 14, 2019, and agreed to come to the U.S. because I felt then I would be treated fairly in this country. The FBI took possession of me in Malaysia almost three months later, on May 3, 2019, After a 3-day journey from Malaysia, I arrived in the New York on May 6, 2019. I have been here ever since. On April 8, 2022, I was convicted of all the crimes in the indictment and I am before you awaiting my sentencing. I write this letter in the hope that I can explain something about my family and also about me.

Your Honor, I was born as the second of three children to parents that you could say were opposites. My father was strict and authoritarian while my mother was gentle and kind. They were married for 50 years until my father passed away on January 21, 2015. My mother was a school teacher while my father was an engineer. My father's career provided me the motivation to work in banking and finance. My grandfather emigrated from China to Malaysia in the 1925 as a laborer due to the turmoil that was in China at that time. He had worked to support 8 children, including my father. When my grandfather was injured permanently from work, my father, born in 1945 and being the eldest son, aged 17, took over the role supporting his family. He worked initially as a school teacher and later a professionally qualified mechanical engineer through apprenticeship. It is perhaps because of these hardships that my father was very strict with our education and work ethic. The stories of the Chinese emigree families to Malaysia are not that dissimilar to that of those to the U.S. We saw education as the only way out of poverty.

Growing up, I was frequently disciplined severely by my father. This was because I never knew what I wanted. I spent more time on the school football field and then on my school work until I was ten. That year my grades were at their worst. I knew I had to face the abyss with my father but the worst was to come. I was disciplined with the usual caning and told I was beyond hope. He gave me $10 and told me to leave the house for good. It was a shock to me but leave the house I did nevertheless. I had walked 10 miles out of my home in a random direction before my mother came chasing behind to take me home 5 hours later. It was very traumatic then for me as a 10 year old and till today I have flashbacks of the event that day. I am just grateful my mother found me. Till today I cannot fathom how she did it, must be a mother's instinct. My mother, is 80 years old, suffers from heart illness and lives in Kuala Lumpur. The thought that I may never see her again leaves me feeling very depressed.

My father, though only 40 years old, began to suffer from severe diabetes with a heart condition. He was forced to retire from his work and he dedicated all his time to mentoring me and my siblings. To my surprise, this time it was without the cane. He told to me how he had built the national mint, how the coins were minted and their role in money supply, how those coins became credit and facilitated activity

EXHIBIT

**2**

*United States v. Roger Ng*, 18 Cr. 538 (MKB)

in the real economy and so on. It inspired me from that moment for a career in banking and finance. My father had a stroke and a heart by-pass operation in 2005 at the age of 62. The operation left him paralyzed and clinically blind. We cared for him for 10 years and he passed away on January 21, 2015, at the age of 72 years old due to heart and kidney failure.

With my father's mentoring, I started to do well at school. I worked every vacation from jobs at rubber factories in Malaysia to university dormitory kitchens and later bank internships while schooling in the U.K. to supplement my school fees. I attended government public schools in Malaysia until the age of 17 years old (1989) and excelled. In 1990, I went to London to pursue my college education and completed it in 6 months to save costs. There I met my wife, Hwee Bin, who was my classmate. Later that year we both enrolled in the same university in London. I married Hwee Bin on Nov 1st, 1997 and remain married with her 25 years to today. I met her when she was 18 years old. She is the only person I have ever dated. She started her career as a solicitor but stopped working due to difficulties of conceiving resulting from 15 years of trying to conceive. We were blessed, though 15 years after our marriage, with our only child and daughter, ██████ on June 3rd, 2012. They are both currently in Kuala Lumpur, Malaysia. Today Hwee Bin is 52 years old. She is also caring also for her 87 years old father who suffers from leukemia and heart illness and her mother, 80 years old, who has osteoporosis and scoliosis. Her father needs medical and blood transfusion every 3 weeks at the general hospital in Kuala Lumpur. Last September, when everyone at home contracted COVID-19, it delayed the scheduled blood transfusion for her father and caused him to lose consciousness and collapse. He broke his hip due to the fall which resulted in a hip replacement operation. Her parents had moved to Kuala Lumpur in 2011 due to the father's heart attack (and later leukemia) as access to the required medical facilities were not available in Kuala Terengganu, where they are originally from.

Until November 1, 2018 (before U.S. charges), I had supported her in caring for them. I helped them go through their medical treatments from hospitalization to post-operation care. Very early on, we had even made our home geriatric friendly - wheel chair ramps, lever door handles, nonslip floors, raised or high-profile toilet. Filial piety is deeply engrained for both us. For the past 5 years, Hwee Bin alone has been bearing these responsibilities. I fear she may be at her breaking point. She is the only care giver for both her parents and our child, this is something that worries me very much.

My brother in Malaysia currently looks after my 80-year-old mother, he is married with 5 daughters who are all in college and has many financial obligations. My sister, who is married with a son, only a year older than my own daughter, lives and works in London. Both my siblings have been financially supporting me with my living and legal expenses in New York these past 4 years. Due to their own obligations with their children and my brother's obligation to look after my mom, neither can help Hwee Bin with her obligations. I feel contrite that I have been adding to their burden.

Your Honor, I have led a hardworking, ethical and frugal life. I did not indulge in excesses and have dedicated my spare time to my family and religion. My family and I are Buddhist, devoted in our believes with the Tibetan Buddhism Nyingma tradition at the Palyul Monastery in Tibet and its affiliates in Malaysia[1]. We have also been long term donors to Shelter Home[2], a registered welfare organization, which has been in existence since 1981 to help abused, abandoned, neglected or at-risk children in Malaysia. The story of Shelter Home was born from our daughter. When she was born prematurely in

---

[1] https://en.wikipedia.org/wiki/Palyul_Monastery
[2] https://www.shelterhome.org

2012, we discovered that her nurse that had to abandon her 7-year-old son at this shelter as she was a single parent. As new parents, we could not begin to imagine her plight of having to do this. We made the decision to not only support the shelter, but her 7-year-old son. I look back today on when I was being arrested, ███ too was about 7 years old. I now can relate to that deep pain of separation of parent from a child.

Upon graduating in 1993, I had returned to Malaysia and started my career in banking as a project finance loans officer with a Malaysian bank. I had worked for 2 years before returning to U.K. to pursue my MBA in 1995 after having sufficient savings to supplement my school fees. During my MBA, I interned with Deutsche Bank in London and later worked with the bank for 10 years in Asia. In 2005, I was head hunted by Goldman Sachs to work in Hong Kong. I left in 2014, after about a decade. In my career with both banks, I worked 16-hour days, usually 7 days a week.

I was not blessed with enough time to be with my father as he passed away on January 21st, 2015, shy of a year after I left my job to care for him. It was only after this that I had time to contemplate on what to do next. Around early March 2015, I had, at the invitation by Tim Leissner, invested US$1.25 million or equivalent of 1,453,488 shares in Celsius Holdings Inc. (the energy drink company[3]). I had even travelled to Los Angeles on March 27th 2015 to meet with the representatives of the company and Horizon ventures Hong Kong (shareholder). The company and its shareholders, Horizon Venture Hong Kong and Leissner subsequently proposed that I join the company, first as a consultant and later as the head of the Hong Kong office, to help build and lead their franchise in Asia. I had believed in the company, but my trust with Leissner was misplaced. I would later learn that he would blatantly defraud my family and I of millions of dollars more.

At Celsius, the energy drink company I joined after Goldman Sachs, I was highly commended by the Chairman, CEO and Director International Business when I successfully made Celsius's first ever distribution in Asia (Singapore and Hong Kong) in 2017. I had worked hard and diligently and even set up the Celsius Asia office in Hong Kong and China until my arrest in November 2018. In December 2018, Celsius terminated me on the basis that I was not contactable (I was in jail). I lost my job and share options amounting to some 125,000, worth over $12.5 million today.

Your Honor, turning to this case, the first and foremost I want to express is my gratitude and thanks to you. While many matters outside Your Honor's control made this process difficult, Your Honor was always available to me and my attorneys whenever issues would arise. Your Honor always allowed my attorneys speak on my behalf and would render decisions that you did believe was just and fair. When my attorney, Marc Agnifilo first met me in prison in Malaysia, he said that he could not promise any particular outcome but promised that the process would be fair. It was. I am very thankful for all the time that Your Honor has devoted to my case and made it a priority given I have been away from my family for so long. I want Your Honor to know I appreciate this very much.

I do understand that I am not telling Your Honor that I am guilty. My attorneys have told me that it is typical and expected at sentencing for a defendant to admit responsibility for the actions a defendant was convicted of. My lawyers have also told me that a defendant must always only tell the truth. As such I am. The only way to explain my actions, even so prior to the trial, is to share with Your Honor that I believe I am not guilty. When the FBI and Government prosecutors asked for my cooperation before and

---

[3] https://www.celsius.com/

after I had arrived in New York, I wanted to cooperate. I had cooperated with Singaporean authorities for three months the year before my arrest. But, I was told that cooperation required me to plead guilty. I could not truthfully do that. Even though I could have saved years of being away from my family, and even though I was told I would likely not serve a day in jail if I cooperated, I could not truthfully say that I helped bribe the Prime Minister of Malaysia when I had no knowledge such a thing was happening. And so, I am simply unable to honestly say that I am guilty. But, Your Honor, I maintain my utmost respect for the U.S. Court system and Your Honor's position through the entire process this past 5 years. I also want to say that I accept the jury's verdict, even though I believe it is not the right verdict. I respect it because of the process of which the verdict is a part, and the process is very worthy of respect.

I was initially approached by a government body investigating the fraud in 2015. On August 20th, 2015, the Malaysian Anti-Corruption Commission (MACC) had approached me for documents relating to the 1MDB bond issue that Goldman Sachs arranged. I had co-operated and directed them to appropriate persons at Goldman Sachs as I was no longer working there and did not retain any documents. After this on August 8th, 2017, while I was visiting Singapore on behalf of Celsius, I was asked to report to the Singapore Police Force to assist them in their investigations of 1MDB. I spent 3 months cooperating and interviewing over 20 times with Singapore Police and Monetary Authority of Singapore. On November 8th, 2017, I was allowed to leave to attend to my Celsius work related meetings in Kuala Lumpur, Hong Kong and Beijing but needed to return to Singapore on December 6th, 2017 to continue my cooperation with the Singapore Authorities. The authorities in Singapore claimed that the Silken Waters/Victoria Square funds were derived from 1MDB. This was the first time I had heard of this. The investigations into me continued in December 2017, when I tried to return to Singapore, the Malaysian authorities prevented me. I immediately informed Singapore Police and my lawyer in Singapore and even offered to meet Singapore Police at the Singapore embassy in Malaysia. I have persistently showed my respect for, and never fled from, any investigating authorities since the beginning in 2015.

Around June 2018, one month after the change of government in Malaysia, the Malaysian Police-Commercial Crimes Investigation Department (CCID) called me for an interview to assist in their investigations into 1MDB. I cooperated. My wife, Hwee Bin, her mother, and her brother were also interviewed about their family funds. When told that funds they had were connected to 1MDB and to do the right thing, my in-laws voluntarily surrendered their funds. They agreed and executed all surrender documents before October 31, 2018. In total, I think they surrendered more than US$35 million as one of their bank accounts included 499,500 shares of Celsius Holdings U.S. Inc shares which alone is worth US$50 million today. My in-laws did not think they had committed any crime but this was the only way my elderly father in-law would be allowed to get lifesaving surgery scheduled to be in Singapore as a travel ban was placed his wife and children, his primary care givers. This monies also included US$2.02 million in funds that my wife and I had deposited into the family funds that was in no way traceable to 1MDB and my brother-in-law Chee Khang's money of US$1.0 million that did not come from 1MDB. Nonetheless, we gave this money to the government.

The very next day, on November 1, 2018, the same Malaysian Police asked me to meet at their offices in the late afternoon. Unbeknownst to me, at around 7 pm in Kuala Lumpur, the indictment naming me as a defendant was unsealed in the U.S. I was shocked to say the least and unprepared. FBI agents who were already in Kuala Lumpur arrived at the CCID office and asked me to cooperate with them and provide statements. They said that if I did, I could avoid spending even a single day in jail. I expressed I was willing to cooperate as I consistently did in the past with other authorities but needed at least to be represented given I was unfamiliar with U.S. laws. However, I was unable to engage a Malaysian lawyer

let alone U.S. attorney that day and by 10 pm, the same Malaysian Police said that they were arresting me on U.S. extradition request in relation to the US indictment. That evening, November 1, 2018, for the first time in my life, I was brought to a jail holding cell. It was in one of the main police stations in Kuala Lumpur. My wife was weeping as they took me away and it devastated me more to see her in her state than being in a jail cell my first time.

The next morning, I was brought to court and denied bail on the basis that the U.S. government insisted I be detained. I was transferred to the Sungai Buloh prison[4] 30 miles outside the city, in an area surrounded by palm oil plantations. For the second time, my heart broke when I saw my family tearing as I was being carted away. As I arrived at the prison facility in the afternoon, it was dark with the overcast of a monsoon storm. I was processed, strip searched, and my head shaved bald. This process took many hours and I was placed in a solitary confinement cell only in the late evening. There were no visible clocks to tell time but I could hear the last prayer call for the day *(Isha)* from the prison mosque which indicated it was past 9 pm. I was placed in solitary confinement in a 12ft x 6ft cell alone with a single hole in the ground for sanitation, a single water tap and with a narrow opening 2ft x1ft for ventilation. The narrow opening allowed access to "air" which the only ventilation in the constant 90°F humid tropical heat but unfortunately also the mosquitos, rats and other vermin from which I later contracted infectious diseases from. When I was not in the hospital or the prison infirmary, this was to be my home for the next 183 days.

The first 2 weeks was absolute hell for my family as they had tried to visit me at the prison but were told there was no such inmate. They had to plead and seek the help from the same police officers that forced them to surrender their family funds just to learn that I was alive and could be located. Those first two weeks I spent in jail, I was in true solitary confinement, isolated in a cement cell. It contained a single hole in the ground for sanitation and a single water tap without windows, a bed, running water, or plumbing. I was isolated with no communication and slept on the bare cement floor. Later, my mind started playing tricks on me. This was mentally very disturbing for me, as I was mentally suffocating and suffering from intense claustrophobia. I have a hard time, Your Honor, putting into words what prison in Malaysia was like. Those first two weeks felt like a pressure chamber. I heard things that were not there; I saw things that did not exist; and I hallucinated. I would hear other inmates on the block scream for hours on end, until they fainted or fell asleep. The only way for me to survive was to go to a place in my brain that did not exist—essentially, I mentally left to another world.

After two weeks, I was given a thin latex mattress, a blanket and a single plastic canteen cup which is used for everything from containing water for bathing and consuming water to food rations. For two weeks, I could not brush my teeth or bathe. I finally saw my wife and my brother—they provided me funds in the commissary for me to purchase basics like clothing, soap, a toothbrush and toothpaste. They were allowed to visit me once every week for 40 minutes. The prison block I was held in was dedicated to high security risk and high profile inmates. It was notorious for housing inmates who committed crimes while in the prison, including murder and drug distribution, and detainees detained without trial for national security reasons. I constantly had a heightened sense of fear and hypervigilance.

The lights in the cell were kept on 24 hours a day. The wardens woke me up every two hours during the night to ensure I was alive**.** I developed severe a sleep disorder and insomnia issues that I have not been able to recover from since**. I was only allowed out of my solitary confinement once a week for**

---

[4] https://en.wikipedia.org/wiki/Sungai_Buloh_Prison

**one hour into a yard for sunlight.** Otherwise, I was confined to my cell alone all the time. The cell was always damp and vermin infested. There were frequent altercations between the inmates and the wardens in the block and inmates would be subdued with brute force with of thick rubber pipes as batons. The yard time was retracted as collective punishment for everyone the entire block and on many occasions, I was in solitary confinement for as long as two weeks without being let out at all and no sunlight. Many days I would be confine 24 hours in the cell without any interaction.

Within the first month of being imprisoned, I fell very ill. On November 18th, 2018, less than three weeks after being detained, I was vomiting constantly and experiencing severe diarrhea. I asked for medical treatment but was declined and issued only paracetamol (known as Tylenol in the U.S.). I did not recover and felt very ill and delirious. Three days later, I was allowed to visit prison infirmary to seek medical treatment, and I fell unconscious several times on the infirmary floor. When I came around and was attended to by the prison infirmary medical assistant, he diagnosed me with dysentery and issued me with re-hydration salt, anti-vomit medication and more paracetamol and sent me back to solitary confinement. After a week, I still did not recover. By November 26th, my condition worsened, I was also feeling extreme chills and body aches.

Despite my illness, I had to continue to appear in court for case management. To get to court, we were hand cuffed together in a 20-person single long chain. We were then loaded into an overcrowded police truck.[5] The hour long journey in the police truck to the court house was a treacherous given we were all chained together with no seats while moving at very high speeds. Today, I still have flashbacks of being herded in chains and sometimes walking in public place can be so overwhelming that I have to leave.

On November 30th, I asked for medical treatment once again as my condition continue to deteriorate. It would only be three days later on December 2nd, that I would be attended by a doctor and finally, a blood test was done. I was called back to the prison infirmary the next day, as I was tested positive for Malaria and Leptospirosis (a bacterial disease spread through the urine of infected animals)[6]. That day I was immediately transferred to the emergency ward of a civilian hospital as the illness could not be treated within the prison. At the hospital, I was chained to the bed and in quarantined ward for treating Malaria, as the virus was deadly and transmittable, for one week. After that, for more than a month, from December 9th and January 16th, I kept in the prison infirmary and was in an out between the hospital for treatment. I was constantly vomiting and purging (blood). I could not eat. In less than three months, I lost nearly 40% of my body weight. I knew that I was dying.

I did not know at the time, of course, but I learned later, the Malaysian Police raided my home during this period. They sought what they claimed to be illegal proceeds relating to 1MDB. They arrived in the middle of the night when my wife, 6-year-old daughter and my elderly in-laws were fast asleep. The police seized their cars and took the equivalent of about US$10,000 in local currency (which was Chinese New Year red packet money from the family). They froze my wife's bank accounts and my bank accounts, and they wanted to forfeit funds within them claiming they were illegal proceeds from 1MDB. None of this was true. The vehicles were returned before the end of 2019 and the bank accounts unfrozen by the Malaysian Courts on November 8, 2021. However, the incident left an indelible mark on my family, especially my young daughter.

---

[5] Appendix 2 illustration - http://pahang-ku.blogspot.com/2013/05/banduan-lari-dari-trak-polis.html
[6] https://en.wikipedia.org/wiki/Leptospirosis

Your Honor, I finally met my U.S.-based attorney, Marc Agnifilo, on January 4, 2019, nearly three months after being in prison. I had only met him at court during my case management and was unable to have further consultations despite pleading with the Judge, Prison Authorities and the Home Ministry in Malaysia. The next time I met Marc was on February 13, 2019, during his second trip to Malaysia where with the assistance of the U.S. government, which I was very grateful, he was able to gain access to meet me in the Malaysian prison. He brought with him, from New York, the proposed terms of my consent to waive extradition if I agreed to face trial in the U.S. I believed that I was innocent and wanted to face trial, but the hardest part was the thought of not seeing my family. It was a difficult decision, but I decided to come to the U.S. to prove my innocence. In court, my lawyer requested that I be extradited within 30 days, but I was not extradited for nearly 3 months. I was still recovering from earlier infections and was not eating at all to avoid getting ill again from dysentery or other sickness. I loss more weight. I constantly feared I would not live long enough to be extradited. After waiving, I never could have imagined that agreeing with Marc that day to come to the U.S. back then, it would be 1,576 days to this day from when I was arrested in Malaysia on the U.S. extradition request.

Six months in the Malaysian prison had a devasting effect mentally and physically. Until today, I find myself reclusive socially as I continue to deal with this brutal and distressing experience. The time without sunlight and in isolation made me lose my mind and become frightful. I am scared because I have been there before and I am scared to go back again. I suffered from chronic insomnia from this—a condition I never had before, despite constantly traveling for work. I experienced a feeling of hopelessness that I have not recovered from since. November 1st, 2018 was the last day I had any friends or social interaction. Until today, my only social interactions are with my attorneys and my family, who I speak to over the phone. I have a fear of engaging with people—how do I engage with them? How do I speak with them? How can I feel safe in a stranger's presence? I cannot.

