AES/DGR/DAS
F. #2016R00467

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
– – – – – – – – – – – – – – – – – – –X

UNITED STATES OF AMERICA

    - against -                          Docket No. 18-CR-538 (MKB)

NG CHONG HWA,
      also known as "Roger Ng,"

               Defendant.

– – – – – – – – – – – – – – – – – –X

## THE GOVERNMENT'S SENTENCING MEMORANDUM

                                BREON PEACE
                                United States Attorney
                                Eastern District of New York

                                BRENT WIBLE
                                Chief, Money Laundering & Asset
                                      Recovery Section
                                Criminal Division

                                GLENN LEON
                                Chief, Fraud Section
                                  Criminal Division

Alixandra E. Smith
Drew G. Rolle
Dylan A. Stern
Assistant United States Attorneys

David A. Last
Trial Attorney

## TABLE OF CONTENTS

PRELIMINARY STATEMENT .......................................................................................... 1

I.    FACTUAL BACKGROUND .................................................................................. 4

    A.    Overview ...................................................................................................... 4

    B.    The Defendant's Relationship with Jho Low.............................................. 6

        1.    The Defendant Knew of "Red Flags" in Low's Background ................... 7

        2.    Ng Continued to Discuss Business Opportunities with Low..................... 9

        3.    Ng's Personal Relationship with Low ..................................................... 10

        4.    The Defendants' Use of Personal Email Accounts................................. 11

    C.    The Bribery Scheme ................................................................................. 11

        1.    Project Magnolia .................................................................................... 11

        2.    Project Maximus and Project Catalyze ................................................... 16

    D.    Circumvention of Goldman's Internal Accounting Controls.............................. 19

    E.    Money Laundering Conspiracy................................................................ 22

        1.    Corrupt Payments from Project Magnolia .............................................. 23

        2.    Additional Corrupt Payments Received by The Defendant..................... 26

        3.    Account Activity After the Corrupt Payments........................................... 27

    F.    Additional Evidence of The Defendant's Knowledge and Corrupt Intent .......... 29

II.    APPLICABLE PENALTIES ............................................................................... 31

    A.    The Applicable Guidelines Term of Imprisonment is Life, and the Restricted
Guidelines Term of Imprisonment is 360 months .................................. 31

    B.    The Defendant's Objections to the Guidelines Calculation Are Unavailing........ 33

        1.    The Sentencing Enhancement for "More than One Bribe" is Warranted . 34

        2.    The Sentencing Enhancement for a Total Bribe Amount in Excess of
$550,000 is Warranted .............................................................. 36

        3.    The Sentencing Enhancement for Obstruction of Justice is Warranted ... 39

        4.    The Defendant Has Not and Cannot Show He is Entitled to a Minimal
Role Reduction.................................................................................... 42

        5.    Even Accepting the Defendant's Arguments, the Applicable Guidelines
Calculation Remains Approximately 20 Years' Imprisonment............... 49

    C.    The Court is Required by Statute to Order Forfeiture in the Amount of $35.1
Million.................................................................................................... 51

        1.    Legal Standard ....................................................................................... 51

2

2. Evidentiary Basis for the Government's Proposed Order of Forfeiture ... 54

3. The Defendant is Not Permitted to Offset or Reduce Forfeiture Owed to the United States by Funds Paid to Malaysia to Avoid Criminal Prosecution.................................................................................. 55

D. The Court Has Discretion to Order the Defendant to Pay a Fine ........................ 57

III. LEGAL STANDARD........................................................................................................ 58

IV. A Substantial Term of Imprisonment is Warranted ........................................................ 60

A. Nature and Circumstances of the Offense (18 U.S.C. § 3553(a)(1)).................... 60

B. History and Characteristics of the Defendant (18 U.S.C. § 3553(a)(1))............... 62

C. The Need for General Deterrence (18 U.S.C. § 3553(a)(1)) ................................ 71

V. The Defendant's Additional Arguments for a Time Served Sentence Should Be Rejected .................................................................................................................................. 74

A. Unwarranted Sentencing Disparities................................................................... 75

B. The Defendant's Pre-Extradition Detention in Malaysia..................................... 77

C. The Defendant's Time on Bail in the United States ............................................ 83

D. The Defendant's Citizenship.............................................................................. 85

E. The Defendant's Pending Criminal Charges in Malaysia.................................... 88

CONCLUSION.......................................................................................................................... 89

## PRELIMINARY STATEMENT

The defendant Roger Ng played a critical role in a massive bribery and money laundering scheme that stole billions of dollars intended for infrastructure and economic projects to aid the Malaysian people, and used it instead to pay bribes to at least a dozen corrupt government officials in Malaysia and Abu Dhabi, as well as to line the pockets of the defendant and others who masterminded the scheme.  As overwhelmingly proven at trial, the defendant—a well-educated, sophisticated investment banker who was a Managing Director at Goldman Sachs—acted to execute his part in the scheme knowingly and deliberately, profited handsomely by taking more than $35 million for himself and carefully covered his tracks.  His participation in a crime so brazen and audacious that defense counsel opened his trial defense by calling it "one of the biggest financial crimes in the history of the world" was a choice, and it warrants substantial and meaningful punishment.

To ensure that the scheme would succeed, the defendant conspired with international fixer Jho Low and fellow Goldman Sachs banker Tim Leissner to structure lucrative, billion-dollar bond deals for 1MDB, a company owned and controlled by the Malaysian government, which were intended to raise money for projects to develop Malaysia's economy.  The defendant's role was to give the deals the veneer of legitimacy, so that no one would suspect that the money raised would go not to economic projects in Malaysia but instead to pay off government officials and to provide massive kickbacks.  The defendant was also instrumental in getting Goldman to approve the deals by concealing from Goldman's internal committees their true nature so that those committees would authorize them.  And once the deals were complete, and the defendant received what he had been promised for helping to execute the scheme—kickbacks totaling more than $35 million—he concealed both his illegal profits and his

1

participation in the scheme by funneling the kickbacks to a shell company and laundering them through a series of bank accounts in the names of his wife and mother-in-law, deleting email accounts linking him to his crimes and lying repeatedly to law enforcement in two countries about his knowledge of the scheme itself and the true source of those funds.

At the time that the defendant committed these crimes, he was already making more than a million of dollars a year at Goldman Sachs. He was motivated by the glory of bringing in the biggest deals that Goldman had ever done in Asia, by the prospect of advancing within the bank and by pure greed—the chance to increase his wealth exponentially. The $35 million he ultimately reaped is an almost incomprehensible amount of money for one person. And truly, the numbers in this case are staggering: more than a billion dollars in bribes paid to a dozen corrupt government officials in Malaysia and Abu Dhabi, and more than a billion dollars in kickbacks to the defendant, Leissner, Low and others. That's because the money was supposed to go to help the people of Malaysia on a national level: to build roads, to improve the country's power grids, and to better their lives. Instead, the defendant his co-conspirators stole that money and enabled the corruption of officials in two countries, which caused real and lasting harm far beyond the dollars that were stolen. Foreign corruption undermines the public's confidence in international markets and institutions, it destroys people's faith in their leaders and it is deeply unfair to everybody else who plays by the rules. And when, as here, foreign corruption is undertaken by the defendant and others working for an American bank operating overseas, it impacts the confidence and trust in American businesses worldwide.

The defendant must be held to account for these serious crimes. His sentence must also send a message to other professionals in the financial world who are tempted to gain an advantage or to win business through cheating and bribery. But the defendant's sentencing

memorandum seeks to minimize his conduct and defy the jury's verdict.  As the defendant would tell it, Leissner and Low are the true criminals; the defendant was just in the wrong place at the wrong time, a low-level functionary unaware of the massive scheme unfolding with his assistance; and ultimately, as the person with the "least authority, influence and power of virtually everyone involved," the only true victim of the crimes.  (Defendant's Sentencing Memorandum, ECF No. 226 ("Def. Mem.") at 68).  Based on this premise, and the suggestion that he has "already been punished" (id. at 2), the defendant takes the extraordinary step of seeking a time served sentence, equivalent to six months, despite an effective Guidelines term of 360 months' imprisonment—that is, an approximately 98% reduction in his sentence.

The defendant is not entitled to the truly extraordinary sentence that he seeks. The defendant was proven guilty at trial, where the evidence showed that he was not a victim. He was a deeply corrupt banker, who carefully cultivated a relationship with Low over many years, who repeatedly lied to Goldman, violated its rules and discussed paying bribes in exchange for business with Low and Leissner long before participating in his crimes of conviction.  He committed his crimes knowingly and deliberately over several years.  He was convicted because of the actions he chose to take.

The defendant faces a Guidelines term of life and an effective Guidelines term of 360 months' imprisonment.  This range appropriately reflects the serious nature of his extensive, deceptive and deliberate criminal conduct.  Although the government agrees that a sentence at or near this range is unwarranted in this instance, for the reasons set forth herein, the Court should nonetheless reject the defendant's extraordinary request to avoid meaningful punishment. Instead, the government urges the Court to sentence the defendant to a substantial term of imprisonment of no less 180 months.

3

I.      **FACTUAL BACKGROUND**[1]

    A.      Overview

       1Malaysia Development Berhad ("1MDB") was a strategic investment and development company wholly owned and controlled by the government of Malaysia.  The International Petroleum Investment Company ("IPIC") was a sovereign wealth fund wholly owned by the government of Abu Dhabi.

       In 2012 and 2013, 1MDB engaged in three bond transactions (the "1MDB Bond Transactions"), which collectively raised more than $6 billion for 1MDB.  The 1MDB Bond Transactions were either directly or indirectly guaranteed by IPIC.  The purpose of the funds raised by the 1MDB Bond Transactions was to support energy- and infrastructure-related projects that would benefit the Malaysian people.

       The Goldman Sachs Group, Inc. ("Goldman Sachs") and its subsidiaries and affiliates (collectively, "Goldman") facilitated the 1MDB Bond Transactions.  The defendant Ng Chong Hwa, also known as "Roger Ng," was a Goldman employee during this period.  The defendant agreed with others, including co-defendants Tim Leissner ("Leissner"), another Goldman employee, and Low Taek Jho, a Malaysian financier also known as "Jho Low" ("Low"), to pay bribes to foreign officials in Malaysia and Abu Dhabi, including officials at 1MDB and IPIC.  In exchange for these corrupt payments, the 1MDB officials agreed to hire

---

[1] Many of these facts are also set forth in the PSR, at ¶¶ 8-75.  The defendant has objected to certain of these facts in his objections to the PSR, which were provided to the Probation Department ("Probation") on January 27, 2023 (see ECF No. 222, "Def. PSR Obj.").  The government filed its responses on February 15, 2023 (see ECF No. 223 ("Gov't PSR Response")), and incorporates its responses to objections to these facts by reference here.

Goldman to orchestrate the 1MDB Bond Transactions.  For its work on the 1MDB Bond Transactions, Goldman ultimately earned more than $600 million in fees and revenue.

In total, the defendant, Leissner and Low conspired for billions of dollars that were raised through the 1MDB Bond Transactions to be laundered into accounts that Low personally controlled.  From there, the government has traced approximately $1.6 billion in bribes that were paid to officials at 1MDB and IPIC, and other governments officials in Malaysia and Abu Dhabi, and has traced more than $1 billion in kickbacks that were paid to the defendant, Leissner, Low and others involved in the scheme.

To execute the scheme, the defendant, Leissner and others at Goldman both affirmatively lied to and failed to disclose information to multiple Goldman committees responsible for authorizing the 1MDB Bond Transactions.  Specifically, the defendant, Leissner and others concealed from Goldman that Low was the ultimate decisionmaker behind the 1MDB Bond Transactions.  In addition, the defendant and Leissner also concealed from Goldman's committees that (1) corrupt payments would be made to government officials in Malaysia and Abu Dhabi in order to complete the 1MDB Bond Transactions, (2) funds raised from the 1MDB Bond Transactions would be diverted from 1MDB to make the corrupt payments as part of the scheme, and (3) the defendant and Leissner would personally receive kickbacks from the 1MDB Bond Transactions.

The defendant then conspired to conceal his connection to the criminal proceeds from the 1MDB Bond Transactions using his close relatives.  He used an account for a shell company in the name of his mother-in-law to receive kickback payments from Low and Leissner.  He and his wife provided false statements about the source of the funds, used the shell

company account to make purchases and investments in excess of $10,000, and dissolved the shell company account after disbursing the funds.

B.      The Defendant's Relationship with Jho Low

The defendant's professional and personal relationship with Low predated the 1MDB Bond Transactions, as well as Leissner's own relationship with Low.  The defendant first met Low in 2008, and introduced Leissner to Low in January 2009.  From that point forward, the defendant sought to establish a relationship with Low for Goldman; he began exchanging messages with Low, at times using personal e-mail accounts, and arranging in-person meetings, to discuss potential business deals that would benefit Goldman as well as the defendant and Leissner personally.  During the 2009-2011 time period, it was the defendant who served as Low's primary contact for these communications, and met with Low frequently.  (See, e.g., GX-77, GX-1504, GX-1525, GX-1531, GX-1538, GX-1546, GX-1554, GX-1558, GX-1567, GX-1575).[2]  In addition, the defendant endorsed Low as a candidate for a Private Wealth Management ("PWM") account at Goldman on two occasions; each time, Goldman declined to bring Low on as a client because of "red flags" that arose during the review process, including Goldman's inability to determine Low's source of wealth and Low's close connections to foreign officials.  Despite knowing about these red flags, the defendant continued to communicate with Low about potential business deals and travelled with Low on lavish trips across the world.

---

[2] References to "T," "GX," and "DX" are the trial transcript, the government exhibits at trial, and the defense exhibits at trial, respectively.

1.    The Defendant Knew of "Red Flags" in Low's Background

The defendant agreed to "try to establish a relationship" with Low to benefit Goldman in January 2009.  (T. 416-17).  After their initial meeting, the defendant said that Low would "play ball" and wanted to be associated with Goldman.  (GX-1504).  In the months that followed, the defendant and Low coordinated trips to discuss potential business opportunities. (GX-1538, GX-1546).  Throughout their relationship, the defendant communicated with Low using personal e-mail accounts.  (GX-1525, GX-1531).

During this period, the defendant was aware that Low had close ties to high-ranking members of the Malaysian government.  In July 2009, the defendant forwarded himself an article about the inner circle of Najib Razak, the Malaysian prime minister, which identified Low as a member of that inner circle.  (GX-1554).  The article further stated that Low was "a key architect" of the Terengganu Investment Authority ("TIA") (a sovereign wealth fund that was the predecessor to 1MDB), an advisor to the Malaysian king and had close ties with Middle East investment funds.  Id.  In November 2009, shortly after 1MDB was formally created, the defendant met with Low and Prime Minister Razak's three children in Low's New York City apartment.  (GX-1027-B, GX-1575, GX-3004, GX-3005).  After the meeting, the defendant sent an e-mail to Leissner with the subject line "One idea for 1MDB," writing that he would "work on getting them to join GS [i.e. Goldman Sachs]."  (Id.).

It was also clear to the defendant during this period that Low did not want it to be publicly known that he had a close relationship with Prime Minister Razak and officials at 1MDB.  In one e-mail, Low asked the defendant to "[p]lease remove any reference to [Low] being close to the PM [i.e. the Malaysian Prime Minister] or advisor to the King."  (GX-1558). Low later wrote, "[w]hen e-mailing the 1mdb guys, please bcc me."  (GX-1567).

7

In October 2009, the defendant referred Low to Goldman for a PWM account based in Switzerland. (GX-1564, GX-1591). Two Goldman employees testified at trial that the defendant's referral was considered an endorsement of Low. (T. 2736-37, 3130, 3135). When asked to provide additional background on Low, the defendant wrote that Low was a wealthy individual and a "close associate" to the Abu Dhabi royal family. (GX-1564).

After the defendant's referral, Goldman's compliance personnel examined Low's background and credentials. Their review identified multiple "red flags." (T. 2728). First, they could not identify the source of Low's wealth; it was "difficult to understand and corroborate how [Low] had made this much money." (Id.). Second, Low was associated with government officials in "high risk" jurisdictions. (Id.). The "Red Flag Summary" compiled by Goldman compliance personnel noted that the defendant was aware of these issues. (GX-1601). When the defendant was briefed on the details of Low's claims, the defendant "advised caution in accepting the claims at face value." (Id.). At no point, however, did the defendant recommend that Low be rejected as a PWM client, and the defendant continued to support his referral of Low. (T. 2759-60, 3160; GX-1627).

The Red Flag Summary further indicated that the defendant lied to the compliance division about his relationship to Low. The defendant reported that he had not heard of Low apart from meeting him on a single occasion, and that Low was not "well-known" to him. (GX-1601). To the contrary, prior to the publication of the Red Flag Summary, the defendant and Low had been in close email correspondence for more than a year, and the two had met more than 20 times. (GX-77, GX-1546, GX-1575).

In May 2010, the Goldman compliance division informed the defendant that they rejected Low as a PWM client. (GX-1632). The defendant subsequently told Leissner that

8

Goldman would not bring on Low as a PWM client because they were not "comfortable" with the source of Low's wealth and Low's profile in the "gossip papers." (T. 687).

Despite knowing about the "red flags" that arose during the PWM investigation, the defendant continued to pursue business opportunities with Low. For example, in December 2010, Low asked the defendant if he was interested in pursuing a deal involving KazakhGold, a gold mining company based in Kazakhstan. (GX-1659). The defendant and Leissner brought the opportunity to the Business Intelligence Group ("BIG"), a component of Goldman's Legal Department that, among other things, reviewed transactions for, among other things, risks related to bribery, money laundering, and other financial crime. (GX-1669). Reviewers at BIG again expressed concern about Low's source of wealth and the fact that he was a politically-exposed person. (Id.). Ultimately, the defendant was informed that the KazakhGold opportunity would not move forward because BIG "could not clear buyer." (GX-1669).

In March 2011, the defendant supported another attempt to establish Low as a Goldman PWM client, this time for an account based in Singapore. The Singapore compliance team initiated another check on Low and found that Ng's attempt to open a Swiss PWM account for Low was unsuccessful. (GX-1679). When the Swiss team learned about this second attempt, they considered Low's case to be "open and shut." (T. 2766). Nevertheless, the defendant met with Low to discuss a Singapore PWM account. (GX-1680). The defendant was later informed that it was unlikely that Low would clear the compliance division's background investigation process. (GX-1692).

2.      Ng Continued to Discuss Business Opportunities with Low

Even after Goldman compliance and BIG personnel identified concerns with Low related to two attempts to onboard Low as a PWM client and in connection with the KazakhGold

9

venture, the defendant continued to serve as a point of contact between Low and Goldman.  In an April 2011 e-mail exchange about a business opportunity, the defendant wrote that he would "get this material to JL [i.e. Low] and have him speak with the PM [i.e. Prime Minister Razak] as well."  (GX-1696).  Later that year, the defendant discussed opportunities that involved Low using his personal e-mail address, roger.ng1@gmail.com (the "Ng Gmail Account"), instead of his official Goldman e-mail address.  (GX-2215, GX-2216).  In one e-mail, Leissner asked the defendant to forward a message about potential deals with Low, suggesting that the defendant was in direct contact with Low.  (GX-2216).

