1

```
1              UNITED STATES DISTRICT COURT
               EASTERN DISTRICT OF NEW YORK
2    - - - - - - - - - - - - - - X
       UNITED STATES OF AMERICA,    :   18-CR-00538(MKB)
3                                   :
                                    :
4                                   :   United States Courthouse
          -against-                 :   Brooklyn, New York
5                                   :
                                    :
6                                   :   February 14, 2022
                                    :   9:30 a.m.
7      NG CHONG HWA,                :
                                    :
8           Defendant.             :
     - - - - - - - - - - - - - - X
9
             TRANSCRIPT OF CRIMINAL CAUSE FOR TRIAL
10          BEFORE THE HONORABLE MARGO K. BRODIE
            UNITED STATES CHIEF DISTRICT JUDGE
11
                  A P P E A R A N C E S:
12
     For the Government:       BREON PEACE, ESQ.
13                             Acting United States Attorney
                               Eastern District of New York
14                             271 Cadman Plaza East
                               Brooklyn, New York 11201
15
                               BY:  ALIXANDRA SMITH, ESQ.
16                                  DREW ROLLE, ESQ.
                                    DYLAN STERN, ESQ.
17                                  BRENT WIBLE, ESQ.
                                    JENNIFER AMBUEHL, ESQ.
18                                  Assistant United States Attorneys

19   For the Defendant:        BRAFMAN & ASSOCIATES, P.C.
                               256 Fifth Avenue, 2nd Floor
20                             New York, New York 10001

21                             BY:  MARC AGNIFILO, ESQ.
                                    TENY GERAGOS, ESQ.
22                                  ZACH INTRATER, ESQ.
                                    JACOB KAPLAN, ESQ.
23
     Court Reporter:           DENISE PARISI, RPR, CRR
24                             E-mail: DeniseParisi72@gmail.com

25   Proceedings recorded by computerized stenography.  Transcript
     produced by Computer-aided Transcription.
```

*Proceedings*                                                                    2

1              (In open court; jury not present.)

2              THE COURT:  Please be seated, everyone.

3              Are we ready to proceed?

4              MR. ROLLE:  Yes, Judge.

5              MR. AGNIFILO:  We are.

6              I had a quick question about protocol.

7              THE COURT:  Sure.

8              MR. AGNIFILO:  Masks when we speak or no masks?

9              THE COURT:  Well, you do have to wear your masks.

10             Does anyone have the clear shield?

11             MR. AGNIFILO:  I don't.

12             THE COURT:  So the only thing the epidemiologist has

13     advised is that you can go without your mask if you're in --

14     well, if you are separated by that, and there's a HEPA filter,

15     which I believe we have in the courtroom.

16             MR. WIBLE:  We have two.

17             THE COURT:  All right.  I will allow you to unmask

18     for purposes of the address to the jury.

19             MR. AGNIFILO:  But we have to be behind the glass?

20             THE COURT:  You have to be behind the glass.

21             MR. AGNIFILO:  Okay.

22             THE COURT:  And when you are questioning the

23     witness, I believe we should all wear our masks.

24             MR. AGNIFILO:  Very good.

25             THE COURT:  Okay?

 1          MR. AGNIFILO:  Yes, Judge.

 2          THE COURT:  Unless it becomes a challenge, then

 3   we'll discuss it further.

 4          Everyone is ready to go?

 5          THE COURTROOM DEPUTY:  Yes, Judge.

 6          THE COURT:  Okay.

 7          The jurors are all ready.  Are the parties ready to

 8   proceed?

 9          MR. AGNIFILO:  Yes, Your Honor.

10          THE COURT:  Who is opening for each side?

11          MR. AGNIFILO:  I'm opening on behalf of defense.

12          MR. WIBLE:  I will open on behalf of the Government,

13   Brent Wible.

14          THE COURT:  All right.

15          Why don't you call the case, and then we'll bring

16   the jury in.

17          THE COURTROOM DEPUTY:  Criminal cause for trial,

18   docket number 18-CR-538.

19          Counsel, please state your name for the record

20   starting with the Government.

21          MR. ROLLE:  Good morning, Your Honor.

22          Drew Rolle, Alix Smith, Dylan Stern, Brent Wible,

23   and Jennifer Ambuehl for the Government.  We are joined by

24   Paralegal Specialist Daniel Youkilis and Special Agent Sean

25   Fern from the FBI.

*Proceedings*                                                            4

1           THE COURT:  Are your mics on?

2           MR. ROLLE:  I can repeat that if the court reporter

3    needs it.

4           THE COURT:  Why don't you have a seat so we can make

5    sure the mics are working.

6           MR. ROLLE:  Yes, I think the mic is on.

7           THE COURT:  It is.  Why don't you repeat your

8    appearance for the record.

9           MR. ROLLE:  Drew Rolle, Alix Smith, Brent Wible,

10   Jennifer Ambuehl, Dylan Stern for the Government.  We are

11   joined by Paralegal Specialist Daniel Youkilis and Special

12   Agent Sean Fern of the FBI.

13          THE COURT:  Okay.  Thank you.

14          MR. AGNIFILO:  Good morning, Your Honor.

15          You have Marc Agnifilo, you have Teny Geragos, you

16   have Zach Intrater, you have Jacob Kaplan, you have Jennifer

17   Silverstein, and we have our client here today, of course,

18   Mr. Roger Ng.

19          THE COURT:  Yes.

20          MR. AGNIFILO:  Good morning, Your Honor.

21          THE COURT:  Good morning, to everyone.

22          We are going to bring the jurors in.  They are

23   coming in through that entrance to the side of the courtroom

24   behind you, Mr. Agnifilo; and I encourage the parties to

25   please remember to utilize the mics, since we are streaming to

*Proceedings* 5

1  another room for public access --

2        MR. AGNIFILO:  Very good, Your Honor.

3        THE COURT:  -- and we want to make sure that the

4  public does have access to the proceedings.  Okay?

5        MR. ROLLE:  Judge, before we bring the jury in, we

6  did want to raise one question relative to openings --

7        THE COURT:  Okay.

8        MR. ROLLE:  -- which was, the Government had raised,

9  I think, a couple status conferences ago, the relevance of Jho

10  Low's status as a fugitive.  Counsel had not gotten back to

11  the Government about their determination on that.

12        THE COURT:  I thought I already ruled on that, that

13  his --

14        MR. AGNIFILO:  We're not getting into it.

15        THE COURT:  Yes.

16        MR. ROLLE:  That should be fine, then, Judge.

17        THE COURT:  Okay.  And we will follow up as

18  necessary later on today.

19        Bring in the jury, Winnie.

20        THE COURTROOM DEPUTY:  All rise.

21        (Jury enters.)

22        THE COURT:  Please be seated, everyone.

23        Good morning, members of the jury.

24        Is the jury acceptable to the parties?

25        First, to the Government?

*Proceedings*                                                        6

1          MR. ROLLE:  Yes, Your Honor.

2          THE COURT:  The defense?

3          MR. AGNIFILO:  Very much so, Your Honor.

4          THE COURT:  Please stand.  I'm going to have you

5    sworn.

6          THE COURTROOM DEPUTY:  Please raise your right hand.

7          (Jury sworn.)

8          THE COURTROOM DEPUTY:  Thank you.

9          THE COURT:  Please be seated.

10         Members of the jury, now that you are about to begin

11   the criminal case of U.S. versus Ng, and you have been sworn,

12   I have some preliminary instructions to guide you in your

13   participation in the trial.

14         To begin with, you are here to administer justice in

15   this case according to the law and the evidence.  In deciding

16   this case, you must not be influenced by any personal likes or

17   dislikes, opinions, prejudices, sympathy, or biases, including

18   unconscious bias.  Unconscious biases are stereotypes,

19   attitudes, or preferences that people may consciously reject

20   but maybe express without conscious awareness, control, or

21   intention.  Like conscious bias, unconscious bias, too, can

22   affect how we evaluate information and make decisions.  You

23   are to perform your task with complete fairness and

24   impartiality, and without bias, prejudice, or sympathy, for or

25   against the Government or Mr. Ng.  This is important for

1   Defendant Roger Ng who is charged with three crimes and has

2   the constitutional right to receive a fair trial.  This case

3   is also important to the Government, since the enforcement of

4   the criminal law is important.

5          The case, as you learned during jury selection, is

6   based on an indictment, which I discussed with you, charging

7   Mr. Ng with conspiracy to violate antibribery provisions of

8   the Foreign Corrupt Practices Act, conspiracy to circumvent or

9   intentionally evade the internal accounting controls or

10  protocols of Goldman Sachs, and conspiracy to commit money

11  laundering.

12         As I have already advised you, an indictment is the

13  document by which a criminal action is commenced.  It is

14  merely the accusation, a charge; it is not evidence of

15  Mr. Ng's guilt.  It will be your duty to find from the

16  evidence what the facts are.  You, and you alone, will be the

17  judges of the facts.  You will then have to apply to those

18  facts the law on which I will instruct you.  You must follow

19  the law whether you agree with it or not.  From time to time,

20  legal issues may arise, which are of no concern to you.  You

21  decide the facts, but I decide the law.  These issues may make

22  it necessary for me to confer with counsel either at sidebar,

23  or to excuse you from the courtroom.  Please do not take

24  offense at this or speculate on what we are discussing.

25  Nothing that I may say or do during the course of the trial is

1    intended to indicate or should be taken by you as indicating

2    what your verdict should be.  At times, I may ask questions.

3    If so, it is for the purpose of clarification.  It is not in

4    any way to indicate an opinion about the facts or to indicate

5    the weight you should give to the testimony of that witness.

6            Now, there are three basic rules about a criminal

7    case that you must keep in mind.  First, the defendant, Roger

8    Ng, is presumed isn't until proven guilty.  Again, the

9    indictment brought by the Government against him is only an

10   accusation.  Nothing more.  It is not proof of guilt or

11   anything else.  Mr. Ng, therefore, starts with a clean slate.

12           Second, the burden of proof is on the Government

13   until the very end of the case.  The defendant has no burden

14   to prove his innocence, or to present any evidence, or to

15   testify.  Since the defendant has a right to remain silent,

16   the law prohibits you from arriving at your verdict by

17   considering that the defendant may not have testified.

18           Third, the Government must prove the defendant's

19   guilt beyond a reasonable doubt.  I will give you further

20   instructions on this point later, but bear in mind that in

21   this respect, a criminal case is different from a civil case.

22           Now, the evidence from which you will find the facts

23   will consist of the testimony of witnesses, both on direct and

24   cross-examination; documents; other items or material received

25   into the record as exhibits; and any facts that the lawyers

1   agree to, or stipulate to, or that I may instruct you to find.

2   Certain things are not evidence and must not be considered by

3   you.  I will list them for you now.

4           Statements, arguments, and questions by lawyers are

5   not evidence.  Objections to questions are not evidence.

6   Lawyers have an obligation to their clients to make objections

7   when they believe that the evidence being offered is improper

8   under our rules of evidence.  You should not hold that against

9   them.  You should not be influenced by the objection, or by my

10  ruling on it.  If the objection is sustained, ignore the

11  question.  If it's overruled, treat the answer like any other.

12          Testimony that I have excluded or told you to

13  disregard is also not evidence and must not be considered.  If

14  you are instructed that some item of evidence is received for

15  a limited purpose only, you must follow that instruction.

16          Anything you may have seen or heard outside the

17  courtroom is not evidence and must be disregarded.  You are to

18  decide the case solely on the evidence presented here in the

19  courtroom.

20          There are two kinds of evidence:  direct and

21  circumstantial.  Direct evidence is direct proof of a fact

22  such as testimony of an eyewitness.  Circumstantial evidence

23  is proof of facts from which you may infer or conclude that

24  other facts exist.  I will give you further instructions on

25  these, as well as other matters, at the end of the case, but

*Proceedings*                                                        10

 1   keep in mind that you may consider both kinds of evidence.  It

 2   will be up to you to decide which witnesses to believe, which

 3   witnesses not to believe, and how much of any witness's

 4   testimony to accept or reject.  I will give you some

 5   guidelines for determining the credibility of witnesses at the

 6   end of the case.

 7            Now, a few words about your conduct as jurors.

 8            First, I instruct you that during the trial, you are

 9   not to discuss the case with anyone or permit anyone to

10   discuss it with you.  Until you retire to the jury room at the

11   end of all of the evidence to deliberate on your verdict, you

12   simply are not to talk about the case.  This instruction about

13   not discussing the case extends to members of your family or

14   friends.  Don't discuss the case with anyone, not even your

15   fellow jurors, until you are retire to deliberate.  The

16   attorneys, the parties, and witnesses in this case are not

17   allowed to communicate with you.  They're not even allowed to

18   tell you hello or good morning.  As I told you during jury

19   selection, when they pass you in the hallway and they ignore

20   you, they're not being rude; they're simply following my

21   instructions to not interact with you as a juror.

22            Second, as I instructed you also during jury

23   selection, do not read or listen to anything touching on this

24   case in any way.  If anyone tries to talk to you about it,

25   please bring it to my attention promptly.  You also may not

1    disclose any information about this case, so don't Twitter

2    about it, don't write a blog about it, don't text about it,

3    don't communicate in any way to anyone about the trial, the

4    case, or the people involved in the case, until you are

5    excused from jury service at the end of your deliberations.

6            Third, as I also told you previously, as jurors, you

7    must decide this case based solely on the evidence presented

8    here within the four walls of this courtroom.  This means that

9    during the trial, you must not conduct any independent

10   research about this case, the issues in this case, the

11   individuals, or the entities involved in this case, including

12   looking up information on social media.  You are just not

13   allowed to do any of that.  In other words, you should not

14   consult dictionaries, reference materials, search the

15   internet, websites, blogs, Twitter.  Whatever it is that's

16   being used these days, you are not allowed to use it.  No

17   electronic tools to obtain information about this case or to

18   help you decide this case.  Please do not try to find out any

19   information from any source outside the confines of this

20   courtroom.  A juror who violates these restrictions

21   jeopardizes the fairness of these proceedings and a mistrial

22   could result, which would require the entire trial process to

23   start all over again.

24           Finally, do not form any opinion until all the

25   evidence is in.  Keep an open mind until you start your

*Proceedings*                                                          12

1   deliberations at the end of the case.

2          Now, one of you inquired at the end of jury

3   selection about taking notes, and I saw that most of you

4   walked in with a pad this morning.  You may take notes during

5   the course of the trial, but keep in mind, however, that

6   during your deliberations, you can request that some or all of

7   the transcript being made of the trial be sent back to you in

8   the jury room.  As you see, there are court reporters in the

9   room.  You will see them come and go.  They're recording

10  everything that's being said, and you will have access to all

11  of that during jury deliberation.  If you do decide to take

12  notes, be sure that your note-taking does not interfere with

13  your listening and considering all of the evidence.  Your

14  notes are to be used solely to assist you and are not a

15  substitute for your recollection of the evidence in the case.

16  Also, if you do take notes, do not discuss them with anyone

17  before you begin your deliberations; and at the end of the

18  day, be sure to leave your notes in the jury room.  You cannot

19  take them home with you.  If you choose not to take notes,

20  remember that it is your own individual responsibility to

21  listen carefully to the evidence.  You cannot give this

22  responsibility to someone who is taking notes.

23          I ask you to please arrive at the courthouse every

24  day so that we can start at 9:30, and I thank you for doing so

25  this morning, and I apologize that we got started a few

1   minutes late.  When you are here on time, it is a courtesy to

2   your fellow jurors and to all the parties and witnesses.  As I

3   mentioned before, we cannot begin the trial until you are all

4   present.  I will do everything I can to minimize the delay

5   during the trial.  We will take a 15-minute break in the

6   morning, 15-minute break in the afternoon, and also a half an

7   hour lunch break, but if at any time you need to use the

8   restroom, simply raise your hand, and I will take a break to

9   accommodate that.

10          The trial will now begin.  The only thing that I

11  should say is we are going to sit, as I said, during jury

12  selection from 9:30 in the morning until 3:30 in the

13  afternoon.  Keep in mind, however, that if we have a witness

14  who has traveled from a distance, and is on the stand, and we

15  could finish up that testimony by staying over a little bit

16  that day, I will try to accommodate that witness.  I will make

17  sure I check with you first to ensure that you don't otherwise

18  have plans that require you to leave at 3:30 that day.

19          The trial will now begin.

20          First, the Government will make an opening statement

21  which is simply an outline to help you understand the evidence

22  when it is presented.

23          Next, the defendant's attorney will make an opening

24  statement.  Opening statements are neither evidence nor

25  arguments.  The Government will then present its witnesses,

1    and counsel for Mr. Ng may cross-examine them.

2            Following the Government's case, the defendant may,

3    if he wishes, present witnesses whom the Government may

4    cross-examine.  After all the evidence is in, the attorneys

5    will present their closing arguments to summarize and

6    interpret the evidence for you, and I will instruct you on the

7    law; and after that, you will retire to deliberate on your

8    verdict.

9            To the alternate jurors, let me specifically inform

10   you that you should listen as carefully and conscientiously as

11   all other jurors.  You may very well be called upon prior to

12   the conclusion of the case to take a place of one of the

13   jurors, and you will have to render a verdict, so please pay

14   strict attention at all times.

15           Is the Government ready to present its opening

16   statement?

17           MR. WIBLE:  Yes.  Thank you, Your Honor.

18           THE COURT:  Please proceed, Counsel.

19           MR. WIBLE:  Thirty-five million dollars.  That's how

20   much money that man, the defendant, Roger Ng received as

21   payment for his role in a massive bribery and money laundering

22   scheme.

23           It was a scheme to steal more than a billion dollars

24   from the Government of Malaysia to pay millions of dollars in

25   bribes to government officials so they would turn a blind eye

1    to the theft, and to cover up the crime by laundering the

2    money through offshore companies in bank accounts all over the

3    world, including right here in New York.

4            The defendant worked as a banker at Goldman Sachs,

5    an investment firm based here in New York out of Goldman's

6    offices in Southeast Asia.  He saw an opportunity to use his

7    position at Goldman to get rich by cheating.  How did he do

8    it?  The Malaysian government-owned and controlled a company

9    called 1MDB that was supposed to raise money for projects to

10   develop the country's economy, and the defendant had a

11   relationship with a young Malaysian socialite named Jho Low,

12   who had close ties to powerful government officials in

13   Malaysia who ran 1MDB; so the defendant, Low, and others,

14   hatched an illegal plan, what's called a conspiracy.

15           They agreed to have Goldman Sachs raise billions of

16   dollars for 1MDB by saying that the money would be used for

17   development projects; but, secretly, they planned to steal

18   much of that money from 1MDB to enrich themselves; and to make

19   sure that their plan would succeed, the defendant, Low, and

20   others, agreed to bribe government officials to approve the

21   fund-raising and to look the other way while they stole the

22   money.

23           The scheme worked as planned.  Once 1MDB got the

24   money, hundreds of millions of dollars got siphoned off and

25   sent through offshore companies in bank accounts all over the

1   world to cover up the scheme.  The stolen money was used to

2   pay bribes to the government officials who had approved the

3   bond deals.  It was also used to pay off others in the scheme,

4   including the defendant, who got $35 million -- $35 million in

5   criminal proceeds.  That is why we are here.

6            Ladies and gentlemen, this opening statement is the

7   Government's opportunity to give you an overview of the

8   evidence we are going to show you in this case.

9            First, I will describe what we expect the evidence

10  in the trial to show; second, I will give you a brief overview

11  of the charges against the defendant; and, finally, I will

12  explain how the Government will prove its case to you.

13           So, what will the evidence show?

14           First, and crucially, it will show that the

15  defendant saw an opportunity to make millions of dollars by

16  cheating, and he took it.  As you will learn, the defendant

17  was a managing director at Goldman Sachs, and he was one of

18  the people with primary responsibility to the bank's business

19  in Malaysia, a country in Southeast Asia.  As a global

20  investment firm, Goldman was in the business of raising money

21  for its clients -- typically, large companies, and sometimes

22  foreign governments -- in advising those clients on financial

23  transactions.  The defendant's job was to try to get business

24  for Goldman.  But to try to get business for Goldman, the

25  defendant invested time and energy in building a relationship

1    with Jho Low.  Jho Low was a young Malaysian social climber

2    who lived lavishly.  He threw over-the-top parties that were

3    attended by Hollywood stars, and he had political connections

4    with powerful government officials in Malaysia and the Middle

5    East, and the defendant knew that those connections could be

6    useful in winning business for Goldman Sachs, including with

7    government-owned companies like 1MDB.

8            And, sure enough, in early 2012, Jho Low approached

9    the defendant and Tim Leissner, another Goldman banker and

10   close friend of the defendant, with the plan to raise money

11   for an investment firm -- an investment fund that was owned

12   and controlled by the Government of Malaysia.  This fund was

13   called 1 Malaysia Development Berhad, or 1MDB.  It was

14   supposed to raise money to help develop Malaysia's economy.

15           The plan Jho Low proposed to the defendant and

16   Leissner was to have Goldman Sachs raise over a billion

17   dollars for 1MDB, but the plan wasn't to use the money to

18   benefit the people of Malaysia.  Instead, the plan was to

19   steal it so they could get rich.  To make that plan succeed,

20   they would have to bribe government officials -- Jho Low's

21   powerful connections -- to sign off on raising all of that

22   money and to go along with the scheme of stealing; and for

23   making sure that Goldman would help 1MDB raise the money, the

24   defendant and Leissner would get paid millions of dollars in

25   secret kickbacks -- or side payments -- from this Goldman

1   money.

2          The defendant and Leissner agreed with Low's

3   proposal, and they set the plan in motion.  How are they going

4   to raise all of that money for 1MDB?  Well, Goldman was going

5   to help 1MDB issue bonds.  The bond is just a type of loan

6   used to raise money from investors; and, here, when the

7   investors bought the bonds, that meant they were loaning money

8   to 1MDB for development projects, and they were supposed to be

9   repaid on a set schedule.  The defendant and Goldman Sachs

10  were crucial to the scheme because investors would give

11  billions of dollars to 1MDB only if a respected global bank

12  like Goldman Sachs was involved -- 1MDB needed Goldman to

13  raise all that money -- and the defendant's role was to pull

14  the strings at Goldman Sachs to make sure Goldman would held

15  1MDB.

16          Now, you will hear that the defendant had tried to

17  get Goldman Sachs to do business with Jho Low in the past, but

18  there was a problem.  Just because a banker wants to do a deal

19  doesn't mean that Goldman will do it.  Goldman has rules about

20  how it does business and people would enforce those rules.

21  When the people at Goldman who review potential business

22  partners couldn't confirm the source of Jho Low's wealth, it

23  had serious concerns about news reports describing Low's

24  lavish life, and because of these red flags, Goldman had

25  refused to do business with Low.  (Continued on next page.)

1    (Continuing.)

2         MR. WIBLE:  To make sure that Goldman would approved

3    the 1MDB deals, even though they were working closely with Jho

4    Low, the defendant and Leissner knew they had to hide

5    Leissner's involvement.  They hid the involvement with Jho Low

6    using their personal e-mail accounts.  By using the personal

7    e-mail accounts rather than their official Goldman accounts

8    they made sure that Goldman wouldn't know what they were

9    discussing and so that they wouldn't know that Jho Low was

10   involved.