After waiving extradition, I stayed in Malaysia in these conditions for another three months. Three days prior to leaving Malaysia with the FBI, I was moved from the prison facility to a local police station holding jail cell. I was placed in a holding cell initially alone but awoken in shock suddenly in the middle of the night with more than 50 other people crowding in. I later discovered they were Rohinga refugees that fled persecution in Myanmar and were relocated in Malaysia. [7] They were arrested for working illegally and had plights worse than mine. Even until today, I occasionally wake up hallucinating that there is a crowd always next to me.

My journey to the U.S. took another three days. After arraignment on May 6th, 2019, I was released on bail but placed on house arrest. For three weeks, I was confined to the apartment and allowed 90 minutes of laundry once a week and 90 minutes of food/grocery shopping twice a week. I was only allowed to meet with my attorneys on request, but my attorneys were engaged in a trial, so I was not able to see them often. On May 22nd, 2019, I was allowed 60 minutes outside three times a week after a medical doctor in New York that requested for daily exposure of sunlight and exercise due to my history of confinement.

Under house arrest and alone in New York, I was grateful for basic necessities, such as sanitation with plumbing, running water, windows and shelter. However, the isolation and road to recovery has been long, unrelenting, and full of hopelessness. I finally obtained a phone which gave me access to FaceTime with my family but I had no interpersonal interactions. I found myself confined again like I was during my

---

[7] United Nations High Commissioner for refugees

7

6 months in prison in Malaysia. I did not have anyone to interact with so I kept to myself, alone and more than 10,000 miles away from home. It was hard, I was still reeling from what had happened in the last six months after my U.S. indictment, and my health recovered slowly. I was now an accused. I was desperately in need of religious guidance and help at the Tibetan Dharma Centre here in New York which I did not have the opportunity to visit until early 2022 for a variety of reasons.

I continue to have relapses and nightmares from my imprisonment in Malaysia. This has led to sleep impairments and impulse control problems. I have first dealt with this by self-imposed isolation. Avoidance, however, only offered temporary relief of the symptoms. I resorted to ███████████ to calm anxieties and medicate my insomnia issues in the evenings. I am grateful to the Probation Department, who referred me to a psychiatrist and therapist who have been helping me through these issues since August 2022.

During this period, I devoted all my time to reviewing and understanding the indictment to prepare for the trial. The day started with rising early at 6 am. After performing my religious practices, I would FaceTime my family as they concluded their dinner on the other side of the world. Every day, I would read to my daughter before her bedtime before setting out for my attorney's office to review trial evidence.

Reading to my daughter to sleep was something that I had done for her without fail since her birth in 2012, except for the six months during my imprisonment in Malaysia. I still remember finally completing a book entitled "Sophie's World"[8] which I had started prior to my arrest in Malaysia when I had arrived here. My sister had brought that book with her at my daughter's request who wanted me to finish it with her. She had secretly placed a bookmark in it with a note *I already miss you* in her own hand writing.[9] I carry it with me every day to remind myself that despite the imprisonment and current house arrest, I was very thankful I was able to see her even if it was remotely. All I wanted was the chance for a fair trial and return to home to her. I have since read her countless books every night before bed. Recently, we completed a historical novel entitled "New York."[10] It chronicles the birth and growth of New York City, from the arrival of the first Dutch and other European colonists in the 17th century to the summer of 2009. It builds on the histories of fictional families who live in New York. These families represented the successive waves of immigrants who have made the city multicultural. I hope that if she ever visits New York one day, she will one day see it unlike the way I have.

Every morning, my daughter would FaceTime me at 6 am when she wakes up while it would be 5 pm in New York. She would want me to stay online with her while she prepares for school. She does this religiously. She reminds me that on November 1st, 2018, I told her I went for a meeting and have yet to return home. I was without contact for more than 6 months. If there is any time that I am unavailable she develops a panic and frantically calls repeatedly. Our FaceTime when she wakes up at 6 am and goes to bed at 9 pm have become sacred for both us to ensure she does not experience another traumatic event. I am gutted every time I think of how all this has badly affected her since she was six years old.

I was granted a new sense of purpose with the day was now occupied with connecting my daughter and family followed by reviewing evidence to prepare for the trial early that next year. I had

---

[8] https://en.wikipedia.org/wiki/Sophie%27s_World
[9] Appendix 3 - illustration
[10] https://en.wikipedia.org/wiki/New_York_(novel)

sight of a path to return home to my family. These hopes were soon crushed. On March 15th, 2020, U.S. instituted a nationwide shut down due to the COVID-19 pandemic. Broadway in Manhattan, near where my apartment was, shut down. My attorney's office, the only other place I could go aside from my single room apartment, was also closed. I then went more than three months without the interpersonal interactions with my attorneys. During this time, I also witnessed destructive riots outside of my apartment building between 8th and 9th Avenue in Times Square. The shouts, screams, and noises made me scared. I was depressed as I knew my trial would be delayed, once again, but without certainty this time given the severity of the pandemic. I did not communicate in person with anyone in New York for the entirety of the shutdown.

During this time, all food outlets closed except for delivery. The apartment in the building I rented prohibited all deliveries to the apartment doorstep. Deliveries were only allowed at designated areas at the ground lobby and resident recipients were required to collect on person from the lobby. These COVID-19 protocols were similar in most buildings throughout the city. Given the Pre-trial conditions, I was restricted from leaving my apartment unless prescribed. I would buy as much as I could carry during the bi-weekly of 90 minutes of grocery time provided. I would ration my food during this period. Even though, Pre-trial allowed me to leave the apartment to collect my food delivery when requested it would take a while to respond. I passively accepted the severely restricted acts of daily living within those environments. In keeping with my Buddhist beliefs, I repress all my personal lifestyle preferences.

During this time, my home in Malaysia had also similar lock down conditions, even more draconian. Only one person in the household was allowed to purchase food supplies and there were nationwide curfews in the evenings. My wife being the only able adult was the only one the household relied on for food supplies. I was constantly stressed and worried that if she fell ill and had to be moved to a quarantine location, the family would have no access to food supplies. What if her condition worsened during quarantine and she died, leaving my daughter alone with her elderly grandparents -- what would happen to the old and young at home? I was constantly anxious and negative. I felt a sense of constant self-doubt and helplessness. Alone, with no one to reach out to. I was exhausted and burned out thinking repeatedly about these things. I was not able to sleep due to worry. Many days again I spent 24 hours isolated without any interaction with anyone. Looking back to this period, my attorney Teny Geragos indirectly distracted me and might have prevented me from slipping into a major depressive disorder. Teny dedicated at least 10 hours a day to monitor me on Zoom (a condition imposed by the government) as I reviewed the trial evidence online from my apartment.

Even after New York's Phase 1 re-opening in June 2020, I still had an inherent fear of infection given my history of medical illness. In fact, around Autumn 2020, I fell very ill with high fever and other COVID-19 like symptoms. There were no vaccinations until March 27th, 2021 for the vulnerable (immunocompromised) and adults my age. Yet even after these vaccines, I continue fall ill and test COVID-19 positive frequently, the most recent being last October and January this year. Being alone, I had no one to reach out to for care other than self medicate with "paracetamol" and wait out the illness, usually for up to 10 days. I had flashbacks and trauma from the experience of falling severely ill while being imprisoned awaiting extradition in Malaysia.

Your Honor, on January 28th, 2021, you kindly granted relaxation to my house arrest and allowed me to be out from my apartment from 8 am to 8 pm. Thus, after 635 days in my apartment in New York, I had a chance to manage a lot of the difficulties faced during COVID-19 lock downs including regaining my sanity. I am deeply grateful to you. I still recall the first time I was allowed to have more than 60

minutes of outside exercise time, I had visited the Central Park in Manhattan for first time two years after arriving in New York. I was very thankful for this and had no one to tell except my family and my attorneys.

Since my arrest and indictment on November 1st, 2018, most acquaintances I knew ceased to contact me or avoided me. This scarring of the indictment was permanent on me and pushed me more into a reclusive state. I only interacted with my immediate family and attorneys. It has been 1,388 days, or nearly 4 years, now since arriving in New York on May 6th, 2019. I have no valid passport, no bank account, no medical insurance, no ability to work and no ability to support myself. I do not know what my future will be like with this conviction and potential sentencing. I am not sure if I can even pick up my life with the mortgages, debts and other obligations I have incurred since 2018.

Your Honor, last year the Court Probation Officer Ms. Jennifer Baumann and the Pretrial Office provided me psychiatric assistance. They assigned me to see a mental therapist weekly [11] and a psychiatrist[12] monthly since August 3rd, 2022. My therapist had diagnosed me with severe depression and anxiety. In the past 7 months, my psychiatrist prescribed a drug called Gabapentin to help treat █████████ and help with my sleep disorder condition. The therapy is something very new to me. I found talking about mental issues extremely uncomfortable. I have never been treated by a mental therapist or psychiatrist before. My life and self dignity is at a low point. I feel particularly sad and depressed when we had to speak about my daughter. I have forsaken her. Not being able to be there in person as she faced traumatic experiences as a young child since she was six years old. The many difficulties at home and at school she has had to encounter everyday due to her father's absence, trial and now conviction in the U.S. for conspiracies involving with 1MDB saga has engulfed my entire nation. I am truly concerned and worried. When I speak with her she tries to appear unaffected and unaware of what has been happening but deep inside I know she is fully aware given the exposure to the internet and the coverage of my trial. I constantly think about the conversation I would have with her the day I return to my home to meet and speak with her in person. The many version of how to begin this conversion has been replaying in my mind thousands of times with no conclusion.

I sometimes have obsessive thoughts that I cannot control. My prolonged solitary confinement has imposed both social isolation and sensory deprivation. I have developed what I can only describe as a regression into myself and I cannot plan anything beyond the moment. This feeling is very helpless. To be completely honest, I have been barely holding on to my sanity going through these past 5 years by relying on the practices and refuge of Tibetan Buddhism at the Dharma Centre in Queens. Your Honor has on several occasions granted me reprieve orders on my curfew to attend the prayers and practices in person at the center. I am extremely thankful to you for these opportunities.

Your Honor, I contracted Hepatitis B when I was 13 years old in 1985 and was on medical treatment for 10 years until 1995. To this date, I have to frequently monitor my liver condition. Contracting Leptospirosis and Malaria during imprisonment in Malaysia in 2018 and 2019 has stressed my immunocompromised condition. In 2007, I suffered acute arthritis. My knee joints had to be aspirated frequently as there was constant fluid build up and was treated with injected steroids. I was initially on wheel chair and later crutches for over 6 months. My 2011 severe bicycle accident in Malaysia has also left me with lower spinal nerve and hip related issues even to the present day. I am currently in pain when walking short distance and have control and mobility issues with my legs. I have been deferring

---

[11] Dr. Jennifer McCarthy PhD and Mr. Alan Gonzales of The New York Mental Health Group
[12] Dr. Lama Bazzi, MD, (https://drbazzipsychiatry.com/)

comprehensive spinal and nerve related medical treatment to when I return home Malaysia due to the cost of healthcare in the U.S. However, the pain has become unbearable and started physical therapy in New York last November in the interim. The prolonged psychological stress has also manifested into my physical symptoms. In January this year, Dr. Lama Bazzi, my psychiatrist, increased my psychiatric medication dosage, at my request, to help my worsening anxiety and insomnia. As part of this she ordered bloodwork to be done. The bloodwork results showed that my red and white blood counts is below normal healthy limits and I have excess Hemoglobin concentration.

Your Honor, I will never have a career in banking or finance with this conviction and potentially other charges in Malaysia. I will struggle to find employment in order to support my family and pay back my debts accumulated from this litigation and unemployment during the past five years. The loss of my ability to work has brought ruin to me. I have always been passionate in finance but this ordeal has branded me an outcast and I know I will never be able to work to support my family in this or even other industries again. I will not be able to recover from this stigma. My family has been ostracized by our community because of me. I am embarrassed and ashamed that I have failed them. The road ahead is long and unclear.

Many who know me have written on my behalf asking for leniency. As you must sentence me, I ask that you allow me to repay through a sentence that is productive. I do not want to live with resentment and want to find a way to redeem myself. My family is better with me available rather than incarcerated. I have lost my father over illness that lasted over 30 years with his last 10 years being bed ridden and I know the challenges as one of his care givers. My own mother, my mother and father-in-law are all over 80 and this is the time that they need to be cared for. My daughter ███████ turns 11 this year and starts high school the next year. She has been growing up without me the past five years and enduring many ordeals at school that is related to me. My wife, whom I love very much, has been bearing the burden of the being the sole care giver to everyone at home and relying on the charity of relatives financially and emotionally. I have been arrested, imprisoned, living alone under house arrest, supervised by pretrial and suffering a variety of medical issues. It is destroying me thinking that my family will be further punished without me.

Your Honor, while I stand before you to be sentenced, please know that my life has been completely changed since 2017. I am ashamed of how this has affected my family but overwhelmed by their support of my innocence, despite the indictment and conviction. Many of the discussions and letters have reminded me that I am a good person and can still do good for my community and society. I can only hope you can take this into account when I am judged. I plead for your mercy. Thank you.

Yours sincerely,


Roger Ng

**Appendix 1**

*A sketch of the Tawakal cell where I was imprisoned for 183 days.*



Source : https://cilisos.my/wp-content/uploads/2018/07/Alvin-picture.jpg

**Appendix 2**



*Source : http://pahang-ku.blogspot.com/2013/05/banduan-lari-dari-trak-polis.html*

**Appendix 3**



The Honorable Margo K. Brodie
Chief United States District Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, NY 11201

Re: United States v. Ng Chong Hwa a.k.a. Roger Ng, 18 Cr.538 (MKB)

Dear Judge Brodie,

My name is Julie PeiSze Ng and I am Roger's younger sister. I am 46 year's old, 4 years younger than Roger. I currently reside in London, United Kingdom and have been for over 20 years. I am married and have one son,                who is now 11. I work as a ratings analyst at Moody's Investor Service London, UK and have been since 2007. I graduated with a B.Eng. degree from Imperial College London, U.K. where I read Mechanical Engineering. I also have an MBA from the Imperial College Business School.

I spent the definitive years of my life in Kuala Lumpur, Malaysia growing up in a family of 5 where I am the youngest of three siblings. My father who has since passed, my mother, my older brother, Rudy who is 6 years my senior and Roger make up the core of my family. I remember that my parents worked very hard to support us as they would come home relatively late. My older brother, Rudy was very studious and very mature for his age. As such it was always Roger who would be the one playing with me and hence my closeness to him.

As with all siblings, it is a love hate relationship. I was the annoying little sister that he was stuck with who wanted to follow him everywhere. We would fight, scream and shout and managed to get into a lot of trouble with our father, who was very strict. But when push comes to shove, Roger was always there for me. I remember an incident when I had just started kindergarten in the same school that Roger was in. It was raining heavily that afternoon and the path leading to the school bus was flooded. I so scared that my mother would be angry if I got my brand new white school shoes dirty in the muddy waters. I flatly refused to budge and valiantly he carried me on his back so that I would not dirty my shoes.

Over the years, both my brothers had left home for university and I was at home with my parents. I was a stroppy teenager with both my parents constantly on my back. It was through Roger's regular letters that calmed me down. When I was studying for my Master's in 2003 in London, U.K. Roger, would take the effort to stopover and check on my wellbeing, no matter how hectic his schedules were, to catch up with me over a meal or a drink. I remembered he once fell asleep while he was talking to me as he had been flying through 3 different time zones in 3 days.

In 2005, my father had a stroke and was bedridden. I had just graduated and started a new job in London. Roger had also just started his job at Goldmans in Hong Kong. I had half the mind to quit and come home to help out my mother but my older brother Rudy insisted that I stayed on and pursue my career. Rudy subsequently moved in next door to my parent's home so that he could take care of them. Roger would take every opportunity to stop over Kuala Lumpur and spent time with my parents and I would come home at least twice a year to see them. Even though we were apart physically we had managed to keep a tightly knit relationship. As my father's health deteriorated over the years, I knew that Roger was planning to take a step back in his career or somehow find a way to come back to Kuala Lumpur. Hence it was no surprise when my mother told me that Roger had decided to retire from Goldmans in 2014. I believe one of the reasons for this was also due to the arrival of his daughter,              in 2012, after 3            over the span of 10 years.

1

EXHIBIT
3
United States v. Roger Ng, 18 Cr. 538 (MKB)

Never have I seen him so happy and contented. We were all truly happy for Roger and his wife, Hwee Bin. His life revolved around her and they were inseparable. ███ and Roger would have date nights on Fridays at a pizzeria near where they live. The pizzeria even named ███ 's favourite pizza after her. When Roger was held unexpectedly in November 2018, ███ would secretly cry (as she did not want to upset her mother) to sleep every night hugging her father's shirt. In that sense, ███ is very much like her father. Even in times of great adversity, she would always consider other people feelings in lieu of her own. I recalled when I saw him for the first time after he was imprisoned in November 2018, he had lost so much weight and looked horribly gaunt. I knew through Rudy that he was living in a hell hole. He had been put in a high security prison along with very hard core convicts. And yet when I met him, he gave me his usual smile and asked me how I was and how long I was home for as if everything was ok. I recall receiving a call from my sister in law later than year that Roger had been admitted to the hospital and that he had almost died.

When I got the call from Rudy in May 2019 that Roger was finally being extradited to the United States after waiving extradition three months earlier, I flew to New York to be there for Roger as the other members of my family were unable to travel. I took every opportunity I could to be there with him as he was under house arrest and was all on his own. I know he feels bad having to rely on all of us to make ends meet. He is constantly worried about how he will ever pay everyone back and is always keeping tabs on how much debt he has incurred since the start of this. When the pandemic hit, I was unable to fly to New York for up to 2 years. We would regularly speak over facetime and I could sense his frustration. I could feel that he is exhausted and at the end of a very thin rope. And yet, he would put on a brave face, always cheerful and smiling whenever we spoke. Roger had everything he could wish for. A childhood sweetheart whom he has been married to for over 20 years and a beautiful funny daughter, and in a blink of an eye, everything has vanished. Roger has worked so hard all his life.

My brother has been living in isolation, away from family, friends as well as without employment in a foreign country for almost 5 years. I am still struggling to make sense of the tribulations that he has faced over this period of time, across some really rocky patches given Covid. This absence in itself, has already taken a heavy toll on him and his family. He is not a bad person. Everyone who knows him will remember him as kind, humble, and compassionate. This is evident from the unquestionable support he has had from friends and family. I implore you, Your honour to see the lives of others that Roger has touched and the good that he is capable of giving back to society and appeal to your unprejudiced judgement for leniency. Hwee Bin and ███ have already suffered beyond imaginable belief. I cannot bear to imagine the insurmountable grief that it would have on their lives with a further prolonged absence of Roger.

Thank you for taking the time to hear my side of the story.

Yours sincerely,

Julie Ng

2



**EXHIBIT**

**4**

*United States v. Roger Ng,* 18 Cr. 538 (MKB)

# SK CHEONG

advocates & solicitors

---

Cheong Sek Kwan, Advocate & Solicitor                    February 14, 2023

**IN MATTER OF NG CHONG HWA, ROGER**

**MAY IT PLEASE THE COURT:**

---

My name is SK Cheong, an advocate of the High Court in Malaya. I have been in practise as an advocate at every level of the Malaysian judicial hierarchy in trial and appellate proceedings for 22 years, and counting. Prior to becoming a lawyer, I was an analyst in the Offshore Banking Division of Banque Nationale de Paris, now BNP Paribas. And prior to that, a consultant in the Tax Division of Arthur Andersen.

It was in the course of my career at Arthur Andersen (circa. 1994) that I met a fledgling banker, Roger Ng. Right from the word GO! he impressed me as a person of impeccable integrity. His personality reflects an aura which is founded on a conservative up-bringing, from a home that is grounded on the strongest family values.

I am not alone in holding Roger in the highest esteem. My first impressions were repeatedly affirmed over time as I noted enviously from the sidelines, his meteoric rise as an investment banker, first with Deutsche Morgan Grenfell and then with Goldman Sachs. These are institutions of global repute and will expect nothing less than the absolute best in their employees. The responsibilities reposed on Roger at an early age are the clearest testimony that his supervisors were equally impressed by his personality, which must have been borne out by collective observation of his daily conduct and demeanour.   Therefore, the slightest suggestion of any voluntary compromise to his integrity is a defiance of logic of the highest order.