In addition to discussing potential business for Goldman with Low, the defendant and Leissner also attempted to engage in side deals with Low, including deals for their own benefit, which they did not disclose to Goldman.  For example, in October 2010, Leissner forwarded information about a business venture to the defendant and added, "[w]hat do you think for JL [i.e. Low]?"  (GX-2204).  A few months later, the defendant told Leissner that he and Low discussed a deal involving Petronas, an oil and gas company owned by the Malaysian government.  (GX-2208).  In his message about the Petronas deal, the defendant wrote that they would need to "pay Omar [i.e. a Petronas board member] so that he plays ball."  (GX-2208).  Leissner testified that he understood the defendant to be saying that the Petronas board member would need to be paid a bribe to complete the deal.  (T. 782-85).

### 3.  Ng's Personal Relationship with Low

Ng also maintained a personal relationship with Low.  For example, in November 2010, the defendant traveled to Las Vegas on Low's private jet and gambled with Low, Low's brother, and Low's associate, Eric Tan Kim Loong ("Eric Tan").  (GX-2841-C, GX-2841-E, GX-2841-F, GX-2148-G, GX-2855).  In May 2011, the defendant traveled to Nice, France to meet

Low, where Low paid over €1 million to rent a yacht; the defendant and Low then returned together from Nice to London on Low's private jet.  (GX-1113-A-02, GX-2825, GX-2826, GX-2831-H).

      4.      <u>The Defendants' Use of Personal Email Accounts</u>

The defendant and Leissner frequently communicated with Low using personal email accounts instead of their official Goldman email accounts.  In addition to the Ng Gmail Account discussed above, in April 2011, the defendant created queensgate.capital@gmail.com (the "Queensgate E-Mail Account"), a second personal e-mail account that did not reference his name, and that he used to communicate with Low and Leissner.  (GX-2207).  Low also frequently used email accounts that did not reference his name to communicate with the defendant and Leissner, including dealrainman1@gmail.com (the "Deal Rainman Account") and project.lionfish@gmail.com.  (GX-2207, GX-2555-E).

\* \* \* \* \*

By early 2012, the strengthening relationship among the defendant, Leissner and Low, the defendant and Leissner's desire to bring 1MDB business to Goldman for the benefit of Goldman and themselves, and Low's close connections to government officials in Malaysia and Abu Dhabi all culminated in the bribery, circumvention and money laundering schemes.

    C.    <u>The Bribery Scheme</u>

      1.     <u>Project Magnolia</u>

In the first of the three 1MDB Bond Transactions, called "Project Magnolia" within Goldman Sachs, Goldman helped 1MDB raise approximately $1.5 billion to, among other things, facilitate 1MDB's purchase of Tanjong Energy Assets ("Tanjong Energy"), a company that operated power plants in Asia and the Middle East.  In advance of the transaction, the

defendant, Leissner, and Low agreed to make a series of corrupt payments to government officials in Malaysia and Abu Dhabi to ensure that the deal would be consummated and to enrich themselves and Goldman.  Ultimately, the funds to make those corrupt payments were taken from the funds raised by Goldman for Project Magnolia, as well as from funds raised in the two subsequent bond transactions.  At trial, the government presented evidence of four key meetings prior to Project Magnolia in furtherance of the bribery conspiracy.  The government also presented evidence that, while the defendant and Leissner were attempting to close the deal at Goldman, they continually communicated with Low, Jasmine Loo (1MDB's general counsel) and others using personal email accounts to conceal, among other things, Low's involvement in the deal and the true aim of the bribery conspiracy.  (GX-1753, GX-1758, GX-1764, GX-1766, GX-1767, GX-1768, GX-1812, GX-2251, GX-2266).

The first meeting occurred on February 26, 2012, at Low's apartment in London.  (T. 442-43).  Ng, Leissner, and Low met with, among others, Loo and Nik Faisal, the Chief Executive Officer ("CEO") of a 1MDB subsidiary.  (T. 442; GX-1107-A-03, GX-1349-A-03, GX-1751, GX-2831-A).  Leissner testified at trial that the purpose of the London meeting was to discuss Goldman's role in Project Magnolia.  (T. 443).  During the meeting, Low began to discuss "the scheme" and how to "buy approvals and authorizations within Malaysia and within Abu Dhabi."  (T. 446-47).  Low explained that the money used to "buy approvals" would be sourced from the funds raised by Project Magnolia.  (T. 450).

To explain the plan, Low drew two columns on a sheet of paper: one for Malaysia, and one for Abu Dhabi.  (T. 446-47).  In the first column, Low included Prime Minister Razak and his wife, multiple 1MDB officials, and members of the Malaysian government.  (Id.).  On the Abu Dhabi side, Low listed several government officials: Sheikh

12

Mansour, the deputy prime minister of the United Arab Emirates and chairman of IPIC; Khadem Al-Qubaisi, the managing director of IPIC; Mohamed Badawy Al-Husseiny, the CEO of Aabar, a subsidiary of IPIC; and Yousef Al-Otaiba, the United Arab Emirates' ambassador to the United States.  (T. 446-49).  After the meeting, Loo sent a chart displaying the structure of Project Magnolia to the defendant and Leissner's personal e-mail accounts.  (GX-1745).

The second meeting took place on March 3 and March 4, 2012, in Abu Dhabi. Ng, Leissner, and Low convened at the Emirates Palace hotel to meet with representatives from IPIC and Aabar.  (GX-1114-A, GX-1352-A-02, GX-1780, GX-2831-B).  After the meeting, the defendant wrote to another Goldman employee, stating that the CEO of IPIC and the CEO of Aabar had agreed in principle to provide a guarantee for Project Magnolia.  (GX-1780).  On the same day, the defendant e-mailed a document detailing Tanjong Energy cash flows from his Goldman e-mail account to the Ng Gmail Account.  (GX-1781).  Low then used the Deal Rainman Account to discuss delivery of a letter from Prime Minister Razak to Sheikh Mansour that would help secure IPIC's involvement in Project Magnolia; Leissner ultimately delivered the letter to Al-Qubaisi to provide to Sheikh Mansour during a second trip to Abu Dhabi.  (GX-1791, GX-2252; T. 1656).

Later that month, the defendants participated in a third key meeting in the United States.  The defendants planned to meet with Ananda Krishnan, the owner of Tanjong Energy, to discuss the assets that would be sold to 1MDB as part of Project Magnolia.  The meeting was originally scheduled to occur in New York, but on March 23, 2012, the defendant received a call from Low that the meeting had been moved to Los Angeles.  (GX-1113-A, GX-1808).  More specifically, they agreed to meet at L'Ermitage Beverly Hills hotel because, as the defendant described, it was "owned by the a [sic] related client on the deal and he's insisted we stay there."

13

(GX-1808).  The "client" was Low, who had an ownership stake in the L'Ermitage.  (T. 921).

On March 25, 2012, Leissner, Low and the defendant met at the L'Ermitage to discuss Project

Magnolia.  (GX-1113-A-01, GX-2007, GX-2264; T. 921-22).  From there, the defendant

returned to Asia, while Leissner and Low then flew on Low's private jet from Los Angeles to

New York for the planned meeting with Krishnan.  (GX-1352-A, GX-1352-A-04, GX-2831-D,

GX-2852; DX-2219; T. 922).

        Shortly after Leissner and Low met with Krishnan in New York, the defendant

and Leissner communicated with Loo using their personal e-mail accounts about Project

Magnolia.  On March 28, 2012, Loo used a personal e-mail account under the name "Janet Lane"

to discuss Project Magnolia with the defendant and Leissner.  (GX-2266).  In reply, Leissner

asked Loo to forward the e-mail to his Goldman e-mail account so that they could "handle

officially."  (Id.).  Loo then sent the same message from her official 1MDB e-mail account to the

defendant and Leissner's Goldman e-mail accounts.  (GX-1812).

        The fourth key meeting related to Project Magnolia occurred in Singapore on

April 21, 2012, when Ng, Low and Leissner attended a meeting with representatives of BSI

Bank, an entity that the defendants would ultimately use to siphon proceeds from Project

Magnolia that were used to make the bribe payments.  (GX-1118-A-03, GX-1355-A-01, GX-

2897-A).  The purpose of the meeting was for the co-conspirators to make BSI Bank comfortable

that the transaction would take place; at the meeting, the defendants dismissed any concerns

about due diligence and simply assured the bank that the deal was happening.  (T. 943, 945,

3238-40; GX-2269).

        On May 21, 2012, Project Magnolia was finalized, and Goldman wired $907.5

million to a bank account controlled by a 1MDB subsidiary (the "1MDB Energy Account") for

the acquisition of Tanjong Energy.  (GX-151, GX-810, GX-1860).  The next day, the 1MDB

Energy Account wired approximately $577 million to an account at BSI Bank in the name of

"Aabar PJS Limited," which appeared an account affiliated with Aabar but was in fact controlled

by Low (the "Fake Aabar Account").  (GX-151, GX-159, GX-2282).  The Fake Aabar Account

had no affiliation with Aabar, the subsidiary of IPIC that guaranteed the 1MDB bonds.  The

payment, described as a "guarantee fee," was authorized by Terence Geh, the deputy CEO of

1MDB and a friend of the defendant's who ultimately received bribe payments for his

involvement in the scheme.  (GX-152, GX-153, GX-2282).  Geh sent a copy of the wire

authorization to an e-mail account used by Low.  (Id.).  On May 25, 2012 and July 25, 2012, the

Fake Aabar Account wired approximately $295 million and $133 million, respectively, to

"Blackstone Asia Real Estate Partners" (the "Blackstone Account"), a bank account controlled

by Low's associate, Eric Tan.  (GX-151).

   After the deal closed and over $425 million was siphoned from the transaction,

the defendants discussed the series of bribe payments and kickbacks that would follow.  (T. 981).

The defendant and Leissner expected to receive their kickbacks shortly after the closing, but they

were not paid immediately; Leissner also learned from Loo that she was also experiencing a

delay in payment, and the defendant told Leissner that he had a similar discussion with Geh.  (Id.

at 981, 995).  As a result, both the defendant and Leissner discussed the situation with each

other, and spoke to Low about the delay in an attempt to "speed things up"; Leissner ultimately

suggested using one of his "entities" in Hong Kong, a shell company called Capital Place

Holdings in the name of Leissner's wife, Judy Chan, as a conduit to make payments to others in

the scheme as well as to the defendant and Leissner.  (Id.).  Leissner subsequently used the bank

account for Capital Place Holdings (the "Capital Place Account") to help distribute bribe and

kickback payments, although he and the defendant heard that some individuals still did not get paid in a timely fashion from Projects Magnolia and Maximus, including Loo and Geh. (T. 1028). The timing of the bribe payments reflects this initial delay; Project Magnolia closed in May 2012, but Leissner, Low and Loo did not get initial payments until June and July 2012, and Geh did not receive a payment until after Project Maximus closed later in 2012. (GX-151, GX-152).

Ultimately, the Blackstone Account made several corrupt payments to Leissner and to the government officials involved in Project Magnolia. (GX-151). These payments included approximately $258 million to an account controlled by Al-Qubaisi, approximately $35 million to the wife of Al-Husseiny, approximately $25 million to Prime Minister Razak, and approximately $1.6 million to Loo. On June 11, 2012, the Blackstone Account wired approximately $35 million to the Capital Place Account which, again, was an account controlled by Leissner in the name of his wife. The Capital Place Account then wired approximately $17.5 million to a bank account in the name of the defendant's mother-in-law, Tan Kim Chin ("Tan"), which originally had the name "Silken Waters" and later changed its name to "Victoria Square" (the "Silken Waters/Victoria Square Account"). On July 9, 2012, the Blackstone Account wired an additional $16.9 million to the Capital Place Account; one week later, the Capital Place Account transferred $6.9 million to the Silken Waters/Victoria Square Account.

2. Project Maximus and Project Catalyze

Shortly after Project Magnolia concluded, Low told the defendant and Leissner that "the scheme had worked well" and that "there was more money to be made in a similar scheme." (T. 1005-06). Subsequently, the defendant and his co-conspirators completed two additional bond transactions in furtherance of the bribery conspiracy. First, five months after the

16

closing of Project Magnolia, Goldman underwrote another 1MDB bond transaction, called "Project Maximus" within Goldman.  This transaction purported to facilitate 1MDB's investment in domestic energy projects, including the purchase of assets from a Malaysian company, Genting Berhad.  (GX-53-A).

The defendant and Leissner served on the deal team at Goldman for Project Maximus, and continued to use their personal email accounts to discuss the deal with Low.  (GX-811, GX-814, GX-1878).  When the transaction ultimately closed, the defendant was also present at a celebratory "closing dinner" with 1MDB officials in Hong Kong on November 12, 2012. (GX-1885).  The day before the closing dinner, the defendant had a private dinner with Leissner and Loo, and the defendant's wife purchased diamonds using more than $300,000 in diverted 1MDB bond funds in the Silken Waters/Victoria Square Account; Loo also purchased jewelry valued at over $35,000 from the same jeweler.  (GX-154, GX-349, GX-350, GX-1149-A).  In directing payment from the Silken Waters/Victoria Square account, Ng's wife used an email address that appeared to be her mother's but that she controlled.  (GX-348, GX-350).

When Project Maximus closed in October 2019, Goldman wired approximately $1.64 billion to the account of a 1MDB subsidiary (the "1MDB Energy Langat Account").  (GX-152).  That same day, the 1MDB Energy Langat Account transferred approximately $790 million to the Fake Aabar Account.  Over the following two months, the Fake Aabar Account forwarded approximately $664 million to the Blackstone Account.  Hundreds of millions of dollars in corrupt payments were then laundered from the Blackstone Account to various accounts controlled by individuals associated with Project Maximus.

Because not all of the government officials involved in Project Magnolia were paid through the first round of bribe payments, Low asked Leissner to make payments to the not-

17

yet-paid officials from the Capital Place Account.  (T. 1040, 1043).  The Blackstone Account wired approximately $20.5 million to the Capital Place Account in December 2012 and January 2013.  Leissner, at Low's direction, then wired a total of approximately $3.7 million to the bank accounts of shell companies controlled by participants in the scheme.  (GX-152).

In March 2013, the defendants continued the scheme through a third 1MDB bond transaction underwritten by Goldman, called "Project Catalyze" within Goldman.  While the defendant did not work on the deal team for Project Catalyze, as he had for the prior two bond transactions, he sold bonds issued during Project Catalyze and worked with Low to identify investors who could purchase the bonds.  (GX-2409).

After Project Catalyze closed in March 2013, the defendant received a second set of corrupt payments in relation to his involvement in the bribery scheme.  (GX-153).  On March 19, 2013, Goldman wired approximately $2.72 billion to an account affiliated with a third subsidiary of 1MDB (the "1MDB Global Investment Account").  (Id.).  Approximately $75 million from the 1MDB Global Investment Account passed through an intermediary account and transferred to an account in the name of "Affinity Equity" (the "Affinity Equity Account").  (Id.).  The Affinity Equity Account then wired approximately $65 million to the Capital Place Account, controlled by Leissner.  (Id.).  On September 18, 2013, the Capital Place Account wired $4.2 million directly to the Silken Waters/Victoria Square Account, nominally owned by Ng's mother-in-law.  (Id.).  That same day, the Silken Waters/Victoria Square Account received an additional $6.5 million from another account controlled by Leissner's wife.  (Id.).

* * * * *

In total, as a result of the bribery and money laundering scheme, at least a dozen foreign officials in Malaysia and Abu Dhabi received more than $1.6 billion in bribe payments,

all of which were traceable to the funds raised in the 1MDB Bond Transactions.  At trial, the

government presented evidence of the following approximate total bribe amounts:

- $756 million to Prime Minister Razak;
- $472.75 million to Al-Qubaisi;
- $76.6 million to Al-Husseiny;
- $12.6 million to Loo;
- $238 million to Riza Aziz, the son of Prime Minister Razak;
- $4.9 million to Yan Yahaya, a Malaysian government official and advisor to Razak;
- $1.7 million to Jerome Lee, a 1MDB official;
- $40 million to Al-Otaiba;
- $2 million to Geh;
- $2 million to Nurzahid Taib, a 1MDB official;
- $2 million to Vincent Koh, a 1MDB official;
- $895,000 to Amhari Nazaruddin, a Malaysian government official and advisor to Razak; and
- $980,000 to Azlin Alias, a Malaysian government official and advisor to Razak.

(GX-157, GX-158).  For their roles in the conspiracies, Low and his associates received more

than $1.42 billion, Leissner received approximately $73.4 million and the defendant received

$35.1 million.

> D.    Circumvention of Goldman's Internal Accounting Controls

In order for Goldman to approve and underwrite the 1MDB Bond Transactions,

the deal teams – which included the defendant and Leissner for Projects Magnolia and Maximus,

and Leissner for Project Catalyze – were required to obtain authorization from Goldman

committees that functioned as part of Goldman's internal accounting controls (namely, to ensure

that transactions received appropriate approval and authorization).  The defendant, Leissner, and

19

others obtained the necessary approvals from these committees through a series of false statements and omissions.  Specifically, the defendant and Leissner, along with others at Goldman who knew of Low's involvement in the deals (including Goldman executives Andrea Vella, Toby Watson and Jonathan Donne) lied, concealed from, or did not disclose to Goldman's committees that Low was the key decisionmaker for the 1MDB Bond Transactions.  In addition, the defendant and Leissner also concealed from Goldman's committees that (1) corrupt payments would be made to government officials in Malaysia and Abu Dhabi in furtherance of the 1MDB Bond Transactions, (2) 1MDB would wire funds from the 1MDB Bond Transactions to the Fake Aabar Account (that is, that IPIC/Aabar would receive a direct payment, and not just warrants, for their role in the deal), and (3) the defendant and Leissner would personally receive kickbacks from the 1MDB Bond Transactions.

At trial, a Goldman committee member testified that the 1MDB Bond Transactions would not have proceeded if the deals included the use of bribes or undisclosed monetary transactions.  (T. 3053, 3060-61).  Other committee members testified that Goldman agents executing the transactions were expected to report the use of third-party intermediaries, and it would be a "very significant concern" if a Goldman employee had a personal financial interest in the deals.  (T. 286-87, 3657).  The evidence presented at trial demonstrated that the defendant knew of these internal controls; his employee records indicated that he completed multiple Goldman anti-bribery and anti-money laundering trainings.  (T. 4077-78, 4084-85). These trainings discussed both the anti-bribery provisions and the internal accounting controls provision of the Foreign Corrupt Practices Act.  (T. 4087).

Because the 1MDB Bond Transactions were structured as debt transactions, and Goldman used its own capital to purchase the bonds issued by 1MDB before reselling the bonds

to financial investors, the Goldman deal teams executing the transactions had to obtain

authorization from Goldman's Firmwide Capital Committee (the "Capital Committee") and the

Firmwide Suitability Committee (the "Suitability Committee").  (T. 108, 112, 3047-48, 3647;

GX-513).  Clearance by the Capital Committee and the Suitability Committee equated to

Goldman's approval of the transaction, and the committees' review of the 1MDB Bond

Transactions functioned as one of Goldman's internal controls over financial reporting.  (T. 278,

4407-08; GX-952).