11        To raise money for 1MDB, Goldman handled three bond

12   deals for 1MDB in 2012 and 2013.  These deals were referred to

13   internally at Goldman as Project Magnolia, Project Maximus and

14   Project Catalyze.  The first of the three bond deals, Project

15   Magnolia, raised $1.75 billion and it was supposed to be used

16   to acquire a power company from Malaysia.  The bonds were

17   guaranteed by an investment fund that was owned by the

18   government of Abu Dhabi which is part of the United Arab

19   Emirates, a country in the middle east.  In other words, if

20   1MDB couldn't repay the investors, the investment fund from

21   Abu Dhabi would help make the repayments.

22        A company owned in Abu Dhabi Investment Fund Aabar

23   Investment PJS was supposed to be paid for providing that

24   guarantee.  However, you will hear that around that very same

25   time, Jho Low along with a couple of corrupt government

Case 1:18-cr-00538-MKB   Document 239   Filed 03/21/23   Page 20 of 168 PageID #: 6548

1  officials from Abu Dhabi was trying to get a bank account

2  opened in Singapore under the name Aabar Investments PJS

3  Limited.  This Aabar entity had been incorporated in the

4  British Virgin Islands or BVI and its name sounded like the

5  name of the real Abu Dhabi Investment Fund that was involved

6  in Project Magnolia, but the two entities were not related.

7  It would be like opening a bank account in the name of Burger

8  King Limited that had nothing to do with the fast food

9  restaurant.

10          In the spring of 2012, the defendant, Leissner and

11  Jho Low all went to Singapore where the defendant and Leissner

12  met with representatives of the bank and as you will hear this

13  bogus Aabar BVI bank account ultimately received $1 billion

14  that had been stolen from 1MDB.

15          Meanwhile, Project Magnolia was being reviewed

16  internally at Goldman Sachs.  There were two separate

17  committees based in New York that looked at the proposed deal

18  from different angles before ultimately approving it.

19  Throughout that process, the defendant and Leissner continued

20  to hide Jho Low's involvement in the deal; their meetings with

21  him, their secret e-mails with him and the criminal scheme

22  that they had hatched with Jho Low, including that they

23  expected to personally profit to the tune of tens of millions

24  of dollars from the deal.

25          You will learn that the defendant and Leissner hid

1   all of that because there were bright red flags around Jho Low

2   and you will hear that Goldman prohibited its bankers from

3   receiving kickbacks and side payments for working on a deal.

4           In May 2012, Project Magnolia closed and Goldman

5   transferred nearly $1 billion to 1MDB.  One day later, more

6   than half of that money, over $500 million was siphoned out of

7   1MDB and into the Singapore bank account held by the bogus

8   Aabar BVI entity.  That's when just as the defendant and his

9   co-conspirators had planned only a few months earlier,

10  millions of dollars in bribes got paid to government officials

11  in both Malaysia and Abu Dhabi and when the defendant and

12  Leissner got their cut of the stolen money for making sure

13  that Goldman handled the deal.  Many of these corrupt payments

14  went through the United States including right here in New

15  York.

16          Over the course of the trial you will follow the

17  money, you will learn about how the defendant and his

18  co-conspirators tried to cover their tracks and conceal these

19  payments.  To cover up a massive theft and bribery scheme,

20  they had to take five steps.  They used bank accounts in the

21  name of offshore companies, companies that only exist on paper

22  and don't do any business to receive the stolen money.  You

23  will hear that roughly three weeks after Project Magnolia

24  closed and the bonds were issued, $35 million of the stolen

25  bond funds was transferred to an account in the name of a

1  shell company that was owned and controlled by Leissner and

2  his ex-wife.

3          Only days later, Leissner sent the defendant exactly

4  half of that total.  Leissner was giving the defendant his cut

5  of the criminal proceeds.  It was a kickback for getting the

6  deal done which was prohibited by Goldman's rules and which

7  the defendant never told Goldman about.  Only a few weeks

8  after that, Leissner sent the defendant even more money for a

9  total of $24 million in kickback payments.

10         In the two months after the first bond deal closed,

11 the defendant received his kickback payments into an account

12 in the name of an offshore British Virgin Islands shell

13 company that had been opened up at the very same time that

14 Project Magnolia closed.  And, as we will show you, the

15 defendant used this shell company and even his own wife and

16 mother-in-law as a front to hide his identity.

17         This may all seem a bit complicated and some of the

18 financial transactions are, but at bottom, this was a simple

19 scheme.  The defendant and his co-conspirators stole a huge

20 amount of money.  They paid bribes to multiple government

21 officials and they moved the money through shell companies and

22 into offshore bank accounts to cover it up.

23         Not long after that first bond deal was done, the

24 defendant and Goldman started helping 1MDB on yet another $2

25 billion bond.  This transaction would become known as Project

1   Maximus.  The plan was the same:  Raise the money for 1MDB,

2   steal it, pay bribes and move the money through shell

3   companies and offshore bank accounts to cover up the crime.

4          The defendant and Leissner again made sure that

5   Goldman helped raise the money for 1MDB and that money flowed

6   into 1MDB and days after this deal closed in late 2012 nearly

7   half the bond proceeds, almost $800 million was diverted to

8   the same fake Aabar BVI account that was used for the first

9   bond deal, all before the money was sent out as bribe payments

10  to foreign officials and others.

11         Now, despite raising more than $3 billion over the

12  course of just a few months in early 2013 Goldman arranged a

13  third multibillion dollar bond transaction for 1MDB.  This was

14  Project Catalyze.  And, yet again, the plan was the same.

15  After the deal closed, more than $1 billion in bond proceeds

16  had been diverted including to foreign officials as bribe

17  payments.  Not long after the third bond deal closed, one of

18  Jho Low's shell companies sent millions of dollars of the

19  stolen money to the shell company that was owned and

20  controlled by Leissner and his ex-wife.

21         A few months after that, with kickbacks tied to the

22  scheme Leissner sent millions of dollars to the defendant's

23  shell company.  In all, between 2012 and 2013 the defendant

24  got over $35 million in kickbacks for his role in making sure

25  that Goldman Sachs helped 1MDB raise billions of dollars so

1    that the coconspirators could steal.

2         The Government officials that approved the bond

3    deals also got millions of dollars as did Jho Low, Leissner

4    and other co-conspirators.  That money got laundered through

5    accounts all over the world and spent on high-end real estate

6    and luxury goods like art, jewelry and handbags, including

7    right here in New York.

8         Now, the defendant left Goldman Sachs in the spring

9    of 2014 and in early 2015 as the corruption at 1MDB became

10   publicly known and things started to unwrap, the evidence will

11   show that the defendant tried to cover his tracks and he

12   deleted the entire contents of four personal e-mail accounts

13   that he had used to communicate with Jho Low, Leissner and

14   other participants in the scheme and that he had used to

15   communicate about his shell company.

16        For this conduct, the defendant has been charged

17   with three crimes.  I will briefly explain the charges to you

18   but Judge Brodie will instruct you on the law at the end of

19   the trial and you should follow her instructions.  First, the

20   defendant is charged with conspiracy to violate the Foreign

21   Corrupt Practices Act or FCPA.  That's a law that outlaws

22   offering or paying bribes to foreign government officials when

23   the purpose of the bribe is to obtain or get some sort of

24   business advantage.  Conspiracy, that's just another word for

25   an agreement between at least two people to commit a crime.

1        Second, the defendant is charged with conspiracy to

2  circumvent Goldman Sachs's internal accounting controls.  I

3  expect the judge will instruct you that the law requires

4  companies that issues stock to investors here in the United

5  States to have controls or rules around how the money gets

6  used and you will hear it's a crime to try to evade or get

7  around those rules.

8        Third, the defendant is charged with conspiracy to

9  commit money laundering and you will learn it's federal crime

10  to transfer money into or outside of the United States when

11  the money is the product of criminal activity and the purpose

12  of the transfer is to conceal something about the money such

13  as its source or who controls it.  You will also learn that

14  it's a crime to send money into or out of the United States

15  when the purpose of the transfer is to promote bribery.  And

16  you will learn it's a crime to spend or transfer over $10,000

17  in dirty money.

18        You will see that the defendant and others wired

19  millions of dollars in funds tied to the criminal scheme into

20  and out of banks right here in New York.  That's a summary of

21  what the evidence in this case will show and the charges

22  against the defendant.  So, how will the Government prove it's

23  case to you?

24        You are going to hear from a number of witnesses and

25  you will see e-mails, bank records and many other documents

1    that lay out the details of the scheme.  Keep in mind the

2    evidence will come in in bits and pieces.  No single witness

3    will give you the full picture, but at the end of the trial we

4    are going to have another opportunity to speak with you and

5    explain how the evidence all fits together.

6              So, witnesses from Goldman Sachs will testify

7    including about the bank's serious concerns about Jho Low, the

8    terms of the 1MDB bond deals, how Goldman's own money was used

9    to finance the bonds and the controls that were in place and

10   the approvals that were required before Goldman's money could

11   go out the door.  They will tell you that the defendant and

12   Leissner never disclosed Jho Low's role in the transactions or

13   the criminal scheme that the defendant and Leissner knew was

14   at the heart of the deals.  You will also hear from other

15   witnesses, including a former employee of the bank that that

16   account held by the bogus Aabar BVI entity had received over

17   $1 billion in stolen 1MDB funds.  He will tell you how the

18   defendant and Leissner met with a number of employees in April

19   of 2012 about the bond deal.

20             And who else will testify?  One of the people who

21   profited from this corrupt deal alongside the defendant.  His

22   partner in crime and coconspirator, Tim Leissner.  Leissner

23   worked with the defendant at Goldman Sachs.  He worked closely

24   with the defendant and Jho Low to pursue business with 1MDB.

25   He will give you an inside view of this bribery and money

1   laundering scheme that earned them millions of dollars and had

2   enriched other members of the conspiracy.

3           Leissner has pleaded guilty for his role in the

4   scheme.  He's going to be testifying here under a cooperation

5   with the Government.  He is going to do that because he is

6   hoping to get a lighter sentence.  Now, we are not asking you

7   to approve of Leissner's conduct in this case.  He committed

8   and he has pleaded guilty to serious crimes and you should

9   scrutinize his testimony carefully.  I submit that when you

10  do, you will see that his testimony makes sense and that it's

11  corroborated or supported by all of the other evidence in the

12  case; evidence like bank statements and wire transfer records

13  that will allow you to follow the money.

14          Step-by-step you will see how billions of dollars

15  flowed from Goldman Sachs to 1MDB and then got diverted.  You

16  will see how bribes flowed out to foreign officials in

17  Malaysia and Abu Dhabi and how the defendant received a cut of

18  the stolen bond funds, more than $35 million in total.  But

19  that is not all.  You will see documentary proof showing you

20  how the defendant tried to hide the millions of dollars he

21  received.

22          You will see e-mails and bank records showing that

23  the defendant's cut was transferred to a bank account in the

24  name of an offshore shell company.  You will learn that this

25  account was opened at nearly the exact same time the first

1    bond deal closed and you will learn about how the bank account

2    was opened based on lies about who the account was for and

3    where the money had come from.

4            You will see that the account was actually

5    controlled by the defendant and his wife and that the money

6    actually came out of the stolen 1MDB bond money.  You will see

7    e-mails and other records showing that the defendant's wife

8    used the criminal proceeds in the account to buy expensive

9    jewelry, including a six-carat diamond and the defendant and

10   his wife were looking to buy real estate with the stolen

11   money.  You will see evidence that the defendant's involvement

12   and role in this conspiracy grew out of his years'-long

13   efforts to cultivate a relationship with Jho Low.

14           You will see e-mails, travel records and other

15   documents showing that in the years leading up to the three

16   bond deals that Goldman Sachs handled for 1MDB in 2012 and

17   2013, the defendant flew on multiple chartered jets with Jho

18   Low, attended a lavish, celebrity-studded event that Jho Low

19   hosted in Las Vegas and that he visited Jho Low on a luxury

20   yacht in the Mediterranean Sea off the coast of France.

21           Finally, you will see records showing that in 2015

22   as things started to unravel, the defendant and other multiple

23   co-conspirators deleted the entire contents of numerous e-mail

24   accounts that they used to communicate about the scheme and

25   the criminal proceeds of the scheme.

1          Ladies and gentlemen, all of this evidence, the

2    witnesses, the bank records and e-mails and other documents

3    will prove beyond a reasonable doubt that the defendant

4    received more than $35 million in secret kickbacks for his

5    role in a brazen bribery and money laundering scheme; a scheme

6    that involved bribes paid to government officials in Malaysia

7    and Abu Dhabi, paid with millions of dollars in stolen bond

8    funds that were supposed to have been used to benefit the

9    people of Malaysia.  The evidence will show that the defendant

10   hid the scheme from Goldman to make sure that it would

11   succeed.  The evidence will prove beyond a reasonable doubt

12   that the defendant committed these acts and is guilty of the

13   crimes with which he has been charged.

14          Now, I am about to sit down, but before I do, I want

15   to ask you to do three things over the course of this trial:

16   First, listen carefully to the witnesses and pay close

17   attention to the evidence; second, follow Judge Brodie's

18   instructions on the law; and, third, use your common sense,

19   the same common sense you use every day in making important

20   decisions in your own lives.  If you do those three things, at

21   the end of the trial, you will return the only verdict that is

22   consistent with the evidence, the law and your common sense,

23   that the defendant is guilty as charged.

24          THE COURT:  Thank you, counsel.

25          Mr. Agnifilo.

1            MR. AGNIFILO:  Good morning, everybody.  My name is

2    Marc Agnifilo.  I am joined by Teny Geragos.  We have Jennifer

3    Silverstein, Matthew Trotter and Jacob Kaplan, and the most

4    important person is the defendant, Roger Ng.  I'm going to

5    call him Roger.

6            Roger is 100 percent innocent.  You will see in the

7    evidence he is 100 percent innocent.  That is not because of

8    some technicality.  That is not because of some trick.  That's

9    because of the evidence and we are going to go through the

10   evidence in a little more detail than the Government went

11   through the evidence because this case is not going to be

12   based on slogans or the Government's conclusions like

13   what's -- like what is a kickback or what is a shell company.

14   It's going to be based on the evidence.

15           Now, when we were selecting you, Judge Brodie

16   pointed out that Mr. Ng is not from here.  He's from Malaysia

17   and he has come here to an American courtroom, to an American

18   trial, presided over by an American judge, to be prosecuted by

19   the United States of America and by all of you, an American

20   jury.

21           And what we have here is among the rarest of things

22   to happen in an American courtroom because we are about to

23   actually have a trial of an innocent man.  Now, what in the

24   evidence -- talking about the evidence, what in the evidence

25   will point to Mr. Ng's innocence?  Let's get started:  This is

1    a very big case.  The Government has pointed out some aspects

2    of just how big it is.  It takes place in many different

3    countries.  It is -- it involves billions and billions of

4    dollars.  It involves the highest of government; the prime

5    minister of Malaysia, major public figures in Abu Dhabi.  But

6    the Government didn't tell you and what you are going to see

7    in the evidence is that there is one witness, one witness, who

8    is going to say that Mr. Ng broke the law.  No one else.  One

9    witness.  And that witness is Tim Leissner, his boss at

10   Goldman Sachs.  We're going to talk about Tim Leissner in more

11   detail in a little while.

12          The other thing that the Government talked about was

13   bank records.  The bank records will not show, I submit when

14   you see the evidence, that Mr. Ng sent money to a public

15   official.  The bank records are not going to show that anyone

16   in his family sent money to a public official.  It's not going

17   to show that.  It's going to show that other people did that,

18   yes.  Keep in mind one thing, and let me say at the outset, I

19   represent Roger, that's it.  This is a massive crime and there

20   are lots of guilty people.  He's just not one of them.

21          So when the bank records start coming into evidence,

22   look at who is actually sending the money.  It's never him.

23   You know how they say never say never, I am saying never.

24   It's never him.  Written communications, e-mails, text

25   messages, BlackBerry messages and the 15 other ways that

1  people use their thumbs to send things most, of which I don't

2  know.  The Government has hundreds of thousands of them, maybe

3  even millions.  Look at them.  You are not going to see one

4  message, not one BlackBerry message, not one e-mail, not one

5  text message of Roger talking about bribery or trying to

6  influence public officials or doing anything inappropriate or

7  anything criminal.  Again, I am saying never.  It's never

8  going to happen.

9              Tape recordings -- you are going to hear that the

10 Government cooperator made recordings; that for a period of

11 time Tim Leissner was making recordings based on phone calls

12 and he was videotaping some of these and audiotaping some of

13 these working with the FBI.  You will not hear a single

14 recording of Roger.  When the evidence is coming in and we are

15 at that point in the trial where Mr. Leissner is sitting in

16 the jury box where all the witnesses are going to go and he's

17 talking about the period of time when he is making recordings

18 Foster FBI, ask yourself a question when you are listening to

19 that evidence, please:  Why didn't they try to make a

20 recording of Roger?  Ask yourself the question and to ask the

21 question may be enough to know the answer.  Why didn't they

22 make a recording of Roger?

23             The reason it's important is because Tim Leissner is

24 going to come into the courtroom and ist in this jury box and

25 he is going to tell you all the things that Roger did, right?

1  He is going to say, Roger told me who to pay, Roger told me

2  who to bribe.  Roger was involved in the bribe.  If that's

3  true, wouldn't it be great for the U.S. government to have

4  that in a recording?  If that's true, wouldn't that be

5  something the FBI would do backflips to record?  If the reward

6  to law enforcement is so great by getting a recording, ask

7  yourself why aren't there any, and you will reach your own

8  conclusion by the end of the case.  The evidence, I think,

9  will show you the reason is because innocent people say

10  innocent things.  And you don't want to have innocent things

11  on your audiotape so there's no recording of Roger, not one.

12        The absence of evidence is evidence of absence.

13  It's not just a lack of evidence.  It's not like when you're

14  listening to the evidence in this case and there's no bad text

15  messages and no bad e-mails.  It's not like when you listen to

16  the evidence in this case and there's no bank records that

17  show he sent money to any public officials.  It's not like

18  it's just a lack of evidence.  It's actually evidence that

19  he's not involved.  And the reason is what you will see in the

20  evidence is that the co-conspirators did leave evidence

21  behind.  You are going to see text messages between Leissner

22  and Jho Low and Leissner's former wife, Judy, and other people

23  from the middle east.  Someone named Mohammed Husseiny.

24        The co-conspirators used these methods.  They used

25  text messages.  They used BlackBerry messages to communicate

1   with each other.  So it's not like there is no evidence that

2   Roger did, but there is no evidence that anyone else did

3   either.  It's quite the opposite.  You know what they did

4   because there's evidence of what they did.  So when you look

5   at the evidence and you see none of it, none of it, with Roger

6   it's absence of evidence.

7           One of the things I want you to think about, you are

8   going to be seeing a lot of e-mails in this case.  The

9   Government is going to show you a lot of e-mails.  One thing

10  you will learn about Goldman Sachs is that, man, they send

11  e-mails.  Roger sent a lot of e-mails and Roger received a lot

12  of e-mails.  I want to tell you something now that I want you

13  to look for when you are looking at the e-mails:  Roger

14  follows process.  And what I mean by that is when he's

15  supposed to move things up to his boss for his boss'

16  consideration, he does it.  When Goldman expects him to do

17  certain things as part of his job, he does it.

18          I will give you an example.  Roger is based in

19  Malaysia.  He's a Malaysia coverage person, sort of a

20  specialist in Malaysia.  If something comes up in a deal that

21  has to do with Abu Dhabi -- you will see e-mails of this:

22  Roger, make sure we get the Abu Dhabi team on this.  Roger

23  follows process and the reason following process, and I

24  suggest you will see it in the evidence, is important in this

25  case is because bribery is the opposite of process.  Bribery

1    is the destruction of process.  Bribery is utterly

2    inconsistent with process.  So what I want you to do as you're

3    looking at all the e-mails, and it might be hundreds or

4    thousands, just back of your head -- you will be looking at

5    the e-mails for different things; what's going on in the deal,

6    what's going on here.  Is Roger following the process?  Is

7    Roger following the process in the e-mail because it's an

8    important thing to keep in mind.

9              (Continued on the following page.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1   (Continuing.)

2           MR. AGNIFILO:  You would think so.  We've talked

3   about this massive series of bond deals, we talked about

4   Goldman Sachs.  You might be sitting here thinking, who is

5   Roger at Goldman Sachs.  He must be really important to be

6   bearing the full weight of all that we heard in the

7   Government's opening.  He must be a very important person at

8   Goldman Sachs.

9           Is he the chief executive officer?  No.  Is he the

10  chief finance officers?  No.  He's not a chief of anything.

11  He's not even a partner.  Goldman Sachs has 40,000 employees.

12  It has 400 partners.  Just like we hear in society, the

13  1 percent, Goldman has 1 percent too.  1 percent are partners,

14  99 percent aren't.  He's not.  He doesn't run Goldman Sachs,

15  he does not set bank policy, he doesn't decide what deals to

16  go after.  He doesn't share in the firm's profits.  He doesn't

17  do any of it.  They didn't ever make him a partner.

18  Leissner's a partner.  You're going to hear a lot of partners

19  from Goldman Sachs doing a lot of things.  One man here.  One.

20  This man.  Not a partner.

21          One of the reasons you guys are all on this jury is

22  you guys can figure stuff out.  You can size people up, you

23  can figure out situations, and you'll reach your own

24  conclusion about why he is the only one here.

25          One of the things I want you to think about as

1    you're listening to the evidence, very important, motive.  As

2    you're listening to the evidence, think about what does this

3    mean in terms of motive, okay, because it's a very important

4    concept.  So here are a few things that's going to come out in

5    the evidence.  Roger comes from a modest family.  He didn't

6    grow up rich, by any means.  And he worked very hard his whole

7    life, and you'll see that.  You'll see that in the e-mails.  I

8    think people will even say that.  He worked hard his whole

9    life, and he is well paid by Goldman Sachs.  Very well paid.

10   No question about it.  But he has a modest lifestyle and he

11   has -- he's had the good fortune to marry into a family -- his

12   wife has certain means.  So the point of all this is, he

13   doesn't need extra money.  He doesn't need extra money.  He

14   has a good salary, his wife has plenty of money from her own

15   family.  We're going to talk about that in a minute.  We're

16   going to talk at great length about the 35 million.  But we'll

17   do that in a few minutes.  His wife is fine.  She comes from a

18   family of means.  And it's not just anybody or for no reason

19   at all that someone would decide, you know what would be

20   really good for my life, I'm going to commit one of the

21   biggest financial crimes in the history of the world.  Why

22   would you do that?  You would do that if you had a motive.

23          Now let's talk about Jho Low, okay.  Jho Low is pure

24   low.  Jho Low is the polar opposite of Roger.  You're going to

25   hear a lot at this trial about Jho Low.  In a nutshell, you're

1    going to hear Jho Low is a young guy and he wants all the

2    money.  He wants all the money as soon as possible, and he

3    wants all the money as soon as possible, because he wants to

4    have the most over-the-top lifestyle that's ever been had.  He

5    wants to have parties with celebrities whom he pays.  He wants

6    to have yachts.  He wants to have planes.  He wants to have

7    homes.  He is just looking for the biggest of lifestyles.  And

8    the own only way to make that kind of money without investing

9    it longterm and waiting like everybody else does, is to steal

10   it.  So Low steals the money for Low.

11           Leissner -- we're going to talk a lot about

12   Leissner.  Both in the opening and during the trial.

13   Leissner's different than Low.  And Leissner maybe didn't

14   quite start out like Low.  Leissner just started at immoral.