Then came a telephone call from his wife one fateful evening in 2017. I was told that Roger was barred from leaving Singapore. Without further ado, I immediately made my way to Singapore, a drive which takes approximately 5 hours. I am told that the authorities have classified him as a "person of interest" i.e. he is neither a wanted person, a suspect nor a witness for the prosecution. Instead, he was needed to confirm a series of transactions connected with the Malaysian sovereign fund, 1MDB and its promoters. While the reasons for barring his departure sounded harmlessly neutral, the fact was that he was repeatedly summoned by the Commercial Affairs Department for lengthy and relentless questioning. It was

**SK CHEONG**
advocates & solicitors

by judicial intervention that Roger was able to resume his travel within the region for work and  finally reunited in Malaysia with his wife and daughter towards the end of 2017.

Roger was required to return to Singapore for further "questioning" in mid-December, 2017. But, Alas! He was barred from leaving Malaysia. In the months that followed, Roger was at liberty to travel within Malaysia. By now it became clear that proceedings have been instituted by various jurisdictions against persons directly involved in transactions involving 1 MDB. Certain personalities who were once prominently associated with 1MDB are no longer contactable.

Meanwhile Roger was summoned numerous times to appear at the Commercial Crimes Division of the Royal Malaysian Police and the Malaysian Anti-Corruption Commission. The questioning was no less relentless as the sessions in Singapore. Yet he scrupulously attended each meeting with prompt punctuality. Roger had every opportunity and resource to take flight as did the other officers of 1 MDB. But taking flight would be repugnant to his conscience. His upbringing would have impressed upon him that "he who has done no wrong would have nothing to hide". He would stand his ground. And he did.


Apart from suffering a loss of reputation and employment while being put to hefty financial legal expense, the emotional loss upon Roger is incalculable. The impact is felt not only by Roger alone, but also his elderly mother, his wife and young daughter (who has not seen her father for 5 years and counting). To impose any penalty on Roger will only add to the suffering he has been put through.

Therefore, WITH UTMOST HUMILITY, I beg this Honourable Court to exercise its judicial powers with grace and mercy.
Thank you.

Telephone: 
e-mail:

The Honorable Margo K. Brodie
Chief United States District Judge
Eastern District of New York
225 Cadman Plaza East Brooklyn, NY 11201                    February 14, 2023

Dear Your Honor,

**RE : United States V. Ng Chong Hwa a.k.a. Roger Ng, Cr. 538 (MKB)**

     My name is Tan Soon Muay  alias Tan Kim Huay, 80 years old and I am Roger's mother.  I have three children, Roger is my second child.

My late husband, Roger's father, graduated as a Chartered Engineer and was elected a member of the Institution of Mechanical Engineers, United Kingdomon1stJanuary 1973. In the course of his career amongst others, he was instrumental in setting up the Malaysian Central Bank Mint in the mid 70s. He was responsible for the operation of the Mint including printing of Malaysian coins.

I was a secondary school teacher. I spent most of my time besides teaching at school, with my three children often reading, doing house work and gardening together. My family over the years have also homed many of my late husband's relatives.  My late husband often spent a lot of time with the children and his nieces and nephews whom we had the opportunity to provide and care for.  They often would gather at the patio at night drinking tea while listening to my late husband.  He would often tell them stories, history, philosophy, current affairs or even jokes.

As a child, Roger has demonstrated his kind and caring nature. His willingness to help and share his belongings and space with family members has been instituted from young. Due to his caring nature, Roger was often tasked to take care of my late in laws who suffered blindness and dementia in their old age. My late husband believed that good character must be developed from young by making the children understand core values in life. Roger since young was taught to be honest, righteous, benevolence and positive. Such are the core values that Roger holds deeply and despite his condition, spent most of his mornings and evenings reading to ███████  continuing his father's legacy and beliefs in installing the good character and core values to his only child.

1

EXHIBIT
5
*United States v. Roger Ng*, 18 Cr. 538 (MKB)

My three children were brought up humbly. My late husband often repeated his mantra to the children to never beg, steal or borrow and to live with pride and dignity.

What happened to Roger on the night of November 1, 2018 still haunted me today. I was shock and devastated when informed that Roger was taken into lockup by the Malaysian Police at the behest of the United States Government.  Roger endured 6 months of incarceration in Malaysian prison despite agreeing to be extradited in February after having found a United States Attorney to represent him.  Roger was kept in prison for further 3 months at the request of the Malaysia Attorney General.  He was extradited 3 months later in May to United States.  Throughout Roger's incarceration in prison, Roger did not want me to visit him in prison nor in court for fear I could not contain my sorrow seeing his poor health condition.  I was heart broken when informed Roger was suffering from Weils' disease and Malaria.  I prayed day and night for God's mercy and divine healing grace to be upon him. Praise the Lord that he made it.  Later, I had traveled to New York to see my son in July 2019.  His was still frail from his imprisonment.  That trip, I experienced the Manhattan July 2019 blackout but due to Roger's condition of house arrest, we stayed put in the apartment in total darkness.  In my visit last year, after a gap of nearly 4 years due to the pandemic and his conviction,  I was saddened to see him reclusive and in a depressive state.  Roger also has a low immunity generally after being infected with Hepatitis B when he was 10. He has been constantly ill from various viruses including being very ill from COVID-19 last year when I visited him.  I miss my son, dearly and very much. The distance between the New York and Kuala Lumpur makes it difficult for me to visit him as often as I would have wanted to, especially at my age.

Roger, as many has known him have been in the financial industry for over 25 years. He has good reputation and I have personally heard many praises of him from my late husband's counterparts. He is hard working and diligent. Whatever he undertakes, he does it well. With the recent ordeals, I know Roger's self-dignity and integrity were stripped off and pressure was mounting upon him. I sensed his depression, feelings of cheats and betrayals.  But my words for him have kept him going until today.  All this time in New York, Roger is frugal and even keeps to a vegetarian diet.  I know because he does not want to burden the family further financially, saving every bit he could. This pains me so much that his already weak health is compromised but I am also proud of him for he has grown up to be a man his father would have wanted him to become.

As a mother, I could only keep my emotions and sorrows to myself for fear of adding further burden to the rest of the family members who have otherwise already drown by the immense pressure to keep up with the situations. I continue to give whatever supports I could to Roger, Hwee Bin and ███████ in my own ways.  There is nothing I could do to get him out of the situation that he is in.  I knelt down to pray to the almighty God for help and divine intervention. I advised Roger to be brave and face the situation with a clear mind. Continue to stay on the path of truth for only truth will set him free even if it means having to go through much endurance and sufferings.

Roger tells me that he often visits the Tibetan Dharma Centre in Queens, New York.  In fact, the Dharma centre was the first place he visited when Your Honor relaxed house arrest restriction last year.  We speak often about religion and the path to the land of God.  That's where Roger found his peace and path to spiritual wisdom.

Your Honor, I am heading towards my twilight years. I sincerely hope to see my son again. I almost lost Roger once and the fear of losing him or not able to see him for a long time keeps me awake most nights. The sudden fear sets in each time I think of Roger. ███████, though innocent is growing up.  It's been 5 years since she last saw her daddy physically. I do not wish to see more harm upon ███████. Please let Roger come home to where he belongs.  Give him the opportunity to make amends in a meaningful way with the help and support of the many people who love him.

Thank you for reading my letter and for your kind consideration.


Yours sincerely,

*Tan Soon Muay*

Tan Soon Muay
Kuala Lumpur
Malaysia

3

**EXHIBIT**

**6**

*United States v. Roger Ng*, 18 Cr. 538 (MKB)

The Honorable Margo K. Brodie
Chief United States District Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, NY 11201

Feb 14th, 2023

Re: United States v Ng Chong Hwa a.k.a Roger Ng, 18 Cr.538 (MKB)

Dear Your Honor,

I was born and raised in Kuala Lumpur, Malaysia. I am currently 22 years old and pursuing a Bachelor of Economics and Finance degree at The University of Hong Kong. I am a niece of Roger Ng and my father is his elder brother. I was brought up in a religious and closely knitted family. Since young, I have been taught about right values to live by. Although my uncle was not always around due to travelling for work, he never failed to be around when I needed his help and advice. I never felt distant from him despite the physical distancing between us.

My uncle is my role model and serve as an inspiration for me. His advice gave me great clarity and guidance whenever I face any difficulties. He is a person I always seek for advice, and not once he turned me down despite his busy work schedule. He never fail to be there for me when I needed him. He is the reason that I decided to pursue a career in finance. I am not surprised to repeatedly hear good words spoken about

him by the business community in Malaysia and his friends. He is a kind, hardworking, generous, honest and responsible individual. This reflects him at home and at work where I have the opportunity to witness.

When my grandfather was invalid during the period of 2005 to 2015, he took care of my grandfather and helped the family greatly. He prioritized his family, and would do anything to help them in every way. And for that I look up to him because it reflects his values, personality and work ethic. Through his actions, he has taught me to be a more compassionate and kind person.

I had accompanied my grandmother who is in her 80s to look into my uncle's well being in NYC last year. Whilst I was there, I witnessed first hand my uncle's solitude behaviour from living alone in isolation in the past 5 years and my grandmother sadness seeing my uncle in such a poor emotional state. I sensed how he felt, how much he truly misses his family and being back home in Malaysia. His daughter,          , was a long awaited arrival for him and the family when she was born in 2012. The present distance and time difference did not deter him from interacting with her. He would religiously wake up early in the morning everyday to read bedtime stories to his daughter, and in the evening, to be there when she wakes up for school. Throughout the day, he would constantly be on facetime, to always be present with his family like nothing changed. His commitment to dedicate time with his daughter and share with her the values of life, stories of different religions to help form the right mindset to face difficulties in school and in life must have been keeping his sanity given all the insanity he has been put through in the last 5 years.

Through this difficult time, I saw how my parents, his wife, and my relatives pull through together as a family for my uncle's trial and ordeals. My family has never been more closer to support each other and get through every hardships along the way.

Your honor, I was heart broken when I learnt my uncle almost couldn't make it when he contracted to Malaria and Weil's disease (Leptospirosis) simultaneously while being imprisoned in Malaysia due to the U.S. extradition. Thankfully for god, he survived.  In sentencing my uncle,plead that that he has suffered  I hope you will return him to the people who cherish and love him.

Thank you for your kind consideration.

Yours sincerely,


Ashley Ng Zhen Zhen

Attn: The Honorable Margo K. Brodie

Chief United States District Judge

Eastern District of New York

225 Cadman Plaza East

Brooklyn, NY 11201

Re: United States v. Ng Chong Hwa a.k.a. Roger Ng, 18 Cr. 538 (MKB)

Dear Judge Brodie,

My name is Loke Sow Fan and I currently work as a real estate agent and senior group manager at Metro Homes Realty, a brokerage firm dealing in Property in Malaysia. I registered as real estate agent back in 1995, and have since built a successful career by selling properties in Malaysia. I was conferred an honorary title of Datin by the King of Malaysia in 2015.

I first met both Roger and Hwee Bin in 2007. They were enquiring about an advertisement on one of the properties which I published in the local newspaper. My first impression of Roger was that he was well mannered, humble and intelligent individual. I showed Roger and Hwee Bin the property which they eventually bought and live in till today. Dear Judge, I would like to relate an incident to you. The property which I showed and Roger eventually bought was owned by a very senior investment banker in Kuala Lumpur. I informed the owner of Roger's interest in the property and unknowingly, the owner contacted Roger directly. When the purchase was completed, my firm's sale commission was not fully compensated by the owner. I was queried by my superior and was issued show cause letter by my firm. I was worried for my career and reputation. I decided to inform Roger of what had happened. Upon hearing my predicament, Roger decided to compensate my firm despite not his legal responsibility to do so. There are many more instances big and small of Roger's humility and kindness, for example, sending fever medication to me personally upon hearing that I had high fever which later confirmed as dengue fever. Such is a person, who would just do to help without much being spoken.

Over the years, we became closer and form a lasting relationship, at both personal and professional level. Our family members too have come to know each other well, that includes the in laws from both sides and their extend families. We share similar fundamental values in religion and common interests, such as our love for

EXHIBIT

**7**

*United States v. Roger Ng, 18 Cr. 538 (MKB)*

exploring new food in the local areas of Kuala Lumpur. These have led to many intimate gatherings for both our families, and I can confirm that my impression of Roger remains true as the first impression I had formed of him so many years ago. My children have also become fond of Roger, often referring him as their 'uncle Roger' and as mentor throughout their teenage years.

As we are of Chinese descent, traditional Chinese cultures are deeply rooted in our beliefs. This includes the use of Chinese geomancy, also known as 'Feng Shui', to read an individual's prediction of events in a specific year. I came to know Master Pang in the mid 1980s, a renowned Feng Shui master in Malaysia. Following the blossoming of our relationship, I introduced Master Pang to the couple, who read them their fortune on childbearing. In 2012, Roger and Hwee Bin's first and only child, ▮▮▮▮ was born. I have witnessed an insurmountable love and care showered on her by the both of them.

Naturally, Roger's trouble with the American authorities has been well publicised in Malaysia and when it was first made known, it came as a great shock to us all. I witnessed the emotional journey of Roger and the entire family, Roger's mother and Hwee Bin's parents included. I wish I could offer more to help but decided the best is just to accompany them often saying prayers together. I tried to give as much support to Hwee Bin as possible in these trying times. As for her parents and their misfortune, I could only offer words of comfort. ▮▮▮▮ is growing up, who was only 6 years old when it all happened.

Many of us who knows Roger personally until today still could not believe Roger is found guity and convicted. We were truly taken back by this decision and felt extremely sad and sorry. In the years I have known Roger, and I strongly believe this is also the views shared by many who knows him that Roger is a man of good character.

Dear Judge, we have lived, and continue to live, in an unprecedented time where many have lost their loved ones to COVID-19. This has taught us that time is precious, once gone can never be replaced. With this, I humbly and respectfully urge Your Honour to consider this good character man for leniency when sentencing him. Let him be with his family especially his daughter ▮▮▮▮ whom has not seen her father for 4 years and counting. The family have suffered enough.

Thank you.

Yours sincerely,

Loke Sow Fan

The Honorable Margo K. Brodie
Chief United States District Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, NY 11201                                              February 15, 2023


Dear Your Honor,

Re: <u>United States v. Ng Chong Hwa a.k.a. Roger Ng</u>, 18 Cr.538 (MKB)

     My name is Lim Chee Khang and I am currently 57 years old married with two college attending sons. I am a qualified solicitor in Malaysia with 30 years of practice in corporate law. I am Roger's brother in law and have known Roger since 1990, through my sister Hwee Bin, when they both studied in the same college and later in the same university in London. I too was in London at that time completing my law degree
.

     Roger comes from a humble yet respectable background with a strict father and religious mother. As a student, I noticed that Roger possessed great self-discipline and was frugal.  I recall vividly that on a few occasions he would take my sister out on dates but noticed that my sister would have to pay for her own meals which was unacceptable to me as an elder brother. However, I later found out from my sister that Roger had insufficient funds from his parents and was working while studying to supplement his education funds. Roger has been in the banking industry for over 25 years and I have only heard praises by the business community here on his honesty and integrity.

     Due to our different careers and especially after Roger moved to Hong Kong in 1997, we saw less of each other and only met when he was passing through Kuala Lumpur for work. I only saw more of Roger when ███████ was born. Roger expressed countless times of his intention to retire from the banking industry after Hwee Bin was successfully pregnant with child in the Autumn of 2011. From what I could recall, he was asked to stay back in Goldman Sachs due to senior departures of personnel in Asia in his division. In hindsight, he should have left the bank in the end of 2011.

     My family's nightmare began after the collapse of the Barisan Nasional government in May 2018 after ruling for nearly 60 years.  My elderly mother and Hwee Bin had to endure the pressure of interviews and statements taken by the Commercial Crime Investigation Department (CCID) of the Royal Malaysian Police in Malaysia in excess of 20 times between July to October of 2018.  We did not engage any lawyers for those meetings as we were advised by the officers against engaging lawyers on this matter. CCID explained that some of the funds in our family bank accounts in Singapore received from Judy Chan personally and companies associated with her totaling approximately USD35 million originated from 1MDB. We were advised to voluntarily surrender the monies to the Malaysian Government. My family and I have on many occasions rejected



the idea of doing this as we felt it was not right that we were robbed of our rightful monies. Each questioning session was met with many hard and soft persuasion to surrender the monies.

However as time passed from July to October in 2018, the 1MDB issue became so political and toxic in Malaysia and pressures were mounting on my family to surrender the monies. By this time, my family and my bank accounts were frozen by the government and we were also barred from travelling or leaving the country.

Subsequently, we were advised by the CCID officers, that an arrangement has been reached and agreed upon by both the Attorney General of Malaysia and Singapore, that if my family surrendered the monies voluntarily via a signed statutory declaration prepared by Singaporean law firm Messrs Tan Rajah and Cheah, we were promise the following:-

   a)  We were assured of no further disruption in our daily undertakings;
   b)  Our travel ban will be lifted;
   c)  Our bank accounts will be unfrozen;
   d)  No further investigations from any authorities within Malaysia and Singapore; and
   e)  No double jeopardy in any form to any family members and relatives

These assurances together with my father's (who was 83 years old at that time and also suffering from leukemia and heart complications) spinal operation scheduled on Nov 1, 2018, made up the core consideration for my family members to execute the statutory declaration to surrender the monies and assets in the Singapore bank accounts. These accounts included monies and assets unrelated to or not received from Judy Chan and/or her associated companies.

Throughout the entire period of questioning from July to October of 2018, there were no indication that Roger was in any way pursued by any authorities least from as far as the United States. To the contrary, we were under the impression that my family members would be in trouble if we had not acted upon the government's advise to execute the statutory declaration. I remembered my sister was informed by the CCID officers that Tim Leissner was involved in the misappropriation of the 1MDB funds. As such my sister had even requested permission from the CCID officers to speak with Tim Leissner to seek help on supporting documents from Judy Chan on the funds received as Judy Chan was not responding to her. My sister had also testified in Roger's trial in New York in relation to the funds. In that conversation, Leissner had advise he was unable to help as his relationship with Judy had deteriorated and even suggested my sister pursue with Judy Chan and her family directly. Roger's troubles to come were so unforeseen even up until then. I believed in the sincerity of the CCID officers involved when promises stated above were made and were even told not to engage with any authorities, foreign or local when approached. Such was the situation then.

2

Three sets of statutory declaration on surrendering all monies and assets to the Malaysian government were signed by my mother, my sister and me on October 30th, 2018. These statutory declarations were hand delivered to the officers on October 31, 2018, a day ahead of my father's spinal operation.  On November l, 2018, I was shocked to receive a call from my sister around 7pm in Kuala Lumpur informing me that Roger was detained at the CCID on United States charges.  From that day Roger has not returned home. On November 2, 2018, Roger was brought to court for a remand order on United States charges.  This sudden turn of events came as a shock to all of us. We were clueless and unprepared. Worse, we had no lawyers to represent Roger who later that day had to appear for his remand appearance in court.  I had only manage to engage a lawyer for Roger who had literally prepare his engagement letter for Roger to execute in court just before the start of his remand proceeding in the United States charges. Such was the situation we were all in and how remotely conceivable this was all happening.

Roger had spent 183 days in the Malaysian prison on United States charges prior to arriving in New York in May 2019. Whilst Roger was incarcerated in prison and unable to attend to his legal or personal matters, I shouldered all the responsibilities on his behalf to ensure that he was represented in the Malaysia and United States while ensuring that my sister and her 6 year old daughter remained safe. Communication with Roger was hampered by once a week visitation for about forty minutes upon request. Our lives and daily routine drastically changed overnight. We were scrambling for information and details pertaining to Roger's arrest, utter confusion and shock is an understatement. I had to ensure our family stay close and our faith in religion grew stronger in the trying times. It made me cherish every moment I had to meet to assist Roger.

The entirety of Roger's prison sentence was a nightmare for us all. We went through thinking we would lose Roger due to Leptospirosis and Malaria while being incarcerated under inhumane conditions in Malaysia; my sister, her daughter and my parents had to endure the middle of the night raids last Lunar New Year on February 19th, 2019 by the Malaysian authorities confiscating vehicles and cash and only to return them quietly that same year. We lived in constant fear of harassment from the press, and slander from online blogs. My mother, sister and her 6 year old daughter were not spared. Our family suffered in silence at the wrath due to the legal process.