   Ng facilitated the bribery scheme by shielding evidence of Low's involvement in

the 1MDB Bond Transactions from the Goldman committees.  Despite knowing that Low's

background raised "red flags" and he was twice rejected as a PWM client, the defendant and

Leissner continued to work with Low on the 1MDB Bond Transactions because they "wanted

that business."  (T. 425-26).  From their perspective, "there was no way that [Ng and Leissner]

could go around Jho if [they] wanted business with 1MDB."  (T. 426).  Ng, Leissner, Vella and

others expressly agreed to be "very careful" with their internal communications in order to hide

Low's authority at 1MDB from Goldman's control functions.  (T. 436-37).  This included the

defendants' practice of using their private e-mail accounts to discuss the 1MDB Bond

Transactions and making no reference to Low while using their Goldman e-mail addresses.  (T.

437).

   The attempt to conceal Low's involvement continued even when the committees

specifically inquired about Low's connection to the 1MDB Bond Transactions. The defendant

was invited to several meetings with the committees for the Project Magnolia Bond Transaction.

(GX-1815, GX-1821, GX-1822, GX-1849, GX-1854, GX-2014).  These committee meetings,

along with committee memos and e-mail communications, noted the risk of government

21

corruption and inquired about Low's role at 1MDB and relationship to Sheikh Mansour; at no point did the defendant disclose Low's involvement.  (T. 166, 266-67, 3067; GX-803).  Similar questions about Low's role were raised during the approval process for the Project Maximus Bond Transaction, and the defendant again concealed information from the committees.  (T. 1025; GX-814, GX-823).

The defendant and Leissner also never disclosed to the Goldman committees that the purpose of the "guarantee fee," the wire payment sent to the Fake Aabar Account, was to pay bribes and kickbacks.  (T. 919-20).  A committee member testified at trial that the committee would review all payments in a transaction to identify any impropriety, and it was expected that the deal team would disclose to the committee all payments and personal interests in a deal.  (T. 285-88).  Finally, the defendant and Leissner expected to receive millions of dollars in kickbacks from the 1MDB Bond Transactions, but their personal financial interest in the deals was not reported to any of the committees charged with authorizing the transactions.

E.     Money Laundering Conspiracy

The evidence presented at trial also demonstrated that Ng, Leissner, Low and other co-conspirators engaged in a money laundering conspiracy in connection with the 1MDB Bond Transactions.  As described above, the co-conspirators took steps to conceal the source of the criminal proceeds that were used to make bribe and kickback payments, including through the use of shell companies and shell bank accounts in the names of relatives and associates, and through false statements to banks; to promote the bribery conspiracy by transferring large sums of money abroad; and by engaging in transactions using criminal proceeds in excess of $10,000 in the United States.  (GX-151 to GX-159).  In addition, the defendant and his wife, Hwee Bin Lim ("Lim"), concealed the receipt of their portion of the criminal proceeds by utilizing the

22

Silken Waters/Victoria Square Account.  The defendant and Lim provided false explanations to bank representatives for the source of the funds, and subsequently attempted to conceal evidence of their connection to the Silken Waters/Victoria Square Account after the payments were made, including by communicating with bank representatives by using email accounts that appeared to belong to Tan but in fact belonged to the defendant and Lim.  The defendant then used his profits from the scheme to fund investments and purchases in excess of $10,000 in the United States, including hundreds of thousands of dollars spent on luxury jewelry items.

  1. <u>Corrupt Payments from Project Magnolia</u>

    In anticipation of receiving millions of dollars in kickbacks from the 1MDB Bond Transactions, the defendant and his co-conspirators formed a network of bank accounts designed to conceal their connection to the funds.  On May 18, 2012, Goldman's committees approved Project Magnolia.  (GX-61).  Two days later, Leissner wrote to his wife using his personal e-mail address, and asked her to send him the account information for the Capital Place Account.  (GX-2276).  Leissner specifically noted that it would be "[b]est if they are US$ accounts," and that they should inform the bank about an expected transfer of funds.  (<u>Id.</u>).  On the same day that Leissner inquired about the Capital Place Account (i.e., the day before Project Magnolia closed), Lim called Evelyn Teah ("Teah"), a banker at UBS in Singapore.  (GX-463, GX-701-A, GX-1870).

    On May 21, 2012, Goldman wired approximately $907.5 million to the 1MDB Energy Account.  (GX-159).  Both Leissner and the defendant were notified of this payment.  (GX-1860).  On the same day, Lim contacted Teah via e-mail (using a personal Gmail account in her own name) and expressed interest in setting up a shell company under the name "Victoria Square Capital Limited" (i.e., the Silken Waters/Victoria Square Account).  (GX-2463).  ████

23

███████████████████████████████████████████

███

      While Tan was listed as the beneficial owner of the Silken Waters/Victoria Square Account on UBS account opening documents, the defendant and Lim were secretly controlling and managing the account.  Lim's correspondence with UBS made clear that she personally intended to set up the account, as she offered to meet representatives of the bank herself at the home that she shared with Ng.  (GX-701-A, GX-2463).  Furthermore, the Silken Waters/Victoria Square Account listed Lim's phone number on the account opening documents and as the beneficiary's contact information.  (GX-303, GX-346, GX-701-A).  Lim and Teah also continued to discuss the account using their private e-mail addresses.  (GX-2464).

      In addition to preparing the Silken Waters/Victoria Square Account, the defendant and Lim created two e-mail accounts to impersonate Tan and monitor the expected incoming wire transfers.  The first was kctan9983@gmail.com (the "Tan E-Mail Account"), which was created on May 21, 2012, the day Project Magnolia closed.  (GX-2566-A).  This e-mail account purportedly belonged to Tan, but the account user agreed to the terms of service from the same IP address that was associated with Ng's Apple account.  (GX-2557-A-02, GX-2566-A). The defendant and Lim also created the e-mail account victoriasquare.investment@gmail.com (the "Victoria Square E-Mail Account") to track the activity of the Victoria Square Account.  In August 2012, the Victoria Square E-Mail Account sent an e-mail regarding investments that was signed "R," a signature frequently used by the defendant in his other personal e-mail accounts. (GX-2479).  Several emails sent to the Tan E-Mail Account and the Victoria Square E-Mail Account from a banker at another bank were addressed to "Mr. and Ms. Ng."  (GX-2465, GX-2466, GX-2467).

24

On May 22, 2012, the 1MDB Energy Account wired approximately $577 million to the Fake Aabar Account at BSI Bank in Switzerland, which the defendants then disbursed to themselves and government officials in Malaysia and Abu Dhabi.  (GX-151, GX-159, GX-204-A, GX-2282).  That same day, UBS internal records indicated that Tan and other members of the defendant's family met with representatives from the bank to discuss the Silken Waters/Victoria Square Account.  (GX-305).  (Lim had used her own personal email account to schedule the meeting with Teah at the residence Lim and the defendant shared in Kuala Lumpur, Malaysia. (GX-2463).)  The internal UBS records reflect that Tan falsely reported that she had "recently taken profit on her equity investments in Switzerland totaling about $26m," and that she intended to transfer the funds from BSI Bank to an account based in Asia.  (Id.).  This meeting occurred approximately one month after the defendants, including the defendant, met with bankers from BSI Bank in Singapore to discuss Project Magnolia, and was intended to provide a cover story for the receipt of the criminal proceeds.

As detailed above, Leissner ultimately agreed to distribute a portion of the bribes and kickback payments through the Capital Place Account, so that the funds did not in fact come from a BSI Bank account as the defendant had originally expected.  On June 5, 2012, Leissner sent the wire information for the Capital Place Account to the defendant's personal e-mail address.  (GX-2287, GX-2287-A).  Six days later, the Capital Place Account received a $35 million wire transfer from the Blackstone Account.  (GX-151).  The Capital Place Account then forwarded $17.5 million (i.e., exactly half of the amount sent from the Blackstone Account) to the Silken Waters/Victoria Square Account.  (GX-151, GX-307).  During the four days between these two transfers, the defendant and Leissner called each other at least nine times.  (GX-57).

25

On July 9, 2012, the Capital Place Account received an additional wire transfer of $16.96 million from the Blackstone Account.  (GX-151).  One week later, Judy Leissner e-mailed herself the wire information for the Silken Waters/Victoria Square Account, noting that the account was "[f]or Roger."  (GX-2297).  Leissner testified that he directed Judy Leissner to execute the transfer to the defendant.  (T. 996).  The Capital Place Account subsequently wired $6.9 million to the Silken Waters/Victoria Square Account.  (GX-151, GX-159, GX-307).

2.    Additional Corrupt Payments Received by The Defendant

Following the Project Maximus and Project Catalyze transactions, the defendant received a second set of corrupt payments for his role in the conspiracies.  (GX-153).  On August 22, 2013, a UBS banker sent instructions on incoming wire payments for the Silken Waters/Victoria Square Account to both the Tan E-Mail Account and the Victoria Square E-Mail Account.  (GX-352).  Shortly thereafter, Leissner sent Judy Leissner an identical copy of the wire information; the subject line noted that the instructions were "[f]or next week."  (GX-2395).

After receiving the wire instructions for the Silken Waters/Victoria Square Account, Judy Leissner wrote, "11? Sending $6.5 from MS. The rest from capital place."  (GX-2397).  On September 18, 2013, Leissner replied, "[a]ctually, make that 10.7 and 300K, send to my hsbc account in Singapore, please."  (Id.)  Judy Leissner proceeded to authorize two transfers to the Silken Waters/Victoria Square Account: $4.2 million from the Capital Place Account, and $6.5 from Judy Leissner's account at Morgan Stanley.  (GX-153, GX-307).  On September 23 and September 24, 2013, the defendant and Lim received a total of $10.7 million in stolen proceeds.  (GX-153).

After the two multi-million dollar wires were processed, UBS followed up to inquire about the source of the payments.  The bank's call logs reported that the owner of the

26

Silken Waters/Victoria Square Account was "in a gold PE [i.e. private equity] venture with her friends which has been liquidated." (GX-362, GX-362-A). The logs further stated that the payments were sent by two different banks because "she has 2 different portions/percentage with 2 friends." (Id.) These statements contain two lies. First, the two wires were not sent by "2 friends"; they were both sent by Judy Leissner. Second, the payments were unrelated to any "gold PE venture"; they were the defendant's kickback payments for executing the 1MDB Bond Transactions.

According to UBS records, the Silken Waters/Victoria Square Account received a total of only four deposits – the four corrupt payments that Leissner transferred to the defendant from Capital Place. (GX-154). Specifically, in June and July 2012, the Silken Waters/Victoria Square Account received two wire payments totaling $24.5 million from the Capital Place Account. (GX-154). In September 2013, the Silken Waters/Victoria Square Account received $4.2 million from the Capital Place Account, and $6.5 million from another account in Judy Leissner's name. (Id.) All four wire payments, totaling over $35 million, were traceable to the 1MDB Bond Transactions. (T. 2950-51).

3.     Account Activity After the Corrupt Payments

After receiving the wire transfers containing stolen proceeds from the 1MDB Bond Transactions, the defendant and Lim made several purchases and investments for their personal benefit. For example, on December 27, 2012, Lim used her personal e-mail address to request that a payment of $300,500 be prepared for "Karen Collection," a company in Hong Kong that sells luxury jewelry. (GX-349). Later that day, an e-mail from the Tan E-Mail Account requested instructions for a wire transfer in order to "make payment for [Lim's] bling bling purchase," which included a six-carat diamond. (GX-348). On January 2, 2013, the Silken

27

Waters/Victoria Square Account wired $300,500 to an account registered to Karen Collection; that wire transfer passed through the Eastern District of New York, and represented a transaction in excess of $10,000 that took place in the United States.  (GX-154, GX-159).  Lim also testified at trial that she wanted to purchase an antique hourglass.  (T. 4735).  On March 5, 2013, the Silken Waters/Victoria Square Account wired $20,000 to the Rose Trading Company to purchase the hourglass, which was filled with diamonds; that wire transfer also passed through the Eastern District of New York and also represented a transaction in excess of $10,000 that took place in the United States.  (GX-154, GX-159, GX-451-A).  In March 2014, the Silken Waters/Victoria Square Account transferred over $200,000 to purchase shares of Bristol Myers Squibb, a publicly-traded company based in the United States.  (GX-154).  The evidence presented at trial further indicated that the defendant intended to use the funds to purchase real estate in London.  (GX-65, GX-351, GX-456-A, GX-456-B, GX-456-C, GX-456-D, GX-1895, GX-1901, GX-1912, GX-1915, GX-1918, GX-2337, GX-2341, GX-2346, GX-2361, GX-2366, GX-2751).

The defendant and Lim also transferred approximately $26.78 million from the Silken Waters/Victoria Square Account to shell companies under their control.  Approximately $2.3 million passed through an intermediary account before being deposited in an account that Lim held in the name of "River Blue" (the "River Blue Account").  (GX-154).  Four days after the funds were deposited in the River Blue Account, the defendant added his name to the account as an authorized signer.  (GX-403).  Another $9.78 million was wired to an account nominally held by Tan; internal records for the account noted that it account was "effectively managed by Lim Hwee Bin and Roger Ng."  (GX-385).  In October 2013, $4.1 million passed through an intermediary to an account held by Lim and Tan.  The wire authorization form listed Lim as the

28

recipient of the funds and stated that the purpose of the transfer was to purchase land in Johor, Malaysia.  (GX-397).  On the same day as the wire transfer, the defendant was researching real estate investment opportunities in Johor.  (GX-1932).

After spending hundreds of thousands of dollars on luxury items, Lim attempted to destroy the mail affiliated with the Silken Waters/Victoria Square Account.  On March 21, 2014, Lim was informed via telephone that the mail could not be destroyed and would be retained in the British Virgin Islands (where the trust company that helped incorporate Silken Waters was located) for five years.  (GX-359-T).  In response, Lim stated that she wanted the mail to "stop," and questioned whether dissolving the company would allow her to destroy the mail.  (Id.)  Representatives from UBS then met with the defendant, Lim, and Tan to discuss closing the Silken Waters/Victoria Square Account.  (GX-356).  Ultimately, Lim dissolved the account in May 2014.  (GX-355; T. 5018-19).

F.    Additional Evidence of The Defendant's Knowledge and Corrupt Intent

In addition to the evidence detailed above, the government presented additional evidence at trial that demonstrated the defendant's knowledge of the bribery, circumvention, and money laundering conspiracies.  This evidence included the following:

- The defendant's actions were closely coordinated with his co-conspirators through the conspiracies, including the following:

    o  The defendant worked closely with other co-conspirators on the 1MDB Bond Transactions and other business deals.  (GX-1845, GX-2211, GX-2420).

    o  The defendant and other co-conspirators worked to conceal Low's connections to 1MDB from Goldman and others.  (T. 769-70; GX-1558, GX-2209, GX-2228).

    o  The defendant and Lim had personal friendships with many of the co-conspirators outside of business dealings.  (GX-74, GX-75, GX-76, GX-1719, GX-2502, GX-2520, GX-2578-B-22, GX-2578-B-30).

29

- o The defendant and other co-conspirators used shell companies and related bank accounts to conceal the criminal proceeds of the schemes, many of which were created shortly before those accounts received criminal proceeds.  (GX-151-155, GX-224-B, GX-346, GX-2259).

- o The defendant and other co-conspirators lied to banks about the purpose of fund transfers in furtherance of the schemes.  (GX-215-A, GX-219-H, GX-305, GX-362-A).

- o The defendant and other co-conspirators used family members and associates to conceal their connections to shell bank accounts.  (GX-155).

- o The defendant and other co-conspirators purchased luxury items with criminal proceeds.  (GX-154, GX-207-K, GX-349, GX-451-A, GX-452-I, GX-454-F).

- o The defendant and other co-conspirators created secret, personal email accounts to communicate about business details, to communicate about transfers of criminal proceeds and to impersonate others in furtherance of the schemes.  (GX-2002, GX-2207, GX-2266, GX-2299, GX-2333, GX-2398, GX-2479, GX-2540, GX-2555-E).

- The defendant and co-conspirators took steps to destroy evidence of communications with each other and about the schemes both during the course of the conspiracies (GX-359-T, GX-2267, GX-2389) and directly afterwards.  Significantly, in 2015, news reports about corruption issues at 1MDB increased dramatically, including an expose in the Sarawak Report in February 2015.  (GX-101, GX-1968, GX-1969, GX-1973).  At or around that same time, between February and March of 2015, the defendant and/or Lim deleted four email accounts related to the conspiracies:  the Ng Gmail Account, the Queensgate Account, the Victoria Square Account and another personal email account that the defendant had used to communicate with Leissner and Low about the schemes.  (GX-72).  Low and other co-conspirators also deleted an additional eight email accounts related to the schemes in this same time period, including the Deal Rainman Account.  (Id.).  Moreover, Low and the defendant stopped traveling to the United States around this same time.  (GX-2851, GX-2853).

- In furtherance of the conspiracies, the defendant violated a number of Goldman's internal policies, including a prohibition on the use of personal email accounts to conduct company business (T. 4081-82), and policies that required private investments and outside activities (including the defendant's creation of various shell companies and his attempted engagement in numerous side deals, as well as the bribery and money laundering conspiracies) to be reported to Goldman (T. 4076-80).  The defendant's failure to report these activities to Goldman is further evidence of his knowledge that his actions were criminal.

- In 2017, the defendant was detained in Singapore, and law enforcement asked him and Lim about the four transfers into Silken Waters/Victoria Square from Capital Place.  (T.

30

4801, 4820-21).  Low provided Leissner with updates on the defendant's detention in Singapore (GX-2602-E-01, GX-2602-C-02, GX-2602-B), and discussed that detention with Leissner and Lim (T. 1294-1300).

- In June 2018, after a news report was published that stated that the defendant and Low might be arrested, Lim was warned by a friend connected to Low that Leissner might be "compromised."  (T. 4998-5000.  Lim then asked Leissner whether he was "compromised" on a video call.  (T. 5000).

## II.    APPLICABLE PENALTIES

For the reasons set forth below, (1) the applicable Guidelines term of imprisonment in this case is life, with a restricted Guidelines term of imprisonment of 360 months, and is correctly calculated in the PSR; (2) forfeiture is mandatory on the offenses of conviction and should be ordered in the amount of $35.1 million; and (3) the defendant has not met his burden to show that he cannot pay a fine, and, as a result, the Court should consider the imposition of a fine.

A.    The Applicable Guidelines Term of Imprisonment is Life, and the Restricted Guidelines Term of Imprisonment is 360 months

The government respectfully submits that the appropriate Guidelines calculation is set forth in the PSR and below (PSR ¶¶ 85-111):

COUNTS ONE & TWO – CONSPIRACY TO VIOLATE THE FCPA (USSG § 2C1.1)

| | |
|---|---|
| Base Offense Level (USSG § 2C1.1(a)(2)): | 12 |
| More than One Bribe (USSG § 2C1.1(b)(2)): | +2 |
| Value of Bribes (more than $550,000,000) (USSG §§ 2C1.1(b)(2), 2B1.1(b)(1)(P)): | +30 |
| High-Level Official (USSG § 2C1.1(b)(3)): | +4 |
| Obstruction of Justice (USSG § 3C1.1) | +2 |
| Total Offense Level: | 50 |

31

<u>COUNT THREE – MONEY LAUNDERING CONSPIRACY (USSG § 2S1.1)</u>

| | |
|---|---|
| Base Offense Level (USSG § 2S1.1(a)(1)): | 48 |
|     (SUA is FCPA conspiracy calculated | |
|     pursuant to USSG § 2C1.1, including | |
|     base offense level 12, more than one bribe, | |
|     value of bribes in excess of $550 million and | |
|     high-level official, as set forth above) | |
| | |
| Conviction Under 1956 (USSG § 2S1.1(b)(2)(B)): | +2 |
| | |
| Sophisticated Laundering (USSG § 2S1.1(b)(3)): | +2 |
| | |
| Obstruction of Justice (USSG § 3C1.1) | <u>+2</u> |
| | |
| Total Offense Level: | 54 |

The counts all involve substantially the same harm, so constitute a single group under USSG § 3D1.2, and there is no increase in offense level under USSG § 3D1.4. As a result, the combined offense level is 54. However, the Guidelines state that in those "rare cases" where the offense level is more than 43, the offense level will be treated as a level 43. USSG § 5A cmt 2.