15   Flat out immoral.  You guys will size him up yourself.  He

16   started out immoral.  But then something happened.  He met Low

17   and that immortality came alive.  What was just kind of a lie

18   burn of immorality, you'll hear about that.  He keeps getting

19   in trouble at Goldman, he keeps doing the wrong thing, he's

20   leaking information to the reporter, he's doing things at

21   Goldman that they don't want him to do.  But it's just normal

22   immorality.  Low sets Leissner's immorality on fire, and all

23   of a sudden, Leissner basically meets Low and says where has

24   this been all my life.  I want what that guy has.  I want

25   yachts.  He gets a yacht.  I want planes.  I want homes.  I

1   want a house in Beverly Hills.  I want a house in New York.  I

2   want to buy houses for women in my life in different parts of

3   the world.  And so he becomes Low.  I'm not even sure he's a

4   mini version of Low.  He sort of goes Low, you know, toe to

5   toe with Low.  And so Leissner has motive.

6           What you're going to see -- and these are really

7   important e-mails that you're going to see -- you're going to

8   see Leissner desperate for money.  He uses the use word

9   desperate.  I'm desperate for money.  I don't have enough

10  money.  But you know what Leissner's going to do -- and you'll

11  see this in the evidence -- at one point, he marries Kimora

12  Lee Simmons.  He's going to blame it all on her.  Why am I

13  desperate for money?  It's Kimora.  When the evidence comes

14  in, watch how many people Leissner blames.  He blames Kimora,

15  because he bought Kimora a yacht.  He blames everybody.  But

16  the blame in this case really rests with Leissner and Leissner

17  alone.  Leissner has tremendous motive.  Jho Low has

18  tremendous motive.  They found each other and they share a

19  motive.  Very different, polar opposite, you'll see this in

20  the evidence is Roger.  Not like them, has no motive, didn't

21  commit this crime along with them.

22          So let's go back to really where this case starts,

23  2005.  In 2005, Roger starts at Goldman Sachs.  Leissner's

24  been there for about seven years by that point, and the two of

25  them meet each other.  The next year, Leissner becomes a

1   participating managing director.  And the word participating

2   is really the most important word of those three, because when

3   you're a participating managing director, what you're

4   participating in are the profits of Goldman Sachs.  It means

5   you're a partner, okay.  One of the 1 percent.  And Leissner

6   is a partner.  Roger's never a partner, and he's not a partner

7   when he meets Leissner.  So Roger and Leissner are both

8   working at Goldman Sachs, and they're respective wives -- kind

9   of a tricky phrase, but we are we'll say wives for a second.

10  I don't know if someone is your wife if you're married to

11  someone else at the time.  But we're not here in marriage

12  court.  But we'll call Judy his wife.  His wife at the time,

13  Judy, meets Hwee Bin, Roger's wife.  Hwee Bin's comes from a

14  well-to-do family and Hwee Bin's family has a certain amount

15  of investment in China.  Okay.  So Hwee Bin and Judy get to

16  speaking, and Judy, Judy Leissner, Tim Leissner's wife, we'll

17  call it, says you know, I have all these businesses in China,

18  I have a vineyard, I have a very large vineyard called Grace

19  Vineyard.  I have water treatment plants.  I have all these

20  businesses in China.  Hwee Bin says, I have money in China.

21  I'll invest in your businesses.  And the two of them invests

22  Hwee Bin's family money in Judy's businesses in China.

23          Everything's fine for six years.  The investment in

24  China is proceeding along.  There are no problems.  Then in

25  about 2011, there's a problem.  And the problem is this, Tim

1    Leissner, while married to Judy, is having a long-term
2    romantic relationship with someone named Rohana Rozhan, okay.
3    And you're going to hear a lot about Rohana Rozhan in this
4    trial, and you're going to hear about her a few more times
5    just in my opening statements.  And Rohana Rozhan is a
6    Malaysian, Hwee Bin is a Malaysian, and Judy says to Hwee Bin,
7    did you know that Tim is sleeping with Rohana Rozhan.  Hwee
8    Bin says, I thought you knew too.  And friction develops
9    between Judy and Hwee Bin.  And Judy says, you know what, Hwee
10   Bin, I think this investment thing has kind of run its course.
11   I think you should start taking your money out.  Here's the
12   problem, Judy doesn't have the money.  Judy doesn't have the
13   money to pay Hwee Bin, and you'll see this in e-mails between
14   Judy and Leissner.  So this account is corroborated by e-mails
15   between Judy and Leissner about the fact that Grace Vineyard
16   doesn't have enough money.  They're trying to do an IPO.
17   Leissner is trying to do an IPO of the vineyard.
18            But then something happens in 2012.  In 2012,
19   Leissner and Low and not Roger -- Leissner, and Low, reach a
20   corrupt agreement where basically Leissner starts working for
21   Low, flat out.  He's a Goldman Sachs partner, he's about to be
22   chairman of Goldman Sachs in Asia, but really, who he's really
23   working for is Low.  And he's doing a lot of work for Low and
24   you're going to hear a lot about it during the Leissner cross
25   examination.  And he gets paid for it.  And he gets paid

1    $35 million.  Leissner gets paid $35 million.  He splits that

2    with Judy and Judy sends her $17.5 million to Hwee Bin to

3    start paying down on the investment.  Roger has nothing to do

4    with that.  He's not hiding his money with his in-laws.  It's

5    the in-laws' money.  I don't know how things work in

6    Malaysian, but here in Brooklyn, your in-laws' money is not

7    your money.  It's not almost your money, it's not your money.

8    It's your in-law's money and it's the same in Malaysia.  It's

9    not Roger's money.  The Government in their opening kept

10   saying, it's Roger's, money it's Roger's money.  It's not

11   Roger's money.  It's the in-laws' money, because it's the

12   in-laws' money.  And you're going to see that in the evidence.

13           One of the things that I'm going to ask you to do,

14   for all the things that happened, is to see every event in a

15   context.  What's all the things that happened before, what's

16   all the things that happened after, to see everything in a

17   context.  To see all of these events in the right context, we

18   have to start in the December of 2008.  In December of -- and

19   one of the things that I want to say to you now, because I

20   think the Government kinds of bunches all of these times

21   together -- the timing of everything is very important.  And

22   the truth is, the first deal, when the deal comes in is not

23   1MDB at all.  1MDB starts much later.  So let's actually

24   address, accurately, what the evidence is going to show about

25   this.

1              In December of 2008, Roger and Tim, and Roger and

2    Tim's boss at the time, David Ryan, get an e-mail from someone

3    at Goldman Sachs.  And the e-mail basically says that the

4    Estate of Malaysian, called Tringganu, okay -- so like the

5    United States Malaysia is broken up into states, and one of

6    the states of Malaysia is called Tringganu.  And then a

7    feature of Malaysian politics, the sultan of Tringganu is the

8    king of Malaysian.  So let me tell you this, when you got your

9    jury summons, you didn't know that you were going to have to

10   understand about the Sultan   of Tringganu, but you never

11   know what's going to happen when you come down here.

12             So the way that Malaysia works is that different

13   heads of the state rotate to be the king, okay.  And it's the

14   Sultan of Tringganu's turn to be the king.  So he's the king.

15   And basically, the Goldman e-mail says the King of Malaysia,

16   the Sultan of Tringganu is going to start a fund, get on that.

17   That's basically what -- Goldman Sachs says, hey, Roger, hey,

18   Tim, go chase down this opportunity for us.  Roger realizes

19   the adviser to the King of Malaysia is Jho Low.  He didn't

20   choose him to be the adviser for the King of Malaysia, he was

21   the adviser for the king.  So what you're going to see in

22   early 2009, we have to be very precise with our time periods,

23   in early 2009, you're going to see Roger and Tim, both of

24   them, chasing down this business opportunity.  They're meeting

25   with Low, they're talking to Low, they're pitching Low, and

1    the reason they're doing these things is because this is what

2    Goldman Sachs does.  Goldman Sachs sees investment opportunity

3    and they try to get involved and they want to advise the King

4    of Tringganu on this investment opportunity.  And what you're

5    going see is no doubt about it, is that Roger is playing a

6    very active role in trying to get this business opportunity

7    that he was told to go get, and he's now doing it.

8            So what I expect you're going to see and we embrace

9    it, it's part of the evidence and it's absolutely true, is

10   that Roger is courting Low, trying to get Low to like Goldman

11   Sachs, trying to get Low to go with Goldman Sachs, with this

12   investment opportunity.  No question about it.  As part of the

13   process, does Roger go on a couple of planes with Low?  He

14   does.  This is not abnormal.  You're going to hear a lot of

15   this in the evidence.  What you're not going too see -- and

16   this is the key -- is Roger lying to people.  Do lies come out

17   of Roger's mouth and say something materially untrue about

18   this?  No, you will not see that here.  You will not.  Does

19   Roger hide Low?  He does not.  We'll talk about Leissner in

20   that in a minute.  He does not hide Low.  He's honest,

21   everything that he does is what he's expected to do as a

22   Goldman Sachs employee.

23           I need to give you a couple of examples to really

24   understand this point that's going to be very much in the

25   evidence that you'll see.  2010 -- so we're out of 2009.  Now

1    we're at 2010.   In 2010, Low wants to be a private wealth

2    management client at the bank.   What he basically wants is he

3    wants to bank, essentially, with Goldman Sachs.   He wants

4    Goldman Sachs to be his bank.   And there's a pretty rigorous

5    review process, okay, that is apart of the Goldman Sachs, sort

6    of due diligence, do we want this guy to be in our bank.   And

7    what you're going to see in the evidence is there's a series

8    of slides, a presentation, from March of 2010, from March of

9    2010, and in the slides, they get evidence from a lot of

10   different sources and one of the sources is Roger.   You know

11   what Roger says?   I don't trust Low.   I don't trust Low.

12   Engage in very careful due diligence.   Make sure that you look

13   at all his factual claims critically.   Roger is telling the

14   people who are trying to determine whether Low is going to be

15   a client of the bank, he doesn't necessarily believe Low, that

16   the bank should make sure it uses very great care and do very

17   careful due diligence in trying to figure out whether they

18   want Low as a client.

19           But that's not all.   A month later, this is still

20   going on, and what you're going to see is Roger says the same

21   things to people in a part of the Goldman Sachs called BIG,

22   B-I-G, Business Integrity Group.   And you're going to see it

23   time and again.   You're going to see Roger being the one,

24   probably the one in the bank more than anyone else that says,

25   be careful of this guy.   Make sure you check him out, make

1  sure you scrutinize him.  It's going to be in e-mails.  This

2  isn't just me talking to you.  I'm talking to you about what

3  the evidence is going to be in this case.  It's going to be as

4  part of a Goldman Sachs presentation.

5         The next year -- now we're at February, 2011.  Some

6  thing's going on called Kazakh Gold.  It's a Goldman Sachs

7  project.  And in Kazakh Gold, what's going on is that Low is

8  with a company called Jynwel, all right.  And Jynwel is sort

9  of forming this joint venture to try to do this financing.

10  But it's a little murky and unclear because it's a joint

11  venture.  It's Jynwel and it's another company and Goldman

12  Sachs is sometimes representing one and maybe represents both,

13  and Roger comes into the situation and he says something with

14  remarkable clarity.  He says, Jynwel is driving the

15  fundraising process, and that goes -- that is relevant because

16  it is acted upon.  It is acted upon directly.  What you're

17  going to see when you see this e-mail is Roger says it and he

18  was heard, he was heard loud and clear by his superiors,

19  because they don't let the project go forward because of what

20  Roger said.  So when the Government gets up there in their

21  opening statements and says that Roger is endorsing Low, the

22  evidence is going to be the exact opposite, the exact

23  opposite, and this is based on evidence.

24         Last piece on this, you're going to see a series of

25  chats between Leissner and Low from 2014.  You're going to see

1    it because Leissner's on the chat, and Leissner and Low are

2    talking about how Low is disappointed that he was not able to

3    be a private wealth management client of Goldman Sachs.  And

4    you know what Leissner says, Leissner says, when I'm chairman

5    of Asia, I'll get you in.  I'll get you in.  Because by this

6    point, Roger's out of the bank.  Roger's out of Goldman in

7    2014.  Leissner says, when I'm chairman of Asia, I'll get you

8    in.  So the protector of Low all along was Leissner, it wasn't

9    Roger.  The evidence will show you this, time and time again.

10   I've given you three examples and there are dozens more.  The

11   protector of Low was Leissner, it was never Roger.

12           So one of the things that I expect is going to come

13   out in the evidence is even though Roger said these things,

14   even though Roger said, watch out for Low, be careful of Low,

15   Jynwel is driving the process, he continued to try to do deals

16   with Low.  No question about it.  Let me tell you why.  This

17   is what you're going to see in the evidence.  Roger is a

18   process guy.  No one ever told Roger don't deal with Low.

19   They told Leissner.  You're going to see e-mails of people in

20   compliance telling Leissner, back off of Low, don't deal with

21   Low.  But once you know what's in the evidence about Leissner,

22   I think you can readily conclude, Leissner wants Low.

23   Leissner is not going to share this with Roger.  Leissner's

24   going to keep this to himself.  So when you look in the

25   evidence, keep in mind, the most important distinction in this

1   case, the most important distinction in this case is between

2   Tim Leissner and Roger.  They're not partners in crime, and

3   you're going to see that.  There's a gulf between these two

4   men a mile wide, and that's what the evidence is going to show

5   you.  And just because Leissner did something and just because

6   Leissner knows something, all that means is that Leissner did

7   it and Leissner knows it, and nothing else.

8           The Government referred to personal e-mail, that

9   part of the way that the Governments says there's proof beyond

10  a reasonable doubt is because Roger uses personal e-mails.

11  And I want you to really scrutinize this very carefully.  And

12  here's what you're going to see, I expect several of the

13  Government's witnesses are going to tell you they use their

14  personal e-mails too at Goldman Sachs.  I think one of the

15  first witnesses in the case might say that.  So I don't know

16  if that's really all that here or there.  What you're also

17  going to hear is that this is common.  This is not uncommon

18  among Asian clients to ask for people's person e-mails.  And

19  so Roger gave his personal e-mails.

20          What you're also going too see in the evidence is

21  that at different points in time, Roger was considering

22  leaving Goldman Sachs.  He was working very hard, he's good at

23  what he does, and he was considering leaving Goldman Sachs to

24  open his own private advisory, you know, away from Goldman

25  Sachs.  And you're going to see personal e-mails, sort of,

1    around that.  And it's not going to implicate him.  It has

2    nothing to do with this case.  It's not going to show that

3    he's hiding Low.  It's going to show that at one point he was

4    thinking about leaving Goldman Sachs, and you're also going to

5    hear from other government witnesses that the use of personal

6    e-mails is not all that uncommon, especially in Asia.

7         The Government mentioned the fact that he deleted

8    e-mail accounts, okay.  You're going to find there was no

9    investigation going on, nothing was going on, no one was

10   asking about these things, and what you're going to hear about

11   the evidence is that he leaves Goldman Sachs, okay, he has

12   Goldman e-mails on his personal e-mail.  He's not supposed to

13   have them.  Okay.  His father passes away in January of 2015,

14   February 2015 is Chinese New Year, shortly after Chinese New

15   Year and after his father passes away, he gets rid of a number

16   of e-mail accounts that he wasn't using.  Part of the reason

17   he does is so that the Goldman e-mails that he probably should

18   have deleted from his personal e-mails, when he got them, he

19   gets red of all of them.  Rather than just deleting them one

20   by one, he just gets rid of them.  You're going to find that

21   there's no conspiracy that involves Roger to do this.  You're

22   going to find that, like I said, it's not like he got a

23   subpoena and destroyed the evidence.  You're not going to find

24   anything like that.

25         All right.  Let's go to 2012, because that's really

1   where things start getting hop.  So we have the lead up, we

2   have 2009, '10, '11, we've covered that.  Now we're in 2012.

3   And what you're going to see in the evidence about 2012, 2012,

4   Leissner is a man on fire to start 2012.  He's meeting with

5   everybody.  He wants to make a big score.  He's also thinking

6   about leaving Goldman.  Leissner, you will size him up for

7   yourself, but he's a man who moves fast, gets a lot done in a

8   lot of different ways, and in January of 2012, he is having

9   meetings with a number of people, and this bond deal, the

10  first bond deal, what Goldman called, Project Magnolia, kind

11  of comes in the door.

12          So what's Leissner doing exactly?  He's meeting with

13  someone named Ananda Krishnan.  Ananda Krishnan is a Malaysian

14  billionaire, and he owns a company called Tanjong which owns

15  the power assets.  So Leissner is meeting with Krishnan.  And

16  you'll see the records of these meetings, over and over and

17  over.  And he's had Ananda, Leissner, almost like as his

18  personal client, for about 10 years at this point.  And part

19  of what he has with Ananda Krishnan is he has had --

20  Leissner -- a long long-term romantic relationship with one of

21  the key CEOs, one of the key chief executive officers in

22  Krishnan's companies, Rohana Rozhan.  And we're going to talk

23  about her one more time in a minute.  So Leissner has this

24  long-term relationship with Krishnan, they vacation together,

25  they go on yachts together, but he also has this long-term

1   relationship with Rohana Rozhan.  So he's in.  Leissner

2   doesn't -- Leissner is not a process guy.  Roger is a process

3   guy.  Leissner is not a process guy.  Leissner is all about

4   how do I get a unique personal advantage.  And you're going to

5   see that in the evidence.  You're going to see that he uses

6   intimacy to get a unique personal advantage.  And he does that

7   with Rohana Rozhan.

8           But he has another very important relationship.

9   There's someone named Jasmine Loo.  Who is Jasmine Loo?

10  Jasmine Loo is the general counsel 1MDB.  1MDB is the

11  centerpiece of everything we're talking about this morning.

12  1MDB is a Malaysian company that basically is doing these bond

13  deals.  It's an extension of the Malaysian government.  And

14  probably the most person that you could know at 1MDB if you

15  want to get things done with 1MDB is Jasmine Loo.  She's the

16  general counsel and she's just a dynamic person, and she's

17  just the person to know.  Leissner knows that and Leissner has

18  a several-month romantic relationship with Jasmine Loo.  And

19  there's going to be prove of it.  There's going to be proof.

20          I don't know what he's going to come here and say,

21  but you know what you guys are going to see?  Here's what you

22  guys are going to see, you guys are going to see the two of

23  them going away together, and you're going to see Leissner,

24  who never wants to pay for his own meal, dinner, breakfast,

25  Jasmine Loo, dinner, breakfast, Jasmine Loo.  You guys are all

1   grown up.  You'll know exactly what's going on.  He's having a

2   romantic relationship with Jasmine Loo.  One of the ways

3   you're going to see in the evidence that that's so is Jasmine

4   Loo sends him lyrics of a Kenny Rogers song -- can't make this

5   stuff up -- sad romantic Kenny Rogers.  The two were in a

6   relationship.

7           Why is that important?  We're not here to figure out

8   who likes who and who's having romantic relations with who.

9   Jasmine Loo is a public official.  Leissner is having these

10  relationships to have the unique personal advantage, because

11  intimacy can help you do that, and Leissner uses intimacy to

12  do that better than anyone you might ever meet.  Because when

13  you're sharing things, when you share intimacy with somebody

14  in whatever fashion, especially when that intimacy is

15  illicit -- because like Leissner, you're married, you're

16  married to Judy -- you have a bond with that person that you

17  can't recreate any other way.  The two of you have this kind

18  of like dark trust, because you're in an intimate illicit

19  relationship and nothing is ever on the level again.  For

20  instance, if Leissner and Jasmine Loo and two other people are

21  at a meeting, those two other people don't know things about

22  and between Leissner and Loo.  It's a secret.  And you will

23  see that Leissner uses this.  Leissner, you will see in the

24  evidence, uses people.  Leissner uses intimacy to get what he

25  wants, and what he wants, at the end of the day, is money.

1    He's all about money.

2         Unique personal advantage.  Illicit intimate

3    relationships.  He has them with Jasmine Loo.  He has this

4    whole thing locked up.  He has the seller of the power assets

5    in the first bond deal, Ananda Krishnan.  He has the mover and

6    shaker from 1MDB.

7

         (Continued on the following page.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          MR. AGNIFILO: (Continuing.)  The point is, he

2    doesn't need Roger.  Roger, you will see, plays no role.  Tim

3    Leissner does not need Roger.

4          One of the things that I want to preview for you

5    guys in the evidence, in the spring of 2012.  Leissner is

6    going to come in here and talk about a very interesting

7    meeting.  Maybe it happened, maybe it didn't.  You guys will

8    decide.  Leissner is going to come here and testify that he

9    was given a letter from the Malaysian Prime Minister and that

10   he delivered that letter, Leissner.  He delivered the letter

11   like he's a postman.  He delivered that letter to someone

12   named Sheikh Mansoor.  That's what he's going to come and tell

13   you, that he delivered this letter to Sheikh Mansoor.  I want

14   you to really scrutinize this.  And when you scrutinize this,

15   there are a couple of things that I want you to be thinking

16   about.  On a number of occasions, when Leissner was married to

17   two women at the same time twice -- ready?  I mean, I don't

18   want you to miss this.  He was married to two different women

19   at the same time, two times.  He was married to two women at

20   once at the same time.  He was then married to two women again

21   at the same time.  And when he got caught because one of them

22   said, hey, Leissner, I think you're already married, do you

23   know what he did?  He forged fake documents, fake divorce

24   documents and said, no, I'm not, here's a divorce document.

25   And it's fake.  When Leissner is on this witness stand talking

1  about how he delivered a letter to Sheikh Mansoor and that

2  Sheikh Mansoor wrote a letter back, I want you to figure out,

3  is this really what happened?  Because it's a very important

4  part of the case, so I wanted to preview it to you now.

5          One of the things that's a very important part of

6  this case, too, is Goldman Sachs compliance divisions.  And I

7  am not going to go into all of them now because there are too

8  many to go into, but you're going to hear about this business

9  intelligence group, BIG, and you're going to hear about these

10 committees.  Okay?  And these committees form and the

11 committees, like, review the bond deals and all of these

12 things and it's an important part of the process.  And it

13 really kind of showcases that Roger -- all these things that

14 the government is saying Roger did, Roger did, Roger did,

15 Roger is a small cog in this huge machine that is Goldman

16 Sachs with all of these committees and all of these, you know,

17 levels of review.

18         And so the committees are important and they're also

19 interesting.  And one of the ways that they're interesting is

20 the committee, the main committee that's sort of passing on

21 this bond deal, takes a look at this meeting, Leissner says

22 everything is okay, the bond deal is going to be fine because

23 I, Tim Leissner, all by myself, brought a letter from the

24 Malaysian Prime Minister and hand delivered it to Sheikh

25 Mansoor, so the two countries, the two countries involved in

Agnifilo - Opening Statement                    56

1    this bond deal, are together and they're together because of

2    me, Tim Leissner.  The Goldman Sachs committee says basically,

3    okay, that sounds plausible, that sounds like it might have

4    happened.  You're going to hear Goldman Sachs was trying to

5    get a meeting with Sheikh Mansoor for years.  They couldn't

6    get a meeting with him for years.  Leissner hand delivers this

7    letter in secret, doesn't tell anybody, and then when he's

8    confronted about it, he lies about it.  And despite all of

9    this, the Goldman Sachs committee is saying, you know, you

10   know one of the things -- this is in one of the committee

11   memos, you'll see it for yourself -- one of the things that

12   makes us feel good about this deal is that we have full

13   confidence that Tim Leissner had this meeting with Sheikh

14   Mansoor, that's one of the reasons we're going to go forward.

15            And so one of the things that I want you to think

16   about when you're listening to the evidence on this case, what

17   do these committees do?  Are these committees here really to

18   get to the bottom of stuff?  Are these committees really here

19   to make sure that we all live in a world that's more

20   consistent with truth and honesty?  I don't think you're going

21   to reach that conclusion.  The conclusion I think you're going

22   to reach is these committees do what's best for Goldman Sachs.