My family has been severely punished with multiple jeopardies. After surrendering our monies and assets in the Singapore bank accounts in 2018, our travel ban and frozen bank accounts in Malaysia were not lifted as promised.  Roger and Hwee Bin continue to face legal challenges in Malaysia.  On December 19th, 2018, the Malaysian Government charged Roger with abetting Goldman Sachs pertaining to the sale of 1MDB bonds.  On May 8th, 2019, the Malaysian Government filed a notice of forfeiture to forfeit all monies in Roger and Hwee Bin's frozen bank accounts in Malaysia, this claim was dismissed by the High Court on November 8th, 2021.

3

I learned that Tim Leissner used my name and status as a lawyer to obtain loans from banks for himself around August 2015. Had I known this I would not have loaned USD 1 million on October 13, 2015 to him.  This sum has yet to be repaid to me to date. I am further shocked and disappointed to also hear that he had accused Roger of participating in a conspiracy that involves our family funds while admitting to defrauding him of more than USD 2 million of investments in 2015 which include Celsius Holdings Inc., U.S. ("Celsius") shares (worth in excess of USD 100 million presently). These Celsius shares which he defrauded Roger are currently held by the Department of Justice being used as forfeiture for Tim Leissner's charges which he plead, and does not even represent the full amount of money he received from Jho Low and 1MDB. While claiming our family funds are illicit, Tim Leissner has managed not to pay any money out of his own pocket, not to pay me or my family back for his fraud, while even I have surrendered monies.

Despite suffering financially, we continue to support Roger and my sister's expenses for the past 5 years. Roger's mental health has slowly been deteriorating but I am unable to do anything being half a world away. My elderly parents who are nearing 90 years old continue to seek answers for what started off as an investment with Judy Chan's family has now become their biggest anguish and regret.

Your honor, our family have suffered immensely in the past 6 years, financially and emotionally. We are all very tired and exhausted not mentioning the pain and grief. Roger's prolong absence from the family is causing more suffering and mantle harm especially to his daughter who misses her daddy every much. I plea with you to let Roger come home. It's been 6 long years.  Give him a chance to pick up what he has left behind and I believe he is still capable of giving back to the society.  I say this with utmost sincerity and appeal to you to allow our family to reunite again. Please have mercy on him and all of us.  Thank you for your consideration.

Yours sincerely,

Lim Chee Khang

4

The Honorable Margo K. Brodie
Chief United States District Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, NY 11201                                    February 15, 2023


**Re: United States v. Ng Chong Hwa a.k.a. Roger Ng, 18 Cr.538 (MKB)**

Dear Judge Brodie,

My name is Wai Yee Chiong and I work as an Associate curator of Asian art at the Rhode Island School of Design (RISD) Museum. I obtained my B.A. at Middlebury College in Vermont and my M.A. and Ph.D. from the School of Oriental and African Studies (SOAS) in London, and Princeton University.

I was born and raised in Kuala Lumpur, Malaysia and met Roger when I was 10 years old. Roger and his family moved into my neighborhood and I became fast friends with his sister, Julie. We rode the same school bus and went to the same primary school. We often had play dates and I visited their home often.

Having no older brothers of my own, I was struck by the warm relationship I witnessed between Julie and her brother. Roger was 4 years older than us and I remembered that he was much more affectionate toward his sister than my sister (who was his age) toward me. While teenagers his age usually had little time or patience for their younger siblings, Roger often played with Julie. I remember many instances of them wrestling and fooling around and feeling warmed by these encounters. Growing up in a household with little affection, I was touched by these episodes and wished I had a brother like Roger.

Years later when I was studying in London where Julie currently lives, I met an older and married Roger. He had become a successful banker, I heard, but there was not an ounce of arrogance in his demeanor. He was still the same warm and funny brother that I met years ago. Over Christmas dinner, it felt like no time had passed as he still joked and jested with us like he used to when we were kids.

It is with great shock and surprise that I learned of Roger's trial and subsequent conviction. During the last two years, I visited him a few times when I was in New York City and was moved that despite his predicament, he remained



EXHIBIT
**9**
*United States v. Roger Ng, 18 Cr. 538 (MKB)*

humble, warm, and cheerful. He prepared for his trial relentlessly and diligently, but always made time for his family. While his days were spent working, his nights were spent with his family, talking to his wife and daughter. His dedication as a parent and spouse was truly impressionable and earned my deep respect.

Like those who know him, I was deeply saddened by the news of Roger's conviction and would like to appeal to Your Honor for leniency. His affection and dedication to his family is exemplary and I very much hope that he can be reunited with his loved ones.

Thank you for your consideration.

Yours sincerely,

Wai Yee Chiong

████████████████

████████████████

12 December 2022

The Honourable Margo K. Brodie
Chief United States District Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn NY 11201

**RE : UNITED STATES VS. NG CHONG HWA A.K.A. ROGER NG 18 CR538 (MKB)**

Dear Judge Brodie,

My name is Rudy Ng and I am Roger's elder brother. We grew up practically together as we were only 2 years apart. My father worked at the Malaysian Central Bank while my mother was a secondary school English teacher until her retirement. During our early age, although emphasis was on English and the Malay language, my father ensured we had a strong and basic understanding of Mandarin and the Confucious teachings and values. We were taught to respect our elders (superiors), family values to look out for each other, loyalty, integrity and honesty. My father was very strict with us, disciplined us in the traditional way where canning was part of the punishment. He guided us every step of the way and inspired us through his unique examples and anecdotal teachings. He worked hard to fund our education all the way to university degrees in the United Kingdom.

After graduation, Roger and I began our separated work career and we saw less of each other. I have seen how Roger with this determination, motivation and work hard to build his path in the banking industry. Roger hardly talked or discussed details of his work as I believe there are many confidential matters he had deal with. Due to hectic schedules and frequent travelling, our lives grew apart as we see less of each other. Despite this my father will always take time whenever possible to in part his advice, words of wisdom until he had a stroke in 2005.

News that Roger has been arrested by the Malaysian Police on US Department of Justice's request came as a shock to me. I was totally unprepared and had no idea what was happening. As things unfolded, the nightmare began. I have seen how Roger was incarcerated in a Malaysian prison 6 months. His family were harassed by the Malaysian authorities, house searched, cars and assets confiscated, brought in for questioning after questioning, barred from travelling even now for his wife and daughter to be together as a family. Associates and friends all shy away as if any association with Roger was considered toxic. I was informed that I even named a "Co-conspirator" to Roger by the DOJ. DOJ also obtained a warrant to go through all my emails. I felt so angry and that this is an invasion of my privacy. Moreover we were all helpless in facing the forms of accusations and investigations, even though it was far from the truth, just to achieve to their objectives.

Perhaps the good thing that came out from this was to see our family got very close to each other. My sister and I and even my ageing mother (77 years of age) came together to help wherever we can, physically, financially and spiritually. As a son, it hurts to witness my mother insisting on selling some of the asset inherited from my late father (her retirement fund) to pay for Roger's expenses. It made me realize how important family is and reaffirm our faith and believe in family relationship and values. ` Faced with the impossible, we continue to strengthen our faith in the Lord that somehow, someday justice will prevail as long as we stay the path of truth.

**EXHIBIT**

**10**

*United States v. Roger Ng*, 18 Cr. 538 (MKB)

Scanned v

As the case unfolded in the courts in US in early 2022, I was shocked by the stories of lies by Tim Liesnner. Following instructions from bosses, a team player, loyalty to the firm are some of the basic fundamental which organisation demand from their employee and this was just what Roger did. For Tim to accuse Roger to be involved in all his activities is just short of comprehension and does not make sense.

Judge, I believe Roger is innocent and I plea that you pass down the most lenient sentence possible. Allow him a chance to pick up whatever life he has left. He has nothing now other than a family waiting for his return. Please do not take that away as well. ████ has not been with her father since 2018, a long four years and counting. I personally have 5 daughters and cannot imagine how I will handle and how my daughters can grow up without her father beside her guiding and experiencing every moment.

I will continue to pray and have faith that there are still good and fair people in this world.

Yours faithfully,

Rudy Ng

The Honorable Margo K. Brodie
Chief United States District Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, NY 11201                                    February 13, 2023


Dear Judge Brodie,

RE: United States v. Ng Chong Hwa a.k.a. Roger Ng, 18 Cr. 538 (MKB)


I am Madam Tan Saw Hun, 77 years old now. I am a government retired teacher, I would dare say I am a good judge of good or bad character of a person through my years of teaching experience.

I volunteered to write this letter to show my support of Roger and support my sister Tan Kim Chin, who is in constant pain due to this situation. This process is slowly killing the family emotionally and financially.

Having known Roger Ng for more than 25 years, I was shocked to read of his involvement in the 1MDB scandal in the press. I have known Roger to be a caring person. He is passionate about his job. And has integrity in everything he does, he works hard and tirelessly for all the banks that had employed him. He worked hard, very hard, just to put food on the table for his young family.

He is young and still capable. I believe that any company that he works for would definitely benefited from his hard working attitude, his integrity and his honesty. But that has all seemed useless. He is now like a broken man. I often have wondered, how on earth can this happened to him?

He was very comfortable with his young family, wife Hwee Bin and daughter ▮▮▮▮▮, who do not need much. I believe he will never do anything bad that will cause harm or hardship to his young loving family.

Roger has always been a religious person, strongly believe in Karma. He is God fearing and a believer in "good begets good". I sincerely hope and pray that all will eventually turn out well for him. He has suffered enough physically, emotionally and financially.

Roger comes from a very discipline and respected family, strict father and a kind hearted and loving mother. His father was employed by our Malaysian Central Bank, Bank Negara. His mother is a government retired teacher, who had taught Roger well. And that is to be honest and righteous to oneself and others. We are a family of seven generations of migrants now living in Malaysia. We were brought up to be lawful citizens. Never cheat or lie.



EXHIBIT
**11**
*United States v. Roger Ng,* 18 Cr. 538 (MKB)

1

My eldest sister Tan Kim Chin, Hwee Bin's mother, had since her teen had to work to support us in the family. She had to work hard since our parents were not doing so well in their business. She had always been there for us siblings. She later married Hwee Bin's father who started his own business. They both worked very hard, saved every cent they earned. They managed well and built up their own empire. While Hwee Bin's parents work day and night, we as siblings helped to take care of Hwee Bin and her siblings.

My sister and Hwee Bin had never complain to us of their untold miseries. Their bank accounts were frozen. Their assets and monies were surrendered to our Malaysian Government. They suffered alone. They lived their lives like rats in their holes.

We can only feel the pain and suffering that they are going through. I as a sibling to Kim Chin and aunty to Hwee Bin, pray and hope that God the Almighty will show mercy on Roger and his little daughter innocent ███████ is growing up without her father by her side. Despite of the difficulties, Hwee Bin continues to devote time to ███████, especially her education and upbringing.  She is now taking care of ███████ like a single parent. She misses her daddy Roger a lot. Yet she can't understand why Roger is not around for her for so many years now. She too suffered in silence. She used to ask other members of the family about her father, but no one could bring themselves give her answers.

From the day Roger was taken in by the authorities in Malaysia, my sister Kim Chin had to endure tremendous pain and heartache in silence. At her twilight years of 80 she has untold miseries and sleepless nights. Her ailing husband at 87 has been going in and out of hospital due to ███████. Who can understand her sorrows? She suffered in silence. It may have been a blessing in disguise that she can't read or write in English, as she was Chinese educated. For that she had been spared the news in the English newspaper about Roger. I wish these nightmares and miseries for her and her family will end soon.

Dear Judge Brodie, I plea with you. Have mercy on poor Roger and send him home to his waiting family. He has been spending time all alone for the last 5 years in Malaysian prison then New York. His endurance to remain sane is waning. I have not begged in my life but this time, at my twilight years, I am begging you to be lenient with Roger. Please send him home. For this, I thank you.


Yours sincerely,

Tan Saw Hun

███████████████.

2

The Honorable Margo K. Brodie
Chief United States District Judge
Eastern District of New York
225, Cadman Plaza East
Brooklyn, NY 11201

Re. : <u>United States v. Ng Chong Hwa a.k.a. Roger Ng,</u> 18 Cr.538 (MKB)

Dear Judge Brodie,

My name is Erlny Low Sze Wei and I currently work as the Chief Human Resource Officer of a Fintech organisation in Malaysia. I obtained my BA (Hons) in Accounting & Finance from Oxford Brookes University, UK and have worked in both public accounting firm and financial institutions previously.

I am Roger's cousin and have known him since being a toddler. Roger's father and my mother were very close as siblings which later saw our two families spending the majority of weekends and holidays together since young.

When I was 13 years old, both of my parents divorced and Roger's father, through his unwavering support and kindness, opened his home to my mother, brother, and me. We continued to live with my Uncle's family until I was 19 years old. During the 6 years of living together with my Uncle's family, I was taught invaluable life lessons and core values that have indeed been the foundation of who I am today as an individual, wife, and mother. These are the very same values that my uncle had also instilled in my cousin Roger as well. Through the years Roger and I have spent a substantial amount of time growing up together, which allowed us to form a close bond similar to what a brother and sister would have.

Roger is a very positive, supportive, and caring individual that has a penchant for living life to the fullest. He has always unselfishly provided me with advice and unwavering support whenever I needed it since young. I have looked up to him as a mentor and role model and have tremendous respect for all that he has done for me over the years. One of the most impactful changes in which Roger has influenced upon me until today is his perseverance and discipline.

Growing up as a young girl I was an overweight individual that possessed a low self-esteem and as such was discouraged from pursuing my highest potential. It was Roger that had always encouraged me not to give up and to remain resilient, even during the most difficult of times. It was because of his belief in me that I that I managed to develop a healthy lifestyle, grew up with strong principles of determination, persistence, and a positive attitude. Living with these core values enabled me to become a confident individual with a successful career, a happy marriage, and mother with three wonderful children.

Having witnessed Roger build a successful and aspiring career through his steadfast work ethics, become a devoted husband, and loving father to his young daughter has been a real inspiration to our entire family.

**EXHIBIT**

**12**

*United States v. Roger Ng, 18 Cr. 538 (MKB)*

During the past 3.5 years, Roger has been separated from his family and friends unable to attend special occasions and memorable life events while all along remaining steady in his beliefs. Even under such difficult circumstances, he remains a humble, positive, and resolute individual.

In view of the above, we would like to kindly request Your Honor to please take this into consideration when it comes to sentencing by imposing the most lenient sentence that the court considers appropriate. Roger is fundamentally a very decent and completely dedicated person in all aspects of his life.

We hope that Roger can be reunited with his family and loved ones very soon.

Thank you for your time and consideration.

Sincerely,

Eriny Low Sze Wei



The Honorable Margo K.Brodie
Chief United States District Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn,NY 11201

Re: United States v. Ng Chong Hwa a.k.a Roger Ng,18 Cr.538 (MKB)

Dear Judge Brodie,

My name is J███ s B███, I am eleven years old and I am the son of Julie Ng. I was born and raised in London. I attend████School, which has strong Catholic beliefs and sing frequently in the███(Choir). I often go to Malaysia to meet my relatives and family.

The first time I met my uncle Roger, he was just an ordinary adult in my eyes, then. But, unlike most adults, he acknowledged me and let me take part in his conversations with friends or family. This act of kindness helped me seal a strong, secure bond with him as the years passed by. Visiting him more often in New York made me realise just how long he had been alone, by himself, in his flat. If I were in his situation and put my feet into his shoes, I would be mentally destroyed. Frankly, I expected him to be so too, but as soon as he caught a glimpse of me, his eyes would fill with happiness and he would try to entertain me, cracking jokes and making wacky rhymes, as tired as he was. He had always joked about how he had 'pearls of wisdom', I denied this, then, but on the inside I knew this was true.

Of all the times I have been to New York to visit him, there was one thing that he never failed to do and that was calling his beloved daughter,█████The twelve hour time difference did not stop him from keeping this date daily. Every morning he would wake up at dawn to Facetime his daughter so he could read to her at bedtime and every night he would stay up late to say goodbye to her before she leaves for school.█████ is exactly like her father, funny, kind and knowledgeable. She is the innocent victim in this situation and has no idea about what is going on. I feel terrible for her whenever she asks me about her father and when he is going to come back. From this I can tell that she has a strong connection with her father and truly misses him.

His positivity in times so dark has inspired me as I continue to have conversations with him, bringing back fresh, new knowledge from them. I can tell that he yearns for home in deep conversations with him, but he just sighs and changes the subject when it is mentioned, in hope not to make things awkward for me. He always came out with us when we decided to, no matter how short the trip was, even if he was feeling reluctant to go. As he had played with my mother, Julie as a teenager, he has been playing with me like a friend, watching TV, going for runs and having an ice-cream together. All these small things really reflect on my relationship with him and how different he is to all the other adults I have met. Saint Nicholas, the Patron Saint of the wrongly accused, will guide him.

My Uncle Roger's dedication to parenting and family has touched me and I was flabbergasted when I heard about his conviction and any further tests that he may face. I would like to appeal for Your Honour's leniency, I put my faith in your impartial judgement.

Thank you for your consideration.

Yours sincerely,

EXHIBIT

13

*United States v. Roger Ng*, 18 Cr. 538 (MKB)

The Honorable Margo K. Brodie
Chief United States District Judge
Eastern District of New York
225 Cadman Plaza East Brooklyn, NY 11201                    February 14, 2023

**RE : United States V. Ng Chong Hwa a.k.a. Roger Ng, 18 Cr. 538 (MKB)**

Dear Judge Brodie,

My name is Ee Sze. I am Hwee Bin's cousin. I was ceremoniously adopted by Hwee Bin's parents at birth and have since been affectionately referring to Hwee Bin's parents as my God dad and God mom. I am very close to my God parents' family and hence naturally grew close to Roger as well.

I am currently working on my own as a web marketing consultant after spending almost 15 years in the same industry. I first met Roger in the early 1990s when he visited Kuala Terengganu. My impression towards Roger then was he is a very kind, gentle and knowledgeable guy. He respects the elders, and willing to give good advice to the young cousins. I remembered seeking his advice on furthering my studies abroad between Australia and England.

Years later when I started working in Kuala Lumpur, we grew closer as I often seek his advice on work and other matters and Roger would spare his time for me no matter how busy or where he was.  Whenever he was in Kuala Lumpur, we would meet up with the rest of the family members for meals. When Roger finally set up a home in Kuala Lumpur, I would visit them very often as I am very close with his family.

Last year, when I learned that Roger's emotional health has been deteriorating, I took few months off from work to look into him in New York.  During my time there from April to June, I accompanied Roger to the Tibetan Dharma Centre in Queens to help him seek refuge and guidance to wade through these very difficult periods.  I was worried for Roger as he had been convicted and was alone ever since. I observe him turning from a confident man to one that's broken and shattered. I overheard him during prayer seeking divine answers on how to deal with living life when his innocence is constantly being challenged. Roger remained devoted despite painfully trying to make sense of all that is happening.  We participated in the Tibetan Buddhism religious "Nyunge" practise event at the Dharma Centre last Memorial Day weekend in May for 3 consecutive days including fasting for 72 hours.

Your honour, this is the longest period I have spent with Roger and I am voluntarily writing to you because I have witnessed how Roger and family members has suffered. Firstly, the entire family was facing financial distress when bank freezes all their money, they can't afford on tuition fees for the daughter and medical fees for

1

their elderly parents.  Everyday Roger's wife, Hwee Bin, has to worry how to put a meal on the table for the rest of the family. Secondly, is the loss of freedom. The whole family was banned from travelling and Roger's has been in New York for 5 years. This has also affected ██████████ of their daughter. Roger used to run and play sports with her but since his absence, she has lost interest in socialising or any other activities.  This then led to the fourth issue, which is her ██████████ Hwee Bin has to worry about the media and news relating to Roger and how teachers or other students will prejudice young ██████ in school. In order to protect and avoid any potential bullying, ██████'s social circle in school has been severely narrowed.  She is not able to grow as a normal kid in school and all this is affecting her ██████. ██████ used to be a very cheerful and happy girl, now now she has changed to become a quiet and very lonely 10 years old. She doesn't make friends easily or socialise anymore. From young ██████ ██████████. Whenever that happens she would have difficulties ██████████ and would ask for ██████████ and her dad. It breaks my heart everytime when I see her asking for her dad who cannot be with her when she needs her dad most. Much as a mother is able, she cannot replace a father figure that a 10 years old needs.

Apart from this Roger had missed a lot from being away from the family in the past 5 years.  He missed his daughter's graduation from kindergarten, he missed his daughter's first day of elementary school, he missed every of his daughter's birthday, he missed every family gathering at Chinese New Year, Christmas, Thanksgiving, weddings and funerals.  All these might be small little things in life, but it is these little things that makes life meaningful for a person. You will not realize how important these little things are until all these are taken away. They are valuable time & precious moments that a person's spend with their family, these little things are priceless and cannot be replaced, I felt sorry for Roger that all the above are taken away from him for 5 years.