The defendant has a criminal history score of zero, and thus a criminal history category of I. (PSR ¶ 114). Based on the total offense level of 43 and a criminal history category of I, the defendant's Guidelines range of imprisonment is life. (<u>See id.</u> ¶ 147). However, since the statutorily authorized maximum sentences are less than the minimum of the applicable Guidelines range (specifically, the maximum term of imprisonment for Count One is five years; the maximum term of imprisonment on Count Two is five years; and the maximum term of imprisonment on Count Three is 20 years), the restricted Guidelines term of imprisonment is 360 months. (<u>See id.</u>).

Moreover, because this Guidelines range is in Zone D of the Sentencing Table, the Guidelines "do not authorize a sentence of probation." U.S.S.G. § 5B1.1 cmt. 2; see also

U.S.S.G. § 5C1.1(f) ("If the applicable guidelines range is in Zone D of the Sentencing Table, the minimum term shall be satisfied by a sentence of imprisonment.").

      B.      <u>The Defendant's Objections to the Guidelines Calculation Are Unavailing</u>

      In his sentencing memorandum, the defendant objects to many of the enhancements that Probation and the government have determined to be applicable, and also contends that he is entitled to a minimal role reduction. His objections should be rejected in their entirety. There is clear evidence to show that, by at least a preponderance, it was reasonably foreseeable to the defendant that more than one bribe would be paid in furtherance of the scheme; that it was reasonably foreseeable to the defendant that the total amount of the bribes paid in furtherance of the scheme, to the more than dozen public officials identified by Low to the defendant and Leissner, would be more than $550 million; and that the defendant obstructed justice by deleting email accounts and dissolving a shell company used in furtherance of the scheme. Moreover, the defendant cannot meet his burden to show that he qualifies for a minimal role reduction, an extraordinary request which the Guidelines themselves say should be applied "infrequently" and only when a defendant is "plainly among the least culpable of those involved in the conduct of a group." USSG § 3B1.2 cmt. 4. To the contrary, the defendant was an active, knowing and crucial participant in each conspiracy, and far more culpable than many of his co-conspirators.[3]

---

[3] As noted <u>infra</u>, the defendant filed objections to the PSR, including to the Guidelines calculation, and the government has responded to those objections.

1.      The Sentencing Enhancement for "More than One Bribe" is Warranted

The defendant concedes that the "evidence is indeed clear that there was in fact more than one bribe," he nonetheless objects to the two-level increase in the offense level pursuant to USSG § 2C1.1(b)(2) because he contends that there is "no credible evidence that Mr. Ng knew there was more than one bribe."[4]  (Def. Mem. 22-23).  The defendant further states that the "only evidence in the case" of the defendant's knowledge of more than one bribe "stems from Leissner's incredible testimony about the meeting in London in February 2012" where Low advised the defendant, Leissner and others of the government officials in Abu Dhabi and Malaysia who needed to be bribed in order for the 1MDB deals to succeed.  (Id.).

The defendant's argument fails.  As an initial matter, the defendant is incorrect to assert that the enhancement only applies if the defendant "knew" there was more than one bribe. To the contrary, for the purposes of the Guidelines, in the case of "jointly undertaken criminal activity" such as a conspiracy, the defendant is held responsible "all acts and omissions of others that were (i) within the scope of the jointly undertaken criminal activity, (ii) in furtherance of that criminal activity, and (iii) reasonably foreseeable in connection with that criminal activity." USSG § 1B1.3.

Here, not only were there multiple bribes paid that were clearly within the scope of and in furtherance of the conspiracies to violate the anti-bribery and circumvention provisions of the FCPA of which the defendant was convicted—as the defendant concedes—but the evidence is more than sufficient to prove by a preponderance that the payment of multiple bribes

_____

[4] The defendant did not make this objection in his submission to Probation on January 27, 2023.  (Def. PSR Obj. 15 (making no objection to PSR ¶ 88)).

34

was reasonably foreseeable to the defendant.  In fact, the evidence shows that the defendant knew that multiple bribes would be paid.  As detailed above, the defendant was not only at the meeting in London in February 2012 where Low discussed with Leissner, the defendant and others the need to pay bribes to multiple government officials in Abu Dhabi and Malaysia, but he subsequently discussed the scheme with Low and Leissner on multiple occasions, and was involved in structuring the deals so that billions of dollars—funds far in excess of the kickback payment he ultimately received—could be secretly siphoned off, including by proposing various iterations of a guarantee fee and participating with Leissner and Low in meetings with BSI bank in Singapore.

Moreover, Leissner and the defendant became aware in late June 2012 of a delay in bribe and kickback payments from Project Magnolia.  Specifically, as detailed above in Section I.C.1, Leissner and the defendant were not paid their kickbacks as quickly as they expected after Project Magnolia closed, and learned that Loo and Geh had also not received their payments in a timely fashion.  Indeed, these two separate bribe payments alone are sufficient to establish that more than one bribe would be paid.  But here, the defendant also knew that others were awaiting their delayed bribe payments.  The bank records showing the timing of the bribe payments to various individuals corroborated these delayed payments.  Leissner and the defendant spoke to Low about the delays in payments to themselves and others, which ultimately led to Leissner volunteering to use his Capital Place Account to help facilitate such payments, as the defendant well knew since he received his own kickback payment through the Capital Place Account.

For these reasons, the fact that more than one bribe would be paid was foreseeable to the defendant, and the enhancement is applicable.

35

      2.    <u>The Sentencing Enhancement for a Total Bribe Amount in Excess of</u>
<u>$550,000 is Warranted</u>

The defendant objects to the 30-level increase pursuant to USSG

§§ 2B1.1(b)(1)(P) and 2C1.1(b)(2) for losses of more than $550,000,000, arguing that "there is

no evidence Ng was told, knew, or should have known the total amount of the bribes paid" and

that the "amount was unforeseeable to him and should not be considered port of the offense or

relevant conduct."  (Def. Mem. 23).  This argument runs counter to both the law and the facts,

and it should be rejected.

      "The loss amount attributable to a particular defendant includes the loss caused by

the defendant's own acts and omissions and, in the case of jointly undertaken criminal

activity[,] . . . all reasonably foreseeable acts and omissions of others in furtherance of the jointly

undertaken criminal activity."  <u>United States v. Bliss</u>, 566 F. App'x 49, 52 (2d Cir. 2014) (citing

U.S.S.G. § 1B1.3(a)(1) and <u>United States v. Royer</u>, 549 F.3d 886, 905 (2d Cir. 2008)); <u>see also</u>

<u>United States v. Iannuzzi</u>, 372 F. App'x 98, 100 (2d Cir. 2010); USSG § 1B1.3.  Specifically,

where a member of the conspiracy was "involved from the beginning," is "all over" a host of key

documents, acted in a "savvy and sophisticated manner," and told a series of "bold face lies," it

is appropriate to hold that conspirator responsible for the entirety of the loss.  <u>Bliss</u>, 566 F. App'x

at 52.

      Based on the case law and the specific facts here, the full amount of the bribes are

appropriately attributable to the defendant.  First, the defendant was involved in the bribery

scheme from the beginning, establishing the relationship between Low and Goldman Sachs and

cultivating it in the years preceding the bond deals.  As discussed above, the defendant proposed

Low as a Private Wealth Management client first in October 2009 in Switzerland, and then again

in March 2011 in Singapore after Low had been rejected by Compliance.  Second, the defendant was an essential piece of the overall bribery plan from the outset, acting alongside Leissner to get the imprimatur of Goldman Sachs attached to bond transactions that the defendant knew would be used to pay massive bribes to government officials in Malaysia and Abu Dhabi, given his attendance at the February 2012 London meeting and subsequent conversations with Low, Leissner and others.

As discussed above, the defendant was a savvy and sophisticated player in the scheme, both in terms of its implementation and its concealment.  From the outset, the defendant was an active participant in this extraordinarily complex scheme, coordinating with Low from his personal email account and working to both structure the bond transactions and get Goldman Sachs's approval without revealing the massive bribes to be paid to ensure its success.  As demonstrated at trial, these were exceedingly complicated transactions, and the defendant worked diligently to close the deals.  And when it came time for him to receive his own bribery payment, the defendant acted in a highly sophisticated manner:  as discussed above, he established multiple fake email accounts, had his wife act as the primary communicator with the bank personnel, concocted a cover story for the source of the $35.1 million, and ultimately deleted the email accounts he used in connection with the scheme in an attempt to cover his tracks.  The defendant was a central player who should be held responsible for the full extent of the jointly undertake criminal activity.

In addition, the full extent of the bribes were foreseeable to the defendant because he understood the sums in play—both generally and personally.  The defendant was a central player in $6.5 billion of bond transactions, an unprecedented sum, especially in Asia, and the largest transactions of his career, and Ng knew that these massive transactions would be the

source of the bribe payments. And on a more personal level, the defendant certainly knew exactly how much he received: over $35 million. The defendant also had a sense of where he fell on the overall spectrum of bribe recipients. As described by Low at the London meeting, at the top of the Malaysian column were Prime Minister Najib Razak and his wife, Rosmah Mansour, and below that were Malaysian officials; on the Abu Dhabi side, there was Sheikh Mansour at the top, followed by Khadem Al-Qubaisi, Mohamed Al-Husseiny, Yousef Al-Otaiba and IPIC in general. And then, of course, there were kickback recipients like Low, Leissner and the defendant. This hierarchy of bribes was reflected in actual payments to these individuals, as demonstrated at trial. Thus, even if the defendant did not know the exact payments to each bribe recipient, it was foreseeable to him that individuals like Low, Razak, Qubaisi and others would be receiving exorbitant sums, significantly in excess of his already-enormous $35.1 million payment. For these reasons, the full amount of the bribes was foreseeable to the defendant, and the 30-level increase is applicable.

The defendant also claims that the 30-level increase "significantly overstates Ng's criminal activity." (Def. Mem. 40). We disagree. As described above, the defendant was an essential participant in a brazen bribery scheme that siphoned billions of dollars away from the people of Malaysia and put over $35 million in corrupt kickbacks in his own pocket. The defendant went to great lengths to ensure that the deals went through as planned and conceal the bribes he received for his efforts. The defendant's greed not only victimized the people of Malaysia, but it also fundamentally undercut the public's faith in government and institutions on a global scale.

3.    The Sentencing Enhancement for Obstruction of Justice is Warranted

The defendant contends that the enhancement for obstruction of justice under

USSG § 3C1.1 is inapplicable because the "record before the Court did not show the

relationship, if any, between the deletion of the [defendant's] email accounts between February

and March 2015 (prior to any FBI investigation) and the offense of conviction."  (Def. Mem. 24).

To the contrary, the two-point offense level increase for obstruction of justice is well-supported

by the evidence presented at trial.  Section 3C1.1 provides for an enhancement where:

> (1) the defendant willfully obstructed or impeded, or attempted to obstruct or
> impede, the administration of justice with respect to the investigation,
> prosecution, or sentencing of the instant offense of conviction, and (2) the
> obstructive conduct related to (A) the defendant's offense of conviction and any
> relevant conduct; or (B) a closely related offense.

USSG § 3C1.1.

"[A]n obstruction of justice enhancement only applies 'if the court finds that the defendant

willfully and materially impeded the search for justice in the instant offense.'"  United States v.

Gershman, 31 F.4th 80, 103 (2d Cir. 2022) (quoting United States v. Zagari, 111 F.3d 307, 328

(2d Cir. 1997)).  As the Second Circuit recently noted, the "threshold for materiality is

conspicuously low" for purposes of applying the obstruction enhancement, and there is "no

general requirement that the obstruction succeed."  Gershman, 31 F.4th at 103–104.

Where the alleged obstruction "occur[s] prior to the start of the investigation of the instant

offense of conviction," the adjustment may apply "if the conduct was purposefully calculated,

and likely, to thwart the investigation or prosecution of the offense." U.S.S.G. § 3C1.1, cmt n. 1.

This extends to efforts to thwart state, local, and foreign investigation where such acts would

reasonably be expected to affect the U.S. prosecution.  See United States v. Ayers, 416 F.3d 131,

134 (2d Cir. 2005) (Section 3C1.1 "does not purport to limit its reach to federal investigations or

39

federal judicial proceedings."); United States v. Teyer, 322 F. Supp. 2d 359, 367 (S.D.N.Y.

2004) (applying Section 3C1.1 enhancement where the defendant's "effort to frustrate the

Belizean prosecution would reasonably be expected to have an effect on the prosecution here").

      Here, the defendant's deliberate efforts to obstruct the investigation into his

criminal conduct through his destruction of communications related to the scheme—both

electronic and hard copy—and the dissolution of shell companies used in the scheme, are clearly

obstructive conduct within the meaning of Section 3C1.1.  As detailed above in Section I.F., in

late 2013 and continuing into 2014, there continued to be critical coverage of Low and his

suspected misconduct at 1MDB and corruption allegations.  Among the outlets covering Low

closely was the Sarawak Report, a website read widely in Malaysia and bookmarked by the

defendant in his iCloud account.  The government established at trial that during this time, on a

recorded call in March 2014, the defendant's wife called to request the destruction of mail for the

Silken Waters / Victoria Square shell company—the entity that had received criminal proceeds

from the 2012 bond deal.  Shortly thereafter, the defendant and his wife then transferred all of

the funds out of Victoria Square and dissolved the shell company altogether.

      In early 2015, the defendant and his wife worked to delete the entirety of multiple

email accounts used in the scheme.  Indeed, the very month that additional news reports broke

concerning corruption at 1MDB, the defendant and his wife deleted the

"victoriasquare.investment" email account, which they personally used to communicate with the

bank holding his criminal proceeds from the 1MDB bribery and money laundering scheme.   The

following month, the "queensgate.capital," "rogerch.ng" and "roger.ng1" accounts—all used to

communicate with Low—were also deleted in their entirety.  At the same time, the defendant

stopped travelling to the United States.  And just five months later, the defendant was questioned by the Malaysian Anti-Corruption Commission.

These acts properly support the enhancement, as they were "purposefully calculated, and likely, to thwart the investigation or prosecution of the offense."  USSG § 3C1.1, cmt n.1.  In particular, they helped hide the defendant's communications with Low, Leissner and other co-conspirators and further obfuscated the defendant's control over the bank accounts and shell companies used in furtherance of the bribery and money laundering scheme.  The timing of these acts—particularly the email deletions in 2015—show that the defendant was concerned with the expanding official investigations into 1MDB.  The defendant's concern extended to the U.S. investigation into 1MDB, as evidenced by Leissner and the defendant's coordination with each other in February 2016 immediately after Leissner was stopped by the FBI and served with a grand jury subpoena.

Attempting to minimize the significance of these acts, the defendant claims that the deletion of the multiple email accounts was unconnected to "the offenses of conviction." (Def. Mem. 24).  That objection ignores the evidence and its import in this case.  These were email accounts used by the defendant to communicate with Low, including about the 1MDB bond deals, and, as to the "victoriasquare.investments" account, to exclusively communicate about the use of the criminal proceeds he gained from the scheme.  Evidence of the defendant's control over the anonymized email accounts would have linked him directly to the shell companies and bank accounts being operated from that email account.

As to the shell account dissolution and mail destruction, the defendant claims that this was all done to "simply transfer[] [the money] to an account in Mrs. Tan's personal name, who was the original beneficiary of the corporation."  (Def. Mem. 25).  As the government

41

established at trial, Ms. Tan—the defendant's mother-in-law—had no real tie to these companies

and accounts at all, aside from concealing the defendant's control by having her name on the

paperwork.  It was the defendant who filled the account with criminal proceeds, and planned to

use that money for real estate, stocks, and jewels.  The closure of the accounts, dissolution of the

company and destruction of the mail had nothing to do with Ms. Tan—it was to ensure that the

true ownership and control of the shell companies would be harder to determine.  As such, these

acts support application of the enhancement.

4.    The Defendant Has Not and Cannot Show He is Entitled to a Minimal Role Reduction

The defendant bears the burden of establishing a downward role adjustment, and

he fails to do so here.  "The commentary to the Guidelines provides that a 'minimal role'

adjustment applies to a defendant who is 'plainly among the least culpable of those involved in

the conduct of a group.'"  United States v. Carpenter, 252 F.3d 230, 234 (2d Cir. 2001) (quoting

USSG § 3B1.2 cmt. n.1).  "The Guidelines make clear that the "minimal role" adjustment should

be used 'infrequently.'"  Id.

Whether a minor role reduction is appropriate is a "fact-based determination"

based on the "totality of the circumstances," and a court should consider the following "non-

exhaustive list" of factors:  (i) the defendant's understanding of the scope and structure of the

criminal activity, (ii) the degree to which the defendant participated in planning or organizing the

criminal activity, (iii) the degree to which the defendant either exercised decision-making

authority or influenced the degree of the exercise of such authority, (iv) the nature and extent of

the defendant's participation in the criminal activity, and (v) the degree to which the defendant

stood to benefit from the criminal activity.  USSG § 3B1.2 cmt. n.3(C); see also United States v.

42

Ravelo, 370 F.3d 266, 270 (2d Cir. 2004) (district courts look to factors such as "the nature of the defendant's relationship to other participants, the importance of the defendant's actions to the success of the venture, and the defendant's awareness of the nature and scope of the criminal enterprise") (quoting United States v. Yu, 285 F.3d 192, 200 (2d Cir. 2002)).

Historically, the Second Circuit has also held that a "reduction will not be available simply because the defendant played a lesser role than his co-conspirators; to be eligible for a reduction, the defendant's conduct must be 'minor' or 'minimal' as compared to the average participant in such a crime." United States v. Rahman, 189 F.3d 88, 159 (2d Cir. 1999) (per curiam). However, as the Second Circuit observed in United States v. Kirk Tang Yuk, 885 F.3d 57, 88 n.16 (2d Cir. 2018), the Guidelines have been amended to explain that a role reduction is appropriate if the defendant was "substantially less culpable than the average participant in the criminal activity," and that the "average participant" specifically refers to the defendant's "co-participants in the case at hand." The Second Circuit further observed that the Sentencing Commission's interpretation is given "controlling weight" and "undercuts" the prior Second Circuit's interpretation in Rahman and its progeny. Id.

Notably, the defendant cites the commentary to the Guidelines for the proposition that "even a defendant who performs an essential or indispensable role in the criminal activity … may receive a mitigating role adjustment." (Def. Mem. 26). However, this citation is incomplete, as the full text of the commentary reads as follows:

> "The fact that a defendant performs an essential or indispensable role in the criminal activity is not determinative. Such a defendant may receive an adjustment under this guideline if he or she is substantially less culpable than the average participant in the criminal activity."

USSG § 3B1.2 cmt. n.3(C) (emphasis added).  In other words, a defendant whose participation in the conspiracy is essential may qualify for a mitigating role only if "he/she is also substantially less culpable than the average participant in the conspiracy."  Id.