23   And you shouldn't expect them to do anything else, but don't

24   let them come in here and tell you that they're doing

25   something other than that.  And you're going to listen to the

1    evidence about that and you will a make up your own decision.

2            So in 2012, Leissner and Low join forces and a

3    number of things happen.  After the bond deal closes, there is

4    the -- an Astro IPO.  Now, I talked about Rohana Rozhan.

5    Rohana Rozhan, as you heard, is the CEO of Astro.  What you

6    don't know yet is that the CEO of Astro is doing this IPO

7    which makes Goldman Sachs a lot of money.  What Goldman Sachs

8    probably didn't know at the time is that Tim Leissner had

9    bought Rohana Rozhan not one but two houses.  Okay?  This is

10   the CEO of Astro that Goldman Sachs has as a client and Tim

11   Leissner has bought this client, the CEO of Astro, a house in

12   Melbourne, Australia and a house in London, and he's going to

13   come in here, Leissner, and say Roger did something?

14   Leissner, what you will see in the evidence, has this whole

15   situation locked down and he has it locked down because, among

16   other things, he himself, by himself, is buying homes for the

17   CEOs of the companies that are Goldman's clients.  And that's

18   just one of the things that he does.

19           A very important thing happens on June 7, 2012.

20   What happens on June 7, 2012 is Jho Low, one of his people,

21   reach out to Leissner by e-mail:  We want you to have a

22   meeting on June 11, 2012.  We want you to be at a meeting in

23   another city.  So Leissner has to go to another city on

24   June 11, 2012.  And what Leissner does is, Leissner shows up

25   for work in his new job as a criminal associate of Jho Low.

Agnifilo - Opening Statement                    58

1    And do you know what happens that same day, the same day that

2    Leissner shows up to work?  Low sends him $35 million.  Low

3    sends him $35 million.  Here's your signing bonus, Tim,

4    welcome to my employ.  Same day.  Not a different day, not a

5    day before, not a day later; the day that Leissner has to show

6    up at the meeting with Low.  Low is no fool.  This guy is

7    going to make me a lot of money, I'm going to make him a lot

8    of money.  Here's $35 million.

9            After this happens, Leissner and Low go on a

10   criminal rampage, the two of them.  The two of them.  Leissner

11   and Low start committing bank fraud.  They commit bank fraud

12   starting on October 25th, 2012 because the second deal,

13   Genting -- Genting is the second of the three deals,

14   Project Maximus -- after the Genting deal closes, guess what

15   happens?  Genting directly sends a company called World Merit,

16   Leissner's company, 30, three-zero, million dollars.  And

17   Leissner sends a little less than half of that out to someone

18   you'll hear about in the evidence who is associated with the

19   owner of Genting.  But to do it, they create fake contracts.

20   And the "they" is Leissner and his wife Judy.  And you will

21   see the e-mails between them.  And they basically create a

22   bogus contract between their company, World Merit, and a

23   company called Vielle, which is getting the money -- which is

24   the company that this person is using to get the money.  And

25   the contract is false because, in fact, these two companies

1  have nothing to do with each other, they don't have actual

2  business together, but the contract says that this money is

3  for actual business.  You will not see Roger anywhere around

4  this stuff.  This is Leissner and Judy and it's Leissner

5  paying out Low's money because he's working for Low, him and

6  him alone.

7           It happens again and again and again and you're

8  going to see it every time.  And you know what it is every

9  time?  It's bank fraud every time.  And when the government

10 says he's pleading guilty to what he did, no he's not.  No

11 he's not.  He committed bank fraud over and over and over and

12 over.

13          Let me give you another example, because this is an

14 important one for Low.  Low wants to open a bank account at a

15 bank called Banque Havilland.  Banque Havilland is in the

16 United Kingdom, having a hard time doing it.  His employee,

17 Tim Leissner, will help him.  From Leissner's home in

18 Los Angeles, Leissner creates a bogus -- he forges -- a common

19 term you're going to hear when it comes to Leissner -- he

20 forges a Goldman Sachs letter on Goldman Sachs letterhead that

21 says that Goldman Sachs has done due diligence on Jho Low and

22 Goldman Sachs has no concerns that Low is laundering money and

23 that Goldman Sachs has no concern that Low is involved in

24 terrorist financing.  Now, there's no evidence that Low is

25 involved in terrorist financing, but that is a heck of a lie

1    that Leissner made, and he's lying directly to Banque

2    Havilland so that Banque Havilland will take Low on as a

3    client.  And he's lying about Low not being a money launderer

4    and saying no reason to fear, Goldman Sachs checked this guy

5    out, no terrorist financing here.  He got a pass.  He got a

6    pass.  He's not pleading to that.  He gets a pass.

7            The last bank fraud that I'm going to talk about

8    today; not the last bank fraud in the case by a long stretch,

9    the last one I'm going to talk about today, Leissner is

10   getting funding for his yacht from C1 Bank and he lies to C1

11   Bank.  Now, no bank fraud is good, every bank fraud is bad.

12   Committing bank fraud to finance your yacht?  Really?  That's

13   their guy.  That's their guy.  He gets a pass on all of it.

14           One last crime and then I'm going to sit down.  In

15   the latter part of the case, 2014-2015, Leissner's doing work

16   for a company called Celsius.  Okay?  Celsius is a soft drink

17   company.  It says that if you drink it, like it burns calories

18   and stuff.  Leissner's working with them.  He's soliciting

19   investors.  One of the people that he gets to invest is this

20   gentleman right here, the man that he's going to come in and

21   testify against.  He takes over one and a half million dollars

22   from him and steals it.  You heard me right.  The government's

23   star witness stole the defendant's money and is getting a pass

24   from the government.  Do you know how you're going to know

25   that Leissner, the government's star witness, the only witness

1  who is going to say that this gentleman did anything wrong, do

2  you know how you're going to know that Leissner was stealing

3  his money from the get-go?  Because I'm going to tell you,

4  because it's in an e-mail.  When he gets part of the money, he

5  says, this money is from Roger, my accountant.  What he's

6  saying is, it's my money, it's not Roger's money; Roger is my

7  accountant, Roger is giving you my money.  And you know what

8  that's going to mean to you?  He was stealing it from the

9  door.  He was stealing it from jump street.  He stole Roger's

10  money and he's going to come in here and testify against him,

11  and the government's giving him a pass on it.

12          Leissner uses people.  You will see that time and

13  time again.  He uses women, he uses false intimacy, and here

14  he is trying to use my client.  And what he's trying to use my

15  client to do is to serve his jail time.  That is what he is

16  trying to use Roger to do.  And I think that when you listen

17  to all the evidence and you listen to how the government has

18  handled Leissner, you will reach the conclusion that they're

19  not holding him accountable.  And so you know what we need?

20  We need you to hold him accountable.  We need you to say, I am

21  not going to believe him, I am not going to believe a word he

22  says and without him, I am not going to believe this case.

23          One of the -- maybe the best thing about this

24  country, really might be the best thing -- a lot of people

25  are, you know, sort of down on our country.  The best thing is

Agnifilo - Opening Statement                    62

1    that we have the jury system.  We don't trust governments to

2    do this.  We trust people, just people, just folks.  We trust

3    you to do this.  And maybe the most important commitment this

4    country has ever made is that, as it concerns literally every

5    single human being on this earth no matter where they're from,

6    no matter what country they live in, no matter where they were

7    born, every single human being on Earth, standing between

8    every single human being on Earth and a criminal conviction is

9    a group of 12 Americans.  You are those 12 Americans.  Right

10   now you're more; one day you'll be 12.  You are those 12

11   Americans, and Roger needs you.  And the only part about the

12   government's opening statement that I agree with is I want you

13   to use your common sense, I want you to pay close attention to

14   the evidence, and I want you to reach a verdict that's

15   consistent with the facts.  And when you do those things, you

16   will send this man back home to his family.

17          Thank you.

18          THE COURT:  Thank you, Counsel.

19          It is 11:36.  We are going to break for 15 minutes

20   for our morning break.  I promised you a 15-minute break.

21   Ms. Valentine will escort you back to the jury deliberation

22   room and I will see you in 15 minutes.

23          THE CLERK:  All rise.

24          THE COURT:  Please remember not to discuss the case.

25          (Jury exits.)

Proceedings                                              63

1          THE COURT:  Please be seated, everyone.

2          I see the government has its first witness ready to

3     go.

4          MR. ROLLE:  We do, Your Honor.

5          THE COURT:  Okay.

6          MR. ROLLE:  Judge, we want to raise two points from

7     openings just now, two comments that I think deserve followup,

8     at least from Your Honor potentially, but Mr. Agnifilo made a

9     comment to the jury about telling them that they're going to

10    be able to figure out for themselves why it is that this

11    particular defendant is here on trial.  In my estimation,

12    based on how the context was presented, goes back to exactly

13    what we moved to preclude him from, the idea that this

14    defendant, by -- whether it's his nationality or something

15    else, that that's the true reason.  The jury is not here to

16    speculate why this defendant is on trial.  He's on trial

17    because he's on trial.  And so we didn't object, but we -- we

18    can go back to the transcript, but I think it was entirely

19    improper and should be -- they should be asked to disregard

20    that.

21         THE COURT:  You can go back to the transcript and

22    raise it to me, but I did not hear anything inappropriate.

23         MR. ROLLE:  We'll flag that, Your Honor.

24         And then secondly, almost as he closed he said that

25    the government's witness wants to use the defendant to do his

Proceedings                    64

1    jail time.  Again, we think this is entirely improper to sort

2    of raise the punishment in his opening and to suggest that

3    that was what was happening here, Judge.

4            THE COURT:  Well, I agree that some of

5    Mr. Agnifilo's statements were more arguments that were

6    probably more appropriate for summation, but I do not believe

7    that it is anything that is prejudicial and that I need to

8    raise with the jurors.  If you believe there is something

9    specific in the transcript that maybe I missed in listening to

10   the opening that you want to bring to my attention, I will

11   consider it, but while it did appear more as a summation, I am

12   not sure that there is anything there that I need to address

13   with the jury.

14           Mr. Agnifilo, would you like to be heard?

15           MR. AGNIFILO:  Yes.

16           I in no way suggested any Malaysian prejudice.  And

17   Tim Leissner is going to testify as to what his view of his

18   own jail exposure is, so that's going to be part of the

19   evidence one way or the other.

20           THE COURT:  It will be, but the jury is not allowed

21   to consider what possible punishment Mr. Ng would face.  But

22   again, I did not perceive the statement at the end as

23   suggesting that, so I will hear from the parties later on at

24   the next break if you believe there is something that I need

25   to address with the jury in listening to the statements.  I do

Proceedings                                      65

1    not believe there is anything that I really need to address.

2    Okay?

3              MR. ROLLE:  Thank you, Judge.

4              THE COURT:  I will see the parties in a few minutes.

5              MR. INTRATER:  Thank you, Your Honor.

6              (Recess taken.)

7              (Jury enters.)

8              (In open court; jury present.)

9              THE COURT:  Please be seated, everyone.  Thank you

10   for being on time.  We are going to hear from the government's

11   first witness.

12             Can the government please identify the witness for

13   the record?

14             MS. SMITH:  Yes, Your Honor.

15             The government calls Andy Tai.

16             THE COURT:  Mr. Tai -- please have a seat,

17   Ms. Smith, until the witness is sworn.

18             Please stand and raise your right hand.

19             THE CLERK:  Do you solemnly swear or affirm that the

20   answers you're about to give to the Court will be the truth,

21   the whole truth and nothing but the truth?

22             THE WITNESS:  I do.

23             (Witness sworn.)

24             THE CLERK:  State your name for the record.

25             THE WITNESS:  Andy Tai.

```
                        Proceedings                    66
```

1              THE COURT:  You may be seated, Mr. Tai.

2              Please proceed, Ms. Smith.

3              MS. SMITH:  And, Your Honor, I am just going to move

4    over to the podium.

5              THE COURT:  Okay.

6              MS. SMITH:  Thank you.

7              THE COURT:  Can you spell your last name for the

8    record, Mr. Tai?

9              THE WITNESS:  T-a-i.

10             THE COURT:  T-a-i.

11             Can you speak into the mike, please?

12             THE WITNESS:  T-a-i.

13             THE COURT:  Thank you.

14             Please proceed, Ms. Smith.

15             MS. SMITH:  Is the microphone working?

16             No?

17             Can you hear me now?

18             THE COURT:  It is working when you hit it, but when

19   you speak we are not hearing you through the mike.

20             MS. SMITH:  Hello?

21             THE COURT:  Still cannot hear you through the mike.

22             Do you have another mike, Winnie?

23             THE CLERK:  Actually, no, Judge.

24             THE COURT:  And, ladies and gentlemen of the jury,

25   the reasons that we have to make sure the mike is working, as

Proceedings                                                  67

1   I indicated at jury selection, normally the jury would be

2   sitting in the jury box, the witness would be sitting in the

3   witness chair and the public would be sitting where you are.

4   Because you are sitting in the gallery of the courtroom, the

5   public cannot sit in this courtroom with us.  As a result, we

6   have an overflow room and the only way for them to hear us

7   speak is if we utilize the mike.  So we have to make sure the

8   mikes are working so that the public can observe and follow

9   the trial as we go along.  So thank you for your patience and

10  understanding as we work with making sure that the mikes are

11  working.

12          THE CLERK:  Judge, IT is on their way over.

13          THE COURT:  Okay.  Does that have a long enough

14  extension cord?

15          THE CLERK:  No.

16          (Pause.)

17          THE COURT:  Some things are out of our control.

18  These mikes were tested this morning, they worked fine.  But

19  now that one is not working, so the IT department will be

20  right back with a substitute.  Thank you for your patience.

21          (Pause.)

22          Members of the jury, thank you for your patience.

23          Ms. Smith, you may proceed with your questioning of

24  Mr. Tai.

25          Mr. Tai, for purposes of your testimony, you may

1    remove your mask.  Thank you.

2            And, ladies and gentlemen of the jury, as you can

3    see, we have a screen in front of the witness and there is

4    also a HEPA filter to ensure everyone's safety.

5            Please proceed, Ms. Smith.

6    **ANDY TAI,** having been first duly sworn, was examined and

7    testified as follows:

8    DIRECT EXAMINATION

9    BY MS. SMITH:

10   Q    Good afternoon, Mr. Tai.

11           Where do you currently live?

12   A    I live in Singapore.

13   Q    And did you travel from Singapore to testify today?

14   A    That's correct.

15   Q    Where do you currently work?

16   A    I work at Goldman Sachs.

17   Q    How old are you?

18   A    I am 39 this year.

19           (Pause.)

20           THE COURT:  Please proceed, Ms. Smith.

21   Q    Where were you born?

22   A    I was born in Singapore.

23   Q    Did you also grow up in Singapore?

24   A    That's correct.

25   Q    And what is your highest level of education?

Tai - Direct - Smith                          69

1   A    I have an undergraduate degree in business and finance.

2   Q    Where did you get undergraduate degree?

3   A    The University of Michigan.

4        THE COURT:  Can I ask you to speak up, please?

5   Because we are still not hearing you through the mike.

6   A    From the University of Michigan.

7        THE COURT:  Thank you.

8   Q    And what did you do after you finished college at the

9   University of Michigan?

10  A    I joined an investment bank, UBS, in Los Angeles.

11  Q    How long were you there?

12  A    For a year.

13  Q    And what did you do after that year at UBS?

14  A    I joined Goldman Sachs in New York as an analyst in

15  investment banking.

16  Q    And you said that Goldman Sachs is where you currently

17  work?

18  A    That's correct.

19  Q    Before we go any further, can you tell us what Goldman

20  Sachs is?

21  A    Goldman Sachs is a global investment bank headquartered

22  in New York.  We are a publicly listed entity on the NYSE

23  engaging in investment banking activities.

24  Q    And you said NYSE.  What is that?

25  A    The New York Stock Exchange.

1   Q     And what do you mean by an investment bank?

2   A     As an investment bank, we mainly deal with two principal

3   activities, one which is what we call the advisory part of the

4   business; we advise our clients on merger and acquisitions and

5   similar type transactions.  The other piece that we kind of

6   work on are what we call capital markets or capital raising

7   activities whereby we help clients raise capital through

8   either typically equity or debt securities.

9   Q     How does an investment bank differ from say a bank on the

10  corner where you go and use the ATM?

11  A     So an investment bank, our main clients tend to be

12  corporates; i.e., companies, as well as, you know, financial

13  institutions like investment funds, private equity, whereas

14  for, you know, the other examples you mentioned, these tend to

15  focus more on individuals or retail investors.

16  Q     You mentioned companies and investment funds as clients

17  of Goldman Sachs.  What other clients does Goldman Sachs have?

18  A     We have -- so other clients would be, you know, private

19  equity, corporates, sovereign wealth funds, venture

20  capitalists, venture funds.  You know, from time to time you

21  may get banking officers and advise high net worth

22  individuals, but those are the main ones.

23  Q     You mentioned a sovereign wealth fund.  What is a

24  sovereign wealth fund?

25  A     A sovereign wealth fund tends to be an investment fund

1    that is wholly owned by a government.  The funds within the

2    sovereign wealth funds typically are government reserves or

3    could be pension money, things like that, yes.

4    Q    You also said that Goldman Sachs was a public company

5    listed on the New York Stock Exchange.  What does that mean?

6    A    So we are publicly listed, so our shares of stock are

7    traded on the stock exchange.  So anyone who wants to buy a

8    share in Goldman Sachs and become a shareholder, you can just

9    buy it from the New York Stock Exchange.

10   Q    You said that New York was the global headquarters of

11   Goldman Sachs?

12   A    That's correct.

13   Q    Where else does Goldman Sachs have offices?

14   A    We have offices in London, Chicago, L.A.  In Asia it

15   would be Hong Kong, Beijing, Shanghai, Singapore.

16   Q    Are the offices organized into regions at all?

17   A    Yes, we do.  Tends to be the Americas.  Europe is its own

18   region.  We have what we call Japan as a region and then

19   Asia ex-Japan.

20   Q    And how big is Goldman in terms of number of people

21   globally?

22   A    Globally, we have about 40,000 employees, approximately.

23   Q    So turning back to your work at Goldman, what is your

24   current title?

25   A    Right now I'm a managing director with Goldman Sachs.

1    Q    When you first joined Goldman, what was your position?

2    A    I was an analyst.

3    Q    Have you held other positions while at Goldman?

4    A    Yes.  So in line with kind of the years that I worked

5    with Goldman, so I start as an analyst, then associate, vice

6    president and managing director now.

7    Q    And when were you promoted from associate to vice

8    president?

9    A    I was promoted in 2012.

10   Q    And when were you promoted from vice president to

11   managing director?

12   A    2019.

13   Q    Is that considered an accomplishment to become a managing

14   director?

15   A    I would think so, yes.

16   Q    And is that progression sort of, associate analyst, vice

17   president, managing director, the normal route for promotion

18   at Goldman Sachs?

19   A    That's correct.

20   Q    Is there a level above managing director?

21   A    Yes.  We call it partner.

22   Q    What were your responsibilities in sort of your earlier

23   time period at Goldman when you were an associate?

24   A    An associate, I would be the one helping the senior

25   members of the team to conduct diligence, do analysis and help

1  them prepare documents for client meetings.  And from time to

2  time, I may also coordinate with, you know, various parties on

3  their transactions for meetings or -- yeah, for meetings

4  basically.

5  Q    And how did those responsibilities change when you became

6  vice president?

7  A    As you get more senior, I would say that probably, you

8  know, in terms of client interactions, that's probably much

9  more, as well as I think in terms of kind of the

10  decision-making and kind of access to information is probably

11  more because you deal more with the clients at that point.

12  Q    And then how did your responsibilities change again when

13  you were promoted to managing director?

14  A    So as managing director, my responsibilities are -- I

15  think one -- you know, I still have a lot more client

16  interactions, client meetings, and the idea is now for me to

17  go find clients and find business for Goldman Sachs.  On top

18  of that, I also manage a team now within Singapore that's

19  suppose to -- that includes associates and vice presidents

20  that help me kind of advise and find clients.

21        THE COURT:  Mr. Tai, I am going to ask you to keep

22  your voice up so that we can hear you.

23        THE WITNESS:  Sorry.

24        THE COURT:  Thank you.  It's alright.

25  Q    And you said one of your responsibilities as a managing

Tai - Direct - Smith                           74

1   director is to go out and get business?

2   A    That's correct.

3   Q    As a managing director, do you have signatory authority

4   for the company?

5   A    For the entities that I am assigned to.  So today, for

6   example, it would be Goldman Sachs Singapore.

7   Q    And what does signatory authority mean?

8   A    I can sign engagement letters or nondisclosure agreements

9   representing the fund.

10  Q    And did you have authority as a vice president?

11  A    No.

12  Q    So it's something that comes with being a managing

13  director?

14  A    That's correct.

15  Q    During your career at Goldman, how many hours did you

16  sort of work in a typical week?

17  A    On average, I would think about probably 80 to 90 hours a

18  week.

19  Q    And has that been consistent throughout your entire

20  career?

21  A    Yes, it is.

22  Q    How about travel?  Do you travel frequently for work?

23  A    Yes, I do.

24  Q    And has that been consistent throughout your career at

25  Goldman?

Tai - Direct - Smith                          75

1   A    Yes.

2   Q    And how do you get paid for your work?

3   A    I have a salary and then an annual bonus that we'll get,

4   you know, typically in January or February.

5   Q    Is your bonus tied to the performance that you -- at the

6   firm?

7   A    Yes.

8   Q    And do you receive any other compensation from Goldman

9   for your work?

10  A    No.

11  Q    Do you receive shares for the work that you do?

12  A    Yes, I receive shares, but that's typically under the

13  bonus.

14  Q    And does that make you then a stockholder of Goldman?

15  A    Yes.

16  Q    So going back to your time when you first joined Goldman,

17  where were you working again?

18  A    Sorry, can you repeat that?

19  Q    When you first joined Goldman, where physically were you

20  working?

21  A    I was working in the New York office.

22  Q    Where is the New York office located?

23  A    Back then was 85 Broad Street.

24  Q    Is that in Downtown Manhattan?

25  A    Downtown.  It's close to Wall Street.

1   Q    And you said that that was Goldman's global headquarters;

2   is that right?

3   A    Yes, but back then.

4        Now I think we moved our headquarters to 200 West

5   Street, yes.

6   Q    Is 200 West Street also in Manhattan?

7   A    That's correct.

8   Q    When you joined Goldman in 2007, were you working in a

9   particular group or a division?

10  A    I was working in what we call our -- it was in investment

11  banking.  The stock group is what we call telecom media and

12  technology, so the TMT group.

13  Q    And what does that group do?

14  A    We focus mainly on clients within the technology media

15  and telecom space.  And same thing, advising them of typical

16  investment banking activities, such as mergers and

17  acquisitions, advisory and capital markets.

18  Q    How long did you work in Goldman's New York office?

19  A    I worked there from '07 to end of '09.

20  Q    What happened in 2009?

21  A    At the end of 2009, I transferred back to Singapore and

22  started working in the Singapore office.

23  Q    So you began working in the Singapore office in 2010?

24  A    That's correct.

25  Q    How long did you work in the Singapore office?

1   A     I worked there from January 1st, 2010, all the way until

2   November 2017.

3   Q     And then what office did you move to in 2017?

4   A     Hong Kong.

5   Q     And where are you currently?

6   A     So I moved back to Singapore about two weeks ago, so I am

7   currently in the Singapore office.