Your honour, I plead that you can reunite Roger with his family so that they can have the opportunity resume a normal life. Therefore, I hope you can to show leniency to Roger and send him home. We all miss him very dearly.

Yours sincerely,

Tan Ee Sze

**Teny Geragos Krishnaswamy**
New York, NY · tgeragos@braflaw.com

VIA ECF
The Honorable Margo K. Brodie
Chief United States District Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, NY 11201

Re:    United States v. Ng Chong Hwa a.k.a Roger Ng, 18 Cr. 538 (MKB)

Dear Chief Judge Brodie:

I write this letter in support of Roger Ng, not in my role as his attorney, not as his friend, but as someone who, through spending day-in-and-day-out with Roger over the last four years, has witnessed the physical, emotional and mental torture he has endured. It is unusual for a defendant's attorney to write a letter on behalf of the defendant for sentencing purposes, but there is nothing usual about this case. Over the course of four years, and as a result of the requirements of the Protective Order, I estimate that I have spent over 6,000 hours with Roger. Because I was privileged to get to know him so well, I am compelled to share what I know, and respectfully request that Your Honor show him mercy when determining the appropriate sentence in this case.

As a result of unavoidable court delays caused by the worldwide pandemic, Roger has been in the United States since early 2019. His bail conditions meant that the only place he could go was our office, and we spent almost every day together, preparing for his trial. We get to know many clients in the stressful, demanding, and emotional context of preparing to face accusations by the government. In this crucible, one's personality is tested, and everyone reacts differently. Roger came to the office every day and worked hard. He was unfailingly respectful. He was always kind. He always put first the wellbeing of those around him. He always inquired into the good of the other attorneys at our office who were not working on his case. He is a gentle man, completely devoted to his family and his beliefs, and it is this person I hope to share with Your Honor.

Roger, a Malaysian-born citizen, arrived in the United States on May 6th, 2019, three months after waiving extradition. He had just been released from six months of detainment in a filthy Malaysian prison, was suffering from a powerful viral disease (from which he still suffers serious health problems). In our line of work, we often see people at the worst moment in their life. I always imagine that, aside from the day of the verdict, this was Roger's. He was weak, thinning and pale. He left his homeland to arrive on foreign soil—thousands of miles from his wife, young daughter, and familiar territory and procedures. He left home for an unknown length of time to face an unknown future in a foreign land and an intimidating criminal justice system.  Remarkably, however, in that moment Roger was still grateful, kind, and mild-mannered.

On the very day of Roger's arrival, Marc Agnifilo and I started a different Eastern District trial that lasted for the following eight weeks. Roger's only tie to the United States, given his bail conditions, were now themselves unavailable to him for two months. Roger, gracious as always, wished us the

1

EXHIBIT
15
*United States v. Roger Ng,* 18 Cr. 538 (MKB)

**Teny Geragos Krishnaswamy**
New York, NY · tgeragos@braflaw.com

best on our trial and consistently inquired about how *we* were doing—he, who we could not spend time with, who was alone, and scared, and about to embark on a fight for his own life, always asked about us. I found this remarkable and profoundly moving.

Roger did his best to adjust to a solitary life in New York. His sister, who was able to visit his first week in New York, had to fly back to London to take care of her son. We did not know at the time that that would be the last time he would see her for two years due to the pandemic.

When we started receiving discovery in July and August of 2019, Roger came to the office daily. Due to the provisions of the Protective Order, a member of the defense team was required to physically observe him at all times while he viewed the discovery. We set up a desk just a few feet from mine, and from nine to five, five days a week, we worked steadfast alongside him to review literally millions of pages of documents, emails and recordings.

Roger's six-year-old daughter, ███ home in Malaysia, would ask him constantly when he was returning home. When it was night in Malaysia, Roger would FaceTime and read books from his Kindle to her. ███, struggling with the absence of her father, became reliant on this routine to fall asleep. He never missed a day.

Roger's pain as a parent, being away from his young daughter for so long, with doubtful promises of return, and an uncertain future was palpable although he rarely revealed the depths of his pain. Only once, three years into prep for our trial, did Roger say out loud, " ███ told me this morning, 'Daddy, you left when I was six and now I am nine. You have been gone a third of my life.'" With someone as quiet and reserved as Roger, you have to listen carefully, and the fact that he shared this personal and jarring exchange with his daughter illustrated his sadness as a parent. It is only in the last year that I have truly come to appreciate Roger's family predicament. This past July, I was blessed with the birth of a beautiful baby daughter. Every day at work, I count down the hours until I will be home again to hold my daughter in my arms. Lately, I think of Roger when I hold my daughter. After trying to have a child for over a decade, Roger and Hwee Bin were finally blessed with ███, their only child, in 2012. Roger has not held his daughter in his arms in five years. I cannot imagine his pain.

On March 16th, 2020, our office, like the rest of the world, shut-down. While many people survived a years-long isolation by family and friends, for Roger, this isolation was particularly complete. Between March and June 2020, I would Zoom with Roger for ten hours each day as we reviewed discovery, as necessitated by the Protective Order. He was permitted to do nothing else. On his Zooms with me, Roger would express grave concern for his family, parents, and in-laws. What would happen if they fell ill? What if ███ got sick? How could his wife manage alone? What if the inverse happened? He was helpless and alone during a time when we all needed support the most.

Roger was in extraordinary circumstances, within a time of extraordinary circumstance. He had no family visitation nor social visits. He was granted sixty minutes of exercise three times a week and ninety minutes of grocery shopping once a week. He could not receive deliveries of food or household items  because of his building's restrictions combined with his pretrial release conditions.

**Teny Geragos Krishnaswamy**
New York, NY · tgeragos@braflaw.com

Through it all, Roger never once complained. Instead, he would inquire about my family, and kept a mild-mannered humor that belied the inner turmoil we all knew he must have been feeling.

A full fourteen months after the lockdown, Roger finally saw his sister and nephew. This lifted his spirits a great deal as we headed into the final sprint preparing for trial. Our team felt ever ready and sought to bring our several years of discovery, unwinding this complex financial case and distilling it for a jury of our peers. I pour my heart and soul into every case I have. I develop a familial closeness with all of my clients, for better or for worse, but for none but Roger have I felt such a deep conviction. It is a testament to Roger's character that he, at least visibly did not cry after the verdict, even though I did not stop for nearly a week.

In the days, weeks and months, since Roger's conviction I have replayed every moment of the trial and the preparation to myself. However, the point now is to try my best to explain to Your Honor that Roger is a man who has suffered physically, mentally and emotionally for close to four years, but disguises it under a demeanor of patience, curiosity, and good intent. That he is a man who regrets the company he kept and has been paying the price for years. And that he is a man who wants nothing but good things for those around him, his family, and society writ large.

But in this life, there is no chance to do it over. The only chance I have left is this letter, and so I write to you as Teny Geragos, Roger's attorney, turned friend, turned confidant, and on behalf of ███ Ng, Roger's daughter, who has missed her patient, gracious and wonderful father for nearly half her life, I beg for your mercy and plea that she misses him no more.

Very Truly Yours,

*Teny*

Teny Geragos

The Honorable Margo K. Brodie                                                      25th October 2022
Chief United States District Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, NY 11201


Re: United States v. Ng Chong Hwa a.k.a. Roger Ng, 18 Cr.538 (MKB)

Dear Your Honor,

I was born in the Tashigang District of Bhutan in 1965. I am a Buddhist monk and had previously taught at the Buddhist college at the Nyingma Palyul monastery in Tibet. For the past 19 years, I have been assigned to teach students here in the United States at the Nyingma Palyul Dharma Centre in New York (www.palyulnyc.org). The Nyingma Palyul Dharma Center serves as the practice center for students of the Palyul tradition, which can be traced back to 1665, in the New York City metropolitan area, as well as visitors to the city from around the world. Established in 2005 by Khenchen Tsewang Gyatso Rinpoche and myself in accordance with the wishes of His Holiness Penor Rinpoche, the Nyingma Palyul Dharma Center also hosts talks for the general public and teachings and empowerments from the Palyul tradition at a number of venues in New York City.

I first met Roger in the summer of 2019 when he had just arrived in New York. I had visited him in person while he was under house arrest. I found him to be humble and kind while looking forward to preparing for his trial. Roger and his family have always been devoted members of our Nyingma Palyul Dharma Center branch in Malaysia. Given the Covid-19 pandemic and his house arrest, the next time we would meet again in person would be in early 2022 when Your Honor granted him flexibility to his house arrest and allowed a curfew between 8pm to 8am. Roger had visited me at our Palyul Dharma Center in Queens, the very first place outside his restricted movement order. It was to my surprise to learn he was still in New York and had been enduring the past 3 years alone.

Despite the unfavorable outcome of his trial in April, I have witnessed him coming to our dharma center in Queens regularly and participating in events with our "Sangha" community. I saw that this was able to provide him much needed refuge and support to continue to endure this very challenging and stressful period in his life on his own and away from his family, particularly his wife and young daughter.

I am also very pleased that Roger has been able to participate in our daily prayer practices and the opportunity to attend our dedicated "Nyungne" abstention practices (May 28-30) and teachings on "Uttaratantra" Buddha nature (June 14-28) and Aspirations Prayers (October 11-28) with extended curfew time from the court this year. During these practices and teachings that I had conducted personally, I have witnessed Roger's devotion and effort to renew and keep faith.

Your honor, I know Roger to be a decent person who is very dedicated to his religion, his family and his community. There is much he can make amends and contribute to his community in Malaysia, allow him this opportunity. To this, I hope you can show compassion and wisdom in sentencing him.


Thank you for your consideration.

Yours sincerely,

Khenpo Tenzin Norgay Rinpoche
Nyingma Palyul Dharma Center
23-11, 98th Street, East Elmhurst, New York, NY 11369

EXHIBIT
16
United States v. Roger Ng, 18 Cr. 538 (MKB)

# DOCUMENT PRODCUED IN ELECTRONIC FORMAT

EXHIBIT

**17**

*United States v. Roger Ng*, 18 Cr. 538 (MKB)

# DOCUMENT PRODCUED IN ELECTRONIC FORMAT

**EXHIBIT**

**18**

*United States v. Roger Ng*, **18** Cr. 538 (MKB)

The Honorable Margo K. Brodie
Chief United States District Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, NY 11201                                                    February 14, 2023


Dear Judge Brodie,

**RE: Unites States V. Ng Chong Hwa a.k.a. Roger Ng, 18 Cr. 538 (MKB)**

My name is Pang Kim Bun, and my given Dharma name in spiritual practice is Jin Xing. I am now 72 years old.  When I was in my 20s, by chance I encountered a spiritual master who guided my life to whom I am today. The master was a well-known monk Venerable Hong Choon, a well-known Feng Shui grand master and the abbot of Kong Meng San Phor Kark See Monastery in Singapore (http://kmspks.org/). My achievement today is attributed to the strict guidance from my Master (http://masterpang.com).

People in general call me Master Pang. This honorific title is a special reminder of my Master's intention - that is to be kind to all beings and to help all those whom we are destined to meet.

I first met Roger through the introduction of a friend. Roger has been married for more than 10 years and without child.  He came to ask for my advice.  After a year, Mrs. Roger finally became pregnant, and ▆▆▆▆ was born in June 2012. I have been a believer in Buddhism all my life, specializing in reading the luck pattern of any person through the date of birth and through Taoist astrology known as "Zi Ping Bazi" and "Zi Wei Dou Su".  However, I want to stress that these readings are only a general guide to one's life as it can reveal the patterns of one's luck cycle. It is not a prophecy or prediction of what will happen in the future.  A firm believer in karma, retribution and rebirth, therefore, I hereby solemnly swear, everything I say here is absolutely true.

Roger, as a young man, is loyal and benevolent. He is kind and straight forward. Eager to serve the society, he will do his best and is faithful in his undertaking.

In 2015, Roger at the request of Tim, asked me to read Tim's Bazi as Tim had planned to relocate back to Asia and wanted to rekindle his life with his ex-wife Judy. At the first look at Tim's Bazi, I warned Roger to be careful of Tim.  Tim's Bazi indicates that both Tim and Roger had a previous life conflict.

1



In 2016, Roger made an arrangement for me to meet Tim and his ex-wife Judy in Hong Kong, Shangri-La Hotel as I happened to be in Hong Kong with my wife to attend a friend's company listing ceremony on the Hong Kong Stock Exchange.

As a master, I feel responsible and truthful of my advice. I told Tim not to commit misdeeds in telling lies as this will be backfired in eventual karmic retribution. I deeply believed that happiness and blissful life comes out of our deeds, be it from words or actions that build up our integrity. I advised Tim that his fatal injury is 'peach blossoms', an out of marriage fun and "playboy type of life style" is fatal to his personal luck. And his future will be ruin because of that.

As it turned out, what Tim has done and caused, Roger is dragged by Tim into this dreadful situation including his loss of personal freedom, is due to a predisposed condition in their previous life and if nothing change, Roger will again become a scapegoat of Tim. This is karma and all life are the result of retribution of what we have done. We reap what we sowed, no one can escape from this law of karma. I advise Tim that if he does not change his habit and life style, his karma will catch up on him. Tim had expressed his desire to renew his relationship with his ex-wife Judy. However, his Bazi indicates that their relationship has expired. I told him there is no way to rekindle to their previous courtship.

I read the reporting of Roger's New York trial  in the Malaysian newspapers whereby my name has been mentioned and the incident of our meeting in Hong Kong refers. To that, I can confirm that Tim is lying and fabricating stories to justify whatever he has done to cover himself up. In our Hong Kong meeting, Roger and his wife came to the Excelsior Hotel to pick me up and after our meeting, we left Shangri-La Hotel together. At no time was any cover story on money scheme or payment scheme as mentioned by Tim was ever discussed. I too never discuss any of his trouble with the authorities as claimed in the newspaper as I only tell what I could read from his Bazi with respect to his character and personality which will result in his luck pattern. He has put all blames to Roger. I have deep feelings for Roger as I know that he is a scapegoat for Tim, and I deeply sympathized with Roger and his family.

When Roger invested in Celsius, he promised to donate 50,000 Celsius shares to our Buddhist foundation fund to build temples and charitable homes for the elderly. When I learned that Roger's portion of the Celsius shares was still being held by Tim, I repeatedly advised Roger to assume control as soon as possible. Tim also promised to transfer Roger's portion of the Celsius shares to him as soon as possible. This matter was also mentioned during our meeting in Hong Kong when Roger had requested me to advise on the feng shui of the Celsius office location in Hong Kong.  Now that this has happened to Roger, he is unable to fulfill his promise on the donation.  As a result, the construction of the temples and charitable homes have been delayed due to the lack of funds and many people who would have benefited from Roger's generosity will

continue to suffer in their present circumstances.  What otherwise would have been a great charitable act is now in vain. It is painful and heartache to see so much suffering by so many people just because of a single individual's act of telling lies.

As I can read it from their Bazi regarding Roger and Tim's encounter, Roger is doomed to be a loser. Roger is not suave nor flatter with his words and he has no skill in scheming. Being comfortable, moderate and doing one's part well is his virtue, it is also his biggest failure. Because currently he is encountering someone who is his nemesis coming in this life to inflict harm on him.

Your Honour, I believe that you have laid down many judgements under countless legal cases during your career as Judge, and with your experience and wisdom, it is not difficult to see through the intricacies of this case and see beyond the surface.  To this, I pray that you show compassion and mercy to Roger and his family when sentencing him.

Thank you for your consideration.

Yours sincerely,

Pang Kim Bun (Jin Xing)

3

The Honorable Margo K. Brodie 16 February 2023
Chief United States District Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, NY 11201

Re: United States v. Ng Chong Hwa a.k.a. Roger Ng, 18 Cr.538 (MKB)

Dear Your Honor,

I was born in Bhutan in 1985 and entered the Tibetan Namdroling Monastery at the age of 14 and studied for 9 year at Ngagyur Nyingma Institute, the Buddhist monastic institute in Namdroling Monastery, Bylakuppe, India. Bylakuppe is the second largest Tibetan settlement in the world outside Tibet after Dharamshala. I am currently a Buddhist monk at the monastery.

The monastery was established by His Holiness Penor Rinpoche in 1963, following his 1959 exit from Tibet to India due to the "annexation", as the second seat of the Palyul Monastery of Tibet (https://en.wikipedia.org/wiki/Palyul_Monastery). There were only about ten monks at the time that the monastery was established in 1979, but the numbers gradually grew year by year as followers from Tibet, Nepal, Bhutan and all over the world. To date, more than 9000 monks and nuns are registered, out of which more than 3,500 monks and nuns are present and engaged in studies. Our Nyingma Palyul mother monastery in Tibet was re-established in 1994 and the Dharma Centre in New York City was established in 2005 is currently led by my teacher, Venerable Khenpo Norgay.

I have known Roger and his family for more than 4 years through our Tibetan Buddhist Dharma Centre in Malaysia (established in 2015). Roger and his family are devoted members there and I am their resident teacher leading the regular Dharma practices and teachings. When I heard of Roger's plight of being incarcerated in Malaysia in late 2018 due to U.S. extradition request, I was sadden and concerned. Knowing that he had survived two deadly illnesses during his half a year imprisonment awaiting extradition to the U.S. gave me great comfort that he must have preserved his faith and practice to pull through one of his most difficult period of his life.

Upon hearing him finally arriving in New York sometime in late Spring of 2019, I had sought the help of Khenpo Norgay in New York, to help me assist Roger's well-being, in particular spiritually. I was initially pleased to learn from Khenpo Norgay that his visit with Roger in New York when he had arrived under house arrest, Roger was in high spirits and getting ready to prepare for his trial. However, no one had anticipated that the Covid-19 pandemic would descend upon the world such that regular functions of society as we know it would change drastically. This caused Roger's trial to be delayed 3 years from the Autumn of 2019 to the Spring of 2022.

Roger has been participating remotely via Zoom in my bi-weekly teachings from India and the daily practices conducted by our Dharma Centre in New York. The Roger I know is kind, compassionate and has the aptitude to understand the Dharma. During these sessions I have witness Roger embrace his previous imprisonment and present isolation in New York for the nearly 5 years now akin to solitary confinement and contemplative life. Roger has shown great strength in managing his ordeal for the sake of his ailing parents, wife and young daughter but I can see the stress is weighing on him year after year. However, his conviction in April last year broke his hopes of reuniting with his family and I can sense his mental anguish and pain is particularly intense when we speak about his only daughter and inability to raise her in person during her important formative years.

Your honour, the Buddha taught awareness of impermanence of are steps in the spiritual progress toward enlightenment and I sincerely believe Roger is on that path. Paradoxically, given all the ordeals and suffering he has embraced, Roger is able to contribute immensely to the "Dharma" and the "Sangha" (community) if given a chance.

Finally, in Tibetan Vajrayana Buddhism, we believe that it is possible for one to "reach enlightenment in a single lifetime" through instructed unique prayers and practices. For this to be achieved, the teachings must be in person. The recent Covid 19 pandemic interrupted this but I am optimistic that we would resume all of our teachings in person soon and have that opportunity to "reach enlightenment in a single lifetime" again. I also pray that Roger will reunite with his family soon and his daughter to have a father again.

Your honor, every moment in life is precious, I plead that you could show clemency and sentence Roger with compassion.

Thank you for your consideration.

Yours sincerely,

Venerable Khenpo Ugyen Wangchuk
Namdroling Monastery

EXHIBIT
20
United States v. Roger Ng, 18 Cr. 538 (MKB)

The Honorable Margo K. Brodie
Chief United States District Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, NY 11201

Re: <u>United States v. Ng Chong Hwa a.k.a. Roger Ng</u>, 18 Cr.538 (MKB)

Dear Your Honor,

I was born and raised in the Sultanate of Brunei Darussalam, a small neighboring country to Malaysia.  I went to university in the United Kingdom where I graduated with a law degree in 1994, called to the English Overseas Bar in 1995 and MBA from Imperial College in 1996.  Since 2006, I have been an international civil servant at the United Nations in its Headquarters in New York City where I currently live with my family.

About 27 years ago, I met Roger when we started business school together in 1995 at Imperial College Business school, University of London in the United Kingdom.  We have been friends ever since.

As a friend, he has always been unpretentious, amicable, generous, honest and down-to-earth.  Roger is someone who has a good idea who he is, who is steadfast and not easily affected by the ups and downs.