Applying this standard to the evidence adduced at trial, which is reflected in the PSR and detailed above, it is clear that the defendant cannot meet his burden to show that he should receive a minimal role reduction.  As an initial matter, in his submission, the defendant compares his role in the conspiracy primarily to Leissner and in some cases to Low, arguing that he is less culpable than either of them, and focuses primarily on relitigating significant portions of Leissner's trial testimony while ignoring the rest of the government's evidence.  (See, e.g., Def. Mem. 29 (rehashing the timetable of the London meeting to suggest that the defendant and Leissner could not have completed both an early dinner and a walk by 6:45 p.m.); 31-32 (contrasting the defendant's role at the Project Magnolia committee meeting to Leissner's role, but failing to address the defendant's role as compared to any other co-conspirator); 36 (centering his argument that the "three people charged in the United States are Mr. Ng, Low and Leissner" and reiterating that the defendant was the least culpable of the three); and 38 ("the Court is required to compare Mr. Ng's conduct with the two other people charged in this matter").

The defendant artificially narrows the scope of the conspiracies of which he was convicted to make it appear that he is the least culpable participant of only three players.  This must be rejected.  Contrary to the defendant's misleadingly myopic view, the evidence at trial established that each conspiracy encompassed a large number of participants with varying roles. For Count One, the co-conspirators included Low, Leissner, the defendant; 1MDB officials including Loo, Geh, Koh, Lee and Taib; other Malaysian government officials including Prime

44

Minister Razak, Nazaruddin, Alias and Yahaya; Abu Dhabi officials including Sheikh Mansour, Al-Otaiba, Al-Qubaisi and Al-Husseiny; individuals who worked for Low, including Eric Tan Kim Loong and Nik Faisal; and assorted family members who helped facilitate bribe payments, including Mansor and Aziz.  For Count Two, the co-conspirators included Low, Leissner and the defendant; 1MDB officials working directly on the deal, including Loo, Geh, Koh and Lee; and others at Goldman Sachs who helped conceal Low's involvement in the deal, including Vella, Watson and Dunne.  For Count Three, the co-conspirators included all of the individuals involved in Count One, as well as more than a dozen family members of bribe recipients, including Leissner's wife and the defendant's wife and mother-in-law.  The five factors set forth in the Guidelines must be applied to the defendant's role in the conspiracies as compared to <u>all</u> of these co-conspirators and, when they are, it is clear that the defendant cannot meet the high burden to show that his conduct qualifies for one of the "infrequent" instances where a four-level minimal role reduction is appropriate.

<u>First</u>, with respect to (i) the defendant's understanding of the scope and structure of the criminal activity, and (ii) the defendant's participation in planning or organizing the criminal activity, as described above, the defendant played a crucial role.  Along with Leissner and Low, the defendant was at all four key meetings in 2012—in London, Abu Dhabi, Los Angeles and Singapore—where the scheme for the Project Magnolia deal was conceived, planned and finalized.  The defendant worked diligently with Leissner and Loo to engineer the structure of the deal, communicating with them over personal emails and off of Goldman's systems to avoid detection, and helped shepherd the deal through Goldman's byzantine committee process.  Within Goldman, the defendant helped conceal Low's role in the deal, along with the fact that bribes and kickbacks would be paid, including to Leissner and himself, to

45

ensure that the deal would be completed; notably, without an approved transaction, there was no money to divert and use to pay bribes and kickbacks.  And once the deal was finalized, he and Leissner pushed Low on the timing of their payments and discussed how to help facilitate payments for themselves and others through Leissner's shell company based in Hong Kong.  The defendant knew that his $35.1 million in kickbacks were being paid out of money raised for Project Magnolia, and set up his own shell company, shell company bank account and email address in the name of his mother-in-law to conceal his receipt of those payments and facilitate the movement of them into additional accounts.  The structure of Project Magnolia (as well as the structure of the money laundering operation that moved funds to bribe and kickback recipients) was essentially "cut-and-paste" for Projects Maximus and Catalyze, each of which followed on within a year; the defendant played a similar role for Project Maximus as he had for Project Magnolia, and was involved in selling bonds for Goldman for Project Catalyze, and received additional kickback payments following the close of Project Catalyze.  Overall, the defendant's actions were central to all three conspiracies, and his role was far more significant than many of his co-conspirators:  the defendant was involved in planning and structuring the deals, getting the deals approved, concealing key information from Goldman, receiving enormous kickback payments (as noted below, far more than many other participants) and setting up a sophisticated structure to conceal and launder those ill-gotten gains, while many of his co-conspirators only received bribe payments in exchange for approvals, only lent their names to

shell companies or helped move money, or only helped circumvent controls at Goldman without knowing the true scope of the scheme.[5]

        <u>Second</u>, with respect to (iii) the exercise of decision-making authority or influence over the exercise of such authority, while the defendant, Leissner and others certainly played a lesser role in the overall scheme than Low, who determined which individuals needed to be bribed and what amounts, the defendant worked with Leissner to suggest alternatives to Low for making payments when there was a delay, ultimately settling on Leissner's existing shell companies; worked closely with Loo and Leissner to determine the financial structure of deals, which enabled the money for the bribe and kickback payments to be looted; directed Tai and others in the drafting of the deal documents necessary to get the deals approved by Goldman; and was the mastermind of the elaborate money laundering structure he put into place with Lim and Tan to receive, conceal and launder the $35.1 million in kickbacks that he received through multiple shell companies.

---

[5] For example, while Watson, Donne and Vella (the other co-conspirators at Goldman for the circumvention conspiracy (Count Two)) also helped to conceal Low's role in the deals to ensure that they would be approved, they, unlike Leissner and the defendant, did not know the full scope of the bribery and money laundering scheme; and unlike Leissner and the defendant, they did not receive tens of millions of dollars from the scheme, a fact that Leissner and the defendant also concealed from Goldman. The defendant tries to argue that he was somehow less culpable than Watson, Donne and Vella because he claims certain emails reflect that those individuals thought that the defendant did not work as hard as others at Goldman, particularly with respect to selling Project Catalyze bonds. (Def. Mem. 35-36). Whether the defendant was an effective or diligent salesperson is not relevant to his culpability in the scheme—clearly, his knowledge of the full scope of the scheme, participation in it and concealment of all aspects of it from Goldman, combined with his receipt of $35.1 million in kickbacks, make him far more culpable than Watson, Dunne and Vella, who did not have full information about the scheme, did not participate in it other than to conceal Low's involvement from Goldman, and never received any payments.

Third, with respect to (iv) the nature and extent of the defendant's participation in the criminal activity, the defendant was in on the scheme from the very beginning, working to cultivate a relationship with Low for Goldman in the years leading up to the scheme, and was an active participant until the very end of the conspiracy periods;[6] he also took significant steps after the conspiracies were complete to conceal both his role and the roles of others, by deleting email accounts, dissolving a shell company and providing false information to investigating authorities in Malaysia and Singapore, as detailed supra. And, as set forth at length above, the defendant played a crucial role in the schemes.

Finally, with respect to (v) the degree to which the defendant stood to benefit from the criminal activity, the $35.1 million that the defendant earned directly from the criminal scheme in kickbacks—which is separate and apart from the millions in dollars in cash and stock he earned from Goldman as a result of obtaining and retaining the 1MDB business for the bank—was 30 times more than the corrupt payments made to lower level Malaysian government officials like Amhari Nazaruddin and Azlin Alias, places him in the top eight earners out of all of the co-conspirators for illegal funds traced by the government at trial. (GX-158). In addition,

---

[6] The defendant states that "Mr. Ng and Low did not speak after 2012" (Def. Mem. 25), but that is not accurate. As an initial matter, email communications between the defendant and Low no longer exist because, as shown at trial, the defendant deleted the entirety of the email accounts over which he communicated with Low. However, there is clear evidence of their continued relationship well after 2012. Among other things, the defendant stored Low's dealrainman1 email address in his Apple account. GX 2555-E. In December 2013, Low and his father Larry Low communicated via email, and Larry Low reported that the defendant was setting up a meeting for him in Singapore. GX 2420. As Leissner explained, in 2017, Low and the defendant remained in communication concerning the defendant's detention in Singapore. T. 1286–1300. This was also reflected in Low's WeChat message to Leissner recounting details concerning Ng's detention. GX 2602. The defendant's communication with Low continued into 2018, as reflected in a consensually recorded call between Leissner and Low in which Low reported, "Roger is still in Malaysia is my understanding."

there were a number of co-conspirators that did not receive any monetary benefit from the scheme, including Goldman co-conspirators Watson, Donne and Vella.

For all of these reasons, the defendant has not met his burden to show that he is entitled to any offense level reduction based on his role in the schemes, let alone the extraordinary reduction afforded for being a "minimal" participant.

5. <u>Even Accepting the Defendant's Arguments, the Applicable Guidelines Calculation Remains Approximately 20 Years' Imprisonment</u>

For the reasons set forth above, each of the defendant's challenges to Probation's Guidelines calculation is wrong.  However, the challenges, even if correct, need not be resolved by this Court if they would not affect the defendant's sentence.  <u>See</u> <u>United States v. Borrego</u>, 388 F.3d 66, 70 (2d Cir. 2004) (A "court is not obliged to waste its time making [Guidelines] findings that would have no effect on the sentence."); <u>United States v. Tracy</u>, 12 F.3d 1186, 1203 (2d Cir. 1993) (when a sentencing dispute has no bearing on the determination of a sentence, courts need not rule on disputed offense level adjustments).  Here, the government notes that, even accepting all of the defendant's objections to the Guidelines calculation at face value (that he should only be held accountable for the $35 million in illicit funds that he received, that he should not be held responsible for more than one bribe; that he should not get an enhancement for obstruction of justice; and that he should get a minimal role reduction)—the applicable Guidelines term of imprisonment would be still be significant:

<u>COUNTS ONE & TWO[7] – CONSPIRACY TO VIOLATE THE FCPA (USSG § 2C1.1)</u>

Base Offense Level (USSG § 2C1.1(a)(2)):                     12

---

[7] The defendant contends that Count Two should not have the same Guidelines calculation as Count One, stating only that "there is no precedent for what [G]uidelines provision

49

| | |
|---|---|
| Value of Bribes (more than $25,000,000) (USSG § 2C1.1(b)(2)): | +22 |
| High-Level Official (USSG § 2C1.1(b)(3)): | +4 |
| Minor Role Reduction | <u>-4</u> |
| Total Offense Level: | 34[8] |

### COUNT THREE – MONEY LAUNDERING CONSPIRACY (USSG § 2S1.1)

| | |
|---|---|
| Base Offense Level (USSG § 2S1.1(a)(1)): (SUA is FCPA conspiracy calculated pursuant to USSG § 2C1.1, including base offense level 12, value of bribes in excess of $25 million and high-level official, as set forth above) | 38[9] |

---

would apply to the circumvention of a company's accounting controls." (Def. Mem. 22). However, Count Two involves a violation of 15 U.S.C. §§ 78m(b)(2)(B) and 78m(b)(5), the penalty provision for which is 15 U.S.C. § 78ff(a), which the Guidelines index indicates should be calculated pursuant to 2B1.1 and 2C1.1. <u>See</u> USSG Appendix A. In any event, the defendant does not provide an alternative method for calculating the offense level for Count Two, and notes that any error is "harmless." (Def. Mem. 22). The government also notes that the defendant did not make this objection to Probation.

[8] The defendant fails object to or even address the applicable four-point "high level official" enhancement, either in his objections to Probation or in his sentencing memorandum. As a result, the total offense level accepting at face value all objections made by the defendant for Count One would 34, not 30.

[9] The defendant states, without explanation, that the base offense level for Count Three is 8, and cites USSG § 2S1.1(a)(2). (Def. Mem. 22). However, Section 2S1.1(a)(2) is only used to calculate the base offense level where "the base offense level for the underlying offense is impossible or impracticable to determine," which is clearly not the case here. <u>See</u> USSG § 2S1.1 cmt. n.3(A). Moreover, even if Section 2S1.1(a)(2) provided the calculation for the base level, it would not be 8; it would be 8 <u>plus</u> "the number of offense levels from the table in Section 2B1.1 … corresponding to the value of the laundered funds," or 30 (assuming the 22-level enhancement advocated for by the defendant for laundering $35 million). <u>See</u> USSG § 2S1.1(a)(2). Moreover, as noted <u>infra</u>, the defendant fails object to or even address the applicable four-point "high level official" enhancement, either in his objections to Probation or in his sentencing memorandum. As a result, the total offense level accepting at face value all objections made by the defendant for Count Three would 38, not 18.

Conviction Under 1956 (USSG § 2S1.1(b)(2)(B)):          +2

Sophisticated Laundering (USSG § 2S1.1(b)(3)):          +2

Minor Role Reduction                                    -4

Total Offense Level:                                    38

As before, the counts would group, and so the total offense level would be 38.  Given that the

defendant falls into Criminal History Category I, the applicable Guidelines range would be 235-

293 months' imprisonment, which is not significantly lower than the restricted Guidelines term

of imprisonment of 360 months.  That is, even considering only those enhancements that the

defendant does not dispute, the applicable Guidelines range is approximately 20-24 years'

imprisonment.[10]

C.     The Court is Required by Statute to Order Forfeiture in the Amount of $35.1
       Million

As set forth in the PSR, forfeiture is to be imposed by a convicted defendant as

provided by statute.  (PSR ¶¶ 159-160).  Here, forfeiture is warranted in the amount of the

defendant's ill-gotten gains from the scheme, which the government proved at trial totaled

$35.1 million.  As a result, the Court should enter the proposed order of forfeiture.  (Proposed

Order of Forfeiture, ECF No. 228).

1.     Legal Standard

Rule 32.2(b)(1)(A) of the Federal Rules of Criminal Procedure provides that if the

government seeks a personal money judgment, the court must determine the amount of money

---

[10] The defendant also argues that he is entitled to a downward departure under USSG §
5K2.0 as a result of the six months that he served in prison in Malaysia before his extradition to
the United States.  (Def. Mem. 52).  The government addresses this argument in Section V.B
below.

that the defendant will be ordered to pay. See Fed. R. Crim. P. 32.2(b)(1)(A).  Courts in the

Second Circuit have routinely imposed forfeiture money judgments pursuant to 18 U.S.C.

§§ 981(a)(1)(C) and 982(a)(1).  See, e.g., United States v. Marsh, Nos. 10–CR–0480, 10–CR–

0697, 10–CR–0700, 10–CR–0800, 10–CR–0801, 2011 WL 5325410 (E.D.N.Y. Oct. 26, 2011)

(Weinstein, J.); United States v. Dipascali, No. 09 Cr. 764, 2010 WL 9002774 (S.D.N.Y. June

18, 2010); United States v. Capoccia, No. 1:03-CR-35-01, 2009 WL 2601426 (D. Vt. Aug. 19,

2009), aff'd, 402 Fed. Appx. 639 (2d Cir. 2010).  Any unpaid amount that remains outstanding

may be reduced to an in personam forfeiture money judgment.  United States v. Awad, 598 F.3d

76, 78 (2d Cir. 2010) ("[W]hen a defendant lacks the assets to satisfy the forfeiture order at the

time of sentencing, the money judgment [against the defendant] is effectively an in personam

judgment in the amount of the forfeiture order . . .") (internal quotation marks omitted); United

States v. Kalish, 626 F.3d 165, 168-69 (2d Cir. 2010) (same); United States v. Roberts, 696 F.

Supp. 2d 263, 268 (E.D.N.Y. 2010) (Irizarry, J.) (same), aff'd and forfeiture order vacated on

other grounds, 660 F.3d 149, 168 (2d Cir. 2011).

Further, Rule 32.2(b)(1)(B) provides that the Court's determination may be based

on evidence already in the record, and on any additional evidence or information submitted by

the parties and accepted by the court as relevant and reliable. See United States v. Capoccia, 503

F.3d 103,109 (2d Cir. 2007); United States v. Roberts, 660 F.3d 149, 166 (2d Cir. 2011)

("district courts may use general points of reference as a starting point for a forfeiture calculation

and 'make reasonable extrapolations' supported by a preponderance of the evidence").

In contrast to the guilt phase of the criminal trial, the government bears the burden

of establishing the amount of money subject to forfeiture only by a preponderance of the

evidence.  See Capoccia, 503 F.3d at 116 ([S]entencing courts determine forfeiture amounts by a

52

preponderance of the evidence); United States v. Bellomo, 176 F.3d 580, 595 (2d Cir. 1999)

(upholding trial court's application of preponderance standard on grounds that criminal forfeiture

is part of sentencing). The government is not required to provide a precise calculation of the

amount of money a defendant must forfeit. United States v. Treacy, 639 F.3d 32, 48 (2d Cir.

2011).  Instead, the money judgment amount can be reasonably estimated based upon the

available information. Id.  Sentencing courts may consider trial evidence, hearsay, as well as

"evidence or information submitted by the parties and accepted by the court as relevant and

reliable," in determining forfeiture. Fed. R. Crim. P. 32.2(b)(1)(B); Capoccia, 503 F.3d at 109-10

(citing United States v. Gaskin, 364 F.3d 438, 462-63 (2d Cir. 2004)).

      Notably, criminal forfeiture "serves no remedial purpose, [and] is designed to

punish the offender. . . ."  United States v. Contorinis, 692 F.3d at 146.  Furthermore, criminal

forfeiture is mandatory, and a creature of statute.  See United States v. Monsanto, 491 U.S. 600,

607 (1989) ("Congress could not have chosen stronger words to express its intent that forfeiture

be mandatory" in cases where the relevant forfeiture statute provides that the court "shall order"

forfeiture).  It is well-settled in the Second Circuit that forfeiture is a mandatory obligation of a

defendant at sentencing that is entirely separate from restitution, which is also mandatory.

United States v. Kalish, 626 F.3d 165, 169 (2d Cir. 2010) (There is "no infirmity in the District

Court's imposition of both a forfeiture remedy and a restitution remedy.  These remedies are

authorized by separate statutes, and their simultaneous imposition offends no constitutional

provision."); see also United States v. Bengis, 631 F.3d 33, 41 (2d Cir. 2011) (same) (quoting

Kalish).  Accordingly, the court should impose forfeiture as part of the defendant's sentence,

separate and apart from any restitution that is awarded to victims.

2.      Evidentiary Basis for the Government's Proposed Order of Forfeiture

The evidence at trial, detailed above, established that the defendant illegally

obtained at least $35,100,000 from his involvement in the scheme.[11]  Thus, the defendant is

liable to forfeit $35,100,000 to the United States as a result of his commission of the crimes of

conviction.