8   Q     Okay.  Earlier you talked about how Goldman's offices are

9   arranged into regions.  What region is the Singapore office

10  located in?

11  A     It is under Southeast Asia, which is under what we call

12  Asia ex-Japan.

13  Q     And what countries are covered by this Southeast Asia

14  region?

15  A     So typically it's the Asian countries, so Singapore,

16  Malaysia, Thailand, Philippines, Vietnam and Indonesia and the

17  rest of the Indochina countries.

18  Q     And where in Southeast Asia does Goldman have offices?

19  A     We have offices in Singapore and Malaysia and Indonesia.

20  Q     And where in Malaysia does Goldman Sachs have an office?

21  A     Kuala Lumpur.

22  Q     I am going to show you what has been marked as Government

23  Exhibits 51 and 51-A for identification, and those are in the

24  binder next to you at Tabs 1 and 1-A and then it should also

25  be on your screen.

1           Do you recognize these documents?

2    A    Yes, I do.

3    Q    What are they?

4    A    It's a map of Asia.

5    Q    And based on your experience in that region, are these

6    fair and accurate representations of the Southeast Asia region

7    and Malaysia?

8    A    Yes.

9           MS. SMITH:  Your Honor, we move to admit Government

10   Exhibit 51 and Government Exhibit 51-A.

11          MR. AGNIFILO:  No objection, Your Honor.

12          THE COURT:  Admitted.

13          (Government's Exhibits 51 and 51-A received in

14   evidence.)

15   Q    So let's start with Government Exhibit 51.

16          MS. SMITH:  And can we zoom in on that a little bit?

17          Thank you.

18   Q    So can you tell the jurors where Singapore is on the map?

19   I know it's not a touchscreen, so if you can just describe it

20   and then Mr. Youkilis can circle it.

21   A    It's north of Indonesia.  It's a very -- at the end of

22   the -- that kind of peninsula.

23          Yes, that's correct.

24   Q    And is Singapore a city or a country?

25   A    It's both.  (Continued on the next page.)

1  DIRECT EXAMINATION

2  BY MS. SMITH: (Continuing.)

3  Q    Is Singapore a city or a country?

4  A    It's both.

5  Q    And then you also mentioned that Goldman had an office in

6  Kuala Lumpur in Asia.  Can you tell me where that is on the

7  map in relation to Singapore?

8  A    So it's on the map if you move the circle slightly up to

9  the northwest, you can -- yeah, that's correct.

10  Q    And have you traveled between Singapore and Kuala Lumpur

11  for work?

12  A    Yes.

13  Q    How long does it take to travel there by plane?

14  A    Less than an hour.

15  Q    You also said that Goldman has an office in the region in

16  Hong Kong.

17          Can you tell us where that is on the map?

18  A    Sorry, Indonesia, right.  So Indonesia would be in

19  Jakarta, so all the way south.  And then Hong Kong is just

20  Hong Kong by itself.

21  Q    Okay.  And can you explain where Hong Kong is in relation

22  to Singapore?

23  A    It's a four-hour flight, kind of, northeast, so if you

24  see Cheung Chau -- yeah, south of Cheung Chau, that's right.

25          MS. SMITH:  And can we now show the witness

1    Government's Exhibit 51A?

2    BY MS. SMITH:

3    Q    What does this document show?

4    A    It is a map of Malaysia.

5    Q    And so is it just a close-up of what we saw on the other

6    map?

7    A    That's correct.

8    Q    Can you again point out where Singapore and Kuala Lumpur

9    are on the map?

10   A    Singapore is -- so it's at the southern tip of Malaysia;

11   and Kuala Lumpur is in the middle of the peninsula on the west

12   side.  Yes, that's correct.

13   Q    And given how close Singapore is to Malaysia, is it

14   possible to live in Malaysia and commute to Singapore for

15   work?

16   A    Yes.

17            MS. SMITH:  So, Mr. Youkilis, if you can take that

18   down.

19            Thank you.

20   BY MS. SMITH:

21   Q    So let's talk about when you joined the Singapore office

22   in 2010.

23            Were you working in any particular division in

24   Singapore?

25   A    The investment banking division.

1    Q    Just remind us what your position was at that time.

2    A    When I joined, I was an associate.

3    Q    And did you stay in the investment banking division the

4    entire time you were in the Singapore office 2010 to 2017?

5    A    That's correct.

6    Q    When you first joined, how many people were in investment

7    banking in that office?

8    A    About 25 of us.

9    Q    And what was Goldman's investment banking business in the

10   Southeast Asia region like at that time?

11   A    We did all the investment banking, kind of, advisory

12   to -- talk about activities that I mentioned before.  And in

13   terms of the activity, it's fairly busy.  We did, you know, a

14   lot of transactions in Singapore, Malaysia, Indonesia,

15   Thailand.  Those were the main markets.

16   Q    Were there bankers who had primary responsibility for

17   particular countries within the Southeast Asia that region?

18   A    Yes.  We would have what we call country heads that was

19   in charge of the countries.

20   Q    And what did it mean to be a country head?

21   A    They would be the main banker in charge of local clients

22   within those countries, so they had to find the clients in

23   those countries, maintain contact with those clients, be the

24   one basically, you know, closest to -- closest in maintaining

25   dialogue with clients.

1  Q     And based on your work in the region, is there any

2  particular benefit to having someone serve as a country head?

3  A     Typically, the country heads tend to be locals, so they

4  would have a better understanding culturely about the local

5  clients.  They typically would have grown up in the country as

6  well, so they have a better network as well, so these are all

7  benefits that -- that's why we have country heads.

8  Q     When you joined the Singapore office in 2010, who was the

9  country head for Malaysia?

10 A     Roger Ng.

11 Q     Did you work with Mr. Ng during your time in the

12 Southeast Asia region?

13 A     Yes, I did.

14 Q     Do you see Roger Ng in the courtroom today?

15 A     Yes.

16 Q     Can you please describe where he is in the courtroom and

17 identify him by a piece of clothing that he's wearing?

18 A     He's at the back benches wearing a dark tie, white shirt.

19         MR. AGNIFILO:  He identified the defendant, Your

20 Honor.

21         THE COURT:  Let the record reflect that the witness

22 has identified the defendant, Roger Ng.

23 BY MS. SMITH:

24 Q     Mr. Tai, you said that Roger Ng was the country head from

25 Malaysia when he first started.  What title did he have at

1    that point?

2    A    He's managing director, head of Malaysia coverage.

3    Q    Was he therefore senior to you at that time?

4    A    Yes.

5    Q    In the, sort of, 2010 to early 2012 time frame, did you

6    work on any transactions with Roger Ng?

7    A    Yes.

8    Q    What were those transactions?

9    A    We -- the first one I did, I remember, was trying to get

10   the Malaysian client to list their real estate assets.

11   Another one was advising a local Malaysian high net worth

12   client to buy a luxury business in Malaysia.

13   Q    And so when you joined the Singapore office in 2010, who

14   was in charge of investment banking in the region at the time?

15   A    Tim Leissner.

16   Q    What was Tim Leissner's position at that time?

17   A    He was a partner and head of Southeast Asia.

18   Q    Did you work with Mr. Leissner during your time in the

19   Southeast Asia region?

20   A    Yes.

21   Q    I'm going to show you what has been marked for

22   identification as Government's Exhibits 1 and 2, which will

23   come up on your screen, and should also be behind tab 34.

24            Do you recognize these documents?

25   A    Yes.

1    Q    And what are they?

2    A    The left one is a picture of Roger, and the right one is

3    a picture of Tim Leissner.

4    Q    And are these fair and accurate depictions of Roger Ng

5    and Tim Leissner?

6    A    Yes.

7            MS. SMITH:  Your Honor, the Government moves to

8    admit Government's Exhibits 1 and 2.

9            MR. AGNIFILO:  No objection, Your Honor.

10           THE COURT:  They're admitted.

11           (Government's Exhibit 1 and 2 received in evidence.)

12   BY MS. SMITH:

13   Q    So now that the jury can see them, Government's Exhibit

14   is on left.

15           Who is depicted in that photograph?

16   A    On the left?  Roger.  Roger.

17   Q    And Government's Exhibit 2 is depicted on the right.  Who

18   is in that photograph?

19   A    Tim Leissner.

20   Q    And you said that you worked with Tim Leissner.  In that

21   same, sort of, 2010 to early 2012 time frame, what

22   transactions did you work on with Tim Leissner?

23   A    Tim was also involved in the lottery business I mentioned

24   as well.  We also kind of talking to various private equity

25   kind of investors in Southeast Asia for ideas.

1   Q     And the lottery business you mentioned, was that a deal

2   that Roger Ng worked on as well?

3   A     That's correct.

4   Q     Earlier you said that throughout your career you worked

5   long hours and traveled frequently.

6           Was that the same when you were in the Singapore

7   office?

8   A     That's correct.

9   Q     Did you often work long hours with Roger Ng and Tim

10  Leissner?

11  A     Yes.

12  Q     And did you travel with Roger Ng and Tim Leissner?

13  A     Yes.

14  Q     As a result, did you have an opportunity to observe them

15  together?

16  A     Yes.

17  Q     Based on your observations, how would you describe your

18  working relationship?

19  A     They were very close and always in contact.

20  Q     And did Roger Ng stay in the investment banking division

21  the entire time that you were in the Singapore office?

22  A     No.  After -- he moved to the securities division.

23  Q     And how is the securities division different than the

24  investment banking division?

25  A     So investment banking, like I mentioned, we can advise

1    corporate clients mainly on advisory in capital markets.  In

2    the securities, they deal with more funds to do sales and

3    trading of securities, so it's more of a trading business.

4    Q     So when Roger Ng moved over to the securities division,

5    does that -- did that mean he was no longer in the same group

6    as you and Tim Leissner?

7    A     That's correct.

8    Q     Did you continue to work with Roger Ng on deals even

9    though he wasn't in the investment banking division?

10   A     Sometimes he -- yes.

11         MS. SMITH:  Mr. Youkilis, you can take those two

12   down.

13         Thank you.

14   BY MS. SMITH:

15   Q     So I would like to turn your attention to early 2012.  At

16   this point, you're still in the Singapore office; is that

17   right?

18   A     That's correct.

19   Q     And what was your title at that point?

20   A     In 2012; right?

21   Q     Yes.

22   A     Vice president.

23   Q     Were you still working with Roger Ng and Tim Leissner?

24   A     Mainly Tim, but, yes, I think Roger would be involved in

25   some transactions.

1    Q    At that time, did you work on any transactions with Tim

2    Leissner and Roger Ng related to an entity called 1MDB?

3    A    Yes.

4    Q    What is 1MDB?

5    A    1MDB -- 1 Malaysia Development Berhad -- was a sovereign

6    wealth fund that was wholly-owned by the government of

7    Malaysia.  It's mandate was to partner with foreign sovereigns

8    to get foreign -- foreign direct investments into -- into

9    Malaysia.

10   Q    And can you remind us what a sovereign wealth fund is

11   again?

12   A    A sovereign wealth fund is an investment -- the deal

13   investment fund that's wholly-owned by the government.

14   Typically, the funds are government reserves, pension money.

15   In some ways, you have that in the U.S. as well.  It's like a

16   municipal fund.  It's kind of similar concept where they're

17   supposed to invest in public money.

18   Q    Based on your experience, what are the economic benefits

19   to a country like Malaysia of having a sovereign wealth fund

20   like 1MDB?

21   A    I would say two broad buckets.  One is they would deploy

22   the capital to make investments and you generate an economic

23   return on those investments.

24          The second broad bucket will be, you know, by

25   getting foreign investments, you are creating more jobs and

1   more economic value into the local Malaysia economy.

2   Q    So who ultimately benefits if a sovereign wealth fund

3   like 1MDB is a success?

4   A    The people of Malaysia.

5   Q    Who at Goldman was responsible for the relationship with

6   1MDB?

7   A    Tim and Roger.

8   Q    And when you say "Tim and Roger," you mean Tim Leissner

9   and --

10  A    Tim Leissner and Roger Ng.

11  Q    You said you worked on financing transactions related to

12  1MDB.

13            How many were there?

14  A    So there were three financing transactions.

15  Q    At Goldman, how do bankers refer to specific

16  transactions?

17  A    So there's a project code for each of the transactions.

18  Q    And so what was the project code for the three financing

19  transactions that you worked on related to 1MDB?

20  A    It was Magnolia, Maximus, and Catalyze.

21  Q    And who at Goldman did you work on these transactions

22  with, in general?

23  A    So Tim Leissner, Roger Ng, Andrea Vella, Jonathan Dunne,

24  Toby Watson, Cyrus Shey, among others.  There was quite a big

25  team.

1    Q    Who is Andrea Vella?

2    A    Andrea Vella, at that point in time, was head of what we

3    call financing group, so he was in charge of equity, capital

4    markets, and debt capital markets.

5    Q    What was his position at Goldman at that time?

6    A    He was a partner.

7    Q    Did you work with anybody at 1MDB on these projects?

8    A    Yes, I did.

9    Q    Who at 1MDB did you work on in connection with these

10   projects?

11   A    Sorry, mainly dealt with Vincent Koh, Jerome Tun, Jasmine

12   Loo, and Terence Geh.

13   Q    Did you meet these four individuals in person?

14   A    Yes, I met them in person before.

15   Q    On what occasions did you meet them?

16   A    During client meetings.

17   Q    How often do you think you met them during the time

18   period of the deals?

19   A    I saw -- during the deal, I saw Vincent Koh and Jerome

20   Cuomo as they were making the investments on acquisitions.  I

21   would see Jasmin and Terence from time to time.

22   Q    I'm going to show you what have been marked as

23   Government's Exhibits 8, 9, 10, and 11, all of which are

24   behind tab 34.

25        Do you recognize these documents?

1   A     Yes.

2   Q     What are they?

3   A     The left side, it's a picture of Jasmine Loo.  The right

4   side is a picture of Terence Geh.

5           MS. SMITH:  If you can also just put up 10 and 11.

6   BY MS. SMITH:

7   Q     Do you recognize these photographs as well?

8   A     The left is a picture of Vincent Dunne.  The right is

9   Jerome Koh -- I'm sorry, Vincent Koh and then the right is

10  Jerome Tun.

11  Q     And are these fair and accurate representations of the

12  individuals in these photographs?

13  A     Yes.

14          MS. SMITH:  Your Honor, the Government moves to

15  admit Government Exhibits 8, 9, 10, and 11.

16          MR. AGNIFILO:  No objection, Your Honor.

17          THE COURT:  Admitted.

18          (Government's Exhibit 8, 9, 10, and 11 received in

19  evidence.)

20          MS. SMITH:  And, Mr. Youkilis, can we start with

21  Government's Exhibit 8?

22  BY MS. SMITH:

23  Q     Mr. Tai, who is depicted in this photograph?

24  A     Jasmine Loo.

25  Q     What was Jasmine Loo's role at 1MDB?

1    A     She was the general counsel.

2    Q     What interactions did you have with her on those three

3    projects?

4    A     She -- she was in -- she was in charge of the legal

5    documentations, so from time to time, I would see her as we

6    were negotiating the documents.

7              MS. SMITH:  And, Mr. Youkilis, can we put up

8    Government's Exhibit 9?

9    BY MS. SMITH:

10   Q     Who is the person in this photograph?

11   A     Terence Geh.

12   Q     What was Terence Geh's role in 1MDB?

13   A     He was the deputy treasurer of 1MDB.

14   Q     And what were your interactions with Terence Geh like?

15   A     Sorry, I think he was the treasurer of 1MDB.

16   Q     Okay.

17   A     Deputy CFO.  He was in charge of the funds management --

18   handling the money of 1MDB.

19             MS. SMITH:  Can we put up Government's Exhibit 10?

20   BY MS. SMITH:

21   Q     And who is depicted in Government's Exhibit 10?

22   A     Vincent Koh.

23   Q     What was his role at 1MDB?

24   A     He was the chief investment officer.

25   Q     And?

1           MS. SMITH:  And then can we put up Government's

2    Exhibit 11?

3    BY MS. SMITH:

4    Q    And who is depicted in this photograph?

5    A    Jerome Tun.

6    Q    What was his role at 1MDB?

7    A    He was part of the investment team.  I don't remember his

8    specific title.

9    Q    And you used a couple of terms earlier that I just want

10   to make sure we explain.  So you used the term "CFO."

11           What does that stand for?

12   A    Chief financial officer.

13   Q    And then you also, at one point, referred to Jasmine Loo

14   as the GC.

15           What does that stand for?

16   A    General counsel.

17   Q    And I think you also used the term "CIO."

18   A    Chief investment officer.

19   Q    And those were all positions at 1MDB?

20   A    That's correct.

21   Q    You said earlier that Roger Ng and Tim Leissner were

22   responsible for the 1MDB relationship.

23           To your knowledge, did they also interact directly

24   with individuals at 1MDB?

25   A    Yes.

1    Q    And were they interacting with the same people that you

2    were, or were they interacting with people who are more senior

3    than you?

4    A    These are individuals and more senior as well.

5    Q    And who else was, sort of, more senior at 1MDB?

6    A    The one that comes to mind is the CEO, chief executive

7    officer.

8    Q    Who is that?

9    A    I don't -- I don't remember his name.

10   Q    Okay.  We will come back to that.

11   A    Okay.

12   Q    In addition to 1MDB, were there any other sovereign

13   wealth funds involved in the 1MDB transactions?

14   A    Yes, IPIC was involved.

15   Q    So what is IPIC?

16   A    International Petroleum Investment Corporation.

17   Q    Is that also sometimes pronounced IPIC?

18   A    That's correct.

19   Q    And what is the International Petroleum Investment

20   Company?

21   A    My understanding was it was a sovereign wealth fund owned

22   by the Government of Abu Dhabi.

23   Q    Where is Abu Dhabi located?

24   A    In the Middle East.

25   Q    Were there any entities related to IPIC involved in the

1   transactions?

2   A    They had a subsidiary called Aabar that was involved as

3   well.

4   Q    What does it mean to be a subsidiary?

5   A    It's a -- it's a company that is wholly-owned by another

6   parent.

7   Q    Does that mean that company is controlled by the parent?

8   A    That's correct.

9   Q    And what was the name of the subsidiary of IPIC that was

10  involved in the transaction?

11  A    Aabar.

12  Q    You told us earlier about some of the people you worked

13  with at 1MDB on the transactions.  Did you work with anybody

14  directly at IPIC on the transactions?

15  A    No, never met anyone.

16  Q    So before we talk about Projects Magnolia, Maximus, and

17  Catalyze in some more detail, I'm going to ask you about an

18  individual named Jho Low.

19          When did you first hear the name Jho Low?

20  A    When I was in New York.

21  Q    And how did you first learn the name Jho Low?

22  A    His name was coming up in the papers as this guy, you

23  know, Malaysian, you know, spending money, going to parties in

24  New York, hanging out with celebrities.

25  Q    And about what time period are you talking about when you

1   were in New York?

2   A    I think approximately around '09.

3   Q    And what country did you understand Jho Low to be from?

4   A    Malaysia.

5   Q    At the time of the 1MDB bond transactions -- so Project

6   Magnolia, Project Maximus, Project Catalyze, did you

7   understand Jho Low to have any connection to 1MDB?

8   A    At that point in time, no.

9   Q    At any point when you were in the Singapore office, did

10  you ever discuss Jho Low with Roger Ng?

11  A    No -- maybe I asked him who Jho Low was.

12  Q    What, if anything, did Roger Ng say about Jho Low?

13  A    He said Jho Low was from Penang.

14  Q    Did Roger Ng tell you whether he knew Jho Low?

15  A    I don't remember that.

16  Q    And did Roger Ng tell you whether Jho Low had any

17  connection to 1MDB?

18  A    No.

19  Q    Did you ever discuss Jho Low with Tim Leissner?

20  A    No.

21  Q    Have you ever spoken to Jho Low?

22  A    No.

23  Q    Have you ever emailed with Jho Low?

24  A    No.

25  Q    Have you ever met Jho Low?

1  A    No.

2  Q    So I would like to get an understanding of the three

3  deals that we discussed, sort of, at a high level, so I'm

4  going to show you what's been marked for identification as

5  Government's Exhibit 53, which is behind tab 35, but should

6  also be up on your screen.

7          Do you recognize this document?

8  A    Yes.

9  Q    So what is this document?

10 A    It's a high level summary of the three financing deals

11 that Goldman worked on with 1MDB.

12 Q    And is it an accurate summary of information about these

13 three deals?

14 A    Yes.

15 Q    Will it assist you in helping to explain the details of

16 the deal to the jury?

17 A    The key details, yeah -- the key items of the three

18 transactions.

19          MS. SMITH:  Your Honor, at this time we are going to

20 offer Government's Exhibit 53 as a demonstrative.  We may

21 later offer it in evidence.

22          THE COURT:  Admitted as a demonstrative.

23          (Government's Exhibit 53 received as a

24 demonstrative.)

25          MS. SMITH:  Can we please publish it to the jury?

1   BY MS. SMITH:

2   Q    So let's just take a minute to walk through this chart,

3   which lists the three deals we mentioned earlier, which is

4   Project Magnolia, Project Maximus, and Project Catalyze.

5           At a very high level, what were these three

6   financing deals?

7   A    They -- high level -- the three financing deals were to

8   provide capital to 1MDB for various investments and

9   acquisitions they had made.

10  Q    And they're listed here as bond deals.

11  A    That's correct.

12  Q    Before we go further, what is a bond?

13  A    A bond, it's a debt instrument whereby the borrower will

14  borrow X amount of money up front and have an obligation to

15  pay it back.  For example, in this case, ten years later, in

16  the interim, they would have to make interest payments from

17  time to time as well as a, kind of, financial return to the

18  lender.

19  Q    And you used the term "debt instrument."

20          What's an example of a debt instrument that someone

21  might use in their everyday life?

22  A    A mortgage, a car loan.

23  Q    So is a bond, then, just a way in which to borrow money?

24  A    That's correct.

25  Q    And what does it mean to issue a bond?

1    A    To issue a bond means you are the borrower; you are the
2    person actually borrowing and receiving the money.
3    Q    So if 1MDB issues bonds, who has to pay those bonds back?
4    A    1MDB.
5    Q    And are there any terms for how the bonds get paid back?
6    A    Sorry, can you repeat that?
7    Q    Are there any terms as to how the bond gets repaid?
8    A    If I'm understanding your question, it's, you know, in
9    this case, ten years later, they would have to pay back the --
10   the amount borrowed.
11   Q    And what happens if you don't pay back the amount
12   borrowed or the interest on time?
13   A    Typically, the lenders will call it what we call a
14   default.  If they have defaulted on the bond, then they have
15   the right to seize whatever collateral or any assets that were
16   owned by 1MDB.
17   Q    So for each of these three deals, how much money was 1MDB
18   raising by issuing bonds?
19   A    So Project Magnolia was 1.75 billion; Project Maximus
20   1.75 billion; and Project Catalyze was 3 billion, so in total,
21   it's 6.5 billion.
22   Q    In terms of the size of the deals, how did these bond
23   transactions compare to other bond transactions that you
24   worked on in the Southeast Asia region?
25   A    They were on the larger size.

1    Q    Let's just look at the closing date of each deal.

2         What was the closing date for Project Magnolia?

3    A    May 18, 2012.

4    Q    And what was the closing date for project Maximus?

5    A    October 17, 2012.

6    Q    And then what was the closing date for Project Catalyze?

7    A    March 19, 2013.

8    Q    So all three of these deals took place within a calendar

9    year?