I remember, once he got me to come along to meet the seller of a really old Fiat (car) that he bought really cheaply for £500.  He was worried it could be a scam and he could be robbed as he turned up with the cash.  Nothing bad happened.  But an hour later, as we were driving the car back to his home, the car stalled and refused to move, in the middle of the street, in the middle of London.  And then, it began to snow.  We pushed the car to the side, had dinner in a bistro as we waited for the tow truck.  All through out, he remained calm, good-humored and made the best of the situation.

Roger is generous, cheerful and loving to people around him, especially his family.  He is most generous and caring brother to his sister, Julie for as long as I could remember.

We met a handful of times after graduate school and remained distantly in-touch for the next 2 decades.   When I read on the news that he was extradited to New York City, I reconnected with him to see how he was.  I found that he is fundamentally the same person I knew from years ago.   I witness him as a loving husband and father, and as a wonderful uncle to ▇▇▇▇, his young nephew he visits from London.  He is clearly heartbroken by being separated from his family.  Whenever I visited him, his daughter would be in the background, on video-call, doing her own thing or getting ready to go to bed.  For months, he would read her historical stories in nightly installments.  Sometimes they would watch the same shows on TV, spending time together across the time-zones.

EXHIBIT
21

*United States v. Roger Ng, 18 Cr. 538 (MKB)*

I know being separated is doubly hard on his daughter and his family as well, for their love and affection is deep and genuine.   Your honor, I hope you would give due consideration and show leniency to a man, who despite the convictions, is fundamentally a very decent man.   The law might call for a custodial sentence but, in sentencing, please give him the opportunity to make amends and give back to society in Malaysia a meaningful way, with support of the many people who love him.

Thank you for your consideration.

Yours sincerely,

**Kin Hui Chang**

Jan 20, 2023

Case 1:18-cr-00538-MKB   Document 226-1   Filed 02/25/23   Page 64 of 98 PageID #: 5911

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

---------------------------------------------------X

NG CHONG HWA, also known as
ROGER NG,

                       Plaintiff,

     -against-

TIMOTHY LEISSNER,

                      Defendant.

---------------------------------------------------X

                      Index No.:

                      Filing Date: Nov 11, 2022

                      **SUMMONS**

                      Plaintiff designates New York
                      County as the place of trial

To the above-named Defendant:

     **YOU ARE HEREBY SUMMONED** to answer the verified complaint in this action and to serve a copy of your answer, or, if the complaint is not served with this summons, to serve a notice of appearance, on the Plaintiff's attorney(s) with 20 days after the service of this summons, exclusive of the day of service (or within 30 days after the service is complete if this summons is not personally delivered to you within the State of New York); and in case of your failure to appear or answer, judgment will be taken against you by default for the relief demanded herein.

Dated:          November 11, 2022
                New York, New York

                      BRAFMAN & ASSOCIATES, P.C.

                      Marc A. Agnifilo, Esq.
                      Teny R. Geragos, Esq.
                      Zach Intrater, Esq.
                      Jacob Kaplan, Esq.
                      *Attorneys for Plaintiff*
                      256 Fifth Avenue, 2nd Floor
                      New York, New York 10001
                      (212) 750-7800

**EXHIBIT 22**

*United States v. Roger Ng*, 18 Cr. 538 (MKB)

Case 1:18-cr-00538-MKB   Document 226-1   Filed 02/25/23   Page 65 of 98 PageID #: 5912

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

-------------------------------------------------X

NG CHONG HWA, also known as
ROGER NG,

                             Plaintiff,

    -against-

TIMOTHY LEISSNER,

                             Defendant.

-------------------------------------------------X

Index No.

**COMPLAINT FOR FRAUD,
FRAUDULENT
CONCEALMENT, AND UNJUST
ENRICHMENT**

DEMAND FOR JURY TRIAL

TO THE SUPREME COURT OF THE STATE OF NEW YORK

    Plaintiff, NG CHONG HWA, also known as ROGER NG (hereinafter "plaintiff Ng"), through his counsel, Marc Agnifilo, Teny Geragos, Zach Intrater and Jacob Kaplan of the firm Brafman & Associates, P.C., as and for his Complaint against defendant TIMOTHY LEISSNER (hereinafter "defendant Leissner"), alleges as follows:

### INTRODUCTION

    1.    Between early 2015 and the present, the defendant Timothy Leissner has committed fraud against plaintiff Roger Ng. This fraud has consisted of a pattern of lies, deceptions, and false statements. The fraud is documented: defendant Leissner himself admitted on cross examination at the trial of <u>United States v. Roger Ng</u>, 18-cr-538 (MKB) (E.D.N.Y.), that he lied to plaintiff Ng. Also, emails admitted into evidence at that trial further prove the fraud committed by defendant Leissner against plaintiff Ng. Indeed, based on defendant Leissner's trial testimony and the exhibits admitted into evidence consisting of his emails and other documents, Leissner lied to plaintiff Ng time and again between early 2015 and the present. Defendant Leissner did so as a part of a concerted effort to steal and keep plaintiff Ng's property: cash and shares in companies called Celsius Holdings, Inc. ("Celsius"), and Sentient Technologies Holdings, Ltd. ("Sentient").

1

FILED: NEW YORK COUNTY CLERK 11/11/2022 04:15 PM INDEX NO. 159736/2022

NYSCEF DOC. NO. 1    Case 1.18-cr-00538-MKB   Document 226-1   Filed 02/25/23   Page 66 of 98 PageID #: 5913 RECEIVED NYSCEF: 11/11/2022

Leissner's fraud included conduct that took place, in part, in New York County. Plaintiff Ng brings this complaint against defendant Timothy Leissner for fraud, fraudulent concealment and unjust enrichment to hold Leissner accountable for the lies he told plaintiff Ng—lies Leissner told to receive and retain plaintiff Ng's money and property.

2.      Defendant Leissner lied to plaintiff Ng, Ng's wife and others repeatedly, as a part of a pattern and scheme to defraud, between in or about February 2015 and the present. Defendant Leissner told these lies as part of his continuing fraud and theft of a $1,250,000 investment in a company Celsius that the plaintiff Ng made and entrusted to Leissner and a $1,000,000 payment to defendant Leissner to obtain part of defendant Leissner's interest in a company called Sentient. Today, plaintiff Ng's investment amount in Celsius is worth in excess of $130,000,000. Despite defendant Leissner representing to plaintiff Ng and others that the investment was secure, that the shares were available and that Leissner himself would personally guarantee the principal, Leissner has never given Ng a dime. Instead, defendant Leissner lied to get plaintiff Ng's money, lied to keep Ng's money, and lied when he promised to provide Ng with a return on his investment.

3.      Defendant Leissner used the very shares he stole from plaintiff Ng to secure his own bail and satisfy his criminal forfeiture in connection with a criminal case filed in the Eastern District of New York entitled <u>United States v. Tim Leissner</u>, 13-cr-00439 (MKB).

4.       Finally, by defrauding Ng and stealing his investment that in 2015 was worth about $1,250,000 and is currently worth about $130,000,000, defendant Leissner deprived, and is currently depriving, plaintiff Ng of the funds needed to finance his own defense, including an appeal of the conviction at the trial at which Leissner was the Government's star witness. Plaintiff Ng is in the unimaginable position of having to defend himself against allegations made by the

Case 1:18-cr-00538-MKB Document 226-1 Filed 02/25/23 Page 67 of 98 PageID #: 5914

person who defrauded him and who stole the money that plaintiff Ng needs to defend against those same allegations.

### THE PARTIES AND OTHER RELEVANT INDIVIDUALS AND ENTITIES

5.      Plaintiff Roger Ng is a Malaysian national. He was charged as part of the same criminal case as his former boss, defendant Leissner. In February 2019, Ng waived extradition to the United States. He was brought to the U.S. pursuant to this extradition waiver in May 2019. He was effectively trapped in the United States for the entire COVID-19 pandemic, which repeatedly delayed his criminal trial, and so between May 2019 and the present he has lived in New York County. Ng eventually went to trial in February 2022. At trial, the government's star witness – indeed, the only witness to directly implicate Ng in criminal activity – was none other than Tim Leissner. Ng was convicted at trial, and is currently released on bond pending sentencing and appeal.

6.      Defendant Leissner is believed to now be a resident of Texas. From in or about 2016, Leissner lived in Los Angeles, California, in a $25 million home paid for with the proceeds of money he stole from 1Malaysia Development Berhad ("1MDB"), a strategic investment and development company wholly owned by the Government of Malaysia through its Ministry of Finance.

7.      Hwee Bin Lim is an individual who is married to plaintiff Roger Ng.

8.      Boon Kee Tan is an individual who worked at Goldman Sachs.

9.      Kimora Lee Simmons-Leissner is an individual who, at the relevant times herein, was and has been married to, and in business with, defendant Leissner.

10.     Russell Simmons is an individual who, at the relevant times herein, was the ex-husband of Ms. Simmons.

3

Case 1:18-cr-00538-MKB Document 226-1 Filed 02/25/23 Page 68 of 98 PageID #: 5915

11. Nu Horizons Investment Group LLC ("NHIG") is a limited liability company that conducted business in California and New York. In a separate lawsuit filed in California Superior Court, NHIG and its manager, Russell Simmons, sued Leissner, Kimora Lee Leissner and several other entities and individuals for fraud, breach of contract and other causes of action. See Russell Simmons et al v. Tim Leissner et al, 21STCV18852. At times relevant to this Complaint, NHIG maintained a bank account in New York County.

12. All Def Digital, Inc. is a digital hip hop platform founded by Russell Simmons.

13. KLS Holdings, LLC is a limited liability company that at all relevant times was controlled by Ms. Simmons (the Managing Member and CEO) and maintained an address at 43 W. 24th Street, 9th Floor, New York, NY 10010. It maintained a bank account at Bank of America.

14. Keyway Pride Ltd., LLC is a limited liability company that at all relevant times was controlled by defendant Leissner and others.

15. Newland is Hong Kong entity with an address of "Room 1605, Wilson House, 19-27 Wyndam Street, Central Hong Kong."

16. Oryx is also a Hong Kong entity which shares the identical address with Newland, namely, "Room 1605, Wilson House, 19-27 Wyndam Street, Central Hong Kong".

17. Midas is a Delaware LLC with an address listed as "c/o Paracorp Incorporated, 2140 S Dupont Highway, Camden, Kent, DE 19934".

18. Al-Kuwari is an individual citizen of Qatar with an address of Salman Bin Rabiah Street, 56, Al Khalifat Al Jadeeda, Doha, Qatar.

## JURISDICTION AND VENUE IN NEW YORK COUNTY

19. Defendant Timothy Leissner's fraud, fraudulent concealment and unjust enrichment occurred, in part, in New York County. For example, as part of the fraud, defendant

4

Case 1:18-cr-00538-MKB   Document 226-1   Filed 02/25/23   Page 69 of 98 PageID #: 5916

Leissner directed plaintiff Ng to send three separate wires, totaling $1.25 million, to the NHIG bank account at JP Morgan Chase in New York County. Pursuant to Leissner's directions, Ng sent these funds to this account in New York County. In addition, as noted, Roger Ng is currently residing in New York County, and has resided in New York County since May 2019.

20.    At times relevant to this Complaint, defendant Leissner owned, used and possessed real property within the State of New York, specifically an apartment located at 11 East 68th Street, New York, New York.

21.    Defendant Leissner is subject to the personal jurisdiction of this Court for several reasons. First, per CPLR 302(1), because the causes of action in this complaint arise from defendant Leissner transacting business within the State of New York and contracting to provide goods and services in the State of New York. Second, per CPLR 302(2), because defendant Leissner committed a tortious act, specifically common law fraud and fraudulent concealment, within the State of New York. Third, per CPLR 302(3), because defendant Leissner committed a tortious act outside the State of New York, causing injury within the State of New York, and because defendant Leissner owned, used and possessed real property within the State of New York, specifically an apartment located at 11 East 68th Street.

22.    Venue is also proper in New York County, because defendant Leissner directed plaintiff Ng to send money to a bank account located at JP Morgan Chase bank in New York County, emailed plaintiff Ng wire instructions for this money to be sent, and maintained a residence in New York County.

### FACTS COMMON TO ALL CLAIMS

23.    This complaint alleges three causes of action against the defendant Timothy Leissner. First, common law fraud. Defendant Leissner lied to plaintiff Ng and others repeatedly

5

FILED: NEW YORK COUNTY CLERK 11/11/2022 04:15 PM
Case 1:18-cr-00538-MKB   Document 226-1   Filed 02/25/23   Page 70 of 98 PageID #: 5917

and as part of a single coherent effort to wrongfully acquire and retain plaintiff Ng's money and shares. <u>Second</u>, fraud in the inducement. Defendant Leissner engaged in a years-long pattern of lies with the specific intent of fraudulently inducing plaintiff Ng to part with his money and to allow Leissner to keep it. <u>Third</u>, unjust enrichment. Because defendant Leissner lied to get and keep plaintiff Ng's money and valuable shares, defendant Leissner has been unjustly enriched in the amount of at least $130,000,000.

### Leissner's Fraud Is a Continuing Wrong for Purposes of the Statute of Limitations

24.     Defendant Leissner's ongoing scheme to defraud plaintiff Ng has taken several forms between January 2015 and the present. First, defendant Leissner lied to plaintiff Ng in 2015 when he assured Ng that Leissner would personally ensure the principal of Ng's investment into Celsius. This false statement lured plaintiff Ng, on an ongoing basis, into parting with his money. All along, though, defendant Leissner knew that he would not in fact personally ensure plaintiff Ng's investment. Defendant Leissner also knew that once he had taken control of plaintiff Ng's investment, Leissner would then commit additional fraudulent acts to wrongfully and permanently retain Ng's shares and funds up to the present.

25.     Second, Leissner lied to plaintiff Ng in 2016 when he took $1,000,000 to supposedly sell plaintiff Ng 50% of defendant Leissner's investment in a company called Sentient. Defendant Leissner knew he would never transfer the shares to plaintiff Ng and would instead continue to retain plaintiff Ng's money.

26.     Third, defendant Leissner lied repeatedly to plaintiff Ng and his wife from 2016 through 2018 in an effort to fraudulently convince them that the shares and investment were secure and that the proceeds of the shares and investments would be forthcoming.

FILED: NEW YORK COUNTY CLERK 11/11/2022 04:15 PM

Case 1:18-cr-00538-MKB   Document 226-1   Filed 02/25/23   Page 71 of 98 PageID #: 5918

27. Fourth, defendant Leissner lied yet again during his direct testimony during the trial in <u>U.S. v. Roger Ng</u> earlier this year when he testified that he borrowed this money from Ng and that he had the intention of paying Ng back over time.

28. This pattern of lies and deceit commencing in 2015 and continuing steadily through 2016, 2017, 2018 and up until his trial testimony in 2022 amount to a continuous course of conduct all with the same objective: to get and keep Roger Ng's shares and money.

**<u>This Lawsuit Has Been Commenced Within Two Years of the Time Ng Discovered or Could Reasonably Have Discovered the Fraud</u>**

29. Defendant Leissner's fraud on plaintiff Ng had the desired effect: Ng errantly believed that he owned shares in Celsius, that these shares were being kept safely for Ng and that Leissner would cause the shares or their current value to be provided to Ng upon request.

30. It was not until Russell Simmons sued defendant Leissner in California Superior Court on or about May 12, 2021, that plaintiff Ng and his counsel learned for the first time that Leissner had stolen Ng's shares and, in fact, had used them to secure his release in the case of <u>U.S. v. Leissner</u>. Counsel for Ng notified the government. In particular, counsel notified the government that a portion of NHIG's Celsius shares belonged to plaintiff Ng and accordingly, requested documents related to the lawsuit pursuant to <u>Brady</u>, <u>Gigilio</u> and their progeny. Plaintiff Ng's counsel asked the government whether NHIG's shares were securing Leissner's bail, because if they were, that would be problematic on a number of levels. The government asked why. Plaintiff's counsel stated in sum and substance, "it is problematic because of where those shares came from. Leissner was able to purchase those shares from Ng who funded the purchase and it appears he has now stole them." Counsel further laid out plaintiff Ng's transfers to defendant Leissner and the government replied that even if that were to be the case, that would be <u>Giglio</u> material.

7

Case 1:18-cr-00538-MKB Document 226-1 Filed 02/25/23 Page 72 of 98 PageID #: 5919

31.     Finally, after several phone calls and more letters to the government, the government provided counsel for Ng with disclosures on October 13, 2021: (1) finally producing the NHIG bank records to counsel, and (2) producing a seizure warrant of the NHIG shares from Kimora and Tim Leissner. Therefore, it was not until October 13, 2021, that plaintiff Ng discovered or could have discovered the fraud with reasonable diligence.

**Defendant Timothy Leissner's Scheme to Defraud**

32.     In 2014, Leissner was a partner at Goldman Sachs and the Chairman of Southeast Asia and had entered a full-fledged criminal partnership with Jho Low. This included receiving already tens of millions in criminal funds from Jho Low and his related entities. Though this is an unthinkable amount of money for most people, for Mr. Leissner, it was not nearly enough. He was, at that time, carrying on two simultaneous marriages with two different wives in two different continents—Judy Chan Leissner in Hong Kong and Kimora Lee Simmons in Los Angeles, California—and at least one other mistress in Southeast Asia, Rohana Rohzan, to whom he was engaged to be married. Due to defendant Leissner's many relationships, he was spending a mind-boggling amount of money per month. Instead of working to continue paying for his lavish lifestyle, he decided to steal from 1MDB and from his friends and associates, including plaintiff Ng. Beginning in 2015 and continuing until the present, defendant Leissner stole money from plaintiff Ng, and several other people, claiming, among other things, that he was buying Celsius shares on their behalf, when in fact, he diverted the monies for his personal use.

33.     Beginning in 2015, defendant Leissner's need for liquidity was mounting, unbeknownst to plaintiff Ng. Amongst other obligations, defendant Leissner and Ms. Kimora Lee Simmons were looking at homes listed for tens of millions of dollars in Los Angeles, and the couple had agreed to contribute to a new round of funding for All Def Digital ("ADD"). On or

8

Case 1:18-cr-00538-MKB Document 226-1 Filed 02/25/23 Page 73 of 98 PageID #: 5920

about January 9, 2015, Leissner agreed to the new round of funding for ADD despite telling several people in separate conversations that he needed "liquidity." To try to get "liquidity," defendant Leissner was seeking repayment on a loan he remitted to a company called ISC years prior and promised to invest €2 million to yet another company called Friendsurance. These were only a few of his multiple financial obligations at that time. Another included monthly payments for the yacht he purchased with stolen funds, called Sai Ram.

### Defendant Leissner Induced Plaintiff Ng's Investment Into NHIG for Investment into Celsius, Inc. Based on False Pretenses And Diverted Plaintiff Ng's Property for Personal Use Without Plaintiff Ng's Knowledge or Consent

34.     In or around early 2015, defendant Leissner asked plaintiff Ng to be a co-investor along with defendant Leissner in Celsius, Inc., in which Leissner was investing through NHIG. In the weeks and months that followed, defendant Leissner and plaintiff Ng had numerous conversations and written communications concerning the investment defendant Leissner proposed. Many of these written communications are emails that have been admitted into evidence to the trial of the U.S. v. Ng, and which defendant Leissner has admitted to writing and sending during his sworn testimony at the trial.

35.     Unbeknownst to plaintiff Ng, defendant Leissner was also soliciting investments into Celsius from numerous other friends and acquaintances during the same time period, taking millions of dollars from unsuspecting friends and claiming to use it for investment into Celsius.

36.     On or about February 24, 2015, John Fieldly, the Chief Financial Officer of Celsius, emailed defendant Timothy Leissner that the Celsius Board approved defendant Leissner and the consortium getting, among other things, a seat on the Celsius Board and an 8% discount on Celsius stock.

9

37.     Two days later, on or about February 26, 2015, defendant Leissner met with plaintiff Ng at Fullerton Bay, a hotel in Singapore, and first brought up the idea of plaintiff Ng investing into Celsius through the NHIG.

38.     At the February 26, 2015, meeting between defendant Leissner and plaintiff Ng, defendant Leissner, as part of a scheme to defraud plaintiff Ng and steal his money, solicited plaintiff Ng to invest in Celsius. Defendant Leissner explained to plaintiff Ng that Leissner would be leading a consortium of investors into Celsius. Defendant Leissner touted the merits of Celsius, assured plaintiff Ng that any investment in Celsius would be highly profitable, and that plaintiff Ng would be investing alongside defendant Leissner and others as part of a consortium of investors.