As a result, the government has submitted a proposed Order of Forfeiture

pursuant to Rule 32.2 of the Federal Rules of Criminal Procedure, which provides for the entry

of a forfeiture money judgment in the amount of Thirty-Five Million One Hundred Thousand

Dollars and Zero Cents ($35,100,000.00), as: (a) property, real or personal, that constitutes or is

derived from, proceeds obtained directly or indirectly as a result of the defendant's violations of

---

[11] In addition to the $35.1 million traceable to the 1MDB bond deals that the defendant received in the Victoria Square shell company and subsequently laundered through additional accounts, the defendant earned a significant salary and bonus from Goldman during the conspiracy periods that reflected, in part, his success in obtaining and retaining the illegal 1MDB business for Goldman.  (See GX-732, GX-733 (reflecting a $2.4 million total bonus paid to the defendant in 2012, the year that Projects Magnolia and Maximus closed)).  Any portion of his salary and bonus that he received as a result of that illegal business may be forfeited as proceeds of the crimes.  See, e.g., Contorinis, 692 F.3d at 147-48 (defendant is liable for forfeiture of proceeds that he receives indirectly, such as bonuses or other benefits from his employer, based upon amount of proceeds that employer received from illegal activity); United States v. Torres, 703 F.3d 194, 199-200 (2d Cir. 2012) (finding that "[s]o long as there is a causal nexus between the wrong-doer's possession of the property and her crime, the property may be said to have been 'obtained' by her 'indirectly' as a result of her offense," and rejecting defendant's argument that she only received an intangible benefit from her offense).  It is the government's understanding that in October 2020, Goldman Sachs canceled shares of the company worth approximately $473,000 that had been scheduled to be delivered to the defendant, but has not to date clawed back any of the approximately $1.6 million in shares that had already been paid out to the defendant during the course of his employment, which were retained by the defendant (along with all cash payments made during the course of his employment).  However, given the complexity of determining what portion of the defendant's salary and bonus was specifically attributable to the crimes of conviction, the government has elected not to pursue forfeiture of these funds.

18 U.S.C. § 371, pursuant to 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c); (b) property,

real or personal, involved in the defendant's violation of 18 U.S.C. § 1956(h), or any property

traceable to such property, pursuant to 18 U.S.C. § 982(a)(1); and/or (c) substitute assets,

pursuant to 21 U.S.C. § 853(p), as incorporated by 18 U.S.C. § 982(b)(1).

        3.    <u>The Defendant is Not Permitted to Offset or Reduce Forfeiture Owed to the United States by Funds Paid to Malaysia to Avoid Criminal Prosecution</u>

The defendant does not directly address the payment of forfeiture in this case in

his sentencing memorandum, but in his objections to the PSR alleges that "Ng's wife and her

family agreed with the Malaysian government to return all funds deemed by the Malaysian

Government to have been derived from 1MDB in October 2018.  Included in the funds the

defendant's family surrendered to the Malaysian Government was $2,020,829.16 of the

defendant and his wife's personal funds that were transferred into the account on August 21,

2024."  (Def. PSR Obj. 16).  The defendant reiterates these claims in his sentencing

memorandum (in the context of the Section 3553(a) analysis, <u>see</u> <u>infra</u> Section IV.B.), and

contends that in October 2018, Ms. Lim, Ms. Tan, and the defendant's brother-in-law Lim Chee

Kang signed statutory declarations and agreed to "relinquish all claims to monies" in eleven

accounts, which the defendant claims included an unspecified amount of money that was derived

from 1MDB, along with the $2 million referenced above, $1 million in funds belonging to Lim

Chee Kang, and 499,500 shares of Celsius stock.  (Def. Mem. 45-46).  The defendant further

states that "in exchange for forfeiting the 1MDB funds as well as the funds not derived from

1MDB, neither Malaysia (the country from which the funds were misappropriated) nor

Singapore (the country in which the bank accounts were present) would bring criminal charges

against anyone, that travel bans would be lifted and that bank accounts would be unfrozen."  (<u>Id.</u>

at 46).  However, while the defendant has attached copies of the statutory declarations (see

Defendant's Appendix, Exhibit 1), those declarations do not provide a specific accounting of

what assets—either traceable to 1MDB or otherwise—were in those eleven accounts at the time

that their contents were provided to the Malaysian government.  Nor does the defendant provide

any other documentation or evidence in support of his claims.[12]

> In any event, none of the assets that the defendant and his family provided to the

Malaysian government in a bid to avoid criminal prosecution—even if some of them were

traceable to ill-gotten gains he received from the schemes, and even if the defendant could

provide an accounting of such funds—could serve to "offset" the $35.1 million in forfeiture that

the defendant is required by statute to pay to the United States.  This is because the doctrine of

dual sovereignty permits the federal government to impose a money judgment for the full

amount of a defendant's ill-gotten gains from the offenses of conviction even if another

sovereign—like a state or a foreign government—has also sought forfeiture based upon the same

underlying conduct.  Cf. United States v. Williams, 519 F. App'x. 303, 304 (5th Cir. 2013)

(doctrine of dual sovereignty allows federal court to impose money judgment without any offset

for forfeiture ordered by state court based upon same conduct).  Moreover, forfeiture serves a

punitive purpose, not a remedial one.  See Contorinis, 692 F.3d at 146.  Accordingly, to the

extent that the defendant could provide evidence that quantifies the amount funds that he

provided to the government of Malaysia as compensation for losses incurred as a result of the

---

[12] The defendant cites DX-401-1, which is a record of certain deposits into the River Blue account controlled by the defendant and Lim in 2014.  (Def. Mem. 46).  However, that document does not prove that such funds were transferred to and, crucially, remained in one of the accounts referenced in the statutory declarations at the time those declarations were signed in October 2018, nearly four years later.

charged conspiracies, those funds could potentially offset any award of <u>restitution</u> to Malaysia as

a victim under the MVRA.  <u>See, e.g.</u>, <u>United States v. Thompson</u>, 792 F.3d 273, 280 (2d Cir.

2015) (holding that reduction to restitution award was appropriate under MVRA where

defendant had returned portion of stolen funds to victims).  However, in this case, it is the

government's understanding that the government of Malaysia is not owed restitution because it

has already been made whole by payments from other sources.  (PSR ¶ 158).

      D.     <u>The Court Has Discretion to Order the Defendant to Pay a Fine</u>

Title 18, United States Code, Section 3572(a) sets forth the factors to be

considered by the Court before imposing a fine, in addition to the factors set forth in Section

3553(a).  Those factors include: (1) the defendant's income, earning capacity, and financial

resources; (2) the burden that a fine will impose upon the defendant and any dependents; (3) any

pecuniary loss inflicted upon others as a result of the offenses; (4) whether restitution is ordered;

(5) the need to deprive the defendant of illegally obtained gains from the offenses; and (6) the

expected costs to the government of any imprisonment.  18 U.S.C. § 3572(a).

The Guidelines provide, in turn, that a district court "<u>shall</u> impose a fine in all

cases, except where the defendant establishes that he is unable to pay and is not likely to become

able to pay any fine."  U.S.S.G. § 5E1.2(a) (emphasis added).  The Guidelines further provide

that "[t]he amount of the fine should always be sufficient to ensure that the fine, taken together

with other sanctions imposed, is punitive."  <u>Id.</u>  The defendant bears the burden of demonstrating

an inability to pay a fine at present and in the future.  <u>See</u> <u>United States v. Camargo</u>, 393 F.

App'x 796, 798 (2d Cir. 2010) (upholding imposition of a fine despite the fact that Probation and

the defendant argued the defendant was currently unable to pay such a fine because court

57

concluded defendant was likely to be able to pay a fine in the future); United States v. Salameh,

261 F.3d 271, 276 (2d Cir. 2001).

Here, as set forth in the PSR, no restitution is warranted because the Malaysian

government has been repaid for its losses from other sources.  (See PSR ¶ 158).  As a result,

whether a fine will impose a "burden" on the defendant and whether a fine, taken together with

other sanctions, is sufficiently "punitive," will depend on the amount of forfeiture the Court

ultimately imposes.  As set forth in the PSR, the maximum fine on Count One is $250,000, the

maximum fine on Count Two is $250,000 and the maximum fine on Count Three is $500,000,

for a total potential maximum fine of $1 million.  Probation has concluded, based on a review of

the financial information that the defendant provided to Probation, that while "the defendant has

a negative monthly cashflow, he has considerable assets that may be liquidated," and that he has

the ability to pay a fine.  (PSR ¶ 145).  The defendant does not address the imposition of a fine in

his sentencing memorandum, but he stated in his objections to the PSR that he cannot pay a fine.

(Def. PSR Obj. 16).

## III.   LEGAL STANDARD

A "district court should begin all sentencing proceedings by correctly calculating

the applicable Guidelines range.  As a matter of administration and to secure nationwide

consistency, the Guidelines should be the starting point and the initial benchmark."  Gall v.

United States, 552 U.S. 38, 49 (2007) (citation omitted).  Next, a sentencing court should

"consider all of the § 3553(a) factors to determine whether they support the sentence requested

by a party.  In so doing, [it] may not presume that the Guidelines range is reasonable. [It] must

make an individualized assessment based on the facts presented."  Id. at 50 (citation and footnote

omitted).

58

Title 18, United States Code, Section 3553(a) provides that, in imposing sentence, the Court shall consider:

(1)     the nature and circumstances of the offense and the history and characteristics of the defendant;

(2)     the need for the sentence imposed—

   (A)     to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

   (B)     to afford adequate deterrence to criminal conduct; [and]

   (C)     to protect the public from further crimes of the defendant.

Section 3553 also addresses the need for the sentence imposed "to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner."  18 U.S.C. § 3553(a)(2)(D).  "[I]n determining whether to impose a term of imprisonment, and, if a term of imprisonment is to be imposed, in determining the length of the term, [the Court] shall consider the factors set forth in section 3553(a) to the extent that they are applicable, recognizing that imprisonment is not an appropriate means of promoting correction and rehabilitation."  18 U.S.C. § 3582(a).

At sentencing, "the court is virtually unfettered with respect to the information it may consider."  United States v. Alexander, 860 F.2d 508, 513 (2d Cir. 1988).  Indeed, "[n]o limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence."  18 U.S.C. § 3661.  Thus, the Court should first calculate the applicable Guidelines range, and then apply the Section 3553(a) factors to arrive at an appropriate sentence, considering all relevant facts.

59

## IV.    **A Substantial Term of Imprisonment is Warranted**

A significant sentence of incarceration is warranted here given the nature and seriousness of the defendant's criminal offenses, the defendant's history and characteristics and the need for general deterrence.  See 18 U.S.C. § 3553(a).  For these reasons, the government respectfully submits that a sentence of imprisonment of no less than 180 months is sufficient, but not greater than necessary, to satisfy the goals of sentencing.

### A.    Nature and Circumstances of the Offense (18 U.S.C. § 3553(a)(1))

The nature of and circumstances of the defendant's participation in what defense counsel has acknowledged was "one of the biggest financial crimes in the history of the world" counsels strongly in favor of a significant sentence of incarceration.  In many ways, it is difficult to fully grasp the complexity, scope and impact of the 1MDB bribery and money laundering scheme, which involved complex financial deals that raised almost $6.5 billion in less than two years, bribes paid to at least a dozen officials in two countries, including those at the very highest levels of government, and theft on a scale so staggering—$1.6 billion in bribes, and more than $1 billion in kickbacks—as to be almost incomprehensible.  Those billions of dollars in funds, which were meant for significant infrastructure and investment projects to benefit the people of Malaysia, were instead stolen and spirited away through a labyrinth of dozens and dozens of shell companies all over the world.

As proven at trial and detailed above at length, the defendant sat at the very center of this scheme; not only was he involved in the planning with Low and Leissner from the very beginning, but he was also instrumental to structuring the deals that made it possible for 1MDB to raise the billions of dollars necessary to set the scheme in motion, and his concealment of the true purpose of the deals from Goldman was necessary for those deals to be consummated.  He

also was rewarded handsomely for his efforts:  more than $35 million in kickbacks, which he laundered using his own shell company and web of accounts in the names of his family members.  The defendant did not participate in the 1MDB bribery and money laundering scheme hesitantly, fleetingly, or minimally.  He acted knowingly and deliberately, over many years, and took careful steps to hide his tracks, including destroying email accounts that would tie him to the scheme and lying repeatedly to law enforcement about his culpability.

Despite submitting a 78-page sentencing memorandum and an appendix with 24 exhibits, the defendant allotted only one paragraph to address the nature and circumstances of his crimes of conviction.  (See Def. Mem. 21).  Tellingly, any other substantive discussion of the defendant's conduct is focused on characterizing the defendant as the least culpable of the dozens of co-conspirators involved in the conspiracy (id. at 25-40, 68 ("Roger Ng is the person with the least authority, influence and power of virtually everyone involved in the serious of crimes concerning 1MDB")); attempting at length to re-litigate his cross-examination of Leissner, seeking to both discredit Leissner's testimony and dwell on details of his personal life (see, e.g., id. at 30 ("yet another example of Leissner lying about Mr. Ng's involvement in order to fabricate Mr. Ng's role"); 32 (Leissner "lied to the Government and the jury as well"); 36-37 (discussing Leissner's other crimes); 38 ("One month before he was arrested in the U.S., Leissner tried to renew his Brazilian passport so he could travel to Brazil with his children's nanny who he was having an affair with")); inaccurately characterizing himself as a low-level Goldman employee despite holding a position in the top 3% of the organization. (id. 28 ("Mr. Ng, who was never a partner at Goldman and lacked meaningful authority")); and at one part going so far as to suggest he—a Managing Director of Goldman Sachs—was a disinterested and incompetent banker because others at Goldman did not think he put enough effort into selling

61

Project Catalyze bonds (id. at 35); all the while ignoring the actual and exceedingly egregious nature and circumstances of his crimes.  The defendant's attempts to ignore, minimize and distract from the actual and exceedingly egregious nature and circumstances of his crimes should not be credited, and a substantial term of incarceration is appropriate.

B.    History and Characteristics of the Defendant (18 U.S.C. § 3553(a)(1))

The defendant's sentencing submission describes certain aspects of his history and characteristics at length.  The submission is notable both for what it shows, and for what it leaves out.  It shows a defendant who had what many defendants before this Court lack:  a loving and supportive family, an excellent education, loyal friends, professional success and significant wealth.  It shows that the defendant had every reason not to commit crimes, and yet still decided to do so.  It also shows that, as a result of his crimes, the defendant has caused pain to his family and friends, and has surrendered many of the advantages and opportunities of his former life.  However, such consequences are not a reason to treat the defendant more leniently than other defendants, whose more modest circumstances meant that they did not have such advantages and opportunities to lose.  Moreover, what the defendant's sentencing submission omits is that the defendant repeatedly and deliberately engaged in unethical conduct during the conspiracy period in addition to the criminal conduct underlying his conviction—important information that helps provide the true measure of the defendant's character, and counsels in favor of a significant sentence of incarceration.

From the very beginning, the defendant cultivated his relationship with Low by showing Low that he was willing to do basically anything Low wanted in order to get Low's business to Goldman, including communicating with him off-line using personal email accounts to discuss business in violation of Goldman's policies and concealing Low's connections to

political figures in Malaysia, including the Prime Minister and 1MDB officials.  When he

proposed Low as a Goldman PWM client in Switzerland and the vetting process turned up a

number of red flags about Low—including the fact that he had close relationships with

government officials, which the defendant well knew, as he had already told Low he would keep

those relationships quiet, and had accompanied Low to a meeting with the Prime Minister's

children—he baldly and repeatedly lied to Goldman's compliance personnel, falsely telling them

that he did not know Low well and had only met him on one occasion, even though they had met

more than a dozen times by that point.  After Low was rejected by the compliance department, in

a decision that was conveyed to the defendant, the defendant nevertheless attempted to get Low

onboarded as a PWM client a second time, craftily seeking to circumvent the compliance

personnel he had dealt with originally by proposing Low for the Singapore office instead of

Switzerland.

   Throughout the lead-up to the 1MDB bond deals, the defendant demonstrated that

he had no qualms about continuing to break any and all rules—as well as the law—to make sure

to get Low's business to Goldman and to enrich himself.  Among other things, he continued to

use personal emails to communicate with Low, Leissner and others about business deals in

violation of Goldman's policies, and repeatedly attempted to set up side deals with Leissner and

Low that would make him money above and beyond his already lucrative Goldman

compensation which were not disclosed to Goldman, also in violation of its policies.  Most

significantly, it was the defendant who, after discussion with Low, recommended to Leissner that

they pay a bribe to get one of their side deals accomplished, telling Leissner that they would "pay

Omar so that he plays ball."  The manner in which the defendant made this suggestion is

telling—the language is casual, as if paying a bribe is not a serious concern to him, and the

defendant made sure to convey this suggestion to Leissner over personal email so that it would not be captured on Goldman's systems (notably, via one of the email accounts that he later deleted in 2015).

Moreover, the defendant's actions during and after his criminal conduct, detailed at length above (and, with respect to his encounters with Malaysian and Singaporean law enforcement, below), are also telling, as they further show the defendant to be an individual who believes he is above the law, and who was willing to do just about anything—including lie, obfuscate and leverage his wealth and status—to get what he wanted.

In his sentencing memorandum, the defendant presents two main reasons why his personal history and characteristics should result in a time served sentence: because he allegedly "cooperated" with law enforcement in Singapore and Malaysia, and because of his "frugal" and "gentle" nature. Neither of these arguments is persuasive.

First, the defendant contends that both he and his family "cooperated" with investigations into the 1MDB schemes by law enforcement in Singapore and Malaysia, which he asserts shows "his true character and respect for the law." (Def. Mem. 41) To the contrary, the defendant's actions in response to law enforcement in both countries—which, far from being cooperative, including lying to law enforcement about the source of the funds in the Victoria Square account and trying to buy his way out of criminal charges—further underscore the need for a significant sentence in this case.

The defendant was extensively questioned about his work at Goldman for 1MDB and the funds in the Victoria Square account by law enforcement in Singapore in 2017, and during the period of that questioning was not permitted to leave the country. The defendant now claims that he cooperated with this inquiry because "he answered every question asked of him by

64

Singaporean law enforcement." (Def. Mem. 42).  To be sure, he did answer questions.  And he

lied—over and over again.  Indeed, it is clear from both the trial evidence and the defendant's

own sentencing memorandum that he was not remotely truthful.  Leissner, Low and Lim

discussed the defendant's detention in Singapore via WeChat and over the phone, and shared

their concerns that various investigations into the 1MDB scheme were intensifying; once the

defendant was released from Singapore, Lim reassured Leissner that, during questioning, the

defendant had stuck with the story of "just focusing on the bonds and the financial aspects of the

bonds." (GX-2602, T. 1294-1300).  Lim also told Leissner that Low had "gotten help from the

Trump administration at the time to get Roger out of Singapore." (T. 1300).  She further wanted

Leissner's assurances that Chan, if questioned, would also stick to the "cover story" that the

funds the defendant received were the repayment of an investment. (Id.).  In addition, the

defendant states in his sentencing memorandum that he first learned that the 1MDB deals were

the "true origin" of the $35.1 million during questioning in Singapore (Def. Mem. 42), which is

contrary to the overwhelming evidence at trial, and makes evident that he did not tell the

Singaporeans the truth about the source of the funds.

        The defendant also repeatedly states that, following his return to Malaysia after he

was allowed to leave Singapore, he "and his family stayed in Malaysia," suggesting that he did

so voluntarily and because he believed he was innocent (and contrasting his behavior with

Low's, who fled to China, and Leissner's, who talked about moving to Brazil). (See Def. Mem.

42, 63).  However, in a recorded call in 2018, Lim lamented that she and the defendant were

stuck in Kuala Lumpur, making it clear that the defendant and his family did not voluntarily

remain in the country as the investigations were ongoing, contrary to what he now asserts. (Def.

Mot. in Limine, Ex. 1 at 10–11, ECF No. 132).  Moreover, the defendant's contention that he and

65

his family cooperated with the Malaysian investigation in 2018 is also false.  (Def. Mem. 43).