10   A    Yes.

11   Q    Just going to the next column, what does additional

12   credit support mean?

13   A    So additional credit support is, you know, additional

14   support by maybe a third party or, in this case, to -- to

15   ensure that there's future repayment of the interest and the

16   outstanding amount of the bonds.

17   Q    What specifically -- the first two deals mention a

18   guarantee.  What's a guarantee?

19   A    A guarantee is a promise or obligation by the

20   guarantor -- the person providing the guarantee -- to make the

21   principle or interest payment if the borrower could not

22   actually pay it themselves.

23   Q    And can you give us an example, sort of, again, in

24   everyday life where someone might have a guarantor or get a

25   guarantee?

1   A    Like a credit card or housing loan, you know, where if

2   you just started, you're out of school, and you want to get a

3   car, typically, you don't have enough income to support buy a

4   car, so you ask your parents for it to be a guarantor on the

5   lease itself or something like that.

6   Q    And in this case, it says that there was additional

7   credit support starting with Project Magnolia given by what

8   you called IPIC.

9         What does that mean for that IPIC was the one

10  getting the guarantee?

11  A    So it means that if 1MDB defaulted or couldn't pay the

12  interest or the outstanding amount under the bonds, IPIC would

13  step in to pay -- to repay on 1MDB's behalf.

14  Q    Was that also true for Project Maximus?

15  A    That's correct.

16  Q    And then Project Catalyze, it says that the additional

17  credit support was a letter from the Government of Malaysia.

18        What did that mean?

19  A    So the Government of Malaysia gave a letter of support to

20  just, kind of -- as additional credit support.

21  Q    Why would 1MDB want to have additional credit support in

22  the form of a guarantee or the letter for these deals?

23  A    It -- I think two folds.  One is IPIC was a well known

24  borrower that was outstanding, so when you have better

25  guarantee, it makes issuing the bond or talking to lenders

1  easier.

2          The second thing is IPIC -- it's because people know

3  who they are, it's also in terms of the cost, actual interest

4  payments potentially could be cheaper as well.

5

6          (Continued on the following page.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    BY MS. SMITH:   (Continuing.)

2    Q    And in general, why would an entity like IPIC agree to

3    have a guarantee -- to agree to give a guarantee on a deal?

4    A    It would have some economic benefit to them.

5    Q    And what kind of economic benefit might be received?

6    A    They may receive a -- you know, a payment for the

7    guarantee.  They may be also be working with 1MDB as a partner

8    for the investments.

9    Q    And turning first to Project Magnolia, what was IPIC

10   supposed to get for giving a guarantee on Project Magnolia?

11   A    They would be getting a set of warrants that would

12   entitle them to get equity stake in the selected investments

13   of 1MDB.

14   Q    Can you just explain to us more what a warrant is?

15   A    A warrant is like an option whereby there's a pre-agreed

16   price to buy the shares -- and, so -- at a later point in

17   time.  So if, for example, the asset -- the underlying asset

18   has a higher value than the price that one could purchase, you

19   obviously exercise the warrants because you are making a

20   profit off of it.  If the asset declines in value, the option

21   would be worthless.  There's no stake in it so it becomes

22   meaningless.

23   Q    So if the asset gets -- the value goes up, do you get a

24   benefit?

25   A    Yes.

1   Q    And if the value goes down, do you lose anything?

2   A    You don't lose anything because you did not elect to

3   exercise the option to buy an equity stake.

4   Q    And is there a value to the warrants themselves?

5   A    There is some value, option value.

6   Q    Okay.  And with respect to Project Magnolia, did one IPIC

7   go up in exchange for the guarantee change at all during the

8   deal process?

9   A    To my knowledge, no.

10  Q    Was there ever a -- a benefits IPIC that was sort of

11  contemplated other than the warrants while you guys were

12  working through the deal?

13  A    I think in the beginning there was talk about a guarantee

14  fee, but it ultimately ended up in the options.

15  Q    What does it mean to get a guaranteed fee?

16  A    It would be a payment from 1MDB as a fee.

17  Q    So at some point there was a discussion of the fee but at

18  the end of the deal instead IPIC got the options?

19  A    That's correct.

20  Q    I will circle back to that in a moment.

21       The next column says "Stated the Use of Proceeds."

22  What does use of proceeds mean for a deal?

23  A    Use of proceeds means for the money that was being

24  borrowed, what the money would be used for.

25  Q    And, so, if we can walk through it for each deal.  So,

1    what was the use of proceeds for Project Magnolia?

2    A    The use of proceeds was to invest in energy projects that

3    1MDB was looking to acquire or develop.  Particularly one of

4    the M&A transactions I worked on was purchasing the energy

5    assets of Genting.

6    Q    That's listed as Project Turin?

7    A    That's right.

8    Q    Does that mean that Project Turin is one of the assets

9    that was purchased as part of the bond deal?

10   A    That's correct.

11   Q    Can we look at the same stated use of proceeds for

12   Project Maximus?  So what were those stated proceeds?

13   A    To invest in energy projects and also the purchase of the

14   power assets from Genting.

15   Q    What was the project name for that specific asset

16   purchase?

17   A    Project Greyhound.

18   Q    And for Project Catalyze what was the money that was

19   being raised going to be used for?

20   A    For Project Catalyze it was to create a joint venture

21   between 1MDB and Aabar to make an investment.

22   Q    And what does it mean to have a joint venture?

23   A    It's like a partnership but in this case they're all

24   equal shareholdings of a company that would make those

25   investments.

1          THE COURT:  It's 1 o'clock, Ms. Smith.  We're going

2    to break for half an hour for lunch.

3          Please remember that you cannot discuss the case.

4    There is a cafeteria on the third floor -- I'm sorry, it's

5    closed today.  I apologize.  I'm sorry it's closed, which

6    means you may have to venture out in the cold.  But I will see

7    you back here at 1:30.

8          THE COURTROOM DEPUTY:  All rise.

9          (Jury exits.)

10          THE COURT:  Please be seated everyone.

11          You may step out.

12          (Witness steps down.)

13          THE COURT:  I will see the parties back here five

14    minutes early in case there's anything we need to discuss.

15          MR. AGNIFILO:  Thank you, Your Honor.

16          MS. SMITH:  Thank you, Your Honor.

17          (Luncheon recess taken.)

18

19

20

21

22

23

24

25

1             A F T E R N O O N   S E S S I O N

2                  (Time noted:  1:44 p.m.)

3                       (Jury enters.)

4             THE COURT:  You may be seated when you come into the

5      courtroom.  We stand to show respect for you.

6             Please be seated, everyone.

7             Ms. Smith, you may proceed

8             MS. SMITH:  Thank you, Your Honor.

9      CONTINUED EXAMINATION

10     BY MS. SMITH:

11     Q    Mr. Tai, I just wanted to circle back to one thing before

12     the Court break.  You had said that Roger Ng told you he was

13     from Penang?  What is Penang?

14     A    Penang is a state in Malaysia on the north side of west

15     Malaysia.

16     Q    And as one other follow up, we talked about how at some

17     point Roger Ng moved from the investment banking division to

18     the securities division.  How does it work in terms of who you

19     report to?  Do you report within your division in terms of to

20     people more senior then yourself?

21     A    That's correct.

22     Q    So if somebody is not in the investment banking division,

23     do they report up within the investment banking division or

24     within their own division?

25     A    Within their own division.

1  Q    You said that you still continued to work with Roger Ng

2  when he moved over to securities?

3  A    I think some of those commercial -- so, in some cases

4  Roger would have a better relationship because of legacy

5  reasons with their clients and he was previously in investment

6  banking as well so they do whatever makes the client feel

7  comfortable and while Roger was in the securities division, we

8  do a wall crossing where we would get him involved with all

9  the internal compliances in place to help him -- to get him to

10  work on investment banking transactions as well.

11  Q    And you said that that was because the client felt more

12  comfortable, would that 1MDB?

13  A    Yes.

14  Q    Could you explain what wall crossing means?

15  A    There's a bunch of internal procedures that we would have

16  to do where we log in records within the home system to give

17  non-investment banking personnel access to investment banking

18  deals because we are working on private information.

19  Q    I am going to direct your attention back to Government

20  Exhibit 35 if we can put that back up.

21           THE COURT:  What exhibits?

22           MS. SMITH:  It's in as a demonstrative.  Government

23  Exhibit 53.  I said 35.  I apologize.

24           (Exhibit published.)

25  BY MS. SMITH:

1  Q    When we broke for lunch we were just finishing up the

2  column "Stated Use of Proceeds."  The next column says

3  "Goldman's Role."  What does this column set forth?

4  A    It highlights Goldman Sach's role, what we did on the

5  transaction.

6  Q    So, can you tell us what Goldman did for Project

7  Magnolia?

8  A    We arranged and underwrote the bond, so we structured the

9  deal and underwrote the bond and the documentation.  We bought

10 the bonds first.  So we used our balance sheet to find those

11 proceeds.  Afterwards we would resell the bonds to financial

12 investors.

13 Q    And then the third item here says you were an advisor on

14 Project Turin?

15 A    That's correct.

16 Q    What does that mean?

17 A    Project Turin, if you remember, was the M&A transaction

18 where we advised 1MDB on the acquisition of the power assets

19 of the Tanjong PLC.  And so we were advising them because it

20 was an M&A transaction so we were giving transaction advice.

21 Q    What is an M&A transaction?

22 A    M&A is mergers and acquisitions.  So, in this case, they

23 were acquiring the assets so we were giving them advice to

24 acquire the power assets.

25 Q    What role did Goldman play with Project Maximus?

1  A    It's similar to Magnolia.  So we arranged and underwrote

2  the bonds and structured the bonds and other documentation.

3  Similarly, we were the initial purchaser where we used the

4  balance sheet to buy the bonds and then resold it to financial

5  investors.

6  Q    And then it also says advisor on Project Greyhound?

7  A    Project Greyhound was the acquisition of the power assets

8  of Genting.  So we advised 1MDB on that acquisition as well.

9  Q    And then, finally, what was Goldman's role for Project

10 Catalyze?

11 A    Catalyze which was $3 billion bonds where we arranged --

12 we rearranged and structured those bonds.  And, similarly, we

13 used our balance sheet to buy those bonds and resold them to

14 financial investors.

15 Q    You used the term balance sheet a few times?

16 A    Yes.

17 Q    What do you mean when you say that Goldman used a balance

18 sheet?

19 A    So, we bought it.  We were the initial lenders and so we

20 used our own internal funds, i.e. the balance sheet, to give

21 1MDB the money first.

22 Q    So Goldman used its own money to purchase --

23 A    To buy, to lend the money up front, yes.

24 Q    So Goldman was the initial lender of the money for the

25 three deals?

1    A    Right.

2    Q    And you said that Goldman did something with the bonds

3    after that initial point?

4    A    So, after that we would either sell the bonds, resell the

5    bonds to financial investors or in some cases we could

6    repackage it into a different type of securities and resell it

7    to other financial investors.

8    Q    How long did it take to put a deal like the 1MDB bond

9    deals together?

10   A    And when you mean from, you know, from beginning to when

11   we funded or we closed the transaction?

12   Q    Yes.

13   A    If I remember correctly around two to three months.

14   Q    And what was just the process at a really high level of

15   putting together and finalizing a transaction like this?

16   A    So, there would be the diligencing of the assets and the

17   business plan.  There would also include structuring in terms

18   of other legal entities, and the flow of funds and last year I

19   would say it's generally making sure it was the right

20   documentation.  Those, I think, would be some of the work

21   streams.

22   Q    And, broadly speaking, what was your role on these three

23   transactions?

24   A    It would be mainly under diligence in terms of the

25   business plan and the assets given that I -- the team or I

1    worked on the Project Turin and bring on acquisitions.  I knew

2    what the assets they were acquiring.  I'm most familiar with

3    those operating kind of background as well.  That was my main

4    role around the diligence.

5    Q    Were you involved in putting together documents and

6    presentations?

7    A    Yes.

8    Q    And how did you go about doing that in the course of the

9    deal?

10   A    Typically someone on the team there would be a bunch of

11   meetings.  We need to prepare the documents or there would be

12   some member of the team that would do structuring and so there

13   were also lawyers involved so my role was to coordinate

14   between the various advisors.

15   Q    Are transactions like the 1MDB bond transactions reviewed

16   internally at Goldman Sachs before they can move forward?

17   A    Yes, they are.

18   Q    Why are deals reviewed internally?

19   A    You know, to make sure that we get all the necessary

20   diligence, the -- good documentation is correct; the

21   structuring -- to make sure there are no missing pieces before

22   a transaction can move forward.

23   Q    And we discussed a minute ago that Goldman used its own

24   money to buy the bonds in the deals.  Is there a term for the

25   transaction when Goldman uses its own money?

1    A    It's basically a principal trade.  I think it's principal

2    in this case rather than an agent.

3    Q    And are there extra steps they have to go through if it's

4    a principal transaction and Goldman is using its own money?

5    A    It would be part of the committee internal review as

6    well.

7    Q    What was the internal review process for these deals?

8    A    We would have to do due diligence and then put together

9    committee memos.  There was various committees, both within

10   the Asia -- as well as global or fund-wide committees that we

11   would need to get approval.

12   Q    And what were the firm-wide committees that needed to

13   review the bond deals?

14   A    So we would have firm-wide capital committee, firm-wide

15   suitability committee.  I think those are the main ones.

16   Q    What's the firm-wide capital committee?

17   A    The firm-wide capital committee reviews any -- all or any

18   debt-related transactions that Goldman is working on, whether

19   we are agent or principal, and any approval for transaction to

20   proceed.

21   Q    And what's the firm-wide suitability committee?

22   A    The suitability committee is if a transaction is

23   particularly high profile, if there are, you know, certain

24   risks or things that or similar things that are sensitive

25   things that need to be debated at the firm level.

1   Q     And where is the firm-wide capital committee based?

2   A     In New York.

3   Q     What materials were presented to the committee?

4   A     There would be a memo that includes the -- kind of

5   summarizes the transaction, the diligence that was done, the

6   kind of considerations, the underlying business profile, you

7   know, various information that would be -- kind of how we

8   price the bonds, the methodology to sell down the bonds.  It's

9   a very thorough assessment about how a transaction would be

10  executed.

11  Q     And how are those materials prepared?

12  A     The deal team would typically prepare with input from all

13  members of the team and then, you know, we would circulate to

14  get final approval from the various senior members of the

15  review team and submit it to the committee.

16  Q     And for these three bond deals, what was your role in

17  preparing the sort of materials for the committee?

18  A     So, there was certain sections.  Like, one was the

19  background of the transaction, you know, the financial profile

20  of the assets.  Those sections would be the ones drafting it.

21  I would be coordinating with the other sections and I would be

22  working with the deal team to put it in the memo and submit it

23  for review and submit the memo.

24  Q     And who sits on the committees, the capital committee and

25  the suitability committee?

1   A     Senior members of Goldman Sachs.  They are business --

2   members of the investment banking as well as -- as well as

3   what we call the control side the legal department, BIG, our

4   business intelligence group, compliance; so, other parts of

5   the internal organization.

6   Q     And when a deal is presented to the committee, can the

7   committee members raise issues with the deal?

8   A     So, when we submit the memo, then a -- there would be a

9   weekly schedule, slot, for the firm-wide capital committee.

10  So there is -- that slot is where the committee members would

11  then come together and kind of discuss any further

12  clarifications that's required with the deal team and so, that

13  yes, that would be the next steps after submission of the

14  memo.

15  Q     And at the committee itself, who attends the committee

16  meetings?

17  A     The deal team and the committee members.

18  Q     And how are those committee meetings generally held?

19  A     Usually it's a conference call.

20  Q     And then who actually presents at the committee meetings?

21  A     Whoever the partner or the senior member of the team is.

22  Q     And if the committee raises an issue in the course of a

23  meeting, what's the next step?

24  A     Ideally it's discussed on the spot during the call if

25  it's a basic clarification questions.  If it's something that

1    requires more further analysis, there would be a secretary of

2    the committee who would take notes and follow-ups and the deal

3    team is supposed to then do the follow-ups and then I just

4    submit an addendum, an additional document, for the follow-ups

5    or just go back to the committee members separately.

6    Q    Is it important for the materials that are provided to

7    the committee to be accurate?

8    A    Yes.

9    Q    Is it important for them to be complete?

10   A    Yes.

11   Q    Why is that?

12   A    So the committee members have a good understanding of the

13   transaction, are able to -- to understand and identify or talk

14   about any risk in the transaction and then ultimately be in a

15   position -- comfortable in a position to sign off.

16   Q    And it is important for any responses to the committee to

17   be accurate and complete as well?

18   A    That's correct.

19   Q    And is that for the same reason?

20   A    Yes.

21   Q    For the 1MDB transactions, did you attend the committee

22   meetings?

23   A    Yes, I did.

24   Q    And were those held by conference call as well?

25   A    Yes.

1   Q    And so did you dial in to the conference call?

2   A    Yes.

3   Q    Did you present at all at those meetings?

4   A    No.

5   Q    Were there issues that came up in the committee meetings

6   in connection with the 1MDB deals that then needed to be

7   addressed?

8   A    I think, if I remember correctly, there would be -- I

9   think there are things that need to be followed up.

10  Q    In particular, was the question of whether Jho Low was

11  involved in the deals raised by any of the committees

12  approving the 1MDB bond deals?

13  A    I think there was -- yeah, it was asked before.

14  Q    And what do you remember the question to be about Jho

15  Low's involvement?

16  A    If I remember correctly, the question was is Jho Low

17  involved in the transaction.

18  Q    And who responded to that question?

19  A    Tim Leissner.

20  Q    What did he say in response to that question?

21  A    He said on the call with Tim:  Jho Low is not involved.

22  Q    Did anyone else respond to that question?

23  A    Not that I can remember.

24  Q    Was the committee approval process for the 1MDB

25  transactions any more or less thorough than for any other

1  deal?

2  A     No, just as thorough, the same.

3  Q     And in addition to preparing materials for the committee

4  process, did you also work on materials for 1MDB and for IPIC?

5  A     The presentation, yes.

6  Q     Why did you prepare those materials?

7  A     I was asked to do so.

8  Q     And who to did you work with on the preparation of those

9  materials?

10 A     Tim Leissner, Andrea Vella And other members of the deal

11 team.

12 Q     And are those the same people you worked with on the

13 capital committee memo as well?

14 A     Yes.

15 Q     So I would like to talk a little about the first deal

16 which is Project Magnolia.  I'm going to ask you to look at a

17 number of documents at once, so I will speak slowly for the

18 Court Reporter.  But it's Government Exhibits 801, 803, 806,

19 809, 810, 811, 812, 813, 814, 815, 818, 823, 827, 828, and

20 1799.

21        And those are at tabs 3 to 16 of your binder as well

22 as tab 24.

23

24 A     You said 3 to 16?

25 Q     Yes, 3 to 16 and 24.

1  A    (Reviewing.)

2         Tab 24, okay.

3  Q    Do you recognize these documents?

4  A    Yes.

5  Q    And what are these documents at a high level?

6  A    The majority of them are committee memos that we would

7  submit to committee to get their approval.

8  Q    And did you either compile the documents that I just

9  listed or send or receive them in the course of your work on

10 the three transactions?

11 A    Yes.

12        MS. SMITH:  Your Honor, the Government moves to

13 admit Government Exhibits 801, 803, 806, 809 to 815, 818, 823

14 827, 828, and 1799.

15        MR. AGNIFILO:  We have no objection to the admission

16 of those exhibits, Judge.

17        THE COURT:  They are all admitted.

18        (Government Exhibits 801, 803, 806, 809 to 815, 818,

19 823 827, 828, and 1799 received in evidence.)

20 BY MS. SMITH:

21 Q    Let's start with Government Exhibit 801.

22        (Exhibit published.)

23 BY MS. SMITH:

24 Q    That is tab 3 and should also be up on the screen.

25        So Mr. Tai, what is this document?

1   A    This would be a capital committee memo that we would have

2   drafted and submitted to the committee for the review for

3   Project Magnolia.

4   Q    And, for the record, is it 20 pages?

5   A    (Reviewing.)

6          It looks like more than 20.

7   Q    Just go to the last page.

8   A    It goes to 28.

9   Q    It goes to 28?  Okay.  So, turning to the first page --

10  A    Yes.

11  Q    -- it says, today's date.  What's the date as today's

12  date?

13  A    That's correct, March 27th.

14  Q    And it says, the committee date?

15  A    Yes, March 29th.

16  Q    And then what is the project name for this one?

17  A    Project Magnolia.

18  Q    And who is listed in this front page here?

19  A    Tim Leissner, Andrea Vella and the rest of the deal team.

20  Q    And you were listed under the investment banking section?

21  A    That's correct.

22  Q    And then who is listed in the securities division?

23  A    So, Jon Donne, Toby Watson, Roger Ng, Dexter D'Souza and

24  Dominik Burckgard.

25  Q    And then at the bottom here there's a sort of schedule.

1  What is that?

2  A    So, we would have different levels of committees for --

3  typically for a deal in Asia, we would go to the Asia

4  committee first.  So Asia standards, Asia-Pacific suitability

5  Committee and Asia Pacific capital committee.  For deals that

6  are larger or more sensitive than those deals where we

7  escalate what's called Asia Pacific to what we call firm-wide,

8  which is our global committee.

9  Q    I'm going to ask you to take a look at Government Exhibit

10  803 which is behind tab 4.

11         (Exhibit published.)

12  BY MS. SMITH:

13  Q    We'll zoom in on the top.  What is this document?

14  A    This was another kind of a capital committee memo for

15  Project Magnolia.

16  Q    And what's the date on this memo?

17  A    April 2nd -- sorry -- it should be April 2, 2012.

18  Q    And is that a date after the date we saw in the first

19  version?

20  A    Yes.

21  Q    And why were there sort of a second version of the memo?

22  A    I can't remember why we have two versions.

23  Q    In general were there sometimes multiple versions made of

24  the capital committee memos?

25  A    Yes.

1   Q    On the bottom of this one on the first one it mentioned

2   the schedule for the Asia-Pacific committee?

3   A    Yes.

4   Q    What sort of committees are listed on the schedule at the

5   bottom of this version?

6   A    Asia standards committee, Asia-Pacific transfer

7   committee, firm-wide capital committee and firm-wide

8   suitability committee.

9   Q    So, there are additional committees listed on this

10  version?

11  A    That's correct.

12  Q    And if we can go up to the middle of the page again.  So,

13  once again, you were listed in the investment banking section;

14  is that right?

15  A    That's right.

16  Q    And then who is listed under, coverage?

17  A    Roger Ng.

18  Q    What does that mean, coverage?

19  A    It means that he was covering the client.

20  Q    And then this version of the memo, if you can look to the

21  last page, is 37 pages; is that right?

22  A    That's correct.

23            (Continued on the following page.)

24

25

1   DIRECT EXAMINATION (Continued)

2   BY MS. SMITH:

3   Q    And just before I go on, it says coverage and then it

4   says on the first page -- sorry?

5             Where it says coverage and we were looking at Roger

6   Ng's name, what does FICC mean?

7   A    Fixed Income Currency and Commodities.  It's the official

8   name for the securities division.

9   Q    So as I said, this is 37 pages, and we'll just look at a

10  few of them just to get a sense of what's in the document.  So

11  if we could look at Page two.  And this is a sort of summary

12  fact sheet.