39.     On or about February 27, 2015, in furtherance of the discussions between plaintiff Ng and defendant Leissner concerning defendant Leissner's request that plaintiff Ng invest in Celsius, plaintiff Ng emailed defendant Leissner an article about Celsius. In determining whether or not to invest, plaintiff Ng asked defendant Leissner if the Celsius CEO was himself investing, and defendant Leissner responded that the CEO was making a small investment.

40.     As part of this same discussion, and in order to further persuade plaintiff Ng to invest in Celsius, on or about February 27, 2015, defendant Leissner stated in an email to plaintiff Ng, in substance, that Solina Chau—a wealthy, prominent, respected business-person, CEO of Horizon Ventures Limited Hong Kong—was investing in Celsius and that she would be distributing Celsius's product in China. Defendant Leissner stated this to plaintiff Ng because having Solina Chau actively marketing Celsius products in China was a significant development for Celsius and its profitability. As defendant Leissner testified, "if she can bring Celsius, which

10

Case 1:18-cr-00538-MKB   Document 226-1   Filed 02/25/23   Page 75 of 98 PageID #: 5922

at that time was only being sold in the U.S. and Sweden, essentially, if she could open the Chinese market for distribution there, it could be a very – very significant move for Celsius."

41.     On or about March 7, 2015, ADD was organizing financing for its latest fund raise, in which both defendant Leissner and Ms. Kimora Lee Simmons Leissner had agreed to participate.

42.     On or about March 9, 2015, defendant Leissner communicated with Osman Eralp and Rich Slomovitz, the business manager and accountant for Rush Communications and Russell Simmons. Leissner had, at the time, promised a nearly three-million-dollar investment in ADD. Mr. Eralp asked defendant Leissner if he could wire the money to satisfy the ADD financing through NHIG, to which defendant Leissner responded "[t]hat's not a problem. We should budget for 10 days to get you the money as I have to release some deposits…." Mr. Eralp asked if it would "be possible to write $500k earlier," and defendant Leissner said "[y]es, that would be ok. Will this week work?"

43.     Two days later, on or about March 11, 2015, defendant Leissner emailed plaintiff Ng with bank information for NHIG "for purposes of the investment into Celsius."

44.     The bank information in the email that defendant Leissner sent to plaintiff Ng directed that the funds should be sent to a particular bank located in New York County that was controlled by NHIG.

45.     When defendant Leissner sent the bank information for NHIG to plaintiff Ng, defendant Leissner knew full well that he was going to steal Ng's money and use it for his own investment in ADD. Despite knowing that he was stealing this money from plaintiff Ng, defendant Leissner falsely and fraudulently assured plaintiff Ng that defendant Leissner would "guarantee you the principal amount of the investment." As with the other assurances that defendant Leissner

made in order to defraud plaintiff Ng to part with his money, defendant Leissner blatantly lied to plaintiff Ng about guaranteeing his principal. The truth of course was that defendant Leissner was stealing plaintiff Ng's money and using it for his own investment, and he absolutely knew he was stealing this money at the moment he made the statement about guaranteeing it.

46.     Plaintiff Ng did not know that his money was being transferred to NHIG for the benefit of ADD. Plaintiff Ng believed that he was transferring his money on behalf of an investment consortium. Accordingly, he forwarded defendant Leissner's email to their mutual friend, Boon Kee Tan, and removed the part of defendant Leissner's email guaranteeing the principal, so that Ms. Tan would also have the NHIG banking information for purpose of the investment.

47.     On or about March 16, 2015, defendant Leissner, as part of his scheme to defraud plaintiff Ng out of his money and/or Celsius shares, emailed Osman Eralp regarding the ADD financing. In this email, Leissner lied to Eralp and blatantly misrepresented his relationship with Roger Ng. Leissner wrote that the $500,000 should be coming tomorrow and that the money would be coming from defendant Leissner's "accountant," Roger Ng. Plaintiff Ng was a banker. He worked at Goldman Sachs. He is not, and never was, an accountant. He is not, and never was, defendant Leissner's accountant. Defendant Leissner of course knew that when he told this lie. Indeed, defendant Leissner lied to Osman Eralp because he did not want Eralp to know that defendant Leissner was stealing plaintiff Ng's money.  Also, defendant Leissner did not want Eralp to indicate on company documents or otherwise that this $500,000 belonged to plaintiff Ng. Rather, defendant Leissner lied to Eralp and caused him to falsely believe that this $500,000 was defendant Leissner's money for Leissner's investment into ADD, and that it was being sent by plaintiff Ng only because plaintiff Ng was defendant Leissner's accountant.

12

Case 1.18-cr-00538-MKB Document 226-1 Filed 02/25/23 Page 77 of 98 PageID #: 5924

48.     On or about March 9, 2015, a letter of intent (LOI) was issued from Celsius to Ms. Simmons indicating that KLS, on behalf of an investor group, planned to invest $10,000,000 U.S. at $0.86 per share.  Defendant Leissner presented this LOI to plaintiff Ng so that plaintiff Ng understood the cost of each share he was purchasing in Celsius.

49.     On or about March 11, 2015, defendant Leissner orally stated to plaintiff Ng in substance, and among other things, that if plaintiff Ng invested money in Celsius, defendant Leissner personally guaranteed Ng's principal. In addition to these oral statements, on March 11, 2015, defendant Leissner wrote an email to plaintiff Ng in which he stated, "as it related to your $500,000 I will guarantee you the principal amount of the investment." Defendant Leissner made these representations to Ng both orally and in writing in an effort to convince Ng to participate in the investment. Ng, in turn, relied heavily on Leissner's assurance in deciding to make the investment. Without Leissner making this assurance, Ng would not have participated in the investment being pitched by Leissner.  To this extent, Leissner's assurance that he personally would guarantee Ng's principal was material, and indeed, central, to Ng in his decision to part with the money that Leissner immediately stole.

50.     At the time that Leissner made this statement to Ng, Leissner purported to have, and in fact did have, superior knowledge and control as to the company Celsius, its shares and this investment. Moreover, Leissner also knew that as Ng's former boss at Goldman Sachs, Leissner had a position of authority and expertise in Ng's estimation.  Leissner knowingly and fraudulently made this statement that he would personally guarantee Ng's investment with knowledge that it was false insofar as Leissner never intended to personally guarantee Ng's principal and that Leissner was making this false statement for one reason alone: to gain control of Ng's money and shares with the intent to permanently deprive Ng of them.

13

51.     As part of the false and fraudulent factual representation that Leissner would personally guarantee Ng's principal, defendant Leissner provided to plaintiff Ng wiring instructions to a bank account maintained by NHIG at JP Morgan Chase located at 980 Sixth Avenue in New York, New York.

52.     On March 17, 2015, in reliance on the false and material factual representation of defendant Leissner that he himself would personally guarantee the principal of plaintiff Ng's investment, plaintiff Ng wired $500,000 to the JP Morgan Chase account of NHIG, the address of which is 512 Fashion Avenue, New York, New York 10018, in New York County. Approximately a week after plaintiff Ng wired $500,000 to the NHIG account, defendant Leissner told plaintiff Ng that he should invest an additional $500,000 in Celsius. Leissner reiterated his prior factual assurance that he would personally guarantee Ng's principal.

53.     On or about March 17, 2015, defendant Leissner emailed Osman Eralp and Rich Slomovitz, stating "Btw, there will be two more $500k tranches coming over the next two days. We can decide if we want to keep those in Nu Horizon for now or send them along to ADD."

54.     On or about March 24, 2015, in reliance on Leissner's repeated factual representations that he personally guaranteed plaintiff Ng's investment in Celsius, plaintiff Ng wired another $500,000 to the NHIG account at JP Morgan Chase bank. Plaintiff Ng believed that both $500,000 payments were for NHIG's investment into Celsius. Additionally, on or about March 23, 2015, Boon Kee Tan's husband Yeo Hong Ping transferred $500,000 to the NHIG account at JP Morgan Chase Bank believing that they were also investing into Celsius.

55.     Leissner's factual representations to Ng that Leissner personally guaranteed Ng's investment, which as of the end of March 2015 amounted to $1,000,000, were knowingly and intentionally false and were specifically designed to induce Ng to make an investment that he

14

Case 1:18-cr-00538-MKB   Document 226-1   Filed 02/25/23   Page 79 of 98 PageID #: 5926

otherwise would not have made. Defendant Leissner knew that he exerted influence and authority over Ng and that Ng would be particularly swayed by a promise by defendant Leissner to personally guarantee his investment. First, defendant Leissner had previously been Ng's boss at Goldman Sachs where defendant Leissner was a powerful, rich and influential partner and at all times was superior to plaintiff Ng in rank, income and authority. Second, defendant Leissner had a tremendous advantage in terms of the quality and nature of the information concerning the investment available to, and known by, the two men.

56.    Defendant Leissner's knowingly and intentionally false statements were part of defendant Leissner's long-term plan to acquire and then permanently retain plaintiff Ng's money through additional false and fraudulent statements and actions. Indeed, as of March 2015, defendant Leissner knew something that plaintiff Ng and almost everyone else did not know, specifically that defendant Leissner had committed a massive theft, defrauding the Malaysian public out of funds, and that he needed a criminal war-chest of resources in the event law enforcement one day caught up to him and his criminal confederates.

57.    Because defendant Leissner knew he had committed a massive fraud, and was continuing to do so, and further knew that one day he might be brought to justice, he also knew that he would have to acquire financial resources in any way he could.  He proceeded to compile these financial resources in a variety of fashions including committing fraud against plaintiff Ng in the manner set forth in this Complaint.

58.    On or about March 25, 2015, defendant Leissner invited plaintiff Ng to dinner in Beverly Hills, California and introduced plaintiff Ng to Chris Lai, the Investment Director at Horizon Ventures, Ltd. Hong Kong, the entity jointly investing into Celsius alongside NHIG. In the presence of Ms. Simmons, there was a discussion about defendant Leissner's and Lai's plans

15

to grow the business of Celsius, especially in Asia. During a series of meetings on or about March 25, 2015, and March 26, 2015, Leissner told Lai, his wife Ms. Simmons and others that plaintiff Ng was an investor in Celsius.

59.     Yet, once defendant Leissner received $1,000,000 from plaintiff Ng, unbeknownst to plaintiff Ng, defendant Leissner instructed Eralp and Slomvitz that he "would like to keep $1 million back as I might need the $1mm for something else in the short term.". On or about April 1, 2015, Leissner diverted this $1,000,000 to an Escrow Trust Account for a down payment of a house. On or about April 6, 2015, defendant Leissner diverted $500,000 from NHIG to ADD without plaintiff Ng's knowledge.

60.     On or about April 16, 2015, the investor group consisting of defendant Leissner, Kimora Simmons, Horizon Ventures, plaintiff Ng and others closed the investment in Celsius.

61.     On or about May 2015, Defendant Leissner proposed to plaintiff Ng that defendant Leissner sell him an additional $500,000 in Celsius investment made through NHIG. Plaintiff Ng initially declined to make an additional investment on top of the $1,000,000 he had already invested. However, defendant Leissner insisted that soon he would take an active role in the company and that plaintiff Ng should not worry about making this additional investment as it would be safe and secure.

62.     On or about May 29, 2015, in reliance on defendant Leissner's statements, plaintiff Ng agreed to invest $250,000 more and transferred $250,000 to NHIG's bank account in New York, New York. Additionally, on or about the same day, Boon Kee Tan's husband, Yeo Hong Ping transferred $250,000 to NHIG's bank account. Plaintiff Ng believed that both transfers were for the purpose of NHIG's investment into Celsius.

16

Case 1:18-cr-00538-MKB   Document 226-1   Filed 02/25/23   Page 81 of 98 PageID #: 5928

63.     As of May 29, 2015, plaintiff Ng understood, based on his agreement with defendant Leissner that plaintiff Ng's $1,250,000 investment purchased 1,453,488 shares for $0.86 per share.

64.     However, unbeknownst to plaintiff Ng, two days later, on or about June 1, 2015, Defendant Leissner caused $400,000 to be transferred from the NHIG account at JP Morgan Chase to Nigel Burgess Ltd for payment of his yacht, the Sai Ram. Eighteen days later, on or about June 19, 2015, defendant Leissner caused $100,000 to be transferred from the NHIG account at JP Morgan Chase to KLS Holdings, Ms. Simmons' holding company. Plaintiff Ng believed that his $250,000 payment on or about May 29, 2015, was for the purchase of shares in Celsius, not for the maintenance of defendant Leissner's yacht, and not for an infusion of cash into Ms. Simmons' business.

65.     On or about July 23, 2015, plaintiff Ng was hired as a consultant to Celsius in Asia. As part of his role at the company, he knew that NHIG was part of Celsius' capitalization table. Accordingly, plaintiff Ng believed and understood that the $1,250,000 that he transferred to NHIG's JP Morgan Chase account was for the purchase of Celsius shares.

**Plaintiff Ng Transferred $1,000,000 in 2015 and 2016 to Acquire 50% of Defendant Leissner's Stake in Sentient Technologies**

66.     In or about September 2015, defendant Leissner complained to plaintiff Ng that Ms. Simmons was spending too much money and he needed more money to fuel her expensive lifestyle before extricating himself from the relationship with Ms. Simmons. Defendant Leissner stated that to help cover his costs, he needed a loan in the amount of $500,000. Based on the past relationship between defendant Leissner and plaintiff Ng and the trust plaintiff Ng had in defendant Leissner, plaintiff Ng wired $500,000 to the KLS Holdings LLC as a loan to defendant Leissner on September 2, 2015.

17

Case 1:18-cr-00538-MKB Document 226-1 Filed 02/25/23 Page 82 of 98 PageID #: 5929

67.     In January of 2016, Goldman Sachs put defendant Leissner on leave after they discovered that he falsified a document relating to his co-conspirator in the 1MDB fraud, Jho Low. Without company approval, defendant Leissner wrote a letter on Goldman Sachs' letterhead to Banque Havilland stating that "[i]n the course of Goldman Sachs acting as advisor for the above-mentioned transaction, Goldman Sachs conducted all required regulatory due diligence on the Low Family and hereby confirms that the Low Family's wealth of an estimated $1.8 billion at the point of our engagement was generated through legal means." As defendant Leissner has since admitted, that statement, to a regulated bank, was "not true." It was publicized, at that point in time, that Leissner was leaving Goldman Sachs, but the reason was not yet made public.

68.     Defendant Leissner was facing the fact that his multi-million-dollar salary and bonus had come to an abrupt end, but his cash hemorrhaging was showing no signs of slowing. He and Ms. Simmons were continuing to spend more money than they earned, so defendant Leissner panicked and asked multiple friends and acquaintances for more money. One of those friends was plaintiff Ng.

69.     On or about January 28, 2016, defendant Leissner stated to plaintiff Ng that defendant Leissner was leaving his position at Goldman Sachs and that he was hemorrhaging money due to Ms. Simmons' lifestyle. Defendant Leissner asked plaintiff Ng for a loan that would be against defendant Leissner's Goldman Sachs shares. During this conversation, defendant Leissner assured plaintiff Ng that his $1,250,000 investment in Celsius was secure, despite defendant Leissner's own financial difficulties at the time. Plaintiff Ng stated that he would not be comfortable loaning against defendant Leissner's Goldman Sachs shares but would instead convert the $500,000 September 2015 payment and an upcoming $500,000 payment into a $1,000,000 stake in an Artificial Intelligence company Leissner had invested in called Sentient Technologies.

18

Case 1:18-cr-00538-MKB   Document 226-1   Filed 02/25/23   Page 83 of 98 PageID #: 5930

70.     During conversations on or about January 28, 2016, and at other times during this time period, defendant Leissner stated to plaintiff Ng that plaintiff Ng's investment was secure, and that defendant Leissner would keep the promises he had made that defendant Leissner would continue to personally guarantee plaintiff Ng's investment. Moreover, defendant Leissner stated to plaintiff Ng that Celsius was profitable and that Ng's shares would turn a large profit at the appropriate time.

71.     Leissner's statements during this time period were false and were intended to induce plaintiff Ng into keeping his $1,250,000 Celsius investment with defendant Leissner and not pulling any or all of those funds out of the investment.  However, defendant Leissner was simply lying to plaintiff Ng all the while knowing that Leissner had designs on keeping Ng's money and his shares, which as of January 28, 2016, were worth approximately $3 million.

72.     On or about February 1, 2016, defendant Leissner and plaintiff Ng finalized an agreement whereby plaintiff Ng would transfer $500,000 more, in addition to the $500,000 plaintiff Ng transferred on or about September 2, 2015, to acquire 50% of defendant Leissner's interest in Sentient Technologies.

73.     On or about February 4, 2016, plaintiff Ng transferred $500,000 to defendant Leissner.

74.     Despite plaintiff Ng repeatedly asking defendant Leissner for his shares in Celsius and his shares in Sentient, defendant Leissner has never transferred either to plaintiff Ng.

75.     On or about November 11th and 12th, 2016, the defendant Timothy Leissner, his ex-wife, Judy Chan, plaintiff Ng and plaintiff Ng's wife, Hwee Bin Lim, met in Hong Kong with Master Pang.  On or about November 12, 2016, while at the Shangri La Hotel in Hong Kong, plaintiff Ng asked defendant Leissner for plaintiff's shares.  Defendant Leissner responded that

19

Case 1:18-cr-00538-MKB Document 226-1 Filed 02/25/23 Page 84 of 98 PageID #: 5931

NHIG still held plaintiff Ng's shares and that defendant Leissner would give plaintiff Ng the shares

as soon as possible. Defendant Leissner explained during this meeting that he intended to divorce

his wife Ms. Simmons, and that as soon as he did, he would give plaintiff Ng the shares he owed

him. Defendant Leissner also stated that he needed some additional time to divorce Ms. Simmons

and that he would give plaintiff Ng the shares in a short amount of time.

Defendant Leissner's statements directly to plaintiff Ng while the two men were in the presence

of the others at the Shangri La hotel in Hong Kong were false, fraudulent and intended to deceive

plaintiff Ng. Defendant Leissner had no intention of giving plaintiff Ng the shares in a short

amount of time or indeed at any time. Simply put, defendant Leissner lied to plaintiff Ng's face,

and he did so in order to convince plaintiff Ng to stop asking about the shares by instilling in him

the false belief that the shares were available and that defendant Leissner would give them over

shortly. The falsity of defendant Leissner's statements is borne out by the fact that as of November

2022, almost six years later, defendant Leissner still has not provided plaintiff Ng with the shares,

and, short of being sued, would never do so.

### Defendant Leissner Fraudulently Transferred the Shares on May 9, 2018

76.     On or about May 9, 2018, defendant Leissner spoke with plaintiff's wife, Lim Hwee

Bin, by telephone. During this call, Leissner stated that he would provide plaintiff Ng and his wife

a total of 1,400,000 shares of Celsius by no later than October of 2018.

77.     Defendant Leissner's statements to Lim Hwee Bin were false and were made with

the specific intention of mollifying both Lim Hwee Bin and her husband, plaintiff Ng, who were

anxious to gain possession of these shares.

78.     By making these false statements to Lim Hwee Bin, defendant Leissner was hoping

and intending that she would tell her husband, plaintiff Ng, that defendant Leissner made oral

Case 1:18-cr-00538-MKB   Document 226-1   Filed 02/25/23   Page 85 of 98 PageID #: 5932

representations that the shares were secure and that he would be providing them with a total of

1,400,000 shares in roughly six months' time.

79.     However, unbeknownst to plaintiff Ng, that same day, on or about May 9, 2018, a

schedule 13G was filed with the Securities and Exchange Commission for Celsius Holdings, Inc.

related to the 3,972,659 NHIG shares. The Schedule 13G reports that defendant Leissner and Mr.

Simmons caused a series of transactions to occur by which defendant Leissner, Ms. Simmons,

Keyway Pride, Midas Commodities Agents LLC, Ghanim Saad M Al-Saad Al-Kuwari, Newland

Inc. Limited and Oryx obtained full dominion, custody and control over NHIG and its interests in

Celsius. The net sum of defendant Leissner's unlawful transactions set forth herein is that NHIG,

and thereby plaintiff Ng, were defrauded such that his ownership interests in the roughly 1.4

million Celsius shares, were converted and misappropriated by defendant Leissner; and in

addition, ownership and control of NHIG was converted and fraudulently transferred to defendant

Leissner and others.