Lim answered questions from law enforcement about the funds in the Victoria Square account on

numerous occasions and, similarly to the defendant, did not tell Malaysian law enforcement the

truth, namely, that the funds were kickbacks paid to the defendant for his role in the 1MDB

scheme.  For example, in October 2018, the defendant accompanied Lim to a meeting with

Malaysian law enforcement and was present when she reiterated, falsely, that the funds that went

to Lim and Tan's accounts were "proceeds/earnings from investments."  (ECF No. 135-1).

In addition, the defendant makes the astonishing argument that the Court should

"consider the loss of property and restraint on liberty that [he] suffered as he cooperated with

these two governmental investigations" in support of his request for a time-served sentence,

while admitting that the defendant and his family forfeited the funds in the accounts via the

statutory declarations, including funds the defendant admits were stolen from 1MDB

understanding, "in exchange[,]. . . neither Malaysia (the country from which the funds were

misappropriated) nor Singapore (the country in which the bank accounts were present) would

bring criminal charges against anyone, that travel bans would be lifted and that bank accounts

would be unfrozen." (Def. Mem. 46).  In other words, the defendant wants credit from this Court

for effectively trying to buy his (and his family's) way out of criminal charges in two countries

by returning money that he knew did not belong to him (the funds stolen from 1MDB) and

paying an additional several million dollars to the government of Malaysia.[13]

---

[13] The defendant repeatedly states that the focus of Malaysia's inquiry in 2018 "was exclusively on the individuals holding the different bank accounts.  [He] was not a focus of the Malaysian investigation as of late October 2018."  (Def. Mem. 46-47).  As an initial matter the defendant used "the individuals holding the different bank accounts" to conceal his own involvement.  But accepting the defendant's claim as true, even if this were the case, the

In short, these payments are not the "evidence of good character" that the defendant claims they are.  Rather, they are evidence that the defendant believed and apparently continues to believe that giving up money he stole somehow is sufficient punishment for stealing it.  The payments are also not evidence that the defendant "voluntarily and fully forfeited" the stolen funds "prior to any criminal charges being brought." (Id. at 43).  As an initial matter, the accounts had already been frozen by law enforcement in Singapore, so the defendant did not have an opportunity to move the funds elsewhere, and was aware that the investigations into those funds and his role in the 1MDB scheme was serious.  And the defendant plainly did not turn over stolen funds out of the goodness of his heart.  On the contrary, as he appears to concede, he wanted something in return— to avoid criminal charges for himself and his family— which is why he paid the money before any charges were brought, and also why he was upset when the Malaysian authorities subsequently arrested him on criminal charges in the United States and later brought their own criminal charges against him for the same conduct. (See id. at 48).

But instead of recognizing that his failed gambit to use millions of dollars to avoid criminal liability was, at a minimum, distasteful, the defendant paints himself as a victim, and asks this Court to consider that criminal charges were brought against him by Malaysia despite his payments as "a [prior] punishment."  (Id.).  The defendant is correct that the Court should consider his conduct in fashioning a sentence, but wrong about the conclusion it should reach.

---

defendant knew full well the extent of his own criminal actions related to 1MDB at the time that the statutory declarations were signed, and it is more reasonable to conclude—as detailed above—that he was hoping that his payment of funds to Malaysia would deter it from further criminal investigation of him.

The defendant's actions in connection with the Singaporean and Malaysian investigations, and in particular his attempt to effectively buy his way out of jail, are yet another basis for a significant sentence of incarceration.  The defendant is not entitled to special treatment, or the extraordinary sentence he seeks, because he became increasingly wealthy through criminal activity, and then sought to use that very wealth to avoid meaningful consequences for his criminal activity.  His suggestion to the contrary, if accepted, would effectively reward him for succeeding in his crimes.  It would also create the result that a wealthy defendant, precisely because he is wealthy and therefore has money to offer to pay, would receive a lower sentence than a poor defendant who committed or attempted to commit the same crimes.  That would not be equal justice under the law.  It would be a perversion of justice.

Second, the defendant repeatedly contends that he is a "frugal" man (Def. Mem. 5 ("His life has been defined by hard work, frugalness …"); Def. Mem. Ex. 2 at 2 ("I have led a hardworking, ethical and frugal life")), and a "gentle" person (Def. Mem. 1, id. at 5 (citing trial testimony from Andy Tai)), and that these characteristics warrant a lesser sentence.  However, the defendant's actions during the course of his criminal conduct, and while a banker at Goldman, belie these claims.

With respect for his claim that he is "frugal," the defendant traveled with Low on his private jet to Las Vegas and gambled with Low, Low's brother, and Eric Tan, and also to Nice, France, where he partied with Low on a yacht that Low rented for over €1 million; complained repeatedly to Leissner that his salary and bonus at Goldman, which totaled $2.4 million in 2012 and close to a million dollars per year several other years between 2006 and 2013 (GX-732) was insufficient (T. 456-57, 714-15), and sought to make additional money with Leissner on various side deals (GX-2202 (noting that a proposed side deal would yield him

68

"more than my bonus :-)"; T. 711-14); and accepted more than $35 million in funds diverted from 1MDB for his participation in the scheme.  Once the defendant received those kickbacks in the Victoria Square account, the bank records show that he and Lim spent money lavishly, using more than $300,000 to purchase jewelry, including a six-carat diamond; more than $20,000 to purchase an hourglass filled with diamonds; and more than $200,000 to purchase stock.  Other records also show that they put considerable time and energy into researching various luxury property investments around the world during this time period.  By May 2014, the defendant and Lim had dissolved the shell company and transferred the remainder of the $35 million to a series of accounts in the names of relatives that concealed the ultimate use of the remaining funds.  None of these actions are those of a "frugal" individual; rather, they are consistent with the characteristic greed evidenced by the defendant and his co-conspirators.

There is also substantial evidence that is in tension, to the say the least, with the defendant's assertion that he is "gentle."  Specifically, as the government moved to admit at trial, the defendant's Goldman Sachs' personnel file reflects an incident at in 2012 when the defendant was at a work-related event and got into a verbal altercation with a colleague.  The defendant and his colleague argued over whether the defendant was encroaching on what the colleague perceived as her business for Goldman Sachs, and the defendant's tone during the incident was described as aggressive and shouting.  In the course of that dispute, the defendant told the colleague that "with Indians like you, you say one thing and do another."  He further stated "f*ck, man, it isn't like I care about your business.  I run a really big business.  This is small change to me."  (ECF No. 143-2).  Following an investigation, Goldman Sachs concluded that the defendant "used inappropriate language and acted in a confrontational manner towards a

colleague at a work-related event," and the defendant was counseled that his behavior and language were unacceptable.  (ECF No. 143-1).[14]

In any event, even assuming arguendo that the defendant were "frugal" and/or "gentle," he engaged in a massive, deliberate bribery and money laundering scheme, and should be sentenced accordingly.  It is utterly irrelevant to what sentence should be imposed whether, apart from that abuse of his power, he is supposedly "frugal" or "gentle."

Finally, among the character letters submitted on behalf of the defendant was one written by a current attorney (see Def. Mem. Ex. 15), who has represented the defendant throughout the pendency of this case and continues to serve as one of his attorneys.  The letter is not appropriate given the attorney's current representation of the defendant, and the letter should be disregarded by the Court and stricken from the record.  See, e.g., United States v. Bilzerian, 926 F.2d 1285, 1292 (2d Cir. 1991) ("[a] defendant may not use the privilege to prejudice his opponent's case or to disclose some selected communications for self-serving purposes.")); New York Rule of Professional Conduct 3.4(d) ("In appearing as a lawyer before a tribunal, a lawyer shall not … assert personal knowledge of facts in issue except when testifying as a witness" or "assert a personal opinion as to … the justness of a cause, the credibility of a witness … or the guilt or innocence of an accused").

---

[14] The government previously filed a motion with this information under seal because it did not want to risk unfair prejudice to the defendant if the information was not admitted at trial (as it ultimately was not) but appeared publicly, and was inadvertently seen by a member of the jury.  See ECF No. 143.  That concern is no longer present.

C.    The Need for General Deterrence (18 U.S.C. § 3553(a)(1))

The sentence imposed must also consider the need for deterrence of those who would consider engaging in similar conduct under similar circumstances. Given the strong economic incentives in taking advantage of countries with public officials willing to trade contracts for kickbacks, it is critical that there be equally strong counterincentives. See United States v. Blech, 550 F. App'x 70, 71 (2d Cir. 2014) (summary order) ("Blech was sentenced based on the 18 U.S.C. § 3553(a) factors, including the need for specific deterrence for a recidivist, and the need for general deterrence for those who might otherwise feel that some white-collar crimes are 'game[s] worth playing.'") (quoting United States v. Goffer, 721 F.3d 113, 132 (2d Cir. 2013)); S. Rep. No. 98-225, at 76 (1983), reprinted in 1984 U.S.C.C.A.N. 3182, 3259 ("The second purpose of sentencing is to deter others from committing the offense. This is particularly important in the area of white collar crime. Major white collar criminals often are sentenced to small fines and little or no imprisonment. Unfortunately, this creates the impression that certain offenses are punishable only by a small fine that can be written off as a cost of doing business.")). The government's recommended sentence will send a strong deterrent message to those who, like the defendant, are in senior roles in American companies that conduct business globally and seek to engage in bribery and related conduct to gain a competitive edge in business or to enrich themselves and the companies that they work for, often at the expense—as was the case here—of ordinary people in the countries where such schemes are allowed to proliferate.

Furthermore, given that sophisticated bribery and money laundering schemes are incredibly difficult to detect and prosecute, there is greater need for general deterrence. See, e.g., Harmelin v. Michigan, 501 U.S. 957, 988 (1991) (noting that "since deterrent effect depends not

71

only upon the amount of the penalty but upon its certainty, crimes that are less grave but significantly more difficult to detect may warrant substantially higher penalties").  Because "economic and fraud-based crimes are more rational, cool and calculated than sudden crimes of passion or opportunity, these crimes are prime candidates for general deterrence."  See, e.g., United States v. Martin, 455 F.3d 1227, 1240 (11th Cir. 2006) (quoting Stephanos Bibas, White-Collar Plea Bargaining and Sentencing After Booker, 47 Wm. & Mary L. Rev. 721, 724 (2005)) (internal quotation marks omitted); United States v. Heffernan, 43 F.3d 1144, 1149 (7th Cir. 1994) ("Considerations of (general) deterrence argue for punishing more heavily those offenses that either are lucrative or are difficult to detect and punish, since both attributes go to increase the expected benefits of a crime and hence the punishment required to deter it."); Drago Francesco, Roberto Galbiati & Pietro Vertova, The Deterrent Effects of Prison: Evidence From a Natural Experiment, 117 J. of Political Econ. 257, 278 (2009) ("Our findings provide credible evidence that a one-month increase in expected punishment lowers the probability of committing a crime. This corroborates the theory of general deterrence.").

The defendant's arguments that he need not be sentenced to any additional prison time whatsoever to achieve robust general deterrence (Def. Mem. 62-68)—notwithstanding how difficult it is to detect and successfully prosecute cases such as this—fly in the face of case law, logic, and human experience.

First, the defendant's suggestion that general deterrence has already been achieved because highly publicized prosecutions have been brought against Goldman Sachs and other co-conspirators in several countries should be rejected out of hand.  Indeed, the approach for which the defendant advocates would lead to the perverse result that sentences in the largest and most complex cases would be the lowest, because those are precisely the cases most likely to

72

involve the largest number of defendants, the prosecution of corporate entities and significant media attention.  The defendant does not deserve a lower sentence because the case he was involved in garnered global media attention and because multiple co-conspirators have been held to account.  If anything, the media attention in this case militates in favor of a more significant sentence, because the case has international visibility and thus the sentence imposed by this Court will be known in the very circles in which individuals may be tempted to repeat the defendant's offenses.  Moreover, the approach for which the defendant advocates would lead to similarly short or non-existent custodial sentences in all corruption cases, regardless of their size, scope, or complexity, which would frustrate proportionality, a paramount goal of sentencing. See United States v. Booker, 543 U.S. 220, 264 (2005).

Second, the argument that there is no need for general deterrence because "the U.S. has recovered $3 billion from Goldman [and] because Malaysia has, recovered, and will recover, almost $4 billion from Goldman," is unpersuasive.  Goldman Sachs is a corporate entity, not an individual, and thus cannot be sentenced to incarceration; instead, the company was punished by being forced to pay significant fines in both the United States and Malaysia (in addition to disgorging ill-gotten gains, making restitution to the people of Malaysia, the victim of this crime, and entering into an agreement that included mandatory improvements to their compliance and internal controls).  Such significant fines are designed, in part, to deter other entities like Goldman Sachs from engaging in similar conduct in the future; this is not and cannot be a substitution for the need to deter individuals like the defendant who are employed by such entities and who, ultimately, are the agents who carry out criminal conduct on behalf of and for the benefit of the companies for whom they work.  Again, the outcome that the defendant argues for here would create perverse incentives; if the only punishment when an employee committed a

73

crime to benefit his or her employer was that the corporate entity would be forced to pay large sums of money on the employee's behalf, then individuals who committed corporate crime would never themselves have to face consequences for their actions.

Third, the defendant contends that his imprisonment in Malaysia is "effective general deterrence" because of his conditions of confinement and because of the monies that he and his family members paid to the Malaysian government in a bid to avoid criminal prosecution.  (Def. Mem. 64-65).  While the defendant's pre-extradition imprisonment in Malaysia is discussed in greater detail below in Section V.B., it is highly unlikely that the defendant's very specific circumstances—the result of his status as a Malaysian citizen arrested in Malaysia on a warrant issued out of the United States, whose extradition process was governed by the specific treaty between those two countries—would deter individuals who are citizens of, and operate in, many other countries.  It is also unclear how the defendant's unsuccessful bid to buy his way out of criminal charges in Malaysia could serve as "general deterrence" for other individuals; if anything, the defendant's belief that this was an appropriate course of action suggests to other would-be criminals that they too can be above the law, and purchase their freedom, if they are wealthy enough.

For these reasons, a substantial sentence of incarceration is necessary here to achieve the sentencing goal of general deterrence.

## V.     The Defendant's Additional Arguments for a Time Served Sentence Should Be Rejected

The defendant raises a number of additional arguments in support of his request for a sentence of time served, i.e., an effective sentence of only six months, including that (1) it is necessary to ensure that the defendant is not punished more harshly than other similarly

situated defendants, (2) the prison conditions in Malaysia during his six-month detention prior to

his extradition, (3) the time the defendant has spent on bail in the United States awaiting trial and

sentencing, (4) the fact that the defendant is not a U.S. citizen, and (5) the defendant's desire to

return to Malaysia to face charges for his criminal conduct there.  None of these arguments

supports the truly extraordinary sentence that the defendant seeks.

A.     <u>Unwarranted Sentencing Disparities</u>

The defendant argues that he has "already suffered more than anyone else

involved in the 1MDB theft," and suggests that a sentence of time served is appropriate because

other similarly situated defendants have escaped similar punishment.  (Def. Mem. 68-70).  To the

contrary, a sentence of six months for this defendant—given his central role in perpetrating an

international bribery scheme of unprecedented scope for which he personally received over $35

million in illicit payments—would frustrate the goal of "avoid[ing] unwarranted sentence

disparities among defendants with similar records who have been found guilty of similar

conduct."  18 U.S.C. § 3553(a)(6).  Because the scheme at issue here involved such exorbitant

sums, totaling over $1.6 billion in bribes, there is no perfect comparison, but courts across the

country have imposed sentences on similarly situated defendants that demonstrate that the

defendant's requested sentence here is wildly disproportionate given his conduct.  For example,

within the Second Circuit:

- <u>United States v. Napout</u>, No. 15-cr-252 (PKC) (E.D.N.Y.) (defendant sentenced to 108 months' imprisonment after being convicted at trial for receiving over $3 million in bribes and agreeing to receive more than $20 million more in connection with a scheme involving the sale of marketing and media rights for various soccer tournaments);

- <u>United States v. Marin</u>, No. 15-cr-252 (PKC) (E.D.N.Y.) (defendant sentenced to 48 months' imprisonment after being convicted at trial for receiving over $3 million in bribes and agreeing to receive approximately $10 million more in

75

connection with a scheme involving the sale of marketing and media rights for various soccer tournaments);

- <u>United States v. Thiam</u>, No. 14-cr-47 (DLC) (S.D.N.Y.) (defendant sentenced to 84 months' imprisonment after being convicted at trial for receiving approximately $8.5 million in bribes from a Chinese conglomerate in connection with the awarding of investment rights in the Republic of Guinea);

- <u>United States v. Portillo</u>, No. 09-cr-1142 (RPP) (S.D.N.Y.) (defendant sentenced to 70 months' imprisonment after pleading guilty to receiving $2.5 million in bribery payments from the government of Taiwan while he was serving as president of Guatemala);

- <u>United States v. Ng Lap Seng</u>, No. 15-cr-706 (VSB) (S.D.N.Y.) (defendant sentenced to 48 months' imprisonment after being convicted at trial for paying over $1 million in bribes to two senior United Nations ambassadors); and

- <u>United States v. Chinea</u>, <u>United States v. DeMeneses</u>, No. 14-cr-240 (DLC) (S.D.N.Y.) (defendants sentenced to 48 months' imprisonment after pleading guilty to arranging bribe payments to a Venezuelan state-owned bank in exchange for that bank directing its trading business to the defendants' company, which earned Chinea and DeMeneses approximately $3.6 million and $2.7 million, respectively, in commissions and/or bonuses).

Sentences imposed outside of the Second Circuit also demonstrate that a time-served sentence would create significant disparities with similarly situated defendants, and does not accord with the purposes of Section 3553(a)(6):

- <u>United States v. Esquenazi</u>, <u>United States v. Duperval</u>, <u>United States v. Rodriguez</u>, No. 09-cr-21010 (JEM) (S.D. Fla.) (defendants sentenced to 15 years', 9 years' and 7 years' imprisonment, respectively, after being convicted at trial for conspiring to pay approximately $2.2 million in bribes to a Haitian-run telecommunications company);

- <u>United State v. Jefferson</u>, No. 07-cr-209 (TSE) (E.D. Va.) (defendant, a U.S. Representative, sentenced to 13 years' imprisonment after being convicted at trial for receiving approximately $500,000 in bribe payments in exchange for using his position to promote deals in Nigeria, Ghana, Equatorial Guinea, Botswana and the Democratic Republic of the Congo);

- <u>United States v. Harder</u>, No. 15-cr-1 (PD) (E.D. Pa.) (defendant sentenced to 60 months' imprisonment after pleading guilty to paying approximately $3.5 million in bribes to corruptly influence a foreign official's actions regarding energy project approvals);

- United States v. Reyes, No. 17-cr-20747 (KMW) (S.D. Fla.) (defendant sentenced to 53 months' imprisonment after pleading guilty to receiving $2.1 million in bribes in connection with a bribery scheme to provide illicit payments to officials from Ecuador's state-run oil company);

- United States v. Domenech, No. 20-cr-20179 (DPG) (S.D. Fla.) (defendant sentenced to 51 months' imprisonment after pleading guilty to using his official position as an advisor to the president of Ecuador to award insurance contracts and obtain more than $2 million in bribes);

- United States v. Chacin Haddad, United States v. Veroes, No. 19-cr-20351 (CMA) (S.D. Fla.) (defendants each sentenced to 51 months' imprisonment after pleading guilty to conspiring to pay bribes to secure contracts for a state-owned electricity company and for which each defendant personally benefitted approximately $5.5 million); and

- United States v. Lambert, No. 18-cr-12 (TDC) (D. Md.) (defendant sentenced to 48 months' imprisonment after being convicted at trial for conspiring to authorize $1.5 million in corrupt bribe payments that provided over $11 million in benefits to the defendant's company).