13            So what kind of information is contained here?

14  A    It's an overview of the transaction, who the issuer,

15  borrower was, guarantors, the size, the use of proceeds, and

16  economics to Goldman Sachs.

17  Q    And the issuer here is listed 1MDB Energy Limited.

18            What was that?

19  A    That was a Corleon subsidiary that 1MDB created to be the

20  borrower.

21  Q    And then if you look down there's a section that says key

22  committee discussion points and other transaction concerns.

23            What does this section contain?

24  A    So these are the key considerations and issues that were

25  identified by either the deal team or, you know, various

1   committee members that needed to be discussed.

2   Q    And is there more information on those key committee

3   issues later in the document?

4   A    Yes.  There will be a section that kind of describes in

5   greater detail, what these points are and what the mitigants

6   are.

7             MS. SMITH:  If we can turn to Page 12.  And then

8   just zoom in on the top half.

9   Q    So is this the section where those key issues are sort of

10  discussed in greater detail?

11  A    That's correct.

12  Q    And can you just remind us again, where did these come

13  from?

14  A    Either from the deal team, other members of, you know,

15  committee members that kind of discuss, as well, and raise the

16  previously.

17  Q    And then what was your role in sort of putting together

18  the information that was contained in this section?

19  A    Some sections I would kind of draft the responses for

20  review.  You know, some sections I would just coordinate with

21  the various members of the deal team to get their input.

22  Q    And for this section in particular, which of those did

23  you do?

24  A    I think if I remember correctly, probably, some of these

25  potential media and political scrutiny point, and the role of

1    UT in the transaction.

2    Q    And what was UT?

3    A    UT is short form for Usaha Tegas which was the settler of

4    the Tanjong assets.

5    Q    And there's a section here on Page 12 where it talks

6    about concerns, potential media and political scrutiny.

7         You said you worked on that section?

8    A    Yeah, I probably would have drafted some of the

9    responses.

10   Q    Okay.  And there's a section there that says deals

11   property, Government cronies.

12        THE COURT:  Ms. Smith, if you could slow down your

13   questioning, I think that would help considerably.  Okay.

14   Q    All right so there a section that says deals profiting

15   Government cronies and then there's some language here about

16   how 1MDB is a closely linked to the ruling political party and

17   the reports directly to the prime minister, the Malaysian

18   Federal Elections are expected to take place on or before

19   early 2013.

20        Do you remember questions or issues around this

21   particular section?

22   A    I think if I remember correctly, like the issue came from

23   our BIG team, the questions of profiting Government cronies.

24   I don't remember who drafted that response though.

25   Q    And what would BIG's role have been in sort of

1   investigating or working on is this particular concern?

2   A    They would be the ones identifying, you know, the

3   concern, because they deal with the background checks and they

4   then are supposed to raise it to the deal team and the

5   committee, and they will kind of review the responses.

6   Q    And then if we can look at Page 28.

7        And is this a list of the board of advisers from

8   1MDB?

9   A    Yes.  Looks like it, yes.

10  Q    And who's the first person listed as on the board of

11  advisers?

12  A    The Honorable Dato' Sri Mohammad Najib.

13  Q    And who was that?

14  A    At that point in time, he was the prime minister of

15  Malaysia and finance minister.

16  Q    What was your understanding, in addition to being on the

17  board of advisers, of his connection with 1MDB?

18  A    He was also -- he was chairman of the board of advisers

19  and finance minister and 1MDB is a subsidiary of the minister

20  of finance.

21  Q    And then the last page I'm going to ask you to take a

22  look at is Page 36.

23        So what does this appendix detail?

24  A    This is a summary of what's called the contribution

25  agreement which is basically the options that Aabar or IPIC

1    will receive as their financial, you know, return on

2    compensation for providing, you know, some of the credit

3    support.

4    Q    So is this the details of the payment for the guarantee

5    for IPIC that we talked about earlier?

6    A    That's correct.

7    Q    I'm also going to show you what's been marked as

8    Government Exhibit 806 which is tab five and already in

9    evidence.

10            And so what is this document?

11   A    This was addendum to Firmwide Suitability Committee and

12   Firmwide Capital Committee.

13   Q    Is this also for Project Magnolia?

14   A    Yes, it is.

15            THE COURT:  Slow down your questioning, Ms. Smith.

16            MS. SMITH:  Sorry.

17   Q    What kind of information is contained in an addendum?

18   A    So you have the summary transaction and then a list of, I

19   guess, follow-up questions or issues from suitability

20   committee and capital committee with the responses.

21   Q    And do those issues and questions need to be finalized

22   before the deal can move forward?

23   A    Yes.

24   Q    Having looked at those three memos that we looked at, the

25   two capital committee memos and the addendum, what, if

1  anything, do the memos and the addendum say about the

2  involvement of Jho Low in the deal?

3  A     Nothing.

4  Q     What, if anything, did the memos and addendum say about

5  payments to foreign officials in connection with the deal?

6  A     There's nothing inside.

7  Q     What, if anything, did do the memos and addendum say

8  about payments that anyone at Goldman would receive in

9  connection with the deal?

10 A     There's nothing about that.

11 Q     Now, I want to talk to you the guarantee, the IPIC

12 guarantee for Project Magnolia.

13       So as we discussed a minute ago, what did IPIC

14 ultimately receive in return for providing a guarantee?

15 A     As far as I know, the contribution agreement.

16 Q     And earlier today, we talked about that there was a

17 different form of payment that was considered at one point for

18 IPIC?

19 A     Yes.

20 Q     And what was that?

21 A     A guarantee payment.

22 Q     I'm going to show you a few e-mails connected to those

23 discussions.  And those are what have been marked as

24 Government Exhibit's 1736 --

25       THE COURT:  These are not yet in evidence.

1          MS. SMITH:  Not yet in evidence.  For

2    identification.

3    Q    -- 1736, 1737, 1746, 1754, 1766, and 1785, which are at

4    tabs 17 to 23 in your binder.

5          Do you recognize these documents?

6    A    Yes.

7    Q    And are these all e-mails that you've sent other received

8    in connection with Project Magnolia?

9    A    Yes.

10   Q    Okay.

11         MS. SMITH:  Your Honor, I move to admit Government

12   Exhibit's 1736, 1737, 1746, 1754, and 1766, and 1785.

13         THE COURT:  Are there any objections?

14         MR. AGNIFILO:  No, your Honor, seeing that he's on

15   the e-mails, I have no objection.

16         THE COURT:  They're all admitted.

17         (Government's Exhibits 1736, 1737, 1746, 1754, and

18   1766, and 1785 received in evidence.)

19   Q    All right.  So I'd like you to start with Government

20   Exhibit 1736 which is behind tab 17.

21         MS. SMITH:  And Mr. Youkilis, if we could just start

22   with the top e-mail.  Okay.

23   Q    So what is the date of this e-mail?

24   A    February 13, 2012.

25   Q    And just to orient us a little bit, when does Project

1    Magnolia close, in what month?

2    A    May 18, 2012.

3    Q    So this is dated February 13th, 2012?

4    A    That's correct.

5    Q    And the e-mail is from Jane Lah.

6            Who is Jane Lah?

7    A    She was a member in our capital markets.

8    Q    And the recipients of this e-mail include yourself, Roger

9    Ng, and Tim Leissner; is that right?

10   A    That's correct.

11   Q    And Jane Lah here says that she's copying Tim on the

12   latest version of the presentation?

13   A    That's right.

14   Q    And in the first bullet point there talks about the IPIC

15   guarantee for 10 years, including at 6.75 percent?

16   A    Yes.

17   Q    So what is she saying there about the IPIC guarantee at

18   this point in February?

19   A    So for the 10-year bond that 1MDB was issuing, if there

20   was an IPIC guarantee, the interest on that bond will be

21   6.75 percent, plus you know, whatever guarantee fee 1MDB would

22   have to pay to IPIC.

23   Q    And just to go back to the header a minute.  Jane Lah,

24   there's a little sort of brackets next to her name and it says

25   IBD.

1              What does that stand for?

2    A    Investment banking division.

3    Q    So is that also next to your name and next to Tim

4    Leissner's name?

5    A    That is correct.

6    Q    And what is next to Roger Ng's name?

7    A    Sec Division, security division.

8    Q    So the e-mail addresses show which division you're in at

9    the time?

10   A    That's right.

11   Q    So I also just want to show you Page 3 of this e-mail.

12             And if you look at the bottom e-mail there from Jane

13   Lah on an earlier date it's February 12?

14   A    Yes.

15   Q    And so what is she saying, sort of, in this original,

16   sort, of bottom e-mail here?

17   A    I guess she was referring to the -- there was some

18   attachment here that has the financing structure.  Yeah.

19   Q    And then if you look back through the rest of the e-mail

20   chain, we can go to Page 2 of the e-mail.

21             Is this a discussion about various updates to the

22   presentation?

23   A    Yes.  It looks like it.

24   Q    And in the middle of the page there, there's an e-mail

25   from Roger Ng?

1   A     That's correct.

2   Q     And he's saying that he provided some comments?

3   A     Yes.

4   Q     And then he's saying we should reach out to Jasmine at

5   1MDB?

6   A     Yes.

7   Q     And who is that again?

8   A     Jasmine Loo is the general counsel at 1MDB.

9   Q     And then we can take a look at the attachment that you

10  mentioned which is Page 5 of the document.

11         Is this the presentation that everybody's referring

12  to and making comments on?

13  A     It looks like it.  I think so.

14  Q     And then if we turn to the second page.

15  A     Yes.

16  Q     And this says a summary overview proposed financing

17  structure?

18  A     Yes.

19  Q     So is this sort of an early discussion of what the deal

20  might look like?

21  A     Yeah.  At that point in time, probably, yes.

22  Q     I'm going to show you what's been marked as Government

23  Exhibit 1737 which is at tab 18.

24  A     Okay.

25  Q     And what's the date on this e-mail?

1   A    February 21, 2012.

2   Q    And there you say that you were attaching a draft of the

3   presentation for IPIC?

4   A    Yes.

5   Q    At the bottom, you say we need to show a copy to Tim and

6   Roger by late afternoon, if possible.

7         Why are you saying that you needed to show a copy to

8   Tim and Roger?

9   A    I assumed they asked for it.

10        MR. AGNIFILO:  I'm going to objecting unless he

11  remembers, Judge.

12        THE COURT:  Objection overruled.

13        The witness will answer if he does remember.

14  A    I don't remember specifically.

15  Q    In general, were the presentations you were creating

16  circulated to members of the deal team?

17  A    Yes.

18  Q    And in general, were you considered a more junior member

19  of the deal team?

20  A    Yes.

21  Q    Were presentations then circulated to more senior members

22  of the deal team?

23  A    Yes.

24  Q    And were Roger and Tim more senior members of the deal

25  team?

1    A    Yes.

2    Q    I'm going to show you what's been marked as Government

3    Exhibit 1746 which is tab 20.

4          What's the date on this e-mail?

5    A    February 26, 2012.

6    Q    And who is it an e-mail from?

7    A    At the bottom?  Jasmine Loo.

8    Q    I'm sorry, the document tabs 20 which is Government

9    Exhibit 1746.

10   A    Yeah, I see.  Sorry.  At the top right.  Tim, Tim

11   Leissner.

12   Q    That's okay.  And who is he sending the e-mail to?

13   A    Tim is sending it to me and Andrian Soew and the CCd

14   Roger.

15   Q    And what does he say?

16   A    Please include in the presentation.

17   Q    And is that a forward or something that he received from

18   somebody else?

19   A    Yes.  Looks like it, from the bottom of the e-mail.

20   Q    So if we can look down at the bottom.

21          And then who is he forwarding an e-mail from?

22   A    Jasmine Loo.

23   Q    And who did Jasmine Loo send that e-mail to?

24   A    Tim Leissner.

25   Q    If we can then look at the second page which is the

1    attachment.

2              Do you recognize the handwriting in this document?

3    A    No, I don't.

4    Q    What do you understand this chart to represent?

5    A    It looks like a chart for the structure of the bonds and

6    the financing.

7    Q    And in terms of your role on the transaction, were you

8    involved in the structuring, at all?

9    A    No.

10   Q    So how did you get information about the structure of the

11   deal to put into the transaction documents?

12   A    Someone on the deal team either give me information or,

13   you know, it would be created by someone on the deal team.

14   Q    And if we look at the chart itself, there's a reference

15   to MOF.

16             What is that?

17   A    Ministry of Finance of Malaysia.

18   Q    And then right below that there's a reference to 1MDB.

19   A    Gesture).

20   Q    And then right below that is a reference to 1MDB Energy

21   Limited?

22   A    Yes.

23   Q    And we talked that earlier, but what is that entity?

24   A    That was the subsidiary that 1MDB created to issue the

25   bonds.

1    Q     And then on the right side of the chart, there's a

2    reference to the Abu Dhabi Government?

3    A     Yes.

4    Q     And then there's a line below that says 100 percent to

5    IPIC?

6    A     Yes.

7    Q     What does that represent?

8    A     It represents that the Abu Dhabi government owns

9    100 percent of IPIC.

10   Q     And then there's another line down to Aabar Investments

11   PJS?

12   A     Yes.

13   Q     What does that line represent?

14   A     It means that Aabar is a subsidiary of IPIC.

15   Q     And then there's another line with 100 percent down to

16   Aabar SPV?

17   A     (Nonverbal gesture).

18         So Aabar owns the 100 percent of SPV.

19   Q     And what's an SPV?

20   A     SPV is special purpose vehicle.  Typically, these are

21   shell companies created as part of some financial transaction.

22   Q     And then if you look, there's a, sort of, dotted line

23   from 1MDB to Aabar Investments PJS.

24   A     Yes.

25   Q     And it says, in return, Aabar delivers on IPIC guarantee?

1    A     Yes.  Yes.

2    Q     And then below that it also -- there's another line from

3    1MDB Energy to Aabar SPV?

4    A     Yes.

5    Q     And it says there's a payment there?

6    A     That's correct.

7    Q     And then there's a line -- there's a third one above

8    between 1MDB and Aabar, also that says Aabar SPV to receive

9    call option?

10   A     That's correct.

11   Q     So at this point in the deal process, does this chart

12   reflect that there was a discussion of both options and a fee

13   in exchange for the guarantee?

14   A     Yes, it does look like it.

15   Q     And if we could go back to the first page of the e-mail.

16   And just show both at the same time.

17          So just to clarify, this was an e-mail that was sent

18   by Jasmine Loo to who?

19   A     To Tim Leissner.

20   Q     And to who else?

21   A     I don't see anyone else.

22   Q     On the bottom --

23   A     At the bottom, yeah.  Oh, I'm sorry, Roger and Tim --

24   Q     That's okay.  So it was sent from Jasmine Loo to Tim

25   Leisnner and Roger Ng?

1   A    Yes.  Correct.

2   Q    And then the top is Tim forwarding that to you?

3   A    That's correct.

4   Q    And then he asked you to put it in a presentation?

5   A    Yes.

6   Q    So if we could turn to Government Exhibit 1754 --

7           THE COURT:  Before you do that, Ms. Smith, in view

8   of the fact that we leave at 3:30 today, we should take our

9   afternoon break, unless the jury doesn't need a break, and

10  then we can continue until 3:30.

11          I assume you would prefer a break.

12          Okay.  Raise your hand if you would like a break.

13          Okay.  Then we'll take a break for 15 minutes.  I'll

14  see you back then.

15          (Jury exits the courtroom.)

16          (A recess was taken at 2:40 p.m.)

17          (Jury enters the courtroom.)

18          THE COURT:  Please be seated, everyone.

19          You may proceed, Ms. Smith.

20          MS. SMITH:  Thank you, Your Honor.

21          Mr. Youkilis, can you put back up Government

22  Exhibit 1746.  And that's tab 20.

23  Q    So before the break, we were talking about this e-mail

24  which attached the handwritten diagram which is on Page 2.

25  And now I'm going to show you what's been marked as Government

1    Exhibit 1754 which is at tab 21.

2              And is this an e-mail from you?

3    A    That's correct.

4    Q    And what's the date of the e-mail?

5    A    February 29, 2012.

6    Q    And what are you doing in this e-mail?

7    A    I sent the presentation to Jasmine Loo and CCd the rest

8    of the team.

9    Q    And this is about a presentation for IPIC?

10   A    That's correct.

11   Q    And if we can look at Page 2.

12             Is this the cover page of the presentation?

13   A    That's correct.

14   Q    And now if we can skip to Page 13 which is slide 10 of

15   the presentation.

16             And you were the person sending this e-mail, right?

17   A    Yes.

18   Q    And so had you worked to put together this presentation?

19   A    Yes.

20   Q    So what's represented on this Page 13 which is slide 10?

21   A    It looks -- I mean, it's the financing structure for the

22   Project Magnolia bonds.

23   Q    And does this have the same entities and layout as that

24   handwritten document from the last e-mail that we looked at?

25   A    Yes.

1   Q    And does it have the same, sort of, two-part compensation

2   that guarantees -- the options and the payment as that prior

3   chart?

4   A    Yes.

5   Q    And so does this represent you, sort of, taking

6   information and putting it into the presentation?

7   A    That's correct.

8   Q    Do you remember any discussions with Mr. Ng or

9   Mr. Leissner about this structure?

10  A    I don't remember.

11  Q    And were you involved in putting that structure together?

12  A    Just, like, word processing, but not, you know, coming up

13  with the structure.

14  Q    Just word processing?  Is that what you said?

15  A    Yes.  Word processing.

16  Q    So just taking it and putting in the document, but not

17  actually being involved in the structure itself?

18  A    That's correct.  Yes.

19        MS. SMITH:  You can take that down, Mr. Youkilis.

20  Q    So during the time period that you're working on the deal

21  and we just saw a number of e-mails about it, how often were

22  you communicating with Mr. Ng or Mr. Leissner, about these

23  deals?

24  A    I mean, fairly often, I guess.

25  Q    So if we say by e-mail, by phone or in-person, would it

1    on a daily basis?

2    A    I would think almost daily basis yes.

3    Q    And did you travel with Mr. Ng during this time period

4    for meetings about the deals?

5    A    Yes.

6    Q    Did you also travel with Mr. Leissner?

7    A    Yes.

8    Q    How often would you say that you were traveling and

9    attending meetings?

10   A    I mean, not daily.  But I can't recall.  Maybe monthly or

11   maybe once every two weeks.  I can't remember now how often.

12   Q    But you said maybe once every two weeks traveling with

13   them?

14   A    Yes.

15   Q    Did the committees that we talked about earlier

16   ultimately sign off on Project Magnolia?

17   A    Yes.

18   Q    And was that sign-off necessary for Project Magnolia to

19   actually close?

20   A    Yes.

21   Q    I'm going to show you what's been marked as Government

22   Exhibit 809 which is already in evidence and that's at tab 6.

23           So who is this an e-mail from?

24   A    Cherie Er.

25   Q    Who is Cherie Er?

1   A    She was an associate in our debt capital markets.

2   Q    And what's the date on this e-mail?

3   A    May 18, 2012.

4   Q    And in the two -- actually in the CC line, there's a,

5   sort of, two e-mail addresses that look like lists.  One's a

6   Project Magnolia, and one's GS.Project Magnolia FICC.

7            What are those two lists?

8   A    Those are what we call group distribution lists, where

9   when you kind of add it to a e-mail address, it sends the

10  e-mail to a bunch of people within the team.

11  Q    And was it common to have those sort of lists for

12  projects?

13  A    Yes.

14  Q    And would you have been apart of one of those lists

15  because you were on the deal team?

16  A    I would think Project Magnolia.

17  Q    And so Cherie Er says, dear committee secretaries, we

18  have now completed all committee follow-up items.  Please see

19  below.  And then there's, sort of, a whole list of various

20  items.

21  A    Yes.

22  Q    One from the suitability committee, one set, and one set

23  from the capital committee?

24  A    Yes.

25  Q    What do those items represent?

1  A    So those were for each committee, what the follow ups was

2  and on the right side, the status and response.

3  Q    And if we can go back to Government Exhibit 53.

4         So this is our overview chart of the bond deals?

5  A    (Nonverbal gesture).

6  Q    After Project Magnolia closed, what was the next 1MDB

7  transaction that you worked on?

8  A    For financing for the Project Maximus.

9  Q    And so just to remind the jury, what was, sort of, the

10 key terms of Project Maximus?

11 A    Project Maximus was the $1.75 billion bond issuance by

12 1MDB.

13 Q    And who else worked on that deal from Goldman?

14 A    Almost the same deal team as Magnolia.

15 Q    And then the assets sale that was connected to Project

16 Maximus was Project Greyhound?

17 A    That's correct.

18 Q    And who was your role in working on, sort of, Maximus and

19 Greyhound in terms of where you were on the deal team?

20        Was it similar to Project Magnolia?

21 A    Yes.  Fairly similar.  So you know, more of the diligence

22 and most of the work that was done on project Greyhound in

23 terms of the acquisition advisory, and then some of the

24 information we then used for Project Maximus.

25 Q    I'm going to show you what have been marked, a number of

1    Government Exhibits related to Project Maximus.

2              THE COURT:  For identification?

3              MS. SMITH:  For identification.

4    Q    So those are 1867, 1878, and then 1885 to 1889.  And

5    Mr. Tai, those are tabs 25 to 30 of your binder.

6    A    Okay.

7              MS. SMITH:  Your Honor, the Government is going to

8    offer Government Exhibits 1867, 1878, 1885, 1886, 1887, and

9    1889 into evidence.

10             THE COURT:  Are these more e-mails?

11             MR. AGNIFILO:  We have no objection, your Honor.

12             No objection.

13             THE COURT:  Okay.  Are these additional e-mails,

14   counsel?

15             MS. SMITH:  Yes, Your Honor.  These are additional

16   e-mails related to Project Maximus.

17             THE COURT:  Okay.  They're all admitted.

18             (Government's Exhibits 1867, 1878, 1885, 1886, 1887,

19   and 1889 received in evidence.)

20   Q    And so Mr. Tai, we're going to start with the Government

21   Exhibit 1867 which is at tab 25.

22             Before we look at the document, you talked earlier

23   about something called the Business Intelligence Group?

24   A    Yes.

25   Q    Can you just remind us what the Business Intelligence

1    Group is?

2    A    They're a group to do background checks on clients and

3    identify any issues, you know, particular around media and

4    things in the public domain.

5    Q    And would BIG have been involved in reviewing the three

6    1MDB deals that we've talked about?

7    A    Yes.

8    Q    So turning to Government Exhibit 1867, just starting with

9    the top e-mail.

10             Is this an e-mail from you?

11   A    Yes.

12   Q    And then what's the date?

13   A    June 21, 2012.

14   Q    And then again, just for sort of, putting us on the

15   timeframe, did Project Maximus close in October of 2012?

16   A    That's correct.

17   Q    So is this towards the beginning of the process of

18   working towards Project Maximus?

19   A    Yes.

20   Q    It's a long e-mail chain, but I'm going to start at the

21   bottom or the earliest e-mail which is on Page 5.

22             (Continued on the following page.)

23

24

25

1   DIRECT EXAMINATION

2   BY MS. SMITH:   (Continued.)

3   A    Yes.

4   Q    So this bottom e-mail, who is it from?

5   A    Wong.  Hong Hui Wong.

6   Q    And who is Hong Hui Wong?

7   A    He is a member of our BIG team.

8   Q    And who is it to?

9   A    Tim Leissner.

10  Q    And then there is a CC to Gilbert Chan.  Who is that?

11  A    Gilbert is the -- our -- one of the legal department

12  personnel.