80.     On October 31, 2018, plaintiff Ng was arrested and incarcerated in Kuala Lumpur,

Malaysia on a provisional U.S. arrest warrant. Central to the Government's case against plaintiff

Ng was the defendant Leissner. As he testified at the trial in <u>United States v. Ng</u>, Leissner had been

debriefed many times by the Federal Bureau of Investigation between June 12, 2018, and October

31, 2018, the day on which plaintiff Ng was arrested and incarcerated. As defendant Leissner also

admitted during his testimony, defendant Leissner lied repeatedly to the FBI in an effort to

implicate plaintiff Ng in criminal conduct in which defendant Leissner knew he was not involved.

81.     In February and March 2022, defendant Leissner testified against plaintiff Ng at the

trial of <u>United States v. Ng</u>. During this testimony, defendant Leissner admitted to having told

numerous lies to the FBI on a great range of subjects. However, one of the many lies that Leissner

21

Case 1:18-cr-00538-MKB   Document 226-1   Filed 02/25/23   Page 86 of 98 PageID #: 5933

told during the trial is that he did not steal plaintiff Ng's shares of Celsius and had only asked

plaintiff Ng to "borrow money." On this point, Leissner testified as follows:

> Q: Did there come a time when didn't have access to more money?
> A: Yes.
> Q: How was that possible since you received millions of dollars from the scheme and from Goldman Sachs?
> A: As I mentioned, I had made several investments in companies, as well as real estate, in other items such as the boat. All of these investments were essentially illiquid meaning, that I couldn't just buy and sell those assets and raise more cash out of it. I had to, effectively, borrow against those assets or borrow money on a stand-alone basis. But it had been spent on investments that weren't throwing cash off back to me as quickly as I wanted it to be.
> Q: Why did you need more money?
> A: Because I was continuing to make investments that I found attractive and I was also using it on providing for the family.
> Q: And that family, which family at that point?
> A: My family with Kimora.
> Q: Did you ever ask anyone for money during that time?
> A: Yes, sir. I asked several of my friends to borrow money from them.
> Q: Who did you asked?
> A: I asked Roger for some, Boon-Kee, Jasmine, and other friends as well.
> Q: Why did you ask them?
> A: Because they were very close to me and we trusted each other.

82.     Defendant Leissner continued to lie on the witness stand about the money plaintiff

Ng entrusted Leissner with—even stating that the $1,250,000 that plaintiff Ng paid to NHIG was

somehow used to acquire defendant Leissner's stake in Sentient:

> Q: Did you pay the millions back to the defendant – how much was it?
> A: A million and a quarter.
> Q: Did you pay the million and a quarter back to the defendant?
> A: No. We had one agreement whereby part of the – part of that payment, that one and a quarter, was used to acquire a stake I had in a company called Sentient Technologies which was an artificial intelligence company. I believe he took half of that million dollars or so of that investment. My investment had been 2 million. So he got half of that, a million dollars worth, and I had the intention to pay him back over time.
> Q: Did you pay him back?
> A: No. We had not established a timetable for a repayment, sir, and I had not -- I didn't have a chance to pay him back.

22

Case 1:18-cr-00538-MKB   Document 226-1   Filed 02/25/23   Page 87 of 98 PageID #: 5934

83.    These lies, which happened to be told in a federal courtroom, was just another lie that defendant Leissner told plaintiff Ng repeatedly between 2015 and 2022 in an effort to get and retain Ng's money and shares in Celsius.

### FIRST CAUSE OF ACTION
### (COMMON LAW FRAUD)

84.    Plaintiff repeats and realleges the allegations contained in all prior paragraphs as if set forth fully here.

85.    As alleged above, defendant Leissner lied to plaintiff repeatedly as part of an ongoing fraud to gain access to plaintiff's money, to falsely lead plaintiff to believe that defendant was securing the Celsius shares, and to discourage plaintiff from taking legal action to recoup his shares in Celsius.

As alleged above, defendant Leissner made numerous, specific misrepresentations of material facts as well as omissions of fact.  In addition, these misrepresentations and omissions were false and were known to be false by defendant Leissner. Moreover, defendant Leissner made these misrepresentations and omissions for the purpose of tricking Ng into relying on them.  Also, given the nature of the misrepresentations and omissions as well as the relationship between the parties, plaintiff Ng was justified in relying on them.  Finally, plaintiff Ng did rely on these material false statements and omissions and has been injured in an amount in excess of $130,000,000.

### SECOND CAUSE OF ACTON
### (FRAUD IN THE INDUCEMENT)

86.    Plaintiff repeats and realleges the allegations contained in all prior paragraphs as if set forth fully here.

87.    As alleged above, defendant Leissner represented matters of fact to plaintiff Ng. These misrepresentations were material and false. Moreover, defendant Leissner knew his

Case 1:18-cr-00538-MKB   Document 226-1   Filed 02/25/23   Page 88 of 98 PageID #: 5935

misrepresentations were false and that he intentionally made them in order to induce plaintiff Ng

into relying on them. Plaintiff Ng did in fact rely on the material, false misrepresentations and did

not know that they were false.

88.     As a result of his reliance, plaintiff Ng was injured in an amount in excess of

$130,000,000.

### THIRD CAUSE OF ACTION
### (UNJUST ENRICHMENT)

89.     Plaintiff repeats and realleges the allegations contained in all prior paragraphs as if

set forth fully here.

90.     By reason of the defendant's conduct, the defendant has profited and has enriched

himself unjustly at the expense of, and to the detriment of, the plaintiff.

91.     The defendant should not be permitted, as a matter of fairness and equity and in

good conscience, to retain for himself the money and shares that rightfully belong to the plaintiff.

92.     By reason of the false and fraudulent statements of the defendant, the defendant has

realized profit of in excess of $130,000,000, for which sum the defendant is liable to the plaintiff.

93.     WHEREFORE, plaintiff demands judgment on each of the causes of action in an

amount to be determined by the Court but which is in excess of $130,000,000.

Dated: November 11, 2022
       New York, New York

                                        BRAFMAN & ASSOCIATES, P.C.


                                        Marc A. Agnifilo, Esq.
                                        *Attorneys for Plaintiff*
                                        256 Fifth Avenue, 2nd Floor
                                        New York, New York 10001
                                        (212) 750-7800

24

Case 1:18-cr-00538-MKB   Document 226-1   Filed 02/25/23   Page 89 of 98 PageID #: 5936

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

-------------------------------------------------X

NG CHONG HWA, also known as                        Index No.
ROGER NG,

                Plaintiff,

   -against-

TIMOTHY LEISSNER,

                Defendant.

-------------------------------------------------X

## ATTORNEY'S CERTIFICATION

      Pursuant to 22 NYCRR130-1.1, the undersigned, an attorney admitted to practice in the courts of New York State, certifies that, upon information and belief and reasonable inquiry, the contentions contained in the annexed document(s) are not frivolous.

Dated:      November 11, 2022
           New York, New York

                            BRAFMAN & ASSOCIATES, PC

                            Marc A. Agnifilo, Esq.
                            256 Fifth Avenue, 2nd Floor
                            New York, New York 10001
                            (212) 750-7800

**EXHIBIT**

**23**

*United States v. Roger Ng*, 18 Cr. 538 (MKB)



# THE NEW YORK MENTAL HEALTH GROUP

**Jennifer A. McCarthy, Ph.D.**
**Executive Director**

## _Psychiatric Evaluation_

February 8 2023

Ng Chong Hwa
PACTS #: 5974371
Date of Birth: August 22, 1972

**Identifying Information**

Mr. Hwa is a 50-year-old Malaysian man who is came to be under my care in September 2022. He was under house arrest and mandated by a curfew. He was post-conviction and presentencing on charges of conspiracy under the Foreign Corrupt Practices Act. He was extradited from Malaysia to the Eastern District Federal Court in Brooklyn in 2018. Mr. Hwa lived alone and was financially supported by his sister and his brother.

**Background Information**

Mr. Hwa told me he was born and raised in Malaysia by both his parents. His father used corporal punishment, but it was within cultural norms. Mr. Hwa moved to London and studied finance at the City University in London. He earned his MBA from the Imperial College in London. Mr. Hwa lived and worked in Malaysia before his arrest in 2018 and his extradition to the United States in 2019.

Mr. Hwa married his wife in 1997 and they had a daughter. His daughter was 5 years old at the time of his arrest and 10 years old at the time of this evaluation. He Facetimed with her daily, and he read her a bedtime story every night. A big source of his anxiety and depression at the time this evaluation was requested centered around what he would tell his daughter because she asked questions about his whereabouts and when he was coming home.

Mr. Hwa told me he was arrested in 2018 and had been under house arrest with an ankle bracelet since his arrival in the United States. Because the government asked for more time, the case dragged into the COVID-19 pandemic and the Courts were closed for several months. Mr. Hwa's trial took place in March and April 2022 and that was the only time he saw his wife in the past five years. Mr. Hwa was convicted in May 2022.

**EXHIBIT**

**24**

_United States v. Roger Ng, 18 Cr. 538 (MKB)_

**Lama Bazzi MD MRO FAPA**
**Brooklyn Office: 26 Court Street, Suite 702, Brooklyn, NY 11242**
**Manhattan Office: 100 Church Street, Suite 800, New York, NY 10007**
**Long Island Office: 171 South Wellwood Avenue, Suite A, Lindenhurst, NY 11757**
**T: 347-661-9002          F: 347-438-3073**

**Psychiatric History**

Prior to his detention in 2018, Mr. Hwa told me that he did not have a history of psychiatric illness or psychiatric symptoms. He denied having a history of anxiety, depressive episodes, nightmares, insomnia, mania, or psychosis. Mr. Hwa did not have a history of being psychiatrically evaluated for any reason before today. He had never been in a psychiatric emergency room or psychiatrically hospitalized. He had never been prescribed any psychiatric medications for any reason.

**Medical History**

Mr. Hwa had not been to see a physician for a check up for over five years since his extradition to the United States. He had a history of prediabetes and his father died of diabetes. He was constantly thirsty and often fatigued, which he thought could perhaps be diabetes. He had a history of Hepatitis B he said he contracted from having the live vaccine administered to him back home in Malaysia. He said the disease was remitting and relapsing in nature. Mr. Hwa contracted malaria and leptospirosis while in prison in November 2018. Mr. Hwa complained of nonspecific tingling and weakness in his upper extremities, which he believed could be because of a 2011 motor vehicle accident where he sustained neck injuries. Mr. Hwa had not seen a dentist in five years either.



**Current Psychiatric Status**

Mr. Hwa told me he was struggling with depressed mood, poor concentration, anxiety, constantly feeling wound up, variable appetite, and difficulty sleeping. He explained he was unable to work so his sister and his brother supported him. His wife had run out of funds, and she took care of her elderly parents. Her father required regular blood transfusions and she had a lot of responsibilities. He did not have thoughts of harming others.

**Description of Traumatic Events Leading to Post Traumatic Stress Disorder**

Mr. Hwa told me that his traumatic experiences began with his detention at the Sungai Buloh prison facility in Malaysia while awaiting extradition to the United States. Mr. Hwa did not have an advocated explaining his legal situation to him or informing him through the extradition process. He was in solitary confinement, unable to communicate with the outside world for the next 183 days. His prison cell consisted of a small room with a tiny window, a hole in the ground that served as a toilet and a water tap. There were no clocks in the room so he would listen for the call to prayer from the prison mosque to estimate the time of day.

Mr. Hwa did not bathe, brush his teeth, or have contact with a familiar face for two weeks. When they did visit, he was able to get soap, a toothbrush and toothpaste. He had a single plastic cup he was to use for bathing, drinking, and for receiving his food rations. He was allowed to see his family once a week for 40 minutes. He went outside into a yard for one hour a week and otherwise stayed indoors, in his cell, alone.

Mr. Hwa was in a high security wing, in solitary confinement, surrounded, to his best knowledge, by murderers and drug dealers. He heard frequent altercations between the inmates the wardens, and inmates were beaten by the wardens with thick, rubber pipes. If one inmate transgressed to the point of warranting punishment, yard time was revoked from all inmates, so there were times where he was confined for weeks at a time. He lived in a state of constant fear and was afraid he was going to die if he slept. It was difficult to sleep well anyway because the lights were on in his cell 24 hours a day. He was woken up every two hours, around the clock. It was during his time in prison that he developed nighttime panic attacks, insomnia, and overwhelming hypervigilance.

Mr. Hwa began having visual and auditory hallucinations, which were terrifying. He did not know if the sounds he was hearing were real, because he did often hear inmates screaming all night. However, he also heard relentless screaming when there was no one around. Eventually Mr. Hwa dissociated completely ███████████████████████████████████ ████████████ to survive.

I asked Mr. Hwa why he kept insisting that he was physically ill or that he had some physical ailment that was not being noticed or diagnosed. He told me he became very ill in November 2018, shortly after his confinement began. He was vomiting and had diarrhea around the clock for four days before a doctor saw him. The doctor only offered him the equivalent of Tylenol. After another three days, he became delirious and lost consciousness. Only then was he taken to the prison infirmary, where a nurse gave him antibiotics and more Tylenol, telling him this was food poisoning. He continued to deteriorate and after 10 days of being sick, while still suffering from vomiting, diarrhea, and body aches, he was chained to another 20 prisoners and driven 45 minutes in a bus with no seats to go to court for a hearing.

After about two weeks of being sick, laboratory testing was conducted and showed he had Malaria and Leptospirosis, a parasitic infection endemic to developing regions. He was vomiting and defecating blood and yet the hospital kept trying to discharge him back to the prison, he would spend time in the infirmary, and need to be taken back to the hospital. His recovery was arduous, and he did not trust that physicians would tell him the truth about his medical status, which was why he worried about every ache and pain and was convinced, much of the time, that his organs were failing, and he was going to die.

Mr. Hwa came to the United States under the impression that he would be able to prove that he was innocent and did not understand the adversarial nature of the U.S. legal system. In the United States, he was under house arrest, and he was allowed limited time to do laundry and collect necessary household items. Mr. Hwa saw a doctor in May 2019 and the doctor recommended he be allowed to go outside. Mr. Hwa was desperate for community, and he was becoming hopeless ████████████████████████████████████████████ ████████████████████ He was allowed to worship at the Tibetan temple, which has brought him some relief.

Every time Mr. Hwa has fallen ill while here in the United States, his trauma is reactivated, and he becomes fearful he is going to die. Because he does not have family here or a support system and he does not have health insurance, he fears that he will have a bout of Malaria or contract another illness and he will die alone. He has images of himself dead in his apartment, his corpse rotting, and no one finding his body for a week, while his wife and daughter Facetime him and he does not respond.

Mr. Hwa's insomnia became so bad ███████████████████████████████████ █████████████████████████████████████████████████████████████████████ ███████████████████████████ his dismal future would be the worst at night.

**Psychiatric Treatment Course**

Mr. Hwa was started on Gabapentin, a medication used to stabilize mood. Gabapentin also helps with anxiety, depressed mood, and insomnia. ███████████████████████████████████ █████████████████████ Despite sleeping better, he has become more anxious and depressed as time has progressed.

Because of his ongoing complaints of fatigue, excessive thirst, and numbness and tingling in his extremities, Mr. Hwa underwent laboratory testing. His bloodwork did not show any abnormalities that would account for his symptoms. While he did not have health insurance and could not afford more extensive testing, I recommended he be seen by a Primary Care Physician who could then make appropriate referrals to specialists who could adequately work up his symptoms, determine their cause, and offer him treatment.

**Mental Status Examination on February 8, 2023:**  Mr. Hwa cooperative with the interview. He made good eye contact with me. He spoke with a normal rate, rhythm, and volume. He did not have any auditory or visual hallucinations. He was depressed, anxious, and ruminating about his physical health, the symptoms he was experiencing and worried about dying from diabetes, liver failure, or another silent ailment. Mr. Hwa's mood was depressed, and his affect was flat and unanimated. Mr. Hwa had good insight into his situation. He had no thoughts, intent, plan, or desire to harm others. ████████████████████████████████████, but he had no intention of acting on it.

**Diagnostic Impression**

███████████████████████████

**Post Traumatic Stress Disorder**

**Agoraphobia with Panic Disorder**

**Persistent Depressive Disorder**

**Somatic Symptom Disorder**

**Discussion:**

4

Mr. Hwa is a 50-year-old man with no prior psychiatric history who was extradited to the United States, where he was convicted on federal charges of corruption. He was awaiting sentencing when he presented with depressed mood, heightened anxiety, rumination, fearfulness, and insomnia. He was interested in a medication that would decrease his anxiety, help him sleep, and help his mood. Considering he had a history of intermittent liver disease; I offered him risks/benefits/alternatives to Gabapentin. He agreed to taking 300 to 900 mg of Gabapentin at bedtime daily. I offered him Gabapentin 100 mg to use as needed for anxiety.

Because Mr. Hwa continued to complain of tingling and numbness in his hands and arms, relentless fatigue, and constant thirst, we ordered laboratory tests for him. His bloodwork did not show any significant abnormalities that would explain his symptoms and he remained convinced that he was suffering from a silent illness that would kill him unexpectedly. It is my recommendation that Mr. Hwa see a Primary Care Physician who could make the appropriate referrals to specialists who could then work up his symptoms. Because Somatic Symptom Disorder is a diagnosis of exclusion, only once any physical abnormalities are ruled out can a diagnosis of Somatic Symptom Disorder be made.

Mr. Hwa's psychiatric status is concerning as his Post Traumatic Stress Disorder symptoms are prominent. He is hypervigilant and mistrustful, he has mood swings, he has difficulty sleeping, he suffers from a foreshortened sense of the future, is constantly waiting for something bad to happen, and he lives in fear of those in authority who have control of his life subjecting him to solitary confinement or locking him in a small space. He has nightmares, awakens in cold sweats on a nightly basis and he is unable to sleep without ████████████████████, high doses of Gabapentin. He has panic attacks in crowds because he has flashbacks to being in the bus, shackled to other prisoners, sick, vomiting, and suffering from diarrhea and delirium. Mr. Hwa's mood symptoms are still present and although he is sleeping better on the Gabapentin, he remains anxious, depressed, and somatically preoccupied. He is desperately afraid of confinement and he dissociates completely when he thinks about how it will feel to be in a small room, alone, cold, and wet, again. He frequently hyperventilates when he thinks about confinement and the unknown nature of his future makes him feel more helpless, hopeless, and completely alone.

I considered the possibility that Mr. Hwa was malingering or exaggerating his PTSD symptoms. After meeting with him several times and discussing his case with his therapist, I ruled out malingering. He has symptoms of genuine PTSD that he does not thrust forward and that he avoids discussing, if he can. He is emotionally detached from his experiences but simultaneously clearly has intrusive thoughts about his past and is scared to reactivate his PTSD and avoids talking about the details of his confinement. His insomnia is so profound and his night time panic attacks and nightmares so frequent, that, looking at the totality of the circumstances and the specific constellation of symptoms from which he suffers, it is highly unlikely that Mr. Hwa is malingering and it is more likely than not that his symptoms are genuine.

Because Mr. Hwa suffers from PTSD and has frequent dissociation from reality, he sometimes appears to be unengaged in the conversation or distant from the emotions associated with his trauma. This is a hallmark of PTSD and is a primitive defense mechanism that occurs when he is flooded emotionally and feels completely incapacitated by his experiences. Mr. Hwa's treatment for PTSD is limited by his financial situation, the fact that he is not entitled to health insurance, and the nature of his house arrest and terms under which he lives in the community. This exacerbates his somatic fears that he is actually dying and no one will help him, and he imagines

himself dead, alone, for days before anyone notices, almost on a daily basis.

Mr. Hwa's experiences in confinement in Malaysia rise to the level of Criterion A of PTSD and he has all of the hallmark symptoms of PTSD. These symptoms are unlikely to resolve spontaneously, and his PTSD is likely going to be exacerbated by confinement and by any experiences that reactivate his trauma.  The prognosis for PTSD, even in the best of circumstances, is guarded because the individual must first be able to believe that that world can be safe for them and that they are competent in navigating their circumstances and that they have agency over their lives and their future. Because this is not the case for Mr. Hwa, it is likely that his PTSD is chronic in nature, and he will decompensate in times of stress and in situations that reactive his trauma.

Please feel free to contact me with any questions or for clarification.


Lama Bazzi MD MRO FAPA
Board Certified Adult and Forensic Psychiatrist
Board Certified Addiction Medicine Specialist
2/24/2023