As demonstrated above, there is not a single case that compares to the size of either the bribes facilitated by, or kickbacks received by, the defendant and his co-conspirators in this case. However, the sentences received by defendants convicted of similar crimes demonstrate that the defendant's request is not appropriate.

B.     The Defendant's Pre-Extradition Detention in Malaysia

In his sentencing memorandum, the defendant discusses at length the conditions of his incarceration in Malaysia between his arrest on November 1, 2018, and his extradition on May 3, 2019, and the alleged effects of those conditions on his physical and mental health. (Def. Mem. 52-57). He argues that that experience and its impact on him warrant a sentence of time served, imposed pursuant to either a massive downward departure under USSG § 5K2.0 or as a

77

"substantial reduction" in the defendant's sentence under Section 3553(a).  (Id.).[15]  Of course,

the Court can—and indeed, should—consider the defendant's experience while incarcerated in

Malaysia, as well as his current physical and mental health.  But that is not all that the Court

must consider, and for multiple reasons, the defendant's claim that he has been sufficiently

punished already should be rejected.

            First, the Federal Bureau of Prisons ("BOP") will apply a credit towards the

defendant's U.S. sentence for the time he served in Malaysia awaiting extradition.  The operable

statute is 18 U.S.C. § 3585(b), titled "Calculation of a term of imprisonment," which states that a

defendant "shall be given credit toward the service of a term of imprisonment for any time he has

spent in official detention prior to the date the sentence commences (1) as a result of the offense

for which the sentence was imposed."  In short, in circumstances such as those here, a defendant

"shall be" credited for any time spent in detention on the charges for which he or she is

sentenced.  Consequently—other than taking into account the conditions of the defendant's prior

confinement, and any resulting effects on him—the Court should issue its sentence in this case as

it would in any other case.  To do otherwise would be to improperly double-count that time: for

---

[15] The defendant notes several times that "despite waiving extradition on February 15, 2019, and requesting to be extradited within 30 days, U.S. authorities picked up [the defendant] and transport[ed] him to the U.S. on May 3, 2019, almost three months later."  (Def. Mem. 52). The process of extraditing the defendant after he stated his desire to waive extradition was complicated by the terms of the operable treaty between the United States and Malaysia, and the fact that Malaysia brought criminal charges against the defendant.  As a result, Malaysia did not simply extradite the defendant on the charges in the indictment, but agreed to temporarily surrender the defendant to the United States (discussed in greater detail in Section V.E.).  The process of finalizing the temporary surrender, which involved court orders in Malaysia, took until May 2019, at which time law enforcement promptly picked the defendant up in Malaysia and transported him to the United States.  Contrary to the defendant's suggestion, there was nothing improper about the time it took to extradite him, much less is the three-month period to which he points sufficient to warrant the sentence that he now seeks.

example, if the Court would otherwise have sentenced the defendant to 180 months'
imprisonment but took the defendant's pre-trial detention into account and only sentenced the
defendant to 174 months' imprisonment, the BOP would still credit the defendant for the six
months he served in Malaysia, and further reduce the defendant's sentence to 168 months'
imprisonment.

Second, the defendant's citation of, and principal reliance on, United States v.
Kaleil Isaza Tuzman, No. 15 Cr. 536 (PGG) (S.D.N.Y.), is unpersuasive.  The defendant asserts
that "judges have relied heavily on harsh pretrial prison conditions in issuing drastically below-
[G]uidelines sentences . . . even with defendants convicted in large-scale white-collar cases with
very high [G]uidelines."  (Def. Mem. 53).  The defendant further notes that, in Tuzman, the
applicable Guidelines range was 210-262 months, and the court sentenced the defendant to time
served, which was approximately 10 months.  (Id.; see also Tuzman Sentencing Transcript, Dkt.
No. 1216, attached hereto as Exhibit 1).  But that does not mean that the defendant here should
get time served (which would also be a lower sentence than in Tuzman, given that the defendant
in that case spent longer in prison).  The defendant should be sentenced for who he is and what
he has done.  In any event, the Tuzman case is an extreme outlier that involved a series of highly
unusual circumstances not present here.

As detailed in the transcript of the sentencing proceeding, the defendant in
Tuzman was a United States citizen who was arrested on securities fraud charges while on a five-
day business trip from the United States to Colombia.  (Id. at 51, 64).  While he was pending
extradition, he was held at La Picota prison in Bogota, Colombia, where the conditions were
extremely harsh—"no heat, no food, no running water and no medical care"—and the defendant
was also targeted for extortion and assault because he was known to be wealthy.  (Id. at 64-65).

79

Multiple threats were made against him, and his attorneys advised the U.S. Embassy in Colombia that he was in "imminent danger of serious harm"; in response, the U.S. Embassy indicated that there was nothing it could do. (<u>Id.</u> at 65). Subsequently, the defendant was subject to a "brutal" physical and sexual assault. (<u>Id.</u>). The defendant's attorneys then appealed to the district court for assistance, which held a hearing and "made it clear that the appropriate officials in Washington were going to have to answer for what happened" to the defendant. (<u>Id.</u>). The very next day, the defendant was moved out of La Picota to a "much safer prison," and the district court concluded that "steps could have been taken before [the defendant] was assaulted to ensure his safety." (<u>Id.</u>). In fashioning its sentence, the district court stated that it gave great weight to the "horrors" the defendant suffered in Colombia, the fact that the defendant had completed thousands of hours of community service while on bail, and the fact that he cooperated with authorities in Colombia to help get prison officials at La Picota arrested and prosecuted; moreover, the Colombian authorities put in a letter <u>on the defendant's behalf</u>. (<u>Id.</u> at 66). In addition, the defendant's ill-gotten gains from the schemes were approximately $288,000, which he consented to fully repay via forfeiture. (<u>Id.</u> at 68-69).

This case bears little or no resemblance to these facts. Here, the defendant is not a United States citizen arrested on a business trip in a foreign country that had no connection to the underlying crime; he was a Malaysian citizen arrested in his home country for crimes that he committed in part in Malaysia and for conduct for which he was also charged in Malaysia. Also unlike in <u>Tuzman</u>, there is no evidence that the defendant was subject to different treatment in prison from any other prisoner, targeted by other prisoners or prison staff for any reason, or threatened by other prisoners or assaulted. And unlike in <u>Tuzman</u>, during the pendency of his incarceration, neither the defendant nor his attorney made any appeal to U.S. authorities to be

80

moved due to the conditions of his confinement.  Indeed, the defendant did not complain about his conditions of confinement in a bail application made to the Malaysian court in late 2018. (See December 13, 2018 decision denying the defendant's bail application in Malaysia, attached hereto as Exhibit 2 (stating that the defendant sought bail because he said he was not a flight risk; because he needed access to his attorney; and because a 60-day detention was too onerous)).  In a second oral bail application made to the Malaysian court in January 2019 the defendant also did not raise his conditions of confinement.  To be sure, the government's understanding is that the defendant's Malaysian counsel advised the court that he had been hospitalized from December 3, 2018 to December 8, 2018 for various conditions including leptospirosis, food poisoning, dengue and viral infection, and had not fully recovered, but the Malaysian court found that there was insufficient evidence to show that the defendant was too unfit to remain in custody.  See "Ex-Goldman Sachs banker Roger Ng denied bail in Malaysia, pending extradition to the U.S.," The Straits Times, January 7, 2019, available at https://www.straitstimes.com/asia/se-asia/ex-goldman-sachs-banker-roger-ng-denied-bail-in-malaysia-pending-extradition-to-us; "Ex-Goldman Sachs banker Roger Ng denied bail," The Edge Markets, Jan. 7, 2019, available at https://www.theedgemarkets.com/article/exgoldman-sachs-banker-roger-ng-denied-bail (the court denied bail on grounds "that there was insufficient evidence of medical illness").

And perhaps most importantly, all of the other sentencing factors here also radically distinguish this case from Tuzman.  The defendant, as detailed above, did not cooperate with foreign law enforcement, but lied to them; he has not dedicated himself while on bail to doing "thousands of hours of community service"; and he received a significant personal benefit from his crimes—$35.1 million in kickbacks versus $288,000 in profits, that is, more than 120 times a larger benefit.

81

Third, the record does not support the defendant's assertion that because of his experience in prison in Malaysia and the impact of that experience on his mental health, he has "vulnerabilities that are [so] unique" that he cannot be sentenced to any period of incarceration in the United States.  (Def. Mem. 76).  As stated above, the Court can and should consider the defendant's prior experience and all resulting material effects on him.  However, the defendant's argument that he cannot be sentenced to any prison time whatsoever does not withstand examination, and, if accepted, it would fail wholly to account for all other appropriate sentencing considerations.

Prior to his interview with Probation in June 2022 for the purpose of preparing the PSR, the defendant did not raise an alleged need for, nor did he independently seek, any mental health treatment.  Then, after his conviction, during his PSR interview, the defendant told Probation that he was feeling "hopeless" and ███████████████████████ because of "the instant legal situation, especially since he is facing additional time in prison."  (PSR ¶ 131).  Pre-Trial Services accordingly referred the defendant to attend mental health treatment, which he has attended weekly, and he was subsequently prescribed medication for depression and anxiety.  (Id. ¶ 132).  The record, in short, supports the conclusion that the defendant is anxious and/or depressed at the thought of punishment, for which he is receiving treatment.  That fact is not unique, and while it can and should be considered by the Court, it does not support what the defendant seeks, particularly because, as the Court is aware, the BOP is well-equipped to handle defendants who have a wide range of physical and mental conditions, and the defendant will continue to have access to medication and treatment while incarcerated as needed.

C.      The Defendant's Time on Bail in the United States

        The defendant also suggests that, in fashioning a sentence, the Court should give him credit for the fact that he has spent almost four years on bail in the United States awaiting his trial and sentencing, away from his family in Malaysia.  (Def. Mem. 58).[16]  As the defendant acknowledges, this length of time was due to factors beyond the control of the Court or the parties, including the onset of the COVID-19 pandemic and defense counsel's travel to China to obtain evidence prior to trial.  (Id. at 58, 71).  The defendant also chose to file lengthy pretrial motions, on multiple subjects, rather than demand a speedy trial, as was his statutory right.  The government does not doubt the difficulty of the defendant's separation from his family, regardless of the bases for the separation, but that is a burden that is no greater than—and in many cases, much less than—other burdens that American and foreign citizens had to bear during the pandemic.  Nor is it remotely unique in cases involving foreign corruption for a defendant to spend years on bail with restrictive conditions (often far more restrictive than those imposed on the defendant) prior to sentencing—and yet in nearly all such cases, defendants have received substantial prison terms.  See, e.g., Napout, No. 15-cr-252 (PKC) (E.D.N.Y.) (Paraguayan citizen defendant extradited from Switzerland to the United States in custody and released on bail in the United States in December 2015 (with conditions including private security, 24/7 video surveillance and a curfew), then remanded post-conviction in December 2017, and sentenced to 108 months' incarceration); Ng, No. 15-cr-706 (VSB) (S.D.N.Y.)

_____

[16] The government was first made aware that Malaysia had imposed a formal travel restriction on Lim that prevented her from leaving the country on January 18, 2022, when defense counsel filed a motion requesting that Lim be permitted to testify at trial remotely from Malaysia.  (See ECF No. 122).

(Chinese citizen defendant arrested in the United States and released on bail (with conditions including house arrest with a consensual T-III on his phone, private security, not permitted to use a computer, not permitted to leave for exercise) in October 2015, then sentenced to 48 months' imprisonment and remanded in July 2018).

The defendant also contends that the Court consider the supposedly excessive "restrictive conditions" of his bail when fashioning a sentence.  (Def. Mem. 58).  That contention is baseless.  As the defendant was aware at the time of his extradition, because the defendant is subject to pending criminal charges in Malaysia, and because the defendant is here pursuant to an agreement with Malaysia for his temporary surrender, the treaty between the United States and Malaysia required that the United States seek the detention of the defendant. ████

████████████████████████████████████████████

████████████████████████████████████

████████████████████████████████████████

███████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████

██████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████

Even at its most restrictive, that permitted the defendant to spend up to seven hours a day—every day—traveling to and at the offices of his attorneys, and four hours a week outside for exercise, as well as for medical appointments, while on GPS monitoring.  In any event, despite his initial agreement with the government and representations to the government of Malaysia, the

defendant subsequently and repeatedly sought to loosen the conditions of his bail further, and each request was granted:

- February 5, 2020 – Defendant permitted to spend up to nine hours per day at his attorneys' offices.

- January 28, 2021 – Defendant no longer on home confinement, but granted the ability to be on curfew from 8:00 a.m. to 8:00 p.m. daily.

- July 20, 2021 – Defendant no longer on GPS monitoring, but on monitoring via radio frequency.

- January 7, 2022 – Defendant's curfew modified to 7:00 a.m. to 10:00 p.m., and he was permitted to modify the funds he posted for bail from $1 million to $250,000.

- February 2022 to April 2022 – Defendant was permitted to be at his attorneys' offices during trial until whatever time was needed, and he was out until 1:00 a.m.

The defendant was also permitted, on numerous occasions, an extension of his curfew for other attorney meetings and for worship at his temple.

In short, the defendant's conditions while on bail were plainly not excessively or unreasonably "restrictive" and were not remotely tantamount to a period of incarceration. They were also far less onerous than bail conditions imposed on numerous other defendants, particularly those charged with foreign corruption. While the Court of course may consider the length of the defendant's time on bail when fashioning a sentence, it does not warrant anything close to a sentence of time served.

D.    The Defendant's Citizenship

The defendant also urges the Court to give him a lesser sentence based on his assertion that he would not be eligible to be designated to a federal prison "camp" or eligible for certain other sentence reductions due to his status as a non-citizen. (Def. Mem. 77). As an initial matter, many foreign national non-resident defendants are subject to the exact same factors, yet routinely receive substantial sentences.

85

Moreover, the Second Circuit has repeatedly rejected the same argument in the context of a downward departure for reasons that apply with equal force to the defendant's request for time served.  In United States v. Restrepo, 999 F.2d 640 (2d Cir. 1993), the Second Circuit held that, although there may be rare circumstances when alienage can be considered in sentencing a defendant, a district court may not consider "(1) the unavailability of preferred conditions of confinement [or] (2) the possibility of an additional period of detention pending deportation following the completion of sentence."  Id. at 644.

With respect to the issue of whether the defendant could be designated to a "camp," the Second Circuit has stated:

> Even if it were a steadfast policy of the B[OP] to deny reassignment to relaxed-security facilities to alien prisoners who must be deported on account of their convictions, we would consider that policy an inappropriate basis for departure from the imprisonment range prescribed by the Guidelines.  Assuming that § 3624(c) was intended to apply to deportable aliens, the statute does not on its face require the B[OP] to ensure that all prisoners participate in such a program, but only to do so if practicable. For example, the B[OP] need not reassign the prisoner to a halfway house if there is no such unit in his home state, and the absence of such a facility has been held to be an impermissible ground for departure from the Guidelines.

Id. at 645 (citation omitted).  The Second Circuit concluded that, "if there is a defect in the B[OP]'s policy toward reassignment of deportable aliens, the appropriate way to remedy that defect would be pursuit of an action that challenges such a policy head-on, not the ad hoc granting of departures that have the effect of creating the very type of disparity in sentencing that the adoption of the Guidelines was intended to eliminate."  Id. at 646.

In any event, courts—principally in other circuits—that have permitted departures based on alienage have done so where, unlike in this case, "the conditions in question are

86

'substantially more onerous than the framers of the guidelines contemplated in fixing the punishment range for the defendant's offense [ . . . ,] and the differences in the conditions of confinement or other incidents of punishment between deportable aliens and other citizen (or nondeportable alien) defendants . . . are not great.'" United States v. Mohammed, 315 F. Supp. 2d 354, 367 (S.D.N.Y. 2003) (quoting United States v. Guzman, 236 F.3d 830, 834 (7th Cir. 2001)) (alterations in original). The court in Mohammed, in rejecting a departure, found that "[i]neligibility for half-way houses or minimum security institutions, the only consequences Mohammed relies upon, are not such extraordinary deprivations as to warrant a finding that the Commission did not take into account the chance that someone in this sentencing range would be subjected to them." Id.

The Second Circuit has reaffirmed its holding in Restrepo in the post-Booker advisory Sentencing Guidelines regime. See United States v. Duque, 256 F. App'x 436, 437-38 (2d Cir. 2007) (citing Restrepo for the proposition that "'(1) the unavailability of preferred conditions of confinement, [and] (2) the possibility of an additional period of detention pending deportation following the completion of sentence,' generally do not justify a departure from the Sentencing Guidelines range"); see also United States v. Wills, 476 F.3d 103, 107 (2d Cir. 2007) ("Now, after Booker, we reaffirm the reasoning of Restrepo and apply it to Wills's non-Guidelines sentence, which was partly based on the purported 'additional punishment' of deportation."); Rosario v. United States, 625 F. Supp. 2d 123, 130 (S.D.N.Y. 2008) (declining to exercise discretion afforded by Kimbrough v. United States, 552 U.S. 85 (2007), and holding "[i]n light of the legal authority in this Circuit, therefore, Petitioner's ineligibility for certain correctional programs due to his alien status, while unfortunate, is not an adequate basis for a downward departure of his sentence"). And again, even if this Court were to consider, or even

87

fully credit, the defendant's argument, it does not warrant the extraordinary sentence that he seeks.

E.     The Defendant's Pending Criminal Charges in Malaysia

Finally, the defendant argues that he should receive a sentence of time served so that he can be returned to Malaysia "as soon as possible" so that the pending Malaysian criminal charges against him can be litigated.  (Def. Mem. 71-72).  However, his personal desire to resolve the pending Malaysian criminal charges expeditiously should not take precedence over the need for the defendant to be appropriately sentenced in the United States in connection with the charges in this case on which he has already been convicted.

████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████   OIA has further consulted with the government of Malaysia, which has agreed that it will not seek the return of the defendant to Malaysia at this time and will extend the defendant's period of temporary surrender in the United States until the defendant has exhausted the appeals process for his conviction and sentence.  At that time, the government of Malaysia will discuss with OIA the appropriate next steps with respect to his temporary surrender.

## **CONCLUSION**

For the foregoing reasons, the government respectfully submits that the Court

should sentence the defendant to a substantial sentence of no less than 15 years' imprisonment,

which is sufficient, but not greater than necessary, to advance the goals of sentencing.

Dated: Brooklyn, New York
       March 3, 2023

Respectfully submitted,

BREON PEACE
United States Attorney

By: _____/s/_____
Alixandra E. Smith
Drew G. Rolle
Dylan A. Stern
Assistant U.S. Attorneys
(718) 254-7000


BRENT WIBLE
Chief, Money Laundering & Asset Recovery Section
Criminal Division
U.S. Department of Justice


GLENN LEON
Chief, Fraud Section
Criminal Division
U.S. Dept. of Justice

By: _____/s/_____
David Last
Trial Attorney

89