13  Q    And the subject line is Genting?

14  A    Yes.

15  Q    Now, what was Genting?

16  A    So Genting is a large conglomerate in Malaysia.

17  Q    And was Genting involved in Project Greyhound, which was

18  the asset sale?

19  A    Yes, they were, the sale of assets to 1MDB.

20  Q    So that bottom e-mail, then Tim Leissner responds right

21  above that.  Do you see that?

22  A    Yes.

23  Q    And he says, adding, "Andy and Cyrus will fill in the

24  details"?

25  A    Yes.

1    Q     Are you copied into that e-mail?

2    A     Yes, I am.

3    Q     And who is Cyrus?

4    A     Cyrus was a vice president in the capital markets team.

5    Q     So what is Tim Leissner basically saying to Hong Hui Wong

6    in response here?

7    A     So he's saying -- so, you know, Hong Hui Wong asked him

8    for the details so they could run the background check.  And

9    Tim then replied that Cyrus and myself will give them some of

10   the basic transaction details for them to start running their

11   background check.

12   Q     If we can turn to page 4 of the document and in the

13   bottom.

14          So is this then Hong Hui Wong's response to Tim

15   Leissner?

16   A     Yes.

17   Q     And he says, "Can you please provide us with the

18   following information to commence the BIG check"?

19   A     Yes.

20   Q     What is your understanding of what he means to commence

21   the BIG check?

22   A     To -- for BIG to start their background checks.

23   Q     And then there's a bunch of questions here.  Are those

24   questions from Hong Hui Wong?

25   A     Yes.

1   Q    If you look sort of two e-mails up, you respond, "We'll
2   send over shortly" and then there's a top e-mail from someone
3   named Adrian?
4   A    Yes.
5   Q    Who is Adrian?
6   A    Adrian was the associate within my -- on the investment
7   banking team.
8   Q    And what does he say to Hong Hui in that e-mail?
9   A    I think he was answering some of the questions that Hong
10  Hui had before.
11  Q    And it's a little hard because it's all the same color --
12  A    Yes.
13  Q    -- but if you look below in the e-mail for Hong Hui, are
14  those answers to those questions?
15  A    Yes.
16  Q    And Adrian says, "Please find our responses below"?
17  A    Yeah, that's right.
18  Q    Sorry, can you hold on one minute.
19  A    So Adrian is giving the responses to Hong Hui's question
20  below.
21  Q    Okay.
22  A    Yeah.
23  Q    So, sorry, I don't think we had it right up on the
24  screen?
25            MS. SMITH:  So, Daniel, if you could just scroll to

1   the top of that page.

2   Q    This is page 4.  And this is where I was saying Adrian

3   was responding to Hong Hui, "Please see our responses below."

4             MS. SMITH:  And then, Daniel, if you can scroll down

5   to the bottom of that.

6   Q    And then, as I was saying, are these where you can see

7   Adrian's e-mails in -- Adrian's responses in -- among the

8   questions that Hong Hui asked?

9             Is that correct?

10  A    That's correct.

11  Q    So, for example, it says, "Full name of the Genting power

12  generations assets."  And then below that there's an answer of

13  what the names are; is that right?

14  A    Yeah.  So the second and third bullets are the answers

15  and the first one is the questions.

16  Q    The first one is the question?

17  A    Yes.

18            MS. SMITH:  So if we can go back to the top of

19  page 5, which is a continuation of that e-mail, and just zoom

20  in on that top piece.

21  Q    And are these some more questions that were then answered

22  by Adrian?

23  A    That's correct.

24  Q    So it says, "Genting's role in the transaction."  And the

25  answer is -- "i.e., vendor only?"  And then the answer is yes?

1   A    Yes, that's correct.

2   Q    And the second one there says, "Any use of intermediary

3   or finder in sourcing this transaction?"

4            And what was the answer that was given?

5   A    "No."

6   Q    What's an intermediary or a finder?

7   A    So the finder -- the intermediary or finder is, you know,

8   someone who was working on the transaction and they will be

9   paid by Goldman to source the -- you know, make introductions

10  for us to work on the transaction.

11  Q    And BIG was asking here whether or not there was an

12  intermediary or a finder?

13  A    That's correct.

14  Q    Do you know why BIG was asking that question?

15  A    They typically ask so that, you know, if there's any more

16  for -- to make sure the background is comprehensive.

17  Q    And would that information need to be disclosed?

18  A    Yes.

19  Q    If we can turn to page 2 of the e-mail in the middle, and

20  it's the Hong Hui Wong e-mail at 5:56 p.m.

21            So is this a continuation of the e-mail chain we

22  were just looking at?

23  A    Yes.

24  Q    And he says, "Following the 1MDB call organized by

25  conflicts with senior bankers, can you please provide us with

1    the following information for BIG check."

2            And are there three questions below that?

3    A    Yes.

4    Q    And can you read the third question, the one that says

5    "Is Jho Low"?

6    A    "Is Jho Low involved in this transaction?  Please keep us

7    posted if there are any other politically exposed person

8    involved in this transaction in a nonofficial capacity."

9    Q    Do you know what the term "politically exposed person"

10   means?

11   A    It's a broad term we use for basically politicians or

12   anyone in government.

13   Q    And why does BIG ask about politically exposed persons?

14   A    So they can run a background check and, you know, make

15   sure we don't have any exposure to, you know, foreign -- FCPA

16   and antibribery risk.

17   Q    When you say FCPA, what do you mean?

18   A    The Foreign Corrupt Practices Act.

19   Q    And then can we turn to the first page then?

20   A    Yes.

21   Q    And you write, respond to the group, and at the top here

22   you say "For 1."  Is that providing the answer to the first

23   question that Hong Hui asked?

24   A    That's correct.

25   Q    And what is the information you're providing here?

1  A    The background of the buyers of the 1MDB management.

2         MS. SMITH:  And if we can scroll down a little bit

3  to the -- so we can focus on the Jasmine and Vincent sections.

4  Q    There is a section here on Jasmine Loo and a section on

5  Vincent Koh.  Are those two of the people that we talked about

6  before that you worked with at 1MDB?

7  A    That's correct.

8         MS. SMITH:  And then, Mr. Youkilis, if we can turn

9  to the second page at the top.

10  Q    And you say "For 2, IPIC is involved."  Is this the

11  answer to the second question?

12  A    Yes.

13  Q    And there are three names under that answer.  What are

14  those three names?

15  A    I think it's the senior management of IPIC.

16  Q    And so the first name there is listed as Sheikh Mansour

17  bin Zayed Al Nahayen?

18  A    Yes.

19  Q    That's the chairman of IPIC?

20  A    Yes.

21  Q    And then what's the second name?

22  A    Khadem Al-Qubaisi, CEO of IPIC.

23  Q    And what does CEO mean again?

24  A    Chief executive officer.

25  Q    And then what's the third name?

1   A    Mohamed Badawy Al Husseiny, CEO of Aabar.

2   Q    And Aabar was the subsidiary of IPIC?

3   A    That's correct.

4   Q    Earlier I had asked you whether you worked directly with

5   anybody at IPIC or Aabar.  Did you meet any of these three

6   individuals at IPIC?

7   A    Not the first two.

8        On the third one, there was a trip to Abu Dhabi.  I

9   met him, like shook hands and that's it.

10  Q    And who accompanied you on that trip?

11  A    Tim Leissner was there, Roger Ng, Andrea Vella and, you

12  know, some members of the deal team.

13  Q    And what was the purpose of the trip?

14  A    If I remember correctly, it was to kind of discuss with

15  IPIC the transactions.

16  Q    And then the right below that it says, "For 3, no."  And

17  which question below is that an answer to?

18  A    That one that Jho Low is involved.

19  Q    And so the information here says that no, that Jho Low is

20  not involved in the deal?

21  A    That's correct.

22  Q    Where did you get the information to answer that

23  question?

24  A    I don't remember that.

25  Q    Would you have discussed it with other members of the

1    deal team?

2    A     Not sure.  I don't think so, but I don't remember.

3    Q     Was this based then on your own experience of the deal?

4    A     That's correct.

5    Q     So the next document I'd like to show you is Government

6    Exhibit 813, which is Tab 10, already in evidence.

7              And so what is this document?

8    A     This was the firm wide committee memo and firm wide

9    suitability committee memo.

10   Q     And is this for Project Maximus?

11   A     Yes, it is.

12   Q     And so did this go through -- Project Maximus going

13   through the same committee process as Project Magnolia?

14   A     That's correct.

15   Q     And so which section are you listed under for this deal?

16   A     Investment banking.

17   Q     And is Tim Leissner listed there as well?

18   A     Yes.

19   Q     And there's something that says IBS next to him.  What

20   does that stand for?

21   A     It stands for investment banking services.  It just means

22   he's the coverage guy.

23   Q     And then Roger Ng is listed under the coverage section

24   again?

25   A     Yes.

1   Q    And does this memo contain sort of the same types of

2   information as the memo we saw last time?

3   A    Similar, yes.

4   Q    So if we can look to page 2 of this document, is this the

5   same sort of summary fact sheet that we saw before?

6   A    That's correct.

7   Q    And then if we can turn to page 8 of the document, and in

8   the middle there it says the status of the BIG review.

9           Is there a section here as well, as there was last

10  time, that says there was a concern with deals profiting

11  government cronies?

12  A    Yes.  It's one of the bullet points.

13  Q    And does this reflect some of the other concerns that

14  they've raised in connection with this deal?

15  A    Yes.

16  Q    And so if you look at this document and then also

17  Government Exhibit 814, which is behind Tab 11 and is also in

18  evidence.

19          And is that, as last time, an addendum to the

20  original memo with more information about the deal?

21  A    That's correct.

22  Q    So if you look at both of those, what, if anything, did

23  the memos for Maximus say about the involvement of Jho Low in

24  this deal?

25  A    There's nothing.

1    Q    And what, if anything, do the memos for Maximus say about

2    payments to foreign officials in connection with this deal?

3    A    Nothing.

4    Q    What, if anything, did the memos from Maximus say about

5    payments that anyone at Goldman would receive in connection

6    with the deal?

7    A    Nothing.

8    Q    I'm going to show you what has been marked as Government

9    Exhibit 1878 in evidence, which is Tab 26.

10           And so I just want to focus on the top two e-mails

11   here.  I'm sorry, the -- let's see.  The top four, sorry, the

12   second part of questions.

13           MS. SMITH:  That's good, actually, Mr. Youkilis.

14   Q    Mr. Tai, just looking at the bottom e-mail, where it says

15   August 21st.

16   A    Yes.

17   Q    From Khoo Lay Khoon to you and a bunch of other

18   individuals.

19   A    Yes.

20   Q    Including Roger Ng.

21   A    Yes.

22   Q    And the subject line says Project Greyhound.

23   A    Yes.

24   Q    What is he sort of -- what kinds of questions is he

25   asking you in this e-mail?

1  A    He's asking about kind of the operating information for

2  you know, the greyhound assets.

3  Q    And who is Khoo Lay Khoon?

4  A    If I remember correctly, it's one of the RHB Bank, which

5  is a local Malaysian bank, one of the person there.

6  Q    Why is he asking these questions on Project Greyhound?

7  A    At that point in time, as part of the acquisition, 1MDB

8  was concerting to get local financing as well, so, you know,

9  take a bank loan from RHB to fund the purchase of the

10 greyhound assets.

11 Q    And then if you can look up, there's an e-mail from

12 Jasmine Loo right above that.  And it's sent to Jasmine Loo,

13 to you, to Tim Leissner and an e-mail address that says

14 queensgate.capital@gmail.com?

15 A    Yes.

16 Q    Are you familiar with that e-mail?

17 A    No.

18 Q    Do you know whose e-mail that is?

19 A    No.

20 Q    If you can go to the next e-mail up.

21       And this is an e-mail from you just responding to

22 Jasmine?

23 A    Yes.

24 Q    You said, "We're working on the answers to Greyhound.

25 And then on the group level questions, we probably need to

1   discuss the business plan."

2            So what are you conveying to Jasmine here?

3   A    That we were working to answer some of the questions that

4   RHB asked.  And, you know, for 1MDB group, that all questions,

5   we should discuss the business with RHB, but don't send any

6   numbers for now.

7   Q    And you were responding to Jasmine's e-mail.  And did you

8   copy all the people that were copied on Jasmine's e-mail?

9   A    Yes, I think I hit reply all.

10  Q    Okay.  And then can we look at the top e-mail in this

11  chain.

12           And it's an e-mail from Jasmine Loo to you and to

13  Tim Leissner, correct?

14  A    That's correct.

15  Q    Is that Queensgate Capital e-mail on that chain?

16  A    No.

17  Q    And what does Jasmine Loo say in her top e-mail here?

18  A    She said she copied the wrong person on the e-mail, so

19  please reply in a new e-mail without that e-mail.

20  Q    And is the reference to the wrong individual a reference

21  to that Queensgate Capital e-mail?

22  A    I think so.

23  Q    Did Project Maximus ultimately close as well?

24  A    Yes, it did.

25  Q    So I'm going to turn your attention to Government

1    Exhibit 818, which is already in evidence, and it's Tab 13 of

2    your binder.

3            Is this an e-mail that discusses preparations for

4    the closing of Project Maximus?

5    A    That's correct, yes.

6    Q    And there are a couple of e-mails from Dan Swift here,

7    but I want to focus on the one at 5:44 p.m., which is at the

8    top, second from the top.

9    A    Yes.

10   Q    And can you just read that e-mail?

11   A    "Mark, David, Matthew, Dan, we got word this afternoon

12   from IPIC that they are prepared to sign the guarantee

13   document and we expect that both IPIC and 1MDB will push to

14   get all the documents countersigned ASAP.  We will talk to

15   Eugene and New York committee members later this evening

16   to" --

17           THE COURT:  Slow down, Mr. Tai.

18           THE WITNESS:  Sorry.

19   A    "We will talk with Eugene and New York committee members

20   later this evening to resolve the internal approvals.

21           "Are you all comfortable from a business

22   leadership/EO perspective to proceed?

23           "Happy to speak live or organize a call if need be.

24           "Thanks, Dan."

25   Q    What does it mean "from an EO perspective"?

1    A    Executive office.

2    Q    And there's a reference to a Eugene.

3    A    Yes.

4    Q    Who is that a reference to?

5    A    Eugene was our chief underwriting -- if I remember

6    correctly, underwriting officer at that time.

7    Q    And it says, "We'll talk to Eugene and the New York

8    committee members."  What is that generally a reference to?

9    A    The firm wide committee.

10   Q    And is this a discussion of the internal approvals from

11   the committee that are needed to finalize Project Maximus?

12   A    That's correct.

13   Q    So we're going to move on to the third deal, which is

14   Catalyze, and go back to Government Exhibit 53, which is the

15   demonstrative.

16            So Catalyze, if you can just sort of tell us again,

17   what was the amount and sort of purpose of the third deal in

18   the series?

19   A    Project Catalyze was the issuance of a $3 billion bond.

20   It was supposed to be injected in a joint venture between 1MDB

21   and Aabar.

22   Q    And what was the purpose of the joint venture?

23   A    To make investments, you know, on behalf of the JV to

24   generate economic returns.

25   Q    And so let's look at the capital committee memo for the

1    final deal, which is Government Exhibit, already in evidence,

2    823 at Tab 14.

3           And so is this the capital committee memo for

4    Project Catalyze?

5    A    Yes.

6    Q    And who is on the deal from the investment banking

7    division here?

8    A    Tim Leissner, Dan Swift, myself, Adrian Seow and Alvin

9    Adisusanto.

10   Q    And are the members of the individuals who worked on the

11   team from the various divisions on this memo?

12   A    Yes.

13   Q    And is Roger Ng listed on the memo as someone who worked

14   on Project Catalyze?

15   A    No, he's not on there.

16   Q    And do you remember whether you worked with Roger Ng on

17   Project Catalyze?

18   A    I don't remember.  I mean, I -- I don't remember the

19   specifics.

20   Q    But he's not listed on this document?

21   A    But he's not listed, yeah.

22   Q    If we can turn to page 2 of the memo.

23          And is this the same sort of fact summary that we

24   saw for the other two deals as well?

25   A    That's correct.

1  Q    And does it also include, on page 3 of the document, the

2  section on sort of the key committee discussion points and

3  other concerns?

4  A    Yes.

5  Q    And here, one of the concerns that's listed is timing of

6  the transaction relative to the Malaysia general elections?

7  A    That's correct.

8  Q    What was your understanding of what that concern was

9  referring to?

10 A    So my understanding was, when we were thinking about

11 executing Project Catalyze, it was very close to the actual

12 Malaysia general elections to elect, you know, the government

13 and prime minister, so needed to -- you know, given that the

14 prime minister was involved in -- current prime minister was

15 involved in 1MDB, needed to have a discussion if, you know,

16 there is any risk from the elections, you know, in terms of

17 forming the government or maintaining the existing government

18 that will negatively impact 1MDB.

19 Q    And when you say "negatively impact 1MDB," what do you

20 mean?

21 A    You know, it could be if -- you know, if the prime

22 minister and the ruling government gets voted out, for

23 example, what happens to 1MDB.

24 Q    And you made a reference to the prime minister.

25 A    Yes.

1   Q     Is that the prime minister of Malaysia?

2   A     That's correct.

3   Q     And was that Najib Razak, the individual we looked at the

4   bio for earlier?

5   A     That's correct.

6   Q     I'm going to show you what has been marked as Government

7   Exhibit 827, already in evidence, which is the next tab, 15.

8           And as we saw with Project Magnolia and Project

9   Maximus, is this an e-mail detailing sort of committee signoff

10  for Project Catalyze?

11  A     That's correct.

12  Q     And it's being sent by Dan Swift.

13          Who is Dan Swift?

14  A     Dan Swift was a managing director on the investment

15  banking team.

16  Q     And then finally, if we can look at Tab 16, which is

17  Government Exhibit 828.

18  A     Yes.

19  Q     And what's the date on this e-mail?

20  A     March 19, 2013.

21  Q     And is this the date of the Catalyze closing?

22  A     Yes.

23  Q     And are you someone who received this e-mail?

24  A     Yes.

25  Q     The e-mail says, "Bond issuance completed and now all

1  funds transferred to issuer.  SWIFT messages for both bonds,

2  USD 2.75 billion and USD 250 million pieces for client's

3  reference below," and then there's sort of a whole list of

4  details below that?

5  A    Yes.

6  Q    So what is a SWIFT message?

7  A    A SWIFT is -- it's like wiring instructions to kind of

8  show the transfer of funds.

9  Q    And so what is this e-mail with the wiring instruction

10 reflecting?

11 A    It shows that the funds is being sent to, you know,

12 wherever 1MDB wanted the funds to be sent to.

13            MS. SMITH:  Your Honor, this is a good stopping

14 point if that works.

15            THE COURT:  Ladies and gentlemen, it is 3:30 and so

16 we are going to end for today.  Please remember you cannot

17 discuss the case with anyone, you cannot read or let anyone

18 speak to you about the case.  Have a good night, and we will

19 see you tomorrow morning at 9:30.

20            THE CLERK:  All rise.

21            (Jury exits.)

22            THE COURT:  Please be seated, everyone.

23            So I --

24            MS. AMBUEHL:  Mr. Tai.

25            THE COURT:  You may step out.  I'm sorry.

Proceedings                    164

1          (Witness exits.)

2          I saw the parties' filings from this weekend, which

3    I reviewed.  I assume the government has now reviewed all

4    reports related to this matter so that there are no further

5    surprises.

6          MR. ROLLE:  Yes, Judge, we looked through the FBI's

7    reports and found no others.

8          THE COURT:  Okay.  And are you confident that you

9    have now looked at all of the reports that were prepared and

10   related in any way to this transaction to 1MDB?

11         MR. ROLLE:  Yes, Judge, I think we've gone through

12   the FBI's Sentinel file and reviewed the reports filed in this

13   case.

14         THE COURT:  Okay.  Anything else, Mr. Agnifilo?

15         MR. AGNIFILO:  Your Honor, one logistical matter.

16         THE COURT:  Pull the mike towards you.

17         MR. AGNIFILO:  I'm sorry, Judge.

18         THE COURT:  It's okay.

19         MR. AGNIFILO:  So currently -- it's about our

20   client's time.  We would like him to go stay in our office

21   later in the evening.

22         THE COURT:  Okay.

23         MR. AGNIFILO:  He has to be home at 10:00?  10:00?

24         THE COURT:  I thought we changed that.

25         MR. AGNIFILO:  So we moved it to 10:00.  And we

Proceedings                              165

1    thought 10:00 would be fine, but now that we're on trial,

2    maybe we could do 11:30?  I mean, he's going to be with us.

3    That's the truth.

4              THE COURT:  Why don't we make it midnight.

5              MR. AGNIFILO:  Fine.  That's good, Judge.

6              MR. INTRATER:  Thanks, Judge.

7              THE COURT:  Sure.

8              Is there a reason at this point for us to maintain

9    the curfew?  I mean, I do not know that there is,

10   Mr. Agnifilo, so I am happy to extend it to midnight.

11             MR. AGNIFILO:  That's fine.

12             THE COURT:  But if there is any reason or any

13   evening -- I know I work better late at night -- that your

14   client needs to stay late, I am giving you permission for that

15   to happen.

16             MR. AGNIFILO:  Very good.

17             THE COURT:  So we can just discuss it after the

18   fact.

19             MR. AGNIFILO:  Very good, Judge.

20             THE COURT:  Okay?

21             MR. AGNIFILO:  One second.

22             THE COURT:  Sure.

23             MR. AGNIFILO:  Because we've been talking to

24   Pretrial and Pretrial seems to have no issue with it.  So all

25   that Pretrial needed to know is if we get permission from the

Proceedings                              166

1   Court to have our client stay with us until past the curfew,

2   that that's fine with Pretrial.

3            THE COURT:  So you have standing permission from the

4   Court to do that.

5            MR. AGNIFILO:  Very good.  Okay.  Perfect.  Thank

6   you, Judge.

7            THE COURT:  And that way, you should not have any

8   issues with them.

9            MR. AGNIFILO:  Very good.  Thank you.  I appreciate

10  it very much.

11           THE COURT:  Sure.

12           Is there anything else we need to discuss?

13           MR. AGNIFILO:  Nothing from us.

14           THE COURT:  Have a good night, everyone.

15           MR. AGNIFILO:  Thank you, Your Honor.

16           THE COURT:  I will see you -- make it five minutes

17  early just in case there is anything.  Obviously if there is

18  nothing, the parties can communicate that to Ms. Valentin and

19  I won't come in at 9:25, I will just see everyone at 9:30.

20           MR. AGNIFILO:  Thank you, Your Honor.

21           MR. INTRATER:  Thank you, Your Honor.

22

23           (Matter adjourned to Tuesday, February 15, 2022 at

24  9:30 a.m.)

25

<u>**I N D E X**</u>

**WITNESS**                                                    **PAGE**


**ANDY TAI**

    DIRECT EXAMINATION

    BY MS. SMITH                                            68

1                          **E X H I B I T S**

2

3

4        Government's Exhibits 51 and 51-A                    78

5

6        Government's Exhibit 1 and 2                         84

7

8        Government's Exhibit 8, 9, 10, and 11                90

9

10       Government's Exhibit 53 received as a

11       demonstrative                                        96

12

13       Government Exhibits 801, 803, 806, 809 to

14       815, 818, 823 827, 828, and 1799                     118

15

16       Government's Exhibits 1736, 1737, 1746,

17       1754, and 1766, and 1785                             128

18

19       Government's Exhibits 1867, 1878, 1885,

20       1886, 1887, and 1889                                 143

21

22

23

24

25